# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CIGNA CORP.,<br><br>                         Plaintiff,<br><br>     v.<br><br>ACTAVIS HOLDCO US, INC.,<br>ACTAVIS ELIZABETH, LLC,<br>ACTAVIS PHARMA, INC.,<br>ALVOGEN INC.,<br>AMNEAL PHARMACEUTICALS, INC.,<br>APOTEX CORP.,<br>ASCEND LABORATORIES, LLC,<br>AUROBINDO PHARMA USA, INC.,<br>BAUSCH HEALTH AMERICAS, INC.,<br>BAUSCH HEALTH US, LLC,<br>BRECKENRIDGE PHARMACEUTICAL, INC.,<br>CAMBER PHARMACEUTICALS, INC.,<br>CITRON PHARMA, LLC,<br>DR. REDDY'S LABORATORIES INC.,<br>FOUGERA PHARMACEUTICALS INC.,<br>GENERICS BIDCO I, LLC,<br>GLENMARK PHARMACEUTICALS INC., USA,<br>G&W LABORATORIES, INC.,<br>HERITAGE PHARMACEUTICALS INC.,<br>HIKMA PHARMACEUTICALS USA INC. F/K/A WEST-WARD PHARMACEUTICALS CORP.,<br>IMPAX PHARMACEUTICALS, LLC F/K/A/ IMPAX PHARMACEUTICALS, INC.,<br>LANNETT COMPANY, INC.,<br>LUPIN PHARMACEUTICALS, INC.,<br>MAYNE PHARMA, INC.,<br>MORTON GROVE PHARMACEUTICALS, INC.,<br>MYLAN, INC.,<br>MYLAN, N.V.,<br>MYLAN PHARMACEUTICALS, INC.,<br>OCEANSIDE PHARMACEUTICALS, INC.,<br>PAR PHARMACEUTICAL COMPANIES, INC.,<br>PAR PHARMACEUTICAL, INC.,<br>PERRIGO NEW YORK, INC.,<br>SANDOZ, INC., | Civil Action No. _____<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

SUN PHARMACEUTICAL INDUSTRIES, INC.,
TARO PHARMACEUTICALS USA, INC.,
TELIGENT, INC.,
TEVA PHARMACEUTICALS USA, INC.,
UPSHER-SMITH LABORATORIES, LLC,
WOCKHARDT USA LLC, AND
ZYDUS PHARMACEUTICALS (USA) INC.,

                                        Defendants.

## Table of Contents

I.      NATURE OF THE CASE ................................................................................. 1

II.     THE DRUGS SUBJECT TO THE CONSPIRACY ("SUBJECT DRUGS") ................... 5

III.    JURISDICTION AND VENUE ....................................................................... 21

IV.     THE PARTIES ............................................................................................ 22

        A.      Plaintiff ......................................................................................... 22

        B.      Defendants .................................................................................... 25

        C.      Co-Conspirators ............................................................................ 36

V.      REGULATORY AND ECONOMIC BACKGROUND ......................................... 37

        A.      Generic Drugs Should Provide Lower-Priced Options for Purchasers ........ 37

        B.      The Prescription Drug Distribution System .................................... 39

        C.      The Market for Generic Drugs is Highly Susceptible to Collusion ........ 40

VI.     GOVERNMENT INVESTIGATIONS OF THE CONSPIRACY ........................... 42

        A.      Congress Launched An Investigation Into Generic Price Hikes ......... 43

        B.      The DOJ Investigates Criminal Generic Drug Collusion ................ 45

        C.      State Attorneys General Launch Their Own Investigation ............... 47

VII.    THE GENERIC DRUG MARKET ................................................................. 51

        A.      The Cozy Nature Of the Industry and Opportunities for Collusion ........ 51

                1.      Trade Association Meetings and Conferences ......................... 52

                2.      Industry Dinners and Private Meetings ................................... 53

                3.      Personal Telephone Calls, E-Mails, and Text Message Communications 55

                4.      Individual Relationships ......................................................... 55

        B.      The Overarching Conspiracy Between Generic Drug Manufacturers –
                "Playing Nice in the Sandbox" ...................................................... 63

        C.      Generic Drug Price Spikes Since 2013 .......................................... 77

VIII.   THE CONSPIRACY:  HERITAGE-RELATED CONDUCT ............................... 79

        A.      Market Allocation Agreements to Maintain Market Share and Avoid Price
                Erosion .......................................................................................... 80

                1.      Nimodipine ............................................................................. 81

                2.      Zoledronic Acid ..................................................................... 87

                3.      Meprobamate .......................................................................... 90

                4.      Doxy DR ................................................................................. 92

                5.      Hydralazine HCL .................................................................. 105

        B.      Agreements to Fix Prices ............................................................. 105

|  |  | 1. | Doxycycline Monohydrate (2013) | 106 |
|---|---|---|---|---|
|  |  | 2. | Heritage 2014 Price Increases | 113 |
| IX. |  | THE CONSPIRACY:  TEVA-RELATED CONDUCT | | 149 |
|  | A. | Early 2013 Teva Business Strategies, Hiring of Patel, and Ranking Competitors | | 149 |
|  |  | 1. | April 2013:  Teva Hires Nisha Patel | 149 |
|  |  | 2. | Ranking "Quality of Competition" to Identify Price Increase Candidates | 153 |
|  | B. | Price Increase Hiatus | | 159 |
|  | C. | New Relationships Emerge | | 160 |
|  | D. | Competitors Become "High Quality" After Successfully Colluding With Teva | | 161 |
|  | E. | Quality Competitors Collude With Each Other, Sandoz/Mylan | | 161 |
|  | F. | Commitment to the Overarching Conspiracy | | 162 |
|  | G. | Low Quality Competitors Comply with the Overarching Conspiracy | | 163 |
|  | H. | Teva Profitability Increases Dramatically | | 164 |
|  | I. | Teva and its Executives Knowingly Violated the Antitrust Laws | | 164 |
| X. |  | THE OVERARCHING CONSPIRACY IN OPERATION WITH RESPECT TO THE SUBJECT DRUGS | | 168 |
|  | A. | Customer and Market Allocation Agreements To Maintain Market Share and Avoid Price Erosion | | 168 |
|  |  | 1. | Teva/Mylan | 168 |
|  |  | 2. | Teva/Sandoz | 184 |
|  |  | 3. | Teva/Lupin | 194 |
|  |  | 4. | Teva/Actavis | 202 |
|  |  | 5. | Teva/Par | 209 |
|  |  | 6. | Teva/Taro | 214 |
|  |  | 7. | Teva/Zydus | 222 |
|  |  | 8. | Teva/Glenmark | 235 |
|  |  | 9. | Teva/Lannett | 239 |
|  |  | 10. | Teva/Amneal | 242 |
|  |  | 11. | Teva/ Dr. Reddy's | 243 |
|  |  | 12. | Other Teva Conspiracies | 250 |
|  |  | 13. | Mylan / Sandoz | 258 |
|  | B. | Taking the Overarching Conspiracy to a New Level:  Price Fixing (2012 – 2015) | | 261 |

1.      July 31, 2012 Price Increase ................................................................ 261

2.      February – April 2013:  Increasing Prices Before A New Competitor
        Enters the Market:  Budesonide Inhalation Suspension ......................... 266

3.      May 13, 2013 Price Increase – Tizanidine.............................................. 267

4.      May 24, 2013 First List of Price Increases ............................................ 270

5.      July 3, 2013 Price Increases................................................................... 280

6.      July 19, 2013 Price Increase – Enalapril Maleate.................................. 290

7.      August 9, 2013 Price Increases .............................................................. 295

8.      July 2013 – January 2014:  Competitors Seek to "Follow" Price Increases:
        Haloperidol and Trifluoperazine HCL, Benazepril HCTZ, Levothyroxine,
        Clomipramine HCL ................................................................................. 316

9.      March 7, 2014:  Price Increases and Overarching Conspiracy Converge
        (Niacin ER) ............................................................................................. 334

10.     April 4, 2014 Price Increases ................................................................. 338

11.     Impact of April 4, 2014 Price Increases to Teva ................................... 358

12.     April 15, 2014 Price Increase (Baclofen) ............................................. 359

13.     July 1, 2014 Price Increase (Fluocinonide)........................................... 362

14.     August 28, 2014 Price Increases ............................................................ 371

15.     January 28, 2015 Price Increases ........................................................... 383

XI.     COMPETITORS BECOME "HIGH QUALITY" AFTER SUCCESSFULLY
        COLLUDING WITH TEVA .................................................................... 391

1.      Apotex ..................................................................................................... 391

2.      Zydus........................................................................................................ 393

3.      Heritage ................................................................................................... 395

4.      Lupin........................................................................................................ 396

5.      Par ............................................................................................................ 397

6.      Amneal...................................................................................................... 398

7.      Non-Defendant Rising ............................................................................ 400

8.      Breckenridge ........................................................................................... 401

9.      Glenmark.................................................................................................. 402

10.     Camber Pharmaceuticals......................................................................... 403

XII.    OTHER DRUGS...................................................................................... 409

A.      Acetazolamide Tablets ............................................................................ 409

B.      Albuterol Sulfate..................................................................................... 412

C.      Amitriptyline ........................................................................................... 412

D.      Clobetasol Propionate ............................................................................. 414

|        |      |                                                                      |     |
|--------|------|----------------------------------------------------------------------|-----|
|        | E.   | Desonide                                                             | 419 |
|        | F.   | Digoxin                                                              | 422 |
|        | G.   | Divalproex Sodium ER                                                | 425 |
|        | H.   | Doxycycline Hyclate                                                 | 427 |
|        | I.   | Econazole                                                           | 431 |
|        | J.   | Lidocaine                                                           | 433 |
|        | K.   | Metronidazole                                                       | 434 |
|        | L.   | Propranolol HCL capsules                                           | 436 |
|        | M.   | Ursodiol                                                           | 438 |
| XIII.  | PRICE INCREASES SLOW DRAMATICALLY AFTER GOVERNMENT INVESTIGATIONS COMMENCE | | 440 |
| XIV.   | CONSCIOUSNESS OF GUILT | | 441 |
| XV.    | SPOLIATION OF EVIDENCE | | 444 |
| XVI.   | OBSTRUCTION OF JUSTICE | | 445 |
| XVII.  | PLAINTIFF'S PURCHASES AND ANTITRUST INJURY | | 446 |
| XVIII. | INTERSTATE TRADE AND COMMERCE | | 447 |
| XIX.   | TOLLING AND FRAUDULENT CONCEALMENT | | 448 |
| XX.    | DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY | | 450 |
| XXI.   | CAUSES OF ACTION | | 450 |
| XXII.  | DEMAND FOR JUDGMENT | | 468 |
| XXIII. | JURY DEMAND | | 469 |

Plaintiff Cigna Corp. ("Cigna" or "Plaintiff") files this Complaint against Defendants Actavis Holdco US, Inc., Actavis Elizabeth, LLC, Actavis Pharma, Inc., Alvogen Inc., Amneal Pharmaceuticals, Inc., Apotex Corp., Ascend Laboratories, LLC, Aurobindo Pharma USA, Inc., Bausch Health Americas, Inc., Bausch Health US, LLC, Breckenridge Pharmaceutical, Inc., Camber Pharmaceuticals, Inc., Citron Pharma, LLC, Dr. Reddy's Laboratories Inc., Fougera Pharmaceuticals Inc., Generics Bidco I, LLC, Glenmark Pharmaceuticals Inc., USA, G&W Laboratories, Inc., Heritage Pharmaceuticals Inc., Hikma Pharmaceuticals USA Inc. F/K/A West-Ward Pharmaceuticals Corp., Impax Pharmaceuticals, LLC F/K/A Impax Pharmaceuticals, Inc., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Mayne Pharma, Inc., Morton Grove Pharmaceuticals, Inc., Mylan, Inc., Mylan, N.V., Mylan Pharmaceuticals, Inc., Oceanside Pharmaceuticals, Inc., Par Pharmaceutical Companies, Inc., Par Pharmaceutical, Inc., Perrigo New York, Inc., Sandoz, Inc., Sun Pharmaceutical Industries, Inc., Taro Pharmaceuticals USA, Inc., Teligent, Inc., Teva Pharmaceuticals USA, Inc., Upsher-Smith Laboratories, LLC, Wockhardt USA LLC, and Zydus Pharmaceuticals (USA) Inc. and alleges based on personal knowledge and information made public during ongoing government investigations of Defendants and other generic drug companies as follows:

## I.     NATURE OF THE CASE

1.     This is a civil action against Defendants for conspiring to fix, increase, stabilize, or maintain prices, allocate customers and markets, and rig bids for generic pharmaceutical drugs in violation of federal antitrust and state antitrust and competition laws.  As described further below, Cigna seeks damages incurred from overcharges paid directly and indirectly by certain Cigna businesses for certain generic drugs, arising from this far-reaching conspiracy to fix the price of such drugs.  This conspiracy increased the Defendants' profits at the expense of many customers including Cigna, which operates pharmacy and insurance-related businesses.

2.      Defendants, along with other generic drug manufacturers, conspired to fix prices and allocate markets for generic drugs amongst themselves, and to obstruct competition as part of an ongoing conspiracy to fix, increase, stabilize, or maintain prices, allocate customers and markets, and rig bids for the generic drugs identified in Section II below (the "Subject Drugs"), among others.  Rather than competing in a full-throated manner, for many years, generic manufacturers have operated pursuant to an illegal agreement not to compete with one another and to instead "play nice in the sandbox" and allocate markets according to what these would-be competitors refer to as "fair share."

3.      Information establishing the existence of this illicit arrangement has been made public during ongoing government investigations into Defendants' conduct.  Jeffrey Glazer and Jason Malek, executives at Heritage Pharmaceuticals, Inc. ("Heritage"), pleaded guilty to participating in a conspiracy to fix prices of Glyburide and Doxycyline between at least 2013 and 2015.  Heritage and Co-Conspirator Rising Pharmaceuticals, Inc. ("Rising") have entered into deferred prosecution agreements with the United States that involved admissions that they conspired to fix the prices of Glyburide and Benazepril HCTZ, respectively.  Heritage also resolved False Claims Act claims brought by the United States related to price fixing of Hydralazine and Thephylline ER.  Hector Armando Kellum, a former executive at Sandoz, Inc. ("Sandoz"), pleaded guilty to conspiring to fix prices, rig bids, and allocate customers for generic drugs, including, but not limited to, the generic drugs Clobetasol and Nystatin Triamcinolone Cream.  Sandoz entered a deferred prosecution agreement with the United States that involved admissions that it conspired to fix prices, rig bids, and allocate customers for generic drugs including Clobetasol (cream, emollient cream, gel, ointment, and solution), Desonide ointment, Nystatin Triamcinolone cream, Benazepril HCTZ, and Tobramycin inhalation solution.  Ara

Aprahamian, a former executive at Taro Pharmaceuticals USA, Inc. ("Taro"), was indicted for participating in conspiracies to fix prices, rig bids, and allocate customers for generic drugs, and for making a false statement to federal agents who were investigating those conspiracies. Apotex Corp. ("Apotex") entered a deferred prosecution agreement with the United States that involved admissions that it conspired to increase and maintain prices of Pravastatin. The DOJ's criminal investigation remains ongoing. The DOJ has publicly acknowledged that its criminal investigation has uncovered evidence that a "significant number" of the drugs that are not yet the subject of government enforcement actions were nonetheless impacted by collusion.

4.     The Attorney General of Connecticut and the Attorneys General of 48 additional states ("State AGs") have conducted their own investigation uncovering a far-reaching conspiracy, outlined in two civil complaints addressing over 100 generic drugs. The State AGs indicate an additional complaint is forthcoming. The Washington Post has reported that ongoing investigations by state and federal regulators have expanded to include 300 generic drugs and conduct that can be traced back to at least 2006.[1] As noted by the State AGs at a 2018 court conference, "this could be the largest cartel case in the history of the United States."[2]

5.     Pursuant to this illegal cartel, Defendants routinely and systematically communicated with one another to determine and agree on, for example, how much market share, and which customers, each conspirator was entitled to under the illegal agreement. Defendants orchestrated their conspiracy through secret communications and meetings. Defendants frequently communicated by e-mail, telephone, and text message, and participated in

---

[1]     Christopher Rowland, *Investigation of generic 'cartel' expands to 300 drugs*, WASH. POST (Dec. 9, 2018).

[2]     Tr. of Oral Args. on Disc. Mots. at 48:10–16, *In re Generic Pharmaceutical Pricing Antitrust Litig.*, No. 2:16-md-02724 (E.D. Pa. July 11, 2018).

a large number of in-person meetings, which were facilitated by regular trade association and industry group meetings, such as meetings held by the Generic Pharmaceutical Association ("GPhA").

6.      Pursuant to their conspiracy, Defendants determined market share, fixed prices, and rigged bids on the Subject Drugs listed below, and likely additional drugs.  This "fair share" understanding permeated virtually every segment of the generic drug industry.  The Defendants avoided competition among generic manufacturers that would normally result in significant price erosion and significant savings for purchasers, including Cigna.

7.      Defendants effectuated their market allocation by either refusing to bid for particular customers or providing high and pretextual cover bids.  This customer allocation and bid rigging created an artificial equilibrium that enabled the conspirators to then collectively raise and/or maintain prices for a particular generic drug.

8.      Defendants understood and acted upon a code of conduct widespread in the generic drug industry.  When a generic competitor entered a particular drug market, under the conspiracy it could contact its competitors and allocate the market according to a generally agreed-upon standard of "fair share" in order to avoid competing and keep prices high.  Although different drugs may involve different competitors, this understanding remains constant throughout much of the industry.

9.      But for the conspiracy, prices for the Subject Drugs would have been competed down to near marginal cost levels.  Defendants were able to impose extraordinary price increases and keep prices artificially high, as reflected in industry-wide data, by engaging in the conspiracies.  As a result of the conspiracies, prices of generic drugs skyrocketed at unprecedented rates, some by more than 1000%, like for example, Albuterol Sulfate (3,400%),

Amitriptyline (2,400%), Clobetasol Propionate (1,800%), Clomipramine (2,600%), Doxazosin

Mesylate (1053%), Doxycycline (8,000%), Fluconazole (1,570%), Leflunomide (1,300%),

Nadolol (2,762%), Oxybutynin Chloride (between 1,100 and 1,500%), Propranolol HCL

(1,000%), and Ursodiol (1,000%).

10.     Defendants knew their conduct was unlawful.  They often limited their

communications to in-person meetings, or mobile phone calls, to avoid creating a record of their

conduct.  When communications were reduced to writing or text messages, as alleged by the

State AGs, Defendants often destroyed the evidence of those communications.

11.     This scheme to fix, increase, stabilize, or maintain prices, allocate customers and

markets, and rig bids for generic pharmaceutical drugs, and otherwise stifle competition caused,

and continues to cause, significant harm to the United States healthcare system.  Defendants'

scheme violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and various state antitrust and

unfair competition laws, as alleged in this Complaint.  As a result of the conspiracy, as discussed

further below, Cigna's pharmacy businesses, which purchased generic drugs directly and

indirectly from manufacturers, and Cigna's health plan and pharmacy plan businesses, which

reimbursed claims in connection with purchases of generic drugs, paid substantially inflated and

anticompetitive prices for generic pharmaceutical drugs, and Defendants illegally profited as a

result.

12.     Cigna seeks treble damages and injunctive relief.

## II.     THE DRUGS SUBJECT TO THE CONSPIRACY ("SUBJECT DRUGS")

13.     The full scope of the conspiracy can only be determined through discovery, but

currently, Cigna understands the conspiracy encompasses the following Subject Drugs:

a.      Acetazolamide.  Acetazolamide is an extended-release version of a

medication used to treat glaucoma, epilepsy, altitude sickness, periodic

paralysis, and heart failure.  It may be sold in an extended release ("ER") formulation.

b.     Adapalene.  Adapalene is used to treat acne and other skin conditions. Adapalene comes in different forms including gels and creams.

c.     Albuterol Sulfate.  Albuterol sulfate is used to treat shortness of breath caused by asthma and chronic obstructive pulmonary disease.

d.     Amiloride HCL/HCTZ.  Amiloride hydrochloride ("HCL") and amiloride hydrochlorothiazide ("HCTZ") are used in combination to treat hypertension, heart failure, or extra fluid in the body (edema).  They also help to treat or prevent low potassium levels.

e.     Amitriptyline.  Amitriptyline is an antidepressant.

f.     Amoxicillin/Clavulanate.  Amoxicillin/clavulanate is an antibiotic consisting of amoxicillin and clavulanate potassium.  Amoxicillin is an antibiotic used to treat bacterial infections.  Clavulanate potassium is an inhibitor to bacterial resistance.

g.     Amphetamine/Dextroamphetamine.  Amphetamine/dextroamphetamine is a combination stimulant used to treat attention deficit hyperactivity disorder (ADHD) and narcolepsy.  The medication comes in both extended release ("ER") and instant release ("IR") forms.

h.     Azithromycin.  Azithromycin is an antibiotic used to treat bacterial infections and malaria.

i.     Baclofen.  Baclofen is a muscle relaxant and an anti-spastic agent.  It is used to treat muscle symptoms caused by multiple sclerosis, including spasms,

pain, and stiffness, as well as muscle spasms in people with spinal injury or disease.

j.      Benazepril HCTZ.  Benazepril is used to treat hypertension (high blood pressure).

k.      Bethanechol Chloride.  Bethanechol chloride is used to treat dry mouth and bladder problems such as the inability to urinate or empty the bladder completely.

l.      Budesonide.  Budesonide is administered through inhalers or similar devices and used to prevent asthma attacks.  It can also be used to treat allergic rhinitis, nasal polyps, and is used to treat inflammatory bowel diseases including Crohn's disease, ulcerative colitis, and microscopic colitis.

m.      Bumetanide.  Bumetanide is a diuretic used to treat swelling as a result of heart failure, liver failure, or kidney problems.  It is also used to treat high blood pressure.

n.      Buspirone HCL.  Buspirone hydrochloride is used for the short-term treatment of anxiety disorders, particularly generalized anxiety disorders.

o.      Cabergoline.  Cabergoline is used to treat medical problems that occur when too much of the hormone prolactin is produced.  It can be used to treat certain menstrual problems, fertility problems in men and women, and tumors of the pituitary gland.

p.      Capecitabine.  Capecitabine, also known by the brand name Xeloda, is an anti-cancer chemotherapy drug used to treat a variety of cancers, including breast and colon cancer.

q.      Carbamazepine.  Carbamazepine is an anticonvulsant medication used to treat epilepsy and neuropathic pain.  It is also used to treat schizophrenia and bipolar disorder.

r.      Cefdinir.  Cefdinir is an antibiotic used to treat pneumonia, otitis media, strep throat, and cellulitis.

s.      Cefprozil.  Cefprozil is an antibiotic used to treat ear infections, skin infections, and other bacterial infections.

t.      Celecoxib.  Celecoxib is a nonsteroidal anti-inflammatory medication used in the treatment of pain and inflammation associated with arthritis, juvenile rheumatoid arthritis, and other disorders.

u.      Cephalexin.  Cephalexin is an antibiotic used to treat bacterial infections including otitis media, streptococcal pharyngitis, bone and joint infections, pneumonia, cellulitis, and urinary tract infections.

v.      Cimetidine.  Cimetidine is a histamine receptor antagonist that inhibits stomach acid production and is used to treat heartburn and peptic ulcers.

w.      Ciprofloxacin HCL.  Ciprofloxacin hydrochloride is an antibiotic used to treat bacterial infections including bone and joint infections, intra-abdominal infections, infectious diarrhea, respiratory tract infections, skin infections, typhoid fever, and urinary tract infections.

x.      Clarithromycin ER.  Clarithromycin is an antibiotic used to treat bacterial infections including strep throat, pneumonia, skin infections, and Lyme disease, among others.  It can be taken in extended release tablet form.

y.      Clemastine Fumarate.  Clemastine fumarate is used to treat hay fever and
        allergy symptoms including sneezing, runny nose, red itchy tearing eyes,
        and hives.

z.      Clobetasol Propionate.  Clobetasol propionate is used to treat inflammation
        and itching caused by several skin conditions, such as allergic reactions,
        eczema, and psoriasis.  It comes in a variety of forms, including a cream,
        foam, gel, lotion, ointment, shampoo, solution, and spray.

aa.     Clomipramine.  Clomipramine is an antidepressant used to treat symptoms
        of obsessive-compulsive disorder.

bb.     Clonidine TTS.  Clonidine transdermal therapeutic system ("TTS") is a
        medication in the form of a transdermal patch that is used to treat high blood
        pressure.

cc.     Clotrimazole.  Clotrimazole is an antifungal medication used to treat vaginal
        yeast infections, oral thrush, diaper rash, pityriasis versicolor, and types of
        ringworm including athlete's foot and jock itch.  Clotrimazole is sold as a
        topical solution applied as a cream at various doses.

dd.     Cyproheptadine HCL.  Cyproheptadine hydrochloride is an antihistamine
        used to relieve allergy symptoms such as watery eyes, runny nose, itching
        eyes and nose, sneezing, hives, and itching.

ee.     Desmopressin Acetate.  Desmopressin acetate is used to treat diabetes
        insipidus and other conditions.

ff.     Desogestrel/Ethinyl Estradiol.  Desogestrel/ethinyl estradiol, brand name
        Kariva, is a progestin medication used in birth control pills for women and
        also for treatment of menopausal symptoms in women.

gg.     Desonide.  Desonide is used to treat skin disorders, including eczema,
        psoriasis, and dermatitis.

hh.     Dexmethylphenidate HCL ER ("Dexmeth ER").  Dexmethylphenidate
        hydrochloride is used to treat attention deficit hyperactivity disorder
        (ADHD).  It can be taken in an extended release form.

ii.     Dextroamphetamine Sulfate ER.  Dextroamphetamine sulfate is a CNS
        stimulant and amphetamine enantiomer used to treat attention deficit
        hyperactivity disorder (ADHD) and narcolepsy.  It can be taken in an
        extended release form.

jj.     Diclofenac Potassium.  Diclofenac potassium is an NSAID used to treat
        pain, inflammatory disorders, and dysmenorrhea.

kk.     Dicloxacillin Sodium.  Dicloxacillin sodium is an antibiotic used to treat
        mild to moderate staphylococcal infections.

ll.     Diflunisal.  Diflunisal is used to treat mild to moderate pain, osteoarthritis,
        and rheumatoid arthritis.

mm.     Digoxin.  Digoxin is used to treat heart failure and atrial fibrillation.

nn.     Diltiazem HCL.  Diltiazem hydrochloride is used to treat hypertension,
        angina, and heart arrhythmias.

oo.     Disopyramide Phosphate.  Disopyramide phosphate is used to treat
        ventricular tachycardia.

pp.　　Divalproex Sodium ER.  Divalproex sodium extended release is used to treat various types of seizure disorders, to treat manic episodes related to bipolar disorder, and to prevent migraine headaches.

qq.　　Doxazosin Mesylate.  Doxazosin mesylate is used to treat symptoms of an enlarged prostate and hypertension.

rr.　　Doxycycline.  Doxycycline is used to treat bacterial infections, such as acne, urinary tract infections, intestinal infections, eye infections, gonorrhea, chlamydia, and periodontitis.  It is also used to treat symptoms of rosacea. Doxycycline hyclate ("Doxy Hyclate") is a water-soluble form of doxycycline that absorbs quickly into the bloodstream.  A delayed release version of doxycycline hyclate ("Doxy DR") is used to treat acne. Doxycycline monohydrate ("Doxy Mono") is less water soluble and absorbs more slowly than Doxy Hyclate.  It is also used to prevent malaria.

ss.　　Drospirenone and Ethinyl Estradiol (Ocella).  Drospirenone and ethinyl estradiol, known by the brand name Ocella, is used in birth control pills and menopausal hormone therapy.

tt.　　Econazole.  Econazole refers to econazole nitrate cream 1%.  Econazole is a topical antifungal agent used to treat skin infections caused by fungus or yeast, including ringworm, tinea versicolor, and yeast infections.

uu.　　Enalapril Maleate.  Enalapril maleate is used to treat hypertension, symptomatic heart failure, asymptomatic left ventricular dysfunction, and diabetic kidney disease.

vv.      Entecavir.  Entecavir is an antiviral medication used to treat hepatitis B virus infection.

ww.      Epitol.  Epitol is a branded generic form of Carbamazepine, described above.

xx.      Estazolam.  Estazolam is used to treat sleep disorders.

yy.      Estradiol.  Estradiol is used in menopausal hormone therapy to prevent and treat moderate to severe menopausal symptoms such as hot flashes, vaginal dryness, and atrophy.  It is also used to treat osteoporosis.

zz.      Estradiol/Norethindrone Acetate (Mimvey).  Estradiol/norethindrone acetate, brand name Mimvey, is a combination estradiol and norethisterone acetate used to treat vasomotor symptoms, vulvar and vaginal atrophy, and osteoporosis associated with menopause.

aaa.      Ethinyl Estradiol and Levonorgestrel (Portia and Jolessa).  Ethinyl estradiol and levonorgestrel, brand names Portia and Jolessa, when used in combination, is an oral contraceptive used to prevent pregnancy.

bbb.      Ethinyl Estradiol/Norethindrone (Balziva).  Ethinyl estradiol/norethindrone, brand name Balziva, is a combination of ethinyl estradiol and norethisterone.  It is used for birth control, and to treat menstruation symptoms, endometriosis, and menopausal symptoms.

ccc.      Ethosuximide.  Ethosuximide is used for absence seizures.

ddd.      Etodolac.  Etodolac is a nonsteroidal anti-inflammatory drug that is used to treat symptoms of juvenile arthritis, rheumatoid arthritis, and osteoarthritis.

eee.    Fenofibrate.  Fenofibrate is used to treat abnormal blood lipid levels.  It is also used to treat high cholesterol to reduce the risk of cardiovascular disease and diabetic retinopathy in those with diabetes mellitus.

fff.    Fluconazole.  Fluconazole is an antifungal medication used to treat fungal infections including candidiasis, blastomycosis, coccidioidomycosis, cryptococcosis, histoplasmosis, dermatophytosis, and pityriasis versicolor.

ggg.    Fluocinonide.  Fluocinonide is a topical glucocorticoid used to treat psoriasis and eczema.

hhh.    Fluoxetine HCL.  Fluoxetine hydrochloride is an antidepressant used for treatment of major depressive disorder, obsessive-compulsive disorder, bulimia nervosa, panic disorder, and premenstrual dysphoric disorder.

iii.    Flurbiprofen.  Flurbiprofen is  primarily used as a pre-operative antibiotic as well as for arthritis or dental pain.

jjj.    Flutamide.  Flutamide is used to treat prostate cancer.  It is also used to treat androgen-dependent conditions such as acne, excessive hair growth, and high androgen levels in women.

kkk.    Fluvastatin Sodium.  Fluvastatin sodium is a statin used to treat high cholesterol and to prevent cardiovascular disease.

lll.    Fosinopril HCTZ.  Fosinopril hydrochlorothiazide is a combination medicine used to treat hypertension and heart failure.

mmm.    Gabapentin.  Gabapentin is an anticonvulsant medication used to treat seizures, neuropathic pain, hot flashes, and restless pain syndrome.  Some

doctors also prescribe it to treat anxiety disorders, insomnia, and bipolar
disorder.

nnn.    Glimepiride.  Glimepiride is used to treat diabetes mellitus type 2.

ooo.    Glipizide-Metformin.  Glipizide-metformin is a combination medicine used
to treat high blood sugar levels that are caused by a type of diabetes mellitus
or sugar diabetes called type 2 diabetes.

ppp.    Glyburide.  Glyburide is an oral medication used to control blood sugar in
patients with type 2 diabetes.

qqq.    Glyburide-Metformin.  Glyburide-metformin is a combination medication
used to control blood sugar in patients with type 2 diabetes.

rrr.    Griseofulvin.  Griseofulvin is an antifungal medication used to treat
dermatophytosis (ringworm).

sss.    Haloperidol.  Haloperidol is an antipsychotic used to treat schizophrenia,
Tourette syndrome, bipolar disorder, nausea and vomiting, delirium,
agitation, acute psychosis, and hallucinations caused by alcohol withdrawal.

ttt.    Hydralazine HCL.  Hydralazine hydrochloride is used to treat hypertension
and heart failure.

uuu.    Hydroxyurea.  Hydroxyurea is used to treat sickle-cell disease, chronic
myelogenous leukemia, cervical cancer, polycythemia vera, and psoriasis.

vvv.    Hydroxyzine Pamoate.  Hydroxyzine pamoate is an antihistamine used to
treat itchiness, anxiety, and nausea due to motion sickness.

www.    Irbesartan.  Irbesartan is used to treat hypertension, heart failure, and
diabetic kidney disease.

xxx.     Isoniazid.  Isoniazid is an antibiotic used to treat tuberculosis and atypical mycobacterial infections.

yyy.     Ketoconazole.  Ketoconazole is an antifungal medication used to treat fungal infections such as tinea, cutaneous candidiasis, pityriasis versicolor, dandruff, and seborrheic dermatitis.  It is also used to treat excessive hair growth and Cushing's syndrome.

zzz.     Ketoprofen.  Ketoprofen is used to treat arthritis-related inflammatory pains, severe toothaches, musculoskeletal pain, and nerve pain.

aaaa.     Ketorolac Tromethamine.  Ketorolac tromethamine is used for the management of moderate to severe pain.

bbbb.     Labetalol HCL.  Labetalol hydrochloride is used to treat hypertension and for the long-term management of angina.

cccc.     Lamivudine/Zidovudine (Combivir).  Lamivudine/zidovudine, brand name Combivir, is a combination antiretroviral medication used to treat human immunodeficiency virus (HIV) / acquired immunodeficiency syndrome (AIDS).

dddd.     Leflunomide.  Leflunomide is used to reduce inflammation that causes pain and swelling in patients with rheumatoid arthritis.

eeee.     Levothyroxine.  Levothyroxine is a manufactured, synthetic form of the thyroid hormone, thyroxine.  It is used to treat hypothyroidism, a condition in which the thyroid gland fails to produce enough hormone.  It is also used to treat goiter (enlarged thyroid gland), thyroid cancer, and cretinism (congenital hypothyroidism).

ffff.    Lidocaine.  Lidocaine is a local anesthetic agent used to numb an area of the

body to reduce pain or discomfort caused by invasive medical procedures.

It is sold in several formulations and combinations, including lidocaine-

prilocaine.

gggg.    Loperamide HCL.  Loperamide hydrochloride is used to treat diarrhea,

inflammatory bowel disease, or short bowel syndrome.

hhhh.    Medroxyprogesterone.  Medroxyprogesterone is used to treat conditions

such as absent or irregular menstrual periods and abnormal uterine bleeding.

It is also used with estrogens to decrease the risk of endometrial hyperplasia.

A derivative, medroxyprogesterone acetate, is used as a method of birth

control and in menopausal hormone therapy.  It is also used to treat

endometriosis, abnormal uterine bleeding, abnormal sexuality in males, and

certain types of cancer.

iiii.    Meprobamate.  Meprobamate is used to treat short term anxiety, tension,

and insomnia.

jjjj.    Methimazole.  Methimazole is used to treat hyperthyroidism.

kkkk.    Methotrexate.  Methotrexate is used to treat cancer, autoimmune diseases,

and ectopic pregnancy, and also for medical abortions.

llll.    Metronidazole.  Metronidazole is an antibiotic available in cream, jelly, and

lotion form.  It is used to treat vaginal infections, among other infections.

mmmm. Moexipril HCL.  Moexipril hydrochloride is used to treat hypertension and

congestive heart failure.

nnnn.  Moexipril HCL/HCTZ.  Moexipril hydrochlorothiazide is a combination of moexipril HCL, as described above, and hydrochlorothiazide, a diuretic.

oooo.  Nabumetone.  Nabumetone is used to treat pain and inflammation.

pppp.  Nadolol.  Nadolol is used to treat hypertension and for long-term treatment of angina pectoris.  It is also used for heart rate control in people with atrial fibrillation, prevention of migraine headaches, prevention of bleeding veins in people with cirrhosis, and to treat people with high levels of thyroid hormone.

qqqq.  Niacin ER.  Niacin is an organic compound that is a form of vitamin B3.  It is an essential human nutrient and the extended release form is used to treat high blood cholesterol and niacin deficiency.

rrrr.  Nimodipine.  Nimodipine is a used to manage and reduce problems caused by bleeding blood vessels in the brain.

ssss.  Nitrofurantoin MAC.  Nitrofurantoin microcrystal ("MAC") is an antibiotic used to treat bladder infections.

tttt.  Norethindrone Acetate.  Norethindrone acetate is used in birth control pills, menopausal hormone therapy, and for treatment of gynecological disorders such as abnormal uterine bleeding.

uuuu.  Norethindrone/Ethinyl Estradiol.  Norethindrone/Ehinyl Estradiol, when used in combination, is a hormone medication used to prevent preganncy.

vvvv.  Nortriptyline HCL.  Nortriptyline hydrochloride is used to treat depression, neuropathic pain, ADHD, and anxiety and is also used for smoking cessation.

wwww.   Nystatin.  Nystatin is an antifungal medication.  It is used to treat yeast infections, diaper rash, thrush, and esophageal candidiasis.

xxxx.   Omega-3-Acid Ethyl Esters.  Omega-3 acid ethyl esters are used to reduce triglyceride levels in adults with severe hypertriglyceridemia.

yyyy.   Oxaprozin.  Oxaprozin is  used to relieve inflammation, swelling, stiffness, and joint pain associated with osteoarthritis and rheumatoid arthritis.

zzzz.   Oxybutynin Chloride.  Oxybutynin chloride is used to treat an overactive bladder, bed wetting in children, and excessive sweating.

aaaaa.   Paricalcitol.  Paricalcitol is used for the prevention and treatment of secondary hyperparathyroidism associated with long-term kidney disease.

bbbbb.   Paromomycin.  Paromomycin is a broad-spectrum oral antibiotic.  It is used to treat parasitic infections in the intestines and complications of liver disease.

ccccc.   Penicillin VK.  Penicillin V potassium ("Penicillin VK") is an antibiotic used to treat bacterial infections including strep throat, otitis media, and cellulitis.  It is also used to treat rheumatic fever and to prevent infections following removal of the spleen.

ddddd.   Pentoxifylline.  Pentoxifylline is a xanthine derivative used to treat muscle pain, cramping, numbness, or weakness in people with peripheral artery disease.  It is also used for the treatment of chronic venous leg ulcers and alcoholic hepatitis.

eeeee.   Piroxicam.  Piroxicam is used to treat rheumatoid arthritis, osteoarthritis, and juvenile rheumatoid arthritis.

fffff.   Pravastatin.  Pravastatin is a statin used to lower cholesterol and triglycerides in the blood.

ggggg.   Prazosin HCL.  Prazosin hydrochloride is used to treat hypertension, symptoms of an enlarged prostate, and post-traumatic stress disorder.

hhhhh.   Prochlorperazine.  Prochlorperazine is used to treat nausea, schizophrenia, migraines, and anxiety.

iiiii.   Propranolol HCL.  Propranolol hydrochloride is used to treat hypertension, heart rhythm disorders, tremors, and other heart and circulatory conditions, and to prevent heart attacks, migraine headaches, and angina.  Propranolol is available as a capsule, a tablet, an oral liquid solution, and an injection.

jjjjj.   Raloxifene HCL.  Raloxifene hydrochloride is used to prevent and treat osteoporosis in postmenopausal women and those on glucocorticoids.

kkkkk.   Ranitidine HCL.  Ranitidine hydrochloride is used to treat peptic ulcer disease, gastroesophageal reflux disease, Zollinger-Ellison syndrome, and hives.

lllll.   Tamoxifen Citrate.  Tamoxifen citrate is used to prevent and treat breast cancer.

mmmmm. Temozolomide.  Temozolomide is an oral chemotherapy drug used to treat some brain cancers.

nnnnn.   Theophylline ER.  Theophylline extended release is used to treat asthma and airway narrowing associated with long-term asthma and other lung problems, such as chronic bronchitis and emphysema.

ooooo.   Tizanidine.  Tizanidine is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

ppppp.   Tobramycin.  Tobramycin is an antibiotic used to treat various bacterial infections.

qqqqq.   Tolmetin Sodium.  Tolmetin sodium is used to reduce hormones that cause pain, swelling, tenderness, and stiffness in conditions such as osteoarthritis, rheumatoid arthritis, and juvenile rheumatoid arthritis.

rrrrr.   Tolterodine.  Tolterodine is used to treat an overactive bladder.  It is sold in extended release form and as tolterodine tartrate.

sssss.   Topiramate Sprinkle.  Topiramate sprinkle is used to treat epilepsy and alcohol dependence and to prevent migraines.

ttttt.   Trifluoperazine HCL.  Trifluoperazine hydrochloride is an antipsychotic used to treat schizophrenia and for the short-term treatment of generalized anxiety disorder.

uuuuu.   Ursodiol.  Ursodiol is used to dissolve gallstones made of cholesterol in patients whose gallbladders do not need to be removed or where surgery is not an option.  It is also used to prevent the formation of gallstones and to treat primary biliary cirrhosis.  Ursodiol can also be used to prevent organ rejection in liver transplant patients.

vvvvv.   Valsartan HCTZ.  Valsartan hydrochlorothiazide is used to treat hypertension, heart failure, and diabetic kidney disease.

wwwww.  Verapamil.  Verapamil is a calcium channel blocker.  It is used to treat hypertension, angina, and certain heart rhythm disorders.

xxxxx.    Warfarin Sodium.  Warfarin sodium is an anticoagulant used to treat blood clots such as deep vein thrombosis and pulmonary embolism.  It is also used to prevent stroke in people who have atrial fibrillation, valvular heart disease, or artificial heart valves.

yyyyy.    Zoledronic Acid.  Zoledronic acid is used to prevent bone disease in cancer patients.

## III.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337.  Cigna asserts claims for relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.  This Court has jurisdiction over non-federal claims alleged in this Complaint pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal antitrust claims as to form part of the same case or controversy.

15.    This Court may exercise personal jurisdiction over Defendants because each Defendant transacted business throughout the United States (including in this District), sold and distributed one or more of the Subject Drugs throughout the United States (including in this District), has registered agents in the United States (including in this District), may be found in the United States (including in this District), engaged in an unlawful conspiracy to artificially increase prices for one or more of the Subject Drugs that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States (including in this District), and is otherwise subject to the service of process provisions of 15 U.S.C. § 22.

16.    Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391. During the relevant time period (at least January 1, 2012 to the present), Defendants resided,

transacted business, and/or were found or had agents in the United States, including in this District.

17.     During the alleged time period, Defendants sold and shipped the generic drugs at issue in a continuous and uninterrupted flow of interstate commerce in the United States, including in this District.  Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District. Defendants engaged in an unlawful conspiracy to artificially increase prices for generic drugs at issue that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  Throughout the time period alleged herein, there was a continuous and uninterrupted flow of purchase orders, invoices, and other documents essential to the sale and provision of the generic drugs at issue transmitted between and among offices of Defendants and their customers throughout the United States, including in this District.

## IV.     THE PARTIES

### A.     Plaintiff

18.     Cigna Corp. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Bloomfield, Connecticut.

19.     Cigna is the parent company, or otherwise affiliated/related company, to businesses that operate pharmacies, including mail-order, specialty pharmacies, and retail pharmacies, as well as specialty pharmaceutical distribution services.  During the relevant period, certain of these assignor subsidiaries and/or affiliates operated under Express Scripts banners, and certain of these assignor subsidiaries and/or affiliates operated under Cigna banners. Cigna became the corporate parent of Express Scripts Holding Company ("Express Scripts") in or about December 2018, when it acquired Express Scripts and all of its subsidiaries (the

"Acquisition").  Through Express Scripts, Cigna is the parent company, or otherwise affiliated/related company, to assignor subsidiaries and/or affiliates that operated as Express Scripts entities prior to the Acquisition, including:  Accredo Health Group, Inc., CuraScript, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts, Inc., Express Scripts Pharmaceutical Procurement LLC, Express Scripts Pharmacy, Inc., Lynnfield Drug, Inc., Lynnfield Compounding Center, Inc., Priority Healthcare Corporation, Priority Healthcare Distribution, Inc., and Specialty Products Acquisitions, LLC (collectively, "Express Scripts Purchasers").  The Express Scripts Purchasers buy generic prescription drugs from manufacturers and wholesalers strictly for the purposes of (1) dispensation by their subsidiaries and/or affiliates that operate mail-order and specialty pharmacies, and/or (2) distribution by their subsidiaries and/or affiliates that provide specialty pharmaceutical distribution services.  Cigna is also the parent company, or otherwise affiliated/related company, to assignor subsidiaries and/or affiliates that operated as Cigna entities prior to the Acquisition, including:  Cigna HealthCare of California, Inc., Tel-Drug, Inc., Tel-Drug of Pennsylvania, LLC, HealthSpring Pharmacy of Tennessee, LLC, and HealthSpring Pharmacy Services, LLC (collectively, "Cigna Pharmacies").  The Cigna Pharmacies bought generic prescription drugs from manufacturers and wholesalers strictly for purposes of dispensation by their subsidiaries and/or affiliates that operate mail-order, specialty, and retail pharmacies.  Through the Express Scripts Purchasers and Cigna Pharmacies, Cigna has purchased numerous of the Subject Drugs from Defendants directly and indirectly pursuant to various contractual arrangements.  The Express Scripts Purchasers and Cigna Pharmacies have assigned their claims based on these purchases to Cigna Corp.

20.     Cigna is the parent company, or otherwise affiliated/related company, to various health insurance plans and prescription drug plans (collectively, "Cigna Plans").  Cigna, either

directly or through its subsidiaries, insures and/or administers health and prescription drug plan

benefits for its members and group customers, including self-funded group customers that

contract with Cigna to administer claims on their behalf and pursue recoveries related to those

claims.  Many of these health plan benefits provide members with prescription drug coverage

under which claims for drugs manufactured by Defendants were submitted and paid.  Cigna is

pursuing recovery related to those claims.  The Cigna Plans issue insurance and/or administrative

services covering prescription drugs in the form of (1) fully insured commercial ("Commercial")

health plans; (2) self-funded administrative services only ("ASO") health plans; (3) hybrid-

funded health plans; (4) Medicare Advantage plans; (5) Medicare Prescription Drug Plans; and

(6) Medicaid Plans.  Cigna's subsidiaries provide these benefits to Cigna insureds and clients

nationwide.  These assignor subsidiaries and/or affiliates include:  Bravo Health Pennsylvania

Inc., Bravo Health Mid-Atlantic Inc., Cigna Health and Life Insurance Company, Cigna

HealthCare of Arizona, Inc., Cigna HealthCare of California, Inc., Cigna HealthCare of

Colorado, Inc., Cigna HealthCare of Connecticut, Inc., Cigna HealthCare of Florida, Inc., Cigna

HealthCare of Georgia, Inc., Cigna HealthCare of Illinois, Inc., Cigna HealthCare of Indiana,

Inc., Cigna HealthCare of Maine, Inc., Cigna HealthCare of Massachusetts, Inc., Cigna

HealthCare of Mid-Atlantic, Inc., Cigna HealthCare of New Hampshire, Inc., Cigna HealthCare

of New Jersey, Inc., Cigna HealthCare of North Carolina, Inc., Cigna HealthCare of

Pennsylvania, Inc., Cigna HealthCare of South Carolina, Inc., Cigna HealthCare of St. Louis,

Inc., Cigna HealthCare of Tennessee, Inc., Cigna HealthCare of Texas, Inc., Cigna HealthCare of

Utah, Inc., HealthSpring of Florida, Inc., HealthSpring Life & Health Insurance Company, Inc.,

Medco Containment Insurance Company of NY, and Medco Containment Life Insurance

Company.  The Cigna Plans have assigned their claims based on these purchases to Cigna Corp.

21.     Cigna's Complaint seeks recovery for unlawful overcharges incurred in connection with direct and indirect purchases of generic pharmaceuticals made by Express Scripts Purchasers and Cigna Pharmacies strictly in connection with their busiensses that provide mail-order pharmacy dispensation, retail pharmacy dispensation, specialty pharmacy dispensation, and specialty pharmaceutical distribution.  Cigna's Complaint also seeks recovery for unlawful overcharges incurred in connection with paying for generic drugs dispensed to Cigna insureds, including all those receiving insurance, administrative services, or prescription drug benefits from any of the Cigna Plans (or their predecessors or successors).

### B.     Defendants

#### 1.     Actavis

22.     Defendant Actavis Holdco US, Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey 07054.  In March 2015, Actavis plc, the then-parent company of Defendants Actavis Elizabeth, LLC and Actavis Pharma, Inc., merged with Allergan, Inc. and changed its name to Allergan plc ("Allergan").  In August 2016, Teva Pharmaceutical Industries Ltd., the Israeli parent company of Defendant Teva, purchased Allergan's generics business, which included Defendants Actavis Elizabeth and Actavis Pharma, Inc.  The assets and liabilities of Allergan's generics business were transferred to the newly-formed Actavis Holdco.  Actavis Holdco is a wholly-owned subsidiary of Defendant Teva Pharmaceuticals USA, Inc.

23.     Defendant Actavis Elizabeth, LLC ("Actavis Elizabeth") is a Delaware limited liability company with its principal place of business at 200 Elmora Avenue, Elizabeth, New Jersey 07202.  It is a wholly-owned subsidiary of Defendant Actavis Holdco and is a research and development and manufacturing entity for the Actavis generics operations.

24.     Defendant Actavis Pharma, Inc., is a Delaware corporation with its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey 07054.  It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc.  It manufactures, markets, and/or distributes generic pharmaceuticals.

25.     Actavis Holdco, Actavis Elizabeth, and Actavis Pharma, Inc. are collectively referred to herein as "Actavis." At all times relevant to the Complaint, Actavis marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 2.     Alvogen

26.     Defendant Alvogen Inc. ("Alvogen") is a Delaware corporation with its principal place of business at 44 Whippany Road, Suite 300, Morristown, New Jersey 07960.  At all times relevant to the Complaint, Alvogen marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 3.     Amneal

27.     Defendant Amneal Pharmaceuticals, Inc. ("Amneal") is a Delaware corporation with a principal place of business at 400 Crossing Boulevard, 3rd Floor, Bridgewater, New Jersey 08807.  At all times relevant to the Complaint, Amneal marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 4.     Apotex

28.     Defendant Apotex Corp. ("Apotex") is a Delaware corporation with a principal place of business at 2400 North Commerce Parkway, Suite 400, Weston, Florida 33326.  At all times relevant to the Complaint, Apotex marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 5. Ascend

29.     Defendant Ascend Laboratories, LLC ("Ascend") is a New Jersey corporation with its principal place of business at 339 Jefferson Road, Suite 101, Parsippany, New Jersey 07054.  At all times relevant to the Complaint, Ascend marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 6. Aurobindo

30.     Defendant Aurobindo Pharma USA, Inc., ("Aurobindo") is a Delaware corporation with its principal place of business at 279 Princeton Highstown Road, East Windsor, New Jersey 08520.  At all times relevant to this Complaint, Aurobindo marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 7. Bausch/Valeant

31.     Defendant Bausch Health Americs, Inc. (formerly Valeant Pharmaceuticals International, Inc.) is a Delaware corporation with its principal place of business at 400 Somerset Corporate Boulevard, Bridgewater, New Jersey 08807.

32.     Defendant Bausch Health US, LLC (formerly Valeant Pharmaceuticals North America, LLC) is a Delaware corporation with its principal place of business at 400 Somerset Corporate Boulevard, Bridgewater, New Jersey 08807.

33.     Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a Delaware corporation with its principal place of business at One Enterprise, Aliso Viejo, California 92656. Oceanside is a wholly-owned subsidiary of Bausch Health Americas, Inc..

34.     Unless addressed individually, Bausch Health Americas, Inc., Bausch Health US, LLC, and Oceanside Pharmaceuticals, Inc. are collectively referred to herein as "Valeant."  At all times relevant to the Complaint, Valeant sold one or more of the Subject Drugs in this District and throughout the United States.

### 8.    Breckenridge

35.    Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business at 15 Massirio Drive, Suite 201, Berlin, Connecticut 06037.  At all times relevant to the Complaint, Breckenridge marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 9.    Camber

36.    Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation with its principal place of business at 1031 Centennial Avenue, Piscataway, New Jersey 08854. At all times relevant to the Complaint, Camber marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 10.    Citron

37.    Defendant Citron Pharma, LLC ("Citron") is a Delaware corporation with its principal place of business at 2 Tower Center Boulevard, Suite 1101, East Brunswick, New Jersey 08816.  During the relevant time period, Citron marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 11.    Dr. Reddy's

38.    Defendant Dr. Reddy's Laboratories Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business at 107 College Road East, Princeton, New Jersey 08540.  Dr. Reddy's is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian company with its principal place of business in Hyderabad, India.  At all times relevant to the Complaint, Dr. Reddy's marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 12.   G&W

39.    Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey corporation with its principal place of business at 301 Helen Street, South Plainfield, New Jersey 07080.  At all times relevant to the Complaint, G&W marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 13.   Glenmark

40.    Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a Delaware corporation with a principal place of business at 750 Corporate Drive, Mahwah, New Jersey 07430.  At all times relevant to the Complaint, Glenmark marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 14.   Heritage

41.    Defendant Heritage Pharmaceuticals Inc. ("Heritage") is a Delaware corporation with its principal place of business at 12 Christopher Way, Suite 300, Eatontown, New Jersey 07724.  Heritage is a wholly-owned subsidiary of Emcure Pharmaceuticals, Ltd. ("Emcure"), an Indian corporation with its principal place of business at Emcure House, T 184, M.I.D.C., Bhosari, Pune, India.  Emcure is also the parent company of Emcure Pharmaceuticals USA, Inc., which has a principal place of business at 21-B Cotters Lane, East Brunswick, New Jersey.  At all times relevant to the Complaint, Heritage marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 15.   Impax

42.    Defendant Impax Laboratories, LLC, formerly known as Impax Laboratories, Inc. ("Impax"), is a Delaware limited liability company with its principal place of business at 30831 Huntwood Avenue, Hayward, California 94544.  Impax is a wholly-owned subsidiary of Defendant Amneal, which purchased Impax in May 2018.  At all times relevant to the

Complaint, Impax marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 16.   Lannett

43.     Defendant Lannett Company, Inc., ("Lannett") is a Delaware corporation with its principal place of business at 9000 State Road, Philadelphia, Pennsylvania 19136.  At all times relevant to the Complaint, Lannett marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 17.   Lupin

44.     Defendant Lupin Pharmaceuticals, Inc., ("Lupin") is a Delaware corporation with its principal place of business at Harborplace Tower, 111 S. Calvert Street, 21st Floor, Baltimore, Maryland 21202.  Lupin is a wholly-owned subsidiary of Lupin Limited, an Indian company with its principal place of business at B/4 Laxmi Towers, Bandra Kurla Complex, Bandre (E), Mumbai, India.  At all times relevant to the Complaint, Lupin marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 18.   Mayne

45.     Defendant Mayne Pharma, Inc. ("Mayne") is a Delaware corporation with its principal place of business at 3301 Benson Drive, Suite 401, Raleign, North Carolina 27609. Mayne is a wholly-owned subsidiary of Mayne Pharma Group Limited, an Australian company with its principal place of business at 1538 Main North Road, Salisbury, SA 5106, Australia.  In 2012, Mayne acquired Metrics, Inc. and its division Midlothian Laboratories ("Midlothian") and has operated under the name Midlothian since that time.  At all times relevant to the Complaint, Mayne marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 19.    Morton Grove

46.    Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business at 6451 Main Street, Morton Grove, Illinois 60053.  Morton Grove is a wholly-owned subsidiary of Wockhardt, Ltd. At all times relevant to the Complaint, Morton Grove marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 20.    Mylan

47.    Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business at 1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317.  It is the parent company of Defendant Mylan Pharmaceuticals, Inc.

48.    Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505.

49.    Defendant Mylan N.V. is a Dutch company with its principal place of business and global headquarters at 1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317.  Mylan N.V. is the direct parent of Defendant Mylan Inc. and the ultimate parent of Defendant Mylan Pharmaceuticals, Inc.

50.    Mylan Inc., Mylan Pharmaceuticals, Inc., and Mylan N.V. are collectively defined as "Mylan." At all times relevant to the Complaint, Mylan marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 21.    Par

51.    Defendant Par Pharmaceutical Companies, Inc., is a Delaware corporation with its principal place of business at One Ram Ridge Road, Chestnut Ridge, New York 10977.

52.     Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal place of business at One Ram Ridge Road, Chestnut Ridge, New York 10977.  Par Pharmaceutical, Inc. is a direct subsidiary of Defendant Par Pharmaceutical Companies, Inc.

53.     Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are each wholly-owned subsidiaries of Endo International plc, an Irish company with global headquarters in Dubline, Ireland, and U.S. headquarters at 1400 Atwater Drive, Malvern, Pennsylvania.  In August 2014, Endo's subsidiary, Generics International (US), Inc., d/b/a Qualitest Pharmaceuticals, acquired co-conspirator DAVA Pharmaceuticals, Inc. ("DAVA").  In September 2015, Endo complete the acquisition of Par Pharmaceuticals Holdings, Inc. and its subsidiaries, including Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc., and merged Par's business with Qualitest Pharmaceuticals, Inc. ("Qualitest"), naming the segment Par Pharmaceutical, Inc.  Par Pharmaceutical, Inc. is therefore the successor in interest to both DAVA and Qualitest.

54.     Defendant Generics Bidco I, LLC ("Generics Bidco") is a Delaware company with its principal place of business at 130 Vintage Drive NE, Huntsville, Alabama 35811, and formerly conducted business as Qualitest.  Generics Bidco is a wholly-owned subsidiary of Endo, and affiliate of Defendant Par.

55.     Par Pharmaceutical Companies, Inc., Par Pharmaceutical, Inc. (including DAVA and Qualitest), and Generics Bidco I, LLC are collectively refrred to as "Par."  At all times relevant to the Complaint, Par has marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 22.     Perrigo

56.     Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its executive offices at 515 Eastern Avenue, Allegan, Michigan 49010 and its principal place of

business at 1701 Bathgate Avenue, Bronx, New York 10457.  Perrigo New York is a wholly-owned subsidiary of Perrigo plc, an Irish Company with its principal place of business in Dublin, Ireland.  During the relevant time period, Perrigo marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 23.   Sandoz

57.     Defendant Sandoz, Inc., is a Colorado corporation with its principal place of business at 100 College Road West, Princeton, New Jersey 08540.  Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland.

58.     Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business at 60 Baylis Road, Melville, New York 11747.  It is under common ownership with Defendant Sandoz, Inc., as both are wholly-owned subsidiaries of Novartis AG ("Novartis").  Fougera specializes in the production, marketing, and sale of dermatological products.

59.     Unless addressed individually, Sandoz Inc. and Fougera are referred to together as "Sandoz."  At all times relevant to the Complaint, Sandoz marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 24.   Sun

60.     Defendant Sun Pharmaceuticals Industries, Inc. ("Sun") is a Michigan corporation with its principal place of business at 1 Commerce Drive, Cranbury, New Jersey 08512.  Until February 2011, Sun was known as Caraco Pharmaceutical Laboratories, Ltd.  Since 2011, Sun has been a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian company with its principal place of business in Mumbai, India, which also owns, and owned throughout the relevant period, a large majority stake of Defendant Taro Pharmaceuticals USA, Inc.  In late 2012, Sun acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical

Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia, Pennsylvania.  Sun also does business under the name Caraco Pharmaceutical Laboratories ("Caraco"), a company Sun acquired in 1997.  Unless addressed individually, Sun, URL, Mutual and Caraco are collectively referred to herein as "Sun."  During the relevant time period, Sun marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 25.    Taro

61.    Defendant Taro Pharmaceuticals USA, Inc. is a New York corporation with its principal place of business at 3 Skyline Drive, Hawthorne, New York 10532.  Taro is a wholly-owned subsidiary of Taro Pharmaceuticals Industries Ltd., an Israeli company with its principal place of business at 14 Hakitor Street, Haifa Bay, Israel.  As noted above, throughout the relevant time period, Sun Pharmaceutical Industries, Ltd. owned a controlling stake in Taro Pharmaceutical Industries, Ltd.  At all times relevant to the Complaint, Taro marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 26.    Teligent

62.    Defendant Teligent, Inc. (F/K/A IGI Laboratories, Inc.) ("Teligent") is a Delaware corporation with its principal place of business at 105 Lincoln Avenue, Buena, New Jersey 08310.  During the relevant time period, Teligent marketed and sold one or more of the Subject Drugs in this District and throughout the United States, either on its own or through subsidiaries.

### 27.    Teva

63.    Defendant Teva Pharmaceuticals USA, Inc., ("Teva") is a Delaware corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454. Teva is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli corporation

with its principal place of business at 5 Basel Street, P.O. Box 3190, Petah Tikva, Israel.  At all times relevant to the Complaint, Teva marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 28.    Upsher-Smith

64.    Defendant Upsher-Smith Laboratories, LLC ("Upsher-Smith") is a Minnesota limited liability company located at 6701 Evenstad Drive, Maple Grove, MN 55396.  Upsher-Smith is a subsidiary of Sawaii Pharmaceutical Co., Ltd., a large generics company in Japan.  At all times relevant to the Complaint, Upsher-Smith marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 29.    West-Ward

65.    Defendant Hikma Pharmaceuticals USA Inc. F/K/A West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with its principal place of business at 246 Industrial Way West, Eatontown, New Jersey 07724.  Hikma Pharmaceuticals USA Inc. is a wholly-owned subsidiary of Hikma Pharmaceuticals PLC, a London-based pharmaceutical company.  At all times relevant to the Complaint, West-Ward marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 30.    Wockhardt

66.    Defendant Wockhardt USA LLC, ("Wockhardt") is a Delaware limited liability company located at 20 Waterview Boulevard, 3rd Floor, Parsippany, New Jersey 07054.  At all times relevant to the Complaint, Wockhardt marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 31.    Zydus

67.    Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey corporation with its principal place of business at 73 Route 31 North, Pennington, New Jersey

08534.  At all times relevant to the Complaint, Zydus marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

C.      **Co-Conspirators**

1.      **Akorn**

68.      Non-Defendant Akorn, Inc. ("Akorn") is a Louisiana corporation with its principal place of business at 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045. Akorn filed for bankruptcy in 2020.  Akorn is the parent company of Hi-Tech Pharmacal Co., Inc. and VersaPharm, Inc.  At all times relevant to the Complaint, Akorn marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

69.      Non-Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business at 369 Bayview Avenue, Amityville, New York 11701.  Hi-Tech is a wholly-owned subsidiary of Akorn.  At all times relevant to the Complaint, Hi-Tech marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

70.      Non-Defendant VersaPharm, Inc. ("VersaPharm") is a corporation organized and existing under the laws of the State of Georgia with its principal place of business at 1775 West Oak Parkway, Suite 800, Marietta, Georgia 30062.  VersaPharm is a wholly-owned subsidiary of Akorn.  At all times relevant to the Complaint, Versapharm has marketed and sold generic pharmaceuticals in this District and throughout the United States.

2.      **Rising**

71.      Non-Defendant Rising Pharmaceuticals Inc. (Rising) is a Delaware corporation with its principal place of business at 2 Tower Center Blvd., Suite 1401A, East Brunswick, New Jersey 08816.  Rising is a wholly-owned subsidiary of Aceto Corp., which filed for bankruptcy in 2019.  On December 3, 2019, the Department of Justice announced Rising had entered into a

deferred prosecution agreement in connection with Rising's participation in a conspiracy to suppresss and eliminate competition by agreeing to allocate customers for and to stabilize, maintain, and fixc prices of Benazepril HCTZ sold in the United States.

### 3.    Presently Unkown Generic Manufacturer Co-Conspirators

72.    Various other persons, firms, entities, and corporations not named as defendants in this Complaint have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

73.    Cigna may amend this Complaint to allege the true names of additional co-conspirators as they are discovered.

## V.    REGULATORY AND ECONOMIC BACKGROUND

### A.    Generic Drugs Should Provide Lower-Priced Options for Purchasers

74.    Generic drugs generally can provide a lower-cost but therapeutically equivalent substitute for brand-name drugs.  Generic drugs can be manufactured in a variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments, creams, solutions, emollients, and gels.  A manufacturer seeking to sell a drug in the United States must obtain FDA approval.  The FDA typically evaluates the safety and efficacy of the drug, the manufacturing process, labelling, and quality control.

75.    Congress enacted the Hatch-Waxman Act ("Hatch-Waxman") in 1984 to encourage the production and sale of cheaper generic drugs by simplifying the regulatory hurdles that generic pharmaceutical manufacturers must clear to market and sell their drug products.[3]

---

[3]    Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

76.    To obtain marketing approval for a generic drug, a manufacturer must generally file an Abbreviated New Drug Application ("ANDA") with the Food and Drug Administration ("FDA").  ANDA applications rely on the safety and efficacy evidence previously submitted in connection with the approval of the brand-name equivalent, or reference-listed drug ("RLD"), and therefore allow generic manufacturers to avoid conducting costly and duplicative clinical trials.

77.    Typically, generic versions of brand-name drugs are priced significantly below their brand-name counterparts.  The only material difference between a generic and its brand name counterparts is price.  When multiple manufacturers enter the market, prices erode, sometimes by as much as 90%, as price competition increases.  An FDA study recently noted that "[g]reater competition among generic drug makers is associated with lower generic drug prices."[4]  Because of this, FDA-approved generic drugs generally gain sales rapidly.  As more generic drugs enter the market, all else equal, the price of those drugs should progressively decrease, resulting in lower costs for purchasers, like the Express Scripts Purchasers and Cigna Pharmacies.  These cost reductions were the intent of Hatch-Waxman's expedited generic approval pathway.

78.    Because each generic version of the same RLD is readily substitutable for another generic, the products behave like commodities; price is the primary differentiating feature, and the basis for competition.[5]  Generic competition, therefore, when functioning in a market undisturbed by anticompetitive forces, reduces drug costs and drive prices down.

_____

[4]    U.S. Food & Drug Admin., *Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices* 2 (Dec. 2019), *available* at https://www.fda.gov/about-fda/about-center-drug-evaluation-and-research/generic-competition-and-drug-prices.

[5]    *See, e.g.*, Federal Trade Commission, *Authorized Generic Drugs:  Short-Term Effects and Long-Term Impact,* at 17 (Aug.  2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on

79.     In the United States, a prescription drug may be dispensed to a patient only by a licensed pharmacist pursuant to a doctor's prescription that identifies the drug.  The prescription generally may only be filled with either the innovator brand-name drug identified or an FDA-approved generic equivalent.

80.     Generic competition enables purchasers, including Express Scripts Purchasers and Cigna Pharmacies, to purchase a generic equivalent of a brand-name drug at substantially lower prices.

**B.     The Prescription Drug Distribution System**

81.     Generic manufacturers compete with one another to sell the drugs they produce directly to wholesalers, distributors, retail pharmacy chains, mail-order and specialty pharmacies, and hospital chains.  Competition among generic drug manufacturers is dictated largely by price; as such generic manufacturers do not generally differentiate their products in other ways. Consequently, generic drugs are usually marketed only by the name of the active pharmaceutical ingredient.

82.     Generic manufacturers often report list prices for generic drugs that they offer, including the average wholesale price ("AWP") and wholesale acquisition cost ("WAC").  The AWP and WAC can serve as pricing benchmarks, but given the different characteristics of various buyers and individual negotiations, manufacturers may supply the same generic drug at varying price points depending on the size or type of customer.

---

the basis of price."), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short- term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf; U.S. Cong. Budget Off., *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry* (July 1998), *available at* https://www.cbo.gov/sites/default/files/105th- congress-1997-1998/reports/pharm.pdf.

83.     Wholesalers and distributors purchase pharmaceutical products from manufacturers and distribute them to a variety of customers.  Wholesalers and distributors normally pay lower prices to acquire generics than the corresponding brand-name drug.

84.     Pharmacies—including the Express Scripts and Cigna Pharmacies—purchase drugs, including the Subject Drugs during the relevant period, either directly from manufacturers or from wholesalers/distributors.  Pharmacies generally pay lower prices to acquire generic drugs than to acquire the corresponding brand-name drug.

85.     Insurance and benefits plans—including the Cigna Plans—administer prescription drug benefits and/or provide prescription drug coverage.  When pharmacies sell generic drugs to insureds, plans administer and/or pay claims for generic drugs to pharmacies.

**C.     The Market for Generic Drugs is Highly Susceptible to Collusion**

86.     Defendants' anticompetitive conduct is a *per se* violation of Section 1 of the Sherman Act, as it constitutes a conspiracy to fix, increase, stabilize, or maintain prices, allocate customers and markets, and rig bids for generic pharmaceuticals.  Therefore, Cigna is not required to define relevant markets.  However, there are certain features characteristic of the markets for generic drugs that indicate they are susceptible to collusion and that collusion caused the price increases.

87.     Factors showing that a market is susceptible to collusion include:

        a.     High level of industry concentration:  A small number of competitors control roughly 100% of the markets for each of the Subject Drugs.  Beginning in 2005, the generic pharmaceutical market has undergone remarkable and extensive consolidation.  As a result, for most of the Subject Drugs, there were between two and four manufacturers providing that drug for sale in the United States during the relevant time period, rendering each market sufficiently concentrated to carry on collusive activities.

b.      Sufficient numbers to drive competition:  While the market for each of the Subject Drugs had a small enough number of competitors to foster collusion, the number of sellers or potential sellers was large enough and the nature of the market otherwise was such that prices should have been at near marginal cost levels absent collusion.

c.      High barriers to entry:  The high costs of manufacturing, developing, testing, securing regulatory approval, and oversight are among the barriers to entry in the generic drug market.  The Defendants here control virtually all of the market for the Subject Drugs and sell those drugs pursuant to FDA approvals granted years before the price hikes began in 2012.  Any potential new entrant would have to go through the ANDA approval process before commercially marketing its product.  This type of barrier to entry increases a market's susceptibility to a coordinated effort among the primary players to maintain supracompetitive prices.

d.      High inelasticity of demand and lack of substitutes:  For many patients, the particular Subject Drug they are prescribed is the only effective treatment.  Substituting other drugs presents risks and challenges, and both patients and physicians are generally unwilling to sacrifice patient well-being for potential cost savings.

e.      Commoditized market:  Defendants' products are fully interchangeable because they are bioequivalent.  Thus, pharmacists may freely substitute one for another.  The primary differentiating feature, and therefore the primary way a Defendant can gain market share, is by competing on price.

f.      Absence of departures from the market:  There were no departures from the market during the relevant period sufficient to explain the drastic price increases.

g.      Absence of non-conspiring competitors:  Defendants have maintained all or virtually all of the market share for each of the Subject Drugs between 2010 and the present. Thus, Defendants collectively have market power in the market for each of the Subject Drugs, which enables them to increase prices without loss of market share to non-conspirators.

h.      Opportunities for contact and communication among competitors: Defendants participate in the committees and events of the GPhA, Healthcare Distribution Management Association ("HDMA"), Efficient Retail Marketing ("ECRM"), Multistate Contracting Alliance for Pharmacy ("MMCAP"), Healthcare Supply Chain Association ("HSCA"), and other industry groups, as set forth below, which provide and promote opportunities to communicate.

i.      Size of Price Increases:  The magnitude of the price increases involved in this case further differentiates it from examples of non-collusive parallelism.  The price increases here are not limited to 5% or even 10% jumps – they are often of far greater magnitude.  A rational company would not implement such large price increases unless it was certain that its conspirator-competitors would follow.

j.      Reimbursement of Generic Drugs:  The generic market has institutional features that make non-collusive, parallel price increases less likely.  These features include insurers' formulary placements and required substitution at the pharmacy level.  As a result, the usual hesitance of a manufacturer to unilaterally raise prices is strengthened in the generic reimbursement system.

## VI.     GOVERNMENT INVESTIGATIONS OF THE CONSPIRACY

88.     Defendants and other generic drug manufacturers' conduct has resulted in extensive and widespread scrutiny by federal and state regulators, including the United States

Department of Justice Antitrust Division, the United States Senate, the United States House of Representatives, and the State AGs.

89.     The DOJ's and State AGs' investigations followed a Congressional hearing and investigation, which itself was prompted by a January 2014 letter from the National Community Pharmacists Association ("NCPA") to the United States Senate Committee on Health, Education, Labor, and Pensions ("Senate HELP Cmte.") and the United States House Energy and Commerce Committee highlighting nationwide spikes in prices for generic drugs.

**A.     Congress Launched An Investigation Into Generic Price Hikes**

90.     In January 2014, the NCPA urged the Senate HELP Cmte. and the House Energy and Commerce Committee to hold hearings on significant generic pharmaceutical price spikes, citing surveys and data from over 1,000 community pharmacists who reported price hikes on essential generic pharmaceuticals exceeding 1,000%.

91.     On October 2, 2014, Senator Bernie Sanders, then Chair of the Subcommittee on Primary Health and Retirement Security of the Senate HELP Cmte. and Representative Elijah E. Cummings, Ranking Member of the House Committee on Oversight and Government Reform, sent letters to 14 drug manufacturers, including Actavis, Apotex, Dr. Reddy's, Endo, Heritage, Lannett, Mylan, Par, Sun, Teva, and Zydus, requesting information about the escalating prices of generic drugs.[6]  More recently on August 13, 2019, Senator Sanders and Representative Cummings sent letters to executives of Mylan and Teva – companies that did not produce documents in response to the 2014 letters – asking for drug pricing information as part of their ongoing probe into the rising cost of generics.

---

[6]     Press Release, U.S. Sen. Bernie Sanders, Congress Investigating Why Generic Drug Prices Are Skyrocketing (Oct.  2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

92.     Senator Sanders and Representative Cummings issued a joint press release, advising that "[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses."  They noted the "huge upswings in generic drug prices that are hurting patients."[7]

93.     On February 24, 2015, Senator Sanders and Representative Cummings sent a letter requesting that the Office of the Inspector General ("OIG") of the Department of Health and Human Services ("HHS") "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[8]  The OIG responded to the request on April 13, 2015, advising it would examine pricing for the top 200 generic drugs to "determine the extent to which the quarterly [AMP] exceeded the specified inflation factor."[9]

94.     In August 2016, the Government Accountability Office ("GAO") issued the GAO Report, a study examining Medicare Part D prices for 1,441 generic drugs between 2010 and 2015.  The study found that 300 of the 1,441 drugs experienced at least one "extraordinary price increase" of 100% or more.  Among the drugs with extraordinary price increases were 47 of the Subject Drugs:  Acetazolamide ER, Amiloride HCL/HCTZ, Amitriptyline, Baclofen, Benazepril HCTZ, Bumetanide, Carbamazepine, Cephalexin, Cimetidine, Ciprofloxacin HCL, Clarithromycin ER, Clobetasol Propionate, Clomipramine, Clotrimazole, Desonide,

---

[7]     *Id.*

[8]     Letter from Bernie Sanders, U.S. Sen., and Elijah Cummings, U.S. Rep., to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), *available at* https://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[9]     Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Bernie Sanders, U.S. Sen. (Apr. 13, 2015), *available at* https://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

Dextroamphetamine Sulfate ER, Digoxin, Diltiazem HCL, Divalproex Sodium ER, Doxazosin

Mesylate, Doxycycline Hyclate, Econazole, Enalapril Maleate, Ethosuximide, Etodolac,

Fluconazole, Fluocinonide, Fluoxetine HCL, Haloperidol, Ketoconazole, Labetalol HCL,

Lidocaine, Methotrexate, Nadolol, Nitrofurantoin MAC, Nystatin, Oxaprozin, Oxybutynin

Chloride, Piroxicam, Pravastatin, Prazosin HCL, Prochlorperazine, Ranitidine HCL,

Theophylline ER, Tobramycin, Trifluoperazine HCL, and Ursodiol.[10]

> **B.      The DOJ Investigates Criminal Generic Drug Collusion**

95.      The DOJ opened a criminal investigation into collusion in the generic

pharmaceutical industry that initially focused on just two drugs and has since expanded.[11]  Most

of the Defendants here have come under DOJ scrutiny.

96.      The DOJ first charged Heritage executives Jeffrey Glazer and Jason Malek with

criminal counts related to price collusion for Doxycycline Hyclate and Glyburide.  The two

pleaded guilty to violating Section 1 of the Sherman Act.

97.      Actavis, Aurobindo, Dr. Reddy's, Endo, Fougera (through Sandoz), Impax,

Lannett, Mylan, Par, Sandoz, Sun, Taro, and Teva admitted to receiving grand jury subpoenas

from the DOJ.  The DOJ executed a search warrant on Mylan.  Perrigo disclosed that its offices

were searched as well.[12]

---

[10]   U.S. Gov't Accountability Off., GAO-16-706, *Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases* (Aug. 2016) ("the GAO Report").

[11]   David McLaughlin and Caroline Chen, *U.S. Charges in Generic-Drug Probe to be Filed by Year-End*, BLOOMBERG MARKETS (Nov. 3, 2016), *available at* https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said- to-be-filed-by-year-end.

[12]   A search warrant will only be issued if DOJ was able to persuade a federal judge that there was probable cause to believe that one or more antitrust violations had occurred, and that evidence of these violations would be found at the corporate offices of Mylan and Perrigo.

98.     A DOJ grand jury subpoena indicates "staff [ ] considered the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[13]

99.     The DOJ has intervened in numerous civil antitrust actions that are now part of the consolidated and coordinated proceedings captioned *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-MD-2724 (E.D. Pa.), stating that these cases overlap with the DOJ's ongoing criminal investigation.

100.    On May 31, 2019, the DOJ released a statement that Heritage admitted that it "conspired to fix prices, rig bids, and allocate customers for glyburide," and agreed to pay $7 million in criminal penalty and civil damages, and to cooperate fully with ongoing parallel investigations into the generics industry.  Heritage entered a deferred prosecution agreement, which "d[id] not include any provision for restitution" "[i]n light of the availability of civil causes of action, and civil cases already filed against Sandoz, including the multidistrict litigation *In Re: Generic Pharmaceuticals Pricing Antitrust Litigation*, Case No. 2:16-md-2724."

101.    In 2020, the DOJ charged former Taro executive Ara Aprahamian with engaging in a criminal conspiracy to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stablize, maintain, and fix prices of, generic drugs sold in the United States, including, but not limited to, clotrimazole cream, desonide ointment, fluocinonide ointment, lidocaine ointment, nystatin triamcinolone cream, and nystatin triamcinolone ointment, in violation of Section 1 of the Sherman Act.

---

[13]    DOJ, ANTITRUST DIV. MANUAL (5th ed. 2015) at III-82.

102.     In February 2020, the DOJ charged former Sandoz executive Hector Armando

Kellum with conspiring to fix prices, rig bids, and allocate customers for generic drugs,

including, but not limited to, the generic drugs Clobetasol and Nystatin Triamcinolone Cream.

Kellum pleaded guilty.

103.     In March 2020, the DOJ entered a deferred prosecution agreement with Sandoz to

resolve charges that Sandoz conspired to fix prices, rig bids, and allocate customers for generic

drugs including Clobetasol (cream, emollient cream, gel, ointment, and solution), Desonide

ointment, Nystatin Triamcinolone cream, Benazepril HCTZ, and Tobramycin inhalation

solution.  The deferred prosecution agreement "d[id] not include any provision for restitution"

"[i]n light of the availability of civil causes of action, and civil cases already filed against

Sandoz, including the multidistrict litigation *In Re: Generic Pharmaceuticals Pricing Antitrust

Litigation*, Case No. 2:16-md-2724."

104.     In May 2020, the DOJ entered a deferred prosecution agreement with Apotex to

resolve charges that Apotex conspired with other generic drug manufacturers to suppress and

eliminate competition by agreeing to increase and maintain prices of pravastatin.  The deferred

prosecution agreement "d[id] not include any provision for restitution" "[i]n light of the

availability of civil causes of action, and civil cases already filed against Apotex, including the

multidistrict litigation *In Re: Generic Pharmaceuticals Pricing Antitrust Litigation*, Case No.

2:16-md-2724."

### C.     State Attorneys General Launch Their Own Investigation

105.     In July 2014, the State of Connecticut initiated a non-public investigation into

suspicious price increases for certain generic pharmaceuticals.  Based on evidence procured

through their own subpoena power, the State AGs filed a civil action on December 15, 2016

alleging a wide-ranging series of conspiracies implicating numerous generic drugs and

47

manufacturers.  *The Connecticut Mirror* reported that the State AGs "suspected fraud on a broader, nearly unimaginable scale," that "new subpoenas are going out, and the investigation is growing beyond the companies named in the suit."[14]  Then-Connecticut Attorney General George Jepsen called the evidence obtained in that investigation "mind-boggling."[15]

106.    Mr. Jepsen confirmed the scope of the State AGs' action in a press release in December 2016:

> My office has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States. . . While the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, we have evidence of widespread participation in illegal conspiracies across the generic drug industry. Ultimately, it was consumers – and, indeed, our healthcare system as a whole – who paid for these actions through artificially high prices for generic drugs.[16]

107.    In their consolidated amended complaint filed on June 18, 2018 ("State AG Complaint No. 1"), the State AGs broadened their case to include fifteen drugs, all of which are Subject Drugs in this Complaint.  At the time, Connecticut Attorney General Jepsen stated that "[t]he issues we're investigating go way beyond the two drugs and six companies.  Way beyond . . . We're learning new things every day."[17]  According to a recent interview with

---

[14]   Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, THE CONN. MIRROR (Jan. 27, 2017), available at https://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big- leagues/.  *The Connecticut Mirror* further reported that the DOJ grand jury was convened in this District shortly after the Connecticut Attorney General issued its first subpoena.  Id.

[15]   *Id.*

[16]   Press Release, Att'y Gen. George Jepsen, Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies (Dec. 15, 2016), *available at* https://portal.ct.gov/AG/Press-Releases-Archived/2016-Press-Releases/Connecticut-Leads-20-State-Coalition-Filing-Federal-Antitrust-Lawsuit-against-Heritage-Pharmaceutica.

[17]   Kaiser Health News, *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices,* THE DAILY BEAST, Dec. 21, 2016, http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round- raised-your-prescription-drug-prices?source=twitter&via=desktop.

Joseph Nielsen, the court-appointed Liaison Counsel for the State AGs in these consolidated

MDL proceedings, "[t]his is most likely the largest cartel in the history of the United States."[18]

108.    On May 10, 2019 the State AGs filed a new complaint focusing on a network of

collusion Teva orchestrated with various other Defendant generic drug manufacturers, named

herein, that led to either artificial stabilization or price increases on over 100 generic drug

products ("State AG Complaint No. 2"[19]), all of which are Subject Drugs in this Complaint.  The

allegations in the Amended State AG Complaint No. 2 were based on "(1) the review of many

thousands of documents produced by dozens of companies throughout the generic

pharmaceutical industry, (2) an industry-wide phone call database consisting of more than 11

million phone call records from hundreds of individuals at various levels of Defendant

companies and other generic manufacturers, and (3) information provided by several as-of-yet

unidentified cooperating witnesses who were directly involved in the conduct alleged . . . ."[20]

109.    As alleged by the State AGs, during the course of their investigation, the State

AGs obtained cooperation from a number of individuals.  The expected testimony from certain

of those individuals will directly support and corroborate the allegations throughout the

---

[18]    Christopher Rowland, *Investigation of Generic "Cartel" Expands to 300 Drugs,* THE WASH. POST, Dec. 9, 2018, available at https://www.washingtonpost.com/business/economy/investigation-of-generic-cartel-expands-to- 300-drugs/2018/12/09/fb900e80-f708-11e8-863c- 9e2f864d47e7_story.html?utm_term=.a838a7f671cd.

[19]    On November 1, 2019, the State AGs filed an amendment to State AG Complaint No. 2 ("Amended State AG Complaint No. 2").

[20]    Amended State AG Complaint No. 2 at ¶ 4.  The State AGs detail their extensive investigatory efforts in Amended State AG Complaint No. 2.  They have compiled over 7 million documents, issued more than 300 subpoenas to telephone carriers, issued over 30 subpoenas to generic drug manufacturers and examined the names and contact information of over 600 drug manufacturer employees, giving the State AGs a "unique perspective to know who in the industry was talking to who, and when" *Id.* ¶¶ 64-65.  The State AGs state they have also corroborated these allegations through cooperating witnesses, including senior executives and employees of many Defendants named here.

Amended State AG Complaint No. 2 and this Complaint.  Some of those cooperating witnesses

include:

        a.      A former pricing executive at Sandoz during the time period relevant to

this Complaint [referred to herein as CW-1];

        b.      A former sales and marketing executive at non-Defendant Rising

Pharmaceuticals, Inc. ("Rising") and Sandoz during the time period relevant to this Complaint

[referred to herein as CW-2];

        c.      A former senior sales executive at Sandoz during the time period relevant

to this Complaint [referred to herein as CW-3];

        d.      A former senior sales executive at Sandoz during the time period relevant

to this Complaint [referred to herein as CW-4];

        e.      A former senior executive at Glenmark during the time period relevant to

this Complaint [referred to herein as CW-5]; and

        f.      Jason Malek ("Malek"), former Vice President of Commercial Operations

at Heritage.

        110.    As alleged by the State AGs, Teva has, at all times relevant to the Complaint,

maintained a live database that it refers to as Delphi where it has catalogued nearly every

decision it has made regarding the products it sells, including those decisions that were made

collusively – which Teva often referred to as "strategic" decisions.  Although the State AGs do

not have full access to that database, they have obtained static images of the database that were

internally disseminated over time by Teva, which were referred to as Market Intel Reports.

Through its review and investigation of some of those reports, in combination with the phone

records, the State AGs have, to date, identified over 300 instances of collusion where Teva spoke

to competitors shortly before or at the time it made what the company referred to as a "strategic" market decision.  A number of those instances are detailed throughout this Complaint.

## VII.    THE GENERIC DRUG MARKET

### A.    The Cozy Nature Of the Industry and Opportunities for Collusion

111.    At all relevant times, Defendants conspired to fix, increase, stabilize, or maintain prices, allocate customers and markets, and rig bids for the Subject Drugs, along with other drugs, which had the actual and intended effect of causing Cigna to pay artificially inflated prices at supracompetitive rates.

112.    In formulating and effectuating their conspiracy, Defendants engaged in various forms of anticompetitive conduct, including but not limited to:

a.    Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of the Subject Drugs in the United States;

b.    Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid-rigging for the Subject Drugs sold in the United States;

c.    Agreeing during those meetings, conversations, and communications to engage in price increases, market and customer allocation, and/or bid-rigging for the Subject Drugs sold in the United States;

d.    Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers with respect to the Subject Drugs sold in the United States;

e.      Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

f.      Selling the Subject Drugs in the United States at collusive and noncompetitive prices; and

g.      Accepting payment for the Subject Drugs sold in the United States at collusive and noncompetitive prices.

113.    The Defendants ensured that all conspirators were adhering to their collective scheme by communicating (1) at trade association meetings and conferences; (2) at private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers; and (3) through individual, private communications between and among Defendants' employees by use of the telephone, electronic messaging, and similar means.

### 1.      Trade Association Meetings and Conferences

114.    Throughout the year, many healthcare entities within the generic drug industry hold multi-day conferences, which representatives from generic manufacturers regularly attend.

115.    Additionally, Defendants and other generic drug manufacturers attend various trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") (now the Association of Accessible Medicine), Efficient Collaborative Retail Marketing ("ECRM"), the Minnesota Multistate Contracting Pharmacy Alliance ("MMCAP"), and the Healthcare Supply Chain Association ("HSCA").

116.    On information and belief, Defendants used opportunities at trade shows and conferences to share competitively-sensitive information concerning upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, and

to implement schemes that unreasonably restrain competition in the United States' market for generic drugs.

### 2.     Industry Dinners and Private Meetings

117.     Many Defendants are headquartered in close proximity, providing them with easy and frequent access to one another.  At least forty-one (41) different generic drug manufacturers have offices located between New York City and Pennsylvania, including, among others, Actavis, Ascend, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Fougera, Glenmark, Heritage, Lannett, Mylan, Par, Perrigo, Sandoz, Sun, Taro, Teva, Wockhardt, and Zydus.

118.     In January 2014, while generic drug prices were soaring, at least thirteen (13) high-ranking executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.  Executives (including Berthold, Falkin, and Ostaficiuk) from Actavis, Aurobindo, Breckenridge, Dr. Reddy's, Lannett, and Sun, among others, attended this particular dinner.

119.     At this dinner and others like it, one company is typically responsible for paying the bill for all attendees.  For example, in December 2013 a Dr. Reddy's executive joked "[y]ou guys are still buying for Mark and I, right?" Another executive responded "Well. . . I didn't think the topic would come up so quickly but. . . we go in alphabetical order by company and [another company] picked up the last bill. . . PS. . . no backing out now!  Its [sic] amazing how many in the group like 18 year-old single malt scotch when they aren't buying."

120.     From September 17-19, 2014, high-level executives from Teva, Apotex, Actavis, Amneal, Lannett, Par, Zydus, and others attended a golfing event at a country club in Bowling Green, Kentucky.  Rekenthaler was in attendance.  Rekenthaler and Apotex's Vice President of Commercial Operations, US and Latin America, Jeffrey Hampton, stayed together in the home of the owner of the packaging company.  By the end of the outing, Ostaficiuk sent an e-mail to the

other attendees, stating "This is a crazy biz but I am grateful to have friends like all of you!!!!
Happy and honored to have you all as 'fraternity brothers.'"

121.    Generic drug manufacturer employees met with their competitors and discussed
proprietary and competitive information at "Girls' Night Out" or "Women in the Industry"
meetings and dinners.

122.    Many "Women in the Industry" dinners were organized by A.S., a salesperson
from Heritage.  In November 2014, Sullivan of Lannett sent A.S. (Heritage) a text message
asking "[w]hen is your next industry women event?  I'm due for a trip out there and I'd love to
plan for it if possible. . ."  A.S. responded:  "There is an Xmas [sic] party at Tanya's house on
Dec 6th.  Yes that is a Saturday.  We do it about once a quarter and usually it is during the week
– this was an exception."

123.    Dinners were also planned around visits of certain out-of-town competitors.
When organizing one of these such dinners, A.S. commented, "Sorry if the meeting/dinner invite
is a little short notice, but Kate Neely of Dr. Reddy's will be in MN on Sept 29th and it would be
a great time for everyone to get together! So much has been happening in the Industry too – we
can recap all our findings from NACDS over a martini or glass of wine!  ☺  Plus the food is
super yummy!"

124.    Several different "Girls Night Out" events were held in 2015, including (1) at the
ECRM conference in February (involving Citron, Dr. Reddy's, Heritage, Lannett, Teva, Upsher-
Smith, and Zydus, among others); (2) in Baltimore in May (involving Citron, Dr. Reddy's,
Heritage, Lupin, and Teva, among others); and (3) at the NACDS conference on August 24,
2015 (involving Citron, Dr. Reddy's, and Heritage, among others).

54

### 3.     Personal Telephone Calls, E-Mails, and Text Message Communications

125.     Representatives of several Defendants with pricing responsibility had frequent telephone calls with representatives of competitors.  Executives at Heritage had at least 513 contacts with executives from Actavis, Apotex, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Teva, and Zydus.  And executives at Teva had at least 1,500 contacts with competitors, including from Actavis, Apotex, Ascend, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Par, Sandoz, and Zydus.  Many of these contacts are described in detail below.

### 4.     Individual Relationships

126.     Each of the individuals described below had their own relationships with contacts at competitor companies that they utilized to allocate markets and raise prices on overlap drugs. Many of these relationships are discussed throughout this Complaint.

127.     Teva's Director of Strategic Customer Marketing, Nisha Patel, met Heritage's then-Senior Vice President Malek when she worked at Amerisource Bergen ("ABC"), which was a Heritage customer that Malek managed.  When Patel moved to Teva in April 2013, she contacted Malek to determine which generic drugs both Teva and Heritage sold so that they could coordinate pricing.  As detailed below, Malek and Patel orchestrated a number of price increases between 2013 and the present—some led by Teva, others by Heritage.

128.     Malek and Patel's relationship was valued and accepted by Malek's supervisors. In April 2014, Malek and Glazer met with the CEO (Satish Mehta) and President (Vikas Thapar) of Emcure, Heritage's parent company, to discuss potential price increases for several drugs. During that meeting, Malek told Mehta and Thapar about his Teva contact, Patel.  Malek, who had been discussing price increases for Nystatin with Patel since mid-2013, told them that Patel

could be a vehicle for communicating with Teva about price increases and customer allocation. Mehta and Thapar approved of Malek's strategy to coordinate prices and allocate customers with Teva.

129.     The following sections profile each of these individuals and their primary contacts at competitor Defendants, including cataloging the number of phone calls and/or text messages exchanged between them.  The charts that follow are limited to certain communications with employees at other Defendants and do not include communications these individuals may have had with executives at competitor companies that are not named in this Complaint.

        a.       *Ara Aprahamian*

130.     Aprahamian is the former Vice President of Sales at Taro.  He assumed that position when he moved to Taro from Actavis in March 2013.  Aprahamian regularly communicated with competitors in furtherance of the conspiracy, including with several of his former colleagues at Actavis, and has established relationships with individuals at many of the Defendants.  For example, between March 2013 and October 2018, Aprahamian exchanged at least 702 phone calls and text messages with his contacts at Sandoz, Glenmark, Teva, Dr. Reddy's, Actavis, Mylan, Wockhardt, Lannett, Amneal, and Aurobindo. [21] On February 4, 2020, Aprahamiam was indicted for "his role in conspiracies to fix prices, rig bids, and allocate customers for generic drugs, and for making a false statement to federal agents who were investigating those conspiracies."[22]

---

[21]   Amended State AG Complaint No. 2 ¶ 1061.

[22]   *Generic Drug Executive Indicted on Antitrust and False Statement Charges*, DEP'T OF JUSTICE (Feb. 4, 2020), https://www.justice.gov/opa/pr/generic-drug-executive-indicted-antitrust-and-false-statement-charges.

### b. David Berthold

131.    Berthold is the Vice President of Sales at Lupin and has held that position since June 2006.  During his tenure at Lupin, Berthold has been the primary person at the company communicating with competitors in furtherance of the conspiracies.  Indeed, Berthold has relationships with individuals at many of the Defendants.  For example, between March 2011 and October 2018, Berthold exchanged at least 3,386 phone calls and text messages with his contacts at Aurobindo, Glenmark, Actavis, Wockhardt, Zydus, Teva, Breckenridge, Mylan, Sandoz, Dr. Reddy's, Amneal, and Lannett.[23]

### c. Jim Brown

132.    Brown is the Vice President of Sales at Glenmark and has held that position since November 2012.  Brown was one of several Glenmark executives that communicated with competitors in furtherance of the conspiracies.  Although not as prolific in his communications with competitors as some of the other individual Defendants, he did communicate when necessary to further the agreements.  For example, between June 2012 and August 2018, Brown exchanged at least 395 calls and text messages with his contacts at Actavis, Teva, Lupin, Amneal, Wockhardt, Breckenridge, Lannett, Sandoz, Aurobindo, Zydus, Par, Apotex, and Taro.[24]

### d. Maureen Cavanaugh

133.    Cavanaugh was the Senior Vice President and Commercial Officer, North America, at Teva until April 2018.  She is currently the Senior Vice President and Chief Commercial Officer at Lannett.  During her employment at Teva, Cavanaugh knew that her

---

[23]    *Id.* at ¶ 1062.

[24]    *Id.* at ¶ 1063.

subordinates were communicating with competitors about pricing and customer allocation.  In

addition, Cavanaugh maintained her own relationships with certain competitors and coordinated

with them directly when necessary to further the conspiracies.  For example, between January

2011 and August 2017, Cavanaugh exchanged at least 611 phone calls and text messages with

her contacts at Actavis, Amneal, Zydus, Sandoz, and Glenmark.[25]

> e.    *Marc Falkin*

134.    Falkin was the Vice President of Marketing, Pricing and Contracts at Actavis until

Actavis was acquired by Teva in August 2016.  For a period of time, Falkin was also the Senior

Vice President, US Generic Sales, at Teva.  During his employment at Actavis, Falkin was a

prolific communicator in furtherance of the conspiracies and had established relationships with

executives at many of the Defendants.  For example, between August 2013 and July 2016, Falkin

exchanged at least 2,521 phone calls and text messages with his contacts at Zydus, Teva,

Glenmark, Lannett, Aurobindo, Mylan, Lupin, Par, Apotex, Taro, Amneal, Sandoz, and

Wockhardt.[26]

> f.    *Jim Grauso*

135.    Grauso was employed as a Senior Vice President of Commercial Operations at

Aurobindo until January 2014.  In February 2014, Grauso moved to Glenmark and currently

holds the position of Executive Vice President, North America, Commercial Operations.  Grauso

regularly communicated with competitors in furtherance of the conspiracy while he was at

Aurobindo and continued those relationships when he transferred to Glenmark.  For example,

between December 2011 and January 2014, Grauso exchanged at least 1,732 phone calls and text

---

[25]   *Id.* at ¶ 1064.

[26]   *Id.* at ¶ 1065.

messages with his contacts at Lupin, Teva, Actavis, Taro, Zydus, Amneal, Glenmark, Wockhardt, and Breckenridge.[27]

136.    Similarly, after moving to Glenmark, Grauso continued to communicate frequently with his contacts at competitor companies in furtherance of the conspiracy, including his former colleagues at Aurobindo.  For example, between February 2014 and October 2018, he exchanged at least 2,001 phone calls and text messages with his contacts at Lupin, Aurobindo, Zydus, Teva, Taro, Wockhardt, Sandoz, Dr. Reddy's, Amneal, non-Defendant Rising, Par, Breckenridge, Upsher-Smith, and Mylan.[28]

g.    *Kevin Green*

137.    Green worked at Teva as a Director of National Accounts until November 2013 when he took a position with Zydus.  Green is currently the Vice President of Sales at Zydus. Green developed a number of relationships with individuals at many of the Defendants.  He regularly communicated in furtherance of the conspiracy with competitors while at Teva and then carried those relationships over to his time at Zydus.  For example, between January 2010 and October 2013, Green exchanged at least 1,384 phone calls and text messages with his contacts at Zydus, Mylan, Dr. Reddy's, Aurobindo, Lupin, Sandoz, Breckenridge, Wockhardt, and Lannett.[29]

138.    Similarly, when Green became employed at Zydus, he continued to communicate frequently with competitors in furtherance of the conspiracy, including with his former colleagues at Teva.  For example, between November 2013 and August 2018, Green exchanged

---

[27]    *Id.* at ¶ 1066.

[28]    *Id.* at ¶ 1067.

[29]    *Id.* at ¶ 1068.

at least 965 phone calls and text messages with his contacts at Teva, Glenmark, Mylan, Lupin, Aurobindo, non-Defendant Rising, Amneal, Sandoz, Lannett, and Dr. Reddy's.[30]

> h.   *Armando Kellum*

139.    Kellum was the Director of Pricing and Contracts at Sandoz until July 2015. While at Sandoz, Kellum directed his subordinates, including CW-1, CW-2, CW-3, and CW-4, to enter into price fixing and market allocation agreements with competitors.  In addition, Kellum had his own relationships with certain competitors and communicated with those contacts directly when necessary to further the conspiracies.  For example, between May 2011 and April 2015, Kellum exchanged at least 107 phone calls and text messages with his contacts at Lupin, Teva, Upsher-Smith, Zydus, Actavis, non-Defendant Rising, Amneal, and Dr. Reddy's.[31]

140.    As discussed above, in 2020, Kellum pleaded guilty to conspiring to fix prices, rig bids, and allocate customers for generic drugs, including, but not limited to, the generic drugs Clobetasol and Nystatin Triamcinolone Cream.

> i.   *James Nesta*

141.    Nesta started his employment with Mylan in 2000 and is currently the Vice President of Sales at Mylan.  Nesta communicates regularly with his counterparts at many of the Defendants.  For example, between January 2011 and February 2016, Nesta exchanged at least 2,983 phone calls and text messages with his contacts at Amneal, Teva, Dr. Reddy's, Zydus, Aurobindo, Actavis, Lupin, Sandoz, Lannett, Taro, and Par.[32]

---

[30]   *Id.* at ¶ 1069.

[31]   *Id.* at ¶ 1070.

[32]   *Id.* at ¶ 1073.

j.      *Konstantin Ostaficiuk*

142.    Ostaficiuk is the President of Camber and has held that position since 2009.

During his tenure at Camber, Ostaficiuk has been the primary person responsible for furthering

price fixing and market allocation agreements with his competitors.  Indeed, Ostaficiuk regularly

communicated with competitors in furtherance of the conspiracy and maintained relationships

with executives at many of the Defendants.  For example, between March 2011 and August

2017, Ostaficiuk exchanged at least 464 phone calls with his contacts at Amneal, Lannett,

Breckenridge, Aurobindo, Lupin, Teva, non-Defendant Rising, Breckenridge, Taro, Glenmark,

Zydus, Dr. Reddy's, Wockhardt, Sandoz, and Actavis. [33]

k.      *Nisha Patel*

143.    Patel worked at Teva from April 2013 to December 2016, first as a Director of

Strategic Customer Marketing and then as a Director of National Accounts.  As discussed in

great detail below, Patel was in frequent communication with her counterparts at the Defendants

in furtherance of the conspiracy.  For example, during her time at Teva, Patel exchanged at least

1,117 phone calls and text messages with her contacts at Zydus, Sandoz, Actavis, Glenmark,

Taro, Lupin, Dr. Reddy's, Lannett, Par, Apotex, Aurobindo, Mylan, Amneal, Upsher-Smith, and

Breckenridge.  As discussed in various sections of this Complaint, Patel also frequently

communicated with competitors using Facebook Messenger, LinkedIn messaging, and the

messaging application WhatsApp.[34]

---

[33]  *Id.* at ¶ 1074.

[34]  *Id.* at ¶ 1075.

l.    *David Rekenthaler*

144.    Rekenthaler was the Vice President of Sales, US Generics at Teva until April 2015.  Rekenthaler is now the Vice President of Sales at Apotex.  During his time at Teva, Rekenthaler knew that his colleagues, including Green and Patel, were colluding with competitors.  Indeed, Rekenthaler was also in frequent contact with competitors himself and had relationships with executives at nearly all the Defendants.  For example, between January 2011 and March 2015, Rekenthaler exchanged at least 1,037 phone calls and text messages with his contacts at Actavis, Mylan, Par, Aurobindo, Apotex, Zydus, Sandoz, non-Defendant Rising, Amneal, Breckenridge, Lupin, Dr. Reddy's, Glenmark, Taro, Lannett, and Wockhardt.[35]

m.    *Rick Rogerson*

145.    Rogerson was the Executive Director of Pricing and Business Analytics at Actavis until Actavis was acquired by Teva in August 2016.  Rogerson now works at Amneal as a Senior Director of Marketing and Business Analytics.  During his time at Actavis, Rogerson communicated with his contacts at several Defendants in furtherance of the conspiracies.  For example, between February 2010 and July 2016, Rogerson exchanged at least 635 phone calls and text messages with his contacts at Wockhardt, Teva, Dr. Reddy's, Sandoz, Lannett, Glenmark, Taro, and Zydus.[36]

n.    *Tracy Sullivan*

146.    Tracy Sullivan has been employed at Lannett since 2007 and is currently the Director of National Accounts.  Sullivan regularly communicated with competitors in furtherance of the conspiracies and maintained relationships with executives at many of the

---

[35]    *Id.* at ¶ 1076.

[36]    *Id.* at ¶ 1077.

Defendants.  For example, between March 2011 and August 2016, Sullivan exchanged at least

458 phone calls and text messages with her contacts at Zydus, Wockhardt, Teva, Dr. Reddy's,

Par, Amneal, Aurobindo, Mylan, and Breckenridge.[37]

    **B.**    **The Overarching Conspiracy Between Generic Drug Manufacturers –
"Playing Nice in the Sandbox"**

147.    As a result of the cozy nature of the industry, sales and marketing executives in

the generic pharmaceutical industry are well aware of their competitors' current and future

business plans.  This reciprocal sharing of information greatly facilitates agreements among

competitors to allocate markets to avoid price competition.

148.    The overarching conspiracy among generic manufacturers – which ties together

all the agreements on the Subject Drugs identified in this Complaint – is an agreement that each

competitor is entitled to its "fair share."  That term is generally used by the conspirators as an

approximation of how much market share each competitor is entitled to in a Subject Drug or

across multiple Subject Drugs.  "Fair share" is based on the number of competitors in the market,

with a potential adjustment based on the timing of entry or the anticompetitive allocation of

buyers amongst similar or the same competitors in another generic drug market.  Once a

manufacturer has achieved its "fair share," the conspirators generally understood that it will no

longer compete for additional business.  The common goal or purpose of this overarching

agreement is to keep prices high, reduce price competition, and serve as the basis for further

supra-competitive price increases.

149.    This overarching agreement is widespread across the generic drug industry and is

broader than the Defendant manufacturers named in this Complaint.  Cigna focuses here on the

---

[37]  *Id.* at ¶ 1078.

role of these named Defendants and their participation in, and agreement with, this overarching conspiracy as applied to the Subject Drugs, as well as how these specific conspiracies are also part of the larger overarching conspiracy.

150.    The exact contours of this "fair share" understanding, which has been in place for many years (and pre-dates any of the specific conduct detailed herein), has evolved over time during the numerous in-person meetings, telephonic communications, and other interactions between generic manufacturers about specific drugs.  These business and social events occur with such great frequency that there is an almost constant ability for Defendants to meet in person and discuss their business plans.  For example, between February 20, 2013 and December 20, 2013 (a 41-week period), there were at least forty-four (44) different tradeshows or customer conferences where the Defendants had the opportunity to meet in person, some of which are described above.  These in-person meetings gave the Defendants the opportunity and cover to have these conversations, and reach these agreements, without fear of detection.

151.    As described in more detail below, when necessary, this larger understanding was reinforced through phone calls and text messages between the Defendants to discuss "fair share" and the desire to maintain or raise prices with respect to specific drugs.  These types of communications occur with great frequency across the industry, including among Defendants.

152.    For example, from January 1, 2013 through December 31, 2013, senior sales executives and other individuals responsible for the pricing, marketing, and sales of generic drugs at Teva spoke to representatives of every significant competitor by phone and/or text on multiple occasions, totaling over 1,300 phone and/or text message communications.[38]

---

[38]    *Id.* at Table 1.

153.    Of the over 1,300 calls, over 1,200 of them involved Green, Patel, and Rekenthaler of Teva speaking with competitors.  Many – though not all – of those communications involve matters that are addressed throughout this Complaint.

154.    Similarly, from January 1, 2014 through December 31, 2014, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Teva continued to speak to representatives of every significant competitor by phone and/or text on multiple occasions.  For example, there were over 940 calls or text messages between Teva and competitors during 2014.[39]

155.    Of the over 940 calls, over 770 involved Patel and Rekenthaler of Teva speaking with competitors (by this time, Green no longer worked at Teva).  Many – though not all – of those communications involve the Subject Drugs that are addressed throughout this Complaint. It was not just Teva personnel speaking to their competitors, however.  All of these individuals were speaking to each other, when needed, hundreds or even thousands of times to ensure adherence to the overarching conspiracy, as illustrated in the graphic on page 37 of Amended State AG Complaint No. 2.

156.    In order to provide some organizational principle around the massive amount of collusive behavior by the Defendants described in this Complaint, certain sections are centered around the relationships between, respectively, Heritage and its would-be competitors and Teva and its would-be competitors.  However, this organization should not imply that the Complaint is solely concerned with bilateral relationships involving Heritage and/or Teva.

---

[39]    *Id.* at Table 2.

157.     The specific drug agreements often involve overlapping sets of Defendants in communication with each other, all following their agreed-upon "fair share" code of conduct. For example, to view only a small portion of the interlocking, overlapping web of collusion formed by Defendants:  Teva, Taro, and Wockhardt discussed amongst themselves the allocation of the Enalapril Maleate market; Teva and Taro communicated with Sandoz concerning the prices for Ketoconazole cream; Sandoz worked with Mylan to allocate the market for Valsartan HCTZ; and Teva, Mylan, and Par all communicated with each other in the spring of 2014 concerning the market for Budesonide DR capsules.  These are not merely one-off agreements, but evidence of the ongoing, sprawling nature of the Defendants' overarching conspiracy.

158.     The fair share understanding among Defendants dictates that, when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to approximately 50% of the market.  When a third competitor enters, each competitor expects to obtain a 33% share; when a fourth competitor enters, each expects 25%; and so on, as additional competitors enter the market.

159.     When a generic drug manufacturer is the first to enter a particular drug market on an exclusive basis, it is commonly understood that that manufacturer is entitled to a little more than its proportional share of the market.  For example, when Heritage was preparing to launch Zoledronic Acid as the patent on the branded drug was about to expire, O'Mara (Heritage) spoke to Austin (Dr. Reddy's) to "see if he [was] willing to discuss strategy at all." After speaking with Austin, O'Mara stated that "[Austin] views it this way.  If [Dr. Reddy's] are first and others come out after, he deserves 60%.  If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

160.    Conversely, those generic manufacturers that enter later are typically entitled to a little less than their proportional share.  One of the many examples of this occurred in March 2014, when – as discussed more fully below – Lupin entered the Niacin ER market after Teva had previously been exclusive.  Patel of Teva and Berthold of Lupin spoke directly by phone a number of times during this period, including three (3) calls on March 24, 2014.  That same day, Rekenthaler of Teva sent an internal e-mail to Patel stating:  "We should concede Optum then defend everything else.  This should be it for Lupin.  I believe this should be the 40% we were okay with conceding." Here, Teva's expectation to maintain 60% share in a two-player market, after being the first in that market, was consistent with the overarching conspiracy.

161.    Taro went so far as to create a graphic representation of that understanding, taking into account both the number of competitors and order of entry to estimate what its "fair share" should be in any given market:



| | Number of Competitors | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| Order of Entry | 1 | 100% | 60% | 45% | 35% | 30% | 30% | 30% |
| | 2 | | 40% | 35% | 30% | 25% | 25% | 25% |
| | 3 | | | 20% | 20% | 20% | 20% | 20% |
| | 4 | | | | 15% | 15% | 15% | 15% |
| | 5 | | | | | 10% | 10% | 10% |
| | 6 | | | | | | 10% | 10% |
| | 7 | | | | | | | 10% |
| Total | | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Market Share - Fair Unit Share assumptions
Order of Entry Grid
Number of Competitors

162.    Although these general parameters are well-known, there is no precise method for apportioning "fair share" because market share is ultimately determined by the business of various customers, which is inherently somewhat variable.  The shared objective, however, is to

---

[40]    *Id.* at ¶ 129.

attain a state of equilibrium, where no manufacturers are incentivized to compete for additional

market share by eroding price.

163.    This common goal was stated succinctly by Aprahamian, who advised the Taro

Pricing Department in training documents from September and November 2013 that "[g]iving up

share to new entrant (as warranted) shows responsibility and will save us in the long run" and

"[d]on't rock the boat – [g]reedy hogs go to slaughter." As demonstrated throughout this

Complaint, Aprahamian's idea of "responsibility" meant constantly reaching out to competitors

in order to coordinate giving up share to reach a "fair" allocation and keep prices high.

164.    This scheme to reduce competition and allocate "fair share" is typically

implemented as follows.  First, Defendants allocate the market for an individual drug based on

the number of competitors and the timing of their entry so that each competitor obtains an

acceptable share of the market.  Then, the competitors agree on ways to avoid competing on

price and, at times, significantly raise price.  This pattern is frequently followed even in the

absence of direct communication between the competitors, demonstrating the universal code of

conduct Defendants agreed to.

165.    The "fair share" understanding has been particularly effective when a new

competitor enters the market – a time when, in a free-functioning, competitive market for generic

drugs, prices would be expected to go down.  In today's generic drug markets, a new competitor

will either approach or be approached by existing competitors.  Existing competitors will agree

to "walk away" from a specific customer or customers by either refusing to bid or submitting a

cover bid.  The new competitor's transition into the market is seamless; the new entrant is ceded

market share and immediately charges a supra-competitive price.  The competitors then continue

this process of dividing up customers until the market reaches a new artificial equilibrium.  This is referred to as a "stable" market.

166.    "Fair share" principles also dictate how generic drug manufacturers respond when a competitor experiences supply issues.  If the disruption is temporary, the existing competitors will refrain from taking any action that might upset the conspiratorial balance.  By contrast, if the disruption is for a longer term, the competitors will divide up customers until each player achieves a revised "fair share" based on the number of players remaining in the market.  For example, in July 2013, a retail pharmacy customer e-mailed Taro stating that one of Mylan's products was on back order and asked Taro to bid for the business.  Aprahamian sent an internal e-mail stating "Not inclined to take on new business . . .  Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists.  Don't want to overreact to this product.  Not sure how long Mylan is out."

167.    These rules about "fair share" apply equally to price increases.  As long as everyone is playing fair, and the competitors believe that they have their "fair share," the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business.  Doing so is viewed as "punishing" a competitor for raising prices – which is against the "rules."  Indeed, rather than competing for customers in the face of a price increase, the would-be competitors often use this as an opportunity to follow with comparable price increases of their own.

168.    For example, in May 2013, after a Glenmark price increase on a number of different drugs (discussed more fully below), Teva was approached by a large retail customer requesting a bid for several drugs.  Green immediately sought to determine whether this request was due to a competitor price increase, in order to determine what Teva's strategy should be:

On May 29, 2013, at 11:52 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:

> Do you think the Fluconazole Tabs below is due to a recent price increase. I don't have my list here at home. We are in a great inventory position, but not sure I want to steal it on an increase. [41]

169.    Teva declined to bid, only after conversations with its competitors confirmed that the reason for the request was due to a competitor's price increase.

170.    When a generic manufacturer participates in this scheme, and prices stay high, this is viewed as "playing nice in the sandbox."  When a generic manufacturer is "playing nice in the sandbox," it is generally referred to as a "responsible" or "rational" competitor.  For example, in May 2013, R.T., a senior sales and marketing executive at Sandoz, sent an internal e-mail to J.G., another Sandoz senior executive, stating "My sense is that Sandoz is viewed by customers and competition as a respectful/responsible player in the market, which we should be proud of and has taken years to develop.  I would be very careful to destroy this through behavior that is too aggressive or desperation."  Sandoz has since pleaded guilty to conspiring to fix prices, allocate customers, and rig bids for generic drugs in violation of the antitrust laws.

171.    Sandoz, in turn, uses that same terminology to refer to its competitors that are acting in accordance with "fair share" principles.  In internal company presentations throughout 2014, Sandoz consistently referred to Actavis as a "responsible competitor" and Taro as a "very responsible price competitor."

172.    Teva had its own term of art – referring to the competitors it had the most collusive relationships with as "high quality" competitors.  As described more fully below, Teva had long-standing relationships with these competitors, including several of the Defendants, which affected nearly every overlapping drug they sold.  As just one example, Patel of Teva

---

[41]  *Id.* at ¶ 137.

exchanged seven (7) text messages and had two (2) long phone calls with Aprahamian of Taro on June 3 and 4, 2014. After a lengthy twenty-five (25) minute call with Aprahamian on the morning of June 4, Patel sent an internal e-mail to K.G., a Teva senior marketing executive, stating "[w]e should probably discuss how we want to handle all Taro increase items. Taro is a high quality competitor – I think we need to be responsible where we have adequate market share."

173.    Adherence to the agreement regarding "fair share" is critical in order to maintain high prices. Maintaining high prices is the primary purpose of the agreement. If even one competitor does not adhere to the "fair share" agreement,, it can lead to unwanted competition and lower prices. In the relatively few instances where a competitor prioritizes gaining market share over the larger understanding of maintaining "fair share," that competitor is viewed as "irresponsible," and is spoken to by other competitors. For example, in March 2015, Upsher-Smith learned that Sandoz had submitted a bid on a product not identified in this Complaint at one of Upsher-Smith's customers. B.P., a senior account manager at Upsher-Smith, forwarded that information internally stating "I can't believe they have chosen to compete against us since we had this business. How does this help us? We play fair and they don't?"

174.    "Fair share," "playing nice in the sandbox," "rationalizing the market," and similar terminology have become part of the industry lexicon, and thus part of the larger understanding between Defendants. Generic drug manufacturers actively and routinely monitor their fair share and that of their competitors, as well as discuss customer allocation amongst each other within the context of agreements on specific drugs, as set forth more fully below. For example, in July 2013, L.J., a senior marketing executive at Sandoz, sent an internal e-mail identifying 47 products where Sandoz did not have "fair share" of the market. After some back-

and-forth internal joking among Sandoz executives about the idea that Sandoz might actually attempt to compete for business in those markets by driving prices down, Kellum responded by emphasizing the truly industry-wide nature of the agreement:

| | |
|---|---|
| **From:** | Kellum, Armando |
| **Sent:** | Tuesday, July 02, 2013 12:31 AM |
| **To:** | ████████████████████ |
| **Subject:** | Re: Product Sales and Market Share Performance_v17 (3).xls |

Fair Share for all!!!

[42]

175.     The "fair share" agreement is not limited to any one market; these principles constantly inform and guide the market actions that generic drug manufacturers decide to take (or not take) both within and across product markets.  "Fair share" decisions consider factors across multiple generic drug markets.  Customers in one drug market might be traded for customers in another drug market so to create a global "fair share" outcome.  Or a putative competitor may decline to compete meaningfully on a bid for one drug in exchange for the opportunity to provide a pre-determined bid for a different drug.  Or competitors might avoid challenging a price increase on one generic drug based on a *quid pro quo* arrangement from other competitors on different drugs.

176.     Defendants understood that to effectuate a successful price-fixing and market allocation agreement on one drug, they would need to effectuate an agreement across a broad swathe of each Defendant's portfolio of drugs.  If the agreement were limited to one or two drugs, it could more easily fall apart.  For example, an agreement between two Defendants to raise prices or to allocate market share on one drug would not likely hold where those same two

---

[42]    *Id.* at ¶ 143.

Defendants engaged in vigorous price competition on another drug, or where a third

manufacturer not party to that agreement entered the market with an intent to compete on price.

177.    There are many examples of Defendants conspiring across drug markets.  As

detailed below, this is illustrated by Heritage's attempt to impose industry-wide price increases

simultaneously on eighteen drugs, including a number of the Subject Drugs:  Acetazolamide ER,

Doxy Mono, Fosinopril HCL/HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin,

Leflunomide, Nystatin, Paromomycin, Theophylline ER, and Verapamil.  This involved reaching

out to competitors as to each of the drugs to agree on price increases.

178.    Similarly, Teva implemented collusive price increases on several drugs at one

time in a series of price increases detailed below and communicated with certain would-be

competitors as to multiple drugs as part of each such wave of price increases.

179.    Defendants also conspired across drug markets to maintain their market allocation

scheme.  For example, in November 2013, Dr. Reddy's won the "B" slot[43] business at a large

wholesale customer on a product not identified in this Complaint.  Dr. Reddy's had previously

won the "A" slot business at that customer because Mylan had "walked away" from the business.

J.A., a senior account executive at Dr. Reddy's, sent an internal e-mail stating "My concern here

is that [Mylan] will retaliate somewhere else.  I'm unsure of the $ volume, but this would pull

somewhere around 4% share from Mylan, and I don't think they would take that lying down."

180.    Similarly, in October 2013, CW-1, a senior pricing executive at Sandoz, sent an

internal e-mail, including to Kellum, stating that Sandoz had decided not to bid on two drugs not

identified in the Complaint at a large retail customer.  CW-1 explained his reasoning as follows:

---

[43]   Some large customers contract with multiple suppliers – referring to them as primary ("A slot") or secondary
("B slot") suppliers – so that in the event of a supply disruption for a particular drug, there is a secondary source
of supply.

"We have been running up against Mylan a lot lately (Nadolol/Benaz/Hctz), and fear blowback if we take any more products at this moment.  Trying to be responsible in the sandbox."  And in June 2014, Sandoz again chose not to bid at a customer on a product not identified in this Complaint out of concern that Mylan would retaliate.  As CW-1 explained, "I do not want to pursue, I believe this is due to a Mylan increase.  We have a lot of products crossing with Mylan right now, I do not want to ruffle any feathers."  As discussed more fully below, these decisions were made by Sandoz executives as a direct result of communications between the competitors, and in the context of an ongoing understanding between Sandoz and Mylan to fix prices and avoid competition on a number of different drugs, including Nadolol.

181.     A similar scenario occurred in August 2015, when Taro declined to bid on Etodolac ER tablets at a large supermarket chain where Zydus was the incumbent.  Taro voiced concerns internally that Zydus might retaliate and take share from them on another product, Warfarin Sodium tablets.  As C.L., an analyst at Taro, reasoned in an internal e-mail, Zydus "could hit us on Warfarin.  Not worth a fight in the sandbox over 300 annual units for Etodolac."  As discussed more fully below, both Etodolac ER and Warfarin Sodium were drugs where Taro had previously agreed with its competitors, including Teva and Zydus, to fix prices and allocate customers in 2014.  Taro's focus on playing nice in the sandbox was merely an extension of those already-existing agreements.

182.     As these and other examples alleged below make clear, the agreements among generic manufacturers transcend product markets as these companies make decisions not only based on what impact their actions will have in a given product market, but also on how those actions will impact other product markets where the competitors overlap and any future markets where they might eventually compete.

183.     In fact, as explained in more detail below, certain Defendants had long-standing agreements with some of their competitors to limit competition on any products on which the companies overlapped.  For example, shortly after Patel was hired by Teva in 2013, she reached out to CW-1 and asked how Sandoz handled price increases.  Patel explained that she had been hired by Teva to identify products where Teva could increase prices.  CW-1 told Patel that Sandoz would follow any Teva price increases and that Sandoz would not poach Teva's customers after Teva increased price.  CW-1 reiterated his conversation to Kellum, who understood and approved.

184.     As set forth above, generic manufacturers often communicated about, and colluded on, multiple drugs at any given time.  For example, in July 2013, Teva increased pricing on a list of 21 different products.  There was a great deal of internal pressure from management at Sandoz – including from Kellum and CW-1 – to obtain a copy of the Teva price increase list.  As a result, CW- 2 (then a Sandoz employee) reached out to his former colleague, Rekenthaler, the Vice President of Sales at Teva, to obtain a copy of the full Teva price increase list.  Rekenthaler forwarded the list to his own personal e-mail address before then forwarding it to CW-2's personal e-mail address.  Upon receiving the list, CW-2 read it to his supervisor – CW-1 – over the phone.  Notably, the Teva list included a number of products that Sandoz did not even sell.

185.     It was not uncommon for generic manufacturers to communicate with each other about products that they did not sell.  For example, Teva, Wockhardt, and Mylan collusively raised pricing on Enalapril Maleate in July 2013 (discussed more fully below).  After a lengthy conversation with Patel in the midst of the price increases, Aprahamian of Taro (not in the market for Enalapril Maleate at that time) sent an internal e-mail, including to M.P., a senior

Taro executive, stating "[t]here has been some significant changes in the market landscape with this product and I'd like to get product back in Taro label (and fast)." And Taro did move fast. By December 2013, Aprahamian spoke again with Patel, M.A., an account manager at Mylan, and M.C., a senior sales and marketing executive at Wockhardt.  Taro then re-entered the Enalapril Maleate market and matched competitor pricing.

186.    As another example, on January 1, 2013 – the day before a substantial Mylan price increase on a number of items – Green of Teva spoke five (5) times with Nesta of Mylan. The next day, Green spoke with Kellum of Sandoz.  Kellum then sent an internal e-mail to the Sandoz team stating "[j]ust heard from a customer that – Teva and Mylan . . . have raised price on Nadolol to our levels and Mylan took a significant price increase on Levothyroxine.  Let's please be cautious on both these products." Despite the fact that Teva did not sell Levothyroxine, Green still conveyed to Sandoz that Mylan raised price on that product.

187.    Unlike their branded counterparts, generic drugs are commodities and generic manufacturers are constantly making decisions to enter new markets and leave existing markets. Under the conspiracy,  these decisions are often made, at least in part, based on who the competitors are and how strong the relationship is between the two companies.  For example, in July 2013, Sandoz was looking to implement a "Taro Strategy" that involved temporarily delisting ten products that they overlapped on with Taro.  This strategy would allow Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher price.

188.    This agreement between generic manufacturers is further demonstrated by the countless examples of companies sharing sensitive information with competitors as a matter of course.  The State AGs have gathered evidence going back more than a decade of generic

companies routinely communicating and sharing information with each other about bids and pricing strategy.  This includes forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, or at the request of a competitor.

189.    Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price protection, and rebates.  Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of payors and consumers.  For example, in December 2013, Teva was negotiating new price increase language in its customer contracts and wanted some comfort that its competitors had similar language.  On December 23, 2013, Rekenthaler spoke with Nesta of Mylan three times, including a 13-minute call.  Immediately after hanging up the phone with Nesta after the third call, Rekenthaler sent the following e-mail:

> From:     Dave Rekenthaler
> Sent:     Mon 12/23/2013 10:41 AM (GMT-05:00)
> To:       ████████████, Maureen Cavanaugh
> Cc:       Nisha Patel02
> Bcc:
> Subject:  RE: Proposed Price Increase Language
>
> Mylans language is vague.  "Pricing subject to change at Mylan's sole discretion."

[44]

## C.    Generic Drug Price Spikes Since 2013

190.    Against this industry backdrop, the prices for a large number of generic pharmaceutical drugs skyrocketed throughout at least 2013 and 2014.  As Senator Sanders noted, the prices of more than 1,200 generic medications increased an average of 448 percent between

---

[44]    Amended State AG Complaint No. 2 ¶ 158.

July 2013 and July 2014.[45]  An analysis conducted by Sandoz showed that during the calendar years 2013 and 2014, there were 1,487 "large price increases" (increases of the WAC price greater than 100%), of which 12% (178) were increased by greater than 1,000%.

191.    These increases in 2013 and 2014 were staggering compared to prior years.  The following table (which contains information about WAC pricing changes through October 2014 only) demonstrates the surge in the number of large drug price increases per year in 2013 and 2014:

| | Year | Total Number of Increases | Increases Greater than 100% | Increases Greater than 50% |
|---|---|---|---|---|
| | 2010 | 3820 | 125 | 260 |
| | 2011 | 4265 | 255 | 409 |
| | 2012 | 4071 | 223 | 433 |
| | 2013 | 5694 | 739 | 1072 |
| YTD Oct. | 2014 | 4461 | 637 | 1521 |

[46]

192.    A January 2014 survey of 1,000 members of the National Community Pharmacists Association ("NCPA") found that more than 75% of the pharmacists surveyed reported higher prices on more than 25 generic drugs, with the prices spiking by 600% to 2,000% in some cases.

193.    More than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100%.

---

[45]   *Why are Some Generic Drugs Skyrocketing in Price?:  Hearing on S. 113-859 Before the Sen. Comm. on Health, Education, Labor, and Pensions*, 113th Cong. 2 (2014) (statement of Sen. Bernie Sanders, Chairman, S. Subcomm. on Primary Health and Aging).

[46]   Amended State AG Complaint No. 2 ¶ 163.

## VIII.   THE CONSPIRACY:  HERITAGE-RELATED CONDUCT

194.    When entering a generic drug market, Defendants routinely and systematically sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price.  These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

195.    Illustrative examples of these agreements are set forth below, describing specific examples relating to many of the Subject Drugs.

196.    By 2012 the overarching "fair share" conspiracy was well established in the industry, including among the Defendants.  Generic manufacturers replaced full-throated competition with coordination in order to maintain their fair share of a given generic drug market and avoid price erosion.  The structure and inner workings of the agreement were understood and adopted throughout the industry.

197.    Around this time, however, manufacturers began to focus more on price increases than they had in the past.  They were no longer satisfied to simply maintain stable prices – there was a concerted effort by many in the industry to significantly raise prices.  Manufacturers started communicating with each other about those increases with greater and greater frequency.

198.    Starting sometime in 2012 or even earlier, and continuing for several years, competitors would systematically communicate with each other as they were identifying opportunities and planning new price increases, and then again shortly before or at the time of each increase.  The purpose of these communications was not only to secure an agreement to raise prices, but also to reinforce the essential tenet underlying the fair share agreement – i.e., that they would not punish a competitor for leading a price increase or steal a competitor's market share on an increase.  There was an understanding among many of these generic drug

manufacturers – including the Defendants – that a competitor's price increase be quickly followed; but even if it could not be, the overarching conspiracy dictated that the competitors who had not increased their prices would, at a minimum, not seek to take advantage of a competitor's price increase by increasing their own market share (unless they had less than "fair share").

199.    Generic drug manufacturers could not always follow a competitor's price increase quickly.  Various business reasons – including supply disruptions or contractual price protection terms with certain customers that would result in the payment of significant penalties – could cause such delays.  In those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net to ensure that the competitor not seek to take advantage of a competitor's price increase by stealing market share.

200.    Examples of specific collusive price increases on many of the Subject Drugs are set forth below.

A.    **Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion**

201.    When entering a generic drug market, Defendants routinely sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices, and/or avoid competing on price.  These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

202.    The allegations immediately below focus on Heritage's conduct with respect to market entry, while the allegations in Sections IX through XI focus on Teva's conduct in similar circumstances.

1.      **Nimodipine**

      *a.      The Heritage/Sun Agreement*

203.    As of June 2012, Heritage and Sun, through its division Caraco, were the only two competitors in the market for Nimodipine, as Teva had recently left the market.  Heritage saw Teva's departure as an opportunity to raise prices.

204.    In June 2012, Malek asked Sather to contact Caraco to discuss raising the price of Nimodipine.  The resulting conversations reflect an agreement between the two companies to allocate the market and avoid competing on price, while at the same time making overt efforts to increase pricing market wide.

205.    Sather subsequently exchanged numerous text messages and participated in calls with her Caraco contact throughout June 2012.  On June 28, 2012, in an e-mail titled "Caraco", Sather wrote:

> [Sun Senior Sales Manager Susan Knoblauch] brought up nimo[dipine] to her boss [Sun President GP Singh Sachdeva], his only concern was that they get their fair share of the market.  She was not so much help on the pricing discussion- because she does not have much control over it.  All pricing goes through [GP Singh Sachdeva (Sun)] and [GP Singh Sachdeva (Sun)] sets is.  I do not know [GP Singh Sachdeva (Sun)] but [Knoblauch (Sun)] mentioned our discussion with him so I can only hope the ground work has been set.  I reiterated that we would like to see $ go up and we would be fair.

206.    Malek responded:  "Thanks for the info.  Not sure what this means 'his only concern was that they get their fair share of the market.'  They are getting their fair share of the market at a price they don't need to go to is what I wanted to communicate to them."

207.    In her e-mail response, Sather agreed:

> That is exactly how I stated it to [Knoblauch] too! She made it almost seem like he did not care about the price of even this product. She admitted she knew nothing about the item – it is not a big/key

item for them.  I said it is big for us and with only two players it
should command more $.

I'd like to see if [Knoblauch] can communicate back to [GP Singh
Sachdeva (Sun)] and the Nimo[dipine] on the Cardinal RFP (when
it gets closer to the close of the RFP) – specifically mentioning the
pricing we are going at so that Caraco can bring their price up too.
This could demonstrate how communication can and should work
between us to get the $ up.

208.    The same day Sather sent an analysis of the upcoming Cardinal RFP to Malek and

others at Heritage.  The notes section regarding Nimodipine reflected that Heritage should "keep

price high for Caraco."  The plan for Heritage was that it would bid at a high price, which would

be communicated to Sun beforehand, and would allow Sun to raise its price and still retain the

Cardinal business.

209.    On July 20, 2012, Fleming, a Contract Analyst at Heritage, circulated proposed

pricing for the Cardinal RFP which included pricing for Nimodipine that was lower than that

proposed by Sather.  In an e-mail exchange that same day, Sather and Malek discussed raising

prices:

Sather:  My only concern is Nimodipine – and situation with Caraco
and raising our market pricing.  If we don't let them increase pricing
here – will it always be a fight to the bottom with them?

Malek:  I don't have a problem with it but, we need another account.
Who is that account?  They took CVS from us and we let it go and
now they are getting aggressive at public and at GPO's.

Sather:  I understand – I just think the timing is critical if we want
to raise our pricing everywhere.  This Cardinal RFP was mentioned
in previous conversations – and now with NACDS coming – it is a
perfect time to have those off-show conversations with the right
folks and reiterate the 'plan.'  Plus the RFP pricing will not be
effective until Oct 1st – we would have time to discuss our pricing
with Cardinal (and others) before that final date.  Ie:  I think we
could still lowball the Nimo a little later if necessary.

Malek:  If you feel comfortable we can have those conversations and
benefit from this then I agree.  We can talk off line.

> Sather:  If I don't continue the conversations now (and at NACDS)
> and if we lowball right of the gate on the RFP, I think we close the
> door for a long time.

> Malek:  Ok, let's give it a shot.  So we will increase the price, you
> should tell them that so they can do the same without any comp.

210.   That same day, Sather spoke to Knoblauch.  During this and other communications in the succeeding weeks, by text, phone and in-person at NACDS, the two companies reached an understanding about raising the price and avoiding competition for Nimodipine.  Pursuant to the agreement, Heritage provided a cover bid so that Sun would be able to significantly raise its price and still retain the Cardinal business.

211.   Heritage and Caraco were both able to significantly raise prices to other customers as well as a result of this agreement.

212.   When Malek learned that Sun would potentially be subject to FDA recall on Nimodipine, he directed employees to contact their Sun counterparts to inquire about the recall.  A Heritage employee later reported that her contact at Sun was "not aware or [sic] any problems/issues and supply was fine."

213.   Then, on April 16, 2013, after an employee reported that Caraco has not been bidding as it was unsure when it would have product, Malek responded "Great feedback, time for next increase!" But he also followed up with some additional instructions about a week later, expressing his willingness to continue the agreement with Sun when it did re-enter the market: "to make sure if/when they are back [on the market] they talk to us first so we can be smart about it."

214.   On May 23, 2013, Sather again spoke with Knoblauch, who indicated that Caraco may be returning to the market for Nimodipine in June or July.  Sather immediately reported this news to Malek:  "Caraco's Nimodipine has an estimated ship date of June/July but frankly that

looks even too hopeful.  And there's a small rumor they may not come back with it.  A reminder was provided about our recent changes on that item."

215.    This resulted in the following e-mail exchange between the two:

Malek:  OK...Where did you hear this from!!

Sather:  Vendor/friend [Knoblauch]

Malek:  Are they raising theirs?

Sather:  They are not yet but admit it would be nice to

Malek:  Well we would follow in one second.

Sather:  I did say that!

Malek:  hahahahahahaha

216.    During the next year, Caraco did not return to the market.  Heritage was able to continue charging the artificially inflated prices previously agreed to by Caraco, and at times higher prices, as a result – knowing that if Caraco did return to the market, the original agreement between the companies would continue.

217.    This agreement between Heritage and Sun was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

b.    *The Heritage/Ascend Agreement*

218.    In April of 2014, Defendant Ascend received FDA approval to begin producing Nimodipine for sale.  On April 8, 2014, Malek immediately reached out to Ascend's Executive Vice President of Sales and Marketing, John Dillaway, through LinkedIn, asking if Dillaway had "time to catch up tomorrow afternoon or Thursday morning."  Dillaway responded, "I would like to catch up."

219.    On April 22, 2014, Heritage identified Nimodipine as one of eighteen different drugs designated for a price increase.  As discussed below, a large majority of the price increases were to be achieved through collusive efforts.  During a "Price Increase Discussion" conference call with members of the Heritage sales team, led by Malek, Heritage noted that Ascend was going to launch Nimodipine.  Malek took responsibility within Heritage to communicate with Ascend about market shares.  Heritage planned to offer Ascend one-third (1/3) market share, so that Ascend would not compete with Heritage on price.

220.    Malek took this responsibility to communicate with Ascend because he already had a relationship with Dillaway.  The pair had previously met in February 2013.  Malek had also been communicating frequently with Dillaway through the website LinkedIn in the weeks leading up to the April 22, 2014 Price Increase Discussion.

221.    Later in the day after the Heritage "Price Increase Discussion" on April 22, 2014 described below, Malek called Dillaway and the two spoke for nineteen minutes.  Upon information and belief, during this conversation they agreed on a plan where Heritage would raise its prices, Ascend would enter the market at a high price to avoid erosion, and in exchange Heritage would walk away from certain accounts that Ascend had targeted so that Ascend could gain market share at favorable pricing.

222.    On May 9, 2014, Heritage had another internal conference to discuss price increases.  After obtaining buy-in from Ascend during the April 22 telephone call between Malek and Dillaway, Heritage confirmed that it would be raising prices of Nimodipine across the board.  Heritage also identified specific customers that it would "let go" to the "new entrant into market," Ascend.

223.     In June 2014, Malek sought to continue his conversations with Dillaway regarding Nimodipine.  He e-mailed Dillaway on June 6, 2014 seeking to arrange a phone call. After they were unable to connect by phone, Dillaway suggested they meet in person and "grab coffee" at the NACDS conference in Boston.

224.     At the end of June, Heritage implemented the price increase.  Heritage raised the price of Nimodipine to at least twelve customers.

225.     Malek e-mailed Dillaway on October 29, 2014, again asking to "catch up."  The two spoke by phone for ten minutes the next day.  On November 4, 2014, Malek e-mailed Dillaway to "[l]et me know when we re-connect to continue our discussions from the other day." Instead of communicating specifics over e-mail, Malek and Dillaway made plans to have lunch together when Malek returned from India.

226.     Two weeks later, on November 18, 2014, Malek e-mailed Dillaway stating "[j]ust sent you a text.  Fresh back from India.  Wanted to pick up discussions.  Let me know if you can chat." On November 25, 2014, Malek e-mailed Dillaway again asking if Dillaway "had a few minutes to connect."

227.     On January 22, 2015, Malek asked Heritage employee R.S. to reach out to Ascend to see if Ascend had Nimodipine in its warehouse.  Malek stressed that this inquiry should be kept confidential.

228.     R.S. reached someone at Ascend.  By January 24, 2015, Malek was able to inform his sales team that Ascend had Nimodipine in its warehouse.

229.     By May 1, 2015, Ascend had fully launched Nimodipine.  Instead of trying to compete with Heritage upon entry, Ascend's WAC price, per tablet, was even higher than Heritage's.

230.    Notwithstanding this higher pricing per tablet, Ascend began to gain market share throughout the second half of 2015.

231.    This agreement between Heritage and Ascend was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### 2.    Zoledronic Acid

232.    At all relevant times, Dr. Reddy's and Heritage dominated the market for Zoledronic Acid.

233.    Heritage began selling a 5mg formulation of Zoledronic Acid in the spring of 2013, when the product was first coming off patent.  The brand manufacturer, Novartis, had previously marketed two formulations of the drug: a 5mg injection called Reclast®, and a 4mg injection called Zometa®.  Heritage initially sought to launch only on the 5mg formulation. Even before the product was officially launched, Heritage began communicating with its potential competitors in order to divvy up the market and avoid price competition.

234.    On January 21, 2013, Malek e-mailed O'Mara (Heritage) directing him to reach out to Dr. Reddy's, the only other competitor Malek believed would be marketing Zoledronic Acid.  Malek wrote:

> Would like you to have a call with [Austin (Dr. Reddy's)] on Zoledronic.  Right now, only us and DRL have a tentative on the 5mg (reclast).
>
> Need to know if he's going to be there day one and see if he's willing to discuss strategy at all.
>
> This is huge right now if it's only a two player market and we need to lock in our strategy.

235.    In a follow-up communication to O'Mara the next day, Malek outlined what O'Mara should ask Austin:

OK.  Here are the questions if you would.

Are they going to be there day one (March 4)

Have they heard of any others there say [sic] one?

Are they launching the 4mg (Zometa) at risk?[47]

Have they heard of anyone else launching the 4mg at risk?

What's their market share goal?

236.     Through numerous phone calls in late January 2013 between Heritage and

Dr. Reddy's sales representatives, an agreement was reached to allocate the market for

Zoledronic Acid between Heritage and Dr. Reddy's.  As O'Mara described it, "[Austin] views it

this way.  If they are first and others come out after, he deserves 60%.  If he launches with others

on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

237.     Communications between the two companies continued in March 2013 in

preparation for Heritage's market entry, including communications on March 1, 4, 6, 12, and 13,

2013.

238.     As the launch approached, Heritage continued to communicate with Dr. Reddy's

to refine their agreement on market share and initial pricing for Zoledronic Acid, acutely aware

that what they were doing was illegal.  For example, on March 1, O'Mara e-mailed Malek

informing him that he had left Austin a message "to have him call me back."  He added, "Did not

leave anything that would incriminate me—very generic."  O'Mara and Austin then spoke for

almost eight minutes on March 4, 2013.

---

[47]   An "at risk" generic launch refers to a scenario where a generic manufacturer launches product sales after the
FDA has reviewed and approved its ANDA, but while patent litigation is still ongoing.

239.    The March 6 communication arose from Malek's concern that Dr. Reddy's' initial pricing to at least one customer appeared to be lower than he had hoped.  Malek e-mailed O'Mara asking, "[a]ny chance you can talk to them and educate them on supply and demand economics?"  O'Mara's response was "[y]es, they were working on it yesterday, but [I] will give him a call and discuss."

240.    On March 13, M.E., a Senior National Accounts Manager at Heritage, told Malek that he had called his counterpart at Dr. Reddy's about Zoledronic Acid and they would "talk about it soon."  The two spoke on April 3, 2013 and M.E. confirmed that Dr. Reddy's had begun shipping the 5mg product that day and that pricing would be "in the 500 range." The two continued to speak throughout April.

241.    Malek sent a text message to his entire sales team on April 19, 2013, reminding them to keep their discussions out of writing: "Team:  please hold off on emails regarding zoledronic indication, insert, prescribing, etc. take all questions off line."

242.    Heritage and Dr. Reddy's continued to police their market allocation agreement. Whenever there were challenges between Heritage and Dr. Reddy's for specific customers, those disagreements were resolved through direct communications between the companies.  For example, in November 2013, Dr. Reddy's offered a lower price for Zoledronic Acid to one of Heritage's customers.  When Malek learned of this, he e-mailed M.E., "When you spoke to [your counterpart at Dr. Reddy's], weren't they going to chill on share[?]" M.E. replied.  "He told me that he was going to speak to their injectable people and let them know that they should chill."

243.    Despite these occasional challenges, the general agreement regarding market share allocation between Heritage and Dr. Reddy's continued.  For most of 2013 and 2014, the

market remained stable with Dr. Reddy's maintaining roughly 60 percent market share to Heritage's 40 percent for the 5mg Reclast® formulation.

244.    Par entered the market for Zoledronic Acid in late 2013, approximately eight months after Heritage and Dr. Reddy's.  Shortly before entering the market for Zoledronic Acid, Par personnel attended the NACDS Total Store Expo in Las Vegas, which was also attended by personnel from numerous Defendants, including personnel from Heritage and Dr. Reddy's, among others.  When Par entered the market in late 2013, it announced list prices even higher than the Heritage and Dr. Reddy's list prices.  Although it was the third generic manufacturer to enter the market, Par did not undercut Heritage and Dr. Reddy's in price.

### 3.    Meprobamate

245.    In 2013, Heritage and Dr. Reddy's were the only manufacturers for Meprobamate. The two companies had an agreement in place to allocate market share between them and not compete on price.

246.    Heritage decided it wanted to increase price significantly.  On March 21, 2013, Malek e-mailed members of his team that he is "Looking to take a price increase on [mepro]. Only other competition is DRL [Dr. Reddy's].  We don't want to make any waves and we are not looking for additional share, just want to maintain what we have at a minimum of a 4x price. Anyone want to reach out to DRL and communicate to feel out?"

247.    On a call on March 22, the two companies agreed to set and increase prices on Meprobamate.  The agreement was confirmed in an e-mail later that day from a Heritage representative:  "DRL is on board with price increase.  I will fill you in later."

248.    On March 27, 2013, Heritage received a request for a bid from a national wholesaler on Meprobamate that was a Dr. Reddy's customer.  The Heritage employee reported to Malek that "Due to my conversation with [Dr. Reddy's] the other day, I think we should tread

lightly or else bid a high price to show them where we are going."  Malek replied "Unless [the national wholesaler] calls you and asks for supply, I recommend letting the market dry up a bit and showing DRL we stayed away from their business."

249.     In April 2013, Dr. Reddy's approached Heritage to discuss its desire to get additional market share on Meprobamate.  Dr. Reddy's requested Heritage "walk away" from a national pharmacy chain.  On April 24, 2013 Heritage e-mailed the large pharmacy chain that it was increasing Meprobamate prices.  The pharmacy replied that it "made a business decision to name another manufacturer as our primary supplier of Meprobamate tablets."

250.     The following month, Malek told his employee to explain to Heritage "we decided to walk away based on the conversation we had two weeks ago.  This makes the playing field for market share more even and I assume since you were looking for one more customers that you are good now.  Tell him you don't think the team is going to walk from anymore share at this point."

251.     Both Heritage and Dr. Reddy's were able to significantly raise prices across the board – nearly simultaneously – as a result of this agreement.  Heritage's price increases became effective in late April, 2013.  Dr. Reddy's' price increases became effective May 10, 2013.

252.     Over the next several years, the market for Meprobamate remained highly stable, but at supracompetitive levels, as a result of the agreement between Heritage and Dr. Reddy's. Prices and profit margins for the two companies remained very high, due to the lack of competition in the market.

253.     This agreement between Heritage and Dr. Reddy's was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### 4.    Doxy DR

#### a.    The Heritage/Mylan Agreement

254.    Mylan served as the exclusive generic manufacturer in the market for Doxy DR until July 2013 when Heritage entered the market.  Mylan and Heritage then dominated the market for Doxy DR until Mayne entered the market in 2014.

255.    While Mylan held exclusivity over the Doxy DR generic market, prices remained high, as would be expected without competition. Because Mylan was the only manufacturer of Doxy DR in the generic market at that time, pricing for the drug was still very profitable. By 2013, Heritage considered entering the Doxy DR market.  Aware that the entrance of a second manufacturer typically drives down prices, Heritage contacted Mylan before entering the market for Doxy DR to coordinate pricing and market share in alignment with their "fair share" agreement to prevent price from eroding when Heritage entered.

256.    In April 2013, Glazer and Malek traveled to India to meet with two executives of Heritage's parent company, Emcure.  Glazer and Malek met with Satish Mehta, the CEO of Emcure, and Vikas Thapar, the President of Emcure.  The purpose of their trip was to discuss Heritage's plans to enter the Doxy DR market and to coordinate how Heritage and Mylan could minimize competition.  It was decided that Mehta would reach out first to a high-level counterpart at Mylan, Rajiv Malik ("Malik"), in order to facilitate subsequent communications between Glazer and Malek and their Mylan counterparts.

257.    In early May, upon return to the United States, Heritage employees at many levels began to reach out to their counterparts at Mylan to discuss Doxy DR pricing and market allocation.

258.    For instance, On May 3, 2013, Malek asked O'Mara (Heritage) to set up a call between Malek and his counterpart, the Vice President of Sales at Mylan.  The next day, Malek

learned that the Vice President of Sales had little to do with the National Accounts and O'Mara instead provided Malek with contact information for James Nesta, a Vice President and Executive Director at Mylan.  Malek immediately connected with Nesta through LinkedIn. Malek and Nesta communicated by phone on multiple occasions and continued to communicate about various drugs, including Doxy DR.

259.    Additionally, on May 7, 2013, Glazer e-mailed Malik, copying both Mehta and Thapar:  "Rajiv [Malik]:  Would like to schedule a time for a call to catch up and discuss some recent Heritage news.  Please let me know when you are available and we'll pencil it in." Malik responded with a phone number where he could be reached in England and the two spoke the next day.

260.    During their May 8, 2013 phone call, Glazer and Malik reached an agreement to refrain from competing in the Doxy DR market.  Glazer told Malik that Heritage intended to pursue two of Mylan's large Doxy DR customers (wholesaler McKesson and retail pharmacy CVS), who collectively comprised 30% of the market.  Glazer confirmed they would not price aggressively (lower than Mylan) and Malik responded that Mylan would "play fair," agreeing to give up the two accounts to Heritage.

261.    Over the course of several discussions, Malik reached an agreement with Glazer whereby Mylan would give up its accounts with McKesson and CVS based on the understanding that Heritage would coordinate with Mylan to keep prices of Doxy DR elevated.  Malik made clear that Mylan entered this agreement willingly because Heritage had abided by its "fair share" agreements with Mylan in the past on other drugs by allowing Mylan to enter the market without competition.  The competitors understood that this agreement would allow Heritage to gain market share without eroding the lucrative Doxy DR pricing in the market at that time.  Malik

told Glazer he would inform others at Mylan about their agreement.  Similarly, Glazer kept

Malek informed on his conversations with Mylan.

262.    In the months that followed, Mylan surrendered the McKesson and CVS accounts

to Heritage.

(i)      Wholesaler A

263.    In June 2013, Malek met with a senior executive from "Wholesaler A" (believed

to be McKesson) at an HDMA Conference in Orlando to discuss potential product opportunities,

including Doxy DR.  Very shortly thereafter, Heritage submitted a detailed product proposal to

Wholesaler A and Malek continued to reiterate to them Heritage's strong interest in entering a

supply agreement for Doxy DR over the following days.

264.    During that same period, Heritage and Mylan executives remained in touch and

continued to discuss their market allocation scheme during this time.  On June 11, Michael

Aigner, a National Account Manager at Mylan, called O'Mara and spoke for nearly ten minutes.

O'Mara then immediately called Malek to report his conversation, initially leaving a voicemail,

but connecting 15 minutes later for a 7-minute conversation.

265.    On June 18, 2013, a senior manager at Wholesaler A contacted Lance Wyatt, a

National Account Manager at Mylan, to inform him of the unsolicited bid he received from a

new entrant (Heritage) on Doxy DR and offer Mylan the opportunity to submit a bid to retain the

business by June 21, 2013.  This is a customary practice in the industry referred to as "Right of

First Refusal" ("ROFR") and is often included in the terms of supply contracts between

manufacturers and their customers, allowing the incumbent manufacturer an opportunity to beat

a competitor's price and retain the business.  Keeping its agreement with Heritage to cede a

customer, Mylan failed to submit a counter bid to retain the Doxy DR business at the wholesaler.

266.    On June 27, 2013, with no counterbid from Mylan, Wholesaler A entered a distribution agreement with Heritage to serve as the wholesaler's primary supplier of Doxy DR.

267.    To date, Heritage maintains Wholesaler A's Doxy DR business without any competition from Mylan.

(ii)    *The Large Retail Pharmacy Account ("Pharmacy-1")*

268.    In July 2013, Mylan upheld its agreement with Heritage to cede Pharmacy-1 account for Doxy DR.

269.    On July 8, 2013, Heritage submitted a proposal to Pharmacy-1 to bid for Doxy DR business.  Pharmacy-1 rejected the bid the following morning because the pricing was too high.

270.    On July 11, 2013, Heritage e-mailed a revised bid to Pharmacy-1 and lowered its proposed pricing in a continued effort to obtain the Doxy DR business.

271.    At the same time that Heritage was attempting to secure an agreement with Pharmacy-1, both Heritage and its parent company Emcure continued to communicate with Mylan to keep its competitor updated on the company's efforts.  In particular, Heritage wanted to make sure that Mylan was still committed to the agreement and would cede the very important large retail pharmacy account to Heritage if challenged.  To further this effort, Mehta spoke with Malik on July 18, 2013 and then Thapar followed up by e-mailing Glazer, "Satish spoke to Rajiv.  Call me when free." Glazer spoke with Thapar and then e-mailed Malik asking if he had time for a call that day.  Malik responded that he could call Glazer later that evening.

272.    Malik called Glazer, left a voicemail, and Glazer returned the call fifteen minutes later.  They had a 4-minute conversation where Glazer conveyed Heritage's strategy and position about the Pharmacy-1 bid and Doxy DR in general.  Glazer told Malik that Mylan's reaction to

Heritage's bid with Pharmacy-1 would "set the tone of whether this is a high priced item or more erosion."

273.    As set forth more fully below, Mylan's reaction was to cede the business to Heritage and avoid price erosion.  After speaking to Glazer, Malik immediately spoke to certain Mylan employees,.and Mylan ultimately walked away from Pharmacy-1.

274.    On August 6, 2013, Aigner (Mylan) called O'Mara (Heritage) and had a 13-minute conversation.

275.    On August 15, 2013, an executive at Pharmacy-1 contacted Gary Tighe, a National Account Manager at Mylan, to inform him it had received an unsolicited bid for Doxy DR business and provide a short window for Mylan to submit a counter bid to retain the business.

276.    In keeping with its agreement with Heritage, Mylan submitted a counter bid, but only lowered its price by $10, knowing the price adjustment would not be enough to retain the business.  Pharmacy-1 contacted Tighe again later that day to notify him Mylan's price reduction would not be enough to maintain the business and offer Mylan a second opportunity to lower its price.  Tighe responded that he would let Pharmacy-1 know by morning if Mylan intended to submit a revised bid.

277.    Mylan declined to submit a revised bid to retain the Doxy DR business at Pharmacy-1.  As a result, in September 2013, Pharmacy-1 awarded the agreement to Heritage to serve as the retailer's primary supplier of Doxy DR.

278.    To date, Heritage still maintains the Doxy DR business at Pharmacy-1 without any competition from Mylan.

*(iii)     Other Customer Accounts*

279.    Even after Heritage obtained the Doxy DR business at the two former Mylan accounts, the competitors continued to coordinate their efforts to maintain artificially high prices for Doxy DR. In furtherance of that goal, on several occasions, Heritage walked away and/or refrained from competing with Mylan for the Doxy DR business at other customer accounts so as not to upset the market share understanding between the two companies.

280.    For example, on November 25, 2013, after Mylan sought to protect its business with another large account, Malek wanted to check in with Mylan to see if this was an account they intended to keep as part of the market re-allocation agreement before soliciting the business. On November 25, 2013, Malek tasked O'Mara (Heritage) to check in with Mylan.  Malek e-mailed O'Mara, "can you reach out?" and O'Mara responded:  "I have tried with [Aigner (Mylan)] and nothing.  Will try again."

281.    Malek also e-mailed Glazer, suggesting Heritage expected an agreement to transfer one more account from Mylan to Heritage, "Mylan is trying to protect [the one large account at issue].  We should reach out to rajiv [sic.] [Rajiv Malik (Mylan)], we need one more account and we are done." Heritage clearly sought to gain Mylan's permission before taking any action that might disrupt their market share agreement.

282.    After conducting the evaluation, Heritage determined not to risk altering the Doxy DR market-share balance between the two companies and, thus, declined to further pursue the Doxy DR business at the large retailer.

283.    As a result of Heritage's unlawful agreement with Mylan, pricing for Doxy DR has been substantially higher than it would have been in a competitive market.

284.    This agreement between Heritage, Emcure and Mylan was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

b.    *The Heritage/Mayne Agreement*

285.    In February 2014, a new competitor, Mayne (formerly Midlothian Labs) entered the Doxy DR market.  Even before launching their product, Mayne approached Heritage to discuss its plan, recognizing that it would need to establish an agreement to coordinate a re-balancing of market share for each company.  On January 7, 2014, Gloria Peluso-Schmidt, a Director of National Accounts for Mayne, called Sather, a National Account Manager at Heritage, for 12 minutes and Mayne agreed not to compete with Heritage in the Doxy DR market.

286.    Mayne's initial strategy was to target Mylan customers because Mylan held approximately 60% of the Doxy DR market at the time.  This proved to be difficult, however, without an agreement yet in place with Mylan.

287.    For instance, Mayne bid on a large wholesaler currently held by Mylan.  The wholesaler asked Heritage to submit a competing bid as well, but Heritage declined, consistent with their arrangement not to compete against Mylan.  Mylan retained the business and Mayne's Executive Vice President of Generic Products, Chris Schneider, provided Peluso-Schmidt his assessment of the situation based on his experience in the industry:  "How I read this is Mylan has given up several large customers to Heritage and they are not giving any more.  We need to go after business at Heritage also." Peluso-Schmidt replied "Perhaps. . . ."

288.    Paluso-Schmidt maintained conversations with Sather about Doxy DR as she continued to pursue a customer base for Mayne.  They spoke by phone on March 13, 2014 and again for 17 minutes on March 17, 2014.

289.     After her conversation with Paluso-Schmidt on March 17th, Sather e-mailed

Malek and others at Heritage to recount their latest conversation and the understanding they

reached.  In an e-mail titled "Midlothian [Mayne] intel on Doxy DR," Sather stated:

> I just spoke with [G.S.] of Midlothian (Mayne Pharma) about Doxy
> DR. She is the "one-man" show for that company -- she has all
> accounts including GPOs.  She has not been able to get much share
> on the product yet, so she says.
>
> She did not bid OneStop, we have that customer.  She did not bid
> Optisource, we have that customer, and she was aware that Rick had
> no interest in switching.
>
> She has been shut down at WalMart (Walmart said they couldn't go
> back to Mylan to reduce price again after we bid); and she was shut
> down at Rite Aid, Cardinal and ABC -- stating Mylan does not seem
> to want to give up any share.  I shared info that we chose not to bid
> at Cardinal when asked.
>
> She will be bidding it on the HD Smith RFP.  She will be targeting
> M&D now.  She may go after NC Mutual but the usage is very small
> there.  She already has some GPO business and they already have
> Publix and WinnDixie business.  (Important for tracking reports).
> They are nowhere near a contract with WAG yet so she feels like
> that is not an option.
>
> She is feeling pressure from the Mayne Pharma folks to get some
> share on this product asap.  I let her know what accounts we had
> locked up -- and I got the impression she would not target those
> folks.

290.     Malek replied "[t]hanks for the notes below.  How well do you know [Paluso-

Schmidt]?"  And Sather responded, "I know her pretty well from over the years in the industry."

291.     Two weeks later, however, Heritage learned Mayne made an unsolicited bid for

Doxy DR to one of Heritage's large retail pharmacy accounts.  Malek e-mailed Sather on March

31, 2014, saying Mayne "[t]ook a shot at our doxy dr [at the large pharmacy account].  Can you

reach out?" Sather (Heritage) responded "Yes - I can."

292.    On April 1, 2014, Sather spoke with Paluso-Schmidt for 27 minutes, then immediately texted Malek:  "[s]poke with [Paluso-Schmidt] of Midlothian.  Said she had to go to [the large pharmacy customer].  Just got declined at Walgreens and went back a second time to cardinal and got declined again."  Malek replied, insisting that Heritage "can't walk from [the large pharmacy customer].  Tell her to try Walmart."

293.    Paluso-Schmidt and Sather spoke again the next day for 11 minutes.  Malek also e-mailed Glazer, relaying the news about Mayne and their status with the pharmacy:  "[w]e are going to have to take doxy dr 30% lower at [the large pharmacy customer].  They don't pick up the phone for less than 20% difference.  In this case, we spoke with Midlothian and they have struck out completely on getting share.  They have gone to wag [Walgreens] and cah [Cardinal Health] twice and mylan won't budge.  Please let me know your thoughts."

294.    Paluso-Schmidt and Sather spoke again on April 9, 2014 for three minutes. Sather then reported their conversation to Malek and O'Mara:  "Just got a call from [Paluso-Schmidt] at Midlothian and she said she has offers in to One Stop and Econdisc."

295.    On April 10, 2014, Paluso-Schmidt and Sather exchanged a series of text messages.  Sather told Paluso-Schmidt that Heritage would "protect" the accounts they don't currently hold because they are "strategically aligned" with both, implying their ongoing agreement with Mylan:

> (1:14 p.m.) <u>Sather</u>:  Hi! It is [Sather]! Just getting back to you on our discussion yesterday.  I don't have either account but my boss said since we are strategically aligned with both they will probably not move.  We will protect.  Sorry – I know it is not the news you wanted to hear.

> (1:16 p.m.) <u>Paluso-Schmidt</u>:  Thanks.  Had he given up CVS we would not have gone after the other two.  We'll just keep going back as soon as we can.

(1:18 p.m.) <u>Sather</u>:  I am bummed for you.  I am keeping my ears open to understand the landscape too.  I will let you know what I find out.  Best bets are the RFPs that are out now.

(1:19 p.m.) <u>Paluso-Schmidt</u>:  Need volume.  Need one Large account.

296.    Mayne continued to pursue large customers for several months and Heritage walked away from one account in May 2014 when Mayne underbid Heritage's price.  Upon learning of Mayne's bid, Keith Fleming, Associate Director of Pricing and Contracts at Heritage, asked Malek, "[l]et me know what you want me to do on this.  Would like to keep, but at the same time, Midlothian will keep going after accounts."  Malek replied, "[w]e will walk."

297.    In November 2014, Mayne again placed bids with McKesson One Stop (a wholesaler) and Econdisc (a GPO that represents the Express Scripts Purchasers and several other businesses that purchase generics).  On November 20, 2014, Matthew Edelson, a Senior National Account Manager at Heritage, e-mailed Malek and others at Heritage, conveying that "Midlothian has taken another shot at our business on the Doxy 150mg at Econdisc and we have to respond to this in a timely manner."

298.    The next morning, Sather sent a text message to Paluso-Schmidt:  "Happy Friday! Do you have a minute to talk about Econdisc?"  Paluso-Schmidt (Mayne) responded, "Yes.  Call me."  Sather called Paluso-Schmidt and the two spoke for 15 minutes.

299.    Sather asked Paluso-Schmidt what her goals were for Doxy DR and Paluso-Schmidt responded that Mayne was looking for market share and needed a "big customer like Econdisc."  She explained Mayne submitted an offer to McKesson 10 days earlier and Sather suggested that Heritage might be willing to walk from Econdisc if Mayne agreed to withdraw its offer from McKesson and not to price Doxy DR aggressively.

300.    Right after her conversation with Paluso-Schmidt, Sather e-mailed Malek with the subject, "spoke with [Paluso-Schmidt]" and saying "[c]an discuss any time."  Sather conveyed her conversation to Malek and exchanged several text messages and voicemails with Paluso-Schmidt over the course of the day.

301.    Later that afternoon, November 21, O'Mara e-mailed Malek and others at Heritage, saying "Midlothian coming after us @ McKesson.  Will discuss with you on Monday." Malek immediately forwarded the e-mail to Sather, who responded, "[Paluso-Schmidt] and I played phone tag after I had spoken to you for the second time so we will definitely connect Monday."

302.    On November 24, 2014, Sather and Paluso-Schmidt connected and spoke for 6 minutes.  Sather then e-mailed Malek with an update, "Just spoke with her ...  can you call me anytime?" After speaking with Malek, Sather formally offered Paluso-Schmidt an agreement via text message:  "If you retract McK[esson] - we will give up Econ[disc].  I can talk anytime."

303.    On November 25, 2014, Malek e-mailed Sather asking "[d]id you speak with [Paluso-Schmidt]?"  Sather responded "Yes -- told her exactly what we talked about.  She is on vacation this week but was going to try to rescind McKesson. . . ."  Malek ended the conversation by saying "[s]ounds like we know what we need to do."

304.    In the weeks following, Glazer confirmed through internal e-mail communications that Heritage was "walking away from one [customer] so pricing would stabilize" and that Heritage "wanted to give Midlothian [market] share so they stop eroding" the price for Doxy DR.

305.    Communications between Sather and Paluso-Schmidt continued throughout December, including text messages and an in-person meeting at the American Society of Health-System Pharmacists ("ASHP") conference on December 9, 2014.

306.    Econdisc put the Doxy DR business out to bid again in January 2015 and Heritage intentionally bid higher than Mayne, providing a "cover bid" and fulfilling Heritage's agreement to "walk away" from Econdisc.  In March 2015, a Heritage employee confirmed this, saying "[w]e basically walked from Doxy DR" at Econdisc.

307.    The agreements between Heritage, Mayne, and Mylan on Doxy DR business and pricing continued and all three companies held the understanding that they would refrain from competing on market share and eroding price.  In September 2015, a large nationwide pharmacy chain approached Heritage requesting a bid on Doxy DR. Sather confirmed internally that Heritage had the capacity to bid, but Malek cautioned that "[w]e need to know why this is out to bid and find out who the incumbent is" before providing a response.

308.    Upon learning that Mayne served as the incumbent supplier, Sather contacted Paluso-Schmidt.  Paluso-Schmidt conveyed that Mayne had no supply issues and that the pharmacy chain was simply shopping for a better price.  Keeping with their agreement, Heritage refused to provide a bid.  Sather sent a follow-up text message to Paluso-Schmidt reiterating Heritage's intent to keep their agreement, "Confirming we are not bidding."  Paluso-Schmidt replied, "Thank you."

309.    This agreement between Heritage and Mayne was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

310.    In a competitive market, Heritage and Mayne's entry into the Doxy DR market should have spurred price competition across all customers and lowered market prices.  Instead, by allocating large accounts, Mylan and later Heritage were able to stabilize Doxy DR prices across the market at supracompetitive levels.

311.    These Defendants also maintained their communications at trade association events throughout this period, providing them ample opportunity to coordinate pricing and market share agreements in-person.  Key pricing executives from Heritage, Mayne, and Mylan all attended the Feb. 20-22, 2013 GPhA Annual Meeting in Orlando, Florida.  And key pricing executives from these three companies attended the October 28-30, 2013 GPhA Fall Technical Conference in Bethesda, Maryland.

312.    NADAC data confirm that average market prices for Doxy DR increased dramatically between November 2012 and February of 2014 and remained artificially high thereafter.  Pricing for various dosages are depicted below.



5.      **Hydralazine HCL**

313.    Although not arising in the context of market entry, Heritage engaged in conduct similar to that alleged above in connection with Hydralazine HCL.

314.    Heritage agreed with another generic manufacturer that is not a Defendant in this Complaint to allocate customers for Hydralazine HCL pursuant to the larger fair share agreement alleged throughout this Complaint.

B.      **Agreements to Fix Prices**

315.    In addition to reaching agreements with competitors to allocate markets in connection with entry of a new competitor, Heritage and the other Defendants routinely sought and obtained agreements with competitors to fix and raise prices.

316.    This was often done by "socializing" a competitor to a price increase.  This involved a generic manufacturer such as Heritage reaching out to competitors to first raise the possibility of a price increase, and then obtaining an agreement to join the price increase or that the competitor would not take advantage of the proposed price increase by bidding to take the initiating manufacturer's customers.  Such an agreement would allow each competitor to maintain its market share and avoid competition despite the price increase.

317.    Often, a generic manufacturer such as Heritage would identify a large group of drugs for which it would like to increase prices, and then seek to socialize its competitors to obtain their agreement as described above for as many of these drugs as possible.  Heritage engaged in such collusive multi-drug price increases, as set forth immediately below.  Teva also engaged in such collusive multi-drug price increases, as set forth in Sections IX through XI below.

1.      **Doxycycline Monohydrate (2013)**

318.    In February 2013, Heritage learned from a customer that demand for some Doxycycline products was increasing and wanted to use this as a pretext to raise the prices of Doxy Mono. Heritage reached out to its competitors in the Doxy Mono market – Lannett, Mylan, and Par – to discuss and form agreements on price increases and prevent loss of market share.

319.    On March 7, 2013, Sather spoke to Tracy Sullivan, the Director of National Accounts at Lannett, for fourteen minutes.

320.    On March 13, 2013, Sather e-mailed Sullivan, saying "Hi! I just had a question for you on Doxycycline Monohydrate.  Would you have a chance to chat today? Or tomorrow? Let me know a convenient time for you. . ."  Later that day, they spoke for five minutes and discussed Heritage's intent to increase Doxy Mono prices.

321.    On March 17, 2013, Malek e-mailed himself a spreadsheet of various items for him to follow-up on, including "Price Increases:  Take Doxy Mono up more than 3x asap."  On March 21, 2013, Malek e-mailed Glazer that he intended to increase the price for Doxy Mono by as much as four times the current price and asked for Glazer's thoughts.

322.    On March 25, 2013, Malek e-mailed his sales team, indicating that Heritage would be "taking a price increase in the market this week" for Doxy Mono and another drug. Heritage continued to contact its Doxy Mono competitors throughout 2013.  Sather spoke, texted, and met in person with several different Lannett employees during this time.

323.    On March 25, 2013, Sullivan e-mailed her boss relaying news of the price increase Heritage intended to institute.  The e-mail was titled "Recap" and in it she claimed to be "[w]orking on a WAC & SWP review" for certain drugs, including Doxy Mono, but heard that "there will be a price increase on Doxycycline from Heritage soon.  We are waiting to find out

when and why." Sullivan and Sather continued to communicate through numerous phone calls, text messages, and in-person meetings over the next several months.

324.   On April 25, 2013, Sather called Sullivan and left a message.  When Sullivan returned the call the next day, they spoke for approximately eight minutes.

325.   In April 2013, as outlined above, Malek and Glazer traveled to India to meet with Mehta and Thapar of Emcure, where they discussed how Heritage could implement price increases without instigating competition, particularly in the Doxy DR market.  Afterward, Mehta contacted Malik of Mylan, a competitor in both the Doxy DR and Doxy Mono markets, to facilitate communications between Mylan and Heritage counterparts.

326.   Continued communications between Doxy Mono competitors often overlapped with trade association meetings they attended together.  For example, on May 13, 2013, Sullivan and Sather spoke for approximately six minutes and the next day, they attended a conference together where they discussed Doxy Mono.

327.   On May 14, 2013, Sather and Sullivan exchanged text messages to coordinate time to speak at the conference, which confirmed plans for a "market wide increase," seemingly in Doxy Mono:

> Sather:  Meeting in parking lot at Cardinal at 5:45 to carpool over. Can meet you at Cardinal then or at the bar? Should be to bar a little after 6.
>
> Sullivan:  I have a conference call in a half hour about a market wide increase.  I might have to meet you at the bar.
>
> Sather:  Ok sounds good – see u there
>
> Sather:  Is it doxy mono?
>
> Sullivan:  Headed over now.

328.     Subsequently, on June 4, 2013, Sather reached out to Grace Wilks, Director of National Accounts at Lannett by phone and text message.  On June 5, 2013, Sather, Wilks, and Sullivan attended the the HDMA June 2-5 Business and Leadership Conference in Orlando, Florida, during which Sather and Sullivan exchanged numerous calls and text messages.  Key executives for generic sales and pricing from Mylan and Par also attended the same conference.

329.     Heritage, Lannett, Mylan, and Par agreed to implement their price increases during the summer of 2013 and communicated frequently throughout this period, including the days surrounding Lannett's June 12 Doxy Mono price increase.

330.     During this same time period, the four competitors selling Doxy Mono were all communicating frequently.  For example, the day before Lannett raised its price on June 11, 2013, O'Mara (Heritage) spoke to Aigner (Mylan) for nearly ten minutes.

331.     Sullivan also communicated regularly with Karen O'Connor, Vice President of National Accounts at Par during this time.  They were friends and saw each other frequently at trade shows and customer conferences, discussing anticompetitive information.

332.     O'Connor communicated frequently with Aigner in June and July of 2013, including several phone calls on June 7, 2013 and June 13, 2013.

333.     O'Connor also communicated frequently with Wilks, including through nine text messages exchanged on June 11 and 12, 2013.

334.     Lannett increased its price for Doxy Mono on June 12, 2013.  One customer contacted Lannett in July of 2013 to request a lower price for Doxy Mono and a Lannett National Account Manager responded, "We just took a price increase on this item effective 6/12/13.  This is our standard pricing across the board going forward.  Any pricing you see out there right now will not be that low for long."

335.    Heritage maintained communications with Lannett and other competitors.  Due to concerns about supply issues, Heritage was slower to raise its prices.  In October 2013, Sather informed a customer that "[w]e are expecting continued supply issues with" Doxy Mono and that "supply will be tight through Oct and Nov."  In a competitive environment, other Doxy Mono competitors would have viewed Heritage's supply problems as opportunities to gain market share.  However, Defendants' "fair share" agreement mitigated any customer losses for Heritage.  To ensure their market share stability, Heritage kept in frequent communication with their competitors, reaffirming Heritage's commitment to their agreement.  For instance, Sather met in person with Sullivan and O'Connor during a conference in Arizona on August 1 and 2, 2013.

336.    A flurry of communications between the four competitors followed throughout August 2013.  As Heritage planned its Doxy Mono price increase, Malek asked Sather to obtain specifics regarding Lannett's price increases.  Accordingly, Sather and Sullivan, while both attending the NACDS 2013 Total Store Expo held on August 10-13, exchanged text messages on August 12, 2013:

> Sather:  From our conversation, [i]ncreasing WAC too?
>
> Sullivan:  Yes
>
> Sather:  When are you guys changing WAC or have u already?
>
> Sullivan:  Are you free at 4:30?
>
> Sather:  Yes—but still need to hang around for 5pm mtg
>
> Sullivan:  OK I'll swing by

337.    Aigner and O'Connor also attended this conference.

338.    On August 13, while still together at the conference, Sather texted Sullivan, saying "Let's connect sometime today—need a little more specifics on the $ we discussed."  Sather also exchanged several text messages and phone calls with Lauren Carotenuto, National

Accounts Representative for Lannett and another conference attendee.  O'Connor, who also

attended the conference, received a text message from Wilks the same day.

339.    Later that evening, the Senior Vice President of Generic Sales at Par (likely Jon

Holden, who attended the conference) sent an e-mail to Par's Vice President of Marketing and

Business Analytics (likely Michael Altamuro, who also attended the conference), reading:  "I

hear that Lannett is taking a price increase on doxy mono and Heritage will follow." The e-mail

was forwarded internally at Par with the instruction:  "FYI. . .we will follow.  . . . No new opps

until we see where pricing ends up."

340.    On August 20, 2013, Sather e-mailed Malek, confirming that Lannett "tripled

WACs and did/will do similar to contract prices."

341.    Mylan and Par announced their price increases for Doxy Mono in the summer of

2013.

342.    By the spring of 2014, Heritage also increased their prices.  On January 23, 2014,

Sather informed a large supermarket chain customer that "I also wanted to let you [know] that

we are looking to take a price increase on all the Doxy Monohydrate skus some time in 2014."

In March 2014, Heritage increased its Doxy Mono prices with at least one customer and on April

22, 2014, Malek held a teleconference with Heritage's sales team to discuss strategy for

increasing prices on eighteen drugs, including Doxy Mono, which was slated for a "big price

increase."

343.    Sather was responsible, among others, for communicating with Lannett about

Doxy Mono. Right after the Heritage conference call on April 22, she contacted three different

competitors and reached pricing agreements covering Doxy Mono and four other drugs

(Glyburide-Metformin, Verapamil, Nystatin, and Paromomycin).  One of those communications included a 29-minute phone call with Sullivan about pricing for Doxy Mono.

344.    O'Mara was primarily responsible for communicating with Mylan and contacted Aigner the next day (April 23) to reach an agreement on price increases for Doxy Mono (as well as Glipizide-Metformin and Verapamil).  Immediately after his conversation, O'Mara e-mailed Malek and Sather, with the subject line "Mylan:"  "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

345.    On May 8, 2014, Malek sent an e-mail to O'Mara asking, "Did you ever to [sic] with [Michael Burton] at Par?"  Par was a competitor with Heritage for two of the target drugs on the list, Doxy Mono and Methimazole.  O'Mara and Burton spoke on the phone on June 2, 2014.

346.    Malek also e-mailed the entire Heritage sales team on May 8, asking for confirmation on everyone's progress on speaking with their competitor counterparts about price increases.  Sather, responsible for communicating with Lannett responded:  "Jason:  I made contact with all my take aways -- with positive results.  I can resend those notes or talk with you on any details."

347.    Sather then attended the MMCAP Conference in Bloomington, Minnesota during May 12-15, 2014, where she met in person with numerous competitors to discuss price increases, including with Sullivan regarding Doxy Mono.  Sather reported back to Malek via e-mail on her success reaching pricing agreements, including with Lannett:  "Hi Jason:  At the MMCAP meeting yesterday, spoke with some other industry reps and found similar like minding on the

pricing strategies we discussed.  Overall, spoke with . . .  Lannett. . . " Par and Mylan executives also attended this conference, including O'Connor.

348.     Sather continued her outreach to other Doxy Mono competitors through joint attendance at conferences.  On June 3, 2014, while attending the HDMA 2014 Business and Leadership Conference in Arizona, Sather met O'Connor and Sullivan for dinner and drinks along with other competitors.  Their continued communications during the price hike implementations provided opportunities to re-affirm their collusive agreements and coordinate pricing.

349.     By way of example, Heritage's IMS NSP price for 50mg Doxy Mono tablets more than tripled between February and July 2013.  Lannett's IMS NSP price for 75mg tablets steadily increased between February and July 2013, more than doubling during that period. Mylan also increased IMS NSP prices for 75mg tablets in the summer of 2013, as its prices nearly doubled from a low in June to a high in November.  Lannett's IMS NSP price for 100mg Doxy Mono tablets approximately doubled between January and August of 2013.  Heritage, Mylan, and Par IMS NSP prices for 150mg Doxy Mono tablets all increased significantly between the spring and fall of 2013.

350.     Between the summer of 2013 and spring of 2014, Heritage, Lannett, Mylan, and Par had ample opportunity to coordinate their price increases and market share agreements in person.  Key pricing executives from at least Heritage, Mylan, and Par attended the February 20-22, 2013 GPhA Annual Meeting in Orlando, Florida.  Key pricing executives from at least Heritage, Lannett, Mylan, and Par attended the June 2-5, 2013 HDMA Business & Leadership Conference in Orlando, Florida; the June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland; the October 28-30, 2013 GPhA Fall Technical Conference in Bethesda, Maryland; the

February 23-26, 2014 ECRM Retail Pharmacy EPPS in Amelia Island, Florida; the May 12-15, 2014 MMCAP National Member Conference in Bloomington, Minnesota; the June 1-4, 2014 HDMA Business & Leadership Conference in Phoenix, Arizona; and the June 3-4, 2014 GPhA CMC Workshop in Bethesda, Maryland.

351.    This agreement between Heritage, Lannett, Par and Mylan was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### 2.    Heritage 2014 Price Increases

352.    In early 2014, Malek held a meeting with Heritage pricing executives, Keith Fleming, Associate Director of Pricing and Contracts, and Daniel Lukasiewicz, Heritage's Senior Manager, Marketing Operations, to ask them to begin analyzing the impact of numerous planned price increases.

353.    On April 15, 2014, Heritage's Jason Malek called Nisha Patel, Teva's Director of Strategic Customer Marketing, to discuss price increases on Acetazolamide ER, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, Theophylline, and others. On their 17-minute conversation, Patel agreed that if Heritage increased the prices for those drugs, Teva would either follow or not challenge Heritage's price increases by underbidding.

354.    Because Teva was already planning a price increase on Nystatin and Theophylline, Malek and Patel agreed Teva would take the lead on those increases.  In subsequent months, Malek and Patel spoke several more times on Heritage's price increases and timing.

355.    On April 22, 2014, Heritage held a "Price Increase Discussion" teleconference in which Malek identified 18 drugs that Heritage would target for increase.  Prior to the call, Malek circulated to his sales team a spreadsheet ("the Heritage list") which listed each drug, the

competitors, and their respective market share.  The Heritage list included Acetazolamide ER, Doxy Mono (which was slated for a "big price increase," as described above), Fosinopril HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline ER, and Verapamil HCl, among others. Malek instructed members of the team to immediately reach out to contacts at each competitor for the drugs on the list and attempt to reach agreement on price increases.  Different Heritage employees were identified as being primarily responsible for communication with different competitors.

356.    The Heritage sales team promptly began to contact their competitors.  For example, Sather communicated with three counterparts at different competitors, reaching agreements with all of them to increase prices.  First, she spoke with Knoblauch (Sun/Caraco) for 45 minutes and agreed to increase prices for Nystatin and Paromomycin.  Then, she spoke to Michael Dorsey, a National Account Manager at Actavis for nine minutes, which led to an agreement to increase prices for Verapamil and Glipizide Metformin HCl.  Finally, she spoke to Sullivan (Lannett) for 29 minutes and they agreed to raise the price of Doxy Mono.

357.    Heritage's O'Mara also reached an agreement on April 23 with his Mylan counterpart, Michael Aigner, Director of National Accounts, to increase the prices of Doxy Mono, Verapamil and Glipizide-Metformin.  O'Mara summarized in an e-mail to Malek and Sather titled "Mylan":  "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone.  They are looking at price increases as well on a number of products."

358.    A few days later, Malek sent an e-mail to Heritage employee D.L. titled "bindo" referring to Aurobindo stating:  "Let me know when you speak with [Paul McMahon, Senior

Director of Commercial Operations at Aurobindo.]"  On the Heritage list, D.L. was charged with responsibility for communication on Fosinopril HCTZ, of which Aurobindo was a competitor. Aurobindo was also a competitor with Heritage on Glyburide and Glyburide-Metformin.  D.L. exchanged numerous voicemails with McMahon on April 28 and 29, 2014.

359.    In addition to Teva, Malek took responsibility for reaching out to Ascend – who, as detailed above, was a new entrant in the market for Nimodipine – and offering Ascend a one-third (1/3) share of the market in exchange for not competing on price.  Following the market-wide "fair share" agreement, as a new entrant into the Nimodipine market, Ascend agreed to enter at a high price to avoid price erosion as set forth above.  In exchange, Heritage agreed to walk away from certain accounts Ascend targeted to help increase Ascend's market share.

360.    On May 8, 2014, Malek sent an e-mail to the Heritage sales team stating:

> Two weeks back we had a teleconference regarding 13 [sic] products where the pricing dynamics may change.
> We each had takeaways, can everyone confirm or not who they have/not spoken with since our call?
> Need to move forward with the plan asap.

361.    Heritage's Matt Edelson, Senior Director of Sales, responded immediately "Spoke with everyone and waiting in [sic] feedback on Mepro[bamate]."  Malek tasked Edelson with communication with Dr. Reddy's on Meprobamate.  He exchanged six text messages with Jake Austin, Director of National Accounts at Dr. Reddy's, on April 24, 2014, and then spoke with Austin on May 6, 2014.

362.    Sather responded:  "Jason, I made contact with all my take aways – with positive results.  I can resend those notes or talk with you on any details." Sather had been tasked with communicating with Lannett on Doxy Mono, Actavis on Glyburide-Metformin and Verapamil, and Sun on Nystatin and Paromomycin, among others.

363.    Also on May 8, 2014, D.L. and McMahon held a 16-minute phone call and then an 18-minute phone call on June 25, 2014.  They spoke again for 3.5 minutes on July 7, 2014.

364.    On May 9, 2014, Heritage held another teleconference to discuss the price increases for the 18 targeted drugs.  During this teleconference, the Heritage sales team shared their results in seeking agreement from competitors to raise prices on the various drugs.

365.    On June 23, 2014, Heritage employees had a "Price Change Call" to discuss the specific percentage amounts by which they would seek to increase the pricing of certain drugs, including drugs for which they had already obtained agreement from all competitors (or potential future competitors), and the strategies for achieving this goal.  The drugs discussed on the call included Acetazolamide ER (75% increase); Paromomycin (100% increase); Glyburide (200% increase); Nimodipine (48% increase); Theophylline ER (150% increase); and Nystatin (95% increase). It was discussed on the call that those six increases alone would amount to an additional $16 million in profit per year for Heritage, assuming no loss in market share.

366.    Malek continued to push Heritage employees to discuss the planned price increases with competitors, and he continued to do the same.  Two days later, on June 25, 2014, Malek spoke with Patel for 14 minutes and informed her that Heritage would shortly be increasing prices for a number of drugs that Teva was a competitor for.

367.    On June 26, 2014, Sather sent a text message to a large wholesaler customer stating:

> As of 7/1 [m]arket wide we are increasing prices on Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTS, Glip/Met, Glyburide and Theophylline ER.  You will see only the Paro and Nimo increases – you have those letters.

368.    Sather quickly followed up:  "Here are the approximate/average $ increases on the other items:  Acetazolamide 75% increase, Fosi/HCTS 200%, Glip/Met 100%, Glyburide 200%, Theo ER...150%."

369.    On July 1, 2014, Malek e-mailed Heritages' sales team:

> Team:
>
> Looks like you are making good traction with our July 1 price increase.
>
> Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.
>
> Please send each day until further notice or until all or [sic] accounted for.
>
> Any questions please call me directly.

370.    In the following weeks Heritage employees continued to reach out to their competitors to obtain additional agreements to raise prices.  Ultimately, Heritage was able to increase prices on at least nine (9) of the drugs: Acetazolamide ER; Fosi/HCTZ; Glipizide-Metfonnin; Glyburide; Leflunomide; Nimodipine; Nystatin; and Paromomycin.

### a.    *Acetazolamide ER capsules*

371.    As of April 2014, Heritage and Teva controlled 78% of the market for Acetazolamide ER capsules.  The only other competitor was Zydus.

372.    As part of the market-wide conspiracy to increase generic drug prices, Heritage began communicating with high-level executives at Teva, a competitor on seven of the Heritage list drugs.  Malek was responsible for obtaining Teva's agreement to the price increases.  On April 15, 2014, Malek spoke with Nisha Patel, Teva's Director of Strategic Customer Marketing for more than 17 minutes to discuss increasing the price of Acetazolamide ER capsules and other drugs.  Patel had already secured Heritage's agreement to support Teva's price increases in

Nystatin and Theophylline.  During the April 15 call, Patel agreed that if Heritage raised prices for Acetazolamide ER capsules, Teva would follow suit or at minimum refrain from competing for Heritage's accounts.  Malek and Patel's conversations would continue through the spring and summer to coordinate and confirm their price increases.

373.    After speaking with Malek on April 15, Teva executives reached out to Zydus executives to coordinate the price increases.  Between April 16 and 17, 2014, Patel and Kevin Green, the Senior Director of National Accounts at Zydus, spoke twice regarding Acetazolamide ER prices, first for approximately 20 minutes, then for 12.  They communicated frequently over the next several months, along with other Teva and Zydus executives, as outlined below.

374.    As set forth above, on April 22, 2014, Malek held a telephone conference call with the Heritage sales team to dictate a pricing strategy that targeted 18 drugs for price increases, including Acetazolamide ER.  In order to implement the price increases without losing customers, Heritage coordinated with competitors to form agreements that prevented competition.

375.    For Heritage, Malek was also responsible for communicating with Zydus.  To coordinate with Zydus, Malek contacted Kristy Ronco, Zydus's Vice President of Sales, on April 24, 2014 through LinkedIn.  Malek wrote:  "Hi Kristy, I hope this email finds you doing well.  I wanted to see if you have a few minutes to chat.  Let me know when you are free."  Ronco responded that day "Hi Jason – I'm out in Arizona.  I can give you a call tomorrow afternoon or call me anytime."

376.    Heritage came to agreements with both Teva and Zydus on price increases and market share.  In an internal Heritage e-mail, Malek confirmed the Acetazolamide ER price-fixing agreements and reiterated that Heritage needed to refrain from bidding on contracts held

by competitors.  Malek previously asked Anne Sather to refrain from responding to a large GPO customer that requested a price quote on Acetazolamide ER.  In e-mails on May 6 and 7, 2014, Malek told Sather that he formed agreements to raise the price of Acetazolamide ER and not to compete on customers.  Malek said, "[w]e have buy in from all to go up..." and Heritage agreed not to reduce its price in response to the request from the GPO customer.  As Malek stated:  "We are going to pass [on reducing the price] and most likely are taking an increase within the next week."

377.    Teva and Zydus also remained in close contact during this time as well.  On May 14, 2014, Jessica Peters, an Associate Director of National Accounts at Teva, exchanged numerous text messages with Ronco.

378.    Defendants had many opportunities to speak in person about their agreements. On May 12-15, 2014, Sather attended the MMCAP National Member Conference in Bloomington, Minnesota.  She used this opportunity to speak in person with a number of different competitors on pricing agreements.  Executives from Teva also attended, such as Nick Gerebi, National Account Manager.  On June 1-4, 2014, Heritage's Sather, Glazer, and Malek all attended the HDMA Business and Leadership Conference at the JW Marriott Desert Ridge in Phoenix, Arizona, along with Teva's Patel and Gerebi and Zydus' Green, among others.  At this conference, Sather met in person for dinner and drinks with O'Connor and Sullivan, as well as Christopher Bihari, Director of National Accounts at Sandoz.  Defendants used these meetings as an opportunity to confirm agreements on pricing and market share.

379.    During these months, Heritage avoided soliciting or bidding on Acetazolamide ER customers supplied by Zydus in order to maintain the artificial equilibrium their conspiracy created.

380.     As set forth above, on June 23, 2014, Heritage held a "Price Change Call" to discuss specific price increases on certain drugs and related strategies, including for Acetazolamide ER, which was targeted for a 75% increase.  According to the discussion, the increases on the six drugs discussed would amount to an additional $16 million in profit per year for Heritage and assumed no loss in market share.

381.     On June 25, 2014, Malek spoke with Patel for approximately 14 minutes, confirming that Heritage would soon be increasing prices for a number of drugs sold by Teva.

382.     On June 26, 2014, Heritage began sending out price increase notices to customers for nine different drugs, including Acetazolamide ER.  Sather sent a text message to a large wholesaler customer:

> As of 7/1, [m]arket wide we are increasing prices on:  Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTZ, Glip/Met, Glyburide and Theophylline ER.   You will see only the Paro and Nimo increases—you have those letters." She followed up with another text moments later, "Here are the approximate/average $ increases on the other items:  Acetazolamide 75% increase, Fosi/HCTZ 200%, Glip/Met 100%, Glyburide 200%, Theo ER. . . 150%.

383.     On July 1, 2014, Malek e-mailed the Heritage sales team with the subject "update - price increase" that read:

> Team:
>
> Looks like you are making good traction with our July 1 price increase.
>
> Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.
>
> Please send each day until further notice or until all or [sic] accounted for.
>
> Any questions please call me directly.

384.    By July 9, 2014, Heritage was able to raise Acetazolamide ER prices to at least 17 customers nationwide.  Heritage, Teva, and Zydus collectively implemented a successful 75% increase on prices for Acetazolamide ER.

385.    This agreement between Heritage, Teva and Zydus was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

                *b.*     *Fosinopril HCTZ*

386.    At all relevant times, Heritage, Aurobindo, Citron, Sandoz, and Glenmark dominated the market for Fosinopril HCTZ.  By April 2014, Heritage had a 47% market share for this drug.

387.    On May 2, 2014, Edelson (Heritage) contacted Glenmark's Vice President of Sales, Jim Brown via LinkedIn.  Heritage's Lukasiewicz spoke with McMahon (Aurobindo) on May 8, 2014 via phone.  That same day, McMahon called Glenmark's Executive Vice President of Generics, James Grauso, and they spoke on the phone.  On May 9, 2014, Aurobindo's Tim Gustafson spoke with Glenmark's Director of Sales and Marketing, Jeff Johnson.  All of these calls were regarding price increases for Fosinopril HCTZ.

388.    That same day, Heritage held another internal call regarding price increases where Fosinopril HCTZ was on the agenda.  Within one month, Anne Sather of Heritage spoke to Aurobindo and Sandoz representatives about the Heritage "price increase strategies" for Fosinopril HCTZ and other generics during an MMCAP conference.

389.    After in-person meetings with Aurobindo's Gustafson and Sandoz's National Accounts Executive, Christopher Bihari, on May 14, Sather confirmed to Malek that the three were of "similar like minding on the pricing strategies we discussed."  The next day, representatives of Aurobindo and Sandoz spoke by phone and texted numerous times.

390.     On June 3, 2014, Sather texted Bihari and invited him to meet with a group of competitors at the Sandbar Restaurant while at an HDMA conference in Phoenix.  This initiated a series of communications during the summer of 2014 that included three calls between Gustafson and Bihari and five calls, and multiple texts, between Gustafson and Johnson. Gustafson would have one final call with Johnson on August 26, 2014, before going radio silent until April 8, 2015.

391.     Heritage's Lukasiewicz and Aurobindo's McMahon spoke on June 25, 2014 via phone, and again on July 7, 2014.

392.     On June 25, 2014, Sather texted Citron's Kaitlin Alexander to find out if Citron was entering the market for Glyburide, but found out that Citron was actually entering the market for both Glyburide and Fosinopril HCTZ.  Sather informed Alexander of the pricing scheme. Then, on July 1, Citron's Executive Vice President of Sales & Marketing, Karen Strelau called Lukasiewicz, informing him that she had been "looped" in on the pricing plan and that Heritage employees should not contact Citron employees via e-mail.  Strelau also told Lukasiewicz that Sather should communicate through Citron's Vice President of Sales, Laura Short, if she had sensitive information about Fosinopril HCTZ or other price increases.  The following day, Short and Sather spoke for over 20 minutes.  Their conversations continued through July and August 2014.

393.     On June 26, 2014, Heritage began sending out Price Increase Notices to its Fosinopril HCTZ customers.  On June 27, McMahon and Grauso spoke twice.

394.     By July 9, 2014, Heritage successfully raised prices on 18 different customers for Fosinopril HCTZ.  That same day, Citron confirmed internally that Heritage had increased its WAC prices for Fosi-HCTZ and two other drugs, and that it (Citron) was trying to match those

price increases.  On July 14, 2014, Strelau and Grauso spoke.  The next day, Citron increased its pricing for Fosi-HCTZ to be in line with the price increases adopted by Heritage.

395.    Sandoz also increased its pricing for Fosinopril HCTZ.  By early January 2015, it was charging twice as much for Fosinopril HCTZ than it had been one year earlier.

396.    This agreement between Heritage, Aurobindo, Citron, Glenmark and Sandoz was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

                        c.    *Glipizide-Metformin*

397.    At all relevant times, Heritage, Mylan, and Teva dominated the market for Glipizide-Metformin.

398.    Malek was responsible for communicating with Teva about Glipizide-Metformin price increases.  On April 15, 2014, Malek discussed with his Teva counterpart their intention and agreement to raise the price of Glipizide-Metformin and other drugs.

399.    O'Mara (Heritage) spoke to Mylan's Michael Aigner on April 23, 2014 and reached an agreement to raise prices for Glipizide-Metformin and two other drugs.

400.    To complete the conspiratorial triangle, Teva and Mylan were also in frequent contact with one another, including a May 9, 2014 phone call between a Vice President of Sales at Mylan and a National Accounts Director at Teva.  The two continued to stay in close contact throughout the rest of 2014.

401.    Heritage slated Glipizide-Metformin for a price increase on an internal May 9, 2014 call.  Heritage informed customers by the end of June of a 100% price increase on Glipizide-Metformin as of July 1, 2014.  Heritage began sending out Price Increase Notices to its customers for Glipizide-Metformin the same day.

402.    By July 9, 2014, Heritage increased the price nationwide to 27 different customers for Glipizide-Metformin.  Mylan did not challenge Heritage's price increases, while Teva actually increased its bids to potential customers to protect Heritage's increases.  By November 2014, K.S. of Heritage reported to Malek that most of Heritage's price increases "had stuck."

403.    This agreement between Heritage, Mylan and Teva was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

                          d.    *Glyburide*

404.    At all relevant times, Aurobindo, Heritage, and Teva dominated the Glyburide market.

405.    On April 15, 2014, Malek spoke with Patel and discussed Heritage's intention to raise prices on Glyburide.  Patel agreed that if Heritage raised the price, Teva would follow suit.

406.    Heritage also brought Aurobindo into the scheme.  Several different Heritage employees were also able to successfully communicate with their counterparts at Aurobindo and reach agreements to raise the price of Glyburide.  For example, on May 8, 2014, Lukasiewicz contacted McMahon (Aurobindo) by phone to discuss Glyburide price increases.

407.    On May 9, 2014, Heritage held an internal call on price increases, and included Glyburide on the list of drugs set for an increase.

408.    One week later, Heritage and Aurobindo representatives spoke to one another at the MMCAP conference in Minnesota.  The Heritage representative reported to Malek that the Aurobindo representative expressed "similar like minding on the pricing strategies we discussed."

409.    On June 23, 2014, Heritage employees held a "Price Change Call" where they discussed the specific percentage amounts by which they would seek to increase prices for

certain drugs, and the strategies for doing so.  Among those included on the list was Glyburide, which was slated for a 200% increase.

410.    In June 2014, Heritage learned of a potential new competitor in the Glyburide market.  Sather texted a Citron employee, Alexander, inquiring into whether Citron would be entering the Glyburide market.

> Sather:  "Work question:  is Citron launching Glyburide anytime soon?"
>
> Alexander:  "Yes we currently have the product in our warehouse."
>
> Sather:  "We are raising the price right now – just letting you know. Teva says they will follow."
>
> Sather:  "Aurobindo agrees too."
>
> Alexander:  "?"
>
> Alexander:  "You have micronaise brand equivalent."
>
> Alexander:  "And are you also raising your wacs?"
>
> Sather:  "Sorry – was on conference call.  Ours is Micronaise? Is yours Micro or Diabeta?"
>
> Alexander:  "Micro"
>
> Sather:  "I don't think we are changing WAC – verifying now"
>
> Alexander:  "Okay i talked to [K.S., Executive Vice President, Sales & Marketing at Citron] we are def in to raise pricing...are doing this immediately, i know she was mentioning teva can take a while to raise prices"
>
> Sather:  "Teva is slow but conversations have been good."
>
> Sather:  "No change to WAC for us"
>
> Sather:  "We are raising our customers 200% over current market price."
>
> Alexander:  "Okay ill make sure the appropriate people find out"

Sather:  "Teva has 66% of mkt – great target for share!  By [sic] [t]hey should play fair.  Aurobindo and us each have about 18% share.  Good luck!"

Alexander:  "Thanks! Is this something you will be doing like this week?"

Sather:  "Letters going out this week!  A lot of customers have 30 days notices and price protection so real price will be felt in 30+ days"

Alexander:  "Perfect makes sense...  Your not going anything with glyb/met pricing right?"

Sather:  "Not yet – but is on a short list!"

Sather:  "Glyburide and Fosi/HCTZ are increasing too – those are Aurobindo items too"

Alexander:  "Okay yeah we have that too. . .  Thanks for the info!"

411.    Sather quickly reported to the Heritage sales team.  Then, on July 2, 2014, Strelau of Citron called Lukasiewicz confirming Citron's agreement to raise prices and informing him that she had been "looped" in on Heritage's plan.  On July 2, a different Citron representative spoke to Sather.  They continued to communicate throughout the summer of 2014.

412.    After reaching agreement with competitors Aurobindo, Citron and Teva to raise prices for Glyburide, Heritage began implementing the price increases.  Price Increase Notices were sent out to customers beginning on June 26, 2014.

413.    By July 9, Heritage increased the price for Glyburide on at least 17 customers. When Heritage customers, wary of the price increases, contacted Teva to supply alternative bids, Teva representatives instructed their teams "we will not be bidding.  Thanks."

414.    The unlawful agreement resulted in specific price increases to customers who sold Glyburide to customers nationwide.  For example, on July 9, 2014, Teva was contacted by a

large national retail chain requesting a bid on both Glyburide and Nystatin, due to the Heritage price increases.

415.    Teva also increased its WAC pricing on Glyburide by July 9, 2014.  Not even one week later, on July 15, 2014, Citron raised its WAC and AWP for Glyburide to meet Heritage's levels.

416.    After Heritage raised its price to one large wholesaler in July 2014, that wholesaler solicited bids from both Teva and Aurobindo in an effort to obtain lower pricing. Teva and Aurobindo both declined to provide bids when a Heritage customer, outraged with the price increases, requested bids from both companies.  Teva and Aurobindo acted at the direction of Heritage's Malek.

417.    By mid-July, Teva also added Glyburide to its list of potential customer price increase items for the third quarter of 2014 and began to evaluate its own price increases.

418.    As Citron entered the market in July 2014, it set a target of less than 10% market share.  During this time and over the next several months it remained in frequent contact with Heritage to discuss Glyburide pricing, bidding strategies, and how Citron might be able to acquire additional market share without eroding the price increases.

419.    This anticompetitive agreement to avoid competition and unlawfully increase prices for Glyburide continued until at least December 2015, and the effects continue to this day.

420.    This agreement between Heritage, Teva, Aurobindo and Citron was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

e.      *Glyburide-Metformin*

421.    At all relevant times, Actavis, Aurobindo, Heritage, and Teva dominated the

Glyburide-Metformin market.  As of April 2014, Heritage had 5% market share and was eager to

raise prices.

422.    On April 15, 2014, Malek contacted Patel and discussed Heritage's price increase

goals with respect to Glyburide-Metformin, as well as other drugs.  Patel agreed that if Heritage

raised the price on Glyburide-Metformin, as well as the other drugs, Teva would follow with its

own price increases or would not challenge Heritage's price increases by underbidding on

Heritage's accounts.  Their communications continued over the next several months.

423.    Anne Sather of Heritage called Actavis' Director of National Accounts Michael

Dorsey.  On an April 2014 telephone call, on information and belief, they reached an agreement

to increase the price of Glyburide-Metformin and another drug, Verapamil.

424.    Shortly thereafter, Dorsey informed the sales and pricing team at Actavis of

Heritage's intention to raise prices on these two drugs.  In an internal April 28 e-mail, an Actavis

pricing manager stated, "[Dorsey] made mention of keeping an eye out for an increase on

Glyburide/Met and Verapamil IR."

425.    On May 1, 2014, Actavis' Vice President of Marketing, Pricing and Contracts,

Marc Falkin, who was a recipient of the e-mail described above, called a Teva counterpart.

Their communications continued over the next several months.

426.    On May 12, Falkin spoke twice with Aurobindo's CEO.  Falkin also exchanged

30 text messages with a Teva representative between May 19 and May 22, 2014.

427.    Around this same time, several Heritage employees communicated with their

counterparts at Aurobindo about the Glyburide-Metformin price increase.

428.    For example, Lukasiewicz made contact with P.M. of Aurobindo by phone on May 8, 2014, and then in person on May 14.  He reported that he had "found similar like minding on the pricing strategies we discussed."

429.    On May 9, 2014, Heritage slated Glyburide-Metformin for a price increase on an internal call.  Through at least June 2014, Heritage still planned to increase prices for Glyburide-Metformin.

430.    On June 25, 2014, Sather exchanged text messages with a Citron representative about raising prices for Glyburide wherein the Citron representative agreed to raise prices for that drug, and then inquired "Your [sic] not doing anything with glyb/met pricing right?"  Sather responded, "Not yet- but is on a short list!"  Although Citron had approval to sell Glyburide-Metformin, it was not yet actively selling the drug and had zero market share throughout this time period.

431.    Heritage increased its WAC prices for Glyburide-Metformin in July 2014.

432.    In an August 20, 2014 text message exchange with a Sun representative, a Heritage representative admitted that Heritage had reached an agreement with Actavis to increase the prices of Glyburide-Metformin and Verapamil:

> Sun representative:  Have you heard anything about an Actavis price increase?
>
> Heritage representative:  I heard they were on board with it.  What item specifically?
>
> Sun representative:  I don't know.  I am just hearing about an increase but no details.  What product have you heard about
>
> Heritage representative: We were communicating on Glyburide/Metformin and Verapamil

433.    This agreement between Heritage, Teva, Aurobindo and Actavis was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

434.    In September 2014, Citron entered the market for Glyburide-Metformin.  Instead of undercutting the prices of Actavis, Aurobindo, Heritage, and Teva in an effort to gain market share, Citron announced list prices higher than its competitors.

f.    Leflunomide

435.    As of April 2014, Heritage was a dominant player in the market for Leflunomide, holding a 61% share.  Its main competitors at that time were Defendants Apotex and Teva.

436.    During Heritage's April 2014 "Price Increase Discussion" teleconference as described above, Malek identified Leflunomide as one of the eighteen drugs targeted for a price increase.  Malek was responsible for communicating with Teva about Heritage's price increase on this drug (among others).

437.    On April 15, 2014, Malek called Patel about the drugs on his list and Patel agreed that if Heritage increased its prices, Teva would follow or, at a minimum, would not compete with Heritage by underbidding.  In the following months, Malek and Patel spoke frequently and Malek kept her informed on the strategy for price increases.

438.    Heritage's Edelson was tasked with communicating with Apotex regarding the Leflunomide price increase.  On May 2, 2014, Edelson called Deborah Viera, a Sales Manager at Apotex, regarding Leflunomide prices and they spoke for more than 13 minutes.

439.    Also, in May 2014, Heritage learned Teva might be leaving the Leflunomide market.  On May 6, 2014, Sather e-mailed Malek that "the Teva discontinuation of Leflunomide has everyone in a fuss! Wow – can we take more share???"  Malek responded "we may give some to apotex and follow our strategy we discussed.  Will have clarity by tomorrow."

440.    That same day, Edelson had two more phone calls with Viera.  Edelson then reported to Malek that Apotex "has taken another shot at our Leflunomide....I am waiting for a callback from the VP of Apotex before we do anything."  Malek replied, "Let's walk from leflunomide," confirming the strategy he mentioned to Sather.  Beth Hamilton, Vice President of Sales at Apotex, called Edelson.  They connected four times in two days – first for nine minutes and shortly thereafter for eight minutes on May 6th; then twice on May 7th.  Heritage and Apotex representatives thereafter held four phone calls within two days.  Upon information and belief, Heritage and Apotex agreed to avoid competition and increase prices on Leflunomide during these calls.

441.    In response to Malek's May 8 e-mail to the Heritage sales team requesting confirmation on agreements reached with competitors, Edelson responded that he spoke "with everyone" and was only waiting for feedback regarding the drug Meprobamate.

442.    On Heritage's May 9 call on "Price Increases," Leflunomide remained on the list of target drugs.

443.    On May 27, 2014, Heritage learned that Apotex increased prices on Leflunomide and Malek confirmed with Edelson, "we are going to increase."  By July 9, 2014, Heritage successfully increased prices on Leflunomide for at least fifteen different customers.

444.    On June 25, 2014, Malek told Patel that Heritage would be increasing prices for several drugs sold by Teva.

445.    By July 2014, Teva began to exit the market for Leflunomide.  In conformity with its agreement, Teva never challenged Heritage's price increases.  This decision countered Teva's self-interest, as it could have benefitted by undercutting the higher prices charged by Apotex and Heritage and thereby gained market share.

446.     NADAC data show that the average market price for Leflunomide rose dramatically between June 2015 and December 2015 and remained artificially high thereafter:

Leflunomide (10mg):  increased by 730%; and

Leflunomide (20mg):  increased by 617%.



447.     This agreement between Heritage, Teva and Apotex was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

g.     *Methimazole*

448.     Prior to Heritage's April 22, 2014 Price Increase discussion call, Malek circulated a spreadsheet listing all drugs targeted for a price increase, the competitors for each such drug, and their respective market shares.  Methimazole was among the drugs listed.

449.     Par was a competitor with Heritage on Methimazole.  Neal O'Mara was identified as the Heritage employee primarily responsible for communicating with Par on Methimazole and communicated with a counterpart at Par about a price increase for Methimazole.

h.      *Nystatin*

450.    In 2013 and 2014, Heritage's two main competitors for Nystatin were Teva and Sun, through its division Mutual Pharmaceuticals ("Mutual").

451.    Various forms of Nystatin were already subject to market allocation and price fixing even before Heritage's 2014 price increase.

452.    During the relevant times, Actavis, Par, Perrigo, Sandoz, and Taro dominated the market for Nystatin cream; Actavis, Perrigo, and Sandoz dominated the market for Nystatin ointment; and Teva, Heritage, and Sun (through Mutual) dominated the market for Nystatin tablets.

(i)      *Nystatin Cream*

453.    Actavis, Par, Perrigo, Sandoz, and Taro all experienced fluctuations in their respective market shares for Nystatin cream until these market shares suddenly stabilized in 2013.  As detailed below, prices *increased* for all these Defendants, even as those with smaller market shares captured more of the market.  This runs counter to economic theory, which dictates that competitors must lower prices to gain market share.

454.    As late as 2009, Sandoz enjoyed approximately a 50% market share for Nystatin cream, Taro had 40%, Perrigo had approximately 7%, and Par and Actavis controlled the remainder.  Through 2009 and into 2010, Sandoz's market share began to decline.  By the summer of 2010, Sandoz was effectively out of the market.  By this time, Actavis and Par also were effectively out of the market.  Although Sandoz, Actavis and Par appear to have continued making *de minimis* sales, they each had a market share of less than 1% by the spring of 2011.  By May 2011, Taro had captured as much as 96% of the Nystatin cream market, leaving Perrigo approximately a 4% share.

455.     Beginning in June of 2011, Taro and Perrigo dramatically increased their prices for Nystatin cream largely in unison and Actavis, Par, and Sandoz joined these price increases as their market shares increased.

456.     In June of 2011, Taro initiated a large price increase of more than 600%.  Rather than compete on price to gain market share, Perrigo almost immediately followed Taro's increase and raised its own prices to nearly identical levels.  Perrigo ramped up production and managed slowly to gain some market share over the next two years, but—as contemplated by the overarching "fair share" agreement—market prices remained elevated and stable.

457.     In August, although it had only approximately 1% of the market, Par followed the Taro and Perrigo price increase in lockstep, also choosing to eschew price-competition.  Par also managed to grow its market share over the next couple of years, but it did so without eroding the elevated prices imposed by Taro and Perrigo, just as the "fair share" agreement intended.

458.     In November 2011, Actavis ramped up production of Nystatin cream and re-joined the market.  It, too, immediately elevated its prices to match that of Taro, Perrigo and Par, also choosing to forego price competition and the prospect of winning a larger share of the market.  Even a fourth entrant into the Nystatin cream market did not cause prices to erode.

459.     Sandoz's share of the Nystatin cream market was close to 0% until the fall of 2013, at which point it ramped up production for re-entry into the market.  Like Perrigo, Par and Actavis before it, rather than compete on price to regain lost market share, Sandoz priced its Nystatin cream at the same inflated level as its co-conspirators.  Prices remained stable and elevated even with a fifth seller in the market.

460.    WAC prices for each Defendant demonstrate that Nystatin cream prices remained relatively stable prior to May 2011 until they increased dramatically and largely in unison around June of 2011, remaining artificially inflated thereafter.



461.    AWP prices for Nystatin cream show the same trend of dramatically inflated and nearly identical prices.

462.    These price increases followed the March 6-10, 2011 ECRM EPPS Retail Pharmacy Conference, February 2012 ECRM EPPS Retail Pharmacy Conference; October 2012 GPhA Fall Technical Conference in Bethesda, Maryland; and June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland, among others, which representatives from Actavis, Par, Perrigo, Sandoz, and Taro attended.

*(ii)    Nystatin Ointment*

463.    Nystatin external ointment prices followed a similar pattern to those of Nystatin cream.  Actavis, Perrigo, and Sandoz increased their prices, often while gaining market share, contrary to economic theory.  In 2009, Sandoz had captured approximately 75% of the market,

135

while Perrigo had 20% and Actavis 5%.  From that point through the summer of 2011, Actavis and Sandoz drastically reduced production until they were effectively out of the market.  By the summer of 2010 Actavis had approximately a 0% market share, though *de minimis* sales appear to have continued.  By the summer of 2011, Sandoz had approximately a 5% market share.

464.    Beginning in June of 2011, Actavis, Perrigo, and Sandoz increased their prices dramatically and largely in unison.

465.    In June 2011, after Sandoz and Actavis had all but ceded the Nystatin ointment market, Perrigo implemented a large price increase—more than 300%.

466.    Five months later, Actavis ramped up production of Nystatin ointment.  Rather than undercut Perrigo's elevated price to gain market share, Actavis hiked its list prices to nearly identical levels as Perrigo.  As intended by the overarching "fair share" agreement among Defendants, the list prices and AWP price for Nystatin ointment remained virtually unchanged, even with the addition of a new seller in the market place.

467.    In the summer of 2012, the pattern repeated itself.  Sandoz ramped up its production of Nystatin ointment in June.  Rather than compete on price to regain its lost market share, Sandoz raised its list prices to nearly identical levels as Perrigo and Actavis.  Even with a third market participant, prices remained unchanged as provided for by Defendants' agreement.

468.    WAC prices demonstrate that Nystatin ointment prices remained relatively stable prior to May 2011 until they increased dramatically and largely in unison around June of 2011,

remaining artificially inflated thereafter.



469.     Actavis, Perrigo, and Sandoz had the opportunity to discuss pricing of Nystatin

ointment at numerous industry events during the relevant period.  For example, representatives

of each attended the March 2011 ECRM EPPS Retail Pharmacy Conference, and February 2012

ECRM EPPS Retail Pharmacy Conference, among others.

*(iii)     Nystatin Tablets*

470.     In 2010 and 2011, the Nystatin tablet market was split between Teva and Sun

(sold at least in part through its subsidiary, Mutual).  During that time, Teva held approximately

60% of the market, Sun held 40%, and they had nearly identical list prices for Nystatin tablets.

471.     In the summer of 2012, Heritage entered the Nystatin tablet market.  Rather than

undercut Teva and Sun's prices to gain market share, Heritage matched Teva and Sun's prices,

consistent with the "fair share" agreement they and the other Defendants maintained throughout

the generics market.

472.     Sun, through its division Mutual, increased Nystatin tablet prices on April 15, 2013.

473.     As detailed below, Patel was hired by Teva in April 2013 to "run the pricing team."  On July 9, Patel called Malek and they spoke for 21 minutes.  The two spoke again on July 23 (for ten minutes), and twice on July 30, 2013 (once for more than 12 minutes).

474.     Between July 23 and July 30, 2013, Anne Sather (Heritage) spoke with Susan Knoblauch, Senior Sales Manager at Sun, for 11 minutes.  Heritage remained in close contact with Sun before and after Sun (through Mutual) took its price increase in April 2013.  On April 16, 2013 – the day after Mutual increased Nystatin tablet prices – Knoblauch called Sather and they spoke for nearly 40 minutes.  The two continued to communicate throughout the summer of 2013.

475.     By late July 2013, Teva's "Price Increase Candidates" list, created by Patel, included Nystatin, with the note "Heritage involved; follow Mutual."

476.     On August 1, 2013, Malek e-mailed O'Mara (Heritage), Edelson (Heritage), and Sather, saying "Team:  Pricing dynamics may be changing for us for Nystatin.  Please advise when Mutual/URL/ (now Caraco) took their Nystatin price increase and if they kept it." On August 20, 2013, Malek e-mailed Fleming (Heritage) and copied Glazer with the subject "PRICE INCREASES," saying:  "We need [to] analyze the following product price increases and understand how much to increase and which customers to extend." Malek provided a list of four drugs, including Nystatin.

477.     As described below, Patel was on maternity leave from August 2013 through December 2013 and decisions regarding Teva and Heritage's Nystatin price increases were put on hold.

478.    Also, as described below, on February 7, 2014 Patel created a spreadsheet titled "PI Candidates" which included Nystatin.  The Nystatin notes read "Shared with Heritage and Mutual/Caraco" and "WAC increase likely."  Patel called Malek on February 14, 2014 and the two connected the next day.

479.    Malek and Patel continued to talk throughout March and April of 2014.  On a 17-minute phone call on April 15, 2014, Malek and Patel came to an agreement on all of the identified drugs involving Teva (at least seven drugs, including Nystatin).  They agreed Teva would take the lead on the Nystatin (and Theophylline) price increase, which Heritage would follow and match.

480.    On April 4, 2014, Teva announced an increase of more than 100% on Nystatin, doubling WAC price from $47.06 to $100.30.

481.    During the April 2014 Heritage "Price Increase Discussion" teleconference, Malek identified Nystatin as one of the 18 drugs targeted for a price increase.  Sather was tasked with reaching out to Sun regarding Nystatin (and other drugs).  Immediately after the April call, Sather reached out to Knoblauch.  They spoke for 45 minutes and agreed to increase prices for Nystatin (and Paromomycin).  Afterward, Sather reported to Malek and Glazer, "Caraco notified and on board."  Glazer quickly responded, "No emails please."

482.    On the June 23 Heritage "Price Increase Call," Nystatin was designated for a 95% price increase.  Heritage's Kate Brodowski, Associate Director of International Sales, noted that Heritage had to increase its WAC pricing for Nystatin because Teva "increased WAC already."

483.    On June 25, 2014, Heritage held another internal call regarding "Product Price Changes" and Nystatin again appeared on the list of drugs slated for a price increase.  During the call, Sather texted Knoblauch to update Sun on Heritage's anticipated Nystatin price increase:

Sather:  Work news:  we are raising price on Nystatin.  Just letting you know.  :)

Knoblauch:  How much

Sather:  Double the price

Sather:  On conf call- will call you back

Knoblauch:  Yes

484.    On June 25, 2014, Malek spoke to Patel again for nearly 14 minutes.  During that call, Malek reported that Heritage would be sending out Price Increase Notices the next day for Nystatin and several of the other drugs that Heritage and Teva had agreed to raise prices on.

485.    In June 2014, Heritage announced a price increase of nearly 100% on Nystatin.  By July 9, 2014, Heritage successfully raised the price for at least 1444 customers nationwide.

486.    Sun implemented a similar price increase by August 2014.

487.    In conformity with their agreement, Teva refused to bid or challenge Heritage's price increases when requested by incumbent Heritage customers.

488.    On July 8, a large retail customer e-mailed Teva requesting a quote for Nystatin tablets because of a recent large price increase instituted by the incumbent supplier.  A Teva representative forwarded that e-mail to Patel, asking "Are you aware of the below? Should we engage?" Patel responded that she was aware, and that Heritage would be "following Teva on the Nystatin." She confirmed "we will not be bidding.  Thanks."

489.    By at least August of 2014, exact dates unknown, Sun also had begun implementing price increases on Nystatin.

490.    NADAC data for Nystatin tablets is only available dating back to April 2014.  As depicted on the chart below, the average price for Nystatin 500,000 unit oral tablets continued to

increase after the first price increase implemented by Sun in April 2013 and the subsequent price

increases implemented by Heritage, Sun, and Teva around April and June of 2014:



491.     This agreement between Heritage, Teva and Sun was part of an overarching

conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in

the generic pharmaceutical industry.

*i.     Paromomycin*

492.     At all relevant times, Heritage and Sun, through its division Caraco, dominated

the Paromomycin market.

493.     In April 2014, Heritage had approximately 65% of the market.  Sun had

approximately 35% market share.

494.     On April 22, 2014, a Heritage representative spoke to a Sun counterpart for 45

minutes.  Shortly thereafter, the Heritage representative notified her superiors via e-mail that

Caraco was on board with price increases, to which a superior responded, "No emails please."

495.    On May 8, 2014 a Heritage employee e-mailed Malek, who had asked for an update on pricing agreement progress, explaining "I made contact with all my take aways – with positive results."

496.    Heritage held another internal pricing call on May 9, 2014.  Paromomycin was on the list for a price increase.

497.    On May 20, a Sun employee informed a Heritage employee that Sun would be "temporarily discontinuing" Paromomycin production to transfer its operations to another facility.  The employee immediately relayed the information to Malek who responded "Need price increase to go immediately.  Jack it up."

498.    On a June 23, 2014 internal pricing call, Heritage slated Paromomycin for a 100% increase.  By July 9, 2014, Heritage had been able to successfully increase prices to at least thirteen (13) different customers nationwide.

499.    Sun continued to sell the drug through January 2015, maintaining a 40% market share.  Despite this, Heritage continued to increase its prices with no fear of losing market share as an agreement was already in place.

500.    This agreement between Heritage and Sun was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

            j.      *Theophylline ER*

501.    At all relevant times, Heritage and Teva dominated the market for Theophylline ER.

502.    Prior to Heritage's entry into the market for 300mg and 450mg Theophylline ER tablets in late 2011, Teva held nearly 100% of market share.

503.    When Heritage entered the market, rather than price its product below Teva's to gain market share, it listed its products identical to or even slightly above Teva's prices.  As a result, Theophylline ER prices remained relatively stable despite the entry of a new competitor and, upon information and belief, Heritage gained market share through collusive agreements in accordance with their market-wide "fair share" agreement.

504.    In early 2014, Teva began to consider raising the price of Theophylline ER.  On February 4, 2014, Patel called Malek upon her return from maternity leave and the two spoke for over an hour the next day.  On February 7, Patel (Teva) created a spreadsheet titled "PI Candidates," targeting Theophylline for a price increase.

505.    Patel and Malek spoke numerous times in February and March 2014.  They came to an agreement that Teva would lead the Theophylline ER price increase and Heritage would follow, matching Teva's pricing.

506.    Effective April 4, 2014, Teva began implementing across-the-board price increases for Theophylline ER.  By late April 2014, Teva fully implemented a price increase for Theophylline by approximately 150% and Heritage planned to follow.

507.    On April 24, 2014, shortly after implementing the price increases, Teva received the following e-mail with the subject line "PLIVA.com [Info] Price Gouging":[48]

> I have been a consultant to virtually every major pharma company including Teva and Pliva (before it was acquired and located in E. Hanover).  Since retiring I have been asked to participate with a US Senate Special Committee on the issue of pharmaceutical price gouging in the U.S.A.    Today, I acquired my usual Rx of Theophylline ER from Costco for which I usually pay $19.01 and was charged $53.28 an increase of almost 200%.  Costco Pharmacy confirmed that this increase is correct and was instituted sometime

---

[48] Teva marketed and/or sold its generic Theophylline ER, at least in part through Pliva, Inc.  ("PLIVA"), a wholly-owned subsidiary of Teva USA.  Teva USA acquired PLIVA's assets as part of its acquisition of Barr Pharmaceuticals, LLC.

earlier this year (2014.).  Before having this listed in our national report as another example of Pharmaceutical Price Gouging, [w]e respectfully request a confirmation response from you, the manufacturer, relative to the accuracy of our data.  Please respond to me at the above email address.  If you prefer you can respond to Senator Schumer a New York State representative.

508.    A member of Teva's Government Affairs Department received the internally forwarded e-mail and responded:  "Can I get some details on the specifics of this product and the price increase.  I'm hoping someone increased the price and we had to follow it up.  Or, API or something I can give the senate." Patel ultimately received the correspondence and replied, "I don't have a great story.  I'll take a closer look." The real story was that Teva conspired with Heritage to raise market prices.

509.    At the April 22, 2014 Heritage "Price Increase Discussion," Malek instructed his team that Heritage would follow Teva's pricing on Theophylline ER.

510.    On May 9, Heritage again slated Theophylline ER for a price increase.  During a June 23, 2014 "Price Change Call," Heritage employees discussed a 150% price increase for Theophylline ER.

511.    On June 25, 2014, Heritage held one last call regarding "Product Price Changes" before the price increases were to be implemented.  On the same day, Malek and Patel spoke for 14 minutes.  During that call, Malek reported that Heritage would be sending out Price Increase Notices shortly for Theophylline and several of the other drugs for which Heritage and Teva had agreed to raise prices.

512.    Heritage began sending price increase notices to customers the next day.  On June 26, 2014, Sather texted a large wholesaler customer that "As of 7/1, [m]arket wide we are increasing prices on: . . Theophylline ER. . ." She followed with another text message, "Here are the approximate/average $ increases on the other items: . . .  Theo ER . . .150%." On June 30,

2014, Patel e-mailed her team that "[i]t appears that Heritage took an increase to follow Teva. The new pricing looks like it will be effective tomorrow and matches Teva's WACs."  She continued that this "will likely trigger some bid requests/activity," but Teva "should not be considering decreases."

513.    By July 9, 2014, Heritage successfully increased prices to at least 20 customers nationwide, following in lock step with Teva.

514.    According to NADAC data, the average market price for generic Theophylline ER saw the following price increases between April 2014 and January 2015:

> Theophylline ER 100mg:  increases from $0.12 per unit to $0.37 per unit, a 250% increase
>
> Theophylline ER 200mg:  increases from $0.16 per unit to $0.40 per unit, a 150% increase
>
> Theophylline ER 300mg:  increases from $0.20 per unit to $0.35 per unit, a 75% increase.

515.    NADAC data show that the average market prices for Theophylline ER were stable prior to April 2014, then rose dramatically and remained artificially high thereafter.

516.    The 300mg dosage of Theophylline ER saw an even larger price increase in 2016, increasing from an average of $0.36 per unit in April 2016 to $2.46 in July 2016, a 580% increase.



517.    This agreement between Heritage and Teva was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

*k.    Verapamil*

518.    From 2009 forward, Actavis and Mylan dominated the market for Verapamil. Combined, the two companies enjoyed nearly 100% market share until Heritage began to gain share in 2013.

519.    Heritage entered the Verapamil tablet market in the second half of 2011, but its share remained around 5% until 2013.  When Heritage entered, it announced list (WAC) prices identical to Mylan and slightly higher than Actavis for 80mg tablets.  Heritage announced prices slightly higher than both Mylan and Actavis for 120mg tablets.  Heritage did not begin to sell 40mg Verapamil tablets until the second half of 2015, at which point it set list prices identical to Actavis, the only seller of 40mg tablets at that time.

520.    In other words, in conformity with the market-wide "fair share" agreement between Defendants, when Heritage entered the market for Verapamil, it set prices at or above competitors Actavis and Mylan.  In October 2012, Mylan then increased its tablet prices by approximately 50%, allowing Heritage to gain more than 25% market share.  Shortly thereafter, market share between Actavis, Heritage, and Mylan quickly stabilized.

521.    On Heritage's April 2014 "Price Increase Discussion," Verapamil was targeted for a price increase.  O'Mara (Heritage) was primarily responsible for communicating with Mylan about Verapamil, among other drugs, and reached out to Aigner (Mylan).  On an April 23, 2014 phone call, O'Mara and Aigner reached an agreement to raise prices for Verapamil (and two other drugs).  O'Mara immediately sent an e-mail to Malek, titled "Mylan," saying "Just let me know a day before we price adjust on the three Mylan products and they will put the word

out to the reps to leave us alone.  They are looking at price increases as well on a number of products."

522.    Sather was responsible for communicating with Actavis about Verapamil (and another drug).  Within hours of the April 22 call, she called Michael Dorsey, Director of National Accounts at Actavis and they spoke for nine minutes, reaching an agreement to raise the price of Verapamil (and Glyburide-Metformin).

523.    Dorsey immediately thereafter called Christina Koleto and Michael Reed, two Senior Pricing Managers at Actavis, to update them on the pricing strategy.  In an April 28, 2014 internal e-mail, an Actavis pricing manager said "[Dorsey] made mention of keeping an eye out for an increase on . . . Verapamil IR." Marc Falkin, Actavis' Vice President of Marketing, Pricing, and Contracts, received the e-mail.

524.    On May 6, 2014, Falkin called Nesta (Mylan).  The two spoke regularly over the next several months, including a three-minute call on May 7th and a seven-minute call on May 19.  They continued to speak regularly for the next several months.

525.    In response to Malek's May 8 e-mail to the Heritage sales team trying to finalize price increase agreements, Sather responded, "Jason:  I made contact with all my take aways – with positive results.  I can resend those notes or talk with you on any details."  This would have included her conversation with Actavis on Verapamil.

526.    When Heritage held another call about the "Price Increases" on May 9, 2014, Verapamil remained on the list of drugs targeted for increase.

527.    Heritage did not initially increase prices market-wide for Verapamil, but it did raise prices to at least one customer as part of its price increase initiative in July 2014.

528.    Heritage announced its price increase in June 2014, and Actavis and Mylan soon followed with similar price increases.

529.    On August 20, 2014, Sather exchanged text messages with Knoblauch (Sun) describing the agreements Heritage reached with Actavis to increase the prices of Verapamil (and Glyburide-Metformin):

> Knoblauch:   Have you heard anything about an Actavis price increase?"
>
> Sather:  I heard they were on board with it.  What item specifically?
>
> Knoblauch:  I don't know.  I am just hearing about an increase but no details.  What product have you heard about
>
> Sather:   We were communicating on Glyburide/Metformin and Verapamil
>
> Knoblauch:  We haven't touched verapamil yet

530.    NADAC data show that average market prices for Verapamil rose dramatically in 2015, with price increases continuing throughout 2016, as depicted below.



531.    This agreement between Heritage, Mylan, and Actavis was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

## IX.    THE CONSPIRACY:  TEVA-RELATED CONDUCT

### A.    Early 2013 Teva Business Strategies, Hiring of Patel, and Ranking Competitors

532.    Despite Teva's initial attempts to increase its revenues through price increases in 2012 and early 2013, as set forth below, its generic business was struggling as of early 2013. Throughout the first quarter of 2013, Teva realized it needed to do something drastic to increase profitability.  On May 2, 2013, Teva publicly announced disappointing first quarter 2013 results. Among other things:  (1) net income was down 26% compared to the prior year; (2) total net sales were down 4%; and (3) generic sales declined by 7%.

533.    By this time, Teva had already started to consider new options to increase its profitability, including more product price increases.  Over the next several years, Teva embarked on an aggressive plan to use the conspiracies with its competitors to increase and sustain price on many generic drugs – completely turning around the company's fortunes.

#### 1.    April 2013:  Teva Hires Nisha Patel

534.    In April 2013, Teva took a major step toward implementing more significant price increases by hiring Patel as its Director of Strategic Customer Marketing.  In that position, her job responsibilities included, among other things:  (1) serving as the interface between the marketing (pricing) department and the sales force teams to develop customer programs; (2) establishing pricing strategies for new product launches and in-line product opportunities; and (3) overseeing the customer bid process and product pricing administration at Teva.

535.    Most importantly, she was responsible for – in her own words – "product selection, price increase implementation, and other price optimization activities for a product portfolio of over 1,000 products." In that role, Patel had 9-10 direct reports in the pricing department at Teva.  One of Patel's primary job goals was to effectuate price increases.  This was a significant factor in her performance evaluations and bonus calculations and, as discussed more fully below, Patel was rewarded handsomely by Teva for doing it.

536.    Prior to joining Teva, Patel had worked for eight years at a large drug wholesaler, ABC, working her way up to Director of Global Generic Sourcing.  During her time at ABC, Patel had routine interaction with representatives from every major generic drug manufacturer and developed and maintained relationships with many of the most important sales and marketing executives at Teva's competitors.

537.    Teva hired Patel specifically to identify potential generic drugs for which Teva could raise prices, and then utilize her relationships to effectuate those price increases.

538.    Even before Patel started at Teva, she was communicating with potential future competitors about the move, and about her new role.  For example, on April 2, 2013, nearly three weeks before Patel started at Teva, Aprahamian, the Vice President of Sales and Marketing at Taro, sent an e-mail to the Chief Operating Officer ("COO") at Taro stating:  "Nisha Going To Teva - Hush Hush for now . . ."  The COO responded by saying "[m]aybe the industry will be better for it.  Teva can only improve." Teva had, up to that point, acquired a reputation in the industry for being slow to follow price increases, and the Taro COO viewed Patel as someone who would change that mindset at Teva.  Patel had also worked with Aprahamian several years earlier at ABC.

539.    Patel's last day at ABC was April 11, 2013 and she started at Teva on April 22, 2013.  Patel began communicating with competitors, by phone and text, the day after she left ABC, before she even started at Teva.  For example:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 4/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:01:10 |
| 4/13/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:06:05 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |

[49]

540.    Once Patel began her employment at Teva, her communications with certain competitors became much more systematic and frequent, and focused around market events such as price increases, market entry, customer challenges and loss of exclusivity.

541.    When she joined Teva, Patel's highest priority was identifying drugs where Teva could effectively raise price without competition.  On May 1, 2013, Patel began creating an initial spreadsheet with a list of "Price Increase Candidates."  As part of her process of identifying candidates for price increases, Patel started to look very closely at Teva's relationships with its competitors, and also her own relationships with individuals at those competitors.  In a separate tab of the same "Price Increase Candidates" spreadsheet, Patel began ranking Teva's "Quality of Competition" by assigning companies into several categories, including "Strong Leader/Follower," "Lag Follower," "Borderline" and "Stallers."

---

[49]    Amended State AG Complaint No. 2 ¶ 572.

542.     Patel understood – and stressed internally at Teva – that "price increases tend to stick and markets settle quickly when suppliers increase within a short time frame." Thus, it was very important for Patel to identify those competitors who were willing to share information about their price increases in advance, so that Teva would be prepared to follow quickly. Conversely, it was important for Patel to inform Teva's competitors of Teva's increase plans so those competitors could also follow quickly. Either way, significant coordination would be required for price increases to be successful – and quality competitors were those who were more willing to coordinate.

543.     As she was creating the list, Patel was talking to competitors to determine their willingness to increase prices and, therefore, where they should be ranked on the scale. For example, in one of her first conversations with CW-1 after Patel joined Teva, Patel told CW-1 that she had been hired by Teva to identify drugs where Teva could increase its prices. She asked CW-1 how Sandoz handled price increases. CW-1 told Patel that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after Teva increased. Not surprisingly, Sandoz was one of Teva's highest "quality" competitors. Patel and Teva based many price increase (and market allocation) decisions on this understanding with Sandoz over the next several years.

544.     Patel had several different ways of communicating with competitors. This Complaint references various phone calls and text messages that she was exchanging with competitors. But she also communicated with competitors in various other ways, including but not limited to instant messaging through social media platforms such as LinkedIn and Facebook; encrypted messaging through platforms like WhatsApp; and in-person communications.

Although the Plaintiff States have been able to obtain some of these communications, many of them have been destroyed by Patel.

545.    Through her communications with her competitors, Patel learned more about their planned price increases and entered into agreements for Teva to follow them.  On May 2, 2013, Patel spoke to her contacts at Glenmark, Actavis and Sandoz several times:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:15:48 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:39 |

[50]

546.    After one of her calls with CW-5 of Glenmark, Patel sent an internal e-mail to one of her subordinates directing him to add six (6) different Glenmark drugs to Teva's "high priority" price increase list:  Adapalene gel; Nabumetone; Pravastatin; Ranitidine HCL; Moexipril HCL; and Moexipril HCL/HCTZ.  As discussed more fully below, these are all drugs that Glenmark eventually increased prices on two weeks later, on May 16, 2013, and Teva followed with its own price increases shortly thereafter.

### 2.    Ranking "Quality of Competition" to Identify Price Increase Candidates

547.    By May 6, 2013, Patel had completed her initial ranking of fifty-six (56) different manufacturers in the generic drug market by their "quality." Patel defined "quality" by her assessment of the "strength" of a competitor as a leader or follower for price increases.  Ranking was done numerically, from a +3 ranking for the "highest quality" competitor to a -3 ranking for

---

[50]    *Id.* at ¶ 577.

the "lowest quality" competitor.  The top ranked competitors at that time included the following companies:

| Strong Leader/Follower | Point Scale |
|---|---|
| Mylan | 3 |
| Mylan Institution | 3 |
| Watson/Actavis | 3 |
| Sandoz/Fougera | 3 |
| Glenmark | 3 |
| Taro | 3 |

[51]

548.    The lowest ranked competitors were:

| Strong Leader/Follower | Point Scale |
|---|---|
| Apotex | -3 |
| Zydus | -3 |

[52]

549.    Patel created a formula, which heavily weighted those numerical ratings assigned to each competitor based on their "quality," combined with a numerical score based on the number of competitors in the market and certain other factors including whether Teva would be leading or following the price increase.  According to her formula, the best possible candidate for a price increase (aside from a drug where Teva was exclusive) would be a drug where there was only one other competitor in the market, which would be leading an increase, and where the competitor was the highest "quality." Conversely, a Teva price increase in a drug market with several "low quality" competitors would not be a good candidate due to the potential that low quality competitors might not follow Teva's price increase and instead use the opportunity to steal Teva's market share.

---

[51]    *Id.* at ¶ 578.

[52]    *Id.*

550.     Notably, the companies with the highest rankings at this time were companies with whom Patel and other executives within Teva had significant relationships.  Some of the notable relationships are discussed in more detail below.

a.     The "High Quality" Competitor Relationships

551.     The highest quality competitors in Patel's rankings were competitors where Teva had agreements to lead and follow each other's price increases.  The agreements and understandings regarding price increases were what made each of those competitors high quality. As part of their understandings, those competitors also agreed that they would not seek to compete for market share after a Teva price increase.

b.     Mylan (+3)

552.     Mylan was Teva's highest-ranked competitor by "quality." The relationship between these two competitors was longstanding and deeply engrained.  It survived changes in personnel over time and pre-dated Patel's creation of the quality competitor rankings.

553.     Green, who was employed by Teva beginning in 2006 through late October 2013, first began communicating with Nesta of Mylan by telephone on February 21, 2012.  From that time until the time that Green left Teva, Green and Nesta were in almost constant communication, speaking by phone at least 392 times, and exchanging at least 12 text messages – including at or around every significant price increase taken by either company.  This amounts to an average of nearly one call or text message every business day during this period.

554.     Shortly after Patel started her employment at Teva, she called Nesta on May 10, 2013 and the two spoke for over five (5) minutes.  Because Green had already established a relationship with Mylan, Patel did not need to speak directly with Nesta very often.  Typically, Patel would e-mail Green and ask him to obtain market intelligence about certain Mylan drugs; Green would then speak to Nesta – often about a long list of drugs – and report his findings back

to Patel.  Several examples of these communications are outlined more fully in various sections below.

555.    When Green left Teva to join Zydus in late October 2013, the institutional relationship and understanding between Teva and Mylan remained strong.  Rekenthaler promptly took over the role of communicating with Nesta.  Starting in December 2013, through the time that Rekenthaler left Teva in April 2015, Rekenthaler spoke to Nesta 100 times.  Prior to Green leaving Teva in late-October 2013, Rekenthaler and Nesta had only spoken by phone once, more than a year earlier in 2012.

556.    The relationship between Teva and Mylan even pre-dated the relationship between Green and Nesta.  For example, between January 1, 2010 and October 26, 2011, R.C., a senior executive at Teva, communicated with R.P., a senior executive counterpart at Mylan, by phone or text at least 135 times.  The pace of communications between the two companies slowed dramatically in November 2011 after R.C. left Teva and before Green began communicating with Nesta – but continued nevertheless as needed during that time through communications between Rekenthaler and R.P. at Mylan.

c.    *Watson/Actavis (+3)*

557.    Actavis was Teva's next highest quality competitor by ranking.  Patel had strong relationships with several executives at Actavis, including Rogerson, the Executive Director of Pricing and Business Analytics, and A.B., a senior sales executive at Actavis.  Rekenthaler also communicated frequently with A.S., a senior sales executive at Watson – a relationship that pre-dated Patel joining Teva.

558.    Patel contacted A.B. shortly after she started her employment at Teva, as she was creating the quality competitor rankings.  She called him on April 30, 2013, and the two exchanged several text messages the next day, May 1, 2013.  But as detailed herein, Patel

communicated on a more frequent basis with Rogerson, her counterpart in the pricing department at Actavis.  From May 2, 2013 through November 9, 2015, Patel spoke and/or texted with Rogerson 157 times, including calls at or around every significant price increase taken by the respective companies.

559.    In August 2013, Falkin joined Actavis and the relationship between Teva and Actavis grew stronger through his communications with Rekenthaler.  From August 7, 2013 through the date that Rekenthaler left Teva in April 2015, Rekenthaler and Falkin communicated by phone or text at least 433 times.

560.    Cavanaugh also had a very strong relationship with Falkin.  The two communicated with great frequency.  From August 7, 2013 through the end of May 2016, Cavanaugh and Falkin spoke or texted with each other 410 times.

              d.      *Sandoz (+3)*

561.    Sandoz was also considered a top-quality competitor by Teva.  Patel had a very strong relationship with CW-1 at Sandoz.

562.    Beginning on April 12, 2013 – the day after Patel's last day at ABC – until August 2016, Patel and CW-1 spoke 185 times by phone, including at or around every significant price increase taken by either company.  As detailed above, in one of her initial calls with CW-1 after she joined Teva, Patel asked CW-1 how Sandoz handled price increases.  Patel explained that she had been hired at Teva to identify products where Teva could increase prices.  CW-1 reassured Patel that Sandoz would follow any Teva price increases on overlapping drugs, and that Sandoz would not poach Teva's customers after Teva increased price.

563.    Green and Rekenthaler of Teva also both had a very strong relationship with CW-2, who was – at that time – a senior Sandoz executive.  These relationships pre-dated Patel joining Teva.

e.      *Glenmark (+3)*

564.    Glenmark was one of Teva's highest-ranked competitors primarily because Patel had very significant relationships with several different individuals at Glenmark, including CW-5, Brown and J.C., a sales and marketing executive at Glenmark.

565.    As stated above, Patel began communicating with CW-5 even before she began her employment at Teva.  Patel was also communicating frequently with both CW-5 and J.C. during the time she created the quality competitor rankings, and agreed to follow several Glenmark price increases, in May 2013.

566.    Patel and CW-5 communicated by phone with great frequency – including at or around the time of every significant price increase affecting the two companies – until CW-5 left Glenmark in March 2014, at which point their communication ceased for nearly six (6) months. After CW-5 left Glenmark, Patel began communicating with Brown with much greater frequency to obtain competitively sensitive information from Glenmark.  Patel and Brown had never spoken by phone before Patel started at Teva, according to the phone records produced.

f.      *Taro (+3)*

567.    Taro was highly rated because of Patel's longstanding relationship with the Vice President of Sales at Taro, Aprahamian.  Patel had known Aprahamian for many years, dating back to when Patel had started her professional career as an intern at ABC.

568.    Even though she knew Aprahamian well, they rarely ever spoke or texted by phone until Patel started at Teva.  From April 22, 2013 through March 2016, however, Patel and Aprahamian spoke or texted at least 100 times, including calls or text messages at or around the time of every significant price increase affecting the companies during those years.

g.      *Lupin (+2)*

569.    Although initially not the highest ranked competitor, Lupin was assigned a high rating because of Patel's strong relationship with Berthold, the Vice President of Sales at Lupin. The relationship between Teva and Lupin, however, pre-dated Patel.  Prior to Patel starting at Teva, Green and others at Teva conspired directly with Berthold.  Several of those examples are discussed below.  Between January 2012 and October 2013, Berthold and Green, for example, communicated by phone 125 times.

570.    From May 6, 2013 through April 8, 2014, Patel and Berthold communicated by phone 76 times, including at or around the time of every significant drug price increase where the two companies overlapped.

571.    Demonstrating the strength of the relationship between the two companies, the price increase coordination continued between Teva and Lupin even when Green had left Teva and when Patel was out on maternity leave.  For example, as discussed more fully below, in October 2013 Lupin was preparing to increase its pricing on the drug Cephalexin oral suspension.  Without Green or Patel to communicate with, Berthold instead communicated with Rekenthaler and T.S. of Teva in order to coordinate the price increase.

**B.      Price Increase Hiatus**

572.    Shortly after the August 9, 2013 price increase described below went into effect, Patel left the office for several months while on maternity leave.

573.    This slowed down Teva's plans for its next round of price increases.  During the time period while Patel was out on maternity leave, Teva did not implement or plan any additional price increases, instead waiting for Patel to return and continue her work.  Patel began to return to the office on a part-time basis beginning in November 2013.

574.    During this time period, Green left Teva to join Zydus as the Associate Vice President of National Accounts.  His last day of employment at Teva was October 23, 2013. This prompted Rekenthaler to assume the role of communicating with specific competitors, including Mylan.  Rekenthaler also identified and began communicating on a more frequent basis with co-conspirators at different companies to facilitate the price increase process for Teva.

575.    As discussed more fully below, although Patel's absence slowed Teva in its plans for price increases on additional drugs, it did not stop certain competitors – including Lupin – from attempting to coordinate with Teva regarding their own price increases.  In Patel's absence, they simply communicated through different channels.  These communications were conveyed to Patel upon her return and she included the information in her efforts to identify new price increase candidates.

576.    As discussed more fully below, by early 2014 Patel had picked up right where she left off planning for the next round of Teva increases.

**C.    New Relationships Emerge**

577.    By early 2014, the generic drug industry was in the midst of a price increase explosion.  In an internal Teva presentation given shortly after the April 2014 price increases – titled "2014 US Pricing Strategy" – Teva reflected on the current state of the industry, noting that the "[c]ompetitive landscape is supportive of price increases."  In commenting on the future implications for Teva's pricing strategy, the company stated:  "Mature competitors participate in price appreciation; immature competitors are starting to follow."

578.    Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases, specific examples of which are described below.

**D.      Competitors Become "High Quality" After Successfully Colluding With Teva**

579.     A little more than a year after she first circulated her Quality of Competitor List, Patel finalized an updated list on May 9, 2014.  This updated list reflected changes in Teva's conspiratorial relationships.

580.     Although certain competitors retained a high-quality ranking throughout the entire relevant time period – like Mylan, Sandoz, Actavis and Taro – other competitors saw their ranking increase (sometimes dramatically) after successfully colluding with Patel or others at Teva on one or more drugs during the prior twelve-month period.  These changes demonstrate that Teva's quality competitor rankings were, in reality, a list of co-conspirators that Teva could trust to adhere to the illegal agreements.

**E.      Quality Competitors Collude With Each Other, Sandoz/Mylan**

581.     In addition to conspiring with Teva, the "quality" competitors also colluded with each other on drugs that Teva did not market.  Indeed, each of the quality competitors had their own set of relationships with their counterparts at competitor companies that they used to facilitate agreements regarding drugs where they overlapped.  The relationship highlighted in this Complaint is the relationship between executives at Sandoz and Mylan.  However, to the extent that some of the drugs at issue involve additional competitor companies, those relationships are also discussed.

582.     In September 2012, CW-4 was concerned about her job security at Sandoz and sought to network with executives at competing companies in the hope of obtaining new employment.  CW-4 contacted Nesta because she was interested in potentially working at Mylan.  CW-4 obtained Nesta's phone number from a mutual contact and called to introduce herself.  During that phone call, Nesta immediately started talking about competitively-sensitive

information.  Although CW-4 was surprised that Nesta was being so blatant, she did not stop him.

583.     In the year that followed, between September 2012 and October 2013, CW-4 and Nesta developed an ongoing understanding that they would not poach each other's customers and would follow each other's price increases.  Examples of their coordination with respect to specific drugs are discussed in more detail below.

## F.     Commitment to the Overarching Conspiracy

584.     As detailed above, the overall understanding among the co-conspirators required a commitment that each competitor was entitled to its "fair share" of a given market.  When a competitor was satisfied that it had its "fair share" of a particular drug market, competition waned and prices rose.  These "fair share" principles were the foundation upon which the price increases were built.  So long as each competitor had its "fair share," no competitor was incentivized to compete for business when another competitor increased price.  In short, competition resulted in lower prices; and as far as Defendants were concerned, nobody won in that scenario.  Indeed, it was generally understood that when a competitor increased price, the other competitors in the same drug market would either decline to bid for the business or would bid high so as not to punish the party that took the price increase.  Often, the competitor would then follow with its own comparable price increase.

585.     There are numerous examples throughout this Complaint of competitors refusing to compete in the face of a price increase so as not to "punish" the leader or "steal" market share.  As just one example, when Teva was approached by a large retail customer in May 2013 to bid on a drug for which another generic manufacturer had increased prices, Green expressed caution stating, "not sure I want to steal it on an increase."  Teva later declined to bid on the business.

586.    The concept of "fair share" and price increases went hand in hand.  For example, as discussed above the ongoing understanding between Teva and Sandoz that they would follow each other's price increases was predicated on the agreement that the follower would not poach the leader's customers after the increase.  The same was true for the understanding between Sandoz and Mylan.  As discussed below, Nesta specifically cautioned CW-4 that Mylan did not appreciate having its prices challenged after an increase – i.e., Mylan did not want Sandoz to steal its business by underbidding its customers.  Similarly, Aprahamian of Taro often spoke with CW-3 of Sandoz about coordinating price increases between the two companies.  Almost invariably, he would conclude the conversations with phrases like "don't take my fucking customers," "don't take my business" or "don't be stupid."

587.    Further, because of this "fair share" understanding, it was not essential for the competitors to communicate with each other in advance of every price increase, although they often did so anyway.  So long as the competitor knew before it was approached by customers that the reason for the solicitation was due to a price increase by the incumbent supplier, the competitor knew not to compete for the business.  Similarly, the competitor knew it would have the opportunity, which it often took, to follow the increase with a comparable price increase of its own.

### G.    Low Quality Competitors Comply with the Overarching Conspiracy

588.    As a further demonstration that the "fair share" understanding was universally accepted and understood in the generic pharmaceutical industry, even companies that Patel and Teva referred to as "low quality competitors" – because they were not viewed as strong leaders or followers for price increases – consistently complied with the principles of "fair share" and "playing nice in the sandbox." Several examples of this with respect to some of the Subject Drugs are alleged below.

### H.      Teva Profitability Increases Dramatically

589.      As discussed more fully below, from July 3, 2013 through January 28, 2015, Teva conspired with its competitors to raise prices on dozens of different drugs.  The impact of these price increases on Teva's profitability was dramatic.

590.      After these price increases – on July 30, 2015 – Teva reported strong results and raised its guidance for the full year 2015.  Among other things:  (1) net income was up 15% compared to the prior year; (2) operating income was up 16% compared to the prior year; and (3) cash flow from operations was up 41% compared to the prior year.  Teva reported a gross profit margin of 62.8%, which was up from 58.1% the prior year.  Teva's stock prices also soared.  By July 2015, Teva's stock price was trading at an all-time high.  These significant results were obtained largely as a result of the anticompetitive conduct detailed herein.

### I.      Teva and its Executives Knowingly Violated the Antitrust Laws

591.      Teva was aware of the antitrust laws and paid them lip service in its Corporate Code of Conduct.  For example, Teva's Code of Conduct from the summer of 2013 states specifically:

[53]

---

[53]      Amended State AG Complaint No. 2 ¶ 1109.

592.    But high-level executives at Teva were aware that those laws were being violated systematically and egregiously, and never instructed Teva employees to stop or to rescind the agreements that Teva had reached with its competitors.

593.    For example, when Patel started at Teva in late-April 2013, she immediately began ranking Teva's competitors by their "quality." "Quality" was nothing more than a euphemism for "good co-conspirator," and it was well known internally at Teva that Patel was identifying price increase candidates based on who Teva's competitors were for those drugs, and whether she or others at Teva had an understanding in place.  Indeed, Patel already had a short list of price increase candidates in place on the day she started at Teva, which was based at least in part on conversations she had already been having with Teva's competitors before she started, including Aprahamian at Taro.

594.    As Patel was starting to create her ranking of quality competitors and identify candidates for price increases, she sent her very first iteration of the quality competitor ranking to her supervisor, K.G. – a senior marketing executive at Teva – on May 1, 2013.  That ranking included, within the category of "Strong Leader/Follower," the following competitors:  Mylan, Actavis, Sandoz, Glenmark, Taro and Lupin.  The preliminary list of price increase candidates also included the formula that Patel would use to identify price increase candidates using the quality of competitor scores.

595.    With K.G.'s approval of her methodology for identifying price increase candidates, Patel continued communicating with competitors and agreeing to price increases. She also routinely provided K.G. with intelligence that she had received from her communications with competitors.  For example, when Patel sent her very first formal "PI Candidates" spreadsheet to K.G. on May 24, 2013, she identified, for example, that the drug

Nabumetone was a price increase candidate because, among other things, "Sandoz [was] also bidding high." For the drug Adapalene gel, Patel noted that there were "[r]umors of a Taro increase" – even though Taro had not yet increased its prices for Adapalene gel. Patel had obtained this competitively sensitive information directly from her communications with competitors.

596. K.G. immediately forwarded that information to Cavanaugh, the Senior Vice President of Sales at Teva, who approved of the price increases based on the reasoning that Patel provided for each drug. As discussed more fully below, Teva raised prices on those drugs (and others) on July 3, 2013.

597. Cavanaugh was well aware that Patel was communicating with competitors about price increases and making recommendations based on those communications, because Patel told her so directly. For example, during a 2013 meeting of Teva sales and pricing personnel where Cavanaugh was present, Patel was discussing her communications with certain competitors about price increases when Cavanaugh smiled, put her hands over her ears, and pretended that she could not hear what was being said. Not once, however, did Cavanaugh ever tell Patel or anyone else at Teva to stop conspiring with Teva's competitors or rescind the agreements that had been reached.

598. Patel continued to send intelligence that she had obtained from competitors to her supervisor, K.G. On August 7, 2013, Patel sent to K.G. a summary list of drugs slated for a price increase on August 9, 2013. In the "Reasons for Increase" column, Patel again included specific

information that could only have come from her communications with competitors, including:

| Product Category | Reason for Increase |
|---|---|
| ETODOLAC ER TABLETS | Follow Taro (likely to be this week with IR) |
| ETODOLAC TABLETS | Follow Sandoz; Taro likely to follow this week |
| PRAVASTATIN TABLETS | Follow Glenmark, Zydus and Apotex. Lupin waiting on Teva. [54] |

599.    This time, K.G. – recognizing that it was inappropriate for Teva to have this information in writing – asked Patel to change those references above, to remove the offending language:

> Under reasons, I would change to the following:
>
> 1. Etodolac ER : Follow Taro
> 2. Etodolac : Follow Sandoz; Taro increase anticipated.
> 3. Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated. [55]

600.    As discussed more fully below, Teva increased prices on those three drugs two days later.  Not once did K.G. ever tell Patel to stop communicating with competitors, or to rescind any of the agreements she had reached on behalf of Teva.

601.    Patel also spoke regularly to both Rekenthaler and Green about their communications with competitors.  Patel was aware that both Rekenthaler and Green were communicating with competitors, sometimes at her direction.  Green and Rekenthaler, in turn, were also both aware that Patel was communicating with competitors and implementing price increases based on those communications.

602.    Rekenthaler – the Vice President of Sales at Teva – was aware that communicating with competitors about pricing and market allocation was illegal, and took steps

---

[54]    *Id.* at ¶ 1116.

[55]    *Id.*

to avoid any evidence of his wrongdoing.  For example, as discussed more fully above, on July 15, 2013 CW-2 of Sandoz called Rekenthaler at Teva and left a message.  Rekenthaler called CW-2 back immediately and they had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all drugs that Teva had recently increased pricing on – not just those drugs where Teva overlapped with Sandoz.  Rekenthaler complied.  Understanding, however, that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his work e-mail account to a personal e-mail account, then forwarded the list from his personal e-mail account to CW-2's personal e-mail account.

## X.   THE OVERARCHING CONSPIRACY IN OPERATION WITH RESPECT TO THE SUBJECT DRUGS

### A.   Customer and Market Allocation Agreements To Maintain Market Share and Avoid Price Erosion

#### 1.   Teva/Mylan

##### a.   Fenofibrate

603.    As of the end of 2012, Teva and Lupin were the only major suppliers of generic Fenofibrate 48mg and 145mg tablets, with Teva having approximately 65% market share and Lupin having approximately 35% market share.

604.    On February 27, 2013, K.G., a senior marketing executive at Teva, e-mailed multiple Teva colleagues asking them to provide "any noise you may be hearing in the market relative to additional competition on Fenofibrate 48mg and 145mg."  Specifically, K.G. was seeking "Competitive Intelligence" on Mylan's potential entry to the market.  In order to get this information, Green called Mylan's Vice President of National Accounts, Nesta.  Over the course of that day, Green and Nesta spoke at least four (4) different times.  That same day, Green

reported back to K.G. and other Teva colleagues what he had learned:  Mylan planned to launch

Fenofibrate 48mg and 145mg sometime around November 2013.

605.    A few months later, however, Teva learned that Mylan was moving up its launch

date for Fenofibrate.  In advance of this launch, Teva, Lupin, and Mylan conspired to allocate the

market for Fenofibrate.  On May 8, 2013, Green e-mailed his colleagues at Teva that "Mylan is

entering [the market for Fenofibrate] very soon." To assist in Teva's efforts to allocate the

Fenofibrate market, Green asked a colleague for the "typical data on Fenofibrate".  This request

for information was reiterated – and its purpose made clear – the following day when K.G. sent

an internal e-mail stating that Mylan expected to launch Fenofibrate 48mg and 145mg tablets "on

or around May 14" and that he needed Teva's Fenofibrate sales and profitability information "to

determine who we want to keep and who we want to concede" to Mylan.

606.    Up to this point, executives for Teva, Mylan, and Lupin had all been in regular

contact by phone.  These calls include at least those listed below.  On these calls, Teva, Mylan,

and Lupin executives shared information about Mylan's Fenofibrate launch and the plan to

allocate market share to Mylan.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/6/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:06 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:18 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:11:12 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:02:53 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Berthold, David (Lupin) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:08:55 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:20 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:03:46 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Incoming | Berthold, David (Lupin) | 0:12:00 |
| 5/9/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:05 [56] |

---

[56]    *Id.* at ¶ 172.

607.    In one striking example of the coordination between the three companies, Nesta called Green at 2:42 p.m. on May 7, 2013 and they spoke for more than eleven (11) minutes. Immediately after hanging up the phone – at 2:54 p.m. – Nesta called Berthold and spoke for nearly three (3) minutes.

608.    On May 10, 2013, K.G. received the Teva sales and profitability information he requested.  After having the information for barely a half hour, and before there was even a formal price challenge by Mylan at any of Teva's customers, K.G. concluded that "it is best to concede Econdisc [to Mylan] and try to maintain the balance of our customers . . . ." By conceding Econdisc to Mylan, Teva would walk away from its single biggest customer (in terms of gross profit) for the 48mg tablets and the third largest out of six customers (in terms of gross profit) for the 145mg tablets.  Patel, who had been at Teva for only two weeks at that point, said she "want[ed] to understand the logic you [K.G.] use for determining this." The logic, of course, was to allocate a customer of sufficient size to Mylan so that Mylan would be comfortable with its "fair share" and not need to compete on price to acquire market share.

609.    Teva executives immediately reached out to executives at Mylan and Lupin through a series of phone calls.  These calls include at least those listed below.  On these calls, executives of Teva, Mylan, and Lupin confirmed the market allocation scheme.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:28 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:10:46 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:02:19 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Patel, Nisha (Teva) | 0:05:25 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:17 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:26 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:17:28 |

[57]

---

[57]    *Id.* at ¶ 175.

610.    Teva made good on its agreement to concede Econdisc to Mylan.  On May 15, 2013, Econdisc informed Teva that a new market entrant had submitted a competitive offer for Fenofibrate 48mg and 145mg tablets and asked Teva for a counteroffer to retain Econdisc's business.  Less than an hour after receiving the notice of the price challenge, Green recommended conceding Econdisc based on "prior conversations." K.G. later agreed:  "this is the customer we should concede on Fenofibrate."

611.    Following Teva's internal confirmation of the market allocation scheme, Teva executives spoke with executives at Mylan and Lupin numerous times.  These calls include at least those listed below.  On these calls, executives of Teva, Mylan, and Lupin confirmed that Teva was sticking to the market allocation scheme by conceding Econdisc to Mylan.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:34 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Outgoing | Nesta, Jim (Mylan) | 0:02:21 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:10:06 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:11:50 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:02:23 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:09 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:21 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:12 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:25 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/17/2013 | Text | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:16:02 [58] |

---

[58]    *Id.* at ¶ 177.

*b.*     *Clonidine-TTS*

612.    As of September 2011, Mylan and Teva were at rough parity in the market for

generic Clonidine-TTS, with Mylan having approximately 48.4% market share and Teva having

approximately 44.4% market share.  At the end of 2011 and beginning of 2012, however, Teva

began to take more than its "fair share."

613.    In November 2011, Teva took over Mylan's business for Clonidine-TTS at

Walgreens after Walgreens solicited Teva to provide a bid.  Then, in late January 2012, Cardinal

Health solicited a bid from Teva for a one-time-buy to cover an alleged short-term "supply

disruption" that Mylan was experiencing.  A few days after Teva submitted its offer to Cardinal

for the one-time-buy, Cardinal asked Teva to become Cardinal's primary supplier for Clonidine

TTS.  Believing that Cardinal's request was prompted by Mylan having supply issues, Teva

accepted and took over the primary position at Cardinal for Clonidine-TTS.

614.    On February 10, 2012, the move of Cardinal's business to Teva prompted K.G. of

Teva to order his colleagues to get intelligence on the extent of Mylan's alleged supply issues.

That same day, Rekenthaler called B.P., a senior national accounts executive at Mylan, to obtain

the information and they spoke for six (6) minutes.  Later that day, Rekenthaler reported back to

his Teva colleagues that, contrary to Teva's assumptions, "Mylan is back in supply" and

cautioned that Teva should "tread carefully." Rekenthaler was concerned that Mylan might

retaliate against Teva for taking more than its "fair share" without consulting with Mylan.  With

the awards from Walgreens and Cardinal, Teva was projected to have between 65%-70% market

share for Clonidine-TTS.

615.    To gain back some market share, Mylan challenged Teva's Clonidine-TTS

business at McKesson.  To de-escalate the situation, Teva "conceded the McKesson business to

Mylan." Then, in April 2012, Mylan aggressively challenged Teva's Clonidine-TTS business at

CVS to gain back market share and further signal its displeasure with Teva for taking the Cardinal business.  Internally, Teva lamented that Mylan was "trashing the price in pretty much a two-player market." Ultimately, Teva "conceded [the CVS business] due to price."

616.    Teva heard Mylan's retaliatory message loud and clear.  On May 4, 2012, just a few days after losing the CVS Clonidine-TTS business to Mylan, Teva was approached by Cardinal about a different drug, Doxazosin.  At the time, Mylan was the primary supplier for Doxazosin at Cardinal.  Cardinal representatives told Teva that Mylan was on backorder for one of the four Doxazosin dosage strengths until the end of June 2012, but Cardinal wanted to move the entire Doxazosin line to Teva.  Rather than take this business, K.G. cautioned his colleagues that Teva "will need to be cautious after what happened with Clonidine.  I would rather cover them on a short-term basis where they have an issue and revisit if it becomes a more prolonged and extensive event."

617.    On July 18, 2012, E.G., a senior Teva product manager, circulated an internal e-mail to Teva's national account managers that the "[m]arket rumor is Mylan may be having Clonidine Patch supply issues." Teva learned of this "rumor" directly from Mylan over the course of at least two calls between Green and Nesta on July 17 and the morning of July 18, 2012.  Those calls lasted three (3) minutes and five (5) minutes, respectively.

618.    On the morning of September 28, 2012, Nesta and Green spoke by phone at least twice, once for four (4) minutes and once for fourteen (14) minutes.  On those calls, Nesta informed Green of Mylan's impending temporary exit from the Clonidine-TTS market.  As expected, later in the day on September 28, 2012, Teva began getting solicitations from Mylan customers, such as Wal-Mart and CVS, seeking a bid from Teva for Clonidine TTS because Mylan had just issued a temporary discontinuation notice.

619.    Mylan's exit from the Clonidine-TTS market presented an opportunity to raise prices and collusively reallocate the market at the inflated prices when Mylan fully reentered the market.  For example, in April 2012, before Mylan had challenged Teva's Clonidine TTS business at CVS, Teva's direct invoice price to CVS for the .1mg, .2mg, and .3mg Clonidine-TTS was $22.13, $37.81, and $54.41, respectively.  Mylan's retaliation against Teva drove the prices for CVS down to below $10.49, $18.17, and $26.51 for those dosages, respectively. Because of Mylan's exit from the market, however, when Teva took back the CVS business in October 2012, Teva was able to charge CVS a direct invoice price of $33.28, $56.08, and $80.76, respectively.

620.    Mylan and Teva maintained regular contact as former Mylan customers came to Teva because of Mylan's supply issues with Clonidine-TTS.  For example, Teva submitted bids to CVS and Wal-Mart – which were ultimately accepted by those companies – on October 4, 2012 and October 5, 2012, respectively.  In the days leading up to those bids, Teva and Mylan representatives had at least the following phone calls:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 10/1/2012 | Voice | Rekenthaler, David (Teva) | Outgoing | B.P. (Mylan) | 0:01:00 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:10 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:06 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:05:00 |
| 10/4/2012 | Voice | Green, Kevin (Teva) | Incoming | Nesta, Jim (Mylan) | 0:11:00 [59] |

621.    Teva and Mylan representatives continued to keep in contact going forward so that if Mylan reentered the Clonidine-TTS market, Mylan could regain market share without eroding price through competitive bidding.  For example, on October 10, 2012, Green and Nesta

---

[59]    *Id.* at ¶ 187.

spoke for ten (10) minutes.  That same day, E.G. of Teva sent an e-mail to Teva national account managers and other senior representatives reiterating that Teva representatives should "advise of any update to this market intelligence."

622.    In or about February 2013, Mylan relaunched Clonidine-TTS and began seeking market share.  In early March 2013 Mylan sought to secure the Clonidine-TTS business at Econdisc.  Rather than competitively bid for the business, Teva's internal documents state that they chose to "concede" Econdisc back to Mylan.  By April 2013 Teva also "gave up Rite Aid" and "concede[d]" McKesson to Mylan.

623.    In a stark admission of Teva's willingness to help Mylan regain market share without competition, Rekenthaler acknowledged in an internal e-mail dated February 28, 2013 that Teva was "trying to concede the Clonidine business at CVS" to Mylan.  Because Teva had been able to increase the price at CVS following Mylan's exit, Mylan gave a bid to CVS that was higher than Mylan's "previous price prior to their supply problems."  For its part, Teva was "not going to make any effort in the form of price concessions to retain the CVS business" if CVS brought Mylan's price challenge to Teva's attention.  CVS pushed Mylan to lower its bid in light of its prior prices but, confident that its brinkmanship would work because of Teva's cooperation, Mylan would not do so.  Ultimately, CVS declined Mylan's bid because of Mylan's refusal to lower its bid in light of its prior pricing.  Nonetheless, because Mylan's bid to CVS was not competitive – but rather an effort to allocate the market without eroding price – Teva was able to maintain artificially higher prices at CVS.

624.    To carry out their scheme to allocate the Clonidine-TTS market without eroding price, representatives of Teva and Mylan remained in regular contact.  In February and March

2013 alone, Teva and Mylan representatives called each other at least 33 different times and spoke for nearly 2 hours and 45 minutes.

625.    By April 2013, Teva had "conceded all customers [it] plan[ned] on conceding." Having successfully allocated the market, however, Mylan and Teva were now conspiring to raise prices on Clonidine-TTS.  On April 8, 2013, J.L., a marketing manager at Teva, reported internally to his Teva colleagues, including Rekenthaler, that Mylan had agreed to raise prices:



626.    Green knew that Mylan would follow a price increase on Clonidine-TTS because earlier that day, Green had two phone calls with Nesta (Mylan), with one lasting one (1) minute and the other lasting eight (8) minutes.  In a follow-up call the following day between Green and Nesta lasting eleven (11) minutes, Mylan and Teva reconfirmed their agreement that Mylan would follow a Teva price increase on Clonidine-TTS.

---

[60]    *Id.* at ¶ 192.

c.     *Tolterodine Extended Release*

627.     Teva planned to launch Tolterodine Extended Release ("Tolterodine ER") on January 2, 2014.  During the first half of December 2013, Teva was under the impression—based on conversations with potential customers—that Mylan was not in a position to launch until 30 to 60 days after Teva launched.  Nonetheless, Teva was considering how to allocate the market with Mylan when it did eventually launch.  On December 3, 2013, J.K., a marketing executive at Teva, sent an e-mail to Rekenthaler, K.G., and several other Teva colleagues stating "we prepared for 50-60 share . . .  I am looking into the numbers as far as what this means."  To prepare offers and figure out the allocation of customers that would bring Teva its desired 50% to 60% market share, Teva executives were instructed to gather usage from potential customers.

628.     Through the first half of December 2013, as Teva was soliciting usage amounts from potential customers, customers were asking Teva to send in pricing offers before the launch.  Teva resisted sending out those offers and instead did not plan to do so until the January 2, 2014 launch date.  Teva's delay in putting together pricing for potential customers was part of a plan to drive up the amount it could charge for Tolterodine ER.  Specifically, Teva expected that on January 1, 2014, the price of branded Detrol LA would increase.  This would allow Teva to peg its price to the now inflated price of the branded drug and thereby command a higher price for Tolterodine ER on the January 2, 2014 generic launch date.

629.     At the end of the day on Friday, December 20, 2013, T.C. of Teva learned from D.H. at Cardinal that Mylan intended to launch its Tolterodine ER on January 2, 2014.  D.H. further provided T.C. with Mylan's pricing for two dosages, and conveyed that Mylan is "looking for a 40% market share," and that Teva "can figure the rest out."

630.     Figure it out they did.  T.C. informed her Teva colleagues of Mylan's plans.  K.G. of Teva then worked over the weekend to turn this information into initial pricing for all of

Teva's potential customers and then shared it internally. In a telling admission that Teva had no intention to bid competitively for all accounts, K.G. noted that the next step was "to pick who should receive" bids. The goal in "pick[ing] who should receive" bids was to ensure that both Mylan and Teva received their previously stated market share goals: Teva wanted "50-60 [%] share" while Mylan was only "looking for a 40% market share."

631.    On Monday, December 23, 2013, Rekenthaler, Patel, K.G., T.C., and several others at Teva had a telephone conference scheduled from 8:00 a.m. to 9:00 a.m. to discuss the Tolterodine ER launch strategy. Just minutes before the meeting was to start, Rekenthaler tried calling Nesta at Mylan. Nesta returned Rekenthaler's call at 8:15 a.m., which was during Teva's scheduled Tolterodine ER phone conference. Rekenthaler nonetheless answered Nesta's call on his cell phone and the pair spoke for 1 minute, 26 seconds. Immediately after Teva's scheduled Tolterodine ER phone conference, Rekenthaler tried calling Nesta two more times. At 10:22 a.m., Nesta returned Rekenthaler's calls and the pair spoke for an additional 12 minutes, 2 seconds. During these calls, Rekenthaler and Nesta exchanged the details about their offers to various customers, including the specific contractual language used in their offers.

632.    For example, at 10:33 a.m., while Rekenthaler was still on the phone with Nesta, K.G. sent an e-mail to Rekenthaler and others asking about the appropriate contractual language to use in offers about the potential for price increases. Minutes after Rekenthaler finished his call with Nesta, he replied with the exact language, in quotes, that Mylan was using:



```
From:      Dave Rekenthaler
Sent:      Mon 12/23/2013 10:41 AM (GMT-05:00)
To:        ████████, Maureen Cavanaugh
Cc:        Nisha Patel02
Bcc:
Subject: RE: Proposed Price Increase Language

Mylans language is vague.  "Pricing subject to change at Mylan's sole discretion."
```
[61]

---

[61]   *Id.* at ¶ 200.

633.     Most importantly though, during these calls between Nesta and Rekenthaler, Teva and Mylan reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and Mylan could reach their target share without eroding pricing.

634.     At 12:12 p.m. on December 23, 2013, K.G. circulated a revised version of Teva's pricing plan for the Tolterodine ER launch.  This new version incorporated Teva and Mylan's plan to allocate the market, including the submission of cover bids and abstention from bidding. Notably, the revised pricing plan included the following chart identifying the major customers (and their associated market share percentage) that Teva would receive to get close to its desired 60% market share while Mylan would get its desired 40% share:

| | |
|---|---|
| CVS | 18 |
| Wal-Mart | 5 |
| Cardinal | 8 |
| Omnicare | 1 |
| Anda | 2 |
| Rite Aid | 4 |
| Econdisc | 15 |
| McKesson | 6 |
| | 59 |

[62]

635.     In exchange for Mylan either submitting cover bids or abstaining from bidding on these customers, Teva reciprocated by submitting cover bids and/or refusing to submit bids to customers that Mylan targeted.  This is demonstrated by the fact that Teva's newly revised pricing plan now included considerably higher direct invoice prices for major customers allocated to Mylan; namely Walgreens, Cigna, Humana, Optum RX, Prime Therapeutics, and

---

[62] *Id.* at ¶ 201.

Kaiser.  The table below includes a comparison of Teva's pricing plan for these Mylan customers before and after Rekenthaler spoke with Nesta on December 23, 2013:

| Dosages | Initial Pricing Plan | | Price after Dave Rekenthaler Speaks with Jim Nesta | |
|---|---|---|---|---|
| | **WALGREEN** | | **WALGREEN** | |
| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 83.03 | 114.30 | 107.93 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 249.08 | 342.90 | 323.80 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,383.78 | 1,866.90 | 1,798.91 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 83.03 | 114.30 | 107.93 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 249.08 | 342.90 | 323.80 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,383.78 | 1,866.90 | 1,798.91 |
| | **CIGNA** | | **CIGNA** | |
| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| | **HUMANA** | | **HUMANA** | |
| Product Description | | Direct Invoice | | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | | 88.05 | | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | | 264.15 | | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | | 1,467.50 | | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | | 88.05 | | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | | 264.15 | | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | | 1,467.50 | | 1,800.00 |
| | **OPTUM RX** | | **OPTUM RX** | |
| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |

[63]

636.    In addition to submitting inflated bids for Walgreens, Cigna, Humana, Optum RX, Prime Therapeutics, and Kaiser, Teva agreed to refrain from bidding for certain customers, such as Publix, Ahold, Hannaford, and PVA Health.

---

[63]    *Id.* at ¶ 202.

637.    The following day, on December 24, 2013, Rekenthaler and Nesta had two more calls to confirm and refine Teva and Mylan's market allocation agreement.  Those calls lasted for nine (9) minutes and eight (8) minutes, respectively.

d.    Capecitabine

638.    To resolve patent litigation, the brand manufacturer, Roche Pharmaceuticals, entered into settlement agreements with various generic manufacturers—including Teva and Mylan—that would allow those generic manufacturers to sell generic Capecitabine after a certain period of time.

639.    As early as January 2014, both Teva and Mylan were making plans for their eventual launch of Capecitabine.  Part of this planning included the sharing of information so that they could allocate the market between them.  For example, in a January 31, 2014 e-mail, J.P., a national accounts executive at Teva, informed K.G., Rekenthaler, and others at Teva that Mylan was courting a specific customer, Armada Health Care, and that "Mylan estimated Armada's share on [Capecitabine] at 37%."  Teva incorporated this data it received from Mylan into its own launch plan for Capecitabine.

640.    On February 26, 2014, Nesta of Mylan called Rekenthaler of Teva and the two spoke for sixteen (16) minutes.  Nesta informed Rekenthaler that Mylan would not be able to launch on time with Teva.  Rekenthaler immediately reported this news internally at Teva.

641.    In early March 2014, Teva launched as the exclusive generic Capecitabine manufacturer.  Teva remained the exclusive generic Capecitabine manufacturer until Mylan entered in August 2014.

642.    On August 4, 2014, Nesta and Rekenthaler spoke by phone three times.  On these calls, Nesta informed Rekenthaler that Mylan would soon enter the Capecitabine market and the pair discussed how to allocate the market.

643.    For example, at 12:46 p.m. that day, Nesta called Rekenthaler and they spoke for a little more than five (5) minutes.  Immediately after hanging up the phone, Rekenthaler sent the following e-mail:

| | |
|---|---|
| From: | Dave Rekenthaler |
| Sent: | Mon 8/04/2014 12:51 PM (GMT-05:00) |
| To: | ▬▬▬▬▬▬▬▬▬▬▬ Nisha Patel02 |
| Cc: | Maureen Cavanaugh |
| Bcc: | |
| Subject: | Capcetibine |

Hearing Mylan to get approval this week.  We need to look at our market and discuss defense strategy. [64]

644.    Cavanaugh responded that she would be in the office the next day and wanted to discuss it with Rekenthaler in person.

645.    Less than an hour later, Rekenthaler sent another e-mail, just to Patel, asking her to run a customer report and indicating that Mylan will "be looking at ABC, McKesson, and Econdisc as well as a couple small guys, probably aiming at 35% share." Mylan did seek the business for each of these three companies and Teva conceded each of them, pursuant to the agreement Rekenthaler had reached with Nesta.

646.    On August 7, 2014, McKesson informed Teva that it received a bid for Capecitabine and gave Teva the opportunity to bid to retain the business.  Patel then sent an e-mail to K.G., Rekenthaler, and C.B. at Teva to ask if they had "[t]houghts in regards to [loss of exclusivity]."  C.B., a senior operations executive at Teva, replied that Teva did "have a plan," but C.B. did not want to put the plan in writing.  Instead C.B. told Patel she "wi[ll] call" to discuss it.  K.G., separately, questioned whether the competitive bid was coming from Mylan, and asked Rekenthaler whether he had any additional information.  Rekenthaler also did not

---

[64]    *Id.* at ¶ 211.

want to put that "additional information" in writing, so he responded:  "I'll catch up with you today."

647.    The "plan" was the market allocation scheme previously agreed to by Nesta and Rekenthaler on behalf of Mylan and Teva.  The same day that Mylan put a bid in to McKesson, August 7, 2014, Nesta and Rekenthaler spoke by phone for nearly thirteen (13) minutes.  On that call, Rekenthaler and Nesta discussed Mylan's bid to McKesson and reconfirmed their market allocation scheme.

648.    This market allocation "plan" was highlighted in other e-mails as well.  On August 10, 2014, C.B. e-mailed Rekenthaler, Patel, and K.G. about the plan.  C.B. stated that C.B.'s "notes are showing that are (sic) plan is to concede McKesson, Econdisc, Rite-Aid, and Cardinal," but that C.B. wanted to confirm.  Rekenthaler corrected C.B., stating that Mylan is "going after McKesson, ABC (only) and Econdisc," but that Teva "ha[s] not heard from Econdisc yet." Rekenthaler knew Mylan was targeting Econdisc, even though Econdisc had not contacted Teva, because he and Nesta had previously discussed it.

649.    The next morning, at 8:30 a.m. on August 11, 2014, Rekenthaler alerted others at Teva that Mylan had received formal approval to market Capecitabine and that he was "[c]hecking on shipping status."  Five minutes later, Rekenthaler received a call from Nesta. After exchanging voicemails, the two spoke at 8:52 a.m.  The call lasted nearly six (6) minutes. Shortly after hanging up the phone, at approximately 9:02 a.m., Rekenthaler e-mailed K.G., Patel and others at Teva to confirm that Mylan's "primary targets are ABC, McKesson and Econdisc." He added that Teva "may hear from some other smaller guys as well" and that he "do[es]n't expect price to be aggressive."

650.     In accordance with their market allocation scheme, Mylan targeted and Teva conceded the Capecitabine business at ABC, Econdisc, and McKesson/Rite-Aid.

651.     Teva also conceded some of the "smaller guys" as well, pursuant to the agreement.  On August 14, 2014, for example, Cigna informed Teva that it received a bid for Capecitabine.  On August 18, 2014, Rekenthaler called Nesta to discuss the market allocation scheme and Mylan's bid to Cigna.  The pair talked for thirteen (13) minutes.  The next day, K.G. circulated an internal e-mail confirming that Teva "will be conceding this business" at Cigna.

### 2.     Teva/Sandoz

#### a.     *Ethinyl Estradiol and Levonorgestrel*

652.     During the relevant time period, both Teva and Sandoz marketed Ethinyl Estradiol and Levonorgestrel under multiple names – including both Portia and Jolessa.

653.     In or around May 2012, Teva had much higher market share than Sandoz for both Portia and Jolessa.  Teva's market share for Portia was 37% compared to Sandoz's 17%, while Teva's market share for Jolessa was 43% compared to Sandoz's 11%.

654.     On May 11, 2012, Walmart contacted Teva with a right of first refusal and explained that another supplier had made an offer for the sale of four drugs, including Portia and Jolessa.  T.C., a senior sales executive at Teva, responded, "We really need to know who is challenging.  Sandoz???  Glenmark???"  The customer responded that it was Sandoz.  T.C. had initially been very reluctant to let Sandoz have the business, candidly remarking to the customer that, "[w]e are not going to let Walmart go to Sandoz [because] we have conceded a number of accounts to Sandoz that were not as strategic to Teva."

655.     After sending out a competitive offer for the sale of three drugs, including Portia and Jolessa, to the customer on May 16, 2012 and an even more competitive offer on May 18 – Teva abruptly backtracked on May 23, 2012 and removed Portia and Jolessa from the offer.  The

night before this change in plans, on May 22, Green of Teva spoke on the phone with CW-2, then at Sandoz, for five (5) minutes, and agreed to withdraw the offer for Portia and Jolessa. The decision to concede the Walmart business to Sandoz led to a more equal share split between the companies for both Portia and Jolessa. Teva discussed the decision internally and explained that the reason for the "change in plans" was that Teva was "going to concede this business to Sandoz . . ."

656.   Sandoz continued to coordinate with Teva to achieve its "fair share" of the markets for both Portia and Jolessa. On July 2, 2013, another key customer contacted Teva stating it had received bids on Portia and Jolessa and, in order for Teva to retain the business, Teva would need to submit its "best bids." On July 9, 2013, CW-1 of Sandoz called Patel and left a voicemail. Shortly thereafter, they connected for a sixteen (16) minute call. On July 10, Teva learned that the challenger was Sandoz. At 12:16 p.m., Rekenthaler forwarded an e-mail to Patel and posed the question, "Who's over at Sandoz now?" Patel did not respond by e-mail, but due to the close proximity of their offices she likely related her conversation with CW-1 directly to Rekenthaler.

657.   Rekenthaler then called CW-2 at Sandoz at 1:26 p.m. that same day and they spoke for two (2) minutes. CW-2 called Rekenthaler back a few minutes later and they spoke for nine (9) minutes. CW-2 and Rekenthaler would speak once more later that day, at 4:48 p.m., for seven (7) minutes. Later that same evening, Teva submitted a cover bid to the customer for Portia and Jolessa, which the customer described as "not aggressive enough" for their primary supply. Teva submitted an intentionally inflated bid for the two drugs in order to ensure that Sandoz obtained the primary award with the customer.

b.     *Temozolomide*

658.    The patent on Temodar, the branded version of Temozolomide, was set to expire in early 2014, but both Teva and Sandoz had independently obtained the right to launch in August 2013 – six months prior to the patent expiration.  Leading up to the launch of the generic, Teva coordinated with Sandoz to divide up the market.

659.    On July 18, 2013, a large retail pharmacy customer ("Pharmacy-2") submitted an RFP to Sandoz for Temozolomide.  Playing by the rules of the road, Sandoz waited to see what Teva was going to do before submitting their own bid.  That same day, CW-1 received a telephone call from Patel.  Patel sought information on Sandoz's current customers and discussed options to allocate customers for Temozolomide.  Nothing was agreed to on that call.

660.    On July 22, 2013, P.G., a senior Sandoz executive, instructed his team to find out Teva's plans with regard to Pharmacy-2:  "Please find out if Teva is submitting an offer to them." The next morning, S.G., a national accounts executive at Sandoz, spoke with Pharmacy-2 and asked Pharmacy-2 to find out Teva's plans.  S.G. summarized his call with Pharmacy-2 to his team:  "I just spoke to [Pharmacy-2] regarding Temozolomide.  [Pharmacy-2] has not yet received an offer from Teva on the product.  At this time, [Pharmacy-2] is reaching out to Teva to understand their supply and launch status.  [Pharmacy-2] will be circling back and I will share the feedback we receive with everyone on this email trail."

661.    At the same time, CW-1 was reaching out to Teva directly to get more information.  CW-1 called Patel at approximately 1:45 p.m. on July 23, 2013.  After exchanging voicemails, they spoke for over fourteen (14) minutes that same afternoon.

662.    Also on the afternoon of July 23, Pharmacy-2 replied to Sandoz and cryptically delivered Teva's message regarding its plans for Temozolomide:

186

**From:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Sent:** Tuesday, July 23, 2013 3:26 PM
**To:** Greenstein, Steven
**Subject:**

8/11 launch

Looking to play nice in 2 player market

Have supply for that share.

What are your plans?                                    65

663.     By using Pharmacy-2 as its intermediary, Teva was able to communicate to Sandoz (a) when it was prepared to launch Temozolomide, (b) that it was not planning to compete aggressively or pursue more than its fair share, (c) that it had sufficient stock of Temozolomide to sustain around a 50% market share, and (d) an inquiry regarding Sandoz's plans for Temozolomide.  Sandoz understood the implications of the communication and understood that "Teva is seeking a ~45-50% share." One Sandoz executive responded internally and exclaimed that this was "[g]reat news . . . !"

664.     On July 30, 2013, another customer, CVS Caremark, contacted Teva asking for an offer on Temozolomide.  T.C., a senior sales executive at Teva, discussed the matter internally and asked her boss, Rekenthaler, "[i]s the strategy to target CVS[?]" Rekenthaler responded by alluding to the deal that had already been struck with Sandoz:  "We'll send offers out to everyone.  My instincts tell me Sandoz will end up with them as we'll probably be more focused on [Pharmacy-2] on this one.  Again, we'll send them out an offer same time as everyone else and respond from there."  Rekenthaler most likely got his information from Patel.  Just one day earlier, on July 29, 2013, Patel had called CW-1 at Sandoz and spoke for nine (9) minutes, where the two discussed how to carve up the market for the drug.

---

65     Source:  Amended State AG Complaint No. 2 ¶ 230.

665.     Teva and Sandoz were also coordinating through other channels.  After receiving the RFP from Pharmacy-2, S.G. of Sandoz coordinated with T.S., a senior account executive at Teva, on a seven (7) minute call on July 29, 2013 followed by an eleven (11) minute call on July 31, 2013.  After those calls, S.G. suggested in an internal e-mail on July 31 that Sandoz cede the business and instead submit a cover bid:  "[Pharmacy-2] has received an offer from Teva on Temozolomide.  They are asking for an offer from Sandoz.  Even if we decide not to take this business, I would recommend that we submit an offer."

666.     Similarly, on July 29, 2013, Green spoke to CW-2 of Sandoz two (2) times.  The two spoke again on July 31, 2013 for six (6) minutes.  During those calls, Green told CW-2 about Teva's launch plans and that Teva wanted Pharmacy-2's business.  The next day, August 1, 2013, D.P., another Sandoz executive, e-mailed Kellum, conveying the message from Green:

| From: | ███████ [/O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=████ ███:108848C-2032-4369-BDD7-5742A8329215] |
|---|---|
| Sent: | 8/1/2013 11:52:29 AM |
| To: | Kellum, Armando [/O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Kellum, Armando3a1dd060-78e9-4d1c-904b-da70bd48a7c5] |
| CC: | ███████ [/O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=██████████554612fa-c83d-4cef-8dde-6baf08aeaa0f] |
| Subject: | Teva temzol |

AK:

███ just got some intel from a reputable source:

Teva plans to launch on Monday (Aug 12)
Teva sending offers to all customers today
Teva wants ███████

Regards,

███████                                                                                                      66

667.     Teva and Sandoz communicated their future plans with each other for other accounts in addition to Pharmacy-2 and CVS.  On July 31, 2013, D.P. of Sandoz e-mailed an

---

66  *Id.* at ¶ 234.

update on Temozolomide to his coworker, stating: "Teva has sent offers to ABC and [Pharmacy-2] and is planning to send to Econdisc tomorrow[.]"

668.    Going forward, Sandoz and Teva continued to coordinate with respect to Temozolomide. On August 12, 2013, the same day as Teva's launch, CW-2 met in person with Rekenthaler at the Grand Lux Café in Las Vegas during the NACDS Total Store Expo conference. There, Rekenthaler discussed, among other things, Temozolomide and informed CW-2 that Teva had officially launched and shipped all formulations of the drug.

669.    Although Teva initially obtained the CVS account in August 2013 due to Sandoz's inability to supply the 250mg strength of Temozolomide, the companies had agreed that the account would revert to Sandoz once Sandoz could supply that dosage strength. In an internal e-mail dated August 16, 2013, a Teva employee confirmed the plan: "This is perfect I spoke to [a CVS representative] and as soon as Sandoz is available to launch the 250mg we kill the contract."

670.    CW-1 spoke to Patel both before and after Sandoz sent out any offers regarding Temozolomide to develop and ensure the appropriate fair share balance between the two competitors.

### c.    *Tobramycin*

671.    Beginning in October 2013, prior to the first generic launch of Tobramycin (for which Teva would have 180-day generic exclusivity), Sandoz began making plans for its entry after Teva's exclusivity period. These plans included going after Sandoz's "fair share," but depended on Teva being "rational." A.S., a Sandoz executive responsible for product launches, wrote in an internal e-mail in October 2013: "[w]e will aim to go for our fair share of the market, and exact goals will depend on how Teva goes into the market on day 1, and how rational they behave on day 181."

672.     As expected, Teva was "rational" when it came time to give up share to Sandoz. Nearing Teva's loss of exclusivity and Sandoz's entry, on July 1, 2014, Teva and Sandoz began sharing information and coordinating to divide up the market for Tobramycin.  Patel exchanged seven (7) calls with CW-1 on July 1, during which they discussed Sandoz's launch plans and how to divide up the market for Tobramycin.  Patel conveyed some of this information in an internal Teva e-mail the same day, writing, "[A]s a heads up, I heard that Sandoz plans to ship Tobi [Tobramycin] prior to Akorn.  Hearing they are ready to ship once they secure business, and we have been challenged."  The next day, Teva made the decision to concede two different accounts for Tobramycin to Sandoz.

673.     On July 7, 2014, Patel and CW-1 spoke five more times, including one call lasting eleven (11) minutes.  On these calls, CW-1 and Patel discussed how to divide up the market for Tobramycin, including specific accounts that each would maintain or concede to the other.  Patel then memorialized the agreement in an e-mail two days later.  The result:  Teva would take Walgreens, McKesson, Econdisc, ABC, and Omnicare; while Sandoz would take CVS, Cigna, Prime Therapeutics, Kinney Drugs, and OptumRx.  Teva also planned to concede the Cardinal business to Sandoz.

674.     Patel told CW-1 specifically that Teva would not even submit a bid to CVS.  This was significant because Tobramycin was a very expensive product, and Sandoz was able to acquire the CVS business by offering only a nominal reduction to the extremely high Teva price.

675.     According to plan, Teva conceded the CVS business to Sandoz after CVS contacted Teva and requested that Teva submit a lower price to retain the business.  Rekenthaler wrote in an internal e-mail, "I notified CVS that we would be conceding their business.  [T.C.],

never a pleasant call so I figured I'd simply handle it myself." Teva also went through with its

plan to concede Cardinal to Sandoz.

676.    CW-1, in turn, told Patel that Sandoz would not pursue business from ABC and

Walgreens.  CW-1 spoke with Kellum about his conversations with Patel and the agreement to

stay away from Walgreens and ABC, and Kellum agreed with the plan.  Pursuant to that

agreement, Sandoz made no effort to contact those two large customers when it entered the

market.

677.    CW-1 and Patel also discussed Sandoz's target market share.  CW-1 informed

Patel that Sandoz was seeking a 50% share, but Patel thought that was "unrealistic due to

Akorn's expected entry." After discussing Sandoz's share goal with Rekenthaler, Patel went

back to CW-1 and informed him "that a 25% share was reasonable." Sandoz appeared to comply

with that, as Patel observed that Sandoz "appear[s] to be taking a responsible approach."

678.    On July 9, 2014, one of the above allocated customers, Kinney Drugs, approached

Teva asking for a lower price on Tobramycin.  A Teva analyst stated in an internal e-mail, "[w]e

are strategically going to decline to bid on this request per Nisha." A Teva national accounts

director was confused by this decision and responded, "Really? Do you have a little more detail?

It is such a small qty." The analyst responded and said, "[w]e were given direction from Nisha

not to pursue this opportunity.  My understanding of this is there is a new market entrant,

(Sandoz) and we are trying to keep our current customers instead of picking up new business."

Patel's direction had come after she had called CW-1 at Sandoz twice on July 9, 2014 and left

him a voicemail.  CW-1 then returned her call the same day and the two spoke for four (4)

minutes.

d.      *Dexmethylphenidate HCL Extended Release*

679.    As Sandoz was preparing to enter the market on the 40mg strength of Dexmethylphenidate HCL ER in February 2014, Patel of Teva spoke frequently with CW-1 at Sandoz about how to divide the market so that Sandoz could obtain its fair share without significantly eroding the price.  On February 10, 2014, for example, CW-1 began internal preparations to pursue the Rite Aid account for Dexmeth ER 40mg.  Later that night, CW-1 called Patel and the two spoke for more than thirteen (13) minutes.  On February 18, Patel left a voicemail for CW-1.  That same day, Teva conceded the Rite Aid account to Sandoz.  Patel and CW-1 then spoke again by phone on February 20, 2014.

680.    Similarly, on February 12, 2014, Sandoz submitted a bid to ABC for the 40mg strength of Dexmeth ER.  After Patel spoke with CW-1 on February 10 and again on February 12, 2014, Teva agreed to let Sandoz have the business.  In an e-mail to her team on February 12, Patel summarized the understanding that Teva had reached with Sandoz:



From:     Nisha Patel02
Sent:     Wed 2/12/2014 6:34 PM (GMT-05:00)
To:       ████████████
Cc:
Bcc:
Subject: Re: ABC Dexmethylphenidate 40mg - Challenge

We have 100% of the market, so will have to give someone up. ABC is the smallest wholesaler, so it makes sense for this class of trade. Sandoz is being responsible with their pricing. We should be responsible with our share. Plus, between the WBAD members, makes more sense to hold onto Walgreens than ABC, if we were going to lose one of them.

Sent from my iPhone                                                                                        67

681.    One of the Teva national account managers on the e-mail responded by confirming that the approach "makes total sense."

---

67  *Id.* at ¶ 250.

682.     On February 14, 2014, Teva also refused to lower its price for Dexmeth ER when approached by a GPO customer, Anda, even though Sandoz's price was not significantly lower than Teva's – essentially conceding the business to Sandoz.

683.     Further, on February 20, 2014, another large retail customer approached Teva indicating that because a new competitor had launched for Dexmeth ER, the customer was entitled to certain price protection terms (i.e., a lower purchase price for the drug).  Patel spoke to CW-1 the same day for almost twenty-one (21) minutes.  The next day, February 21, Patel responded internally about the customer's request, with additional inside information from Sandoz, stating:  "[t]he competitor (Sandoz) has not yet shipped.  The new price will become effective on and the price protection should be calculated on the date that Sandoz ships.  The expected date is 2/28/14."

684.     Also on February 21, 2014, Patel sent a calendar invitation to Rekenthaler and other team members for a meeting on February 24 where one of the topics to be discussed was "Post Launch Strategy" for "Dexmethylphenidate 40mg:  Sandoz (AG) entering market."  Not surprisingly, she called CW-1 a few days later, on February 27, to further coordinate about Dexmeth ER.

685.     Throughout this time period, Sandoz abided by fair share principles and its ongoing understanding with Teva.  In February 2014, Sandoz's target market share for varying strengths of Dexmeth ER varied by how many manufacturers were in the market.

686.     Teva and Sandoz were not alone in allocating customers for certain formulations of Dexmeth ER.  The agreement was also carried out by other manufacturers allowing Sandoz to take share from them.  In February 2014, for example, as Sandoz was seeking share on the 15mg dosage strength of Dexmeth ER, Par "gave up the business to keep the market share even."  As

Sandoz was entering the market, Rekenthaler of Teva was speaking to M.B., a senior national

account executive at Par, right around the same times that Patel had been speaking to CW-1 –

including two calls on February 10 (18 and 3 minutes), two (2) calls on February 19 (2 and 22

minutes), and calls on February 24 and 25, 2014 – in order to effectuate the scheme.

687.    The market allocation scheme between Teva and Sandoz on Dexmeth ER

continued through at least mid-2015.  On May 6, 2015, for example, Teva declined to submit a

bid to Walgreens for Dexmeth ER 5mg on the basis that "there is equal share in the market

between competitors." Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed

Health Care Associates, a large GPO, on Dexmeth ER 20mg, on the basis that Sandoz already

had 57% market share – greater than its sole competitor on this dosage strength, Teva.  When a

Sandoz national account representative communicated this decision to the customer, he lied and

explained that the decision not to bid was based on limited supply.

### 3.    Teva/Lupin

#### a.    Lamivudine/Zidovudine (generic Combivir)

688.    Teva launched its generic Combivir product in December 2011.

689.    In mid-May 2012, two competitors – Lupin and Aurobindo – received FDA

approval for generic Combivir and were preparing to enter the market.

690.    Even before those two companies obtained FDA approval, Teva was

communicating with both about how to share the market with the new entrants.  Rekenthaler was

speaking to R.C., a senior-most executive at Aurobindo, while Green was speaking to Berthold

of Lupin and Grauso of Aurobindo.

691.    For example, on April 24, 2012, T.C. of Teva asked her co-workers whether they

had heard about any new entrants to the market for generic Combivir.  Rekenthaler responded

immediately that Aurobindo was entering.  When T.C. questioned that information based on her

understanding of how quickly the FDA typically approved new product applications,

Rekenthaler assured her that the information was coming from a reputable source:

> **From:** Dave Rekenthaler
> **Sent:** Tuesday, April 24, 2012 11:17 AM
> **To:** ███████
> **Subject:** RE: what r you guys hearing on generic combivir?
>
> It was brought up to me last week by our good friend so I'm assuming it's accurate. [68]

692.    That "good friend" was Aurobindo's R.C., who had previously worked with both

T.C. and Rekenthaler while at Teva.  Rekenthaler was reluctant to identify R.C. in writing as it

would evidence conspiratorial communications between the two competitors.  To confirm this

information, Green also called and spoke to Grauso of Aurobindo that same day for twelve (12)

minutes and Berthold of Lupin for four (4) minutes.

693.    After speaking with Berthold, Green responded separately to T.C., providing

specific information regarding Lupin's entry plans, including commercially sensitive intelligence

about Lupin's anticipated bid at a large wholesaler.  Green and Berthold then spoke again the

next day, April 25, 2012, for seven (7) minutes.

694.    In early May, with the Lupin and Aurobindo launches just days away,

communications among all three competitors accelerated noticeably.  Over the four-day period

from May 7 to May 10, for example, the three companies spoke at least 32 times, as set forth in

---

[68]    *Id.* at ¶ 261.

the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Durati |
|---|---|---|---|---|---|
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:10 |
| 5/7/2012 | Text | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:00 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:41 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:03:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:36 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:02:32 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:17 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:00 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:02:00 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:47 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:31 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:02:29 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Teva) | 0:00:24 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:07:57 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:02 |
| 5/9/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 0:13:00 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:06:07 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:01 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:39 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:07:27 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:03:10 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:10:15 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:05:52 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:13:29 |

[69]

695.    During this four-day period, the three individuals were negotiating and discussing the specific customers that Teva would concede and retain in order to make Lupin and Aurobindo's entry into the generic Combivir market as seamless as possible. The phone records demonstrate several instances during this four-day period where two of the individuals

---

[69]    *Id.* at ¶ 263.

referenced above (Green, Berthold and/or Grauso) would speak, followed by a phone call by one of those two individuals to the individual that was not part of the original conversation.

696.   Lupin was able to enter the market for generic Combivir and obtain more than a 30% market share without significantly eroding the price due to the understanding with Teva and Aurobindo that each was entitled to its fair share of the market.

<em>b.   Irbesartan</em>

697.   Teva received approval to manufacture generic Irbesartan in March 2012.

698.   On March 6, 2012, Teva's K.G. polled the Teva sales team seeking information about competitors that were also making offers to supply Irbesartan.

699.   At 11:27 a.m., J.P., an account manager at Teva responded:  "Lupin is promising offers today." Less than twenty minutes later, Green placed a call to Berthold at Lupin.  They talked for seventeen (17) minutes.  Shortly after hanging up the phone, Green e-mailed his colleagues with the information he obtained:



700.   That same day, Rekenthaler informed the group that he still had not received "a call from any other manufacturer on Irbesartan." He received an immediate response from a

---

70   *Id.* at ¶ 273.

senior commercial operations executive at Teva, expressing his displeasure:



71

701.    At 10:54 a.m. the next day, Green called Berthold again.  They spoke for nearly

seven (7) minutes.  At 12:20 p.m., K.G. of Teva shared with the sales team the competitively

sensitive information Green had obtained.  Included were the details Berthold had shared with

Green about which competitors were launching/not launching the drug, and the identity of the

customers that received offers.  K.G. stated that Teva was in a position to take up to a 40%

market share when it launched Irbesartan on March 30, 2012.

c.    *Drospirenone and Ethinyl Estradiol (Ocella)*

702.    Barr Pharmaceuticals received approval to market generic Ocella in 2008, and

Teva continued to market the drug after the acquisition of Barr in 2011 under the name Gianvi®.

703.    In late 2012, Lupin received approval to market a generic Ocella product.

704.    By April 2013, Lupin was making plans for a summer 2013 entry into the market

and contacted Teva to initiate negotiations on how the competitors would allocate fair share

between themselves.  On April 24, 2013, Berthold of Lupin called Green at Teva.  The two

spoke for over three (3) minutes.  Berthold called Green two more times the following day.

705.    The negotiations intensified the following week among Teva, Lupin, and a third

competitor – Actavis.  In preparation, on April 29, 2013, K.G. of Teva asked a colleague for

---

71    *Id.* at ¶ 274.

current market share figures along with a list of Teva's generic Ocella customers. The colleague responded with a customer list, estimating Teva's current share of the market at 70-75%.

706.    The next day, April 30, A.B., a senior sales and marketing executive at Actavis, and Rekenthaler of Teva spoke twice by phone. That same day, Patel of Teva also called A.B. On May 1, Patel sent A.B. four (4) text messages.

707.    The competitors' communications continued into early May. On May 6, Patel and Berthold spoke twice by phone; the second call lasting twenty-two (22) minutes. Green and Berthold also spoke that same day. On May 7, Patel and Berthold had yet another call, this one lasting over ten (10) minutes. Patel also placed a call to Rogerson at Actavis, which lasted thirty-nine seconds.

708.    Faced with the news it had received from a major customer on May 8 – that Actavis had bid for that customer's business for generic Ocella – Teva doubled down on its efforts to reach a deal with its competitors that would give each its fair share. Patel called Rogerson on May 8, and they spoke for nineteen (19) minutes. On May 9, Green spoke with Berthold twice, for one (1) and twelve (12) minutes, respectively.

709.    The following day, Teva's L.R. complied with Rekenthaler's request for an analysis of the business Teva would lose by conceding its two major customers for this drug to Actavis and/or Lupin. Armed with that analysis, Patel spoke to Berthold three times that afternoon – with one call lasting over seventeen (17) minutes. Patel also called Rogerson at Actavis and the two spoke for more than five (5) minutes.

710.    On May 14, 2013, K.G. of Teva recommended to Rekenthaler that Teva concede the business to Actavis. Rekenthaler replied simply: "Agreed."

711.    On July 10, 2013, Green spoke to Berthold twice (for more than eight (8) minutes and more than two (2) minutes).  After the first of those calls, Green requested specific information from a colleague to help him continue to negotiate with Lupin:

> **From:** Kevin Green
> **Sent:** Wednesday, July 10, 2013 9:46 AM
> **To:**
> **Cc:**                , Nisha Patel02
> **Subject:** Ocella
>
>
> Tom,
>
>
> Can you run me the normal profitability analysis on all customers with pricing and market share. Lupin is entering the market.

[72]

712.    Later that day, Green called and spoke to Patel for more than seven (7) minutes, conveying what he had learned from Berthold.  During that call, the two decided that Patel would call Berthold back and confirm the agreement between Teva and Lupin.  Patel called Berthold shortly after and the two spoke for more than four (4) minutes.  They spoke again first thing the next morning, for nearly one (1) minute.

713.    The next day, Patel e-mailed Green, saying:  "BTW, Ocella.  Check!"  Green, confused by the e-mail, responded:  "Huh...  you are calling....correct?"  Patel confirmed that she had indeed called her counterpart at Lupin:  "Yes.  I was saying it's all done."

714.    Discussions between Teva and Lupin continued on July 17, 2013 with a call between Green and Berthold that lasted twenty (20) minutes.

715.    On July 29, 2013, Green announced to his colleagues:  "Lupin has entered and we need to evaluate."

716.    The lines of communication between competitors Teva and Lupin remained open and active over the next few months as they worked on the details of which company would take

---

[72]  *Id.* at ¶ 286.

which generic Ocella accounts.  On September 5, 2013, for example, Rekenthaler conveyed to a colleague the importance of retaining a particular customer's account, along with his understanding of Green's discussions with Berthold about Lupin's desired market share.  Green spoke to Berthold by phone twice the following day to confirm the understanding between the two companies.

717.    On September 9, 2013, K.G. of Teva sent an internal e-mail to his colleagues conveying his thoughts about Lupin's bid for a portion of another customer's generic Ocella business.  He informed them that because Teva had secured two other significant customers, "we will likely need to give up some of our formulary position to this new market entrant."

718.    In mid-October 2013, as Teva and Lupin finalized the allocation of accounts between them, K.G. sent a word of caution to a co-worker, reminding her of the parameters of the furtive arrangement.  He told her to be careful before conceding large customers on a "bucket basis" rather than drug-by-drug in order to "make sure we are not giving up volume on products where we do not have our fair share."

*d.    Norethindrone/Ethinyl Estradiol (Balziva ®)*

719.    Teva markets its generic version of Norenthindrone/Ethinyl Estradiol under the name Balziva®.

720.    On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business.  Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing Norethindrone/Ethinyl Estradiol.

721.    Teva employees discussed internally how to make room for this new player in the market, with one expressing concern that "[w]e would lose our current market lead if we were to concede this business."

722.     The discussions about how to share the market with the recent entrant were not limited to internal communications, however.  On January 24, 2014, Patel spoke to Berthold at Lupin twice by phone.

723.     Five days later, on January 29, Patel informed Rekenthaler of her recommendation based on her communications with Berthold, to take a cooperative stance towards this competitor, saying:  "Kevin and I are in agreement that we should concede part of the business to be responsible in the market."

724.     On February 4, Patel received the profitability analysis she requested in order to determine how much of the customer's business to hand over to Lupin.  That same day, she spoke to Berthold two more times to further coordinate Lupin's seamless entry into the market.

### 4.     Teva/Actavis

#### a.     Amphetamine/Dextroamphetamine Extended Release

725.     Teva began marketing Amphetamine/Dextroamphetamine Extended Release ("MAS-XR"), after the expiration of brand manufacturer Shire's patent on Adderall XR®.

726.     On April 9, 2012, a large customer contacted Teva to request a price reduction because a new competitor had expressed an interest in "all or some" of its MAS-XR business.  A senior Teva sales director, T.C., insisted on knowing the identity of the competitor before deciding what Teva's response would be.  The customer responded that the competitor was Actavis, and that Actavis was expecting approval soon to enter the market for that drug.

727.     Teva deferred its decision on pricing until Actavis was in a position to ship the product.

728.     Actavis obtained FDA approval to manufacture various formulations of MAS-XR on June 22, 2012.  At 9:58 p.m. that same evening, Rekenthaler instructed Teva employees to find out Actavis's plans regarding its newly-approved generic, including shipping details and

inventory levels.  At 8:32 a.m. the next morning, Teva employee T.S. responded that she had

spoken to M.P., a senior Actavis sales and marketing executive, and conveyed to Rekenthaler the

details of their conversation:

> **From:** ▆▆▆▆
> **Sent:** Saturday, June 23, 2012 8:32 AM
> **To:** Dave Rekenthaler; ▆▆▆▆▆▆▆         Kevin Green
> **Subject:** Re: Actavis Adderall XR
>
> Spoke to ▆▆▆▆. Going after approx 15 share.
> 1 wholesaler (either McKesson or Cardinal) as backup and possibly Econdisc. NOT Walgreens and CVS. [73]

729.    The customer that had sought a price reduction from Teva in April 2012 was not

among those named by Actavis as its targets.

730.    Upon learning which customers Actavis wanted, T.C. warned colleagues that this

allocation of market share could be tricky.  She cautioned that if Teva decided to concede a

particular wholesaler to Actavis, it needed to be "mindful" that the wholesaler also did product

warehousing for a different customer whose business Actavis was not soliciting.

731.    One year later, Teva's customer renewed its request for a price reduction on

MAS-XR, citing Actavis's desire to gain a share of the customer's business for the drug.  On

May 7, 2013, T.C. informed the customer that Teva would agree to revise its price in order to

retain 100% of the customer's business.  T.C. made it clear that Teva had already conceded an

appropriate amount of business to its competitor.  She stated:  ". . . we have plenty of supply and

want to keep you [sic] full business [sic] we have already let other customers go to activis [sic]

go to help the market dynamites [sic]."

---

[73]    *Id.* at ¶ 333.

b.      *Amphetamine/Dextroamphetamine Immediate Release*

732.     In March 2014, Aurobindo was making plans to enter the market with its

amphetamine/dextroamphetamine immediate release ("MAS-IR") product.  On March 18, 2014,

Teva's J.P. shared with her colleagues that Aurobindo's market share target for the impending

launch was 10%.  Teva's senior marketing operations executive, K.G., indicated that Teva was

aware that both Aurobindo and Actavis were launching.

733.     A flurry of telephone communications between Teva and these two competitors

took place on the days surrounding the foregoing e-mail.  The day before, on March 17, 2014,

Patel had spoken to Actavis's Director of Pricing, Rick Rogerson, three (3) times.  Rekenthaler

and Falkin of Actavis also spoke once on that day.  On March 18, 2014, the day of the e-mail,

Rekenthaler and R.C., a senior-most executive at Aurobindo, had a thirty (30) minute telephone

conversation.  Rekenthaler and Falkin spoke again seven (7) times on March 20, 2014.

734.     On April 16, 2014, Teva received word from a customer that a new competitor in

the market had offered a lower price than Teva's current price for MAS-IR.  Patel informed K.G.

that the challenge was coming from Actavis and recommended that Teva concede that

customer's account.  At 1:43 p.m., she communicated to another colleague that the decision had

been made to concede.  Apparently closing the loop, she called Rogerson at Actavis at 1:55 p.m.

They spoke for just over four (4) minutes.

c.      *Dextroamphetamine Sulfate Extended Release*

735.     On June 19, 2014, as Actavis was entering the market for Dextroamphetamine

Sulfate Extended Release ("Dex Sulfate XR"), Patel reviewed a profitability analysis for that

drug and asked Rekenthaler what share of the market Actavis was targeting.  Rekenthaler

responded:  "20-25%." Rekenthaler knew Actavis's market share goals because he and Falkin of

Actavis had spoken twice by phone that morning – once for more than eleven (11) minutes and again for more than nine (9) minutes.

736.    Five days later on June 24, 2014, Teva employee S.B. confirmed to her colleagues in an e-mail that Actavis had entered the market for Dex Sulfate XR.  She remarked that Teva had a 72.2% share of this "multi-player market" and thus recommended giving up a large customer to Actavis and reducing Teva's market share to 58.3% – in accordance with the industry understanding to allocate the market, and Teva's ongoing agreement with Actavis.  Later internal e-mails confirmed Teva's decision to concede that customer to Actavis because "Actavis is entering the market and seeking share."

### d.    Clonidine-TTS

737.    Clonidine-TTS Patch—also known by the brand name Catapres-TTS—is a medication in the form of a transdermal patch that is used to treat high blood pressure.

738.    Teva began marketing Clonidine-TTS in 2010 after the expiration of brand manufacturer Boehringer Ingelheim's patent on Catapres-TTS®.

739.    On May 6, 2014, Actavis was granted approval to market Clonidine-TTS.  Teva and Actavis immediately commenced an extensive negotiation over price and market share.  Rekenthaler and Falkin spoke by phone three times that day for fifteen (15) minutes, one (1) minute, and three (3) minutes, respectively.

740.    The next day, Rekenthaler announced to his colleagues that Actavis was entering the market.  K.G. of Teva responded by requesting that Patel come up with a recommendation as to which customers Teva should concede to Actavis.  At the same time, Teva employees bemoaned Actavis's "ridiculous" low pricing for a new entrant, saying that price "is already eroded here."

741.    On May 8, 2014, Teva personnel accelerated their efforts to convince Actavis to revise its pricing and market share plans for Clonidine-TTS to more acceptable levels with an even more intensive flurry of phone calls.  On that day, Rekenthaler spoke to Falkin three more times (5-, 10-, and 8-minute calls).  Patel spoke to Rogerson at Actavis four times, the last call coming at 9:54 a.m.  At 10:02 a.m., she informed her colleagues of the results of the negotiations, instructing them:  "Please concede Ahold and HEB."

742.    The following day, May 9, 2014, Patel learned from yet another customer of a "competitive price challenge" on this drug.  Suspecting the source of the challenge was Actavis, Patel called Rogerson three times.  Following those conversations, Patel informed her colleagues that Actavis wanted 25% of the market.  She also stated that Actavis would likely want 10%-15% of that share from Teva.  During those conversations, she also likely conveyed her displeasure to Rogerson about how low Actavis's pricing was, because not long after those phone calls, she conveyed to her supervisor, K.G., that "I just found out that Actavis rescinded their offer." Shortly after that, Patel also learned that Actavis had "resent all of their offer letters at pricing that is higher than our [Teva's] current."

743.    Rekenthaler described to his colleagues the agreement he was willing to strike with Actavis over market share, saying:  "I'm okay with adjusting 15% but we're not going to play any games with them.  They take the 15% and I don't want to hear about this product again."  Teva's senior sales executive, T.C., cautioned him on the importance of maintaining a cooperative stance towards this competitor, saying:  "now, now Mr.  Rekenthaler play nice in the sand box . . . .  If history repeats itself activist [sic] is going to be responsible in the market. . . ."

744.    The market share give-and-take between Teva and Actavis continued over the coming weeks, with Teva conceding accounts to the new entrant in order to allow Actavis to

achieve its "fair share" of the market for Clonidine-TTS.  On May 14, 2014, for example, Patel told colleagues that Teva must be "responsible" and concede a particular wholesaler's account to Actavis.  On May 17, 2014, Teva conceded a large retailer account to Actavis.  On May 20, 2014, Patel again declined to bid at another customer due to the new entrant Actavis, stating: "We are trying to be responsible with share and price."

745.    When L.R., Teva's analytics manager, recommended giving up yet another Clonidine-TTS account to Actavis on May 23, 2014, after several conversations between Patel and Rogerson the prior day, K.G. of Teva reluctantly approved, saying:  "[o]kay to concede, but we are getting to the point where we will not be able to concede further."

### e.    Budesonide Inhalation

746.    Teva obtained approval to market Budesonide inhalation in November 2008.  Prior to February 2015, Teva controlled virtually the entire market for generic Budesonide inhalation, with other competitors having less than 1% market share.

747.    On February 13, 2015, Rekenthaler informed other Teva employees of Actavis's plans to enter the market, saying:  "[i]t appears that Actavis is intending on shipping" Budesonide inhalation.  Rekenthaler and Falkin of Actavis had spoken by phone three days earlier on February 10, 2015.

748.    On February 16, 2015, Rekenthaler and Falkin had another lengthy telephone conversation lasting twenty-three (23) minutes.  The following morning, Teva's T.C. confirmed to her colleagues that Teva had conceded the Budesonide inhalation accounts of two major customers to Actavis.  She explained that Actavis's sense of urgency to obtain the accounts was due to concerns about getting its product into market before it faced legal action from the brand manufacturer.  Thus, she explained, she was working with the customers on an "exit strategy" to get Teva's product out of the supply channel, so as to streamline Actavis's entry into the market.

f.      *Celecoxib*

749.     Teva received approval to market Celecoxib in May 2014.

750.     On November 20, 2014, as Teva was preparing to launch its Celecoxib capsules, a customer informed Teva that Actavis was vying for some of the customer's Celecoxib business. The customer indicated that Actavis was preparing for a launch of its own and had advocated its position by pointing out that it was just trying to "get their share" in light of the fact that Teva had already secured over 30% of the market.

751.     Rekenthaler took a cooperative – rather than competitive – stance upon hearing that news, saying:  "That's all pretty accurate and hard to argue with."

752.     By December 1, 2014, however, the issue of where Actavis would obtain its desired market share remained undecided.  Another customer, a large retail pharmacy chain ("Pharmacy-4"), became actively involved in trying to broker an agreement between Teva and Actavis on how much share each company would take upon launch.  Actavis reportedly sought 25% of Pharmacy-4's Celecoxib business.  A representative of Pharmacy-4 told Teva's T.C. that "he would not move this unless we are all on the same page" and that he did not have an issue with sending Actavis "a message."

753.     Rekenthaler's response was consistent with the "fair share" understanding, saying "I don't want to give up anything . . . .  We're at 32% and I think that's reasonable."

754.     In the days leading up to Teva's December 10, 2014 launch, Teva executives had numerous telephone conversations with their counterparts at Actavis.  Rekenthaler had a six (6) minute call with Falkin at Actavis on November 25.  The two spoke twice more on December 3 – once for two (2) minutes and another time for one (1) minute.  Patel spoke to A.B., a senior sales and marketing executive at Actavis, for over eight (8) minutes on December 5, and for over sixteen (16) minutes on December 8.  Rekenthaler and Falkin resumed their communications the

day before the Teva launch – December 9 – with a one (1) minute phone call.  On the day of the launch – December 10 – Rekenthaler and Falkin spoke three times with calls of one (1) minute, nine (9) minutes, and three (3) minutes in duration.

> **5.  Teva/Par**
>
> *a.  Omega-3-Acid Ethyl Esters*

755.    Teva launched Omega-3-Acid Ethyl Esters on April 8, 2014.  During this time period, manufacturers of the drug were all experiencing various supply problems, affecting how much market share each would be able to take on.

756.    On the morning of June 26, 2014, Patel e-mailed C.B., a senior operations executive at Teva, to inform C.B. that Par had recently received FDA approval for Omega-3-Acid Ethyl Esters.  C.B. responded by asking if Par had started shipping that product.  Patel replied at 10:24 a.m. that she had not heard anything yet but promised to "snoop around."

757.    Patel had indeed already started "snooping around."  At 9:46 a.m., she had sent a message to T.P., a senior-most executive at Par, through the website LinkedIn, stating:



[74]

---

758.     T.P. did not respond through LinkedIn, but texted Patel on her cell phone later that day, initiating a flurry of ten (10) text messages between them in the late afternoon and early evening of June 26.  That night, Patel followed up with C.B., informing her that the only thing Patel knew at that point was that Par was limited on supply, but that she was "working on getting more . . . ."

759.     The next morning, T.P. called Patel and they spoke for nearly thirty (30) minutes. That was the first and only voice call ever between the two according to the phone records.  That same morning, Patel informed C.B. that she now had "some more color" on Par's launch of Omega-3-Acid Ethyl Esters and would "fill you in when we speak." Patel also communicated this information to Rekenthaler.  At 11:27 a.m. that same morning, Rekenthaler sent an e-mail to T.C., a Teva sales executive, with a veiled – but clear – understanding about Par's bidding and pricing plans:

> "You're aware PAR receive [sic] an approval.  I would imagine that CVS is going to receive a one time buy offer from PAR.  I'm also assuming the price would be above ours so there should not be a price request (which we would not review anyway).  My point in the email is to ensure that you are aware of all of this . . . ."

760.     Par launched Omega-3-Acid Ethyl Esters Capsules the following Monday, June 30, 2014.

761.     After the discussions between Patel and T.P. at Par, Teva proceeded to concede business to Par to ensure Par's smooth entry into the market.  As of July 11, 2014, Teva's share of the market for new generic prescriptions had dropped 15.9 points to 84.1% and its share of the total generic market (new prescriptions and refills) had dropped 16.3 points to 83.7%.

762.     As new competitors entered the market, Teva coordinated with them to avoid competition and keep prices high.  For example, in an internal e-mail on October 2, 2014, Teva's K.G. stated that "[w]e heard that Apotex may be launching with limited supply and at a high

price." Rekenthaler had obtained this information through phone calls with J.H., a senior sales executive at Apotex, on September 25 and 27, 2014 – and then conveyed the information internally at Teva.

763.    Because of supply limitations, Par was not able to meaningfully enter the market until late November 2014.  On November 10, 2014, Patel and T.P. exchanged five (5) text messages.  On December 1, 2014, Teva was notified by a customer that it had received a price challenge on Omega-3-Acid Ethyl Esters.  T.C. at Teva speculated that the challenge was from Apotex, but Rekenthaler knew better, stating "I'm confident it's Par."  Rekenthaler informed T.C. that Teva would not reduce its price to retain the business – thus conceding the business to Par.

764.    By mid-February 2015, Teva had conceded several large customers to Par to smooth Par's entry into the market and maintain high pricing.  During this time, Rekenthaler was speaking frequently with M.B., a senior national account executive at Par, to coordinate.

765.    By April 2015, Apotex had officially entered the market, and consistent with the "fair share" understanding, Teva's market share continued to drop.  By April 25, Teva's share of the market for new generic prescriptions for Omega-3-Acid Ethyl Esters had dropped to 68.3% and its share of the total generic market (new prescriptions and refills) had dropped to 66.8%.  Rekenthaler was speaking frequently with J.H. at Apotex to coordinate during the time period of Apotex's entry in the market.

b.    *Entecavir*

766.    As Teva was preparing to enter the market for Entecavir in August 2014, T.C., a senior sales and business relations executive at Teva, informed an executive at WBAD that Teva was planning on launching Entecavir "shortly" depending on when the FDA approved the drug.  T.C. further noted:  "We may or may not be alone on the market at launch.  Sandoz has a

settlement and we do not know their terms.  Apotex has recently filed a PIV [Paragraph IV certification] but we invalidated the patent.  We are hearing PAR has the [authorized generic] and is stating they will launch after we launch, but there is still a good chance we may be alone in the market for a short time."

767.    On August 28, 2014, Rekenthaler informed Teva sales employees that Teva had received approval on Entecavir and would circulate offers later that day or the next day. Rekenthaler noted:  "[w]e are looking for at least a 60 share.  Known competition is Par with an [authorized generic]." Rekenthaler also noted that Teva would be pricing as if they were "exclusive" in the market and expressed concern that customers might react negatively to the launch of this drug "because of our recent price increase [on other drugs]."

768.    The same day, August 28, 2014, Rekenthaler had three phone calls with M.B., a senior national account executive at Par.  The two spoke two (2) more times the next day, August 29, 2014.

769.    On August 29, a Teva sales employee reported that a customer had informed her that Par was launching Entecavir at a lower price point than Teva.  The employee inquired whether Teva might consider reducing its price as well.  Rekenthaler, after speaking with M.B. at Par several times on August 28 and 29, replied that Teva would remain firm on the price and noted that he was "doubtful PAR will be much lower." Despite Teva's refusal to lower its price, that customer signed an agreement with Teva to purchase Entecavir.

770.    Also on August 29, Rekenthaler e-mailed T.C. asking if she had received any feedback from CVS on Entecavir.  T.C. replied that she had not and followed up later saying that ABC had indicated that it would sign Teva's offer letter.  Rekenthaler replied:  "Great, that helps.  We may end up conceding our friends up north [CVS] if they make too much fuss." T.C.

dismissed that concern:  "I think they will work with us really...We need them they need us so we just have to make it work."

771.    Teva and Par both launched their respective Entecavir products on September 4, 2014.  Within days of its launch, Teva had captured 80% of the market for new generic prescriptions and 90.9% of the total generic market (new prescriptions and refills).

772.    Within a few weeks, however, Teva's share of the market was much more in line with "fair share" principles – 52.6% for new generic prescriptions, and 47% of the total generic market (new prescriptions and refills).

773.    On October 9, 2014, another customer, who had already received a discount on Entecavir, asked for an additional discount to "help close the gap with current market prices." Teva declined to do so, citing that the "pricing is competitive and in line with the market." Rekenthaler had spoken to M.B. at Par twice on October 2, 2014.

774.    The two-player market for Entecavir remained stable over time.  By January 2, 2015, Teva's share of the market for new generic prescriptions was 52.2%, and its share of the total generic market (new prescriptions and refills) was 46.7%.

c.    *Budesonide DR Capsules*

775.    Teva was preparing to enter the market for Budesonide DR Capsules in or about March 2014.  At that time, it was a 2-player market:  Par had 70% market share and Mylan had the remaining 30%.

776.    Shortly before Teva received approval to market Budesonide DR, Par decided to increase the price of the drug.  On April 1, 2014, M.B., a senior national account executive at Par, called Rekenthaler at Teva.  The two executives spoke for twenty-six (26) minutes.  The next day, April 2, 2014 — which happened to be the same day that Teva received FDA approval to market Budesonide DR — Par increased its price for Budesonide DR by over 15%.

777.    That same day, Teva sales employees were advised to find out which customers were doing business with Par and which were with Mylan, so that Teva would have a better sense of how to obtain its fair share:  "it would be helpful to gather information regarding who is with mylan and who is with par . . . they are the two players in the mkt. . . as well as usage."

778.    Par and Mylan were also communicating at this time.  On April 3, 2014 – the day after the Par price increase – K.O., a senior account executive at Par, spoke to M.A., a senior account manager at Mylan, for fifteen (15) minutes.

779.    On April 4, 2014, Rekenthaler informed some members of Teva's sales force that, although the company had received approval to market and manufacture Budesonide DR, Teva was not prepared to launch the product and he did not yet know when it would do so. Nonetheless, Rekenthaler spoke to both Nesta, the Vice President of Sales at Mylan, and M.B., a similarly high-level executive at Par, that same day.

780.    Although Teva did not launch Budesonide DR until approximately June 2016, company executives clearly attempted to coordinate pricing and market share with its competitors in anticipation of its product launch date.

### 6.    Teva/Taro

#### a.    *Enalapril Maleate*

781.    In 2009, Taro discontinued its sales of Enalapril Maleate ("Enalapril") under its own label and effectively exited the market.  It continued supplying Enalapril thereafter only to certain government purchasers under the "TPLI" label.

782.    By mid-2013, the Enalapril market was shared by three players:  Mylan with 60.3%, Wockhardt with 27.5%, and Teva with 10.7%.  Those three companies coordinated a significant anticompetitive price increase for Enalapril in July 2013.

783.     Shortly before the Teva and Wockhardt price increases, on or about July 12, 2013, Aprahamian, the Vice President of Sales and Marketing at Taro, was considering whether to renew or adjust Taro's price on Enalapril for its national contract (for government purchasers), which was slated to expire in September 2013.

784.     In the midst of that coordinated price increase, however, Aprahamian was communicating with both Patel of Teva as well as M.C., a senior sales and marketing executive at Wockhardt, about Enalapril.  As a result of those conversations, Taro's plans changed.

785.     On July 17, 2013 – the same day that Teva was taking steps to implement the price increase – Patel called Aprahamian and left a message.  He returned the call and the two spoke for almost fourteen (14) minutes.  Then, on July 19, 2013 – the day that both Teva and Wockhardt's price increases for Enalapril became effective – Aprahamian called M.C. at Wockhardt on his office phone and left a message.  He then immediately called M.C.'s cell phone, which M.C. answered.  They spoke for nearly eleven (11) minutes.

786.     On the morning of July 19, Aprahamian sent an internal e-mail to Taro colleagues signaling a change in plans:



From: Ara Aprahamian/US//TARO
To:
Cc:
Date: 07/19/2013 07:19 AM
Subject: Taro Enalapril

Currently if I'm not mistaken we only supply the government with Enalapril in TPU label (looks like we exited our label in 2009). There has been some significant changes in the market landscape with this product and I'd like to get product back in Taro label (and fast).

[75]

---

[75]   Amended State AG Complaint No. 2 ¶ 397.

787.     Aprahamian followed up with another e-mail shortly after, adding that Taro "[w]ould only look for 10-15% MS [market share] but with recent market changes and units on this product, it would be incremental."

788.     In the coming months, both Teva and Taro engaged in intensive analyses of how the market should look after Taro's re-launch so that each competitor would have its desired, or "fair," share of the market.

789.     On July 31, 2013, for example, Patel provided her analysis of the drugs Teva should bid on in response to a request for bids from a major customer, which was largely based on whether Teva had reached its "fair share" targets.  Enalapril was one of the drugs where, according to Patel, Teva was "seeking share," so she authorized the submission of a bid.  Prior to sending that e-mail, Patel had spoken to Aprahamian on July 30 (11-minute call) and July 31, 2013 (4 minute call).  Based on the agreement between the two companies, and in accordance with the industry's "fair share" code of conduct, Taro understood that it would not take significant share from Teva upon its launch because Teva had a relatively low market share compared to others in the market.

790.     Meanwhile, as he worked on pricing for Taro's upcoming re-launch, Aprahamian emphasized to his colleagues that Taro's final prices would be set largely based on "continued market intelligence to secure share . . . ."

791.     In early December 2013, Taro was fully ready to re-enter the Enalapril market. On December 3, 2013, Aprahamian consulted twice by phone with Mylan's senior account executive, M.A., during conversations of two (2) and eleven (11) minutes.

792.     On December 4, 2013, one customer that had recently switched from Wockhardt to Teva expressed an interest in moving its primary business to Taro for the 2.5mg, 5mg, 10mg,

and 20mg strengths.  At 4:30 p.m. that afternoon, Aprahamian instructed a colleague to prepare a price proposal for that customer for all four products.

793.     Before sending the proposal to the customer, however, Aprahamian sought the input of his competitor, Teva.  On December 5, 2013, he and Patel spoke by phone for nearly five (5) minutes.

794.     Taro's fact sheet for the Enalapril re-launch generated on the day of Aprahamian's call with Teva showed a "[t]arget market share goal" of 15%, with pricing identical to Teva's and nearly identical to Wockhardt's and Mylan's.

795.     Taro began submitting offers on Enalapril the following day, December 6, 2013.  But even with the bidding process underway, Aprahamian made certain to communicate with Mylan's M.A. during a brief phone conversation that afternoon.  This particular communication was important since Mylan was the market share leader and Taro was targeting more of Mylan's customers than those of other competitors.

796.     Over the next ten days, the discussions between Taro and Mylan continued over how to allocate the Enalapril market.  Aprahamian and M.A. talked for ten (10) minutes on December 11, and for seven (7) minutes on December 12.

797.     Thereafter, and with the likely consent of Mylan, Aprahamian reported on an internal Sales and Marketing call on December 16, 2013, that Taro's prior target Enalapril market share goal of 15% had been raised to 20%.

798.     Taro continued to gain share from both Mylan and Wockhardt, and to coordinate with both.  For example, in late December, Taro submitted a competitive offer to Morris & Dickson, a Wockhardt customer.  This caused M.C. of Wockhardt to call Aprahamian on December 31, 2013, to discuss the situation.  During the call, M.C. agreed that so long as

Wockhardt was able to retain McKesson as a customer, it would concede Morris & Dickson to

Taro.  In an e-mail on January 2, 2014, S.K. of Wockhardt conveyed the details to his colleagues:

| From: | ▮▮▮▮ |
|---|---|
| Sent: | Thursday, January 2, 2014 10:20 AM |
| To: | ▮▮▮▮ |
| Subject: | RE: Competitive Offer for Enalapril |

▮▮▮

I spoke to ▮▮▮ on NYE.  Once we confirm we are keeping McKesson, let's yield MoDick.  Call to discuss.

76

799.    By May 2014 the market was stable, and market share for Enalapril was

reasonably distributed among the companies.  As Teva was considering whether to bid on

specific drugs for an RFP sent out by a large wholesaler customer, Patel provided the following

caution with regard to Enalapril:  "no bid due to potential market/customer disruption, aka

strategic reasons." The same day she sent that e-mail – May 14, 2014 – Patel spoke to

Aprahamian for more than four (4) minutes and exchanged eight (8) text messages with him.

800.    By June 2014, Taro had obtained 25% market share for Enalapril in a 4-player

market.  Mylan and Teva each had approximately 28% market share.

*b.    Nortriptyline Hydrocholoride*

801.    While Taro was approved in May 2000 to market generic Nortriptyline

Hydrochloride ("Nortriptyline"), it subsequently withdrew from the market.  As of early 2013,

the market was shared by only two players – Teva with a 55% share, and Actavis with the

remaining 45%.

---

76    *Id.* at ¶ 408.

802.     By February 2013, Taro personnel had come to believe that they should reclaim a portion of this market, one opining that ". . . Nortriptyline capsules should be seriously considered for re-launch as soon as possible."

803.     In early November, Taro was formulating re-launch plans, including a "Target Market share goal" for Nortriptyline of 25% that would leave Teva with 42.45% and Actavis with 31.02%.

804.     On November 6, 2013, Aprahamian pressed his team to ".  .get some offers on Nortrip[tyline] out . . ." He emphasized the need to find out who currently supplied two particular large customers so that Taro could "determine our course (Cardinal or MCK)".

805.     Two days later, on November 8, Aprahamian received confirmation that McKesson was a Teva customer.

806.     Several days of conversations ensued among the affected competitors in an effort to sort out how Teva and Actavis would make room for Taro in this market.  For example, Rekenthaler of Teva and Falkin of Actavis spoke twice by phone on November 10, 2013.

807.     Then, on November 12, 2013, Taro's Aprahamian called Patel at Teva.  Their conversation lasted almost eleven (11) minutes.  That same day, Aprahamian announced to his colleagues that Taro would not be pursuing Teva's business with McKesson, saying simply: "Will pass on MCK on Nortrip." Accordingly, he instructed a subordinate to put together an offer for Cardinal instead.

808.     The discussions of how to accommodate Taro into the Nortriptyline market were far from over, however.  Falkin of Actavis and Rekenthaler of Teva spoke on November 14, 15 and 18.  Falkin also exchanged two text messages with Maureen Cavanaugh of Teva on November 17, and one on November 18, 2014.

809.    Immediately following this series of discussions, Aprahamian began delivering a new message to his team:  Taro had enough offers out on Teva customers – it needed to take the rest of its share from Actavis.  On November 19, 2013 when a colleague presented an opportunity to gain business from Teva customer HD Smith, Aprahamian flatly rejected the idea, saying:  "Looking for Actavis..  [sic] We have outstanding Teva offers out ..  [sic]".

810.    The next day, November 20, 2013, another Taro employee succeeded in finding an Actavis customer that Taro might pursue.  Armed with this new information, Aprahamian wasted no time in seeking Actavis's permission, placing a call to M.D., a senior national account executive at Actavis, less than four hours later.  They ultimately spoke on November 22, 2013 for more than eleven (11) minutes.

811.    Meanwhile, Teva employees finalized plans to cede Cardinal to Taro as discussed in the negotiations with Actavis and Taro.  On November 21, 2013, Teva informed its customer that "[w]e are going to concede the business with Cardinal."

812.    The competitors continued consulting with each other over the coming months on Nortriptyline.  On December 6, 2013, for example, Aprahamian called M.D. at Actavis and the two spoke for over thirteen (13) minutes.  On December 10, 2013, a Taro colleague informed Aprahamian that a large customer, HEB, was with Actavis for all but one of the Nortriptyline SKUs, and that HEB was interested in moving the business to Taro.

813.    Having already cleared the move with Actavis during his December 6 call with M.D., Aprahamian put the wheels in motion the next day for Taro to make an offer to HEB.

814.    Aprahamian also continued to coordinate with Teva.  He called Patel on January 28, 2014, but she did not pick up.  The dialogue continued on February 4, 2014 when Patel called Aprahamian back.  The two talked for nearly twenty-four (24) minutes.

815.    Two days later, on February 6, a potential customer solicited Taro to bid on its business.  When a colleague informed Aprahamian of that fact and asked if he wanted to pursue the opportunity, Aprahamian responded firmly that Teva had already done enough to help Taro with its re-launch and thus only Actavis accounts should be pursued:



[77]

816.    Over the first ten days of March, executives at Teva, Taro and Actavis called and texted each other frequently in their continuing efforts to work out the details of Taro's re-entry. These calls include at least those listed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

[78]

---

[77]   *Id.* at ¶ 426.

[78]   *Id.* at ¶ 427.

817.    At the end of this flurry of communications, Teva documented its internal game plan for Nortriptyline.  Prior to this time – particularly in early 2014 – Nortriptyline had been listed by Teva as a potential candidate for a price increase.  On March 10, 2014, however, as Patel was revising that list of price increase candidates (and the same day she spoke to Aprahamian for more than five (5) minutes), she removed Nortriptyline from contention in order to accommodate Taro's entry.  The spreadsheet that she sent to a colleague on that date expressly took into account the negotiations over Taro's entry that had occurred over the past few weeks. With respect to a possible Nortriptyline price increase, it stated:  "Delay – Taro (new) seeking share." Teva subsequently raised the price of Nortriptyline on January 28, 2015 – in coordination with both Taro and Actavis.

### 7.    Teva/Zydus

818.    Green left Teva in November 2013 and moved to Zydus where he took a position as an Associate Vice President of National Accounts.  Once at Zydus, Green capitalized on the relationships he had forged with his former Teva colleagues to collude with Teva (and other competitors) on several Teva/Zydus overlap drugs.

819.    In the spring/early summer of 2014 in particular, Zydus was entering four different product markets that overlapped with Teva.  During that time period, Green was in frequent contact with Patel and Rekenthaler, and others, to discuss pricing and the allocation of customers to his new employer, Zydus.  Indeed, given the close timing of entry on these four products, Green, Patel, and Rekenthaler were often discussing multiple products at any given time.

a.      *Fenofibrate*

820.    As discussed in detail above, Teva colluded with Mylan and Lupin to allocate the Fenofibrate market upon Mylan's entry in May 2013.  To effectuate that agreement, Green was in frequent contact with Nesta of Mylan and Berthold of Lupin.

821.    In February 2014, Zydus was preparing to launch into the Fenofibrate market. Green, now at Zydus, colluded with Patel, Rekenthaler, Nesta, and Berthold to share pricing information and allocate market share to his new employer, Zydus.

822.    On February 21, 2014, Teva's Patel sent a calendar invite to Rekenthaler and to her supervisor, K.G., Senior Director, Marketing Operations, for a meeting to discuss "Post Launch Strategy (Multiple Products)" on February 24, 2014.  One discussion item was Zydus's anticipated entry into the Fenofibrate market.  Notably, Zydus did not enter the Fenofibrate market until a few weeks later, on March 7, 2014.

823.    In the days leading up to the meeting, between February 19 and February 24, Patel and Green spoke by phone at least 17 times – including two calls on February 20 lasting twenty-seven (27) minutes and nearly nine (9) minutes, respectively; one call on February 21 lasting twenty-five (25) minutes; and a call on February 24 lasting nearly eight (8) minutes.

824.    On or about March 7, 2014, Zydus entered the Fenofibrate market at WAC pricing that matched Teva, Mylan, and Lupin.  In the days leading up to the launch, individuals from all four competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus.  Indeed, between March 3 and March 7, these competitors

exchanged at least 26 calls with each other.  These calls are detailed in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Rekenthaler, David (Teva) | 0:13:30 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:07 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |
| 3/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:08:15 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:03:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:17:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:07:20 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:12:00 |

[79]

825.    During the morning of March 17, 2014, Patel and Green had two more phone

calls, lasting nearly six (6) minutes and just over five (5) minutes.  During those calls they were

discussing how to divide up the market for several products where Zydus was entering the

market.  Half an hour after the second call, Patel e-mailed her supervisor, K.G., identifying

"LOE Targets to Keep" for several products on which Teva overlapped with Zydus, including

Fenofibrate.  With respect to Fenofibrate, Patel recommended "Defend all large customers."

Later that same day, Patel called Green again and they spoke for more than eleven (11) minutes.

---

[79]   *Id.* at ¶ 436.

826.     In the months that followed, Teva "strategically conceded" several customers to Zydus in accordance with the agreement they had reached.

827.     For example, on Friday, March 21, 2014, J.P., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, notifying them that Zydus had submitted an unsolicited bid to a Teva customer, OptiSource. Patel responded that Teva was "Challenged at Humana as well."

828.     That morning, Patel sent a calendar invite to Rekenthaler and to K.G. scheduling a meeting to discuss "Open Challenges-Retain/Concede Plan." One item on the agenda was "Fenofibrate (Zydus at Opti and Humana-propose to concede)."

829.     The following Monday, March 24, 2014, Patel sent internal e-mails directing that Teva "concede" OptiSource and Humana to Zydus. Patel further stated that Teva provided a "courtesy reduction" to a third customer, NC Mutual, but stated that Teva should "concede if additional reduction is requested." That same day, Patel called Green and they spoke for more than fourteen (14) minutes. She also spoke with Berthold of Lupin for nearly twelve (12) minutes.

830.     In the meantime, Zydus bid at another Teva customer, Ahold. On March 25, 2014, Patel e-mailed Rekenthaler stating "Need to discuss. NC pending, and new request for Ahold. We may not be aligned." Patel then sent an internal e-mail directing that Teva "concede" the Ahold business. Later that day, Patel called Green. He returned the call and they spoke for nearly eight (8) minutes. Patel also called Berthold of Lupin and they spoke for five (5) minutes.

831.     On May 13, 2014, Zydus bid on Fenofibrate at Walgreens, which was also Teva's customer. The next day, on May 14, 2014, Patel forwarded the bid to her supervisor, K.G., and

explained "if we concede, we will still be majority share, but only by a few share points.  On the other hand, if Zydus is seeking share, they're challenging the right supplier, but the size of the customer is large.  What are you[r] thoughts on asking them to divide the volume 25% Zydus and 75% Teva?  This way, we've matched, retained majority and will hopefully have satisfied Zydus, and minimize them going elsewhere."

832.    K.G. agreed with the approach and on May 15, 2014, Patel sent an internal e-mail directing that Teva reduce its price to Walgreens but explained that "we will retain 75% of the award.  The remainder will go to Zydus.  Hopefully, this will satisfy their share targets." Patel emphasized that we "need to be responsible so that Zydus doesn't keep challenging Teva in the market." Later that day, Green called Patel and they spoke for twenty (20) minutes.

833.    On June 2, 2014, Green called Patel and they spoke for nearly six (6) minutes.  He also called Rekenthaler, and they spoke for two (2) minutes.  Two days later, on June 4, 2014, Zydus submitted an unsolicited bid for Fenofibrate at Anda, a Teva customer.

834.    On June 10, 2014, T.S., Senior Analyst, Strategic Support at Teva e-mailed J.P., Director of National Accounts, stating "We are going to concede this business to Zydus per upper management."  T.S. forwarded the e-mail to K.G., copying Patel and Rekenthaler, asking to "revisit the decision to concede ANDA" because "[w]e need to send Zydus a message to cease going after all of our business."  Rekenthaler responded, "At Anda I would suggest you try to keep our product on their formulary in a secondary position and we'll continue to get sales. . . . Zydus has little market share on Fenofibrate that I can tell and they'll continue to chip away at us until they get what they are looking for."  A few hours later, J.P. responded that Anda would maintain Teva on secondary and award the primary position to Zydus.  Anda was fully aware that Teva was conceding Anda's business to Zydus because it was a new entrant.

835.    The next day, on June 11, 2014, Green called Rekenthaler and they spoke for eight (8) minutes.  Later that day, Patel called Green.  He returned the call and they spoke for nearly fifteen (15) minutes.

b.    *Paricalcitol*

836.    Teva entered the market on Paricalcitol on September 30, 2013.  As the first generic to enter the market, it was entitled to 180 days of exclusivity.

837.    In March 2014, with the end of the exclusivity period approaching, Teva began planning which customers it would need to concede.  Teva had advance knowledge that Zydus and another generic manufacturer not named as a Defendant in this case planned to enter the market on day 181, which was March 29, 2014.

838.    In the month leading up to the Zydus launch, Patel and Rekenthaler spoke with Green and discussed, among other things, which Paricalcitol customers Teva would retain and which customers it would allocate to the new market entrant.

839.    On February 28, 2014, T.S., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, advising that ABC was requesting bids on two Zydus overlap drugs – Paricalcitol and Niacin ER.  After receiving that e-mail, Rekenthaler called Green.  The call lasted less than one (1) minute (likely a voicemail).  The next business day, on March 3, 2014, Rekenthaler called Green again and they spoke for twenty (20) minutes.  Later that afternoon, Patel also called Green.  The two exchanged four calls that day, including one that lasted nearly twenty (20) minutes.  On March 4, Patel called Green again and left a voicemail.

840.    On March 12, 2014, T.S. e-mailed Patel and Rekenthaler stating that Zydus had bid on Paricalcitol at ABC.  That same day, Patel sent an internal e-mail asking for a loss of exclusivity report for Paricalcitol, listing out Teva's customers and the percentage of Teva's

business they represented.  This was typically done by Teva employees before calling a competitor to discuss how to divvy up customers in a market.

841.    On March 13, 2014, Patel directed that Teva retain ABC and match the Zydus pricing.  The next day, on March 14, 2014, Patel called Green.  A few minutes later, Green returned the call and they spoke for nineteen (19) minutes.  Rekenthaler then called Patel and they spoke for eleven (11) minutes.

842.    During the morning of March 17, 2014, Patel and Green had two more phone calls, lasting nearly six (6) minutes and just over five (5) minutes.  During those calls they were discussing how to divvy up the market for several products where Zydus was entering the market.  Half an hour after the second call, Patel e-mailed her supervisor, K.G., identifying "LOE Targets to Keep" for several products on which Teva overlapped with Zydus – including Paricalcitol.  With respect to Paricalcitol, Patel recommended that Teva "Keep Walgreens, ABC, One Stop, WalMart, Rite Aid, Omnicare."  Later that same day, Patel called Green again and they spoke for more than eleven (11) minutes.

843.    Over the next several weeks, Teva would "strategically" concede several customers to the new entrant Zydus.

844.    For example, on March 27, 2014, Green called Patel.  Patel returned the call and they spoke for nearly nine (9) minutes.  The next day, on March 28, 2014, OptiSource, one of Teva's GPO customers, notified J.P., a Director of National Accounts at Teva, that it had received a competing offer from Zydus for its Paricalcitol business.  J.P. forwarded the OptiSource e-mail to Patel.  Within minutes, Patel responded "[w]e should concede."

845.    That same day, Teva was notified by another customer, Publix, that Zydus had submitted a proposal for its Paricalcitol business.  On April 1, 2014, Teva conceded the customer

to Zydus and noted in Teva's internal database, Delphi, that the reason for the concession was "Strategic New Market Entrant."

846.    Also on April 1, 2014, Zydus bid for the Paricalcitol business at NC Mutual, another Teva customer.  That same day, Patel called Green and left a 22-second voicemail.  The next day, on April 2, 2014, Patel tried Green twice more and they connected on the second call and spoke for nearly ten (10) minutes.  Later that evening L.R., an Associate Manager, Customer Marketing at Teva, sent an internal e-mail to T.S., the Teva Director of National Accounts assigned to NC Mutual, copying Patel, asking:  "May we please have an extension for this request until tomorrow?"  Patel responded, "I apologize for the delay! We should concede."

847.    On April 15, 2014, Walmart received a competitive bid for its Paricalcitol business and provided Teva with the opportunity to retain its business.  Two days later, on April 17, 2014, K.G. responded that he thought it might be Zydus.  Patel replied, "We have conceded a reasonable amount of business (as planned) to Zydus.  I would be surprised if they were going after a customer this big after they've picked up business recently."  Later that day, Green called Patel.  She returned his call and they spoke for nearly twelve (12) minutes.  Later that day, after her discussion with Green, Patel sent an internal e-mail stating "After further review, I believe this is [a company not identified as a defendant in this case]."  On April 22, 2014, Patel sent an internal e-mail regarding Walmart directing, "Need to retain.  Please send an offer.  Thanks."

        *c.*    *Niacin ER*

848.    Teva entered the Niacin ER market on September 20, 2013 as the first-to-file generic manufacturer and was awarded 180 days of exclusivity.  Teva's exclusivity was set to expire on March 20, 2014.

849.    Teva had advance knowledge that Lupin planned to enter on March 20, 2014 and that Lupin would have 100 days or until June 28, 2014 before a third generic manufacturer would be allowed to enter.  Teva also knew that Zydus planned to enter on June 28, 2014. Armed with that knowledge, Teva increased its price on Niacin ER on March 7, 2014 in advance of the competitors' entry.  In the days leading up to the price increase, all three competitors exchanged several calls during which they discussed, among other things, the price increase on Niacin ER and the allocation of customers to the new entrants, Zydus and Lupin.  The communications between Green of Zydus, Patel and Rekenthaler of Teva, and Berthold of Lupin are detailed in the chart below.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 [80] |

850.    Similarly, in the days leading up to the Lupin launch on March 20, 2014, all three competitors spoke again to discuss their plans for Niacin ER.  The communications between

---

[80]    Amended State AG Complaint No. 2 ¶ 464.

Green, Rekenthaler, Patel, and Berthold are detailed in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:01:00 |
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:05:04 |
| 3/17/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:06:16 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:11:13 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:06:26 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:04:12 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:07:00 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:12:39 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:26:00 [81] |

851.     In May 2014, Zydus began readying to enter the Niacin ER market.  On May 5, 2014, Zydus bid on the Niacin ER business at ABC - a Teva customer.  The next day, on May 6, 2014, Green called Rekenthaler and they spoke for three (3) minutes.  Less than an hour later, Green called Patel and they spoke for eight (8) minutes.  A few minutes later, Green called Patel again and left a twelve-second voicemail.  Later that evening, Patel e-mailed K.G., reporting what Teva had learned on those calls:

852.     K.G. responded that Patel should schedule an internal meeting to discuss their strategy for Niacin ER and include Rekenthaler.

853.     Over the next several days, Patel and Rekenthaler exchanged several calls with

---

[81]     *Id.* at ¶ 465.

Green.  Green also exchanged several calls with Berthold of Lupin.  These calls are listed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:08:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:37 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:11:15 [82] |

854.    Ultimately, the competitors agreed that Teva would retain ABC and concede McKesson, another large wholesaler, to Zydus.

855.    On May 29, 2014, C.D., an Associate Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, stating:  "A customer is reporting that Zydus is soliciting usage for Niacin with an anticipated launch of June 24."  After receiving the e-mail, Rekenthaler called Green.  The call lasted two (2) minutes.  Green returned the call a few minutes later and they spoke for twenty-eight (28) minutes.  Later that day, Patel called Green and they spoke for nearly twenty-one (21) minutes.

856.    On June 2, 2014, J.P., a Director of National Accounts at Teva, sent an internal e-mail stating "I received a ROFR from McKesson due to Zydus entering the market.  They apparently did not secure ABC.  They are launching 6/28, but are sending offers early due to Sun entering as well."  Patel replied, "Please be sure to consult with [K.G.] on this one.  Thanks."  Later that morning, Green called Rekenthaler.  The call lasted two (2) minutes.  Green then called Patel and they spoke for nearly six (6) minutes.

857.    On June 5, 2014, J.P. sent an internal e-mail regarding "McKesson Niacin" stating "Per Dave [Rekenthaler], Maureen [Cavanaugh] has agreed to concede this item."  J.P.  also

---

[82]   *Id.* at ¶ 467.

entered the loss in Teva's internal database, Delphi, and noted that the reason for the concession was "Strategic New Market Entrant."

858.     On June 28, 2014, Zydus formally launched Niacin ER and published WAC pricing that matched the per-unit cost for both Teva and Lupin.

### d.     Etodolac Extended Release

859.     Prior to Zydus' entry into the Etodolac ER market, Teva and Taro were the only generic suppliers of the product.  As described below, Teva and Taro, through Patel and Aprahamian, colluded to significantly raise the price of Etodolac ER in August 2013.

860.     On May 12, 2014, Zydus entered the Etodolac ER market at WAC pricing that matched Teva and Taro's artificially high pricing.  Not surprisingly, in the days leading up to the Zydus launch, Patel was relaying communications back and forth between Green and Aprahamian.  During these calls, the competitors discussed, among other things, the allocation of market share to the new entrant, Zydus.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:08:00 |
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:12 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:36 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:16:45 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Incoming | Patel, Nisha (Teva) | 0:13:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:07:00 [83] |

---

[83]     *Id.* at ¶ 475.

861.    On May 14, 2014, Anda – a wholesaler customer of Teva – notified Teva that Zydus had submitted a bid for its Etodolac ER business.  That same day, Patel exchanged eight (8) text messages and had a four (4) minute call with Aprahamian.  The next day, on May 15, 2014, Green called Patel and they spoke for twenty (20) minutes.

862.    On May 20, 2014, Green called Patel and they spoke for four (4) minutes.  That same day, K.R., a senior sales executive at Zydus, also exchanged two (2) text messages and had a 39-second call with Cavanaugh of Teva.  The next day – May 21, 2014 – Green called Patel again and they spoke for twenty-eight (28) minutes.  That same day, K.R. of Zydus and Cavanaugh of Teva exchanged four (4) text messages.

863.    The next day, on May 22, 2014, T.S., Senior Analyst, Strategic Support at Teva, sent an internal e-mail to certain Teva employees, including Patel, stating:  "I have proposed we concede Anda as they are a small percent of market share and we will have to give up some share with a new market entrant.  Anda is looking for a response today."  Patel responded: "agree with concede."

864.    Similarly, on June 27, 2014, Econdisc notified Teva that it had received a competitive offer for its Etodolac ER business.  Later that day, Patel spoke with Aprahamian at Taro for fourteen (14) minutes.

865.    On July 2, 2014, Patel called Green and left a 4-second voicemail.  The next day, on July 3, 2014, Patel sent an internal e-mail advising that "We will concede."  Later that day, Teva told Econdisc that it was unable to lower its pricing to retain the business.

866.    When Patel's supervisor, K.G., learned that Teva had lost the Econdisc business, he sent an internal e-mail asking, "Did we choose not to match this?"  Patel responded, "Yes. New market entrant – Zydus."  K.G. replied, "Okay good.  Thank you."

8.      **Teva/Glenmark**

a.      *Moexipril Hydrochloride Tablets*

867.    Glenmark entered the market for the 7.5mg and 15mg tablets of Moexipril

Hydrochloride ("Moexipril") on December 31, 2010.

868.    Glenmark and Teva coordinated with each other to raise pricing on two different

formulations of Moexipril between May and July 2013.  When Patel colluded with CW-5, a

senior-most executive at Glenmark, to raise prices on Moexipril, one of the fundamental tenets of

that agreement was that they would not try to poach each other's customers after the increase and

the competitors would each maintain their "fair share."

869.    On August 5, 2013, Teva learned that it had been underbid by Glenmark at one of

its largest wholesaler customers, ABC.  Upon hearing this news, Rekenthaler, the Vice President

of Sales at Teva, forwarded an e-mail discussing the Glenmark challenge to Patel, expressing his

confusion over why Glenmark would be challenging Teva's business:

> **From:** Dave Rekenthaler
> **Sent:** Monday, August 05, 2013 7:05 PM
> **To:** Nisha Patel02
> **Subject:** Fwd: ABC - Loss business on Moexipril
>
>
> ???
>
> Sent from my iPhone

[84]

870.    Rekenthaler forwarded the e-mail only to Patel because he was aware that she had

been the person at Teva who had been colluding with Glenmark.

---

[84]   *Id.* at ¶ 484.

871.    Five (5) minutes after receiving the e-mail from Rekenthaler, Patel responded:

From:    Nisha Patel02
Sent:    Mon 8/05/2013 7:10 PM (GMT-05:00)
To:      Dave Rekenthaler
Cc:
Bcc:
Subject: RE: ABC - Loss business on Moexipril

I know…made the call already

[85]

872.    The call that Patel had made earlier that day was to CW-5, a senior executive at Glenmark, to find out why Glenmark sought to underbid Teva at ABC.

873.    Patel spoke to CW-5 three times that day.  The following day – August 6, 2013 – Brown, the Vice President of Sales at Glenmark, called Patel at 9:45 a.m. but did not reach her. Patel returned Brown's call at 10:08 a.m. and the two spoke for approximately thirteen (13) minutes.  Later that day, at 1:11 p.m., the two spoke again for approximately fifteen (15) minutes.  During these calls, Patel reminded Brown and CW-5 of their prior agreement not to poach each other's customers after a price increase.

874.    As a result of these communications, Glenmark decided to withdraw its offer to ABC and honor the agreement it had reached with Teva not to compete on Moexipril.  Later that same day – August 6, 2013 – T.S. of Teva informed colleagues that "[t]oday is a new day and today. . . .  ABC has now informed me that they will NOT be moving the Moexipril business to Glenmark."

_____

[85]    *Id.* at ¶ 485.

b.    *Desogestrel/Ethinyl Estradiol Tablets (Kariva)*

875.    Desogestrel/Ethinyl Estradiol ("Kariva") is marketed by Glenmark under the name Viorele and Teva markets the drug under the name Kariva.  These drugs are also known by the brand name, Mircette.  Glenmark entered the market for Kariva 0.15mg/0.02mg tablets on April 4, 2012.

876.    During the morning of May 19, 2014, Patel learned that Glenmark had bid a low price for it own version of Kariva – Viorele – at Publix, a retail pharmacy purchaser.  S.B., an analyst at Teva, e-mailed Patel a list of suggested re-bid prices to send to Publix for various drugs, including generic Kariva.  The chart included a suggested re-bid price for Kariva of $76.14 - which was $52.64 higher than the $23.50 price that Glenmark had offered Publix.

877.    This sparked a flurry of communications that same day between Patel and three different Glenmark representatives – Brown and Grauso, and J.C., a sales and marketing executive at Glenmark – as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Glenmark) | 11:46:15 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 11:47:03 | 0:24:09 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 12:21:00 | 0:12:53 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:08 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:31 | 0:00:26 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 13:50:15 | 0:06:51 [86] |

878.    After this flurry of communications between the two competitors, Patel decided that Teva would offer Publix a re-bid price with a nominal 10% reduction off the originally proposed rebid price of $76.14 - virtually guaranteeing that the business would be awarded to Glenmark.

---

[86]    *Id.* at ¶ 490.

c.      *Gabapentin*

879.      Glenmark entered the market for Gabapentin 800mg and 600mg tablets on April 1, 2006.

880.      On October 13 and 14, 2014, Patel attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of Teva's competitors.  The PCMA described its Annual Meeting as "the . . .ideal venue for senior executives from PBMs, specialty pharmacy, payer organizations and pharmaceutical manufacturers to network, conduct business and learn about the most current strategic issues impacting the industry."

881.      Shortly after returning from that meeting, during the morning of October 15, 2014, Patel informed colleagues at Teva that Glenmark would be taking a price increase on Gabapentin and suggested that this would be a great opportunity to pick up some market share. The Glenmark increase had not yet been made public and would not be effective until November 13, 2014.  Nonetheless, Patel informed her colleagues in an e-mail that same day that there would be a WAC increase by Glenmark effective November 13, and that she had already been able to obtain certain contract price points that Glenmark would be charging to distributors.  At around the time she sent the e-mail, Patel exchanged two (2) text messages with Brown of Glenmark.

882.      Having relatively little market share for Gabapentin, Teva discussed whether it should use the Glenmark price increase as an opportunity to pick up some market share.  Over the next several weeks, Teva did pick up "a bit of share" to be more in line with fair share principles but cautioned internally that it did not "want to disrupt Glenmark's business too much."

9.    **Teva/Lannett**

a.    *Baclofen*

883.    Except as set forth below, at all relevant times, Lannett, Par, Teva, and Upsher-Smith have dominated, and continue to dominate, the market for Baclofen.

884.    Baclofen is available in 10mg and 20mg tablets.

885.    According to NADAC data, the average market price for Baclofen remained steady prior to the spring of 2014.  From November 2013 through March 2014, the average market price of Baclofen fluctuated by less than $0.003 per unit for 10mg tablets and by less than $0.0065 per unit for 20mg tablets.

886.    Beginning around February 2014, however, the overall average market price rose by more than 550%.  These price increases affected both dosages of Baclofen, *i.e.* 10mg and 20mg tablets.

887.    According to NADAC data, the average market price for Baclofen increased by the following percentages:

Baclofen 10mg tablet:  Between March 2014 and April 2014, prices increased 636%; and

Baclofen 20mg tablet:   Between March 2014 and January 2015, prices increased 437%.

888.    WAC data confirms that Teva and Upsher-Smith both imposed dramatic price increases for Baclofen largely in unison, by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Upsher-Smith | 00832102500 | $0.10 | $0.49 | 2/21/2014 | 420% |
| 100ct | Teva | 00172409760 | $0.10 | $0.49 | 4/15/2014 | 420% |
| 1,000ct | Upsher-Smith | 00832102510 | $0.10 | $0.49 | 2/21/2014 | 420% |
| 1,000ct | Teva | 00172409780 | $0.09 | $0.49 | 4/15/2014 | 447% |

889.    Although WAC data is not available for Par, upon information and belief, it implemented nearly simultaneous and identical price increases as Upsher-Smith and Teva.

890.     Defendants had numerous opportunities to coordinate their price increases.  All Baclofen Defendants attended the (i) October 28-30, 2013 GPhA Technical Conference in North Bethesda, Maryland; and executives from at least Par, Teva, and Upsher-Smith attended the (ii) February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida.  Shortly thereafter, the average prices for generic Baclofen increased dramatically.

891.     In June 2014, Lannett was preparing to re-enter the market for Baclofen, but was faced with limited supply.  In an internal e-mail sent to his sales staff, K.S., a senior sales executive at Lannett, stated:  "Baclofen launch in four weeks, need market intelligence.  We can only take a 10% market share."  At that time, Teva had a large market share in relation to the existing competitors in the market.

892.     Sullivan, a Director of National Accounts at Lannett and a recipient of the e-mail, promptly communicated with Patel (Teva was a competitor for Baclofen) using Facebook Messenger.  On June 12, 2014, Sullivan messaged Patel, stating:



<sup>87</sup>

893.     The message was sent at 11:16 a.m.  At 11:30 a.m., Patel called Sullivan and they spoke for seven (7) minutes.  This was the first phone conversation between Sullivan and Patel since Patel had joined Teva in April 2013.  During the conversation, Sullivan informed Patel that

---

<sup>87</sup>  *Id.* at ¶ 498.

Lannett would be entering the market for Baclofen shortly.  In a follow-up message through Facebook Messenger later that afternoon, Sullivan confirmed:



894.    True to her word, Sullivan called Patel on July 1, 2014 and left a voicemail.  Patel promptly returned the call, and the two spoke for almost seven (7) minutes.

895.    On July 11, 2014, as Teva was evaluating future forecasting and whether to try and take on additional Baclofen business with a large wholesaler, Patel stated to a Teva colleague:  "[n]ot sure if it helps your review, but there is another entrant coming to market (Lannett).  I'm not sure about their share targets, but I know it's probably soon."  That same day, Patel sent a text message to Sullivan asking "Around?" Sullivan immediately called Patel and left a voicemail.  Patel called Sullivan back promptly, and they spoke for more than three (3) minutes.  After speaking, Patel sent another text message to Sullivan, stating:  "Thank you!!" Sullivan responded:  "No prob!"

896.    Shortly thereafter, on July 22, 2014, Teva was approached by a customer stating "[w]e were contacted by another mfg that is going to be launching Baclofen in the coming weeks." The customer asked whether Teva wanted to exercise its right of first refusal (i.e., offer a lower price to maintain the account).  Even though the new manufacturer's price was only slightly below Teva's price, Teva declined to bid.  Patel specifically agreed with the decision to

---

88    *Id.*

concede, stating "I believe this is Lannett."  Teva's internal tracking database noted that the customer had been conceded to a "Strategic New Market Entrant."

897.    Teva had significantly increased its price for Baclofen in April 2014 (following an Upsher-Smith price increase) and was able to maintain those prices even after Lannett entered the market a few months later.  In fact, when Lannett entered the market it came in at the exact same WAC price as Teva.

> **10.    Teva/Amneal**
>
> *a.    Norethindrone Acetate*

898.    On September 9, 2014, a customer approached Teva asking if Teva would lower its pricing on certain drugs, including Norethindrone Acetate.  One of Teva's competitors for Norethindrone Acetate was Amneal.  The same day, Patel received phone calls from two different Amneal employees – S.R.(2), a senior sales executive (call lasting more than three (3) minutes), and S.R.(1), a senior sales and finance executive (almost twenty-five (25) minutes).  These were the first calls Patel had with either S.R.(1) or S.R.(2) since she joined Teva in April 2013.  That same day, S.R.(1) also spoke several times with Brown, Vice President of Sales at Glenmark – the only other competitor in the market for Norethindrone Acetate.

899.    After speaking with the two Amneal executives, Teva refused to significantly reduce its price to the customer; instead providing only a nominal reduction so as not to disrupt the market.  At that time, market share was almost evenly split between the three competitors.  When discussing it later, Patel acknowledged internally that Teva had "bid high" at the customer based on its understanding "that it would be an increase candidate for Amneal.  They increased shortly after."  By bidding high and not taking the business from Amneal, in anticipation of a future price increase, Teva reinforced the "fair share" understanding among the competitors in the market.

### 11.  Teva/ Dr. Reddy's

##### a.  *Oxaprozin*

900.    In early 2013, Dr. Reddy's began having internal discussions about re-launching Oxaprozin in June of that year.  In March 2013 – when Teva was still the sole generic in the market – the plan was to target one large retail chain and one large wholesaler in order to obtain at least 30% market share.  Two months later, in May 2013, Dr. Reddy's adjusted its market share expectations down to 20% after a non-Defendant generic manufacturer and Sandoz both re-launched Oxaprozin.

901.    On June 13, 2013, members of the Dr. Reddy's sales force met for an "Oxaprozin Launch Targets Discussion" to "discuss launch targets based on the market intelligence gained by the sales team."

902.    Dr. Reddy's re-launched Oxaprozin on June 27, 2013 with the same WAC price as Teva.  At the time, Teva had 60% market share.  Dr. Reddy's almost immediately got the Oxaprozin business at two customers, Keysource and Premier.  Dr. Reddy's also challenged for Teva's business at McKesson, but Teva reduced its price to retain that significant customer.

903.    Eager to obtain a large customer, Dr. Reddy's turned its sights to Walgreens.  At a July 1, 2013 sales and marketing meeting, there was an internal discussion among Dr. Reddy's employees about "asking to see if Teva would walk away from the business" at Walgreens.  Within a week, Dr. Reddy's employees had learned that Teva would defend the Walgreens business and recognized that they would have to "bid aggressively" to obtain that customer.

904.    Dr. Reddy's did bid aggressively at Walgreens.  On or around July 14, 2013, Walgreens informed Green, then a National Account Director at Teva, that Dr. Reddy's had made an unsolicited bid for the Oxaprozin business, at a price of roughly half of Teva's current price.  Per Green, Walgreens did not "want to move but obviously want[s] the price."

905.     While the Dr. Reddy's offer to Walgreens was still pending – on July 23, 2013 – J.A. of Dr. Reddy's called Green.  That phone call – the only one ever between the two individuals that is identified in the phone records – lasted for nearly five (5) minutes.

906.     Two days later, Green noted that "[i]f we give D[r.  Reddy's] this business, they may be satisfied.  I will see if I can find this out." Green also warned, however, that if Teva decided to defend and keep Walgreens' business, Dr. Reddy's will "just go elsewhere" – meaning Dr. Reddy's would continue to offer unsolicited bids to Teva customers and drive prices down.

907.     While deciding whether to match the Dr. Reddy's offer at Walgreens or concede the business to Dr. Reddy's, Teva engaged in internal discussions about strategy.  On July 29, 2013, K.G. at Teva suggested the possibility of keeping the Walgreens business, but conceding Teva's next largest customer for Oxaprozin – Econdisc – to Dr. Reddy's.  Eager to avoid any further price erosion from the Dr. Reddy's entry, Rekenthaler immediately asked Patel to "look at our business on Oxaprozin in order to accommodate Dr. Reddy's entry." Rekenthaler's goal was to identify customers other than Walgreens that Teva could concede to Dr. Reddy's in order to satisfy its market share goals.

908.     At 12:33 p.m. that day, Patel asked a colleague to "run the customer volume and profitability analysis for Oxaprozin." It was typical at Teva to run this type of report before negotiating market share with a competitor.  At 2:20 p.m., that colleague provided the information to Patel, copying Rekenthaler and K.G.  With this information in hand, less than an hour later Rekenthaler placed a call to T.W., a Senior Director of National Accounts at Dr. Reddy's.  The call lasted two (2) minutes and was their only telephone conversation in 2013.

909.    After having this conversation with T.W., Teva decided to maintain the Walgreens business, but concede the Econdisc business to Dr. Reddy's.  Teva conceded the Econdisc business on August 7, 2013.  Green listed "Strategic Market Conditions" in Teva's Delphi database as the reason for conceding the business to Dr. Reddy's.

910.    By September 10, 2013, Dr. Reddy's had achieved its goal of obtaining 20% share of the Oxaprozin market.  At that time, its customers included Econdisc, Keysource, and Premier.

b.    *Paricalcitol*

911.    Teva entered the market for Paricalcitol on September 30, 2013 as the first-to-file generic and had 180 days of generic exclusivity.

912.    Following its period of exclusivity, Teva's "goal was to concede business on day 181" but "to retain CVS, Walgreens and ABC.  All others are not an automatic concede, but we expect to concede." During March and April 2014, Teva coordinated with and conceded several customers to Zydus, as Zydus was entering the market for Paricalcitol.  By mid-April 2014, Teva "ha[d] conceded the share [it] planned for" to Zydus.

913.    By May 2014, Dr. Reddy's started preparing to enter the Paricalcitol market.  On May 1, 2014, T.W. of Dr. Reddy's spoke with Rekenthaler of Teva for nearly eleven (11) minutes.

914.    At a May 20 sales and marketing team meeting, the Dr. Reddy's sales force was instructed to find out which customers were currently purchasing Paricalcitol from which manufacturers, and their prices.  Dr. Reddy's was targeting a 20% market share.  At the time, Teva's share was 73%.

915.    On June 10, 2014 – as Dr. Reddy's was starting to approach certain customers – including a large retail pharmacy customer ("Pharmacy-5") – Patel spoke with V.B., the Vice

President of Sales for North American Generics at Dr. Reddy's, several times.  At 8:50 a.m., Patel called V.B. and left a voicemail.  V.B. returned the call at 9:18 a.m., and the two spoke for more than ten (10) minutes.  Later that day, at 2:46 p.m., Dr. Reddy's provided Pharmacy-5 with a market share report for Paricalcitol indicating that Teva was the market leader at 60% share.  A representative of Pharmacy-5 responded that it "[l]ooks like Teva is the right target."  Shortly after this e-mail exchange, at 3:21 p.m., V.B. called Patel again and the two spoke for nearly nine (9) minutes.

916.    By June 19, 2014, Dr. Reddy's had made offers to Omnicare, Cardinal, ABC, and Pharmacy-5.  The internal plan was that if Pharmacy-5 declined, then Dr. Reddy's would make an offer to CVS.  That same day, Teva agreed to concede its Paricalcitol business at Omnicare, dropping its market share by 3%.

917.    Teva also strategically conceded what remained of its Cardinal business (it had previously conceded some of that business to Zydus).  After receiving Dr. Reddy's bid, Cardinal approached Teva and asked whether Teva would bid to retain the 4mcg portion of the business.  Patel recommended to her boss, K.G., that Teva concede the business:  "We have ~70 share and it is ideal to concede here because of the incomplete family."  K.G. agreed.  Patel then instructed S.B., a customer analyst at Teva, to concede "due to [T]eva's high share."  S.B. subsequently e-mailed T.C., Teva's Senior Director of Sales & Trade Relations:  "Due to the fact that we have high share and already conceded on the other strengths, we are going to concede on this strength as well."  T.C. relayed this statement, word-for-word, to Cardinal.

918.    Dr. Reddy's also submitted a bid to ABC, which was one of the customers that Teva had targeted to keep after losing exclusivity.  ABC notified Teva of Dr. Reddy's competitive bid for Paricalcitol on June 26, 2014.  In internal e-mails discussing this price

challenge, Teva employees noted that Dr. Reddy's was "aggressively seeking market share" and potentially eroding the price of the drug.  When asked for his thoughts on this, Rekenthaler remarked:

From:     Dave Rekenthaler
Sent:     Tue 7/01/2014 9:42 AM (GMT-05:00)
To:       Nisha Patel02
Cc:
Bcc:
Subject: RE: ABC Paricalcitol CPC #12233 (DRL LAUNCH) -->DUE TODAY <--

My thoughts are that Dr. Reddy is really a pain in my ass.  Have they picked anyone up to date?

[89]

919.    Despite the pricing challenge, Teva retained the ABC Paricalcitol business.  As ABC explained to Dr. Reddy's, "Teva wanted to keep the business and has given us a competitive price."

920.    Dr. Reddy's formally launched Paricalcitol on June 24, 2014.  On or around that date, it sent offers to, *inter alia*, Winn-Dixie, Giant Eagle, and Schnucks.  On June 26, 2014, Teva's K.G. told Patel that he was "willing to concede 10-15% share total on Paricalcitol" to Dr. Reddy's.

921.    Winn-Dixie informed Teva that it had received a competing offer for Paricalcitol from Dr. Reddy's.  Patel recommended that Teva concede the business.  Teva did, and Winn-Dixie informed Dr. Reddy's that it had won its Paricalcitol business on July 9, 2014.

922.    Giant Eagle informed Teva that it had received a competing offer on Paricalcitol on July 10, 2014.  That same day, V.B. of Dr. Reddy's called Patel and the two spoke for more than twelve (12) minutes.  Shortly after getting off the phone with V.B., Patel responded to a question from a colleague regarding an RFP to another supermarket chain.  One of the potential

---

[89]    Amended State AG Complaint No. 2 ¶ 526.

bid items was Paricalcitol.  Patel directed her colleague to "bid a little high on Paricalcitol.  We should not be aggressive since we are in the process of conceding share due to additional entrants." Her colleague responded:  "I will bid higher" on Paricalcitol.

923.    The next day, Teva conceded the Giant Eagle business to Dr. Reddy's.  S.B., a Teva Strategic Customer Analyst, wrote in an internal e-mail, "Due to DRL recent launch and pressure to give up share, we are going to concede." Giant Eagle accepted Dr. Reddy's proposal the next day.

924.    After receiving an offer from Dr. Reddy's, Schnucks also asked Teva for reduced pricing in order to retain the business.  Teva decided internally to concede Paricalcitol at Schnucks "[d]ue to new entrants and having to give up some share." In order to create the appearance of competition with this customer, Teva engaged in what Patel referred to as "fluff pricing," by which it offered Schnucks an inflated price (cover bid) for Paricalcitol to ensure that Teva did not win the business.  Indeed, Schnucks was "so insulted" by Teva's price that it moved to Dr. Reddy's the same day it received Teva's offer.  When Patel learned of this, she remarked to a Teva salesperson (who she had been discussing "fluff pricing" with recently):

> From:    Nisha Patel02
> Sent:    Thu 7/17/2014 11:36 AM (GMT-05:00)
> To:      ▓▓▓▓▓▓▓▓
> Cc:
> Bcc:
> Subject: RE: Schnucks Paricalcitol CPC (#12201)
>
> Sorry! Had to laugh.  In regards to our recent conversation….this is what we see when we provide fluff pricing. Can't win!

[90]

925.    Schnucks accepted Dr. Reddy's Paricalcitol proposal on June 30, 2014.

---

[90]  *Id.* at ¶ 531.

926.    On July 16, 2014, McKesson informed Teva that it had received a competing bid for Paricalcitol, and that Teva would need to submit its best bid in order to retain the business. Teva initially decided to concede the One Stop portion of McKesson's business only, while retaining the RiteAid portion.  Patel wrote internally to her team that "[t]his decision is based on the number of competitors, DRL's potential share target and our current/conceded share.  (Dr. Reddy's should be done with challenging our business on this product.)"  Patel further added that Teva had been "looking to give up One Stop to be responsible with share" and that "[t]he responsible thing to do is concede some share to DRL but not all."

927.    On July 18, 2014, a Friday, Patel called V.B. at Dr. Reddy's at 4:20 p.m. and left a message.  V.B. returned the call on Monday morning, and the two spoke for more than four (4) minutes.  They spoke again the next morning, July 22, 2014, for more than six (6) minutes. During these calls, Patel and V.B. agreed that Dr. Reddy's would stop competing for additional market share (and driving price down further) if Teva conceded all of its McKesson business (One Stop and Rite Aid) to Dr. Reddy's.  Dr. Reddy's confirmed to McKesson (that same day) that it "would be done after this" – meaning it would not compete for additional business because it had attained its fair share.  McKesson passed this information along to Teva on July 22.

928.    The next day, July 23, 2014, Teva conceded its entire McKesson business – both RiteAid and One Stop – to Dr. Reddy's.  In its Delphi database, Teva noted that the McKesson Paricalcitol business had been conceded to a "Strategic New Market Entrant."  After the fact, former customer McKesson informed Teva that Dr. Reddy's had been "so aggressive because [Teva was] not giving up share."

929.    By early August 2014, Dr. Reddy's had attained 15-16% of the total Paricalcitol market, which it decided – pursuant to its understanding with Teva – it would "maintain for now."

### 12.    Other Teva Conspiracies

#### a.    Oxaprozin

930.    On March 27, 2013, a non-Defendant generic manufacturer entered the market for Oxaprozin 600mg tablets with the exact same WAC pricing as Teva. In the days and weeks leading up to the entry, Green exchanged at least thirteen calls and one text with an account executive at the non-Defendant generic manufacturer.[91]

931.    During these communications, Teva agreed to concede specific customers to the non-Defendant generic manufacturer in order to avoid competition and price erosion resulting from the entry.

932.    Part of the understanding between the companies was that Teva would concede at least two large customers, CVS and Cardinal, and that Teva would retain Walmart as a customer. On March 27, 2013, however, Teva learned that the non-Defendant generic manufacturer had either misunderstood the deal or was trying to cheat on the agreement by approaching Walmart.

933.    On March 27, 2013, T.C. of Teva forwarded an e-mail that T.C. had received from Walmart to Green and Rekenthaler.  The e-mail from Walmart, sent the same day, requested that Teva provide a more competitive price on Oxaprozin 600mg tablets because Walmart had received a new bid from a competitor (the non-Defendant generic manufacturer).

---

[91]    *Id.* at ¶ 300.

934.     Rekenthaler's immediate reaction to T.C.'s e-mail was "Great.  More idiots in the market..."  In subsequent e-mails between T.C. and Rekenthaler, T.C. reminded Rekenthaler that, pursuant to the agreement with the non-Defendant generic manufacturer, "[w]e just conceded at cardinal . . . remember[?]"  Rekenthaler corrected T.C., stating that Teva had conceded both Cardinal *and* CVS to the non-Defendant generic manufacturer.  Rekenthaler remarked that "[t]hey should not have gone to Walmart.  Poor strategy on their part for sure."  In her reply, T.C. made it clear that there was an understanding between Teva and the non-Defendant generic manufacturer:

From:     ████████
Sent:     Wed 3/27/2013 4:36 PM (GMT-05:00)
To:       Dave Rekenthaler; Kevin Green
Cc:
Bcc:
Subject:  RE: Oxaprozin 600mg Tab

I thought they said they were done after cardainl.. I am pissed. [92]

935.     Teva took immediate steps to address the situation.  That same day – March 27, 2013 – Green called an employee at the non-Defendant generic manufacturer at 5:25 p.m. but she did not answer.  The next morning, at 8:06 a.m., T.C. sent an e-mail to Walmart stating: "Addressing this morning. . ."  Less than a half hour later, T.C. sent an e-mail to Green, stating: "CALL ME IN MY OFFICE when you get a chance."

936.     After Green spoke to T.C., he immediately called an account executive at the non-Defendant generic manufacturer.  The account executive relayed the information from Green to

---

[92]     *Id.* at ¶ 303.

her boss in a series of at least eight calls and nine text messages over the course of that morning and later in the day.[93]

937.    During those conversations, the non-Defendant generic manufacturer agreed to withdraw the offer to Walmart and honor the agreement with Teva.

938.    At 1:22 p.m. that day, after several of the communications outlined above, Walmart sent an e-mail to T.C. at Teva confirming that the offer to Walmart had in fact been withdrawn:  "FYI - I just received word from [the non-Defendant generic manufacturer] that they have met their market share and the proposal has expired.  Please see what you can do with pricing." T.C.  forwarded the e-mail to Green, with a one-word response making it clear that Teva would not be reducing its price for Oxaprozin:  "FUNNY."

939.    Pursuant to the agreement, there was very little price erosion as a result of the non-Defendant generic manufacturer's entry.  A couple of months later, as Dr. Reddy's was preparing to enter the market for Oxaprozin, a Dr. Reddy's representative commented positively that "[p]ricing [is] still high" on Oxaprozin.  That same representative had also talked to wholesaler Cardinal about the drug and conveyed that "Cardinal switched to [the non-Defendant generic manufacturer].  Teva was 'fine' with it!"

b.    *Tolterodine Tartrate*

940.    On January 23, 2014, a non-Defendant generic manufacturer entered the market for Tolterodine Tartrate 1mg and 2mg tablets ("Tolterodine") with the exact same WAC prices as Teva for all formulations.  In the days leading up to January 23, 2014, employees of non-Defendant generic manufacturer were speaking frequently to Patel and Rekenthaler of Teva to

---

[93]    *Id.* at ¶ 305.

coordinate the non-Defendant generic manufacturer's entry into the market. Patel and Rekenthaler exchanged at least twelve calls and eight texts with the non-Defendant generic manufacturer in the days leading up to January 23, 2014.[94]

941.    During these calls and text messages, Teva and the non-Defendant generic manufacturer agreed that Teva would concede business in order to avoid significant price erosion in the market.

942.    On January 24, 2014, in a message to Teva national account managers about how important it was for them to determine and document which competitor was challenging Teva for business in a particular situation (because it would help Teva determine whether to concede or not), Patel stated: "As we've heard, [the non-Defendant generic manufacturer] is entering the market for Tolterodine. I'm sure we will have to concede somewhere. . . ."

943.    On January 28, 2014, Teva was informed by CVS that it had received a competitive price challenge on Tolterodine. K.G. of Teva immediately asked: "do we know who this could be?" Rekenthaler responded that it was the non-Defendant generic manufacturer, but noted that he did not want to put the details into writing.[95]

944.    The next day, Patel and an employee of non-Defendant generic manufacturer tried to reach each other several times, and were ultimately able to speak once, for more than two (2) minutes.

945.    On Monday, February 3, 2014, Patel instructed a colleague at Teva to concede the business at CVS by providing a small price reduction that she knew would not be sufficient to retain the business. T.C. of Teva, who had the customer relationship with CVS, challenged the

---

[94]    *Id.* at ¶ 309.

[95]    *Id.* at ¶ 311.

decision to concede the business.  Rekenthaler responded – again not wanting to put the details into writing:

> On Feb 3, 2014, at 11:29 AM, "Dave Rekenthaler" <Dave.Rekenthaler@tevapharm.com> wrote:
>
> ███ I'll discuss the details of this with you later. There was a strategy here and you weren't in the office Thursday or Friday so we proceeded. Again, it will make sense after I discuss with you.  [96]

946.    The next day, Patel called an employee at non-Defendant generic manufacturer and the two spoke for nearly sixteen (16) minutes.

947.    After some internal discussions at Teva regarding the CVS business, Teva confirmed its decision to concede CVS to the non-Defendant generic manufacturer.  CVS represented more than 20% of Teva's business on Tolterodine.

            c.      *Piroxicam*

948.    On March 3, 2014, the non-Defendant generic manufacturer received FDA approval to market Piroxicam capsules.  It entered the market with the exact same WAC pricing as Teva for both the 10mg and 20mg capsules.

949.    At 10:07 a.m. on March 5, 2014, J.L. of Teva sent an e-mail to Patel informing her that the non-Defendant generic manufacturer had just received Piroxicam approval and was challenging Teva on several accounts.  J.L. asked Patel:  "Do we have any strategy in place for Piroxicam?"

950.    Before responding to that e-mail, Patel called an employee at the non-Defendant generic manufacturer at 10:55 a.m. and they spoke briefly.  Shortly after that call, Patel also

---

[96]   *Id.* at ¶ 312.

called that employee's supervisor.  At 2:14 p.m. that afternoon, Patel and that employee's

supervisor at spoke briefly.  Immediately after hanging up, Patel responded to J.L.'s e-mail:



951.    Teva immediately began preparing a strategy to deal with the non-Defendant

generic manufacturer's entry into the Piroxicam market.  On March 6, 2014, Patel requested a

customer profitability and share analysis.  During these negotiations with competitors regarding

market entry, it was typical for Teva employees to request a "customer profitability and share

analysis" (as Patel did here) so they could easily determine which customers to concede when

talking to competitors about dividing the market.

952.    That same day, Patel exchanged at least ten calls with employees at the non-

Defendant generic manufacturer to discuss their plans for dividing the Piroxicam market.[98]

953.    The next day, March 7, 2014, after the flurry of phone calls detailed above, Patel

sent an e-mail to L.R., a customer marketing manager at Teva, identifying specific customers to

concede.  Based on her several conversations with the non-Defendant generic manufacturer, and

her understanding of the concept of "fair share," Patel also noted:  "I'm guessing that [the non-

Defendant generic manufacturer] will not stop here since we are the share leader, but for the

customers listed below, we should concede.  We will review additional challenges as they come,

if they come."

---

[97]    *Id.* at ¶ 317.

[98]    *Id.* at ¶ 319.

954.    Additional challenges did come.  On March 12, 2014, Patel learned that the non-Defendant generic manufacturer was challenging Teva at CVS – Teva's largest account for Piroxicam.  Teva refused to concede CVS to the non-Defendant generic manufacturer because CVS represented 26.1% of Teva's total market share for that drug.  Teva lowered its price by 20%, and the next morning CVS notified Teva that it would retain the account.  The same day, after hearing that Teva was not going to back down on the CVS challenge, an employee of the non-Defendant generic manufacturer called Patel at 1:41 p.m. and they spoke briefly.

955.    On March 17, 2014, Patel called an employee of the non-Defendant generic manufacturer and they spoke briefly.  The employee called Patel back at 11:35 p.m. that same day and they spoke for fifteen (15) minutes.  Immediately after speaking to Patel, the employee of the non-Defendant generic manufacturer called a colleague and they spoke for ten (10) minutes.  Teva retained the CVS account but conceded other customers (representing less market share) through March and April.

956.    For example, on March 25, 2014 Teva learned of a challenge from the non-Defendant generic manufacturer at Anda, a wholesaler distributor.  Following an analysis of its market share, Teva determined that it still had more than its "fair share" of the market.  Pursuant to the understanding among generic manufacturers alleged above, Teva determined that it would be prudent to concede the Anda business on Piroxicam, in order to alleviate any future challenges.  Patel agreed with the decision to concede on April 1, 2014.

            d.    *Cabergoline*

957.    In December 2014, as the non-Defendant generic manufacturer was preparing to enter the market for Cabergoline, F.H., a senior executive responsible for generic products at a large joint venture between a retail pharmacy ("Pharmacy-3") and a large wholesaler ("The Wholesaler") to pool the companies' drug purchasing globally, approached T.C. of Teva on

behalf of the non-Defendant generic manufacturer.  In a December 9, 2014 e-mail, F.H. directly sought to facilitate a customer allocation between the non-Defendant generic manufacturer and Teva:  "I need to talk to you about Cabergoline.  [The non-Defendant generic manufacturer] is now shipping and they are targeting [The Wholesaler] and 2 small grocery chains.  [The Wholesaler] owes [the non-Defendant generic manufacturer] a favor and would be ok if you walked away from their business.  [The non-Defendant generic manufacturer] has promised to play nice in the sandbox.  Let me know if you are available to discuss."

958.    The Wholesaler represented about 13% of Teva's total business for Cabergoline, and about $861,000 in annual net sales.

959.    T.C. of Teva did not respond immediately, asking for a little extra time "to figure something out on our side." F.H. responded:  "Of course.  I will let [the non-Defendant generic manufacturer] know not to do anything crazy."

960.    The next day, after some internal conversation at Teva, T.C. agreed to the proposed allocation:  "Tell [the non-Defendant generic manufacturer] we are playing nice in the sandbox and we will let them have [The Wholesaler]."

961.    Pursuant to this agreement, [the non-Defendant generic manufacturer] was able to acquire The Wholesaler as a customer for Cabergoline without any fear that Teva would compete to retain the business.  In exchange, [the non-Defendant generic manufacturer] agreed to "play nice in the sandbox" – i.e., not compete with Teva for other customers and drive prices down in the market.

13.     **Mylan / Sandoz**

a.     *Valsartan HCTZ*

962.     The first drug that CW-4, of Sandoz, and Nesta, of Mylan, coordinated about was Valsartan HCTZ.  Valsartan HCTZ, also known by the brand name Diovan, is used to treat high blood pressure.

963.     Diovan was a large volume drug that had sales in the United States of approximately $1.6 billion for the 12 months ending June 30, 2012.

964.     Mylan was the first to file an abbreviated new drug application (ANDA) to market the generic version – Valsartan HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity.  Sandoz manufactured the authorized generic.  This meant that Sandoz and Mylan would be the only two manufacturers of the generic for six months.

965.     Mylan and Sandoz launched Valsartan HCTZ on the same day – September 21, 2012.  In the days leading up to the launch, CW-4 and Nesta spoke at least twenty-one (21) times by phone during which they discussed, among other things, allocating market share for this

product.  These calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:20:01 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:11 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:18 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:43 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:35 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:03 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:22:22 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:35 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:06 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:26 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:19 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:57 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:03:30 |
| 9/14/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:07:36 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:09 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:32 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:02:40 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:51 |[99] |

966.     During these phone calls, Sandoz and Mylan – through CW-4 and Nesta – agreed to divide up the market so that each competitor obtained roughly a 50% market share.

967.     Throughout this time, CW-4 also kept Kellum (her supervisor) regularly informed of her discussions with Nesta and met with Kellum in person to discuss her customer accounts, including a meeting on September 14, 2012.

968.     On September 21, 2012 – the date of the Valsartan HCTZ launch – R.T., a senior sales and marketing executive at Sandoz, sent an internal e-mail stating "[a]s a cross functional team, we have optimized this launch successfully securing ~52% market share vs.  a formidable competitor like Mylan. . . . you should be very proud!"

---

[99]   *Id.* at ¶ 979.

969.    That same day, Mylan issued a press release announcing that it had received final FDA approval to market generic Valsartan HCTZ.  In an internal series of e-mails reacting to this news, a Sandoz employee remarked:  "Fyi, good news, Mylan has 180 days as expected." H.F., a senior-most executive of Sandoz Germany responded, ". . . sometimes a little help from our competition is welcome as well."  D.D., a senior-most executive of Sandoz North America, replied:

> I guess this is what they call "co-opetition". [100]

970.    Kellum forwarded Mylan's press release announcing the Valsartan launch to the Sandoz pricing and sales teams.  S.G., a national account executive at Sandoz, replied "Hallelulah!!!!!!!!!!!!!!! (sic)."

971.    On September 25, 2012 – only four days after the launch – ABC contacted Sandoz seeking a price reduction on Valsartan HCTZ.  S.G. forwarded the request to CW-1 and Kellum stating "ABC has provided additional information regarding the market pricing on Valsartan HCTZ (specifically to McK [a Mylan customer]).  Please review and advise if Sandoz will continue to let the market settle or move in a different direction.  Kellum replied, "[n]o price change."

972.    On November 16, 2012, Sandoz executives met to discuss increasing sales for Valsartan HCTZ.  R.T. sent an internal e-mail in advance of the meeting asking, "Are there opportunities with non-Sandoz customers that we should evaluate?" After a colleague responded with a list of potential Mylan customers, Kellum responded, "I'm concerned we are going to disrupt the market.  I understand the need for additional sales but we need to be thoughtful here."

---

[100]  *Id.* at ¶ 983.

R.T. then informed the Sandoz team "Do not approach new customers, with[out] me or Armando [Kellum]'s consent."

**B.     Taking the Overarching Conspiracy to a New Level:  Price Fixing (2012 – 2015)**

**1.     July 31, 2012 Price Increase**

973.    Effective July 31, 2012, Teva increased pricing on a number of different drugs. Many were drugs where Teva was exclusive, but several of them were drugs where Teva faced competition, including the following:

| Drug | Competitors |
|---|---|
| Buspirone Hydrochloride Tablets | Mylan (29.5%); Watson (23.5%) |
| Estradiol Tablets | Mylan (26.7%); Watson (16.4%) |
| Labetalol HCL Tablets | Sandoz (61.4%); Watson (10%) |
| Loperamide HCL Capsules | Mylan (67%) |
| Mimvey (Estradiol/Noreth) Tablets | Breckenridge (66.2%) |
| Nadolol Tablets | Mylan (49.8%); Sandoz (10.3%) |
| Nitrofurantoin MAC Capsules | Mylan (45.3%); Alvogen (7.9%) |
| Tamoxifen Citrate Tablets | Mylan (22.2%); Watson (10.3%) |

[101]

974.    Before raising prices on these drugs, Teva coordinated each of these price increases with its competitors.  For every drug on the list above, either Green or Rekenthaler was communicating directly or indirectly with Teva's competitors to coordinate in the days and weeks leading up to the price increase.  For example:

a.      Mylan:  Green spoke to Nesta on July 23 (7 minutes), July 24 (2 calls:  4 and 8 minutes); July 25 (4 minutes); July 26 (4 minutes); July 30 (2 calls, including one 8 minutes); and July 31, 2012 (5 calls:  6, 2, 4, 7 and 2 minutes);

---

[101]    *Id.* at ¶ 540.

b.      Watson[102]:  Rekenthaler spoke to A.S., a senior Watson sales executive, on July 11, 2012 (2 calls:  1 and 9 minutes);

c.      Sandoz:  Green spoke to CW-2 at Sandoz on July 29, 2012 (2 calls:  2 and 4 minutes) and July 31, 2012 (6 minutes).

d.      Breckenridge:  Rekenthaler spoke to D.N. a senior sales executive at Breckenridge on July 17, 2012 (4 minutes);

e.      Alvogen:  Green had several calls with Nesta at Mylan (noted above) on July 31, 2012.  After some of those calls between Green and Nesta on July 31, Nesta called B.H., a senior sales and marketing executive at Alvogen.

*a.      Nadolol*

975.    As early as 2012, Teva was speaking to competitors about the drug Nadolol.

976.    In 2012 and 2013, Teva's only competitors for Nadolol were Mylan and Sandoz. All three companies experienced supply problems of some sort during that time period, but they were in continuous communication to coordinate pricing and market allocation in order to maintain market stability.  Nadolol was a high-volume drug and one of the most profitable drugs where Teva, Mylan and Sandoz overlapped, so it was very important that they maintain their coordination.

977.    By 2012, an anticompetitive understanding among Teva, Mylan and Sandoz was firmly entrenched.

---

[102]  Watson Pharmaceuticals, Inc.  ("Watson"), acquired Actavis in or around October 2012.  The two companies operated as a single entity, albeit under separate names until January 2013, when Watson announced that it had adopted Actavis, Inc. as its new global name.  *See* Press Release, Actavis, Inc. (Jan. 24, 2013), *available at* https://www.prnewswire.com/news-releases/watson-pharmaceuticals-inc-is-now-actavis-inc-188196701.html.

978.    Teva raised its price on Nadolol on July 31, 2012.  In the days leading up to that increase, Green, at the time in the sales department at Teva, was in frequent communication with executives at both Sandoz and Mylan.  Green spoke to CW-2 from Sandoz twice on July 29, 2012, and again on the day of the price increase, July 31, 2012.  Similarly, Green was communicating with Nesta of Mylan often in the days leading up to the increase, including five (5) calls on the day of the price increase.

979.    Sandoz followed with its own increase on August 27, 2012.  The increases were staggering – varying from 736% to 798% depending on the formulation.  The day before the Sandoz increase, Kellum, then the Senior Director of Pricing and Contracts at Sandoz, called Green.  They had also spoken once earlier in the month, shortly after the Teva increase.  CW-2 also called Green twice on August 21, 2012 – the same day that Sandoz requested approval from its Pricing Committee to raise the Nadolol price.  The day after the Sandoz increase, Green – acting as the conduit of information between Sandoz and Mylan – called Nesta of Mylan twice, with one call lasting fourteen (14) minutes.

980.    Mylan, which returned to the market after a brief supply disruption, followed  the Teva and Sandoz increases on January 4, 2013.  The day before the Mylan increase Nesta spoke to Green four (4) times.  The next day, Green conveyed the information he had learned from Nesta directly to his counterpart at Sandoz.  On January 4, 2013 – the day of the Mylan increase, Green called Kellum twice in the morning, including a six (6) minute call at 9:43 a.m.  Shortly after hanging up with Green, Kellum reported internally on what he had learned – but concealing the true source of the information – a convention that was frequently employed by many Sandoz

executives to avoid documentation of their covert communications with competitors:

> **From:** Kellum, Armando
> **Sent:** Friday, January 04, 2013 11:28 AM
> **To:** ████████████████████████████
> ████████████████████
> **Subject:** Levothryoxine and nadolol
>
> Just heard from a customer that
>
> - Teva and Mylan raised have now raised price on Nadolol to our levels
>
> and
>
> Mylan took a significant price increase on Levothryoxine
>
> Let's please be cautious on both of these products.
>
> Thanks                                                                 [103]

981.     Being "cautious" on those products meant that Sandoz did not want to steal business away from its competitors by offering a lower price and taking their market share.

982.     Kellum's phone records demonstrate that he did not speak with any customers during the morning of January 4, 2013.  At 11:50 a.m. the same morning, Green also called CW-2 at Sandoz and they spoke for fifteen (15) minutes.

983.     Significantly, Green was not speaking with his Sandoz contacts solely about Nadolol, the common drug between Teva and Sandoz, but was also conveying information to Sandoz about a Mylan price increase on another drug that Teva did not even sell – Levothyroxine.  Such conversations further demonstrate the broad, longstanding agreement among each of these competitors to share market intelligence in order to facilitate the scheme.

984.     Teva continued to conspire with Mylan and Sandoz about Nadolol and many other drugs throughout 2013 and into the future.

---

[103]   Amended State AG Complaint No. 2 ¶ 548.

b.      *Labetalol HCL*

985.    After Teva increased its pricing on Labetalol HCL on July 31, 2012, it continued to coordinate with its competitors to maintain that supra-competitive pricing for that drug.  For example, in October 2012, Teva learned that Sandoz was "no longer having supply issues" but that "Watson is on allocation" (i.e., did not have enough supply to meet all of its demand).  In an internal e-mail sent on October 16, 2012, J.L., a senior analyst at Teva, questioned whether Teva should consider lowering "strategic customer pricing" in order to retain its market share.

986.    That same day, Green spoke to CW-2 of Sandoz two (2) times.  After those calls with CW-2, Green responded to the analyst's question:

> Sandoz is back in good supply. They took a 500% price increase several months back, and they are holding firm with their prices.
>
> Stay the course and maintain our higher price [104]

987.    T.C. of Teva agreed:  "We need to stay the TEVA course."

988.    Rekenthaler was not satisfied, however.  In order to confirm that Watson was also still committed to maintaining high pricing on Labetalol HCL, Rekenthaler called and spoke to A.S., a senior sales executive at Watson, four (4) times on October 18, 2012.

c.      *Nitrofurantoin MAC*

989.    Teva's July 31, 2012 price increase on Nitrofurantoin MAC was between 90-95% depending on the dosage and formulation.  After that increase, Teva continued to coordinate with Mylan and non-Defendant manufacturer Alvogen to maintain those high prices.

990.    For example, on October 10, 2012, a distributor customer approached Teva requesting a lower price for Nitrofurantoin MAC because it was having difficulty competing

---

[104]   *Id.* at ¶ 555.

with the prices being charged by the distributor's competitors (i.e., other distributors).  At 9:49

a.m. on October 10, 2012, K.G. of Teva sent an internal e-mail to the Teva sales team, including

Green and Rekenthaler, among others, saying:

> Sales Team,
>
> We adjusted our pricing on Nitrofurantoin based on market pricing we had received in the past.  Please confirm current market pricing.

[105]

991.    Immediately after receiving that e-mail, Green reached out to both Nesta at Mylan

and B.H., his counterpart at Alvogen.  At 10:01 a.m., Green called Nesta and the two spoke for

ten (10) minutes.  After hanging up – at 10:11 a.m. – Green called B.H. at Alvogen for the first

of three (3) calls that day, including one call lasting fourteen (14) minutes.  To close the loop,

Nesta also separately spoke to B.H. two times that same day, including a call lasting almost ten

(10) minutes.  Teva did not lower its price.

### 2.    February – April 2013:  Increasing Prices Before A New Competitor Enters the Market:  Budesonide Inhalation Suspension

992.    As of February 2013, Teva was the only company in the market for generic

Budesonide inhalation suspension.  Teva knew, however, that a potential legal action challenging

the validity of the patent on the brand drug could allow additional competition into the generic

market shortly.  Before any additional competition could enter the market, effective February 8,

2013, Teva raised the WAC price for its Budesonide inhalation suspension by 9%.  Although a

very modest increase in percentage terms, the 9% price increase added $51 million to Teva's

annual revenues.

---

[105]    *Id.* at ¶ 559.

993.    On April 1, 2013, Actavis won a legal challenge in federal district court against the brand manufacturer declaring the patent for the brand drug, Pulmicort Respules, invalid. Actavis immediately began planning to launch the product "at risk," which is when a generic manufacturer puts the product on the market before all appeals in the patent lawsuit are formally resolved and there is still a risk that the new generic entrant might ultimately be found to violate the patent.  That same day, Rekenthaler of Teva called his counterpart at Actavis, A.B. – a senior sales and marketing executive – and they spoke for two (2) minutes.  This was the first-ever phone call between them based on the phone records produced.

994.    The next day, April 2, 2013, Rekenthaler spoke to A.B. two (2) more times, including one call lasting eight (8) minutes.  Actavis then immediately began shipping the product.  Instead of competing to obtain market share as a new entrant, however, Actavis entered the market with the exact same WAC price as Teva.  Indeed, when Teva inquired of a customer that same day to confirm Actavis's pricing, Teva was informed by the customer that Actavis's pricing was "in line with [Teva's] current wholesale pricing."

995.    At some point thereafter, further legal action from the brand manufacturer prevented Actavis from permanently entering the market.  In the interim, though, Teva was able to continue to charge the agreed-upon prices.  In addition, once Actavis entered the market in 2015, Teva immediately conceded customers to Actavis in accordance with the fair share agreement – after calls between Rekenthaler and Falkin, by then a Vice President at Actavis.

### 3.    May 13, 2013 Price Increase – Tizanidine

996.    As of May 2013, Sandoz, Mylan, and Dr. Reddy's were in the market for Tizanidine.  Dr. Reddy's led the increase on this product on May 13, 2013, increasing its WAC price and raising contract pricing tenfold.  At that time, Dr. Reddy's was the market leader with 59% market share, while Mylan had 24%, and Sandoz had 17%.

997.   Tizanidine was a drug that had been on the market for many years and whose price had eroded as many competitors entered and exited the market depending on the profitability of the drug.  As Dr. Reddy's explained in an internal presentation, "Price needs to be adjusted to incentivize current manufacturers to stay in this product" and stated that Dr. Reddy's assumes "Mylan and Sandoz are responsible players, and they may not be able to pick up the large volumes we currently service."

998.   Sandoz was thrilled when it learned that Dr. Reddy's had increased its price on Tizanidine.  For example, on May 10, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail stating that "Giant Eagle just let me know that Dr. Reddy just took a price increase on Tizanidine! Pricing on the 2 & 4mg 150 ct went from $4.50 to $45.00. . . .  We should secure confirmation but if this is true it would be very positive . . . ." Kellum responded, "Wow! Thank you."  Kellum then quickly sent out a directive to the team to "[p]lease put the product on strict allocation to forecast.  Pricing Team – no new offers."

999.   On May 13, 2013, Dr. Reddy's published its new WAC pricing for Tizanidine. That same day, Nesta of Mylan called CW-4 at Sandoz and they spoke for 4 minutes.  Two days later, CW-1 of Sandoz sent an internal e-mail to Kellum regarding "Tizanidine" stating "[l]et's discuss."

1000.   On May 24, 2013, Sandoz followed and matched Dr. Reddy's WAC pricing on several formulations, and even exceeded Dr. Reddy's pricing on one formulation.  Sandoz's WAC increases were significant, ranging from 248% to 344%, depending on the formulation.  In the days leading up to the Sandoz increase, Nesta of Mylan exchanged phone calls with both CW-4 of Sandoz and J.A., a national account executive at Dr. Reddy's, to coordinate the price

increase regarding Tizanidine.  At least some of those calls are set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/20/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:06 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:42 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:01:25 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:20 [106] |

1001.   Notably, after this, Nesta would not speak with J.A. again until three months later in August 2013.

1002.   On May 29, 2013, customer Omnicare e-mailed Sandoz and asked whether it wanted to submit a bid for Tizanidine.  CW-3 of Sandoz forwarded the request internally to CW-1 and Kellum asking "[a]re we considering additional Tizanidine market share? I'm assuming are [sic] intent is not to be disruptive at this time." A few minutes later, Nesta called CW-4 at Sandoz and they spoke for nearly thirteen (13) minutes.  Later that day, CW-1 replied to CW-3's e-mail stating, "[w]e will sit tight for now." CW-3 then responded to Omnicare, stating that "[a]lthough we are not in a back order situation we cannot assume additional usage at this time. If this were to change I will let you know."

1003.   On June 14, 2013, Anda, a wholesale customer, e-mailed J.A. of Dr. Reddy's asking "[d]id mylan follow your increase?" J.A. responded, "We've heard they did." J.A. had learned of Mylan's intent to follow the price increase through his prior communications with Nesta.  However, Mylan had not actually raised its price on Tizanidine at the time of the inquiry and would not do so until July 2, 2013.

---

[106]   *Id.* at ¶ 1056.

1004.   On June 26, 2013, Meijer, a supermarket chain customer, e-mailed Dr. Reddy's requesting a bid for Tizanidine.  J.A. forwarded the request to N.M., a marketing executive at Dr. Reddy's, stating:  "I'm assuming they got a price increase."  N.M. responded:  "I think, given the market situation and us leading the price adjustment, I think, we should not go behind additional market share since it will erode the market even further."  J.A. replied, "[y]eah, I was just sending it as an FYI, no intention to bid."  A few weeks later, Meijer forwarded the same request to Sandoz.  Sandoz's response was similar:  "[w]e cannot supply unfortunately."

### 4.      May 24, 2013 First List of Price Increases

1005.   When Patel began at Teva, she completed and sent her first formal list of recommended price increases to her supervisor, K.G., on May 24, 2013.  She sent the list via e-mail, with an attached spreadsheet entitled "Immediate PI File."  The attached list included twelve (12) different drugs where Patel recommended that Teva follow a "high quality" competitor's price increase as soon as possible.  The spreadsheet also revealed competitively sensitive information about future pricing and bidding practices of several of Teva's high quality competitors – information that Patel could have only learned through her discussions with those competitors.  The relevant columns from that spreadsheet are set forth below:

| Product Category | Competitors | Reason for Increase |
|---|---|---|
| NABUMETONE TABLETS Total | Watson 26, Glenmark 25, Sandoz 5 | Follow 10% below Glenmark. Sandoz also bidding high. |
| RANITIDINE HCL TABLETS Total | Glenmark 1, Amneal 35, Wockhardt 107 | Follow Glenmark and Amneal increase. 3% below Glenmark. |
| MOEXIPRIL HCL TABLETS Total | Glenmark 18, Paddock 16 | Follow Glenmark increase.  5% lower |
| MOEXIPRIL HCL/HCTZ TABLETS Total | Glenmark 78, Paddock 2 | Follow Glenmark increase.  5% lower |
| ADAPALENE GEL Total | Glenmark 13, Taro 45 | Follow Glenmark increase. 5% lower. Rumors of Taro increase |
| CEFDINIR ORAL SUSPENSION Total | Lupin 35, Northstar 5, Sandoz 3 | Follow Lupin. 8-10% lower |
| CEFPROZIL TABLETS Total | Lupin 42, Northstar 10, Sandoz 18 | Follow Lupin. 8-10% lower |
| CEFDINIR CAPSULES Total | Lupin 49, Sandoz 16, Northstar 7 | Follow Lupin. 8-10% lower |
| FLUOCINONIDE OINTMENT Total | Taro 44, Sandoz 1 | Raise to follow Taro |
| FLUOCINONIDE CREAM E Total | Taro 62, Sandoz 10 | Raise to follow Taro |
| FLUOCINONIDE GEL Total | Taro 63, Sandoz 9 | Raise to follow Taro |
| FLUOCINONIDE CREAM Total | Taro 68, Sandoz 1 | Raise to follow Taro |
| CEFACLOR ER TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEPHALEXIN TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEFADROXIL TABLETS Total | Westward 41 | EXCLUDE; ERROR IN SOURCE DATA [107] |

---

[107]   *Id.* at ¶ 602.

1006.   For every one of the relevant drugs on the list, Patel or another executive at Teva spoke frequently with Teva's competitors in the days and weeks leading up to May 24, 2013. During these communications, Teva and its competitors agreed to fix prices and avoid competing with each other in the markets for the identified drugs.  For some of these drugs – including the four different formulations of Fluocinonide – Patel knew before she even began her employment at Teva that she would be identifying those drugs as price increase candidates because of communications she had already had with Aprahamian of Taro.

1007.   The graphic on page 168 of AG Complaint No. 2 summarizes some of the calls related to each of the respective competitors leading up to May 24, 2013.  Those communications included communications between Teva, Actavis, Glenmark, and Sandoz concerning Nabumetone Tablets; between Teva, Amneal, and Glenmark concerning Ranitidine HCL Tablets; between Teva and Glenmark concerning Moexipril HCL Tablets and Moexipril HCL/HCTZ Tablets; between Teva, Glenmark, and Taro concerning Adapalene Gel; between Teva and Lupin concerning Cefdinir Oral Suspension, Cefprozil Tablets, and Cefdinir Capsules; and between Teva and Taro concerning Fluocinonide Ointment, Fluocinonide Cream E, Fluocinonide Gel, and Fluocinonide Cream.

1008.   The "Immediate PI File," including the competitively sensitive information Patel had obtained from competitors, was sent by Patel's supervisor K.G. to Cavanaugh – at that time the Senior Vice President of Sales and Marketing at Teva – on May 27, 2013.  Cavanaugh adopted and approved Patel's price increase recommendations on May 28, 2013.

1009.   The Teva price increases for the drugs identified in Patel's May 24, 2013 "Immediate PI File" went into effect on July 3, 2013.  Patel went to great lengths to coordinate

these price increases with competitors prior to sending the list to K.G. on May 24, 2013.  Some illustrative examples of that coordination are set forth below.

a.     Glenmark

1010.   A number of the drugs identified in the "Immediate PI File" were targeted because of a recent Glenmark price increase on May 16, 2013.  As soon as Patel started at Teva, she began to identify price increase candidates through her conversations with various sales and marketing executives at Glenmark, including:

        a.      CW-5:  4 calls on 5/2/13 (5:02; 0:06; 7:18 and 11:39), 2 calls on 5/3/13 (1:53 and 0:06); 1 text message on 5/3/13;

        b.      J.C.:  3 calls on 5/6/13 (6:45; 20:44; 8:39); 2 calls on 5/7/13 (7:59 and 1:03); For example, early in the morning on May 2, 2013, Patel informed a colleague that she expected to have some new drugs to add to the price increase list imminently:

> From:    Nisha Patel02
> Sent:    Thu 5/02/2013 6:49 AM (GMT-05:00)
> To:
> Cc:
> Bcc:
> Subject: RE: Price Increases — will you be scheduling time next week to discuss?
>
> When you get in, let's touch base on the high priority items below. Please gather/calculate the shelf stock and any other financial exposure involved. If possible, use an assumption of a 30% increase for now with a variable formula where the percentages can be changed for different scenarios. I also expect to have some high priority items to add to this list. I should have them shortly.

[108]

1011.   Less than fifteen minutes later, Patel received a call from CW-5 of Glenmark and the two spoke for just over five (5) minutes.  Shortly after that call, at 7:44 a.m., Patel sent a follow-up e-mail where she identified six different "high priority" Glenmark drugs to add to the price increase list, including:  Adapalene gel; Nabumetone; Pravastatin; Ranitidine HCL;

---

[108]   *Id.* at ¶ 607.

Moexipril HCL; and Moexipril HCL/HCTZ.  Glenmark had not yet increased price on any of those drugs, nor had it sent any notices to customers indicating that it would be doing so (and would not send such notices until May 15, 2013).

1012.   As the Glenmark price increases were approaching, Patel took steps to make sure that Teva did not undermine its competitor's action.  During the morning on May 15, 2013, in anticipation of the Glenmark price increases that had not yet been implemented or made public, Patel instructed her Teva colleagues to alert her of any requests by customers for pricing relating to eight different drugs that Teva and Glenmark both marketed:



1013.   In accordance with the fair share understanding outlined above Patel wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

---

[109]   *Id.* at ¶ 608.

1014.   Patel also spoke to CW-5 of Glenmark for nearly six (6) minutes the next day, May 16, 2013 – the day of the Glenmark price increases.  Effective that day, Glenmark increased price on the following drugs where there was an overlap with Teva:  Adapalene gel; Nabumetone; Fluconazole tablets; Ranitidine HCL; Moexipril HCL; Moexipril HCL/HCTZ; Pravastatin; and Ondansetron.  Patel also spoke to CW-5 and J.C. at Glenmark multiple times on May 17, 2013.

1015.   After Glenmark price increase implementation on May 16, 2013, and before Teva had the opportunity to follow those increases, several customers approached Teva looking for a lower price.  Teva refused to bid on most of these solicitations so as to maintain market stability. When it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business.  As Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several Glenmark drugs:  "IF we bid, we need to bid high, or we will disturb the market."

1016.   Patel did not immediately include all of the Glenmark price increase drugs on Teva's price increase list, however, because certain drugs involved non high "quality" competitors.  For these drugs, a little more work (and communication) was required before Patel would feel comfortable moving forward with a price increase.

1017.   For example, the market for Fluconazole tablets included a non-Defendant generic manufacturer as a competitor (albeit with relatively low market share) in addition to Teva and Glenmark.  As of Friday May 17, 2013, Patel had not yet decided whether Teva should follow the Glenmark price increase on Fluconazole, fearing that the non-Defendant generic manufacturer might not be a responsible competitor.  In an internal e-mail that day, Patel indicated to colleagues – including her supervisor, K.G. – that she was "[g]athering some revised

intel" about Fluconazole in order to determine next steps.  The following Monday, May 20, Patel

called a national account manager at the non-Defendant generic manufacturer but was unable to

connect.  Patel was ultimately not able to communicate with the national account manager by

phone until May 28, 2013.  The next day after speaking to the national account manager – May

29, 2013 – Patel promptly added Fluconazole to the Teva price increase list.

1018.   Teva followed the Glenmark price increase for Fluconazole tablets on July 3,

2013.  That same day, Patel spoke to the national account manager and also spoke to CW-5 at

Glenmark for almost five (5) minutes.  The Teva price increases were a staggering 875% -

1,570%, depending on the dosage strength.  The non-Defendant generic manufacturer then

followed with an increase of its own on August 16, 2013.  Patel coordinated those increases with

both Glenmark and the non-Defendant generic manufacturer.

### b.    Sandoz

1019.   In her May 24 "Immediate PI File," Patel included competitively sensitive

information about the drug Nabumetone, indicating that she was confident following Glenmark's

increase because Sandoz was "bidding high" on that drug.  In other words, Sandoz would

provide cover bids that were too high to be successful, so that Sandoz would not take its

competitors' market share even if it did not take its own price increase.  Patel had spoken to CW-

1 for nearly twenty-five (25) minutes on May 15, 2013, and again for more than eighteen (18)

minutes on May 20, 2013, during which time she learned this information.

1020.   At the same time, Sandoz was internally discussing its "bidding high" strategy for

Nabumetone.  Two days before Patel sent the "Immediate PI File" to her supervisor, a Sandoz

pricing analyst sent the following e-mail to Kellum and CW-1 confirming the strategy:

| From: | |
|---|---|
| Sent: | Wednesday, May 22, 2013 4:14 PM |
| To: | Kellum, Armando; |
| Subject: | Target RFP Question |

AK,

I know we agreed not to bid on potential price increase items, but we bid Nabumetone at a high price.  Are you okay with us bidding on this one?  McKesson does not purchase this product from us.

[110]

1021.  Patel continued to coordinate with CW-1 and other competitors about increasing prices for drugs on the list even after she sent it to K.G. on May 24, 2013.  For example, at 8:15 a.m. on May 30, 2013, Patel spoke to CW-5 at Glenmark for nearly twelve (12) minutes. Immediately after hanging up the phone, Patel called CW-1 at Sandoz to discuss Glenmark's increase on the drug Ranitidine HCL and Teva's plans to follow that increase (Sandoz was also in the market for Ranitidine HCL).  She left CW-1 a voicemail, which he returned promptly. Patel and CW-1 then had several substantive telephone calls over the next half-hour.

1022.   After these conversations with Patel, at 10:02 a.m., CW-1 sent an e-mail to Kellum indicating that he believed there would be price increases in the pipeline with respect to

---

[110]  *Id.* at ¶ 616.

Ranitidine HCL, and suggesting a potentially substantial increase in Sandoz's price:

**From:** ███████
**Sent:** Thursday, May 30, 2013 10:02 AM
**To:** Kellum, Armando
**Cc:** ███████
**Subject:** Ranitidine tabs

I think there might be some price increases in the pipeline.

Per analysource Glenmark just took a WAC increase to $9.53 from $2.70(we are at 4.98) on the 150mg on 5/16.  I wonder if Teva and Amneal will follow?  They are the two dominant players on this molecule

We just bid and I think we are getting the award at a contract price of $1.77.  This contract is negative gross margins but 15% above variable costs.  RAD was at $0.95.  Looking at the competition of Amneal, Teva and Glenmark I thought that this was the best way to go to get into this product, we are currently sitting with a 1.8% share.

RAD is also buying up a lot of our short dated product.

Wonder if there is any way to work with them to revise the cost at a future date if Teva and Amneal go up as well.  I'm thinking we can go from $1.77 to $5 maybe                                              [111]

1023.   The communication between Patel and CW-1 about competitively sensitive information was constant and unrelenting during this period.  For example, in June 2013 Teva was "attempting to understand how [its] pricing for Isoniazid compares to the rest of the market." On June 11, 2013, L.R., a Teva marketing representative, asked Patel whether she was "aware of any competitive market intel for this family?"  According to the marketing representative, Sandoz was also in the market for Isoniazid and had "drastically increased their pricing" in January 2013.  Patel responded:  "I will try to get the scoop on Sandoz pricing tomorrow.  When do you need this by?"

1024.   The next day - June 12, 2013 - Patel exchanged at least five (5) calls with CW-1

---

[111]   *Id.* at ¶ 618.

at Sandoz, including those listed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:19:04 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:20 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:00 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:23 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:09:21 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:25 [112] |

1025.   At 8:27 a.m., after the first two of the phone calls listed above, Patel sent the following e-mail clarifying some of the information that L.R. had provided, reflecting some of the conversations about market share she was having with CW-1:

From: Nisha Patel02
Sent: Wednesday, June 12, 2013 8:27 AM
To:
Cc:
Subject: RE: Isoniazid market pricing

I hope to get intel later today. In the meantime, I am hearing about IMS info that contradicts what we have. I am being told that as of quarter ending March 2013, Sandoz has 62% share, with Teva having about 36% share. The data also indicates that Westward has less than 1% share, which implies that they are not back. I have also heard that Westward makes the product for Versa, so they are out for now as well. You may want to request more current share data from Market Research to verify?

It is my opinion that we could have raised pricing to a higher level, but I also understand that there are several factors to consider in these decisions. Depending on what you plan to include in your response, I would also have supply info handy. I imagine that we could easily have picked up more share at this very low price, but were probably limited by supply...which is why Sandoz is able to maintain business at their high price.

I'll pass on additional info as I receive it. If you have any questions, please feel free to come by to chat.

[113]

1026.   Later that day, at 3:21 p.m., Patel passed along additional information with

_____

[112]   *Id.* at ¶ 620.

[113]   *Id.*

specific price points she had received from CW-1 at Sandoz:



From:    Nisha Patel02
Sent:    Wed 6/12/2013 3:21 PM (GMT-05:00)
To:
Cc:
Bcc:
Subject: RE: Isoniazid market pricing

Wholesaler nets for Sandoz product are around $100 for the 300mg 100s and $80 for 100mg 100s. Our WACs are very low. Let me know if you need anything else.

<sup>114</sup>

1027.   As discussed more fully below, Teva ultimately increased price on Isoniazid on January 28, 2015 – in coordination with Sandoz.  Patel spoke to CW-1 for more than sixteen (16) minutes shortly before the increase, on January 22, 2015.

<em>c.    Taro</em>

1028.   Patel noted in her May 24, 2013 "Immediate PI File" that for the drug Adapalene Gel, she was confident in following the Glenmark price increase because there were also "[r]umors of a Taro increase" on that drug.  In addition to Teva and Glenmark, Taro was the only other competitor in the market for Adapalene gel at that time.  Patel had heard the "rumors" about a Taro increase directly from Aprahamian, the Vice President of Sales and Marketing at Taro.  During a nearly eleven (11) minute phone conversation between the two on May 22, 2013, the competitors agreed to follow the Glenmark increase.  This was the first call between Patel and Aprahamian since Patel joined Teva.

1029.   Shortly after the phone call with Patel, Aprahamian made an internal request for a report with specific information about Adapalene gel in order to evaluate a potential Taro increase on the drug, including volume and pricing.  Aprahamian indicated that the reason for his request was that the "[r]umor mill has some price changes in the market."

---

<sup>114</sup>   *Id.* at ¶ 621.

1030.   The next day, May 23, 2013, Aprahamian directed a Taro employee to implement a price increase on Adapalene gel:



1031.   Exactly one week after the call between Patel and Aprahamian, on May 29, 2013, Taro increased its price on Adapalene gel.  As discussed below, Teva followed with its own price increase on July 3, 2013, which was coordinated with both Glenmark and Taro.

### 5.   July 3, 2013 Price Increases

1032.   Teva implemented its first formal set of price increases using Patel's high-quality competitor formula on July 3, 2013, relating to twenty-one (21) different generic drugs.  Many of the drugs slated for price increases were from the May 24, 2013 "Immediate PI File," but several others had been added in the interim.  Patel scheduled a conference call for the day before the

---

[115]   *Id.* at ¶ 625.

price increases to discuss those increases with members of Teva's sales and pricing departments:

| | Price Increase -- Agenda |
|---|---|
| Date and Location | Tuesday, July 02, 2013 11:00 AM - 11:30 AM, Call In Number Below/Dave's Office |
| Attendees | Nisha Patel02; Kevin Green; Dave Rekenthaler; ███████████████████████████ |
| Message | We are currently preparing to announce a price increase effective Wednesday, 7/3/13. The list includes several items. I wanted to take some time to do a quick review of the item list and answer any questions you may have.<br><br>Dial In: 866-225-0660<br>Access Code: 4075453 |

1)  Price increase effective Wednesday, 7/3/2013

2)  List of items affected:

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (not actual inc) |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Total | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

[116]

1033.   Patel and/or Green spoke to every important competitor in the days and weeks leading up to the July 3, 2013 Teva price increase to coordinate the increases and reiterate the understanding already in place with those competitors.

---

[116]   *Id.* at ¶ 626.

1034.   The graphic on page 178 of the Amended State AG Complaint No. 2 details some of the calls between Teva representatives and Teva's competitors in the days and weeks leading up to the July 3, 2013 price increase.  Those communications included communications between Teva and Taro regarding Adapalene Gel; between Teva and Lupin regarding Cefdinir Capsules, Cefdinir Oral Suspension, and Cefprozil Tablets; between Teva and Mylan regarding Cimetidine Tablets, Methotrexate Tablets, Nadolol Tablets, and Prazosin HCL Capsules; between Teva and Glenmark regarding Fluconazole Tablets, Moexipril HCL Tablets, Moexipril HCL/HCTZ Tablets, Nabumetone Tablets, and Ranitidine HCL Tablets; and between Teva and Upsher-Smith regarding Oxbutynin Chloride Tablets.

1035.   The only drugs that Patel or Green did not coordinate with Teva's competitors (those not highlighted in the referenced graphic) were drugs where Teva was exclusive – i.e., had no competitors.

1036.   Patel – and other executives at Teva – went to great efforts to coordinate these price increases with competitors prior to July 3, 2013.  Some illustrative examples of generic drugs that were added to the list after May 24, 2013 are set forth in more detail below.

<em>a.    Upsher-Smith</em>

1037.   On June 13, 2013, as Patel was in the process of finalizing the Teva price increase list, she learned that Upsher-Smith had increased its listed WAC prices for the drug Oxybutynin Chloride.

1038.   On June 13, 2013, K.G. of Teva sent an e-mail to several Teva employees, including Patel, asking them to "share any competitive intelligence you may have or receive" regarding Oxybutynin Chloride.  At that time, Teva had been considering whether to remove the drug from its inventory, due to low supply and profitability.  One factor that could potentially change that calculus for Teva was the ability to implement a significant price increase.  On June

282

14, 2013, while considering whether to change Teva's plan to delete the drug, a Teva employee asked Patel whether she could "provide an estimate of the pricing we might secure business at?"

1039.   On June 15, 2013, Patel exchanged six (6) text messages with B.L., a senior national account executive at Upsher-Smith.

1040.   Patel deemed Upsher-Smith a highly-ranked competitor (+2) in large part because of her relationship and understanding with B.L.  In the week before she began her employment at Teva (after leaving her previous employment), Patel and B.L. exchanged several text messages. During her first week on the job, as she was beginning to identify price increase candidates and "high quality" competitors, Patel spoke to B.L. on April 29, 2013 for nearly twenty (20) minutes. During these initial communications, the two competitors reached an understanding that Teva and Upsher-Smith would follow each other's price increases.  This understanding resulted in Upsher-Smith receiving a +2 "quality competitor" ranking from Patel.

1041.   On June 19, 2013, Teva learned that the other competitor in the market for Oxybutynin Chloride, a company not identified as a Defendant in this Complaint, also increased its price for that drug.  As a result, a national account executive at Teva sent an e-mail to Patel stating "Did you know about the Oxybutynin?  We have small share, but huge increase there!" Patel responded:  "Yes, heard late last week.  The train is moving so fast, I'm worried we won't get on!"  That same day, Patel instructed a colleague to add Oxybutynin Chloride to the Teva price increase list and began taking steps to implement the increase.

1042.   On July 3, 2013, Teva implemented a price increase ranging between 1,100-1,500% on Oxybutynin Chloride, depending on the dosage strength.  Like the other drugs on the list, Teva would not have increased its price without first obtaining agreement from competitors that they would not compete with Teva or steal market share after the increase.

b.      *Mylan*

1043.   Immediately after she began at Teva, Patel began to investigate Mylan drugs as a potential source for coordinated price increases.  For example, on May 6, 2013, as she was creating the list of "Immediate PI" candidates, Patel sent Green an e-mail with an attached spreadsheet titled "Price Increase Candidate Competitive Landscape." Patel asked Green to "gather as much market intelligence as possible" for certain, specific items that she had highlighted in blue, including nine (9) Mylan drugs:  Tolmetin Sodium capsules; Doxazosin Mesylate tablets; Methotrexate tablets; Diltiazem HCL tablets; Flurbiprofen tablets; Nadolol tablets; Amiloride HCL/HCTZ tablets; Cimetidine tablets; and Estradiol tablets.

1044.   The next day, May 7, 2013, Green spoke to Nesta at Mylan three times, including one call lasting more than eleven (11) minutes.  Green also called Patel twice that day to report on what he had learned.  Green and Nesta also spoke a number of times over the next several days, including on May 8 (3:46), May 9 (4:05) and May 10, 2013 (0:28; 10:46 and 2:19).

1045.   On May 14, 2013, Patel asked several Teva national account managers, including Green, to obtain "price points" on certain Mylan drugs including Cimetidine and Nadolol in preparation for a potential price increase.  She indicated internally to another Teva colleague that she was expecting "additional Mylan intel" and that she was expecting Mylan "to take an additional increase" on those items.  On May 17, 2013, Green spoke to Nesta six (6) times, including calls lasting 11:50, 2:23, 4:25 and 16:02.

1046.   On May 29, 2013, after a discussion with Cavanaugh, Patel added four Mylan drugs to the Teva price increase list:  Nadolol, Cimetidine, Prazosin HCL, and Methotrexate.

1047.   Discussions between Green and Nesta about specific drugs continued into June, as Mylan was also preparing for its own major price increase on a number of drugs.  From June 24

through June 28, 2013, for example, Green and Nesta had at least the following telephone calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:25:29 | 0:00:06 |
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 13:32:25 | 0:10:13 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:43:27 | 0:00:06 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:02:58 | 0:00:32 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:51:43 | 0:00:03 |
| 6/26/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:55:29 | 1:00:25 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 10:47:23 | 0:00:06 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:04:04 | 0:01:03 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:42:07 | 0:04:20 |
| 6/28/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:59:56 | 0:03:53 |

[117]

1048.   On June 26, 2013, in the midst of this flurry of communications between Teva and Mylan (and the same day that Green and Nesta had a one-hour phone call), one of Patel's colleagues sent her a suggestion with the following list of potential drugs to add to the price increase list:

| Product | Competitors (Mkt Share) |
|---------|-------------------------|
| Disopyramide Phosphate Capsules | Actavis (61%) |
| Ketorolac Tablets | Mylan (32%) |
| Ketoprofen Capsules | Mylan (63%) |
| Hydorxyzine Pamoate Capsules | Sandoz (39%); Actavis (9%) |
| Nystatin Tablets | Heritage (35%); Mutual (32%) |

[118]

1049.   In response, Patel's supervisor, K.G., commented that "Ketoprofen would have a high likelihood of success." Patel also responded favorably with regard to some of the drugs,

---

[117] *Id.* at ¶ 640.

[118] *Id.* at ¶ 641.

alluding to the fact that she had inside information about at least Ketoprofen:

From: Nisha Patel02
Sent: Wednesday, June 26, 2013 1:41 PM
To: ▮▮▮▮▮▮▮▮▮▮▮
Subject: RE: India Transfer Review – Price Increase List Question

▮▮▮▮▮▮▮▮

I definitely agree on Ketoprofen since there are rumors of activity on this one...From a "quality of competitor" standpoint, I definitely think all, but Nystatin, are strong candidates. We'll gather intel on the rest and factor into the potential items for later. Is there a time constraint and a need for actual numbers, or is this just an inquiry to see if they would be possible in the near future? Sorry for the basic questions. I'm just trying to understand how to look at possible deletions v. any other candidate item.

[119]

1050.   Not surprisingly given the "rumors," Mylan raised its price for both Ketorolac Tromethamine and Ketoprofen (the two Mylan drugs on the list above) six days later, on July 2, 2013.  Teva then quickly followed with its own price increase for both drugs (and others) on August 9, 2013.  As discussed more fully below, those price increases were closely coordinated and agreed to by Teva and Mylan.

1051.   At the end of the flurry of phone communications between Teva and Mylan described above – on June 28, 2013 – Green and Nesta had a four (4) minute call starting at 10:59 a.m..  Within minutes after that call, Patel sent the following e-mail internally at Teva:

From:     Nisha Patel02
Sent:     Fri 6/28/2013 11:22 AM (GMT-05:00)
To:
Cc:       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Bcc:
Subject: Competitor Increase Items

All,

It is my understanding that Mylan is announcing a long list of price increases today, for a Monday effective date. As we confirm the items and overlap with Teva, we should add the items to the CM alert list and determine what our plan of response is based on various factors (WAC limitation, no WAC limitation, supply, etc).

▮▮▮▮,

Hearing that Ketoprofen is on the list.

[120]

---

[119] *Id.*

[120] *Id.* at ¶ 643.

1052.   Patel obtained this information directly from Green but got one significant point wrong (which confirms that she had advance notice of the Mylan increase).  In fact, Mylan did not announce the price increases until the following Monday, July 1, 2013 – with an effective date of July 2, 2013.

1053.   Patel consistently used the term "rumors" in e-mails to camouflage that Teva was communicating with competitors about future price increases.  She used the term when discussing Taro in the May 24, 2013 "Immediate PI" spreadsheet, after speaking with Aprahamian and before Taro raised its price on Adapalene gel.  She used it again on June 26, 2013 – after Green and Nesta spoke several times in advance of Mylan's price increase on Ketoprofen.

1054.   Similarly, on July 2, 2013 – the day before Teva's price increases (including for the drug Methotrexate) went into effect, a colleague asked Patel how Teva's competitors' pricing compared with regard to Methotrexate.  Patel responded that Mylan's pricing was a little low on that drug, "but we are hearing rumors of them taking another increase," so Teva felt comfortable increasing the price of that drug on July 3, 2013.  These "rumors" – which were based on the direct communications between Green and Nesta noted above – again turned out to be accurate: Mylan increased its price of Methotrexate, pursuant to its agreement with Teva, on November 15, 2013.

            c.      *Sandoz*

1055.   After the large Teva and Mylan price increases on July 2 and 3, 2013, Sandoz sought to obtain a "comprehensive list of items" price-fixed so that it would "not respond to something adversely" by inappropriately competing for market share on any of those drugs.  Sandoz executives had previously conveyed to their counterparts at both Mylan and Teva that Sandoz would follow their price increases and not steal their customers after an increase.  Sandoz

ensured it was aware of every increase taken by both competitors so it could live up to its end of the bargain.

1056.   On July 9, 2013, CW-1 stated in an internal Sandoz e-mail that he would "call around to the [Sandoz directors of national accounts] to try and gather a comprehensive list of items."

1057.   Pursuant to that direction, on July 15, 2013 CW-2 of Sandoz called Rekenthaler at Teva and left a message.  Rekenthaler called CW-2 back immediately and the two had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all the Teva price increase drugs – not just those drugs where Teva overlapped with Sandoz.  Rekenthaler complied.  Understanding that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his Teva work e-mail account to a personal e-mail account, and then forwarded the list from his personal e-mail account to CW-

2's personal e-mail account:

| | |
|---|---|
| **From:** | David Rekenthaler [daverek@verizon.net] |
| **Sent:** | Monday, July 15, 2013 5:02 PM |
| **To:** | ▮▮▮▮n@icloud.com |
| **Subject:** | Fwd: |

Sent from my iPhone

Begin forwarded message:

From: Dave Rekenthaler <Dave.Rekenthaler@tevapharm.com>
Date: July 15, 2013, 4:59:27 PM EDT
To: "daverek@verizon.net" <daverek@verizon.net>

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase [net actual inc] |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1300% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econodisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

Best regards,

———————————————————————————————[121]

    1058.   CW-2 later called CW-1 and conveyed the information orally to CW-1, who transcribed the information into a spreadsheet.

    1059.   One of the drugs that both Teva and Mylan increased the price of in early July 2013 was Nadolol.  Sandoz was the only other competitor in that market.  Shortly after the Teva increase, CW-1 sent Patel a congratulatory message regarding the increase.

———————————————————————

[121]   *Id.* at ¶ 648.

### 6.      July 19, 2013 Price Increase – Enalapril Maleate

1060.   Immediately after the July 3, 2013 price increases, Patel began preparing for what she called "Round 2" – another large set of Teva price increases.  In the interim, however, Teva was presented with an opportunity to coordinate a price increase with competitors on a single drug – Enalapril Maleate tablets.

1061.   Mylan previously increased its price for Enalapril Maleate effective July 2, 2013. At that time, there were only three manufacturers in the market:  Mylan, Teva and Wockhardt. Enalapril Maleate was on the list of drugs slated for a price increase that Teva had received from Mylan in June 2013, before those price increases were put into effect (as discussed above).

1062.   Shortly after the Mylan price increase, on July 10, 2013, Teva received a request from a customer for a lower price on Enalapril Maleate.  Interestingly, the customer indicated that the request was due to Wockhardt having supply problems, not because of the Mylan increase.  K.G. of Teva confirmed that Enalapril Maleate "was on the Mylan increase communicated last week.  They took a ~75% increase to WAC."

1063.   The comment from the customer sparked some confusion at Teva, which Teva quickly sought to clarify.  That same day, Green and Nesta had two phone calls, including one lasting almost sixteen (16) minutes.  The next day, July 11, 2013, Green and Nesta spoke two more times.  During these conversations, Nesta explained to Green that Wockhardt had agreed to follow the Mylan price increase on Enalapril Maleate.  This information sparked the following e-

mail exchange between Green and Patel (starting from the bottom):

**From:** Kevin Green
**Sent:** Friday, July 12, 2013 1:12 AM
**To:** Nisha Patel02
**Subject:** Re: Enalapril / Wockhardt Supply Constraint

Wockhardt followed Mylan. They are not having supply issues. Just allocating based on the Mylan increase. They make their own API

Sent from my iPhone

On Jul 11, 2013, at 9:54 PM, "Nisha Patel02" <Nisha.Patel02@tevapharm.com> wrote:

> Wockhardt took an increase before Mylan? Then had their supply issue? I thought it was their supply issue plus Mylan increase.
>
> Nisha Patel
>
> Teva Pharmaceuticals USA
>
> Director, Strategic Customer Marketing
>
> On Jul 11, 2013, at 10:25 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:
>
>> This is all a result of a wockhardt price increase following a Mylan increase
>>
>> Sent from my iPhone

[122]

1064.   As it turned out, there must have been a miscommunication between Green and Nesta because although Wockhardt did in fact plan to follow Mylan's price increase, it had not yet had the opportunity to do so as of July 11, 2013.

1065.   On Friday, July 12, 2013, J.P., a national account executive at Teva, asked Patel whether Teva was "planning on increasing [its price for Enalapril]." Patel responded:  "I hope to increase, but we're gathering all the facts before making a determination." J.P. then inquired whether Teva would make an offer to the customer, and Patel responded:  "Not sure yet.  Need some time.  We're exploring the possibility of an increase just on this item . . . in the near future. Maybe next week."

---

[122]   *Id.* at ¶ 654.

1066.   That same day, Patel and Green each started "exploring the possibility" and "gathering the facts" by reaching out to Teva's two competitors for Enalapril Maleate.  Patel called Nesta of Mylan directly and they spoke three times, including calls lasting six (6) and five (5) minutes.  Patel likely called Nesta directly in this instance because Green was attending the PBA Health Conference at the Sheraton Overland Park, Overland Park, Kansas, where he was participating in a golf outing.  Upon information and belief, K.K. – a senior national account executive at Wockhardt – attended the same conference, and likely spoke directly to Green either at the golf outing during the day or the trade show at night, because at 12:40 a.m. that evening (now the morning of July 13, 2013) K.K. created a contact on his cell phone with Green's cell phone number in it.

1067.   On Sunday, July 14, 2013, after Green returned home from the conference, Green and Patel spoke three times, including one call lasting twenty-one (21) minutes.  During these calls, Green conveyed to Patel what he had learned from K.K.:  that Wockhardt planned to follow the Mylan price increase.

1068.   First thing the next morning, on Monday, July 15, 2013, Patel sent an e-mail to a Teva executive stating "new developments. . .heard that Wockhardt is taking an increase today or tomorrow."  At the same time, Wockhardt began planning to raise the price of Enalapril Maleate and sought to confirm specific price points for the increase.  Internally, Wockhardt employees understood that K.K. would try to obtain price points from a competitor.  That morning, K.K. of Wockhardt called Green for a one (1) minute call; shortly thereafter, Green returned the call and they spoke for two (2) more minutes.  At 9:57 a.m. that morning, K.K. reported internally the specific price ranges that he had obtained from Green.

1069.   Armed with this competitively sensitive information, and the understanding that Wockhardt intended to follow the Mylan increase, Teva began to plan its own price increase.  On Tuesday, July 16, 2013, Patel sent the following internal e-mail to her supervisor K.G., again using the term "rumors" to obfuscate the true source of her information:

From:    Nisha Patel02
Sent:    Tue 7/16/2013 11:08 AM (GMT-05:00)
To:      ██████████████
Cc:
Bcc:
Subject: Enalapril Increase Overview

███████

As you are aware, we are currently preparing the information to hopefully be able to implement a price increase on Enalapril.

This is a 3-player market that we share with Mylan and Wockhardt. Mylan announced a price increase last week. We are hearing rumors that Wockhardt will follow or exceed Mylan sometime this week. It would be ideal if we could follow very soon at a slightly more competitive price, with the intent of picking up some additional share in the market. Current share make up is as follows:

1. Mylan: 44%
2. Wockhardt: 43%
3. Teva: 13%

At this time, we are holding off on responding to a couple of bids in-house since a WAC increase would be required to follow the market. It would be a great opportunity to win this share and hopefully additional business as customers request bids going forward. (I think it would be ideal to capture an additional 10%.)

[123]

1070.   That same day, Nesta called Patel and left a voicemail.

1071.   Patel's July 16, 2013 e-mail referred to above was forwarded to Cavanaugh, who promptly approved the price increase.  That same day, July 16, 2013, Patel then scheduled a "Price Increase Discussion" with members of Teva's sales and pricing teams, and sent the

---

[123]   *Id.* at ¶ 659.

following agenda:

| Subject | **Price Increase Discussion** |
|---|---|
| Date and Location | Wednesday, July 17, 2013 10:30 AM - 11:00 AM, Dial In Below/Dave's Office |
| Attendees | Nisha Patel02; ███████████████████████████ Dave Rekenthaler ███████████████████████████████████████████ b; Kevin Green; ████████████████████████████████████████████ ████████ |
| Message | Sorry for the re-schedules! <br><br> We are planning to announce an increase on Enalapril Tablets effective Friday. I would like to do a quick review of the changes and answer any questions you may have. A summary will be sent prior to the meeting. <br><br> Dial In: 866-225-0660 <br> Access Code: 4075453 |

**Notes**

1)  Price increase effective 7/19/2013

2)  List of items affected:

| NDC | Generic Name | Strength | Form | Package Size |
|---|---|---|---|---|
| 00093-0026-01 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 100 |
| 00093-0026-10 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 1000 |
| 00093-0027-01 | ENALAPRIL MALEATE | 5 mg | TABLET | 100 |
| 00093-0027-50 | ENALAPRIL MALEATE | 5 mg | TABLET | 5000 |
| 00093-0028-01 | ENALAPRIL MALEATE | 10 mg | TABLET | 100 |
| 00093-0028-10 | ENALAPRIL MALEATE | 10 mg | TABLET | 1000 |
| 00093-0028-50 | ENALAPRIL MALEATE | 10 mg | TABLET | 5000 |
| 00093-0029-01 | ENALAPRIL MALEATE | 20 mg | TABLET | 100 |
| 00093-0029-10 | ENALAPRIL MALEATE | 20 mg | TABLET | 1000 |
| 00093-0029-50 | ENALAPRIL MALEATE | 20 mg | TABLET | 5000 |

- Pricing Overview
  - 400-650% increase in invoice/contract pricing
  - 350-450% increase in WAC
  - 10% increase in SWP

- All customers are affected  (Top Customers: CVS, Rite Aid and Medco)

- Expecting Wockhardt to increase. Please pass on any intelligence you are able to get.

[124]

1072.   Teva and Wockhardt simultaneously implemented price increases on July 19,

2013.  Although the timing of the price increase was coordinated among the competitors, Patel

nevertheless described the simultaneous increase as a coincidence in an internal e-mail that same

---

[124]   *Id.* at ¶ 660.

day:



From: Nisha Patel02
Sent: Fri 7/19/2013 8:10 AM (GMT-05:00)
To:                                              Dave Rekenthaler;
Cc:
Bcc:
Subject: RE: Enalapril Competitive Customer Volume

FYI, I heard that Wockhardt announced a price increase yesterday morning (probably effective today). Coincidentally, Teva's increase was announced yesterday afternoon with an effective date of today.

I will pass on any supply information I receive.

                                                                                    125

1073.   Within a few days after the increases, a customer complained to K.K. at Wockhardt, asking:  "What is going on in the market that justifies your price increases?" K.K.'s response to the customer was direct:  "Mylan took up first we are just following."  Similarly, in early August a different customer asked Wockhardt to reconsider its increase, suggesting that Wockhardt's competitors were offering a lower price point.  Knowing this to be untrue, K.K. replied again "we followed Mylan and Teva for the increase."

### 7.   August 9, 2013 Price Increases

1074.   On August 9, 2013, Teva raised prices on twelve (12) different drugs.  These increases were again coordinated with a number of Teva's competitors, including Mylan, Sandoz, Taro, Lupin, Glenmark, Zydus and Apotex.

1075.   Patel began planning for the increases shortly after the July 3 increases were implemented.  On July 11, 2013, Patel sent a preliminary draft list of price increase candidates to a colleague for what she referred to as "Round 2."  For the drugs on the preliminary list, Patel stated that "this does not guarantee that [they] will end up getting an increase, but at the very least, it will be put through the review process."

---

[125]   *Id.* at ¶ 661.

1076.   The list included a number of drugs involving the following competitors, primarily:  Actavis, Aurobindo, Glenmark, Heritage, Lupin, Mylan and Sandoz.  In the days leading up to July 11, 2013, Patel was communicating directly with executives at nearly all of those competitors, including the following:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:24 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:21:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:05 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:07 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:16:16 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:04 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:04:26 |
| 7/10/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:54 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:29 |

[126]

1077.   Patel was also communicating indirectly with Mylan through Green.  For example, on July 10, 2013 – the day before Patel sent the preliminary "Round 2" increase list – Green and Nesta spoke twice.  Shortly after the second call, Green called Patel and the two spoke for just over seven (7) minutes.  The next day, on July 11, Nesta and Green exchanged several more calls.  The timing of those calls is set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:29:50 | 0:15:38 |
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:46:55 | 0:02:18 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 15:59:38 | 0:07:05 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:11:34 | 0:00:08 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:12:47 | 0:00:17 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:38:48 | 0:04:03 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:43:51 | 0:00:00 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:20:15 | 0:01:52 |

[127]

---

[126]   *Id.* at ¶ 665.

[127]   *Id.* at ¶ 666.

1078.   Patel and other Teva executives continued to coordinate with competitors over the next several weeks, refining the list and preparing for the next large Teva price increase.

1079.   By August 7, 2013, Patel had finalized the list.  That day she sent an e-mail to her supervisor, K.G., with a "Price Increase Overview" spreadsheet which she had prepared for Cavanaugh, summarizing the increases.  As shown below, the spreadsheet included competitively sensitive information about certain competitors' plans regarding future price increases that Patel and/or Green could have only learned from directly colluding with those competitors:

Price Increase Overview—Effective August 9, 2013

| Product Category | Average % Increase | Reason for Increase | Competitors |
|---|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | 53% | Follow Mylan | Mylan, 95.7% |
| CLEMASTINE FUMARATE ORAL LIQUIDS | 7% | Teva Exclusive, Lead | |
| CLEMASTINE FUMARATE TABLETS | 76% | Lead | Sandoz/Fougera, 80.8% |
| DICLOFENAC TABLETS | 302% | Follow Mylan; Teva share leader | Mylan, 19.4% - Sandoz/Fougera, 19.4% - Apotex, 0.3% |
| DILTIAZEM HCL TABLETS | 90% | Follow Mylan | Mylan, 61.3% |
| DOXAZOSIN MESYLATE TABLETS | 1031% | Follow Mylan and Apotex; Teva share leader | Mylan, 28.1% - Apotex, 2.2% - Dava, 0.4% |
| ETODOLAC ER TABLETS | 138% | Follow Taro (likely to be this week with it) | Taro, 56.9% |
| ETODOLAC TABLETS | 434% | Follow Sandoz; Taro likely to follow this week | Taro, 56.6% - Sandoz/Fougera, 30.8% - Watson(Actavis), 0.5% - Apotex, 0.3% |
| KETOPROFEN CAPSULES | 148% | Follow Mylan | Mylan, 93.4% |
| KETOROLAC TABLETS | 268% | Follow Mylan | Mylan, 31.7% |
| PRAVASTATIN TABLETS | 453% | Follow Glenmark, Zydus and Apotex. Is pls waiting on Teva. | Glenmark, 33.2% - Apotex, 7.1% - Zydus, 5.8% - Lupin, 1.8% - Dr Reddy, 0.9% |
| TOLMETIN SODIUM CAPSULES | 80% | Follow Mylan; Teva almost exclusive | Mylan, 6.3% |

[128]

1080.   K.G. immediately recognized that having such explicit evidence of a competitor's price increase plans in writing would be problematic for Teva.  In response to the e-mail, K.G.

---

[128]   *Id.* at ¶ 668.

politely asked Patel to remove some of the incriminating information:

From:
Sent:      Wed 8/07/2013 11:00 AM (GMT-05:00)
To:        Nisha Patel02
Cc:
Bcc:
Subject: RE: PI Overview-MC

Nisha,

Please add Teva share to the competitors commentary and change header to Market Share.

Under reasons, I would change to the following:

1. Etodolac ER : Follow Taro
2. Etodolac : Follow Sandoz; Taro increase anticipated.
3. Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated.

[129]

1081.   In accordance with the executive's request, Patel deleted the information.

1082.   Patel and Green coordinated the increases with every important competitor in the days and weeks leading up to the increase.  The graphic on page 197 of Amended State AG Complaint No. 2 details some of the calls with competitors in the days and weeks leading up to the increases.  Those communications included communications between Teva and Mylan regarding Amiloride HCL/HCTZ Tablets, Diclofenac Tablets, Diltiazem HCL Tablets, Ketoprofen Capsules, Ketorolac Tablets, and Tolemetin Sodium Capsules; between Teva and Sandoz regarding Clemastine Fumarate Tablets; between Teva, Mylan, and Apotex regarding Dokazsin Mesylate Tablets; between Teva and Taro regarding Etodolac ER Tablets; and between Teva, Apotex, Glenmark, Lupin, and Zydus regarding Pravastatin Tablets.

---

[129]   *Id.* at ¶ 669.

1083.   The only drug on the list that Patel and/or Green were not coordinating with competitors on in advance (Clemastine Fumarate oral liquids) was a drug where Teva was exclusive and thus had no competitors.  That drug was slated for the lowest increase of all drugs on the list (7%).

1084.   The day before the price increase went into effect - August 8, 2013 - Patel was particularly busy, spending most of her morning reaching out and communicating with several key competitors:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 7:27:26 | 0:00:33 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:34:46 | 0:11:41 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:48 | 0:00:01 |
| 8/8/2013 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:01:07 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 8:04:04 | 0:12:15 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:05 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:28 | 0:00:07 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Nesta, Jim (Mylan) | 9:27:19 | 0:00:37 |

[130]

1085.   As it turned out, Mylan was also in the process of implementing its own price increases on August 9, 2013 on several drugs (including several sold by Teva), and it is likely that Nesta reached out to Patel to coordinate those increases.

a.   *Mylan*

1086.   Teva and Mylan were coordinating price increases consistently during this period, including the time leading up to the August 9, 2013 increases.  During each step in the process, Teva and Mylan executives kept their co-conspirators apprised of their decisions.  The communications were typically initiated by Patel, who asked Green to communicate with Nesta of Mylan and obtain what she referred to as "intel" on many different drugs.  But at times Patel communicated directly with Nesta.

---

[130]   *Id.* at ¶ 672.

1087.   For example, on July 22, 2013, Patel sent Green an e-mail with an attached spreadsheet of "Round 2" increase items.  She indicated that she was "seeking intel" for a group of drugs in the attached spreadsheet with a highlighted yellow "x" and included in a column titled "Follow Mylan/Other:"



| Product Family | Initial Comments | PM Related | Follow Mylan/Other |
|---|---|---|---|
| Amiloride | Mylan increase; Teva only has HCTZ | | x |
| Diclofenac Tab | Mylan increase; On historical PI list | x | x |
| Doxazosin Mesylate Tabs | Mylan increase; On historical PI list | | x |
| Enalapril Tab | Mylan increase; On historical PI list--COMPLETED | | x |
| Ketoprofen | Follow Mylan; Deletion candidate; PM related | x | x |
| Ketorolac | Follow Mylan; Deletion candidate; PM related | x | x |
| Metoprolol | Mylan increase (Teva does not have 25mg but small sku) | | x |
| Nystatin | Heritage involved  follow Mutual  deletion candidate  PM related | x | x |
| Pravastatin | Carried over from round 1 | | x |
| Sotalol | Mylan increase; On historical PI list | | x |
| Tolmetin Tab | Mylan increase; Teva has 94 share; On historical PI list | | x |
| Verapamil  (Isoptin SR) | Mylan increase (lost Kroger and OneStop--to who?) | | x |

[131]

1088.   A large majority were Mylan drugs.

1089.   The next day – July 23, 2013 – at 4:30 p.m., Green and Nesta spoke for more than six (6) minutes.  Immediately after hanging up the phone, Green called Patel to convey the intel he had obtained from Mylan.  The call lasted more than three (3) minutes.

1090.   On July 29, 2013, Green at Teva was approached by a large retail pharmacy asking for bids on several of the drugs that Mylan had increased prices on in early July.  Green's first step was to request market share information for those drugs so that Teva could make a decision on how to respond to the customer's inquiry based on the generally accepted

---

[131]   *Id.* at ¶ 674.

understanding regarding fair share:

**From:** Kevin Green
**Sent:** Monday, July 29, 2013 9:49 AM
**To:** ██████████
**Cc:**
**Subject:** Walgreens: Items for discussion

██████

From the list of items below, can you pull in current market share. These are new opportunities at Walgreens, and I want to see what the current market looks like.

[132]

1091.   The next day, July 30, 2013, Patel sent Green the "latest" price increase file as an attachment, saying that she "[f]igured it would help since I've changed a few things on you." Patel asked Green to obtain additional "market intel" for a group of seven Mylan drugs, some of which varied slightly from the prior spreadsheet.

1092.   Following the same consistent pattern, Green and Nesta spoke six (6) times over the next two days.  After hanging up from the last call between the two on August 1, 2013, Green called Patel and conveyed the results of his conversations.  This series of phone calls is detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:10:33 | 0:04:52 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:50:57 | 0:01:09 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:54:39 | 0:03:21 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:59:57 | 0:06:53 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:46:59 | 0:01:27 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:23:47 | 0:05:48 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:21:43 | 0:00:59 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 12:29:55 | 0:02:36 |

[133]

---

[132]   *Id.* at ¶ 676.

[133]   *Id.* at ¶ 678.

1093.   In the midst of the phone calls between Green and Nesta on July 31, 2013, Patel

sent the following e-mail with "commentary" about the customer request, with a particular focus

on balancing Teva's desire to increase prices against its commitment to adhere to the fair share

agreement and how that may affect its market share for certain products sold by Mylan:

From:   Nisha Patel02
Sent:   Wed 7/31/2013 3:23 PM (GMT-05:00)
To:     Kevin Green; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Dave Rekenthaler
Cc:
Bcc:
Subject: RE: DELPHI 9429 Walgreens: Items for discussion


My initial commentary…


If we can take on the supply, we can bid on items we have already taken our increase on (bold).


**Enalapril: seeking share**

**Cimetidine: shared with Mylan, but do not have our fair share**

**Prazosin: shared with Mylan, but do not have our fair share**

**Nadolol: can pursue additional share (Mylan) for 3-player market**

Loperamide: consider it added to the PI candidates list

Fluoxetine: no plans to follow Mylan increase, but have high share in a 7 player market

Diltiazem IR: consider it added to the PI candidates list


There are plans to follow Mylan on the rest. Need to determine how we want to respond on these if we haven't implemented an increase by the time we respond. From what I understand, we have some time.

[134]

1094.   Based on all of these communications between Teva and Mylan (and at times

other competitors), Teva was able to successfully increase price on seven different drugs that it

overlapped with Mylan on August 9, 2013, as set forth above.

---

[134]   *Id.* at ¶ 679.

b.  *Pravastatin*

1095.   As early as May 2, 2013, Patel engaged in discussions regarding a price increase for Pravastatin with CW-5, a senior executive at Glenmark.  Early in the morning of May 2, as she was in the process of formulating her list of "high quality" competitors and the list of price increase candidates, Patel informed a colleague that she expected to have some "priority items" to add to the price increase list "shortly."  Within minutes, she received a call from CW-5 and they discussed price increases for a number of different drugs, including Pravastatin.  Shortly after that call, Patel sent an e-mail to her Teva colleague directing him to add Pravastatin, and several other Glenmark drugs, to the price increase list.  In all, Patel spoke to CW-5 four (4) times throughout the day on May 2, 2013, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 7:02:23 | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 7:56:12 | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 10:00:09 | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 18:40:29 | 0:11:39 |

[135]

1096.   As of May 2013, the market for Pravastatin included five competitors:  Glenmark, Teva, Lupin, Zydus and Apotex.  The number of competitors made it more difficult to coordinate a price increase.  This difficulty stemmed in part because two of those competitors – Zydus and Apotex – were also the two lowest quality competitors in Patel's quality of competition rankings, and any price increase for that drug would require significant coordination and communication before Teva could feel comfortable raising its own price.

1097.   Teva was able to achieve a sufficient level of comfort and substantially raise prices for Pravastatin by systematically communicating and reaching agreement with each and every competitor on that drug over the next several months.

---

[135]  *Id.* at ¶ 682.

1098.   On May 3, 2013, Green called M.K., a senior executive at Zydus, twice with one call lasting four (4) minutes.  Over the next several weeks, Green communicated numerous times with both M.K.  and K.R., a senior sales executive at Zydus, to coordinate a Zydus price increase on Pravastatin.

1099.   On May 6 and 7, 2013, Patel communicated with her contacts at Lupin (Berthold) and Glenmark (J.C., a national account executive) multiple times.  Those calls are detailed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:06:45 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:20:44 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:08:39 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 0:08:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:01:03 |

[136]

During one or more of her calls with J.C. and/or CW-5 of Glenmark in early May 2013, Patel obtained specific price points from Glenmark for its Pravastatin (and other) price increases – well before the Glenmark increases became public – and documented those price points in her price increase spreadsheet.

1100.   By May 8, 2013, Teva executives clearly understood that Glenmark would be leading the Pravastatin price increase and were comfortable enough with the situation that one marketing executive at Teva indicated in an e-mail to Patel that he was hoping to raise price on Pravastatin "if/when Glenmark does."

---

[136]   *Id.* at ¶ 686.

1101.   As the Glenmark increase for Pravastatin was approaching, Patel began preparing. On May 15, 2013 – the day before Glenmark's increase would become effective – a Teva executive sent an e-mail out to the pricing team stating that "Nisha would like to be made aware of any requests (including in-house RFPs) that include" several of the Glenmark product families, including Pravastatin.  The Teva executive concluded:  "[i]n the event you are reviewing these products for any request, please make her aware and as a group we can discuss where to price based on market intelligence she has collected."

1102.   That same day, Glenmark notified its customers that it would substantially raise the price of Pravastatin, effective May 16, 2013.

1103.   As had become the practice among co-conspirators, the day before and the day of the Glenmark increase brought a flurry of phone calls among several of the competitors, including Teva executives.  At least some of those calls are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:05:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Incoming | M.K. (Zydus) | 0:03:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:16:00 |
| 5/16/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:04:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:05:57 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |

[137]

1104.   As of May 16, 2013, Patel was still considering whether Teva should increase its price for Pravastatin, because she was concerned about whether Zydus would act responsibly and

---

[137]   *Id.* at ¶ 690.

follow a price increase.  At that time, Patel did not view Zydus as a quality competitor.  Patel stated:  "I have asked to get Zydus' ability to supply on this.  If it's not so great, I would like to add back to the increase list."  Patel later indicated that "[t]he only threat was Zydus.  Just waiting to hear on their ability to supply."

1105.   Green was responsible for coordinating with Zydus.  As seen in the table above, on May 15, 2013, Green spoke with three Zydus employees, including a call with K.R. of Zydus lasting sixteen (16) minutes.  The next day, on May 16, Green spoke with M.K. for 4 minutes. Later that day, K.R. called M.K. and the two Zydus executives spoke for more than seventeen (17) minutes.  Green also spoke to Rekenthaler and Patel the same day, conveying what he had learned from his communications with the Zydus executives.

1106.   Also on May 16, Patel's supervisor, K.G., sent an internal e-mail to several colleagues, including Patel and Rekenthaler, stating "I think we need to understand additional competitor ability to take on additional share and pricing actions.  The volume is huge for us.  It would be nice to try to increase our price, but we do not really want to lose a lot of share on this product." In response, Rekenthaler indicated that he was now comfortable with the price increase, but he did not want to put his reasoning in writing:

From:	Dave Rekenthaler
Sent:	Thu 5/16/2013 1:42 PM (GMT-05:00)
To:	Nisha Patel02
Cc:	; Kevin Green
Bcc:
Subject: RE: Pravastatin Price Increase

I feel comfortable with this ███. Let's talk about it in person.

[138]

---

[138]   *Id.* at ¶ 693.

306

1107.   The next day – May 17, 2013 – Patel continued to coordinate the price increase with executives at both Glenmark and Lupin.  For example, at 12:08 p.m., Patel called Berthold at Lupin for an eleven (11) minute call.  While she was on the phone with Berthold, CW-5 of Glenmark called Patel (at 12:09 p.m.). and left a 23-second voicemail.  Immediately after she hung up the phone with Berthold, Patel returned the call to CW-5; they ultimately connected for nearly eight (8) minutes.

1108.   As of this point, Teva executives had spoken to all of their competitors about Pravastatin except Apotex.  From May 20-24, Patel had the following series of phone calls with B.H., a senior sales executive at Apotex, during which Apotex agreed to raise its price for Pravastatin:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/20/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:21:56 |
| 5/21/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:11:28 |
| 5/23/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:06:13 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:00:39 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Outgoing | B.H. (Apotex) | 0:12:07 |[139]

These were the first documented phone calls between Patel and B.H. since Patel had joined Teva.

1109.   But even with this agreement in hand, Patel was still hesitant to add Pravastatin to the price increase list until Apotex actually increased its price.  For example, when she sent the "Immediate PI" spreadsheet to her supervisor K.G. on May 24, 2013, Pravastatin was still not on the list.

1110.   That would change shortly.  On May 28, 2013, Apotex raised its price for Pravastatin.  That same day, Green also exchanged six (6) text messages with K.R. at Zydus.

---

[139]   *Id.* at ¶ 695.

The next day, after a conversation with Maureen Cavanaugh, Patel added Pravastatin to the Teva price increase list.

1111.   The day after the Apotex increase, Green spoke to K.R. at Zydus two more times, and exchanged four (4) more text messages.  Zydus then quickly followed with a price increase of its own on June 14, 2013.

1112.   Following the normal pattern, Green spoke to KR. and M.K at Zydus several times in the days leading up to the Zydus increase, including at least the following calls and text messages:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Incoming | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |
| 6/13/2013 | Voice | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:07:11 [140] |

1113.   Teva ultimately followed Glenmark, Apotex and Zydus with a significant (653%) price increase of its own on August 9, 2013.  As described in more detail above, in the days and weeks leading up to August 9, Patel and Green were communicating with all of Teva's competitors for Pravastatin to coordinate the increase.

1114.   When Patel sent the "Price Increase Overview" to her supervisor, K.G., on August 7, 2009, two days in advance of Teva's price increase, she included one piece of very telling information about the agreement she had in place with Berthold and Lupin:  specifically, that

---

[140]   *Id.* at ¶ 699.

Lupin was "waiting on Teva" before implementing its own increase.  Based on this representation from Lupin, and Lupin's status as a high-quality competitor, Teva executives felt comfortable implementing the significant price increase.

1115.   A couple of days after Teva implemented its increase, a colleague at Teva asked Patel when Zydus and Apotex implemented their price increases.  In her response, Patel confirmed that it was Green ("KGn") who had indeed coordinated the Pravastatin price increase with Zydus:

> Assuming we're talking Prava. Glenmark dud theirs 5/15. Zydus followed right before/after hdma i think. apotex i think was early to mid june? KGn got the Zydus intel...he might know off the top if his head. [141]

1116.   Pursuant to that agreement, shortly after Teva's increase – on August 28, 2013 – Lupin raised its price to follow competitors Glenmark, Apotex, Zydus and Teva.

1117.   The extra work required to implement the Pravastatin price increase was well worth it to Teva.  As she was preparing to implement Teva's August 9, 2013 price increases, Patel also calculated the quarterly increase in sales revenues resulting from the price increase taken by Teva on July 3, 2013.  The analysis also included the financial impact of the recent Pravastatin increase.  The results were staggering.

1118.   According to her analysis, the "Total Net Upside after Credits" as a result of the July 3 price increases, plus Pravastatin and one other drug, was a staggering $937,079,079

---

[141]   *Id.* at ¶ 718.

(nearly $1 billion) *per quarter* to Teva, as shown below:

| Price Increase Category | Incremental Sales Value (Est ASPs) | Total Credit Estimate | CVS Credit Estimate | Credit Estimate (Less CVS) | Total Net Upside after Credits | Total Net Upside (CVS credits deferred) | |
|---|---|---|---|---|---|---|---|
| Grand Total | $973,184,165 | ($36,105,086) | ($10,188,095) | ($25,916,991) | $937,079,079 | $962,996,070 | |
| IHI Total | $850,711,025 | ($31,676,647) | ($7,898,091) | ($23,778,555) | $819,034,379 | $842,812,934 | |
| ILI Total | $34,078,176 | ($1,489,058) | ($594,035) | ($895,023) | $32,589,117 | $33,484,141 | |
| UR Total | $88,394,964 | ($2,939,381) | ($1,695,968) | ($1,243,413) | $85,455,583 | $86,698,996 | 142 |

1119.   Patel was rewarded handsomely by Teva for effectuating these price increases.  In March 2014, less than a year after starting at Teva, Patel was rewarded with a $37,734 cash bonus, as well as an allocation of 9,500 Teva stock options.

1120.   As a result of the price-fixing agreements set forth above, prices rose more than 500% for Pravastatin, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings.

1121.   NADAC data demonstrates that average market prices for Pravastatin remained stable prior to July 2013, then increased dramatically and remained artificially high thereafter. For instance, the average market price for Pravastatin 40mg increased by over 640%, from $0.09

---

142   *Id.* at ¶ 722.

per tablet in July 2013 to $0.67 per tablet by December 2013.



1122.   WAC pricing confirms that Apotex, Lupin, Teva, and Zydus all increased their

Pravastatin prices substantially and largely in unison.

| Package Size (10mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90ct | Apotex | 60505016809 | $0.26 | $0.56 | 5/28/2013 | 119% |
| 500ct | Apotex | 60505016805 | $0.26 | $0.56 | 5/28/2013 | 119% |
| 90ct | Zydus | 68382007016 | $0.17 | $0.48 | 6/14/2013 | 189% |
| 500ct | Zydus | 68382007005 | $0.15 | $0.48 | 6/14/2013 | 222% |
| 90ct | Teva | 00093077198 | $0.17 | $0.48 | 8/9/2013 | 189% |
| 1,000ct | Teva | 00093077110 | $0.15 | $0.48 | 8/9/2013 | 221% |
| 90ct | Lupin | 68180048509 | $0.17 | $0.48 | 8/28/2013 | 190% |
| 500ct | Lupin | 68180048502 | $0.15 | $0.48 | 8/28/2013 | 222% |

1123.   Although WAC data is not available for Glenmark, upon information and belief, it

implemented virtually identical price increases at virtually the same time for its Pravastatin

products.

1124.   Prices continued to increase after August of 2013.  In the October 2014 letters

Senator Sanders and Representative Cummings sent to generic manufacturers as part of their

investigation, they outlined the price increase Pravastatin saw between October 2013 and April

2014.  They sent letters to Dr. Reddy's, Apotex, Teva, and Zydus, and depicted the following

price increases during that six-month period:

| Drug | Package Size | Avg. Market Price Oct. 2013 | Avg. Market Price April 2014 | Percentage increase: |
|------|-------------|------------------------------|------------------------------|----------------------|
| Pravastatin Sodium | 20mg, 1,000ct | $77 | $368 | 377% |
| Pravastatin Sodium | 40mg, 1,000ct | $114 | $540 | 373% |
| Pravastatin Sodium | 10mg, 500ct | $27 | $196 | 625% |
| Pravastatin Sodium | 80mg, 500ct | $59 | $299 | 365% |
| Pravastatin Sodium | 10mg, 90ct | $6 | $34 | 406% |
| Pravastatin Sodium | 20mg, 90ct | $7 | $35 | 400% |
| Pravastatin Sodium | 40mg, 90ct | $9 | $51 | 466% |
| Pravastatin Sodium | 80mg, 90ct | $14 | $52 | 271% |

1125.   These price increases cannot be explained by supply shortages or costs. According to a November 2014 report by the New York Times, a three-month supply of generic pravastatin cost $230 in the United States, but $31.50 for the branded version, Pravachol, in Canada.[143]

c.      Etodolac

1126.   As of July 13, 2013, Teva sold both Etodolac and Etodolac ER.  Teva's competitors for the standard version of Etodolac were Taro and Sandoz.  For Etodolac ER, Teva had only one competitor – Taro.

1127.   When Patel first began planning for "Round 2" of Teva's price increases, Etodolac and Etodolac ER were not slated for increases.  For example, when she circulated a long list of potential "Round 2" increases on July 11, 2013 (that would later be cut down substantially) – neither of those drugs was on the list.

---

[143]   Elisabeth Rosenthal, *U.S. Lawmakers Look for Ways to Provide Relief for Rising Costs of Generic Drugs*, N.Y. TIMES (Nov. 24, 2014), https://www.nytimes.com/2014/11/25/us/lawmakers-look-for-ways-to-provide-relief-for-rising-cost-of-generic-drugs.html.

1128.   Around that time, Sandoz began identifying a list of drugs where it believed it could increase price by the end of July.  Etodolac was on the list, primarily because Sandoz would be able to implement a substantial increase without incurring significant price protection penalties from its customers.

1129.   On July 16, 2013, CW-3, then a senior executive at Sandoz, reached out to Aprahamian at Taro and they spoke for sixteen (16) minutes.  Aprahamian called CW-3 back the next day and the two spoke again for eight (8) minutes.  After hanging up the phone with CW-3, Aprahamian immediately called Patel.  They exchanged voicemails until they were able to connect later in the day for nearly fourteen (14) minutes.  On July 18, 2013, Patel called CW-1 at Sandoz and the two spoke for more than ten (10) minutes.

1130.   During this flurry of phone calls, Sandoz, Taro and Teva agreed to raise prices for both Etodolac and Etodolac ER.

1131.   On July 22, 2013 – before any price increases took effect or were made public, Patel added both Etodolac and Etodolac ER to her price increase spreadsheet for the first time, with the following notations:

| Etodolac | Sandoz* (All strong competitors) |
|---|---|
| Etodolac ER | Could follow IR (Shared with Taro) |

[144]

1132.   Based on her conversations with CW-1 and Aprahamian, Patel understood that Sandoz planned to increase its price on Etodolac, and that Taro would follow suit and raise its price for Etodolac ER.  During those conversations, Teva agreed to follow both price increases.

1133.   That same day, Sandoz sent out a calendar notice to certain sales and pricing employees for a conference call scheduled for July 23, 2013 to discuss planned price increases,

---

[144]   Amended State AG Complaint No. 2 ¶ 711.

including for Etodolac.  Prior to the conference call on July 23, CW-1 called Patel at Teva.  After exchanging voicemails, the two were able to connect for more than fourteen (14) minutes that day.  During that call, CW-1 confirmed the details of the Sandoz price increase on Etodolac. Similarly, CW-3 of Sandoz called Aprahamian at Taro that same day and the two spoke for more than three (3) minutes.

1134.   The Sandoz price increase for Etodolac was effective July 26, 2013.  That same day, Taro received a request from a customer for a one-time buy on Etodolac 400mg Tablets. After learning of the request, Aprahamian responded swiftly internally:  "Not so fast.  Why the request? Market just changed on this and not apt to undercut."

1135.   When Taro received another request on July 30 from a large wholesale customer for a bid due to the Sandoz price increase, Aprahamian's internal response was equally short:

| Message | |
|---------|---|
| **From:** | ara.aprahamian@taro.com [ara.aprahamian@taro.com] |
| **Sent:** | 7/30/2013 11:14:49 PM |
| **To:** | |
| **CC:** | |
| **Subject:** | Re: Fw: Bid Request - Etodolac |
| **Attachments:** | _.gif; _; _ |

recent market changes, not taking on additional share...

145

1136.   Also on July 26, Patel sent an e-mail to others at Teva – including her supervisor K.G., Rekenthaler and others – informing them of the Sandoz increase on Etodolac IR (immediate release).  She instructed them to "[p]lease watch ordering activity for both, IR and ER.  The intent is that we will follow in the near future, but a date has not been determined."

---

145   *Id.* at ¶ 714.

1137.   Patel continued to coordinate with both Sandoz and Taro regarding the Etodolac and Etodolac ER price increases (among other things).  Between July 29 and August 2, 2013, for example, Patel engaged in the following series of calls with CW-1 of Sandoz and Aprahamian at Taro:



| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/29/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:44:23 | 0:09:08 |
| 7/30/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:05:11 | 0:09:51 |
| 7/31/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 13:17:12 | 0:03:33 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 11:01:31 | 0:09:05 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:35:17 | 0:03:24 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 16:41:05 | 0:14:34 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:59:51 | 0:05:23 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:15:46 | 0:08:27 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:59:57 | 0:00:28 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:33:12 | 0:00:00 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:34:43 | 0:00:55 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:35:47 | 0:00:02 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:36:12 | 0:05:40 |

[146]

1138.   Aprahamian was also speaking to his contact at Sandoz, CW-3, during this time, including the following calls:



| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:56:00 | 0:01:00 |
| 8/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:43:00 | 0:14:00 |
| 8/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:26:00 | 0:06:00 |

[147]

1139.   On August 1, 2013, shortly after speaking with Patel, Aprahamian instructed a colleague at Taro to begin implementing a price increase on Etodolac and Etodolac ER. Aprahamian stated "[w]e need to get these out next week." Not wanting to provide the details in writing, Aprahamian concluded:  "Will come over and discuss with you."

---

[146]   *Id.* at ¶ 716.

[147]   *Id.*

1140.   By August 5, 2013, it was well known internally at Teva that Taro would soon be raising prices on both Etodolac and Etodolac ER.  The minutes from a Teva "Marketing Ops" meeting on August 5, 2013, which Patel attended, reflect the following:

> 4.  Etodolac – Sandoz did take price increase on IR, Taro taking a price increase on IR and ER this week.  CIM still monitoring to 100% forecast for all customers.

148

1141.   When Patel sent the "Price Increase Overview" spreadsheet to her supervisor K.G. on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that the reason Teva was increasing its prices for Etodolac and Etodolac ER was because Teva senior executives knew that Taro would be raising its prices on both drugs "this week." K.G. quickly instructed Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

1142.   Teva and Taro raised prices for Etodolac and Etodolac ER simultaneously, with the price increases effective on August 9, 2013.  Both their AWP and their WAC prices were increased to the exact same price points.  The increases were substantial.  For Etodolac, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

### 8.    July 2013 – January 2014:  Competitors Seek to "Follow" Price Increases:  Haloperidol and Trifluoperazine HCL, Benazepril HCTZ, Levothyroxine, Clomipramine HCL

1143.   As detailed above, after Mylan and Teva implemented significant price increases in early July 2013, Sandoz executives sought to obtain a "comprehensive list" of those Teva and

---

148   *Id.* at ¶ 718.

Mylan price increases.  Sandoz sought this information because it did not want to accidentally compete for market share on any of the Teva or Mylan drugs that overlapped with Sandoz.

1144.   To that end, on July 15, 2013, Sandoz executives held an internal meeting during which CW-1 instructed members of the Sandoz sales team, including CW-2 and CW-4, "to investigate [the] list of Mylan and Teva increase items."

1145.   That same day, as detailed above, CW-2 contacted his counterpart at Teva, Rekenthaler, and obtained the list of drugs that Teva increased on July 3, 2013, along with the percentage increases for each.  Similarly, on July 16, 2013, CW-4 called her contact at Mylan, Nesta.  The call lasted two-and-a-half (2.5) minutes.  A half hour later, Nesta returned the call and they spoke for nearly nineteen (19) minutes.

1146.   During those two calls, CW-4 asked Nesta to identify the drugs Mylan had increased prices on so that Sandoz could follow with its own price increase.  Nesta provided CW-4 with a list of drugs, highlighting that the Nadolol price increase would be large.  Nesta also emphasized that Mylan did not appreciate having its prices challenged and that prices should be kept high.  After the phone call ended, CW-4 sent the following e-mail to her superiors (the

"July 2013 E-mail"):



1147.   For at least one drug on the list – Haloperidol – Mylan had yet to raise price at the time of the July 2013 e-mail.  Indeed, Mylan would not raise price on this product until August 9, 2013.  On that date, Mylan also raised the price on Levothyroxine – a drug on the list that was also increased by Mylan in January 2013 – and at least two other Sandoz overlap drugs not on the list – Trifluoperazine HCL and Benazepril HCTZ.

1148.   Over the next several months, and consistent with their understanding, Sandoz declined to bid and take business from Mylan customers (except in one instance where Mylan had more than its fair share) and raised prices to match Mylan on a number of products.  Some examples of this conduct are detailed below.

<em>a.      Haloperidol and Trifluoperazine HCL</em>

1149.   On August 6, 2013, Nesta of Mylan called CW-4 at Sandoz twice.  Both calls were less than a minute long.  Three days later, on August 9, 2013, Mylan implemented

---

[149]   *Id.* at ¶ 990.

significant price increases on both Haloperidol and Trifluoperazine HCL.  For Haloperidol,

Mylan increased the WAC price by 250% on several formulations.  For Trifluoperazine HCL,

Mylan increased the WAC price by 80% on all formulations.

1150.   On August 19, 2013, S.G., a national account executive at Sandoz, sent an

internal e-mail stating that Mylan increased its prices on Haloperidol and Trifluoperazine HCL

and that Sandoz needed to "rationalize the market."

1151.   On August 22, 2013, CW-2 e-mailed Kellum stating that CVS "wanted to know if

we will be raising price on Haloperidol and Trifluoperazine.  Mylan took substantial increases."

Kellum forwarded the request to CW-1 and F.R., a pricing manager at Sandoz.  F.R. responded,

"I believe the answer is yes?? We bid at current price in RFP and did not go after this business.  I

would answer yes.  Thoughts?" CW-1 replied that he would obtain the pricing data, "but I would

imagine we will be fast followers."

1152.   On September 18, 2013, CW-1 e-mailed Kellum with his price increase analyses

for Haloperidol and Trifluoperazine HCL.  For Haloperidol, CW-1 indicated that Mylan had

72% market share, Sandoz had 15%, and Zydus had 10%.  For Trifluoperazine HCL, CW-1

stated that "Mylan has 73% and we have 24%.  This is a no brainer."

1153.   On September 25, 2013, Walgreens – a Mylan customer – e-mailed Sandoz

asking for bids on Haloperidol and Trifluoperazine HCL.  CW-1 sent an internal e-mail

explaining that "Mylan took a price increase on this product.  That's why he is asking.  We are

currently evaluating tak[ing] one ourselves."

1154.   On October 2, 2013, CW-1 e-mailed S.G., the Sandoz national account executive

assigned to Walgreens, directing S.G.  to not only decline to bid at Walgreens, but also lie about

the reason for doing so:



From:
Sent:            Wednesday, October 02, 2013 6:45 PM
To:
Cc:              Kellum, Armando
Subject:         Haloperidol and Trifluoperazine - WAGS

Steve,

We discussed internally and decided not to pursue WAGS on these at this point.  We have been running up
against Mylan a lot lately(Nadolol, Benaz/Hctz), and fear blowback if we take on any more products at this
moment.

Trying to be responsible in the sandbox.

I recommend you blame supply.

150

1155.   Over the next several days, CW-4 and Nesta spoke by phone several times.  These

communications are detailed in the table below.  Prior to these calls, CW-4 and Nesta had not

communicated by phone since August 6, 2013.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:11:19 |

151

1156.   On October 15, 2013 (the day after the last of the phone calls noted above), CW-1

e-mailed the Sandoz Pricing Committee recommending that Sandoz increase pricing on

Haloperidol and Trifluoperazine HCL.  After reviewing the e-mail, O.K., a senior executive

responsible for business planning at Sandoz, recommended approval of the Haloperidol price

increase, but advised that Sandoz wait to increase the price of Trifluoperazine HCL until January

---

[150] *Id.* at ¶ 999.

[151] *Id.* at ¶ 1000.

2014 because of price protection penalties that would be triggered if Sandoz increased in October 2013.  As O.K. explained, "I understand that both price increases have been taken by Mylan in August and we are the followers.  We might be sending the wrong signal to Mylan by not following promptly however 1.6m top/bottom-line hit with no upside is too big to swallow."

1157.   Ultimately, Sandoz followed O.K.'s recommendation and increased its WAC pricing on Haloperidol to match Mylan's pricing on October 25, 2013 but waited to follow on Trifluoperazine HCL until January 31, 2014.

### b.     Benazepril HCTZ

1158.   In July 2013, Sandoz finalized its plan to re-launch Benazepril HCTZ.  However, because Sandoz executives knew that Mylan planned to increase price on this product, it chose to wait to re-enter the market until after Mylan increased its price so that Sandoz could enter at the higher price.

1159.   On July 12, 2013, a marketing executive at Sandoz sent an internal e-mail regarding "Benazepril Orders for Cardinal" stating:  "[b]efore any release, we are expecting Mylan to raise their price." Similarly, during a Commercial Operations meeting on July 15, 2013, it was confirmed that Sandoz was just waiting for confirmation of a Mylan price increase before re-entering the market.

1160.   The next day, on July 16, 2013, CW-4 spoke with Nesta and sent the July 2013 e-mail outlining the Mylan price increase drugs that Nesta had provided to her (discussed more fully above).  That list did not include Benazepril HCTZ.  CW-1 forwarded the July 2013 e-mail to Kellum stating "See [CW-4's] note below for Mylan increases....I'm surprised benazepril hctz isn't on the list below for Mylan?" CW-1 then e mailed CW-4 asking, "Benazepril hctz? Was hoping to see that one."

1161.   Over the next few days, CW-4 and Nesta communicated several times, during which they discussed Benazepril HCTZ.  These phone calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 14:32:56 | 0:00:31 |
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 14:41:59 | 0:01:21 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:13:44 | 0:00:04 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:14:20 | 0:01:57 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:24:49 | 0:03:11 |

[152]

1162.   On August 2, 2013, CW-1 sent a spreadsheet to Kellum entitled, "Teva increases July 2013." In the e-mail, CW-1 stated:  "Mylan is also in there.  Be on the lookout for bumetanide and Benazepril/hctz."

1163.   One week later, on August 9, 2013, Mylan increased WAC pricing on Benazepril HCTZ.  The increase was large – nearly 334% on all dosage strengths.

1164.   On August 20, 2013, consistent with their agreement to maintain high prices, Sandoz quickly re-entered the Benazepril HCTZ market and essentially matched Mylan's WAC pricing.

1165.   A third competitor – non-Defendant Rising – entered the Benazepril HCTZ market on April 2, 2014 as the authorized generic.  When Rising entered, it essentially matched the WAC pricing of Sandoz and Mylan.  Both before and after entering the market, CW-2 – then at Rising – communicated with his former colleagues at Sandoz (CW-1, CW-3, and L.J.) about obtaining market share on Benazepril HCTZ.  Through those communications, Sandoz ultimately agreed to relinquish ABC to Rising so that the new entrant could achieve its fair share of the market.

---

[152]  *Id.* at ¶ 1007.

1166.   As a result, prices across the market rose more than 300% for Benazepril HCTZ, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, as depicted in the chart below:

| Dosage | Package Size | October 2013 | July 2014 | Percentage Price Increase |
|---|---|---|---|---|
| 12.5-20mg | 100 ct | $34 | $149 | 338% |
| 20-25mg | 100ct | $34 | $149 | 338% |
| 5-6.25mg | 100ct | $34 | $149 | 338% |

1167.   NADAC data show that average market prices of Benazepril HCTZ remained stable prior to October 2013 but rose dramatically and remained artificially high after that time, as depicted for certain forms and dosages below.



c.     *Levothyroxine*

1168.   Since approximately December 2010, Mylan, Sandoz, and Lannett have dominated the generic Levothyroxine market.

1169.   In the years 2013 and 2014, the three competitors coordinated to significantly raise the price of Levothyroxine.  Nesta of Mylan spearheaded the discussions by speaking with K.S., a senior sales executive at Lannett, and with CW-4 of Sandoz.  In addition to communicating directly with CW-4 on this drug, Nesta also communicated indirectly with

Sandoz through a mutual contact at a competitor company – Green of Teva.  Notably,

Levothyroxine was not a drug that Teva sold.

1170.   As detailed above, Mylan increased prices on a number of drugs on January 4,

2013, including Levothyroxine.  The day before the Mylan increase, on January 3, 2013, Nesta

of Mylan and Green of Teva spoke at least four times by phone.  The next morning – the day of

the Mylan price increases – Green spoke twice with Kellum, including a six (6) minute call at

9:34 a.m.

1171.   Shortly after hanging up the phone with Green, Kellum sent an internal e-mail

stating, among other things, that he "[j]ust heard from a customer that . . .  Mylan took a

significant price increase on Levothyroxine" and Kellum advised his team to "please be

cautious" on this product.  As the phone records demonstrate, Kellum's source for the

information was not "a customer," but rather Green of Teva.

1172.   That same morning, K.S. of Lannett called Nesta of Mylan.  The phone call lasted

44 seconds.  Then, on January 10, 2013, Nesta called K.S. back and they spoke for more than six

(6) minutes.  That same day, McKesson e-mailed Sandoz and requested a price reduction on

Levothyroxine.  Kellum responded internally, "This is a No. We just learned that Mylan took a

large price increase."

1173.   The following Monday – January 14, 2013 – Lannett raised its WAC pricing for

Levothyroxine to match Mylan.  Notably, after these phone calls, Nesta would not speak again

with K.S. of Lannett until August 6, 2013 – three days before Mylan increased its prices for

Levothyroxine a second time.

1174. On July 16, 2013 – as detailed above – CW-4 spoke with Nesta and sent the July 2013 e-mail identifying the Mylan price increases. The price list included Levothyroxine and noted that Lannett had followed.

1175. On August 6, 2013, Nesta called CW-4 two times. Both calls lasted less than a minute. A few minutes after the second call, Nesta called K.S. at Lannett. The call lasted 24 seconds (likely a voicemail). Three days later, on August 9, 2013, Mylan increased WAC pricing on Levothyroxine for a second time.

1176. On August 10, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail that stated: "Mylan took a 300% price increase on Levothyroxine!!! Based on my intelligence (we will need to confirm), please lock down inventory (strict allocation per AK) and no new product offers until we can clarify the situation." CW-4 replied to S.G.'s e-mail stating, "This is correct based on my info as well."

1177. Pursuant to their ongoing understanding, Lannett followed quickly and matched Mylan's WAC pricing on August 14, 2013.

1178. On August 14, 2013, S.G. sent an e-mail to Kellum, copying CW-1, regarding "Levothyroxine Mylan" and asked "[w]e taking the pricing up?" CW-1 responded: "[w]orking on it." In response, S.G. replied: "Thx. I believe Lannett rationalized the market earlier this week." CW-1 answered "We just noticed that as well."

1179. On September 5, 2013, Cigna – a Mylan customer – contacted Lannett and requested a bid on Levothyroxine. J.M., a national account manager at Lannett, forwarded the request to K.S. stating "due to Mylan's across the board price increases on a number of products, they are looking for new suppliers wherever there is crossover." J.M. explained that "[t]he volume isn't gigantic on the 1000s so it wouldn't attract much attention from Mylan if it went to

us ....." Nonetheless, on September 12, 2013, Lannett declined the opportunity and blamed supply issues stating "[a]s much as we'd love to take on the business, we are not in a position to do so at this time."

1180.   During a September 10, 2013 earnings call, Lannett's CEO, A.B., was asked for his reaction to Mylan's Levothyroxine price increase.  A.B. responded, "You mean after I sent them a thank you note? I'm just kidding.  .  .  .  I'm always grateful to see responsible generic drug companies realize that our cost of doing business is going up as well.  .  .  .  So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful."

1181.   On September 13, 2013, Sandoz did indeed act "responsibly" and, consistent with the understanding it had with its competitors, raised WAC pricing to match Mylan and Lannett.

1182.   The three competitors – Mylan, Lannett, and Sandoz – did not stop there.  They coordinated again to raise price on Levothyroxine in April/May 2014.

1183.   Consistent with the 2013 increases, Mylan was the first to raise its WAC pricing on Levothyroxine on April 25, 2014.  In the two days leading up to the increase, Nesta and K.S. of Lannett spoke by phone several times.  These calls are listed below.  Notably, these calls are the last documented telephone calls between these two executives.

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 18:31:26 | 0:00:03 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 18:59:53 | 0:00:34 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 19:57:39 | 0:00:50 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 21:04:47 | 0:05:07 |

[153]

1184.   On April 25, 2014 – the day that Mylan increased its pricing for Levothyroxine – P.G., a sourcing manager at Cardinal Health, sent a text message to Sullivan of Lannett stating:

---

[153]   *Id.* at ¶ 1029.

"[n]ot sure if you knew already ... Mylan increasing levos." Sullivan responded: "Thanks for the heads up ... We heard 55% on contract price, can you confnm?" P.G. replied, "[y]es ~50-55%." Sullivan had "heard" about the Mylan increase from her supervisor, K.S., who had communicated with Nesta only days prior.

1185.   Lannett quickly followed with a price increase of its own – raising its WAC pricing to match Mylan on April 28, 2014.  In accordance with their ongoing agreement, and consistent with past practice, Sandoz followed shortly thereafter on May 23, 2014 and matched the WAC pricing of its competitors.

1186.   These price increases are reflected in WAC data:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000ct | Mylan | 00378180310 | $0.18 | $0.27 | 8/9/2013 | 45% |
| 100ct | Lannett | 00527134201 | $0.18 | $0.27 | 8/14/2013 | 46% |
| 1,000ct | Lannett | 00527134210 | $0.18 | $0.27 | 8/14/2013 | 46% |
| 90ct | Sandoz | 00781518192 | $0.12 | $0.27 | 9/13/2013 | 120% |
| 1,000ct | Sandoz | 00781518110 | $0.12 | $0.27 | 9/13/2013 | 54% |
| 1,000ct | Mylan | 00378180310 | $0.27 | $0.41 | 4/25/2014 | 55% |
| 100ct | Lannett | 00527134201 | $0.27 | $0.41 | 4/28/2014 | 54% |
| 1,000ct | Lannett | 00527134210 | $0.27 | $0.41 | 4/28/2014 | 54% |
| 90ct | Sandoz | 00781518192 | $0.27 | $0.41 | 5/23/2014 | 54% |
| 1,000ct | Sandoz | 00781518110 | $0.27 | $0.41 | 5/23/2014 | 54% |

1187.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases.  In a November 2014 hearing in the United States Senate HELP Subcommittee, pharmacist Stephen W. Schondelmeyer testified that in the prior year, Levothyroxine experienced a 35-50% price hike.  Mr. Schondelmeyer added that Mylan increased its prices for nine different strengths of Levothyroxine by between 44-63%.

Pharmacist Robert Frankil also testified that in 2013, Levothyroxine experienced a dramatic price increase.[154]

1188.   In 2015, patients complained of a dramatic price increase for their levothyroxine medication.  One patient in Detroit explained they routinely paid $20 for 90 tablets, but their cost skyrocketed to $76.77 from one refill to the next.[155] The Wisconsin Center for Investigative Journalism found that between 2011 and 2016, the price per pill for generic Levothyroxine increased from 14 cents to 46 cents.[156]

### d.   Clomipramine HCL

1189.   In addition to Sandoz and Mylan, Taro also manufactured Clomipramine HCL. Indeed, it was Taro that led a price increase on this product on May 1, 2013.  The price increase was striking – more than a 3,440% increase to Taro's WAC pricing on certain formulations.

1190.   In the weeks leading up to the Taro price increase on Clomipramine HCL, Aprahamian of Taro spoke several times with both CW-3 at Sandoz and M.A., a national account manager at Mylan.  In fact, on several occasions during this time period, Aprahamian hung up the phone with one competitor and immediately called the next.  At the same time, CW-4 of Sandoz was also speaking with D.S., a senior sales and national account executive at Taro.

---

[154]   *Why Are Some Generic Drugs Skyrocketing in Price?: Hearing Before the Subcomm. On Primary Health and Aging of the Sen. Comm. on Health, Educ., Labor, and Pensions*, 113th Cong. 10 (2014) (statement of Stephen W.  Schondelmeyer, Director, Prime Institute and statement of Robert Frankil, President, Sellersville Pharmacy, Inc.), available at https://www.gpo.gov/fdsys/pkg/CHRG-113shrg24459/pdf/CHRG-113shrg24459.pdf.

[155]   Keith Roach, *Hike in prescription cost can be a hardship*, DETROIT NEWS (Mar. 29, 2015), https://www.detroitnews.com/story/life/advice/2015/03/29/keith-roach-health-high-prescription-cost-hardship/70639116/.

[156]   Sean Kirby, Dee J. Hall & Bridgit Bowden, *Prices of Lifesaving Drugs Skyrocketing*, WIS. CTR. FOR INVESTIGATIVE JOURNALISM (Nov.  28, 2016), https://urbanmilwaukee.com/2016/11/28/prices-of-lifesaving-drugs-skyrocketing/.

During these conversations, Taro, Sandoz, and Mylan agreed to raise the price of Clomipramine

HCL.  Certain of these phone calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:06:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:15:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:06:00 |
| 4/9/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:07:00 |
| 4/9/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:00:06 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:18:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:01:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:11:00 |
| 4/17/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:12:00 |
| 4/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:02:00 |
| 4/17/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:04:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:13:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 4/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:09:00 |
| 4/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:04:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:05:00 |
| 4/25/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/26/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:08:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:14:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:02:00 |

[157]

1191.   CW-3 of Sandoz also took contemporaneous notes of some of his conversations

with competitors.  For example, after speaking with Aprahamian of Taro twice on April 30,

2013, CW-3 made the following notes identifying Clomipramine HCL as one of the products

that Taro planned to increase on May 1st:



[158]

---

[157]   Amended State AG Complaint No. 2 ¶ 1034.

[158]   *Id.* at ¶ 1035.

Indeed, there are notations in CW-3's notebook that demonstrate that he began communicating with Aprahamian about Taro's May 1 increase as early as April 2, 2013.

1192.   As part of the agreement to raise prices and not poach each other's customers on Clomipramine HCL, Sandoz consistently refused to bid for Taro's customers after Taro raised its price.  For example, on April 30, 2013, Publix e-mailed Sandoz stating that it had received a price increase letter from Taro regarding several Sandoz overlap products, including Clomipramine HCL, and asked whether Sandoz wanted to bid for the business.  Kellum e-mailed CW-4 stating "I'm not inclined to do anything here as these may be opportunities for us.  We can blame supply if these are in fact opps for us." CW-4 replied, "Agreed! Especially the opportunities for us part!"

1193.   Taro did agree to concede one customer to Sandoz so that the competitor could achieve its "fair share" of the market.  On May 1, 2013, Rite Aid e-mailed Sandoz asking for a bid on Clomipramine HCL.  Kellum responded:  "I want to raise price and perhaps pick up share here if possible.  [CW-4] try to keep Rite Aid warm and let them know we are evaluating but need to assess supply etc. . . ."

1194.   The next day, on May 2, 2013, Aprahamian of Taro called CW-3 at Sandoz and they spoke for five (5) minutes.  CW-3 hung up the phone and then immediately called Kellum. The two spoke for eight (8) minutes.  First thing the next morning – on May 3, 2013 – CW-3 called Aprahamian back and they spoke for another five (5) minutes.  Within a half hour, CW-3 again contacted Kellum and spoke for two (2) minutes.  Later that day, CW-4 of Sandoz e-mailed Kellum regarding an upcoming call with Rite Aid stating:  "[w]hen we speak to the clomipramine – let's reiterate we need to keep it on the DL from taro as long as possible.  . . . like we don't already know the cat's out of the bag."

1195.   Ultimately, Sandoz was awarded the Clomipramine HCL business at Rite Aid. When Rite Aid notified Taro, Aprahamian forwarded the e-mail to M.P., Chief Commercial Officer at Taro, stating "[a]s expected Rite Aid moving Clomipramine."

1196.   Mylan was the next to increase price on Clomipramine HCL.  On May 16, 2013, Mylan increased to the same WAC per unit cost as Taro.  In the days leading up to the Mylan price increase, all three competitors were in contact with each other to coordinate efforts.  Some of these calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:08:00 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:20 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:06:00 |
| 5/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:04:06 |
| 5/14/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 5/14/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 5/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:02:00 |
| 5/16/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:22:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:01:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:02:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:01:00 |

[159]

1197.   On July 3, 2013, HEB Pharmacy informed Taro that Mylan was on back order for Clomipramine HCL and asked Taro to bid for the business.  Aprahamian responded that he was "[n]ot inclined to take on new business... Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists.  Don't want to over react to this product.  Not sure how long Mylan is out."

1198.   On July 16, 2013, CW-4 of Sandoz sent the July 2013 e-mail identifying Clomipramine HCL as a Mylan price increase product.  By this time, Sandoz knew that Mylan had increased its price on this product.

_____

[159]   *Id.* at ¶ 1040.

1199.   On July 20, 2013, Taro received a "Watch List" notification that Sandoz was increasing price on Clomipramine HCL.  Aprahamian forwarded the notice to M.P., stating: "FYI, Sandoz is in the market (and adjusted price to match oms) now with product as expected. Don't want to alert the reps as they could overreact.  They did take Rite Aid as you know.  Will see what happens from here."

1200.   Two days later - on July 22, 2013 - Sandoz increased its WAC pricing to match the per unit cost of Taro and Mylan.

1201.   These price increases are illustrated below:

| Package Size (25mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90ct | Taro | 51672401106 | $0.25 | $8.99 | 5/1/2013 | 3,441% |
| 90ct | Taro | 51672401105 | $0.25 | $8.99 | 5/1/2013 | 3,441% |
| 100ct | Mylan | 378302501 | $0.30 | $8.99 | 5/16/2013 | 2,853% |
| 100ct | Sandoz | 781202701 | $0.31 | $8.99 | 7/22/2013 | 2,778% |

1202.   On August 5, 2013, Walgreens – a Mylan customer – e-mailed Sandoz and requested a bid on Clomipramine HCL.  S.G., a national account executive at Sandoz, sent an internal e-mail asking "[s]hould we consider a 25% share of their business?" Kellum responded negatively, based on the agreement in place with Mylan, stating:  "[t]hat is tempting but I worry very disruptive." On August 6, 2013, Nesta of Mylan called CW-4 at Sandoz twice.  Both calls lasted less than a minute (likely voicemails).  The next day, on August 7, 2013, S.G. replied to Kellum's e-mail, stating:  "[b]ased upon your concerns, I will kill this unless I hear otherwise from you."

1203.   In October 2013, CW-4 and Nesta spoke by phone several times.  At least some

of these calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 10/3/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:11:19 |

[160]

1204.   After this series of calls, during the morning of October 15, 2013, CW-4 of Sandoz called Kellum.  The call lasted one minute.  Approximately one-half hour later, Kellum e-mailed McKesson and asked if Sandoz could submit a bid for Clomipramine HCL.

1205.   On October 23, 2013, Sandoz submitted a bid to McKesson and the customer responded that a reduction was needed to bring the pricing in line with their current supplier, Taro.  CW-1 was surprised and forwarded the request to CW-4, copying Kellum, stating:  "I thought we were taking Mckessons Clomipramine from Mylan? Per below it appears that they have Taro on the 90s." CW-4 responded, "Hey, I'm only as good as my intel .  .  .  which should have been good."

1206.   In December 2013, Sandoz received an inquiry from a Bloomberg reporter who questioned the propriety of the large increases that Sandoz had taken in recent months on a whole host of drugs, including Clomipramine HCL and several other drugs at issue in this Complaint.  After several conversations with antitrust counsel, Kellum prepared the following

---

[160]  *Id.* at ¶ 1046.

response to Bloomberg with regard to Clomipramine HCL:



1207.   As is clear from the above allegations, Kellum's statement was a lie.  In reality, Sandoz had raised its prices after coordinating the increases with Taro and Mylan in advance and stayed true to its commitments to keep those prices high.

1208.   In 2015 alone, total sales revenue for Clomipramine spiked to $519 million, which is more than half the total sales revenue for the same products from 2011-2014 combined. This type of revenue growth in a mature market is evidence of Defendants' collusion.

### 9.   March 7, 2014:  Price Increases and Overarching Conspiracy Converge (Niacin ER)

#### a.   Niacin ER

1209.   On September 20, 2013, Teva entered the market for Niacin ER as the first-to-file generic manufacturer.  As the first-to-file, Teva was awarded 180 days of exclusivity to sell the generic drug before other generic manufacturers could enter the market.

1210.   Teva's period of exclusivity for Niacin ER was scheduled to expire on March 20, 2014.  As that date approached, Teva began to plan for loss of its exclusivity.  By at least as early as February, Teva learned that Lupin would be the only competitor entering the market on March 20.

---

161   *Id.* at ¶ 1049.

1211.   The first thing Teva sought to do – knowing that a high-quality competitor would be the only new entrant – was to raise its price.  On February 28, 2014, Cavanaugh instructed K.G. and others at Teva that "[w]e need to do the Niacin ER price increase before Lupin comes to market and sends offers out." K.G. immediately forwarded the e-mail to Patel with the instruction:  "Please see comment on Niacin ER.  Please make sure you include in your price increase." Later that day, Patel called Berthold at Lupin and the two spoke for nearly seven (7) minutes.

1212.   Within a week, Teva was ready to implement the price increase.  On March 5, 2014, Patel sent an e-mail to the Teva pricing group stating "[p]lease prepare for a price increase on Niacin ER, to be communicated [to customers] this Friday for an effective date of Monday." The next day, March 6, Teva notified its customers that it would be implementing a price increase on Niacin ER effective March 7, 2014.  The increase was for 10% across the board, on all formulations.

1213.   Once Teva coordinated the price increase, it next began taking the necessary steps to divide up the Niacin ER market with new entrant Lupin to avoid competition that would erode Teva's high pricing.  Patel scheduled a meeting with Rekenthaler for March 6, 2014 to discuss an "LOE Plan" for Niacin ER.  "LOE Plan," in Teva parlance, is a plan detailing which customers Teva would concede and which customers it would retain upon Teva's "loss of exclusivity" in a particular generic drug market.  Teva's LOE plans were often secretly negotiated directly with competitors as they were entering the market, consistent with the industry understanding of fair share discussed above.

1214.   During the morning of March 6, 2014, Patel called Berthold and they spoke for more than seven (7) minutes.  During this and several subsequent calls, discussed in more detail

above, Teva and Lupin agreed on which specific customers Teva would concede to Lupin when it entered the market on March 20, 2014.  Teva agreed that it would concede 40% of the market to Lupin upon entry.

1215.   When Lupin entered the market for Niacin ER on March 20, 2014, it entered at the same WAC per unit cost as Teva, for every formulation.  In the days leading up to Lupin's entry, Patel and Berthold were in frequent communication to coordinate the entry, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:44 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:19 |
| 3/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:06:20 |
| 3/20/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:34 |

[162]

1216.   In addition, Lupin entered with customer pricing only 10% below Teva's recently increased pricing – so it was expected that pricing would remain at least at Teva's pre-increase exclusive pricing levels.  In other words, there was little or no price erosion as a result of Lupin's anticompetitive entry into the market for Niacin ER.

1217.   Over the next several days, Patel and Berthold continued to coordinate to make sure Lupin obtained the agreed-upon customers.  For example, on March 24, 2014, a Teva executive received an e-mail from Cardinal indicating that Cardinal had received "a competitive offer for the Niacin ER family."  Cardinal was one of the customers that Teva had already agreed to concede to Lupin.  The Teva executive forwarded the e-mail to several people internally at

---

[162]   *Id.* at ¶ 735.

Teva, including Patel, Rekenthaler and Cavanaugh, confirming the plan:



163

1218.  That same day, Patel spoke to Berthold at Lupin three times, as shown below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:14 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:04:55 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:49 |

164

1219.  Patel responded:



165

1220.  The next day – March 25, 2014 – K.G. of Teva summarized the status of Teva's LOE Plan and the company's agreement with Lupin on Niacin ER:  "With the four concessions (CVS, Cardinal, Optum and Humana), we would be giving up right around 40% share as Dave noted (I calculated 39%) . . . .  We need to keep everybody else."

---

### 10.    April 4, 2014 Price Increases

1221.   On April 4, 2014, Teva raised prices on twenty-two (22) different generic drugs. Nearly all of these increases were coordinated with a number of Teva's high-quality competitors including Sandoz, Taro, Actavis, Mylan, Lupin, and a non-Defendant generic manufacturer.  But for this price increase, Teva also began coordinating with some of what it regarded as "lesser-quality" competitors – such as Breckenridge, Heritage, non-Defendant VersaPharm, and non-Defendant Rising – as new sources for anticompetitive agreements.  For this price increase, Teva also decided to lead many more price increases – which was riskier for Teva and required even greater coordination with competitors.

1222.   Leading more price increases was part of a strategy that Patel memorialized in writing in January of 2014, documenting in many respects the successful strategy that she had implemented in 2013, focused on leveraging Teva's collusive relationships with high-quality competitors.  This strategy was well known, understood and authorized by individuals at much higher levels at Teva, including Cavanaugh and Rekenthaler, and Patel's direct supervisor K.G. For example, on January 16, 2014, Patel sent a document to K.G. titled "2014 Pricing Strategy Brainstorm," where she outlined her plan for implementing price increases:



**2014 Pricing Strategy Brainstorm**

- Lead more increases
- Candidate Identification:
  - Exclusive items
  - Number of competitors; Target 2-4 total players, where quality of competitor is high
  - Teva has majority share and quality of competitors is high - lead
  - Competitors with long term supply issues
  - Competitors exiting market
  - Low or limited financial exposure
  - Adjust  pricing in accordance with volume (secondary, dual, etc)
- Follow market pricing promptly
  - Delayed reactions erode pricing
  - Teva is the market leader. Ability to react to market changes should be reflective of reputation.

[166]

---

[166]   *Id.* at ¶ 741.

1223.   Patel began planning for the next round of Teva price increases in early January 2014, shortly after returning to full-time status from maternity leave.  On January 14, 2014, Patel sent K.G. a preliminary draft list of price "Increase Potentials Q1 2014."  She stated:  "Attached is my list of potential items.  Note that they still need to go through the review process."

1224.   The initial list contained drugs sold by Actavis and Lupin, among others.  Not surprisingly, Patel was communicating frequently with each of those competitors throughout December 2013 and into early January 2014.

1225.   On February 7, 2014, Patel created a formal list of "PI Candidates" in a spreadsheet.  In the days leading up to February 7, Patel was feverishly coordinating by phone with a number of different competitors to identify price increase candidates, including at least the following:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:23:21 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:10 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:15:53 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:22 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:04 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:29 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:11 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:30:28 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 1:02:06 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:05 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:00 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | S.C. (Breckenridge) | 0:01:20 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | S.C. (Breckenridge) | 0:04:53 |

[167]

---

[167]   *Id.* at ¶ 744.

1226.   Those efforts were successful.  By February 26, 2014, Patel had a more refined list of "PI Candidates," which she forwarded to another colleague for his review.  That list included the following drugs and notes about each drug:

| Family | Market Notes | Pricing Notes |
|---|---|---|
| Clarithromycin ER | Zydus exiting | Raise non-Cardinal customers in accordance with new Cardinal price |
| OCs | Secondary at ABC | Raise to non-primary pricing/within 10% of primary market sell-refer to Anda intel |
| Cephalexin DS | | Follow Lupin - price points - WS net \$14.70, 23.52, 16.75, 25.13 |
| Azith Susp | | Follow GS - price points - WS net \$12.50 on all sku's |
| Medroxypro Tabs | | Follow GS - price points - WS net 8.50, 9.50, 10.50 on 100s |
| Nadolol (Econdic only) | | Raise to originally planned increase price |
| Ethosuximide Liquid | Shared only with Versa; test quality of competitor | |
| Ethosuximide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE | |
| Cyproheptadine | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract \$5.10 |
| Minoxy | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 96.30 |
| BUDESONIDE | Exclusive | PER PRICING INFORMATION FROM DECEMBER |
| NIACIN ER | Exclusive but Lupin entering | PER PRICING INFORMATION FROM DECEMBER |
| Bumetanide | Teva exiting  CHECK SALES FOR % INCREASE | Lead market with potential share loss in mind |
| Divalproex ER | UNPROFITABLE  several competitors | |
| Diflunisal | Shared only with Rising | |
| Ketoconazole Cream | Shared with Taro and Sandoz | |
| Ketoconazole Tab | Shared with Taro, Myl and Apo | |
| Mupirocin Ointment | Shared with Perrigo, GM, Taro, Sandoz | |
| Theophylline Tab | Shared with Heritage, Major and Inwood | |
| Nystatin Tab | Shared with Heritage and Mutual/Caraco | |
| Hydroxyzine Pamoate | Shared with Sandoz and Actavis | |
| Pentoxi ER | Shared with Apo and Mylan | |

[168]

1227.   Patel continued to refine the list over the next several weeks.

1228.   On March 17, 2014, Patel sent a near final version of the "PI Candidates" spreadsheet to K.G. with the statement:  "Once you verify these are acceptable, we can finalize for the increase."  Patel and Rekenthaler both were communicating frequently with competitors – in this case Taro, Lupin, Actavis, Zydus, Heritage, and non-Defendant Rising – to coordinate the price increases in the week before Patel sent the price increase list to K.G.

1229. Rekenthaler had also previously spoken with his contact at non-Defendant VersaPharm – J.J., a senior national accounts executive – on January 22, 2014 (a five (5) minute call) and March 7, 2014 (a three (3) minute call) to secure non-Defendant VersaPharm's agreement to follow the Teva increase on two drugs.  Those were the only two identified telephone calls between Rekenthaler and J.J. since 2012.  As discussed more fully below, non-Defendant VersaPharm followed with its own price increase shortly after the Teva increase.

---

[168]  *Id.* at ¶ 745.

1230.   In the days leading up to the price increase, Rekenthaler asked Patel for a list of drugs and competitors associated with each of the increase items so that he could confirm that Teva had successfully coordinated increases with everyone.  On April 1, 2014, Patel responded by providing a list of only those drugs where Teva was leading the price increase – i.e., the drugs with the most risk if Teva did not secure an agreement beforehand with a competitor before raising its own price.

1231.   Satisfied that Patel and Rekenthaler had confirmed agreement with all the appropriate competitors, on April 4, 2014 Teva increased pricing on various dosage strengths of the following drugs:  Azithryomycin Oral Suspension; Azithromycin Suspension; Bumetanide Tablets; Cephalexin Suspension; Clarithroymycin ER Tablets; Cyproheptadine HCL Tablets; Dicloxacillin Sodium Capsules; Diflunisal Tablets; Estazolam Tablets; Ethosuximide Capsules; Ethosuximide Oral Solution; Hydroxyzine Pamoate Capsules; Ketoconazole Cream; Ketoconazole Tablets; Medroxyprogesterone Tablets; Estradiol/Norethindrone Acetate (Mimvey) Tablets; Nystatin Oral Tablets; Pentoxifylline Tablets; Tamoxifen Citrate Tablets; and Theophylline ER Tablets.[169]

1232.   These price increases were all coordinated and agreed to between Teva and its competitors.  Patel and/or Rekenthaler communicated directly with all of their key competitors in the days and weeks leading up to the increase.  Many of those communications are set forth in the graphic at page 221 of the Amended State AG Complaint No. 2.  Those communications included communications between Teva and Sandoz regarding Bumetanide Tablets and Dicloxacillin Sodium Capsules; between Teva and Lupin regarding Cephalexin Suspension;

---

[169]   *Id.* at ¶ 748.

between Teva, Actavis, and Zydus regarding Clarithromycine Tablets; between Teva and Breckenridge regarding Cyproheptadine HCL Tablets; between Teva and Actavis regarding Estazolam Tablets; between Teva and non-Defendant Versapharm regarding Ethosuximide Capsules and Ethosuximide Oral Solution; between Teva, Sandoz, and Actavis regarding Hydroxyzine Pamoate Capsules; between Teva, Taro, and Sandoz regarding Ketoconazole Cream; between Teva, Taro, and Mylan regarding Ketoconazole Tablets; between Teva and Breckenridge regarding Estradiol/Norethindrone Acetate (Mimvey) Tablets; between Teva and Heritage regarding Nystatin Oral Tablets; between Teva, Apotex, and Mylan regarding Pentoxifylline Tablets; between Teva and Actavis regarding Tamoxifen Citrate Tablets; and between Teva and Heritage regarding Theophylline ER Tablets.

1233.   Patel and others at Teva again went to great efforts to coordinate these price increases with competitors prior to April 4, 2014 – including during the time that Patel was out on maternity leave.  Some illustrative examples of those efforts are set forth below.

<em>a.     Cephalexin</em>

1234.   Throughout 2013, Berthold of Lupin colluded with two different individuals at Teva:  Patel and Green.  As discussed above, at times Patel and Green would even coordinate with each other regarding who would communicate with Berthold, and take turns doing so.

1235.   As of late October 2013, however, neither of those options was available to Berthold.  Patel was out of the office on maternity leave, and Green had left Teva to join Zydus as of October 23, 2013.

1236.   This did not deter Berthold; he merely went further down the Teva organizational chart to find a Teva executive to communicate with.  The ongoing understanding between Teva and Lupin was institutional, not dependent upon a relationship between specific individuals.  In October 2013, when Lupin decided to raise price on Cephalexin oral suspension – a drug where

Teva was the only other competitor in the market – Berthold already knew that Teva would follow the increase.

1237.   On October 14, 2013, Berthold called Rekenthaler at Teva.  They ultimately spoke for sixteen (16) minutes that day.  Communication was rare between those two executives.  Prior to October 14, 2013, the last (and only) time they had spoken by phone was November 21, 2011 according to the phone records produced.

1238.   On October 31, 2013 – the day before Lupin was scheduled to increase its price on Cephalexin oral suspension – Berthold also called T.S., a national account executive at Teva, to notify Teva of the price increase.  He called T.S. at 9:18 a.m. that morning and left a message.  T.S. returned the call at 9:57 a.m., and the two spoke for nearly five (5) minutes.

1239.   Within minutes after hanging up the phone with Berthold, T.S. notified others internally at Teva about the substantial increase Lupin was about to take:



170

1240.   The Lupin increase on Cephalexin oral suspension actually became effective the next day, November 1, 2013 – demonstrating that T.S. had advance knowledge of the increase.  Shortly thereafter, T.S. followed up her own e-mail with specific price points that Lupin would be charging for Cephalexin.

---

170   *Id.* at ¶ 756.

1241.   K.G. of Teva responded later that day, asking:  "Did Lupin increase the Caps as well?" Rekenthaler answered immediately, with information he had learned from Berthold in mid-October:  "Lupin did not increase the caps, only the susp[ension]."

1242.   On November 22, 2013, a large customer requested a bid from Teva on Cephalexin due to the Lupin price increase.  T.S. forwarded the e-mail from the customer to Rekenthaler and others with the suggestion that, because Teva already had the majority share, it should not bid for the business.  K.G. agreed, and simultaneously forwarded the e-mail to Patel stating:  "Nisha, let's add this to our list to discuss." Patel called Berthold the same day and left a message.

1243.   When Patel drafted her initial list of possible price increase candidates and forwarded it to K.G. in January 2014, Cephalexin oral suspension was on the list.  Patel coordinated the increase consistently with Berthold throughout the period.

1244.   On April 4, 2014, Teva raised its WAC prices on Cephalexin oral suspension to match Lupin's prices exactly.  The increases to the WAC price ranged from 90% - 185%, depending on the formulation.

### b.    *Azithromycin and Medroxyprogesterone*

1245.   In November 2013, a non-Defendant generic manufacturer began planning to increase prices on several drugs, including some that overlapped with Teva:  Azithromycin oral suspension, Azithromycin suspension and Medroxyprogesterone tablets.  Patel and a national account executive at the non-Defendant generic manufacturer, were communicating frequently during that time, including exchanging six (6) text messages on November 16, 2013 and a phone call on November 23, 2013.  Because the non-Defendant generic manufacturer was a high-quality competitor, and because the companies had successfully conspired to raise prices

previously, it was understood between the two that if the non-Defendant generic manufacturer raised prices Teva would follow and would not seek to poach customers after the increase.

1246.   On December 2, 2013 – the same day that the non-Defendant generic manufacturer was slated to send out notices of the price increases to its customers – Patel spoke to the national account executive at the non-Defendant generic manufacturer three times within a span of twenty (20) minutes.[171]

1247.   After the last of those three calls, Patel sent an e-mail to several colleagues at Teva notifying them of an impending price increase by non-Defendant generic manufacturer – one that would not be effective until January 1, 2014.  Patel encouraged her colleagues to "take this into consideration for bid requests [Teva] may receive."[172]

1248.   On December 5, 2013, Patel continued to communicate with the national account manager at the non-Defendant generic manufacturer about the increases, and how Teva would react to unsolicited customer requests for bids – trading two voicemails.  The next day, Patel sent another e-mail to K.G. about Azithromycin suspension and recommended that Teva declined to bid to maintain its fair share of the market.  In recommending that Teva decline to bid, Patel specifically noted that "in a 2 player market, [Teva has] 54% share and this includes a gain of ~4% in June."[173]

1249.   K.G. agreed with Patel's recommendation.  Later that day, J.L. of Teva sent a notice to several Teva colleagues indicating that Teva would not pursue any Azithromycin OS

---

[171]   *Id.* at ¶ 763.

[172]   *Id.* at ¶ 764.

[173]   *Id.* at ¶ 765.

business at the time.  In the same e-mail, K.G. instructed his collegues to "inform the customer that [Teva was] unable to provide an offer at [that] time."[174]

1250.   That same day, Teva declined to bid on Azithromycin at multiple customers.

1251.   Over the next several months – during the period of time before Teva followed the non-Defendant generic manufacturer's price increases – Teva continued to refuse to bid (and avoid taking market share) when requested by customers, for both Azithromycin formulations and Medroxyprogesterone tablets.  For example, on January 27, 2014, Teva was approached by a large wholesaler asking for bids on both Azithromycin suspension and Medroxyprogesterone due to a "Change in Market Dynamics." After speaking with an employee of the non-Defendant generic manufacturer for more than five (5) minutes that same day, Patel agreed with the recommendation not to provide a bid to that customer.

1252.   Similarly, on March 17, 2014 – which was the same day that Patel sent a nearly final price increase list to K.G. – Teva was approached by another wholesaler requesting a lower price for Azithromycin oral suspension.  A national account executive at Teva asked Patel:  "Can we provide any better pricing than [the non-Defendant generic manufacturer]? . . .  I know we have picked up our target share." Patel had spoken with an employee of non-Defendant generic manufacturer twice earlier that day, including one call lasting more than fifteen (15) minutes. Patel's response to the national account executive was:  "Let's talk tomorrow."

1253.   Consistent with the understanding between the two companies, Teva followed the non-Defendant generic manufacturer's price increases for Azithromycin oral suspension,

---

[174]   *Id.*

Azithromycin suspension and Medroxyprogesterone tablets on April 4, 2014.  Patel spoke twice with an employee of non-Defendant generic manufacturer that same day.

> c.    *Clarithromycin ER*

1254.    Teva and Actavis were coordinating several drugs Teva price-fixed on April 4, 2014.  One of them was Clarithromycin ER tablets.  As of December 2013, Teva, Actavis and Zydus were the only generic manufacturers actively selling Clarithromycin ER.

1255.    On December 30, 2013, however, Cardinal approached Teva looking for a bid on Clarithromycin ER because Zydus was exiting the market.  Teva informed Cardinal that it would not have adequate supply to be able to take on this additional market share until April 2014, but if Cardinal could wait until then for Teva to supply, Teva would make an offer.  Cardinal agreed.

1256.    The Cardinal bid request was forwarded to Patel on the morning of January 2, 2014.  At 9:37 a.m. that morning, L.R., a customer marketing manager at Teva, suggested providing an offer to Cardinal at "10% under market intel pricing for [the] Watson/Actavis product." L.R. also stated:  "[i]f Cardinal is willing to wait until April, I suspect that Actavis isn't interested in picking up a lot of additional share."

1257.    Immediately after receiving that e-mail, at 9:40 a.m., Patel called Rogerson at Actavis and the two spoke for more than seventeen (17) minutes.  Shortly after hanging up the phone with Rogerson, at 10:12 a.m., Patel responded to the e-mail, saying:  "I think we have an opportunity to go higher.  Let's aim for around $148 net and request feedback."

1258.    On January 9, 2014, Teva learned that Cardinal had accepted Teva's bid at the higher price.  At 9:19 a.m., Patel called Rogerson at Actavis and they spoke for more than six (6) minutes.  Shortly after that call, at 9:45 a.m., Patel sent an e-mail internally at Teva stating:  "It looks like Cardinal accepted our bid at the higher price.  We may have an opportunity to take some increases."

1259.   When Patel sent her supervisor the initial list of "Increase Potentials Q1 2014" on January 14, 2014, Clarithromycin ER was on the list.

1260.   Similarly, in March 2014, Actavis implemented its own price increase on several other drugs, including some that overlapped with Teva.  Consistent with the ongoing understanding between these high-quality competitors, Actavis understood that Teva would follow the increases or, at a minimum, would not poach Actavis customers after the increase.

1261.   At 9:54 a.m. on March 14, 2014, Rogerson called Patel and left a message.  Patel called Rogerson back at 10:31 a.m., and the two spoke for more than twelve (12) minutes.  Within minutes after hanging up with Rogerson, Patel informed others at Teva about the Actavis increase:



In fact, these increases would not become effective until April 15, 2014, again demonstrating that Teva knew in advance of its competitors' price increase plans.

1262.   Within half an hour of sending that e-mail, Patel instructed colleagues to add the Actavis drugs to the Teva price increase list.  She added:  "We intend to follow where we can."

---

[175]   *Id.* at ¶ 776.

1263.   Less than two hours later, at 12:37 p.m., Patel called Rogerson again.  They spoke for more than five (5) minutes.  Shortly after hanging up the phone, at 12:51 p.m., Patel wrote another e-mail to certain colleagues at Teva, stating:  "Actavis took an increase.  We will follow. We need to review price per my alert list.  Let's wait to see what intel we can get and discuss Monday."

1264.   First thing the next business day – which was the following Monday, March 17, 2014 – Patel forwarded the "PI Candidates" list to K.G. at Teva.  The list included both Tamoxifen Citrate and Estazolam.  Later that morning, Patel called Rogerson.  After quickly exchanging voicemails, they spoke for more than nineteen (19) minutes.  Rekenthaler of Teva and Falkin of Actavis also exchanged four (4) text messages that day and had one call lasting more than six (6) minutes.

1265.   Teva followed the Actavis price increases on Tamoxifen Citrate and Estazolam less than three weeks later, on April 4, 2014.  Patel and Rogerson spoke twice by phone that day. Rekenthaler and Falkin also spoke by phone that day.  Because Teva was able to follow the price increase so quickly, Teva's increase became effective even before the Actavis price increase for those drugs.

1266.   After the price increases became effective, Teva took consistent steps not to disrupt the market or steal market share from Actavis.  For example, on May 14, Patel declined to bid at ABC on both Tamoxifen Citrate and Estazolam, stating:  "unable to bid (strategic reasons, for internal purposes)."  When Patel and her other conspirators at Teva used the term "strategic" in this context, it was code for the fact that there was an understanding in place with a competitor.

1267.   Similarly, on May 21, 2014, Teva received a request from a large customer for a bid on Tamoxifen Citrate.  As of that date, Teva had 58.4% of the market, and Actavis had 40.7%.  A Teva analyst forwarded the request to Patel and others, recommending (pursuant to the fair share understanding in the industry) that Teva not bid "as we are first in a two-player market with good share already."  Patel responded:  "Agree.  We should decline to bid."

d.      *Ketoconazole*

1268.   Patel identified Ketoconazole cream and Ketoconazole tablets as price increase candidates sometime in February 2014.  They were not listed on her original "Increase Potentials" list that she sent to K.G. on January 14, 2014, but they were on the list of "PI Candidates" that she sent to a colleague on February 26, 2014, with the following notes about each:

| | |
|---|---|
| Ketoconazole Cream | Shared with Taro and Sandoz |
| Ketoconazole Tab | Shared with Taro, Myl and Apo |

[176]

1269.   Taro was a common competitor on both drugs, but there were different sets of competitors for each formulation.  For Ketoconazole cream, Teva's competitors were Taro and Sandoz.  For Ketoconazole tablets, Teva's competitors were Taro, Mylan and Apotex.

1270.   Teva led the price increases for both drugs but made sure to coordinate with all of its competitors before (and as it was) doing so.  On April 4, 2014 – the day of the increases – Patel spoke separately with both Aprahamian of Taro and CW-1 of Sandoz.  During each call, she let them know that Teva was increasing the price of Ketoconazole.  The same day, Rekenthaler spoke to Nesta of Mylan; he had previously communicated with J.H., a senior sales executive at Apotex, on March 20 and 25, 2014.

---

[176]   *Id.* at ¶ 783.

1271.   On Ketoconazole cream, co-conspirators at Taro and Sandoz were also communicating directly with each other.  On April 4, 2014, for example, Aprahamian spoke to CW-3 at Sandoz for nineteen (19) minutes.  They discussed the Teva increase and the fact that Taro would follow.  CW-3 then sent an e-mail internally at Sandoz, alerting colleagues of the price increase and conveying information about Taro's price increase plans:



From: ▮
Sent: Friday, April 04, 2014 3:01 PM
To: ▮ Kellum, Armando; ▮
Subject: Ketoconazole Cream Price Increase

As an FYI, Teva increased contract price and WAC on Keto Cream yesterday (tripled).  Taro will more than likely follow shortly.  We should determine if Teva had additional increases yesterday as well. [177]

1272.   CW-1 at Sandoz immediately told his colleagues not to bid on any new opportunities for the drugs, and instead put the products on "strict allocation" until Sandoz determined how to proceed.

1273.   That same day, Aprahamian sent a similar e-mail internally to his colleagues at Taro.

1274.   The following Monday, April 7, 2014, Taro received a request from MMCAP seeking a competitive bid on Ketoconazole tablets due to the Teva price increase.  After reviewing the request, a Taro sales executive sent an internal e-mail stating:  "we are not going to bid this product.  .  .  .  Taro has 27% share in a 4-player market." In a follow-up e-mail, E.G., a Director of Corporate Accounts at Taro, confirmed that Taro would decline to bid, but indicated that Taro would need to lie about the reason:  "Yes, we are declining, but we need to advise its [sic.] due to supply."

---

[177]   *Id.* at ¶ 786.

1275.   Four days after the Teva increase, on April 8, 2014, Aprahamian called Patel and the two spoke for more than nineteen (19) minutes.  Later that same day, he initiated a price increase for all of Taro's customers on both the Ketoconazole cream and tablets.  Aprahamian directed that the notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014.

1276.   Although Sandoz immediately understood that it would follow these price increases, it was not able to implement them until October.  The delay was because Sandoz had contracts with certain customers that contained price protection terms which would impose substantial penalties on Sandoz if it increased its prices at that time – and those penalties would have caused Sandoz to miss certain financial targets during the months after April 2014.  At Sandoz, senior management held monthly budget meetings where they analyzed whether it made financial sense to implement a particular price increase.  In this case, the ramifications of the price protection terms did not make sense for Sandoz to follow until October 2014.

1277.   In the months after the Teva and Taro increases, Teva held up its end of the agreement not to poach its competitors' customers.  For example, on May 14, 2014, Teva was approached by Cardinal requesting a bid due to the Taro increase.  The e-mail from Cardinal was forwarded to Patel, who responded immediately:



[178]

---

[178]   *Id.* at ¶ 791.

1278.   Shortly before sending the e-mail, Patel exchanged several text messages with Aprahamian at Taro.  She would ultimately exchange eight (8) text messages and had one phone call lasting more than four (4) minutes with Aprahamian on that day.

1279.   Later that same day, Patel also directed that Teva decline to bid for Ketoconazole at ABC, citing the same logic:  "unable to bid (strategic reasons, for internal purposes)."

1280.   Sandoz ultimately followed the Teva and Taro increases for Ketoconazole cream on October 10, 2014.  That same day, Patel and CW-1 at Sandoz spoke for more than three (3) minutes.

1281.   The Teva increases on Ketoconazole were significant.  For the cream, Teva, Taro and Sandoz all increased the WAC price by approximately 110%.  For the tablets, Teva's WAC increases were approximately 250%, but its customer price increases were substantially larger – averaging 528%.

> e.    *Estradiol/Norethindrone Acetate and Cyproheptadine HCL*

1282.   Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases.  One of those new co-conspirators was Breckenridge.  Patel already had a relationship with S.C., a senior sales executive at Breckenridge, and Rekenthaler had a relationship with D.N., another senior sales executive at Breckenridge, so Breckenridge was a prime candidate to coordinate pricing.

1283.   On November 14, 2013, Breckenridge increased its pricing on both Estradiol/Norethindrone Acetate tablets (brand name Mimvey) and Cyproheptadine HCL tablets. Breckenridge had acquired the ANDA for Cyproheptadine HCL tablets in September 2013 from another manufacturer, and immediately sought to raise the prices previously charged by the prior manufacturer as it began to sell the product under its own label.  For Cyproheptadine HCL,

Breckenridge increased its WAC pricing by as high as 150% and raised its customer contract pricing even higher – 400%. The increases to Mimvey were a more modest 20-27% for both the WAC and customer pricing.

1284. In the weeks leading up to those increases – when Patel was still out on maternity leave – Rekenthaler had several phone calls with D.N. at Breckenridge to coordinate the price increases. The two spoke twice on October 14, 2013 and had a twenty-six (26) minute call on October 24, 2013. After those calls, they did not speak again until mid-January 2014, when Teva began preparing to implement its increase.

1285. Over the next several months – during the period of time before Teva was able to follow the Breckenridge price increases – Teva followed the "fair share" understanding to the letter.

1286. With respect to Cyproheptadine HCL, Teva had approximately 54% market share in a two-player market. For that drug, Teva consistently refused to bid or take on any additional market share after the Breckenridge increase. For example, on February 7, 2014, a customer gave Teva an opportunity to pick up new business on Cyproheptadine HCL. When she learned the news, Patel called S.C. at Breckenridge. They ended up speaking twice that day – the first and only phone calls ever between them. After speaking to S.C., Patel sent the following e-mail regarding the customer's request:



From:    Nisha Patel02
Sent:    Fri 2/07/2014 2:46 PM (GMT-05:00)
To:      ▮▮▮▮▮▮
Cc:
Bcc:
Subject: RE: Possible Indirect Additions - Safeway # 10769, 70, 71 & 72

Let's hold off on providing a bid. We can provide a bid when we are in a position to do so (post increase).

[179]

---

[179]  *Id.* at ¶ 801.

1287.  With regard to Estradiol/Norethindrone Acetate, however, Teva only had 19% market share in a two-player market.  For that drug, Teva sought to pick up a few customers to level the playing field – before raising its own prices to follow Breckenridge.

1288.  On April 4, 2014, Teva followed the Breckenridge price increases with substantial increases of Estradiol/Norethindrone Acetate (contract increases of as much as 393%) and Cyproheptadine HCL tablets (contract increases of as much as 526%).  In addition, Teva increased the WAC price on Estradiol/Norethindrone Acetate by 26% and the WAC price on Cyproheptadine HCL Tablets by as much as 95% — to exactly match Breckenridge's WAC price on both products.

<em>f.     Diflunisal</em>

1289.  Non-Defendant Rising became a more appealing potential co-conspirator when CW-2, who had formerly been employed at Sandoz, left to join Rising in August 2013. Rekenthaler had known CW-2 for many years, going back to when they both worked together at Teva several years prior.

1290.  Of the drugs on the Teva April 4, 2014 price increase list, Rising was a competitor on Diflunisal.  For that drug, Rising had 21% market share in a two-player market with Teva as of March 2014.

1291.  Rekenthaler spoke to CW-2 of Rising on December 5, 2013 for fourteen (14) minutes.  When Patel sent her initial list of "Increase Potentials" to K.G. on January 14, 2014, Diflunisal was on the list, with Teva expecting to lead the increase.

1292.  Teva and Rising continued to coordinate the increase over the next several months.  For example, when Patel sent a nearly final list of "PI Candidates" to her supervisor K.G. on March 17, 2014, she included the following notation about Diflunisal:

| Diflunisal | Shared only with Rising |
|---|---|

[180]

1293.   That same day, Rekenthaler spoke with CW-2 twice.  During those calls, CW-2 informed Rekenthaler that Rising was having supply problems for Diflunisal and might be exiting the market at some point in the future.  CW-2 confirmed that it would be a good opportunity for Teva to take a price increase.

1294.   Rekenthaler and CW-2 spoke once again on March 31, 2014, shortly before the Teva price increase for Diflunisal.  On April 4, 2014, Teva increased is WAC pricing on Diflunisal by as much as 30%, and its contract pricing by as much as 182% for certain customers.

1295.   Rising ultimately exited the Diflunisal market for a short period of time starting in mid-July 2014.  When Rising decided to exit the market, CW-2 called Rekenthaler to let him know.  Four months later – when Rising's supply problems were cured – Rising re-entered the market for Diflunisal.  Consistent with the fair share principles and industry code of conduct among generic drug manufacturers discussed more fully above, CW-2 and Rekenthaler spoke by phone on several occasions in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4, 2014.  On December 3, 2014, Rising re-entered the market for Diflunisal tablets.  Its new pricing exactly matched Teva's WAC price increase from April 2014.

---

[180]   *Id.* at ¶ 807.

g.    *Ethosuximide*

1296.   On the April 4, 2014 Teva price increase list, non-Defendant VersaPharm was a competitor on two different drugs:  Ethosuximide capsules and Ethosuximide oral solution.

1297.   When Patel began creating the price increase list, neither of these drugs was considered a candidate for an increase.  For example, when Patel sent her initial "Increase Potentials" list to K.G. in mid-January 2014, neither drug was on the list.

1298.   Non-Defendant VersaPharm was not considered a high-quality competitor.  When Patel created the quality competitor rankings in May 2013, non-Defendant VersaPharm was given a -2 score in the rankings.  That did not stop Rekenthaler, however, from calling J.J., a senior national account executive at non-Defendant VersaPharm, and speaking for five (5) minutes on January 22, 2014.  When Patel sent the next "PI Candidate" list to a colleague on February 26, 2014 – Ethosuximide capsules and oral solution were both on the list, with the following notation:

| Ethosuxamide Liquid | Shared only with Versa; test quality of competitor | |
|---|---|---|
| Ethosuxamide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE | 181 |

1299.   Rekenthaler called again and spoke with J.J. at non-Defendant VersaPharm on March 7, 2014.  Teva then raised prices on both drugs on April 4, 2014.  For Ethosuximide capsules, Teva raised its WAC price by 87%, and its contract prices by up to 322%.  For Ethosuximide oral solution, Teva raised its WAC price by 20% and its contract prices by up to 81%.

---

[181]   *Id.* at ¶ 812.

1300.   On April 9, 2014 – only five days after the Teva increase – non-Defendant VersaPharm increased its pricing on both Ethosuximide capsules and oral solution to a price that was nearly identical to Teva's price.

1301.   Following their agreement on those two drugs, and with no reason to speak further, Rekenthaler and J.J. of non-Defendant VersaPharm never spoke by phone again.

**11.    Impact of April 4, 2014 Price Increases to Teva**

1302.   A few weeks after Teva's April 4, 2014 price increases went into effect, Patel calculated the impact to Teva's net sales as a result of the April 4 increase.  Based on her analysis, she found that the April 4, 2014 price increases resulted in a net increase in sales to Teva of $214,214,338 per year.

1303.   For those drugs where Teva was leading the price increases on August 28, 2014, several of Teva's competitors followed in short order and those price increases were also coordinated.

1304.   For example, on October 10, 2014 Sandoz followed Teva's price increases on three drugs:  (1) Amoxicillin/ Glavulanate chewable tablets; (2) Diclofenac Potassium tablets; and (3) Penicillin VK tablets.  Patel of Teva spoke to CW-1 of Sandoz on the day of the Sandoz price increases for more than three (3) minutes.

1305.   Then, on December 19, 2014, Actavis followed the Teva price increase on Desmopressin Acetate tablets.  Rekenthaler of Teva and Falkin of Actavis spoke frequently in the days and weeks leading up to the Actavis price increase, including calls on November 18, November 21, and November 25, 2014.

1306.   Indeed, even before Actavis followed the Teva price increase, Teva knew that Actavis planned to increase.  For example, on October 15, 2014 – approximately six weeks before Actavis raised its price – Teva received a request from a customer asking Teva to reduce

its pricing on Desmopressin Acetate because it was no longer offering competitive prices.

Patel's initial response to the customer was "[w]e believe the market is still settling on this

product.  Can you please review in a few days and advise of more current pricing intelligence?"

In a subsequent internal discussion, Patel wrote:  "I can't quite recall if Actavis followed us or

we followed them....but they definitely did not change their WACs recently."

1307.   Similarly, on March 4, 2015, Mylan followed the Teva and Sandoz price

increases on Diclofenac Potassium tablets.  Rekenthaler coordinated that price increase with

Nesta of Mylan during two phone calls on February 18 and one call on February 19, 2015.

**12.    April 15, 2014 Price Increase (Baclofen)**

1308.   Effective February 21, 2014, Upsher-Smith took a significant price increase on

Baclofen, ranging from 350 - 420% to the WAC price, depending on the formulation.  Prior to

the increase, Baclofen was not a profitable drug for Upsher-Smith, and Upsher-Smith was

considering whether to exit the market or significantly raise price.  It chose the latter.

1309.   The primary competitors in the market for Baclofen at this time were Teva

(62.4%), Qualitest (22.5%), and Upsher-Smith (6.8%).

1310.   Teva initially considered following the Upsher-Smith price increase quickly, as

part of its April 4, 2014 price increases – but decided against it.  The primary reason was that

Qualitest was in the market, and Teva considered Qualitest a "low-quality" competitor.  In other

words, Qualitest would likely compete for market share if Teva increased its price.

1311.   Starting on April 10, 2014, however, Teva learned that Qualitest was having

supply problems, and could exit the market for at least 3-4 months, if not permanently.

1312.   Upon learning that the only significant remaining competitor in the market would

now be Upsher-Smith – a high-quality competitor – Teva immediately decided to follow the

price increase.  Patel asked one of her direct reports to start working up price increase scenarios for Baclofen that same day.

1313.   Upsher-Smith was a highly-ranked competitor by Patel (+2) in large part because of Patel's relationship and understanding with B.L., a national account executive at Upsher-Smith.  In the week before she started her employment at Teva (after leaving her previous employment), Patel and B.L. exchanged several text messages.  During her first week on the job, as she was beginning to identify price increase candidates and "high quality" competitors, Patel spoke to B.L. on April 29, 2013 for nearly twenty (20) minutes.  During these initial communications, Patel and B.L. reached an understanding that Teva and Upsher-Smith would follow each other's price increases, and not compete for each other's customers after a price increase.  Their agreement was further cemented in June and July 2013, when the two competitors agreed to substantially raise the price of Oxybutynin Chloride.

1314.   There was no need for the two competitors to communicate directly in this situation because it was already understood between them that Teva would follow an Upsher-Smith price increase based on Patel's prior conversations with B.L. and based on the history of collusion between the two competitors.

1315.   Effective April 15, 2014, Teva raised its WAC and AWP pricing to match Upsher-Smith's pricing exactly.  Teva increased its WAC pricing from 350% to 447%, depending on the dosage strength.  Teva would not have increased its prices on Baclofen unless it had an understanding in place with Upsher-Smith.

1316.   Pursuant to the agreement between the companies, Teva did not seek to take any customers from Upsher-Smith during the time period after Upsher-Smith's increase and before Teva could follow.  Even after Teva's increase, when Qualitest customers approached Teva for a

bid due to Qualitest's supply problems, Teva deferred to Upsher-Smith.  As Patel told K.G. in a June 11, 2014 e-mail:  "Dynamics have changed, but I think we need to see if Upsher wants to pick up share.  We have an unreasonably high share." K.G. agreed:  "I think this is the right thing to do.  .  .  .  we should just give them a high bid."

1317.   Upsher-Smith, on the other hand, was able to secure several new customers as a result of the Qualitest exit.  In short order, Baclofen became a very profitable product for Upsher-Smith.  On April 18, 2014 – only three days after the Teva price increase – J.M., a Senior Director of Sales and Marketing at Upsher-Smtih, made the following pronouncement:



1318.   Only two months later, Lannett would enter the market at the same WAC prices as Teva and Upsher-Smith.  As discussed more fully above, Teva and Lannett colluded so that Lannett could enter the market seamlessly without significantly eroding the high prices in the market.

1319.   According to NADAC data, the average market price for Baclofen remained steady prior to the spring of 2014.  From November 2013 through March 2014, the average market price of Baclofen fluctuated by less than $0.003 per unit for 10mg tablets and by less than $0.0065 per unit for 20mg tablets.

---

182   *Id.* at ¶ 827.

1320.   Beginning around February 2014, however, the overall average market price rose by more than 550%.  These price increases affected both dosages of Baclofen, *i.e.* 10mg and 20mg tablets.

1321.   According to NADAC data, the average market price for Baclofen increased by the following percentages:

> Baclofen 10mg tablet:  Between March 2014 and April 2014, prices increased 636%; and
>
> Baclofen 20mg tablet:   Between March 2014 and January 2015, prices increased 437%.

1322.   WAC data confirms that Teva and Upsher-Smith both imposed dramatic price increases for Baclofen consistent with the timing of the communications set forth above, by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Upsher-Smith | **00832102500** | $0.10 | $0.49 | 2/21/2014 | 420% |
| 100ct | Teva | **00172409760** | $0.10 | $0.49 | 4/15/2014 | 420% |
| 1,000ct | Upsher-Smith | **00832102510** | $0.10 | $0.49 | 2/21/2014 | 420% |
| 1,000ct | Teva | **00172409780** | $0.09 | $0.49 | 4/15/2014 | 447% |

1323.   Although WAC data is not available for Par, upon information and belief, it implemented nearly simultaneous and identical price increases as Upsher-Smith and Teva.  And as set forth above, when Lannett entered the market, it came in at the exact same WAC price as Teva.

### 13.   July 1, 2014 Price Increase (Fluocinonide)

1324.   There are several different formulations of Fluocinonide including, among others: Fluocinonide 0.05% cream, Fluocinonide 0.05% emollient-based cream, Fluocinonide 0.05% gel and Fluocinonide 0.05% ointment.  As of June 2014, Teva, Taro, Sandoz, and Fougera were the only three manufacturers actively selling any of the four Fluocinonide formulations mentioned

above.  On June 11, 2014, Teva identified the market-share breakdown for each of the different formulations of those drugs as follows:

| Product Description | Teva Market Share | Market Data |
|---|---|---|
| FLUOCINONIDE CREAM 0.05% 15GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM 0.05% 30GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM 0.05% 60GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM-E 0.05% 15GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE CREAM-E 0.05% 30GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE CREAM-E 0.05% 60GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE GEL 0.05% 60GM | 26.0% | Taro 61.7% |
| FLUOCINONIDE OINTMENT 0.05% 15GM | 53.8% | Taro 37.7%; Sandoz 8.5% |
| FLUOCINONIDE OINTMENT 0.05% 30GM | 53.8% | Taro 37.7%; Sandoz 8.5% |
| FLUOCINONIDE OINTMENT 0.05% 60GM | 53.8% | Taro 37.7%; Sandoz 8.5% |

[183]

1325.   As discussed above, Teva coordinated with Taro and Sandoz to increase the price of all four of those formulations of Fluocinonide in July 2013, based in part on discussions that started between Patel and Aprahamian even before Patel started her employment at Teva.  The increases to the WAC prices in 2013 were a modest 10-17%, depending on the formulation.

1326.   The second coordinated increase of Fluocinonide was much more significant. Taro raised its prices for all four Fluocinonide formulations effective June 3, 2014.  For each, the increases to Taro's WAC prices are set forth below:

| Formulation | Percentage Increase to WAC |
|---|---|
| Fluocinonide 0.05% Cream | 206 – 754% |
| Fluocinonide 0.05% Gel | 155 – 255% |
| Fluocinonide 0.05% Ointment | 206 – 483% |
| Fluocinonide Emollient-Based 0.05% Cream | 160 – 430% |

[184]

1327.   Taro notified its customers of the increases the day before they became effective – June 2, 2014.

1328.   Patel knew of these (and other) Taro increases well in advance and was prepared so that Teva would be able to quickly follow the price increases.  Patel was already preparing for

---

[183]   *Id.* at ¶ 830.

[184]   *Id.* at ¶ 832.

the next round of Teva price increases in June 2014; many of which would ultimately be implemented by Teva in August.

1329.   On May 14, 2014, Patel and Aprahamian exchanged eight (8) text messages and had one phone conversation lasting more than four (4) minutes.

1330.   Subsequent to the May 14 communications Patel directed a colleague to create a list of future price increase candidates, based on a set of instructions and data she had given him. On May 28, 2014, that colleague sent her a list titled "2014 Future Price Increase Candidate Analysis." The list included several drugs sold by Taro – including the four formulations of Fluocinonide (plus Carbamazepine and Clotrimazole) – with the notation "Follow/Urgent" listed as the reason for the increase, *even though Taro had not yet increased its price on those drugs or notified its customers that it would be doing so*.  The relevant portions of that spreadsheet are set forth below:

| Item Description | Product Family | BUCKET |
|---|---|---|
| CARBAMAZEPINE TABLETS 200MG 100 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 15GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 30GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 60GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 15GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 30GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 60GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE GEL 0.05% 60GM | FLUOCINONIDE TOPICAL GEL | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 15GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 30GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 60GM | FLUOCINONIDE OINTMENT | Follow/Urgent |

[185]

1331.   On June 3, 2014 – the day the Taro increases on Fluocinonide became effective – CVS reached out to T.C., a senior sales executive at Teva, indicating that it had an "immediate opportunity" on Fluocinonide 0.05% Cream and Fluocinonide 0.05% Emollient Cream, but did not give a reason for providing that opportunity to Teva.  The CVS representative offered to

---

[185]   *Id.* at ¶ 835.

move a significant amount of business from Taro to Teva, stating: "Opportunity knocks." The e-mail was forwarded to Patel, who responded:

> **From:** Nisha Patel02
> **Sent:** Tuesday, June 03, 2014 12:46 PM
> **To:**
> **Subject:** Re: Fluocinonide Cream
>
> I suspect a price increase...and we would likely follow.
>
> Sent from my iPhone

[186]

1332.   Of course, Patel already knew the bid request was due to a price increase, because she had spoken to Aprahamian in May and included Fluocinonide on her list of price increases with a notation to "Follow/Urgent." But she still needed to determine the specific price points so that Teva could follow quickly.

1333.   T.C. stated that she had not heard about a price increase from anyone else but indicated that she would "snoop around." Patel stated: "OK.  Thanks.  I'll do the same."

1334.   Patel immediately began snooping around by exchanging five (5) text messages with Aprahamian at Taro.  Later that afternoon, she reported that she had "[c]onfirmed that Taro increased," but that she was "still working on intel." K.G. at Teva suggested that it might be a good opportunity to take some share from Taro – the market share leader on several of the Fluocinonide formulations.  He asked Patel to provide "guidance" by the next day.  Patel responded at 4:23 p.m., making it clear that she had been talking to Aprahamian not only about Fluocinonide, but other drugs as well:

> I expect to provide guidance at some point in the morning.  I'm also
> hearing Warfarin, Carbamazepine as well.  I'll be looking at shares

---

[186]   *Id.* at ¶ 836.

and intel tomorrow and will provide commentary.  (Taro is a high quality competitor.  It's just a matter of who the others are.)

1335.   Shortly after sending that e-mail Patel called Aprahamian and they spoke for nearly seven (7) minutes.  As discussed more fully below, Taro had also increased its prices for Warfarin Sodium and Carbamazepine on June 3.  Teva followed those substantial Taro price increases with equally substantial increases of its own in August.

1336.   First thing the next morning – June 4, 2014 – Patel exchanged two (2) more text messages with Aprahamian, and then the two spoke on the phone for more than twenty-five (25) minutes.  Within minutes after hanging up the phone with Aprahamian, Patel sent the following e-mail to K.G., making it clear that she had obtained additional "intel" that she did not want to put in writing:



[187]

1337.   That same day, Teva received a bid request from another large customer, Walmart.  Shortly after that e-mail was forwarded to her, Patel responded by making it clear that

---

[187]   *Id.* at ¶ 839.

Teva would play nice in the sandbox with Taro:



From:     Nisha Patel92
Sent:     Wed 6/04/2014 2:09 PM (GMT-05:00)
To:
Cc:
Bcc:
Subject: RE: Item Questions

[Please consider the Taro items alert items.] Based on quality of competitor, the intention of being responsible in the market, and market share, below is my commentary:

1. Gel: WAC issue. I estimate that WM nets are right around our WAC. Recommend bidding right below WAC, assuming we can supply.
2. Ointment: Should not pursue. We have reasonable share.
3. Cream: Since we are pursuing CVS, and assuming it works out, we should probably not pursue.

188

1338.   After further deliberation, Teva decided not to bid on any of the Walmart business at all.

1339.   On June 23, 2014, as Teva was planning to implement a price increase on Fluocinonide to follow the Taro increase, Patel forwarded a spreadsheet to a subordinate with "intel" she had obtained directly from Aprahamian.  That spreadsheet contained specific Taro customer price points for the different formulations of Fluocinonide for each of the various classes of trade (i.e., wholesalers, chain drug stores, mail order and GPO).  Prior to sending that "intel," Patel had spoken to Aprahamian on June 17 for fifteen (15) minutes, and June 19 for nearly fourteen (14) minutes.  The contract price points obtained by Patel were not otherwise publicly available.

1340.   Sandoz was also a competitor on two formulations of Fluocinonide – Fluocinonide ointment and Fluocinonide gel – but was only actively marketing the gel.  Not coincidentally, Aprahamian was having similar communications with his contact at Sandoz, CW-

---

188   *Id.* at ¶ 840.

3, during this time period.  At least some of those calls are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 6/17/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/19/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:10:00 |

[189]

1341.   During one of the calls on June 20 referenced above, Aprahamian dictated to CW-3 over the telephone specific Taro contract price points for each of the same classes of trade that he had provided to Patel, for Fluocinonide ointment, Fluocinonide gel, and various other drugs that Taro had increased that overlapped with Sandoz.  CW-3 took very detailed notes of the pricing information Aprahamian provided, which again were not publicly available.  Based on a history and pattern of practice between CW-3 and Aprahamian, it was understood that Sandoz would follow the Taro price increase.

1342.   On June 26, 2014, Teva sent out a calendar notice to a number of sales and pricing employees – including Patel and Rekenthaler – for a 3 p.m. conference call that day.  The notice stated:  "We will discuss the upcoming price increase for all Fluocinonide products:  Fluocinonide Cream, Fluocinonide E-Cream, Fluocinonide Gel, Fluocinonide Ointment.  We are targeting an announcement date of Monday, June 30th for an effective date of July 1st."  The next morning, at 9:57 a.m., Patel and Aprahamian spoke again for nearly thirteen (13) minutes.

1343.   The Teva price increases on Fluocinonide became effective on July 1, 2014.  Teva increased its WAC pricing to match Taro's pricing almost exactly.  That same day, Patel spoke

---

[189]  *Id.* at ¶ 842.

to her contact at Sandoz - CW-1 – several times, including at least those calls set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:54:45 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 9:59:38 | 0:01:34 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 15:05:31 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:10:28 | 0:00:11 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:13:36 | 0:01:59 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:21:17 | 0:07:14 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 17:58:19 | 0:19:46 |

[190]

1344.   During those calls, Patel informed CW-1 of the Teva price increase and provided specific price points to CW-1 so that Sandoz would be able to follow the price increase.

1345.   These price increases are reflected in WAC data:

| Product Cream .05% | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|--------------------|-----------|---------|---------|------------------|---------------------|
| 15gm | Taro | $.79 | $2.43 | June 3, 2014 | 206% |
| 30gm | Taro | $.56 | $2.43 | June 3, 2014 | 337% |
| 60gm | Taro | $.39 | $2.43 | June 3, 2014 | 524% |
| 15gm | Teva | $.79 | $2.43 | July 1, 2014 | 206% |
| 30gm | Teva | $.56 | $2.43 | July 1, 2014 | 337% |
| 60gm | Teva | $.39 | $2.43 | July 1, 2014 | 524% |

1346.   The average market price for Fluocinonide remained artificially high after July

---

[190] *Id.* at ¶ 844.

2014, according to NADAC data:



1347.   Sandoz was in the process of exiting the market for Fluocinonide ointment (it had ceased its sales by September 2014 but followed the increase on the gel three months later, on October 10, 2014).  Sandoz increased its WAC pricing on the gel by 491%.  That same day, Patel spoke to CW-1 at Sandoz by phone for more than three (3) minutes.

1348.   During this time period, Actavis had also started to re-enter the market for Fluocinonide 0.05% cream but had not yet gained any significant market share due to supply problems.  Nonetheless, Actavis still followed the Taro and Teva price increases in December 2014 by raising its prices to the exact WAC prices as Teva and Taro.  The Actavis price increase on Fluocinonide cream was effective December 19, 2014.  Not surprisingly, in the days and weeks leading up to the Actavis price increase, the co-conspirators at Actavis, Taro and Teva were all communicating frequently.  At least some of those communications are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:39 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:06 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:16 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:22 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:07 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:07:59 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:37 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:02:00 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:16:00 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:35 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:08:00 |
| 12/18/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:40 |

[191]

**14.   August 28, 2014 Price Increases**

1349.   On August 28, 2014, Teva raised prices on a number of different drugs, including: Amiloride HCL/HCTZ Tablets; Amoxicillin/Clav Tablets; Carbamazepine Chewable Tablets;

---

[191]   *Id.* at ¶ 846.

Carbamazepine Tablets; Cimetidine Tablets; Clemastine Fumarate Tablets; Clotrimazole Topical

Solution; Desmopressin Acetate Tablets; Diclofenac Potassium Tablets; Dispyramide Phosphate

Capsules; Enalapril Maleate Tablets; Epitol Tablets; Flurbiprofen Tablets; Flutamide Capsules;

Fluvastatin Sodium Capsules; Hydroxyurea Capsules; Loperamide HCL Capsules; Penicillin VK

Tablets; Prazosin HCL Capsules; Prochlorperazine Tablets; Topiramate Sprinkle Capsules; and

Warfarin Sodium Tablets.[192]

1350.   In the days and weeks leading up to the price increase, Patel and Rekenthaler

were communicating with every high-quality competitor on those drugs to coordinate the

increases in advance.  At least some of those communications are set forth in the graphic at page

250 of the Amended State AG Complaint No. 2.  Those communications included

communications between Teva and Mylan regarding Amiloride HCL/HCTZ Tablets; between

Teva and Sandoz regarding Amoxicillin/Clav Chew Tablets; between Teva and Taro regarding

Carbamazepine Chewable Tablets; between Teva, Taro, and Apotex regarding Carbamazepine

Tablets; between Teva, Mylan, and Apotex regarding Cimetidine Tablets; between Teva and

Sandoz regarding Clemastine Fumarate Tablets; between Teva and Taro regarding Clotrimazole

Topical Solution; between Teva and Actavis regarding Desmopressin Acetate Tablets; between

Teva, Mylan, and Sandoz regarding Diclofenac Potassium Tablets; between Teva and Actavis

regarding Disopyramide Phosphate Capsules; between Teva, Mylan, Taro, and Wockhardt

regarding Enalapril Maleate Tablets; between Teva, Apotex, and Taro regarding Epitol Tablets;

between Teva and Mylan regarding Flurbiprofen Tablets; between Teva, Actavis, and Par

regarding Flutamide Capsules; between Teva and Mylan regarding Fluvastatin Sodium Capsules;

---

[192]   *Id.* at ¶ 847.

between Teva and Par regarding Hydroxyurea Capsules; between Teva and Mylan regarding

Loperamide HCL Capsules; between Teva, Aurobindo, and Sandoz regarding Penicillin VK

Tablets; between Teva and Mylan regarding Prazosin HCL Capsules; between Teva, Mylan, and

Sandoz regarding Prochlorperazine Tablets; between Teva, Actavis, and Zydus regarding

Topiramate Sprinkle Capsules; and between Teva, Amneal, Taro, Upsher-Smith, and Zydus

regarding Warfarin Sodium Tablets.

1351.   The day before the increases became effective – August 27, 2014 – Patel spent

most of her morning discussing the price increases with her contacts at Sandoz, Actavis, Taro,

Zydus and Glenmark:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:11:03 | 0:11:13 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:19 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:42 | 0:00:03 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:27:27 | 0:02:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:31:03 | 0:00:33 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:32:42 | 0:20:31 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:01 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:06 | 0:00:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:58:01 | 0:16:23 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 9:23:26 | 0:18:34 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 10:34:34 | 0:00:06 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 16:29:08 | 0:07:52 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:09:15 | 0:00:06 |

[193]

1352.   In addition to those phone communications noted above, representatives from

Teva and every other Defendant met in Boston, Massachusetts shortly before the increase, from

August 23-26, 2014, for the NACDS annual event, which was the largest pharmaceutical

industry meeting of the year.  Cavanaugh, Rekenthaler and Patel, along with many other Teva

executives, as well as executives from every other corporate Defendant, attended.

1353.   With regard to Enalapril Maleate, Patel was speaking to Aprahamian at Taro as

shown above.  Aprahamian, in turn, spoke to M.C., the Vice President of Sales and Marketing at

---

[193]   *Id.* at ¶ 848.

Wockhardt, on August 8, 2014 for thirteen (13) minutes, and again twice on August 14, 2014, including one call lasting eight (8) minutes.

1354.   Similarly, with regard to Prochlorperazine, Rekenthaler communicated with Nesta at Mylan on August 7 and August 11.  Nesta, in turn, communicated with M.D., a senior sales executive at non-Defendant Cadista Pharmaceuticals, on the same days that he had been communicating with Rekenthaler.

1355.   A large number of the drugs on Teva's August 28, 2014 price increase list were selected because Teva was following a "high quality" competitor.  The coordination between Teva and certain co-conspirators regarding those drugs is discussed more fully below.

        *a.*      *Mylan*

1356.   Effective April 17, 2014, Mylan increased its WAC pricing on a number of different drugs, including several that overlapped with Teva.  Mylan also increased its contract prices, but at least some of those price increases would not become effective until mid-May 2014.

1357.   Pursuant to the established understanding between the two companies, Teva immediately decided that it would follow the Mylan increases.  On April 21, 2014, T.S., a national account executive at Teva, forwarded to Patel two spreadsheets with WAC and AWP pricing information for the price increases taken by Mylan.  The spreadsheets were created by Mylan personnel.

1358.   Patel, in turn, forwarded the e-mail to the Teva sales team and stated:  "Our intention is to follow Mylan on this increase.  Below, you will see the list of increase items where Teva overlaps with Mylan.  Please share any pricing intelligence you are able to obtain. Thank you in advance!" The list that Patel referred to included the following products, several of which had been the subject of coordinated price increases in 2013 as well:  Amiloride

HCL/HCTZ tablets; Cimetidine tablets; Enalapril Maleate tablets; Fluvastatin Sodium capsules;

Loperamide HCL capsules; Prazosin HCL capsules; and Sotalol HCL tablets.

1359.   Within days, Teva began receiving requests from its customers for bids due to the

Mylan price increases.  On April 24, 2014, Patel began to formulate a "Mylan Increase Strategy"

in order to respond to those requests but noted that Teva was "still awaiting intel" about the

Mylan customer contract price points, which were not publicly available.  Previously, Patel had

relied on Green to obtain specific Mylan customer price points (referred to as "intel") through his

communications with Nesta of Mylan, which she used to follow Mylan's pricing.  The next day,

in a follow-up e-mail about the Mylan strategy, Patel noted that one of her Mylan increase

strategies would not have been appropriate for this situation, and concluded that:  "Plus, we

really need some intel" about the Mylan contract price points.

1360.   Patel continued to push for specific contract price points from Mylan.  On April

28, 2014, Patel sent an e-mail to the Teva sales team, stating:  "To date, we have no intel on

Mylan's recent increases.  I realize there is a lot of travel going on, but whatever you can gather

and share would be greatly appreciated."

1361.   On May 9, 2014, Patel sent another e-mail:



194

194   *Id.* at ¶ 859.

1362.   Shortly after receiving that e-mail – at 11:15 a.m. that morning – Rekenthaler called Nesta at Mylan and left a message.  Nesta returned the call at 11:23 a.m., and the two spoke for nearly eight (8) minutes.

1363.   Separately, and before Rekenthaler was able to convey any information he had obtained, Patel forwarded a customer request from ABC (relating to the Mylan increase items) directly to T.S. at Teva, lamenting the absence of Green to obtain the Mylan intel:

> I am in a really tough spot on these.  Please help! There are several requests open for offers, but I have ZERO intel.  A little frustrating/discouraging, as we are bound to hear complaints on how long it took to close the Delphi request.  Is there anything you are able to get to help when you are back? . . .  At some point, I know I'll have to find another source of magic :))[195]

1364.   The next day, T.S. sent Patel an e-mail with an attached spreadsheet listing the Mylan contract price points for all of the recent increases:



From:
Sent:        Tue 5/13/2014 1:34 PM (GMT-05:00)
To:          Nisha Patel02
Cc:
Bcc:
Subject:     FW: Dirt
Attachments: Mylan-Price List A.xlsx

FYI

[196]

1365.   The e-mail was unclear on where T.S. had obtained this "dirt," but the spreadsheet attached to her e-mail was created by a Mylan employee.

1366.   Rekenthaler and Nesta spoke again on May 20, 2014.  Armed with this new source of "intel," Patel was more confident that Teva could follow the Mylan price increases exactly, without disrupting the market.  That same day, as Patel began to create a new list of

---

[195]   *Id.* at ¶ 860.

[196]   *Id.* at ¶ 861.

Teva price increase candidates, she instructed a colleague to include the Mylan drugs for which
Mylan had increased price – with specific price points – as its own separate tab in the
spreadsheet, called "follow." Her colleague provided the list, as requested, on May 21.

1367.   On May 27, 2014, Rekenthaler and Nesta spoke twice, including one call lasting
nearly four (4) minutes.  By May 28, Teva had a much more comprehensive list of price increase
items.  On that list, seven of the Mylan items were prominently listed with a "Follow Urgent"
notation listed next to each:

| Item Description | BUCKET | Comments |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 100 | Follow/Urgent | Follow Mylan Increase |
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 1000 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 800MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 1000 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 500 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 1MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 2MG 1000 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 2MG 1000 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 250 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 500 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 80MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 120MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 160MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 240MG 100 | Follow/Urgent | Follow Mylan Increase |

[197]

---

[197]   *Id.* at ¶ 863.

1368.   Also on the list were three additional Mylan drugs for which Teva would be leading the price increase:  Diclofenac Potassium tablets; Flurbiprofen tablets; and Prochlorperazine tablets.

b.    *Taro*

1369.   Taro also significantly raised its prices on the following drugs which overlapped with Teva:  Carbamazepine chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, and Warfarin Sodium tablets.

1370.   Patel learned of the price increases for certain of these drugs in advance, based on her conversations with Aprahamian.  It was understood that Teva would follow the Taro price increases based on these and prior conversations.  In fact, Teva agreed and made plans to follow them before Taro had even put them into effect.

1371.   Specifically, on May 28, 2014, T.S. of Teva sent Patel the then-current version of her "Future Price Increase Candidate" spreadsheet.  That list included the following Taro drugs, which had not yet been increased by Taro:

| Item Description | BUCKET |
|---|---|
| CARBAMAZEPINE TABLETS 200MG 100 | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | Follow/Urgent |

[198]

1372.   Patel likely obtained this information from Aprahamian on May 14, 2014, when the two exchanged eight (8) text messages and spoke for more than four (4) minutes by phone.

1373.   On June 3, 2014 – the date of the Taro price increases on Fluocinonide, Carbamazepine, Clotrimazole, Warfarin Sodium and other drugs – Patel and Aprahamian

---

[198]   *Id.* at ¶ 867.

exchanged five (5) text messages.  After exchanging those text messages, Patel confirmed to her supervisor K.G. and another Teva representative that Taro had in fact raised its pricing on Fluocinonide.  Patel then added:  "I expect to provide guidance at some point in the morning. I'm also hearing Warfarin, Carbamazepine as well.  I'll be looking at shares and intel tomorrow and will provide commentary.  (Taro is a high-quality competitor.  It's just a matter of who the others are.)"  At 5:08 p.m. that evening, Patel called Aprahamian and the two spoke for nearly seven (7) minutes.

1374.   First thing the next morning, Patel and Aprahamian exchanged two (2) text messages.  Then, at 9:56 a.m., the two spoke again for almost twenty-six (26) minutes.  Shortly after hanging up the phone with Aprahamian, Patel sent an e-mail to K.G. making it clear that she had obtained additional "intel" regarding the Taro price increases that she did not want to put into writing, stating:  "I have additional intel (I can discuss with you) that will be useful."

1375.   On June 12, 2014, Teva internally discussed future projections regarding Carbamazepine – including the fact that its API supplier might run out of supply sometime in 2015.  One of the options discussed was a price increase.  K.G. – aware that Patel had been in discussions with Aprahamian and had "intel" regarding the Taro price increase on Carbamazepine (and other drugs) – stated:  "Nisha [Patel] would be able to provide guidance relative to [the Carbamazepine] price increase for the analysis being put together."  In fact, Patel had communicated with Aprahamian earlier that same day for more than nine (9) minutes.

1376.   One of the drugs that Taro increased on June 3, 2014 was Warfarin Sodium tablets.

1377.   As of June 2014, there were three competitors in the market for Warfarin Sodium: Teva, Taro and Zydus.  Ten days after Taro increased its price, Zydus quickly followed with a

price increase of its own on June 13, 2014.  In the days between the Taro and Zydus price increases for Warfarin Sodium, Teva, Taro and Zydus coordinated through various phone communications with each other, including at least the following:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/4/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:11:28 | 0:00:00 |
| 6/4/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 9:16:52 | 0:00:00 |
| 6/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:56:52 | 0:25:57 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/12/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:57:50 | 0:09:18 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

[199]

1378.   On June 13, 2014 – the date of the Zydus increase on Warfarin Sodium – Teva was presented with an offer from a customer for a one-time buy on that drug.  Patel responded that "[w]e will review, but note that we intend to follow [the] Taro and Zydus increase price." Later that same day, Patel sent an internal e-mail alerting her group, including her supervisor K.G., about a list of drugs on which Teva planned to raise prices.  A number of them – including Carbamazepine chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, Fluocinonide cream, emollient cream, gel and ointment, and Warfarin Sodium tablets – included the notation "Follow/Urgent - Taro" as the reason for the increase.  For that list of drugs, Patel directed that "we should not provide any decreases on these products." Patel's directive meant that Teva would not seek to compete for market share against Taro or Zydus when approached by customers due to those competitors' price increases.

1379.   On June 18, 2014, Patel sent that same list to the entire sales team at Teva, informing them of the status of Teva's next price increase.  She noted that Teva had already been "receiving multiple requests on several items that are prioritized as increase candidates." Patel continued:  "While we do not have an exact date of increase, we are taking our increase plans

---

[199]   *Id.* at ¶ 872.

into consideration and are bidding on new business at the planned increase price where our WAC allows." Finally, Patel stated:

> This is all in consideration of market factors, quality of competitors, current market share (including McK RFP results) and intelligence we have been able to gather. As you know, each situation is unique, but this should provide a high level overview.

[200]

1380.   Some of the "intelligence" referred to by Patel was gathered during a phone conversation she had with Aprahamian of Taro the day before, on June 17, 2014, which lasted more than fifteen (15) minutes.

1381.   The next day, Patel continued to gather "intelligence" and made concerted efforts to simultaneously coordinate with both Aprahamian and Green at Zydus.  The timing and duration of those phone calls is set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:38:09 | 0:00:01 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:07 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:56:47 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 14:08:53 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:24:45 | 0:00:09 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 14:25:32 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 15:40:08 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 16:01:31 | 0:13:35 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:23:36 | 0:00:05 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:24:07 | 0:13:15 |

[201]

1382.   On August 28, 2014, Teva followed the Taro price increases on Carbamazepine chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, and Warfarin Sodium tablets.  As discussed more fully above, Teva coordinated those increases with Taro (and Zydus) through direct communications with those competitors in the days leading up to the increase.

---

[200]   *Id.* at ¶ 874.

[201]   *Id.* at ¶ 875.

c.    *Zydus*

1383.   In addition to their agreement on Warfarin Sodium, Teva also agreed with Zydus to raise the price of Topiramate Sprinkle capsules.

1384.   As of June 2014, Zydus and Teva had a large majority of the market share for Topiramate Sprinkle, while Actavis had just 3% of the market.

1385.   In April 2014, Zydus raised its price for Topiramate Sprinkle capsules.  Patel was in frequent communication with Green at the time of the Zydus price increase.

1386.   In the days leading up to the June 13 Zydus price increase on Warfarin Sodium, which is discussed more fully above, Green coordinated with both Patel and Rekenthaler at Teva, as set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/2/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 9:33:00 | 0:02:00 |
| 6/2/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 11:25:26 | 0:05:48 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

[202]

1387.   Green was likely speaking to Patel and Rekenthaler about both Warfarin and Topiramate Sprinkle capsules during those calls because on June 13 – the same day the Zydus price increase on Warfarin Sodium became effective, and after the conversations noted above – Patel added Topiramate Sprinkle capsules to Teva's price increase list, with a notation: "Follow/Urgent - Zydus." Two days before that - the same day that Green had extensive phone calls with both Rekenthaler and Patel - Rekenthaler also spoke twice with Falkin of Actavis, the only other competitor in the market for Topiramate Sprinkle capsules.

---

[202]   *Id.* at ¶ 880.

1388.   Teva followed the Zydus price increase for Topiramate Sprinkle capsules on August 28, 2014.  As noted above, Teva coordinated that increase with both Zydus and Actavis in the days and weeks before it.

### 15.   January 28, 2015 Price Increases

1389.   Shortly after the August 28, 2014 Teva price increases, Patel accepted a new position at Teva.  She left her position in the pricing department to take on the role of Director of National Accounts at Teva.  Her new position meant new responsibilities, necessitating more frequent travel to customer conferences and trade shows, giving her a greater opportunity to meet and collude face-to-face with competitors instead of over the telephone.

1390.   When Patel left the pricing department at Teva her position was not refilled. K.G., Patel's former supervisor, assumed her role and became the executive responsible for identifying price increase candidates and implementing price increases.

1391.   On January 28, 2015, Teva raised prices on a number of different drugs.  Teva's price increase spreadsheet – now maintained by K.G. at Teva, identified the following drugs, among others, along with the price increase strategy and reasons for the increase:

| Product Description | Price Increase Strategy | Reason for Increase | Competitors |
|---|---|---|---|
| BETHANECHOL CHLORIDE TABLETS | Market Intel | Follow Competitor -Amneal | Amneal (65%); Wockhardt (14.9%); Rising (1.7%) |
| CIPROFLOXACIN TABLETS | 193% Increase | Follow Competitor -DRL & Actavis | Actavis (37%); Dr. Reddy's (23.3); Westward (11.2%); Northstar (5.6%); Pack (5.2%) |
| DILTIAZEM HCL TABLETS | 90% Increase | Lead -Semi-Exclusive | Mylan (41.8%) |
| ESTRADIOL TABLETS | 90% Increase | Lead -Semi-Exclusive | Actavis (12.3%); Mylan (3.1%) |
| FLUOXETINE HCL TABLETS | 612% Increase | Mylan (New Market Entrant) (6/23/2014) | Par (45.1%); Mylan (7.3%) |
| GLIMEPIRIDE TABLETS | 300% Increase | Follow Competitor -DRL | Dr. Reddy's (34%); Accord (17%); INT Labs (15.3%); Virtus (3.6%); BluePoint (2%) |
| GRISEOFULVIN SUSPENSION | 50% Increase | Follow Competitor -Actavis | Actavis (47.2%); Qualitest (14.1%); Perrigo (3.9%) |
| ISONIAZID TABLETS | 50% Increase | Lead -Limited Competition | Sandoz (21.2%); Lannett (3.4%) |
| KETOPROFEN CAPSULES | 90% Increase | Lead -Semi-Exclusive | Mylan (42.2%) |
| KETOROLAC TROMETHAMINE TABLETS | 90% Increase | Lead -Semi-Exclusive (Mylan Supply Issues) | Mylan (40%) |
| NORTRIPTYLINE HCL CAPSULES | 90% Increase | Lead- Cost of Goods Increased | Actavis (29.4%); Taro (4.8%) |
| PROPRANOLOL HCL TABLETS | Market Intel | Follow Competitor - Actavis | Heritage (26.5%); Actavis (21.2%); Qualitest (12.8%); Northstar (7.5%); Mylan (2.6%) |

[203]

1392.   Patel and Rekenthaler communicated with a number of Teva's significant competitors about these drugs in the days and weeks leading up to January 28, 2015.  The

---

[203]   *Id.* at ¶ 890.

relevant phone communications between Teva and several of its competitors related to these drugs are set forth in the chart at page 262 of the Amended State AG Complaint No. 2.  Those communications included communications between Teva and Amneal concerning Bethanechol Chloride Tablets; between Teva, Actavis, and Dr. Reddy's concerning Ciprofloxacin Tablets; between Teva and Mylan concerning Diltiazem HCL Tablets; between Teva, Actavis, and Mylan concerning Estradiol Tablets; between Teva, Par, and Mylan concerning Fluoxetine HCL Tablets; between Teva and Dr. Reddy's concerning Gumepiride Tablets; between Teva and Actavis concerning Griseofulvin Suspension; between Teva and Sandoz concerning Isoniazid Tablets; between Teva and Mylan concerning Ketoprofen Capsules; between Teva and Mylan concerning Ketorolac Tromethamine Tablets; between Teva, Actavis, and Taro concerning Nortriptyline HCL Capsules; and between Teva, Actavis, and Mylan concerning Propranolol HCL Tablets.

1393.   Upon information and belief, Patel also spoke in-person with many of these competitors.  For example, in her new role as a Director of National Accounts, Patel personally attended the following trade association events and customer conferences in the fall of 2014 and winter of 2014-15:  NACDS, Boston, MA (August 23-26, 2014); Econdisc Bidders Meeting, St. Louis, MO (September 17-19, 2014); PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14, 2014); Anda Strategy Meeting, Miami, FL (October 26-29, 2014); and the HDMA Round Table, Washington, DC (January 8, 2015).  These industry events were all well-attended by Teva's competitors.

1394.   Some specific examples of Teva's coordination with competitors regarding its January 28, 2015 price increases are set forth below.

### a.    Propranolol HCL Tablets

1395.   On January 15, 2015, Actavis sent a notice to its customers informing them of a significant increase to its WAC and Suggested Wholesale Prices (SWP) for Propranolol HCL tablets.  The increases would not become effective (and thus publicly visible to the rest of the market) until February 17, 2015.

1396.   In the days before Actavis sent this notice to its customers, Falkin of Actavis and Rekenthaler of Teva spoke frequently.  For example:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 1/8/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 7:18:00 | 0:10:00 |
| 1/13/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:39:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

[204]

1397.   Indeed, the day before Actavis sent the price increase notice to its customers, Rekenthaler coordinated the price increase with Falkin and Nesta of Mylan, the other quality competitor in the market for Propranolol HCL tablets, in its own name and/or through its subsidiary, UDL Laboratories Inc.  The timing and duration of those phone calls are set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 3:12:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 5:39:00 | 0:09:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

[205]

1398.   On January 16, 2015 - more than a month before the Actavis price increase for Propranolol HCL tablets was disclosed to the public – Rekenthaler forwarded Teva's price increase list to Patel.  Propranolol HCL tablets were on the list, with the following explanations

---

[204]   *Id.* at ¶ 896.

[205]   *Id.* at ¶ 897.

about pricing strategy and reasons for the price increase:

| Product Description | Price Increase Strategy | Reason for Increase |
|---|---|---|
| PROPRANOLOL HCL TABLETS 10MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 10MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 20MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 20MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 40MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 40MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 60MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 80MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 80MG 500 | Market Intelligence | Follow Competitor - Actavis |

[206]

1399.   Teva raised its pricing for Propranolol HCL tablets on January 28, 2015 – before the Actavis price increase even became effective.  As discussed above, Rekenthaler was in constant communication with Falkin of Actavis and Nesta of Mylan in the days leading up to Teva's price increase.

1400.   When the Actavis price increase on Propranolol HCL tablets did become effective – on February 17, 2015 – Rekenthaler and Falkin continued to discuss pricing.  For example, the day before those price increases became visible to the public – February 16, 2015 – Rekenthaler and Falkin spoke two times, including one call lasting nearly twenty- three (23) minutes. Rekenthaler then spoke to Nesta twice on February 18, 2015 and again on February 19, 2015.

1401.   Mylan ultimately followed the Teva and Actavis price increases for Propranolol HCL tablets with a price increase of its own on July 10, 2015.

1402.   Heritage and Par also agreed to these price increases.

1403.   According to NADAC data, various dosage levels of Propranolol HCL tablets saw the following price increases:

> Propranolol HCL 10mg tablets:  Between February 18, 2015 and September 23, 2015, the average price increased by 819%;

---

[206]  *Id.* at ¶ 898.

Propranolol HCL 20mg tablets: Between February 18, 2015 and November 18, 2015, the average price increased by 892%;

Propranolol HCL 40mg tablets: Between February 18, 2015 and February 17, 2016, the average price increased by 1008%; and

Propranolol HCL 80mg tablets: Between February 18, 2015 and November 18, 2015, the average price increased by 958%.



1404. The following charts depict Medicaid reimbursement rates for exemplary dosage levels of Propranolol HCL tablets showing simultaneous price increases by Actavis, Heritage, Mylan, Teva, and Par.





b.    *Ciprofloxacin HCL and Glimepiride*

1405.   Dr. Reddy's significantly increased its pricing on both Ciprofloxacin HCL and

Glimepiride on August 18, 2014.  The increases to the Ciprofloxacin HCL WAC were 201% -

533% depending on the dosage strength.  The increases to the Glimepiride WAC were

approximately 300% for all dosage strengths.

1406.   In the days and weeks leading up to the Dr. Reddy's price increases for

Ciprofloxacin HCL and Glimepiride, V.B., a senior sales executive at Dr. Reddy's, spoke

frequently with Patel about the planned price increases.  At least some of those phone

communications are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 13:28:12 | 0:12:14 |
| 7/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 16:20:45 | 0:00:10 |
| 7/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:51:53 | 0:04:14 |
| 7/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:19:44 | 0:06:33 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 10:31:30 | 0:00:04 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 10:40:28 | 0:04:03 |

[207]

---

[207]  *Id.* at ¶ 905.

1407.   V.B. continued to communicate with Patel after the Dr. Reddy's price increases became effective, in the hope that Teva would quickly follow with its own price increases.  The two exchanged four (4) text messages on August 25, 2014 – only three days before Teva's substantial price increase on August 28, 2014 (discussed above).

1408.   Despite Dr. Reddy's best efforts, Teva was unable to add Ciprofloxacin HCL or Glimepiride to its August 28 price increase.  On the same day that Teva sent its price increase notices out to its customers, T.W., a senior account executive at Dr. Reddy's, obtained a complete list of Teva's price increases (including a number of drugs not sold by Dr. Reddy's). Although unclear how T.W. obtained this information, the subject line of the e-mail clearly identified the information as "Confidential Teva increases." In her message to several other Dr. Reddy's colleagues, T.W. stated that Teva initiated price increases, but did not include glimepiride:



On Aug 28, 2014, at 4:11 PM, ██████████████████████ > wrote:

Hi All,
Teva had price increases today.  No glimepiride though!
See products below.
Thanks,
███

[208]

1409.   J.M., a senior marketing executive at Dr. Reddy's, replied:  "Thanks for sending. This was shown in the pricing compendium today.  I was a little disappointed.  However, some of the price increase[s] were led by other companies more than a month ago.  So I am still hopeful they may follow." Dr. Reddy's anticipated that Teva would follow its price increases

---

[208]  *Id.* at ¶ 907.

based on the understanding that had been reached between V.B. and Patel during their various conversations.

1410.   In fact, Teva did follow the Dr. Reddy's price increases – on both Ciprofloxacin HCL and Glimepiride – during its next round of price increases on January 28, 2015.  In the interim, V.B. and Patel continued to communicate, exchanging four (4) text messages on October 10, 2014.

1411.   Actavis – the only other quality competitor in the market for Ciprofloxacin HCL – increased its pricing for that drug on December 19, 2014 to exactly match Dr. Reddy's WAC pricing.  In the days leading up to the Actavis price increase, Rekenthaler of Teva spoke to Falkin of Actavis several times to coordinate the increase, including twice on December 17 (including one call lasting nearly nine (9) minutes) and once on December 18, 2014.

1412.   When Teva did follow the Dr. Reddy's (and Actavis) price increases on Ciprofloxacin HCL and Glimepiride, on January 28, 2015, Teva raised its WAC pricing to match Dr. Reddy's WAC prices exactly.  That same day, Dr. Reddy's was (again) able to obtain a full copy of Teva's price increase list.  That list included many drugs that Dr. Reddy's did not market.

c.      *Griseofulvin*

1413.   On September 9, 2014, Actavis notified its customers of a price increase on Griseofulvin microsize oral suspension.  In the days leading up to September 9, 2014, Patel and Rekenthaler of Teva communicated with Falkin and Rogerson of Actavis to coordinate the

increase.  Some of those calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:15:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:21:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:05:00 |
| 9/9/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:04:32 |

[209]

1414.   The Actavis price increase for Griseofulvin became effective on October 6, 2014.

1415.   Teva promptly added Griseofulvin to its own price increase list, with the notation "Follow Competitor- Actavis" as the reason for the price increase.

1416.   Teva followed the Actavis increase for Griseofulvin during its next price increase event on January 28, 2015.  As discussed above, in the days leading up to that price increase Rekenthaler of Teva and Falkin of Actavis coordinated frequently.  Teva's price increase for Griseofulvin microsize oral suspension matched Actavis's WAC pricing exactly.

## XI.   COMPETITORS BECOME "HIGH QUALITY" AFTER SUCCESSFULLY COLLUDING WITH TEVA

### 1.   Apotex

1417.   Apotex was one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3.  When Patel updated her Quality Competitor rankings in May 2014, however, Apotex was rated +2 – an increase in five points over that twelve-month period.

1418.   Apotex made this jump in Teva's quality competitor rankings in large part due to Patel's relationship with B.H., a sales executive at Apotex, and the successful coordination between Apotex and Teva in 2013 on Pravastatin and Doxazosin Mesylate.

---

[209]  *Id.* at ¶ 912.

1419.   Patel revised her May 2013 price increase list on May 29, 2013 to add Pravastatin. The day before – May 28 – Apotex increased its price on Pravastatin by over 100%.  Apotex's new, higher prices for Pravastatin exactly matched Glenmark's May 16, 2013 price increase.

1420.   In the days leading up to Patel's decision to add Pravastatin to her list of price increase candidates – and Apotex actually increasing its prices – Patel communicated frequently with B.H. at Apotex.  Between May 20 and May 24, 2013, the two spoke five (5) times.

1421.   Teva ultimately raised its prices on Pravastatin – to follow Glenmark, Apotex, and Zydus – on August 9, 2013.  In the days leading up to the Teva price increase, Patel spoke to B.H. at Apotex three (3) times to coordinate.

1422.   Teva also increased its pricing on Doxazosin Mesylate in August 2013.  Teva's new, increased price (a 1,053% increase) matched Apotex's (and Mylan's) recent price increases.  Apotex itself had increased the price of this drug on July 23, 2013.  B.H. of Apotex and Patel of Teva had one conversation the week before Apotex took the increase, in addition to coordinating before Teva followed on August 9, 2013.

1423.   Apotex soared dramatically in the quality competitor rankings for one additional reason:  in April 2013, Apotex hired J.H. as a senior executive.  Rekenthaler of Teva and J.H. began communicating regularly after J.H. was hired by Apotex.  There is no record that they had ever communicated by phone before that.

1424.   That relationship continued through 2014.  On April 4, 2014, Teva increased the price on Pentoxifylline by as much as 69%.  Despite the fact that Apotex was the market leader at that time, Teva chose to lead the price increase on Pentoxifylline.  In the weeks leading up to Teva's price increase, Rekenthaler of Teva engaged in numerous communications with J.H. at Apotex.  The two spoke twice on March 7, 2014, for two (2) and three (3) minutes, respectively.

They spoke again on March 20 for four (4) minutes, and again on March 25 for two (2) minutes. A week after Teva increased its price – on April 11, 2014 – they spoke again for five (5) minutes. During these calls, Rekenthaler gathered Apotex's pricing plans and conveyed them to Patel.

1425.   As a result of Patel and Rekenthaler's successful coordination with Apotex executives, Patel dramatically increased Apotex's quality competitor ranking in May 2014.

## 2.     Zydus

1426.   Zydus – like Apotex – had been one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3. But, when Patel updated her quality competitor rankings in May 2014, Zydus was rated +2, an increase in five points over a twelve-month period. While Apotex's increase in the ranking was due to Teva's successful collusion with Apotex on several price increases in 2013 and 2014, Zydus's increase was more personnel-oriented: Green, who had himself conspired with a number of competitors while at Teva (at the direction of and in coordination with Patel and Rekenthaler at Teva, among others) moved from Teva to Zydus in November 2013. With Green firmly installed at Zydus, Patel was emboldened to more fully include Zydus in the conspiracy.

1427.   Patel's confidence was well-founded. In the year after Green joined Zydus, the two companies successfully conspired to divide markets and allocate customers relating to Zydus's entry into the market for multiple drugs, including: Fenofibrate (February – March 2014), Paricalcitol (March – April 2014), Niacin ER (May – June 2014), and Etodolac ER (May – July 2014). These agreements are discussed more fully above.

1428.   Teva and Zydus also agreed to increase prices on Topiramate Sprinkle and Warfarin Sodium tablets. Zydus increased the price for both of those drugs on June 13, 2014. Teva followed with an increase on both drugs on August 28, 2014. With respect to the

Topiramate Sprinkle, Teva was explicit in its internal communications that its increase was to "follow competitor," namely Zydus.

1429.   In the days leading up to both companies' price increases, Green and Patel communicated frequently to coordinate the price increases.  On June 19, 2014 – four days before Zydus increased its prices – Green and Patel spoke four (4) times.  And on August 27, 2014 – the day before Teva raised its prices – Green and Patel spoke three (3) times.

1430.   Green was also communicating frequently with Rekenthaler of Teva around the time of the price increases on Topiramate Sprinkle and Warfarin Sodium tablets.  On June 11, 2014, the two men spoke for eight (8) minutes.  On August 20, the two exchanged an additional pair of phone calls.

1431.   Patel and Rekenthaler did not communicate with Green in isolation.  The two Teva executives made sure to keep each other apprised of their conversations with competitors, including Green.  In early 2014, Patel and Rekenthaler both worked largely out of Teva's home office.  After either one of them engaged in a phone call with a competitor, he or she would be sure to provide an in-person debrief of the communication so as to avoid putting such information in writing.

1432.   Even before Green joined Zydus in November 2013, Teva had success in coordinating price increases with Zydus with respect to Pravastatin.  Patel decided to add Pravastatin to her price increase list only after determining that Zydus agreed to the increase.  In the week leading up to Patel's decision to revise her price increase list to include Pravastatin, Green (still at Teva) spoke to K.R. and M.K., both senior executives at Zydus.

1433.   Just two weeks later, on June 14, 2013, Zydus increased its price on Pravastatin by over 150%.  Green similarly had numerous conversations with Zydus executives in the week prior to that company's Pravastatin increase, as shown in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 6/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:12:00 |
| 6/10/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:02:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |

[210]

1434.   As noted above, Teva ultimately raised its prices on Pravastatin on August 9, 2013.  At that time, Patel recommended that Teva follow the competitors that had already raised their prices – including Zydus.  Prior to Teva raising its prices on August 9, 2013, Green spoke to K.R. at Zydus three times – twice on August 4, 2013 and once on August 5.

### 3.   Heritage

1435.   Heritage, like Apotex and Zydus, was not a highly-ranked competitor when Patel first created the quality of competitor ranking list in May 2013.  Initially, Patel gave Heritage a ranking of "0." However, when Patel updated her quality competitor rankings in May 2014, Heritage received the highest possible ranking of +3.

1436.   The reason for Heritage's significant improvement in Patel's quality competitor rankings was the relationship that Patel established with the Vice President of Heritage, Malek.  After moving to Teva, Patel began communicating with Malek by phone as early as July 9, 2013.  From that date until July 25, 2014, the two spoke by phone at least 37 times.

---

[210]   *Id.* at ¶ 933.

1437.   Heritage's successful efforts to coordinate price increases with Teva on seven drugs – Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline ER – are described above.

### 4.   Lupin

1438.   In Patel's initial May 2013 quality competitor ranking list, Lupin was given a ranking of +2.  When Patel updated her quality competitor rankings a year later, Lupin received the highest possible rating of +3.

1439.   Lupin was awarded the highest score in the quality competitor ranking in 2014 because Berthold of Lupin earned Patel's trust by consistently agreeing to her price increase plans.  From May 2013 through April 2014, for example, Patel and Berthold spoke at least 76 times by phone.  Green, while still at Teva, also had a very strong relationship with Berthold.  As discussed above, at times Patel and Green would even coordinate with each other regarding which one of them should coordinate a price increase or customer allocation agreement with Berthold.

1440.   As discussed more fully above, in 2013 – after Patel joined Teva – Teva and Lupin conspired to fix and raise prices on at least the following four drugs:  Cefdinir oral suspension, Cefdinir capsules, Cefprozil tablets, and Pravastatin.  Then in early 2014, executives at the two companies coordinated Lupin's entrance into the market for Balziva.

1441.   The relationship was so strong between Teva and Lupin that even when Green left Teva, and Patel was out of the office on maternity leave, Berthold still found other executives at Teva to communicate with regarding a price increase for the drug Cephalexin Oral Suspension.  As discussed above, in October 2013, Berthold called Rekenthaler and T.S., a national account executive at Teva, to coordinate Lupin's November 1, 2013 price increase for Cephalexin Oral Suspension.  When Patel returned from maternity leave and began planning the next round of

Teva price increases, she continued these communications with Berthold until Teva followed Lupin's price increase on April 4, 2014.

1442.   Patel and Berthold also coordinated a price increase and market allocation scheme with regard to the drug Niacin ER, as Lupin was entering the market in March 2014.  Given the successful track record between the two competitor companies, Lupin warranted a +3 in the quality competitor rankings when Patel updated them in May 2014.

### 5.      Par

1443. In Patel's initial May 2013 quality competitor ranking list, Par was given a ranking of +1.  When Patel updated her quality competitor rankings a year later, Par improved to a ranking of +2.

1444.   Par rose in the rankings largely because of several strong relationships between executives at the two companies.  For example, T.S., a national sales executive at Teva, had a strong relationship with R.K., a senior sales executive at Par.  The two began communicating by telephone in September 2013.  Between September 2013 and May 2014, the two spoke at least twenty-seven (27) times by phone.

1445.   Similarly, Rekenthaler at Teva had a very strong relationship with another senior executive at Par, M.B.  Rekenthaler spoke with M.B. frequently throughout 2013 and 2014.  From the beginning of 2013 through May 2014, Rekenthaler spoke to M.B. at Par at least thirty-two (32) times by phone.

1446.   Patel was well aware of these strong relationships and relied on the information that T.S. and Rekenthaler obtained from their communications with senior Par executives in order to make pricing or bidding decisions for Teva's drugs.  One such example occurred on Friday, February 7, 2014 when Teva received notice from a customer that it had received a competitive challenge from Par on Labetalol HCL tablets.  Patel forwarded the e-mail to T.S.

with three question marks:  "???"  T.S. responded immediately:  "left message."  The message

that T.S. had left was for R.K. at Par, and the two executives spoke five (5) times that same day.

After these calls with R.K., T.S. responded back to Patel saying "[l]et's speak on Monday.  Just

received call back with more information."

1447.   The following Monday, Patel also forwarded the original e-mail (discussing the

competitive challenge from Par on Labetalol HCl) to Rekenthaler, saying "[n]eed to make a

decision quickly."  One (1) minute after receiving that e-mail, Rekenthaler called M.B. at Par

and the two spoke for eighteen (18) minutes.  Shortly after hanging up the phone with M.B.,

Rekenthaler sent another e-mail to Patel, stating:  "[h]old off on this until I get back with you."

Rekenthaler spoke to M.B. again later that afternoon for three (3) minutes.

1448.   After these discussions between Teva and Par executives, Teva ultimately offered

only a nominal price reduction to that customer – knowing that this would likely concede the

business to Par.

1449.   As discussed more fully above, Teva continued to conspire with Par on various

market allocation and price fixing schemes throughout the remainder of 2014 and into 2015.

### 6.    Amneal

1450.   In Patel's initial May 2013 quality of competitor ranking list, Amneal was given a

ranking of +1.  When Patel updated her quality competitor rankings a year later, Amneal

improved to a ranking of +2.

1451.   One of the reasons why Amneal rose in the rankings was because of several

strong relationships between executives at the two companies.  For example, Rekenthaler of

Teva had a strong relationship with S.R.(2), a senior sales executive at Amneal.  From May 2013

to May 2014, they spoke eight (8) times by phone, and attended many trade association meetings

and customer conferences together as well.  Rekenthaler and S.R.(2) were regular participants in

an annual golf outing hosted by a packaging contractor in Kentucky, where – as discussed above – the generic drug manufacturer participants (competitors) played golf by day and gathered socially by night, referring to each other as "friends" and "fraternity brothers." (Green and Ostaficiuk were also participants.)

1452.   Similarly, Patel also developed strong relationships with two Amneal executives: S.R.(1), a senior sales and finance executive at Amneal, and S.R.(2).  As discussed above, Patel and S.R.(1) coordinated price increases for the drugs Norethindrone Acetate (September 2014) and Bethanechol Chloride (January 2015).

1453.   Patel also spoke to S.R.(2) regarding Norethindrone Acetate in September 2014, and continued to communicate with S.R.(2) into at least 2015 – sometimes using alternative forms of communication.  In addition to their cell phones, the two executives also used Facebook Messenger to coordinate anticompetitive conduct.  In the message exchange below (relating to a drug not identified in this Complaint), S.R.(2) informs Patel that Amneal will concede Econdisc ("E") so long as Amneal is able to retain another large customer, Red Oak Sourcing ("RO"):



[211]

---

1454.   On the day of this message exchange, Patel and S.R.(2) also spoke by phone for nearly five (5) minutes.

**7.      Non-Defendant Rising**

1455.   In Patel's initial May 2013 quality competitor ranking list, non-Defendant Rising was given a ranking of +1.  When Patel updated her quality competitor rankings a year later, Rising improved to a ranking of +2.

1456.   Rising improved in the quality competitor rankings because of the relationship between Rekenthaler and CW-2.  In 2013, CW-2 left Sandoz to join Rising.  At that time, Rising was already preparing to enter the market for a drug called Hydroxyzine Pamoate.  Teva was one of the competitors already in that market.  During several calls in early October 2013, CW-2 coordinated with Green and Rekenthaler of Teva to acquire a large customer and facilitate Rising's entry into the Hydroxyzine Pamoate market.

1457.   Later, in March 2014, CW-2 sought to return the favor.  At that time, Rising experienced supply problems for Diflunisal Tablets – a two-player market involving only Teva and Rising.  In an effort to "play nice in the sandbox," and to further the ongoing understanding between the two competitors, CW-2 contacted Rekenthaler of Teva and informed him of Rising's supply problems and the fact that Rising may have to leave the market at some point in the future.  The purpose for the call was to alert Rekenthaler that Teva would have the opportunity to take a price increase, as Rising would not be in a position to take on any additional market share.

1458.   On April 4, 2014, Teva increased the price on Diflunisal Tablets (by as much as 182%), as well as Hydroxyzine Pamoate (by as much as 165%).  In the weeks leading up to those price increases, Rekenthaler communicated several times with CW-2 at Rising to coordinate the increases.  The two spoke by phone twice on March 17, 2014 and once on March 31.

1459.   When Rising decided to leave the Diflunisal market in mid-July 2014, CW-2 called Rekenthaler to let him know.  Four months later – after Rising remedied its supply problems – Rising re-entered the market for Diflunisal.  Consistent with the fair share understanding discussed above, CW-2 and Rekenthaler communicated in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to ensure the retention of the high prices that Teva had established through its price increase in April 2014.  On December 3, 2014, Rising re-entered the market for Diflunisal Tablets.  Its new pricing matched Teva's WAC price increase from April 2014.

1460.   Rekenthaler's successful efforts to coordinate price increases and customer allocation agreements with CW-2 of Rising led Patel to increase Rising's quality competitor ranking in May 2014.

### 8.      Breckenridge

1461.   In Patel's initial May 2013 quality competitor ranking list, she gave Breckenridge a ranking of +1.  When Patel updated her quality competitor rankings a year later, Breckenridge improved to a ranking of +2.

1462.   Breckenridge improved in the quality competitor rankings largely because of the strong relationship established between Patel and Rekenthaler and certain executives at Breckenridge, which led to several successful price increases.

1463.   For example, on November 14, 2013, Breckenridge increased the WAC pricing of both Estradiol/Norethindrone Acetate Tablets ("Mimvey") and Cyproheptadine HCL Tablets.  In the weeks leading up to those Breckenridge price increases, Rekenthaler communicated by phone several times with D.N., a sales executive at Breckenridge.  The two spoke twice on October 14, 2013 and once on October 24, 2013.  The call on October 24 lasted twenty-six (26) minutes.

1464.   On April 4, 2014, Teva followed the Breckenridge price increases on Mimvey Tablets (increasing the WAC pricing by over 100%) and Cyproheptadine HCL tablets (increasing the WAC pricing by over 90%), to match Breckenridge's WAC pricing on both products.  Teva raised prices even higher on its customer contracts.  Teva increased the contract pricing of Mimvey Tablets by as much as 393%, and the contract pricing of Cyproheptadine HCL tablets by as much as 526%, depending on the dosage strength.

1465.   As Patel planned for Teva's April 4, 2014 price increases, both she and Rekenthaler continued to communicate with their counterparts at Breckenridge.  Rekenthaler spoke to D.N. at Breckenridge on January 15, 2014 – the day after Patel sent her first list of "Increase Potentials Q1 2014" to K.G. – for nineteen (19) minutes.  Similarly, Patel spoke with S.C. – a sales executive at Breckenridge – two times on February 7, 2014, as she was determining whether Teva should provide a bid to a customer.  After her discussions with S.C., Teva declined to bid for the business in order to avoid taking market share away from Breckenridge as a result of the price increases.

1466.   As a result of the successful coordination of these price increases between Teva and Breckenridge, Patel increased Breckenridge's quality competitor ranking in May 2014.

### 9.   Glenmark

1467.   Not every Teva competitor saw its quality competitor ranking increase between 2013 and 2014.  Glenmark, for example, declined slightly in the rankings.  In Patel's initial May 2013 quality competitor ranking list, Glenmark was given a ranking of +3.  When Patel updated her quality competitor rankings a year later, Glenmark was given a ranking of +2.

1468.   The reason that Glenmark declined in the rankings was because Patel lost her most valuable relationship at that company – CW-5.  CW-5 left Glenmark in April 2014.  In the eleven-month period between Patel joining Teva in late April 2013 and CW-5 leaving Glenmark

in April 2014, the two competitors communicated by phone or text message 121 times.  They also communicated frequently using an encrypted messaging application, WhatsApp.  As discussed more fully above, starting in early May 2013 Teva and Glenmark conspired to fix and raise prices on a number of drugs, including:  Adapalene, Nabumetone, Fluconazole Tablets, Ranitidine, Moexipril, Moexipril HCTZ, and Pravastatin.

1469.   In addition to CW-5, Patel also had other contacts at Glenmark – which is why Glenmark did not fall dramatically in the quality competitor rankings when CW-5 left the company.  For instance, Patel exchanged 44 phone calls or text messages with J.C., a sales and marketing executive at Glenmark, between May 2013 and July 2015.  Similarly, Patel exchanged 36 calls with Brown, the Vice President of Sales at Glenmark, between August 2013 and October 2014.  As discussed more fully above, Patel continued to coordinate with J.C. and Brown throughout 2014 on several drugs, including Desogestrel/Ethinyl Estradiol ("Kariva") and Gabapentin Tablets – demonstrating that Glenmark remained a quality competitor even after CW-5 left the company.

### 10.   Camber Pharmaceuticals

1470.   When Patel first created the quality of competitor rankings in early May 2013, she gave Camber Pharmaceuticals a ranking of -2.  When Patel revised those rankings one year later in May 2014, Camber's ranking did not change.  It remained one of the lowest ranked of all of Teva's competitors.

1471.   Nonetheless, Camber adhered to the fair share understanding, and consistently applied those rules in dealing with its competitors.

1472.   This was evident when, in September 2014, Camber entered the market for two different drugs that overlapped with Teva.

1473.   One of those drugs was Raloxifene Hydrochloride Tablets ("Raloxifene"), also known by the brand name Evista.

1474.   Teva had begun marketing Raloxifene in March of that year.  Actavis had received approval to begin marketing Raloxifene in 2014 as well but had not yet entered by September 2014.

1475.   The other drug was Lamivudine/Zidovudine – a combination medication also known by the brand name Combivir.  Camber had received approval to market a generic form of Combivir in February 2014, but as of September 2014 was still in the process of entering the market.  Already in the market were competitors Teva, Aurobindo and Lupin.  As discussed more fully above, Teva, Lupin, and Aurobindo agreed to divide up the generic Lamivudine/Zidovudine market in 2012 when Teva was losing exclusivity on that drug.

1476.   As the anticipated product launches for Raloxifene approached, the new entrants discussed an allocation strategy with Teva to ensure they each received their fair share of the market.  On September 9, 2014, Rekenthaler had a twenty-six (26) minute phone call with A.B., a senior sales and marketing executive at Actavis.  A short time later, a Teva executive told colleagues that she had "just heard Camber and Actavis expect to launch 9/24."

1477.   Teva's discussions with Actavis escalated over the coming week.  On September 10, Rekenthaler exchanged two calls with Falkin of Actavis lasting fifteen (15) minutes and one (1) minute, respectively.  On September 11, the men talked for ten (10) more minutes.  On September 16, Rekenthaler spoke by phone a total of six (6) times with different Actavis personnel, including one call with A.B. lasting thirty-four (34) minutes.

1478.   The following morning, in response to an inquiry regarding whether Teva intended to retain a major customer's Raloxifene HCL business, K.G. of Teva replied in the

affirmative.  Rekenthaler then shared the information he had gathered through his communications with competitors:  "I know Actavis will be late.  Camber is talking but their [sic] being somewhat unclear as well.  I'll know more about them after my trip this week."  That same day, on September 17, 2014, Camber sent an offer for Raloxifene HCL to Econdisc, which was Teva's customer at that time.

1479.   Rekenthaler and Ostaficiuk, the President of Camber, spent the next three days – September 17 through September 19 – playing golf during the day and socializing at night at an industry outing in Kentucky sponsored by a packaging vendor.

1480.   On September 21, 2014, Ostaficiuk called Rekenthaler and the two spoke for two (2) minutes.  The next day, Rekenthaler initiated a series of four (4) phone calls with Ostaficiuk. The two spoke for a total of thirty (30) minutes that day.  Notably, these are the first identified phone calls ever between the two competitors.  As a result, Camber sent a revised offer to its potential customer that same afternoon, containing modified prices for Raloxifene.

1481.   On September 24, Patel discussed a Raloxifene allocation strategy with her Teva colleagues in light of Camber's offer to Econdisc, which was Teva's customer at the time.  She emphasized Camber's expressed commitment to the overarching conspiracy among the competitors – and conveyed information she obtained from Rekenthaler during his conversations with Ostaficiuk – stating:  "Camber indicated that they are targeting Econdisc and a small retailer ... and then they would be 'done.'"

1482.   As a part of this discussion, K.G. considered whether Teva should just concede Econdisc to Camber and seek to recover that market share with another customer.  At 9:07 a.m. that morning, Patel informed her supervisor K.G. and numerous others at Teva, that Rekenthaler

planned to discuss the matter with Camber:



212

1483.   Indeed, at 9:28 a.m. that morning, Rekenthaler called Ostaficiuk and the two

spoke for two (2) minutes.  They spoke two more times that day, including one call that lasted

eight (8) minutes.

1484.   Some of these calls also related to Camber's entry into the market for

Lamivudine/Zidovudine.  Teva and Lupin were already in the market for

Lamivudine/Zidovudine, and Ostaficiuk was engaging in contemporaneous communications

with Rekenthaler of Teva and Berthold of Lupin to negotiate Camber's entry into that market.

At least some of those calls on September 24, 2014 are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 5:28:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Rekenthaler, David (Teva) | 8:19:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Berthold, David (Lupin) | 8:21:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Berthold, David (Lupin) | 8:23:00 | 0:10:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 10:35:00 | 0:07:00 |

213

On that same day, Berthold also spoke with P.M., a senior operations executive at Aurobindo, for

more than eighteen (18) minutes, to close the loop on the Lamivudine/Zidovudine

communications.

1485.   On September 25, after discussing with his colleagues which customers Teva

should concede in order to give Camber its fair share of the Raloxifene market and armed with

---

212   Amended State AG Complaint No. 2 ¶ 1097.

213   *Id.* at ¶ 1098.

the information Rekenthaler had gathered from Camber's President, K.G. concluded:  "Okay, we will concede additional smaller customer challenges (particularly distributors) since they are not going to target One Stop."  Rekenthaler and Ostaficiuk spoke again twice that day.

1486.   That evening, a Camber executive instructed a colleague to gather market intelligence on possible additional customers for Camber's new Raloxifene product but stressed that the company would not bid on any additional Teva accounts "until we know how we do with Econ[disc]."

1487.   On Friday September 26, 2014, Camber publicly announced that it was launching Raloxifene, the generic version of Evista.  Rekenthaler called Ostaficiuk that day, for a short one (1) minute call.

1488.   From those telephone calls, Rekenthaler expressed to Ostaficiuk that Teva did not want Camber challenging for any more of its customers, on Raloxifene or Lamivudine/Zidovudine.  As a result of this communication, on Monday, September 29, 2014 Ostaficiuk sent the following e-mail to his colleagues at Camber:

| Message | |
|---|---|
| From: | Kon Ostaficiuk [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Kon Ostaficiuk] |
| on behalf of | Kon Ostaficiuk |
| Sent: | 9/29/2014 5:27:43 PM |
| To: | [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=▆▆▆▆▆; [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=▆▆▆▆ |
| CC: | ▆▆▆▆ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=▆▆▆ |
| Subject: | RE: McKesson -- dead net prices for OS w/ Riteaid |

Hi Gang,
We do not offer anything to any Teva customers...

Not even a "bad price"!

Please acknowledge...We do not want to upset them more!

Thank you,
Kon

[214]

---

[214]   *Id.* at ¶ 1102.

1489.   A.R., a senior sales executive at Camber, replied:  "We have not made any offers to any Teva Raloxifene accounts since we received the Econ award.  Both Sales and Contracts are aware, & requesting incumbent detail for all offers, if Teva, no offer."  A.R. also added that "We are also not seeking any Lupin business on Lamo/Zidovudine." Ostaficiuk replied:  "Thank you.  We don't want to antagonize either of them and start a war..."

1490.   About a week later, on October 7, 2014, a large Teva customer informed a Teva sales representative that Camber had made an unsolicited bid for its Raloxifene business.  J.P., a Director of National Accounts at Teva, sent an e-mail to certain employees at Teva, including Rekenthaler, notifying them of her conversation with the customer, and expressing surprise given the agreement Teva had previously reached with Camber:  "I thought they were done after securing Econdisc?"  Based on his prior conversations with Ostaficiuk, Rekenthaler doubted that Camber made an offer to another Teva customer, stating:  "You're positive they sent them an offer?"

1491.   J.P. of Teva "relayed 'the message" to the customer that "the market should be stable at this point" and Teva would be surprised if Camber had intended to make an offer to the customer.  After further discussion with the customer, Teva staff learned that it was a misunderstanding.  Camber never actually made the offer but had instead complied with its agreement with Teva.

1492.   The fair share agreement continued to govern as usual until mid-December 2014, when Camber learned of supply problems at Teva on Raloxifene.  A Camber employee described the prospect of Teva being on backorder for this drug as a "Game changer." Expressing her understanding of the rules of the conspiracy, she pointed out:  "**Fair share only applies when**

**there is not supply constraints.**"  Ostaficiuk responded optimistically, but cautiously:  "Good

luck guys but go fishing and gather information before we commit . . . ."

## XII.   OTHER DRUGS

1493.   Upon information and belief, Defendants also colluded to fix, increase, stabilize,

or maintain prices, allocate customers and markets, and rig bids for numerous other drugs,

including those listed below.

### A.      Acetazolamide Tablets

1494.   Even before the Heritage 2014 price increase for Acetazolamide ER capsules

discussed above, Acetazolamide in tablet form was the subject of price-fixing and a "fair share"

allocation.

1495.   Acetazolamide tablets are sold in two dosages:  125mg and 250mg.  In the spring

of 2012, Taro was the only manufacturer of 125mg tablets, but both Taro and Lannett

manufactured the more popular 250mg tablets.  Taro and Lannett conspired to increase the price

of both 125mg and 250mg tablets beginning in April and May of 2012.

1496.   Prior to the spring of 2012, Taro and Lannett competed on pricing and market

share for Acetazolamide tablets.  They implemented independent price increases in different

amounts at different times.  For instance, Taro increased prices in late 2009, but Lannett did not

until a year later.

1497.   In April and May of 2012, Taro and Lannett suddenly imposed 40-50% price

increases in unison, bringing their list prices for Acetazolamide 250mg tablets to identical levels.

Taro's 125mg tablets increased in price simultaneously.

1498.   In early 2013, Taro slightly increased prices on both Acetazolamide tablets and by

the middle of 2013, Taro and Lannett's market share stabilized as a result of their market sharing

agreement.  Lannett held approximately 56% of the 250mg tablet market and Taro held

approximately 44%.  As the only manufacturer at this time, Taro maintained 100% of the market

for 125mg tablets.  When market sales for both tablets are evaluated together, Taro and Lannett's

dollar sales across both products remained virtually even.  The combined market share (total

dollar sales) for both 125mg and 250mg Acetazolamide tablets is depicted in the graph below.



1499.   With their respective market shares allocated by agreement, Taro and Lannett

were well-positioned to raise prices without losing customers.

1500.   Between November of 2013 and February of 2014, Taro and Lannett both

imposed over 200% price increases on their Acetazolamide tablets, bringing their 250mg tablets

to identical list prices.  Taro's 125mg tablets saw similar price increases and AWP prices for

both products increased significantly.

1501.   The price increases imposed by Taro and Lannett, initially in 2012, then by Taro

in early 2013, then most significantly in late 2013, can be seen on the graph below.



1502.   According to NADAC data, the average market price for generic Acetazolamide tablets saw the following price increases from November 2013 to February 2014

Acetazolamide 125mg:  increased by 241%

Acetazolamide 250mg:  increased by 265%

1503.   NADAC data show that average market prices of Acetazolamide tablets remained artificially high thereafter, as depicted below.



1504.   Throughout this period, Lannett and Taro had ample opportunity to coordinate their market share agreements and price increases.  They both attended the (i) October 1-3, 2012 GPhA Fall Technical Conference in Las Vegas, Nevada; (ii) June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland; and (iii) October 28-30, 2013 GPhA Technical Conference in North Bethesda, Maryland.

1505.   The lockstep price increases with nearly perfect market share splits by Taro and Lannett contradicts expected pricing behaviors in a competitive market; it is, however, consistent with Defendants' "fair share" agreement.

**B.      Albuterol Sulfate**

1506.   At all relevant times, Mylan and Sun have dominated the market for Albuterol Sulfate.

1507.   Prior to 2013, the effective prices for Albuterol Sulfate were stable.

1508.   Beginning in March 2013, the average NADAC price for Albuterol Sulfate rose dramatically.

1509.   For example, Mylan's 100ct Albuterol Sulfate 2mg increased in price by over 4,300% from $0.13 to $5.88 on March 6, 2013.  Sun's 100ct Albuterol Sulfate 2mg increased 3,400% from $0.13 to $4.70 on April 15, 2013, as illustrated by WAC data:

| Product 2MG | Defendant | Old WAC | New | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|
| 100 ct | Mylan | $0.13 | $5.88 | March 6, 2013 | 4,317% |
| 500 ct | Mylan | $0.13 | $5.88 | March 6, 2013 | 4,549% |
| 100 ct | Sun | $0.13 | $4.70 | April 15, 2013 | 3,485% |
| 500 ct | Sun | $0.12 | $4.70 | April 15, 2013 | 3,674% |

**C.      Amitriptyline**

1510.   At all relevant times, Mylan, Par, and Sandoz have dominated the market for Amitriptyline.

1511.   Prior to 2014, the effective prices for Amitriptyline were stable.

1512.   Beginning in May 2014, the average NADAC price for Amitriptyline rose dramatically.

1513.   These price increases followed the (i) April 1, 2014 HDMA Annual CEO Roundtable Fundraiser in New York, New York, which Mylan, Par, and Sandoz attended.

1514.   The charts below show average price increases for various dosages of Amitriptyline tablets:





1515.   WAC data confirm that Mylan, Par, and Sandoz increased Amitriptyline prices largely in unison by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Sandoz | 00781148801 | $0.05 | $0.57 | 5/23/2014 | 1,032% |
| 1,000ct | Sandoz | 00781148810 | $0.05 | $0.48 | 5/23/2014 | 945% |
| 100ct | Mylan | 00378265001 | $0.05 | $0.57 | 7/16/2014 | 1,032% |
| 1,000ct | Mylan | 00378265010 | $0.05 | $0.57 | 7/16/2014 | 1,157% |
| 100ct | Par | 00603221421 | | $0.57 | 9/26/2014 | |
| 1,000ct | Par | 00603221432 | | $0.48 | 9/26/2014 | |

1516.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, and market-wide price increases.  For example, the *Financial Times* reported on May 12, 2015 that the $1.07 price for a 100mg pill of Amitriptyline "jumped by 2,487 per cent in under two years" noting that "in July 2013, the same pill cost just 4 cents."[215] The *Boston Globe* similarly reported, in November of the same year, "The cost of the antidepressant drug amitriptyline jumped 2,475 percent, from 4 cents for a 100-milligram pill in 2013 to $1.03 in 2015."[216]

**D.     Clobetasol Propionate**

1517.   In 2009, there were approximately ten Clobetasol Propionate manufacturers.  In 2012, Novartis acquired Fougera and in 2013, non-Defendant Akorn acquired non-Defendant Hi-Tech, consolidating the market.  By 2014, many Clobetasol Propionate manufacturers exited the market, including Teva and Glenmark.

---

[215]  David Crow, *Teva bids for Mylan amid pressure on copycat drugmakers*, FIN. TIMES (May 12, 2015), https://www.ft.com/content/8ff2fc5a-f513-11e4-8a42-00144feab7de

[216]  Priyanka Dayal McCluskey, *As competition wanes, prices for generics skyrocket*, BOS. GLOBE (Nov. 6, 2015), https://www.bostonglobe.com/business/2015/11/06/generic-drug-price-increases-alarm-insurers-providers-and-consumers/H3iA9CSxAUylnCdGjLNKVN/story.html.

1518.   Since June 2014, Actavis, Fougera, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt have dominated the market for generic Clobetasol Propionate.

1519.   Prior to June 2014, prices for Clobetasol Propionate were stable.

1520.   Beginning in June 2014, Actavis, non-Defendant Akorn, Fougera, non-Defendant Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt increased their prices for Clobetasol Propionate abruptly and in unison.

1521.   Collectively, these Defendants raised prices for Clobetasol Propionate by approximately 1,300% between July 2014 and September 2014.

1522.   According to NADAC data, the average market price for generic Clobetasol Propionate saw the following price increases from July 2014 to September 2014, as shown below:  Clobetasol .05% Ointment (15g):  increased by 1,852%; Clobetasol 0.05% Solution (50mL):  increased by 1,176%; and Clobetasol 0.05% Cream (30g):  increased by 1,596%.



415







1523.   WAC data confirm that Actavis, non-Defendant Hi-Tech, Sandoz, and Taro all increased prices in their Clobetasol Propionate cream largely in unison by the following amounts:

| Clobetasol cream .05%: | Defendant: | Old WAC: | New WAC: | Date of Increase: | Percentage Increase: |
|---|---|---|---|---|---|
| 15gm | Taro | $0.38 | $6.84 | 3-Jun-14 | 1684% |
| 15gm | Sandoz | $0.73 | $6.84 | 18-Jul-14 | 833% |
| 15gm | Hi-Tech | $0.37 | $6.84 | 9-Aug-14 | 1732% |
| 15gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 30gm | Taro | $0.33 | $6.84 | 3-Jun-14 | 1993% |
| 30gm | Sandoz | $0.50 | $6.84 | 18-Jul-14 | 1268% |
| 30gm | Hi-Tech | $0.32 | $6.84 | 9-Aug-14 | 2026% |
| 30gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 45gm | Taro | $0.33 | $6.84 | 3-Jun-14 | 1971% |
| 45gm | Sandoz | $0.59 | $6.84 | 18-Jul-14 | 1057% |
| 45gm | Hi-Tech | $0.31 | $6.84 | 9-Aug-14 | 2138% |
| 45gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 60gm | Taro | $0.32 | $6.12 | 3-Jun-14 | 1832% |
| 60gm | Sandoz | $0.50 | $6.12 | 18-Jul-14 | 1124% |
| 60gm | Hi-Tech | $0.29 | $6.12 | 9-Aug-14 | 2016% |
| 60gm | Actavis | * | $6.12 | 10-Mar-15 | * |

1524.   Although WAC data is not available for Fougera, Morton Grove, Perrigo, Sandoz, and Wockhardt, upon information and belief, they implemented simultaneous and identical price increases for their Clobetasol Propionate products.

1525.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases.

1526.   For example, by October 2014, pharmacists expressed outrage at the dramatic price increases.  Kushal Patel, a pharmacy manager at Well Future Pharmacy said "Clobetasol, which used to cost $10 for the entire tube, now costs $300.  The same exact medication we got one day.  Next day, it's an increase of three thousand percent."[217]

---

[217]   Dorothy Tucker, *Prices Soar For Some Generic Drugs – Why?*, CBS CHI. (Oct.  31, 2014), http://chicago.cbslocal.com/2014/10/31/prices-soar-for-some-generic-drugs-why/.

1527.   Ascension Health, a hospital system based in Missouri with facilities in 23 states, reported a price increase from $2.89 in 2013 to $198.64 (or 6,773%) in 2014 for a 45-gram tube of generic Clobetasol Propionate cream.[218]

1528.   A dermatologist reported the experience of his patient in Tucson, Arizona in 2015.  He expressed shock and dismay when his patient informed him that a 60-gram tube of Clobetasol Propionate cream would now cost him $220.  The dermatologist was so surprised that he called around to other local pharmacies, all of whom were pricing the product above $200.[219]

1529.   Patient reports also corroborate the skyrocketing prices for Clobetasol Propionate. In 2014, Millicent Graves of Williamsburg, Virginia paid $35 for her prescription of Clobetasol Propionate solution, but in 2015, it cost $475.88.  And just five weeks later, it rose to $627, overall a 1,691% increase over the course of a few months.[220]

1530.   An article in the *Boston Globe* described price changes from 2013 to 2015, when one form of Clobetasol Propionate's price spiked 1,496% from $0.23 per gram to $4.15 per gram.  In response, non-Defendant Akorn representative Dewey Steadman said that the company simply reacted to price increases by its competitors, Novartis and Taro.  In doing so, he invoked the influence of their market dominance and rejected the possibility of outside price factors:

---

[218]   Samantha Liss, *Hospitals and Pharmacies Grapple With Rising Drug Prices*, ST. LOUIS POST-DISPATCH (Nov. 16, 2014), https://khn.org/news/hospitals-and-pharmacies-grapple-with-rising-drug-prices/.

[219]   Norman Levine, *The Tale of the $200 Tube of Clobetasol Cream*, DERMATOLOGY TIMES (Aug. 5, 2015), https://www.dermatologytimes.com/article/tale-220-tube-clobetasol-cream-3.

[220]   *Unprecedented Generic Drug Price Spikes Wreaking Havoc*, SENIOR CITIZENS LEAGUE (Jul. 6, 2015), http://seniorsleague.org/unprecedented-generic-drug-price-spikes-wreaking-havoc/.

"Following price increases by others in this highly competitive market, Akorn brought Clobetasol's price in line with other generic versions of the product."[221]

1531.   Defendants had numerous opportunities to coordinate their price increases.  Key pricing executives from at least Actavis, Sandoz, Taro, and Wockhardt attended the (i) June 1-4, 2014 HDMA Business and Leadership Conference in Phoenix, Arizona; and key executives from at least Actavis, Fougera, non-Defendant Hi-Tech, Morton Grove, Perrigo, Sandoz, and Taro attended the (ii) June 34, 2014 GPhA Annual CMC Workshop in Bethesda, Maryland.

### E.     Desonide

1532.   At all relevant times, Actavis, Fougera, Perrigo, Sandoz, and Taro have dominated the market for Desonide.

1533.   Prior to May 2013, the effective prices for Desonide remained stable.

1534.   However, beginning in May 2013, the average NADAC price for Desonide rose dramatically.

1535.   According to NADAC data, the average market price for generic Desonide saw the following price increases:

> Desonide 0.05% cream:  between July 11 and July 18, 2013, the average price increased by 442%

> Desonide 0.05% ointment:  between July 11 and July 18, 2013, the average price increased by 390%

1536.   NADAC data show that the average market price of Desonide remained stable prior to May 2013, but rose dramatically and remained artificially high after July 2013, as

---

[221]  Priyanka Dayal McCluskey, *As Competition Wanes, Prices for Generics Skyrocket*, Bos. Globe (Nov.  6, 2015), https://www.bostonglobe.com/business/2015/11/06/generic-drug-price-increases-alarm-insurers-providers-and-consumers/H3iA9CSxAUylnCdGjLNKVN/story.html.

depicted in certain forms and dosages below.



1537.  WAC data confirms that Perrigo, Taro, and Sandoz all increased their prices in

Desonide ointment in lockstep fashion in the following amounts:

| Product Package | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15gm | Taro | 51672128101 | $0.84 | $3.21 | 5/01/2013 | 282% |
| 60gm | Taro | 51672128103 | $0.53 | $3.21 | 5/01/2013 | 501% |
| 15gm | Perrigo | 45802042335 | $0.65 | $3.21 | 5/21/2013 | 392% |
| 60gm | Perrigo | 45802042337 | $0.31 | $3.21 | 5/21/2013 | 932% |

| 15gm | Sandoz | 00168030915 | $0.70 | $3.21 | 1/17/2014 | 357% |
| 60gm | Sandoz | 00168030960 | $0.35 | $3.21 | 1/17/2014 | 815% |

1538.   Although WAC data is not available for Actavis or Fougera, upon information and belief, they implemented similar price increases, largely in unison for their Desonide products.

1539.   Actavis entered the Desonide market in August 2013 and set its prices at supracompetitive levels instead of entering at a lower cost and competing for customers.  Upon information and belief, Actavis contacted Fougera, Perrigo, Sandoz, and Taro well before August 2013 and explained its intention of market entry.  These Defendants then colluded to allocate market share and set supracompetitive prices.  This agreement prevented Actavis' entry from eroding the artificial equilibrium these Defendants conspiratorially created.

1540.   News reports and testimonials from physicians corroborate these dramatic, immediate, market-wide price increases.  For example, dermatologist Alan Rockoff reported in Dermatology News in February 2015:

> Then this week it happened again.   I prescribed hydrocortisone valerate 0.2% for a groin rash.  The patient left a message asking me for an over-the-counter suggestion, since the prescription was going to cost him $52.70 out of pocket.
>
> I asked my secretary to call the pharmacy to get a price for other generic steroid creams.    Triamcinolone would cost $14.70. Alclometasone would cost $35.20.   And desonide – generic desonide – would cost $111.70.  For a 15-g tube.  $111.70 for 15 g of a generic cream that's been on the market forever! Does that make any sense?

1541.   Defendants had numerous opportunities to coordinate their price increases. Shortly before increasing prices, key pricing executives from at least Actavis, Perrigo, Sandoz, and Taro attended the February 20-22, 2013 GPhA Annual Meeting in Orlando, Florida and the June 4-5, 2013 GPhA CMC Workshop.

F.    **Digoxin**

1542.   In late 2012, Impax and Lannett were the only active domestic manufacturers of Digoxin.  Sun, Par and West-Ward re-entered the market in 2014 and Mylan re-entered in 2015. Since that time, Impax, Lannett, Mylan, Par, Sun, and West-Ward have dominated the market for Digoxin.

1543.   Prior to October 2013, effective prices for Digoxin were stable.

1544.   Beginning in October 2013, Impax and Lannett increased their prices abruptly and in unison.  During this period, prices for generic Digoxin rose more than 630%.

1545.   As a result, prices across the market rose more than 884% for Digoxin, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, depicted in the chart below:

| Drug | Avg.  Market Price Oct.  2012 | Avg.  Market Price June 2014 | Percentage Increase: |
|---|---|---|---|
| Digoxin (single tablet 250mcg) | $0.11 | $1.10 | 884% |

1546.   According to NADAC data, the average market price for generic Digoxin saw the following price increases from November 2013 to February 2014:

Digoxin 125 mcg tablets:  881%

Digoxin 250 mcg tablets:  825%

1547.   These dramatic price increases, initially instituted by Impax and Lannett, were maintained even after Par's entry into the market in early 2014, West-Ward's entry soon thereafter, and Mylan's entry in early 2015.  In fact, these Defendants including the new entrants continued to increase prices for Digoxin during the first six months of 2014.  This is especially telling evidence of collusion, as entry of two (and later three) additional competitors would typically lead to substantial price decreases.

1548.   NADAC data show that average market prices for Digoxin rose dramatically and remained artificially high after November 2013, as depicted below.



1549.   WAC and AWP data for 0.25mg Digoxin tablets also shows that prices for Digoxin remained relatively stable prior to the November 2013 price increase.  This chart was submitted by Dr. Stephen Schondelmeyer, Director of the PRIME Institute at the College of Pharmacy for the University of Minnesota, as part of his testimony at the Senate Hearing on drug price inflation.



1550.   WAC pricing depicted below confirms that Impax, Lannett, Mylan, Par, and West-Ward all increased their Digoxin prices substantially and largely in unison.

| Package size (0.125mg) | Defendant | NDG | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100ct | Lannett | 00527132401 | $0.14 | $1.19 | 10/16/2013 | 734% |
| 1,000ct | Lannett | 00527132410 | $0.12 | $0.99 | 10/16/2013 | 738% |
| 100ct | Impax | 00115981101 | $0.14 | $1.19 | 10/22/2013 | 734% |
| 1,000ct | Impax | 00115981103 | $0.12 | $0.99 | 10/22/2013 | 738% |
| 100ct | Par | 49884051401 | | $1.19 | 1/17/2014 | |
| 1,000 | Par | 49884051410 | | $0.99 | 1/17/2014 | |
| 100ct | West-Ward | 00143124001 | $0.16 | $1.19 | 4/14/2014 | 638% |
| 1,000ct | West-Ward | 00143124010 | $0.13 | $0.99 | 4/14/2014 | 687% |
| 100ct | Mylan | 00378615501 | | $1.19 | 11/17/2014 | |
| 1,000ct | Mylan | 00378615510 | | $0.99 | 11/17/2014 | |

1551.   Although WAC data is not available for Sun, upon information and belief, Sun implemented simultaneous and identical price increases for Digoxin after it re-entered the market.

1552.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases.  Bill Drilling, a pharmacy owner in Sioux City, Iowa, apologized to his customers in December of 2013 because a 3-month supply of digoxin totaled $113.12, ten times its cost in August.  Drilling shared in his customers' outrage, adding "I've been doing this since 1985, and the only direction that generics-drug prices have gone is down."[222]

1553.   Rob Frankil, another pharmacist who testified before the Senate in November 2014, offered a similar narrative:  "A recent example from my own experience is the price of

---

[222]  Alan Katz, *Surprise! Generic-Drug Prices Spike*, BLOOMBERG (Dec. 12, 2013), https://www.bloomberg.com/news/articles/2013-12-12/generic-drug-prices-spike-in-pharmaceutical-market-surprise.

Digoxin—a drug used to treat heart failure.  The price of this medication jumped from about $15 for 90 days' supply, to about $120 for 90 days' supply.  That's an increase of 800%.  One of my patients had to pay for this drug...The patient called around to try to get the medicine at the old, lower price, but to no avail."

1554.   Defendants had ample opportunity to coordinate their pricing agreements. Shortly before the price increase, key executives from at least Impax, Lannett, Mylan, Par, and Sun attended the October 28-30, 2013 GPhA Fall Technical Conference.

### G.   Divalproex Sodium ER

1555.   At all relevant times, Dr. Reddy's, Mylan, Par, and Zydus dominated the market for Divalproex Sodium ER.

1556.   Prior to June 2013, effective prices for Divalproex Sodium ER were stable.

1557.   In June 2013, Dr. Reddy's, Mylan, Par, and Zydus increased their prices for Divalproex Sodium ER dramatically and largely in unison.

1558.   As a result, Divalproex Sodium ER prices rose across the market by more than 700%, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, depicted in the chart below:

| Drug | Avg.  Market Price Oct.  2012 | Avg. Market Price June 2014 | Percentage Increase: |
|---|---|---|---|
| Divalproex Sodium ER (bottle of 80, 500 mg tablets ER 24H) | $31 | $234 | 736% |

1559.   NADAC data show that average market prices of Divalproex Sodium ER remained stable prior to June 2013, but rose dramatically and remained artificially high after September 2013, as depicted in a sample dosage below.  For example, the average market price

for Divalproex Sodium ER increased 920%, from $0.31 per tablet to $3.18 per tablet between September 12, 2013 and September 19, 2013.



1560.   These dramatic price increases, initially instituted by Mylan and Par, were maintained even after Dr. Reddy's and Zydus' entry into the market in August 2013.  WAC pricing, depicted below, confirms that Mylan and Par increased their prices uniformly and largely in unison and Dr. Reddy's and Zydus joined in the price increase when they entered the market, instead of competing on price as would be expected of new entrants:

| Package Size (500mg ER) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100ct | Mylan | 00378047301 | $0.74 | $3.26 | 6/14/2013 | 338% |
| 500ct | Mylan | 00378047305 | $0.71 | $3.26 | 6/14/2013 | 361% |
| 100ct | Par | 10370051110 | $0.74 | $3.26 | 6/26/2013 | 338% |
| 500ct | Par | 10370051150 | $0.71 | $3.26 | 6/26/2013 | 361% |
| 100ct | Zydus | 68382031501 | | $3.26 | 8/14/2013 | |
| 500ct | Zydus | 68382031505 | | $3.26 | 8/14/2013 | |
| 100ct | Dr. Reddy's | 55111053401 | | $3.26 | 8/14/2013 | |
| 500ct | Dr. Reddy's | 55111053405 | | $3.26 | 8/14/2013 | |

1561.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases.  According to Spalitto's Pharmacy in Missouri, 500 pills of Divalproex Sodium ER cost $122.99 in May of 2013.  By August 2013,

the same number of pills skyrocketed to $1,629.95, an increase of 1,225%. "We've been doing this for 30 years. We've never seen anything like this," said the third-generation pharmacy owner.[223]

1562.   Industry experts and audit reports echoed this same narrative. In January 2014, a Morgan Stanley analyst report found that "companies have been raising prices on divalproex....aggressively."[224]

1563.   Defendants had numerous opportunities to coordinate their price increases and market share agreements. Shortly before the price increase, key pricing executives from Dr. Reddy's, Mylan, Par, and Zydus all attended the June 2-5, 2013 GPhA CMC Workshop in Bethesda, Maryland. Among others, Burton (Par, Dr. Reddy's), Nesta (Mylan), Tighe (Mylan), Wyatt (Mylan), Aigner (Mylan), Green (Zydus), and Ronco (Zydus) all attended.

### H.   Doxycycline Hyclate

1564.   Prior to October 2012, prices for Doxycycline Hyclate ("Doxy Hyclate") were stable.

1565.   Beginning in October 2012, Actavis, Par, Sun, Teva, and West-Ward increased their prices for Doxy Hyclate abruptly and largely in unison. Collectively, these Defendants raised prices for generic Doxy Hyclate by at least 2,000% (for certain dosages, as much as 8,200%) between November 2012 and March 2013.

1566.   As a result, prices rose dramatically and largely in unison. According to a report produced by PRIME Institute and presented by Dr. Stephen Schondelmeyer at a Senate hearing

---

[223]   Rob Low, *Rising Cost Some of Generic Drugs Set to Shock Consumers*, FOX4 (Aug. 14, 2013), https://fox4kc.com/2013/08/14/rising-cost-some-of-generic-drugs-set-to-shock-consumers/.

[224]   Morgan Stanley, *Specialty Pharmaceuticals Rx Trends in Pictures* (Jan. 27, 2014).

in November 2014, Doxy Hyclate prices rose approximately 2,000% between December 2012 and December 2013.  Dr. Schondelmeyer's report chronicled the retail prices for West-Ward's Doxy Hyclate prices, depicted in the chart below:

| Drug | Dosage | Manufacturer | NDC Code: | Usual Dose/ Day | Retail price/day (Median) Dec.  2012 | Retail price/day (Median) Dec.  2013 | Percentage Increase |
|---|---|---|---|---|---|---|---|
| Doxycycline Hyclate | 100mg tablet | West-Ward | 00143211205 | 2.00 | $0.36154 | $7.21887 | 1,896% |
| Doxycycline Hyclate | 100mg capsule | West-Ward | 00143314205 | 2.00 | $0.34746 | $7.46247 | 2,047% |

1567.   NADAC data show that the average market price for Doxy Hyclate rose dramatically around November 2012 and remained artificially high thereafter, as depicted in the data for 50mg capsules below:



1568.   WAC and AWP data for West-Ward's 100mg Doxy Hyclate capsules show that prices for Doxy Hyclate remained relatively stable prior to the November 2012 price increase. This chart was also submitted by Dr. Stephen Schondelmeyer, as part of his testimony at the

Senate Hearing on drug price inflation.



1569.   WAC data confirm that Actavis, Sun, and West-Ward all increased their prices in

generic Doxy Hyclate by the following amounts:

| Product | Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|---|
| 100mg capsule | 50ct | West-Ward | 00143314250 | $0.10 | $4.43 | 1/21/2013 | 4,326% |
| 100mg capsule | 500ct | West-Ward | 00143314205 | $0.10 | $4.43 | 1/21/2013 | 4,370% |
| 100mg capsule | 50ct | Actavis | 00591544050 | $0.10 | $2.74 | 2/1/2013 | 2,515% |
| 100mg capsule | 500ct | Actavis | 00591544005 | $0.10 | $2.74 | 2/1/2013 | 2,663% |
| 100mg capsule | 50ct | Sun | 53489011902 | $0.10 | $4.92 | 2/5/2013 | 4,847% |
| 100mg capsule | 500ct | Sun | 53489011905 | $0.06 | $4.92 | 2/5/2013 | 7,844% |
| 100mg tablet | 50ct | Actavis | 00591555350 | $0.10 | $2.74 | 2/1/2013 | 2,515% |
| 100mg tablet | 500ct | Actavis | 00591555305 | $0.10 | $2.74 | 2/1/2013 | 2,663% |
| 100mg tablet | 50ct | Sun | 53489012002 | $0.09 | $4.92 | 2/5/2013 | 5,631% |
| 100mg tablet | 500ct | Sun | 53489012005 | $0.08 | $4.92 | 2/5/2013 | 6,268% |

1570.   Although WAC data are not available for Par, upon information and belief, Par implemented simultaneous and identical price increases in Doxycycline Hyclate products.

1571.   Actavis, Par, Sun, Teva, and West-Ward had ample opportunity to conspire and coordinate their price increases and market share agreements.  Shortly before or while implementing the price increase, key pricing executives from at least Actavis, Par, Sun, and Teva attended the October 1-3, 2012 GPhA Technical Conference in Bethesda, Maryland.

1572.   In May of 2013, after the price increase was implemented, Teva discontinued production of Doxy Hyclate – a product it had manufactured for three decades.  This act contradicts Teva's self-interest, but furthered Defendants' conspiracy to coordinate pricing and allocate market share across the entire generic pharmaceutical industry.

1573.   In litigation between DAVA, now part of Par, and Chartwell Therapeutics Licensing, LLC ("Chartwell"), Chartwell alleged that DAVA refused to take delivery of Doxy Hyclate from Chartwell despite demand in the market and conspired to set Doxy Hyclate at an artificially high price.[225]  For example, Chartwell cites to an e-mail dated on or about July 11, 2014 in which Aram Moezinia[226] e-mailed Chartwell and stated that DAVA's plan was to sell doxycycline "slowly not to disturb pricing."  According to Chartwell, Par and Endo both produced discovery materials to the DOJ and State AGs, whose inquiries focus on generic drugs that included Doxy Hyclate.

---

[225] *See generally* Verified Answer and Counterclaims of Chartwell Therapeutics Licensing, LLC and Chartwell Pharmaceuticals LLC, *Dava Pharm., LLC* v. *Chartwell Therapeutics Licensing, LLC*, Index No. 502775/15 (N.Y. Sup Ct, July 29, 2016).

[226] *Id.* at 47.  Aram Moezinia was a Defendant in the litigation and a Director on DAVA's Board at the time of the merger with Endo.

1574.   News reports and testimonials from hospitals and pharmacists corroborate these dramatic, immediate, market-wide price increases.  For example, Michael O'Neil, pharmacy manager at Vanderbilt University Medical Center, expresses his concern over the dramatic price increase for Doxy Hyclate, which increased from $10 for a 50-count bottle of 100mg tablets, to $250:  "It's a change that occurred overnight," he said in the March 2013 report.

**I.     Econazole**

1575.   At all relevant times, Fougera, Perrigo, Sandoz, Taro, and Teligent dominated the market for Econazole, controlling approximately 99% of the market.

1576.   NADAC data show that the average market prices for Econazole remained stable prior to June 2014.

1577.   Between January 2011 and September 2013, Econazole cost approximately 12 cents for one month's worth of treatment.

1578.   Starting at least as early as July 2014, Fougera, Perrigo, Sandoz, Taro, and Teligent increased their prices for generic Econazole abruptly and in unison.  During this period, prices for generic Econazole rose more than 1,657%.

1579.   According to NADAC data, the average market price for Econazole saw the following price increases from July 2014 to March 2015:

Econazole 1% Cream (15g):  increased by 853%

Econazole 1% Cream (30g):  increased by 1,024%

Econazole 1% Cream (85g):  increased by 929%



1580.   WAC data depicted below confirm that Perrigo, Teligent, and Taro all increased

their prices for Econazole cream between July and November 2014 by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 15gm | Perrigo | 45802046635 | $0.79 | $5.80 | 7/24/2014 | 637% |
| 30gm | Perrigo | 45802046611 | $0.69 | $5.80 | 7/24/2014 | 736% |
| 85gm | Perrigo | 45802046653 | $0.50 | $4.09 | 7/24/2014 | 719% |
| 15gm | Teligent | 52565002215 | $0.82 | $5.80 | 9/1/2014 | 610% |
| 30gm | Teligent | 52565002230 | $0.72 | $5.80 | 9/1/2014 | 704% |
| 85gm | Teligent | 52565002285 | $0.52 | $4.09 | 9/1/2014 | 688% |
| 15gm | Taro | 51672130301 | $0.66 | $5.80 | 11/18/2014 | 779% |
| 30gm | Taro | 51672130302 | $0.59 | $5.80 | 11/18/2014 | 890% |
| 85gm | Taro | 51672130308 | $0.42 | $4.09 | 11/14/2014 | 871% |

1581.   Although WAC data are not available for Fougera, upon information and belief,

Fougera implemented simultaneous and identical price increases in their Econazole products.

1582.   No supply shortages or other market events can explain the Econazole price

increases.  The only significant change was Teligent's market entry in February 2013, which

should have, but did not, drive prices down.

1583.   Prior to 2012, Teligent focused its business on contract manufacturing.  But in

late 2012 it sought to enter the market for numerous topical generic products.  By September

2013, Teligent had 12 ANDAs pending.  Teligent currently manufactures 20 topical generics

covered by 33 ANDAs.  For 17 of the 20 drugs, Teligent directly competes with Taro, and for fifteen of the drugs, Teligent directly competes with Perrigo.  This situation in particular lends itself to the Defendants' "fair share" agreement, as these three Defendants can creatively allocate drugs and market share to maintain an artificial equilibrium.

1584.   On February 1, 2013, Teligent obtained an ANDA for Econazole from Prasco LLC.  Shortly thereafter, Teligent's CEO, Jason Grenfell-Gardner, attended the 2013 GPhA Annual Meeting on February 20-22, 2013 in Orlando, Florida and the 2013 ECRM EPPS Retail Pharmacy Generics conference on February 24-27, 2013 in Dallas, Texas, along with representatives from Perrigo and Taro.  Specifically, the CEOs of Perrigo (Joseph Papa) and Taro (Kal Sundaram) joined Teligent's CEO at the 2013 GPhA Annual Meeting.

1585.   When Teligent launched Econazole under its own ANDA, it irrationally increased effective prices immediately, rather than compete for market share on price.

1586.   Significant price increases shortly followed or occurred at about the time of the following trade conferences:  June 1-4, 2014 HDMA 2014 Business and Leadership Conference in Phoenix, Arizona; June 3-4, 2014 GPhA CMC Workshop in North Bethesda, Maryland; October 27-29, 2014 GPhA Fall Technical Conference in Bethesda, MD; February 9-11, 2015 GPhA Annual Meeting in Miami Beach, FL; and February 22-25, 2015 ECRM 2015 Retail Pharmacy Generic Pharmaceuticals EPPS in Destin, FL.  Key executives from Fougera, Perrigo, Sandoz, Taro, and Teligent all attended.

### J.    Lidocaine

1587.   Fougera, non-Defendant Hi-Tech, Impax, and Sandoz dominate the market for one popular formulation of Lidocaine, Lidocaine-Prilocaine.

1588.   Prior to March 2014, the effective prices for Lidocaine-Prilocaine were stable.

1589.   Beginning in April 2014, Fougera, non-Defendant Hi-Tech, Impax, and Sandoz increased their prices abruptly and largely in unison for Lidocaine-Prilocaine.

1590.   Prices for other forms of Lidocaine also experienced increases.  The GAO Report noted an "extraordinary price increase" for Lidocaine 5% ointment in the 2012-2013 period and another "extraordinary price increase" for Lidocaine-Hydrochloride 3% cream in the 2011-2012 period.[227]

1591.   NADAC data show that average market prices for Lidocaine-Prilocaine increased by almost 300% beginning in April 2014 and remained artificially high thereafter:



1592.   These price increases occurred following the February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida, which at least representatives from non-Defendant Hi-Tech, Impax, and Sandoz attended.

**K.    Metronidazole**

1593.   At all relevant times, G&W, Heritage, Impax, Sandoz, Teva, and Valeant dominated the market for Metronidazole.  Heritage entered the market for Metronidazole in May

---

[227]   GAO Report, at 41.

2013.

1594.  G&W, Sandoz, and Teva conspired to increase the price of Metronidazole cream. Throughout the period, G&W, Sandoz, and Teva had ample opportunity to discuss and coordinate pricing of Metronidazole cream at various trade association and industry events including (i) the August 30-31, 2010 NACDS Pharmacy and Technology Conference in San Diego, California; (ii) the August 27-30, 2011 NACDS Pharmacy and Technology Conference in Boston, Mass.; (iii) the April 24-27, 2012 NACDS Annual Meeting; (iv) the February 20-22, 2012 GPhA Annual Meeting in Orlando, Florida; (v) the December 3, 2014 NACDS Foundation and Reception Dinner in New York, N.Y.; and (vi) the April 25-28, 2015 NACDS Annual Meeting in Florida.

1595.  G&W, Impax, Sandoz, and Teva conspired to increase the price of Metronidazole jelly.  The Metronidazole jelly price increase occurred shortly after trade association meetings where representatives from G&W, Impax, Sandoz, and Teva were in attendance, such as:  (i) April-May 2011 NACDS Annual Meeting; (ii) August 27-30, 2011 NACDS Pharmacy and Technology Conference in Boston; (iii) April 24-27, 2012 NACDS Annual Meeting; and (iv) August 2012 NACDS Pharmacy and Technology Conference.

1596.  Sandoz and Teva conspired to increase the price of Metronidazole lotion.  The Metronidazole lotion price increase occurred shortly after trade association meetings where representatives from Sandoz and Teva were in attendance, such as:  (i) August 30-31, 2010 NACDS Pharmacy and Technology Conference in San Diego; (ii) August 27-30, 2011 NACDS Pharmacy and Technology Conference in Boston; (iii) April 24-27, 2012 NACDS Annual Meeting; (iv) February 20-22, 2012 GPhA Annual Meeting in Orlando, Florida; (v) December 3,

2014 NACDS Foundation and Reception Dinner in New York; and (vi) the April 25-28, 2015 NACDS Annual Meeting in Florida.

1597.   Sandoz and Valeant conspired to increase the price of Metronidazole vaginal gel. Valeant manufactures a branded metronidazole gel under the name MetroGel vaginal.

1598.   The Metronidazole vaginal gel price increase occurred shortly after trade association meetings where representatives from Sandoz and Valeant were in attendance, such as:  (i) June 2014 HDMA Business and Leadership Conference; (ii) December 3, 2014, NACDS Foundation and Reception Dinner in New York, New York; and (iii) April 2015 NACDS Annual Meeting.

1599.   Notably, the Metronidazole vaginal gel price increase occurred around the same time Valeant was also dramatically increasing prices of numerous other drugs.  At the end of 2012, Valeant acquired Medicis, which originally manufactured brand MetroGel vaginal, and proceeded to engage in a series of price increases on MetroGel vaginal in 2013 and 2014.  Such price increases are a well-known business strategy of Valeant.[228]  Valeant was among the generic manufacturers that received a letter as part of the Congressional investigation into generic price increases.

### L.     Propranolol HCL capsules

1600.   At all relevant times, Actavis, Breckenridge, and Upsher-Smith have dominated the market for Propranolol HCL capsules.

---

[228] See Press Release, U.S. Sen. Bernie Sanders, "Sanders and Cummings Ramp Up Investigation of Staggering Drug Price Increases" (Aug. 14, 2015), https://www.sanders.senate.gov/newsroom/press-releases/sanders-and-cummings-ramp-up-investigation-of-staggering-drug-price-increases (asking Valeant why prices of drugs increased when the only change in the drugs is "the company that owns them").

1601.   Actavis, Breckenridge, and Upsher-Smith collusively increased prices on Propranolol HCL capsules between December 2013 and October 2014.

1602.   According to NADAC data, various dosage levels of Propranolol HCL capsules saw the following average price increases:

> Propranolol HCL ER 120mg capsules:  increased by 181% between December 2013 and July 2014; and

> Propranolol HCL ER 180mg capsules:  increased by 174% between December 2013 and October 2014.



1603.   Medicaid reimbursement data also confirm that these Defendants increased their prices abruptly and largely in unison.  The following charts depict Medicaid reimbursement rates

for exemplary dosage levels of Propranolol HCL capsules.



1604.   These price increases followed the October 28-30, 2013 GPhA Technical

Conference in North Bethesda, Maryland, which representatives from Actavis, Breckenridge,

and Upsher-Smith attended.

**M.    Ursodiol**

1605.   At all relevant times, Actavis and Lannett dominated the market for Ursodiol.

1606.   Prior to May 2014, prices for Ursodiol were stable.

1607.   Beginning in May 2014, Actavis and Lannett increased their prices for Ursodiol

abruptly and largely in unison.

1608.   According to NADAC data, the average market price for generic Ursodiol saw the following price increase from May 2014 to November 2014:

Ursodiol 300mg Capsules:  increased from $0.29 per unit to

$4.49 per unit, a 1,448% increase.

1609.   NADAC data show that average market price for Ursodiol rose dramatically and remained artificially high after May 2014, as depicted below.



1610.   WAC pricing confirms that Actavis and Lannett increased their Ursodiol prices substantially and largely in unison.

| Dosage | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 300mg | Lannett | 00527132601 | | $5.11 | 5/1/2014 | |
| 300mg | Actavis | 00591315901 | $0.77 | $5.11 | 6/24/2014 | 562% |

1611.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, and market-wide price increases.  In November 2014, patient Barbara

Heller reported that her three-month prescription for Ursodiol increased from $94.50 to $1,212.30 between refills.[229]

## XIII.   PRICE INCREASES SLOW DRAMATICALLY AFTER GOVERNMENT INVESTIGATIONS COMMENCE

1612.   As further evidence that the price increases discussed above were not the result of normal market factors, the massive price spikes that were occurring in the industry in 2013 and 2014 slowed dramatically after the State of Connecticut commenced its antitrust investigation in July 2014.  This was not a coincidence.  Generic drug manufacturers in the industry – including the Defendants in this case – understood that they were under scrutiny and did not want to draw further attention to themselves.

1613.   In January 2015, Sandoz conducted an analysis of the price increases in the generic drug industry in 2013 and 2014, with an early look toward 2015.  In its report, Sandoz found that "[g]eneric drug price increases in 2013 and 2014 were very common." Specifically, the report stated:  "For the years 2013 and 2014, there were 1,487 SKU 'large price increases' (WAC increase greater than 100%)[;] of this 12% (178 SKUs) were increased by more than 1000%."

1614.   The report went on to state that "[t]he number and level of price increases declined noticeably in 4Q 2014." The following graphic, which was included in the Sandoz report, demonstrates that the number of price increases started to decline dramatically after the

---

[229]   Jonathan Lapook, *Why some generic drug prices are skyrocketing*, CBS NEWS (Nov. 12, 2014), http://www.cbsnews.com/news/generic-drug-prices-skyrocketing/.

second quarter of 2014 – the same time that the Plaintiff States commenced their investigation:



1615.   To date, prices for many of these drugs remain at significantly inflated, anti-competitive levels.

## XIV.   CONSCIOUSNESS OF GUILT

1616.   The Defendants were aware that their conduct was illegal.  As alleged in Amended State AG Complaint No. 1 and Amended State AG Complaint No. 2, Defendants made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made.  There are numerous examples, discussed throughout this Complaint, where Teva employees indicated that they could not talk by e-mail, but had additional information that they could only convey personally.  This was part of a consistent effort by Defendants to avoid putting incriminating information in writing, in order to evade detection.

1617.   Going back to at least 2012, for example, Heritage executives took overt steps to conceal their illegal activity and destroy evidence of wrongdoing.

1618.   As alleged by the State AGs, none of the e-mail accounts maintained by Heritage had any document retention policy associated with them.  Heritage executives were aware of this and utilized the lack of a company retention policy to routinely destroy e-mails that memorialized their illegal conduct.  Heritage executives were aware that in order to permanently destroy an e-mail, however, the e-mail had to be deleted from more than just the recipient's in box.  For example, on June 27, 2012, Heritage CEO Glazer sent an e-mail to Malek titled "Email" instructing:  "Clean your sent file out as well."

1619.   Glazer continued to remind Malek not to put any evidence of his illegal conduct into writing.  In a text message dated June 26, 2014, Glazer warned Malek about his use of e-mail:  "No emails about products, price and competitors."

1620.   That same day, in an e-mail to the entire sales team at Heritage, Glazer made the point as clearly as possible:  "We don't talk about pricing dynamics and competition on emails. If you have questions – you can call JM or me directly and then punch yourself in the face."

1621.   Heritage was not alone in its efforts to conceal its illegal activity.  For example, in May 2014, a large customer of Taro's received a bid on a product not identified in this Complaint and gave Taro an opportunity to bid to retain the business.  A.L., a senior contracting executive at Taro, sent an internal e-mail stating "FS ok, will not protect."  E.G., a senior managed care executive at Taro, responded "explain FS, (Fair Share)?"  Aprahamian replied:

> No emails please. Phone call. ▬▬▬ let's discuss. [230]

1622.   Similarly, in June 2014, shortly after a text message exchange between K.A. of Citron and Anne Sather from Heritage wherein the two competitors discussed and agreed to raise

---

[230]   Amended State AG Complaint No. 2 ¶ 159.

the price of Glyburide, K.S. from Citron called D.L. at Heritage, informing him that she had been "looped" in on Heritage's plan.  According to Sather's notes, K.S. told D.L. that Heritage employees should not communicate with Citron through e-mail, but should instead call L.S., the Vice President of Sales at Citron, if they had information to convey.

1623.   Similarly, handwritten notes from an internal Sandoz business review presentation from May 2017 – after the States' investigation was well underway – read:  "Avoid Fair Share terminology on slides – underdeveloped or overdeveloped is better."[231]

1624.   To avoid creating a potentially incriminating paper trail, Kellum of Sandoz routinely admonished colleagues for putting information that was too blatant in e-mails, understanding that it could lead to significant legal exposure for both the company and the individuals involved.

1625.   As Defendants became more aware that they were under state and federal investigation, there was even more urgency to avoid detection.  For example, on June 2, 2015, after it had become public that Connecticut and the DOJ were investigating the industry, Malek sent Sather a text message stating:  "Just got your email on meprobamate.  Let's avoid emailing about other manufacturers and having discussions with them.  Can be misconstrued based on what we are hearing elsewhere...."  Upon information and belief, the referenced e-mail has, along with other relevant documents, been deleted by Heritage.

1626.   As another example, when Green wanted to speak with a particular competitor, he would routinely send a text message to that competitor, saying only "call me." Again, this was done to avoid putting any potentially incriminating communications in writing.  Patel learned

---

[231]   *Id.* at ¶ 159.

this technique from Green, shortly after starting at Teva, and adopted a similar strategy for communicating with competitors.

1627.   Kellum of Sandoz was also aware that what he and others at Sandoz were doing was illegal.  Kellum had received antitrust training and knew that conspiring with competitors to fix, increase, stabilize, or maintain prices, allocate customers and markets, and rig bids was a violation of the antitrust laws.  Kellum would routinely admonish Sandoz employees for putting anything incriminating into e-mails, and voiced concern that the conduct they were engaging in – if discovered – could result in significant liability.  As a result of Kellum's admonishments, Sandoz employees (including Kellum himself) routinely lied in e-mails about the sources of their information to camouflage their conduct, claiming they learned the information from a customer instead of a competitor.

## XV.  SPOLIATION OF EVIDENCE

1628.   As alleged in State AG Complaint No. 1 and Amended State AG Complaint No. 2, many of the individuals named above, and other employees of the various corporate Defendants, took active steps to delete their conspiratorial communications with competitors, and destroy evidence of their illegal behavior.

1629.   As set forth above, Heritage failed to maintain a document retention policy and took active steps to have e-mails destroyed.  Furthermore, upon information and belief, Glazer, Malek and certain other Heritage employees also deleted all text messages from their company iPhones regarding their illegal communications with competitors.

1630.   As another example, Patel produced text messages – in response to the States' subpoena – going back as far as early 2014.  Prior to producing those text messages, however, Patel had deleted all of her text communications with competitors from the same time period, including many text messages with Aprahamian, Brown, Cavanaugh, Grauso, Green,

Rekenthaler and Sullivan; and many other text messages with employees of Dr. Reddy's, Glenmark (including CW-5), Par, Sandoz, Upsher-Smith and Zydus.

1631.   Patel deleted these text messages after a conversation with Rekenthaler in early 2015, when Rekenthaler warned Patel to be careful about communicating with competitors. Rekenthaler was aware of the government investigations that had been commenced and told Patel that the government was showing up on people's doorsteps.  Sometime after that, Patel deleted her text messages with competitors.

1632.    G.S. of Mayne, realizing the illegal nature of the agreements she entered into, also deleted from her cell phone several of the most incriminating text messages between her and Sather before the data on her phone was imaged and produced to Connecticut.

1633.   Apotex also destroyed an entire custodial file for one of its key employees (B.H., a senior sales executive), after the States requested it through an investigatory subpoena in July 2017.  As discussed above, B.H. was involved in coordinating two significant price increases with Patel of Teva in 2013, which resulted in Apotex soaring in the quality competitor rankings.  After the States' subpoena was issued, Apotex destroyed B.H.'s custodial file – and did not inform the States that it had done so for over a year.

## XVI.   OBSTRUCTION OF JUSTICE

1634.   As alleged in State AG Complaint No. 1 and Amended State AG Complaint No. 2, many of the Defendants have been coordinating consistently to obstruct the ongoing government investigations and to limit any potential response.  This coordination goes back at least as far as October 2014, when Congress first started investigating price increases in the generic drug industry.

1635.   When the federal government executed a search warrant against Patel at her home on June 21, 2017, she immediately called Rekenthaler (from another phone because her phone

had been seized) even though Rekenthaler was no longer employed at Teva and was by that point the Vice President of Sales at Apotex.  Rekenthaler then immediately called Cavanaugh and C.B., another senior Teva executive.  Rekenthaler spoke several times to Cavanaugh before then calling his own attorney and speaking twice.  Later that day, Patel called Rekenthaler two more times to coordinate her response to the government.

1636.   Other Defendants took similar action in response to events in the States' investigation.  Several were speaking frequently at or around the time a subpoena was issued, or when the States were engaging in substantive discussions with their counsel.  As just one example, on July 17, 2018 the States sent a subpoena to Grauso, through his counsel.  That same day, Grauso spoke to Aprahamian for more than twelve (12) minutes.  The States then set up a conference call with Grauso's counsel for July 25, 2018.  The day before that call – July 24, 2018 – Aprahamian spoke to his lawyer, and then shortly thereafter called Grauso.  The next day, shortly after a conversation between the States and counsel for Grauso, Aprahamian and Grauso spoke again, this time for nearly seven (7) minutes.

## XVII.  PLAINTIFF'S PURCHASES AND ANTITRUST INJURY

1637.   Because of Defendants' illegal conduct, Cigna has incurred overcharges paid directly and indirectly by Express Scripts Purchasers, Cigna Pharmacies, and Cigna Plans due to artificially-inflated prices for each of the Subject Drugs listed above.  Those prices have been substantially higher than the prices that Cigna would have paid for the Subject Drugs but for Defendants' collusion.

1638.   Consequently, Cigna has sustained substantial losses and damages to its business and property in the form of overcharges.  The full amount, forms, and components of such damages will be determined after discovery and upon proof at trial.

1639.   Defendants' unlawful conduct has harmed competition in the market, and Cigna has sustained, and continues to sustain, significant losses in the form of artificially inflated prices paid to Defendants.  The full amount of such damages will be calculated after discovery and upon proof at trial.

1640.   Defendants, through their unlawful acts, reduced competition in the United States market for the Subject Drugs, increased prices, and caused antitrust injury to Cigna.

1641.   Prices for the Subject Drugs have been and continue to be inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.  The inflated prices that Cigna has paid, and continues to pay, are traceable to, and the foreseeable result of, Defendants' unlawful conduct.

## XVIII. INTERSTATE TRADE AND COMMERCE

1642.   Defendants are the leading manufacturers and suppliers of the Subject Drugs sold in the United States.  At all material times, the Subject Drugs were manufactured and sold by Defendants, directly or through one of more of their affiliates, throughout the United States in a continuous and uninterrupted flow through interstate commerce, including through and into this District.

1643.   Between at least 2010 and the present, in connection with the purchase and sale of the Subject Drugs, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

1644.   Defendants' and their co-conspirators' activities were within the flow of interstate commerce, intending to have and having a substantial effect on interstate commerce in the United States.

1645.   Defendants' and their co-conspirators' conduct, including the marketing and sale of the Subject Drugs, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce in the United States.

1646.   The conspiracy alleged herein has directly and substantially affected interstate commerce; Defendants deprived Cigna and others of the benefit of free and open competition in the purchase of the Subject Drugs within the United States.

1647.   Defendants' agreement to fix, increase, stabilize, or maintain prices, allocate customers and markets, and rig bids for the Subject Drugs, and their actual inflating, fixing, maintaining, or artificially stabilizing prices of the Subject Drugs, were intended to have, and have had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## XIX.   TOLLING AND FRAUDULENT CONCEALMENT

1648.   The claims asserted in this Complaint have been tolled as Defendants engaged in affirmative and fraudulent concealment of the conspiracies alleged in this Complaint.

1649.   Defendants knew their actions were illegal and consistently took overt steps to conceal their illegal conduct and destroy evidence of their agreements.

1650.   Among other things, as alleged in the Amended AG Complaint No. 2, Defendants' executives took affirmative steps to conceal and destroy evidence of their wrongdoing since as early as 2012.  These steps included failing to maintain a document retention policy, instructing each other and their co-conspirators not to put communications relating to the conspiracy in writing, intentionally withholding documents subject to subpoenas, and deleting text messages from their telephones, as alleged in paragraphs 158, 546, 647, 1117, among others, of the Amended State AG Complaint No. 2, which is incorporated by reference.

1651.   Furthermore, Defendants spoke and met in secret to conceal the conspiracies, often under the pretext of trade association and industry activities as set forth above and took steps (beyond those alleged above) to ensure that communications relating to the conspiracies were not recorded in writing.  In some cases, as alleged above, price increases were staggered to conceal the existence of the price-fixing agreements.  Also, as alleged above, Defendants engaged in bid coordination and fake bidding activity, which were intended to, and did, give a false impression of competition among Defendants.

1652.   Cigna acted with due diligence at all relevant times by, among other things, monitoring available prices for the Subject Drugs and seeking to obtain the most competitive prices possible, efforts that were hindered by Defendants' concealment.

1653.   The pendency of certain DOJ actions has also tolled the claims asserted in this Complaint.  On December 12, 2016, the DOJ filed an Information charging Glazer with the criminal offense of violating the U.S. antitrust laws by participating in a conspiracy to allocate customers, rig bids, and fix and maintain prices of generic drugs, including Doxycycline, sold in the United States.  The Glazer criminal proceedings, and the Malek criminal proceedings that were filed one day later, toll the running of the statutes of limitation on Cigna's claims during the criminal proceedings and for one year thereafter under 15 U.S.C. § 16(i), and under New York General Business Law § 342-c.

1654.   The pendency of one or more class action complaints, and any amendments, against Defendants and their co-conspirators for conspiring to fix prices of each of the Subject Drugs tolled the running of the statutes of limitations as of the date the first such class action complaint was filed.

## XX.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY

1655.   Discovery is necessary to determine the full scope of Defendants' conspiracy, including its full length, all affected products, and all participants.  Cigna reserves all rights to amend or supplement this Complaint to add additional Defendants, claims, years, products, or other allegations based upon discovery and further investigation.

## XXI.  CAUSES OF ACTION

**COUNT 1**
**The Overarching Conspiracy**
**Sherman Act § 1**
**(Direct Purchaser Claims: Purchases by Cigna Pharmacies and Express Scripts
Purchasers)**

1656.   Cigna incorporates and re-alleges every preceding allegation as if fully set forth herein.

1657.   As set forth above, each of the Defendants has engaged and participated in one or more contracts, combinations, and/or conspiracies to artificially inflate prices for generic drugs sold throughout the United States.

1658.   Each Defendant's conduct violated, and continues to violate, Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as Section 3, 15 U.S.C. § 3, as an unreasonable restraint of trade.  Defendants' conduct is *per se* unlawful under antitrust law.

1659.   Each of the Defendants has committed at least one overt act in furtherance of one or more of the conspiracies alleged in this Complaint.

1660.   The acts done by each of the Defendants as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or done by Defendants' officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

1661.  The anticompetitive acts by Defendants and their co-conspirators had, and continues to have, a substantial and foreseeable effect on interstate commerce by artificially raising and fixing prices for the generic drugs at issue throughout the United States.

1662.  As a proximate result of Defendants' unlawful conduct, Cigna has been harmed by being forced to pay artificially inflated, supra-competitive prices for generic drugs in the United States.

1663.  Cigna has been injured and will continue to be injured in its business and property by paying more for the generic drugs at issue than in the absence of Defendants' unlawful conduct.  For example, the Express Scripts and Cigna Pharmacies, which purchased the Subject Drugs for dispensation by mail-order, specialty, and retail pharmacies, were injured.

1664.  Cigna seeks and is entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for all overcharges proximately caused by the antitrust violation(s) alleged above.  Such damages have been suffered in an amount to be proven at trial.

1665.  Cigna is also entitled, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to an injunction against Defendants, restraining and preventing the violations alleged in this Complaint, as well as attorneys' fees and costs, and all other forms of relief available under federal law.

**COUNTS 2 – 140**
**<u>Individual Conspiracies</u>**
**Sherman Act § 1**
**(Direct Purchaser Claims:  Purchases by Cigna Pharmacies and Express Scripts Purchasers)**

1666.  Cigna incorporates and re-alleges every preceding allegation as if fully set forth herein.

1667.   Counts 2 through 140 enumerate individual product conspiracies specific to each of the Subject Drugs.  For purposes of Counts 2 through 140, the term "Defendants" refers only to the companies identified in each individual Count.

| Count | Drugs | Defendants |
|---|---|---|
| 2. | Acetazolamide | Heritage, Lannett, Taro, Teva, Zydus |
| 3. | Adapalene | Glenmark, Taro, Teva |
| 4. | Albuterol Sulfate | Mylan, Sun |
| 5. | Amiloride HCL/HCTZ Tablets | Mylan, Teva |
| 6. | Amitriptyline | Mylan, Par, Sandoz |
| 7. | Amoxicillin/Clavulanate Chewable Tablets | Sandoz, Teva |
| 8. | Amphetamine/Dextroamphetamine ER | Actavis, Teva |
| 9. | Amphetamine/Dextroamphetamine IR | Actavis, Aurobindo, Teva |
| 10. | Azithromycin Oral Suspension | Teva |
| 11. | Azithromycin Suspension | Teva |
| 12. | Baclofen | Lannett, Par, Teva, Upsher-Smith |
| 13. | Benazepril HCTZ | Mylan, Sandoz |
| 14. | Bethanechol Chloride Tablets | Amneal, Teva |
| 15. | Budesonide DR Capsules | Mylan, Par, Teva |
| 16. | Budesonide Inhalation | Actavis, Teva |
| 17. | Bumetanide Tablets | Sandoz, Teva |
| 18. | Buspirone HCL Tablets | Actavis, Mylan, Teva |
| 19. | Cabergoline | Teva |
| 20. | Capecitabine | Mylan, Teva |
| 21. | Carbamazepine Chewable Tablets | Taro, Teva |
| 22. | Carbamazepine Tablets | Apotex, Taro, Teva |
| 23. | Cefdinir Capsules | Lupin, Teva |
| 24. | Cefdinir Oral Suspension | Lupin, Teva |
| 25. | Cefprozil Tablets | Lupin, Teva |
| 26. | Celecoxib | Actavis, Teva |
| 27. | Cephalexin | Lupin, Teva |
| 28. | Cimetidine Tablets | Apotex, Mylan, Teva |
| 29. | Ciprofloxacin HCL Tablets | Actavis, Dr. Reddy's, Teva |
| 30. | Clarithromycin ER | Actavis, Teva, Zydus |
| 31. | Clemastine Fumarate Tablets | Sandoz, Teva |
| 32. | Clobetasol Propionate | Actavis, Fougera, Morton Grove, Perrigo, Sandoz, Taro, Wockhardt |

| Count | Drugs | Defendants |
|---|---|---|
| 33. | Clomipramine HCL | Mylan, Sandoz, Taro |
| 34. | Clonidine TTS Patch | Actavis, Mylan, Teva |
| 35. | Clotrimazole Topical Solution | Taro, Teva |
| 36. | Cyproheptadine HCL | Breckenridge, Teva |
| 37. | Desmopressin Acetate Tablets | Actavis, Teva |
| 38. | Desogestrel/Ethinyl Estradiol Tablets (Kariva) | Glenmark, Teva |
| 39. | Desonide | Actavis, Fougera, Perrigo, Sandoz, Taro |
| 40. | Dexmethylphenidate HCL ER Capsules | Sandoz, Teva |
| 41. | Dextroamphetamine Sulfate ER | Actavis, Teva |
| 42. | Diclofenac Potassium Tablets | Mylan, Sandoz, Teva |
| 43. | Dicloxacillin Sodium Capsules | Sandoz, Teva |
| 44. | Diflunisal | Teva |
| 45. | Digoxin | Impax, Lannett, Mylan, Par, Sun, West-Ward |
| 46. | Diltiazem HCL Tablets | Mylan, Teva |
| 47. | Disopyramide Phosphate Capsules | Actavis, Teva |
| 48. | Divalproex Sodium ER | Dr. Reddy's, Mylan, Par, Zydus |
| 49. | Doxazosin Mesylate Tablets | Apotex, Mylan, Teva |
| 50. | Doxycycline Hyclate | Actavis, Mayne, Par, Sun, Teva, West-Ward |
| 51. | Doxycycline Monohydrate | Heritage, Lannett, Mylan, Par |
| 52. | Drospirenone and Ethinyl Estradiol | Actavis, Lupin, Teva |
| 53. | Econazole | Fougera, Perrigo, Taro, Teligent |
| 54. | Enalapril Maleate Tablets | Mylan, Taro, Teva, Wockhardt |
| 55. | Entecavir | Par, Teva |
| 56. | Epitol Tablets | Apotex, Taro, Teva |
| 57. | Estazolam Tablets | Actavis, Teva |
| 58. | Estradiol Tablets | Actavis, Mylan, Teva |
| 59. | Estradiol/Norethindrone Acetate Tablets (Mimvey) | Breckenridge, Teva |
| 60. | Ethinyl Estradiol and Levonorgestrel | Sandoz, Teva |
| 61. | Ethosuximide Capsules | Teva |
| 62. | Ethosuximide Oral Solution | Teva |
| 63. | Etodolac ER | Taro, Teva, Zydus |
| 64. | Etodolac | Sandoz, Taro, Teva |
| 65. | Fenofibrate | Lupin, Mylan, Teva, Zydus |
| 66. | Fluconazole Tablets | Glenmark, Teva |

| Count | Drugs | Defendants |
|---|---|---|
| 67. | Fluocinonide | Actavis, Taro, Teva |
| 68. | Fluoxetine HCL Tablets | Mylan, Par, Teva |
| 69. | Flurbiprofen Tablets | Mylan, Teva |
| 70. | Flutamide Capsules | Actavis, Par, Teva |
| 71. | Fluvastatin Sodium Capsules | Mylan, Teva |
| 72. | Fosinopril HCTZ | Aurobindo, Citron, Glenmark, Heritage, Sandoz |
| 73. | Gabapentin Tablets | Glenmark, Teva |
| 74. | Glimepiride Tablets | Dr. Reddy's, Teva |
| 75. | Glipizide-Metformin | Heritage, Mylan, Teva |
| 76. | Glyburide | Aurobindo, Citron, Heritage, Teva |
| 77. | Glyburide-Metformin | Actavis, Aurobindo, Citron, Heritage, Teva |
| 78. | Griseofulvin Suspension | Actavis, Teva |
| 79. | Haloperidol | Mylan, Sandoz |
| 80. | Hydralazine HCL | Heritage |
| 81. | Hydroxyurea Capsules | Par, Teva |
| 82. | Hydroxyzine Pamoate Capsules | Actavis, Sandoz, Teva |
| 83. | Irbesartan | Lupin, Teva |
| 84. | Isoniazid | Sandoz, Teva |
| 85. | Ketoconazole Cream | Sandoz, Taro, Teva |
| 86. | Ketoconazole Tablets | Mylan, Taro, Teva |
| 87. | Ketoprofen Capsules | Mylan, Teva |
| 88. | Ketorolac Tromethamine Tablets | Mylan, Teva |
| 89. | Labetalol HCL Tablets | Par, Sandoz, Teva |
| 90. | Lamivudine/Zidovudine | Aurobindo, Camber, Lupin, Teva |
| 91. | Leflunomide | Apotex, Heritage, Teva |
| 92. | Levothyroxine | Lannett, Mylan, Sandoz |
| 93. | Loperamide HCL Capsules | Mylan, Teva |
| 94. | Lidocaine-Prilocaine | Fougera, Impax, Sandoz |
| 95. | Medroxyprogesterone Tablets | Teva |
| 96. | Meprobamate | Dr. Reddy's, Heritage |
| 97. | Methimazole | Heritage, Par |
| 98. | Methotrexate Tablets | Mylan, Teva |
| 99. | Metronidazole | G&W, Heritage, Impax, Sandoz, Teva, Valeant |
| 100. | Moexipril HCL Tablets | Glenmark, Teva |
| 101. | Moexipril HCL/HCTZ Tablets | Glenmark, Teva |
| 102. | Nabumetone Tablets | Actavis, Glenmark, Sandoz, Teva |
| 103. | Nadolol Tablets | Mylan, Sandoz, Teva |

| Count | Drugs | Defendants |
|---|---|---|
| 104. | Niacin ER | Lupin, Teva, Zydus |
| 105. | Nimodipine | Ascend, Heritage, Sun |
| 106. | Nitrofurantoin MAC Capsules | Alvogen, Mylan, Teva |
| 107. | Norethindrone Acetate | Amneal, Glenmark, Teva |
| 108. | Norethindrone/Ethinyl Estradiol | Lupin, Teva |
| 109. | Nortriptyline Hydrochloride Capsules | Actavis, Taro, Teva |
| 110. | Nystatin | Actavis, Heritage, Par, Perrigo, Sandoz, Sun, Taro, Teva |
| 111. | Omega-3-Acid Ethyl Esters | Par, Teva |
| 112. | Oxaprozin | Dr. Reddy's, Teva |
| 113. | Oxybutynin Chloride Tablets | Teva, Upsher-Smith |
| 114. | Paromomycin | Heritage, Sun |
| 115. | Paricalcitol | Dr. Reddy's, Teva, Zydus |
| 116. | Penicillin VK Tablets | Aurobindo, Sandoz, Teva |
| 117. | Pentoxifylline Tablets | Apotex, Mylan, Teva |
| 118. | Piroxicam | Teva |
| 119. | Pravastatin | Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Sandoz, Teva, Zydus |
| 120. | Prazosin HCL Capsules | Mylan, Teva |
| 121. | Prochlorperazine Tablets | Mylan, Sandoz, Teva |
| 122. | Propranolol HCL Tablets | Actavis, Heritage, Mylan, Par, Teva |
| 123. | Propranolol HCL Capsules | Actavis, Breckenridge, Upsher-Smith |
| 124. | Raloxifene HCL Tablets | Teva, Camber |
| 125. | Ranitidine HCL Tablets | Amneal, Glenmark, Sandoz, Teva |
| 126. | Tamoxifen Citrate Tablets | Actavis, Mylan, Teva |
| 127. | Temozolomide | Sandoz, Teva |
| 128. | Theophylline ER | Heritage, Teva |
| 129. | Tizanidine | Dr. Reddy's, Mylan, Sandoz |
| 130. | Tobramycin | Sandoz, Teva |
| 131. | Tolmetin Sodium Capsules | Mylan, Teva |
| 132. | Tolterodine ER | Mylan, Teva |
| 133. | Tolterodine Tartrate | Teva |
| 134. | Topiramate Sprinkle Capsules | Actavis, Teva, Zydus |
| 135. | Trifluoperazine HCL | Mylan, Sandoz |
| 136. | Ursodiol | Actavis, Lannett |
| 137. | Valsartan HCTZ | Mylan, Sandoz |

| Count | Drugs | Defendants |
|-------|-------|------------|
| 138. | Verapamil | Actavis, Heritage, Mylan |
| 139. | Warfarin Sodium Tablets | Amneal, Taro, Teva, Upsher-Smith, Zydus |
| 140. | Zoledronic Acid | Dr. Reddy's, Heritage, Par |

1668.   Each of the Defendants has engaged and participated in one or more contracts, combinations, and/or conspiracies to artificially inflate prices for generic drugs sold throughout the United States.

1669.   Each Defendant's conduct violated, and continues to violate, Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as Section 3, 15 U.S.C. § 3, as an unreasonable restraint of trade.  Defendants' conduct is *per se* unlawful under antitrust law.

1670.   Each of the Defendants has committed at least one overt act in furtherance of one or more of the conspiracies alleged in this Complaint.

1671.   The acts done by each of the Defendants as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or done by Defendants' officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

1672.   The anticompetitive acts by Defendants and their co-conspirators had, and continues to have, a substantial and foreseeable effect on interstate commerce by artificially raising and fixing prices for the generic drugs at issue throughout the United States.

1673.   As a proximate result of Defendants' unlawful conduct, Cigna has been harmed by being forced to pay artificially inflated, supra-competitive prices for generic drugs in the United States.

1674.   Cigna has been injured and will continue to be injured in its business and property by paying more for the generic drugs at issue than in the absence of Defendants' unlawful conduct.

1675.   Cigna seeks and is entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for all overcharges proximately caused by the antitrust violation(s) alleged above.  Such damages have been suffered in an amount to be proven at trial.

1676.   Cigna is also entitled, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to an injunction against Defendants, restraining and preventing the violations alleged in this Complaint, as well as attorneys' fees and costs, and all other forms of relief available under federal law.

**COUNT 141**
**<u>The Overarching Conspiracy</u>**
**State Antitrust and Unfair Competition Law**
**(Indirect Purchaser Claims: Purchases by Cigna Pharmacies, Express Scripts Purchasers, and Cigna Plans)**

1677.   Cigna incorporates and re-alleges every preceding allegation as if fully set forth herein.

1678.   By engaging in the conduct alleged above, each of the Defendants has entered into one or more contracts, combinations, or conspiracies in restraint of trade violating the antitrust and competition statutes of each the following States and territories:

(a)   Alabama: Ala. Code §§ 6-5-60, *et seq.*; §§ 8-10-1, *et seq.*

(b)   Arizona: Ariz. Rev. Stat. Ann. §§ 44-1401, *et seq.*

(c)   California: Cal. Bus. Code §§ 16700, *et seq.*

(d)   Connecticut: Conn. Gen. Stat. Ann. § 35-24, *et seq.*

(e)   District of Columbia: D.C. Code Ann. §§ 28-4501, *et seq.*

(f)     Hawaii: Haw. Rev. Stat. §§ 480-1, *et seq.*

(g)     Illinois: 740 Ill. Comp. Stat. 10/1, *et seq.*

(h)     Iowa: Iowa Code §§ 553.1, *et seq.*

(i)     Kansas: Kan. Stat. Ann. §§ 50-101, *et seq.*

(j)     Maine: Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(k)     Maryland: Md. Code, Com. Law § 11-204, *et seq.*

(l)     Michigan: Mich. Comp. Laws Ann. §§ 445.771, *et seq.*

(m)     Minnesota: Minn. Stat. §§ 325D.49, *et seq.*

(n)     Mississippi: Miss. Code Ann. §§ 75-21-1, *et seq.*

(o)     Nebraska: Neb. Code Ann. §§ 59-801, *et seq.*

(p)     Nevada: Nev. Rev. Stat. Atm. §§ 598A.010, *et seq.*

(q)     New Hampshire: N.H. Rev. Stat. §§ 356:1, *et seq.*

(r)     New Mexico: N.M. Stat. Ann. §§ 57-1-1, *et seq.*

(s)     New York: New York Gen. Bus. Law §§ 340, *et seq.*

(t)     North Carolina: N.C. Gen. Stat. §§ 75-1, *et seq.*

(u)     North Dakota: N.D. Century Code §§51-08.1-01, *et seq.*

(v)     Oregon: Or. Rev. Stat. §§ 646.705, *et seq.*

(w)     Puerto Rico: 10 L.P.R.A. §§ 257, *et seq.*

(x)     Rhode Island: R.I. Gen. Laws §§ 6-36-1, *et seq.*

(y)     South Dakota: S.D. Codified Laws §§ 37-1-3.1, *et seq.*

(z)     Tennessee: Tenn. Code Ann. §§ 47-25-101, *et seq.*

(aa)     Utah: Utah Code §§ 76-10-3101, *et seq.*

(bb)     Vermont: Vt. Stat. Ann. 9, §§ 2453, *et seq.*

   (cc)   West Virginia: W. Va. Code §§ 47-18-1, *et seq.*

   (dd)   Wisconsin: Wis. Stat. §§ 133.03, *et seq.*

1679.   The conduct of each of the Defendants further constitutes unfair competition or

unfair, unlawful, unconscionable, deceptive, and/or fraudulent acts or practices in violation of the

consumer protection statutes of each the following States and territories:

   (a)   Alaska: Alaska Stat. § 45.50.471, *et seq.*

   (b)   Arkansas: Ark. Code §§ 4-88-101, *et seq.*

   (c)   California: Cal. Bus. & Prof. Code §§ 17200, *et seq.*

   (d)   Colorado: Colo. Rev. Stat. § 6-1-101, *et seq.*

   (e)   Delaware: 6 Del. Code § 2511, *et seq.*

   (f)   District of Columbia: D.C. Code §§ 28-3901, *et seq.*

   (g)   Florida: Fla. Stat. §§ 501.201, *et seq.*

   (h)   Georgia: Ga. Code Ann. § 10-1-370, *et seq.*; *§* 10-1-390, *et seq.*

   (i)   Hawaii: Haw. Rev. Stat. § 480-1, *et seq.*

   (j)   Massachusetts: Mass. Gen. Laws, Ch. 93A, §§ 1, *et seq.*

   (k)   Michigan: Mich. Compiled Laws § 445.903, *et seq.*

   (1)   Minnesota: Minn. Stat. § 325D.43, *et seq.*

   (m)   Missouri: Mo. Rev. Stat. § 407.010, *et seq.*

   (n)   Montana: Mont. Code, § 30-14-103, *et seq.*; *§* 30-14-201, *et seq.*

   (o)   Nebraska: Neb. Code Ann. §§ 59-1601, *et seq.*

   (p)   Nevada: Nev. Rev. Stat. § 598.0903, *et seq.*

   (q)   New Hampshire: N.H. Rev. Stat. §§ 358-A, *et seq.*

   (r)   New Jersey: N.J. Stat. § 56:8-1, *et seq.*

(s)     New Mexico: N.M. Stat. Ann. §§ 57-12-1, *et seq.*

(t)     New York: New York Gen. Bus. Law §§ 349, *et seq.*

(u)     North Carolina: N.C. Gen. Stat. §§ 75-1.1, *et seq.*

(v)     North Dakota: N.D. Century Code § 51-15-01, *et seq.*

(w)    Rhode Island: R.I. Gen. Laws § 6-13.1-1, *et seq.*

(x)     South Carolina: S.C. Code Ann. § 39-5-10, *et seq.*

(y)     South Dakota: S.D. Codified Laws §§ 37-24-1, *et seq.*

(z)     Utah: Utah Code §§ 13-5-1, *et seq.*

(aa)   Vermont: Vt. Stat. Ann. 9, §§ 2451, *et seq.*

(bb)   Virginia: Va. Code Ann. § 59.1-196, *et seq.*

(cc)   Wisconsin: Wis. Stat. §§ 100.18, *et seq.*

1680.   The unlawful acts by Defendants and their co-conspirators had, and continue to have, a substantial and foreseeable effect on the commerce of each above State and territory by artificially raising and fixing prices for the generic drugs at issue as sold, paid for, and/or dispensed in each State or territory.

1681.   Defendants' unlawful activities, as described in this Complaint, affected both intrastate commerce and interstate commerce flowing in to or out from each of the above States and territories, and had direct, substantial and reasonably foreseeable effects upon trade and commerce in each respective State or territory.

1682.   During the relevant period, through either Defendants themselves or the regional and national distributors, wholesalers, and retailers that Defendants have engaged for the sale of the generic drugs at issue, many millions of dollars' worth of the drugs have been, and continue to be, sold in each of the above States and territories every year.

1683.   As a direct and proximate result of Defendants' violation of each of the foregoing laws, Cigna has been harmed by being forced to pay artificially inflated, supra-competitive prices for generic drugs dispensed to insureds throughout the United States.  Cigna has suffered damages in an amount to be proven at trial.

1684.   There was and is a large disparity between the price that Cigna paid and continues to pay for the generic drugs at issue, and the value received, given that more cheaply-priced generic drugs should have been available, and would have been available, absent Defendants' illegal conduct.

1685.   Cigna has been injured and will continue to be injured in its business and property by paying more for the generic drugs at issue than in the absence of Defendants' unlawful conduct and violation of the foregoing laws.

1686.   Defendants' conduct in violation of each of the foregoing laws was done knowingly, willfully, and flagrantly.

1687.   In light of the foregoing, and other facts to be learned through discovery and/or proved at trial, Cigna seeks damages, trebled or multiplied to the full extent permitted by each of the foregoing States and territories, for all overcharges incurred and paid by Cigna as a result of Defendants' conduct, restitution, attorneys' fees and costs, and all other forms of relief available.

**COUNTS 142-280**
**<u>Individual Conspiracies</u>**
**State Antitrust and Unfair Competition Law**
**(Indirect Purchaser Claims: Purchases by Cigna Pharmacies, Express Scripts Purchasers, and Cigna Plans)**

1688.   Cigna incorporates and re-alleges every preceding allegation as if fully set forth herein.

1689.   Counts 142 through 280 are based on individual product conspiracies specific to each of the Subject Drugs, as enumerated above in Counts 2 through 140.  For purposes of Counts 142 through 280, the term "Defendants" refers only to the companies identified in Counts 2 through 140 and the enumerated individual product conspiracies specific to each of the Subject Drugs.

1690.   By engaging in the conduct alleged above, each of the Defendants has entered into one or more contracts, combinations, or conspiracies in restraint of trade violating the antitrust and competition statutes of each the following States and territories:

(a)   Alabama: Ala. Code §§ 6-5-60, *et seq.*; *§§* 8-10-1, *et seq.*

(b)   Arizona: Ariz. Rev. Stat. Ann. §§ 44-1401, *et seq.*

(c)   California: Cal. Bus. Code §§ 16700, *et seq.*

(d)   Connecticut: Conn. Gen. Stat. Ann. § 35-24, *et seq.*

(e)   District of Columbia: D.C. Code Ann. §§ 28-4501, *et seq.*

(f)   Hawaii: Haw. Rev. Stat. §§ 480-1, *et seq.*

(g)   Illinois: 740 Ill. Comp. Stat. 10/1, *et seq.*

(h)   Iowa: Iowa Code §§ 553.1, *et seq.*

(i)   Kansas: Kan. Stat. Ann. §§ 50-101, *et seq.*

(j)   Maine: Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(k)   Maryland: Md. Code, Com. Law § 11-204, *et seq.*

(1)   Michigan: Mich. Comp. Laws Ann. §§ 445.771, *et seq.*

(m)   Minnesota: Minn. Stat. §§ 325D.49, *et seq.*

(n)   Mississippi: Miss. Code Ann. §§ 75-21-1, *et seq.*

(o)   Nebraska: Neb. Code Ann. §§ 59-801, *et seq.*

(p)     Nevada: Nev. Rev. Stat. Atm. §§ 598A.010, *et seq.*

(q)     New Hampshire: N.H. Rev. Stat. §§ 356:1, *et seq.*

(r)     New Mexico: N.M. Stat. Ann. §§ 57-1-1, *et seq.*

(s)     New York: New York Gen. Bus. Law §§ 340, *et seq.*

(t)     North Carolina: N.C. Gen. Stat. §§ 75-1, *et seq.*

(u)     North Dakota: N.D. Century Code §§51-08.1-01, *et seq.*

(v)     Oregon: Or. Rev. Stat. §§ 646.705, *et seq.*

(w)     Puerto Rico: 10 L.P.R.A. §§ 257, *et seq.*

(x)     Rhode Island: R.I. Gen. Laws §§ 6-36-1, *et seq.*

(y)     South Dakota: S.D. Codified Laws §§ 37-1-3.1, *et seq.*

(z)     Tennessee: Tenn. Code Ann. §§ 47-25-101, *et seq.*

(aa)     Utah: Utah Code §§ 76-10-3101, *et seq.*

(bb)     Vermont: Vt. Stat. Ann. 9, §§ 2453, *et seq.*

(cc)     West Virginia: W. Va. Code §§ 47-18-1, *et seq.*

(dd)     Wisconsin: Wis. Stat. §§ 133.03, *et seq.*

1691.   The conduct of each of the Defendants further constitutes unfair competition or unfair, unlawful, unconscionable, deceptive, and/or fraudulent acts or practices in violation of the consumer protection statutes of each the following States and territories:

(a)     Alaska: Alaska Stat. § 45.50.471, *et seq.*

(b)     Arkansas: Ark. Code §§ 4-88-101, *et seq.*

(c)     California: Cal. Bus. & Prof. Code §§ 17200, *et seq.*

(d)     Colorado: Colo. Rev. Stat. § 6-1-101, *et seq.*

(e)     Delaware: 6 Del. Code § 2511, *et seq.*

(f)     District of Columbia: D.C. Code §§ 28-3901, *et seq.*

(g)     Florida: Fla. Stat. §§ 501.201, *et seq.*

(h)     Georgia: Ga. Code Ann. § 10-1-370, *et seq.*; *§* 10-1-390, *et seq.*

(i)     Hawaii: Haw. Rev. Stat. § 480-1, *et seq.*

(j)     Massachusetts: Mass. Gen. Laws, Ch. 93A, §§ 1, *et seq.*

(k)     Michigan: Mich. Compiled Laws § 445.903, *et seq.*

(1)     Minnesota: Minn. Stat. § 325D.43, *et seq.*

(m)    Missouri: Mo. Rev. Stat. § 407.010, *et seq.*

(n)     Montana: Mont. Code, § 30-14-103, *et seq.*; *§* 30-14-201, *et seq.*

(o)     Nebraska: Neb. Code Ann. §§ 59-1601, *et seq.*

(p)     Nevada: Nev. Rev. Stat. § 598.0903, *et seq.*

(q)     New Hampshire: N.H. Rev. Stat. §§ 358-A, *et seq.*

(r)     New Jersey: N.J. Stat. § 56:8-1, *et seq.*

(s)     New Mexico: N.M. Stat. Ann. §§ 57-12-1, *et seq.*

(t)     New York: New York Gen. Bus. Law §§ 349, *et seq.*

(u)     North Carolina: N.C. Gen. Stat. §§ 75-1.1, *et seq.*

(v)     North Dakota: N.D. Century Code § 51-15-01, *et seq.*

(w)    Rhode Island: R.I. Gen. Laws § 6-13.1-1, *et seq.*

(x)     South Carolina: S.C. Code Ann. § 39-5-10, *et seq.*

(y)     South Dakota: S.D. Codified Laws §§ 37-24-1, *et seq.*

(z)     Utah: Utah Code §§ 13-5-1, *et seq.*

(aa)    Vermont: Vt. Stat. Ann. 9, §§ 2451, *et seq.*

(bb)    Virginia: Va. Code Ann. § 59.1-196, *et seq.*

(cc)     Wisconsin: Wis. Stat. §§ 100.18, *et seq.*

1692.   The unlawful acts by Defendants and their co-conspirators had, and continue to have, a substantial and foreseeable effect on the commerce of each above State and territory by artificially raising and fixing prices for the generic drugs at issue as sold, paid for, and/or dispensed in each State or territory.

1693.   Defendants' unlawful activities, as described in this Complaint, affected both intrastate commerce and interstate commerce flowing in to or out from each of the above States and territories, and had direct, substantial and reasonably foreseeable effects upon trade and commerce in each respective State or territory.

1694.   During the relevant period, through either Defendants themselves or the regional and national distributors, wholesalers, and retailers that Defendants have engaged for the sale of the generic drugs at issue, many millions of dollars' worth of the drugs have been, and continue to be, sold in each of the above States and territories every year.

1695.   As a direct and proximate result of Defendants' violation of each of the foregoing laws, Cigna has been harmed by being forced to pay artificially inflated, supra-competitive prices for generic drugs dispensed to insureds throughout the United States.  Cigna has suffered damages in an amount to be proven at trial.

1696.   There was and is a large disparity between the price that Cigna paid and continues to pay for the generic drugs at issue, and the value received, given that more cheaply-priced generic drugs should have been available, and would have been available, absent Defendants' illegal conduct.

1697.   Cigna has been injured and will continue to be injured in its business and property by paying more for the generic drugs at issue than in the absence of Defendants' unlawful conduct and violation of the foregoing laws.

1698.   Defendants' conduct in violation of each of the foregoing laws was done knowingly, willfully, and flagrantly.

1699.   In light of the foregoing, and other facts to be learned through discovery and/or proved at trial, Cigna seeks damages, trebled or multiplied to the full extent permitted by each of the foregoing States and territories, for all overcharges incurred and paid by Cigna as a result of Defendants' conduct, restitution, attorneys' fees and costs, and all other forms of relief available.

**COUNTS 281-420**
**The Overarching Conspiracy and Individual Conspiracies**
**Unjust Enrichment**
**(Direct and Indirect Purchaser Claims: Purchases by Cigna Pharmacies, Express Scripts Purchasers, and Cigna Plans)**

1700.   Cigna incorporates and re-alleges every preceding allegation as if fully set forth herein.

1701.   To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

1702.   Count 281 is based on the overarching conspiracy alleged in this complaint and in Counts 1 and 141.

1703.   Counts 282 through 420 are based on individual product conspiracies specific to each of the Subject Drugs, as enumerated above in Counts 2 through 140.  For purposes of Counts 282 through 420, the term "Defendants" refers only to the companies identified in Counts 2 through 140 and the enumerated individual product conspiracies specific to each of the Subject Drugs.

1704.   Defendants have benefited from their sales of the Subject Drugs because of the unlawful and inequitable acts alleged in this Complaint.

1705.   Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Cigna.

1706.   To its economic detriment, Cigna conferred upon Defendants an economic benefit, in the nature of revenues and profits resulting from unlawful overcharges.

1707.   Defendants have been enriched by revenue resulting from unlawful overcharges for the generic drugs at issue while Cigna has suffered an impoverishment by the overcharges it paid, imposed through Defendants' unlawful conduct.  Defendants' enrichment is traceable to the impoverishment of Cigna.

1708.   There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused an impoverishment to Cigna, having paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

1709.   Cigna did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

1710.   The benefits conferred upon Defendants are measurable, in that the revenues Defendants have earned due to their unlawful overcharges of the generic drugs at issue are ascertainable by review of sales and/or payment records.

1711.   As to payments by Cigna, it would be futile for Cigna to seek a remedy from any party with whom they have privity of contract.

1712.   The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic drugs is a direct and proximate result of Defendants' unlawful practices.

1713.   The financial benefits derived by Defendants rightfully belong to Cigna, because Cigna paid supracompetitive prices during the relevant period, inuring to the benefit of Defendants.

1714.   It would be inequitable under unjust enrichment principles of all States and territories in the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1715.   Defendants are aware of and appreciate the benefits bestowed upon them by Cigna.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

1716.   By engaging in the foregoing unlawful or inequitable conduct depriving Cigna of lower prices for generic drugs and forcing them to pay higher prices, Defendants have been unjustly enriched.

## XXII.  DEMAND FOR JUDGMENT

WHEREFORE, Cigna demands judgment against Defendants, as follows:

A.   Declaring the acts alleged herein to constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. §§ 1 and 3;

B.   Judgment against Defendants, jointly and severally, awarding Cigna actual, consequential, compensatory, treble, punitive, and/or other damages, in an amount to be proven at trial, including pre-judgment and post-judgment interest at the statutory rates;

C.   Awarding Cigna its reasonable costs and expenses, including attorneys' fees; and

D.   Awarding all other legal or equitable relief as the Court deems just and proper.

## XXIII. JURY DEMAND

Cigna demands a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

Dated:  June _9_, 2020

Respectfully submitted:

By: _____

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
Charles F. Rule
Daniel J. Howley
Paul E. Chaffin
Benjamin Z. Bergmann
2001 K Street, NW
Washington, DC 20006
Tel.: (202) 223-7320
Fax.: (202) 204-7350
rrule@paulweiss.com
dhowley@paulweiss.com
pchaffin@paulweiss.com
bbergmann@paulweiss.com

*Attorneys for Plaintiff Cigna*

MACELREE HARVEY, LTD.
Robert A. Burke, PA ID # 61268
Jeffrey P. Burke, PA ID # 209684
17 Miner Street
West Chester, PA 19382
Tel.: (610) 840-0211
Fax.: (610) 430-7885
rburke@macelree.com
jburke@macelree.com