# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CIGNA CORP.,<br><br>                              Plaintiff,<br><br>     v.<br><br>ACTAVIS HOLDCO US, INC.,<br>ACTAVIS ELIZABETH, LLC,<br>ACTAVIS PHARMA, INC.,<br>ALVOGEN INC.,<br>AMNEAL PHARMACEUTICALS, INC.,<br>APOTEX CORP.,<br>ASCEND LABORATORIES, LLC,<br>AUROBINDO PHARMA USA, INC.,<br>BAUSCH HEALTH AMERICAS, INC.,<br>BAUSCH HEALTH US, LLC,<br>BRECKENRIDGE PHARMACEUTICAL, INC.,<br>CAMBER PHARMACEUTICALS, INC.,<br>CITRON PHARMA, LLC,<br>DR. REDDY'S LABORATORIES INC.,<br>FOUGERA PHARMACEUTICALS INC.,<br>GENERICS BIDCO I, LLC,<br>GLENMARK PHARMACEUTICALS INC., USA,<br>G&W LABORATORIES, INC.,<br>HERITAGE PHARMACEUTICALS INC.,<br>HIKMA PHARMACEUTICALS USA INC. F/K/A<br>WEST-WARD PHARMACEUTICALS CORP.,<br>IMPAX PHARMACEUTICALS, LLC F/K/A/ IMPAX<br>PHARMACEUTICALS, INC.,<br>JUBILANT CADISTA PHARMACEUTICALS, INC.,<br>LANNETT COMPANY, INC.,<br>LUPIN PHARMACEUTICALS, INC.,<br>MAYNE PHARMA, INC.,<br>MORTON GROVE PHARMACEUTICALS, INC.,<br>MYLAN, INC.,<br>MYLAN, N.V.,<br>MYLAN PHARMACEUTICALS, INC.,<br>OCEANSIDE PHARMACEUTICALS, INC.,<br>PAR PHARMACEUTICAL COMPANIES, INC., | Civil Action No. 2:20-cv-02711<br><br>AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

PAR PHARMACEUTICAL, INC.,
PERRIGO NEW YORK, INC.,
SANDOZ, INC.,
SUN PHARMACEUTICAL INDUSTRIES, INC.,
TARO PHARMACEUTICALS USA, INC.,
TELIGENT, INC.,
TEVA PHARMACEUTICALS USA, INC.,
TORRENT PHARMA INC.,
UPSHER-SMITH LABORATORIES, LLC,
WOCKHARDT USA LLC, AND
ZYDUS PHARMACEUTICALS (USA) INC.,

                                        Defendants.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Table of Contents**

| | | | |
|---|---|---|---|
| I. | NATURE OF THE CASE | ............................................................................ | 1 |
| II. | THE DRUGS SUBJECT TO THE CONSPIRACY ("SUBJECT DRUGS") | ................... | 6 |
| III. | JURISDICTION AND VENUE | .............................................................. | 24 |
| IV. | THE PARTIES | ...................................................................... | 25 |

|  | A. | Plaintiff | ........................................................................... | 25 |
|---|---|---|---|---|
|  | B. | Defendants | ................................................................. | 28 |

|  |  | 1. | Actavis | .......................................................... | 28 |
|---|---|---|---|---|---|
|  |  | 2. | Alvogen | ....................................................... | 29 |
|  |  | 3. | Amneal | ........................................................ | 29 |
|  |  | 4. | Apotex | ......................................................... | 29 |
|  |  | 5. | Ascend | ......................................................... | 29 |
|  |  | 6. | Aurobindo | ..................................................... | 30 |
|  |  | 7. | Bausch/Valeant | ............................................... | 30 |
|  |  | 8. | Breckenridge | .................................................. | 31 |
|  |  | 9. | Camber | ........................................................ | 31 |
|  |  | 10. | Citron | ......................................................... | 31 |
|  |  | 11. | Dr. Reddy's | ................................................... | 31 |
|  |  | 12. | G&W | .......................................................... | 32 |
|  |  | 13. | Glenmark | ..................................................... | 32 |
|  |  | 14. | Heritage | ....................................................... | 32 |
|  |  | 15. | Impax | .......................................................... | 32 |
|  |  | 16. | Cadista | ........................................................ | 33 |
|  |  | 17. | Lannett | ........................................................ | 33 |
|  |  | 18. | Lupin | .......................................................... | 33 |
|  |  | 19. | Mayne | ......................................................... | 33 |
|  |  | 20. | Morton Grove | ................................................. | 34 |
|  |  | 21. | Mylan | .......................................................... | 34 |
|  |  | 22. | Par | ............................................................. | 35 |
|  |  | 23. | Perrigo | ........................................................ | 36 |
|  |  | 24. | Sandoz | ........................................................ | 36 |
|  |  | 25. | Sun | ............................................................ | 37 |
|  |  | 26. | Taro | ........................................................... | 37 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

|        | 27.  | Teligent ....................................................................................... | 38 |
|        | 28.  | Teva............................................................................................. | 38 |
|        | 29.  | Torrent......................................................................................... | 38 |
|        | 30.  | Upsher-Smith .............................................................................. | 38 |
|        | 31.  | West-Ward .................................................................................. | 39 |
|        | 32.  | Wockhardt .................................................................................. | 39 |
|        | 33.  | Zydus.......................................................................................... | 39 |
| C.     | Co-Conspirators ..................................................................................... | | 39 |
|        | 1.   | Akorn ......................................................................................... | 39 |
|        | 2.   | Mallinckrodt................................................................................ | 40 |
|        | 3.   | Rising .......................................................................................... | 40 |
|        | 4.   | Presently Unknown Generic Manufacturer Co-Conspirators ................... | 41 |

V.   REGULATORY AND ECONOMIC BACKGROUND ............................................ 41

    A.   Generic Drugs Should Provide Lower-Priced Options for Purchasers................ 41

    B.   The Prescription Drug Distribution System........................................................ 43

    C.   The Market for Generic Drugs is Highly Susceptible to Collusion..................... 44

VI.  GOVERNMENT INVESTIGATIONS OF THE CONSPIRACY ............................ 47

    A.   Congress Launched An Investigation Into Generic Price Hikes ......................... 47

    B.   The DOJ Investigates Criminal Generic Drug Collusion ................................... 49

    C.   State Attorneys General Launch Their Own Investigation................................... 53

VII. THE GENERIC DRUG MARKET ........................................................................ 57

    A.   The Cozy Nature Of the Industry and Opportunities for Collusion.................... 57

        1.   Trade Association Meetings and Conferences........................................... 58

        2.   Industry Dinners and Private Meetings.................................................... 59

        3.   Personal Telephone Calls, E-Mails, and Text Message Communications 61

        4.   Individual Relationships ........................................................................ 61

    B.   The Overarching Conspiracy Between Generic Drug Manufacturers –
        "Playing Nice in the Sandbox" ......................................................................... 69

VIII. THE CONSPIRACY:  HERITAGE-RELATED CONDUCT ......................................... 88

    A.   Market Allocation Agreements to Maintain Market Share and Avoid Price
        Erosion ............................................................................................................ 90

        1.   Nimodipine ............................................................................................ 90

        2.   Zoledronic Acid .................................................................................... 96

        3.   Meprobamate ........................................................................................ 99

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

|  |  | 4. | Doxy DR ........................................................................... | 101 |
|--|--|----|------------------------------------------------------------------------|-----|
|  |  | 5. | Hydralazine HCL ............................................................. | 114 |
|  | B. |  | Agreements to Fix Prices ....................................................... | 114 |
|  |  | 1. | Doxycycline Monohydrate (2013) .................................... | 115 |
|  |  | 2. | Heritage 2014 Price Increases ......................................... | 122 |
| IX. |  |  | THE CONSPIRACY:  TEVA-RELATED CONDUCT ...................... | 159 |
|  | A. |  | Early 2013 Teva Business Strategies, Hiring of Patel, and Ranking Competitors ............................................................................. | 159 |
|  |  | 1. | April 2013:  Teva Hires Nisha Patel ............................... | 160 |
|  |  | 2. | Ranking "Quality of Competition" to Identify Price Increase Candidates ......................................................... | 164 |
|  | B. |  | Price Increase Hiatus ............................................................... | 170 |
|  | C. |  | New Relationships Emerge ...................................................... | 171 |
|  | D. |  | Competitors Become "High Quality" After Successfully Colluding With Teva ................................................................. | 172 |
|  | E. |  | Quality Competitors Collude With Each Other, Sandoz/Mylan ......... | 172 |
|  | F. |  | Commitment to the Overarching Conspiracy ........................... | 173 |
|  | G. |  | Low Quality Competitors Comply with the Overarching Conspiracy .............. | 175 |
|  | H. |  | Teva Profitability Increases Dramatically ............................. | 175 |
|  | I. |  | Teva and its Executives Knowingly Violated the Antitrust Laws ...................... | 175 |
| X. |  |  | THE OVERARCHING CONSPIRACY IN OPERATION WITH RESPECT TO THE SUBJECT DRUGS .................................................... | 180 |
|  | A. |  | Customer and Market Allocation Agreements To Maintain Market Share and Avoid Price Erosion .............................................. | 180 |
|  |  | 1. | Teva/Mylan .................................................................... | 180 |
|  |  | 2. | Teva/Sandoz ................................................................... | 197 |
|  |  | 3. | Teva/Lupin ..................................................................... | 207 |
|  |  | 4. | Teva/Actavis .................................................................. | 215 |
|  |  | 5. | Teva/Par ......................................................................... | 223 |
|  |  | 6. | Teva/Taro ....................................................................... | 228 |
|  |  | 7. | Teva/Zydus .................................................................... | 237 |
|  |  | 8. | Teva/Glenmark .............................................................. | 250 |
|  |  | 9. | Teva/Lannett .................................................................. | 254 |
|  |  | 10. | Teva/Amneal .................................................................. | 257 |
|  |  | 11. | Teva/ Dr. Reddy's .......................................................... | 258 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

12.     Other Teva Conspiracies ........................................................ 266

13.     Mylan / Sandoz ..................................................................... 274

B.     Taking the Overarching Conspiracy to a New Level:  Price Fixing (2012 – 2015) ............................................................................................ 277

1.     July 31, 2012 Price Increase ................................................. 277

2.     February – April 2013:  Increasing Prices Before A New Competitor Enters the Market:  Budesonide Inhalation Suspension .......... 282

3.     May 13, 2013 Price Increase – Tizanidine.............................. 284

4.     May 24, 2013 First List of Price Increases ............................ 286

5.     July 3, 2013 Price Increases.................................................. 297

6.     July 19, 2013 Price Increase – Enalapril Maleate.................. 308

7.     August 9, 2013 Price Increases ............................................. 313

8.     July 2013 – January 2014:  Competitors Seek to "Follow" Price Increases: Haloperidol and Trifluoperazine HCL, Benazepril HCTZ, Levothyroxine, Clomipramine HCL .............................................................. 334

9.     March 7, 2014:  Price Increases and Overarching Conspiracy Converge (Niacin ER) ......................................................................... 352

10.     April 4, 2014 Price Increases ................................................ 356

11.     Impact of April 4, 2014 Price Increases to Teva .................... 377

12.     April 15, 2014 Price Increase (Baclofen) .............................. 378

13.     July 1, 2014 Price Increase (Fluocinonide)............................ 382

14.     August 28, 2014 Price Increases ........................................... 391

15.     January 28, 2015 Price Increases .......................................... 403

C.     Competitors Become "High Quality" After Successfully Colluding With Teva............................................................................................. 411

1.     Apotex................................................................................... 411

2.     Zydus.................................................................................... 413

3.     Heritage ................................................................................ 415

4.     Lupin..................................................................................... 416

5.     Par ........................................................................................ 417

6.     Amneal.................................................................................. 419

7.     Non-Defendant Rising .......................................................... 420

8.     Breckenridge......................................................................... 422

9.     Glenmark............................................................................... 423

10.     Camber Pharmaceuticals........................................................ 424

XI.     THE CONSPIRACY:  DERMATOLOGICAL DRUG-RELATED CONDUCT.......... 430

iv

A.       Generic Topical Products – An Overview ........................................................ 430

B.       Generic Topical Products – The Illegal Schemes ............................................. 435

         1.       The Early Days – Collusion From 2009 to Early 2012 ......................... 436

         2.       Carbamazepine ER Tablets.................................................................... 441

         3.       Imiquimod Cream .................................................................................. 443

         4.       Triamcinolone Acetonide Cream and Ointment .................................... 457

         5.       Adapalene Cream................................................................................... 458

         6.       Betamethasone Dipropionate Lotion ..................................................... 463

         7.       Clotrimazole Betamethasone Dipropionate Cream and Lotion ............. 464

         8.       Fluocinonide Solution ........................................................................... 472

         9.       Erythromycin Base/Ethyl Alcohol Solution ......................................... 476

         10.      Nystatin Ointment ................................................................................. 484

C.       G&W And Its Relationships ........................................................................... 490

D.       G&W/Fougera ................................................................................................ 490

         1.       Metronidazole Cream and Lotion .......................................................... 492

         2.       Calcipotriene Solution ........................................................................... 496

         3.       Fluocinolone Acetonide Cream and Ointment ...................................... 498

         4.       Betamethasone Valerate Lotion ............................................................ 501

         5.       Metronidazole .75% Gel ........................................................................ 504

E.       G&W/Glenmark ............................................................................................. 511

         1.       Ciclopirox Cream – April 2012 ............................................................. 512

F.       Additional Collusive Relationships ................................................................ 518

         1.       Lidocaine Ointment ............................................................................... 518

G.       Focus On Price Increases Intensifies – Collusion From Late 2012 - 2016......... 521

         1.       Shifts In The Market Foster Collusion................................................... 521

         2.       Post-Fougera Acquisition, Sandoz Sales Executives Feel Pressure To
                  Demonstrate Their Value ....................................................................... 522

         3.       Key Relationships Emerge And Existing Relationships Strengthen ...... 523

H.       Sandoz/Taro ................................................................................................... 524

         1.       CW-3's Relationships With Aprahamian And H.M. Of Taro ................ 524

         2.       CW-4's Relationship With D.S. Of Taro................................................ 527

         3.       CW-3's Relationship With T.P. Of Perrigo ........................................... 528

         4.       Perfetto's Relationship With Boothe Of Perrigo ................................... 529

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

5.    Sandoz Management Knew Of, And Encouraged, The Collusion With Competitors ................................................................................. 530

I.    Taro Emerges As A Leader Among Generic Topical Manufacturers ............... 531

1.    Increased Focus On Fair Share And Price Increases ............................... 531

2.    Setting the Stage For Future Collusion –Aprahamian And CW-3 Collude On Products Where Sandoz And Actavis Competed............................. 536

3.    Desonide Lotion................................................................................ 536

4.    Ciclopirox Shampoo ......................................................................... 540

5.    Betamethasone Valerate Ointment ..................................................... 542

6.    Aprahamian Moves To Taro And Immediately Begins Colluding With CW-3 On Products On Which Sandoz And Taro Overlap ..................... 546

7.    Nystatin Triamcinolone Cream and Ointment .................................... 546

8.    Fluocinonide Ointment ..................................................................... 556

9.    Lidocaine Ointment .......................................................................... 558

10.   Aprahamian And Perfetto Orchestrate And Lead Price Increases On A Number Of Key Products In May 2013 ................................................ 562

11.   Aprahamian And Perfetto Communicate And Coordinate With Their Competitors In Advance Of The May 2013 Increases............................. 563

12.   Taro's Competitors Uniformly Declined To Bid On Taro Customers And Followed The May 2013 Increases ........................................................ 569

J.    Building Upon Early Successes – Taro's Continued Collusion Over The Ensuing Years ................................................................................. 575

1.    Alclometasone Dipropionate Ointment ................................................. 575

2.    Fluocinonide Solution........................................................................ 579

3.    Taro's August 2013 Price Increases ..................................................... 581

4.    Triamcinolone Acetonide Paste ........................................................... 584

5.    Acetazolamide Tablets........................................................................ 584

6.    Desonide Ointment ........................................................................... 591

7.    Taro's June 2014 Price Increases.......................................................... 596

8.    Carbamazepine ER Tablets and Clobetasol Propionate......................... 603

9.    Hydrocortisone Valerate Cream ........................................................... 611

10.   Phenytoin Sodium ER Capsules .......................................................... 612

11.   Econazole Nitrate Cream ................................................................... 616

12.   Fluocinonide .1% Cream ................................................................... 619

13.   Metronidazole 1% Gel ....................................................................... 624

14.   Clotrimazole 1% Cream...................................................................... 628

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

|       | 15. | Ketoconazole Cream and Fluocinonide Gel | 631 |
|       | 16. | Ketoconazole Cream | 631 |
|       | 17. | Fluocinonide Gel | 636 |
| K.    |     | Sandoz And Its Other Relationships | 639 |
| L.    |     | Collusion Between Sandoz And Perrigo | 640 |
|       | 1.  | Bromocriptine Mesylate Tablets | 641 |
|       | 2.  | Adapalene Cream | 647 |
|       | 3.  | Calcipotriene Betamethasone Dipropionate Ointment | 653 |
|       | 4.  | Tacrolimus Ointment | 661 |
|       | 5.  | Methazolamide Tablets | 664 |
| M.    |     | Collusion Between Sandoz And Glenmark | 667 |
|       | 1.  | Fluticasone Propionate Lotion (60ml) | 668 |
| N.    |     | Desoximetasone Ointment | 676 |
|       | 1.  | Sandoz Entry (September 2012) | 676 |
|       | 2.  | Glenmark Entry (September 2013) | 679 |
| O.    |     | Collusion Between Sandoz And Aurobindo | 681 |
|       | 1.  | Oxacillin Sodium and Nafcillin Sodium Injectable Vials | 682 |
|       | 2.  | Cefpodoxime Proxetil Oral Suspension and Tablets | 685 |
|       | 3.  | Pioglitazone HCL Metformin HCL Tablets | 689 |
| P.    |     | Collusion Between Sandoz And Rising | 696 |
|       | 1.  | Griseofulvin Microsize Tablets | 696 |
| Q.    |     | Collusion Between Sandoz And Non-Defendant Mallinckrodt | 704 |
|       | 1.  | Methylphenidate HCL Tablets and Methylphenidate HCL ER Tablets | 704 |
| R.    |     | Sandoz's Collusion With A Non-Defendant Manufacturer | 711 |
|       | 1.  | Clindamycin Phosphate | 711 |
|       | 2.  | Latanoprost Drops | 728 |
|       | 3.  | Eplerenone Tablets | 734 |
| S.    |     | G&W And Its Other Relationships | 735 |
|       | 1.  | Collusion Between G&W And Perrigo | 738 |
|       | 2.  | Halobetasol Propionate Cream and Ointment | 739 |
|       | 3.  | Prochlorperazine | 751 |
|       | 4.  | Ciclopirox Solution | 754 |
|       | 5.  | Hydrocortisone Acetate Suppositories (Anucort HC) | 759 |
| T.    |     | Collusion Between G&W And Actavis | 764 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

|   |   | 1. | Promethazine HCL Suppositories | 765 |
|   | U. | Collusion Between G&W And Glenmark | | 773 |
|   |   | 1. | Ciclopirox Cream and Mometasone Furoate | 773 |
|   | V. | Collusion Between G&W And Lupin | | 779 |
|   |   | 1. | Ethambutol HCL Tablets | 779 |
|   | W. | The Defendants' Profitability Increases Dramatically As A Result Of Collusive Conduct | | 784 |
|   |   | 1. | Defendant Taro And Defendant Perrigo's Profits Increased Over 1300% From 2008 To Early 2016 | 784 |
| XII. | OTHER DRUGS | | | 788 |
|   | A. | Acetazolamide Tablets | | 789 |
|   | B. | Albuterol Sulfate | | 792 |
|   | C. | Allopurinol | | 793 |
|   | D. | Amantadine HCL | | 794 |
|   | E. | Amitriptyline HCL Tablets | | 794 |
|   | F. | Atenolol/Chlorthalidone | | 796 |
|   | G. | Atropine Sulfate | | 797 |
|   | H. | Balsalazide Disodium | | 798 |
|   | I. | Betamethasone Dipropionate Augmented | | 798 |
|   | J. | Betamethasone Dipropionate Clotrimazole | | 800 |
|   | K. | Butorphanol Tartrate | | 801 |
|   | L. | Captopril | | 802 |
|   | M. | Cefuroxime Axetil | | 803 |
|   | N. | Chlorpromazine HCL | | 805 |
|   | O. | Cholestyramine | | 805 |
|   | P. | Clobetasol Propionate | | 806 |
|   | Q. | Desonide | | 810 |
|   | R. | Digoxin | | 813 |
|   | S. | Diphenoxylate Atropine HCL | | 816 |
|   | T. | Divalproex Sodium ER | | 817 |
|   | U. | Doxycycline Hyclate | | 819 |
|   | V. | Econazole | | 823 |
|   | W. | Exemestane | | 825 |
|   | X. | Fluticasone Propionate Nasal Spray | | 827 |

Y.    Isosorbide Dinitrate ........................................................................ 828

Z.    Lidocaine ......................................................................................... 829

AA.   Metformin ER (F) ........................................................................... 830

BB.   Methadone HCL ............................................................................... 831

CC.   Methylprednisolone ........................................................................ 832

DD.   Metronidazole ................................................................................. 834

EE.   Naproxen Sodium ............................................................................ 835

FF.   Neomycin Polymyxin Hydrocortisone ........................................... 835

GG.   Oxycodone Acetaminophen ............................................................ 836

HH.   Permethrin ....................................................................................... 838

II.   Perphenazine Tablets ...................................................................... 840

JJ.   Pilocarpine HCL .............................................................................. 841

KK.   Potassium Chloride ER ................................................................... 842

LL.   Prednisolone Acetate ...................................................................... 844

MM.   Prednisone ....................................................................................... 846

NN.   Propranolol HCL capsules .............................................................. 848

OO.   Ranitidine HCL Capsules ............................................................... 849

PP.   Silver Sulfadiazine .......................................................................... 850

QQ.   Spironolactone HCTZ ..................................................................... 850

RR.   Timolol Maleate .............................................................................. 852

SS.   Tobramycin Dexamethasone .......................................................... 853

TT.   Trazodone HCL ............................................................................... 854

UU.   Triamterene HCTZ ......................................................................... 855

VV.   Ursodiol ........................................................................................... 857

XIII.   PRICE INCREASES SLOW DRAMATICALLY AFTER GOVERNMENT INVESTIGATIONS COMMENCE ........................................................... 859

XIV.   CONSCIOUSNESS OF GUILT ............................................................. 860

XV.   SPOLIATION OF EVIDENCE .............................................................. 865

XVI.   OBSTRUCTION OF JUSTICE .............................................................. 866

XVII.   PLAINTIFF'S PURCHASES AND ANTITRUST INJURY ....................... 867

XVIII.   INTERSTATE TRADE AND COMMERCE ............................................ 868

XIX.   TOLLING AND FRAUDULENT CONCEALMENT .................................. 869

XX.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY ...... 870

XXI.   CAUSES OF ACTION .......................................................................... 871

XXII.  DEMAND FOR JUDGMENT ........................................................................................ 892

XXIII. JURY DEMAND ....................................................................................................... 892

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Plaintiff Cigna Corp. ("Cigna" or "Plaintiff") files this Complaint against Defendants Actavis Holdco US, Inc., Actavis Elizabeth, LLC, Actavis Pharma, Inc., Alvogen Inc., Amneal Pharmaceuticals, Inc., Apotex Corp., Ascend Laboratories, LLC, Aurobindo Pharma USA, Inc., Bausch Health Americas, Inc., Bausch Health US, LLC, Breckenridge Pharmaceutical, Inc., Camber Pharmaceuticals, Inc., Citron Pharma, LLC, Dr. Reddy's Laboratories Inc., Fougera Pharmaceuticals Inc., Generics Bidco I, LLC, Glenmark Pharmaceuticals Inc., USA, G&W Laboratories, Inc., Heritage Pharmaceuticals Inc., Hikma Pharmaceuticals USA Inc. F/K/A West-Ward Pharmaceuticals Corp., Impax Pharmaceuticals, LLC F/K/A Impax Pharmaceuticals, Inc., Jubilant Cadista Pharmaceuticals, Inc., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Mayne Pharma, Inc., Morton Grove Pharmaceuticals, Inc., Mylan, Inc., Mylan, N.V., Mylan Pharmaceuticals, Inc., Oceanside Pharmaceuticals, Inc., Par Pharmaceutical Companies, Inc., Par Pharmaceutical, Inc., Perrigo New York, Inc., Sandoz, Inc., Sun Pharmaceutical Industries, Inc., Taro Pharmaceuticals USA, Inc., Teligent, Inc., Teva Pharmaceuticals USA, Inc., Torrent Pharma Inc., Upsher-Smith Laboratories, LLC, Wockhardt USA LLC, and Zydus Pharmaceuticals (USA) Inc. and alleges based on personal knowledge and information made public during ongoing government investigations of Defendants and other generic drug companies as follows:

## I.   NATURE OF THE CASE

1.     This is a civil action against Defendants for conspiring to fix, increase, stabilize, or maintain prices, allocate customers and markets, and rig bids for generic pharmaceutical drugs in violation of federal antitrust and state antitrust and competition laws.  As described further below, Cigna seeks damages incurred from overcharges paid directly and indirectly by certain Cigna businesses for certain generic drugs, arising from this far-reaching conspiracy to fix the

price of such drugs.  This conspiracy increased the Defendants' profits at the expense of many customers including Cigna, which operates pharmacy and insurance-related businesses.

2.      Defendants, along with other generic drug manufacturers, conspired to fix prices and allocate markets for generic drugs amongst themselves, and to obstruct competition as part of an ongoing conspiracy to fix, increase, stabilize, or maintain prices, allocate customers and markets, and rig bids for the generic drugs identified in Section II below (the "Subject Drugs"), among others.  Rather than competing in a full-throated manner, for many years, generic manufacturers have operated pursuant to an illegal agreement not to compete with one another and to instead "play nice in the sandbox" and allocate markets according to what these would-be competitors refer to as "fair share."

3.      Information establishing the existence of this illicit arrangement has been made public during ongoing government investigations into Defendants' conduct.  Jeffrey Glazer and Jason Malek, executives at Heritage Pharmaceuticals, Inc. ("Heritage"), pleaded guilty to participating in a conspiracy to fix prices of Glyburide and Doxycyline between at least 2013 and 2015.  Heritage and Co-Conspirator Rising Pharmaceuticals, Inc. ("Rising") have entered into deferred prosecution agreements with the United States that involved admissions that they conspired to fix the prices of Glyburide and Benazepril HCTZ, respectively.  Heritage also resolved False Claims Act claims brought by the United States related to price fixing of Hydralazine and Thephylline ER.  Hector Armando Kellum, a former executive at Sandoz, Inc. ("Sandoz"), pleaded guilty to conspiring to fix prices, rig bids, and allocate customers for generic drugs, including, but not limited to, the generic drugs Clobetasol and Nystatin Triamcinolone Cream.  Sandoz entered a deferred prosecution agreement with the United States that involved admissions that it conspired to fix prices, rig bids, and allocate customers for generic drugs

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

including Clobetasol (cream, emollient cream, gel, ointment, and solution), Desonide ointment, Nystatin Triamcinolone cream, Benazepril HCTZ, and Tobramycin inhalation solution.  Ara Aprahamian, a former executive at Taro Pharmaceuticals USA, Inc. ("Taro"), was indicted for participating in conspiracies to fix prices, rig bids, and allocate customers for generic drugs, and for making a false statement to federal agents who were investigating those conspiracies. Apotex Corp. ("Apotex") entered a deferred prosecution agreement with the United States that involved admissions that it conspired to increase and maintain prices of Pravastatin.  Glenmark Pharmaceuticals Inc., USA ("Glenmark") and Teva Pharmaceuticals USA, Inc. ("Teva") have been indicted for participation in a conspiracy to suppress and eliminate competition by agreeing to increase and maintain prices of Pravastatin and other generic drugs.  Teva has also been indicted for participation in a conspiracy to fix prices for Carbamazepine Tablets and Chewable Tablets; Clotrimazole Topical Solution (1%); Etodolac IR and ER Tablets; Fluocinonide Cream, Emollient Cream, Gel, and Ointment; Nadolol; Tobramycin; Warfarin; and other generic drugs. The DOJ's criminal investigation remains ongoing.  The DOJ has publicly acknowledged that its criminal investigation has uncovered evidence that a "significant number" of the drugs that are not yet the subject of government enforcement actions were nonetheless impacted by collusion.

4.     The Attorney General of Connecticut and the Attorneys General of more than 40 additional states ("State AGs") have conducted their own investigation uncovering a far-reaching conspiracy, outlined in three civil complaints addressing over 150 generic drugs.   As noted by the State AGs at a 2018 court conference, "this could be the largest cartel case in the history of the United States."[1]

---

[1]     Tr. of Oral Args. on Disc. Mots. at 48:10–16, *In re Generic Pharmaceutical Pricing Antitrust Litig.*, No. 2:16-md-02724 (E.D. Pa. July 11, 2018).

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

5.      Pursuant to this illegal cartel, Defendants routinely and systematically communicated with one another to determine and agree on, for example, how much market share, and which customers, each conspirator was entitled to under the illegal agreement. Defendants orchestrated their conspiracy through secret communications and meetings. Defendants frequently communicated by e-mail, telephone, and text message, and participated in a large number of in-person meetings, which were facilitated by regular trade association and industry group meetings, such as meetings held by the Generic Pharmaceutical Association ("GPhA").

6.      Pursuant to their conspiracy, Defendants determined market share, fixed prices, and rigged bids on the Subject Drugs listed below, and likely additional drugs. This "fair share" understanding permeated virtually every segment of the generic drug industry. The Defendants avoided competition among generic manufacturers that would normally result in significant price erosion and significant savings for purchasers, including Cigna.

7.      Defendants effectuated their market allocation by either refusing to bid for particular customers or providing high and pretextual cover bids. This customer allocation and bid rigging created an artificial equilibrium that enabled the conspirators to then collectively raise and/or maintain prices for a particular generic drug.

8.      Defendants understood and acted upon a code of conduct widespread in the generic drug industry. When a generic competitor entered a particular drug market, under the conspiracy it could contact its competitors and allocate the market according to a generally agreed-upon standard of "fair share" in order to avoid competing and keep prices high. Although different drugs may involve different competitors, this understanding remains constant throughout much of the industry.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

9.      But for the conspiracy, prices for the Subject Drugs would have been competed down to near marginal cost levels.  Defendants were able to impose extraordinary price increases and keep prices artificially high, as reflected in industry-wide data, by engaging in the conspiracies.  As a result of the conspiracies, prices of generic drugs skyrocketed at unprecedented rates, some by more than 1000%, like for example, Albuterol Sulfate (3,400%), Amitriptyline (2,400%), Clobetasol Propionate (1,800%), Clomipramine (2,600%), Doxazosin Mesylate (1053%), Doxycycline (8,000%), Fluconazole (1,570%), Leflunomide (1,300%), Nadolol (2,762%), Oxybutynin Chloride (between 1,100 and 1,500%), Propranolol HCL (1,000%), and Ursodiol (1,000%).

10.     Defendants knew their conduct was unlawful.  They often limited their communications to in-person meetings, or mobile phone calls, to avoid creating a record of their conduct.  When communications were reduced to writing or text messages, as alleged by the State AGs, Defendants often destroyed the evidence of those communications.

11.     This scheme to fix, increase, stabilize, or maintain prices, allocate customers and markets, and rig bids for generic pharmaceutical drugs, and otherwise stifle competition caused, and continues to cause, significant harm to the United States healthcare system.  Defendants' scheme violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and various state antitrust and unfair competition laws, as alleged in this Complaint.  As a result of the conspiracy, as discussed further below, Cigna's pharmacy businesses, which purchased generic drugs directly and indirectly from manufacturers, and Cigna's health plan and pharmacy plan businesses, which reimbursed claims in connection with purchases of generic drugs, paid substantially inflated and anticompetitive prices for generic pharmaceutical drugs, and Defendants illegally profited as a result.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

12.     Cigna seeks treble damages and injunctive relief.

## II.     THE DRUGS SUBJECT TO THE CONSPIRACY ("SUBJECT DRUGS")

13.     The full scope of the conspiracy can only be determined through discovery, but

currently, Cigna understands the conspiracy encompasses the following Subject Drugs:

i)      Acetazolamide.  Acetazolamide is an extended-release version of a medication used to treat glaucoma, epilepsy, altitude sickness, periodic paralysis, and heart failure.  It may be sold in an extended release ("ER") formulation.

ii)     Acetazolamide Tablets.  Acetazolamide Tablets ("Acetazolamide"), also known by the brand name Diamox, is an oral solid medication used to treat glaucoma, epilepsy, altitude sickness, periodic paralysis, and heart failure. Acetazolamide Tablets are available in 250mg and 125mg dosages. The 250mg dosage is the predominant form.

iii)    Adapalene.  Adapalene is used to treat acne and other skin conditions. Adapalene comes in different forms including gels and creams.

iv)     Adapalene Cream, also known by the brand name Differin, is a retinoid used to treat severe acne.

v)      Albuterol Sulfate.  Albuterol sulfate is used to treat shortness of breath caused by asthma and chronic obstructive pulmonary disease.

vi)     Alclometasone Dipropionate Cream.  Alclometasone Dipropionate Cream ("Alclometasone Cream") is a topical steroid used to treat a variety of skin conditions, including eczema, dermatitis, allergies, and rash.

vii)    Alclometasone Dipropionate Ointment.  Alclometasone Dipropionate Ointment ("Alclometasone Ointment"), also known by the brand name Aclovate, is a topical steroid used to treat inflammation and itching caused by skin conditions such as allergic reactions, eczema, and psoriasis.

viii)   Allopurinol.  Allopurinol is a xanthine oxidase inhibitor used to treat gout and certain kinds of kidney stones.  It is available in Tablet and Injection formulations.

ix)     Amantadine Hydrochloride (HCL).  Amantadine HCL is a drug used to treat Parkinson's disease.

x)      Amiloride HCL/HCTZ.  Amiloride hydrochloride ("HCL") and amiloride hydrochlorothiazide ("HCTZ") are used in combination to treat

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

hypertension, heart failure, or extra fluid in the body (edema).  They also help to treat or prevent low potassium levels.

xi)     Amitriptyline.  Amitriptyline is an antidepressant.

xii)    Amoxicillin/Clavulanate.  Amoxicillin/clavulanate is an antibiotic consisting of amoxicillin and clavulanate potassium.  Amoxicillin is an antibiotic used to treat bacterial infections.  Clavulanate potassium is an inhibitor to bacterial resistance.

xiii)   Amphetamine/Dextroamphetamine.  Amphetamine/dextroamphetamine is a combination stimulant used to treat attention deficit hyperactivity disorder (ADHD) and narcolepsy.  The medication comes in both extended release ("ER") and instant release ("IR") forms.

xiv)    Atenolol Chlorthalidone.  Atenolol Chlorthalidone is a pill used to treat high blood pressure.

xv)     Atropine Sulfate.  Atropine Sulfate is an anticholinergic and is available as, for example, a 1% Ophthalmic Solution for use in eye examinations to dilate the pupil and to treat certain eye conditions.

xvi)    Azithromycin.  Azithromycin is an antibiotic used to treat bacterial infections and malaria.

xvii)   Baclofen.  Baclofen is a muscle relaxant and an anti-spastic agent.  It is used to treat muscle symptoms caused by multiple sclerosis, including spasms, pain, and stiffness, as well as muscle spasms in people with spinal injury or disease.

xviii)  Balsalazide Disodium.  Balsalazide Disodium is a medication used to treat ulcerative colitis.

xix)    Benazepril HCTZ.  Benazepril is used to treat hypertension (high blood pressure).

xx)     Betamethasone Dipropionate.  Betamethasone Dipropionate (or "Beta Dip") is a corticosteroid used to treat a variety of skin conditions.  It is manufactured in various formulations, including Augmented, Cream, and Lotion (also known by the brand name "Diprolene").

xxi)    Betamethasone Valerate.  Betamethasone Valerate ("Beta Val"), also known by brand names such as Betamethacot, Beta-Val and Betacort Scalp Lotion, among others, is a medium strength topical corticosteroid prescribed for the treatment of skin conditions such as eczema and

7

dermatitis, as well as allergies and rashes.  It is manufactured in various formulations, including cream, lotion, and ointment.

xxii)     Bethanechol Chloride.  Bethanechol chloride is used to treat dry mouth and bladder problems such as the inability to urinate or empty the bladder completely.

xxiii)    Bromocriptine Mesylate Tablets.  Bromocriptine Mesylate Tablets ("Bromocriptine"), also known by the brand name Parlodel, is used in the treatment of Parkinson's disease, hyperprolactinemia (abnormally high levels of prolactin in the blood), and acromegaly (a syndrome where the pituitary gland produces excess growth hormones).

xxiv)    Budesonide.  Budesonide is administered through inhalers or similar devices and used to prevent asthma attacks.  It can also be used to treat allergic rhinitis, nasal polyps, and is used to treat inflammatory bowel diseases including Crohn's disease, ulcerative colitis, and microscopic colitis.  It is manufactured in various formulations, including DR capsules and inhalation.

xxv)     Bumetanide.  Bumetanide is a diuretic used to treat swelling as a result of heart failure, liver failure, or kidney problems.  It is also used to treat high blood pressure.

xxvi)    Buspirone HCL.  Buspirone hydrochloride is used for the short-term treatment of anxiety disorders, particularly generalized anxiety disorders.

xxvii)   Butorphanol Tartrate.  Butorphanol Tartrate, also known by the brand name Stadol NS, is used to treat moderate pain, including from surgery, muscle pain, and migraine headaches.

xxviii)  Cabergoline.  Cabergoline is used to treat medical problems that occur when too much of the hormone prolactin is produced.  It can be used to treat certain menstrual problems, fertility problems in men and women, and tumors of the pituitary gland.

xxix)    Calcipotriene Betamethasone Dipropionate Ointment.  Calcipotriene Betamethasone Dipropionate Ointment ("CBD Ointment" or "Cal Beta"), also known by the brand name Taclonex Ointment, is a vitamin D analogue and corticosteroid combination product indicated for the topical treatment of psoriasis vulgaris in adults 18 years of age and older. CBD Ointment is available in 60gm and 100gm dosages.

xxx)     Calcipotriene Solution.  Calcipotriene Solution ("Calcipotriene"), also known by the brand name Dovonex Scalp, is a form of vitamin D that

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

impacts the growth of skin cells.  This topical medication is prescribed for the treatment of chronic plaque psoriasis of the scalp.

xxxi)  Capecitabine.  Capecitabine, also known by the brand name Xeloda, is an anti-cancer chemotherapy drug used to treat a variety of cancers, including breast and colon cancer.

xxxii)  Captopril.  Captopril is an angiotensin converting enzyme (ACE) inhibitor prescribed for treating high blood pressure, heart failure, and for preventing kidney failure due to high blood pressure and diabetes.

xxxiii)  Carbamazepine.  Carbamazepine is prescribed for the prevention and control of seizures, for the relief of nerve pain, and for the treatment of certain mental and mood disorders such as bipolar disorder and schizophrenia.  It is manufactured in a variety of forms, including chewable tablets, extended release ("ER") tablets, and regular tablets.

xxxiv)  Cefdinir.  Cefdinir is an antibiotic used to treat pneumonia, otitis media, strep throat, and cellulitis  It is manufactured in a variety of formulations, including capsules and oral suspension.

xxxv)  Cefpodoxime Proxetil.  Cefpodoxime Proxetil ("Cefpodoxime"), also known by the brand name Vantin, is an antibiotic used to treat a wide variety of bacterial infections. It is sold in both oral suspension and tablet form.

xxxvi)  Cefprozil.  Cefprozil is an antibiotic used to treat ear infections, skin infections, and other bacterial infections.

xxxvii)  Cefuroxime Axetil.  Cefuroxime Axetil is an antibiotic used to treat bacterial infections.  It is available in Tablet and Oral Suspension formulations.

xxxviii)  Celecoxib.  Celecoxib is a nonsteroidal anti-inflammatory medication used in the treatment of pain and inflammation associated with arthritis, juvenile rheumatoid arthritis, and other disorders.

xxxix)  Cephalexin.  Cephalexin is an antibiotic used to treat bacterial infections including otitis media, streptococcal pharyngitis, bone and joint infections, pneumonia, cellulitis, and urinary tract infections.

xl)  Chlorpromazine HCL Tablets.  Chlorpromazine is used to treat schizophrenia.

xli)  Cholestyramine.  Cholestyramine is used to treat high cholestoral levels in the blood.

xlii)    Ciclopirox.  Ciclopirox is an antifungal medicine that prevents fungus from growing on skin.

xliii)   Ciclopirox Olamine Cream.  Ciclopirox Olamine Cream, also known by the brand name Loprox, is an antifungal medicine that prevents fungus from growing on your skin.  Ciclopirox Cream is used to treat skin infections such as athlete's foot and ringworm.

xliv)    Ciclopirox Solution.  Ciclopirox Solution, also known by the brand names Penlac and Ciclodan, is an antifungal medication used to treat fungal infections of the fingernails and toenails.

xlv)     Cimetidine.  Cimetidine is a histamine receptor antagonist that inhibits stomach acid production and is used to treat heartburn and peptic ulcers.

xlvi)    Ciprofloxacin HCL.  Ciprofloxacin hydrochloride is an antibiotic used to treat bacterial infections including bone and joint infections, intra-abdominal infections, infectious diarrhea, respiratory tract infections, skin infections, typhoid fever, and urinary tract infections.

xlvii)   Clarithromycin ER.  Clarithromycin is an antibiotic used to treat bacterial infections including strep throat, pneumonia, skin infections, and Lyme disease, among others.  It can be taken in extended release tablet form.

xlviii)  Clemastine Fumarate.  Clemastine fumarate is used to treat hay fever and allergy symptoms including sneezing, runny nose, red itchy tearing eyes, and hives.

xlix)    Clindamycin Phosphate.  Clindamycin Phosphate ("Clindamycin"), also known by the brand names Cleocin T, Clinda Max, and Clinda-Derm, among others, is a topical antibiotic used on the skin to stop the growth of certain bacteria that cause acne. Clindamycin comes in several different formulations, including a cream, gel, lotion, and solution.

l)       Clobetasol Propionate.  Clobetasol propionate is used to treat inflammation and itching caused by several skin conditions, such as allergic reactions, eczema, and psoriasis.  It comes in a variety of forms, including a cream, foam, gel, lotion, ointment, shampoo, solution, and spray.

li)      Clomipramine.  Clomipramine is an antidepressant used to treat symptoms of obsessive-compulsive disorder.

lii)     Clonidine TTS.  Clonidine transdermal therapeutic system ("TTS") is a medication in the form of a transdermal patch that is used to treat high blood pressure.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

liii)      Clotrimazole.  Clotrimazole is an antifungal medication used to treat vaginal yeast infections, oral thrush, diaper rash, pityriasis versicolor, and types of ringworm including athlete's foot and jock itch.  Clotrimazole is sold as a topical solution applied as a cream at various doses.

liv)      Clotrimazole Betamethasone Dipropionate.  Clotrimazole Betamethasone Dipropionate ("CBD"), also known by the brand name Lotrisone, is a combination of clotrimazole (a synthetic antifungal agent) and betamethasone dipropionate (a synthetic corticosteroid).  CBD comes in both a cream ("CBD Cream") and a lotion ("CBD Lotion").  These products are used to treat a variety of inflamed fungal skin infections such as ringworm, athlete's foot, and jock itch.

lv)       Clotrimazole Cream.  Clotrimazole Cream, also known by the brand name Lotrimin AF Cream, is an antifungal medication used to treat vaginal yeast infections, oral thrush, diaper rash, pityriasis versicolor, and various types of ringworm including athlete's foot and jock itch.

lvi)      Cyproheptadine HCL.  Cyproheptadine hydrochloride is an antihistamine used to relieve allergy symptoms such as watery eyes, runny nose, itching eyes and nose, sneezing, hives, and itching.

lvii)     Desmopressin Acetate.  Desmopressin acetate is used to treat diabetes insipidus and other conditions.

lviii)    Desogestrel/Ethinyl Estradiol.  Desogestrel/ethinyl estradiol, brand name Kariva, is a progestin medication used in birth control pills for women and also for treatment of menopausal symptoms in women.

lix)      Desonide.  Desonide is used to treat skin disorders, including eczema, psoriasis, and dermatitis.  It is manufactured in a variety of formulations, including cream, lotion, and ointment.

lx)       Desoximetasone Ointment.  Desoximetasone Ointment ("Desoximetasone"), also known by the brand name "Topicort," is a corticosteroid used to treat a variety of skin conditions, including eczema and dermatitis. Desoximetasone reduces the swelling, redness and itching associated with those conditions.

lxi)      Dexmethylphenidate HCL ER ("Dexmeth ER").  Dexmethylphenidate hydrochloride is used to treat attention deficit hyperactivity disorder (ADHD).  It can be taken in an extended release form.

lxii)     Dextroamphetamine Sulfate ER.  Dextroamphetamine sulfate is a CNS stimulant and amphetamine enantiomer used to treat attention deficit

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

hyperactivity disorder (ADHD) and narcolepsy.  It can be taken in an extended release form.

lxiii)    Diclofenac Potassium.  Diclofenac potassium is an NSAID used to treat pain, inflammatory disorders, and dysmenorrhea.

lxiv)    Dicloxacillin Sodium.  Dicloxacillin sodium is an antibiotic used to treat mild to moderate staphylococcal infections.

lxv)     Diflunisal.  Diflunisal is used to treat mild to moderate pain, osteoarthritis, and rheumatoid arthritis.

lxvi)    Digoxin.  Digoxin is used to treat heart failure and atrial fibrillation.

lxvii)   Diltiazem HCL.  Diltiazem hydrochloride is used to treat hypertension, angina, and heart arrhythmias.

lxviii)  Diphenoxylate Atropine.  Diphenoxylate Atropine is a combination medicine used to treat diarrhea.  It is available in Tablet and Oral Liquid formulations.

lxix)    Disopyramide Phosphate.  Disopyramide phosphate is used to treat ventricular tachycardia.

lxx)     Divalproex Sodium ER.  Divalproex sodium extended release is used to treat various types of seizure disorders, to treat manic episodes related to bipolar disorder, and to prevent migraine headaches.

lxxi)    Doxazosin Mesylate.  Doxazosin mesylate is used to treat symptoms of an enlarged prostate and hypertension.

lxxii)   Doxycycline.  Doxycycline is used to treat bacterial infections, such as acne, urinary tract infections, intestinal infections, eye infections, gonorrhea, chlamydia, and periodontitis.  It is also used to treat symptoms of rosacea.  Doxycycline hyclate ("Doxy Hyclate") is a water-soluble form of doxycycline that absorbs quickly into the bloodstream.  A delayed release version of doxycycline hyclate ("Doxy DR") is used to treat acne.  Doxycycline monohydrate ("Doxy Mono") is less water soluble and absorbs more slowly than Doxy Hyclate.  It is also used to prevent malaria.

lxxiii)  Drospirenone and Ethinyl Estradiol (Ocella).  Drospirenone and ethinyl estradiol, known by the brand name Ocella, is used in birth control pills and menopausal hormone therapy.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

lxxiv)      Econazole Nitrate Cream.  Econazole nitrate cream 1% ("Econazole") is a topical antifungal agent used to treat skin infections caused by fungus or yeast, including ringworm, tinea versicolor, and yeast infections.

lxxv)       Enalapril Maleate.  Enalapril maleate is used to treat hypertension, symptomatic heart failure, asymptomatic left ventricular dysfunction, and diabetic kidney disease.

lxxvi)      Entecavir.  Entecavir is an antiviral medication used to treat hepatitis B virus infection.

lxxvii)     Epitol.  Epitol is a branded generic form of Carbamazepine, described above.

lxxviii)    Eplerenone.  Eplerenone, also known by the brand name Inspra, is an oral medication used alone or in combination with other medicines to treat high blood pressure by blocking a chemical (aldosterone) in your body which in turn lowers the amount of sodium and water the body retains.

lxxix)      Erythromycin Base/Ethyl Alcohol Solution.  Erythromycin Base/Ethyl Alcohol Solution ("Erythromycin Solution") is a topical medication used to treat acne.

lxxx)       Estazolam.  Estazolam is used to treat sleep disorders.

lxxxi)      Estradiol.  Estradiol is used in menopausal hormone therapy to prevent and treat moderate to severe menopausal symptoms such as hot flashes, vaginal dryness, and atrophy.  It is also used to treat osteoporosis.

lxxxii)     Estradiol/Norethindrone Acetate (Mimvey).  Estradiol/norethindrone acetate, brand name Mimvey, is a combination estradiol and norethisterone acetate used to treat vasomotor symptoms, vulvar and vaginal atrophy, and osteoporosis associated with menopause.

lxxxiii)    Ethambutol HCL Tablets.  Ethambutol HCL Tablets ("Ethambutol"), also known by the brand name Myambutol, is a drug used to treat tuberculosis.

lxxxiv)     Ethinyl Estradiol and Levonorgestrel (Portia and Jolessa).  Ethinyl estradiol and levonorgestrel, brand names Portia and Jolessa, when used in combination, is an oral contraceptive used to prevent pregnancy.

lxxxv)      Ethosuximide.  Ethosuximide is used for absence seizures.

lxxxvi)     Etodolac.  Etodolac is a nonsteroidal anti-inflammatory drug that is used to treat symptoms of juvenile arthritis, rheumatoid arthritis, and osteoarthritis.

13

lxxxvii)    Exemestane.  Exemestane is used to treat certain types of breast cancer.  It is available in Tablet form.

lxxxviii)   Fenofibrate.  Fenofibrate is used to treat abnormal blood lipid levels.  It is also used to treat high cholesterol to reduce the risk of cardiovascular disease and diabetic retinopathy in those with diabetes mellitus.

lxxxix)     Fluconazole.  Fluconazole is an antifungal medication used to treat fungal infections including candidiasis, blastomycosis, coccidioidomycosis, cryptococcosis, histoplasmosis, dermatophytosis, and pityriasis versicolor.

xc)         Fluocinonide.  Fluocinonide is a topical glucocorticoid used to treat psoriasis and eczema.  It is manufactured in a variety of formulations, including cream, emollient cream, gel, ointment (also known by the brand name Lidex), and solution.

xci)        Fluocinolone Acetonide.  Fluocinolone Acetonide ("Fluocinolone") is a steroid that reduces inflammation.  In its topical formulations (cream – 0.025%, 0.01% and ointment – 0.025%), it is prescribed for the treatment of skin conditions such as eczema and psoriasis.

xcii)       Fluoxetine HCL.  Fluoxetine hydrochloride is an antidepressant used for treatment of major depressive disorder, obsessive-compulsive disorder, bulimia nervosa, panic disorder, and premenstrual dysphoric disorder.

xciii)      Flurbiprofen.  Flurbiprofen is  primarily used as a pre-operative antibiotic as well as for arthritis or dental pain.

xciv)       Flutamide.  Flutamide is used to treat prostate cancer.  It is also used to treat androgen-dependent conditions such as acne, excessive hair growth, and high androgen levels in women.

xcv)        Fluticasone Propionate.  Fluticasone Propionate is a steroid medication used for the long-term management of asthma and chronic obstructive pulmonary disease.  It is available as a lotion (brand name "Cutivate") and as a 50 cg Nasal Spray.

xcvi)       Fluvastatin Sodium.  Fluvastatin sodium is a statin used to treat high cholesterol and to prevent cardiovascular disease.

xcvii)      Fosinopril HCTZ.  Fosinopril hydrochlorothiazide is a combination medicine used to treat hypertension and heart failure.

xcviii)     Gabapentin.  Gabapentin is an anticonvulsant medication used to treat seizures, neuropathic pain, hot flashes, and restless pain syndrome.  Some

14

doctors also prescribe it to treat anxiety disorders, insomnia, and bipolar disorder.

xcix)     Glimepiride.  Glimepiride is used to treat diabetes mellitus type 2.

c)        Glipizide-Metformin.  Glipizide-metformin is a combination medicine used to treat high blood sugar levels that are caused by a type of diabetes mellitus or sugar diabetes called type 2 diabetes.

ci)       Glyburide.  Glyburide is an oral medication used to control blood sugar in patients with type 2 diabetes.

cii)      Glyburide-Metformin.  Glyburide-metformin is a combination medication used to control blood sugar in patients with type 2 diabetes.

ciii)     Griseofulvin.  Griseoflulvin Microsize Oral Suspension ("Griseoflulvin Oral Suspension") is an antifungal medication used to treat dermatophytosis (ringworm).  Griseofulvin Microsize Tablets ("Griseofulvin Tablets"), also known by the brand name Grifulvin V, is a medication used to treat fungal infections of the skin, hair, or nails that do not respond to creams or lotions.

civ)      Halobetasol Propionate.  Halobetasol Propionate, also known by the brand name Ultravate, is a strong corticosteroid used to treat a variety of skin conditions, including eczema, dermatitis, psoriasis, and rash. Halobetasol comes in both cream and ointment form.

cv)       Haloperidol.  Haloperidol is an antipsychotic used to treat schizophrenia, Tourette syndrome, bipolar disorder, nausea and vomiting, delirium, agitation, acute psychosis, and hallucinations caused by alcohol withdrawal.

cvi)      Hydralazine HCL.  Hydralazine hydrochloride is used to treat hypertension and heart failure.

cvii)     Hydrocortisone Acetate Suppositories.  Hydrocortisone Acetate Suppositories ("Hydrocortisone Acetate"), also known by the G&W brand name Anucort-HC, are used to treat itching or swelling caused by hemorrhoids as well as ulcerative colitis, proctitis, and other inflammatory conditions of the intestines, rectum, or anus. Hydrocortisone Acetate is a corticosteroid.

cviii)    Hydrocortisone Valerate Cream is a topical corticosteroid used to treat a variety of skin conditions including eczema, dermatitis, allergies, and rash.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

cix)      Hydroxyurea.  Hydroxyurea is used to treat sickle-cell disease, chronic myelogenous leukemia, cervical cancer, polycythemia vera, and psoriasis.

cx)       Hydroxyzine Pamoate.  Hydroxyzine pamoate is an antihistamine used to treat itchiness, anxiety, and nausea due to motion sickness.

cxi)      Imiquimod Cream, also known by the brand names Aldara and Zyclara, is a topical medication used to treat actinic keratosis, or precancerous growths on the skin.

cxii)     Irbesartan.  Irbesartan is used to treat hypertension, heart failure, and diabetic kidney disease.

cxiii)    Isoniazid.  Isoniazid is an antibiotic used to treat tuberculosis and atypical mycobacterial infections.

cxiv)     Isosorbide Dinitrate.  Isosorbide Dinitrate is a commonly prescribed medication used to prevent chest pain (angina) in patients with coronary artery disease.  It is available in several dosages, including 5 mg, 10 mg, 20 mg, and 30 mg Tablets.

cxv)      Ketoconazole.  Ketoconazole is an antifungal medication used to treat fungal infections such as tinea, cutaneous candidiasis, pityriasis versicolor, dandruff, and seborrheic dermatitis.  It is also used to treat excessive hair growth and Cushing's syndrome.  It is sold in cream (brand name "Nizoral") and tablet formulations.

cxvi)     Ketoprofen.  Ketoprofen is used to treat arthritis-related inflammatory pains, severe toothaches, musculoskeletal pain, and nerve pain.

cxvii)    Ketorolac Tromethamine.  Ketorolac tromethamine is used for the management of moderate to severe pain.

cxviii)   Labetalol HCL.  Labetalol hydrochloride is used to treat hypertension and for the long-term management of angina.

cxix)     Lamivudine/Zidovudine (Combivir).  Lamivudine/zidovudine, brand name Combivir, is a combination antiretroviral medication used to treat human immunodeficiency virus (HIV) / acquired immunodeficiency syndrome (AIDS).

cxx)      Latanoprost.  Latanoprost, also known by the brand name Xalatan, is an ophthalmic solution, in the form of eye drops, used to treat high blood pressure inside the eye due to glaucoma (open angle type) or other eye diseases including but not limited to ocular hypertension.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

cxxi)       Leflunomide.  Leflunomide is used to reduce inflammation that causes pain and swelling in patients with rheumatoid arthritis.

cxxii)      Levothyroxine.  Levothyroxine is a manufactured, synthetic form of the thyroid hormone, thyroxine.  It is used to treat hypothyroidism, a condition in which the thyroid gland fails to produce enough hormone.  It is also used to treat goiter (enlarged thyroid gland), thyroid cancer, and cretinism (congenital hypothyroidism).

cxxiii)     Lidocaine.  Lidocaine is a local anesthetic agent used to numb an area of the body to reduce pain or discomfort caused by invasive medical procedures.  It is sold in several formulations and combinations, including ointment ("Lidocaine" or "Lido," or brand names such as Xylocaine Topical Solution) and solution.

cxxiv)      Lidocaine/Prilocaine.  Lidocaine/Prilocaine is a topical cream used on the skin to cause numbness or loss of feeling before certain medical procedures.

cxxv)       Loperamide HCL.  Loperamide hydrochloride is used to treat diarrhea, inflammatory bowel disease, or short bowel syndrome.

cxxvi)      Medroxyprogesterone.  Medroxyprogesterone is used to treat conditions such as absent or irregular menstrual periods and abnormal uterine bleeding.  It is also used with estrogens to decrease the risk of endometrial hyperplasia.  A derivative, medroxyprogesterone acetate, is used as a method of birth control and in menopausal hormone therapy.  It is also used to treat endometriosis, abnormal uterine bleeding, abnormal sexuality in males, and certain types of cancer.

cxxvii)     Meprobamate.  Meprobamate is used to treat short term anxiety, tension, and insomnia

cxxviii)    Metformin ER (F).  Metformin ER (F) is a drug used to treat high blood sugar levels caused by type 2 diabetes..

cxxix)      Methadone HCL.  Methadone HCL is an opioid analgesic used to treat addiction to opioids.  It is available in Injectable, Tablet, and Oral Liquid formulations.

cxxx)       Methazolamide.  Methazolamide, also known by the brand name Neptazane, is used to treat ocular conditions where lowering intraocular pressure would be beneficial, including several types of glaucoma.  Methazolamide Tablets are available in 25mg and 50mg dosages.

cxxxi)      Methimazole.  Methimazole is used to treat hyperthyroidism.

17

cxxxii)     Methotrexate.  Methotrexate is used to treat cancer, autoimmune diseases, and ectopic pregnancy, and also for medical abortions.

cxxxiii)    Methylphenidate HCL.  Methylphenidate HCL, also known by the brand name Ritalin, is used to treat attention deficit disorder and attention deficit hyperactivity disorder, as well as some sleep disorders. There are two formulations of Methylphenidate HCL – Immediate Release ("Methylphenidate IR") and Extended Release ("Methylphenidate ER").

cxxxiv)     Methylprednisolone.  Methylprednisolone, also known by the brand name Solu-Medrol, is an adrenocortical steroid used to treat arthritis, lupus, psoriasis, and ulcerative colitis.

cxxxv)      Metronidazole.  Metronidazole is an antibiotic available in cream (Metronidazole 0.75% cream), gel (Metronidazole Topical .75% Gel; Metronidazole 1% Gel), vaginal, and lotion form (Metronidazole 0.75% lotion).  It is used to treat skin lesions resulting from rosacea, among other infections.

cxxxvi)     Moexipril HCL.  Moexipril hydrochloride is used to treat hypertension and congestive heart failure.

cxxxvii)    Moexipril HCL/HCTZ.  Moexipril hydrochlorothiazide is a combination of moexipril HCL, as described above, and hydrochlorothiazide, a diuretic.

cxxxviii)   Mometasone Furoate.  Mometasone Furoate ("Mometasone"), also known by the brand name Elocon, is a medium-strength corticosteroid used to treat skin conditions such as eczema, psoriasis, allergies, and rashes. Mometasone is available in several forms, including cream, ointment, and solution.

cxxxix)     Nabumetone.  Nabumetone is used to treat pain and inflammation.

cxl)        Nadolol.  Nadolol is used to treat hypertension and for long-term treatment of angina pectoris.  It is also used for heart rate control in people with atrial fibrillation, prevention of migraine headaches, prevention of bleeding veins in people with cirrhosis, and to treat people with high levels of thyroid hormone.

cxli)       Nafcillin Sodium.  Nafcillin Sodium ("Nafcillin") is marketed as an antibiotic used to treat infections caused by penicillin-resistant staphylococci, among other bacteria.

cxlii)      Naproxen Sodium.  Naproxen Sodium, also known by the brand name Naprosyn, is a nonsteroidal anti-inflammatory drug (NSAID) used to treat

18

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

pain, menstrual cramps, inflammatory diseases such as rheumatoid arthritis, and fever.

cxliii)   Neomycin Polymyxin Hydrocortisone.  Neomycin Polymyxin Hydrocortisone is a topical antibiotic used to treat outer ear infections caused by bacteria.  It is available in several forms, including a Solution.

cxliv)   Niacin ER.  Niacin is an organic compound that is a form of vitamin B3. It is an essential human nutrient and the extended release form is used to treat high blood cholesterol and niacin deficiency.

cxlv)   Nimodipine.  Nimodipine is a used to manage and reduce problems caused by bleeding blood vessels in the brain.

cxlvi)   Nitrofurantoin MAC.  Nitrofurantoin microcrystal ("MAC") is an antibiotic used to treat bladder infections.

cxlvii)   Norethindrone Acetate.  Norethindrone acetate is used in birth control pills, menopausal hormone therapy, and for treatment of gynecological disorders such as abnormal uterine bleeding.

cxlviii)   Norethindrone/Ethinyl Estradiol (Balziva).  Norethindrone/Ethinyl estradiol, brand name Balziva, is a combination of ethinyl estradiol and norethisterone.  It is used for birth control, and to treat menstruation symptoms, endometriosis, and menopausal symptoms.

cxlix)   Nortriptyline HCL.  Nortriptyline hydrochloride is used to treat depression, neuropathic pain, ADHD, and anxiety and is also used for smoking cessation.

cl)   Nystatin.  Nystatin is an antifungal medication.  It is used to treat yeast infections, diaper rash, thrush, and esophageal candidiasis.

cli)   Nystatin Ointment.  Nystatin Ointment, also known by the brand name Mycostatin, is a topical antifungal medication used to treat fungal skin infections.

clii)   Nystatin Triamcinolone.  Nystatin Triamcinolone ("NT") Cream and Ointment is used for the treatment of cutaneous candidiasis, such as yeast infections and thrush.

cliii)   Omega-3-Acid Ethyl Esters.  Omega-3 acid ethyl esters are used to reduce triglyceride levels in adults with severe hypertriglyceridemia.

cliv)   Ondansetron.  Onandsetron is used to prevent and treat nausea.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

clv)        Oxacillin Sodium.  Oxacillin Sodium ("Oxacillin") is marketed as an antibiotic used to treat infections caused by penicillin-resistant staphylococci, among other bacteria.

clvi)        Oxaprozin.  Oxaprozin is  used to relieve inflammation, swelling, stiffness, and joint pain associated with osteoarthritis and rheumatoid arthritis.

clvii)        Oxybutynin Chloride.  Oxybutynin chloride is used to treat an overactive bladder, bed wetting in children, and excessive sweating.

clviii)        Oxycodone Acetaminophen.  Oxycodone Acetaminophen is a pain reliever that is available in Capsule, Tablet, and Oral Solution formulations.

clix)        Paricalcitol.  Paricalcitol is used for the prevention and treatment of secondary hyperparathyroidism associated with long-term kidney disease.

clx)        Paromomycin.  Paromomycin is a broad-spectrum oral antibiotic.  It is used to treat parasitic infections in the intestines and complications of liver disease.

clxi)        Penicillin VK.  Penicillin V potassium ("Penicillin VK") is an antibiotic used to treat bacterial infections including strep throat, otitis media, and cellulitis.  It is also used to treat rheumatic fever and to prevent infections following removal of the spleen.

clxii)        Pentoxifylline.  Pentoxifylline is a xanthine derivative used to treat muscle pain, cramping, numbness, or weakness in people with peripheral artery disease.  It is also used for the treatment of chronic venous leg ulcers and alcoholic hepatitis.

clxiii)        Permethrin.  Permethrin is a medication used to treat scabies.

clxiv)        Perphenazine.  Perphenaine is used to treat certain mental health issues and mood disorders.  During the period relevant to this Complaint, Qualitest and Sandoz were the primary manufacturers of Perphenazine.

clxv)        Phenytoin Sodium Extended Release Capsules.  Phenytoin Sodium Extended Release Capsules ("Phenytoin Sodium"), also known by the brand name Dilantin, is an antiepileptic drug that is used to prevent and treat seizures.

clxvi)        Pilocarpine HCL.  Pilocarpine HCL is a drug used to reduce pressure inside the eye and treat dry mouth.  It is available in Tablet and Oral Liquid formulations.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

clxvii)     Pioglitazone HCL Metformin HCL.  Pioglitazone HCL Metformin HCL
            ("Pioglitazone Metformin"), also known by the brand name Actoplus Met,
            is used to control high blood sugar in patients with type 2 diabetes
            mellitus.

clxviii)    Piroxicam.  Piroxicam is used to treat rheumatoid arthritis, osteoarthritis,
            and juvenile rheumatoid arthritis.

clxix)      Potassium Chloride ER.  Potassium Chloride is a metal halide salt used to
            treat low levels of potassium.  It is available in different formulations,
            including Tablets LA.

clxx)       Pravastatin Sodium.  Pravastatin is a statin used to lower cholesterol and
            triglycerides in the blood.

clxxi)      Prazosin HCL.  Prazosin hydrochloride is used to treat hypertension,
            symptoms of an enlarged prostate, and post-traumatic stress disorder.

clxxii)     Prednisolone Acetate.  Prednisolone Acetate is a corticosteroid used to
            treat certain eye conditions due to inflammation or injury.  It is available
            in an Ophthalmic Solution and in Ophthalmic Liquid Eye formulations.

clxxiii)    Prednisone.  Prednisone is a corticosteroid used to treat conditions such as
            arthritis, blood disorders, breathing problems, and immune system
            disorders. It is available in Tablet and Oral Solution formulations.

clxxiv)     Prochloperazine Tablets.  Prochlorperazine Tablets are used to treat
            nausea, schizophrenia, migraines, and anxiety

clxxv)      Prochlorperazine Maleate Suppositories.  Prochlorperazine Maleate
            Suppositories ("Prochlorperazine Suppositories"), also known by the
            brand names Compro and Compazine, are used to treat nausea and
            vomiting.

clxxvi)     Promethazine HCL.  Promethazine HCL, also known by the brand name
            Promethegan, is an antihistamine that is used to treat some allergies,
            nausea, and vomiting.

clxxvii)    Propranolol HCL.  Propranolol hydrochloride is used to treat
            hypertension, heart rhythm disorders, tremors, and other heart and
            circulatory conditions, and to prevent heart attacks, migraine headaches,
            and angina.  Propranolol is available as a capsule, a tablet, an oral liquid
            solution, and an injection.

clxxviii)   Raloxifene HCL.  Raloxifene hydrochloride is used to prevent and treat
            osteoporosis in postmenopausal women and those on glucocorticoids.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

clxxix)      Ranitidine HCL.  Ranitidine hydrochloride is used to treat peptic ulcer disease, gastroesophageal reflux disease, Zollinger-Ellison syndrome, and hives.  It is manufactured in tablet and capsule form.

clxxx)       Silver Sulfadiazine.  Silver Sulfadiazine is an antibiotic used to treat second and third-degree burns.  It is available in a Cream formulation.

clxxxi)      Spironolactone Hydrochlorothiazide (HCTZ).  Spironolactone Hydrochlorothiazide (HCTZ) is a commonly prescribed medication used to treat high blood pressure.  It is available in 25-25mg Tablets.

clxxxii)     Tacrolimus Ointment.  Tacrolimus Ointment ("Tacrolimus"), also known by the brand name Protopic, is a secondary treatment option for moderate to severe eczema. Tacrolimus is available in 30gm, 60gm and 100gm dosages.

clxxxiii)    Tamoxifen Citrate.  Tamoxifen citrate is used to prevent and treat breast cancer.

clxxxiv)     Temozolomide.  Temozolomide is an oral chemotherapy drug used to treat some brain cancers.

clxxxv)      Theophylline ER.  Theophylline extended release is used to treat asthma and airway narrowing associated with long-term asthma and other lung problems, such as chronic bronchitis and emphysema.

clxxxvi)     Timolol Maleate.  Timolol Maleate is a beta blocker drug, which is used to treat, for example, high pressure inside the eye due to glaucoma or other eye diseases.  It is available in Opthalmic Gel, Opthalmic Liquid Eye, and Tablet formulations.

clxxxvii)    Tizanidine.  Tizanidine is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

clxxxviii)   Tobramycin.  Tobramycin is an antibiotic used to treat various bacterial infections.

clxxxix)     Tobramycin Dexamethasone.  Tobramycin Dexamethasone is an antibiotic used to treat bacterial eye infections.

cxc)         Tolmetin Sodium.  Tolmetin sodium is used to reduce hormones that cause pain, swelling, tenderness, and stiffness in conditions such as osteoarthritis, rheumatoid arthritis, and juvenile rheumatoid arthritis.

cxci)        Tolterodine.  Tolterodine is used to treat an overactive bladder.  It is sold in extended release form and as tolterodine tartrate.

22

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

cxcii)       Topiramate Sprinkle.  Topiramate sprinkle is used to treat epilepsy and
             alcohol dependence and to prevent migraines.

cxciii)      Trazodone HCL.  Trazodone HCL is a serotonin uptake inhibitor that is
             used to treat depression.  It is available in tablet form in several strengths,
             including 100 mg Tablets.

cxciv)       Triamcinolone Acetonide.  Triamcinolone Acetonide, also known by the
             brand names Aristocort, Aristocort HP, Kenalog, and Triderm, is a
             corticosteroid that is used to treat a variety of skin conditions, including
             eczema, dermatitis, allergies, and rashes.  Triamcinolone Acetonide is
             available as both a cream and an ointment.

cxcv)        Triamcinolone Acetonide Paste.  Triamcinolone Acetonide Paste ("Triam
             Paste"), also known by the brand name Oralone, provides temporary relief
             from pain symptoms caused by mouth lesions. In 2013, the annual market
             size for this drug was approximately $14 million.

cxcvi)       Triamterene HCTZ.  Triamterene HCTZ is a commonly prescribed
             medication used to treat fluid retention and high blood pressure.  It is
             available in multiple forms and dosages, including Capsules (37.5-25 mg)
             and Tablets (37.5-25 mg and 75-50 mg).

cxcvii)      Trifluoperazine HCL.  Trifluoperazine hydrochloride is an antipsychotic
             used to treat schizophrenia and for the short-term treatment of generalized
             anxiety disorder.

cxcviii)     Ursodiol.  Ursodiol is used to dissolve gallstones made of cholesterol in
             patients whose gallbladders do not need to be removed or where surgery is
             not an option.  It is also used to prevent the formation of gallstones and to
             treat primary biliary cirrhosis.  Ursodiol can also be used to prevent organ
             rejection in liver transplant patients.

cxcix)       Valsartan HCTZ.  Valsartan hydrochlorothiazide is used to treat
             hypertension, heart failure, and diabetic kidney disease.

cc)          Verapamil.  Verapamil is a calcium channel blocker.  It is used to treat
             hypertension, angina, and certain heart rhythm disorders.

cci)         Warfarin Sodium.  Warfarin sodium is an anticoagulant used to treat blood
             clots such as deep vein thrombosis and pulmonary embolism.  It is also
             used to prevent stroke in people who have atrial fibrillation, valvular heart
             disease, or artificial heart valves.

ccii)        Zoledronic Acid.  Zoledronic acid is used to prevent bone disease in
             cancer patients.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## III.     JURISDICTION AND VENUE

14.      This Court has jurisdiction over this action pursuant to 15 U.S.C. § 26, and 28

U.S.C. §§ 1331 and 1337.  Cigna asserts claims for relief under Section 1 of the Sherman Act, 15

U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.  This Court has jurisdiction over

non-federal claims alleged in this Complaint pursuant to 28 U.S.C. § 1367, as the state law

claims are so related to the federal antitrust claims as to form part of the same case or

controversy.

15.      This Court may exercise personal jurisdiction over Defendants because each

Defendant transacted business throughout the United States (including in this District), sold and

distributed one or more of the Subject Drugs throughout the United States (including in this

District), has registered agents in the United States (including in this District), may be found in

the United States (including in this District), engaged in an unlawful conspiracy to artificially

increase prices for one or more of the Subject Drugs that was directed at and had the intended

effect of causing injury to persons residing in, located in, or doing business throughout the

United States (including in this District), and is otherwise subject to the service of process

provisions of 15 U.S.C. § 22.

16.      Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391.

During the relevant time period (at least May 1, 2009 to the present), Defendants resided,

transacted business, and/or were found or had agents in the United States, including in this

District.

17.      During the alleged time period, Defendants sold and shipped the generic drugs at

issue in a continuous and uninterrupted flow of interstate commerce in the United States,

including in this District.  Defendants' conduct had a direct, substantial, and reasonably

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

foreseeable effect on interstate commerce in the United States, including in this District.

Defendants engaged in an unlawful conspiracy to artificially increase prices for generic drugs at

issue that was directed at and had the intended effect of causing injury to persons residing in,

located in, or doing business throughout the United States, including in this District.  Throughout

the time period alleged herein, there was a continuous and uninterrupted flow of purchase orders,

invoices, and other documents essential to the sale and provision of the generic drugs at issue

transmitted between and among offices of Defendants and their customers throughout the United

States, including in this District.

## IV.    THE PARTIES

### A.    Plaintiff

18.    Cigna Corp. is a corporation organized under the laws of the State of Delaware,

with its principal place of business in Bloomfield, Connecticut.

19.    Cigna is the parent company, or otherwise affiliated/related company, to

businesses that operate pharmacies, including mail-order, specialty pharmacies, and retail

pharmacies, as well as specialty pharmaceutical distribution services.  During the relevant

period, certain of these assignor subsidiaries and/or affiliates operated under Express Scripts

banners, and certain of these assignor subsidiaries and/or affiliates operated under Cigna banners.

Cigna became the corporate parent of Express Scripts Holding Company ("Express Scripts") in

or about December 2018, when it acquired Express Scripts and all of its subsidiaries (the

"Acquisition").  Through Express Scripts, Cigna is the parent company, or otherwise

affiliated/related company, to assignor subsidiaries and/or affiliates that operated as Express

Scripts entities prior to the Acquisition, including:  Accredo Health Group, Inc., CuraScript, Inc.,

ESI Mail Pharmacy Service, Inc., Express Scripts, Inc., Express Scripts Pharmaceutical

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Procurement LLC, Express Scripts Pharmacy, Inc., Lynnfield Drug, Inc., Lynnfield

Compounding Center, Inc., Priority Healthcare Corporation, Priority Healthcare Distribution,

Inc., and Specialty Products Acquisitions, LLC (collectively, "Express Scripts Purchasers").  The

Express Scripts Purchasers buy generic prescription drugs from manufacturers and wholesalers

strictly for the purposes of (1) dispensation by their subsidiaries and/or affiliates that operate

mail-order and specialty pharmacies, and/or (2) distribution by their subsidiaries and/or affiliates

that provide specialty pharmaceutical distribution services.  Cigna is also the parent company, or

otherwise affiliated/related company, to assignor subsidiaries and/or affiliates that operated as

Cigna entities prior to the Acquisition, including:  Cigna HealthCare of California, Inc., Tel-

Drug, Inc., Tel-Drug of Pennsylvania, LLC, HealthSpring Pharmacy of Tennessee, LLC, and

HealthSpring Pharmacy Services, LLC (collectively, "Cigna Pharmacies").  The Cigna

Pharmacies bought generic prescription drugs from manufacturers and wholesalers strictly for

purposes of dispensation by their subsidiaries and/or affiliates that operate mail-order, specialty,

and retail pharmacies.  Through the Express Scripts Purchasers and Cigna Pharmacies, Cigna has

purchased numerous of the Subject Drugs from Defendants directly and indirectly pursuant to

various contractual arrangements.  The Express Scripts Purchasers and Cigna Pharmacies have

assigned their claims based on these purchases to Cigna Corp.

20.     Cigna is the parent company, or otherwise affiliated/related company, to various

health insurance plans and prescription drug plans (collectively, "Cigna Plans").  Cigna, either

directly or through its subsidiaries, insures and/or administers health and prescription drug plan

benefits for its members and group customers, including self-funded group customers that

contract with Cigna to administer claims on their behalf and pursue recoveries related to those

claims.  Many of these health plan benefits provide members with prescription drug coverage

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

under which claims for drugs manufactured by Defendants were submitted and paid.  Cigna is

pursuing recovery related to those claims.  The Cigna Plans issue insurance and/or administrative

services covering prescription drugs in the form of (1) fully insured commercial ("Commercial")

health plans; (2) self-funded administrative services only ("ASO") health plans; (3) hybrid-

funded health plans; (4) Medicare Advantage plans; (5) Medicare Prescription Drug Plans; and

(6) Medicaid Plans.  Cigna's subsidiaries provide these benefits to Cigna insureds and clients

nationwide.  These assignor subsidiaries and/or affiliates include:  Bravo Health Pennsylvania

Inc., Bravo Health Mid-Atlantic Inc., Cigna Health and Life Insurance Company, Cigna

HealthCare of Arizona, Inc., Cigna HealthCare of California, Inc., Cigna HealthCare of

Colorado, Inc., Cigna HealthCare of Connecticut, Inc., Cigna HealthCare of Florida, Inc., Cigna

HealthCare of Georgia, Inc., Cigna HealthCare of Illinois, Inc., Cigna HealthCare of Indiana,

Inc., Cigna HealthCare of Maine, Inc., Cigna HealthCare of Massachusetts, Inc., Cigna

HealthCare of Mid-Atlantic, Inc., Cigna HealthCare of New Hampshire, Inc., Cigna HealthCare

of New Jersey, Inc., Cigna HealthCare of North Carolina, Inc., Cigna HealthCare of

Pennsylvania, Inc., Cigna HealthCare of South Carolina, Inc., Cigna HealthCare of St. Louis,

Inc., Cigna HealthCare of Tennessee, Inc., Cigna HealthCare of Texas, Inc., Cigna HealthCare of

Utah, Inc., HealthSpring of Florida, Inc., HealthSpring Life & Health Insurance Company, Inc.,

Medco Containment Insurance Company of NY, and Medco Containment Life Insurance

Company.  The Cigna Plans have assigned their claims based on these purchases to Cigna Corp.

21.     Cigna's Complaint seeks recovery for unlawful overcharges incurred in

connection with direct and indirect purchases of generic pharmaceuticals made by Express

Scripts Purchasers and Cigna Pharmacies strictly in connection with their busiensses that provide

mail-order pharmacy dispensation, retail pharmacy dispensation, specialty pharmacy

dispensation, and specialty pharmaceutical distribution.  Cigna's Complaint also seeks recovery

for unlawful overcharges incurred in connection with paying for generic drugs dispensed to

Cigna insureds, including all those receiving insurance, administrative services, or prescription

drug benefits from any of the Cigna Plans (or their predecessors or successors).

      **B.**    **Defendants**

          **1.**    **Actavis**

    22.     Defendant Actavis Holdco US, Inc. ("Actavis Holdco") is a Delaware corporation

with its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey 07054.  In

March 2015, Actavis plc, the then-parent company of Defendants Actavis Elizabeth, LLC and

Actavis Pharma, Inc., merged with Allergan, Inc. and changed its name to Allergan plc

("Allergan").  In August 2016, Teva Pharmaceutical Industries Ltd., the Israeli parent company

of Defendant Teva, purchased Allergan's generics business, which included Defendants Actavis

Elizabeth and Actavis Pharma, Inc.  The assets and liabilities of Allergan's generics business

were transferred to the newly-formed Actavis Holdco.  Actavis Holdco is a wholly-owned

subsidiary of Defendant Teva Pharmaceuticals USA, Inc.

    23.     Defendant Actavis Elizabeth, LLC ("Actavis Elizabeth") is a Delaware limited

liability company with its principal place of business at 200 Elmora Avenue, Elizabeth, New

Jersey 07202.  It is a wholly-owned subsidiary of Defendant Actavis Holdco and is a research

and development and manufacturing entity for the Actavis generics operations.

    24.     Defendant Actavis Pharma, Inc., is a Delaware corporation with its principal place

of business at 400 Interpace Parkway, Parsippany, New Jersey 07054.  It is a wholly-owned

subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

products acquired from Allergan plc.  It manufactures, markets, and/or distributes generic pharmaceuticals.

25.     Actavis Holdco, Actavis Elizabeth, and Actavis Pharma, Inc. are collectively referred to herein as "Actavis." At all times relevant to the Complaint, Actavis marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 2.     Alvogen

26.     Defendant Alvogen Inc. ("Alvogen") is a Delaware corporation with its principal place of business at 44 Whippany Road, Suite 300, Morristown, New Jersey 07960.  At all times relevant to the Complaint, Alvogen marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 3.     Amneal

27.     Defendant Amneal Pharmaceuticals, Inc. ("Amneal") is a Delaware corporation with a principal place of business at 400 Crossing Boulevard, 3rd Floor, Bridgewater, New Jersey 08807.  At all times relevant to the Complaint, Amneal marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 4.     Apotex

28.     Defendant Apotex Corp. ("Apotex") is a Delaware corporation with a principal place of business at 2400 North Commerce Parkway, Suite 400, Weston, Florida 33326.  At all times relevant to the Complaint, Apotex marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 5.     Ascend

29.     Defendant Ascend Laboratories, LLC ("Ascend") is a New Jersey corporation with its principal place of business at 339 Jefferson Road, Suite 101, Parsippany, New Jersey

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

07054.  At all times relevant to the Complaint, Ascend marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 6.   Aurobindo

30.    Defendant Aurobindo Pharma USA, Inc., ("Aurobindo") is a Delaware corporation with its principal place of business at 279 Princeton Highstown Road, East Windsor, New Jersey 08520.  At all times relevant to this Complaint, Aurobindo marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 7.   Bausch/Valeant

31.    Defendant Bausch Health Americas, Inc. (formerly Valeant Pharmaceuticals International, Inc.) is a Delaware corporation with its principal place of business at 400 Somerset Corporate Boulevard, Bridgewater, New Jersey 08807.

32.    Defendant Bausch Health US, LLC (formerly Valeant Pharmaceuticals North America, LLC) is a Delaware corporation with its principal place of business at 400 Somerset Corporate Boulevard, Bridgewater, New Jersey 08807.

33.    Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a Delaware corporation with its principal place of business at One Enterprise, Aliso Viejo, California 92656. Oceanside is a wholly-owned subsidiary of Bausch Health Americas, Inc..

34.    Unless addressed individually, Bausch Health Americas, Inc., Bausch Health US, LLC, and Oceanside Pharmaceuticals, Inc. are collectively referred to herein as "Bausch" or "Valeant."  At all times relevant to the Complaint, Valeant sold one or more of the Subject Drugs in this District and throughout the United States.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 8.    Breckenridge

35.    Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business at 15 Massirio Drive, Suite 201, Berlin, Connecticut 06037.  At all times relevant to the Complaint, Breckenridge marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 9.    Camber

36.    Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation with its principal place of business at 1031 Centennial Avenue, Piscataway, New Jersey 08854. At all times relevant to the Complaint, Camber marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 10.    Citron

37.    Defendant Citron Pharma, LLC ("Citron") is a Delaware corporation with its principal place of business at 2 Tower Center Boulevard, Suite 1101, East Brunswick, New Jersey 08816.  During the relevant time period, Citron marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 11.    Dr. Reddy's

38.    Defendant Dr. Reddy's Laboratories Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business at 107 College Road East, Princeton, New Jersey 08540.  Dr. Reddy's is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian company with its principal place of business in Hyderabad, India.  At all times relevant to the Complaint, Dr. Reddy's marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 12.   G&W

39.    Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey corporation with its principal place of business at 301 Helen Street, South Plainfield, New Jersey 07080.  At all times relevant to the Complaint, G&W marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 13.   Glenmark

40.    Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a Delaware corporation with a principal place of business at 750 Corporate Drive, Mahwah, New Jersey 07430.  At all times relevant to the Complaint, Glenmark marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 14.   Heritage

41.    Defendant Heritage Pharmaceuticals Inc. ("Heritage") is a Delaware corporation with its principal place of business at 12 Christopher Way, Suite 300, Eatontown, New Jersey 07724.  Heritage is a wholly-owned subsidiary of Emcure Pharmaceuticals, Ltd. ("Emcure"), an Indian corporation with its principal place of business at Emcure House, T 184, M.I.D.C., Bhosari, Pune, India.  Emcure is also the parent company of Emcure Pharmaceuticals USA, Inc., which has a principal place of business at 21-B Cotters Lane, East Brunswick, New Jersey.  At all times relevant to the Complaint, Heritage marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 15.   Impax

42.    Defendant Impax Laboratories, LLC, formerly known as Impax Laboratories, Inc. ("Impax"), is a Delaware limited liability company with its principal place of business at 30831 Huntwood Avenue, Hayward, California 94544.  Impax is a wholly-owned subsidiary of Defendant Amneal, which purchased Impax in May 2018.  At all times relevant to the

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Complaint, Impax marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 16.    Cadista

43.    Defendant Jubilant Cadista Pharmaceuticals, Inc. ("Cadista") is a Delaware corporation with its principal place of business at 207 Kiley Drive, Salisbury, MD 21801.  At all times relevant to the Complaint, Cadista marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 17.    Lannett

44.    Defendant Lannett Company, Inc., ("Lannett") is a Delaware corporation with its principal place of business at 9000 State Road, Philadelphia, Pennsylvania 19136.  At all times relevant to the Complaint, Lannett marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 18.    Lupin

45.    Defendant Lupin Pharmaceuticals, Inc., ("Lupin") is a Delaware corporation with its principal place of business at Harborplace Tower, 111 S. Calvert Street, 21st Floor, Baltimore, Maryland 21202.  Lupin is a wholly-owned subsidiary of Lupin Limited, an Indian company with its principal place of business at B/4 Laxmi Towers, Bandra Kurla Complex, Bandre (E), Mumbai, India.  At all times relevant to the Complaint, Lupin marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 19.    Mayne

46.    Defendant Mayne Pharma, Inc. ("Mayne") is a Delaware corporation with its principal place of business at 3301 Benson Drive, Suite 401, Raleign, North Carolina 27609. Mayne is a wholly-owned subsidiary of Mayne Pharma Group Limited, an Australian company with its principal place of business at 1538 Main North Road, Salisbury, SA 5106, Australia.  In

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2012, Mayne acquired Metrics, Inc. and its division Midlothian Laboratories ("Midlothian") and

has operated under the name Midlothian since that time.  At all times relevant to the Complaint,

Mayne marketed and sold one or more of the Subject Drugs in this District and throughout the

United States.

<b>20.     Morton Grove</b>

47.     Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware

corporation with its principal place of business at 6451 Main Street, Morton Grove, Illinois

60053.  Morton Grove is a wholly-owned subsidiary of Wockhardt, Ltd. At all times relevant to

the Complaint, Morton Grove marketed and sold one or more of the Subject Drugs in this

District and throughout the United States.

<b>21.     Mylan</b>

48.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of

business at 1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317.  It is the parent company

of Defendant Mylan Pharmaceuticals, Inc.

49.     Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its

principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505.

50.     Defendant Mylan N.V. is a Dutch company with its principal place of business

and global headquarters at 1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317.  Mylan

N.V. is the direct parent of Defendant Mylan Inc. and the ultimate parent of Defendant Mylan

Pharmaceuticals, Inc.

51.     Mylan Inc., Mylan Pharmaceuticals, Inc., and Mylan N.V. are collectively defined

as "Mylan." At all times relevant to the Complaint, Mylan marketed and sold one or more of the

Subject Drugs in this District and throughout the United States.

34

22.    **Par**

52.    Defendant Par Pharmaceutical Companies, Inc., is a Delaware corporation with its principal place of business at One Ram Ridge Road, Chestnut Ridge, New York 10977.

53.    Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal place of business at One Ram Ridge Road, Chestnut Ridge, New York 10977.  Par Pharmaceutical, Inc. is a direct subsidiary of Defendant Par Pharmaceutical Companies, Inc.

54.    Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are each wholly-owned subsidiaries of Endo International plc, an Irish company with global headquarters in Dubline, Ireland, and U.S. headquarters at 1400 Atwater Drive, Malvern, Pennsylvania.  In August 2014, Endo's subsidiary, Generics International (US), Inc., d/b/a Qualitest Pharmaceuticals, acquired co-conspirator DAVA Pharmaceuticals, Inc. ("DAVA").  In September 2015, Endo complete the acquisition of Par Pharmaceuticals Holdings, Inc. and its subsidiaries, including Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc., and merged Par's business with Qualitest Pharmaceuticals, Inc. ("Qualitest"), naming the segment Par Pharmaceutical, Inc.  Par Pharmaceutical, Inc. is therefore the successor in interest to both DAVA and Qualitest.

55.    Defendant Generics Bidco I, LLC ("Generics Bidco") is a Delaware company with its principal place of business at 130 Vintage Drive NE, Huntsville, Alabama 35811, and formerly conducted business as Qualitest.  Generics Bidco is a wholly-owned subsidiary of Endo, and affiliate of Defendant Par.

56.    Par Pharmaceutical Companies, Inc., Par Pharmaceutical, Inc. (including DAVA and Qualitest), and Generics Bidco I, LLC are collectively refrred to as "Par."  At all times

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

relevant to the Complaint, Par has marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 23.     Perrigo

57.     Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its executive offices at 515 Eastern Avenue, Allegan, Michigan 49010 and its principal place of business at 1701 Bathgate Avenue, Bronx, New York 10457.  Perrigo New York is a wholly-owned subsidiary of Perrigo plc, an Irish Company with its principal place of business in Dublin, Ireland.  During the relevant time period, Perrigo marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 24.     Sandoz

58.     Defendant Sandoz, Inc., is a Colorado corporation with its principal place of business at 100 College Road West, Princeton, New Jersey 08540.  Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland.

59.     Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business at 60 Baylis Road, Melville, New York 11747.  It is under common ownership with Defendant Sandoz, Inc., as both are wholly-owned subsidiaries of Novartis AG ("Novartis").  Fougera specializes in the production, marketing, and sale of dermatological products.

60.     Unless addressed individually, Sandoz Inc. and Fougera are referred to together as "Sandoz."  At all times relevant to the Complaint, Sandoz marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 25. Sun

61.     Defendant Sun Pharmaceuticals Industries, Inc. ("Sun") is a Michigan corporation with its principal place of business at 1 Commerce Drive, Cranbury, New Jersey 08512.  Until February 2011, Sun was known as Caraco Pharmaceutical Laboratories, Ltd.  Since 2011, Sun has been a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian company with its principal place of business in Mumbai, India, which also owns, and owned throughout the relevant period, a large majority stake of Defendant Taro Pharmaceuticals USA, Inc.  In late 2012, Sun acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia, Pennsylvania.  Sun also does business under the name Caraco Pharmaceutical Laboratories ("Caraco"), a company Sun acquired in 1997.  Unless addressed individually, Sun, URL, Mutual and Caraco are collectively referred to herein as "Sun."  During the relevant time period, Sun marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 26. Taro

62.     Defendant Taro Pharmaceuticals USA, Inc. is a New York corporation with its principal place of business at 3 Skyline Drive, Hawthorne, New York 10532.  Taro is a wholly-owned subsidiary of Taro Pharmaceuticals Industries Ltd., an Israeli company with its principal place of business at 14 Hakitor Street, Haifa Bay, Israel.  As noted above, throughout the relevant time period, Sun Pharmaceutical Industries, Ltd. owned a controlling stake in Taro Pharmaceutical Industries, Ltd.  At all times relevant to the Complaint, Taro marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 27.   Teligent

63.      Defendant Teligent, Inc. (F/K/A IGI Laboratories, Inc.) ("Teligent") is a Delaware corporation with its principal place of business at 105 Lincoln Avenue, Buena, New Jersey 08310.  During the relevant time period, Teligent marketed and sold one or more of the Subject Drugs in this District and throughout the United States, either on its own or through subsidiaries.

### 28.   Teva

64.      Defendant Teva Pharmaceuticals USA, Inc., ("Teva") is a Delaware corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454. Teva is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli corporation with its principal place of business at 5 Basel Street, P.O. Box 3190, Petah Tikva, Israel.  At all times relevant to the Complaint, Teva marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 29.   Torrent

65.      Defendant Torrent Pharma Inc. ("Torrent") is a Delaware corporation with its principal place of business located at 150 Allen Road, Suite 102, Basking Ridge, NJ 07920.  At all times relevant to the Complaint, Torrent marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

### 30.   Upsher-Smith

66.      Defendant Upsher-Smith Laboratories, LLC ("Upsher-Smith") is a Minnesota limited liability company located at 6701 Evenstad Drive, Maple Grove, MN 55396.  Upsher-Smith is a subsidiary of Sawaii Pharmaceutical Co., Ltd., a large generics company in Japan.  At all times relevant to the Complaint, Upsher-Smith marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

38

### 31. West-Ward

67.    Defendant Hikma Pharmaceuticals USA Inc. F/K/A West-Ward Pharmaceuticals

Corp. ("West-Ward") is a Delaware corporation with its principal place of business at 246

Industrial Way West, Eatontown, New Jersey 07724.  Hikma Pharmaceuticals USA Inc. is a

wholly-owned subsidiary of Hikma Pharmaceuticals PLC, a London-based pharmaceutical

company.  At all times relevant to the Complaint, West-Ward marketed and sold one or more of

the Subject Drugs in this District and throughout the United States.

### 32. Wockhardt

68.    Defendant Wockhardt USA LLC, ("Wockhardt") is a Delaware limited liability

company located at 20 Waterview Boulevard, 3rd Floor, Parsippany, New Jersey 07054.  At all

times relevant to the Complaint, Wockhardt marketed and sold one or more of the Subject Drugs

in this District and throughout the United States.

### 33. Zydus

69.    Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey

corporation with its principal place of business at 73 Route 31 North, Pennington, New Jersey

08534.  At all times relevant to the Complaint, Zydus marketed and sold one or more of the

Subject Drugs in this District and throughout the United States.

### C. Co-Conspirators

### 1. Akorn

70.    Non-Defendant Akorn, Inc. ("Akorn") is a Louisiana corporation with its

principal place of business at 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

Akorn filed for bankruptcy in 2020.  Akorn is the parent company of Hi-Tech Pharmacal Co.,

Inc. and VersaPharm, Inc.  At all times relevant to the Complaint, Akorn marketed and sold one

or more of the Subject Drugs in this District and throughout the United States.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

71.     Non-Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business at 369 Bayview Avenue, Amityville, New York 11701. Hi-Tech is a wholly-owned subsidiary of Akorn. At all times relevant to the Complaint, Hi-Tech marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

72.     Non-Defendant VersaPharm, Inc. ("VersaPharm") is a corporation organized and existing under the laws of the State of Georgia with its principal place of business at 1775 West Oak Parkway, Suite 800, Marietta, Georgia 30062. VersaPharm is a wholly-owned subsidiary of Akorn. At all times relevant to the Complaint, Versapharm has marketed and sold generic pharmaceuticals in this District and throughout the United States.

## 2.     Mallinckrodt

73.     Non-Defendant Mallinckrodt Inc. is a Delaware corporation with its principal place of business in Webser Groves, Missouri. As of 2013 it is a wholly owned subsidiary of Mallinckrodt plc, which is based in the United Kingdom. Mallinckrodt LLC is a Delaware limited liability corporation headquarted in Hazelwood, Missouri. Collectively, Mallinckrodt Inc. and Mallinckrodt LLC are referred to herein as "Mallinckrodt." At all times relevant to the Complaint, Mallinckrodt has marketed and sold generic pharmaceuticals in this District and throughout the United States.

## 3.     Rising

74.     Non-Defendant Rising Pharmaceuticals Inc. (Rising) is a Delaware corporation with its principal place of business at 2 Tower Center Blvd., Suite 1401A, East Brunswick, New Jersey 08816. Rising is a wholly-owned subsidiary of Aceto Corp., which filed for bankruptcy in 2019. On December 3, 2019, the Department of Justice announced Rising had entered into a

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

deferred prosecution agreement in connection with Rising's participation in a conspiracy to suppresss and eliminate competition by agreeing to allocate customers for and to stabilize, maintain, and fixc prices of Benazepril HCTZ sold in the United States.

### 4.    Presently Unknown Generic Manufacturer Co-Conspirators

75.    Various other persons, firms, entities, and corporations not named as defendants in this Complaint have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

76.    Cigna may amend this Complaint to allege the true names of additional co-conspirators as they are discovered.

## V.    REGULATORY AND ECONOMIC BACKGROUND

### A.    Generic Drugs Should Provide Lower-Priced Options for Purchasers

77.    Generic drugs generally can provide a lower-cost but therapeutically equivalent substitute for brand-name drugs.  Generic drugs can be manufactured in a variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments, creams, solutions, emollients, and gels.  A manufacturer seeking to sell a drug in the United States must obtain FDA approval.  The FDA typically evaluates the safety and efficacy of the drug, the manufacturing process, labelling, and quality control.

78.    Congress enacted the Hatch-Waxman Act ("Hatch-Waxman") in 1984 to encourage the production and sale of cheaper generic drugs by simplifying the regulatory hurdles that generic pharmaceutical manufacturers must clear to market and sell their drug products.[2]

---

[2]    Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

79.     To obtain marketing approval for a generic drug, a manufacturer must generally file an Abbreviated New Drug Application ("ANDA") with the Food and Drug Administration ("FDA").  ANDA applications rely on the safety and efficacy evidence previously submitted in connection with the approval of the brand-name equivalent, or reference-listed drug ("RLD"), and therefore allow generic manufacturers to avoid conducting costly and duplicative clinical trials.

80.     Typically, generic versions of brand-name drugs are priced significantly below their brand-name counterparts.  The only material difference between a generic and its brand name counterparts is price.  When multiple manufacturers enter the market, prices erode, sometimes by as much as 90%, as price competition increases.  An FDA study recently noted that "[g]reater competition among generic drug makers is associated with lower generic drug prices."[3]  Because of this, FDA-approved generic drugs generally gain sales rapidly.  As more generic drugs enter the market, all else equal, the price of those drugs should progressively decrease, resulting in lower costs for purchasers, like the Express Scripts Purchasers and Cigna Pharmacies.  These cost reductions were the intent of Hatch-Waxman's expedited generic approval pathway.

81.     Because each generic version of the same RLD is readily substitutable for another generic, the products behave like commodities; price is the primary differentiating feature, and

---

[3]     U.S. Food & Drug Admin., *Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices* 2 (Dec. 2019), *available* at https://www.fda.gov/about-fda/about-center-drug-evaluation-and-research/generic-competition-and-drug-prices.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the basis for competition.[4]  Generic competition, therefore, when functioning in a market

undisturbed by anticompetitive forces, reduces drug costs and drive prices down.

82.     In the United States, a prescription drug may be dispensed to a patient only by a

licensed pharmacist pursuant to a doctor's prescription that identifies the drug.  The prescription

generally may only be filled with either the innovator brand-name drug identified or an FDA-

approved generic equivalent.

83.     Generic competition enables purchasers, including Express Scripts Purchasers and

Cigna Pharmacies, to purchase a generic equivalent of a brand-name drug at substantially lower

prices.

**B.     The Prescription Drug Distribution System**

84.     Generic manufacturers compete with one another to sell the drugs they produce

directly to wholesalers, distributors, retail pharmacy chains, mail-order and specialty pharmacies,

and hospital chains.  Competition among generic drug manufacturers is dictated largely by price;

as such generic manufacturers do not generally differentiate their products in other ways.

Consequently, generic drugs are usually marketed only by the name of the active pharmaceutical

ingredient.

85.     Generic manufacturers often report list prices for generic drugs that they offer,

including the average wholesale price ("AWP") and wholesale acquisition cost ("WAC").  The

AWP and WAC can serve as pricing benchmarks, but given the different characteristics of

---

[4]     *See, e.g.*, Federal Trade Commission, *Authorized Generic Drugs:  Short-Term Effects and Long-Term Impact,* at
17 (Aug.  2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on
the basis of price."), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-
drugs-short- term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-
short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf; U.S. Cong. Budget Off., *How
Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry*
(July 1998), *available at* https://www.cbo.gov/sites/default/files/105th- congress-1997-1998/reports/pharm.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

various buyers and individual negotiations, manufacturers may supply the same generic drug at varying price points depending on the size or type of customer.

86.     Wholesalers and distributors purchase pharmaceutical products from manufacturers and distribute them to a variety of customers.  Wholesalers and distributors normally pay lower prices to acquire generics than the corresponding brand-name drug.

87.     Pharmacies—including the Express Scripts and Cigna Pharmacies—purchase drugs, including the Subject Drugs during the relevant period, either directly from manufacturers or from wholesalers/distributors.  Pharmacies generally pay lower prices to acquire generic drugs than to acquire the corresponding brand-name drug.

88.     Insurance and benefits plans—including the Cigna Plans—administer prescription drug benefits and/or provide prescription drug coverage.  When pharmacies sell generic drugs to insureds, plans administer and/or pay claims for generic drugs to pharmacies.

**C.     The Market for Generic Drugs is Highly Susceptible to Collusion**

89.     Defendants' anticompetitive conduct is a *per se* violation of Section 1 of the Sherman Act, as it constitutes a conspiracy to fix, increase, stabilize, or maintain prices, allocate customers and markets, and rig bids for generic pharmaceuticals.  Therefore, Cigna is not required to define relevant markets.  However, there are certain features characteristic of the markets for generic drugs that indicate they are susceptible to collusion and that collusion caused the price increases.

90.     Factors showing that a market is susceptible to collusion include:

a.      High level of industry concentration:  A small number of competitors control roughly 100% of the markets for each of the Subject Drugs.  Beginning in 2005, the generic pharmaceutical market has undergone remarkable and extensive consolidation.  As a

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

result, for most of the Subject Drugs, there were between two and four manufacturers providing

that drug for sale in the United States during the relevant time period, rendering each market

sufficiently concentrated to carry on collusive activities.

b.    Sufficient numbers to drive competition:  While the market for each of the

Subject Drugs had a small enough number of competitors to foster collusion, the number of

sellers or potential sellers was large enough and the nature of the market otherwise was such that

prices should have been at near marginal cost levels absent collusion.

c.    High barriers to entry:  The high costs of manufacturing, developing,

testing, securing regulatory approval, and oversight are among the barriers to entry in the generic

drug market.  The Defendants here control virtually all of the market for the Subject Drugs and

sell those drugs pursuant to FDA approvals granted years before the price hikes began in 2012.

Any potential new entrant would have to go through the ANDA approval process before

commercially marketing its product.  This type of barrier to entry increases a market's

susceptibility to a coordinated effort among the primary players to maintain supracompetitive

prices.

d.    High inelasticity of demand and lack of substitutes:  For many patients,

the particular Subject Drug they are prescribed is the only effective treatment.  Substituting other

drugs presents risks and challenges, and both patients and physicians are generally unwilling to

sacrifice patient well-being for potential cost savings.

e.    Commoditized market:  Defendants' products are fully interchangeable

because they are bioequivalent.  Thus, pharmacists may freely substitute one for another.  The

primary differentiating feature, and therefore the primary way a Defendant can gain market

share, is by competing on price.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

f.	Absence of departures from the market:  There were no departures from the market during the relevant period sufficient to explain the drastic price increases.

g.	Absence of non-conspiring competitors:  Defendants have maintained all or virtually all of the market share for each of the Subject Drugs between 2010 and the present. Thus, Defendants collectively have market power in the market for each of the Subject Drugs, which enables them to increase prices without loss of market share to non-conspirators.

h.	Opportunities for contact and communication among competitors: Defendants participate in the committees and events of the GPhA, Healthcare Distribution Management Association ("HDMA"), Efficient Retail Marketing ("ECRM"), Multistate Contracting Alliance for Pharmacy ("MMCAP"), Healthcare Supply Chain Association ("HSCA"), and other industry groups, as set forth below, which provide and promote opportunities to communicate.

i.	Size of Price Increases:  The magnitude of the price increases involved in this case further differentiates it from examples of non-collusive parallelism.  The price increases here are not limited to 5% or even 10% jumps – they are often of far greater magnitude.  A rational company would not implement such large price increases unless it was certain that its conspirator-competitors would follow.

j.	Reimbursement of Generic Drugs:  The generic market has institutional features that make non-collusive, parallel price increases less likely.  These features include insurers' formulary placements and required substitution at the pharmacy level.  As a result, the usual hesitance of a manufacturer to unilaterally raise prices is strengthened in the generic reimbursement system.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## VI.   GOVERNMENT INVESTIGATIONS OF THE CONSPIRACY

91.    Defendants and other generic drug manufacturers' conduct has resulted in extensive and widespread scrutiny by federal and state regulators, including the United States Department of Justice Antitrust Division, the United States Senate, the United States House of Representatives, and the State AGs.

92.    The DOJ's and State AGs' investigations followed a Congressional hearing and investigation, which itself was prompted by a January 2014 letter from the National Community Pharmacists Association ("NCPA") to the United States Senate Committee on Health, Education, Labor, and Pensions ("Senate HELP Cmte.") and the United States House Energy and Commerce Committee highlighting nationwide spikes in prices for generic drugs.

### A.    Congress Launched An Investigation Into Generic Price Hikes

93.    In January 2014, the NCPA urged the Senate HELP Cmte. and the House Energy and Commerce Committee to hold hearings on significant generic pharmaceutical price spikes, citing surveys and data from over 1,000 community pharmacists who reported price hikes on essential generic pharmaceuticals exceeding 1,000%.

94.    On October 2, 2014, Senator Bernie Sanders, then Chair of the Subcommittee on Primary Health and Retirement Security of the Senate HELP Cmte. and Representative Elijah E. Cummings, Ranking Member of the House Committee on Oversight and Government Reform, sent letters to 14 drug manufacturers, including Actavis, Apotex, Dr. Reddy's, Endo, Heritage, Lannett, Mylan, Par, Sun, Teva, and Zydus, requesting information about the escalating prices of

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

generic drugs.[5]  More recently on August 13, 2019, Senator Sanders and Representative

Cummings sent letters to executives of Mylan and Teva – companies that did not produce

documents in response to the 2014 letters – asking for drug pricing information as part of their

ongoing probe into the rising cost of generics.

95.    Senator Sanders and Representative Cummings issued a joint press release,

advising that "[w]e are conducting an investigation into the recent staggering price increases for

generic drugs used to treat everything from common medical conditions to life-threatening

illnesses."  They noted the "huge upswings in generic drug prices that are hurting patients."[6]

96.    On February 24, 2015, Senator Sanders and Representative Cummings sent a

letter requesting that the Office of the Inspector General ("OIG") of the Department of Health

and Human Services ("HHS") "examine recent increases in the prices being charged for generic

drugs and the effect these price increases have had on generic drug spending within the Medicare

and Medicaid programs."[7]  The OIG responded to the request on April 13, 2015, advising it

would examine pricing for the top 200 generic drugs to "determine the extent to which the

quarterly [AMP] exceeded the specified inflation factor."[8]

97.    In August 2016, the Government Accountability Office ("GAO") issued the GAO

Report, a study examining Medicare Part D prices for 1,441 generic drugs between 2010 and

---

[5]    Press Release, U.S. Sen. Bernie Sanders, Congress Investigating Why Generic Drug Prices Are Skyrocketing (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[6]    *Id.*

[7]    Letter from Bernie Sanders, U.S. Sen., and Elijah Cummings, U.S. Rep., to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), *available at* https://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[8]    Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Bernie Sanders, U.S. Sen. (Apr. 13, 2015), *available at* https://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2015.  The study found that 300 of the 1,441 drugs experienced at least one "extraordinary price increase" of 100% or more.  Among the drugs with extraordinary price increases were 47 of the Subject Drugs:  Acetazolamide ER, Amiloride HCL/HCTZ, Amitriptyline, Baclofen, Benazepril HCTZ, Bumetanide, Carbamazepine, Cephalexin, Cimetidine, Ciprofloxacin HCL, Clarithromycin ER, Clobetasol Propionate, Clomipramine, Clotrimazole, Desonide, Dextroamphetamine Sulfate ER, Digoxin, Diltiazem HCL, Divalproex Sodium ER, Doxazosin Mesylate, Doxycycline Hyclate, Econazole, Enalapril Maleate, Ethosuximide, Etodolac, Fluconazole, Fluocinonide, Fluoxetine HCL, Haloperidol, Ketoconazole, Labetalol HCL, Lidocaine, Methotrexate, Nadolol, Nitrofurantoin MAC, Nystatin, Oxaprozin, Oxybutynin Chloride, Piroxicam, Pravastatin, Prazosin HCL, Prochlorperazine, Ranitidine HCL, Theophylline ER, Tobramycin, Trifluoperazine HCL, and Ursodiol.[9]

**B.     The DOJ Investigates Criminal Generic Drug Collusion**

98.     The DOJ opened a criminal investigation into collusion in the generic pharmaceutical industry that initially focused on just two drugs and has since expanded.[10]  Most of the Defendants here have come under DOJ scrutiny.

99.     The DOJ first charged Heritage executives Jeffrey Glazer and Jason Malek with criminal counts related to price collusion for Doxycycline Hyclate and Glyburide.  The two pleaded guilty to violating Section 1 of the Sherman Act.

---

[9]     U.S. Gov't Accountability Off., GAO-16-706, *Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases* (Aug. 2016) ("the GAO Report").

[10]    David McLaughlin and Caroline Chen, *U.S. Charges in Generic-Drug Probe to be Filed by Year-End*, BLOOMBERG MARKETS (Nov. 3, 2016), *available at* https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said- to-be-filed-by-year-end.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

100.    Actavis, Aurobindo, Dr. Reddy's, Endo, Fougera (through Sandoz), Impax, Lannett, Mylan, Par, Sandoz, Sun, Taro, and Teva admitted to receiving grand jury subpoenas from the DOJ.  The DOJ executed a search warrant on Mylan.  Perrigo disclosed that its offices were searched as well.[11]

101.    A DOJ grand jury subpoena indicates "staff [ ] considered the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[12]

102.    The DOJ has intervened in numerous civil antitrust actions that are now part of the consolidated and coordinated proceedings captioned *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-MD-2724 (E.D. Pa.), stating that these cases overlap with the DOJ's ongoing criminal investigation.

103.    On May 31, 2019, the DOJ released a statement that Heritage admitted that it "conspired to fix prices, rig bids, and allocate customers for glyburide," and agreed to pay $7 million in criminal penalty and civil damages, and to cooperate fully with ongoing parallel investigations into the generics industry.  Heritage entered a deferred prosecution agreement, which "d[id] not include any provision for restitution" "[i]n light of the availability of civil causes of action, and civil cases already filed against Heritage, including the multidistrict litigation *In Re: Generic Pharmaceuticals Pricing Antitrust Litigation*, Case No. 2:16-md-2724." As part of that deferred prosecution agreement, Heritage admitted that it participated in a conspiracy with other persons and entities engaged in the production and sale of generic

---

[11]    A search warrant will only be issued if DOJ was able to persuade a federal judge that there was probable cause to believe that one or more antitrust violations had occurred, and that evidence of these violations would be found at the corporate offices of Mylan and Perrigo.

[12]    DOJ, ANTITRUST DIV. MANUAL (5th ed. 2015) at III-82.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

pharmaceutical products for the purpose of suppressing and eliminating competition by

allocating customers and fixing and maintaining prices for glyburide.

104.    In 2020, the DOJ charged former Taro executive Ara Aprahamian with engaging

in a criminal conspiracy to suppress and eliminate competition by agreeing to allocate customers

and rig bids for, and stablize, maintain, and fix prices of, generic drugs sold in the United States,

including, but not limited to, clotrimazole cream, desonide ointment, fluocinonide ointment,

lidocaine ointment, nystatin triamcinolone cream, and nystatin triamcinolone ointment, in

violation of Section 1 of the Sherman Act.

105.    In February 2020, the DOJ charged former Sandoz executive Hector Armando

Kellum with conspiring to fix prices, rig bids, and allocate customers for generic drugs,

including, but not limited to, the generic drugs Clobetasol and Nystatin Triamcinolone Cream.

Kellum pleaded guilty.

106.    In March 2020, the DOJ entered a deferred prosecution agreement with Sandoz to

resolve charges that Sandoz conspired to fix prices, rig bids, and allocate customers for generic

drugs including Clobetasol (cream, emollient cream, gel, ointment, and solution), Desonide

ointment, Nystatin Triamcinolone cream, Benazepril HCTZ, and Tobramycin inhalation

solution.  The deferred prosecution agreement "d[id] not include any provision for restitution"

"[i]n light of the availability of civil causes of action, and civil cases already filed against

Sandoz, including the multidistrict litigation *In Re: Generic Pharmaceuticals Pricing Antitrust

Litigation*, Case No. 2:16-md-2724."  As part of that deferred prosecution agreement, Sandoz

admitted that it participated in a conspiracy with other persons and entities engaged in the

production and sale of generic pharmaceutical products for the purpose of suppressing and

eliminating competition by allocating customers, rigging bigds, and increasing and/or

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

maintaining prices for certain generic drugs, including Clobetasol (cream, emollient cream, gel, ointment, and solution), Desonide ointment, Nystatin Triamcinolone cream, Benazepril HCTZ, and Tobramycin inhalation solution.

107.    In May 2020, the DOJ entered a deferred prosecution agreement with Apotex to resolve charges that Apotex conspired with other generic drug manufacturers to suppress and eliminate competition by agreeing to increase and maintain prices of pravastatin.  The deferred prosecution agreement "d[id] not include any provision for restitution" "[i]n light of the availability of civil causes of action, and civil cases already filed against Apotex, including the multidistrict litigation *In Re: Generic Pharmaceuticals Pricing Antitrust Litigation*, Case No. 2:16-md-2724."  As part of that deferred prosecution agreement, Apotex admitted that it participated in a conspiracy with other persons and entities engage in the sale of generic drugs to suppress and eliminate competition by agreeing to increase and maintain prices of Pravastatin sold in the United States.

108.    In June 2020, the DOJ charged Glenmark with conspiring to suppress and eliminate competition by agreeing to increase and maintain prices of pravastatin and other generic drugs sold in the United States.

109.    On July 27, 2020, the DOJ announced a deferred prosecution agreement with Taro to resolve charges that Taro conspired with other generic drug manufacturers, including Sandoz and a generic drug company based in Pennsylvania, to fix prices, allocate customers, and rig bids for numerous generic drugs, including medications used to prevent and control seizures and treat bipolar disorder, pain and arthritis, and various skin conditions.  As part of that deferred prosecution agreement, Taro admitted that it participated in a conspiracy with other persons and entities engage in the sale of generic drugs to suppress and eliminate competition by agreeing to

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

allocate customers and rig bids for, and/or stablilize, maintain, and fix prices of certain generic drugs, including Clobetasol (cream, emollient cream, gel, ointment, and solution), Desonide Ointment, Nystatin Triamcinolone Cream, Etodolac IR, Etodolac ER, and Carbamazepine.

110. On August 25, 2020, the DOJ charged Teva with conspiring to suppress and eliminate competition by agreeing to increase and maintain prices of pravastatin and other generic drugs sold in the United States, and for conspiring to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States.  Additionally, DOJ charged Teva with conspiring to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs including Carbamazepine Tablets and Chewable Tablets; Clotrimazole Topical Solution (1%); Etodolac IR and ER; Fluocinonide Cream, Emollient Cream, Gel, and Ointment; Nadolol; Tobramycin Inhalation Solution; and Warfarin.

## C. State Attorneys General Launch Their Own Investigation

111. In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals.  Based on evidence procured through their own subpoena power, the State AGs filed a civil action on December 15, 2016 alleging a wide-ranging series of conspiracies implicating numerous generic drugs and manufacturers. *The Connecticut Mirror* reported that the State AGs "suspected fraud on a broader, nearly unimaginable scale," that "new subpoenas are going out, and the investigation is

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

growing beyond the companies named in the suit."[13]  Then-Connecticut Attorney General

George Jepsen called the evidence obtained in that investigation "mind-boggling."[14]

112.    Mr. Jepsen confirmed the scope of the State AGs' action in a press release in

December 2016:

> My office has dedicated significant resources to this investigation
> for more than two years and has developed compelling evidence of
> collusion and anticompetitive conduct across many companies that
> manufacture and market generic drugs in the United States. . . While
> the principal architect of the conspiracies addressed in this lawsuit
> was Heritage Pharmaceuticals, we have evidence of widespread
> participation in illegal conspiracies across the generic drug industry.
> Ultimately, it was consumers – and, indeed, our healthcare system
> as a whole – who paid for these actions through artificially high
> prices for generic drugs.[15]

113.    In their consolidated amended complaint filed on June 18, 2018 ("State AG

Complaint No. 1"), the State AGs broadened their case to include fifteen drugs, all of which are

Subject Drugs in this Complaint.  At the time, Connecticut Attorney General Jepsen stated that

"[t]he issues we're investigating go way beyond the two drugs and six companies.  Way

beyond . . . We're learning new things every day."[16]  According to a recent interview with

---

[13]   Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, THE CONN. MIRROR (Jan. 27, 2017), available at https://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big- leagues/.  *The Connecticut Mirror* further reported that the DOJ grand jury was convened in this District shortly after the Connecticut Attorney General issued its first subpoena.  Id.

[14]   *Id*.

[15]   Press Release, Att'y Gen. George Jepsen, Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies (Dec. 15, 2016), *available at* https://portal.ct.gov/AG/Press-Releases-Archived/2016-Press-Releases/Connecticut-Leads-20-State-Coalition-Filing-Federal-Antitrust-Lawsuit-against-Heritage-Pharmaceutica.

[16]   Kaiser Health News, *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices,* THE DAILY BEAST, Dec. 21, 2016, http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round- raised-your-prescription-drug-prices?source=twitter&via=desktop.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Joseph Nielsen, the court-appointed Liaison Counsel for the State AGs in these consolidated MDL proceedings, "[t]his is most likely the largest cartel in the history of the United States."[17]

114.    On May 10, 2019 the State AGs filed a new complaint focusing on a network of collusion Teva orchestrated with various other Defendant generic drug manufacturers, named herein, that led to either artificial stabilization or price increases on over 100 generic drug products ("State AG Complaint No. 2"[18]), all of which are Subject Drugs in this Complaint.  The allegations in the Amended State AG Complaint No. 2 were based on "(1) the review of many thousands of documents produced by dozens of companies throughout the generic pharmaceutical industry, (2) an industry-wide phone call database consisting of more than 11 million phone call records from hundreds of individuals at various levels of Defendant companies and other generic manufacturers, and (3) information provided by several as-of-yet unidentified cooperating witnesses who were directly involved in the conduct alleged . . . ."[19]

115.    On June 10, 2020 the State AGs filed a new complaint focusing on collusion among manufacturers relating to generic topical products ("State AG Complaint No. 3"), all of which are Subject Drugs in this Complaint.

---

[17]   Christopher Rowland, *Investigation of Generic "Cartel" Expands to 300 Drugs,* THE WASH. POST, Dec. 9, 2018, available at https://www.washingtonpost.com/business/economy/investigation-of-generic-cartel-expands-to- 300-drugs/2018/12/09/fb900e80-f708-11e8-863c- 9e2f864d47e7_story.html?utm_term=.a838a7f671cd.

[18]   On November 1, 2019, the State AGs filed an amendment to State AG Complaint No. 2 ("Amended State AG Complaint No. 2").

[19]   Amended State AG Complaint No. 2 at ¶ 4.  The State AGs detail their extensive investigatory efforts in Amended State AG Complaint No. 2.  They have compiled over 7 million documents, issued more than 300 subpoenas to telephone carriers, issued over 30 subpoenas to generic drug manufacturers and examined the names and contact information of over 600 drug manufacturer employees, giving the State AGs a "unique perspective to know who in the industry was talking to who, and when" *Id.* ¶¶ 64-65.  The State AGs state they have also corroborated these allegations through cooperating witnesses, including senior executives and employees of many Defendants named here.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

116.     As alleged by the State AGs, during the course of their investigation, the State AGs obtained cooperation from a number of individuals.  Some of the State AGs' cooperating witnesses include:

a.     A former pricing executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-1];

b.     A former sales and marketing executive at non-Defendant Rising Pharmaceuticals, Inc. ("Rising") and Sandoz during the time period relevant to this Complaint [referred to herein as CW-2];

c.     A former sales executive at Defendant Fougera, and then senior sales executive at Sandoz, during the time period relevant to this Complaint [referred to herein as CW-3];

d.     A former senior sales executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-4];

e.     A former senior executive at Glenmark during the time period relevant to this Complaint [referred to herein as CW-5];

f.     A former senior sales executive at Fougera and Aurobindo during the time period relevant to this Complaint [referred to herein as CW-6]; and

g.     Jason Malek ("Malek"), former Vice President of Commercial Operations at Heritage.

117.     As alleged by the State AGs, Teva has, at all times relevant to the Complaint, maintained a live database that it refers to as Delphi where it has catalogued nearly every decision it has made regarding the products it sells, including those decisions that were made collusively – which Teva often referred to as "strategic" decisions.  Although the State AGs do

not have full access to that database, they have obtained static images of the database that were internally disseminated over time by Teva, which were referred to as Market Intel Reports. Through its review and investigation of some of those reports, in combination with the phone records, the State AGs have, to date, identified over 300 instances of collusion where Teva spoke to competitors shortly before or at the time it made what the company referred to as a "strategic" market decision.  A number of those instances are detailed throughout this Complaint.

## VII.   THE GENERIC DRUG MARKET

### A.   The Cozy Nature Of the Industry and Opportunities for Collusion

118.    At all relevant times, Defendants conspired to fix, increase, stabilize, or maintain prices, allocate customers and markets, and rig bids for the Subject Drugs, along with other drugs, which had the actual and intended effect of causing Cigna to pay artificially inflated prices at supracompetitive rates.

119.    In formulating and effectuating their conspiracy, Defendants engaged in various forms of anticompetitive conduct, including but not limited to:

a.    Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of the Subject Drugs in the United States;

b.    Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid-rigging for the Subject Drugs sold in the United States;

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

   c. Agreeing during those meetings, conversations, and communications to engage in price increases, market and customer allocation, and/or bid-rigging for the Subject Drugs sold in the United States;

   d. Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers with respect to the Subject Drugs sold in the United States;

   e. Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

   f. Selling the Subject Drugs in the United States at collusive and noncompetitive prices; and

   g. Accepting payment for the Subject Drugs sold in the United States at collusive and noncompetitive prices.

120. The Defendants ensured that all conspirators were adhering to their collective scheme by communicating (1) at trade association meetings and conferences; (2) at private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers; and (3) through individual, private communications between and among Defendants' employees by use of the telephone, electronic messaging, and similar means.

### 1. Trade Association Meetings and Conferences

121. Throughout the year, many healthcare entities within the generic drug industry hold multi-day conferences, which representatives from generic manufacturers regularly attend.

122. Additionally, Defendants and other generic drug manufacturers attend various trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association ("HDMA") (now

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") (now

the Association of Accessible Medicine), Efficient Collaborative Retail Marketing ("ECRM"),

the Minnesota Multistate Contracting Pharmacy Alliance ("MMCAP"), and the Healthcare

Supply Chain Association ("HSCA").

123.    On information and belief, Defendants used opportunities at trade shows and

conferences to share competitively-sensitive information concerning upcoming bids, specific

generic drug markets, pricing strategies and pricing terms in their contracts with customers, and

to implement schemes that unreasonably restrain competition in the United States' market for

generic drugs.

## 2.    Industry Dinners and Private Meetings

124.    Many Defendants are headquartered in close proximity, providing them with easy

and frequent access to one another.  At least forty-one (41) different generic drug manufacturers

have offices located between New York City and Pennsylvania, including, among others,

Actavis, Ascend, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Fougera, Glenmark, Heritage,

Lannett, Mylan, Par, Perrigo, Sandoz, Sun, Taro, Teva, Wockhardt, and Zydus.

125.    In January 2014, while generic drug prices were soaring, at least thirteen (13)

high-ranking executives, including CEOs, Presidents, and Senior Vice Presidents of various

generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.  Executives

(including Berthold, Falkin, and Ostaficiuk) from Actavis, Aurobindo, Breckenridge, Dr.

Reddy's, Lannett, and Sun, among others, attended this particular dinner.

126.    At this dinner and others like it, one company is typically responsible for paying

the bill for all attendees.  For example, in December 2013 a Dr. Reddy's executive joked "[y]ou

guys are still buying for Mark and I, right?" Another executive responded "Well. . . I didn't think

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the topic would come up so quickly but. . . we go in alphabetical order by company and [another company] picked up the last bill. . . PS. . . no backing out now!  Its [sic] amazing how many in the group like 18 year-old single malt scotch when they aren't buying."

127.    From September 17-19, 2014, high-level executives from Teva, Apotex, Actavis, Amneal, Lannett, Par, Zydus, and others attended a golfing event at a country club in Bowling Green, Kentucky.  Rekenthaler was in attendance.  Rekenthaler and Apotex's Vice President of Commercial Operations, US and Latin America, Jeffrey Hampton, stayed together in the home of the owner of the packaging company.  By the end of the outing, Ostaficiuk sent an e-mail to the other attendees, stating "This is a crazy biz but I am grateful to have friends like all of you!!!! Happy and honored to have you all as 'fraternity brothers.'"

128.    Generic drug manufacturer employees met with their competitors and discussed proprietary and competitive information at "Girls' Night Out" or "Women in the Industry" meetings and dinners.

129.    Many "Women in the Industry" dinners were organized by A.S., a salesperson from Heritage.  In November 2014, Sullivan of Lannett sent A.S. (Heritage) a text message asking "[w]hen is your next industry women event?  I'm due for a trip out there and I'd love to plan for it if possible. . ."  A.S. responded:  "There is an Xmas [sic] party at Tanya's house on Dec 6th.  Yes that is a Saturday.  We do it about once a quarter and usually it is during the week – this was an exception."

130.    Dinners were also planned around visits of certain out-of-town competitors. When organizing one of these such dinners, A.S. commented, "Sorry if the meeting/dinner invite is a little short notice, but Kate Neely of Dr. Reddy's will be in MN on Sept 29th and it would be a great time for everyone to get together! So much has been happening in the Industry too – we

can recap all our findings from NACDS over a martini or glass of wine!  ☺  Plus the food is super yummy!"

131.    Several different "Girls Night Out" events were held in 2015, including (1) at the ECRM conference in February (involving Citron, Dr. Reddy's, Heritage, Lannett, Teva, Upsher-Smith, and Zydus, among others); (2) in Baltimore in May (involving Citron, Dr. Reddy's, Heritage, Lupin, and Teva, among others); and (3) at the NACDS conference on August 24, 2015 (involving Citron, Dr. Reddy's, and Heritage, among others).

### 3.    Personal Telephone Calls, E-Mails, and Text Message Communications

132.    Representatives of several Defendants with pricing responsibility had frequent telephone calls with representatives of competitors.  Executives at Heritage had at least 513 contacts with executives from Actavis, Apotex, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Teva, and Zydus.  And executives at Teva had at least 1,500 contacts with competitors, including from Actavis, Apotex, Ascend, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Par, Sandoz, and Zydus.  Many of these contacts are described in detail below.

### 4.    Individual Relationships

133.    Each of the individuals described below had their own relationships with contacts at competitor companies that they utilized to allocate markets and raise prices on overlap drugs. Many of these relationships are discussed throughout this Complaint.  These individuals were acting within the scope of their employment regarding all of the relevant conduct alleged.

134.    Teva's Director of Strategic Customer Marketing, Nisha Patel, met Heritage's then-Senior Vice President Malek when she worked at Amerisource Bergen ("ABC"), which was a Heritage customer that Malek managed.  When Patel moved to Teva in April 2013, she

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

contacted Malek to determine which generic drugs both Teva and Heritage sold so that they could coordinate pricing.  As detailed below, Malek and Patel orchestrated a number of price increases between 2013 and the present—some led by Teva, others by Heritage.

135.    Malek and Patel's relationship was valued and accepted by Malek's supervisors. In April 2014, Malek and Glazer met with the CEO (Satish Mehta) and President (Vikas Thapar) of Emcure, Heritage's parent company, to discuss potential price increases for several drugs. During that meeting, Malek told Mehta and Thapar about his Teva contact, Patel.  Malek, who had been discussing price increases for Nystatin with Patel since mid-2013, told them that Patel could be a vehicle for communicating with Teva about price increases and customer allocation. Mehta and Thapar approved of Malek's strategy to coordinate prices and allocate customers with Teva.

136.    The following sections profile each of these individuals and their primary contacts at competitor Defendants, including cataloging the number of phone calls and/or text messages exchanged between them.  The charts that follow are limited to certain communications with employees at other Defendants and do not include communications these individuals may have had with executives at competitor companies that are not named in this Complaint.

a.    *Ara Aprahamian*

137.    Aprahamian is the former Vice President of Sales at Taro.  He assumed that position when he moved to Taro from Actavis in March 2013.  Aprahamian regularly communicated with competitors in furtherance of the conspiracy, including with several of his former colleagues at Actavis, and has established relationships with individuals at many of the Defendants.  For example, between March 2013 and October 2018, Aprahamian exchanged at least 702 phone calls and text messages with his contacts at Sandoz, Glenmark, Teva, Dr.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Reddy's, Actavis, Mylan, Wockhardt, Lannett, Amneal, and Aurobindo. [20] On February 4, 2020, Aprahamiam was indicted for "his role in conspiracies to fix prices, rig bids, and allocate customers for generic drugs, and for making a false statement to federal agents who were investigating those conspiracies."[21]

### b.   David Berthold

138.   Berthold is the Vice President of Sales at Lupin and has held that position since June 2006.  During his tenure at Lupin, Berthold has been the primary person at the company communicating with competitors in furtherance of the conspiracies.  Indeed, Berthold has relationships with individuals at many of the Defendants.  For example, between March 2011 and October 2018, Berthold exchanged at least 3,386 phone calls and text messages with his contacts at Aurobindo, Glenmark, Actavis, Wockhardt, Zydus, Teva, Breckenridge, Mylan, Sandoz, Dr. Reddy's, Amneal, and Lannett.[22]

### c.   Jim Brown

139.   Brown is the Vice President of Sales at Glenmark and has held that position since November 2012.  Brown was one of several Glenmark executives that communicated with competitors in furtherance of the conspiracies.  Although not as prolific in his communications with competitors as some of the other individual Defendants, he did communicate when necessary to further the agreements.  For example, between June 2012 and August 2018, Brown exchanged at least 395 calls and text messages with his contacts at Actavis, Teva, Lupin,

---

[20]   Amended State AG Complaint No. 2 ¶ 1061.

[21]   *Generic Drug Executive Indicted on Antitrust and False Statement Charges*, DEP'T OF JUSTICE (Feb. 4, 2020), https://www.justice.gov/opa/pr/generic-drug-executive-indicted-antitrust-and-false-statement-charges.

[22]   *Id.* at ¶ 1062.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Amneal, Wockhardt, Breckenridge, Lannett, Sandoz, Aurobindo, Zydus, Par, Apotex, and Taro.[23]

### d.    Maureen Cavanaugh

140.    Cavanaugh was the Senior Vice President and Commercial Officer, North America, at Teva until April 2018.  She is currently the Senior Vice President and Chief Commercial Officer at Lannett.  During her employment at Teva, Cavanaugh knew that her subordinates were communicating with competitors about pricing and customer allocation.  In addition, Cavanaugh maintained her own relationships with certain competitors and coordinated with them directly when necessary to further the conspiracies.  For example, between January 2011 and August 2017, Cavanaugh exchanged at least 611 phone calls and text messages with her contacts at Actavis, Amneal, Zydus, Sandoz, and Glenmark.[24]

### e.    Marc Falkin

141.    Falkin was the Vice President of Marketing, Pricing and Contracts at Actavis until Actavis was acquired by Teva in August 2016.  For a period of time, Falkin was also the Senior Vice President, US Generic Sales, at Teva.  During his employment at Actavis, Falkin was a prolific communicator in furtherance of the conspiracies and had established relationships with executives at many of the Defendants.  For example, between August 2013 and July 2016, Falkin exchanged at least 2,521 phone calls and text messages with his contacts at Zydus, Teva, Glenmark, Lannett, Aurobindo, Mylan, Lupin, Par, Apotex, Taro, Amneal, Sandoz, and Wockhardt.[25]

---

[23]   *Id.* at ¶ 1063.

[24]   *Id.* at ¶ 1064.

[25]   *Id.* at ¶ 1065.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*f.     Jim Grauso*

142.     Grauso was employed as a Senior Vice President of Commercial Operations at Aurobindo until January 2014.  In February 2014, Grauso moved to Glenmark and currently holds the position of Executive Vice President, North America, Commercial Operations.  Grauso regularly communicated with competitors in furtherance of the conspiracy while he was at Aurobindo and continued those relationships when he transferred to Glenmark.  For example, between December 2011 and January 2014, Grauso exchanged at least 1,732 phone calls and text messages with his contacts at Lupin, Teva, Actavis, Taro, Zydus, Amneal, Glenmark, Wockhardt, and Breckenridge.[26]

143.     Similarly, after moving to Glenmark, Grauso continued to communicate frequently with his contacts at competitor companies in furtherance of the conspiracy, including his former colleagues at Aurobindo.  For example, between February 2014 and October 2018, he exchanged at least 2,001 phone calls and text messages with his contacts at Lupin, Aurobindo, Zydus, Teva, Taro, Wockhardt, Sandoz, Dr. Reddy's, Amneal, non-Defendant Rising, Par, Breckenridge, Upsher-Smith, and Mylan.[27]

*g.     Kevin Green*

144.     Green worked at Teva as a Director of National Accounts until November 2013 when he took a position with Zydus.  Green is currently the Vice President of Sales at Zydus.  Green developed a number of relationships with individuals at many of the Defendants.  He regularly communicated in furtherance of the conspiracy with competitors while at Teva and then carried those relationships over to his time at Zydus.  For example, between January 2010

---

[26]     *Id.* at ¶ 1066.

[27]     *Id.* at ¶ 1067.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

and October 2013, Green exchanged at least 1,384 phone calls and text messages with his contacts at Zydus, Mylan, Dr. Reddy's, Aurobindo, Lupin, Sandoz, Breckenridge, Wockhardt, and Lannett.[28]

145.    Similarly, when Green became employed at Zydus, he continued to communicate frequently with competitors in furtherance of the conspiracy, including with his former colleagues at Teva.  For example, between November 2013 and August 2018, Green exchanged at least 965 phone calls and text messages with his contacts at Teva, Glenmark, Mylan, Lupin, Aurobindo, non-Defendant Rising, Amneal, Sandoz, Lannett, and Dr. Reddy's.[29]

*h.    Armando Kellum*

146.    Kellum was the Director of Pricing and Contracts at Sandoz until July 2015. While at Sandoz, Kellum directed his subordinates, including CW-1, CW-2, CW-3, and CW-4, to enter into price fixing and market allocation agreements with competitors.  In addition, Kellum had his own relationships with certain competitors and communicated with those contacts directly when necessary to further the conspiracies.  For example, between May 2011 and April 2015, Kellum exchanged at least 107 phone calls and text messages with his contacts at Lupin, Teva, Upsher-Smith, Zydus, Actavis, non-Defendant Rising, Amneal, and Dr. Reddy's.[30]

147.    As discussed above, in 2020, Kellum pleaded guilty to conspiring to fix prices, rig bids, and allocate customers for generic drugs, including, but not limited to, the generic drugs Clobetasol and Nystatin Triamcinolone Cream.

---

[28]    *Id.* at ¶ 1068.

[29]    *Id.* at ¶ 1069.

[30]    *Id.* at ¶ 1070.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

i.      *James Nesta*

148.    Nesta started his employment with Mylan in 2000 and is currently the Vice President of Sales at Mylan.  Nesta communicates regularly with his counterparts at many of the Defendants.  For example, between January 2011 and February 2016, Nesta exchanged at least 2,983 phone calls and text messages with his contacts at Amneal, Teva, Dr. Reddy's, Zydus, Aurobindo, Actavis, Lupin, Sandoz, Lannett, Taro, and Par. [31]

j.      *Konstantin Ostaficiuk*

149.    Ostaficiuk is the President of Camber and has held that position since 2009. During his tenure at Camber, Ostaficiuk has been the primary person responsible for furthering price fixing and market allocation agreements with his competitors.  Indeed, Ostaficiuk regularly communicated with competitors in furtherance of the conspiracy and maintained relationships with executives at many of the Defendants.  For example, between March 2011 and August 2017, Ostaficiuk exchanged at least 464 phone calls with his contacts at Amneal, Lannett, Breckenridge, Aurobindo, Lupin, Teva, non-Defendant Rising, Breckenridge, Taro, Glenmark, Zydus, Dr. Reddy's, Wockhardt, Sandoz, and Actavis. [32]

k.      *Nisha Patel*

150.    Patel worked at Teva from April 2013 to December 2016, first as a Director of Strategic Customer Marketing and then as a Director of National Accounts.  As discussed in great detail below, Patel was in frequent communication with her counterparts at the Defendants in furtherance of the conspiracy.  For example, during her time at Teva, Patel exchanged at least 1,117 phone calls and text messages with her contacts at Zydus, Sandoz, Actavis, Glenmark,

---

[31]    *Id.* at ¶ 1073.

[32]    *Id.* at ¶ 1074.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Taro, Lupin, Dr. Reddy's, Lannett, Par, Apotex, Aurobindo, Mylan, Amneal, Upsher-Smith, and Breckenridge. As discussed in various sections of this Complaint, Patel also frequently communicated with competitors using Facebook Messenger, LinkedIn messaging, and the messaging application WhatsApp.[33]

*l.     David Rekenthaler*

151.   Rekenthaler was the Vice President of Sales, US Generics at Teva until April 2015. Rekenthaler is now the Vice President of Sales at Apotex. During his time at Teva, Rekenthaler knew that his colleagues, including Green and Patel, were colluding with competitors. Indeed, Rekenthaler was also in frequent contact with competitors himself and had relationships with executives at nearly all the Defendants. For example, between January 2011 and March 2015, Rekenthaler exchanged at least 1,037 phone calls and text messages with his contacts at Actavis, Mylan, Par, Aurobindo, Apotex, Zydus, Sandoz, non-Defendant Rising, Amneal, Breckenridge, Lupin, Dr. Reddy's, Glenmark, Taro, Lannett, and Wockhardt.[34]

*m.     Rick Rogerson*

152.   Rogerson was the Executive Director of Pricing and Business Analytics at Actavis until Actavis was acquired by Teva in August 2016. Rogerson now works at Amneal as a Senior Director of Marketing and Business Analytics. During his time at Actavis, Rogerson communicated with his contacts at several Defendants in furtherance of the conspiracies. For example, between February 2010 and July 2016, Rogerson exchanged at least 635 phone calls

---

[33]   *Id.* at ¶ 1075.

[34]   *Id.* at ¶ 1076.

and text messages with his contacts at Wockhardt, Teva, Dr. Reddy's, Sandoz, Lannett, Glenmark, Taro, and Zydus.[35]

    *n.*  *Tracy Sullivan*

  153. Tracy Sullivan has been employed at Lannett since 2007 and is currently the Director of National Accounts.  Sullivan regularly communicated with competitors in furtherance of the conspiracies and maintained relationships with executives at many of the Defendants.  For example, between March 2011 and August 2016, Sullivan exchanged at least 458 phone calls and text messages with her contacts at Zydus, Wockhardt, Teva, Dr. Reddy's, Par, Amneal, Aurobindo, Mylan, and Breckenridge.[36]

**B. The Overarching Conspiracy Between Generic Drug Manufacturers – "Playing Nice in the Sandbox"**

  154. As a result of the cozy nature of the industry, sales and marketing executives in the generic pharmaceutical industry are well aware of their competitors' current and future business plans.  This reciprocal sharing of information greatly facilitates agreements among competitors to allocate markets to avoid price competition.

  155. The overarching conspiracy among generic manufacturers – which ties together all the agreements on the Subject Drugs identified in this Complaint – is an agreement to avoid competition and maintain high prices.  At the heart of this agreement is an understanding that each competitor is entitled to its "fair share."  That term is generally used by the conspirators as an approximation of how much market share each competitor is entitled to in a Subject Drug or across multiple Subject Drugs.  "Fair share" is based on the number of competitors in the market,

---

[35] *Id.* at ¶ 1077.

[36] *Id.* at ¶ 1078.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

with a potential adjustment based on the timing of entry or the anticompetitive allocation of buyers amongst similar or the same competitors in another generic drug market. Once a manufacturer has achieved its "fair share," the conspirators generally understood that it will no longer compete for additional business. When considering whether to enter the market for a particular generic drug or drugs, the conspirators understood that they would be entitled their "fair share" and no more. The common goal or purpose of this overarching agreement is to keep prices high, reduce price competition, and serve as the basis for further supra-competitive price increases.

156.    This overarching agreement is widespread across the generic drug industry and is broader than the Defendant manufacturers named in this Complaint. Cigna focuses here on the role of these named Defendants and their participation in, and agreement with, this overarching conspiracy as applied to the Subject Drugs, as well as how these specific conspiracies are also part of the larger overarching conspiracy.

157.    The exact contours of this "fair share" understanding, which has been in place for many years (and pre-dates any of the specific conduct detailed herein), has evolved over time during the numerous in-person meetings, telephonic communications, and other interactions between generic manufacturers about specific drugs. These business and social events occur with such great frequency that there is an almost constant ability for Defendants to meet in person and discuss their business plans. For example, between February 20, 2013 and December 20, 2013 (a 41-week period), there were at least forty-four (44) different tradeshows or customer conferences where the Defendants had the opportunity to meet in person, some of which are described above. These in-person meetings gave the Defendants the opportunity and cover to have these conversations, and reach these agreements, without fear of detection.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

158.     As described in more detail below, when necessary, this larger understanding was reinforced through phone calls and text messages between the Defendants to discuss "fair share" and the desire to maintain or raise prices with respect to specific drugs.  These types of communications occur with great frequency across the industry, including among Defendants.

159.     For example, from January 1, 2013 through December 31, 2013, senior sales executives and other individuals responsible for the pricing, marketing, and sales of generic drugs at Teva spoke to representatives of every significant competitor by phone and/or text on multiple occasions, totaling over 1,300 phone and/or text message communications.[37]

160.     Of the over 1,300 calls, over 1,200 of them involved Green, Patel, and Rekenthaler of Teva speaking with competitors.  Many – though not all – of those communications involve matters that are addressed throughout this Complaint.

161.     Similarly, from January 1, 2014 through December 31, 2014, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Teva continued to speak to representatives of every significant competitor by phone and/or text on multiple occasions.  For example, there were over 940 calls or text messages between Teva and competitors during 2014.[38]

162.     Of the over 940 calls, over 770 involved Patel and Rekenthaler of Teva speaking with competitors (by this time, Green no longer worked at Teva).  Many – though not all – of those communications involve the Subject Drugs that are addressed throughout this Complaint.  It was not just Teva personnel speaking to their competitors, however.  All of these individuals were speaking to each other, when needed, hundreds or even thousands of times to ensure

---

[37]   *Id.* at Table 1.

[38]   *Id.* at Table 2.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

adherence to the overarching conspiracy, as illustrated in the graphic on page 37 of Amended State AG Complaint No. 2.

163.    In order to provide some organizational principle around the massive amount of collusive behavior by the Defendants described in this Complaint, certain sections are centered around the relationships between, respectively, Heritage and its would-be competitors, Teva and its would-be competitors, and Sandoz, Taro, and their would-be competitors.  However, this organization should not imply that the Complaint is solely concerned with bilateral relationships involving Heritage and/or Teva and/or Sandoz and Taro.

164.    The specific drug agreements often involve overlapping sets of Defendants in communication with each other, all following their agreed-upon "fair share" code of conduct. For example, to view only a small portion of the interlocking, overlapping web of collusion formed by Defendants:  Teva, Taro, and Wockhardt discussed amongst themselves the allocation of the Enalapril Maleate market; Teva and Taro communicated with Sandoz concerning the prices for Ketoconazole cream; Sandoz worked with Mylan to allocate the market for Valsartan HCTZ; and Teva, Mylan, and Par all communicated with each other in the spring of 2014 concerning the market for Budesonide DR capsules.  These are not merely one-off agreements, but evidence of the ongoing, sprawling nature of the Defendants' overarching conspiracy.

165.    The fair share understanding among Defendants dictates that, when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to approximately 50% of the market.  When a third competitor enters, each competitor expects to obtain a 33% share; when a fourth competitor enters, each expects 25%; and so on, as additional competitors enter the market.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

166.    When a generic drug manufacturer is the first to enter a particular drug market on an exclusive basis, it is commonly understood that that manufacturer is entitled to a little more than its proportional share of the market.  For example, when Heritage was preparing to launch Zoledronic Acid as the patent on the branded drug was about to expire, O'Mara (Heritage) spoke to Austin (Dr. Reddy's) to "see if he [was] willing to discuss strategy at all." After speaking with Austin, O'Mara stated that "[Austin] views it this way.  If [Dr. Reddy's] are first and others come out after, he deserves 60%.  If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

167.    Conversely, those generic manufacturers that enter later are typically entitled to a little less than their proportional share.  One of the many examples of this occurred in March 2014, when – as discussed more fully below – Lupin entered the Niacin ER market after Teva had previously been exclusive.  Patel of Teva and Berthold of Lupin spoke directly by phone a number of times during this period, including three (3) calls on March 24, 2014.  That same day, Rekenthaler of Teva sent an internal e-mail to Patel stating:  "We should concede Optum then defend everything else.  This should be it for Lupin.  I believe this should be the 40% we were okay with conceding." Here, Teva's expectation to maintain 60% share in a two-player market, after being the first in that market, was consistent with the overarching conspiracy.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

168.    Taro went so far as to create a graphic representation of that understanding, taking into account both the number of competitors and order of entry to estimate what its "fair share" should be in any given market:



169.    Although these general parameters are well-known, there is no precise method for apportioning "fair share" because market share is ultimately determined by the business of various customers, which is inherently somewhat variable.  The shared objective, however, is to attain a state of equilibrium, where no manufacturers are incentivized to compete for additional market share by eroding price.

170.    This common goal was stated succinctly by Aprahamian, who advised the Taro Pricing Department in training documents from September and November 2013 that "[g]iving up share to new entrant (as warranted) shows responsibility and will save us in the long run" and "[d]on't rock the boat – [g]reedy hogs go to slaughter."  In this regard, the "fair share" agreement ensured that manufacturers did not compete to increase their market share.  In the same training, the Taro Pricing Department explained that when Taro launched a new product, it would use ███████████████████ to ensure it did not ███████████████ In other words, Taro would

---

39    *Id.* at ¶ 129.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

not enter new drug markets where doing so would decrease the share of a competitor in multiple products.  In this regard, the "fair share" agreement restricted entry, limiting the number of competitors in the market for each affected generic drug.  As demonstrated throughout this Complaint, Aprahamian's idea of "responsibility" meant constantly reaching out to competitors in order to coordinate giving up share to reach a "fair" allocation and keep prices high.

171.    This scheme to reduce competition and allocate "fair share" is typically implemented as follows.  First, Defendants allocate the market for an individual drug based on the number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market.  Then, the competitors agree on ways to avoid competing on price and, at times, significantly raise price.  This pattern is frequently followed even in the absence of direct communication between the competitors, demonstrating the universal code of conduct Defendants agreed to.

172.    The "fair share" understanding has been particularly effective when a new competitor enters the market – a time when, in a free-functioning, competitive market for generic drugs, prices would be expected to go down.  In today's generic drug markets, a new competitor will either approach or be approached by existing competitors.  Existing competitors will agree to "walk away" from a specific customer or customers by either refusing to bid or submitting a cover bid.  The new competitor's transition into the market is seamless; the new entrant is ceded market share and immediately charges a supra-competitive price.  The competitors then continue this process of dividing up customers until the market reaches a new artificial equilibrium.  This is referred to as a "stable" market.

173.    "Fair share" principles also dictate how generic drug manufacturers respond when a competitor experiences supply issues.  If the disruption is temporary, the existing competitors

will refrain from taking any action that might upset the conspiratorial balance.  By contrast, if the disruption is for a longer term, the competitors will divide up customers until each player achieves a revised "fair share" based on the number of players remaining in the market.  For example, in July 2013, a retail pharmacy customer e-mailed Taro stating that one of Mylan's products was on back order and asked Taro to bid for the business.  Aprahamian sent an internal e-mail stating "Not inclined to take on new business . . .  Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists.  Don't want to overreact to this product.  Not sure how long Mylan is out."

174.    These rules about "fair share" apply equally to price increases.  As long as everyone is playing fair, and the competitors believe that they have their "fair share," the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business.  Doing so is viewed as "punishing" a competitor for raising prices – which is against the "rules."  Indeed, rather than competing for customers in the face of a price increase, the would-be competitors often use this as an opportunity to follow with comparable price increases of their own.

175.    For example, in May 2013, after a Glenmark price increase on a number of different drugs (discussed more fully below), Teva was approached by a large retail customer requesting a bid for several drugs.  Green immediately sought to determine whether this request was due to a competitor price increase, in order to determine what Teva's strategy should be:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

On May 29, 2013, at 11:52 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:

Do you think the Fluconazole Tabs below is due to a recent price increase. I don't have my list here at home. We are in a great inventory position, but not sure I want to steal it on an increase.

[40]

176.    Teva declined to bid, only after conversations with its competitors confirmed that the reason for the request was due to a competitor's price increase.

177.    When a generic manufacturer participates in this scheme, and prices stay high, this is viewed as "playing nice in the sandbox." When a generic manufacturer is "playing nice in the sandbox," it is generally referred to as a "responsible" or "rational" competitor. For example, in May 2013, R.T., a senior sales and marketing executive at Sandoz, sent an internal e-mail to J.G., another Sandoz senior executive, stating "My sense is that Sandoz is viewed by customers and competition as a respectful/responsible player in the market, which we should be proud of and has taken years to develop. I would be very careful to destroy this through behavior that is too aggressive or desperation." Sandoz has since pleaded guilty to conspiring to fix prices, allocate customers, and rig bids for generic drugs in violation of the antitrust laws.

178.    Sandoz, in turn, uses that same terminology to refer to its competitors that are acting in accordance with "fair share" principles. In internal company presentations throughout 2014, Sandoz consistently referred to Actavis as a "responsible competitor" and Taro as a "very responsible price competitor."

179.    Teva had its own term of art – referring to the competitors it had the most collusive relationships with as "high quality" competitors. As described more fully below, Teva had long-standing relationships with these competitors, including several of the Defendants,

---

[40]  *Id.* at ¶ 137.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

which affected nearly every overlapping drug they sold.  As just one example, Patel of Teva

exchanged seven (7) text messages and had two (2) long phone calls with Aprahamian of Taro

on June 3 and 4, 2014.  After a lengthy twenty-five (25) minute call with Aprahamian on the

morning of June 4, Patel sent an internal e-mail to K.G., a Teva senior marketing executive,

stating "[w]e should probably discuss how we want to handle all Taro increase items.  Taro is a

high quality competitor – I think we need to be responsible where we have adequate market

share."

180.    Adherence to the agreement regarding "fair share" is critical in order to maintain

high prices.  Maintaining high prices is the primary purpose of the agreement.  If even one

competitor does not adhere to the "fair share" agreement, it can lead to unwanted competition

and lower prices.  In the relatively few instances where a competitor prioritizes gaining market

share over the larger understanding of maintaining "fair share," that competitor is viewed as

"irresponsible," and is spoken to by other competitors.  For example, in March 2015, Upsher-

Smith learned that Sandoz had submitted a bid on a product not identified in this Complaint at

one of Upsher-Smith's customers.  B.P., a senior account manager at Upsher-Smith, forwarded

that information internally stating "I can't believe they have chosen to compete against us since

we had this business.  How does this help us?  We play fair and they don't?"

181.    Adherence to the agreement also informs manufacturers' decisions to exit (or not

enter) new drug markets.  For example, in September 2012, Mylan exited the market for

Clonidine-TTS following phone calls between Mylan and Teva executives.  Absent competition

from Mylan, Teva raised its prices for Clonidine-TTS.  Following regular contact between

Mylan and Teva executives, in February 2013, Mylan re-entered the market for Clonidine-TTS

at higher prices.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

182.    "Fair share," "playing nice in the sandbox," "rationalizing the market," and similar terminology have become part of the industry lexicon, and thus part of the larger understanding between Defendants.  Generic drug manufacturers actively and routinely monitor their fair share and that of their competitors, as well as discuss customer allocation amongst each other within the context of agreements on specific drugs, as set forth more fully below.  For example, in July 2013, L.J., a senior marketing executive at Sandoz, sent an internal e-mail identifying 47 products where Sandoz did not have "fair share" of the market.  After some back-and-forth internal joking among Sandoz executives about the idea that Sandoz might actually attempt to compete for business in those markets by driving prices down, Kellum responded by emphasizing the truly industry-wide nature of the agreement:

| From: | Kellum, Armando |
|---|---|
| Sent: | Tuesday, July 02, 2013 12:31 AM |
| To: | ███████████████ |
| Subject: | Re: Product Sales and Market Share Performance_v17 (3).xls |

Fair Share for all!!!

41

183.    The "fair share" agreement is not limited to any one market; these principles constantly inform and guide the market actions that generic drug manufacturers decide to take (or not take) both within and across product markets.  "Fair share" decisions consider factors across multiple generic drug markets.  Customers in one drug market might be traded for customers in another drug market so to create a global "fair share" outcome.  Or a putative competitor may decline to compete meaningfully on a bid for one drug in exchange for the opportunity to provide a pre-determined bid for a different drug.  Or competitors might avoid

---

41    *Id.* at ¶ 143.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

challenging a price increase on one generic drug based on a *quid pro quo* arrangement from other competitors on different drugs.

184.    Defendants understood that to effectuate a successful price-fixing and market allocation agreement on one drug, they would need to effectuate an agreement across a broad swathe of each Defendant's portfolio of drugs.  If the agreement were limited to one or two drugs, it could more easily fall apart.  For example, an agreement between two Defendants to raise prices or to allocate market share on one drug would not likely hold where those same two Defendants engaged in vigorous price competition on another drug, or where a third manufacturer not party to that agreement entered the market with an intent to compete on price.

185.    There are many examples of Defendants conspiring across drug markets.  As detailed below, this is illustrated by Heritage's attempt to impose industry-wide price increases simultaneously on eighteen drugs, including a number of the Subject Drugs:  Acetazolamide ER, Doxy Mono, Fosinopril HCL/HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, Paromomycin, Theophylline ER, and Verapamil.  This involved reaching out to competitors as to each of the drugs to agree on price increases.

186.    Similarly, Teva implemented collusive price increases on several drugs at one time in a series of price increases detailed below and communicated with certain would-be competitors as to multiple drugs as part of each such wave of price increases.

187.    Defendants also conspired across drug markets to maintain their market allocation scheme.  For example, in November 2013, Dr. Reddy's won the "B" slot[42] business at a large

---

[42]   Some large customers contract with multiple suppliers – referring to them as primary ("A slot") or secondary ("B slot") suppliers – so that in the event of a supply disruption for a particular drug, there is a secondary source of supply.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

wholesale customer on a product not identified in this Complaint. Dr. Reddy's had previously

won the "A" slot business at that customer because Mylan had "walked away" from the business.

J.A., a senior account executive at Dr. Reddy's, sent an internal e-mail stating "My concern here

is that [Mylan] will retaliate somewhere else. I'm unsure of the $ volume, but this would pull

somewhere around 4% share from Mylan, and I don't think they would take that lying down."

188.    Similarly, in October 2013, CW-1, a senior pricing executive at Sandoz, sent an

internal e-mail, including to Kellum, stating that Sandoz had decided not to bid on two drugs not

identified in the Complaint at a large retail customer. CW-1 explained his reasoning as follows:

"We have been running up against Mylan a lot lately (Nadolol/Benaz/Hctz), and fear blowback if

we take any more products at this moment. Trying to be responsible in the sandbox." And in

June 2014, Sandoz again chose not to bid at a customer on a product not identified in this

Complaint out of concern that Mylan would retaliate. As CW-1 explained, "I do not want to

pursue, I believe this is due to a Mylan increase. We have a lot of products crossing with Mylan

right now, I do not want to ruffle any feathers." As discussed more fully below, these decisions

were made by Sandoz executives as a direct result of communications between the competitors,

and in the context of an ongoing understanding between Sandoz and Mylan to fix prices and

avoid competition on a number of different drugs, including Nadolol.

189.    A similar scenario occurred in August 2015, when Taro declined to bid on

Etodolac ER tablets at a large supermarket chain where Zydus was the incumbent. Taro voiced

concerns internally that Zydus might retaliate and take share from them on another product,

Warfarin Sodium tablets. As C.L., an analyst at Taro, reasoned in an internal e-mail, Zydus

"could hit us on Warfarin. Not worth a fight in the sandbox over 300 annual units for Etodolac."

As discussed more fully below, both Etodolac ER and Warfarin Sodium were drugs where Taro

had previously agreed with its competitors, including Teva and Zydus, to fix prices and allocate customers in 2014.  Taro's focus on playing nice in the sandbox was merely an extension of those already-existing agreements.

190.    As these and other examples alleged below make clear, the agreements among generic manufacturers transcend product markets as these companies make decisions not only based on what impact their actions will have in a given product market, but also on how those actions will impact other product markets where the competitors overlap and any future markets where they might eventually compete.

191.    In fact, as explained in more detail below, certain Defendants had long-standing agreements with some of their competitors to limit competition on any products on which the companies overlapped.  For example, shortly after Patel was hired by Teva in 2013, she reached out to CW-1 and asked how Sandoz handled price increases.  Patel explained that she had been hired by Teva to identify products where Teva could increase prices.  CW-1 told Patel that Sandoz would follow any Teva price increases and that Sandoz would not poach Teva's customers after Teva increased price.  CW-1 reiterated his conversation to Kellum, who understood and approved.

192.    As set forth above, generic manufacturers often communicated about, and colluded on, multiple drugs at any given time.  For example, in July 2013, Teva increased pricing on a list of 21 different products.  There was a great deal of internal pressure from management at Sandoz – including from Kellum and CW-1 – to obtain a copy of the Teva price increase list. As a result, CW- 2 (then a Sandoz employee) reached out to his former colleague, Rekenthaler, the Vice President of Sales at Teva, to obtain a copy of the full Teva price increase list. Rekenthaler forwarded the list to his own personal e-mail address before then forwarding it to

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CW-2's personal e-mail address.  Upon information and belief, upon receiving the list, CW-2 read it to his supervisor – CW-1 – over the phone.  Notably, the Teva list included a number of products that Sandoz did not even sell.

193.    It was not uncommon for generic manufacturers to communicate with each other about products that they did not sell.  For example, Teva, Wockhardt, and Mylan collusively raised pricing on Enalapril Maleate in July 2013 (discussed more fully below).  After a lengthy conversation with Patel in the midst of the price increases, Aprahamian of Taro (not in the market for Enalapril Maleate at that time) sent an internal e-mail, including to M.P., a senior Taro executive, stating "[t]here has been some significant changes in the market landscape with this product and I'd like to get product back in Taro label (and fast)."  And Taro did move fast.  By December 2013, Aprahamian spoke again with Patel, M.A., an account manager at Mylan, and M.C., a senior sales and marketing executive at Wockhardt.  Taro then re-entered the Enalapril Maleate market and matched competitor pricing.

194.    As another example, on January 1, 2013 – the day before a substantial Mylan price increase on a number of items – Green of Teva spoke five (5) times with Nesta of Mylan.  The next day, Green spoke with Kellum of Sandoz.  Kellum then sent an internal e-mail to the Sandoz team stating "[j]ust heard from a customer that – Teva and Mylan . . . have raised price on Nadolol to our levels and Mylan took a significant price increase on Levothyroxine.  Let's please be cautious on both these products." Despite the fact that Teva did not sell Levothyroxine, Green still conveyed to Sandoz that Mylan raised price on that product.

195.    Unlike their branded counterparts, generic drugs are commodities and generic manufacturers are constantly making decisions to enter new markets and leave existing markets.  Under the conspiracy,  these decisions are often made, at least in part, based on who the

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

competitors are and how strong the relationship is between the two companies.  For example, in July 2013, Sandoz was looking to implement a "Taro Strategy" that involved temporarily delisting ten products that they overlapped on with Taro.  This strategy would allow Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher price.

196.    This agreement between generic manufacturers is further demonstrated by the countless examples of companies sharing sensitive information with competitors as a matter of course.  The State AGs have gathered evidence going back more than a decade of generic companies routinely communicating and sharing information with each other about bids and pricing strategy.  This includes forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, or at the request of a competitor.

197.    Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price protection, and rebates.  Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of payors and consumers.  For example, in December 2013, Teva was negotiating new price increase language in its customer contracts and wanted some comfort that its competitors had similar language.  On December 23, 2013, Rekenthaler spoke with Nesta of Mylan three times, including a 13-minute call.  Immediately after hanging up the phone with Nesta after the third call, Rekenthaler sent the following e-mail:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

```
From:    Dave Rekenthaler
Sent:    Mon 12/23/2013 10:41 AM (GMT-05:00)
To:      ████████, Maureen Cavanaugh
Cc:      Nisha Patel02
Bcc:
Subject: RE: Proposed Price Increase Language


Mylans language is vague.  "Pricing subject to change at Mylan's sole discretion."
```
[43]

198.    Defendants and generic manufacturers signaled their intention to refrain from competing aggressively with their competitors through statements made in annual reports, press releases, and interviews.  For example, on a September 10, 2013 earnings call, Lannett's CEO explained, "[W]*henever people start acting responsible and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful because Lannett tends to be active in raising prices*."[44]  He concluded by explaining that "[t]his particular [price increase] that was done by a competitor is embraced—*just like I'd do any other price increases*."[45]  Impax's CEO explained that Impax had "done what most of the other generic competitors have done, we look at opportunity, we look at how competition shifts, we look at where there may be some market movement that will allow us to take advantages on price increases and we've implemented those and we'll continue to evaluate our line product-by-product probably a week and monthly basis *to see if there are some opportunities to participate in that practice*."[46]  Mylan's CEO explained on an October 25, 2012 earnings call, "You've heard me quarter after quarter coming and saying *we weren't going to chase the bottom, that there's been irrational behavior and that we would*

---

[43]    Amended State AG Complaint No. 2 ¶ 158.

[44]    Q4 2013 Lannett Company Inc. Earnings Conference Call Transcript (Sept. 10, 2013), at 9.

[45]    *Id.*

[46]    Q3 2013 Impax Earnings Conference Call Transcript (Nov. 4, 2014).

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*continue to hold steady and control what we can control*."[47]  On August 8, 2016, Par's President explained to an analyst that "***typically you want to just be very careful about trying to go after too much share.*  You just have got to take a balanced approach.**"[48]

199.    Analyst and industry reports on the generic manufacturing industry and Defendants' businesses reinforced this messaging and common understanding.  Industry publications including *FDA Week* highlighted that particular generic segments "enjoy[] high margins due to limited competition" and were responsible for driving Defendants' businesses.[49] Analyst reports warned of "increased competition" as a driver of potential "price erosion."[50] These public reports were based on information provided by Defendants and generics manufacturers to analysts.

200.    Defendants and generic manufacturers also seized on the opportunity presented by the many trade association meetings and customer conferences they attended together, including conference of the National Association of Chain Drug Stores (NACDS) and Healthcare Distribution Management Association (HDMA), to reinforce this messaging and common understanding.  For example, in 2010 Sandoz presented at the HDMA conference and detailed its upcoming generic launches, highlighting the ███████████████████████ A June 2012 Apotex presentation from an HDMA conference described generic drug markets as subject to ████████████████████████████████████████████████████ ███████████████████████████████ A Lupin presentation for the 2014 NACDS annual

---

[47]   Q3 2012 Mylan Earnings Conference Call Transcript (Oct. 25, 2012).

[48]   Q2 2016 Par Earnings Conference Call Transcript (Aug. 8, 2016).

[49]   Nanci Bompey, *Teva Executive Proposes Changes to Drug Exclusivity Provisions*, FDA WEEK (Apr. 26, 2013).

[50]   *See, e.g.*, Global Research Desk, *Perrigo Lowering Numbers but Still See Upside*, UBS (July 6, 2016).

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

meeting listed among the ████████████████████████████████████████████

██████████████████████ In 2016 Dr. Reddy's outwardly presented at NACDS its drug pipeline

while describing its strategy as ████████████████████████████████████

Generic Drug Price Spikes Since 2013

201.    Against this industry backdrop, the prices for a large number of generic

pharmaceutical drugs skyrocketed throughout at least 2013 and 2014.  As Senator Sanders noted,

the prices of more than 1,200 generic medications increased an average of 448 prcent between

July 2013 and July 2014.[51]  An analysis conducted by Sandoz showed that during the calendar

years 2013 and 2014, there were 1,487 "large price increases" (increases of the WAC price

greater than 100%), of which 12% (178) were increased by greater than 1,000%.

202.    These increases in 2013 and 2014 were staggering compared to prior years.  The

following table (which contains information about WAC pricing changes through October 2014

only) demonstrates the surge in the number of large drug price increases per year in 2013 and

2014:

|  | Year | Total Number of Increases | Increases Greater than 100% | Increases Greater than 50% |
|---|---|---|---|---|
|  | 2010 | 3820 | 125 | 260 |
|  | 2011 | 4265 | 255 | 409 |
|  | 2012 | 4071 | 223 | 433 |
|  | 2013 | 5694 | 739 | 1072 |
| YTD Oct. | 2014 | 4461 | 637 | 1521 |

[52]

203.    A January 2014 survey of 1,000 members of the National Community

Pharmacists Association ("NCPA") found that more than 75% of the pharmacists surveyed

---

[51]    *Why are Some Generic Drugs Skyrocketing in Price?:  Hearing on S. 113-859 Before the Sen. Comm. on Health, Education, Labor, and Pensions*, 113th Cong. 2 (2014) (statement of Sen. Bernie Sanders, Chairman, S. Subcomm. on Primary Health and Aging).

[52]    Amended State AG Complaint No. 2 ¶ 163.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

reported higher prices on more than 25 generic drugs, with the prices spiking by 600% to 2,000% in some cases.

204.    More than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100%.

## VIII.   THE CONSPIRACY:  HERITAGE-RELATED CONDUCT

205.    When entering a generic drug market, Defendants routinely and systematically sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price.  These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

206.    Illustrative examples of these agreements are set forth below, describing specific examples relating to many of the Subject Drugs.

207.    By 2012 the overarching "fair share" conspiracy was well established in the industry, including among the Defendants.  Generic manufacturers replaced full-throated competition with coordination in order to maintain their fair share of a given generic drug market and avoid price erosion.  The structure and inner workings of the agreement were understood and adopted throughout the industry.

208.    Around this time, however, manufacturers began to focus more on price increases than they had in the past.  They were no longer satisfied to simply maintain stable prices – there was a concerted effort by many in the industry to significantly raise prices.  Manufacturers started communicating with each other about those increases with greater and greater frequency.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

209.    Starting sometime in 2012 or even earlier, and continuing for several years, competitors would systematically communicate with each other as they were identifying opportunities and planning new price increases, and then again shortly before or at the time of each increase.  The purpose of these communications was not only to secure an agreement to raise prices, but also to reinforce the essential tenet underlying the fair share agreement – i.e., that they would not punish a competitor for leading a price increase or steal a competitor's market share on an increase.  There was an understanding among many of these generic drug manufacturers – including the Defendants – that a competitor's price increase be quickly followed; but even if it could not be, the overarching conspiracy dictated that the competitors who had not increased their prices would, at a minimum, not seek to take advantage of a competitor's price increase by increasing their own market share (unless they had less than "fair share").

210.    Generic drug manufacturers could not always follow a competitor's price increase quickly.  Various business reasons – including supply disruptions or contractual price protection terms with certain customers that would result in the payment of significant penalties – could cause such delays.  In those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net to ensure that the competitor not seek to take advantage of a competitor's price increase by stealing market share.

211.    Examples of specific collusive price increases on many of the Subject Drugs are set forth below.

212.    The allegations in Section VIII focus on Heritage's conduct with respect to market entry, while the allegations in Sections IX and X focus on Teva's conduct in similar circumstances, and the allegations in Section XI focus on dermatological drug-related conduct.

A.      **Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion**

213.     When entering a generic drug market, Defendants routinely sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices, and/or avoid competing on price.  These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

1.      **Nimodipine**

a.      *The Heritage/Sun Agreement*

214.     As of June 2012, Heritage and Sun, through its division Caraco, were the only two competitors in the market for Nimodipine, as Teva had recently left the market.  Heritage saw Teva's departure as an opportunity to raise prices.

215.     In June 2012, Malek asked Sather to contact Caraco to discuss raising the price of Nimodipine.  The resulting conversations reflect an agreement between the two companies to allocate the market and avoid competing on price, while at the same time making overt efforts to increase pricing market wide.

216.     Sather subsequently exchanged numerous text messages and participated in calls with her Caraco contact throughout June 2012.  On June 28, 2012, in an e-mail titled "Caraco", Sather wrote:

> [Sun Senior Sales Manager Susan Knoblauch] brought up nimo[dipine] to her boss [Sun President GP Singh Sachdeva], his only concern was that they get their fair share of the market.  She was not so much help on the pricing discussion- because she does not have much control over it.  All pricing goes through [GP Singh Sachdeva (Sun)] and [GP Singh Sachdeva (Sun)] sets is.  I do not know [GP Singh Sachdeva (Sun)] but [Knoblauch (Sun)] mentioned our discussion with him so I can only hope the ground work has been

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

set.  I reiterated that we would like to see $ go up and we would be
fair.

217.    Malek responded:  "Thanks for the info.  Not sure what this means 'his only

concern was that they get their fair share of the market.'  They are getting their fair share of the

market at a price they don't need to go to is what I wanted to communicate to them."

218.    In her e-mail response, Sather agreed:

> That is exactly how I stated it to [Knoblauch] too! She made it
> almost seem like he did not care about the price of even this product.
> She admitted she knew nothing about the item – it is not a big/key
> item for them.  I said it is big for us and with only two players it
> should command more $.
>
> I'd like to see if [Knoblauch] can communicate back to [GP Singh
> Sachdeva (Sun)] and the Nimo[dipine] on the Cardinal RFP (when
> it gets closer to the close of the RFP) – specifically mentioning the
> pricing we are going at so that Caraco can bring their price up too.
> This could demonstrate how communication can and should work
> between us to get the $ up.

219.    The same day Sather sent an analysis of the upcoming Cardinal RFP to Malek and

others at Heritage.  The notes section regarding Nimodipine reflected that Heritage should "keep

price high for Caraco."  The plan for Heritage was that it would bid at a high price, which would

be communicated to Sun beforehand, and would allow Sun to raise its price and still retain the

Cardinal business.

220.    On July 20, 2012, Fleming, a Contract Analyst at Heritage, circulated proposed

pricing for the Cardinal RFP which included pricing for Nimodipine that was lower than that

proposed by Sather.  In an e-mail exchange that same day, Sather and Malek discussed raising

prices:

> Sather:  My only concern is Nimodipine – and situation with Caraco
> and raising our market pricing.  If we don't let them increase pricing
> here – will it always be a fight to the bottom with them?

Malek:  I don't have a problem with it but, we need another account. Who is that account? They took CVS from us and we let it go and now they are getting aggressive at public and at GPO's.

Sather:  I understand – I just think the timing is critical if we want to raise our pricing everywhere.  This Cardinal RFP was mentioned in previous conversations – and now with NACDS coming – it is a perfect time to have those off-show conversations with the right folks and reiterate the 'plan.' Plus the RFP pricing will not be effective until Oct 1st – we would have time to discuss our pricing with Cardinal (and others) before that final date.  Ie:  I think we could still lowball the Nimo a little later if necessary.

Malek:  If you feel comfortable we can have those conversations and benefit from this then I agree.  We can talk off line.

Sather:  If I don't continue the conversations now (and at NACDS) and if we lowball right of the gate on the RFP, I think we close the door for a long time.

Malek:  Ok, let's give it a shot.  So we will increase the price, you should tell them that so they can do the same without any comp.

221.    That same day, Sather spoke to Knoblauch.  During this and other communications in the succeeding weeks, by text, phone and in-person at NACDS, the two companies reached an understanding about raising the price and avoiding competition for Nimodipine.  Pursuant to the agreement, Heritage provided a cover bid so that Sun would be able to significantly raise its price and still retain the Cardinal business.

222.    Heritage and Caraco were both able to significantly raise prices to other customers as well as a result of this agreement.

223.    When Malek learned that Sun would potentially be subject to FDA recall on Nimodipine, he directed employees to contact their Sun counterparts to inquire about the recall. A Heritage employee later reported that her contact at Sun was "not aware or [sic] any problems/issues and supply was fine."

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

224.    Then, on April 16, 2013, after an employee reported that Caraco has not been bidding as it was unsure when it would have product, Malek responded "Great feedback, time for next increase!" But he also followed up with some additional instructions about a week later, expressing his willingness to continue the agreement with Sun when it did re-enter the market: "to make sure if/when they are back [on the market] they talk to us first so we can be smart about it."

225.    On May 23, 2013, Sather again spoke with Knoblauch, who indicated that Caraco may be returning to the market for Nimodipine in June or July.  Sather immediately reported this news to Malek:  "Caraco's Nimodipine has an estimated ship date of June/July but frankly that looks even too hopeful.  And there's a small rumor they may not come back with it.  A reminder was provided about our recent changes on that item."

226.    This resulted in the following e-mail exchange between the two:

Malek:  OK...Where did you hear this from!!

Sather:  Vendor/friend [Knoblauch]

Malek:  Are they raising theirs?

Sather:  They are not yet but admit it would be nice to

Malek:  Well we would follow in one second.

Sather:  I did say that!

Malek:  hahahahahahaha

227.    During the next year, Caraco did not return to the market.  Heritage was able to continue charging the artificially inflated prices previously agreed to by Caraco, and at times higher prices, as a result – knowing that if Caraco did return to the market, the original agreement between the companies would continue.

93

228.    This agreement between Heritage and Sun was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

        *b.*     *The Heritage/Ascend Agreement*

229.    In April of 2014, Defendant Ascend received FDA approval to begin producing Nimodipine for sale.  On April 8, 2014, Malek immediately reached out to Ascend's Executive Vice President of Sales and Marketing, John Dillaway, through LinkedIn, asking if Dillaway had "time to catch up tomorrow afternoon or Thursday morning."  Dillaway responded, "I would like to catch up."

230.    On April 22, 2014, Heritage identified Nimodipine as one of eighteen different drugs designated for a price increase.  As discussed below, a large majority of the price increases were to be achieved through collusive efforts.  During a "Price Increase Discussion" conference call with members of the Heritage sales team, led by Malek, Heritage noted that Ascend was going to launch Nimodipine.  Malek took responsibility within Heritage to communicate with Ascend about market shares.  Heritage planned to offer Ascend one-third (1/3) market share, so that Ascend would not compete with Heritage on price.

231.    Malek took this responsibility to communicate with Ascend because he already had a relationship with Dillaway.  The pair had previously met in February 2013.  Malek had also been communicating frequently with Dillaway through the website LinkedIn in the weeks leading up to the April 22, 2014 Price Increase Discussion.

232.    Later in the day after the Heritage "Price Increase Discussion" on April 22, 2014 described below, Malek called Dillaway and the two spoke for nineteen minutes.  Upon information and belief, during this conversation they agreed on a plan where Heritage would

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

raise its prices, Ascend would enter the market at a high price to avoid erosion, and in exchange Heritage would walk away from certain accounts that Ascend had targeted so that Ascend could gain market share at favorable pricing.

233.    On May 9, 2014, Heritage had another internal conference to discuss price increases.  After obtaining buy-in from Ascend during the April 22 telephone call between Malek and Dillaway, Heritage confirmed that it would be raising prices of Nimodipine across the board.  Heritage also identified specific customers that it would "let go" to the "new entrant into market," Ascend.

234.    In June 2014, Malek sought to continue his conversations with Dillaway regarding Nimodipine.  He e-mailed Dillaway on June 6, 2014 seeking to arrange a phone call. After they were unable to connect by phone, Dillaway suggested they meet in person and "grab coffee" at the NACDS conference in Boston.

235.    At the end of June, Heritage implemented the price increase.  Heritage raised the price of Nimodipine to at least twelve customers.

236.    Malek e-mailed Dillaway on October 29, 2014, again asking to "catch up."  The two spoke by phone for ten minutes the next day.  On November 4, 2014, Malek e-mailed Dillaway to "[l]et me know when we re-connect to continue our discussions from the other day." Instead of communicating specifics over e-mail, Malek and Dillaway made plans to have lunch together when Malek returned from India.

237.    Two weeks later, on November 18, 2014, Malek e-mailed Dillaway stating "[j]ust sent you a text.  Fresh back from India.  Wanted to pick up discussions.  Let me know if you can chat." On November 25, 2014, Malek e-mailed Dillaway again asking if Dillaway "had a few minutes to connect."

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

238.    On January 22, 2015, Malek asked Heritage employee R.S. to reach out to Ascend to see if Ascend had Nimodipine in its warehouse.  Malek stressed that this inquiry should be kept confidential.

239.    R.S. reached someone at Ascend.  By January 24, 2015, Malek was able to inform his sales team that Ascend had Nimodipine in its warehouse.

240.    By May 1, 2015, Ascend had fully launched Nimodipine.  Instead of trying to compete with Heritage upon entry, Ascend's WAC price, per tablet, was even higher than Heritage's.

241.    Notwithstanding this higher pricing per tablet, Ascend began to gain market share throughout the second half of 2015.

242.    This agreement between Heritage and Ascend was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

## 2.    Zoledronic Acid

243.    At all relevant times, Dr. Reddy's and Heritage dominated the market for Zoledronic Acid.

244.    Heritage began selling a 5mg formulation of Zoledronic Acid in the spring of 2013, when the product was first coming off patent.  The brand manufacturer, Novartis, had previously marketed two formulations of the drug: a 5mg injection called Reclast®, and a 4mg injection called Zometa®.  Heritage initially sought to launch only on the 5mg formulation. Even before the product was officially launched, Heritage began communicating with its potential competitors in order to divvy up the market and avoid price competition.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

245.     On January 21, 2013, Malek e-mailed O'Mara (Heritage) directing him to reach

out to Dr. Reddy's, the only other competitor Malek believed would be marketing Zoledronic

Acid.  Malek wrote:

> Would like you to have a call with [Austin (Dr. Reddy's)] on
> Zoledronic.  Right now, only us and DRL have a tentative on the
> 5mg (reclast).
>
> Need to know if he's going to be there day one and see if he's willing
> to discuss strategy at all.
>
> This is huge right now if it's only a two player market and we need
> to lock in our strategy.

246.     In a follow-up communication to O'Mara the next day, Malek outlined what

O'Mara should ask Austin:

> OK.  Here are the questions if you would.
>
> Are they going to be there day one (March 4)
>
> Have they heard of any others there say [sic] one?
>
> Are they launching the 4mg (Zometa) at risk?[53]
>
> Have they heard of anyone else launching the 4mg at risk?
>
> What's their market share goal?

247.     Through numerous phone calls in late January 2013 between Heritage and

Dr. Reddy's sales representatives, an agreement was reached to allocate the market for

Zoledronic Acid between Heritage and Dr. Reddy's.  As O'Mara described it, "[Austin] views it

this way.  If they are first and others come out after, he deserves 60%.  If he launches with others

on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

---

[53]   An "at risk" generic launch refers to a scenario where a generic manufacturer launches product sales after the
       FDA has reviewed and approved its ANDA, but while patent litigation is still ongoing.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

248.    Communications between the two companies continued in March 2013 in preparation for Heritage's market entry, including communications on March 1, 4, 6, 12, and 13, 2013.

249.    As the launch approached, Heritage continued to communicate with Dr. Reddy's to refine their agreement on market share and initial pricing for Zoledronic Acid, acutely aware that what they were doing was illegal.  For example, on March 1, O'Mara e-mailed Malek informing him that he had left Austin a message "to have him call me back."  He added, "Did not leave anything that would incriminate me—very generic."  O'Mara and Austin then spoke for almost eight minutes on March 4, 2013.

250.    The March 6 communication arose from Malek's concern that Dr. Reddy's' initial pricing to at least one customer appeared to be lower than he had hoped.  Malek e-mailed O'Mara asking, "[a]ny chance you can talk to them and educate them on supply and demand economics?"  O'Mara's response was "[y]es, they were working on it yesterday, but [I] will give him a call and discuss."

251.    On March 13, M.E., a Senior National Accounts Manager at Heritage, told Malek that he had called his counterpart at Dr. Reddy's about Zoledronic Acid and they would "talk about it soon."  The two spoke on April 3, 2013 and M.E. confirmed that Dr. Reddy's had begun shipping the 5mg product that day and that pricing would be "in the 500 range." The two continued to speak throughout April.

252.    Malek sent a text message to his entire sales team on April 19, 2013, reminding them to keep their discussions out of writing: "Team:  please hold off on emails regarding zoledronic indication, insert, prescribing, etc. take all questions off line."

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

253.     Heritage and Dr. Reddy's continued to police their market allocation agreement. Whenever there were challenges between Heritage and Dr. Reddy's for specific customers, those disagreements were resolved through direct communications between the companies.  For example, in November 2013, Dr. Reddy's offered a lower price for Zoledronic Acid to one of Heritage's customers.  When Malek learned of this, he e-mailed M.E., "When you spoke to [your counterpart at Dr. Reddy's], weren't they going to chill on share[?]" M.E. replied.  "He told me that he was going to speak to their injectable people and let them know that they should chill."

254.     Despite these occasional challenges, the general agreement regarding market share allocation between Heritage and Dr. Reddy's continued.  For most of 2013 and 2014, the market remained stable with Dr. Reddy's maintaining roughly 60 percent market share to Heritage's 40 percent for the 5mg Reclast® formulation.

255.     Par entered the market for Zoledronic Acid in late 2013, approximately eight months after Heritage and Dr. Reddy's.  Shortly before entering the market for Zoledronic Acid, Par personnel attended the NACDS Total Store Expo in Las Vegas, which was also attended by personnel from numerous Defendants, including personnel from Heritage and Dr. Reddy's, among others.  When Par entered the market in late 2013, it announced list prices even higher than the Heritage and Dr. Reddy's list prices.  Although it was the third generic manufacturer to enter the market, Par did not undercut Heritage and Dr. Reddy's in price.

### 3.     Meprobamate

256.     In 2013, Heritage and Dr. Reddy's were the only manufacturers for Meprobamate. The two companies had an agreement in place to allocate market share between them and not compete on price.

257.     Heritage decided it wanted to increase price significantly.  On March 21, 2013, Malek e-mailed members of his team that he is "Looking to take a price increase on [mepro]. Only other competition is DRL [Dr. Reddy's].  We don't want to make any waves and we are not looking for additional share, just want to maintain what we have at a minimum of a 4x price. Anyone want to reach out to DRL and communicate to feel out?"

258.     On a call on March 22, the two companies agreed to set and increase prices on Meprobamate.  The agreement was confirmed in an e-mail later that day from a Heritage representative:  "DRL is on board with price increase.  I will fill you in later."

259.     On March 27, 2013, Heritage received a request for a bid from a national wholesaler on Meprobamate that was a Dr. Reddy's customer.  The Heritage employee reported to Malek that "Due to my conversation with [Dr. Reddy's] the other day, I think we should tread lightly or else bid a high price to show them where we are going."  Malek replied "Unless [the national wholesaler] calls you and asks for supply, I recommend letting the market dry up a bit and showing DRL we stayed away from their business."

260.     In April 2013, Dr. Reddy's approached Heritage to discuss its desire to get additional market share on Meprobamate.  Dr. Reddy's requested Heritage "walk away" from a national pharmacy chain.  On April 24, 2013 Heritage e-mailed the large pharmacy chain that it was increasing Meprobamate prices.  The pharmacy replied that it "made a business decision to name another manufacturer as our primary supplier of Meprobamate tablets."

261.     The following month, Malek told his employee to explain to Heritage "we decided to walk away based on the conversation we had two weeks ago.  This makes the playing field for market share more even and I assume since you were looking for one more customers

100

that you are good now.  Tell him you don't think the team is going to walk from anymore share at this point."

262.    Both Heritage and Dr. Reddy's were able to significantly raise prices across the board – nearly simultaneously – as a result of this agreement.  Heritage's price increases became effective in late April, 2013.  Dr. Reddy's' price increases became effective May 10, 2013.

263.    Over the next several years, the market for Meprobamate remained highly stable, but at supracompetitive levels, as a result of the agreement between Heritage and Dr. Reddy's. Prices and profit margins for the two companies remained very high, due to the lack of competition in the market.

264.    This agreement between Heritage and Dr. Reddy's was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

    4.    **Doxy DR**

        a.    *The Heritage/Mylan Agreement*

265.    Mylan served as the exclusive generic manufacturer in the market for Doxy DR until July 2013 when Heritage entered the market.  Mylan and Heritage then dominated the market for Doxy DR until Mayne entered the market in 2014.

266.    While Mylan held exclusivity over the Doxy DR generic market, prices remained high, as would be expected without competition. Because Mylan was the only manufacturer of Doxy DR in the generic market at that time, pricing for the drug was still very profitable. By 2013, Heritage considered entering the Doxy DR market.  Aware that the entrance of a second manufacturer typically drives down prices, Heritage contacted Mylan before entering the market

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

for Doxy DR to coordinate pricing and market share in alignment with their "fair share"

agreement to prevent price from eroding when Heritage entered.

267.    In April 2013, Glazer and Malek traveled to India to meet with two executives of

Heritage's parent company, Emcure.  Glazer and Malek met with Satish Mehta, the CEO of

Emcure, and Vikas Thapar, the President of Emcure.  The purpose of their trip was to discuss

Heritage's plans to enter the Doxy DR market and to coordinate how Heritage and Mylan could

minimize competition.  It was decided that Mehta would reach out first to a high-level

counterpart at Mylan, Rajiv Malik ("Malik"), in order to facilitate subsequent communications

between Glazer and Malek and their Mylan counterparts.

268.    In early May, upon return to the United States, Heritage employees at many levels

began to reach out to their counterparts at Mylan to discuss Doxy DR pricing and market

allocation.

269.    For instance, On May 3, 2013, Malek asked O'Mara (Heritage) to set up a call

between Malek and his counterpart, the Vice President of Sales at Mylan.  The next day, Malek

learned that the Vice President of Sales had little to do with the National Accounts and O'Mara

instead provided Malek with contact information for James Nesta, a Vice President and

Executive Director at Mylan.  Malek immediately connected with Nesta through LinkedIn.

Malek and Nesta communicated by phone on multiple occasions and continued to communicate

about various drugs, including Doxy DR.

270.    Additionally, on May 7, 2013, Glazer e-mailed Malik, copying both Mehta and

Thapar:  "Rajiv [Malik]:  Would like to schedule a time for a call to catch up and discuss some

recent Heritage news.  Please let me know when you are available and we'll pencil it in." Malik

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

responded with a phone number where he could be reached in England and the two spoke the next day.

271.    During their May 8, 2013 phone call, Glazer and Malik reached an agreement to refrain from competing in the Doxy DR market.  Glazer told Malik that Heritage intended to pursue two of Mylan's large Doxy DR customers (wholesaler McKesson and retail pharmacy CVS), who collectively comprised 30% of the market.  Glazer confirmed they would not price aggressively (lower than Mylan) and Malik responded that Mylan would "play fair," agreeing to give up the two accounts to Heritage.

272.    Over the course of several discussions, Malik reached an agreement with Glazer whereby Mylan would give up its accounts with McKesson and CVS based on the understanding that Heritage would coordinate with Mylan to keep prices of Doxy DR elevated.  Malik made clear that Mylan entered this agreement willingly because Heritage had abided by its "fair share" agreements with Mylan in the past on other drugs by allowing Mylan to enter the market without competition.  The competitors understood that this agreement would allow Heritage to gain market share without eroding the lucrative Doxy DR pricing in the market at that time.  Malik told Glazer he would inform others at Mylan about their agreement.  Similarly, Glazer kept Malek informed on his conversations with Mylan.

273.    In the months that followed, Mylan surrendered the McKesson and CVS accounts to Heritage.

(i)      *Wholesaler A*

274.    In June 2013, Malek met with a senior executive from "Wholesaler A" (believed to be McKesson) at an HDMA Conference in Orlando to discuss potential product opportunities, including Doxy DR.  Very shortly thereafter, Heritage submitted a detailed product proposal to

Wholesaler A and Malek continued to reiterate to them Heritage's strong interest in entering a supply agreement for Doxy DR over the following days.

275.     During that same period, Heritage and Mylan executives remained in touch and continued to discuss their market allocation scheme during this time.  On June 11, Michael Aigner, a National Account Manager at Mylan, called O'Mara and spoke for nearly ten minutes. O'Mara then immediately called Malek to report his conversation, initially leaving a voicemail, but connecting 15 minutes later for a 7-minute conversation.

276.     On June 18, 2013, a senior manager at Wholesaler A contacted Lance Wyatt, a National Account Manager at Mylan, to inform him of the unsolicited bid he received from a new entrant (Heritage) on Doxy DR and offer Mylan the opportunity to submit a bid to retain the business by June 21, 2013.  This is a customary practice in the industry referred to as "Right of First Refusal" ("ROFR") and is often included in the terms of supply contracts between manufacturers and their customers, allowing the incumbent manufacturer an opportunity to beat a competitor's price and retain the business.  Keeping its agreement with Heritage to cede a customer, Mylan failed to submit a counter bid to retain the Doxy DR business at the wholesaler.

277.     On June 27, 2013, with no counterbid from Mylan, Wholesaler A entered a distribution agreement with Heritage to serve as the wholesaler's primary supplier of Doxy DR.

278.     To date, Heritage maintains Wholesaler A's Doxy DR business without any competition from Mylan.

<em>(ii)      The Large Retail Pharmacy Account ("Pharmacy-1")</em>

279.     In July 2013, Mylan upheld its agreement with Heritage to cede Pharmacy-1 account for Doxy DR.

280.    On July 8, 2013, Heritage submitted a proposal to Pharmacy-1 to bid for Doxy DR business.  Pharmacy-1 rejected the bid the following morning because the pricing was too high.

281.    On July 11, 2013, Heritage e-mailed a revised bid to Pharmacy-1 and lowered its proposed pricing in a continued effort to obtain the Doxy DR business.

282.    At the same time that Heritage was attempting to secure an agreement with Pharmacy-1, both Heritage and its parent company Emcure continued to communicate with Mylan to keep its competitor updated on the company's efforts.  In particular, Heritage wanted to make sure that Mylan was still committed to the agreement and would cede the very important large retail pharmacy account to Heritage if challenged.  To further this effort, Mehta spoke with Malik on July 18, 2013 and then Thapar followed up by e-mailing Glazer, "Satish spoke to Rajiv.  Call me when free." Glazer spoke with Thapar and then e-mailed Malik asking if he had time for a call that day.  Malik responded that he could call Glazer later that evening.

283.    Malik called Glazer, left a voicemail, and Glazer returned the call fifteen minutes later.  They had a 4-minute conversation where Glazer conveyed Heritage's strategy and position about the Pharmacy-1 bid and Doxy DR in general.  Glazer told Malik that Mylan's reaction to Heritage's bid with Pharmacy-1 would "set the tone of whether this is a high priced item or more erosion."

284.    As set forth more fully below, Mylan's reaction was to cede the business to Heritage and avoid price erosion.  After speaking to Glazer, Malik immediately spoke to certain Mylan employees,.and Mylan ultimately walked away from Pharmacy-1.

285.    On August 6, 2013, Aigner (Mylan) called O'Mara (Heritage) and had a 13-minute conversation.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

286.     On August 15, 2013, an executive at Pharmacy-1 contacted Gary Tighe, a National Account Manager at Mylan, to inform him it had received an unsolicited bid for Doxy DR business and provide a short window for Mylan to submit a counter bid to retain the business.

287.     In keeping with its agreement with Heritage, Mylan submitted a counter bid, but only lowered its price by $10, knowing the price adjustment would not be enough to retain the business.  Pharmacy-1 contacted Tighe again later that day to notify him Mylan's price reduction would not be enough to maintain the business and offer Mylan a second opportunity to lower its price.  Tighe responded that he would let Pharmacy-1 know by morning if Mylan intended to submit a revised bid.

288.     Mylan declined to submit a revised bid to retain the Doxy DR business at Pharmacy-1.  As a result, in September 2013, Pharmacy-1 awarded the agreement to Heritage to serve as the retailer's primary supplier of Doxy DR.

289.     To date, Heritage still maintains the Doxy DR business at Pharmacy-1 without any competition from Mylan.

*(iii)     Other Customer Accounts*

290.     Even after Heritage obtained the Doxy DR business at the two former Mylan accounts, the competitors continued to coordinate their efforts to maintain artificially high prices for Doxy DR. In furtherance of that goal, on several occasions, Heritage walked away and/or refrained from competing with Mylan for the Doxy DR business at other customer accounts so as not to upset the market share understanding between the two companies.

291.     For example, on November 25, 2013, after Mylan sought to protect its business with another large account, Malek wanted to check in with Mylan to see if this was an account

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

they intended to keep as part of the market re-allocation agreement before soliciting the business. On November 25, 2013, Malek tasked O'Mara (Heritage) to check in with Mylan.  Malek e-mailed O'Mara, "can you reach out?" and O'Mara responded:  "I have tried with [Aigner (Mylan)] and nothing.  Will try again."

292.     Malek also e-mailed Glazer, suggesting Heritage expected an agreement to transfer one more account from Mylan to Heritage, "Mylan is trying to protect [the one large account at issue].  We should reach out to rajiv [sic.] [Rajiv Malik (Mylan)], we need one more account and we are done." Heritage clearly sought to gain Mylan's permission before taking any action that might disrupt their market share agreement.

293.     After conducting the evaluation, Heritage determined not to risk altering the Doxy DR market-share balance between the two companies and, thus, declined to further pursue the Doxy DR business at the large retailer.

294.     As a result of Heritage's unlawful agreement with Mylan, pricing for Doxy DR has been substantially higher than it would have been in a competitive market.

295.     This agreement between Heritage, Emcure and Mylan was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

b.     *The Heritage/Mayne Agreement*

296.     In February 2014, a new competitor, Mayne (formerly Midlothian Labs) entered the Doxy DR market.  Even before launching their product, Mayne approached Heritage to discuss its plan, recognizing that it would need to establish an agreement to coordinate a re-balancing of market share for each company.  On January 7, 2014, Gloria Peluso-Schmidt, a Director of National Accounts for Mayne, called Sather, a National Account Manager at

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Heritage, for 12 minutes and Mayne agreed not to compete with Heritage in the Doxy DR market.

297.    Mayne's initial strategy was to target Mylan customers because Mylan held approximately 60% of the Doxy DR market at the time.  This proved to be difficult, however, without an agreement yet in place with Mylan.

298.    For instance, Mayne bid on a large wholesaler currently held by Mylan.  The wholesaler asked Heritage to submit a competing bid as well, but Heritage declined, consistent with their arrangement not to compete against Mylan.  Mylan retained the business and Mayne's Executive Vice President of Generic Products, Chris Schneider, provided Peluso-Schmidt his assessment of the situation based on his experience in the industry:  "How I read this is Mylan has given up several large customers to Heritage and they are not giving any more.  We need to go after business at Heritage also." Peluso-Schmidt replied "Perhaps. . . ."

299.    Paluso-Schmidt maintained conversations with Sather about Doxy DR as she continued to pursue a customer base for Mayne.  They spoke by phone on March 13, 2014 and again for 17 minutes on March 17, 2014.

300.    After her conversation with Paluso-Schmidt on March 17th, Sather e-mailed Malek and others at Heritage to recount their latest conversation and the understanding they reached.  In an e-mail titled "Midlothian [Mayne] intel on Doxy DR," Sather stated:

> I just spoke with [G.S.] of Midlothian (Mayne Pharma) about Doxy DR. She is the "one-man" show for that company -- she has all accounts including GPOs.  She has not been able to get much share on the product yet, so she says.
>
> She did not bid OneStop, we have that customer.  She did not bid Optisource, we have that customer, and she was aware that Rick had no interest in switching.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

She has been shut down at WalMart (Walmart said they couldn't go back to Mylan to reduce price again after we bid); and she was shut down at Rite Aid, Cardinal and ABC -- stating Mylan does not seem to want to give up any share. I shared info that we chose not to bid at Cardinal when asked.

She will be bidding it on the HD Smith RFP. She will be targeting M&D now. She may go after NC Mutual but the usage is very small there. She already has some GPO business and they already have Publix and WinnDixie business. (Important for tracking reports). They are nowhere near a contract with WAG yet so she feels like that is not an option.

She is feeling pressure from the Mayne Pharma folks to get some share on this product asap. I let her know what accounts we had locked up -- and I got the impression she would not target those folks.

301.   Malek replied "[t]hanks for the notes below. How well do you know [Paluso-Schmidt]?" And Sather responded, "I know her pretty well from over the years in the industry."

302.   Two weeks later, however, Heritage learned Mayne made an unsolicited bid for Doxy DR to one of Heritage's large retail pharmacy accounts. Malek e-mailed Sather on March 31, 2014, saying Mayne "[t]ook a shot at our doxy dr [at the large pharmacy account]. Can you reach out?" Sather (Heritage) responded "Yes - I can."

303.   On April 1, 2014, Sather spoke with Paluso-Schmidt for 27 minutes, then immediately texted Malek: "[s]poke with [Paluso-Schmidt] of Midlothian. Said she had to go to [the large pharmacy customer]. Just got declined at Walgreens and went back a second time to cardinal and got declined again." Malek replied, insisting that Heritage "can't walk from [the large pharmacy customer]. Tell her to try Walmart."

304.   Paluso-Schmidt and Sather spoke again the next day for 11 minutes. Malek also e-mailed Glazer, relaying the news about Mayne and their status with the pharmacy: "[w]e are going to have to take doxy dr 30% lower at [the large pharmacy customer]. They don't pick up

the phone for less than 20% difference.  In this case, we spoke with Midlothian and they have struck out completely on getting share.  They have gone to wag [Walgreens] and cah [Cardinal Health] twice and mylan won't budge.  Please let me know your thoughts."

305.    Paluso-Schmidt and Sather spoke again on April 9, 2014 for three minutes. Sather then reported their conversation to Malek and O'Mara:  "Just got a call from [Paluso-Schmidt] at Midlothian and she said she has offers in to One Stop and Econdisc."

306.    On April 10, 2014, Paluso-Schmidt and Sather exchanged a series of text messages.  Sather told Paluso-Schmidt that Heritage would "protect" the accounts they don't currently hold because they are "strategically aligned" with both, implying their ongoing agreement with Mylan:

> (1:14 p.m.) <u>Sather</u>: Hi! It is [Sather]! Just getting back to you on our discussion yesterday.  I don't have either account but my boss said since we are strategically aligned with both they will probably not move.  We will protect.  Sorry – I know it is not the news you wanted to hear.

> (1:16 p.m.) <u>Paluso-Schmidt</u>:  Thanks.  Had he given up CVS we would not have gone after the other two.  We'll just keep going back as soon as we can.

> (1:18 p.m.) <u>Sather</u>:  I am bummed for you.  I am keeping my ears open to understand the landscape too.  I will let you know what I find out.  Best bets are the RFPs that are out now.

> (1:19 p.m.) <u>Paluso-Schmidt</u>:   Need volume.   Need one Large account.

307.    Mayne continued to pursue large customers for several months and Heritage walked away from one account in May 2014 when Mayne underbid Heritage's price.  Upon learning of Mayne's bid, Keith Fleming, Associate Director of Pricing and Contracts at Heritage, asked Malek, "[l]et me know what you want me to do on this.  Would like to keep, but at the same time, Midlothian will keep going after accounts."  Malek replied, "[w]e will walk."

308.    In November 2014, Mayne again placed bids with McKesson One Stop (a wholesaler) and Econdisc (a GPO that represents the Express Scripts Purchasers and several other businesses that purchase generics).  On November 20, 2014, Matthew Edelson, a Senior National Account Manager at Heritage, e-mailed Malek and others at Heritage, conveying that "Midlothian has taken another shot at our business on the Doxy 150mg at Econdisc and we have to respond to this in a timely manner."

309.    The next morning, Sather sent a text message to Paluso-Schmidt:  "Happy Friday!  Do you have a minute to talk about Econdisc?"  Paluso-Schmidt (Mayne) responded, "Yes.  Call me."  Sather called Paluso-Schmidt and the two spoke for 15 minutes.

310.    Sather asked Paluso-Schmidt what her goals were for Doxy DR and Paluso-Schmidt responded that Mayne was looking for market share and needed a "big customer like Econdisc."  She explained Mayne submitted an offer to McKesson 10 days earlier and Sather suggested that Heritage might be willing to walk from Econdisc if Mayne agreed to withdraw its offer from McKesson and not to price Doxy DR aggressively.

311.    Right after her conversation with Paluso-Schmidt, Sather e-mailed Malek with the subject, "spoke with [Paluso-Schmidt]" and saying "[c]an discuss any time."  Sather conveyed her conversation to Malek and exchanged several text messages and voicemails with Paluso-Schmidt over the course of the day.

312.    Later that afternoon, November 21, O'Mara e-mailed Malek and others at Heritage, saying "Midlothian coming after us @ McKesson.  Will discuss with you on Monday."  Malek immediately forwarded the e-mail to Sather, who responded, "[Paluso-Schmidt] and I played phone tag after I had spoken to you for the second time so we will definitely connect Monday."

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

313.    On November 24, 2014, Sather and Paluso-Schmidt connected and spoke for 6 minutes.  Sather then e-mailed Malek with an update, "Just spoke with her ... can you call me anytime?" After speaking with Malek, Sather formally offered Paluso-Schmidt an agreement via text message:  "If you retract McK[esson] - we will give up Econ[disc].  I can talk anytime."

314.    On November 25, 2014, Malek e-mailed Sather asking "[d]id you speak with [Paluso-Schmidt]?"  Sather responded "Yes -- told her exactly what we talked about.  She is on vacation this week but was going to try to rescind McKesson. . . ."  Malek ended the conversation by saying "[s]ounds like we know what we need to do."

315.    In the weeks following, Glazer confirmed through internal e-mail communications that Heritage was "walking away from one [customer] so pricing would stabilize" and that Heritage "wanted to give Midlothian [market] share so they stop eroding" the price for Doxy DR.

316.    Communications between Sather and Paluso-Schmidt continued throughout December, including text messages and an in-person meeting at the American Society of Health-System Pharmacists ("ASHP") conference on December 9, 2014.

317.    Econdisc put the Doxy DR business out to bid again in January 2015 and Heritage intentionally bid higher than Mayne, providing a "cover bid" and fulfilling Heritage's agreement to "walk away" from Econdisc.  In March 2015, a Heritage employee confirmed this, saying "[w]e basically walked from Doxy DR" at Econdisc.

318.    The agreements between Heritage, Mayne, and Mylan on Doxy DR business and pricing continued and all three companies held the understanding that they would refrain from competing on market share and eroding price.  In September 2015, a large nationwide pharmacy chain approached Heritage requesting a bid on Doxy DR. Sather confirmed internally that

Heritage had the capacity to bid, but Malek cautioned that "[w]e need to know why this is out to bid and find out who the incumbent is" before providing a response.

319.    Upon learning that Mayne served as the incumbent supplier, Sather contacted Paluso-Schmidt.  Paluso-Schmidt conveyed that Mayne had no supply issues and that the pharmacy chain was simply shopping for a better price.  Keeping with their agreement, Heritage refused to provide a bid.  Sather sent a follow-up text message to Paluso-Schmidt reiterating Heritage's intent to keep their agreement, "Confirming we are not bidding."  Paluso-Schmidt replied, "Thank you."

320.    This agreement between Heritage and Mayne was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

321.    In a competitive market, Heritage and Mayne's entry into the Doxy DR market should have spurred price competition across all customers and lowered market prices.  Instead, by allocating large accounts, Mylan and later Heritage were able to stabilize Doxy DR prices across the market at supracompetitive levels.

322.    These Defendants also maintained their communications at trade association events throughout this period, providing them ample opportunity to coordinate pricing and market share agreements in-person.  Key pricing executives from Heritage, Mayne, and Mylan all attended the Feb. 20-22, 2013 GPhA Annual Meeting in Orlando, Florida.  And key pricing executives from these three companies attended the October 28-30, 2013 GPhA Fall Technical Conference in Bethesda, Maryland.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

323.    NADAC data confirm that average market prices for Doxy DR increased dramatically between November 2012 and February of 2014 and remained artificially high thereafter.  Pricing for various dosages are depicted below.



5.    **Hydralazine HCL**

324.    Although not arising in the context of market entry, Heritage engaged in conduct similar to that alleged above in connection with Hydralazine HCL.

325.    In or around August 2014, Heritage agreed with another generic manufacturer that is not a Defendant in this Complaint, Strides, to allocate customers for Hydralazine HCL pursuant to the larger fair share agreement alleged throughout this Complaint.  Specifically, rather than compete on price, Heritage conceded business to non-Defendant Strides after Strides entered the Hydralazine market.

B.    **Agreements to Fix Prices**

326.    In addition to reaching agreements with competitors to allocate markets in connection with entry of a new competitor, Heritage and the other Defendants routinely sought and obtained agreements with competitors to fix and raise prices.

327.    This was often done by "socializing" a competitor to a price increase.  This involved a generic manufacturer such as Heritage reaching out to competitors to first raise the possibility of a price increase, and then obtaining an agreement to join the price increase or that the competitor would not take advantage of the proposed price increase by bidding to take the initiating manufacturer's customers.  Such an agreement would allow each competitor to maintain its market share and avoid competition despite the price increase.

328.    Often, a generic manufacturer such as Heritage would identify a large group of drugs for which it would like to increase prices, and then seek to socialize its competitors to obtain their agreement as described above for as many of these drugs as possible.  Heritage engaged in such collusive multi-drug price increases, as set forth immediately below.  Teva also engaged in such collusive multi-drug price increases, as set forth in Sections IX through XI below.

### 1.    Doxycycline Monohydrate (2013)

329.    In February 2013, Heritage learned from a customer that demand for some Doxycycline products was increasing and wanted to use this as a pretext to raise the prices of Doxy Mono. Heritage reached out to its competitors in the Doxy Mono market – Lannett, Mylan, and Par – to discuss and form agreements on price increases and prevent loss of market share.

330.    On March 7, 2013, Sather spoke to Tracy Sullivan, the Director of National Accounts at Lannett, for fourteen minutes.

331.    On March 13, 2013, Sather e-mailed Sullivan, saying "Hi! I just had a question for you on Doxycycline Monohydrate.  Would you have a chance to chat today? Or tomorrow? Let me know a convenient time for you. . ."  Later that day, they spoke for five minutes and discussed Heritage's intent to increase Doxy Mono prices.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

332.    On March 17, 2013, Malek e-mailed himself a spreadsheet of various items for him to follow-up on, including "Price Increases:  Take Doxy Mono up more than 3x asap."  On March 21, 2013, Malek e-mailed Glazer that he intended to increase the price for Doxy Mono by as much as four times the current price and asked for Glazer's thoughts.

333.    On March 25, 2013, Malek e-mailed his sales team, indicating that Heritage would be "taking a price increase in the market this week" for Doxy Mono and another drug. Heritage continued to contact its Doxy Mono competitors throughout 2013.  Sather spoke, texted, and met in person with several different Lannett employees during this time.

334.    On March 25, 2013, Sullivan e-mailed her boss relaying news of the price increase Heritage intended to institute.  The e-mail was titled "Recap" and in it she claimed to be "[w]orking on a WAC & SWP review" for certain drugs, including Doxy Mono, but heard that "there will be a price increase on Doxycycline from Heritage soon.  We are waiting to find out when and why." Sullivan and Sather continued to communicate through numerous phone calls, text messages, and in-person meetings over the next several months.

335.    On April 25, 2013, Sather called Sullivan and left a message.  When Sullivan returned the call the next day, they spoke for approximately eight minutes.

336.    In April 2013, as outlined above, Malek and Glazer traveled to India to meet with Mehta and Thapar of Emcure, where they discussed how Heritage could implement price increases without instigating competition, particularly in the Doxy DR market.  Afterward, Mehta contacted Malik of Mylan, a competitor in both the Doxy DR and Doxy Mono markets, to facilitate communications between Mylan and Heritage counterparts.

337.    Continued communications between Doxy Mono competitors often overlapped with trade association meetings they attended together.  For example, on May 13, 2013, Sullivan

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

and Sather spoke for approximately six minutes and the next day, they attended a conference together where they discussed Doxy Mono.

338.    On May 14, 2013, Sather and Sullivan exchanged text messages to coordinate time to speak at the conference, which confirmed plans for a "market wide increase," seemingly in Doxy Mono:

> Sather:  Meeting in parking lot at Cardinal at 5:45 to carpool over. Can meet you at Cardinal then or at the bar? Should be to bar a little after 6.

> Sullivan:  I have a conference call in a half hour about a market wide increase.  I might have to meet you at the bar.

> Sather:  Ok sounds good – see u there

> Sather:  Is it doxy mono?

> Sullivan:  Headed over now.

339.    Subsequently, on June 4, 2013, Sather reached out to Grace Wilks, Director of National Accounts at Lannett by phone and text message.  On June 5, 2013, Sather, Wilks, and Sullivan attended the the HDMA June 2-5 Business and Leadership Conference in Orlando, Florida, during which Sather and Sullivan exchanged numerous calls and text messages.  Key executives for generic sales and pricing from Mylan and Par also attended the same conference.

340.    Heritage, Lannett, Mylan, and Par agreed to implement their price increases during the summer of 2013 and communicated frequently throughout this period, including the days surrounding Lannett's June 12 Doxy Mono price increase.

341.    During this same time period, the four competitors selling Doxy Mono were all communicating frequently.  For example, the day before Lannett raised its price on June 11, 2013, O'Mara (Heritage) spoke to Aigner (Mylan) for nearly ten minutes.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

342.    Sullivan also communicated regularly with Karen O'Connor, Vice President of National Accounts at Par during this time.  They were friends and saw each other frequently at trade shows and customer conferences, discussing anticompetitive information.

343.    O'Connor communicated frequently with Aigner in June and July of 2013, including several phone calls on June 7, 2013 and June 13, 2013.

344.    O'Connor also communicated frequently with Wilks, including through nine text messages exchanged on June 11 and 12, 2013.

345.    Lannett increased its price for Doxy Mono on June 12, 2013.  One customer contacted Lannett in July of 2013 to request a lower price for Doxy Mono and a Lannett National Account Manager responded, "We just took a price increase on this item effective 6/12/13.  This is our standard pricing across the board going forward.  Any pricing you see out there right now will not be that low for long."

346.    Heritage maintained communications with Lannett and other competitors.  Due to concerns about supply issues, Heritage was slower to raise its prices.  In October 2013, Sather informed a customer that "[w]e are expecting continued supply issues with" Doxy Mono and that "supply will be tight through Oct and Nov."  In a competitive environment, other Doxy Mono competitors would have viewed Heritage's supply problems as opportunities to gain market share.  However, Defendants' "fair share" agreement mitigated any customer losses for Heritage.  To ensure their market share stability, Heritage kept in frequent communication with their competitors, reaffirming Heritage's commitment to their agreement.  For instance, Sather met in person with Sullivan and O'Connor during a conference in Arizona on August 1 and 2, 2013.

347.    A flurry of communications between the four competitors followed throughout August 2013.  As Heritage planned its Doxy Mono price increase, Malek asked Sather to obtain

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

specifics regarding Lannett's price increases.  Accordingly, Sather and Sullivan, while both attending the NACDS 2013 Total Store Expo held on August 10-13, exchanged text messages on August 12, 2013:

> Sather:  From our conversation, [i]ncreasing WAC too?
>
> Sullivan:  Yes
>
> Sather:  When are you guys changing WAC or have u already?
>
> Sullivan:  Are you free at 4:30?
>
> Sather:  Yes—but still need to hang around for 5pm mtg
>
> Sullivan:  OK I'll swing by

348.    Aigner and O'Connor also attended this conference.

349.    On August 13, while still together at the conference, Sather texted Sullivan, saying "Let's connect sometime today—need a little more specifics on the $ we discussed." Sather also exchanged several text messages and phone calls with Lauren Carotenuto, National Accounts Representative for Lannett and another conference attendee.  O'Connor, who also attended the conference, received a text message from Wilks the same day.

350.    Later that evening, the Senior Vice President of Generic Sales at Par (likely Jon Holden, who attended the conference) sent an e-mail to Par's Vice President of Marketing and Business Analytics (likely Michael Altamuro, who also attended the conference), reading:  "I hear that Lannett is taking a price increase on doxy mono and Heritage will follow." The e-mail was forwarded internally at Par with the instruction:  "FYI. . .we will follow.  . . . No new opps until we see where pricing ends up."

351.    On August 20, 2013, Sather e-mailed Malek, confirming that Lannett "tripled WACs and did/will do similar to contract prices."

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

352.    Mylan and Par announced their price increases for Doxy Mono in the summer of 2013.

353.    By the spring of 2014, Heritage also increased their prices.  On January 23, 2014, Sather informed a large supermarket chain customer that "I also wanted to let you [know] that we are looking to take a price increase on all the Doxy Monohydrate skus some time in 2014." In March 2014, Heritage increased its Doxy Mono prices with at least one customer and on April 22, 2014, Malek held a teleconference with Heritage's sales team to discuss strategy for increasing prices on eighteen drugs, including Doxy Mono, which was slated for a "big price increase."

354.    Sather was responsible, among others, for communicating with Lannett about Doxy Mono. Right after the Heritage conference call on April 22, she contacted three different competitors and reached pricing agreements covering Doxy Mono and four other drugs (Glyburide-Metformin, Verapamil, Nystatin, and Paromomycin).  One of those communications included a 29-minute phone call with Sullivan about pricing for Doxy Mono.

355.    O'Mara was primarily responsible for communicating with Mylan and contacted Aigner the next day (April 23) to reach an agreement on price increases for Doxy Mono (as well as Glipizide-Metformin and Verapamil).  Immediately after his conversation, O'Mara e-mailed Malek and Sather, with the subject line "Mylan:"   "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

356.    On May 8, 2014, Malek sent an e-mail to O'Mara asking, "Did you ever to [sic] with [Michael Burton] at Par?"  Par was a competitor with Heritage for two of the target drugs

on the list, Doxy Mono and Methimazole.  O'Mara and Burton spoke on the phone on June 2, 2014.

357.    Malek also e-mailed the entire Heritage sales team on May 8, asking for confirmation on everyone's progress on speaking with their competitor counterparts about price increases.  Sather, responsible for communicating with Lannett responded:  "Jason:  I made contact with all my take aways -- with positive results.  I can resend those notes or talk with you on any details."

358.    Sather then attended the MMCAP Conference in Bloomington, Minnesota during May 12-15, 2014, where she met in person with numerous competitors to discuss price increases, including with Sullivan regarding Doxy Mono.  Sather reported back to Malek via e-mail on her success reaching pricing agreements, including with Lannett:  "Hi Jason:  At the MMCAP meeting yesterday, spoke with some other industry reps and found similar like minding on the pricing strategies we discussed.  Overall, spoke with . . .  Lannett. . . " Par and Mylan executives also attended this conference, including O'Connor.

359.    Sather continued her outreach to other Doxy Mono competitors through joint attendance at conferences.  On June 3, 2014, while attending the HDMA 2014 Business and Leadership Conference in Arizona, Sather met O'Connor and Sullivan for dinner and drinks along with other competitors.  Their continued communications during the price hike implementations provided opportunities to re-affirm their collusive agreements and coordinate pricing.

360.    By way of example, Heritage's IMS NSP price for 50mg Doxy Mono tablets more than tripled between February and July 2013.  Lannett's IMS NSP price for 75mg tablets steadily increased between February and July 2013, more than doubling during that period.

Mylan also increased IMS NSP prices for 75mg tablets in the summer of 2013, as its prices nearly doubled from a low in June to a high in November.  Lannett's IMS NSP price for 100mg Doxy Mono tablets approximately doubled between January and August of 2013.  Heritage, Mylan, and Par IMS NSP prices for 150mg Doxy Mono tablets all increased significantly between the spring and fall of 2013.

361.    Between the summer of 2013 and spring of 2014, Heritage, Lannett, Mylan, and Par had ample opportunity to coordinate their price increases and market share agreements in person.  Key pricing executives from at least Heritage, Mylan, and Par attended the February 20-22, 2013 GPhA Annual Meeting in Orlando, Florida.  Key pricing executives from at least Heritage, Lannett, Mylan, and Par attended the June 2-5, 2013 HDMA Business & Leadership Conference in Orlando, Florida; the June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland; the October 28-30, 2013 GPhA Fall Technical Conference in Bethesda, Maryland; the February 23-26, 2014 ECRM Retail Pharmacy EPPS in Amelia Island, Florida; the May 12-15, 2014 MMCAP National Member Conference in Bloomington, Minnesota; the June 1-4, 2014 HDMA Business & Leadership Conference in Phoenix, Arizona; and the June 3-4, 2014 GPhA CMC Workshop in Bethesda, Maryland.

362.    This agreement between Heritage, Lannett, Par and Mylan was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### 2.      Heritage 2014 Price Increases

363.    In early 2014, Malek held a meeting with Heritage pricing executives, Keith Fleming, Associate Director of Pricing and Contracts, and Daniel Lukasiewicz, Heritage's Senior

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Manager, Marketing Operations, to ask them to begin analyzing the impact of numerous planned price increases.

364.    On April 15, 2014, Heritage's Jason Malek called Nisha Patel, Teva's Director of Strategic Customer Marketing, to discuss price increases on Acetazolamide ER, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, Theophylline, and others. On their 17-minute conversation, Patel agreed that if Heritage increased the prices for those drugs, Teva would either follow or not challenge Heritage's price increases by underbidding.

365.    Because Teva was already planning a price increase on Nystatin and Theophylline, Malek and Patel agreed Teva would take the lead on those increases.  In subsequent months, Malek and Patel spoke several more times on Heritage's price increases and timing.

366.    On April 22, 2014, Heritage held a "Price Increase Discussion" teleconference in which Malek identified 18 drugs that Heritage would target for increase.  Prior to the call, Malek circulated to his sales team a spreadsheet ("the Heritage list") which listed each drug, the competitors, and their respective market share.  The Heritage list included Acetazolamide ER, Doxy Mono (which was slated for a "big price increase," as described above), Fosinopril HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline ER, and Verapamil HCl, among others. Malek instructed members of the team to immediately reach out to contacts at each competitor for the drugs on the list and attempt to reach agreement on price increases.  Different Heritage employees were identified as being primarily responsible for communication with different competitors.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

367.     The Heritage sales team promptly began to contact their competitors.  For example, Sather communicated with three counterparts at different competitors, reaching agreements with all of them to increase prices.  First, she spoke with Knoblauch (Sun/Caraco) for 45 minutes and agreed to increase prices for Nystatin and Paromomycin.  Then, she spoke to Michael Dorsey, a National Account Manager at Actavis for nine minutes, which led to an agreement to increase prices for Verapamil and Glipizide Metformin HCl.  Finally, she spoke to Sullivan (Lannett) for 29 minutes and they agreed to raise the price of Doxy Mono.

368.     Heritage's O'Mara also reached an agreement on April 23 with his Mylan counterpart, Michael Aigner, Director of National Accounts, to increase the prices of Doxy Mono, Verapamil and Glipizide-Metformin.  O'Mara summarized in an e-mail to Malek and Sather titled "Mylan":  "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone.  They are looking at price increases as well on a number of products."

369.     A few days later, Malek sent an e-mail to Heritage employee D.L. titled "bindo" referring to Aurobindo stating:  "Let me know when you speak with [Paul McMahon, Senior Director of Commercial Operations at Aurobindo.]"  On the Heritage list, D.L. was charged with responsibility for communication on Fosinopril HCTZ, of which Aurobindo was a competitor.  Aurobindo was also a competitor with Heritage on Glyburide and Glyburide-Metformin.  D.L. exchanged numerous voicemails with McMahon on April 28 and 29, 2014.

370.     In addition to Teva, Malek took responsibility for reaching out to Ascend – who, as detailed above, was a new entrant in the market for Nimodipine – and offering Ascend a one-third (1/3) share of the market in exchange for not competing on price.  Following the market-wide "fair share" agreement, as a new entrant into the Nimodipine market, Ascend agreed to

enter at a high price to avoid price erosion as set forth above.  In exchange, Heritage agreed to

walk away from certain accounts Ascend targeted to help increase Ascend's market share.

371.    On May 8, 2014, Malek sent an e-mail to the Heritage sales team stating:

> Two weeks back we had a teleconference regarding 13 [sic]
> products where the pricing dynamics may change.
> We each had takeaways, can everyone confirm or not who they
> have/not spoken with since our call?
> Need to move forward with the plan asap.

372.    Heritage's Matt Edelson, Senior Director of Sales, responded immediately "Spoke

with everyone and waiting in [sic] feedback on Mepro[bamate]."  Malek tasked Edelson with

communication with Dr. Reddy's on Meprobamate.  He exchanged six text messages with Jake

Austin, Director of National Accounts at Dr. Reddy's, on April 24, 2014, and then spoke with

Austin on May 6, 2014.

373.    Sather responded:  "Jason, I made contact with all my take aways – with positive

results.  I can resend those notes or talk with you on any details." Sather had been tasked with

communicating with Lannett on Doxy Mono, Actavis on Glyburide-Metformin and Verapamil,

and Sun on Nystatin and Paromomycin, among others.

374.    Also on May 8, 2014, D.L. and McMahon held a 16-minute phone call and then

an 18-minute phone call on June 25, 2014.  They spoke again for 3.5 minutes on July 7, 2014.

375.    On May 9, 2014, Heritage held another teleconference to discuss the price

increases for the 18 targeted drugs.  During this teleconference, the Heritage sales team shared

their results in seeking agreement from competitors to raise prices on the various drugs.

376.    On June 23, 2014, Heritage employees had a "Price Change Call" to discuss the

specific percentage amounts by which they would seek to increase the pricing of certain drugs,

including drugs for which they had already obtained agreement from all competitors (or potential

future competitors), and the strategies for achieving this goal. The drugs discussed on the call included Acetazolamide ER (75% increase); Paromomycin (100% increase); Glyburide (200% increase); Nimodipine (48% increase); Theophylline ER (150% increase); and Nystatin (95% increase). It was discussed on the call that those six increases alone would amount to an additional $16 million in profit per year for Heritage, assuming no loss in market share.

377. Malek continued to push Heritage employees to discuss the planned price increases with competitors, and he continued to do the same. Two days later, on June 25, 2014, Malek spoke with Patel for 14 minutes and informed her that Heritage would shortly be increasing prices for a number of drugs that Teva was a competitor for.

378. On June 26, 2014, Sather sent a text message to a large wholesaler customer stating:

> As of 7/1 [m]arket wide we are increasing prices on Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTS, Glip/Met, Glyburide and Theophylline ER. You will see only the Paro and Nimo increases – you have those letters.

379. Sather quickly followed up: "Here are the approximate/average $ increases on the other items: Acetazolamide 75% increase, Fosi/HCTS 200%, Glip/Met 100%, Glyburide 200%, Theo ER...150%."

380. On July 1, 2014, Malek e-mailed Heritages' sales team:

> Team:
>
> Looks like you are making good traction with our July 1 price increase.
>
> Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.
>
> Please send each day until further notice or until all or [sic] accounted for.
>
> Any questions please call me directly.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

381.     In the following weeks Heritage employees continued to reach out to their competitors to obtain additional agreements to raise prices.  Ultimately, Heritage was able to increase prices on at least nine (9) of the drugs: Acetazolamide ER; Fosi/HCTZ; Glipizide-Metfonnin; Glyburide; Leflunomide; Nimodipine; Nystatin; and Paromomycin.

> a.     *Acetazolamide ER capsules*

382.     As of April 2014, Heritage and Teva controlled 78% of the market for Acetazolamide ER capsules.  The only other competitor was Zydus.

383.     As part of the market-wide conspiracy to increase generic drug prices, Heritage began communicating with high-level executives at Teva, a competitor on seven of the Heritage list drugs.  Malek was responsible for obtaining Teva's agreement to the price increases.  On April 15, 2014, Malek spoke with Nisha Patel, Teva's Director of Strategic Customer Marketing for more than 17 minutes to discuss increasing the price of Acetazolamide ER capsules and other drugs.  Patel had already secured Heritage's agreement to support Teva's price increases in Nystatin and Theophylline.  During the April 15 call, Patel agreed that if Heritage raised prices for Acetazolamide ER capsules, Teva would follow suit or at minimum refrain from competing for Heritage's accounts.  Malek and Patel's conversations would continue through the spring and summer to coordinate and confirm their price increases.

384.     After speaking with Malek on April 15, Teva executives reached out to Zydus executives to coordinate the price increases.  Between April 16 and 17, 2014, Patel and Kevin Green, the Senior Director of National Accounts at Zydus, spoke twice regarding Acetazolamide ER prices, first for approximately 20 minutes, then for 12.  They communicated frequently over the next several months, along with other Teva and Zydus executives, as outlined below.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

385.     As set forth above, on April 22, 2014, Malek held a telephone conference call with the Heritage sales team to dictate a pricing strategy that targeted 18 drugs for price increases, including Acetazolamide ER.  In order to implement the price increases without losing customers, Heritage coordinated with competitors to form agreements that prevented competition.

386.     For Heritage, Malek was also responsible for communicating with Zydus.  To coordinate with Zydus, Malek contacted Kristy Ronco, Zydus's Vice President of Sales, on April 24, 2014 through LinkedIn.  Malek wrote:  "Hi Kristy, I hope this email finds you doing well.  I wanted to see if you have a few minutes to chat.  Let me know when you are free."  Ronco responded that day "Hi Jason – I'm out in Arizona.  I can give you a call tomorrow afternoon or call me anytime."

387.     Heritage came to agreements with both Teva and Zydus on price increases and market share.  In an internal Heritage e-mail, Malek confirmed the Acetazolamide ER price-fixing agreements and reiterated that Heritage needed to refrain from bidding on contracts held by competitors.  Malek previously asked Anne Sather to refrain from responding to a large GPO customer that requested a price quote on Acetazolamide ER.  In e-mails on May 6 and 7, 2014, Malek told Sather that he formed agreements to raise the price of Acetazolamide ER and not to compete on customers.  Malek said, "[w]e have buy in from all to go up..." and Heritage agreed not to reduce its price in response to the request from the GPO customer.  As Malek stated:  "We are going to pass [on reducing the price] and most likely are taking an increase within the next week."

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

388.     Teva and Zydus also remained in close contact during this time as well.  On May 14, 2014, Jessica Peters, an Associate Director of National Accounts at Teva, exchanged numerous text messages with Ronco.

389.     Defendants had many opportunities to speak in person about their agreements. On May 12-15, 2014, Sather attended the MMCAP National Member Conference in Bloomington, Minnesota.  She used this opportunity to speak in person with a number of different competitors on pricing agreements.  Executives from Teva also attended, such as Nick Gerebi, National Account Manager.  On June 1-4, 2014, Heritage's Sather, Glazer, and Malek all attended the HDMA Business and Leadership Conference at the JW Marriott Desert Ridge in Phoenix, Arizona, along with Teva's Patel and Gerebi and Zydus' Green, among others.  At this conference, Sather met in person for dinner and drinks with O'Connor and Sullivan, as well as Christopher Bihari, Director of National Accounts at Sandoz.  Defendants used these meetings as an opportunity to confirm agreements on pricing and market share.

390.     During these months, Heritage avoided soliciting or bidding on Acetazolamide ER customers supplied by Zydus in order to maintain the artificial equilibrium their conspiracy created.

391.     As set forth above, on June 23, 2014, Heritage held a "Price Change Call" to discuss specific price increases on certain drugs and related strategies, including for Acetazolamide ER, which was targeted for a 75% increase.  According to the discussion, the increases on the six drugs discussed would amount to an additional $16 million in profit per year for Heritage and assumed no loss in market share.

392.     On June 25, 2014, Malek spoke with Patel for approximately 14 minutes, confirming that Heritage would soon be increasing prices for a number of drugs sold by Teva.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

393.    On June 26, 2014, Heritage began sending out price increase notices to customers for nine different drugs, including Acetazolamide ER.  Sather sent a text message to a large wholesaler customer:

> As of 7/1, [m]arket wide we are increasing prices on:  Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTZ, Glip/Met, Glyburide and Theophylline ER.   You will see only the Paro and Nimo increases—you have those letters."  She followed up with another text moments later, "Here are the approximate/average $ increases on the other items:  Acetazolamide 75% increase, Fosi/HCTZ 200%, Glip/Met 100%, Glyburide 200%, Theo ER. . . 150%.

394.    On July 1, 2014, Malek e-mailed the Heritage sales team with the subject "update - price increase" that read:

> Team:
>
> Looks like you are making good traction with our July 1 price increase.
>
> Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.
>
> Please send each day until further notice or until all or [sic] accounted for.
>
> Any questions please call me directly.

395.    By July 9, 2014, Heritage was able to raise Acetazolamide ER prices to at least 17 customers nationwide.  Heritage, Teva, and Zydus collectively implemented a successful 75% increase on prices for Acetazolamide ER.

396.    This agreement between Heritage, Teva and Zydus was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

b.      *Fosinopril HCTZ*

397.      At all relevant times, Heritage, Aurobindo, Citron, Sandoz, and Glenmark dominated the market for Fosinopril HCTZ.  By April 2014, Heritage had a 47% market share for this drug.

398.      On May 2, 2014, Edelson (Heritage) contacted Glenmark's Vice President of Sales, Jim Brown via LinkedIn.  Heritage's Lukasiewicz spoke with McMahon (Aurobindo) on May 8, 2014 via phone.  That same day, McMahon called Glenmark's Executive Vice President of Generics, James Grauso, and they spoke on the phone.  On May 9, 2014, Aurobindo's Tim Gustafson spoke with Glenmark's Director of Sales and Marketing, Jeff Johnson.  All of these calls were regarding price increases for Fosinopril HCTZ.

399.      That same day, Heritage held another internal call regarding price increases where Fosinopril HCTZ was on the agenda.  Within one month, Anne Sather of Heritage spoke to Aurobindo and Sandoz representatives about the Heritage "price increase strategies" for Fosinopril HCTZ and other generics during an MMCAP conference.

400.      After in-person meetings with Aurobindo's Gustafson and Sandoz's National Accounts Executive, Christopher Bihari, on May 14, Sather confirmed to Malek that the three were of "similar like minding on the pricing strategies we discussed."  The next day, representatives of Aurobindo and Sandoz spoke by phone and texted numerous times.

401.      On June 3, 2014, Sather texted Bihari and invited him to meet with a group of competitors at the Sandbar Restaurant while at an HDMA conference in Phoenix.  This initiated a series of communications during the summer of 2014 that included three calls between Gustafson and Bihari and five calls, and multiple texts, between Gustafson and Johnson.

Gustafson would have one final call with Johnson on August 26, 2014, before going radio silent until April 8, 2015.

402.    Heritage's Lukasiewicz and Aurobindo's McMahon spoke on June 25, 2014 via phone, and again on July 7, 2014.

403.    On June 25, 2014, Sather texted Citron's Kaitlin Alexander to find out if Citron was entering the market for Glyburide, but found out that Citron was actually entering the market for both Glyburide and Fosinopril HCTZ.  Sather informed Alexander of the pricing scheme. Then, on July 1, Citron's Executive Vice President of Sales & Marketing, Karen Strelau called Lukasiewicz, informing him that she had been "looped" in on the pricing plan and that Heritage employees should not contact Citron employees via e-mail.  Strelau also told Lukasiewicz that Sather should communicate through Citron's Vice President of Sales, Laura Short, if she had sensitive information about Fosinopril HCTZ or other price increases.  The following day, Short and Sather spoke for over 20 minutes.  Their conversations continued through July and August 2014.

404.    On June 26, 2014, Heritage began sending out Price Increase Notices to its Fosinopril HCTZ customers.  On June 27, McMahon and Grauso spoke twice.

405.    By July 9, 2014, Heritage successfully raised prices on 18 different customers for Fosinopril HCTZ.  That same day, Citron confirmed internally that Heritage had increased its WAC prices for Fosi-HCTZ and two other drugs, and that it (Citron) was trying to match those price increases.  On July 14, 2014, Strelau and Grauso spoke.  The next day, Citron increased its pricing for Fosi-HCTZ to be in line with the price increases adopted by Heritage.

406.    Sandoz also increased its pricing for Fosinopril HCTZ.  By early January 2015, it was charging twice as much for Fosinopril HCTZ than it had been one year earlier.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

407.     This agreement between Heritage, Aurobindo, Citron, Glenmark and Sandoz was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

c.     *Glipizide-Metformin*

408.     At all relevant times, Heritage, Mylan, and Teva dominated the market for Glipizide-Metformin.

409.     Malek was responsible for communicating with Teva about Glipizide-Metformin price increases.  On April 15, 2014, Malek discussed with his Teva counterpart their intention and agreement to raise the price of Glipizide-Metformin and other drugs.

410.     O'Mara (Heritage) spoke to Mylan's Michael Aigner on April 23, 2014 and reached an agreement to raise prices for Glipizide-Metformin and two other drugs.

411.     To complete the conspiratorial triangle, Teva and Mylan were also in frequent contact with one another, including a May 9, 2014 phone call between a Vice President of Sales at Mylan and a National Accounts Director at Teva.  The two continued to stay in close contact throughout the rest of 2014.

412.     Heritage slated Glipizide-Metformin for a price increase on an internal May 9, 2014 call.  Heritage informed customers by the end of June of a 100% price increase on Glipizide-Metformin as of July 1, 2014.  Heritage began sending out Price Increase Notices to its customers for Glipizide-Metformin the same day.

413.     By July 9, 2014, Heritage increased the price nationwide to 27 different customers for Glipizide-Metformin.  Mylan did not challenge Heritage's price increases, while Teva actually increased its bids to potential customers to protect Heritage's increases.  By November 2014, K.S. of Heritage reported to Malek that most of Heritage's price increases "had stuck."

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

414.    This agreement between Heritage, Mylan and Teva was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

d.    *Glyburide*

415.    At all relevant times, Aurobindo, Heritage, and Teva dominated the Glyburide market.

416.    On April 15, 2014, Malek spoke with Patel and discussed Heritage's intention to raise prices on Glyburide.  Patel agreed that if Heritage raised the price, Teva would follow suit.

417.    Heritage also brought Aurobindo into the scheme.  Several different Heritage employees were also able to successfully communicate with their counterparts at Aurobindo and reach agreements to raise the price of Glyburide.  For example, on May 8, 2014, Lukasiewicz contacted McMahon (Aurobindo) by phone to discuss Glyburide price increases.

418.    On May 9, 2014, Heritage held an internal call on price increases, and included Glyburide on the list of drugs set for an increase.

419.    One week later, Heritage and Aurobindo representatives spoke to one another at the MMCAP conference in Minnesota.  The Heritage representative reported to Malek that the Aurobindo representative expressed "similar like minding on the pricing strategies we discussed."

420.    On June 23, 2014, Heritage employees held a "Price Change Call" where they discussed the specific percentage amounts by which they would seek to increase prices for certain drugs, and the strategies for doing so.  Among those included on the list was Glyburide, which was slated for a 200% increase.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

421.    In June 2014, Heritage learned of a potential new competitor in the Glyburide market.  Sather texted a Citron employee, Alexander, inquiring into whether Citron would be entering the Glyburide market.

> Sather:   "Work question:  is Citron launching Glyburide anytime soon?"
>
> Alexander:  "Yes we currently have the product in our warehouse."
>
> Sather:  "We are raising the price right now – just letting you know. Teva says they will follow."
>
> Sather:  "Aurobindo agrees too."
>
> Alexander:  "?"
>
> Alexander:  "You have micronaise brand equivalent."
>
> Alexander:  "And are you also raising your wacs?"
>
> Sather:  "Sorry – was on conference call.  Ours is Micronaise? Is yours Micro or Diabeta?"
>
> Alexander:  "Micro"
>
> Sather:  "I don't think we are changing WAC – verifying now"
>
> Alexander:  "Okay i talked to [K.S., Executive Vice President, Sales & Marketing at Citron] we are def in to raise pricing...are doing this immediately, i know she was mentioning teva can take a while to raise prices"
>
> Sather:  "Teva is slow but conversations have been good."
>
> Sather:  "No change to WAC for us"
>
> Sather:   "We are raising our customers 200% over current market price."
>
> Alexander:  "Okay ill make sure the appropriate people find out"
>
> Sather:   "Teva has 66% of mkt – great target for share!  By [sic] [t]hey should play fair.  Aurobindo and us each have about 18% share.  Good luck!"

> Alexander:  "Thanks! Is this something you will be doing like this week?"
>
> Sather:  "Letters going out this week!  A lot of customers have 30 days notices and price protection so real price will be felt in 30+ days"
>
> Alexander:  "Perfect makes sense...  Your not going anything with glyb/met pricing right?"
>
> Sather:  "Not yet – but is on a short list!"
>
> Sather:  "Glyburide and Fosi/HCTZ are increasing too – those are Aurobindo items too"
>
> Alexander:  "Okay yeah we have that too. . .  Thanks for the info!"

422.    Sather quickly reported to the Heritage sales team.  Then, on July 2, 2014, Strelau of Citron called Lukasiewicz confirming Citron's agreement to raise prices and informing him that she had been "looped" in on Heritage's plan.  On July 2, a different Citron representative spoke to Sather.  They continued to communicate throughout the summer of 2014.

423.    After reaching agreement with competitors Aurobindo, Citron and Teva to raise prices for Glyburide, Heritage began implementing the price increases.  Price Increase Notices were sent out to customers beginning on June 26, 2014.

424.    By July 9, Heritage increased the price for Glyburide on at least 17 customers. When Heritage customers, wary of the price increases, contacted Teva to supply alternative bids, Teva representatives instructed their teams "we will not be bidding.  Thanks."

425.    The unlawful agreement resulted in specific price increases to customers who sold Glyburide to customers nationwide.  For example, on July 9, 2014, Teva was contacted by a large national retail chain requesting a bid on both Glyburide and Nystatin, due to the Heritage price increases.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

426.    Teva also increased its WAC pricing on Glyburide by July 9, 2014.  Not even one week later, on July 15, 2014, Citron raised its WAC and AWP for Glyburide to meet Heritage's levels.

427.    After Heritage raised its price to one large wholesaler in July 2014, that wholesaler solicited bids from both Teva and Aurobindo in an effort to obtain lower pricing. Teva and Aurobindo both declined to provide bids when a Heritage customer, outraged with the price increases, requested bids from both companies.  Teva and Aurobindo acted at the direction of Heritage's Malek.

428.    By mid-July, Teva also added Glyburide to its list of potential customer price increase items for the third quarter of 2014 and began to evaluate its own price increases.

429.    As Citron entered the market in July 2014, it set a target of less than 10% market share.  During this time and over the next several months it remained in frequent contact with Heritage to discuss Glyburide pricing, bidding strategies, and how Citron might be able to acquire additional market share without eroding the price increases.

430.    This anticompetitive agreement to avoid competition and unlawfully increase prices for Glyburide continued until at least December 2015, and the effects continue to this day.

431.    This agreement between Heritage, Teva, Aurobindo and Citron was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

e.    *Glyburide-Metformin*

432.    At all relevant times, Actavis, Aurobindo, Heritage, and Teva dominated the Glyburide-Metformin market.  As of April 2014, Heritage had 5% market share and was eager to raise prices.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

433.    On April 15, 2014, Malek contacted Patel and discussed Heritage's price increase goals with respect to Glyburide-Metformin, as well as other drugs.  Patel agreed that if Heritage raised the price on Glyburide-Metformin, as well as the other drugs, Teva would follow with its own price increases or would not challenge Heritage's price increases by underbidding on Heritage's accounts.  Their communications continued over the next several months.

434.    Anne Sather of Heritage called Actavis' Director of National Accounts Michael Dorsey.  On an April 2014 telephone call, on information and belief, they reached an agreement to increase the price of Glyburide-Metformin and another drug, Verapamil.

435.    Shortly thereafter, Dorsey informed the sales and pricing team at Actavis of Heritage's intention to raise prices on these two drugs.  In an internal April 28 e-mail, an Actavis pricing manager stated, "[Dorsey] made mention of keeping an eye out for an increase on Glyburide/Met and Verapamil IR."

436.    On May 1, 2014, Actavis' Vice President of Marketing, Pricing and Contracts, Marc Falkin, who was a recipient of the e-mail described above, called a Teva counterpart.  Their communications continued over the next several months.

437.    On May 12, Falkin spoke twice with Aurobindo's CEO.  Falkin also exchanged 30 text messages with a Teva representative between May 19 and May 22, 2014.

438.    Around this same time, several Heritage employees communicated with their counterparts at Aurobindo about the Glyburide-Metformin price increase.

439.    For example, Lukasiewicz made contact with P.M. of Aurobindo by phone on May 8, 2014, and then in person on May 14.  He reported that he had "found similar like minding on the pricing strategies we discussed."

440.    On May 9, 2014, Heritage slated Glyburide-Metformin for a price increase on an internal call.  Through at least June 2014, Heritage still planned to increase prices for Glyburide-Metformin.

441.    On June 25, 2014, Sather exchanged text messages with a Citron representative about raising prices for Glyburide wherein the Citron representative agreed to raise prices for that drug, and then inquired "Your [sic] not doing anything with glyb/met pricing right?"  Sather responded, "Not yet- but is on a short list!"  Although Citron had approval to sell Glyburide-Metformin, it was not yet actively selling the drug and had zero market share throughout this time period.

442.    Heritage increased its WAC prices for Glyburide-Metformin in July 2014.

443.    In an August 20, 2014 text message exchange with a Sun representative, a Heritage representative admitted that Heritage had reached an agreement with Actavis to increase the prices of Glyburide-Metformin and Verapamil:

> Sun representative:  Have you heard anything about an Actavis price increase?
>
> Heritage representative:  I heard they were on board with it.  What item specifically?
>
> Sun representative:  I don't know.  I am just hearing about an increase but no details.  What product have you heard about
>
> Heritage representative: We were communicating on Glyburide/Metformin and Verapamil

444.    This agreement between Heritage, Teva, Aurobindo and Actavis was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

445.    In September 2014, Citron entered the market for Glyburide-Metformin.  Instead of undercutting the prices of Actavis, Aurobindo, Heritage, and Teva in an effort to gain market share, Citron announced list prices higher than its competitors.

f.    *Leflunomide*

446.    As of April 2014, Heritage was a dominant player in the market for Leflunomide, holding a 61% share.  Its main competitors at that time were Defendants Apotex and Teva.

447.    During Heritage's April 2014 "Price Increase Discussion" teleconference as described above, Malek identified Leflunomide as one of the eighteen drugs targeted for a price increase.  Malek was responsible for communicating with Teva about Heritage's price increase on this drug (among others).

448.    On April 15, 2014, Malek called Patel about the drugs on his list and Patel agreed that if Heritage increased its prices, Teva would follow or, at a minimum, would not compete with Heritage by underbidding.  In the following months, Malek and Patel spoke frequently and Malek kept her informed on the strategy for price increases.

449.    Heritage's Edelson was tasked with communicating with Apotex regarding the Leflunomide price increase.  On May 2, 2014, Edelson called Deborah Viera, a Sales Manager at Apotex, regarding Leflunomide prices and they spoke for more than 13 minutes.

450.    Also, in May 2014, Heritage learned Teva might be leaving the Leflunomide market.  On May 6, 2014, Sather e-mailed Malek that "the Teva discontinuation of Leflunomide has everyone in a fuss! Wow – can we take more share???"  Malek responded "we may give some to apotex and follow our strategy we discussed.  Will have clarity by tomorrow."

451.    That same day, Edelson had two more phone calls with Viera.  Edelson then reported to Malek that Apotex "has taken another shot at our Leflunomide....I am waiting for a

callback from the VP of Apotex before we do anything." Malek replied, "Let's walk from leflunomide," confirming the strategy he mentioned to Sather. Beth Hamilton, Vice President of Sales at Apotex, called Edelson. They connected four times in two days – first for nine minutes and shortly thereafter for eight minutes on May 6th; then twice on May 7th. Heritage and Apotex representatives thereafter held four phone calls within two days. Upon information and belief, Heritage and Apotex agreed to avoid competition and increase prices on Leflunomide during these calls.

452.    In response to Malek's May 8 e-mail to the Heritage sales team requesting confirmation on agreements reached with competitors, Edelson responded that he spoke "with everyone" and was only waiting for feedback regarding the drug Meprobamate.

453.    On Heritage's May 9 call on "Price Increases," Leflunomide remained on the list of target drugs.

454.    On May 27, 2014, Heritage learned that Apotex increased prices on Leflunomide and Malek confirmed with Edelson, "we are going to increase." By July 9, 2014, Heritage successfully increased prices on Leflunomide for at least fifteen different customers.

455.    On June 25, 2014, Malek told Patel that Heritage would be increasing prices for several drugs sold by Teva.

456.    By July 2014, Teva began to exit the market for Leflunomide. In conformity with its agreement, Teva never challenged Heritage's price increases. This decision countered Teva's self-interest, as it could have benefitted by undercutting the higher prices charged by Apotex and Heritage and thereby gained market share.

457.    NADAC data show that the average market price for Leflunomide rose dramatically between June 2015 and December 2015 and remained artificially high thereafter:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Leflunomide (10mg):  increased by 730%; and

Leflunomide (20mg):  increased by 617%.



458.    This agreement between Heritage, Teva and Apotex was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

g.    *Methimazole*

459.    Prior to Heritage's April 22, 2014 Price Increase discussion call, Malek circulated a spreadsheet listing all drugs targeted for a price increase, the competitors for each such drug, and their respective market shares.  Methimazole was among the drugs listed.

460.    Par was a competitor with Heritage on Methimazole.  Neal O'Mara was identified as the Heritage employee primarily responsible for communicating with Par on Methimazole and communicated with a counterpart at Par about a price increase for Methimazole.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

h.      *Nystatin*

461.     In 2013 and 2014, Heritage's two main competitors for Nystatin were Teva and Sun, through its division Mutual Pharmaceuticals ("Mutual").

462.     Various forms of Nystatin were already subject to market allocation and price fixing even before Heritage's 2014 price increase.

463.     During the relevant times, Actavis, Par, Perrigo, Sandoz, and Taro dominated the market for Nystatin cream; Actavis, Perrigo, and Sandoz dominated the market for Nystatin ointment; and Teva, Heritage, and Sun (through Mutual) dominated the market for Nystatin tablets.

(i)      *Nystatin Cream*

464.     Actavis, Par, Perrigo, Sandoz, and Taro all experienced fluctuations in their respective market shares for Nystatin cream until these market shares suddenly stabilized in 2013.  As detailed below, prices *increased* for all these Defendants, even as those with smaller market shares captured more of the market.  This runs counter to economic theory, which dictates that competitors must lower prices to gain market share.

465.     As late as 2009, Sandoz enjoyed approximately a 50% market share for Nystatin cream, Taro had 40%, Perrigo had approximately 7%, and Par and Actavis controlled the remainder.  Through 2009 and into 2010, Sandoz's market share began to decline.  By the summer of 2010, Sandoz was effectively out of the market.  By this time, Actavis and Par also were effectively out of the market.  Although Sandoz, Actavis and Par appear to have continued making *de minimis* sales, they each had a market share of less than 1% by the spring of 2011.  By May 2011, Taro had captured as much as 96% of the Nystatin cream market, leaving Perrigo approximately a 4% share.

466.     Beginning in June of 2011, Taro and Perrigo dramatically increased their prices for Nystatin cream largely in unison and Actavis, Par, and Sandoz joined these price increases as their market shares increased.

467.     In June of 2011, Taro initiated a large price increase of more than 600%.  Rather than compete on price to gain market share, Perrigo almost immediately followed Taro's increase and raised its own prices to nearly identical levels.  Perrigo ramped up production and managed slowly to gain some market share over the next two years, but—as contemplated by the overarching "fair share" agreement—market prices remained elevated and stable.

468.     In August, although it had only approximately 1% of the market, Par followed the Taro and Perrigo price increase in lockstep, also choosing to eschew price-competition.  Par also managed to grow its market share over the next couple of years, but it did so without eroding the elevated prices imposed by Taro and Perrigo, just as the "fair share" agreement intended.

469.     In November 2011, Actavis ramped up production of Nystatin cream and re-joined the market.  It, too, immediately elevated its prices to match that of Taro, Perrigo and Par, also choosing to forego price competition and the prospect of winning a larger share of the market.  Even a fourth entrant into the Nystatin cream market did not cause prices to erode.

470.     Sandoz's share of the Nystatin cream market was close to 0% until the fall of 2013, at which point it ramped up production for re-entry into the market.  Like Perrigo, Par and Actavis before it, rather than compete on price to regain lost market share, Sandoz priced its Nystatin cream at the same inflated level as its co-conspirators.  Prices remained stable and elevated even with a fifth seller in the market.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

471.    WAC prices for each Defendant demonstrate that Nystatin cream prices remained

relatively stable prior to May 2011 until they increased dramatically and largely in unison around

June of 2011, remaining artificially inflated thereafter.



472.    AWP prices for Nystatin cream show the same trend of dramatically inflated and

nearly identical prices.

473.    These price increases followed the March 6-10, 2011 ECRM EPPS Retail

Pharmacy Conference, February 2012 ECRM EPPS Retail Pharmacy Conference; October 2012

GPhA Fall Technical Conference in Bethesda, Maryland; and June 4-5, 2013 GPhA CMC

Workshop in Bethesda, Maryland, among others, which representatives from Actavis, Par,

Perrigo, Sandoz, and Taro attended.

*(ii)    Nystatin Ointment*

474.    Nystatin external ointment prices followed a similar pattern to those of Nystatin

cream.  Actavis, Perrigo, and Sandoz increased their prices, often while gaining market share,

contrary to economic theory.  In 2009, Sandoz had captured approximately 75% of the market,

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

while Perrigo had 20% and Actavis 5%.  From that point through the summer of 2011, Actavis

and Sandoz drastically reduced production until they were effectively out of the market.  By the

summer of 2010 Actavis had approximately a 0% market share, though *de minimis* sales appear

to have continued.  By the summer of 2011, Sandoz had approximately a 5% market share.

475.    Beginning in June of 2011, Actavis, Perrigo, and Sandoz increased their prices

dramatically and largely in unison.

476.    In June 2011, after Sandoz and Actavis had all but ceded the Nystatin ointment

market, Perrigo implemented a large price increase—more than 300%.

477.    Five months later, Actavis ramped up production of Nystatin ointment.  Rather

than undercut Perrigo's elevated price to gain market share, Actavis hiked its list prices to nearly

identical levels as Perrigo.  As intended by the overarching "fair share" agreement among

Defendants, the list prices and AWP price for Nystatin ointment remained virtually unchanged,

even with the addition of a new seller in the market place.

478.    In the summer of 2012, the pattern repeated itself.  Sandoz ramped up its

production of Nystatin ointment in June.  Rather than compete on price to regain its lost market

share, Sandoz raised its list prices to nearly identical levels as Perrigo and Actavis.  Even with a

third market participant, prices remained unchanged as provided for by Defendants' agreement.

479.    WAC prices demonstrate that Nystatin ointment prices remained relatively stable

prior to May 2011 until they increased dramatically and largely in unison around June of 2011,

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

remaining artificially inflated thereafter.



480.     Actavis, Perrigo, and Sandoz had the opportunity to discuss pricing of Nystatin

ointment at numerous industry events during the relevant period.  For example, representatives

of each attended the March 2011 ECRM EPPS Retail Pharmacy Conference, and February 2012

ECRM EPPS Retail Pharmacy Conference, among others.

*(iii)     Nystatin Tablets*

481.     In 2010 and 2011, the Nystatin tablet market was split between Teva and Sun

(sold at least in part through its subsidiary, Mutual).  During that time, Teva held approximately

60% of the market, Sun held 40%, and they had nearly identical list prices for Nystatin tablets.

482.     In the summer of 2012, Heritage entered the Nystatin tablet market.  Rather than

undercut Teva and Sun's prices to gain market share, Heritage matched Teva and Sun's prices,

consistent with the "fair share" agreement they and the other Defendants maintained throughout

the generics market.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

483.     Sun, through its division Mutual, increased Nystatin tablet prices on April 15, 2013.

484.     As detailed below, Patel was hired by Teva in April 2013 to "run the pricing team."  On July 9, Patel called Malek and they spoke for 21 minutes.  The two spoke again on July 23 (for ten minutes), and twice on July 30, 2013 (once for more than 12 minutes).

485.     Between July 23 and July 30, 2013, Anne Sather (Heritage) spoke with Susan Knoblauch, Senior Sales Manager at Sun, for 11 minutes.  Heritage remained in close contact with Sun before and after Sun (through Mutual) took its price increase in April 2013.  On April 16, 2013 – the day after Mutual increased Nystatin tablet prices – Knoblauch called Sather and they spoke for nearly 40 minutes.  The two continued to communicate throughout the summer of 2013.

486.     By late July 2013, Teva's "Price Increase Candidates" list, created by Patel, included Nystatin, with the note "Heritage involved; follow Mutual."

487.     On August 1, 2013, Malek e-mailed O'Mara (Heritage), Edelson (Heritage), and Sather, saying "Team:  Pricing dynamics may be changing for us for Nystatin.  Please advise when Mutual/URL/ (now Caraco) took their Nystatin price increase and if they kept it." On August 20, 2013, Malek e-mailed Fleming (Heritage) and copied Glazer with the subject "PRICE INCREASES," saying:  "We need [to] analyze the following product price increases and understand how much to increase and which customers to extend." Malek provided a list of four drugs, including Nystatin.

488.     As described below, Patel was on maternity leave from August 2013 through December 2013 and decisions regarding Teva and Heritage's Nystatin price increases were put on hold.

489.    Also, as described below, on February 7, 2014 Patel created a spreadsheet titled "PI Candidates" which included Nystatin.  The Nystatin notes read "Shared with Heritage and Mutual/Caraco" and "WAC increase likely."  Patel called Malek on February 14, 2014 and the two connected the next day.

490.    Malek and Patel continued to talk throughout March and April of 2014.  On a 17-minute phone call on April 15, 2014, Malek and Patel came to an agreement on all of the identified drugs involving Teva (at least seven drugs, including Nystatin).  They agreed Teva would take the lead on the Nystatin (and Theophylline) price increase, which Heritage would follow and match.

491.    On April 4, 2014, Teva announced an increase of more than 100% on Nystatin, doubling WAC price from $47.06 to $100.30.

492.    During the April 2014 Heritage "Price Increase Discussion" teleconference, Malek identified Nystatin as one of the 18 drugs targeted for a price increase.  Sather was tasked with reaching out to Sun regarding Nystatin (and other drugs).  Immediately after the April call, Sather reached out to Knoblauch.  They spoke for 45 minutes and agreed to increase prices for Nystatin (and Paromomycin).  Afterward, Sather reported to Malek and Glazer, "Caraco notified and on board."  Glazer quickly responded, "No emails please."

493.    On the June 23 Heritage "Price Increase Call," Nystatin was designated for a 95% price increase.  Heritage's Kate Brodowski, Associate Director of International Sales, noted that Heritage had to increase its WAC pricing for Nystatin because Teva "increased WAC already."

494.    On June 25, 2014, Heritage held another internal call regarding "Product Price Changes" and Nystatin again appeared on the list of drugs slated for a price increase.  During the call, Sather texted Knoblauch to update Sun on Heritage's anticipated Nystatin price increase:

Sather:  Work news:  we are raising price on Nystatin.  Just letting you know.  :)

Knoblauch:  How much

Sather:  Double the price

Sather:  On conf call- will call you back

Knoblauch:  Yes

495.    On June 25, 2014, Malek spoke to Patel again for nearly 14 minutes.  During that call, Malek reported that Heritage would be sending out Price Increase Notices the next day for Nystatin and several of the other drugs that Heritage and Teva had agreed to raise prices on.

496.    In June 2014, Heritage announced a price increase of nearly 100% on Nystatin.  By July 9, 2014, Heritage successfully raised the price for at least 1444 customers nationwide.

497.    Sun implemented a similar price increase by August 2014.

498.    In conformity with their agreement, Teva refused to bid or challenge Heritage's price increases when requested by incumbent Heritage customers.

499.    On July 8, a large retail customer e-mailed Teva requesting a quote for Nystatin tablets because of a recent large price increase instituted by the incumbent supplier.  A Teva representative forwarded that e-mail to Patel, asking "Are you aware of the below? Should we engage?" Patel responded that she was aware, and that Heritage would be "following Teva on the Nystatin." She confirmed "we will not be bidding.  Thanks."

500.    By at least August of 2014, exact dates unknown, Sun also had begun implementing price increases on Nystatin.

501.    NADAC data for Nystatin tablets is only available dating back to April 2014.  As depicted on the chart below, the average price for Nystatin 500,000 unit oral tablets continued to

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

increase after the first price increase implemented by Sun in April 2013 and the subsequent price

increases implemented by Heritage, Sun, and Teva around April and June of 2014:



502.    This agreement between Heritage, Teva and Sun was part of an overarching

conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in

the generic pharmaceutical industry.

        i.      *Paromomycin*

503.    At all relevant times, Heritage and Sun, through its division Caraco, dominated

the Paromomycin market.

504.    In April 2014, Heritage had approximately 65% of the market.  Sun had

approximately 35% market share.

505.    On April 22, 2014, a Heritage representative spoke to a Sun counterpart for 45

minutes.  Shortly thereafter, the Heritage representative notified her superiors via e-mail that

Caraco was on board with price increases, to which a superior responded, "No emails please."

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

506.    On May 8, 2014 a Heritage employee e-mailed Malek, who had asked for an update on pricing agreement progress, explaining "I made contact with all my take aways – with positive results."

507.    Heritage held another internal pricing call on May 9, 2014.  Paromomycin was on the list for a price increase.

508.    On May 20, a Sun employee informed a Heritage employee that Sun would be "temporarily discontinuing" Paromomycin production to transfer its operations to another facility.  The employee immediately relayed the information to Malek who responded "Need price increase to go immediately.  Jack it up."

509.    On a June 23, 2014 internal pricing call, Heritage slated Paromomycin for a 100% increase.  By July 9, 2014, Heritage had been able to successfully increase prices to at least thirteen (13) different customers nationwide.

510.    Sun continued to sell the drug through January 2015, maintaining a 40% market share.  Despite this, Heritage continued to increase its prices with no fear of losing market share as an agreement was already in place.

511.    This agreement between Heritage and Sun was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

    j.    *Theophylline ER*

512.    At all relevant times, Heritage and Teva dominated the market for Theophylline ER.

513.    Prior to Heritage's entry into the market for 300mg and 450mg Theophylline ER tablets in late 2011, Teva held nearly 100% of market share.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

514.     When Heritage entered the market, rather than price its product below Teva's to gain market share, it listed its products identical to or even slightly above Teva's prices.  As a result, Theophylline ER prices remained relatively stable despite the entry of a new competitor and, upon information and belief, Heritage gained market share through collusive agreements in accordance with their market-wide "fair share" agreement.

515.     In early 2014, Teva began to consider raising the price of Theophylline ER.  On February 4, 2014, Patel called Malek upon her return from maternity leave and the two spoke for over an hour the next day.  On February 7, Patel (Teva) created a spreadsheet titled "PI Candidates," targeting Theophylline for a price increase.

516.     Patel and Malek spoke numerous times in February and March 2014.  They came to an agreement that Teva would lead the Theophylline ER price increase and Heritage would follow, matching Teva's pricing.

517.     Effective April 4, 2014, Teva began implementing across-the-board price increases for Theophylline ER.  By late April 2014, Teva fully implemented a price increase for Theophylline by approximately 150% and Heritage planned to follow.

518.     On April 24, 2014, shortly after implementing the price increases, Teva received the following e-mail with the subject line "PLIVA.com [Info] Price Gouging":[54]

> I have been a consultant to virtually every major pharma company including Teva and Pliva (before it was acquired and located in E. Hanover).  Since retiring I have been asked to participate with a US Senate Special Committee on the issue of pharmaceutical price gouging in the U.S.A.  Today, I acquired my usual Rx of Theophylline ER from Costco for which I usually pay $19.01 and was charged $53.28 an increase of almost 200%.  Costco Pharmacy

---

[54]   Teva marketed and/or sold its generic Theophylline ER, at least in part through Pliva, Inc.  ("PLIVA"), a wholly-owned subsidiary of Teva USA.  Teva USA acquired PLIVA's assets as part of its acquisition of Barr Pharmaceuticals, LLC.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

confirmed that this increase is correct and was instituted sometime earlier this year (2014.).  Before having this listed in our national report as another example of Pharmaceutical Price Gouging, [w]e respectfully request a confirmation response from you, the manufacturer, relative to the accuracy of our data.  Please respond to me at the above email address.  If you prefer you can respond to Senator Schumer a New York State representative.

519.    A member of Teva's Government Affairs Department received the internally forwarded e-mail and responded:  "Can I get some details on the specifics of this product and the price increase.  I'm hoping someone increased the price and we had to follow it up.  Or, API or something I can give the senate." Patel ultimately received the correspondence and replied, "I don't have a great story.  I'll take a closer look." The real story was that Teva conspired with Heritage to raise market prices.

520.    At the April 22, 2014 Heritage "Price Increase Discussion," Malek instructed his team that Heritage would follow Teva's pricing on Theophylline ER.

521.    On May 9, Heritage again slated Theophylline ER for a price increase.  During a June 23, 2014 "Price Change Call," Heritage employees discussed a 150% price increase for Theophylline ER.

522.    On June 25, 2014, Heritage held one last call regarding "Product Price Changes" before the price increases were to be implemented.  On the same day, Malek and Patel spoke for 14 minutes.  During that call, Malek reported that Heritage would be sending out Price Increase Notices shortly for Theophylline and several of the other drugs for which Heritage and Teva had agreed to raise prices.

523.    Heritage began sending price increase notices to customers the next day.  On June 26, 2014, Sather texted a large wholesaler customer that "As of 7/1, [m]arket wide we are increasing prices on: . . Theophylline ER. . ." She followed with another text message, "Here are

the approximate/average $ increases on the other items: . . .  Theo ER . . .150%." On June 30,

2014, Patel e-mailed her team that "[i]t appears that Heritage took an increase to follow Teva.

The new pricing looks like it will be effective tomorrow and matches Teva's WACs."  She

continued that this "will likely trigger some bid requests/activity," but Teva "should not be

considering decreases."

524.     By July 9, 2014, Heritage successfully increased prices to at least 20 customers

nationwide, following in lock step with Teva.

525.     According to NADAC data, the average market price for generic Theophylline

ER saw the following price increases between April 2014 and January 2015:

> Theophylline ER 100mg:  increases from $0.12 per unit to $0.37 per
> unit, a 250% increase
>
> Theophylline ER 200mg:  increases from $0.16 per unit to $0.40 per
> unit, a 150% increase
>
> Theophylline ER 300mg:  increases from $0.20 per unit to $0.35 per
> unit, a 75% increase.

526.     NADAC data show that the average market prices for Theophylline ER were

stable prior to April 2014, then rose dramatically and remained artificially high thereafter.

527.     The 300mg dosage of Theophylline ER saw an even larger price increase in 2016,

increasing from an average of $0.36 per unit in April 2016 to $2.46 in July 2016, a 580%

increase.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



528.    This agreement between Heritage and Teva was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

*k.      Verapamil*

529.    From 2009 forward, Actavis and Mylan dominated the market for Verapamil. Combined, the two companies enjoyed nearly 100% market share until Heritage began to gain share in 2013.

530.    Heritage entered the Verapamil tablet market in the second half of 2011, but its share remained around 5% until 2013.  When Heritage entered, it announced list (WAC) prices identical to Mylan and slightly higher than Actavis for 80mg tablets.  Heritage announced prices slightly higher than both Mylan and Actavis for 120mg tablets.  Heritage did not begin to sell 40mg Verapamil tablets until the second half of 2015, at which point it set list prices identical to Actavis, the only seller of 40mg tablets at that time.

531.    In other words, in conformity with the market-wide "fair share" agreement between Defendants, when Heritage entered the market for Verapamil, it set prices at or above competitors Actavis and Mylan.  In October 2012, Mylan then increased its tablet prices by

156

approximately 50%, allowing Heritage to gain more than 25% market share.  Shortly thereafter, market share between Actavis, Heritage, and Mylan quickly stabilized.

532.    On Heritage's April 2014 "Price Increase Discussion," Verapamil was targeted for a price increase.  O'Mara (Heritage) was primarily responsible for communicating with Mylan about Verapamil, among other drugs, and reached out to Aigner (Mylan).  On an April 23, 2014 phone call, O'Mara and Aigner reached an agreement to raise prices for Verapamil (and two other drugs).  O'Mara immediately sent an e-mail to Malek, titled "Mylan," saying "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone.  They are looking at price increases as well on a number of products."

533.    Sather was responsible for communicating with Actavis about Verapamil (and another drug).  Within hours of the April 22 call, she called Michael Dorsey, Director of National Accounts at Actavis and they spoke for nine minutes, reaching an agreement to raise the price of Verapamil (and Glyburide-Metformin).

534.    Dorsey immediately thereafter called Christina Koleto and Michael Reed, two Senior Pricing Managers at Actavis, to update them on the pricing strategy.  In an April 28, 2014 internal e-mail, an Actavis pricing manager said "[Dorsey] made mention of keeping an eye out for an increase on . . . Verapamil IR."  Marc Falkin, Actavis' Vice President of Marketing, Pricing, and Contracts, received the e-mail.

535.    On May 6, 2014, Falkin called Nesta (Mylan).  The two spoke regularly over the next several months, including a three-minute call on May 7th and a seven-minute call on May 19.  They continued to speak regularly for the next several months.

536.    In response to Malek's May 8 e-mail to the Heritage sales team trying to finalize price increase agreements, Sather responded, "Jason:  I made contact with all my take aways – with positive results.  I can resend those notes or talk with you on any details."  This would have included her conversation with Actavis on Verapamil.

537.    When Heritage held another call about the "Price Increases" on May 9, 2014, Verapamil remained on the list of drugs targeted for increase.

538.    Heritage did not initially increase prices market-wide for Verapamil, but it did raise prices to at least one customer as part of its price increase initiative in July 2014.

539.    Heritage announced its price increase in June 2014, and Actavis and Mylan soon followed with similar price increases.

540.    On August 20, 2014, Sather exchanged text messages with Knoblauch (Sun) describing the agreements Heritage reached with Actavis to increase the prices of Verapamil (and Glyburide-Metformin):

> Knoblauch:   Have you heard anything about an Actavis price increase?"
>
> Sather:  I heard they were on board with it.  What item specifically?
>
> Knoblauch:  I don't know.  I am just hearing about an increase but no details.  What product have you heard about
>
> Sather:   We were communicating on Glyburide/Metformin and Verapamil
>
> Knoblauch:  We haven't touched verapamil yet

541.    NADAC data show that average market prices for Verapamil rose dramatically in 2015, with price increases continuing throughout 2016, as depicted below.



542.    This agreement between Heritage, Mylan, and Actavis was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

## IX.    THE CONSPIRACY:  TEVA-RELATED CONDUCT

543.    Whereas the allegations in Section VIII  focused on Heritage's conduct with respect to market entry, the allegations that follow in Sections IX and X focus on Teva's conduct in similar circumstances, and the allegations in Section XI focus on dermatological drug-related conduct.

### A.    Early 2013 Teva Business Strategies, Hiring of Patel, and Ranking Competitors

544.    Despite Teva's initial attempts to increase its revenues through price increases in 2012 and early 2013, as set forth below, its generic business was struggling as of early 2013. Throughout the first quarter of 2013, Teva realized it needed to do something drastic to increase profitability.  On May 2, 2013, Teva publicly announced disappointing first quarter 2013 results.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Among other things:  (1) net income was down 26% compared to the prior year; (2) total net sales were down 4%; and (3) generic sales declined by 7%.

545.    By this time, Teva had already started to consider new options to increase its profitability, including more product price increases.  Over the next several years, Teva embarked on an aggressive plan to use the conspiracies with its competitors to increase and sustain price on many generic drugs – completely turning around the company's fortunes.

### 1.    April 2013:  Teva Hires Nisha Patel

546.    In April 2013, Teva took a major step toward implementing more significant price increases by hiring Patel as its Director of Strategic Customer Marketing.  In that position, her job responsibilities included, among other things:  (1) serving as the interface between the marketing (pricing) department and the sales force teams to develop customer programs; (2) establishing pricing strategies for new product launches and in-line product opportunities; and (3) overseeing the customer bid process and product pricing administration at Teva.

547.    Most importantly, she was responsible for – in her own words – "product selection, price increase implementation, and other price optimization activities for a product portfolio of over 1,000 products." In that role, Patel had 9-10 direct reports in the pricing department at Teva.  One of Patel's primary job goals was to effectuate price increases.  This was a significant factor in her performance evaluations and bonus calculations and, as discussed more fully below, Patel was rewarded handsomely by Teva for doing it.

548.    Prior to joining Teva, Patel had worked for eight years at a large drug wholesaler, ABC, working her way up to Director of Global Generic Sourcing.  During her time at ABC, Patel had routine interaction with representatives from every major generic drug manufacturer

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

and developed and maintained relationships with many of the most important sales and marketing executives at Teva's competitors.

549.    Teva hired Patel specifically to identify potential generic drugs for which Teva could raise prices, and then utilize her relationships to effectuate those price increases.

550.    Even before Patel started at Teva, she was communicating with potential future competitors about the move, and about her new role.  For example, on April 2, 2013, nearly three weeks before Patel started at Teva, Aprahamian, the Vice President of Sales and Marketing at Taro, sent an e-mail to the Chief Operating Officer ("COO") at Taro stating:  "Nisha Going To Teva - Hush Hush for now . . ."  The COO responded by saying "[m]aybe the industry will be better for it.  Teva can only improve." Teva had, up to that point, acquired a reputation in the industry for being slow to follow price increases, and the Taro COO viewed Patel as someone who would change that mindset at Teva.  Patel had also worked with Aprahamian several years earlier at ABC.

551.    Patel's last day at ABC was April 11, 2013 and she started at Teva on April 22, 2013.  Patel began communicating with competitors, by phone and text, the day after she left ABC, before she even started at Teva.  For example:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 4/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:01:10 |
| 4/13/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:06:05 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |

[55]

552.    Once Patel began her employment at Teva, her communications with certain competitors became much more systematic and frequent, and focused around market events such as price increases, market entry, customer challenges and loss of exclusivity.

553.    When she joined Teva, Patel's highest priority was identifying drugs where Teva could effectively raise price without competition.  On May 1, 2013, Patel began creating an initial spreadsheet with a list of "Price Increase Candidates."  As part of her process of identifying candidates for price increases, Patel started to look very closely at Teva's relationships with its competitors, and also her own relationships with individuals at those competitors.  In a separate tab of the same "Price Increase Candidates" spreadsheet, Patel began ranking Teva's "Quality of Competition" by assigning companies into several categories, including "Strong Leader/Follower," "Lag Follower," "Borderline" and "Stallers."

554.    Patel understood – and stressed internally at Teva – that "price increases tend to stick and markets settle quickly when suppliers increase within a short time frame."  Thus, it was very important for Patel to identify those competitors who were willing to share information about their price increases in advance, so that Teva would be prepared to follow quickly.

---

[55]    Amended State AG Complaint No. 2 ¶ 572.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Conversely, it was important for Patel to inform Teva's competitors of Teva's increase plans so those competitors could also follow quickly. Either way, significant coordination would be required for price increases to be successful – and quality competitors were those who were more willing to coordinate.

555.    As she was creating the list, Patel was talking to competitors to determine their willingness to increase prices and, therefore, where they should be ranked on the scale. For example, after Patel joined Teva, Patel told CW-1 that she had been hired by Teva to identify drugs where Teva could increase its prices. She asked CW-1 how Sandoz handled price increases. CW-1 told Patel that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after Teva increased. Not surprisingly, Sandoz was one of Teva's highest "quality" competitors. Patel and Teva based many price increase (and market allocation) decisions on this understanding with Sandoz over the next several years.

556.    Patel had several different ways of communicating with competitors. This Complaint references various phone calls and text messages that she was exchanging with competitors. But she also communicated with competitors in various other ways, including but not limited to instant messaging through social media platforms such as LinkedIn and Facebook; encrypted messaging through platforms like WhatsApp; and in-person communications. Although the Plaintiff States have been able to obtain some of these communications, many of them have been destroyed by Patel.

557.    Through her communications with her competitors, Patel learned more about their planned price increases and entered into agreements for Teva to follow them. On May 2, 2013, Patel spoke to her contacts at Glenmark, Actavis and Sandoz several times:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:15:48 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:39 |

[56]

558.    After one of her calls with CW-5 of Glenmark, Patel sent an internal e-mail to one of her subordinates directing him to add six (6) different Glenmark drugs to Teva's "high priority" price increase list:  Adapalene gel; Nabumetone; Pravastatin; Ranitidine HCL; Moexipril HCL; and Moexipril HCL/HCTZ.  As discussed more fully below, these are all drugs that Glenmark eventually increased prices on two weeks later, on May 16, 2013, and Teva followed with its own price increases shortly thereafter.

### 2.    Ranking "Quality of Competition" to Identify Price Increase Candidates

559.    By May 6, 2013, Patel had completed her initial ranking of fifty-six (56) different manufacturers in the generic drug market by their "quality." Patel defined "quality" by her assessment of the "strength" of a competitor as a leader or follower for price increases.  Ranking was done numerically, from a +3 ranking for the "highest quality" competitor to a -3 ranking for the "lowest quality" competitor.  The top ranked competitors at that time included the following companies:

---

[56]   *Id.* at ¶ 577.

| Strong Leader/Follower | Point Scale |
|---|---|
| Mylan | 3 |
| Mylan Institution | 3 |
| Watson/Actavis | 3 |
| Sandoz/Fougera | 3 |
| Glenmark | 3 |
| Taro | 3 |

[57]

560.    The lowest ranked competitors were:

| Strong Leader/Follower | Point Scale |
|---|---|
| Apotex | -3 |
| Zydus | -3 |

[58]

561.    Patel created a formula, which heavily weighted those numerical ratings assigned to each competitor based on their "quality," combined with a numerical score based on the number of competitors in the market and certain other factors including whether Teva would be leading or following the price increase.  According to her formula, the best possible candidate for a price increase (aside from a drug where Teva was exclusive) would be a drug where there was only one other competitor in the market, which would be leading an increase, and where the competitor was the highest "quality." Conversely, a Teva price increase in a drug market with several "low quality" competitors would not be a good candidate due to the potential that low quality competitors might not follow Teva's price increase and instead use the opportunity to steal Teva's market share.

---

[57]    *Id.* at ¶ 578.

[58]    *Id.*

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

562.     Notably, the companies with the highest rankings at this time were companies with whom Patel and other executives within Teva had significant relationships.  Some of the notable relationships are discussed in more detail below.

*a.       The "High Quality" Competitor Relationships*

563.     The highest quality competitors in Patel's rankings were competitors where Teva had agreements to lead and follow each other's price increases.  The agreements and understandings regarding price increases were what made each of those competitors high quality. As part of their understandings, those competitors also agreed that they would not seek to compete for market share after a Teva price increase.

*b.       Mylan (+3)*

564.     Mylan was Teva's highest-ranked competitor by "quality." The relationship between these two competitors was longstanding and deeply engrained.  It survived changes in personnel over time and pre-dated Patel's creation of the quality competitor rankings.

565.     Green, who was employed by Teva beginning in 2006 through late October 2013, first began communicating with Nesta of Mylan by telephone on February 21, 2012.  From that time until the time that Green left Teva, Green and Nesta were in almost constant communication, speaking by phone at least 392 times, and exchanging at least 12 text messages – including at or around every significant price increase taken by either company.  This amounts to an average of nearly one call or text message every business day during this period.

566.     Shortly after Patel started her employment at Teva, she called Nesta on May 10, 2013 and the two spoke for over five (5) minutes.  Because Green had already established a relationship with Mylan, Patel did not need to speak directly with Nesta very often.  Typically, Patel would e-mail Green and ask him to obtain market intelligence about certain Mylan drugs;

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Green would then speak to Nesta – often about a long list of drugs – and report his findings back to Patel.  Several examples of these communications are outlined more fully in various sections below.

567.    When Green left Teva to join Zydus in late October 2013, the institutional relationship and understanding between Teva and Mylan remained strong.  Rekenthaler promptly took over the role of communicating with Nesta.  Starting in December 2013, through the time that Rekenthaler left Teva in April 2015, Rekenthaler spoke to Nesta 100 times.  Prior to Green leaving Teva in late-October 2013, Rekenthaler and Nesta had only spoken by phone once, more than a year earlier in 2012.

568.    The relationship between Teva and Mylan even pre-dated the relationship between Green and Nesta.  For example, between January 1, 2010 and October 26, 2011, R.C., a senior executive at Teva, communicated with R.P., a senior executive counterpart at Mylan, by phone or text at least 135 times.  The pace of communications between the two companies slowed dramatically in November 2011 after R.C. left Teva and before Green began communicating with Nesta – but continued nevertheless as needed during that time through communications between Rekenthaler and R.P. at Mylan.

c.    *Watson/Actavis (+3)*

569.    Actavis was Teva's next highest quality competitor by ranking.  Patel had strong relationships with several executives at Actavis, including Rogerson, the Executive Director of Pricing and Business Analytics, and A.B., a senior sales executive at Actavis.  Rekenthaler also communicated frequently with A.S., a senior sales executive at Watson – a relationship that pre-dated Patel joining Teva.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

570.    Patel contacted A.B. shortly after she started her employment at Teva, as she was creating the quality competitor rankings.  She called him on April 30, 2013, and the two exchanged several text messages the next day, May 1, 2013.  But as detailed herein, Patel communicated on a more frequent basis with Rogerson, her counterpart in the pricing department at Actavis.  From May 2, 2013 through November 9, 2015, Patel spoke and/or texted with Rogerson 157 times, including calls at or around every significant price increase taken by the respective companies.

571.    In August 2013, Falkin joined Actavis and the relationship between Teva and Actavis grew stronger through his communications with Rekenthaler.  From August 7, 2013 through the date that Rekenthaler left Teva in April 2015, Rekenthaler and Falkin communicated by phone or text at least 433 times.

572.    Cavanaugh also had a very strong relationship with Falkin.  The two communicated with great frequency.  From August 7, 2013 through the end of May 2016, Cavanaugh and Falkin spoke or texted with each other 410 times.

*d.      Sandoz (+3)*

573.    Sandoz was also considered a top-quality competitor by Teva.  Patel had a very strong relationship with CW-1 at Sandoz.

574.    Beginning on April 12, 2013 – the day after Patel's last day at ABC – until August 2016, Patel and CW-1 spoke 185 times by phone, including at or around every significant price increase taken by either company.  As detailed above, in one of her initial calls with CW-1 after she joined Teva, Patel asked CW-1 how Sandoz handled price increases.  Patel explained that she had been hired at Teva to identify products where Teva could increase prices.

CW-1 reassured Patel that Sandoz would follow any Teva price increases on overlapping drugs, and that Sandoz would not poach Teva's customers after Teva increased price.

575.    Green and Rekenthaler of Teva also both had a very strong relationship with CW-2, who was – at that time – a senior Sandoz executive.  These relationships pre-dated Patel joining Teva.

> e.    *Glenmark (+3)*

576.    Glenmark was one of Teva's highest-ranked competitors primarily because Patel had very significant relationships with several different individuals at Glenmark, including CW-5, Brown and J.C., a sales and marketing executive at Glenmark.

577.    As stated above, Patel began communicating with CW-5 even before she began her employment at Teva.  Patel was also communicating frequently with both CW-5 and J.C. during the time she created the quality competitor rankings, and agreed to follow several Glenmark price increases, in May 2013.

578.    Patel and CW-5 communicated by phone with great frequency – including at or around the time of every significant price increase affecting the two companies – until CW-5 left Glenmark in March 2014, at which point their communication ceased for nearly six (6) months. After CW-5 left Glenmark, Patel began communicating with Brown with much greater frequency to obtain competitively sensitive information from Glenmark.  Patel and Brown had never spoken by phone before Patel started at Teva, according to the phone records produced.

> f.    *Taro (+3)*

579.    Taro was highly rated because of Patel's longstanding relationship with the Vice President of Sales at Taro, Aprahamian.  Patel had known Aprahamian for many years, dating back to when Patel had started her professional career as an intern at ABC.

580.    Even though she knew Aprahamian well, they rarely ever spoke or texted by phone until Patel started at Teva.  From April 22, 2013 through March 2016, however, Patel and Aprahamian spoke or texted at least 100 times, including calls or text messages at or around the time of every significant price increase affecting the companies during those years.

g.    *Lupin (+2)*

581.    Although initially not the highest ranked competitor, Lupin was assigned a high rating because of Patel's strong relationship with Berthold, the Vice President of Sales at Lupin. The relationship between Teva and Lupin, however, pre-dated Patel.  Prior to Patel starting at Teva, Green and others at Teva conspired directly with Berthold.  Several of those examples are discussed below.  Between January 2012 and October 2013, Berthold and Green, for example, communicated by phone 125 times.

582.    From May 6, 2013 through April 8, 2014, Patel and Berthold communicated by phone 76 times, including at or around the time of every significant drug price increase where the two companies overlapped.

583.    Demonstrating the strength of the relationship between the two companies, the price increase coordination continued between Teva and Lupin even when Green had left Teva and when Patel was out on maternity leave.  For example, as discussed more fully below, in October 2013 Lupin was preparing to increase its pricing on the drug Cephalexin oral suspension.  Without Green or Patel to communicate with, Berthold instead communicated with Rekenthaler and T.S. of Teva in order to coordinate the price increase.

**B.    Price Increase Hiatus**

584.    Shortly after the August 9, 2013 price increase described below went into effect, Patel left the office for several months while on maternity leave.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

585.    This slowed down Teva's plans for its next round of price increases.  During the time period while Patel was out on maternity leave, Teva did not implement or plan any additional price increases, instead waiting for Patel to return and continue her work.  Patel began to return to the office on a part-time basis beginning in November 2013.

586.    During this time period, Green left Teva to join Zydus as the Associate Vice President of National Accounts.  His last day of employment at Teva was October 23, 2013.  This prompted Rekenthaler to assume the role of communicating with specific competitors, including Mylan.  Rekenthaler also identified and began communicating on a more frequent basis with co-conspirators at different companies to facilitate the price increase process for Teva.

587.    As discussed more fully below, although Patel's absence slowed Teva in its plans for price increases on additional drugs, it did not stop certain competitors – including Lupin – from attempting to coordinate with Teva regarding their own price increases.  In Patel's absence, they simply communicated through different channels.  These communications were conveyed to Patel upon her return and she included the information in her efforts to identify new price increase candidates.

588.    As discussed more fully below, by early 2014 Patel had picked up right where she left off planning for the next round of Teva increases.

C.    **New Relationships Emerge**

589.    By early 2014, the generic drug industry was in the midst of a price increase explosion.  In an internal Teva presentation given shortly after the April 2014 price increases – titled "2014 US Pricing Strategy" – Teva reflected on the current state of the industry, noting that the "[c]ompetitive landscape is supportive of price increases."  In commenting on the future

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

implications for Teva's pricing strategy, the company stated: "Mature competitors participate in price appreciation; immature competitors are starting to follow."

590.    Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases, specific examples of which are described below.

**D.    Competitors Become "High Quality" After Successfully Colluding With Teva**

591.    A little more than a year after she first circulated her Quality of Competitor List, Patel finalized an updated list on May 9, 2014.  This updated list reflected changes in Teva's conspiratorial relationships.

592.    Although certain competitors retained a high-quality ranking throughout the entire relevant time period – like Mylan, Sandoz, Actavis and Taro – other competitors saw their ranking increase (sometimes dramatically) after successfully colluding with Patel or others at Teva on one or more drugs during the prior twelve-month period.  These changes demonstrate that Teva's quality competitor rankings were, in reality, a list of co-conspirators that Teva could trust to adhere to the illegal agreements.

**E.    Quality Competitors Collude With Each Other, Sandoz/Mylan**

593.    In addition to conspiring with Teva, the "quality" competitors also colluded with each other on drugs that Teva did not market.  Indeed, each of the quality competitors had their own set of relationships with their counterparts at competitor companies that they used to facilitate agreements regarding drugs where they overlapped.  The relationship highlighted in this Complaint is the relationship between executives at Sandoz and Mylan.  However, to the

extent that some of the drugs at issue involve additional competitor companies, those relationships are also discussed.

594.    In September 2012, CW-4 was concerned about her job security at Sandoz and sought to network with executives at competing companies in the hope of obtaining new employment. CW-4 contacted Nesta because she was interested in potentially working at Mylan. CW-4 obtained Nesta's phone number from a mutual contact and called to introduce herself. During that phone call, Nesta immediately started talking about competitively-sensitive information. Although CW-4 was surprised that Nesta was being so blatant, she did not stop him.

595.    In the year that followed, between September 2012 and October 2013, CW-4 and Nesta developed an ongoing understanding that they would not poach each other's customers and would follow each other's price increases. Examples of their coordination with respect to specific drugs are discussed in more detail below.

F.    **Commitment to the Overarching Conspiracy**

596.    As detailed above, the overall understanding among the co-conspirators required a commitment that each competitor was entitled to its "fair share" of a given market. When a competitor was satisfied that it had its "fair share" of a particular drug market, competition waned and prices rose. These "fair share" principles were the foundation upon which the price increases were built. So long as each competitor had its "fair share," no competitor was incentivized to compete for business when another competitor increased price. In short, competition resulted in lower prices; and as far as Defendants were concerned, nobody won in that scenario. Indeed, it was generally understood that when a competitor increased price, the other competitors in the same drug market would either decline to bid for the business or would

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

bid high so as not to punish the party that took the price increase. Often, the competitor would then follow with its own comparable price increase.

597.    There are numerous examples throughout this Complaint of competitors refusing to compete in the face of a price increase so as not to "punish" the leader or "steal" market share. As just one example, when Teva was approached by a large retail customer in May 2013 to bid on a drug for which another generic manufacturer had increased prices, Green expressed caution stating, "not sure I want to steal it on an increase." Teva later declined to bid on the business.

598.    The concept of "fair share" and price increases went hand in hand. For example, as discussed above the ongoing understanding between Teva and Sandoz that they would follow each other's price increases was predicated on the agreement that the follower would not poach the leader's customers after the increase. The same was true for the understanding between Sandoz and Mylan. As discussed below, Nesta specifically cautioned CW-4 that Mylan did not appreciate having its prices challenged after an increase – i.e., Mylan did not want Sandoz to steal its business by underbidding its customers. Similarly, Aprahamian of Taro often spoke with CW-3 of Sandoz about coordinating price increases between the two companies. Almost invariably, he would conclude the conversations with phrases like "don't take my fucking customers," "don't take my business" or "don't be stupid."

599.    Further, because of this "fair share" understanding, it was not essential for the competitors to communicate with each other in advance of every price increase, although they often did so anyway. So long as the competitor knew before it was approached by customers that the reason for the solicitation was due to a price increase by the incumbent supplier, the competitor knew not to compete for the business. Similarly, the competitor knew it would have

the opportunity, which it often took, to follow the increase with a comparable price increase of
its own.

### G.    Low Quality Competitors Comply with the Overarching Conspiracy

600.    As a further demonstration that the "fair share" understanding was universally
accepted and understood in the generic pharmaceutical industry, even companies that Patel and
Teva referred to as "low quality competitors" – because they were not viewed as strong leaders
or followers for price increases – consistently complied with the principles of "fair share" and
"playing nice in the sandbox." Several examples of this with respect to some of the Subject
Drugs are alleged below.

### H.    Teva Profitability Increases Dramatically

601.    As discussed more fully below, from July 3, 2013 through January 28, 2015, Teva
conspired with its competitors to raise prices on dozens of different drugs.  The impact of these
price increases on Teva's profitability was dramatic.

602.    After these price increases – on July 30, 2015 – Teva reported strong results and
raised its guidance for the full year 2015.  Among other things:  (1) net income was up 15%
compared to the prior year; (2) operating income was up 16% compared to the prior year; and
(3) cash flow from operations was up 41% compared to the prior year.  Teva reported a gross
profit margin of 62.8%, which was up from 58.1% the prior year.  Teva's stock prices also
soared.  By July 2015, Teva's stock price was trading at an all-time high.  These significant
results were obtained largely as a result of the anticompetitive conduct detailed herein.

### I.    Teva and its Executives Knowingly Violated the Antitrust Laws

603.    Teva was aware of the antitrust laws and paid them lip service in its Corporate
Code of Conduct.  For example, Teva's Code of Conduct from the summer of 2013 states

specifically:



604.    But high-level executives at Teva were aware that those laws were being violated systematically and egregiously, and never instructed Teva employees to stop or to rescind the agreements that Teva had reached with its competitors.

605.    For example, when Patel started at Teva in late-April 2013, she immediately began ranking Teva's competitors by their "quality." "Quality" was nothing more than a euphemism for "good co-conspirator," and it was well known internally at Teva that Patel was identifying price increase candidates based on who Teva's competitors were for those drugs, and whether she or others at Teva had an understanding in place.  Indeed, Patel already had a short list of price increase candidates in place on the day she started at Teva, which was based at least in part on conversations she had already been having with Teva's competitors before she started, including Aprahamian at Taro.

---

59    Amended State AG Complaint No. 2 ¶ 1109.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

606.    As Patel was starting to create her ranking of quality competitors and identify candidates for price increases, she sent her very first iteration of the quality competitor ranking to her supervisor, K.G. – a senior marketing executive at Teva – on May 1, 2013.  That ranking included, within the category of "Strong Leader/Follower," the following competitors:  Mylan, Actavis, Sandoz, Glenmark, Taro and Lupin.  The preliminary list of price increase candidates also included the formula that Patel would use to identify price increase candidates using the quality of competitor scores.

607.    With K.G.'s approval of her methodology for identifying price increase candidates, Patel continued communicating with competitors and agreeing to price increases. She also routinely provided K.G. with intelligence that she had received from her communications with competitors.  For example, when Patel sent her very first formal "PI Candidates" spreadsheet to K.G. on May 24, 2013, she identified, for example, that the drug Nabumetone was a price increase candidate because, among other things, "Sandoz [was] also bidding high."  For the drug Adapalene gel, Patel noted that there were "[r]umors of a Taro increase" – even though Taro had not yet increased its prices for Adapalene gel.  Patel had obtained this competitively sensitive information directly from her communications with competitors.

608.    K.G. immediately forwarded that information to Cavanaugh, the Senior Vice President of Sales at Teva, who approved of the price increases based on the reasoning that Patel provided for each drug.  As discussed more fully below, Teva raised prices on those drugs (and others) on July 3, 2013.

609.    Cavanaugh was well aware that Patel was communicating with competitors about price increases and making recommendations based on those communications, because Patel told

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

her so directly.  For example, during a 2013 meeting of Teva sales and pricing personnel where

Cavanaugh was present, Patel was discussing her communications with certain competitors about

price increases when Cavanaugh smiled, put her hands over her ears, and pretended that she

could not hear what was being said.  Not once, however, did Cavanaugh ever tell Patel or anyone

else at Teva to stop conspiring with Teva's competitors or rescind the agreements that had been

reached.

610.    Patel continued to send intelligence that she had obtained from competitors to her

supervisor, K.G.  On August 7, 2013, Patel sent to K.G. a summary list of drugs slated for a price

increase on August 9, 2013.  In the "Reasons for Increase" column, Patel again included specific

information that could only have come from her communications with competitors, including:

| Product Category | Reason for Increase |
|---|---|
| ETODOLAC ER TABLETS | Follow Taro (likely to be this week with IR) |
| ETODOLAC TABLETS | Follow Sandoz; Taro likely to follow this week |
| PRAVASTATIN TABLETS | Follow Glenmark, Zydus and Apotex. Lupin waiting on Teva. |

[60]

611.    This time, K.G.  – recognizing that it was inappropriate for Teva to have this information in writing – asked Patel to change those references above, to remove the offending language:

> Under reasons, I would change to the following:
>
> 1.  Etodolac ER : Follow Taro
> 2.  Etodolac : Follow Sandoz; Taro increase anticipated.
> 3.  Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated.

[61]

612.    As discussed more fully below, Teva increased prices on those three drugs two days later.  Not once did K.G. ever tell Patel to stop communicating with competitors, or to rescind any of the agreements she had reached on behalf of Teva.

613.    Patel also spoke regularly to both Rekenthaler and Green about their communications with competitors.  Patel was aware that both Rekenthaler and Green were communicating with competitors, sometimes at her direction.  Green and Rekenthaler, in turn, were also both aware that Patel was communicating with competitors and implementing price increases based on those communications.

614.    Rekenthaler – the Vice President of Sales at Teva – was aware that communicating with competitors about pricing and market allocation was illegal, and took steps

---

[60]    *Id.* at ¶ 1116.

[61]    *Id.*

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

to avoid any evidence of his wrongdoing.  For example, as discussed more fully above, on July 15, 2013 CW-2 of Sandoz called Rekenthaler at Teva and left a message.  Rekenthaler called CW-2 back immediately and they had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all drugs that Teva had recently increased pricing on – not just those drugs where Teva overlapped with Sandoz.  Rekenthaler complied.  Understanding, however, that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his work e-mail account to a personal e-mail account, then forwarded the list from his personal e-mail account to CW-2's personal e-mail account.

## X.     THE OVERARCHING CONSPIRACY IN OPERATION WITH RESPECT TO THE SUBJECT DRUGS

### A.     Customer and Market Allocation Agreements To Maintain Market Share and Avoid Price Erosion

#### 1.     Teva/Mylan

##### a.     Fenofibrate

615.     As of the end of 2012, Teva and Lupin were the only major suppliers of generic Fenofibrate 48mg and 145mg tablets, with Teva having approximately 65% market share and Lupin having approximately 35% market share.

616.     On February 27, 2013, K.G., a senior marketing executive at Teva, e-mailed multiple Teva colleagues asking them to provide "any noise you may be hearing in the market relative to additional competition on Fenofibrate 48mg and 145mg."  Specifically, K.G. was seeking "Competitive Intelligence" on Mylan's potential entry to the market.  In order to get this information, Green called Mylan's Vice President of National Accounts, Nesta.  Over the course of that day, Green and Nesta spoke at least four (4) different times.  That same day, Green

reported back to K.G. and other Teva colleagues what he had learned:  Mylan planned to launch Fenofibrate 48mg and 145mg sometime around November 2013.

617.    A few months later, however, Teva learned that Mylan was moving up its launch date for Fenofibrate.  In advance of this launch, Teva, Lupin, and Mylan conspired to allocate the market for Fenofibrate.  On May 8, 2013, Green e-mailed his colleagues at Teva that "Mylan is entering [the market for Fenofibrate] very soon." To assist in Teva's efforts to allocate the Fenofibrate market, Green asked a colleague for the "typical data on Fenofibrate".  This request for information was reiterated – and its purpose made clear – the following day when K.G. sent an internal e-mail stating that Mylan expected to launch Fenofibrate 48mg and 145mg tablets "on or around May 14" and that he needed Teva's Fenofibrate sales and profitability information "to determine who we want to keep and who we want to concede" to Mylan.

618.    Up to this point, executives for Teva, Mylan, and Lupin had all been in regular contact by phone.  These calls include at least those listed below.  On these calls, Teva, Mylan, and Lupin executives shared information about Mylan's Fenofibrate launch and the plan to allocate market share to Mylan.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/6/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:06 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:18 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:11:12 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:02:53 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Berthold, David (Lupin) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:08:55 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:20:20 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:03:46 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Incoming | Berthold, David (Lupin) | 0:12:00 |
| 5/9/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:05 |

[62]

619.    In one striking example of the coordination between the three companies, Nesta called Green at 2:42 p.m. on May 7, 2013 and they spoke for more than eleven (11) minutes. Immediately after hanging up the phone – at 2:54 p.m. – Nesta called Berthold and spoke for nearly three (3) minutes.

620.    On May 10, 2013, K.G. received the Teva sales and profitability information he requested.  After having the information for barely a half hour, and before there was even a formal price challenge by Mylan at any of Teva's customers, K.G. concluded that "it is best to concede Econdisc [to Mylan] and try to maintain the balance of our customers . . . ." By conceding Econdisc to Mylan, Teva would walk away from its single biggest customer (in terms of gross profit) for the 48mg tablets and the third largest out of six customers (in terms of gross profit) for the 145mg tablets.  Patel, who had been at Teva for only two weeks at that point, said she "want[ed] to understand the logic you [K.G.] use for determining this." The logic, of course, was to allocate a customer of sufficient size to Mylan so that Mylan would be comfortable with its "fair share" and not need to compete on price to acquire market share.

---

[62]    *Id.* at ¶ 172.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

621.    Teva executives immediately reached out to executives at Mylan and Lupin through a series of phone calls.  These calls include at least those listed below.  On these calls, executives of Teva, Mylan, and Lupin confirmed the market allocation scheme.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:28 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:10:46 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:02:19 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Patel, Nisha (Teva) | 0:05:25 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:17 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:26 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:17:28 [63] |

622.    Teva made good on its agreement to concede Econdisc to Mylan.  On May 15, 2013, Econdisc informed Teva that a new market entrant had submitted a competitive offer for Fenofibrate 48mg and 145mg tablets and asked Teva for a counteroffer to retain Econdisc's business.  Less than an hour after receiving the notice of the price challenge, Green recommended conceding Econdisc based on "prior conversations." K.G. later agreed:  "this is the customer we should concede on Fenofibrate."

623.    Following Teva's internal confirmation of the market allocation scheme, Teva executives spoke with executives at Mylan and Lupin numerous times.  These calls include at least those listed below.  On these calls, executives of Teva, Mylan, and Lupin confirmed that Teva was sticking to the market allocation scheme by conceding Econdisc to Mylan.

---

[63]    *Id.* at ¶ 175.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:34 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Outgoing | Nesta, Jim (Mylan) | 0:02:21 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:10:06 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:11:50 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:02:23 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:09 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:21 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:12 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:25 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/17/2013 | Text | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:16:02 [64] |

b. *Clonidine-TTS*

624. As of September 2011, Mylan and Teva were at rough parity in the market for generic Clonidine-TTS, with Mylan having approximately 48.4% market share and Teva having approximately 44.4% market share. At the end of 2011 and beginning of 2012, however, Teva began to take more than its "fair share."

625. In November 2011, Teva took over Mylan's business for Clonidine-TTS at Walgreens after Walgreens solicited Teva to provide a bid. Then, in late January 2012, Cardinal Health solicited a bid from Teva for a one-time-buy to cover an alleged short-term "supply disruption" that Mylan was experiencing. A few days after Teva submitted its offer to Cardinal for the one-time-buy, Cardinal asked Teva to become Cardinal's primary supplier for Clonidine

---

[64] *Id.* at ¶ 177.

TTS.  Believing that Cardinal's request was prompted by Mylan having supply issues, Teva accepted and took over the primary position at Cardinal for Clonidine-TTS.

626.    On February 10, 2012, the move of Cardinal's business to Teva prompted K.G. of Teva to order his colleagues to get intelligence on the extent of Mylan's alleged supply issues. That same day, Rekenthaler called B.P., a senior national accounts executive at Mylan, to obtain the information and they spoke for six (6) minutes.  Later that day, Rekenthaler reported back to his Teva colleagues that, contrary to Teva's assumptions, "Mylan is back in supply" and cautioned that Teva should "tread carefully." Rekenthaler was concerned that Mylan might retaliate against Teva for taking more than its "fair share" without consulting with Mylan.  With the awards from Walgreens and Cardinal, Teva was projected to have between 65%-70% market share for Clonidine-TTS.

627.    To gain back some market share, Mylan challenged Teva's Clonidine-TTS business at McKesson.  To de-escalate the situation, Teva "conceded the McKesson business to Mylan." Then, in April 2012, Mylan aggressively challenged Teva's Clonidine-TTS business at CVS to gain back market share and further signal its displeasure with Teva for taking the Cardinal business.  Internally, Teva lamented that Mylan was "trashing the price in pretty much a two-player market." Ultimately, Teva "conceded [the CVS business] due to price."

628.    Teva heard Mylan's retaliatory message loud and clear.  On May 4, 2012, just a few days after losing the CVS Clonidine-TTS business to Mylan, Teva was approached by Cardinal about a different drug, Doxazosin.  At the time, Mylan was the primary supplier for Doxazosin at Cardinal.  Cardinal representatives told Teva that Mylan was on backorder for one of the four Doxazosin dosage strengths until the end of June 2012, but Cardinal wanted to move the entire Doxazosin line to Teva.  Rather than take this business, K.G. cautioned his colleagues

that Teva "will need to be cautious after what happened with Clonidine.  I would rather cover them on a short-term basis where they have an issue and revisit if it becomes a more prolonged and extensive event."

629.    On July 18, 2012, E.G., a senior Teva product manager, circulated an internal e-mail to Teva's national account managers that the "[m]arket rumor is Mylan may be having Clonidine Patch supply issues." Teva learned of this "rumor" directly from Mylan over the course of at least two calls between Green and Nesta on July 17 and the morning of July 18, 2012.  Those calls lasted three (3) minutes and five (5) minutes, respectively.

630.    On the morning of September 28, 2012, Nesta and Green spoke by phone at least twice, once for four (4) minutes and once for fourteen (14) minutes.  On those calls, Nesta informed Green of Mylan's impending temporary exit from the Clonidine-TTS market.  As expected, later in the day on September 28, 2012, Teva began getting solicitations from Mylan customers, such as Wal-Mart and CVS, seeking a bid from Teva for Clonidine TTS because Mylan had just issued a temporary discontinuation notice.

631.    Mylan's exit from the Clonidine-TTS market presented an opportunity to raise prices and collusively reallocate the market at the inflated prices when Mylan fully reentered the market.  For example, in April 2012, before Mylan had challenged Teva's Clonidine TTS business at CVS, Teva's direct invoice price to CVS for the .1mg, .2mg, and .3mg Clonidine-TTS was $22.13, $37.81, and $54.41, respectively.  Mylan's retaliation against Teva drove the prices for CVS down to below $10.49, $18.17, and $26.51 for those dosages, respectively. Because of Mylan's exit from the market, however, when Teva took back the CVS business in October 2012, Teva was able to charge CVS a direct invoice price of $33.28, $56.08, and $80.76, respectively.

632.    Mylan and Teva maintained regular contact as former Mylan customers came to Teva because of Mylan's supply issues with Clonidine-TTS.  For example, Teva submitted bids to CVS and Wal-Mart – which were ultimately accepted by those companies – on October 4, 2012 and October 5, 2012, respectively.  In the days leading up to those bids, Teva and Mylan representatives had at least the following phone calls:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 10/1/2012 | Voice | Rekenthaler, David (Teva) | Outgoing | B.P. (Mylan) | 0:01:00 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:10 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:06 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:05:00 |
| 10/4/2012 | Voice | Green, Kevin (Teva) | Incoming | Nesta, Jim (Mylan) | 0:11:00 [65] |

633.    Teva and Mylan representatives continued to keep in contact going forward so that if Mylan reentered the Clonidine-TTS market, Mylan could regain market share without eroding price through competitive bidding.  For example, on October 10, 2012, Green and Nesta spoke for ten (10) minutes.  That same day, E.G. of Teva sent an e-mail to Teva national account managers and other senior representatives reiterating that Teva representatives should "advise of any update to this market intelligence."

634.    In or about February 2013, Mylan relaunched Clonidine-TTS and began seeking market share.  In early March 2013 Mylan sought to secure the Clonidine-TTS business at Econdisc.  Rather than competitively bid for the business, Teva's internal documents state that they chose to "concede" Econdisc back to Mylan.  By April 2013 Teva also "gave up Rite Aid" and "concede[d]" McKesson to Mylan.

---

[65]    *Id.* at ¶ 187.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

635.    In a stark admission of Teva's willingness to help Mylan regain market share

without competition, Rekenthaler acknowledged in an internal e-mail dated February 28, 2013

that Teva was "trying to concede the Clonidine business at CVS" to Mylan.  Because Teva had

been able to increase the price at CVS following Mylan's exit, Mylan gave a bid to CVS that was

higher than Mylan's "previous price prior to their supply problems."  For its part, Teva was "not

going to make any effort in the form of price concessions to retain the CVS business" if CVS

brought Mylan's price challenge to Teva's attention.  CVS pushed Mylan to lower its bid in light

of its prior prices but, confident that its brinkmanship would work because of Teva's

cooperation, Mylan would not do so.  Ultimately, CVS declined Mylan's bid because of Mylan's

refusal to lower its bid in light of its prior pricing.  Nonetheless, because Mylan's bid to CVS

was not competitive – but rather an effort to allocate the market without eroding price – Teva

was able to maintain artificially higher prices at CVS.

636.    To carry out their scheme to allocate the Clonidine-TTS market without eroding

price, representatives of Teva and Mylan remained in regular contact.  In February and March

2013 alone, Teva and Mylan representatives called each other at least 33 different times and

spoke for nearly 2 hours and 45 minutes.

637.    By April 2013, Teva had "conceded all customers [it] plan[ned] on conceding."

Having successfully allocated the market, however, Mylan and Teva were now conspiring to

raise prices on Clonidine-TTS.  On April 8, 2013, J.L., a marketing manager at Teva, reported

internally to his Teva colleagues, including Rekenthaler, that Mylan had agreed to raise prices:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

From: ▮▮▮▮▮▮
Sent: Tuesday, April 09, 2013 2:24 PM
To: ▮▮▮▮▮▮; Dave Rekenthaler
Cc: ▮▮▮▮▮▮▮▮▮▮▮▮
Subject: Clonidine - Mylan Challenges
Importance: High


Kevin / Dave,


Do we have a target share percentage we want to maintain/concede now that Mylan is back in supply?


We just gave up Rite Aid which was worth ~5% of our business and we also have a challenge from Omnicare which is also worth ~5%.  We received the Omnicare challenge yesterday.


Based on a discussion with Kevin Green, Mylan would follow a price increase.

66

638.    Green knew that Mylan would follow a price increase on Clonidine-TTS because earlier that day, Green had two phone calls with Nesta (Mylan), with one lasting one (1) minute and the other lasting eight (8) minutes.  In a follow-up call the following day between Green and Nesta lasting eleven (11) minutes, Mylan and Teva reconfirmed their agreement that Mylan would follow a Teva price increase on Clonidine-TTS.

### c.    *Tolterodine Extended Release*

639.    Teva planned to launch Tolterodine Extended Release ("Tolterodine ER") on January 2, 2014.  During the first half of December 2013, Teva was under the impression—based on conversations with potential customers—that Mylan was not in a position to launch until 30 to 60 days after Teva launched.  Nonetheless, Teva was considering how to allocate the market with Mylan when it did eventually launch.  On December 3, 2013, J.K., a marketing executive at Teva, sent an e-mail to Rekenthaler, K.G., and several other Teva colleagues stating "we

---

66    *Id.* at ¶ 192.

prepared for 50-60 share . . .  I am looking into the numbers as far as what this means."  To prepare offers and figure out the allocation of customers that would bring Teva its desired 50% to 60% market share, Teva executives were instructed to gather usage from potential customers.

640.    Through the first half of December 2013, as Teva was soliciting usage amounts from potential customers, customers were asking Teva to send in pricing offers before the launch.  Teva resisted sending out those offers and instead did not plan to do so until the January 2, 2014 launch date.  Teva's delay in putting together pricing for potential customers was part of a plan to drive up the amount it could charge for Tolterodine ER.  Specifically, Teva expected that on January 1, 2014, the price of branded Detrol LA would increase.  This would allow Teva to peg its price to the now inflated price of the branded drug and thereby command a higher price for Tolterodine ER on the January 2, 2014 generic launch date.

641.    At the end of the day on Friday, December 20, 2013, T.C. of Teva learned from D.H. at Cardinal that Mylan intended to launch its Tolterodine ER on January 2, 2014.  D.H. further provided T.C. with Mylan's pricing for two dosages, and conveyed that Mylan is "looking for a 40% market share," and that Teva "can figure the rest out."

642.    Figure it out they did.  T.C. informed her Teva colleagues of Mylan's plans.  K.G. of Teva then worked over the weekend to turn this information into initial pricing for all of Teva's potential customers and then shared it internally.  In a telling admission that Teva had no intention to bid competitively for all accounts, K.G. noted that the next step was "to pick who should receive" bids.  The goal in "pick[ing] who should receive" bids was to ensure that both Mylan and Teva received their previously stated market share goals:  Teva wanted "50-60 [%] share" while Mylan was only "looking for a 40% market share."

643.   On Monday, December 23, 2013, Rekenthaler, Patel, K.G., T.C., and several others at Teva had a telephone conference scheduled from 8:00 a.m. to 9:00 a.m. to discuss the Tolterodine ER launch strategy.  Just minutes before the meeting was to start, Rekenthaler tried calling Nesta at Mylan.  Nesta returned Rekenthaler's call at 8:15 a.m., which was during Teva's scheduled Tolterodine ER phone conference.  Rekenthaler nonetheless answered Nesta's call on his cell phone and the pair spoke for 1 minute, 26 seconds.  Immediately after Teva's scheduled Tolterodine ER phone conference, Rekenthaler tried calling Nesta two more times.  At 10:22 a.m., Nesta returned Rekenthaler's calls and the pair spoke for an additional 12 minutes, 2 seconds.  During these calls, Rekenthaler and Nesta exchanged the details about their offers to various customers, including the specific contractual language used in their offers.

644.   For example, at 10:33 a.m., while Rekenthaler was still on the phone with Nesta, K.G. sent an e-mail to Rekenthaler and others asking about the appropriate contractual language to use in offers about the potential for price increases.  Minutes after Rekenthaler finished his call with Nesta, he replied with the exact language, in quotes, that Mylan was using:

From:     Dave Rekenthaler
Sent:     Mon 12/23/2013 10:41 AM (GMT-05:00)
To:       ▓▓▓▓▓▓▓ Maureen Cavanaugh
Cc:       Nisha Patel02
Bcc:
Subject: RE: Proposed Price Increase Language

Mylans language is vague.  "Pricing subject to change at Mylan's sole discretion."  [67]

645.   Most importantly though, during these calls between Nesta and Rekenthaler, Teva and Mylan reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and Mylan could reach their target share without eroding pricing.

---

[67]  *Id.* at ¶ 200.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

646.    At 12:12 p.m. on December 23, 2013, K.G. circulated a revised version of Teva's pricing plan for the Tolterodine ER launch.  This new version incorporated Teva and Mylan's plan to allocate the market, including the submission of cover bids and abstention from bidding. Notably, the revised pricing plan included the following chart identifying the major customers (and their associated market share percentage) that Teva would receive to get close to its desired 60% market share while Mylan would get its desired 40% share:

| CVS | 18 |
| Wal-Mart | 5 |
| Cardinal | 8 |
| Omnicare | 1 |
| Anda | 2 |
| Rite Aid | 4 |
| Econdisc | 15 |
| McKesson | 6 |
| | 59 |[68]

647.    In exchange for Mylan either submitting cover bids or abstaining from bidding on these customers, Teva reciprocated by submitting cover bids and/or refusing to submit bids to customers that Mylan targeted.  This is demonstrated by the fact that Teva's newly revised pricing plan now included considerably higher direct invoice prices for major customers allocated to Mylan; namely Walgreens, Cigna, Humana, Optum RX, Prime Therapeutics, and

---

[68] *Id.* at ¶ 201.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Kaiser.  The table below includes a comparison of Teva's pricing plan for these Mylan customers before and after Rekenthaler spoke with Nesta on December 23, 2013:

| Dosages | Initial Pricing Plan | | Price after Dave Rekenthaler Speaks with Jim Nesta | |
|---|---|---|---|---|
| | WALGREEN | | WALGREEN | |
| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 83.03 | 114.30 | 107.93 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 249.08 | 342.90 | 323.80 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,383.78 | 1,866.90 | 1,798.91 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 83.03 | 114.30 | 107.93 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 249.08 | 342.90 | 323.80 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,383.78 | 1,866.90 | 1,798.91 |
| | CIGNA | | CIGNA | |
| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| | HUMANA | | HUMANA | |
| Product Description | | Direct Invoice | | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | | 88.05 | | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | | 264.15 | | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | | 1,467.50 | | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | | 88.05 | | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | | 264.15 | | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | | 1,467.50 | | 1,800.00 |
| | OPTUM RX | | OPTUM RX | |
| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |

[69]

648.    In addition to submitting inflated bids for Walgreens, Cigna, Humana, Optum RX, Prime Therapeutics, and Kaiser, Teva agreed to refrain from bidding for certain customers, such as Publix, Ahold, Hannaford, and PVA Health.

---

[69] *Id.* at ¶ 202.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

649.    The following day, on December 24, 2013, Rekenthaler and Nesta had two more calls to confirm and refine Teva and Mylan's market allocation agreement.  Those calls lasted for nine (9) minutes and eight (8) minutes, respectively.

d.    *Capecitabine*

650.    To resolve patent litigation, the brand manufacturer, Roche Pharmaceuticals, entered into settlement agreements with various generic manufacturers—including Teva and Mylan—that would allow those generic manufacturers to sell generic Capecitabine after a certain period of time.

651.    As early as January 2014, both Teva and Mylan were making plans for their eventual launch of Capecitabine.  Part of this planning included the sharing of information so that they could allocate the market between them.  For example, in a January 31, 2014 e-mail, J.P., a national accounts executive at Teva, informed K.G., Rekenthaler, and others at Teva that Mylan was courting a specific customer, Armada Health Care, and that "Mylan estimated Armada's share on [Capecitabine] at 37%."  Teva incorporated this data it received from Mylan into its own launch plan for Capecitabine.

652.    On February 26, 2014, Nesta of Mylan called Rekenthaler of Teva and the two spoke for sixteen (16) minutes.  Nesta informed Rekenthaler that Mylan would not be able to launch on time with Teva.  Rekenthaler immediately reported this news internally at Teva.

653.    In early March 2014, Teva launched as the exclusive generic Capecitabine manufacturer.  Teva remained the exclusive generic Capecitabine manufacturer until Mylan entered in August 2014.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

654.     On August 4, 2014, Nesta and Rekenthaler spoke by phone three times.  On these calls, Nesta informed Rekenthaler that Mylan would soon enter the Capecitabine market and the pair discussed how to allocate the market.

655.     For example, at 12:46 p.m. that day, Nesta called Rekenthaler and they spoke for a little more than five (5) minutes.  Immediately after hanging up the phone, Rekenthaler sent the following e-mail:



From:     Dave Rekenthaler
Sent:     Mon 8/04/2014 12:51 PM (GMT-05:00)
To:                                                      Nisha Patel02
Cc:        Maureen Cavanaugh
Bcc:
Subject: Capcetibine

Hearing Mylan to get approval this week.  We need to look at our market and discuss defense strategy. [70]

656.     Cavanaugh responded that she would be in the office the next day and wanted to discuss it with Rekenthaler in person.

657.     Less than an hour later, Rekenthaler sent another e-mail, just to Patel, asking her to run a customer report and indicating that Mylan will "be looking at ABC, McKesson, and Econdisc as well as a couple small guys, probably aiming at 35% share." Mylan did seek the business for each of these three companies and Teva conceded each of them, pursuant to the agreement Rekenthaler had reached with Nesta.

658.     On August 7, 2014, McKesson informed Teva that it received a bid for Capecitabine and gave Teva the opportunity to bid to retain the business.  Patel then sent an e-mail to K.G., Rekenthaler, and C.B. at Teva to ask if they had "[t]houghts in regards to [loss of exclusivity]."  C.B., a senior operations executive at Teva, replied that Teva did "have a plan,"

[70]   *Id.* at ¶ 211.

but C.B. did not want to put the plan in writing.  Instead C.B. told Patel she "wi[ll] call" to discuss it.  K.G., separately, questioned whether the competitive bid was coming from Mylan, and asked Rekenthaler whether he had any additional information.  Rekenthaler also did not want to put that "additional information" in writing, so he responded:  "I'll catch up with you today."

659.    The "plan" was the market allocation scheme previously agreed to by Nesta and Rekenthaler on behalf of Mylan and Teva.  The same day that Mylan put a bid in to McKesson, August 7, 2014, Nesta and Rekenthaler spoke by phone for nearly thirteen (13) minutes.  On that call, Rekenthaler and Nesta discussed Mylan's bid to McKesson and reconfirmed their market allocation scheme.

660.    This market allocation "plan" was highlighted in other e-mails as well.  On August 10, 2014, C.B. e-mailed Rekenthaler, Patel, and K.G. about the plan.  C.B. stated that C.B.'s "notes are showing that are (sic) plan is to concede McKesson, Econdisc, Rite-Aid, and Cardinal," but that C.B. wanted to confirm.  Rekenthaler corrected C.B., stating that Mylan is "going after McKesson, ABC (only) and Econdisc," but that Teva "ha[s] not heard from Econdisc yet." Rekenthaler knew Mylan was targeting Econdisc, even though Econdisc had not contacted Teva, because he and Nesta had previously discussed it.

661.    The next morning, at 8:30 a.m. on August 11, 2014, Rekenthaler alerted others at Teva that Mylan had received formal approval to market Capecitabine and that he was "[c]hecking on shipping status."  Five minutes later, Rekenthaler received a call from Nesta. After exchanging voicemails, the two spoke at 8:52 a.m.  The call lasted nearly six (6) minutes. Shortly after hanging up the phone, at approximately 9:02 a.m., Rekenthaler e-mailed K.G., Patel and others at Teva to confirm that Mylan's "primary targets are ABC, McKesson and Econdisc."

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

He added that Teva "may hear from some other smaller guys as well" and that he "do[es]n't expect price to be aggressive."

662.    In accordance with their market allocation scheme, Mylan targeted and Teva conceded the Capecitabine business at ABC, Econdisc, and McKesson/Rite-Aid.

663.    Teva also conceded some of the "smaller guys" as well, pursuant to the agreement.  On August 14, 2014, for example, Cigna informed Teva that it received a bid for Capecitabine.  On August 18, 2014, Rekenthaler called Nesta to discuss the market allocation scheme and Mylan's bid to Cigna.  The pair talked for thirteen (13) minutes.  The next day, K.G. circulated an internal e-mail confirming that Teva "will be conceding this business" at Cigna.

### 2.    Teva/Sandoz

#### a.    Ethinyl Estradiol and Levonorgestrel

664.    During the relevant time period, both Teva and Sandoz marketed Ethinyl Estradiol and Levonorgestrel under multiple names – including both Portia and Jolessa.

665.    In or around May 2012, Teva had much higher market share than Sandoz for both Portia and Jolessa.  Teva's market share for Portia was 37% compared to Sandoz's 17%, while Teva's market share for Jolessa was 43% compared to Sandoz's 11%.

666.    On May 11, 2012, Walmart contacted Teva with a right of first refusal and explained that another supplier had made an offer for the sale of four drugs, including Portia and Jolessa.  T.C., a senior sales executive at Teva, responded, "We really need to know who is challenging.  Sandoz???  Glenmark???"  The customer responded that it was Sandoz.  T.C. had initially been very reluctant to let Sandoz have the business, candidly remarking to the customer that, "[w]e are not going to let Walmart go to Sandoz [because] we have conceded a number of accounts to Sandoz that were not as strategic to Teva."

667.    After sending out a competitive offer for the sale of three drugs, including Portia and Jolessa, to the customer on May 16, 2012 and an even more competitive offer on May 18 – Teva abruptly backtracked on May 23, 2012 and removed Portia and Jolessa from the offer.  The night before this change in plans, on May 22, Green of Teva spoke on the phone with CW-2, then at Sandoz, for five (5) minutes, and agreed to withdraw the offer for Portia and Jolessa.  The decision to concede the Walmart business to Sandoz led to a more equal share split between the companies for both Portia and Jolessa.  Teva discussed the decision internally and explained that the reason for the "change in plans" was that Teva was "going to concede this business to Sandoz . . ."

668.    Sandoz continued to coordinate with Teva to achieve its "fair share" of the markets for both Portia and Jolessa.  On July 2, 2013, another key customer contacted Teva stating it had received bids on Portia and Jolessa and, in order for Teva to retain the business, Teva would need to submit its "best bids."  On July 9, 2013, CW-1 of Sandoz called Patel and left a voicemail.  Shortly thereafter, they connected for a sixteen (16) minute call.  On July 10, Teva learned that the challenger was Sandoz.  At 12:16 p.m., Rekenthaler forwarded an e-mail to Patel and posed the question, "Who's over at Sandoz now?"  Patel did not respond by e-mail, but due to the close proximity of their offices she likely related her conversation with CW-1 directly to Rekenthaler.

669.    Rekenthaler then called CW-2 at Sandoz at 1:26 p.m. that same day and they spoke for two (2) minutes.  CW-2 called Rekenthaler back a few minutes later and they spoke for nine (9) minutes.  CW-2 and Rekenthaler would speak once more later that day, at 4:48 p.m., for seven (7) minutes.  Later that same evening, Teva submitted a cover bid to the customer for Portia and Jolessa, which the customer described as "not aggressive enough" for their primary

supply.  Teva submitted an intentionally inflated bid for the two drugs in order to ensure that

Sandoz obtained the primary award with the customer.

> b.    *Temozolomide*

670.    The patent on Temodar, the branded version of Temozolomide, was set to expire

in early 2014, but both Teva and Sandoz had independently obtained the right to launch in

August 2013 – six months prior to the patent expiration.  Leading up to the launch of the generic,

Teva coordinated with Sandoz to divide up the market.

671.    On July 18, 2013, a large retail pharmacy customer ("Pharmacy-2") submitted an

RFP to Sandoz for Temozolomide.  Playing by the rules of the road, Sandoz waited to see what

Teva was going to do before submitting their own bid.  That same day, CW-1 received a

telephone call from Patel.  Patel sought information on Sandoz's current customers and discussed

options to allocate customers for Temozolomide.  Nothing was agreed to on that call.

672.    On July 22, 2013, P.G., a senior Sandoz executive, instructed his team to find out

Teva's plans with regard to Pharmacy-2:  "Please find out if Teva is submitting an offer to

them." The next morning, S.G., a national accounts executive at Sandoz, spoke with Pharmacy-2

and asked Pharmacy-2 to find out Teva's plans.  S.G. summarized his call with Pharmacy-2 to

his team:  "I just spoke to [Pharmacy-2] regarding Temozolomide.  [Pharmacy-2] has not yet

received an offer from Teva on the product.  At this time, [Pharmacy-2] is reaching out to Teva

to understand their supply and launch status.  [Pharmacy-2] will be circling back and I will share

the feedback we receive with everyone on this email trail."

673.    At the same time, CW-1 was reaching out to Teva directly to get more

information.  CW-1 called Patel at approximately 1:45 p.m. on July 23, 2013.  After exchanging

voicemails, they spoke for over fourteen (14) minutes that same afternoon.

674.    Also on the afternoon of July 23, Pharmacy-2 replied to Sandoz and cryptically delivered Teva's message regarding its plans for Temozolomide:

> **From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> **Sent:** Tuesday, July 23, 2013 3:26 PM
> **To:** Greenstein, Steven
> **Subject:**
>
> 8/11 launch
>
> Looking to play nice in 2 player market
>
> Have supply for that share.
>
> What are your plans?                              [71]

675.    By using Pharmacy-2 as its intermediary, Teva was able to communicate to Sandoz (a) when it was prepared to launch Temozolomide, (b) that it was not planning to compete aggressively or pursue more than its fair share, (c) that it had sufficient stock of Temozolomide to sustain around a 50% market share, and (d) an inquiry regarding Sandoz's plans for Temozolomide.  Sandoz understood the implications of the communication and understood that "Teva is seeking a ~45-50% share." One Sandoz executive responded internally and exclaimed that this was "[g]reat news . . . !"

676.    On July 30, 2013, another customer, CVS Caremark, contacted Teva asking for an offer on Temozolomide.  T.C., a senior sales executive at Teva, discussed the matter internally and asked her boss, Rekenthaler, "[i]s the strategy to target CVS[?]" Rekenthaler responded by alluding to the deal that had already been struck with Sandoz:  "We'll send offers out to everyone.  My instincts tell me Sandoz will end up with them as we'll probably be more focused on [Pharmacy-2] on this one.  Again, we'll send them out an offer same time as everyone else

---

[71]    Source:  Amended State AG Complaint No. 2 ¶ 230.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

and respond from there."  Rekenthaler most likely got his information from Patel.  Just one day

earlier, on July 29, 2013, Patel had called CW-1 at Sandoz and spoke for nine (9) minutes, where

the two discussed how to carve up the market for the drug.

677.    Teva and Sandoz were also coordinating through other channels.  After receiving

the RFP from Pharmacy-2, S.G. of Sandoz coordinated with T.S., a senior account executive at

Teva, on a seven (7) minute call on July 29, 2013 followed by an eleven (11) minute call on July

31, 2013.  After those calls, S.G. suggested in an internal e-mail on July 31 that Sandoz cede the

business and instead submit a cover bid:  "[Pharmacy-2] has received an offer from Teva on

Temozolomide.  They are asking for an offer from Sandoz.  Even if we decide not to take this

business, I would recommend that we submit an offer."

678.    Similarly, on July 29, 2013, Green spoke to CW-2 of Sandoz two (2) times.  The

two spoke again on July 31, 2013 for six (6) minutes.  During those calls, Green told CW-2

about Teva's launch plans and that Teva wanted Pharmacy-2's business.  The next day, August

1, 2013, D.P., another Sandoz executive, e-mailed Kellum, conveying the message from Green:

---

72   *Id.* at ¶ 234.

679.    Teva and Sandoz communicated their future plans with each other for other accounts in addition to Pharmacy-2 and CVS.  On July 31, 2013, D.P. of Sandoz e-mailed an update on Temozolomide to his coworker, stating:  "Teva has sent offers to ABC and [Pharmacy-2] and is planning to send to Econdisc tomorrow[.]"

680.    Going forward, Sandoz and Teva continued to coordinate with respect to Temozolomide.  On August 12, 2013, the same day as Teva's launch, CW-2 met in person with Rekenthaler at the Grand Lux Café in Las Vegas during the NACDS Total Store Expo conference.  There, Rekenthaler discussed, among other things, Temozolomide and informed CW-2 that Teva had officially launched and shipped all formulations of the drug.

681.    Although Teva initially obtained the CVS account in August 2013 due to Sandoz's inability to supply the 250mg strength of Temozolomide, the companies had agreed that the account would revert to Sandoz once Sandoz could supply that dosage strength.  In an internal e-mail dated August 16, 2013, a Teva employee confirmed the plan:  "This is perfect I spoke to [a CVS representative] and as soon as Sandoz is available to launch the 250mg we kill the contract."

682.    CW-1 spoke to Patel both before and after Sandoz sent out any offers regarding Temozolomide to develop and ensure the appropriate fair share balance between the two competitors.

c.    *Tobramycin*

683.    Beginning in October 2013, prior to the first generic launch of Tobramycin (for which Teva would have 180-day generic exclusivity), Sandoz began making plans for its entry after Teva's exclusivity period.  These plans included going after Sandoz's "fair share," but depended on Teva being "rational."  A.S., a Sandoz executive responsible for product launches,

wrote in an internal e-mail in October 2013:  "[w]e will aim to go for our fair share of the market, and exact goals will depend on how Teva goes into the market on day 1, and how rational they behave on day 181."

684.    As expected, Teva was "rational" when it came time to give up share to Sandoz. Nearing Teva's loss of exclusivity and Sandoz's entry, on July 1, 2014, Teva and Sandoz began sharing information and coordinating to divide up the market for Tobramycin.  Patel exchanged seven (7) calls with CW-1 on July 1, during which they discussed Sandoz's launch plans and how to divide up the market for Tobramycin.  Patel conveyed some of this information in an internal Teva e-mail the same day, writing, "[A]s a heads up, I heard that Sandoz plans to ship Tobi [Tobramycin] prior to Akorn.  Hearing they are ready to ship once they secure business, and we have been challenged."  The next day, Teva made the decision to concede two different accounts for Tobramycin to Sandoz.

685.    On July 7, 2014, Patel and CW-1 spoke five more times, including one call lasting eleven (11) minutes.  On these calls, CW-1 and Patel discussed how to divide up the market for Tobramycin, including specific accounts that each would maintain or concede to the other.  Patel then memorialized the agreement in an e-mail two days later.  The result:  Teva would take Walgreens, McKesson, Econdisc, ABC, and Omnicare; while Sandoz would take CVS, Cigna, Prime Therapeutics, Kinney Drugs, and OptumRx.  Teva also planned to concede the Cardinal business to Sandoz.

686.    Patel told CW-1 specifically that Teva would not even submit a bid to CVS.  This was significant because Tobramycin was a very expensive product, and Sandoz was able to acquire the CVS business by offering only a nominal reduction to the extremely high Teva price.

687.    According to plan, Teva conceded the CVS business to Sandoz after CVS contacted Teva and requested that Teva submit a lower price to retain the business.  Rekenthaler wrote in an internal e-mail, "I notified CVS that we would be conceding their business.  [T.C.], never a pleasant call so I figured I'd simply handle it myself." Teva also went through with its plan to concede Cardinal to Sandoz.

688.    CW-1, in turn, told Patel that Sandoz would not pursue business from ABC and Walgreens.  CW-1 spoke with Kellum about his conversations with Patel and the agreement to stay away from Walgreens and ABC, and Kellum agreed with the plan.  Pursuant to that agreement, Sandoz made no effort to contact those two large customers when it entered the market.

689.    CW-1 and Patel also discussed Sandoz's target market share.  CW-1 informed Patel that Sandoz was seeking a 50% share, but Patel thought that was "unrealistic due to Akorn's expected entry." After discussing Sandoz's share goal with Rekenthaler, Patel went back to CW-1 and informed him "that a 25% share was reasonable." Sandoz appeared to comply with that, as Patel observed that Sandoz "appear[s] to be taking a responsible approach."

690.    On July 9, 2014, one of the above allocated customers, Kinney Drugs, approached Teva asking for a lower price on Tobramycin.  A Teva analyst stated in an internal e-mail, "[w]e are strategically going to decline to bid on this request per Nisha." A Teva national accounts director was confused by this decision and responded, "Really? Do you have a little more detail? It is such a small qty." The analyst responded and said, "[w]e were given direction from Nisha not to pursue this opportunity.  My understanding of this is there is a new market entrant, (Sandoz) and we are trying to keep our current customers instead of picking up new business." Patel's direction had come after she had called CW-1 at Sandoz twice on July 9, 2014 and left

him a voicemail.  CW-1 then returned her call the same day and the two spoke for four (4) minutes.

<em>d.    Dexmethylphenidate HCL Extended Release</em>

691.     As Sandoz was preparing to enter the market on the 40mg strength of Dexmethylphenidate HCL ER in February 2014, Patel of Teva spoke frequently with CW-1 at Sandoz about how to divide the market so that Sandoz could obtain its fair share without significantly eroding the price.  On February 10, 2014, for example, CW-1 began internal preparations to pursue the Rite Aid account for Dexmeth ER 40mg.  Later that night, CW-1 called Patel and the two spoke for more than thirteen (13) minutes.  On February 18, Patel left a voicemail for CW-1.  That same day, Teva conceded the Rite Aid account to Sandoz.  Patel and CW-1 then spoke again by phone on February 20, 2014.

692.     Similarly, on February 12, 2014, Sandoz submitted a bid to ABC for the 40mg strength of Dexmeth ER.  After Patel spoke with CW-1 on February 10 and again on February 12, 2014, Teva agreed to let Sandoz have the business.  In an e-mail to her team on February 12, Patel summarized the understanding that Teva had reached with Sandoz:



693.     One of the Teva national account managers on the e-mail responded by confirming that the approach "makes total sense."

---

[73] *Id.* at ¶ 250.

694.     On February 14, 2014, Teva also refused to lower its price for Dexmeth ER when approached by a GPO customer, Anda, even though Sandoz's price was not significantly lower than Teva's – essentially conceding the business to Sandoz.

695.     Further, on February 20, 2014, another large retail customer approached Teva indicating that because a new competitor had launched for Dexmeth ER, the customer was entitled to certain price protection terms (i.e., a lower purchase price for the drug).  Patel spoke to CW-1 the same day for almost twenty-one (21) minutes.  The next day, February 21, Patel responded internally about the customer's request, with additional inside information from Sandoz, stating:  "[t]he competitor (Sandoz) has not yet shipped.  The new price will become effective on and the price protection should be calculated on the date that Sandoz ships.  The expected date is 2/28/14."

696.     Also on February 21, 2014, Patel sent a calendar invitation to Rekenthaler and other team members for a meeting on February 24 where one of the topics to be discussed was "Post Launch Strategy" for "Dexmethylphenidate 40mg:  Sandoz (AG) entering market."  Not surprisingly, she called CW-1 a few days later, on February 27, to further coordinate about Dexmeth ER.

697.     Throughout this time period, Sandoz abided by fair share principles and its ongoing understanding with Teva.  In February 2014, Sandoz's target market share for varying strengths of Dexmeth ER varied by how many manufacturers were in the market.

698.     Teva and Sandoz were not alone in allocating customers for certain formulations of Dexmeth ER.  The agreement was also carried out by other manufacturers allowing Sandoz to take share from them.  In February 2014, for example, as Sandoz was seeking share on the 15mg dosage strength of Dexmeth ER, Par "gave up the business to keep the market share even."  As

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Sandoz was entering the market, Rekenthaler of Teva was speaking to M.B., a senior national account executive at Par, right around the same times that Patel had been speaking to CW-1 – including two calls on February 10 (18 and 3 minutes), two (2) calls on February 19 (2 and 22 minutes), and calls on February 24 and 25, 2014 – in order to effectuate the scheme.

699.    The market allocation scheme between Teva and Sandoz on Dexmeth ER continued through at least mid-2015.  On May 6, 2015, for example, Teva declined to submit a bid to Walgreens for Dexmeth ER 5mg on the basis that "there is equal share in the market between competitors." Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed Health Care Associates, a large GPO, on Dexmeth ER 20mg, on the basis that Sandoz already had 57% market share – greater than its sole competitor on this dosage strength, Teva.  When a Sandoz national account representative communicated this decision to the customer, he lied and explained that the decision not to bid was based on limited supply.

### 3.    Teva/Lupin

#### a.    *Lamivudine/Zidovudine (generic Combivir)*

700.    Teva launched its generic Combivir product in December 2011.

701.    In mid-May 2012, two competitors – Lupin and Aurobindo – received FDA approval for generic Combivir and were preparing to enter the market.

702.    Even before those two companies obtained FDA approval, Teva was communicating with both about how to share the market with the new entrants.  Rekenthaler was speaking to R.C., a senior-most executive at Aurobindo, while Green was speaking to Berthold of Lupin and Grauso of Aurobindo.

703.    For example, on April 24, 2012, T.C. of Teva asked her co-workers whether they had heard about any new entrants to the market for generic Combivir.  Rekenthaler responded

immediately that Aurobindo was entering.  When T.C. questioned that information based on her

understanding of how quickly the FDA typically approved new product applications,

Rekenthaler assured her that the information was coming from a reputable source:

> **From:** Dave Rekenthaler
> **Sent:** Tuesday, April 24, 2012 11:17 AM
> **To:** ██████████
> **Subject:** RE: what r you guys hearing on generic combivir?
>
> It was brought up to me last week by our good friend so I'm assuming it's accurate.
> [74]

704.    That "good friend" was Aurobindo's R.C., who had previously worked with both

T.C. and Rekenthaler while at Teva.  Rekenthaler was reluctant to identify R.C. in writing as it

would evidence conspiratorial communications between the two competitors.  To confirm this

information, Green also called and spoke to Grauso of Aurobindo that same day for twelve (12)

minutes and Berthold of Lupin for four (4) minutes.

705.    After speaking with Berthold, Green responded separately to T.C., providing

specific information regarding Lupin's entry plans, including commercially sensitive intelligence

about Lupin's anticipated bid at a large wholesaler.  Green and Berthold then spoke again the

next day, April 25, 2012, for seven (7) minutes.

706.    In early May, with the Lupin and Aurobindo launches just days away,

communications among all three competitors accelerated noticeably.  Over the four-day period

from May 7 to May 10, for example, the three companies spoke at least 32 times, as set forth in

---

[74] *Id.* at ¶ 261.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Durati |
|------|----------|-------------|-----------|--------------|--------|
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:10 |
| 5/7/2012 | Text | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:00 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:41 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:03:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:36 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:02:32 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:17 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:00 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:02:00 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:47 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:31 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:02:29 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Teva) | 0:00:24 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:07:57 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:02 |
| 5/9/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 0:13:00 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:06:07 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:01 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:39 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:07:27 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:03:10 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:10:15 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:05:52 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:13:29 |

[75]

707.    During this four-day period, the three individuals were negotiating and discussing the specific customers that Teva would concede and retain in order to make Lupin and Aurobindo's entry into the generic Combivir market as seamless as possible.  The phone records demonstrate several instances during this four-day period where two of the individuals

---

[75]   *Id.* at ¶ 263.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

referenced above (Green, Berthold and/or Grauso) would speak, followed by a phone call by one of those two individuals to the individual that was not part of the original conversation.

708.     Lupin was able to enter the market for generic Combivir and obtain more than a 30% market share without significantly eroding the price due to the understanding with Teva and Aurobindo that each was entitled to its fair share of the market.

*b.     Irbesartan*

709.     Teva received approval to manufacture generic Irbesartan in March 2012.

710.     On March 6, 2012, Teva's K.G. polled the Teva sales team seeking information about competitors that were also making offers to supply Irbesartan.

711.     At 11:27 a.m., J.P., an account manager at Teva responded:  "Lupin is promising offers today." Less than twenty minutes later, Green placed a call to Berthold at Lupin.  They talked for seventeen (17) minutes.  Shortly after hanging up the phone, Green e-mailed his colleagues with the information he obtained:

```
From:     Kevin Green
Sent:     Tue 3/06/2012 12:26 PM (GMT-05:00)
To:                              ; Dave Rekenthaler;
Cc:                         ; Maureen Cavanaugh
Bcc:
Subject: RE: Irbesartan


Lupin is looking for a 15% share. They already have ABC. Confirmed Zydus is out. I assume Winthrop id the AG
```
[76]

712.     That same day, Rekenthaler informed the group that he still had not received "a call from any other manufacturer on Irbesartan." He received an immediate response from a

---

[76]   *Id.* at ¶ 273.

senior commercial operations executive at Teva, expressing his displeasure:



From:
Sent:      Tue 3/06/2012 3:08 PM (GMT-05:00)
To:        Dave Rekenthaler;                    ; Kevin Green;
Cc:                    Maureen Cavanaugh
Bcc:
Subject: RE: Irbesartan

Then work harder….

[77]

713.     At 10:54 a.m. the next day, Green called Berthold again.  They spoke for nearly

seven (7) minutes.  At 12:20 p.m., K.G. of Teva shared with the sales team the competitively

sensitive information Green had obtained.  Included were the details Berthold had shared with

Green about which competitors were launching/not launching the drug, and the identity of the

customers that received offers.  K.G. stated that Teva was in a position to take up to a 40%

market share when it launched Irbesartan on March 30, 2012.

> c.     *Drospirenone and Ethinyl Estradiol (Ocella)*

714.     Barr Pharmaceuticals received approval to market generic Ocella in 2008, and

Teva continued to market the drug after the acquisition of Barr in 2011 under the name Gianvi®.

715.     In late 2012, Lupin received approval to market a generic Ocella product.

716.     By April 2013, Lupin was making plans for a summer 2013 entry into the market

and contacted Teva to initiate negotiations on how the competitors would allocate fair share

between themselves.  On April 24, 2013, Berthold of Lupin called Green at Teva.  The two

spoke for over three (3) minutes.  Berthold called Green two more times the following day.

717.     The negotiations intensified the following week among Teva, Lupin, and a third

competitor – Actavis.  In preparation, on April 29, 2013, K.G. of Teva asked a colleague for

---

[77] *Id.* at ¶ 274.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

current market share figures along with a list of Teva's generic Ocella customers.  The colleague responded with a customer list, estimating Teva's current share of the market at 70-75%.

718.    The next day, April 30, A.B., a senior sales and marketing executive at Actavis, and Rekenthaler of Teva spoke twice by phone.  That same day, Patel of Teva also called A.B.  On May 1, Patel sent A.B. four (4) text messages.

719.    The competitors' communications continued into early May.  On May 6, Patel and Berthold spoke twice by phone; the second call lasting twenty-two (22) minutes.  Green and Berthold also spoke that same day.  On May 7, Patel and Berthold had yet another call, this one lasting over ten (10) minutes.  Patel also placed a call to Rogerson at Actavis, which lasted thirty-nine seconds.

720.    Faced with the news it had received from a major customer on May 8 – that Actavis had bid for that customer's business for generic Ocella – Teva doubled down on its efforts to reach a deal with its competitors that would give each its fair share.  Patel called Rogerson on May 8, and they spoke for nineteen (19) minutes.  On May 9, Green spoke with Berthold twice, for one (1) and twelve (12) minutes, respectively.

721.    The following day, Teva's L.R. complied with Rekenthaler's request for an analysis of the business Teva would lose by conceding its two major customers for this drug to Actavis and/or Lupin.  Armed with that analysis, Patel spoke to Berthold three times that afternoon – with one call lasting over seventeen (17) minutes.  Patel also called Rogerson at Actavis and the two spoke for more than five (5) minutes.

722.    On May 14, 2013, K.G. of Teva recommended to Rekenthaler that Teva concede the business to Actavis.  Rekenthaler replied simply:  "Agreed."

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

723.    On July 10, 2013, Green spoke to Berthold twice (for more than eight (8) minutes and more than two (2) minutes).  After the first of those calls, Green requested specific information from a colleague to help him continue to negotiate with Lupin:

> **From:** Kevin Green
> **Sent:** Wednesday, July 10, 2013 9:46 AM
> **To:** ▮▮▮▮▮▮▮▮
> **Cc:** ▮▮▮▮▮▮▮, Nisha Patel02
> **Subject:** Ocella
>
>
> Tom,
>
>
> Can you run me the normal profitability analysis on all customers with pricing and market share. Lupin is entering the market. [78]

724.    Later that day, Green called and spoke to Patel for more than seven (7) minutes, conveying what he had learned from Berthold.  During that call, the two decided that Patel would call Berthold back and confirm the agreement between Teva and Lupin.  Patel called Berthold shortly after and the two spoke for more than four (4) minutes.  They spoke again first thing the next morning, for nearly one (1) minute.

725.    The next day, Patel e-mailed Green, saying:  "BTW, Ocella.  Check!"  Green, confused by the e-mail, responded:  "Huh...  you are calling....correct?"  Patel confirmed that she had indeed called her counterpart at Lupin:  "Yes.  I was saying it's all done."

726.    Discussions between Teva and Lupin continued on July 17, 2013 with a call between Green and Berthold that lasted twenty (20) minutes.

727.    On July 29, 2013, Green announced to his colleagues:  "Lupin has entered and we need to evaluate."

---

[78]    *Id.* at ¶ 286.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

728.    The lines of communication between competitors Teva and Lupin remained open and active over the next few months as they worked on the details of which company would take which generic Ocella accounts.  On September 5, 2013, for example, Rekenthaler conveyed to a colleague the importance of retaining a particular customer's account, along with his understanding of Green's discussions with Berthold about Lupin's desired market share.  Green spoke to Berthold by phone twice the following day to confirm the understanding between the two companies.

729.    On September 9, 2013, K.G. of Teva sent an internal e-mail to his colleagues conveying his thoughts about Lupin's bid for a portion of another customer's generic Ocella business.  He informed them that because Teva had secured two other significant customers, "we will likely need to give up some of our formulary position to this new market entrant."

730.    In mid-October 2013, as Teva and Lupin finalized the allocation of accounts between them, K.G. sent a word of caution to a co-worker, reminding her of the parameters of the furtive arrangement.  He told her to be careful before conceding large customers on a "bucket basis" rather than drug-by-drug in order to "make sure we are not giving up volume on products where we do not have our fair share."

d.    *Norethindrone/Ethinyl Estradiol (Balziva ®)*

731.    Teva markets its generic version of Norenthindrone/Ethinyl Estradiol under the name Balziva®.

732.    On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business.  Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing Norethindrone/Ethinyl Estradiol.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

733.   Teva employees discussed internally how to make room for this new player in the market, with one expressing concern that "[w]e would lose our current market lead if we were to concede this business."

734.   The discussions about how to share the market with the recent entrant were not limited to internal communications, however.  On January 24, 2014, Patel spoke to Berthold at Lupin twice by phone.

735.   Five days later, on January 29, Patel informed Rekenthaler of her recommendation based on her communications with Berthold, to take a cooperative stance towards this competitor, saying:  "Kevin and I are in agreement that we should concede part of the business to be responsible in the market."

736.   On February 4, Patel received the profitability analysis she requested in order to determine how much of the customer's business to hand over to Lupin.  That same day, she spoke to Berthold two more times to further coordinate Lupin's seamless entry into the market.

### 4.   Teva/Actavis

#### a.   Amphetamine/Dextroamphetamine Extended Release

737.   Teva began marketing Amphetamine/Dextroamphetamine Extended Release ("MAS-XR"), after the expiration of brand manufacturer Shire's patent on Adderall XR®.

738.   On April 9, 2012, a large customer contacted Teva to request a price reduction because a new competitor had expressed an interest in "all or some" of its MAS-XR business.  A senior Teva sales director, T.C., insisted on knowing the identity of the competitor before deciding what Teva's response would be.  The customer responded that the competitor was Actavis, and that Actavis was expecting approval soon to enter the market for that drug.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

739.    Teva deferred its decision on pricing until Actavis was in a position to ship the product.

740.    Actavis obtained FDA approval to manufacture various formulations of MAS-XR on June 22, 2012.  At 9:58 p.m. that same evening, Rekenthaler instructed Teva employees to find out Actavis's plans regarding its newly-approved generic, including shipping details and inventory levels.  At 8:32 a.m. the next morning, Teva employee T.S. responded that she had spoken to M.P., a senior Actavis sales and marketing executive, and conveyed to Rekenthaler the details of their conversation:

> **From:** ▮▮▮▮▮
> **Sent:** Saturday, June 23, 2012 8:32 AM
> **To:** Dave Rekanthaler; ▮▮▮▮▮▮▮▮▮▮ Kevin Green
> **Subject:** Re: Actavis Adderall XR
>
> Spoke to ▮▮▮▮. Going after approx 15 share.
> 1 wholesaler (either McKesson or Cardinal) as backup and possibly Econdisc. NOT Walgreens and CVS. [79]

741.    The customer that had sought a price reduction from Teva in April 2012 was not among those named by Actavis as its targets.

742.    Upon learning which customers Actavis wanted, T.C. warned colleagues that this allocation of market share could be tricky.  She cautioned that if Teva decided to concede a particular wholesaler to Actavis, it needed to be "mindful" that the wholesaler also did product warehousing for a different customer whose business Actavis was not soliciting.

743.    One year later, Teva's customer renewed its request for a price reduction on MAS-XR, citing Actavis's desire to gain a share of the customer's business for the drug.  On May 7, 2013, T.C. informed the customer that Teva would agree to revise its price in order to

---

[79]    *Id.* at ¶ 333.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

retain 100% of the customer's business.  T.C. made it clear that Teva had already conceded an appropriate amount of business to its competitor.  She stated:  ". . . we have plenty of supply and want to keep you [sic] full business [sic] we have already let other customers go to activis [sic] go to help the market dynamites [sic]."

b.      *Amphetamine/Dextroamphetamine Immediate Release*

744.    In March 2014, Aurobindo was making plans to enter the market with its amphetamine/dextroamphetamine immediate release ("MAS-IR") product.  On March 18, 2014, Teva's J.P. shared with her colleagues that Aurobindo's market share target for the impending launch was 10%.  Teva's senior marketing operations executive, K.G., indicated that Teva was aware that both Aurobindo and Actavis were launching.

745.    A flurry of telephone communications between Teva and these two competitors took place on the days surrounding the foregoing e-mail.  The day before, on March 17, 2014, Patel had spoken to Actavis's Director of Pricing, Rick Rogerson, three (3) times.  Rekenthaler and Falkin of Actavis also spoke once on that day.  On March 18, 2014, the day of the e-mail, Rekenthaler and R.C., a senior-most executive at Aurobindo, had a thirty (30) minute telephone conversation.  Rekenthaler and Falkin spoke again seven (7) times on March 20, 2014.

746.    On April 16, 2014, Teva received word from a customer that a new competitor in the market had offered a lower price than Teva's current price for MAS-IR.  Patel informed K.G. that the challenge was coming from Actavis and recommended that Teva concede that customer's account.  At 1:43 p.m., she communicated to another colleague that the decision had been made to concede.  Apparently closing the loop, she called Rogerson at Actavis at 1:55 p.m. They spoke for just over four (4) minutes.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

c.      *Dextroamphetamine Sulfate*

747.    On June 19, 2014, as Actavis was entering the market for Dextroamphetamine Sulfate Extended Release ("Dex Sulfate XR"), Patel reviewed a profitability analysis for that drug and asked Rekenthaler what share of the market Actavis was targeting.  Rekenthaler responded:  "20-25%." Rekenthaler knew Actavis's market share goals because he and Falkin of Actavis had spoken twice by phone that morning – once for more than eleven (11) minutes and again for more than nine (9) minutes.

748.    Five days later on June 24, 2014, Teva employee S.B. confirmed to her colleagues in an e-mail that Actavis had entered the market for Dex Sulfate XR.  She remarked that Teva had a 72.2% share of this "multi-player market" and thus recommended giving up a large customer to Actavis and reducing Teva's market share to 58.3% – in accordance with the industry understanding to allocate the market, and Teva's ongoing agreement with Actavis.  Later internal e-mails confirmed Teva's decision to concede that customer to Actavis because "Actavis is entering the market and seeking share."

749.    Aurobindo entered the market for Dex Sulfate Tablets under similar circumstances in 2014.  When Aurobindo entered, Teva ceded customers to Aurobindo.  At that time, in mid-2014, personnel from Aurobindo were in communiation with personnel from Teva.

750.    Before Actavis entered the market for Dex Sulfate XR, Teva and Impax were the principal manufacturers.  Back in 2011, when Impax was preparing to enter the market, Teva increased WAC prices in advance of Impax's entry.  When Impax entered, it matched Teva's prices rather than undercut prices to take share.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

d.      *Clonidine-TTS*

751.    Clonidine-TTS Patch—also known by the brand name Catapres-TTS—is a medication in the form of a transdermal patch that is used to treat high blood pressure.

752.    Teva began marketing Clonidine-TTS in 2010 after the expiration of brand manufacturer Boehringer Ingelheim's patent on Catapres-TTS®.

753.    On May 6, 2014, Actavis was granted approval to market Clonidine-TTS.  Teva and Actavis immediately commenced an extensive negotiation over price and market share. Rekenthaler and Falkin spoke by phone three times that day for fifteen (15) minutes, one (1) minute, and three (3) minutes, respectively.

754.    The next day, Rekenthaler announced to his colleagues that Actavis was entering the market.  K.G. of Teva responded by requesting that Patel come up with a recommendation as to which customers Teva should concede to Actavis.  At the same time, Teva employees bemoaned Actavis's "ridiculous" low pricing for a new entrant, saying that price "is already eroded here."

755.    On May 8, 2014, Teva personnel accelerated their efforts to convince Actavis to revise its pricing and market share plans for Clonidine-TTS to more acceptable levels with an even more intensive flurry of phone calls.  On that day, Rekenthaler spoke to Falkin three more times (5-, 10-, and 8-minute calls).  Patel spoke to Rogerson at Actavis four times, the last call coming at 9:54 a.m.  At 10:02 a.m., she informed her colleagues of the results of the negotiations, instructing them:  "Please concede Ahold and HEB."

756.    The following day, May 9, 2014, Patel learned from yet another customer of a "competitive price challenge" on this drug.  Suspecting the source of the challenge was Actavis, Patel called Rogerson three times.  Following those conversations, Patel informed her colleagues

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

that Actavis wanted 25% of the market.  She also stated that Actavis would likely want 10%-15% of that share from Teva.  During those conversations, she also likely conveyed her displeasure to Rogerson about how low Actavis's pricing was, because not long after those phone calls, she conveyed to her supervisor, K.G., that "I just found out that Actavis rescinded their offer." Shortly after that, Patel also learned that Actavis had "resent all of their offer letters at pricing that is higher than our [Teva's] current."

757.    Rekenthaler described to his colleagues the agreement he was willing to strike with Actavis over market share, saying:  "I'm okay with adjusting 15% but we're not going to play any games with them.  They take the 15% and I don't want to hear about this product again."  Teva's senior sales executive, T.C., cautioned him on the importance of maintaining a cooperative stance towards this competitor, saying:  "now, now Mr.  Rekenthaler play nice in the sand box . . . .  If history repeats itself activist [sic] is going to be responsible in the market. . . ."

758.    The market share give-and-take between Teva and Actavis continued over the coming weeks, with Teva conceding accounts to the new entrant in order to allow Actavis to achieve its "fair share" of the market for Clonidine-TTS.  On May 14, 2014, for example, Patel told colleagues that Teva must be "responsible" and concede a particular wholesaler's account to Actavis.  On May 17, 2014, Teva conceded a large retailer account to Actavis.  On May 20, 2014, Patel again declined to bid at another customer due to the new entrant Actavis, stating:  "We are trying to be responsible with share and price."

759.    When L.R., Teva's analytics manager, recommended giving up yet another Clonidine-TTS account to Actavis on May 23, 2014, after several conversations between Patel and Rogerson the prior day, K.G. of Teva reluctantly approved, saying:  "[o]kay to concede, but we are getting to the point where we will not be able to concede further."

### e.    Budesonide Inhalation

760.    Teva obtained approval to market Budesonide inhalation in November 2008. Prior to February 2015, Teva controlled virtually the entire market for generic Budesonide inhalation, with other competitors having less than 1% market share.

761.    On February 13, 2015, Rekenthaler informed other Teva employees of Actavis's plans to enter the market, saying:  "[i]t appears that Actavis is intending on shipping" Budesonide inhalation.  Rekenthaler and Falkin of Actavis had spoken by phone three days earlier on February 10, 2015.

762.    On February 16, 2015, Rekenthaler and Falkin had another lengthy telephone conversation lasting twenty-three (23) minutes.  The following morning, Teva's T.C. confirmed to her colleagues that Teva had conceded the Budesonide inhalation accounts of two major customers to Actavis.  She explained that Actavis's sense of urgency to obtain the accounts was due to concerns about getting its product into market before it faced legal action from the brand manufacturer.  Thus, she explained, she was working with the customers on an "exit strategy" to get Teva's product out of the supply channel, so as to streamline Actavis's entry into the market.

### f.    Celecoxib

763.    Teva received approval to market Celecoxib in May 2014.

764.    On November 20, 2014, as Teva was preparing to launch its Celecoxib capsules, a customer informed Teva that Actavis was vying for some of the customer's Celecoxib business. The customer indicated that Actavis was preparing for a launch of its own and had advocated its position by pointing out that it was just trying to "get their share" in light of the fact that Teva had already secured over 30% of the market.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

765.     Rekenthaler took a cooperative – rather than competitive – stance upon hearing that news, saying: "That's all pretty accurate and hard to argue with."

766.     By December 1, 2014, however, the issue of where Actavis would obtain its desired market share remained undecided.  Another customer, a large retail pharmacy chain ("Pharmacy-4"), became actively involved in trying to broker an agreement between Teva and Actavis on how much share each company would take upon launch.  Actavis reportedly sought 25% of Pharmacy-4's Celecoxib business.  A representative of Pharmacy-4 told Teva's T.C. that "he would not move this unless we are all on the same page" and that he did not have an issue with sending Actavis "a message."

767.     Rekenthaler's response was consistent with the "fair share" understanding, saying "I don't want to give up anything . . . .  We're at 32% and I think that's reasonable."

768.     In the days leading up to Teva's December 10, 2014 launch, Teva executives had numerous telephone conversations with their counterparts at Actavis.  Rekenthaler had a six (6) minute call with Falkin at Actavis on November 25.  The two spoke twice more on December 3 – once for two (2) minutes and another time for one (1) minute.  Patel spoke to A.B., a senior sales and marketing executive at Actavis, for over eight (8) minutes on December 5, and for over sixteen (16) minutes on December 8.  Rekenthaler and Falkin resumed their communications the day before the Teva launch – December 9 – with a one (1) minute phone call.  On the day of the launch – December 10 – Rekenthaler and Falkin spoke three times with calls of one (1) minute, nine (9) minutes, and three (3) minutes in duration.

5.    **Teva/Par**

          a.    *Omega-3-Acid Ethyl Esters*

769.    Teva launched Omega-3-Acid Ethyl Esters on April 8, 2014.  During this time period, manufacturers of the drug were all experiencing various supply problems, affecting how much market share each would be able to take on.

770.    On the morning of June 26, 2014, Patel e-mailed C.B., a senior operations executive at Teva, to inform C.B. that Par had recently received FDA approval for Omega-3-Acid Ethyl Esters.  C.B. responded by asking if Par had started shipping that product.  Patel replied at 10:24 a.m. that she had not heard anything yet but promised to "snoop around."

771.    Patel had indeed already started "snooping around."  At 9:46 a.m., she had sent a message to T.P., a senior-most executive at Par, through the website LinkedIn, stating:



[80]

_____

[80]    Amended State AG Complaint No. 2 ¶ 366.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

772.     T.P. did not respond through LinkedIn, but texted Patel on her cell phone later that day, initiating a flurry of ten (10) text messages between them in the late afternoon and early evening of June 26.  That night, Patel followed up with C.B., informing her that the only thing Patel knew at that point was that Par was limited on supply, but that she was "working on getting more . . . ."

773.     The next morning, T.P. called Patel and they spoke for nearly thirty (30) minutes. That was the first and only voice call ever between the two according to the phone records.  That same morning, Patel informed C.B. that she now had "some more color" on Par's launch of Omega-3-Acid Ethyl Esters and would "fill you in when we speak." Patel also communicated this information to Rekenthaler.  At 11:27 a.m. that same morning, Rekenthaler sent an e-mail to T.C., a Teva sales executive, with a veiled – but clear – understanding about Par's bidding and pricing plans:

> "You're aware PAR receive [sic] an approval.  I would imagine that CVS is going to receive a one time buy offer from PAR.  I'm also assuming the price would be above ours so there should not be a price request (which we would not review anyway).  My point in the email is to ensure that you are aware of all of this . . . ."

774.     Par launched Omega-3-Acid Ethyl Esters Capsules the following Monday, June 30, 2014.

775.     After the discussions between Patel and T.P. at Par, Teva proceeded to concede business to Par to ensure Par's smooth entry into the market.  As of July 11, 2014, Teva's share of the market for new generic prescriptions had dropped 15.9 points to 84.1% and its share of the total generic market (new prescriptions and refills) had dropped 16.3 points to 83.7%.

776.     As new competitors entered the market, Teva coordinated with them to avoid competition and keep prices high.  For example, in an internal e-mail on October 2, 2014, Teva's

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

K.G. stated that "[w]e heard that Apotex may be launching with limited supply and at a high price." Rekenthaler had obtained this information through phone calls with J.H., a senior sales executive at Apotex, on September 25 and 27, 2014 – and then conveyed the information internally at Teva.

777.    Because of supply limitations, Par was not able to meaningfully enter the market until late November 2014.  On November 10, 2014, Patel and T.P. exchanged five (5) text messages.  On December 1, 2014, Teva was notified by a customer that it had received a price challenge on Omega-3-Acid Ethyl Esters.  T.C. at Teva speculated that the challenge was from Apotex, but Rekenthaler knew better, stating "I'm confident it's Par."  Rekenthaler informed T.C. that Teva would not reduce its price to retain the business – thus conceding the business to Par.

778.    By mid-February 2015, Teva had conceded several large customers to Par to smooth Par's entry into the market and maintain high pricing.  During this time, Rekenthaler was speaking frequently with M.B., a senior national account executive at Par, to coordinate.

779.    By April 2015, Apotex had officially entered the market, and consistent with the "fair share" understanding, Teva's market share continued to drop to accommodate Apotex. Rekenthaler was speaking frequently with J.H. at Apotex to coordinate during the time period of Apotex's entry in the market.

b.    *Entecavir*

780.    As Teva was preparing to enter the market for Entecavir in August 2014, T.C., a senior sales and business relations executive at Teva, informed an executive at WBAD that Teva was planning on launching Entecavir "shortly" depending on when the FDA approved the drug. T.C. further noted:  "We may or may not be alone on the market at launch.  Sandoz has a

settlement and we do not know their terms.  Apotex has recently filed a PIV [Paragraph IV certification] but we invalidated the patent.  We are hearing PAR has the [authorized generic] and is stating they will launch after we launch, but there is still a good chance we may be alone in the market for a short time."

781.    On August 28, 2014, Rekenthaler informed Teva sales employees that Teva had received approval on Entecavir and would circulate offers later that day or the next day. Rekenthaler noted:  "[w]e are looking for at least a 60 share.  Known competition is Par with an [authorized generic]." Rekenthaler also noted that Teva would be pricing as if they were "exclusive" in the market and expressed concern that customers might react negatively to the launch of this drug "because of our recent price increase [on other drugs]."

782.    The same day, August 28, 2014, Rekenthaler had three phone calls with M.B., a senior national account executive at Par.  The two spoke two (2) more times the next day, August 29, 2014.

783.    On August 29, a Teva sales employee reported that a customer had informed her that Par was launching Entecavir at a lower price point than Teva.  The employee inquired whether Teva might consider reducing its price as well.  Rekenthaler, after speaking with M.B. at Par several times on August 28 and 29, replied that Teva would remain firm on the price and noted that he was "doubtful PAR will be much lower." Despite Teva's refusal to lower its price, that customer signed an agreement with Teva to purchase Entecavir.

784.    Also on August 29, Rekenthaler e-mailed T.C. asking if she had received any feedback from CVS on Entecavir.  T.C. replied that she had not and followed up later saying that ABC had indicated that it would sign Teva's offer letter.  Rekenthaler replied:  "Great, that helps.  We may end up conceding our friends up north [CVS] if they make too much fuss." T.C.

dismissed that concern:  "I think they will work with us really...We need them they need us so we just have to make it work."

785.    Teva and Par both launched their respective Entecavir products on September 4, 2014.  Within days of its launch, Teva had captured 80% of the market for new generic prescriptions and 90.9% of the total generic market (new prescriptions and refills).

786.    Within a few weeks, however, Teva's share of the market was much more in line with "fair share" principles – 52.6% for new generic prescriptions, and 47% of the total generic market (new prescriptions and refills).

787.    On October 9, 2014, another customer, who had already received a discount on Entecavir, asked for an additional discount to "help close the gap with current market prices." Teva declined to do so, citing that the "pricing is competitive and in line with the market." Rekenthaler had spoken to M.B. at Par twice on October 2, 2014.

788.    The two-player market for Entecavir remained stable over time.  By January 2, 2015, Teva's share of the market for new generic prescriptions was 52.2%, and its share of the total generic market (new prescriptions and refills) was 46.7%.

### c.    Budesonide DR Capsules

789.    Teva was preparing to enter the market for Budesonide DR Capsules in or about March 2014.  At that time, it was a 2-player market:  Par had 70% market share and Mylan had the remaining 30%.

790.    Shortly before Teva received approval to market Budesonide DR, Par decided to increase the price of the drug.  On April 1, 2014, M.B., a senior national account executive at Par, called Rekenthaler at Teva.  The two executives spoke for twenty-six (26) minutes.  The

next day, April 2, 2014 — which happened to be the same day that Teva received FDA approval to market Budesonide DR — Par increased its price for Budesonide DR by over 15%.

791.    That same day, Teva sales employees were advised to find out which customers were doing business with Par and which were with Mylan, so that Teva would have a better sense of how to obtain its fair share:  "it would be helpful to gather information regarding who is with mylan and who is with par . . . they are the two players in the mkt. . . as well as usage."

792.    Par and Mylan were also communicating at this time.  On April 3, 2014 – the day after the Par price increase – K.O., a senior account executive at Par, spoke to M.A., a senior account manager at Mylan, for fifteen (15) minutes.

793.    On April 4, 2014, Rekenthaler informed some members of Teva's sales force that, although the company had received approval to market and manufacture Budesonide DR, Teva was not prepared to launch the product and he did not yet know when it would do so. Nonetheless, Rekenthaler spoke to both Nesta, the Vice President of Sales at Mylan, and M.B., a similarly high-level executive at Par, that same day.

794.    Although Teva did not launch Budesonide DR until approximately June 2016, company executives clearly attempted to coordinate pricing and market share with its competitors in anticipation of its product launch date.

### 6.    Teva/Taro

#### a.    Enalapril Maleate

795.    In 2009, Taro discontinued its sales of Enalapril Maleate ("Enalapril") under its own label and effectively exited the market.  It continued supplying Enalapril thereafter only to certain government purchasers under the "TPLI" label.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

796.    By mid-2013, the Enalapril market was shared by three players:  Mylan with 60.3%, Wockhardt with 27.5%, and Teva with 10.7%.  Those three companies coordinated a significant anticompetitive price increase for Enalapril in July 2013.

797.    Shortly before the Teva and Wockhardt price increases, on or about July 12, 2013, Aprahamian, the Vice President of Sales and Marketing at Taro, was considering whether to renew or adjust Taro's price on Enalapril for its national contract (for government purchasers), which was slated to expire in September 2013.

798.    In the midst of that coordinated price increase, however, Aprahamian was communicating with both Patel of Teva as well as M.C., a senior sales and marketing executive at Wockhardt, about Enalapril.  As a result of those conversations, Taro's plans changed.

799.    On July 17, 2013 – the same day that Teva was taking steps to implement the price increase – Patel called Aprahamian and left a message.  He returned the call and the two spoke for almost fourteen (14) minutes.  Then, on July 19, 2013 – the day that both Teva and Wockhardt's price increases for Enalapril became effective – Aprahamian called M.C. at Wockhardt on his office phone and left a message.  He then immediately called M.C.'s cell phone, which M.C. answered.  They spoke for nearly eleven (11) minutes.

800.    On the morning of July 19, Aprahamian sent an internal e-mail to Taro colleagues signaling a change in plans:

From: Ara Aprahamian/US/TARO
To:
Cc:
Date: 07/19/2013 07:19 AM
Subject: Taro Enalapril

Currently if I'm not mistaken we only supply the government with Enalapril in TPU label (looks like we exited our label in 2009). There has been some significant changes in the market landscape with this product and I'd like to get product back in Taro label (and fast).

[81]

801.    Aprahamian followed up with another e-mail shortly after, adding that Taro "[w]ould only look for 10-15% MS [market share] but with recent market changes and units on this product, it would be incremental."

802.    In the coming months, both Teva and Taro engaged in intensive analyses of how the market should look after Taro's re-launch so that each competitor would have its desired, or "fair," share of the market.

803.    On July 31, 2013, for example, Patel provided her analysis of the drugs Teva should bid on in response to a request for bids from a major customer, which was largely based on whether Teva had reached its "fair share" targets.  Enalapril was one of the drugs where, according to Patel, Teva was "seeking share," so she authorized the submission of a bid.  Prior to sending that e-mail, Patel had spoken to Aprahamian on July 30 (11-minute call) and July 31, 2013 (4 minute call).  Based on the agreement between the two companies, and in accordance with the industry's "fair share" code of conduct, Taro understood that it would not take significant share from Teva upon its launch because Teva had a relatively low market share compared to others in the market.

---

[81]    Amended State AG Complaint No. 2 ¶ 397.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

804.     Meanwhile, as he worked on pricing for Taro's upcoming re-launch, Aprahamian emphasized to his colleagues that Taro's final prices would be set largely based on "continued market intelligence to secure share . . . ."

805.     In early December 2013, Taro was fully ready to re-enter the Enalapril market. On December 3, 2013, Aprahamian consulted twice by phone with Mylan's senior account executive, M.A., during conversations of two (2) and eleven (11) minutes.

806.     On December 4, 2013, one customer that had recently switched from Wockhardt to Teva expressed an interest in moving its primary business to Taro for the 2.5mg, 5mg, 10mg, and 20mg strengths.  At 4:30 p.m. that afternoon, Aprahamian instructed a colleague to prepare a price proposal for that customer for all four products.

807.     Before sending the proposal to the customer, however, Aprahamian sought the input of his competitor, Teva.  On December 5, 2013, he and Patel spoke by phone for nearly five (5) minutes.

808.     Taro's fact sheet for the Enalapril re-launch generated on the day of Aprahamian's call with Teva showed a "[t]arget market share goal" of 15%, with pricing identical to Teva's and nearly identical to Wockhardt's and Mylan's.

809.     Taro began submitting offers on Enalapril the following day, December 6, 2013. But even with the bidding process underway, Aprahamian made certain to communicate with Mylan's M.A. during a brief phone conversation that afternoon.  This particular communication was important since Mylan was the market share leader and Taro was targeting more of Mylan's customers than those of other competitors.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

810.     Over the next ten days, the discussions between Taro and Mylan continued over how to allocate the Enalapril market.  Aprahamian and M.A. talked for ten (10) minutes on December 11, and for seven (7) minutes on December 12.

811.     Thereafter, and with the likely consent of Mylan, Aprahamian reported on an internal Sales and Marketing call on December 16, 2013, that Taro's prior target Enalapril market share goal of 15% had been raised to 20%.

812.     Taro continued to gain share from both Mylan and Wockhardt, and to coordinate with both.  For example, in late December, Taro submitted a competitive offer to Morris & Dickson, a Wockhardt customer.  This caused M.C. of Wockhardt to call Aprahamian on December 31, 2013, to discuss the situation.  During the call, M.C. agreed that so long as Wockhardt was able to retain McKesson as a customer, it would concede Morris & Dickson to Taro.  In an e-mail on January 2, 2014, S.K. of Wockhardt conveyed the details to his colleagues:

| From: | |
| Sent: | Thursday, January 2, 2014 10:20 AM |
| To: | |
| Subject: | RE: Competitive Offer for Enalapril |

I spoke to ▮ on NYE. Once we confirm we are keeping Mckesson, let's yield MoDick. Call to discuss. [82]

813.     By May 2014 the market was stable, and market share for Enalapril was reasonably distributed among the companies.  As Teva was considering whether to bid on specific drugs for an RFP sent out by a large wholesaler customer, Patel provided the following caution with regard to Enalapril:  "no bid due to potential market/customer disruption, aka

[82]  *Id.* at ¶ 408.

strategic reasons." The same day she sent that e-mail – May 14, 2014 – Patel spoke to

Aprahamian for more than four (4) minutes and exchanged eight (8) text messages with him.

814.    By June 2014, Taro had obtained 25% market share for Enalapril in a 4-player

market.  Mylan and Teva each had approximately 28% market share.

b.    *Nortriptyline Hydrocholoride*

815.    While Taro was approved in May 2000 to market generic Nortriptyline

Hydrochloride ("Nortriptyline"), it subsequently withdrew from the market.  As of early 2013,

the market was shared by only two players – Teva with a 55% share, and Actavis with the

remaining 45%.

816.    By February 2013, Taro personnel had come to believe that they should reclaim a

portion of this market, one opining that ". . . Nortriptyline capsules should be seriously

considered for re-launch as soon as possible."

817.    In early November, Taro was formulating re-launch plans, including a "Target

Market share goal" for Nortriptyline of 25% that would leave Teva with 42.45% and Actavis

with 31.02%.

818.    On November 6, 2013, Aprahamian pressed his team to ".  .get some offers on

Nortrip[tyline] out . . ." He emphasized the need to find out who currently supplied two

particular large customers so that Taro could "determine our course (Cardinal or MCK)".

819.    Two days later, on November 8, Aprahamian received confirmation that

McKesson was a Teva customer.

820.    Several days of conversations ensued among the affected competitors in an effort

to sort out how Teva and Actavis would make room for Taro in this market.  For example,

Rekenthaler of Teva and Falkin of Actavis spoke twice by phone on November 10, 2013.

821.    Then, on November 12, 2013, Taro's Aprahamian called Patel at Teva.  Their conversation lasted almost eleven (11) minutes.  That same day, Aprahamian announced to his colleagues that Taro would not be pursuing Teva's business with McKesson, saying simply: "Will pass on MCK on Nortrip." Accordingly, he instructed a subordinate to put together an offer for Cardinal instead.

822.    The discussions of how to accommodate Taro into the Nortriptyline market were far from over, however.  Falkin of Actavis and Rekenthaler of Teva spoke on November 14, 15 and 18.  Falkin also exchanged two text messages with Maureen Cavanaugh of Teva on November 17, and one on November 18, 2014.

823.    Immediately following this series of discussions, Aprahamian began delivering a new message to his team:  Taro had enough offers out on Teva customers – it needed to take the rest of its share from Actavis.  On November 19, 2013 when a colleague presented an opportunity to gain business from Teva customer HD Smith, Aprahamian flatly rejected the idea, saying:  "Looking for Actavis..  [sic] We have outstanding Teva offers out ..  [sic]".

824.    The next day, November 20, 2013, another Taro employee succeeded in finding an Actavis customer that Taro might pursue.  Armed with this new information, Aprahamian wasted no time in seeking Actavis's permission, placing a call to M.D., a senior national account executive at Actavis, less than four hours later.  They ultimately spoke on November 22, 2013 for more than eleven (11) minutes.

825.    Meanwhile, Teva employees finalized plans to cede Cardinal to Taro as discussed in the negotiations with Actavis and Taro.  On November 21, 2013, Teva informed its customer that "[w]e are going to concede the business with Cardinal."

826.    The competitors continued consulting with each other over the coming months on Nortriptyline.  On December 6, 2013, for example, Aprahamian called M.D. at Actavis and the two spoke for over thirteen (13) minutes.  On December 10, 2013, a Taro colleague informed Aprahamian that a large customer, HEB, was with Actavis for all but one of the Nortriptyline SKUs, and that HEB was interested in moving the business to Taro.

827.    Having already cleared the move with Actavis during his December 6 call with M.D., Aprahamian put the wheels in motion the next day for Taro to make an offer to HEB.

828.    Aprahamian also continued to coordinate with Teva.  He called Patel on January 28, 2014, but she did not pick up.  The dialogue continued on February 4, 2014 when Patel called Aprahamian back.  The two talked for nearly twenty-four (24) minutes.

829.    Two days later, on February 6, a potential customer solicited Taro to bid on its business.  When a colleague informed Aprahamian of that fact and asked if he wanted to pursue the opportunity, Aprahamian responded firmly that Teva had already done enough to help Taro

with its re-launch and thus only Actavis accounts should be pursued:



830.   Over the first ten days of March, executives at Teva, Taro and Actavis called and texted each other frequently in their continuing efforts to work out the details of Taro's re-entry. These calls include at least those listed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

[84]

831.   At the end of this flurry of communications, Teva documented its internal game plan for Nortriptyline.  Prior to this time – particularly in early 2014 – Nortriptyline had been listed by Teva as a potential candidate for a price increase.  On March 10, 2014, however, as

---

[83]   *Id.* at ¶ 426.

[84]   *Id.* at ¶ 427.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Patel was revising that list of price increase candidates (and the same day she spoke to Aprahamian for more than five (5) minutes), she removed Nortriptyline from contention in order to accommodate Taro's entry.  The spreadsheet that she sent to a colleague on that date expressly took into account the negotiations over Taro's entry that had occurred over the past few weeks. With respect to a possible Nortriptyline price increase, it stated:  "Delay – Taro (new) seeking share." Teva subsequently raised the price of Nortriptyline on January 28, 2015 – in coordination with both Taro and Actavis.

### 7.    Teva/Zydus

832.    Green left Teva in November 2013 and moved to Zydus where he took a position as an Associate Vice President of National Accounts.  Once at Zydus, Green capitalized on the relationships he had forged with his former Teva colleagues to collude with Teva (and other competitors) on several Teva/Zydus overlap drugs.

833.    In the spring/early summer of 2014 in particular, Zydus was entering four different product markets that overlapped with Teva.  During that time period, Green was in frequent contact with Patel and Rekenthaler, and others, to discuss pricing and the allocation of customers to his new employer, Zydus.  Indeed, given the close timing of entry on these four products, Green, Patel, and Rekenthaler were often discussing multiple products at any given time.

#### a.    Fenofibrate

834.    As discussed in detail above, Teva colluded with Mylan and Lupin to allocate the Fenofibrate market upon Mylan's entry in May 2013.  To effectuate that agreement, Green was in frequent contact with Nesta of Mylan and Berthold of Lupin.

835.    In February 2014, Zydus was preparing to launch into the Fenofibrate market. Green, now at Zydus, colluded with Patel, Rekenthaler, Nesta, and Berthold to share pricing information and allocate market share to his new employer, Zydus.

836.    On February 21, 2014, Teva's Patel sent a calendar invite to Rekenthaler and to her supervisor, K.G., Senior Director, Marketing Operations, for a meeting to discuss "Post Launch Strategy (Multiple Products)" on February 24, 2014.  One discussion item was Zydus's anticipated entry into the Fenofibrate market.  Notably, Zydus did not enter the Fenofibrate market until a few weeks later, on March 7, 2014.

837.    In the days leading up to the meeting, between February 19 and February 24, Patel and Green spoke by phone at least 17 times – including two calls on February 20 lasting twenty-seven (27) minutes and nearly nine (9) minutes, respectively; one call on February 21 lasting twenty-five (25) minutes; and a call on February 24 lasting nearly eight (8) minutes.

838.    On or about March 7, 2014, Zydus entered the Fenofibrate market at WAC pricing that matched Teva, Mylan, and Lupin.  In the days leading up to the launch, individuals from all four competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus.  Indeed, between March 3 and March 7, these competitors

exchanged at least 26 calls with each other.  These calls are detailed in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Rekenthaler, David (Teva) | 0:13:30 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:07 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |
| 3/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:08:15 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:03:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:17:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:07:20 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:12:00 |

[85]

839.    During the morning of March 17, 2014, Patel and Green had two more phone calls, lasting nearly six (6) minutes and just over five (5) minutes.  During those calls they were discussing how to divide up the market for several products where Zydus was entering the market.  Half an hour after the second call, Patel e-mailed her supervisor, K.G., identifying "LOE Targets to Keep" for several products on which Teva overlapped with Zydus, including Fenofibrate.  With respect to Fenofibrate, Patel recommended "Defend all large customers." Later that same day, Patel called Green again and they spoke for more than eleven (11) minutes.

---

[85]    *Id.* at ¶ 436.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

840.     In the months that followed, Teva "strategically conceded" several customers to Zydus in accordance with the agreement they had reached.

841.     For example, on Friday, March 21, 2014, J.P., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, notifying them that Zydus had submitted an unsolicited bid to a Teva customer, OptiSource. Patel responded that Teva was "Challenged at Humana as well."

842.     That morning, Patel sent a calendar invite to Rekenthaler and to K.G. scheduling a meeting to discuss "Open Challenges-Retain/Concede Plan." One item on the agenda was "Fenofibrate (Zydus at Opti and Humana-propose to concede)."

843.     The following Monday, March 24, 2014, Patel sent internal e-mails directing that Teva "concede" OptiSource and Humana to Zydus.  Patel further stated that Teva provided a "courtesy reduction" to a third customer, NC Mutual, but stated that Teva should "concede if additional reduction is requested."  That same day, Patel called Green and they spoke for more than fourteen (14) minutes.  She also spoke with Berthold of Lupin for nearly twelve (12) minutes.

844.     In the meantime, Zydus bid at another Teva customer, Ahold.  On March 25, 2014, Patel e-mailed Rekenthaler stating "Need to discuss.  NC pending, and new request for Ahold.  We may not be aligned."  Patel then sent an internal e-mail directing that Teva "concede" the Ahold business.  Later that day, Patel called Green.  He returned the call and they spoke for nearly eight (8) minutes.  Patel also called Berthold of Lupin and they spoke for five (5) minutes.

845.     On May 13, 2014, Zydus bid on Fenofibrate at Walgreens, which was also Teva's customer.  The next day, on May 14, 2014, Patel forwarded the bid to her supervisor, K.G., and

explained "if we concede, we will still be majority share, but only by a few share points.  On the other hand, if Zydus is seeking share, they're challenging the right supplier, but the size of the customer is large.  What are you[r] thoughts on asking them to divide the volume 25% Zydus and 75% Teva?  This way, we've matched, retained majority and will hopefully have satisfied Zydus, and minimize them going elsewhere."

846.   K.G. agreed with the approach and on May 15, 2014, Patel sent an internal e-mail directing that Teva reduce its price to Walgreens but explained that "we will retain 75% of the award.  The remainder will go to Zydus.  Hopefully, this will satisfy their share targets." Patel emphasized that we "need to be responsible so that Zydus doesn't keep challenging Teva in the market." Later that day, Green called Patel and they spoke for twenty (20) minutes.

847.   On June 2, 2014, Green called Patel and they spoke for nearly six (6) minutes.  He also called Rekenthaler, and they spoke for two (2) minutes.  Two days later, on June 4, 2014, Zydus submitted an unsolicited bid for Fenofibrate at Anda, a Teva customer.

848.   On June 10, 2014, T.S., Senior Analyst, Strategic Support at Teva e-mailed J.P., Director of National Accounts, stating "We are going to concede this business to Zydus per upper management."  T.S. forwarded the e-mail to K.G., copying Patel and Rekenthaler, asking to "revisit the decision to concede ANDA" because "[w]e need to send Zydus a message to cease going after all of our business."  Rekenthaler responded, "At Anda I would suggest you try to keep our product on their formulary in a secondary position and we'll continue to get sales. . . . Zydus has little market share on Fenofibrate that I can tell and they'll continue to chip away at us until they get what they are looking for."  A few hours later, J.P. responded that Anda would maintain Teva on secondary and award the primary position to Zydus.  Anda was fully aware that Teva was conceding Anda's business to Zydus because it was a new entrant.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

849.    The next day, on June 11, 2014, Green called Rekenthaler and they spoke for eight (8) minutes.  Later that day, Patel called Green.  He returned the call and they spoke for nearly fifteen (15) minutes.

b.    *Paricalcitol*

850.    Teva entered the market on Paricalcitol on September 30, 2013.  As the first generic to enter the market, it was entitled to 180 days of exclusivity.

851.    In March 2014, with the end of the exclusivity period approaching, Teva began planning which customers it would need to concede.  Teva had advance knowledge that Zydus and another generic manufacturer not named as a Defendant in this case planned to enter the market on day 181, which was March 29, 2014.

852.    In the month leading up to the Zydus launch, Patel and Rekenthaler spoke with Green and discussed, among other things, which Paricalcitol customers Teva would retain and which customers it would allocate to the new market entrant.

853.    On February 28, 2014, T.S., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, advising that ABC was requesting bids on two Zydus overlap drugs – Paricalcitol and Niacin ER.  After receiving that e-mail, Rekenthaler called Green.  The call lasted less than one (1) minute (likely a voicemail).  The next business day, on March 3, 2014, Rekenthaler called Green again and they spoke for twenty (20) minutes.  Later that afternoon, Patel also called Green.  The two exchanged four calls that day, including one that lasted nearly twenty (20) minutes.  On March 4, Patel called Green again and left a voicemail.

854.    On March 12, 2014, T.S. e-mailed Patel and Rekenthaler stating that Zydus had bid on Paricalcitol at ABC.  That same day, Patel sent an internal e-mail asking for a loss of

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

exclusivity report for Paricalcitol, listing out Teva's customers and the percentage of Teva's business they represented.  This was typically done by Teva employees before calling a competitor to discuss how to divvy up customers in a market.

855.    On March 13, 2014, Patel directed that Teva retain ABC and match the Zydus pricing.  The next day, on March 14, 2014, Patel called Green.  A few minutes later, Green returned the call and they spoke for nineteen (19) minutes.  Rekenthaler then called Patel and they spoke for eleven (11) minutes.

856.    During the morning of March 17, 2014, Patel and Green had two more phone calls, lasting nearly six (6) minutes and just over five (5) minutes.  During those calls they were discussing how to divvy up the market for several products where Zydus was entering the market.  Half an hour after the second call, Patel e-mailed her supervisor, K.G., identifying "LOE Targets to Keep" for several products on which Teva overlapped with Zydus – including Paricalcitol.  With respect to Paricalcitol, Patel recommended that Teva "Keep Walgreens, ABC, One Stop, WalMart, Rite Aid, Omnicare."  Later that same day, Patel called Green again and they spoke for more than eleven (11) minutes.

857.    Over the next several weeks, Teva would "strategically" concede several customers to the new entrant Zydus.

858.    For example, on March 27, 2014, Green called Patel.  Patel returned the call and they spoke for nearly nine (9) minutes.  The next day, on March 28, 2014, OptiSource, one of Teva's GPO customers, notified J.P., a Director of National Accounts at Teva, that it had received a competing offer from Zydus for its Paricalcitol business.  J.P. forwarded the OptiSource e-mail to Patel.  Within minutes, Patel responded "[w]e should concede."

859.    That same day, Teva was notified by another customer, Publix, that Zydus had submitted a proposal for its Paricalcitol business.  On April 1, 2014, Teva conceded the customer to Zydus and noted in Teva's internal database, Delphi, that the reason for the concession was "Strategic New Market Entrant."

860.    Also on April 1, 2014, Zydus bid for the Paricalcitol business at NC Mutual, another Teva customer.  That same day, Patel called Green and left a 22-second voicemail.  The next day, on April 2, 2014, Patel tried Green twice more and they connected on the second call and spoke for nearly ten (10) minutes.  Later that evening L.R., an Associate Manager, Customer Marketing at Teva, sent an internal e-mail to T.S., the Teva Director of National Accounts assigned to NC Mutual, copying Patel, asking:  "May we please have an extension for this request until tomorrow?"  Patel responded, "I apologize for the delay! We should concede."

861.    On April 15, 2014, Walmart received a competitive bid for its Paricalcitol business and provided Teva with the opportunity to retain its business.  Two days later, on April 17, 2014, K.G. responded that he thought it might be Zydus.  Patel replied, "We have conceded a reasonable amount of business (as planned) to Zydus.  I would be surprised if they were going after a customer this big after they've picked up business recently."  Later that day, Green called Patel.  She returned his call and they spoke for nearly twelve (12) minutes.  Later that day, after her discussion with Green, Patel sent an internal e-mail stating "After further review, I believe this is [a company not identified as a defendant in this case]."  On April 22, 2014, Patel sent an internal e-mail regarding Walmart directing, "Need to retain.  Please send an offer.  Thanks."

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

c.   *Niacin ER*

862.    Teva entered the Niacin ER market on September 20, 2013 as the first-to-file generic manufacturer and was awarded 180 days of exclusivity.  Teva's exclusivity was set to expire on March 20, 2014.

863.    Teva had advance knowledge that Lupin planned to enter on March 20, 2014 and that Lupin would have 100 days or until June 28, 2014 before a third generic manufacturer would be allowed to enter.  Teva also knew that Zydus planned to enter on June 28, 2014. Armed with that knowledge, Teva increased its price on Niacin ER on March 7, 2014 in advance of the competitors' entry.  In the days leading up to the price increase, all three competitors exchanged several calls during which they discussed, among other things, the price increase on Niacin ER and the allocation of customers to the new entrants, Zydus and Lupin.  The communications between Green of Zydus, Patel and Rekenthaler of Teva, and Berthold of Lupin are detailed in the chart below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |

[86]

864.    Similarly, in the days leading up to the Lupin launch on March 20, 2014, all three competitors spoke again to discuss their plans for Niacin ER.  The communications between

---

[86]    Amended State AG Complaint No. 2 ¶ 464.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Green, Rekenthaler, Patel, and Berthold are detailed in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:01:00 |
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:05:04 |
| 3/17/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:06:16 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:11:13 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:06:26 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:04:12 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:07:00 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:12:39 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:26:00 |

[87]

865.    In May 2014, Zydus began readying to enter the Niacin ER market.  On May 5, 2014, Zydus bid on the Niacin ER business at ABC - a Teva customer.  The next day, on May 6, 2014, Green called Rekenthaler and they spoke for three (3) minutes.  Less than an hour later, Green called Patel and they spoke for eight (8) minutes.  A few minutes later, Green called Patel again and left a twelve-second voicemail.  Later that evening, Patel e-mailed K.G., reporting what Teva had learned on those calls:

866.    K.G. responded that Patel should schedule an internal meeting to discuss their strategy for Niacin ER and include Rekenthaler.

867.    Over the next several days, Patel and Rekenthaler exchanged several calls with

---

[87]    *Id.* at ¶ 465.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Green.  Green also exchanged several calls with Berthold of Lupin.  These calls are listed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:08:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:37 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:11:15 [88] |

868.    Ultimately, the competitors agreed that Teva would retain ABC and concede

McKesson, another large wholesaler, to Zydus.

869.    On May 29, 2014, C.D., an Associate Director of National Accounts at Teva, sent

an internal e-mail to certain Teva employees, including Patel and Rekenthaler, stating:  "A

customer is reporting that Zydus is soliciting usage for Niacin with an anticipated launch of June

24." After receiving the e-mail, Rekenthaler called Green.  The call lasted two (2) minutes.

Green returned the call a few minutes later and they spoke for twenty-eight (28) minutes.  Later

that day, Patel called Green and they spoke for nearly twenty-one (21) minutes.

870.    On June 2, 2014, J.P., a Director of National Accounts at Teva, sent an internal

e-mail stating "I received a ROFR from McKesson due to Zydus entering the market.  They

apparently did not secure ABC.  They are launching 6/28, but are sending offers early due to

Sun entering as well."  Patel replied, "Please be sure to consult with [K.G.] on this one.

Thanks."  Later that morning, Green called Rekenthaler.  The call lasted two (2) minutes.

Green then called Patel and they spoke for nearly six (6) minutes.

---

[88]    *Id.* at ¶ 467.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

871.     On June 5, 2014, J.P. sent an internal e-mail regarding "McKesson Niacin" stating "Per Dave [Rekenthaler], Maureen [Cavanaugh] has agreed to concede this item." J.P.  also entered the loss in Teva's internal database, Delphi, and noted that the reason for the concession was "Strategic New Market Entrant."

872.     On June 28, 2014, Zydus formally launched Niacin ER and published WAC pricing that matched the per-unit cost for both Teva and Lupin.

*d.      Etodolac Extended Release*

873.     Prior to Zydus' entry into the Etodolac ER market, Teva and Taro were the only generic suppliers of the product.  As described below, Teva and Taro, through Patel and Aprahamian, colluded to significantly raise the price of Etodolac ER in August 2013.

874.     On May 12, 2014, Zydus entered the Etodolac ER market at WAC pricing that matched Teva and Taro's artificially high pricing.  Not surprisingly, in the days leading up to the Zydus launch, Patel was relaying communications back and forth between Green and Aprahamian.  During these calls, the competitors discussed, among other things, the allocation of market share to the new entrant, Zydus.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:08:00 |
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:12 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:36 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:16:45 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Incoming | Patel, Nisha (Teva) | 0:13:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:07:00 |

[89]

875.    On May 14, 2014, Anda – a wholesaler customer of Teva – notified Teva that Zydus had submitted a bid for its Etodolac ER business.  That same day, Patel exchanged eight (8) text messages and had a four (4) minute call with Aprahamian.  The next day, on May 15, 2014, Green called Patel and they spoke for twenty (20) minutes.

876.    On May 20, 2014, Green called Patel and they spoke for four (4) minutes.  That same day, K.R., a senior sales executive at Zydus, also exchanged two (2) text messages and had a 39-second call with Cavanaugh of Teva.  The next day – May 21, 2014 – Green called Patel again and they spoke for twenty-eight (28) minutes.  That same day, K.R. of Zydus and Cavanaugh of Teva exchanged four (4) text messages.

877.    The next day, on May 22, 2014, T.S., Senior Analyst, Strategic Support at Teva, sent an internal e-mail to certain Teva employees, including Patel, stating:  "I have proposed we concede Anda as they are a small percent of market share and we will have to give up some

---

[89]   *Id.* at ¶ 475.

share with a new market entrant.  Anda is looking for a response today."  Patel responded:
"agree with concede."

878.    Similarly, on June 27, 2014, Econdisc notified Teva that it had received a
competitive offer for its Etodolac ER business.  Later that day, Patel spoke with Aprahamian at
Taro for fourteen (14) minutes.

879.    On July 2, 2014, Patel called Green and left a 4-second voicemail.  The next day,
on July 3, 2014, Patel sent an internal e-mail advising that "We will concede."  Later that day,
Teva told Econdisc that it was unable to lower its pricing to retain the business.

880.    When Patel's supervisor, K.G., learned that Teva had lost the Econdisc business,
he sent an internal e-mail asking, "Did we choose not to match this?"  Patel responded, "Yes.
New market entrant – Zydus."  K.G. replied, "Okay good.  Thank you."

### 8.    Teva/Glenmark

#### a.    Moexipril Hydrochloride Tablets

881.    Glenmark entered the market for the 7.5mg and 15mg tablets of Moexipril
Hydrochloride ("Moexipril") on December 31, 2010.

882.    Glenmark and Teva coordinated with each other to raise pricing on two different
formulations of Moexipril between May and July 2013.  When Patel colluded with CW-5, a
senior-most executive at Glenmark, to raise prices on Moexipril, one of the fundamental tenets of
that agreement was that they would not try to poach each other's customers after the increase and
the competitors would each maintain their "fair share."

883.    On August 5, 2013, Teva learned that it had been underbid by Glenmark at one of
its largest wholesaler customers, ABC.  Upon hearing this news, Rekenthaler, the Vice President

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of Sales at Teva, forwarded an e-mail discussing the Glenmark challenge to Patel, expressing his

confusion over why Glenmark would be challenging Teva's business:

> **From:** Dave Rekenthaler
> **Sent:** Monday, August 05, 2013 7:05 PM
> **To:** Nisha Patel02
> **Subject:** Fwd: ABC - Loss business on Moexipril
>
>
> ???
>
> Sent from my iPhone

[90]

884.   Rekenthaler forwarded the e-mail only to Patel because he was aware that she had

been the person at Teva who had been colluding with Glenmark.

885.   Five (5) minutes after receiving the e-mail from Rekenthaler, Patel responded:

> From:      Nisha Patel02
> Sent:      Mon 8/05/2013 7:10 PM (GMT-05:00)
> To:        Dave Rekenthaler
> Cc:
> Bcc:
> Subject: RE: ABC - Loss business on Moexipril
>
> I know…made the call already

[91]

886.   The call that Patel had made earlier that day was to CW-5, a senior executive at

Glenmark, to find out why Glenmark sought to underbid Teva at ABC.

887.   Patel spoke to CW-5 three times that day.  The following day – August 6, 2013 –

Brown, the Vice President of Sales at Glenmark, called Patel at 9:45 a.m. but did not reach her.

---

[90]   *Id.* at ¶ 484.

[91]   *Id.* at ¶ 485.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Patel returned Brown's call at 10:08 a.m. and the two spoke for approximately thirteen (13) minutes.  Later that day, at 1:11 p.m., the two spoke again for approximately fifteen (15) minutes.  During these calls, Patel reminded Brown and CW-5 of their prior agreement not to poach each other's customers after a price increase.

888.    As a result of these communications, Glenmark decided to withdraw its offer to ABC and honor the agreement it had reached with Teva not to compete on Moexipril.  Later that same day – August 6, 2013 – T.S. of Teva informed colleagues that "[t]oday is a new day and today. . . .  ABC has now informed me that they will NOT be moving the Moexipril business to Glenmark."

b.    *Desogestrel/Ethinyl Estradiol Tablets (Kariva)*

889.    Desogestrel/Ethinyl Estradiol ("Kariva") is marketed by Glenmark under the name Viorele and Teva markets the drug under the name Kariva.  These drugs are also known by the brand name, Mircette.  Glenmark entered the market for Kariva 0.15mg/0.02mg tablets on April 4, 2012.

890.    During the morning of May 19, 2014, Patel learned that Glenmark had bid a low price for it own version of Kariva – Viorele – at Publix, a retail pharmacy purchaser.  S.B., an analyst at Teva, e-mailed Patel a list of suggested re-bid prices to send to Publix for various drugs, including generic Kariva.  The chart included a suggested re-bid price for Kariva of $76.14 - which was $52.64 higher than the $23.50 price that Glenmark had offered Publix.

891.    This sparked a flurry of communications that same day between Patel and three different Glenmark representatives – Brown and Grauso, and J.C., a sales and marketing executive at Glenmark – as set forth below:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Glenmark) | 11:46:15 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 11:47:03 | 0:24:09 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 12:21:00 | 0:12:53 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:08 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:31 | 0:00:26 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 13:50:15 | 0:06:51[92] |

892.    After this flurry of communications between the two competitors, Patel decided that Teva would offer Publix a re-bid price with a nominal 10% reduction off the originally proposed rebid price of $76.14 - virtually guaranteeing that the business would be awarded to Glenmark.

c.    Gabapentin

893.    Glenmark entered the market for Gabapentin 800mg and 600mg tablets on April 1, 2006.

894.    On October 13 and 14, 2014, Patel attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of Teva's competitors.  The PCMA described its Annual Meeting as "the . . .ideal venue for senior executives from PBMs, specialty pharmacy, payer organizations and pharmaceutical manufacturers to network, conduct business and learn about the most current strategic issues impacting the industry."

895.    Shortly after returning from that meeting, during the morning of October 15, 2014, Patel informed colleagues at Teva that Glenmark would be taking a price increase on Gabapentin and suggested that this would be a great opportunity to pick up some market share. The Glenmark increase had not yet been made public and would not be effective until November 13, 2014.  Nonetheless, Patel informed her colleagues in an e-mail that same day that there

---

[92]    *Id.* at ¶ 490.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

would be a WAC increase by Glenmark effective November 13, and that she had already been able to obtain certain contract price points that Glenmark would be charging to distributors.  At around the time she sent the e-mail, Patel exchanged two (2) text messages with Brown of Glenmark.

896.    Aurobindo also manufactured Gapapentin during this time.  In October 2014, Jim Grauso of Glenmark was in communication with R.C., CEO of Aurobindo, and R.C. was in turn in communication with Dave Rekenthaler of Teva.

897.    Having relatively little market share for Gabapentin, Teva discussed whether it should use the Glenmark price increase as an opportunity to pick up some market share.  Over the next several weeks, Teva did pick up "a bit of share" to be more in line with fair share principles but cautioned internally that it did not "want to disrupt Glenmark's business too much."

    9.    **Teva/Lannett**

        a.    *Baclofen*

898.    Except as set forth below, at all relevant times, Lannett, Par, Teva, and Upsher-Smith have dominated, and continue to dominate, the market for Baclofen.

899.    Baclofen is available in 10mg and 20mg tablets.

900.    According to NADAC data, the average market price for Baclofen remained steady prior to the spring of 2014.  From November 2013 through March 2014, the average market price of Baclofen fluctuated by less than $0.003 per unit for 10mg tablets and by less than $0.0065 per unit for 20mg tablets.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

901.    Beginning around February 2014, however, the overall average market price rose by more than 550%.  These price increases affected both dosages of Baclofen, *i.e.* 10mg and 20mg tablets.

902.    According to NADAC data, the average market price for Baclofen increased by the following percentages:

> Baclofen 10mg tablet:  Between March 2014 and April 2014, prices increased 636%; and

> Baclofen 20mg tablet:  Between March 2014 and January 2015, prices increased 437%.

903.    WAC data confirms that Teva and Upsher-Smith both imposed dramatic price increases for Baclofen largely in unison, by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Upsher-Smith | 00832102500 | $0.10 | $0.49 | 2/21/2014 | 420% |
| 100ct | Teva | 00172409760 | $0.10 | $0.49 | 4/15/2014 | 420% |
| 1,000ct | Upsher-Smith | 00832102510 | $0.10 | $0.49 | 2/21/2014 | 420% |
| 1,000ct | Teva | 00172409780 | $0.09 | $0.49 | 4/15/2014 | 447% |

904.    Although WAC data is not available for Par, upon information and belief, it implemented nearly simultaneous and identical price increases as Upsher-Smith and Teva.

905.    Defendants had numerous opportunities to coordinate their price increases.  All Baclofen Defendants attended the (i) October 28-30, 2013 GPhA Technical Conference in North Bethesda, Maryland; and executives from at least Par, Teva, and Upsher-Smith attended the (ii) February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida.  Shortly thereafter, the average prices for generic Baclofen increased dramatically.

906.    In June 2014, Lannett was preparing to re-enter the market for Baclofen, but was faced with limited supply.  In an internal e-mail sent to his sales staff, K.S., a senior sales executive at Lannett, stated:  "Baclofen launch in four weeks, need market intelligence.  We can

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

only take a 10% market share."  At that time, Teva had a large market share in relation to the existing competitors in the market.

907.    Sullivan, a Director of National Accounts at Lannett and a recipient of the e-mail, promptly communicated with Patel (Teva was a competitor for Baclofen) using Facebook Messenger.  On June 12, 2014, Sullivan messaged Patel, stating:



[93]

908.    The message was sent at 11:16 a.m.  At 11:30 a.m., Patel called Sullivan and they spoke for seven (7) minutes.  This was the first phone conversation between Sullivan and Patel since Patel had joined Teva in April 2013.  During the conversation, Sullivan informed Patel that Lannett would be entering the market for Baclofen shortly.  In a follow-up message through Facebook Messenger later that afternoon, Sullivan confirmed:



[94]

909.    True to her word, Sullivan called Patel on July 1, 2014 and left a voicemail.  Patel promptly returned the call, and the two spoke for almost seven (7) minutes.

---

[93]    *Id.* at ¶ 498.

[94]    *Id.*

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

910.    On July 11, 2014, as Teva was evaluating future forecasting and whether to try and take on additional Baclofen business with a large wholesaler, Patel stated to a Teva colleague:  "[n]ot sure if it helps your review, but there is another entrant coming to market (Lannett).  I'm not sure about their share targets, but I know it's probably soon."  That same day, Patel sent a text message to Sullivan asking "Around?" Sullivan immediately called Patel and left a voicemail.  Patel called Sullivan back promptly, and they spoke for more than three (3) minutes.  After speaking, Patel sent another text message to Sullivan, stating:  "Thank you!!" Sullivan responded:  "No prob!"

911.    Shortly thereafter, on July 22, 2014, Teva was approached by a customer stating "[w]e were contacted by another mfg that is going to be launching Baclofen in the coming weeks." The customer asked whether Teva wanted to exercise its right of first refusal (i.e., offer a lower price to maintain the account).  Even though the new manufacturer's price was only slightly below Teva's price, Teva declined to bid.  Patel specifically agreed with the decision to concede, stating "I believe this is Lannett."  Teva's internal tracking database noted that the customer had been conceded to a "Strategic New Market Entrant."

912.    Teva had significantly increased its price for Baclofen in April 2014 (following an Upsher-Smith price increase) and was able to maintain those prices even after Lannett entered the market a few months later.  In fact, when Lannett entered the market it came in at the exact same WAC price as Teva.

### 10.    Teva/Amneal

#### a.    Norethindrone Acetate

913.    On September 9, 2014, a customer approached Teva asking if Teva would lower its pricing on certain drugs, including Norethindrone Acetate.  One of Teva's competitors for

Norethindrone Acetate was Amneal.  The same day, Patel received phone calls from two different Amneal employees – S.R.(2), a senior sales executive (call lasting more than three (3) minutes), and S.R.(1), a senior sales and finance executive (almost twenty-five (25) minutes).  These were the first calls Patel had with either S.R.(1) or S.R.(2) since she joined Teva in April 2013.  That same day, S.R.(1) also spoke several times with Brown, Vice President of Sales at Glenmark – the only other competitor in the market for Norethindrone Acetate.

914.    After speaking with the two Amneal executives, Teva refused to significantly reduce its price to the customer; instead providing only a nominal reduction so as not to disrupt the market.  At that time, market share was almost evenly split between the three competitors.  When discussing it later, Patel acknowledged internally that Teva had "bid high" at the customer based on its understanding "that it would be an increase candidate for Amneal.  They increased shortly after."  By bidding high and not taking the business from Amneal, in anticipation of a future price increase, Teva reinforced the "fair share" understanding among the competitors in the market.

### 11.    Teva/ Dr. Reddy's

#### a.    *Oxaprozin*

915.    In early 2013, Dr. Reddy's began having internal discussions about re-launching Oxaprozin in June of that year.  In March 2013 – when Teva was still the sole generic in the market – the plan was to target one large retail chain and one large wholesaler in order to obtain at least 30% market share.  Two months later, in May 2013, Dr. Reddy's adjusted its market share expectations down to 20% after a non-Defendant generic manufacturer and Sandoz both re-launched Oxaprozin.

916.    On June 13, 2013, members of the Dr. Reddy's sales force met for an "Oxaprozin Launch Targets Discussion" to "discuss launch targets based on the market intelligence gained by the sales team."

917.    Dr. Reddy's re-launched Oxaprozin on June 27, 2013 with the same WAC price as Teva.  At the time, Teva had 60% market share.  Dr. Reddy's almost immediately got the Oxaprozin business at two customers, Keysource and Premier.  Dr. Reddy's also challenged for Teva's business at McKesson, but Teva reduced its price to retain that significant customer.

918.    Eager to obtain a large customer, Dr. Reddy's turned its sights to Walgreens.  At a July 1, 2013 sales and marketing meeting, there was an internal discussion among Dr. Reddy's employees about "asking to see if Teva would walk away from the business" at Walgreens. Within a week, Dr. Reddy's employees had learned that Teva would defend the Walgreens business and recognized that they would have to "bid aggressively" to obtain that customer.

919.    Dr. Reddy's did bid aggressively at Walgreens.  On or around July 14, 2013, Walgreens informed Green, then a National Account Director at Teva, that Dr. Reddy's had made an unsolicited bid for the Oxaprozin business, at a price of roughly half of Teva's current price.  Per Green, Walgreens did not "want to move but obviously want[s] the price."

920.    While the Dr. Reddy's offer to Walgreens was still pending – on July 23, 2013 – J.A. of Dr. Reddy's called Green.  That phone call – the only one ever between the two individuals that is identified in the phone records – lasted for nearly five (5) minutes.

921.    Two days later, Green noted that "[i]f we give D[r.  Reddy's] this business, they may be satisfied.  I will see if I can find this out." Green also warned, however, that if Teva decided to defend and keep Walgreens' business, Dr. Reddy's will "just go elsewhere" –

meaning Dr. Reddy's would continue to offer unsolicited bids to Teva customers and drive prices down.

922.    While deciding whether to match the Dr. Reddy's offer at Walgreens or concede the business to Dr. Reddy's, Teva engaged in internal discussions about strategy.  On July 29, 2013, K.G. at Teva suggested the possibility of keeping the Walgreens business, but conceding Teva's next largest customer for Oxaprozin – Econdisc – to Dr. Reddy's.  Eager to avoid any further price erosion from the Dr. Reddy's entry, Rekenthaler immediately asked Patel to "look at our business on Oxaprozin in order to accommodate Dr. Reddy's entry." Rekenthaler's goal was to identify customers other than Walgreens that Teva could concede to Dr. Reddy's in order to satisfy its market share goals.

923.    At 12:33 p.m. that day, Patel asked a colleague to "run the customer volume and profitability analysis for Oxaprozin." It was typical at Teva to run this type of report before negotiating market share with a competitor.  At 2:20 p.m., that colleague provided the information to Patel, copying Rekenthaler and K.G.  With this information in hand, less than an hour later Rekenthaler placed a call to T.W., a Senior Director of National Accounts at Dr. Reddy's.  The call lasted two (2) minutes and was their only telephone conversation in 2013.

924.    After having this conversation with T.W., Teva decided to maintain the Walgreens business, but concede the Econdisc business to Dr. Reddy's.  Teva conceded the Econdisc business on August 7, 2013.  Green listed "Strategic Market Conditions" in Teva's Delphi database as the reason for conceding the business to Dr. Reddy's.

925.    By September 10, 2013, Dr. Reddy's had achieved its goal of obtaining 20% share of the Oxaprozin market.  At that time, its customers included Econdisc, Keysource, and Premier.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

b.      *Paricalcitol*

926.     Teva entered the market for Paricalcitol on September 30, 2013 as the first-to-file generic and had 180 days of generic exclusivity.

927.     Following its period of exclusivity, Teva's "goal was to concede business on day 181" but "to retain CVS, Walgreens and ABC.  All others are not an automatic concede, but we expect to concede." During March and April 2014, Teva coordinated with and conceded several customers to Zydus, as Zydus was entering the market for Paricalcitol.  By mid-April 2014, Teva "ha[d] conceded the share [it] planned for" to Zydus.

928.     By May 2014, Dr. Reddy's started preparing to enter the Paricalcitol market.  On May 1, 2014, T.W. of Dr. Reddy's spoke with Rekenthaler of Teva for nearly eleven (11) minutes.

929.     At a May 20 sales and marketing team meeting, the Dr. Reddy's sales force was instructed to find out which customers were currently purchasing Paricalcitol from which manufacturers, and their prices.  Dr. Reddy's was targeting a 20% market share.  At the time, Teva's share was 73%.

930.     On June 10, 2014 – as Dr. Reddy's was starting to approach certain customers – including a large retail pharmacy customer ("Pharmacy-5") – Patel spoke with V.B., the Vice President of Sales for North American Generics at Dr. Reddy's, several times.  At 8:50 a.m., Patel called V.B.  and left a voicemail.  V.B. returned the call at 9:18 a.m., and the two spoke for more than ten (10) minutes.  Later that day, at 2:46 p.m., Dr. Reddy's provided Pharmacy-5 with a market share report for Paricalcitol indicating that Teva was the market leader at 60% share.  A representative of Pharmacy-5 responded that it "[l]ooks like Teva is the right target."  Shortly

after this e-mail exchange, at 3:21 p.m., V.B. called Patel again and the two spoke for nearly nine (9) minutes.

931.    By June 19, 2014, Dr. Reddy's had made offers to Omnicare, Cardinal, ABC, and Pharmacy-5.  The internal plan was that if Pharmacy-5 declined, then Dr. Reddy's would make an offer to CVS.  That same day, Teva agreed to concede its Paricalcitol business at Omnicare, dropping its market share by 3%.

932.    Teva also strategically conceded what remained of its Cardinal business (it had previously conceded some of that business to Zydus).  After receiving Dr. Reddy's bid, Cardinal approached Teva and asked whether Teva would bid to retain the 4mcg portion of the business. Patel recommended to her boss, K.G., that Teva concede the business:  "We have ~70 share and it is ideal to concede here because of the incomplete family."  K.G. agreed.  Patel then instructed S.B., a customer analyst at Teva, to concede "due to [T]eva's high share."  S.B. subsequently e-mailed T.C., Teva's Senior Director of Sales & Trade Relations:  "Due to the fact that we have high share and already conceded on the other strengths, we are going to concede on this strength as well."  T.C. relayed this statement, word-for-word, to Cardinal.

933.    Dr. Reddy's also submitted a bid to ABC, which was one of the customers that Teva had targeted to keep after losing exclusivity.  ABC notified Teva of Dr. Reddy's competitive bid for Paricalcitol on June 26, 2014.  In internal e-mails discussing this price challenge, Teva employees noted that Dr. Reddy's was "aggressively seeking market share" and potentially eroding the price of the drug.  When asked for his thoughts on this, Rekenthaler remarked:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

```
From:     Dave Rekenthaler
Sent:     Tue 7/01/2014 9:42 AM (GMT-05:00)
To:       Nisha Patel02
Cc:
Bcc:
Subject: RE: ABC Paricalcitol CPC #12233 (DRL LAUNCH) -->DUE TODAY <--
```

My thoughts are that Dr. Reddy is really a pain in my ass.  Have they picked anyone up to date?

[95]

934.    Despite the pricing challenge, Teva retained the ABC Paricalcitol business.  As ABC explained to Dr. Reddy's, "Teva wanted to keep the business and has given us a competitive price."

935.    Dr. Reddy's formally launched Paricalcitol on June 24, 2014.  On or around that date, it sent offers to, *inter alia*, Winn-Dixie, Giant Eagle, and Schnucks.  On June 26, 2014, Teva's K.G. told Patel that he was "willing to concede 10-15% share total on Paricalcitol" to Dr. Reddy's.

936.    Winn-Dixie informed Teva that it had received a competing offer for Paricalcitol from Dr. Reddy's.  Patel recommended that Teva concede the business.  Teva did, and Winn-Dixie informed Dr. Reddy's that it had won its Paricalcitol business on July 9, 2014.

937.    Giant Eagle informed Teva that it had received a competing offer on Paricalcitol on July 10, 2014.  That same day, V.B. of Dr. Reddy's called Patel and the two spoke for more than twelve (12) minutes.  Shortly after getting off the phone with V.B., Patel responded to a question from a colleague regarding an RFP to another supermarket chain.  One of the potential bid items was Paricalcitol.  Patel directed her colleague to "bid a little high on Paricalcitol.  We should not be aggressive since we are in the process of conceding share due to additional entrants." Her colleague responded:  "I will bid higher" on Paricalcitol.

---

[95]    Amended State AG Complaint No. 2 ¶ 526.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

938.    The next day, Teva conceded the Giant Eagle business to Dr. Reddy's.  S.B., a Teva Strategic Customer Analyst, wrote in an internal e-mail, "Due to DRL recent launch and pressure to give up share, we are going to concede." Giant Eagle accepted Dr. Reddy's proposal the next day.

939.    After receiving an offer from Dr. Reddy's, Schnucks also asked Teva for reduced pricing in order to retain the business.  Teva decided internally to concede Paricalcitol at Schnucks "[d]ue to new entrants and having to give up some share." In order to create the appearance of competition with this customer, Teva engaged in what Patel referred to as "fluff pricing," by which it offered Schnucks an inflated price (cover bid) for Paricalcitol to ensure that Teva did not win the business.  Indeed, Schnucks was "so insulted" by Teva's price that it moved to Dr. Reddy's the same day it received Teva's offer.  When Patel learned of this, she remarked to a Teva salesperson (who she had been discussing "fluff pricing" with recently):

From:      Nisha Patel02
Sent:      Thu 7/17/2014 11:36 AM (GMT-05:00)
To:        ▉▉▉▉▉▉▉▉▉▉
Cc:
Bcc:
Subject: RE: Schnucks Paricalcitol CPC (#12201)

Sorry! Had to laugh.  In regards to our recent conversation....this is what we see when we provide fluff pricing.
Can't win!                                                                                              96

940.    Schnucks accepted Dr. Reddy's Paricalcitol proposal on June 30, 2014.

941.    On July 16, 2014, McKesson informed Teva that it had received a competing bid for Paricalcitol, and that Teva would need to submit its best bid in order to retain the business. Teva initially decided to concede the One Stop portion of McKesson's business only, while retaining the RiteAid portion.  Patel wrote internally to her team that "[t]his decision is based on

---

96   *Id.* at ¶ 531.

the number of competitors, DRL's potential share target and our current/conceded share.  (Dr. Reddy's should be done with challenging our business on this product.)"  Patel further added that Teva had been "looking to give up One Stop to be responsible with share" and that "[t]he responsible thing to do is concede some share to DRL but not all."

942.    On July 18, 2014, a Friday, Patel called V.B. at Dr. Reddy's at 4:20 p.m. and left a message.  V.B. returned the call on Monday morning, and the two spoke for more than four (4) minutes.  They spoke again the next morning, July 22, 2014, for more than six (6) minutes. During these calls, Patel and V.B. agreed that Dr. Reddy's would stop competing for additional market share (and driving price down further) if Teva conceded all of its McKesson business (One Stop and Rite Aid) to Dr. Reddy's.  Dr. Reddy's confirmed to McKesson (that same day) that it "would be done after this" – meaning it would not compete for additional business because it had attained its fair share.  McKesson passed this information along to Teva on July 22.

943.    The next day, July 23, 2014, Teva conceded its entire McKesson business – both RiteAid and One Stop – to Dr. Reddy's.  In its Delphi database, Teva noted that the McKesson Paricalcitol business had been conceded to a "Strategic New Market Entrant."  After the fact, former customer McKesson informed Teva that Dr. Reddy's had been "so aggressive because [Teva was] not giving up share."

944.    By early August 2014, Dr. Reddy's had attained 15-16% of the total Paricalcitol market, which it decided – pursuant to its understanding with Teva – it would "maintain for now."

### 12.   Other Teva Conspiracies

     *a.*    *Oxaprozin*

945.   As discussed above, in the summer of 2012, Teva and Dr. Reddy's were the principal manufacturers of Oxaprozin.  In the second half of 2012, Sandoz was preparing to enter the market.  In anticipation, Teva raised its WAC prices significantly.  When Sandoz entered the market in November 2012, rather than undercut Teva's pricing, Sandoz matched it.

946.   On March 27, 2013, a non-Defendant generic manufacturer entered the market for Oxaprozin 600mg tablets with the exact same WAC pricing as Teva. In the days and weeks leading up to the entry, Green exchanged at least thirteen calls and one text with an account executive at the non-Defendant generic manufacturer.[97]

947.   During these communications, Teva agreed to concede specific customers to the non-Defendant generic manufacturer in order to avoid competition and price erosion resulting from the entry.

948.   Part of the understanding between the companies was that Teva would concede at least two large customers, CVS and Cardinal, and that Teva would retain Walmart as a customer. On March 27, 2013, however, Teva learned that the non-Defendant generic manufacturer had either misunderstood the deal or was trying to cheat on the agreement by approaching Walmart.

949.   On March 27, 2013, T.C. of Teva forwarded an e-mail that T.C. had received from Walmart to Green and Rekenthaler.  The e-mail from Walmart, sent the same day, requested that Teva provide a more competitive price on Oxaprozin 600mg tablets because Walmart had received a new bid from a competitor (the non-Defendant generic manufacturer).

---

[97]   *Id.* at ¶ 300.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

950.     Rekenthaler's immediate reaction to T.C.'s e-mail was "Great.  More idiots in the market..."  In subsequent e-mails between T.C. and Rekenthaler, T.C. reminded Rekenthaler that, pursuant to the agreement with the non-Defendant generic manufacturer, "[w]e just conceded at cardinal . . . remember[?]"  Rekenthaler corrected T.C., stating that Teva had conceded both Cardinal *and* CVS to the non-Defendant generic manufacturer.  Rekenthaler remarked that "[t]hey should not have gone to Walmart.  Poor strategy on their part for sure."  In her reply, T.C. made it clear that there was an understanding between Teva and the non-Defendant generic manufacturer:

From:      ▇▇▇▇▇▇▇
Sent:      Wed 3/27/2013 4:36 PM (GMT-05:00)
To:        Dave Rekenthaler; Kevin Green
Cc:
Bcc:
Subject:   RE: Oxaprozin 600mg Tab

I thought they said they were done after cardainl.. I am pissed. [98]

951.     Teva took immediate steps to address the situation.  That same day – March 27, 2013 – Green called an employee at the non-Defendant generic manufacturer at 5:25 p.m. but she did not answer.  The next morning, at 8:06 a.m., T.C. sent an e-mail to Walmart stating: "Addressing this morning. . ."  Less than a half hour later, T.C. sent an e-mail to Green, stating: "CALL ME IN MY OFFICE when you get a chance."

952.     After Green spoke to T.C., he immediately called an account executive at the non-Defendant generic manufacturer.  The account executive relayed the information from Green to

---

[98]    *Id.* at ¶ 303.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

her boss in a series of at least eight calls and nine text messages over the course of that morning and later in the day.[99]

953.    During those conversations, the non-Defendant generic manufacturer agreed to withdraw the offer to Walmart and honor the agreement with Teva.

954.    At 1:22 p.m. that day, after several of the communications outlined above, Walmart sent an e-mail to T.C. at Teva confirming that the offer to Walmart had in fact been withdrawn: "FYI - I just received word from [the non-Defendant generic manufacturer] that they have met their market share and the proposal has expired.  Please see what you can do with pricing." T.C.  forwarded the e-mail to Green, with a one-word response making it clear that Teva would not be reducing its price for Oxaprozin:  "FUNNY."

955.    Pursuant to the agreement, there was very little price erosion as a result of the non-Defendant generic manufacturer's entry.  A couple of months later, as Dr. Reddy's was preparing to enter the market for Oxaprozin, a Dr. Reddy's representative commented positively that "[p]ricing [is] still high" on Oxaprozin.  That same representative had also talked to wholesaler Cardinal about the drug and conveyed that "Cardinal switched to [the non-Defendant generic manufacturer].  Teva was 'fine' with it!"

> b.    *Tolterodine Tartrate*

956.    On January 23, 2014, a non-Defendant generic manufacturer entered the market for Tolterodine Tartrate 1mg and 2mg tablets ("Tolterodine") with the exact same WAC prices as Teva for all formulations.  In the days leading up to January 23, 2014, employees of non-Defendant generic manufacturer were speaking frequently to Patel and Rekenthaler of Teva to

---

[99]    *Id.* at ¶ 305.

coordinate the non-Defendant generic manufacturer's entry into the market.  Patel and

Rekenthaler exchanged at least twelve calls and eight texts with the non-Defendant generic

manufacturer in the days leading up to January 23, 2014.[100]

957.    During these calls and text messages, Teva and the non-Defendant generic

manufacturer agreed that Teva would concede business in order to avoid significant price erosion

in the market.

958.    On January 24, 2014, in a message to Teva national account managers about how

important it was for them to determine and document which competitor was challenging Teva for

business in a particular situation (because it would help Teva determine whether to concede or

not), Patel stated:  "As we've heard, [the non-Defendant generic manufacturer] is entering the

market for Tolterodine.  I'm sure we will have to concede somewhere. . . ."

959.    On January 28, 2014, Teva was informed by CVS that it had received a

competitive price challenge on Tolterodine.  K.G. of Teva immediately asked:  "do we know

who this could be?"  Rekenthaler responded that it was the non-Defendant generic manufacturer,

but noted that he did not want to put the details into writing.[101]

960.    The next day, Patel and an employee of non-Defendant generic manufacturer tried

to reach each other several times, and were ultimately able to speak once, for more than two (2)

minutes.

961.    On Monday, February 3, 2014, Patel instructed a colleague at Teva to concede the

business at CVS by providing a small price reduction that she knew would not be sufficient to

retain the business.  T.C. of Teva, who had the customer relationship with CVS, challenged the

---

[100]   *Id.* at ¶ 309.

[101]   *Id.* at ¶ 311.

decision to concede the business.  Rekenthaler responded – again not wanting to put the details into writing:

> On Feb 3, 2014, at 11:29 AM, "Dave Rekenthaler" <Dave.Rekenthaler@tevapharm.com> wrote:
>
> ██ I'll discuss the details of this with you later. There was a strategy here and you weren't in the office Thursday or Friday so we proceeded. Again, it will make sense after I discuss with you.
>
> 102

962.     The next day, Patel called an employee at non-Defendant generic manufacturer and the two spoke for nearly sixteen (16) minutes.

963.     After some internal discussions at Teva regarding the CVS business, Teva confirmed its decision to concede CVS to the non-Defendant generic manufacturer.  CVS represented more than 20% of Teva's business on Tolterodine.

c.     <i>Piroxicam</i>

964.     Before 2014, the principal manufacturers of Piroxicam were Teva and Mylan.

965.     In May 2010, Teva increased WAC pricing for Piroxicam.  Shortly before that announcement, Dave Rekenthaler of Teva had a phone call with J.K., Vice President and Executive Director of Sales at Mylan.  The two had another phone call shortly after the price increase.

966.     On March 3, 2014, the non-Defendant generic manufacturer received FDA approval to market Piroxicam capsules.  It entered the market with the exact same WAC pricing as Teva for both the 10mg and 20mg capsules.

967.     At 10:07 a.m. on March 5, 2014, J.L. of Teva sent an e-mail to Patel informing her that the non-Defendant generic manufacturer had just received Piroxicam approval and was

---

102   <i>Id.</i> at ¶ 312.

challenging Teva on several accounts.  J.L. asked Patel:  "Do we have any strategy in place for Piroxicam?"

968.    Before responding to that e-mail, Patel called an employee at the non-Defendant generic manufacturer at 10:55 a.m. and they spoke briefly.  Shortly after that call, Patel also called that employee's supervisor.  At 2:14 p.m. that afternoon, Patel and that employee's supervisor at spoke briefly.  Immediately after hanging up, Patel responded to J.L.'s e-mail:



From:     Nisha Patel02
Sent:     Wed 3/05/2014 2:17 PM (GMT-05:00)
To:
Cc:
Bcc:
Subject: RE: Piroxicam CPCs in house

We will need to concede, but either way, will need to understand the value involved. This will help us to determine the share we want to retain v. concede and in order of customers. Please create the concede analysis and customer profitability analysis (the type that ████ did yesterday for Amphetamine IR).

[103]

969.    Teva immediately began preparing a strategy to deal with the non-Defendant generic manufacturer's entry into the Piroxicam market.  On March 6, 2014, Patel requested a customer profitability and share analysis.  During these negotiations with competitors regarding market entry, it was typical for Teva employees to request a "customer profitability and share analysis" (as Patel did here) so they could easily determine which customers to concede when talking to competitors about dividing the market.

970.    That same day, Patel exchanged at least ten calls with employees at the non-Defendant generic manufacturer to discuss their plans for dividing the Piroxicam market.[104]

971.    The next day, March 7, 2014, after the flurry of phone calls detailed above, Patel sent an e-mail to L.R., a customer marketing manager at Teva, identifying specific customers to

---

[103]   *Id.* at ¶ 317.

[104]   *Id.* at ¶ 319.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

concede.  Based on her several conversations with the non-Defendant generic manufacturer, and her understanding of the concept of "fair share," Patel also noted:  "I'm guessing that [the non-Defendant generic manufacturer] will not stop here since we are the share leader, but for the customers listed below, we should concede.  We will review additional challenges as they come, if they come."

972.     Additional challenges did come.  On March 12, 2014, Patel learned that the non-Defendant generic manufacturer was challenging Teva at CVS – Teva's largest account for Piroxicam.  Teva refused to concede CVS to the non-Defendant generic manufacturer because CVS represented 26.1% of Teva's total market share for that drug.  Teva lowered its price by 20%, and the next morning CVS notified Teva that it would retain the account.  The same day, after hearing that Teva was not going to back down on the CVS challenge, an employee of the non-Defendant generic manufacturer called Patel at 1:41 p.m. and they spoke briefly.

973.     On March 17, 2014, Patel called an employee of the non-Defendant generic manufacturer and they spoke briefly.  The employee called Patel back at 11:35 p.m. that same day and they spoke for fifteen (15) minutes.  Immediately after speaking to Patel, the employee of the non-Defendant generic manufacturer called a colleague and they spoke for ten (10) minutes.  Teva retained the CVS account but conceded other customers (representing less market share) through March and April.

974.     For example, on March 25, 2014 Teva learned of a challenge from the non-Defendant generic manufacturer at Anda, a wholesaler distributor.  Following an analysis of its market share, Teva determined that it still had more than its "fair share" of the market.  Pursuant to the understanding among generic manufacturers alleged above, Teva determined that it would

be prudent to concede the Anda business on Piroxicam, in order to alleviate any future challenges.  Patel agreed with the decision to concede on April 1, 2014.

### d.  Cabergoline

975.    In December 2014, as the non-Defendant generic manufacturer was preparing to enter the market for Cabergoline, F.H., a senior executive responsible for generic products at a large joint venture between a retail pharmacy ("Pharmacy-3") and a large wholesaler ("The Wholesaler") to pool the companies' drug purchasing globally, approached T.C. of Teva on behalf of the non-Defendant generic manufacturer.  In a December 9, 2014 e-mail, F.H. directly sought to facilitate a customer allocation between the non-Defendant generic manufacturer and Teva:  "I need to talk to you about Cabergoline.  [The non-Defendant generic manufacturer] is now shipping and they are targeting [The Wholesaler] and 2 small grocery chains.  [The Wholesaler] owes [the non-Defendant generic manufacturer] a favor and would be ok if you walked away from their business.  [The non-Defendant generic manufacturer] has promised to play nice in the sandbox.  Let me know if you are available to discuss."

976.    The Wholesaler represented about 13% of Teva's total business for Cabergoline, and about $861,000 in annual net sales.

977.    T.C. of Teva did not respond immediately, asking for a little extra time "to figure something out on our side." F.H. responded:  "Of course.  I will let [the non-Defendant generic manufacturer] know not to do anything crazy."

978.    The next day, after some internal conversation at Teva, T.C. agreed to the proposed allocation:  "Tell [the non-Defendant generic manufacturer] we are playing nice in the sandbox and we will let them have [The Wholesaler]."

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

979.    Pursuant to this agreement, [the non-Defendant generic manufacturer] was able to acquire The Wholesaler as a customer for Cabergoline without any fear that Teva would compete to retain the business.  In exchange, [the non-Defendant generic manufacturer] agreed to "play nice in the sandbox" – i.e., not compete with Teva for other customers and drive prices down in the market.

### 13.    Mylan / Sandoz

#### a.    *Valsartan HCTZ*

980.    The first drug that CW-4, of Sandoz, and Nesta, of Mylan, coordinated about was Valsartan HCTZ.  Valsartan HCTZ, also known by the brand name Diovan, is used to treat high blood pressure.

981.    Diovan was a large volume drug that had sales in the United States of approximately $1.6 billion for the 12 months ending June 30, 2012.

982.    Mylan was the first to file an abbreviated new drug application (ANDA) to market the generic version – Valsartan HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity.  Sandoz manufactured the authorized generic.  This meant that Sandoz and Mylan would be the only two manufacturers of the generic for six months.

983.    Mylan and Sandoz launched Valsartan HCTZ on the same day – September 21, 2012.  In the days leading up to the launch, CW-4 and Nesta spoke at least twenty-one (21) times by phone during which they discussed, among other things, allocating market share for this

product.  These calls are detailed in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:20:01 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:11 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:18 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:43 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:35 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:03 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:22:22 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:35 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:06 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:26 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:19 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:57 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:03:30 |
| 9/14/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:07:36 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:09 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:32 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:02:40 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:51 |

[105]

984.    During these phone calls, Sandoz and Mylan – through CW-4 and Nesta – agreed to divide up the market so that each competitor obtained roughly a 50% market share.

985.    Throughout this time, CW-4 also kept Kellum (her supervisor) regularly informed of her discussions with Nesta and met with Kellum in person to discuss her customer accounts, including a meeting on September 14, 2012.

986.    On September 21, 2012 – the date of the Valsartan HCTZ launch – R.T., a senior sales and marketing executive at Sandoz, sent an internal e-mail stating "[a]s a cross functional team, we have optimized this launch successfully securing ~52% market share vs.  a formidable competitor like Mylan. . . . you should be very proud!"

---

[105]  *Id.* at ¶ 979.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

987.    That same day, Mylan issued a press release announcing that it had received final FDA approval to market generic Valsartan HCTZ.  In an internal series of e-mails reacting to this news, a Sandoz employee remarked:  "Fyi, good news, Mylan has 180 days as expected." H.F., a senior-most executive of Sandoz Germany responded, ". . . sometimes a little help from our competition is welcome as well."  D.D., a senior-most executive of Sandoz North America, replied:

I guess this is what they call "co-opetition". [106]

988.    Kellum forwarded Mylan's press release announcing the Valsartan launch to the Sandoz pricing and sales teams.  S.G., a national account executive at Sandoz, replied "Hallelulah!!!!!!!!!!!!!!! (sic)."

989.    On September 25, 2012 – only four days after the launch – ABC contacted Sandoz seeking a price reduction on Valsartan HCTZ.  S.G. forwarded the request to CW-1 and Kellum stating "ABC has provided additional information regarding the market pricing on Valsartan HCTZ (specifically to McK [a Mylan customer]).  Please review and advise if Sandoz will continue to let the market settle or move in a different direction.  Kellum replied, "[n]o price change."

990.    On November 16, 2012, Sandoz executives met to discuss increasing sales for Valsartan HCTZ.  R.T. sent an internal e-mail in advance of the meeting asking, "Are there opportunities with non-Sandoz customers that we should evaluate?" After a colleague responded with a list of potential Mylan customers, Kellum responded, "I'm concerned we are going to

---

[106]   *Id.* at ¶ 983.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

disrupt the market.  I understand the need for additional sales but we need to be thoughtful here."

R.T. then informed the Sandoz team "Do not approach new customers, with[out] me or Armando

[Kellum]'s consent."

**B.     Taking the Overarching Conspiracy to a New Level:  Price Fixing (2012 – 2015)**

**1.     July 31, 2012 Price Increase**

991.     Effective July 31, 2012, Teva increased pricing on a number of different drugs.

Many were drugs where Teva was exclusive, but several of them were drugs where Teva faced

competition, including the following:

| Drug | Competitors |
| --- | --- |
| Buspirone Hydrochloride Tablets | Mylan (29.5%); Watson (23.5%) |
| Estradiol Tablets | Mylan (26.7%); Watson (16.4%) |
| Labetalol HCL Tablets | Sandoz (61.4%); Watson (10%) |
| Loperamide HCL Capsules | Mylan (67%) |
| Mimvey (Estradiol/Noreth) Tablets | Breckenridge (66.2%) |
| Nadolol Tablets | Mylan (49.8%); Sandoz (10.3%) |
| Nitrofurantoin MAC Capsules | Mylan (45.3%); Alvogen (7.9%) |
| Tamoxifen Citrate Tablets | Mylan (22.2%); Watson (10.3%) |

[107]

992.     Before raising prices on these drugs, Teva coordinated each of these price

increases with its competitors.  For every drug on the list above, either Green or Rekenthaler was

communicating directly or indirectly with Teva's competitors to coordinate in the days and

weeks leading up to the price increase.  For example:

        a.     Mylan:  Green spoke to Nesta on July 23 (7 minutes), July 24 (2 calls:  4

and 8 minutes); July 25 (4 minutes); July 26 (4 minutes); July 30 (2 calls, including one 8

minutes); and July 31, 2012 (5 calls:  6, 2, 4, 7 and 2 minutes);

---

[107]   *Id.* at ¶ 540.

b.      Watson[108]:  Rekenthaler spoke to A.S., a senior Watson sales executive, on July 11, 2012 (2 calls:  1 and 9 minutes);

c.      Sandoz:  Green spoke to CW-2 at Sandoz on July 29, 2012 (2 calls:  2 and 4 minutes) and July 31, 2012 (6 minutes).

d.      Breckenridge:  Rekenthaler spoke to D.N. a senior sales executive at Breckenridge on July 17, 2012 (4 minutes);

e.      Alvogen:  Green had several calls with Nesta at Mylan (noted above) on July 31, 2012.  After some of those calls between Green and Nesta on July 31, Nesta called B.H., a senior sales and marketing executive at Alvogen.

*a.      Nadolol*

993.    As early as 2012, Teva was speaking to competitors about the drug Nadolol.

994.    In 2012 and 2013, Teva's only competitors for Nadolol were Mylan and Sandoz. All three companies experienced supply problems of some sort during that time period, but they were in continuous communication to coordinate pricing and market allocation in order to maintain market stability.  Nadolol was a high-volume drug and one of the most profitable drugs where Teva, Mylan and Sandoz overlapped, so it was very important that they maintain their coordination.

995.    By 2012, an anticompetitive understanding among Teva, Mylan and Sandoz was firmly entrenched.

---

[108] Watson Pharmaceuticals, Inc.  ("Watson"), acquired Actavis in or around October 2012.  The two companies operated as a single entity, albeit under separate names until January 2013, when Watson announced that it had adopted Actavis, Inc. as its new global name.  *See* Press Release, Actavis, Inc. (Jan. 24, 2013), *available at* https://www.prnewswire.com/news-releases/watson-pharmaceuticals-inc-is-now-actavis-inc-188196701.html.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

996.     Teva raised its price on Nadolol on July 31, 2012.  In the days leading up to that increase, Green, at the time in the sales department at Teva, was in frequent communication with executives at both Sandoz and Mylan.  Green spoke to CW-2 from Sandoz twice on July 29, 2012, and again on the day of the price increase, July 31, 2012.  Similarly, Green was communicating with Nesta of Mylan often in the days leading up to the increase, including five (5) calls on the day of the price increase.

997.     Sandoz followed with its own increase on August 27, 2012.  The increases were staggering – varying from 736% to 798% depending on the formulation.  The day before the Sandoz increase, Kellum, then the Senior Director of Pricing and Contracts at Sandoz, called Green.  They had also spoken once earlier in the month, shortly after the Teva increase.  CW-2 also called Green twice on August 21, 2012 – the same day that Sandoz requested approval from its Pricing Committee to raise the Nadolol price.  The day after the Sandoz increase, Green – acting as the conduit of information between Sandoz and Mylan – called Nesta of Mylan twice, with one call lasting fourteen (14) minutes.

998.     Mylan, which returned to the market after a brief supply disruption, followed  the Teva and Sandoz increases on January 4, 2013.  The day before the Mylan increase Nesta spoke to Green four (4) times.  The next day, Green conveyed the information he had learned from Nesta directly to his counterpart at Sandoz.  On January 4, 2013 – the day of the Mylan increase, Green called Kellum twice in the morning, including a six (6) minute call at 9:43 a.m.  Shortly after hanging up with Green, Kellum reported internally on what he had learned – but concealing the true source of the information – a convention that was frequently employed by many Sandoz

executives to avoid documentation of their covert communications with competitors:

> **From:** Kellum, Armando
> **Sent:** Friday, January 04, 2013 11:28 AM
> **To:** ███████████████████████████████
> ███████████████████
> **Subject:** Levothryoxine and nadolol
>
> Just heard from a customer that
>
> - Teva and Mylan raised have now raised price on Nadolol to our levels
>
> and
>
> Mylan took a significant price increase on Levothryoxine
>
> Let's please be cautious on both of these products.
>
> Thanks
>
> [109]

999.    Being "cautious" on those products meant that Sandoz did not want to steal business away from its competitors by offering a lower price and taking their market share.

1000.    Kellum's phone records demonstrate that he did not speak with any customers during the morning of January 4, 2013.  At 11:50 a.m. the same morning, Green also called CW-2 at Sandoz and they spoke for fifteen (15) minutes.

1001.    Significantly, Green was not speaking with his Sandoz contacts solely about Nadolol, the common drug between Teva and Sandoz, but was also conveying information to Sandoz about a Mylan price increase on another drug that Teva did not even sell – Levothyroxine.  Such conversations further demonstrate the broad, longstanding agreement among each of these competitors to share market intelligence in order to facilitate the scheme.

1002.    Teva continued to conspire with Mylan and Sandoz about Nadolol and many other drugs throughout 2013 and into the future.

---

[109]    Amended State AG Complaint No. 2 ¶ 548.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

b.    *Labetalol HCL*

1003.   Teva increased its pricing on Labetalol HCL on July 31, 2012.  After that increase, it continued to coordinate with its competitors to maintain that supra-competitive pricing for that drug.  For example, in October 2012, Teva learned that Sandoz was "no longer having supply issues" but that "Watson is on allocation" (i.e., did not have enough supply to meet all of its demand).  In an internal e-mail sent on October 16, 2012, J.L., a senior analyst at Teva, questioned whether Teva should consider lowering "strategic customer pricing" in order to retain its market share.

1004.   That same day, Green spoke to CW-2 of Sandoz two (2) times.  After those calls with CW-2, Green responded to the analyst's question:

> Sandoz is back in good supply. They took a 500% price increase several months back, and they are holding firm with their prices.
>
> Stay the course and maintain our higher price
[110]

1005.   T.C. of Teva agreed:  "We need to stay the TEVA course."

1006.   Rekenthaler was not satisfied, however.  In order to confirm that Watson was also still committed to maintaining high pricing on Labetalol HCL, Rekenthaler called and spoke to A.S., a senior sales executive at Watson, four (4) times on October 18, 2012.

c.    *Nitrofurantoin MAC*

1007.   Teva's July 31, 2012 price increase on Nitrofurantoin MAC was between 90-95% depending on the dosage and formulation.  After that increase, Teva continued to coordinate with Mylan and non-Defendant manufacturer Alvogen to maintain those high prices.

---

[110]   *Id.* at ¶ 555.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1008.   For example, on October 10, 2012, a distributor customer approached Teva requesting a lower price for Nitrofurantoin MAC because it was having difficulty competing with the prices being charged by the distributor's competitors (i.e., other distributors).  At 9:49 a.m. on October 10, 2012, K.G. of Teva sent an internal e-mail to the Teva sales team, including Green and Rekenthaler, among others, saying:

> Sales Team,
>
> We adjusted our pricing on Nitrofurantoin based on market pricing we had received in the past.  Please confirm current market pricing.

[111]

1009.   Immediately after receiving that e-mail, Green reached out to both Nesta at Mylan and B.H., his counterpart at Alvogen.  At 10:01 a.m., Green called Nesta and the two spoke for ten (10) minutes.  After hanging up – at 10:11 a.m. – Green called B.H. at Alvogen for the first of three (3) calls that day, including one call lasting fourteen (14) minutes.  To close the loop, Nesta also separately spoke to B.H. two times that same day, including a call lasting almost ten (10) minutes.  Teva did not lower its price.

## 2.   February – April 2013:  Increasing Prices Before A New Competitor Enters the Market:  Budesonide Inhalation Suspension

1010.   As of February 2013, Teva was the only company in the market for generic Budesonide inhalation suspension.  Teva knew, however, that a potential legal action challenging the validity of the patent on the brand drug could allow additional competition into the generic market shortly.  Before any additional competition could enter the market, effective February 8, 2013, Teva raised the WAC price for its Budesonide inhalation suspension by 9%.  Although a

---

[111]   *Id.* at ¶ 559.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

very modest increase in percentage terms, the 9% price increase added $51 million to Teva's annual revenues.

1011.   On April 1, 2013, Actavis won a legal challenge in federal district court against the brand manufacturer declaring the patent for the brand drug, Pulmicort Respules, invalid. Actavis immediately began planning to launch the product "at risk," which is when a generic manufacturer puts the product on the market before all appeals in the patent lawsuit are formally resolved and there is still a risk that the new generic entrant might ultimately be found to violate the patent.  That same day, Rekenthaler of Teva called his counterpart at Actavis, A.B. – a senior sales and marketing executive – and they spoke for two (2) minutes.  This was the first-ever phone call between them based on the phone records produced.

1012.   The next day, April 2, 2013, Rekenthaler spoke to A.B. two (2) more times, including one call lasting eight (8) minutes.  Actavis then immediately began shipping the product.  Instead of competing to obtain market share as a new entrant, however, Actavis entered the market with the exact same WAC price as Teva.  Indeed, when Teva inquired of a customer that same day to confirm Actavis's pricing, Teva was informed by the customer that Actavis's pricing was "in line with [Teva's] current wholesale pricing."

1013.   At some point thereafter, further legal action from the brand manufacturer prevented Actavis from permanently entering the market.  In the interim, though, Teva was able to continue to charge the agreed-upon prices.  In addition, once Actavis entered the market in 2015, Teva immediately conceded customers to Actavis in accordance with the fair share agreement – after calls between Rekenthaler and Falkin, by then a Vice President at Actavis.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1014.   In July 2015, Sandoz entered the market for Budesonide Inhalation.  Teva ceded

several large accounts to Sandoz so that Sandoz could obtain its fair share.  Sandoz was able to

obtain this share without decreasing price, consistent with the Fair Share Agreement.

### 3.       May 13, 2013 Price Increase – Tizanidine

1015.   As of May 2013, Sandoz, Mylan, Dr. Reddy's, Apotex, and Sun were in the

market for Tizanidine.  Dr. Reddy's led the increase on this product on May 13, 2013, increasing

its WAC price and raising contract pricing tenfold.  At that time, Dr. Reddy's was the market

leader with 59% market share, while Mylan had 24%, and Sandoz had 17%.

1016.   Tizanidine was a drug that had been on the market for many years and whose

price had eroded as many competitors entered and exited the market depending on the

profitability of the drug.  As Dr. Reddy's explained in an internal presentation, "Price needs to be

adjusted to incentivize current manufacturers to stay in this product" and stated that Dr. Reddy's

assumes "Mylan and Sandoz are responsible players, and they may not be able to pick up the

large volumes we currently service."

1017.   Sandoz was thrilled when it learned that Dr. Reddy's had increased its price on

Tizanidine.  For example, on May 10, 2013, S.G., a national account executive at Sandoz, sent an

internal e-mail stating that "Giant Eagle just let me know that Dr. Reddy just took a price

increase on Tizanidine! Pricing on the 2 & 4mg 150 ct went from $4.50 to $45.00. . . .  We

should secure confirmation but if this is true it would be very positive . . . ." Kellum responded,

"Wow! Thank you."  Kellum then quickly sent out a directive to the team to "[p]lease put the

product on strict allocation to forecast.  Pricing Team – no new offers."

1018.   On May 13, 2013, Dr. Reddy's published its new WAC pricing for Tizanidine.

That same day, Nesta of Mylan called CW-4 at Sandoz and they spoke for 4 minutes.  Two days

later, CW-1 of Sandoz sent an internal e-mail to Kellum regarding "Tizanidine" stating "[l]et's discuss."

1019.   On May 24, 2013, Sandoz followed and matched Dr. Reddy's WAC pricing on several formulations, and even exceeded Dr. Reddy's pricing on one formulation.  Sandoz's WAC increases were significant, ranging from 248% to 344%, depending on the formulation.  In the days leading up to the Sandoz increase, Nesta of Mylan exchanged phone calls with both CW-4 of Sandoz and J.A., a national account executive at Dr. Reddy's, to coordinate the price increase regarding Tizanidine.  At least some of those calls are set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/20/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:06 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:42 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:01:25 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:20 |

[112]

1020.   Notably, after this, Nesta would not speak with J.A. again until three months later in August 2013.

1021.   On May 29, 2013, customer Omnicare e-mailed Sandoz and asked whether it wanted to submit a bid for Tizanidine.  CW-3 of Sandoz forwarded the request internally to CW-1 and Kellum asking "[a]re we considering additional Tizanidine market share? I'm assuming are [sic] intent is not to be disruptive at this time." A few minutes later, Nesta called CW-4 at Sandoz and they spoke for nearly thirteen (13) minutes.  Later that day, CW-1 replied to CW-3's e-mail stating, "[w]e will sit tight for now." CW-3 then responded to Omnicare, stating that

---

[112]   *Id.* at ¶ 1056.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"[a]lthough we are not in a back order situation we cannot assume additional usage at this time. If this were to change I will let you know."

1022.   On June 11, 2013, V.B., Director of National Accounts at Dr. Reddy's, spoke to T.B., National Account Manager at Apotex.

1023.   On June 14, 2013, Anda, a wholesale customer, e-mailed J.A. of Dr. Reddy's asking "[d]id mylan follow your increase?" J.A. responded, "We've heard they did." J.A. had learned of Mylan's intent to follow the price increase through his prior communications with Nesta.  However, Mylan had not actually raised its price on Tizanidine at the time of the inquiry and would not do so until July 2, 2013.

1024.   On June 26, 2013, Meijer, a supermarket chain customer, e-mailed Dr. Reddy's requesting a bid for Tizanidine.  J.A. forwarded the request to N.M., a marketing executive at Dr. Reddy's, stating:  "I'm assuming they got a price increase."  N.M. responded:  "I think, given the market situation and us leading the price adjustment, I think, we should not go behind additional market share since it will erode the market even further." J.A. replied, "[y]eah, I was just sending it as an FYI, no intention to bid."  On June 28, 2013, two days later, J.A. of Dr. Reddy's and S.G., Director of Marketing at Sun, communicated by phone.  A few weeks later, Meijer forwarded the same request to Sandoz.  Sandoz's response was similar:  "[w]e cannot supply unfortunately."

### 4.     May 24, 2013 First List of Price Increases

1025.   When Patel began at Teva, she completed and sent her first formal list of recommended price increases to her supervisor, K.G., on May 24, 2013.  She sent the list via e-mail, with an attached spreadsheet entitled "Immediate PI File."  The attached list included twelve (12) different drugs where Patel recommended that Teva follow a "high quality"

competitor's price increase as soon as possible.  The spreadsheet also revealed competitively sensitive information about future pricing and bidding practices of several of Teva's high quality competitors – information that Patel could have only learned through her discussions with those competitors.  The relevant columns from that spreadsheet are set forth below:

| Product Category | Competitors | Reason for increase |
|---|---|---|
| NABUMETONE TABLETS Total | Watson 26, Glenmark 25, Sandoz 5 | Follow 10% below Glenmark. Sandoz also bidding high |
| RANITIDINE HCL TABLETS Total | Glenmark 1, Amneal 35, Wockhardt 107 | Follow Glenmark and Amneal increase. 3% below Glenmark. |
| MOEXIPRIL HCL TABLETS Total | Glenmark 18, Paddock 16 | Follow Glenmark increase. 5% lower |
| MOEXIPRIL HCL/HCTZ TABLETS Total | Glenmark 7B, Paddock 2 | Follow Glenmark increase. 5% lower |
| ADAPALENE GEL Total | Glenmark 13, Taro 45 | Follow Glenmark increase. 5% lower. Rumors of Taro increase |
| CEFDINIR ORAL SUSPENSION Total | Lupin 35, Northstar 5, Sandoz 3 | Follow Lupin. 8-10% lower |
| CEFPROZIL TABLETS Total | Lupin 42, Northstar 10, Sandoz 18 | Follow Lupin. 8-10% lower |
| CEFDINIR CAPSULES Total | Lupin 49, Sandoz 16, Northstar 7 | Follow Lupin. 8-10% lower |
| FLUOCINONIDE OINTMENT Total | Taro 44, Sandoz 1 | Raise to follow Taro |
| FLUOCINONIDE CREAM E Total | Taro 62, Sandoz 10 | Raise to follow Taro |
| FLUOCINONIDE GEL Total | Taro 63, Sandoz 9 | Raise to follow Taro |
| FLUOCINONIDE CREAM Total | Taro 68, Sandoz 1 | Raise to follow Taro |
| CEFACLOR ER TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEPHALEXIN TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEFADROXIL TABLETS Total | Westward 41 | EXCLUDE, ERROR IN SOURCE DATA |

[113]

1026.   For every one of the relevant drugs on the list, Patel or another executive at Teva spoke frequently with Teva's competitors in the days and weeks leading up to May 24, 2013. During these communications, Teva and its competitors agreed to fix prices and avoid competing with each other in the markets for the identified drugs.  For some of these drugs – including the four different formulations of Fluocinonide – Patel knew before she even began her employment at Teva that she would be identifying those drugs as price increase candidates because of communications she had already had with Aprahamian of Taro.

1027.   The graphic on page 168 of AG Complaint No. 2 summarizes some of the calls related to each of the respective competitors leading up to May 24, 2013.  Those communications included communications between Teva, Actavis, Glenmark, and Sandoz concerning Nabumetone Tablets; between Teva, Amneal, and Glenmark concerning Ranitidine

---

[113] *Id.* at ¶ 602.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

HCL Tablets; between Teva and Glenmark concerning Moexipril HCL Tablets and Moexipril HCL/HCTZ Tablets; between Teva, Glenmark, and Taro concerning Adapalene Gel; between Teva and Lupin concerning Cefdinir Oral Suspension, Cefprozil Tablets, and Cefdinir Capsules; and between Teva and Taro concerning Fluocinonide Ointment, Fluocinonide Cream E, Fluocinonide Gel, and Fluocinonide Cream.

1028.   The "Immediate PI File," including the competitively sensitive information Patel had obtained from competitors, was sent by Patel's supervisor K.G. to Cavanaugh – at that time the Senior Vice President of Sales and Marketing at Teva – on May 27, 2013.  Cavanaugh adopted and approved Patel's price increase recommendations on May 28, 2013.

1029.   The Teva price increases for the drugs identified in Patel's May 24, 2013 "Immediate PI File" went into effect on July 3, 2013.  Patel went to great lengths to coordinate these price increases with competitors prior to sending the list to K.G. on May 24, 2013.  Some illustrative examples of that coordination are set forth below.

> a.      *Glenmark*

1030.   A number of the drugs identified in the "Immediate PI File" were targeted because of a recent Glenmark price increase on May 16, 2013.  As soon as Patel started at Teva, she began to identify price increase candidates through her conversations with various sales and marketing executives at Glenmark, including:

> a.      CW-5:  4 calls on 5/2/13 (5:02; 0:06; 7:18 and 11:39), 2 calls on 5/3/13 (1:53 and 0:06); 1 text message on 5/3/13;

> b.      J.C.:  3 calls on 5/6/13 (6:45; 20:44; 8:39); 2 calls on 5/7/13 (7:59 and 1:03); For example, early in the morning on May 2, 2013, Patel informed a colleague that she expected to have some new drugs to add to the price increase list imminently:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

From:     Nisha Patel02
Sent:     Thu 5/02/2013 6:49 AM (GMT-05:00)
To:       ████
Cc:
Bcc:
Subject: RE: Price Increases — will you be scheduling time next week to discuss?

When you get in, let's touch base on the high priority items below. Please gather/calculate the shelf stock and any other financial exposure involved. If possible, use an assumption of a 30% increase for now with a variable formula where the percentages can be changed for different scenarios. I also expect to have some high priority items to add to this list. I should have them shortly.

114

1031.   Less than fifteen minutes later, Patel received a call from CW-5 of Glenmark and the two spoke for just over five (5) minutes.  Shortly after that call, at 7:44 a.m., Patel sent a follow-up e-mail where she identified six different "high priority" Glenmark drugs to add to the price increase list, including:  Adapalene gel; Nabumetone; Pravastatin; Ranitidine HCL; Moexipril HCL; and Moexipril HCL/HCTZ.  Glenmark had not yet increased price on any of those drugs, nor had it sent any notices to customers indicating that it would be doing so (and would not send such notices until May 15, 2013).

1032.   As the Glenmark price increases were approaching, Patel took steps to make sure that Teva did not undermine its competitor's action.  During the morning on May 15, 2013, in anticipation of the Glenmark price increases that had not yet been implemented or made public, Patel instructed her Teva colleagues to alert her of any requests by customers for pricing relating to eight different drugs that Teva and Glenmark both marketed:

---

[114]   *Id.* at ¶ 607.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

From: ▮▮▮▮▮▮▮▮
Sent:   Wed 5/15/2013 7:40 AM (GMT-05:00)
To:     ▮▮▮▮▮▮▮▮
Cc:     Nisha Patel02
Bcc:
Subject: Various Product Family Requests / RFP

▮▮▮▮▮

Nisha would like to be made aware of any requests (including in-house RFPs) that include the following
product families:

Adapalene

Nabumetone

Fluconazole Tabs

Ranitidine

Moexipril

Moexipril HCTZ

Pravastatin

Ondansetron

In the event you are reviewing these products for any request, please make her aware and as a group we can
discuss where to price based on market intelligence she has collected.

[115]

1033.   In accordance with the fair share understanding outlined above Patel wanted to be

careful to avoid obtaining any market share from Glenmark after the price increases.

1034.   Patel also spoke to CW-5 of Glenmark for nearly six (6) minutes the next day,

May 16, 2013 – the day of the Glenmark price increases.  Effective that day, Glenmark increased

price on the following drugs where there was an overlap with Teva:  Adapalene gel;

Nabumetone; Fluconazole tablets; Ranitidine HCL; Moexipril HCL; Moexipril HCL/HCTZ;

Pravastatin; and Ondansetron.  Patel also spoke to CW-5 and J.C. at Glenmark multiple times on

May 17, 2013.

1035.   After Glenmark price increase implementation on May 16, 2013, and before Teva

had the opportunity to follow those increases, several customers approached Teva looking for a

---

[115]   *Id.* at ¶ 608.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

lower price.  Teva refused to bid on most of these solicitations so as to maintain market stability.

When it did provide a customer with a bid, Teva intentionally bid high so that it would not win

the business.  As Patel stated to a Teva colleague when a large wholesaler approached Teva

about bidding on several Glenmark drugs:  "IF we bid, we need to bid high, or we will disturb

the market."

1036.   Patel did not immediately include all of the Glenmark price increase drugs on

Teva's price increase list, however, because certain drugs involved non high "quality"

competitors.  For these drugs, a little more work (and communication) was required before Patel

would feel comfortable moving forward with a price increase.

1037.   For example, the market for Fluconazole tablets included a non-Defendant

generic manufacturer as a competitor (albeit with relatively low market share) in addition to

Teva and Glenmark.  As of Friday May 17, 2013, Patel had not yet decided whether Teva should

follow the Glenmark price increase on Fluconazole, fearing that the non-Defendant generic

manufacturer might not be a responsible competitor.  In an internal e-mail that day, Patel

indicated to colleagues – including her supervisor, K.G. – that she was "[g]athering some revised

intel" about Fluconazole in order to determine next steps.  The following Monday, May 20, Patel

called a national account manager at the non-Defendant generic manufacturer but was unable to

connect.  Patel was ultimately not able to communicate with the national account manager by

phone until May 28, 2013.  The next day after speaking to the national account manager – May

29, 2013 – Patel promptly added Fluconazole to the Teva price increase list.

1038.   Teva followed the Glenmark price increase for Fluconazole tablets on July 3,

2013.  That same day, Patel spoke to the national account manager and also spoke to CW-5 at

Glenmark for almost five (5) minutes.  The Teva price increases were a staggering 875% -

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1,570%, depending on the dosage strength.  The non-Defendant generic manufacturer then followed with an increase of its own on August 16, 2013.  Patel coordinated those increases with both Glenmark and the non-Defendant generic manufacturer.

1039.   Subsequently, Citron and Dr. Reddy's entered the Fluconazole market.  When Citron was preparing to enter the market in late 2013 and early 2014, L.S., VP of Sales at Citron, communicated with T.C., Director of Sales at Teva, in November 2013, December 2013, and February 2014.  In March 2014, K.S., EVP of Sales at Citron, communicated by phone with Jim Grauso of Glenmark.  When Dr. Reddy's was entering the market, Nisha Patel of Teva had contact by phone and text with V.B., VP of Sales at Dr. Reddy's, in June, July, and August of 2014.  Despite entry by Citron and Dr. Reddy's, prices for Fluconazole remained elevated.

b.     *Sandoz*

1040.   In her May 24 "Immediate PI File," Patel included competitively sensitive information about the drug Nabumetone, indicating that she was confident following Glenmark's increase because Sandoz was "bidding high" on that drug.  In other words, Sandoz would provide cover bids that were too high to be successful, so that Sandoz would not take its competitors' market share even if it did not take its own price increase.  Patel had spoken to CW-1 for nearly twenty-five (25) minutes on May 15, 2013, and again for more than eighteen (18) minutes on May 20, 2013, during which time she learned this information.

1041.   At the same time, Sandoz was internally discussing its "bidding high" strategy for Nabumetone.  Two days before Patel sent the "Immediate PI File" to her supervisor, a Sandoz

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

pricing analyst sent the following e-mail to Kellum and CW-1 confirming the strategy:

| From: | |
|---|---|
| Sent: | Wednesday, May 22, 2013 4:14 PM |
| To: | Kellum, Armando; |
| Subject: | Target RFP Question |

AK,

I know we agreed not to bid on potential price increase items, but we bid Nabumetone at a high price. Are you okay with us bidding on this one? McKesson does not purchase this product from us.

[116]

1042.  Patel continued to coordinate with CW-1 and other competitors about increasing prices for drugs on the list even after she sent it to K.G. on May 24, 2013.  For example, at 8:15 a.m. on May 30, 2013, Patel spoke to CW-5 at Glenmark for nearly twelve (12) minutes. Immediately after hanging up the phone, Patel called CW-1 at Sandoz to discuss Glenmark's increase on the drug Ranitidine HCL and Teva's plans to follow that increase (Sandoz was also in the market for Ranitidine HCL).  She left CW-1 a voicemail, which he returned promptly. Patel and CW-1 then had several substantive telephone calls over the next half-hour.

1043.   After these conversations with Patel, at 10:02 a.m., CW-1 sent an e-mail to Kellum indicating that he believed there would be price increases in the pipeline with respect to

---

[116]  *Id.* at ¶ 616.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Ranitidine HCL, and suggesting a potentially substantial increase in Sandoz's price:

> **From:** ▮▮▮▮▮▮▮
> **Sent:** Thursday, May 30, 2013 10:02 AM
> **To:** Kellum, Armando
> **Cc:** ▮▮▮▮▮▮
> **Subject:** Ranitidine tabs
>
> I think there might be some price increases in the pipeline.
>
> Per analysource Glenmark just took a WAC increase to $9.53 from $2.70(we are at 4.98) on the 150mg on 5/16.  I wonder if Teva and Amneal will follow?  They are the two dominant players on this molecule
>
> We just bid and I think we are getting the award at a contract price of $1.77.  This contract is negative gross margins but 15% above variable costs.  RAD was at $0.95.  Looking at the competition of Amneal, Teva and Glenmark I thought that this was the best way to go to get into this product, we are currently sitting with a 1.8% share.
>
> RAD is also buying up a lot of our short dated product.
>
> Wonder if there is any way to work with them to revise the cost at a future date if Teva and Amneal go up as well.  I'm thinking we can go from $1.77 to $5 maybe                                      117

1044.   The communication between Patel and CW-1 about competitively sensitive information was constant and unrelenting during this period.  For example, in June 2013 Teva was "attempting to understand how [its] pricing for Isoniazid compares to the rest of the market." On June 11, 2013, L.R., a Teva marketing representative, asked Patel whether she was "aware of any competitive market intel for this family?"  According to the marketing representative, Sandoz was also in the market for Isoniazid and had "drastically increased their pricing" in January 2013.  Patel responded:  "I will try to get the scoop on Sandoz pricing tomorrow.  When do you need this by?"

1045.   The next day - June 12, 2013 - Patel exchanged at least five (5) calls with CW-1

---

117   *Id.* at ¶ 618.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

at Sandoz, including those listed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:19:04 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:20 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:00 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:23 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:09:21 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:25 [118] |

1046.   At 8:27 a.m., after the first two of the phone calls listed above, Patel sent the following e-mail clarifying some of the information that L.R. had provided, reflecting some of the conversations about market share she was having with CW-1:

**From:** Nisha Patel02
**Sent:** Wednesday, June 12, 2013 8:27 AM
**To:**
**Cc:**
**Subject:** RE: Isoniazid market pricing

I hope to get intel later today. In the meantime, I am hearing about IMS info that contradicts what we have. I am being told that as of quarter ending March 2013, Sandoz has 62% share, with Teva having about 36% share. The data also indicates that Westward has less than 1% share, which implies that they are not back. I have also heard that Westward makes the product for Versa, so they are out for now as well. You may want to request more current share data from Market Research to verify?

It is my opinion that we could have raised pricing to a higher level, but I also understand that there are several factors to consider in these decisions. Depending on what you plan to include in your response, I would also have supply info handy. I imagine that we could easily have picked up more share at this very low price, but were probably limited by supply…which is why Sandoz is able to maintain business at their high price.

I'll pass on additional info as I receive it. If you have any questions, please feel free to come by to chat.

[119]

1047.   Later that day, at 3:21 p.m., Patel passed along additional information with

---

[118]   *Id.* at ¶ 620.

[119]   *Id.*

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

specific price points she had received from CW-1 at Sandoz:



```
From:     Nisha Patel02
Sent:     Wed 6/12/2013 3:21 PM (GMT-05:00)
To:       ████
Cc:       ████
Bcc:
Subject:  RE: Isoniazid market pricing


████

Wholesaler nets for Sandoz product are around $100 for the 300mg 100s and $80 for 100mg 100s. Our WACs are very low. Let me
know if you need anything else.
```
120

1048.   As discussed more fully below, Teva ultimately increased price on Isoniazid on

January 28, 2015 – in coordination with Sandoz.  Patel spoke to CW-1 for more than sixteen (16)

minutes shortly before the increase, on January 22, 2015.

<em>c.     Taro</em>

1049.   Patel noted in her May 24, 2013 "Immediate PI File" that for the drug Adapalene

Gel, she was confident in following the Glenmark price increase because there were also

"[r]umors of a Taro increase" on that drug.  In addition to Teva and Glenmark, Taro was the only

other competitor in the market for Adapalene gel at that time.  Patel had heard the "rumors"

about a Taro increase directly from Aprahamian, the Vice President of Sales and Marketing at

Taro.  During a nearly eleven (11) minute phone conversation between the two on May 22, 2013,

the competitors agreed to follow the Glenmark increase.  This was the first call between Patel

and Aprahamian since Patel joined Teva.

1050.   Shortly after the phone call with Patel, Aprahamian made an internal request for a

report with specific information about Adapalene gel in order to evaluate a potential Taro

increase on the drug, including volume and pricing.  Aprahamian indicated that the reason for his

request was that the "[r]umor mill has some price changes in the market."

---

120   *Id.* at ¶ 621.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1051.   The next day, May 23, 2013, Aprahamian directed a Taro employee to implement a price increase on Adapalene gel:



1052.   Exactly one week after the call between Patel and Aprahamian, on May 29, 2013, Taro increased its price on Adapalene gel.  As discussed below, Teva followed with its own price increase on July 3, 2013, which was coordinated with both Glenmark and Taro.

**5.      July 3, 2013 Price Increases**

1053.   Teva implemented its first formal set of price increases using Patel's high-quality competitor formula on July 3, 2013, relating to twenty-one (21) different generic drugs.  Many of the drugs slated for price increases were from the May 24, 2013 "Immediate PI File," but several others had been added in the interim.  Patel scheduled a conference call for the day before the

---

[121]   *Id.* at ¶ 625.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

price increases to discuss those increases with members of Teva's sales and pricing departments:

| | Price Increase -- Agenda |
|---|---|
| Date and Location | Tuesday, July 02, 2013 11:00 AM - 11:30 AM, Call In Number Below/Dave's Office |
| Attendees | Nisha Patel02; Kevin Green; Dave Rekenthaler; ███████████████████████████████ |
| Message | We are currently preparing to announce a price increase effective Wednesday, 7/3/13. The list includes several items. I wanted to take some time to do a quick review of the item list and answer any questions you may have.<br><br>Dial In: 866-225-0660<br>Access Code: 4075453 |

   1)   Price increase effective Wednesday, 7/3/2013

   2)   List of items affected:

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (not actual inc) |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

122

1054.   Patel and/or Green spoke to every important competitor in the days and weeks leading up to the July 3, 2013 Teva price increase to coordinate the increases and reiterate the understanding already in place with those competitors.

---

122   *Id.* at ¶ 626.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1055.   The graphic on page 178 of the Amended State AG Complaint No. 2 details some of the calls between Teva representatives and Teva's competitors in the days and weeks leading up to the July 3, 2013 price increase.  Those communications included communications between Teva and Taro regarding Adapalene Gel; between Teva and Lupin regarding Cefdinir Capsules, Cefdinir Oral Suspension, and Cefprozil Tablets; between Teva and Mylan regarding Cimetidine Tablets, Methotrexate Tablets, Nadolol Tablets, and Prazosin HCL Capsules; between Teva and Glenmark regarding Fluconazole Tablets, Moexipril HCL Tablets, Moexipril HCL/HCTZ Tablets, Nabumetone Tablets, and Ranitidine HCL Tablets; and between Teva and Upsher-Smith regarding Oxbutynin Chloride Tablets.

1056.   The only drugs that Patel or Green did not coordinate with Teva's competitors (those not highlighted in the referenced graphic) were drugs where Teva was exclusive – i.e., had no competitors.

1057.   Patel – and other executives at Teva – went to great efforts to coordinate these price increases with competitors prior to July 3, 2013.  Some illustrative examples of generic drugs that were added to the list after May 24, 2013 are set forth in more detail below.

a.     <em>Upsher-Smith</em>

1058.   On June 13, 2013, as Patel was in the process of finalizing the Teva price increase list, she learned that Upsher-Smith had increased its listed WAC prices for the drug Oxybutynin Chloride.

1059.   On June 13, 2013, K.G. of Teva sent an e-mail to several Teva employees, including Patel, asking them to "share any competitive intelligence you may have or receive" regarding Oxybutynin Chloride.  At that time, Teva had been considering whether to remove the drug from its inventory, due to low supply and profitability.  One factor that could potentially

change that calculus for Teva was the ability to implement a significant price increase.  On June 14, 2013, while considering whether to change Teva's plan to delete the drug, a Teva employee asked Patel whether she could "provide an estimate of the pricing we might secure business at?"

1060.   On June 15, 2013, Patel exchanged six (6) text messages with B.L., a senior national account executive at Upsher-Smith.

1061.   Patel deemed Upsher-Smith a highly-ranked competitor (+2) in large part because of her relationship and understanding with B.L.  In the week before she began her employment at Teva (after leaving her previous employment), Patel and B.L. exchanged several text messages. During her first week on the job, as she was beginning to identify price increase candidates and "high quality" competitors, Patel spoke to B.L. on April 29, 2013 for nearly twenty (20) minutes. During these initial communications, the two competitors reached an understanding that Teva and Upsher-Smith would follow each other's price increases.  This understanding resulted in Upsher-Smith receiving a +2 "quality competitor" ranking from Patel.

1062.   On June 19, 2013, Teva learned that the other competitor in the market for Oxybutynin Chloride, a company not identified as a Defendant in this Complaint, also increased its price for that drug.  As a result, a national account executive at Teva sent an e-mail to Patel stating "Did you know about the Oxybutynin?  We have small share, but huge increase there!" Patel responded:  "Yes, heard late last week.  The train is moving so fast, I'm worried we won't get on!"  That same day, Patel instructed a colleague to add Oxybutynin Chloride to the Teva price increase list and began taking steps to implement the increase.

1063.   On July 3, 2013, Teva implemented a price increase ranging between 1,100-1,500% on Oxybutynin Chloride, depending on the dosage strength.  Like the other drugs on the

list, Teva would not have increased its price without first obtaining agreement from competitors that they would not compete with Teva or steal market share after the increase.

1064.   This 2013 price increase was not the first price increase for Oxybutynin Chloride. In October 2011, Par and Upsher-Smith had both significantly increased their pricing in parallel. Although this price increase had put Upsher-Smith's pricing above Teva's, Upsher-Smith was still able to gain market share, consistent with the Fair Share Agreement.

<em>b.   Mylan</em>

1065.   Immediately after she began at Teva, Patel began to investigate Mylan drugs as a potential source for coordinated price increases.  For example, on May 6, 2013, as she was creating the list of "Immediate PI" candidates, Patel sent Green an e-mail with an attached spreadsheet titled "Price Increase Candidate Competitive Landscape." Patel asked Green to "gather as much market intelligence as possible" for certain, specific items that she had highlighted in blue, including nine (9) Mylan drugs:  Tolmetin Sodium capsules; Doxazosin Mesylate tablets; Methotrexate tablets; Diltiazem HCL tablets; Flurbiprofen tablets; Nadolol tablets; Amiloride HCL/HCTZ tablets; Cimetidine tablets; and Estradiol tablets.

1066.   The next day, May 7, 2013, Green spoke to Nesta at Mylan three times, including one call lasting more than eleven (11) minutes.  Green also called Patel twice that day to report on what he had learned.  Green and Nesta also spoke a number of times over the next several days, including on May 8 (3:46), May 9 (4:05) and May 10, 2013 (0:28; 10:46 and 2:19).

1067.   On May 14, 2013, Patel asked several Teva national account managers, including Green, to obtain "price points" on certain Mylan drugs including Cimetidine and Nadolol in preparation for a potential price increase.  She indicated internally to another Teva colleague that she was expecting "additional Mylan intel" and that she was expecting Mylan "to take an

301

additional increase" on those items.  On May 17, 2013, Green spoke to Nesta six (6) times, including calls lasting 11:50, 2:23, 4:25 and 16:02.

1068.   On May 29, 2013, after a discussion with Cavanaugh, Patel added four Mylan drugs to the Teva price increase list:  Nadolol, Cimetidine, Prazosin HCL, and Methotrexate.

1069.   Discussions between Green and Nesta about specific drugs continued into June, as Mylan was also preparing for its own major price increase on a number of drugs.  From June 24 through June 28, 2013, for example, Green and Nesta had at least the following telephone calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:25:29 | 0:00:06 |
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 13:32:25 | 0:10:13 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:43:27 | 0:00:06 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:02:58 | 0:00:32 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:51:43 | 0:00:03 |
| 6/26/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:55:29 | 1:00:25 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 10:47:23 | 0:00:06 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:04:04 | 0:01:03 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:42:07 | 0:04:20 |
| 6/28/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:59:56 | 0:03:53 |

[123]

1070.   On June 26, 2013, in the midst of this flurry of communications between Teva and Mylan (and the same day that Green and Nesta had a one-hour phone call), one of Patel's colleagues sent her a suggestion with the following list of potential drugs to add to the price increase list:

---

[123]   *Id.* at ¶ 640.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Product | Competitors (Mkt Share) |
|---------|------------------------|
| Disopyramide Phosphate Capsules | Actavis (61%) |
| Ketorolac Tablets | Mylan (32%) |
| Ketoprofen Capsules | Mylan (63%) |
| Hydorxyzine Pamoate Capsules | Sandoz (39%); Actavis (9%) |
| Nystatin Tablets | Heritage (35%); Mutual (32%) |

[124]

1071.  In response, Patel's supervisor, K.G., commented that "Ketoprofen would have a high likelihood of success."  Patel also responded favorably with regard to some of the drugs, alluding to the fact that she had inside information about at least Ketoprofen:



[125]

1072.  Not surprisingly given the "rumors," Mylan raised its price for both Ketorolac Tromethamine and Ketoprofen (the two Mylan drugs on the list above) six days later, on July 2, 2013.  Teva then quickly followed with its own price increase for both drugs (and others) on August 9, 2013.  As discussed more fully below, those price increases were closely coordinated and agreed to by Teva and Mylan.

1073.  At the end of the flurry of phone communications between Teva and Mylan described above – on June 28, 2013 – Green and Nesta had a four (4) minute call starting at 10:59 a.m..  Within minutes after that call, Patel sent the following e-mail internally at Teva:

---

[124]   *Id.* at ¶ 641.

[125] *Id.*

From:      Nisha Patel02
Sent:      Fri 6/28/2013 11:22 AM (GMT-05:00)
To:        ██████████████████████
Cc:        ██████████████████████
Bcc:
Subject: Competitor Increase Items

All,

It is my understanding that Mylan is announcing a long list of price increases today, for a Monday effective date. As we confirm the items and overlap with Teva, we should add the items to the CM alert list and determine what our plan of response is based on various factors (WAC limitation, no WAC limitation, supply, etc).

██████.

Hearing that Ketoprofen is on the list.
                                                                                                    126

1074.   Patel obtained this information directly from Green but got one significant point wrong (which confirms that she had advance notice of the Mylan increase).  In fact, Mylan did not announce the price increases until the following Monday, July 1, 2013 – with an effective date of July 2, 2013.

1075.   Patel consistently used the term "rumors" in e-mails to camouflage that Teva was communicating with competitors about future price increases.  She used the term when discussing Taro in the May 24, 2013 "Immediate PI" spreadsheet, after speaking with Aprahamian and before Taro raised its price on Adapalene gel.  She used it again on June 26, 2013 – after Green and Nesta spoke several times in advance of Mylan's price increase on Ketoprofen.

1076.   Similarly, on July 2, 2013 – the day before Teva's price increases (including for the drug Methotrexate) went into effect, a colleague asked Patel how Teva's competitors' pricing compared with regard to Methotrexate.  Patel responded that Mylan's pricing was a little low on

---

[126] *Id.* at ¶ 643.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

that drug, "but we are hearing rumors of them taking another increase," so Teva felt comfortable increasing the price of that drug on July 3, 2013.  These "rumors" – which were based on the direct communications between Green and Nesta noted above – again turned out to be accurate: Mylan increased its price of Methotrexate, pursuant to its agreement with Teva, on November 15, 2013.

1077.   During this same time period, Teva's competitors for Methotrexate – West-Ward, Mylan, and Par – also increased Methotrexate prices.  Par had increased prices in February 2013, and West-Ward followed this price increase on May 15, 2013.  Consistent with the Fair Share Agreement, Par and West-Ward knew that they could increase prices without losing share to Mylan or Teva.

1078.   After the large Teva and Mylan price increases on July 2 and 3, 2013, Sandoz sought to obtain a "comprehensive list of items" price-fixed so that it would "not respond to something adversely" by inappropriately competing for market share on any of those drugs. Sandoz executives had previously conveyed to their counterparts at both Mylan and Teva that Sandoz would follow their price increases and not steal their customers after an increase.  Sandoz ensured it was aware of every increase taken by both competitors so it could live up to its end of the bargain.

1079.   On July 9, 2013, CW-1 stated in an internal Sandoz e-mail that he would "call around to the [Sandoz directors of national accounts] to try and gather a comprehensive list of items."

1080.   Pursuant to that direction, on July 15, 2013 CW-2 of Sandoz called Rekenthaler at Teva and left a message.  Rekenthaler called CW-2 back immediately and the two had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full,

comprehensive list of all the Teva price increase drugs – not just those drugs where Teva overlapped with Sandoz.  Rekenthaler complied.  Understanding that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his Teva work e-mail account to a personal e-mail account, and then forwarded the list from his personal e-mail account to CW-

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2's personal e-mail account:

---

From:        David Rekenthaler [daverek@verizon.net]
Sent:        Monday, July 15, 2013 5:02 PM
To:          ████████n@icloud.com
Subject:     Fwd:

Sent from my iPhone

Begin forwarded message:

> From: Dave Rekenthaler <Dave.Rekenthaler@tevapharm.com>
> Date: July 15, 2013, 4:59:27 PM EDT
> To: "daverek@verizon.net" <daverek@verizon.net>

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (not actual inc) |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1300% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econodisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

Best regards,

[127]

1081.   CW-2 later called CW-1 and conveyed the information orally to CW-1, who transcribed the information into a spreadsheet.

1082.   One of the drugs that both Teva and Mylan increased the price of in early July 2013 was Nadolol.  Sandoz was the only other competitor in that market.  Shortly after the Teva increase, CW-1 sent Patel a congratulatory message regarding the increase.

---

[127] *Id.* at ¶ 648.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 6.    July 19, 2013 Price Increase – Enalapril Maleate

1083.   Immediately after the July 3, 2013 price increases, Patel began preparing for what she called "Round 2" – another large set of Teva price increases.  In the interim, however, Teva was presented with an opportunity to coordinate a price increase with competitors on a single drug – Enalapril Maleate tablets.

1084.   Mylan previously increased its price for Enalapril Maleate effective July 2, 2013. At that time, there were only three manufacturers in the market:  Mylan, Teva and Wockhardt. Enalapril Maleate was on the list of drugs slated for a price increase that Teva had received from Mylan in June 2013, before those price increases were put into effect (as discussed above).

1085.   Shortly after the Mylan price increase, on July 10, 2013, Teva received a request from a customer for a lower price on Enalapril Maleate.  Interestingly, the customer indicated that the request was due to Wockhardt having supply problems, not because of the Mylan increase.  K.G. of Teva confirmed that Enalapril Maleate "was on the Mylan increase communicated last week.  They took a ~75% increase to WAC."

1086.   The comment from the customer sparked some confusion at Teva, which Teva quickly sought to clarify.  That same day, Green and Nesta had two phone calls, including one lasting almost sixteen (16) minutes.  The next day, July 11, 2013, Green and Nesta spoke two more times.  During these conversations, Nesta explained to Green that Wockhardt had agreed to follow the Mylan price increase on Enalapril Maleate.  This information sparked the following e-

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

mail exchange between Green and Patel (starting from the bottom):

> **From:** Kevin Green
> **Sent:** Friday, July 12, 2013 1:12 AM
> **To:** Nisha Patel02
> **Subject:** Re: Enalapril / Wockhardt Supply Constraint
>
> Wockhardt followed Mylan. They are not having supply issues. Just allocating based on the Mylan increase. They make their own API
>
> Sent from my iPhone
>
> On Jul 11, 2013, at 9:54 PM, "Nisha Patel02" <Nisha.Patel02@tevapharm.com> wrote:
>
>> Wockhardt took an increase before Mylan? Then had their supply issue? I thought it was their supply issue plus Mylan increase.
>>
>> Nisha Patel
>>
>> Teva Pharmaceuticals USA
>>
>> Director, Strategic Customer Marketing
>>
>> On Jul 11, 2013, at 10:25 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:
>>
>>> This is all a result of a wockhardt price increase following a Mylan increase
>>>
>>> Sent from my iPhone

[128]

1087.  As it turned out, there must have been a miscommunication between Green and Nesta because although Wockhardt did in fact plan to follow Mylan's price increase, it had not yet had the opportunity to do so as of July 11, 2013.

1088.  On Friday, July 12, 2013, J.P., a national account executive at Teva, asked Patel whether Teva was "planning on increasing [its price for Enalapril]." Patel responded:  "I hope to increase, but we're gathering all the facts before making a determination." J.P. then inquired whether Teva would make an offer to the customer, and Patel responded:  "Not sure yet.  Need some time.  We're exploring the possibility of an increase just on this item . . . in the near future. Maybe next week."

---

[128]  *Id.* at ¶ 654.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1089.   That same day, Patel and Green each started "exploring the possibility" and "gathering the facts" by reaching out to Teva's two competitors for Enalapril Maleate.  Patel called Nesta of Mylan directly and they spoke three times, including calls lasting six (6) and five (5) minutes.  Patel likely called Nesta directly in this instance because Green was attending the PBA Health Conference at the Sheraton Overland Park, Overland Park, Kansas, where he was participating in a golf outing.  Upon information and belief, K.K. – a senior national account executive at Wockhardt – attended the same conference, and likely spoke directly to Green either at the golf outing during the day or the trade show at night, because at 12:40 a.m. that evening (now the morning of July 13, 2013) K.K. created a contact on his cell phone with Green's cell phone number in it.

1090.   On Sunday, July 14, 2013, after Green returned home from the conference, Green and Patel spoke three times, including one call lasting twenty-one (21) minutes.  During these calls, Green conveyed to Patel what he had learned from K.K.:  that Wockhardt planned to follow the Mylan price increase.

1091.   First thing the next morning, on Monday, July 15, 2013, Patel sent an e-mail to a Teva executive stating "new developments. . .heard that Wockhardt is taking an increase today or tomorrow."  At the same time, Wockhardt began planning to raise the price of Enalapril Maleate and sought to confirm specific price points for the increase.  Internally, Wockhardt employees understood that K.K. would try to obtain price points from a competitor.  That morning, K.K. of Wockhardt called Green for a one (1) minute call; shortly thereafter, Green returned the call and they spoke for two (2) more minutes.  At 9:57 a.m. that morning, K.K. reported internally the specific price ranges that he had obtained from Green.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1092.   Armed with this competitively sensitive information, and the understanding that Wockhardt intended to follow the Mylan increase, Teva began to plan its own price increase.  On Tuesday, July 16, 2013, Patel sent the following internal e-mail to her supervisor K.G., again using the term "rumors" to obfuscate the true source of her information:

From:    Nisha Patel02
Sent:    Tue 7/16/2013 11:08 AM (GMT-05:00)
To:      ▮▮▮▮▮▮▮▮▮▮▮▮
Cc:
Bcc:
Subject: Enalapril Increase Overview

▮▮▮▮▮

As you are aware, we are currently preparing the information to hopefully be able to implement a price increase on Enalapril.

This is a 3-player market that we share with Mylan and Wockhardt. Mylan announced a price increase last week. We are hearing rumors that Wockhardt will follow or exceed Mylan sometime this week. It would be ideal if we could follow very soon at a slightly more competitive price, with the intent of picking up some additional share in the market. Current share make up is as follows:

1.  Mylan: 44%
2.  Wockhardt: 43%
3.  Teva: 13%

At this time, we are holding off on responding to a couple of bids in-house since a WAC increase would be required to follow the market. It would be a great opportunity to win this share and hopefully additional business as customers request bids going forward. (I think it would be ideal to capture an additional 10%.)

[129]

1093.   That same day, Nesta called Patel and left a voicemail.

1094.   Patel's July 16, 2013 e-mail referred to above was forwarded to Cavanaugh, who promptly approved the price increase.  That same day, July 16, 2013, Patel then scheduled a "Price Increase Discussion" with members of Teva's sales and pricing teams, and sent the

---

[129]   *Id.* at ¶ 659.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

following agenda:

| Subject | **Price Increase Discussion** | | | |
|---|---|---|---|---|
| Date and Location | Wednesday, July 17, 2013 10:30 AM - 11:00 AM, Dial In Below/Dave's Office | | | |
| Attendees | Nisha Patel02; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Dave Rekenthaler ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮; Kevin Green; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ | | | |
| Message | Sorry for the re-schedules! | | | |
| | We are planning to announce an increase on Enalapril Tablets effective Friday. I would like to do a quick review of the changes and answer any questions you may have. A summary will be sent prior to the meeting. | | | |
| | Dial In: 866-225-0660 Access Code: 4075453 | | | |

**Notes**

1) Price increase effective 7/19/2013

2) List of items affected:

| NDC | Generic Name | Strength | Form | Package Size |
|---|---|---|---|---|
| 00093-0026-01 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 100 |
| 00093-0026-10 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 1000 |
| 00093-0027-01 | ENALAPRIL MALEATE | 5 mg | TABLET | 100 |
| 00093-0027-50 | ENALAPRIL MALEATE | 5 mg | TABLET | 5000 |
| 00093-0028-01 | ENALAPRIL MALEATE | 10 mg | TABLET | 100 |
| 00093-0028-10 | ENALAPRIL MALEATE | 10 mg | TABLET | 1000 |
| 00093-0028-50 | ENALAPRIL MALEATE | 10 mg | TABLET | 5000 |
| 00093-0029-01 | ENALAPRIL MALEATE | 20 mg | TABLET | 100 |
| 00093-0029-10 | ENALAPRIL MALEATE | 20 mg | TABLET | 1000 |
| 00093-0029-50 | ENALAPRIL MALEATE | 20 mg | TABLET | 5000 |

- Pricing Overview
  - 400-650% increase in invoice/contract pricing
  - 350-450% increase in WAC
  - 10% increase in SWP

- All customers are affected (Top Customers: CVS, Rite Aid and Medco)

- Expecting Wockhardt to increase. Please pass on any intelligence you are able to get.

[130]

1095.   Teva and Wockhardt simultaneously implemented price increases on July 19,

2013.  Although the timing of the price increase was coordinated among the competitors, Patel

nevertheless described the simultaneous increase as a coincidence in an internal e-mail that same

---

[130]   *Id.* at ¶ 660.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

day:



FYI, I heard that Wockhardt announced a price increase yesterday morning (probably effective today). Coincidentally, Teva's increase was announced yesterday afternoon with an effective date of today.

I will pass on any supply information I receive.

[131]

1096.   Within a few days after the increases, a customer complained to K.K. at Wockhardt, asking:  "What is going on in the market that justifies your price increases?" K.K.'s response to the customer was direct:  "Mylan took up first we are just following."  Similarly, in early August a different customer asked Wockhardt to reconsider its increase, suggesting that Wockhardt's competitors were offering a lower price point.  Knowing this to be untrue, K.K. replied again "we followed Mylan and Teva for the increase."

### 7.   August 9, 2013 Price Increases

1097.   On August 9, 2013, Teva raised prices on twelve (12) different drugs.  These increases were again coordinated with a number of Teva's competitors, including Mylan, Sandoz, Taro, Lupin, Glenmark, Zydus and Apotex.

1098.   Patel began planning for the increases shortly after the July 3 increases were implemented.  On July 11, 2013, Patel sent a preliminary draft list of price increase candidates to a colleague for what she referred to as "Round 2."  For the drugs on the preliminary list, Patel

---

[131]   *Id.* at ¶ 661.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

stated that "this does not guarantee that [they] will end up getting an increase, but at the very least, it will be put through the review process."

1099.   The list included a number of drugs involving the following competitors, primarily:  Actavis, Aurobindo, Glenmark, Heritage, Lupin, Mylan and Sandoz.  In the days leading up to July 11, 2013, Patel was communicating directly with executives at nearly all of those competitors, including the following:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:24 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:21:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:05 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:07 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:16:16 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:04 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:04:26 |
| 7/10/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:54 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:29 |

[132]

1100.   Patel was also communicating indirectly with Mylan through Green.  For example, on July 10, 2013 – the day before Patel sent the preliminary "Round 2" increase list – Green and Nesta spoke twice.  Shortly after the second call, Green called Patel and the two spoke for just over seven (7) minutes.  The next day, on July 11, Nesta and Green exchanged several more calls.  The timing of those calls is set forth below:

---

[132]   *Id.* at ¶ 665.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:29:50 | 0:15:38 |
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:46:55 | 0:02:18 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 15:59:38 | 0:07:05 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:11:34 | 0:00:08 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:12:47 | 0:00:17 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:38:48 | 0:04:03 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:43:51 | 0:00:00 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:20:15 | 0:01:52 | [133]

1101.   Patel and other Teva executives continued to coordinate with competitors over the next several weeks, refining the list and preparing for the next large Teva price increase.

1102.   By August 7, 2013, Patel had finalized the list.  That day she sent an e-mail to her supervisor, K.G., with a "Price Increase Overview" spreadsheet which she had prepared for Cavanaugh, summarizing the increases.  As shown below, the spreadsheet included competitively sensitive information about certain competitors' plans regarding future price increases that Patel and/or Green could have only learned from directly colluding with those competitors:

Price Increase Overview—Effective August 9, 2013

| Product Category | Average % Increase | Reason for Increase | Competitors |
|------------------|--------------------|--------------------|-------------|
| AMILORIDE HCL/HCTZ TABLETS | 55% | Follow Mylan | Mylan, 95.7% |
| CLEMASTINE FUMARATE ORAL LIQUIDS | 7% | Teva Exclusive, Lead | |
| CLEMASTINE FUMARATE TABLETS | 76% | Lead | Sandoz/Fougera, 80.8% |
| DICLOFENAC TABLETS | 102% | Follow Mylan, Teva share leader | Mylan, 19.4% - Sandoz/Fougera, 19.4% - Apotex, 3.3% |
| DILTIAZEM HCL TABLETS | 90% | Follow Mylan | Mylan, 61.3% |
| DOXAZOSIN MESYLATE TABLETS | 1031% | Follow Mylan and Apotex, Teva share leader | Mylan, 28.1% - Apotex, 2.2% - Dava, 0.4% |
| ETODOLAC ER TABLETS | 138% | Follow Tara (likely to be this week with it) | Tara, 56.9% |
| ETODOLAC TABLETS | 434% | Follow Sandoz, Tara likely to follow this week | Tara, 56.8% - Sandoz/Fougera, 30.8% - Watson(Actavis), 6.5% - Apotex, 6.2% |
| KETOPROFEN CAPSULES | 146% | Follow Mylan | Mylan, 61.4% |
| KETOROLAC TABLETS | 258% | Follow Mylan | Mylan, 31.7% |
| PRAVASTATIN TABLETS | 453% | Follow Glenmark, Zydus and Apotex, to phis waiting on Teva | Glenmark, 19.2% - Apotex, 7.1% - Zydus, 3.8% - Lupin, 1.8% - Dr Reddy, 0.9% |
| TOLMETIN SODIUM CAPSULES | 80% | Follow Mylan, Teva almost exclusive | Mylan, 6.5% | [134]

1103.   K.G. immediately recognized that having such explicit evidence of a competitor's price increase plans in writing would be problematic for Teva.  In response to the e-mail, K.G.

---

[133]   *Id.* at ¶ 666.

[134]   *Id.* at ¶ 668.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

politely asked Patel to remove some of the incriminating information:

```
From:        ▮▮▮▮▮▮▮▮
Sent:        Wed 8/07/2013 11:00 AM (GMT-05:00)
To:          Nisha Patel02
Cc:
Bcc:
Subject: RE: PI Overview-MC


Nisha,



Please add Teva share to the competitors commentary and change header to Market Share.



Under reasons, I would change to the following:


   1.  Etodolac ER : Follow Taro
   2.  Etodolac : Follow Sandoz; Taro increase anticipated.
   3.  Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated.
```
                                                                                            [135]

1104.   In accordance with the executive's request, Patel deleted the information.

1105.   Patel and Green coordinated the increases with every important competitor in the days and weeks leading up to the increase.  The graphic on page 197 of Amended State AG Complaint No. 2 details some of the calls with competitors in the days and weeks leading up to the increases.  Those communications included communications between Teva and Mylan regarding Amiloride HCL/HCTZ Tablets, Diclofenac Tablets, Diltiazem HCL Tablets, Ketoprofen Capsules, Ketorolac Tablets, and Tolemetin Sodium Capsules; between Teva and Sandoz regarding Clemastine Fumarate Tablets; between Teva, Mylan, and Apotex regarding Dokazsin Mesylate Tablets; between Teva and Taro regarding Etodolac ER Tablets; and between Teva, Apotex, Glenmark, Lupin, and Zydus regarding Pravastatin Tablets.

---

[135]   *Id.* at ¶ 669.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1106.   The only drug on the list that Patel and/or Green were not coordinating with competitors on in advance (Clemastine Fumarate oral liquids) was a drug where Teva was exclusive and thus had no competitors.  That drug was slated for the lowest increase of all drugs on the list (7%).

1107.   The day before the price increase went into effect - August 8, 2013 - Patel was particularly busy, spending most of her morning reaching out and communicating with several key competitors:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 7:27:26 | 0:00:33 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:34:46 | 0:11:41 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:48 | 0:00:01 |
| 8/8/2013 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:01:07 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 8:04:04 | 0:12:15 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:05 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:28 | 0:00:07 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Nesta, Jim (Mylan) | 9:27:19 | 0:00:37 |

[136]

1108.   As it turned out, Mylan was also in the process of implementing its own price increases on August 9, 2013 on several drugs (including several sold by Teva), and it is likely that Nesta reached out to Patel to coordinate those increases.

a.   Mylan

1109.   Teva and Mylan were coordinating price increases consistently during this period, including the time leading up to the August 9, 2013 increases.  During each step in the process, Teva and Mylan executives kept their co-conspirators apprised of their decisions.  The communications were typically initiated by Patel, who asked Green to communicate with Nesta of Mylan and obtain what she referred to as "intel" on many different drugs.  But at times Patel communicated directly with Nesta.

[136]   Id. at ¶ 672.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1110.   For example, on July 22, 2013, Patel sent Green an e-mail with an attached spreadsheet of "Round 2" increase items.  She indicated that she was "seeking intel" for a group of drugs in the attached spreadsheet with a highlighted yellow "x" and included in a column titled "Follow Mylan/Other:"

| Product Family | Initial Comments | PM Related | Follow Mylan/Other |
|---|---|---|---|
| Amiloride | Mylan increase; Teva only has HCTZ | | x |
| Diclofenac Tab | Mylan increase; On historical PI list | x | x |
| Doxazosin Mesylate Tabs | Mylan increase; On historical PI list | | x |
| Enalapril Tab | Mylan increase; On historical PI list--COMPLETED | | x |
| Ketoprofen | Follow Mylan; Deletion candidate; PM related | x | x |
| Ketorolac | Follow Mylan; Deletion candidate; PM related | x | x |
| Metoprolol | Mylan increase (Teva does not have 25mg but small sku) | | x |
| Nystatin | Heritage involved  follow Mutual  deletion candidate  PM related | x | x |
| Pravastatin | Carried over from round 1 | | x |
| Sotalol | Mylan increase; On historical PI list | | x |
| Tolmetin Tab | Mylan increase; Teva has 94 share; On historical PI list | | x |
| Verapamil  (Isoptin SR) | Mylan increase (lost Kroger and OneStop--to who?) | x | x |

[137]

1111.   A large majority were Mylan drugs.

1112.   The next day – July 23, 2013 – at 4:30 p.m., Green and Nesta spoke for more than six (6) minutes.  Immediately after hanging up the phone, Green called Patel to convey the intel he had obtained from Mylan.  The call lasted more than three (3) minutes.

1113.   On July 29, 2013, Green at Teva was approached by a large retail pharmacy asking for bids on several of the drugs that Mylan had increased prices on in early July.  Green's first step was to request market share information for those drugs so that Teva could make a decision on how to respond to the customer's inquiry based on the generally accepted

---

[137]   *Id.* at ¶ 674.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

understanding regarding fair share:

**From:** Kevin Green
**Sent:** Monday, July 29, 2013 9:49 AM
**To:** ▮▮▮▮▮▮▮
**Cc:**
**Subject:** Walgreens: Items for discussion


▮▮▮▮▮


From the list of items below, can you pull in current market share. These are new opportunities at Walgreens, and I want to see what the current market looks like.

[138]

1114.    The next day, July 30, 2013, Patel sent Green the "latest" price increase file as an attachment, saying that she "[f]igured it would help since I've changed a few things on you." Patel asked Green to obtain additional "market intel" for a group of seven Mylan drugs, some of which varied slightly from the prior spreadsheet.

1115.    Following the same consistent pattern, Green and Nesta spoke six (6) times over the next two days. After hanging up from the last call between the two on August 1, 2013, Green called Patel and conveyed the results of his conversations. This series of phone calls is detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:10:33 | 0:04:52 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:50:57 | 0:01:09 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:54:39 | 0:03:21 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:59:57 | 0:06:53 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:46:59 | 0:01:27 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:23:47 | 0:05:48 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:21:43 | 0:00:59 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 12:29:55 | 0:02:36 |

[139]

---

[138]    *Id.* at ¶ 676.

[139]    *Id.* at ¶ 678.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1116.   In the midst of the phone calls between Green and Nesta on July 31, 2013, Patel

sent the following e-mail with "commentary" about the customer request, with a particular focus

on balancing Teva's desire to increase prices against its commitment to adhere to the fair share

agreement and how that may affect its market share for certain products sold by Mylan:

From:     Nisha Patel02
Sent:     Wed 7/31/2013 3:23 PM (GMT-05:00)
To:       Kevin Green; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Dave Rekenthaler
Cc:
Bcc:
Subject: RE: DELPHI 9429 Walgreens: Items for discussion


My initial commentary…


If we can take on the supply, we can bid on items we have already taken our increase on (bold).


**Enalapril**: seeking share

**Cimetidine**: shared with Mylan, but do not have our fair share

**Prazosin**: shared with Mylan, but do not have our fair share

**Nadolol**: can pursue additional share (**Mylan**) for 3-player market

Loperamide: consider it added to the PI candidates list

Fluoxetine: no plans to follow Mylan increase, but have high share in a 7 player market

Diltiazem IR: consider it added to the PI candidates list


There are plans to follow Mylan on the rest. Need to determine how we want to respond on these if we haven't
implemented an increase by the time we respond. From what I understand, we have some time.

140

1117.   Based on all of these communications between Teva and Mylan (and at times

other competitors), Teva was able to successfully increase price on seven different drugs that it

overlapped with Mylan on August 9, 2013, as set forth above.

---

140   *Id.* at ¶ 679.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

b.      *Pravastatin*

1118.   As early as May 2, 2013, Patel engaged in discussions regarding a price increase for Pravastatin with CW-5, a senior executive at Glenmark.  Early in the morning of May 2, as she was in the process of formulating her list of "high quality" competitors and the list of price increase candidates, Patel informed a colleague that she expected to have some "priority items" to add to the price increase list "shortly." Within minutes, she received a call from CW-5 and they discussed price increases for a number of different drugs, including Pravastatin.  Shortly after that call, Patel sent an e-mail to her Teva colleague directing him to add Pravastatin, and several other Glenmark drugs, to the price increase list.  In all, Patel spoke to CW-5 four (4) times throughout the day on May 2, 2013, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 7:02:23 | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 7:56:12 | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 10:00:09 | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 18:40:29 | 0:11:39 |

[141]

1119.   As of May 2013, the market for Pravastatin included five competitors:  Glenmark, Teva, Lupin, Zydus and Apotex.  The number of competitors made it more difficult to coordinate a price increase.  This difficulty stemmed in part because two of those competitors – Zydus and Apotex – were also the two lowest quality competitors in Patel's quality of competition rankings, and any price increase for that drug would require significant coordination and communication before Teva could feel comfortable raising its own price.

---

[141]   *Id.* at ¶ 682.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1120.   Teva was able to achieve a sufficient level of comfort and substantially raise prices for Pravastatin by systematically communicating and reaching agreement with each and every competitor on that drug over the next several months.

1121.   On May 3, 2013, Green called M.K., a senior executive at Zydus, twice with one call lasting four (4) minutes.  Over the next several weeks, Green communicated numerous times with both M.K.  and K.R., a senior sales executive at Zydus, to coordinate a Zydus price increase on Pravastatin.

1122.   On May 6 and 7, 2013, Patel communicated with her contacts at Lupin (Berthold) and Glenmark (J.C., a national account executive) multiple times.  Those calls are detailed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:06:45 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:20:44 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:08:39 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 0:08:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:01:03 [142] |

During one or more of her calls with J.C. and/or CW-5 of Glenmark in early May 2013, Patel obtained specific price points from Glenmark for its Pravastatin (and other) price increases – well before the Glenmark increases became public – and documented those price points in her price increase spreadsheet.

1123.   By May 8, 2013, Teva executives clearly understood that Glenmark would be leading the Pravastatin price increase and were comfortable enough with the situation that one

---

[142]   *Id.* at ¶ 686.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

marketing executive at Teva indicated in an e-mail to Patel that he was hoping to raise price on

Pravastatin "if/when Glenmark does."

1124.   As the Glenmark increase for Pravastatin was approaching, Patel began preparing.

On May 15, 2013 – the day before Glenmark's increase would become effective – a Teva

executive sent an e-mail out to the pricing team stating that "Nisha would like to be made aware

of any requests (including in-house RFPs) that include" several of the Glenmark product

families, including Pravastatin.  The Teva executive concluded:  "[i]n the event you are

reviewing these products for any request, please make her aware and as a group we can discuss

where to price based on market intelligence she has collected."

1125.   That same day, Glenmark notified its customers that it would substantially raise

the price of Pravastatin, effective May 16, 2013.

1126.   As had become the practice among co-conspirators, the day before and the day of

the Glenmark increase brought a flurry of phone calls among several of the competitors,

including Teva executives.  At least some of those calls are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:05:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Incoming | M.K. (Zydus) | 0:03:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:16:00 |
| 5/16/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:04:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:05:57 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 [143] |

---

[143]   *Id.* at ¶ 690.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1127.   As of May 16, 2013, Patel was still considering whether Teva should increase its price for Pravastatin, because she was concerned about whether Zydus would act responsibly and follow a price increase.  At that time, Patel did not view Zydus as a quality competitor.  Patel stated:  "I have asked to get Zydus' ability to supply on this.  If it's not so great, I would like to add back to the increase list."  Patel later indicated that "[t]he only threat was Zydus.  Just waiting to hear on their ability to supply."

1128.   Green was responsible for coordinating with Zydus.  As seen in the table above, on May 15, 2013, Green spoke with three Zydus employees, including a call with K.R. of Zydus lasting sixteen (16) minutes.  The next day, on May 16, Green spoke with M.K. for 4 minutes.  Later that day, K.R. called M.K. and the two Zydus executives spoke for more than seventeen (17) minutes.  Green also spoke to Rekenthaler and Patel the same day, conveying what he had learned from his communications with the Zydus executives.

1129.   Also on May 16, Patel's supervisor, K.G., sent an internal e-mail to several colleagues, including Patel and Rekenthaler, stating "I think we need to understand additional competitor ability to take on additional share and pricing actions.  The volume is huge for us.  It would be nice to try to increase our price, but we do not really want to lose a lot of share on this product." In response, Rekenthaler indicated that he was now comfortable with the price increase, but he did not want to put his reasoning in writing:



144

1130. The next day – May 17, 2013 – Patel continued to coordinate the price increase with executives at both Glenmark and Lupin. For example, at 12:08 p.m., Patel called Berthold at Lupin for an eleven (11) minute call. While she was on the phone with Berthold, CW-5 of Glenmark called Patel (at 12:09 p.m.). and left a 23-second voicemail. Immediately after she hung up the phone with Berthold, Patel returned the call to CW-5; they ultimately connected for nearly eight (8) minutes.

1131. As of this point, Teva executives had spoken to all of their competitors about Pravastatin except Apotex. From May 20-24, Patel had the following series of phone calls with B.H., a senior sales executive at Apotex, during which Apotex agreed to raise its price for Pravastatin:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/20/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:21:56 |
| 5/21/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:11:28 |
| 5/23/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:06:13 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:00:39 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Outgoing | B.H. (Apotex) | 0:12:07 |

[145]

These were the first documented phone calls between Patel and B.H. since Patel had joined Teva.

---

144   *Id.* at ¶ 693.

145   *Id.* at ¶ 695.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1132.   But even with this agreement in hand, Patel was still hesitant to add Pravastatin to the price increase list until Apotex actually increased its price.  For example, when she sent the "Immediate PI" spreadsheet to her supervisor K.G. on May 24, 2013, Pravastatin was still not on the list.

1133.   That would change shortly.  On May 28, 2013, Apotex raised its price for Pravastatin.  That same day, Green also exchanged six (6) text messages with K.R. at Zydus. The next day, after a conversation with Maureen Cavanaugh, Patel added Pravastatin to the Teva price increase list.

1134.   The day after the Apotex increase, Green spoke to K.R. at Zydus two more times, and exchanged four (4) more text messages.  Zydus then quickly followed with a price increase of its own on June 14, 2013.

1135.   Following the normal pattern, Green spoke to KR. and M.K at Zydus several times in the days leading up to the Zydus increase, including at least the following calls and text messages:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Incoming | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |
| 6/13/2013 | Voice | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:07:11 [146] |

[146]   *Id.* at ¶ 699.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1136.   Teva ultimately followed Glenmark, Apotex and Zydus with a significant (653%) price increase of its own on August 9, 2013.  As described in more detail above, in the days and weeks leading up to August 9, Patel and Green were communicating with all of Teva's competitors for Pravastatin to coordinate the increase.

1137.   When Patel sent the "Price Increase Overview" to her supervisor, K.G., on August 7, 2009, two days in advance of Teva's price increase, she included one piece of very telling information about the agreement she had in place with Berthold and Lupin:  specifically, that Lupin was "waiting on Teva" before implementing its own increase.  Based on this representation from Lupin, and Lupin's status as a high-quality competitor, Teva executives felt comfortable implementing the significant price increase.

1138.   A couple of days after Teva implemented its increase, a colleague at Teva asked Patel when Zydus and Apotex implemented their price increases.  In her response, Patel confirmed that it was Green ("KGn") who had indeed coordinated the Pravastatin price increase with Zydus:

> Assuming we're talking Prava. Glenmark dud theirs 5/15. Zydus followed right before/after hdma i think. apotex i think was early to mid june? KGn got the Zydus intel..he might know off the top if his head. [147]

1139.   Pursuant to that agreement, shortly after Teva's increase – on August 28, 2013 – Lupin raised its price to follow competitors Glenmark, Apotex, Zydus and Teva.

1140.   The extra work required to implement the Pravastatin price increase was well worth it to Teva.  As she was preparing to implement Teva's August 9, 2013 price increases, Patel also calculated the quarterly increase in sales revenues resulting from the price increase

---

[147]   *Id.* at ¶ 718.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

taken by Teva on July 3, 2013.  The analysis also included the financial impact of the recent Pravastatin increase.  The results were staggering.

1141.   According to her analysis, the "Total Net Upside after Credits" as a result of the July 3 price increases, plus Pravastatin and one other drug, was a staggering $937,079,079 (nearly $1 billion) *per quarter* to Teva, as shown below:

| Price Increase Category | Incremental Sales Value (Est ASPs) | Total Credit Estimate | CVS Credit Estimate | Credit Estimate (Less CVS) | Total Net Upside after Credits | Total Net Upside (CVS credits deferred) |
|---|---|---|---|---|---|---|
| Grand Total | $973,184,165 | ($36,105,086) | ($10,188,095) | ($25,916,991) | $937,079,079 | $962,996,070 |
| IHI Total | $850,711,025 | ($31,676,647) | ($7,898,091) | ($23,778,555) | $819,034,379 | $842,812,934 |
| ILI Total | $34,078,176 | ($1,489,058) | ($594,035) | ($895,023) | $32,589,117 | $33,484,141 |
| UR Total | $88,394,964 | ($2,939,381) | ($1,695,968) | ($1,243,413) | $85,455,583 | $86,698,996 |

[148]

1142.   Patel was rewarded handsomely by Teva for effectuating these price increases.  In March 2014, less than a year after starting at Teva, Patel was rewarded with a $37,734 cash bonus, as well as an allocation of 9,500 Teva stock options.

1143.   As a result of the price-fixing agreements set forth above, prices rose more than 500% for Pravastatin, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings.

1144.   NADAC data demonstrates that average market prices for Pravastatin remained stable prior to July 2013, then increased dramatically and remained artificially high thereafter. For instance, the average market price for Pravastatin 40mg increased by over 640%, from $0.09

---

[148]  *Id.* at ¶ 722.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

per tablet in July 2013 to $0.67 per tablet by December 2013.



1145.   WAC pricing confirms that Apotex, Lupin, Teva, and Zydus all increased their

Pravastatin prices substantially and largely in unison.

| Package Size (10mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90ct | Apotex | 60505016809 | $0.26 | $0.56 | 5/28/2013 | 119% |
| 500ct | Apotex | 60505016805 | $0.26 | $0.56 | 5/28/2013 | 119% |
| 90ct | Zydus | 68382007016 | $0.17 | $0.48 | 6/14/2013 | 189% |
| 500ct | Zydus | 68382007005 | $0.15 | $0.48 | 6/14/2013 | 222% |
| 90ct | Teva | 00093077198 | $0.17 | $0.48 | 8/9/2013 | 189% |
| 1,000ct | Teva | 00093077110 | $0.15 | $0.48 | 8/9/2013 | 221% |
| 90ct | Lupin | 68180048509 | $0.17 | $0.48 | 8/28/2013 | 190% |
| 500ct | Lupin | 68180048502 | $0.15 | $0.48 | 8/28/2013 | 222% |

1146.   Although WAC data is not available for Glenmark, upon information and belief, it

implemented virtually identical price increases at virtually the same time for its Pravastatin

products.

1147.   Prices continued to increase after August of 2013.  In the October 2014 letters

Senator Sanders and Representative Cummings sent to generic manufacturers as part of their

investigation, they outlined the price increase Pravastatin saw between October 2013 and April

2014.  They sent letters to Dr. Reddy's, Apotex, Teva, and Zydus, and depicted the following

price increases during that six-month period:

| Drug | Package Size | Avg. Market Price Oct. 2013 | Avg. Market Price April 2014 | Percentage increase: |
|---|---|---|---|---|
| Pravastatin Sodium | 20mg, 1,000ct | $77 | $368 | 377% |
| Pravastatin Sodium | 40mg, 1,000ct | $114 | $540 | 373% |
| Pravastatin Sodium | 10mg, 500ct | $27 | $196 | 625% |
| Pravastatin Sodium | 80mg, 500ct | $59 | $299 | 365% |
| Pravastatin Sodium | 10mg, 90ct | $6 | $34 | 406% |
| Pravastatin Sodium | 20mg, 90ct | $7 | $35 | 400% |
| Pravastatin Sodium | 40mg, 90ct | $9 | $51 | 466% |
| Pravastatin Sodium | 80mg, 90ct | $14 | $52 | 271% |

1148.   These price increases cannot be explained by supply shortages or costs.

According to a November 2014 report by the New York Times, a three-month supply of generic

pravastatin cost $230 in the United States, but $31.50 for the branded version, Pravachol, in

Canada.[149]

> c.      *Etodolac*

1149.   As of July 13, 2013, Teva sold both Etodolac and Etodolac ER.  Teva's

competitors for the standard version of Etodolac were Taro and Sandoz.  For Etodolac ER, Teva

had only one competitor – Taro.

1150.   When Patel first began planning for "Round 2" of Teva's price increases,

Etodolac and Etodolac ER were not slated for increases.  For example, when she circulated a

long list of potential "Round 2" increases on July 11, 2013 (that would later be cut down

substantially) – neither of those drugs was on the list.

---

[149]   Elisabeth Rosenthal, *U.S. Lawmakers Look for Ways to Provide Relief for Rising Costs of Generic Drugs*, N.Y. TIMES (Nov. 24, 2014), https://www.nytimes.com/2014/11/25/us/lawmakers-look-for-ways-to-provide-relief-for-rising-cost-of-generic-drugs.html.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1151.   Around that time, Sandoz began identifying a list of drugs where it believed it could increase price by the end of July.  Etodolac was on the list, primarily because Sandoz would be able to implement a substantial increase without incurring significant price protection penalties from its customers.

1152.   On July 16, 2013, CW-3, then a senior executive at Sandoz, reached out to Aprahamian at Taro and they spoke for sixteen (16) minutes.  Aprahamian called CW-3 back the next day and the two spoke again for eight (8) minutes.  After hanging up the phone with CW-3, Aprahamian immediately called Patel.  They exchanged voicemails until they were able to connect later in the day for nearly fourteen (14) minutes.  On July 18, 2013, Patel called CW-1 at Sandoz and the two spoke for more than ten (10) minutes.

1153.   During this flurry of phone calls, Sandoz, Taro and Teva agreed to raise prices for both Etodolac and Etodolac ER.

1154.   On July 22, 2013 – before any price increases took effect or were made public, Patel added both Etodolac and Etodolac ER to her price increase spreadsheet for the first time, with the following notations:

| Etodolac | Sandoz* (All strong competitors) |
|----------|----------------------------------|
| Etodolac ER | Could follow IR (Shared with Taro) |

[150]

1155.   Based on her conversations with CW-1 and Aprahamian, Patel understood that Sandoz planned to increase its price on Etodolac, and that Taro would follow suit and raise its price for Etodolac ER.  During those conversations, Teva agreed to follow both price increases.

---

[150]   Amended State AG Complaint No. 2 ¶ 711.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1156.   That same day, Sandoz sent out a calendar notice to certain sales and pricing employees for a conference call scheduled for July 23, 2013 to discuss planned price increases, including for Etodolac.  Prior to the conference call on July 23, CW-1 called Patel at Teva.  After exchanging voicemails, the two were able to connect for more than fourteen (14) minutes that day.  During that call, CW-1 confirmed the details of the Sandoz price increase on Etodolac.  Similarly, CW-3 of Sandoz called Aprahamian at Taro that same day and the two spoke for more than three (3) minutes.

1157.   The Sandoz price increase for Etodolac was effective July 26, 2013.  That same day, Taro received a request from a customer for a one-time buy on Etodolac 400mg Tablets.  After learning of the request, Aprahamian responded swiftly internally:  "Not so fast.  Why the request? Market just changed on this and not apt to undercut."

1158.   When Taro received another request on July 30 from a large wholesale customer for a bid due to the Sandoz price increase, Aprahamian's internal response was equally short:

| Message | |
|---|---|
| **From:** | ara.aprahamian@taro.com [ara.aprahamian@taro.com] |
| **Sent:** | 7/30/2013 11:14:49 PM |
| **To:** | ████████████████████ |
| **CC:** | ████████████████████ |
| **Subject:** | Re: Fw: Bid Request - Etodolac |
| **Attachments:** | _.gif; _; _ |

recent market changes, not taking on additional share...

[151]

1159.   Also on July 26, Patel sent an e-mail to others at Teva – including her supervisor K.G., Rekenthaler and others – informing them of the Sandoz increase on Etodolac IR

---

[151]   *Id.* at ¶ 714.

(immediate release).  She instructed them to "[p]lease watch ordering activity for both, IR and ER.  The intent is that we will follow in the near future, but a date has not been determined."

1160.   Patel continued to coordinate with both Sandoz and Taro regarding the Etodolac and Etodolac ER price increases (among other things).  Between July 29 and August 2, 2013, for example, Patel engaged in the following series of calls with CW-1 of Sandoz and Aprahamian at Taro:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/29/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:44:23 | 0:09:08 |
| 7/30/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:05:11 | 0:09:51 |
| 7/31/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 13:17:12 | 0:03:33 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 11:01:31 | 0:09:05 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:35:17 | 0:03:24 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 16:41:05 | 0:14:34 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:59:51 | 0:05:23 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:15:46 | 0:08:27 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:59:57 | 0:00:28 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:33:12 | 0:00:00 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:34:43 | 0:00:55 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:35:47 | 0:00:02 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:36:12 | 0:05:40 |

[152]

1161.   Aprahamian was also speaking to his contact at Sandoz, CW-3, during this time, including the following calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:56:00 | 0:01:00 |
| 8/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:43:00 | 0:14:00 |
| 8/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:26:00 | 0:06:00 |

[153]

1162.   On August 1, 2013, shortly after speaking with Patel, Aprahamian instructed a colleague at Taro to begin implementing a price increase on Etodolac and Etodolac ER. Aprahamian stated "[w]e need to get these out next week." Not wanting to provide the details in writing, Aprahamian concluded:  "Will come over and discuss with you."

---

[152]   *Id.* at ¶ 716.

[153]   *Id.*

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1163.   By August 5, 2013, it was well known internally at Teva that Taro would soon be raising prices on both Etodolac and Etodolac ER.  The minutes from a Teva "Marketing Ops" meeting on August 5, 2013, which Patel attended, reflect the following:

> 4.  Etodolac – Sandoz did take price increase on IR, Taro taking a price increase on IR and ER this week.  CIM still monitoring to 100% forecast for all customers.

154

1164.   When Patel sent the "Price Increase Overview" spreadsheet to her supervisor K.G. on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that the reason Teva was increasing its prices for Etodolac and Etodolac ER was because Teva senior executives knew that Taro would be raising its prices on both drugs "this week." K.G. quickly instructed Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

1165.   Teva and Taro raised prices for Etodolac and Etodolac ER simultaneously, with the price increases effective on August 9, 2013.  Both their AWP and their WAC prices were increased to the exact same price points.  The increases were substantial.  For Etodolac, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

### 8.    July 2013 – January 2014:  Competitors Seek to "Follow" Price Increases:  Haloperidol and Trifluoperazine HCL, Benazepril HCTZ, Levothyroxine, Clomipramine HCL

1166.   As detailed above, after Mylan and Teva implemented significant price increases in early July 2013, Sandoz executives sought to obtain a "comprehensive list" of those Teva and

---

154   *Id.* at ¶ 718.

Mylan price increases.  Sandoz sought this information because it did not want to accidentally compete for market share on any of the Teva or Mylan drugs that overlapped with Sandoz.

1167.   To that end, on July 15, 2013, Sandoz executives held an internal meeting during which CW-1 instructed members of the Sandoz sales team, including CW-2 and CW-4, "to investigate [the] list of Mylan and Teva increase items."

1168.   That same day, as detailed above, CW-2 contacted his counterpart at Teva, Rekenthaler, and obtained the list of drugs that Teva increased on July 3, 2013, along with the percentage increases for each.  Similarly, on July 16, 2013, CW-4 called her contact at Mylan, Nesta.  The call lasted two-and-a-half (2.5) minutes.  A half hour later, Nesta returned the call and they spoke for nearly nineteen (19) minutes.

1169.   During those two calls, CW-4 asked Nesta to identify the drugs Mylan had increased prices on so that Sandoz could follow with its own price increase.  Nesta provided CW-4 with a list of drugs, highlighting that the Nadolol price increase would be large.  Nesta also emphasized that Mylan did not appreciate having its prices challenged and that prices should be kept high.  After the phone call ended, CW-4 sent the following e-mail to her superiors (the

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"July 2013 E-mail"):



1170.   For at least one drug on the list – Haloperidol – Mylan had yet to raise price at the time of the July 2013 e-mail.  Indeed, Mylan would not raise price on this product until August 9, 2013.  On that date, Mylan also raised the price on Levothyroxine – a drug on the list that was also increased by Mylan in January 2013 – and at least two other Sandoz overlap drugs not on the list – Trifluoperazine HCL and Benazepril HCTZ.

1171.   Over the next several months, and consistent with their understanding, Sandoz declined to bid and take business from Mylan customers (except in one instance where Mylan had more than its fair share) and raised prices to match Mylan on a number of products.  Some examples of this conduct are detailed below.

a.      *Haloperidol and Trifluoperazine HCL*

1172.   On August 6, 2013, Nesta of Mylan called CW-4 at Sandoz twice.  Both calls were less than a minute long.  Three days later, on August 9, 2013, Mylan implemented

---

[155]   *Id.* at ¶ 990.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

significant price increases on both Haloperidol and Trifluoperazine HCL.  For Haloperidol, Mylan increased the WAC price by 250% on several formulations.  For Trifluoperazine HCL, Mylan increased the WAC price by 80% on all formulations.

1173.   On August 19, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail stating that Mylan increased its prices on Haloperidol and Trifluoperazine HCL and that Sandoz needed to "rationalize the market."

1174.   On August 22, 2013, CW-2 e-mailed Kellum stating that CVS "wanted to know if we will be raising price on Haloperidol and Trifluoperazine.  Mylan took substantial increases." Kellum forwarded the request to CW-1 and F.R., a pricing manager at Sandoz.  F.R. responded, "I believe the answer is yes?? We bid at current price in RFP and did not go after this business.  I would answer yes.  Thoughts?" CW-1 replied that he would obtain the pricing data, "but I would imagine we will be fast followers."

1175.   On September 18, 2013, CW-1 e-mailed Kellum with his price increase analyses for Haloperidol and Trifluoperazine HCL.  For Haloperidol, CW-1 indicated that Mylan had 72% market share, Sandoz had 15%, and Zydus had 10%.  For Trifluoperazine HCL, CW-1 stated that "Mylan has 73% and we have 24%.  This is a no brainer."

1176.   On September 25, 2013, Walgreens – a Mylan customer – e-mailed Sandoz asking for bids on Haloperidol and Trifluoperazine HCL.  CW-1 sent an internal e-mail explaining that "Mylan took a price increase on this product.  That's why he is asking.  We are currently evaluating tak[ing] one ourselves."

1177.   On October 2, 2013, CW-1 e-mailed S.G., the Sandoz national account executive assigned to Walgreens, directing S.G.  to not only decline to bid at Walgreens, but also lie about

the reason for doing so:



> From:
> Sent:        Wednesday, October 02, 2013 6:45 PM
> To:
> Cc:          Kellum, Armando
> Subject:     Haloperidol and Trifluoperazine - WAGS
>
> Steve,
>
> We discussed internally and decided not to pursue WAGS on these at this point.  We have been running up against Mylan a lot lately (Nadolol, Benaz/Hctz), and fear blowback if we take on any more products at this moment.
>
> Trying to be responsible in the sandbox.
>
> I recommend you blame supply.

[156]

1178.   Over the next several days, CW-4 and Nesta spoke by phone several times.  These communications are detailed in the table below.  Prior to these calls, CW-4 and Nesta had not communicated by phone since August 6, 2013.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:11:19 |

[157]

1179.   On October 15, 2013 (the day after the last of the phone calls noted above), CW-1 e-mailed the Sandoz Pricing Committee recommending that Sandoz increase pricing on Haloperidol and Trifluoperazine HCL.  After reviewing the e-mail, O.K., a senior executive responsible for business planning at Sandoz, recommended approval of the Haloperidol price increase, but advised that Sandoz wait to increase the price of Trifluoperazine HCL until January

---

[156]  *Id.* at ¶ 999.

[157]  *Id.* at ¶ 1000.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2014 because of price protection penalties that would be triggered if Sandoz increased in October 2013.  As O.K. explained, "I understand that both price increases have been taken by Mylan in August and we are the followers.  We might be sending the wrong signal to Mylan by not following promptly however 1.6m top/bottom-line hit with no upside is too big to swallow."

1180.   Ultimately, Sandoz followed O.K.'s recommendation and increased its WAC pricing on Haloperidol to match Mylan's pricing on October 25, 2013 but waited to follow on Trifluoperazine HCL until January 31, 2014.

<i>b.     Benazepril HCTZ</i>

1181.   In July 2013, Sandoz finalized its plan to re-launch Benazepril HCTZ.  However, because Sandoz executives knew that Mylan planned to increase price on this product, it chose to wait to re-enter the market until after Mylan increased its price so that Sandoz could enter at the higher price.

1182.   On July 12, 2013, a marketing executive at Sandoz sent an internal e-mail regarding "Benazepril Orders for Cardinal" stating:  "[b]efore any release, we are expecting Mylan to raise their price." Similarly, during a Commercial Operations meeting on July 15, 2013, it was confirmed that Sandoz was just waiting for confirmation of a Mylan price increase before re-entering the market.

1183.   The next day, on July 16, 2013, CW-4 spoke with Nesta and sent the July 2013 e-mail outlining the Mylan price increase drugs that Nesta had provided to her (discussed more fully above).  That list did not include Benazepril HCTZ.  CW-1 forwarded the July 2013 e-mail to Kellum stating "See [CW-4's] note below for Mylan increases....I'm surprised benazepril hctz isn't on the list below for Mylan?" CW-1 then e mailed CW-4 asking, "Benazepril hctz? Was hoping to see that one."

339<br>
FILED WITH REDACTIONS – PUBLIC VERSION<br>
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1184.   Over the next few days, CW-4 and Nesta communicated several times, during which they discussed Benazepril HCTZ.  These phone calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 14:32:56 | 0:00:31 |
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 14:41:59 | 0:01:21 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:13:44 | 0:00:04 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:14:20 | 0:01:57 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:24:49 | 0:03:11 |

[158]

1185.   On August 2, 2013, CW-1 sent a spreadsheet to Kellum entitled, "Teva increases July 2013." In the e-mail, CW-1 stated:  "Mylan is also in there.  Be on the lookout for bumetanide and Benazepril/hctz."

1186.   One week later, on August 9, 2013, Mylan increased WAC pricing on Benazepril HCTZ.  The increase was large – nearly 334% on all dosage strengths.

1187.   On August 20, 2013, consistent with their agreement to maintain high prices, Sandoz quickly re-entered the Benazepril HCTZ market and essentially matched Mylan's WAC pricing.

1188.   A third competitor – non-Defendant Rising – entered the Benazepril HCTZ market on April 2, 2014 as the authorized generic.  When Rising entered, it essentially matched the WAC pricing of Sandoz and Mylan.  Both before and after entering the market, CW-2 – then at Rising – communicated with his former colleagues at Sandoz (CW-1, CW-3, and L.J.) about obtaining market share on Benazepril HCTZ.  Through those communications, Sandoz ultimately agreed to relinquish ABC to Rising so that the new entrant could achieve its fair share of the market.

---

[158]   *Id.* at ¶ 1007.

1189.  As a result, prices across the market rose more than 300% for Benazepril HCTZ, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, as depicted in the chart below:

| Dosage | Package Size | October 2013 | July 2014 | Percentage Price Increase |
|--------|-------------|--------------|-----------|---------------------------|
| 12.5-20mg | 100 ct | $34 | $149 | 338% |
| 20-25mg | 100ct | $34 | $149 | 338% |
| 5-6.25mg | 100ct | $34 | $149 | 338% |

1190.  NADAC data show that average market prices of Benazepril HCTZ remained stable prior to October 2013 but rose dramatically and remained artificially high after that time, as depicted for certain forms and dosages below.



    *c.*    *Levothyroxine*

1191.  Since approximately December 2010, Mylan, Sandoz, and Lannett have dominated the generic Levothyroxine market.

1192.  In the years 2013 and 2014, the three competitors coordinated to significantly raise the price of Levothyroxine.  Nesta of Mylan spearheaded the discussions by speaking with K.S., a senior sales executive at Lannett, and with CW-4 of Sandoz.  In addition to

communicating directly with CW-4 on this drug, Nesta also communicated indirectly with Sandoz through a mutual contact at a competitor company – Green of Teva.  Notably, Levothyroxine was not a drug that Teva sold.

1193.   As detailed above, Mylan increased prices on a number of drugs on January 4, 2013, including Levothyroxine.  The day before the Mylan increase, on January 3, 2013, Nesta of Mylan and Green of Teva spoke at least four times by phone.  The next morning – the day of the Mylan price increases – Green spoke twice with Kellum, including a six (6) minute call at 9:34 a.m.

1194.   Shortly after hanging up the phone with Green, Kellum sent an internal e-mail stating, among other things, that he "[j]ust heard from a customer that . . .  Mylan took a significant price increase on Levothyroxine" and Kellum advised his team to "please be cautious" on this product.  As the phone records demonstrate, Kellum's source for the information was not "a customer," but rather Green of Teva.

1195.   That same morning, K.S. of Lannett called Nesta of Mylan.  The phone call lasted 44 seconds.  Then, on January 10, 2013, Nesta called K.S. back and they spoke for more than six (6) minutes.  That same day, McKesson e-mailed Sandoz and requested a price reduction on Levothyroxine.  Kellum responded internally, "This is a No. We just learned that Mylan took a large price increase."

1196.   The following Monday – January 14, 2013 – Lannett raised its WAC pricing for Levothyroxine to match Mylan.  Notably, after these phone calls, Nesta would not speak again with K.S. of Lannett until August 6, 2013 – three days before Mylan increased its prices for Levothyroxine a second time.

1197.   On July 16, 2013 – as detailed above – CW-4 spoke with Nesta and sent the July 2013 e-mail identifying the Mylan price increases.  The price list included Levothyroxine and noted that Lannett had followed.

1198.   On August 6, 2013, Nesta called CW-4 two times.  Both calls lasted less than a minute.  A few minutes after the second call, Nesta called K.S. at Lannett.  The call lasted 24 seconds (likely a voicemail).  Three days later, on August 9, 2013, Mylan increased WAC pricing on Levothyroxine for a second time.

1199.   On August 10, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail that stated:  "Mylan took a 300% price increase on Levothyroxine!!! Based on my intelligence (we will need to confirm), please lock down inventory (strict allocation per AK) and no new product offers until we can clarify the situation." CW-4 replied to S.G.'s e-mail stating, "This is correct based on my info as well."

1200.   Pursuant to their ongoing understanding, Lannett followed quickly and matched Mylan's WAC pricing on August 14, 2013.

1201.   On August 14, 2013, S.G. sent an e-mail to Kellum, copying CW-1, regarding "Levothyroxine Mylan" and asked "[w]e taking the pricing up?" CW-1 responded:  "[w]orking on it." In response, S.G. replied:  "Thx.  I believe Lannett rationalized the market earlier this week." CW-1 answered "We just noticed that as well."

1202.   On September 5, 2013, Cigna – a Mylan customer – contacted Lannett and requested a bid on Levothyroxine.  J.M., a national account manager at Lannett, forwarded the request to K.S. stating "due to Mylan's across the board price increases on a number of products, they are looking for new suppliers wherever there is crossover." J.M. explained that "[t]he volume isn't gigantic on the 1000s so it wouldn't attract much attention from Mylan if it went to

us ....." Nonetheless, on September 12, 2013, Lannett declined the opportunity and blamed supply issues stating "[a]s much as we'd love to take on the business, we are not in a position to do so at this time."

1203.   During a September 10, 2013 earnings call, Lannett's CEO, A.B., was asked for his reaction to Mylan's Levothyroxine price increase.  A.B. responded, "You mean after I sent them a thank you note? I'm just kidding.  .  .  .  I'm always grateful to see responsible generic drug companies realize that our cost of doing business is going up as well.  .  .  .  So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful."

1204.   On September 13, 2013, Sandoz did indeed act "responsibly" and, consistent with the understanding it had with its competitors, raised WAC pricing to match Mylan and Lannett.

1205.   The three competitors – Mylan, Lannett, and Sandoz – did not stop there.  They coordinated again to raise price on Levothyroxine in April/May 2014.

1206.   Consistent with the 2013 increases, Mylan was the first to raise its WAC pricing on Levothyroxine on April 25, 2014.  In the two days leading up to the increase, Nesta and K.S. of Lannett spoke by phone several times.  These calls are listed below.  Notably, these calls are the last documented telephone calls between these two executives.

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 18:31:26 | 0:00:03 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 18:59:53 | 0:00:34 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 19:57:39 | 0:00:50 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 21:04:47 | 0:05:07 |

[159]

---

[159]   *Id.* at ¶ 1029.

1207.   On April 25, 2014 – the day that Mylan increased its pricing for Levothyroxine – P.G., a sourcing manager at Cardinal Health, sent a text message to Sullivan of Lannett stating: "[n]ot sure if you knew already ...  Mylan increasing levos." Sullivan responded:  "Thanks for the heads up ...  We heard 55% on contract price, can you confnm?" P.G. replied, "[y]es ~50-55%." Sullivan had "heard" about the Mylan increase from her supervisor, K.S., who had communicated with Nesta only days prior.

1208.   Lannett quickly followed with a price increase of its own – raising its WAC pricing to match Mylan on April 28, 2014.  In accordance with their ongoing agreement, and consistent with past practice, Sandoz followed shortly thereafter on May 23, 2014 and matched the WAC pricing of its competitors.

1209.   These price increases are reflected in WAC data:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000ct | Mylan | 00378180310 | $0.18 | $0.27 | 8/9/2013 | 45% |
| 100ct | Lannett | 00527134201 | $0.18 | $0.27 | 8/14/2013 | 46% |
| 1,000ct | Lannett | 00527134210 | $0.18 | $0.27 | 8/14/2013 | 46% |
| 90ct | Sandoz | 00781518192 | $0.12 | $0.27 | 9/13/2013 | 120% |
| 1,000ct | Sandoz | 00781518110 | $0.12 | $0.27 | 9/13/2013 | 54% |
| 1,000ct | Mylan | 00378180310 | $0.27 | $0.41 | 4/25/2014 | 55% |
| 100ct | Lannett | 00527134201 | $0.27 | $0.41 | 4/28/2014 | 54% |
| 1,000ct | Lannett | 00527134210 | $0.27 | $0.41 | 4/28/2014 | 54% |
| 90ct | Sandoz | 00781518192 | $0.27 | $0.41 | 5/23/2014 | 54% |
| 1,000ct | Sandoz | 00781518110 | $0.27 | $0.41 | 5/23/2014 | 54% |

1210.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases.  In a November 2014 hearing in the United States Senate HELP Subcommittee, pharmacist Stephen W. Schondelmeyer testified that in the prior year, Levothyroxine experienced a 35-50% price hike.  Mr. Schondelmeyer added that Mylan increased its prices for nine different strengths of Levothyroxine by between 44-63%.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Pharmacist Robert Frankil also testified that in 2013, Levothyroxine experienced a dramatic price increase.[160]

1211.   In 2015, patients complained of a dramatic price increase for their levothyroxine medication.  One patient in Detroit explained they routinely paid $20 for 90 tablets, but their cost skyrocketed to $76.77 from one refill to the next.[161] The Wisconsin Center for Investigative Journalism found that between 2011 and 2016, the price per pill for generic Levothyroxine increased from 14 cents to 46 cents.[162]

>                d.       *Clomipramine HCL*

1212.   In addition to Sandoz and Mylan, Taro also manufactured Clomipramine HCL. Indeed, it was Taro that led a price increase on this product on May 1, 2013.  The price increase was striking – more than a 3,440% increase to Taro's WAC pricing on certain formulations.

1213.   In the weeks leading up to the Taro price increase on Clomipramine HCL, Aprahamian of Taro spoke several times with both CW-3 at Sandoz and M.A., a national account manager at Mylan.  In fact, on several occasions during this time period, Aprahamian hung up the phone with one competitor and immediately called the next.  At the same time, CW-4 of Sandoz was also speaking with D.S., a senior sales and national account executive at Taro.

---

[160]  *Why Are Some Generic Drugs Skyrocketing in Price?: Hearing Before the Subcomm. On Primary Health and Aging of the Sen. Comm. on Health, Educ., Labor, and Pensions*, 113th Cong. 10 (2014) (statement of Stephen W.  Schondelmeyer, Director, Prime Institute and statement of Robert Frankil, President, Sellersville Pharmacy, Inc.), available at https://www.gpo.gov/fdsys/pkg/CHRG-113shrg24459/pdf/CHRG-113shrg24459.pdf.

[161]  Keith Roach, *Hike in prescription cost can be a hardship*, DETROIT NEWS (Mar. 29, 2015), https://www.detroitnews.com/story/life/advice/2015/03/29/keith-roach-health-high-prescription-cost-hardship/70639116/.

[162]  Sean Kirby, Dee J. Hall & Bridgit Bowden, *Prices of Lifesaving Drugs Skyrocketing*, WIS. CTR. FOR INVESTIGATIVE JOURNALISM (Nov.  28, 2016), https://urbanmilwaukee.com/2016/11/28/prices-of-lifesaving-drugs-skyrocketing/.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

During these conversations, Taro, Sandoz, and Mylan agreed to raise the price of Clomipramine

HCL.  Certain of these phone calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:06:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:15:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:06:00 |
| 4/9/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:07:00 |
| 4/9/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:00:06 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:18:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:01:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:11:00 |
| 4/17/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:12:00 |
| 4/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:02:00 |
| 4/17/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:04:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:13:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 4/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:09:00 |
| 4/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:04:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:05:00 |
| 4/25/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/26/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:08:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:14:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:02:00 |

[163]

1214.   CW-3 of Sandoz also took contemporaneous notes of some of his conversations

with competitors.  For example, after speaking with Aprahamian of Taro twice on April 30,

2013, CW-3 made the following notes identifying Clomipramine HCL as one of the products

that Taro planned to increase on May 1st:



[164]

---

[163]   Amended State AG Complaint No. 2 ¶ 1034.

[164]   *Id.* at ¶ 1035.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Indeed, there are notations in CW-3's notebook that demonstrate that he began communicating with Aprahamian about Taro's May 1 increase as early as April 2, 2013.

1215.   As part of the agreement to raise prices and not poach each other's customers on Clomipramine HCL, Sandoz consistently refused to bid for Taro's customers after Taro raised its price.  For example, on April 30, 2013, Publix e-mailed Sandoz stating that it had received a price increase letter from Taro regarding several Sandoz overlap products, including Clomipramine HCL, and asked whether Sandoz wanted to bid for the business.  Kellum e-mailed CW-4 stating "I'm not inclined to do anything here as these may be opportunities for us.  We can blame supply if these are in fact opps for us." CW-4 replied, "Agreed! Especially the opportunities for us part!"

1216.   Taro did agree to concede one customer to Sandoz so that the competitor could achieve its "fair share" of the market.  On May 1, 2013, Rite Aid e-mailed Sandoz asking for a bid on Clomipramine HCL.  Kellum responded:  "I want to raise price and perhaps pick up share here if possible.  [CW-4] try to keep Rite Aid warm and let them know we are evaluating but need to assess supply etc.  .  .  ."

1217.   The next day, on May 2, 2013, Aprahamian of Taro called CW-3 at Sandoz and they spoke for five (5) minutes.  CW-3 hung up the phone and then immediately called Kellum. The two spoke for eight (8) minutes.  First thing the next morning – on May 3, 2013 – CW-3 called Aprahamian back and they spoke for another five (5) minutes.  Within a half hour, CW-3 again contacted Kellum and spoke for two (2) minutes.  Later that day, CW-4 of Sandoz e-mailed Kellum regarding an upcoming call with Rite Aid stating:  "[w]hen we speak to the clomipramine – let's reiterate we need to keep it on the DL from taro as long as possible.  .  .  . like we don't already know the cat's out of the bag."

1218.   Ultimately, Sandoz was awarded the Clomipramine HCL business at Rite Aid. When Rite Aid notified Taro, Aprahamian forwarded the e-mail to M.P., Chief Commercial Officer at Taro, stating "[a]s expected Rite Aid moving Clomipramine."

1219.   Mylan was the next to increase price on Clomipramine HCL.  On May 16, 2013, Mylan increased to the same WAC per unit cost as Taro.  In the days leading up to the Mylan price increase, all three competitors were in contact with each other to coordinate efforts.  Some of these calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:08:00 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:20 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:06:00 |
| 5/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:04:06 |
| 5/14/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 5/14/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 5/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:02:00 |
| 5/16/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:22:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:01:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:02:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:01:00 |

[165]

1220.   On July 3, 2013, HEB Pharmacy informed Taro that Mylan was on back order for Clomipramine HCL and asked Taro to bid for the business.  Aprahamian responded that he was "[n]ot inclined to take on new business...  Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists.  Don't want to over react to this product.  Not sure how long Mylan is out."

---

[165]   *Id.* at ¶ 1040.

1221.   On July 16, 2013, CW-4 of Sandoz sent the July 2013 e-mail identifying Clomipramine HCL as a Mylan price increase product.  By this time, Sandoz knew that Mylan had increased its price on this product.

1222.   On July 20, 2013, Taro received a "Watch List" notification that Sandoz was increasing price on Clomipramine HCL.  Aprahamian forwarded the notice to M.P., stating: "FYI, Sandoz is in the market (and adjusted price to match oms) now with product as expected. Don't want to alert the reps as they could overreact.  They did take Rite Aid as you know.  Will see what happens from here."

1223.   Two days later - on July 22, 2013 - Sandoz increased its WAC pricing to match the per unit cost of Taro and Mylan.

1224.   These price increases are illustrated below:

| Package Size (25mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90ct | Taro | 51672401106 | $0.25 | $8.99 | 5/1/2013 | 3,441% |
| 90ct | Taro | 51672401105 | $0.25 | $8.99 | 5/1/2013 | 3,441% |
| 100ct | Mylan | 378302501 | $0.30 | $8.99 | 5/16/2013 | 2,853% |
| 100ct | Sandoz | 781202701 | $0.31 | $8.99 | 7/22/2013 | 2,778% |

1225.   On August 5, 2013, Walgreens – a Mylan customer – e-mailed Sandoz and requested a bid on Clomipramine HCL.  S.G., a national account executive at Sandoz, sent an internal e-mail asking "[s]hould we consider a 25% share of their business?" Kellum responded negatively, based on the agreement in place with Mylan, stating:  "[t]hat is tempting but I worry very disruptive." On August 6, 2013, Nesta of Mylan called CW-4 at Sandoz twice.  Both calls lasted less than a minute (likely voicemails).  The next day, on August 7, 2013, S.G. replied to Kellum's e-mail, stating:  "[b]ased upon your concerns, I will kill this unless I hear otherwise from you."

1226.   In October 2013, CW-4 and Nesta spoke by phone several times.  At least some of these calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 10/3/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:11:19 |

[166]

1227.   After this series of calls, during the morning of October 15, 2013, CW-4 of Sandoz called Kellum.  The call lasted one minute.  Approximately one-half hour later, Kellum e-mailed McKesson and asked if Sandoz could submit a bid for Clomipramine HCL.

1228.   On October 23, 2013, Sandoz submitted a bid to McKesson and the customer responded that a reduction was needed to bring the pricing in line with their current supplier, Taro.  CW-1 was surprised and forwarded the request to CW-4, copying Kellum, stating:  "I thought we were taking Mckessons Clomipramine from Mylan? Per below it appears that they have Taro on the 90s." CW-4 responded, "Hey, I'm only as good as my intel .  .  .  which should have been good."

1229.   In December 2013, Sandoz received an inquiry from a Bloomberg reporter who questioned the propriety of the large increases that Sandoz had taken in recent months on a whole host of drugs, including Clomipramine HCL and several other drugs at issue in this Complaint.  After several conversations with antitrust counsel, Kellum prepared the following

---

[166]   *Id.* at ¶ 1046.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

response to Bloomberg with regard to Clomipramine HCL:

> Here are the details on our price increase for Clomipramine.
>
> 1) On July 22, 2013 We raised WAC by the following %'s
>    25mg    2,778%
>    50m     2,325%
>    75mg    1,778%
>
> 2) We were not the first to raise the price but rather followed Mylan and Taro when we learned they had taken a price increase which we first learned from the pricing services we subscribe to "Analysource" (First Databank) and Prospectrrx (Gold Standard).
>
> 3) We had a very small market share (1%) and have since gained ~15% market share Rite Aid and Mckesson by providing lower prices than their incumbent suppliers (Taro and Mylan/Taro).

[167]

1230.    As is clear from the above allegations, Kellum's statement was a lie.  In reality, Sandoz had raised its prices after coordinating the increases with Taro and Mylan in advance and stayed true to its commitments to keep those prices high.

1231.    In 2015 alone, total sales revenue for Clomipramine spiked to $519 million, which is more than half the total sales revenue for the same products from 2011-2014 combined. This type of revenue growth in a mature market is evidence of Defendants' collusion.

### 9.    March 7, 2014:  Price Increases and Overarching Conspiracy Converge (Niacin ER)

#### a.    Niacin ER

1232.    On September 20, 2013, Teva entered the market for Niacin ER as the first-to-file generic manufacturer.  As the first-to-file, Teva was awarded 180 days of exclusivity to sell the generic drug before other generic manufacturers could enter the market.

1233.    Teva's period of exclusivity for Niacin ER was scheduled to expire on March 20, 2014.  As that date approached, Teva began to plan for loss of its exclusivity.  By at least as early as February, Teva learned that Lupin would be the only competitor entering the market on March 20.

---

[167]  *Id.* at ¶ 1049.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1234.   The first thing Teva sought to do – knowing that a high-quality competitor would be the only new entrant – was to raise its price.  On February 28, 2014, Cavanaugh instructed K.G. and others at Teva that "[w]e need to do the Niacin ER price increase before Lupin comes to market and sends offers out." K.G. immediately forwarded the e-mail to Patel with the instruction:  "Please see comment on Niacin ER.  Please make sure you include in your price increase." Later that day, Patel called Berthold at Lupin and the two spoke for nearly seven (7) minutes.

1235.   Within a week, Teva was ready to implement the price increase.  On March 5, 2014, Patel sent an e-mail to the Teva pricing group stating "[p]lease prepare for a price increase on Niacin ER, to be communicated [to customers] this Friday for an effective date of Monday." The next day, March 6, Teva notified its customers that it would be implementing a price increase on Niacin ER effective March 7, 2014.  The increase was for 10% across the board, on all formulations.

1236.   Once Teva coordinated the price increase, it next began taking the necessary steps to divide up the Niacin ER market with new entrant Lupin to avoid competition that would erode Teva's high pricing.  Patel scheduled a meeting with Rekenthaler for March 6, 2014 to discuss an "LOE Plan" for Niacin ER.  "LOE Plan," in Teva parlance, is a plan detailing which customers Teva would concede and which customers it would retain upon Teva's "loss of exclusivity" in a particular generic drug market.  Teva's LOE plans were often secretly negotiated directly with competitors as they were entering the market, consistent with the industry understanding of fair share discussed above.

1237.   During the morning of March 6, 2014, Patel called Berthold and they spoke for more than seven (7) minutes.  During this and several subsequent calls, discussed in more detail

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

above, Teva and Lupin agreed on which specific customers Teva would concede to Lupin when

it entered the market on March 20, 2014.  Teva agreed that it would concede 40% of the market

to Lupin upon entry.

1238.   When Lupin entered the market for Niacin ER on March 20, 2014, it entered at

the same WAC per unit cost as Teva, for every formulation.  In the days leading up to Lupin's

entry, Patel and Berthold were in frequent communication to coordinate the entry, as set forth

below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:44 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:19 |
| 3/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:06:20 |
| 3/20/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:34 |

[168]

1239.   In addition, Lupin entered with customer pricing only 10% below Teva's recently

increased pricing – so it was expected that pricing would remain at least at Teva's pre-increase

exclusive pricing levels.  In other words, there was little or no price erosion as a result of Lupin's

anticompetitive entry into the market for Niacin ER.

1240.   Over the next several days, Patel and Berthold continued to coordinate to make

sure Lupin obtained the agreed-upon customers.  For example, on March 24, 2014, a Teva

executive received an e-mail from Cardinal indicating that Cardinal had received "a competitive

offer for the Niacin ER family."  Cardinal was one of the customers that Teva had already agreed

to concede to Lupin.  The Teva executive forwarded the e-mail to several people internally at

_____

[168]   *Id.* at ¶ 735.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Teva, including Patel, Rekenthaler and Cavanaugh, confirming the plan:



169

1241.   That same day, Patel spoke to Berthold at Lupin three times, as shown below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:14 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:04:55 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:49 |

170

1242.   Patel responded:



171

1243.   The next day – March 25, 2014 – K.G. of Teva summarized the status of Teva's

LOE Plan and the company's agreement with Lupin on Niacin ER:  "With the four concessions

(CVS, Cardinal, Optum and Humana), we would be giving up right around 40% share as Dave

noted (I calculated 39%) . . . .  We need to keep everybody else."

---

169   *Id.* at ¶ 737.

170   *Id.*

171   *Id.*

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 10.    April 4, 2014 Price Increases

1244.   On April 4, 2014, Teva raised prices on twenty-two (22) different generic drugs. Nearly all of these increases were coordinated with a number of Teva's high-quality competitors including Sandoz, Taro, Actavis, Mylan, Lupin, and a non-Defendant generic manufacturer.  But for this price increase, Teva also began coordinating with some of what it regarded as "lesser-quality" competitors – such as Breckenridge, Heritage, non-Defendant VersaPharm, and non-Defendant Rising – as new sources for anticompetitive agreements.  For this price increase, Teva also decided to lead many more price increases – which was riskier for Teva and required even greater coordination with competitors.

1245.   Leading more price increases was part of a strategy that Patel memorialized in writing in January of 2014, documenting in many respects the successful strategy that she had implemented in 2013, focused on leveraging Teva's collusive relationships with high-quality competitors.  This strategy was well known, understood and authorized by individuals at much higher levels at Teva, including Cavanaugh and Rekenthaler, and Patel's direct supervisor K.G. For example, on January 16, 2014, Patel sent a document to K.G. titled "2014 Pricing Strategy Brainstorm," where she outlined her plan for implementing price increases:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**2014 Pricing Strategy Brainstorm**

- Lead more increases
- Candidate Identification:
    - Exclusive items
    - Number of competitors; Target 2-4 total players, where quality of competitor is high
    - Teva has majority share and quality of competitors is high - lead
    - Competitors with long term supply issues
    - Competitors exiting market
    - Low or limited financial exposure
    - Adjust pricing in accordance with volume (secondary, dual, etc)
- Follow market pricing promptly
    - Delayed reactions erode pricing
    - Teva is the market leader. Ability to react to market changes should be reflective of reputation.

[172]

1246.   Patel began planning for the next round of Teva price increases in early January 2014, shortly after returning to full-time status from maternity leave.  On January 14, 2014, Patel sent K.G. a preliminary draft list of price "Increase Potentials Q1 2014." She stated:  "Attached is my list of potential items.  Note that they still need to go through the review process."

1247.   The initial list contained drugs sold by Actavis and Lupin, among others.  Not surprisingly, Patel was communicating frequently with each of those competitors throughout December 2013 and into early January 2014.

1248.   On February 7, 2014, Patel created a formal list of "PI Candidates" in a spreadsheet.  In the days leading up to February 7, Patel was feverishly coordinating by phone with a number of different competitors to identify price increase candidates, including at least the following:

---

[172]   *Id.* at ¶ 741.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:23:21 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:10 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:22 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:04 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:29 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:11 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:30:28 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 1:02:06 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:05 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:00 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | S.C. (Breckenridge) | 0:01:20 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | S.C. (Breckenridge) | 0:04:53 |

[173]

1249.   Those efforts were successful.  By February 26, 2014, Patel had a more refined list of "PI Candidates," which she forwarded to another colleague for his review.  That list included the following drugs and notes about each drug:



[174]

1250.   Patel continued to refine the list over the next several weeks.

1251.   On March 17, 2014, Patel sent a near final version of the "PI Candidates" spreadsheet to K.G. with the statement:  "Once you verify these are acceptable, we can finalize for the increase."  Patel and Rekenthaler both were communicating frequently with competitors –

---

[173]   *Id.* at ¶ 744.

[174]   *Id.* at ¶ 745.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

in this case Taro, Lupin, Actavis, Zydus, Heritage, and non-Defendant Rising – to coordinate the price increases in the week before Patel sent the price increase list to K.G.

1252. Rekenthaler had also previously spoken with his contact at non-Defendant VersaPharm – J.J., a senior national accounts executive – on January 22, 2014 (a five (5) minute call) and March 7, 2014 (a three (3) minute call) to secure non-Defendant VersaPharm's agreement to follow the Teva increase on two drugs. Those were the only two identified telephone calls between Rekenthaler and J.J. since 2012. As discussed more fully below, non-Defendant VersaPharm followed with its own price increase shortly after the Teva increase.

1253. In the days leading up to the price increase, Rekenthaler asked Patel for a list of drugs and competitors associated with each of the increase items so that he could confirm that Teva had successfully coordinated increases with everyone. On April 1, 2014, Patel responded by providing a list of only those drugs where Teva was leading the price increase – i.e., the drugs with the most risk if Teva did not secure an agreement beforehand with a competitor before raising its own price.

1254. Satisfied that Patel and Rekenthaler had confirmed agreement with all the appropriate competitors, on April 4, 2014 Teva increased pricing on various dosage strengths of the following drugs: Azithryomycin Oral Suspension; Azithromycin Suspension; Bumetanide Tablets; Cephalexin Suspension; Clarithroymycin ER Tablets; Cyproheptadine HCL Tablets; Dicloxacillin Sodium Capsules; Diflunisal Tablets; Estazolam Tablets; Ethosuximide Capsules; Ethosuximide Oral Solution; Hydroxyzine Pamoate Capsules; Ketoconazole Cream; Ketoconazole Tablets; Medroxyprogesterone Tablets; Estradiol/Norethindrone Acetate

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

(Mimvey) Tablets; Nystatin Oral Tablets; Pentoxifylline Tablets; Tamoxifen Citrate Tablets; and Theophylline ER Tablets.[175]

1255.   These price increases were all coordinated and agreed to between Teva and its competitors.  Patel and/or Rekenthaler communicated directly with all of their key competitors in the days and weeks leading up to the increase.  Many of those communications are set forth in the graphic at page 221 of the Amended State AG Complaint No. 2.  Those communications included communications between Teva and Sandoz regarding Bumetanide Tablets and Dicloxacillin Sodium Capsules; between Teva and Lupin regarding Cephalexin Suspension; between Teva, Actavis, and Zydus regarding Clarithromycine Tablets; between Teva and Breckenridge regarding Cyproheptadine HCL Tablets; between Teva and Actavis regarding Estazolam Tablets; between Teva and non-Defendant Versapharm regarding Ethosuximide Capsules and Ethosuximide Oral Solution; between Teva, Sandoz, and Actavis regarding Hydroxyzine Pamoate Capsules; between Teva, Taro, and Sandoz regarding Ketoconazole Cream; between Teva, Taro, and Mylan regarding Ketoconazole Tablets; between Teva and Breckenridge regarding Estradiol/Norethindrone Acetate (Mimvey) Tablets; between Teva and Heritage regarding Nystatin Oral Tablets; between Teva, Apotex, and Mylan regarding Pentoxifylline Tablets; between Teva and Actavis regarding Tamoxifen Citrate Tablets; and between Teva and Heritage regarding Theophylline ER Tablets.

1256.   Patel and others at Teva again went to great efforts to coordinate these price increases with competitors prior to April 4, 2014 – including during the time that Patel was out on maternity leave.  Some illustrative examples of those efforts are set forth below.

---

[175]   *Id.* at ¶ 748.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

a.       *Cephalexin*

1257.   Throughout 2013, Berthold of Lupin colluded with two different individuals at Teva:  Patel and Green.  As discussed above, at times Patel and Green would even coordinate with each other regarding who would communicate with Berthold, and take turns doing so.

1258.   As of late October 2013, however, neither of those options was available to Berthold.  Patel was out of the office on maternity leave, and Green had left Teva to join Zydus as of October 23, 2013.

1259.   This did not deter Berthold; he merely went further down the Teva organizational chart to find a Teva executive to communicate with.  The ongoing understanding between Teva and Lupin was institutional, not dependent upon a relationship between specific individuals.  In October 2013, when Lupin decided to raise price on Cephalexin oral suspension – a drug where Teva was the only other competitor in the market – Berthold already knew that Teva would follow the increase.

1260.   On October 14, 2013, Berthold called Rekenthaler at Teva.  They ultimately spoke for sixteen (16) minutes that day.  Communication was rare between those two executives. Prior to October 14, 2013, the last (and only) time they had spoken by phone was November 21, 2011 according to the phone records produced.

1261.   On October 31, 2013 – the day before Lupin was scheduled to increase its price on Cephalexin oral suspension – Berthold also called T.S., a national account executive at Teva, to notify Teva of the price increase.  He called T.S. at 9:18 a.m. that morning and left a message. T.S. returned the call at 9:57 a.m., and the two spoke for nearly five (5) minutes.

1262.   Within minutes after hanging up the phone with Berthold, T.S. notified others internally at Teva about the substantial increase Lupin was about to take:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

176

1263.   The Lupin increase on Cephalexin oral suspension actually became effective the next day, November 1, 2013 – demonstrating that T.S. had advance knowledge of the increase. Shortly thereafter, T.S. followed up her own e-mail with specific price points that Lupin would be charging for Cephalexin.

1264.   K.G. of Teva responded later that day, asking:  "Did Lupin increase the Caps as well?" Rekenthaler answered immediately, with information he had learned from Berthold in mid-October:  "Lupin did not increase the caps, only the susp[ension]."

1265.   On November 22, 2013, a large customer requested a bid from Teva on Cephalexin due to the Lupin price increase.  T.S. forwarded the e-mail from the customer to Rekenthaler and others with the suggestion that, because Teva already had the majority share, it should not bid for the business.  K.G. agreed, and simultaneously forwarded the e-mail to Patel stating:  "Nisha, let's add this to our list to discuss."  Patel called Berthold the same day and left a message.

1266.   When Patel drafted her initial list of possible price increase candidates and forwarded it to K.G. in January 2014, Cephalexin oral suspension was on the list.  Patel coordinated the increase consistently with Berthold throughout the period.

---

176   *Id.* at ¶ 756.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1267.   On April 4, 2014, Teva raised its WAC prices on Cephalexin oral suspension to match Lupin's prices exactly.  The increases to the WAC price ranged from 90% - 185%, depending on the formulation.

b.    *Azithromycin and Medroxyprogesterone*

1268.   In November 2013, a non-Defendant generic manufacturer began planning to increase prices on several drugs, including some that overlapped with Teva:  Azithromycin oral suspension, Azithromycin suspension and Medroxyprogesterone tablets.  Patel and a national account executive at the non-Defendant generic manufacturer, were communicating frequently during that time, including exchanging six (6) text messages on November 16, 2013 and a phone call on November 23, 2013.  Because the non-Defendant generic manufacturer was a high-quality competitor, and because the companies had successfully conspired to raise prices previously, it was understood between the two that if the non-Defendant generic manufacturer raised prices Teva would follow and would not seek to poach customers after the increase.

1269.   On December 2, 2013 – the same day that the non-Defendant generic manufacturer was slated to send out notices of the price increases to its customers – Patel spoke to the national account executive at the non-Defendant generic manufacturer three times within a span of twenty (20) minutes.[177]

1270.   After the last of those three calls, Patel sent an e-mail to several colleagues at Teva notifying them of an impending price increase by non-Defendant generic manufacturer – one that would not be effective until January 1, 2014.  Patel encouraged her colleagues to "take this into consideration for bid requests [Teva] may receive."[178]

---

[177]   *Id.* at ¶ 763.

[178]   *Id.* at ¶ 764.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1271.   On December 5, 2013, Patel continued to communicate with the national account manager at the non-Defendant generic manufacturer about the increases, and how Teva would react to unsolicited customer requests for bids – trading two voicemails.  The next day, Patel sent another e-mail to K.G. about Azithromycin suspension and recommended that Teva declined to bid to maintain its fair share of the market.  In recommending that Teva decline to bid, Patel specifically noted that "in a 2 player market, [Teva has] 54% share and this includes a gain of ~4% in June."[179]

1272.   K.G. agreed with Patel's recommendation.  Later that day, J.L. of Teva sent a notice to several Teva colleagues indicating that Teva would not pursue any Azithromycin OS business at the time.  In the same e-mail, K.G. instructed his collegues to "inform the customer that [Teva was] unable to provide an offer at [that] time."[180]

1273.   That same day, Teva declined to bid on Azithromycin at multiple customers.

1274.   Over the next several months – during the period of time before Teva followed the non-Defendant generic manufacturer's price increases – Teva continued to refuse to bid (and avoid taking market share) when requested by customers, for both Azithromycin formulations and Medroxyprogesterone tablets.  For example, on January 27, 2014, Teva was approached by a large wholesaler asking for bids on both Azithromycin suspension and Medroxyprogesterone due to a "Change in Market Dynamics." After speaking with an employee of the non-Defendant generic manufacturer for more than five (5) minutes that same day, Patel agreed with the recommendation not to provide a bid to that customer.

---

[179]   *Id.* at ¶ 765.

[180]   *Id.*

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1275.   Similarly, on March 17, 2014 – which was the same day that Patel sent a nearly final price increase list to K.G. – Teva was approached by another wholesaler requesting a lower price for Azithromycin oral suspension.  A national account executive at Teva asked Patel:  "Can we provide any better pricing than [the non-Defendant generic manufacturer]? . . . I know we have picked up our target share." Patel had spoken with an employee of non-Defendant generic manufacturer twice earlier that day, including one call lasting more than fifteen (15) minutes.  Patel's response to the national account executive was:  "Let's talk tomorrow."

1276.   Consistent with the understanding between the two companies, Teva followed the non-Defendant generic manufacturer's price increases for Azithromycin oral suspension, Azithromycin suspension and Medroxyprogesterone tablets on April 4, 2014.  Patel spoke twice with an employee of non-Defendant generic manufacturer that same day.

> c.    *Clarithromycin ER*

1277.   Teva and Actavis were coordinating several drugs Teva price-fixed on April 4, 2014.  One of them was Clarithromycin ER tablets.  As of December 2013, Teva, Actavis and Zydus were the only generic manufacturers actively selling Clarithromycin ER.

1278.   On December 30, 2013, however, Cardinal approached Teva looking for a bid on Clarithromycin ER because Zydus was exiting the market.  Teva informed Cardinal that it would not have adequate supply to be able to take on this additional market share until April 2014, but if Cardinal could wait until then for Teva to supply, Teva would make an offer.  Cardinal agreed.

1279.   The Cardinal bid request was forwarded to Patel on the morning of January 2, 2014.  At 9:37 a.m. that morning, L.R., a customer marketing manager at Teva, suggested providing an offer to Cardinal at "10% under market intel pricing for [the] Watson/Actavis

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

product." L.R. also stated:  "[i]f Cardinal is willing to wait until April, I suspect that Actavis isn't interested in picking up a lot of additional share."

1280.   Immediately after receiving that e-mail, at 9:40 a.m., Patel called Rogerson at Actavis and the two spoke for more than seventeen (17) minutes.  Shortly after hanging up the phone with Rogerson, at 10:12 a.m., Patel responded to the e-mail, saying:  "I think we have an opportunity to go higher.  Let's aim for around $148 net and request feedback."

1281.   On January 9, 2014, Teva learned that Cardinal had accepted Teva's bid at the higher price.  At 9:19 a.m., Patel called Rogerson at Actavis and they spoke for more than six (6) minutes.  Shortly after that call, at 9:45 a.m., Patel sent an e-mail internally at Teva stating:  "It looks like Cardinal accepted our bid at the higher price.  We may have an opportunity to take some increases."

1282.   When Patel sent her supervisor the initial list of "Increase Potentials Q1 2014" on January 14, 2014, Clarithromycin ER was on the list.

1283.   Similarly, in March 2014, Actavis implemented its own price increase on several other drugs, including some that overlapped with Teva.  Consistent with the ongoing understanding between these high-quality competitors, Actavis understood that Teva would follow the increases or, at a minimum, would not poach Actavis customers after the increase.

1284.   At 9:54 a.m. on March 14, 2014, Rogerson called Patel and left a message.  Patel called Rogerson back at 10:31 a.m., and the two spoke for more than twelve (12) minutes.  Within minutes after hanging up with Rogerson, Patel informed others at Teva about the Actavis increase:

> **From:** Nisha Patel02
> **Sent:** Friday, March 14, 2014 10:47 AM
> **To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> **Cc:** Dave Rekenthaler;
> **Subject:** Market Increases
>
>
> NAMs,
>
>
> I'm hearing that Actavis announced a bunch of price increases yesterday. Please share any intel you gather. I
> believe some of the products, that overlap with Teva, are as follows (not sure if there are any more):
>
>
> Tamoxifen
>
> Mirtazipine
>
> Estazolam

[181]

In fact, these increases would not become effective until April 15, 2014, again demonstrating that Teva knew in advance of its competitors' price increase plans.

1285.   Within half an hour of sending that e-mail, Patel instructed colleagues to add the Actavis drugs to the Teva price increase list.  She added:  "We intend to follow where we can."

1286.   Less than two hours later, at 12:37 p.m., Patel called Rogerson again.  They spoke for more than five (5) minutes.  Shortly after hanging up the phone, at 12:51 p.m., Patel wrote another e-mail to certain colleagues at Teva, stating:  "Actavis took an increase.  We will follow. We need to review price per my alert list.  Let's wait to see what intel we can get and discuss Monday."

1287.   First thing the next business day – which was the following Monday, March 17, 2014 – Patel forwarded the "PI Candidates" list to K.G. at Teva.  The list included both Tamoxifen Citrate and Estazolam.  Later that morning, Patel called Rogerson.  After quickly exchanging voicemails, they spoke for more than nineteen (19) minutes.  Rekenthaler of Teva

---

[181]   *Id.* at ¶ 776.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

and Falkin of Actavis also exchanged four (4) text messages that day and had one call lasting more than six (6) minutes.

1288.   Teva followed the Actavis price increases on Tamoxifen Citrate and Estazolam less than three weeks later, on April 4, 2014.  Patel and Rogerson spoke twice by phone that day. Rekenthaler and Falkin also spoke by phone that day.  Because Teva was able to follow the price increase so quickly, Teva's increase became effective even before the Actavis price increase for those drugs.

1289.   After the price increases became effective, Teva took consistent steps not to disrupt the market or steal market share from Actavis.  For example, on May 14, Patel declined to bid at ABC on both Tamoxifen Citrate and Estazolam, stating:  "unable to bid (strategic reasons, for internal purposes)." When Patel and her other conspirators at Teva used the term "strategic" in this context, it was code for the fact that there was an understanding in place with a competitor.

1290.   Similarly, on May 21, 2014, Teva received a request from a large customer for a bid on Tamoxifen Citrate.  As of that date, Teva had 58.4% of the market, and Actavis had 40.7%.  A Teva analyst forwarded the request to Patel and others, recommending (pursuant to the fair share understanding in the industry) that Teva not bid "as we are first in a two-player market with good share already." Patel responded:  "Agree.  We should decline to bid."

> d.   Ketoconazole

1291.   Patel identified Ketoconazole cream and Ketoconazole tablets as price increase candidates sometime in February 2014.  They were not listed on her original "Increase Potentials" list that she sent to K.G. on January 14, 2014, but they were on the list of "PI

Candidates" that she sent to a colleague on February 26, 2014, with the following notes about each:

| Ketoconazole Cream | Shared with Taro and Sandoz |
| Ketoconazole Tab | Shared with Taro, Myl and Apo |

[182]

1292.   Taro was a common competitor on both drugs, but there were different sets of competitors for each formulation.  For Ketoconazole cream, Teva's competitors were Taro and Sandoz.  For Ketoconazole tablets, Teva's competitors were Taro and Mylan.

1293.   Teva led the price increases for both drugs but made sure to coordinate with all of its competitors before (and as it was) doing so.  On April 4, 2014 – the day of the increases – Patel spoke separately with both Aprahamian of Taro and CW-1 of Sandoz.  During each call, she let them know that Teva was increasing the price of Ketoconazole.  The same day, Rekenthaler spoke to Nesta of Mylan; he had previously communicated with J.H., a senior sales executive at Apotex, on March 20 and 25, 2014.

1294.   On Ketoconazole cream, co-conspirators at Taro and Sandoz were also communicating directly with each other.  On April 4, 2014, for example, Aprahamian spoke to CW-3 at Sandoz for nineteen (19) minutes.  They discussed the Teva increase and the fact that Taro would follow.  CW-3 then sent an e-mail internally at Sandoz, alerting colleagues of the price increase and conveying information about Taro's price increase plans:



From: ▮▮▮▮▮
Sent: Friday, April 04, 2014 3:01 PM
To: ▮▮▮▮: Kellum, Armando;
Subject: Ketoconazole Cream Price Increase

As an FYI, Teva increased contract price and WAC on Keto Cream yesterday (tripled).  Taro will more than likely follow shortly.  We should determine if Teva had additional increases yesterday as well.

[183]

---

[182]   *Id.* at ¶ 783.

[183]   *Id.* at ¶ 786.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1295.   CW-1 at Sandoz immediately told his colleagues not to bid on any new opportunities for the drugs, and instead put the products on "strict allocation" until Sandoz determined how to proceed.

1296.   That same day, Aprahamian sent a similar e-mail internally to his colleagues at Taro.

1297.   The following Monday, April 7, 2014, Taro received a request from MMCAP seeking a competitive bid on Ketoconazole tablets due to the Teva price increase.  After reviewing the request, a Taro sales executive sent an internal e-mail stating:  "we are not going to bid this product.  .  .  .  Taro has 27% share in a 4-player market." In a follow-up e-mail, E.G., a Director of Corporate Accounts at Taro, confirmed that Taro would decline to bid, but indicated that Taro would need to lie about the reason:  "Yes, we are declining, but we need to advise its [sic.] due to supply."

1298.   Four days after the Teva increase, on April 8, 2014, Aprahamian called Patel and the two spoke for more than nineteen (19) minutes.  Later that same day, he initiated a price increase for all of Taro's customers on both the Ketoconazole cream and tablets.  Aprahamian directed that the notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014.

1299.   Although Sandoz immediately understood that it would follow these price increases, it was not able to implement them until October.  The delay was because Sandoz had contracts with certain customers that contained price protection terms which would impose substantial penalties on Sandoz if it increased its prices at that time – and those penalties would have caused Sandoz to miss certain financial targets during the months after April 2014.  At Sandoz, senior management held monthly budget meetings where they analyzed whether it made

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

financial sense to implement a particular price increase.  In this case, the ramifications of the price protection terms did not make sense for Sandoz to follow until October 2014.

1300.   In the months after the Teva and Taro increases, Teva held up its end of the agreement not to poach its competitors' customers.  For example, on May 14, 2014, Teva was approached by Cardinal requesting a bid due to the Taro increase.  The e-mail from Cardinal was forwarded to Patel, who responded immediately:



1301.   Shortly before sending the e-mail, Patel exchanged several text messages with Aprahamian at Taro.  She would ultimately exchange eight (8) text messages and had one phone call lasting more than four (4) minutes with Aprahamian on that day.

1302.   Later that same day, Patel also directed that Teva decline to bid for Ketoconazole at ABC, citing the same logic:  "unable to bid (strategic reasons, for internal purposes)."

1303.   Sandoz ultimately followed the Teva and Taro increases for Ketoconazole cream on October 10, 2014.  That same day, Patel and CW-1 at Sandoz spoke for more than three (3) minutes.

1304.   The Teva increases on Ketoconazole were significant.  For the cream, Teva, Taro and Sandoz all increased the WAC price by approximately 110%.  For the tablets, Teva's WAC

---

[184]   *Id.* at ¶ 791.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

increases were approximately 250%, but its customer price increases were substantially larger – averaging 528%.

e.    *Estradiol/Norethindrone Acetate and Cyproheptadine HCL*

1305.   Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases.  One of those new co-conspirators was Breckenridge.  Patel already had a relationship with S.C., a senior sales executive at Breckenridge, and Rekenthaler had a relationship with D.N., another senior sales executive at Breckenridge, so Breckenridge was a prime candidate to coordinate pricing.

1306.   On November 14, 2013, Breckenridge increased its pricing on both Estradiol/Norethindrone Acetate tablets (brand name Mimvey) and Cyproheptadine HCL tablets.  Breckenridge had acquired the ANDA for Cyproheptadine HCL tablets in September 2013 from another manufacturer, and immediately sought to raise the prices previously charged by the prior manufacturer as it began to sell the product under its own label.  For Cyproheptadine HCL, Breckenridge increased its WAC pricing by as high as 150% and raised its customer contract pricing even higher – 400%.  The increases to Mimvey were a more modest 20-27% for both the WAC and customer pricing.

1307.   In the weeks leading up to those increases – when Patel was still out on maternity leave – Rekenthaler had several phone calls with D.N. at Breckenridge to coordinate the price increases.  The two spoke twice on October 14, 2013 and had a twenty-six (26) minute call on October 24, 2013.  After those calls, they did not speak again until mid-January 2014, when Teva began preparing to implement its increase.

1308.   Over the next several months – during the period of time before Teva was able to follow the Breckenridge price increases – Teva followed the "fair share" understanding to the letter.

1309.   With respect to Cyroheptadine HCL, Teva had approximately 54% market share in a two-player market.  For that drug, Teva consistently refused to bid or take on any additional market share after the Breckenridge increase.  For example, on February 7, 2014, a customer gave Teva an opportunity to pick up new business on Cyroheptadine HCL.  When she learned the news, Patel called S.C. at Breckenridge.  They ended up speaking twice that day – the first and only phone calls ever between them.  After speaking to S.C., Patel sent the following e-mail regarding the customer's request:



```
From:     Nisha Patel/02
Sent:     Fri 2/07/2014 2:46 PM (GMT-05:00)
To:       
Cc:       
Bcc:      
Subject:  RE: Possible Indirect Additions - Safeway # 10769, 70, 71 & 72

Let's hold off on providing a bid. We can provide a bid when we are in a position to do so (post increase).
```
[185]

1310.   With regard to Estradiol/Norethindrone Acetate, however, Teva only had 19% market share in a two-player market.  For that drug, Teva sought to pick up a few customers to level the playing field – before raising its own prices to follow Breckenridge.

1311.   On April 4, 2014, Teva followed the Breckenridge price increases with substantial increases of Estradiol/Norethindrone Acetate (contract increases of as much as 393%) and Cyroheptadine HCL tablets (contract increases of as much as 526%).  In addition, Teva increased the WAC price on Estradiol/Norethindrone Acetate by 26% and the WAC price on

---

[185]   *Id.* at ¶ 801.

Cyproheptadine HCL Tablets by as much as 95% — to exactly match Breckenridge's WAC price on both products.

1312.   In the summer of 2015, Impax was preparing to enter the market for Cyproheptadine.  On July 20, S.C., National Director of Sales at Breckenridge, communicated by text with M.G., Senior National Account Manager at Impax.  On July 31, 2015, Impax announced WAC prices for Cyproheptadine that were even higher than those offered by Teva or Breckenridge.  This was consistent with the Fair Share Agreement.

<em>f.    Diflunisal</em>

1313.   Non-Defendant Rising became a more appealing potential co-conspirator when CW-2, who had formerly been employed at Sandoz, left to join Rising in August 2013. Rekenthaler had known CW-2 for many years, going back to when they both worked together at Teva several years prior.

1314.   Of the drugs on the Teva April 4, 2014 price increase list, Rising was a competitor on Diflunisal.  For that drug, Rising had 21% market share in a two-player market with Teva as of March 2014.

1315.   Rekenthaler spoke to CW-2 of Rising on December 5, 2013 for fourteen (14) minutes.  When Patel sent her initial list of "Increase Potentials" to K.G. on January 14, 2014, Diflunisal was on the list, with Teva expecting to lead the increase.

1316.   Teva and Rising continued to coordinate the increase over the next several months.  For example, when Patel sent a nearly final list of "PI Candidates" to her supervisor K.G. on March 17, 2014, she included the following notation about Diflunisal:

| | | |
|---|---|---|
| Diflunisal | Shared only with Rising | 186 |

1317.   That same day, Rekenthaler spoke with CW-2 twice.  During those calls, CW-2 informed Rekenthaler that Rising was having supply problems for Diflunisal and might be exiting the market at some point in the future.  CW-2 confirmed that it would be a good opportunity for Teva to take a price increase.

1318.   Rekenthaler and CW-2 spoke once again on March 31, 2014, shortly before the Teva price increase for Diflunisal.  On April 4, 2014, Teva increased is WAC pricing on Diflunisal by as much as 30%, and its contract pricing by as much as 182% for certain customers.

1319.   Rising ultimately exited the Diflunisal market for a short period of time starting in mid-July 2014.  When Rising decided to exit the market, CW-2 called Rekenthaler to let him know.  Four months later – when Rising's supply problems were cured – Rising re-entered the market for Diflunisal.  Consistent with the fair share principles and industry code of conduct among generic drug manufacturers discussed more fully above, CW-2 and Rekenthaler spoke by phone on several occasions in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4, 2014.  On December 3, 2014, Rising re-entered the market for Diflunisal tablets.  Its new pricing exactly matched Teva's WAC price increase from April 2014.

---

[186]   *Id.* at ¶ 807.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

g.    *Ethosuximide*

1320.   On the April 4, 2014 Teva price increase list, non-Defendant VersaPharm was a competitor on two different drugs:  Ethosuximide capsules and Ethosuximide oral solution.

1321.   When Patel began creating the price increase list, neither of these drugs was considered a candidate for an increase.  For example, when Patel sent her initial "Increase Potentials" list to K.G. in mid-January 2014, neither drug was on the list.

1322.   Non-Defendant VersaPharm was not considered a high-quality competitor.  When Patel created the quality competitor rankings in May 2013, non-Defendant VersaPharm was given a -2 score in the rankings.  That did not stop Rekenthaler, however, from calling J.J., a senior national account executive at non-Defendant VersaPharm, and speaking for five (5) minutes on January 22, 2014.  When Patel sent the next "PI Candidate" list to a colleague on February 26, 2014 – Ethosuximide capsules and oral solution were both on the list, with the following notation:

| Ethosuxamide Liquid | Shared only with Versa; test quality of competitor | |
|---|---|---|
| Ethosuxamide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE | 187 |

1323.   Rekenthaler called again and spoke with J.J. at non-Defendant VersaPharm on March 7, 2014.  Teva then raised prices on both drugs on April 4, 2014.  For Ethosuximide capsules, Teva raised its WAC price by 87%, and its contract prices by up to 322%.  For Ethosuximide oral solution, Teva raised its WAC price by 20% and its contract prices by up to 81%.

---

[187]   *Id.* at ¶ 812.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1324.  On April 9, 2014 – only five days after the Teva increase – non-Defendant VersaPharm increased its pricing on both Ethosuximide capsules and oral solution to a price that was nearly identical to Teva's price.

1325.  Following their agreement on those two drugs, and with no reason to speak further, Rekenthaler and J.J. of non-Defendant VersaPharm never spoke by phone again.

**11.    Impact of April 4, 2014 Price Increases to Teva**

1326.  A few weeks after Teva's April 4, 2014 price increases went into effect, Patel calculated the impact to Teva's net sales as a result of the April 4 increase.  Based on her analysis, she found that the April 4, 2014 price increases resulted in a net increase in sales to Teva of $214,214,338 per year.

1327.  For those drugs where Teva was leading the price increases on August 28, 2014, several of Teva's competitors followed in short order and those price increases were also coordinated.

1328.  For example, on October 10, 2014 Sandoz followed Teva's price increases on three drugs:  (1) Amoxicillin/ Glavulanate chewable tablets; (2) Diclofenac Potassium tablets; and (3) Penicillin VK tablets.  Patel of Teva spoke to CW-1 of Sandoz on the day of the Sandoz price increases for more than three (3) minutes.

1329.  Then, on December 19, 2014, Actavis followed the Teva price increase on Desmopressin Acetate tablets.  Rekenthaler of Teva and Falkin of Actavis spoke frequently in the days and weeks leading up to the Actavis price increase, including calls on November 18, November 21, and November 25, 2014.

1330.  Indeed, even before Actavis followed the Teva price increase, Teva knew that Actavis planned to increase.  For example, on October 15, 2014 – approximately six weeks

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

before Actavis raised its price – Teva received a request from a customer asking Teva to reduce its pricing on Desmopressin Acetate because it was no longer offering competitive prices. Patel's initial response to the customer was "[w]e believe the market is still settling on this product.  Can you please review in a few days and advise of more current pricing intelligence?" In a subsequent internal discussion, Patel wrote:  "I can't quite recall if Actavis followed us or we followed them....but they definitely did not change their WACs recently."

1331.    Similarly, on March 4, 2015, Mylan followed the Teva and Sandoz price increases on Diclofenac Potassium tablets.  Rekenthaler coordinated that price increase with Nesta of Mylan during two phone calls on February 18 and one call on February 19, 2015.

1332.    Shortly after Teva increased its price for Pentoxifylline in October 2014, Valeant entered the market at a similar high price.  Despite the fact that Valeant did not undercut its competitors on price, pursuant to the Fair Share Agreement, it was still able to obtain market share.

### 12.    April 15, 2014 Price Increase (Baclofen)

1333.    Effective February 21, 2014, Upsher-Smith took a significant price increase on Baclofen, ranging from 350 - 420% to the WAC price, depending on the formulation.  Prior to the increase, Baclofen was not a profitable drug for Upsher-Smith, and Upsher-Smith was considering whether to exit the market or significantly raise price.  It chose the latter.

1334.    The primary competitors in the market for Baclofen at this time were Teva (62.4%), Qualitest (22.5%), and Upsher-Smith (6.8%).

1335.    Teva initially considered following the Upsher-Smith price increase quickly, as part of its April 4, 2014 price increases – but decided against it.  The primary reason was that

Qualitest was in the market, and Teva considered Qualitest a "low-quality" competitor.  In other words, Qualitest would likely compete for market share if Teva increased its price.

1336.   Starting on April 10, 2014, however, Teva learned that Qualitest was having supply problems, and could exit the market for at least 3-4 months, if not permanently.

1337.   Upon learning that the only significant remaining competitor in the market would now be Upsher-Smith – a high-quality competitor – Teva immediately decided to follow the price increase.  Patel asked one of her direct reports to start working up price increase scenarios for Baclofen that same day.

1338.   Upsher-Smith was a highly-ranked competitor by Patel (+2) in large part because of Patel's relationship and understanding with B.L., a national account executive at Upsher-Smith.  In the week before she started her employment at Teva (after leaving her previous employment), Patel and B.L. exchanged several text messages.  During her first week on the job, as she was beginning to identify price increase candidates and "high quality" competitors, Patel spoke to B.L. on April 29, 2013 for nearly twenty (20) minutes.  During these initial communications, Patel and B.L. reached an understanding that Teva and Upsher-Smith would follow each other's price increases, and not compete for each other's customers after a price increase.  Their agreement was further cemented in June and July 2013, when the two competitors agreed to substantially raise the price of Oxybutynin Chloride.

1339.   There was no need for the two competitors to communicate directly in this situation because it was already understood between them that Teva would follow an Upsher-Smith price increase based on Patel's prior conversations with B.L. and based on the history of collusion between the two competitors.

1340.   Effective April 15, 2014, Teva raised its WAC and AWP pricing to match Upsher-Smith's pricing exactly.  Teva increased its WAC pricing from 350% to 447%, depending on the dosage strength.  Teva would not have increased its prices on Baclofen unless it had an understanding in place with Upsher-Smith.

1341.   Pursuant to the agreement between the companies, Teva did not seek to take any customers from Upsher-Smith during the time period after Upsher-Smith's increase and before Teva could follow.  Even after Teva's increase, when Qualitest customers approached Teva for a bid due to Qualitest's supply problems, Teva deferred to Upsher-Smith.  As Patel told K.G. in a June 11, 2014 e-mail:  "Dynamics have changed, but I think we need to see if Upsher wants to pick up share.  We have an unreasonably high share." K.G. agreed:  "I think this is the right thing to do. . . .  we should just give them a high bid."

1342.   Upsher-Smith, on the other hand, was able to secure several new customers as a result of the Qualitest exit.  In short order, Baclofen became a very profitable product for Upsher-Smith.  On April 18, 2014 – only three days after the Teva price increase – J.M., a Senior Director of Sales and Marketing at Upsher-Smtih, made the following pronouncement:



188

1343.   Only two months later, Lannett would enter the market at the same WAC prices as Teva and Upsher-Smith.  As discussed more fully above, Teva and Lannett colluded so that

---

188   *Id.* at ¶ 827.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Lannett could enter the market seamlessly without significantly eroding the high prices in the market.

1344.   According to NADAC data, the average market price for Baclofen remained steady prior to the spring of 2014.  From November 2013 through March 2014, the average market price of Baclofen fluctuated by less than $0.003 per unit for 10mg tablets and by less than $0.0065 per unit for 20mg tablets.

1345.   Beginning around February 2014, however, the overall average market price rose by more than 550%.  These price increases affected both dosages of Baclofen, *i.e.* 10mg and 20mg tablets.

1346.   According to NADAC data, the average market price for Baclofen increased by the following percentages:

> Baclofen 10mg tablet:  Between March 2014 and April 2014, prices increased 636%; and
>
> Baclofen 20mg tablet:   Between March 2014 and January 2015, prices increased 437%.

1347.   WAC data confirms that Teva and Upsher-Smith both imposed dramatic price increases for Baclofen consistent with the timing of the communications set forth above, by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Upsher-Smith | 00832102500 | $0.10 | $0.49 | 2/21/2014 | 420% |
| 100ct | Teva | 00172409760 | $0.10 | $0.49 | 4/15/2014 | 420% |
| 1,000ct | Upsher-Smith | 00832102510 | $0.10 | $0.49 | 2/21/2014 | 420% |
| 1,000ct | Teva | 00172409780 | $0.09 | $0.49 | 4/15/2014 | 447% |

1348.   Although WAC data is not available for Par, upon information and belief, it implemented nearly simultaneous and identical price increases as Upsher-Smith and Teva.  And

as set forth above, when Lannett entered the market, it came in at the exact same WAC price as Teva.

### 13.   July 1, 2014 Price Increase (Fluocinonide)

1349.   There are several different formulations of Fluocinonide including, among others: Fluocinonide 0.05% cream, Fluocinonide 0.05% emollient-based cream, Fluocinonide 0.05% gel and Fluocinonide 0.05% ointment.  As of June 2014, Teva, Taro, Sandoz, and Fougera were the only three manufacturers actively selling any of the four Fluocinonide formulations mentioned above.  On June 11, 2014, Teva identified the market-share breakdown for each of the different formulations of those drugs as follows:

| Product Description | Teva Market Share | Market Data |
|---|---|---|
| FLUOCINONIDE CREAM 0.05% 15GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM 0.05% 30GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM 0.05% 60GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM-E 0.05% 15GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE CREAM-E 0.05% 30GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE CREAM-E 0.05% 60GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE GEL 0.05% 60GM | 26.0% | Taro 61.7% |
| FLUOCINONIDE OINTMENT 0.05% 15GM | 53.8% | Taro 37.7%; Sandoz 8.5% |
| FLUOCINONIDE OINTMENT 0.05% 30GM | 53.8% | Taro 37.7%; Sandoz 8.5% |
| FLUOCINONIDE OINTMENT 0.05% 60GM | 53.8% | Taro 37.7%; Sandoz 8.5% |

[189]

1350.   As discussed above, Teva coordinated with Taro and Sandoz to increase the price of all four of those formulations of Fluocinonide in July 2013, based in part on discussions that started between Patel and Aprahamian even before Patel started her employment at Teva.  The increases to the WAC prices in 2013 were a modest 10-17%, depending on the formulation.

1351.   The second coordinated increase of Fluocinonide was much more significant. Taro raised its prices for all four Fluocinonide formulations effective June 3, 2014.  For each, the increases to Taro's WAC prices are set forth below:

---

[189]   *Id.* at ¶ 830.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Formulation | Percentage Increase to WAC |
|---|---|
| Fluocinonide 0.05% Cream | 206 – 754% |
| Fluocinonide 0.05% Gel | 155 – 255% |
| Fluocinonide 0.05% Ointment | 206 – 483% |
| Fluocinonide Emollient-Based 0.05% Cream | 160 – 430% |

[190]

1352.   Taro notified its customers of the increases the day before they became effective – June 2, 2014.

1353.   Patel knew of these (and other) Taro increases well in advance and was prepared so that Teva would be able to quickly follow the price increases.  Patel was already preparing for the next round of Teva price increases in June 2014; many of which would ultimately be implemented by Teva in August.

1354.   On May 14, 2014, Patel and Aprahamian exchanged eight (8) text messages and had one phone conversation lasting more than four (4) minutes.

1355.   Subsequent to the May 14 communications Patel directed a colleague to create a list of future price increase candidates, based on a set of instructions and data she had given him. On May 28, 2014, that colleague sent her a list titled "2014 Future Price Increase Candidate Analysis." The list included several drugs sold by Taro – including the four formulations of Fluocinonide (plus Carbamazepine and Clotrimazole) – with the notation "Follow/Urgent" listed as the reason for the increase, *even though Taro had not yet increased its price on those drugs or notified its customers that it would be doing so*.  The relevant portions of that spreadsheet are set forth below:

---

[190]   *Id.* at ¶ 832.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Item Description | Product Family | BUCKET |
|---|---|---|
| CARBAMAZEPINE TABLETS 200MG 100 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 15GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 30GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 60GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 15GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 30GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 60GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE GEL 0.05% 60GM | FLUOCINONIDE TOPICAL GEL | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 15GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 30GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 60GM | FLUOCINONIDE OINTMENT | Follow/Urgent |

[191]

1356.  On June 3, 2014 – the day the Taro increases on Fluocinonide became effective – CVS reached out to T.C., a senior sales executive at Teva, indicating that it had an "immediate opportunity" on Fluocinonide 0.05% Cream and Fluocinonide 0.05% Emollient Cream, but did not give a reason for providing that opportunity to Teva.  The CVS representative offered to move a significant amount of business from Taro to Teva, stating:  "Opportunity knocks." The e-mail was forwarded to Patel, who responded:

> **From:** Nisha Patel02
> **Sent:** Tuesday, June 03, 2014 12:46 PM
> **To:** ▮▮▮▮▮▮
> **Subject:** Re: Fluocinonide Cream
>
> I suspect a price increase...and we would likely follow.
>
> Sent from my iPhone

[192]

1357.  Of course, Patel already knew the bid request was due to a price increase, because she had spoken to Aprahamian in May and included Fluocinonide on her list of price increases with a notation to "Follow/Urgent." But she still needed to determine the specific price points so that Teva could follow quickly.

---

[191]  *Id.* at ¶ 835.

[192]  *Id.* at ¶ 836.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1358.   T.C. stated that she had not heard about a price increase from anyone else but indicated that she would "snoop around." Patel stated:  "OK.  Thanks.  I'll do the same."

1359.   Patel immediately began snooping around by exchanging five (5) text messages with Aprahamian at Taro.  Later that afternoon, she reported that she had "[c]onfirmed that Taro increased," but that she was "still working on intel." K.G. at Teva suggested that it might be a good opportunity to take some share from Taro – the market share leader on several of the Fluocinonide formulations.  He asked Patel to provide "guidance" by the next day.  Patel responded at 4:23 p.m., making it clear that she had been talking to Aprahamian not only about Fluocinonide, but other drugs as well:

> I expect to provide guidance at some point in the morning.  I'm also
> hearing Warfarin, Carbamazepine as well.  I'll be looking at shares
> and intel tomorrow and will provide commentary.  (Taro is a high
> quality competitor.  It's just a matter of who the others are.)

1360.   Shortly after sending that e-mail Patel called Aprahamian and they spoke for nearly seven (7) minutes.  As discussed more fully below, Taro had also increased its prices for Warfarin Sodium and Carbamazepine on June 3.  Teva followed those substantial Taro price increases with equally substantial increases of its own in August.

1361.   First thing the next morning – June 4, 2014 – Patel exchanged two (2) more text messages with Aprahamian, and then the two spoke on the phone for more than twenty-five (25) minutes.  Within minutes after hanging up the phone with Aprahamian, Patel sent the following e-mail to K.G., making it clear that she had obtained additional "intel" that she did not want to put in writing:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



193

1362.   That same day, Teva received a bid request from another large customer,

Walmart.  Shortly after that e-mail was forwarded to her, Patel responded by making it clear that

Teva would play nice in the sandbox with Taro:



194

1363.   After further deliberation, Teva decided not to bid on any of the Walmart business

at all.

1364.   On June 23, 2014, as Teva was planning to implement a price increase on

Fluocinonide to follow the Taro increase, Patel forwarded a spreadsheet to a subordinate with

"intel" she had obtained directly from Aprahamian.  That spreadsheet contained specific Taro

---

193   *Id.* at ¶ 839.

194   *Id.* at ¶ 840.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

customer price points for the different formulations of Fluocinonide for each of the various classes of trade (i.e., wholesalers, chain drug stores, mail order and GPO).  Prior to sending that "intel," Patel had spoken to Aprahamian on June 17 for fifteen (15) minutes, and June 19 for nearly fourteen (14) minutes.  The contract price points obtained by Patel were not otherwise publicly available.

1365.   Sandoz was also a competitor on two formulations of Fluocinonide – Fluocinonide ointment and Fluocinonide gel – but was only actively marketing the gel.  Not coincidentally, Aprahamian was having similar communications with his contact at Sandoz, CW-3, during this time period.  At least some of those calls are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 6/17/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/19/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:10:00 |

[195]

1366.   During one of the calls on June 20 referenced above, Aprahamian dictated to CW-3 over the telephone specific Taro contract price points for each of the same classes of trade that he had provided to Patel, for Fluocinonide ointment, Fluocinonide gel, and various other drugs that Taro had increased that overlapped with Sandoz.  CW-3 took very detailed notes of the pricing information Aprahamian provided, which again were not publicly available.  Based on a history and pattern of practice between CW-3 and Aprahamian, it was understood that Sandoz would follow the Taro price increase.

---

[195]   *Id.* at ¶ 842.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1367.   On June 26, 2014, Teva sent out a calendar notice to a number of sales and pricing employees – including Patel and Rekenthaler – for a 3 p.m. conference call that day.   The notice stated:   "We will discuss the upcoming price increase for all Fluocinonide products: Fluocinonide Cream, Fluocinonide E-Cream, Fluocinonide Gel, Fluocinonide Ointment.   We are targeting an announcement date of Monday, June 30th for an effective date of July 1st." The next morning, at 9:57 a.m., Patel and Aprahamian spoke again for nearly thirteen (13) minutes.

1368.   The Teva price increases on Fluocinonide became effective on July 1, 2014.   Teva increased its WAC pricing to match Taro's pricing almost exactly.   That same day, Patel spoke to her contact at Sandoz - CW-1 – several times, including at least those calls set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:54:45 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 9:59:38 | 0:01:34 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 15:05:31 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:10:28 | 0:00:11 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:13:36 | 0:01:59 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:21:17 | 0:07:14 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 17:58:19 | 0:19:46 |

[196]

1369.   During those calls, Patel informed CW-1 of the Teva price increase and provided specific price points to CW-1 so that Sandoz would be able to follow the price increase.

1370.   These price increases are reflected in WAC data:

| Product Cream .05% | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|
| 15gm | Taro | $.79 | $2.43 | June 3, 2014 | 206% |
| 30gm | Taro | $.56 | $2.43 | June 3, 2014 | 337% |
| 60gm | Taro | $.39 | $2.43 | June 3, 2014 | 524% |
| 15gm | Teva | $.79 | $2.43 | July 1, 2014 | 206% |
| 30gm | Teva | $.56 | $2.43 | July 1, 2014 | 337% |
| 60gm | Teva | $.39 | $2.43 | July 1, 2014 | 524% |

1371.   The average market price for Fluocinonide remained artificially high after July

---

[196]   *Id.* at ¶ 844.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2014, according to NADAC data:



FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1372.   Sandoz was in the process of exiting the market for Fluocinonide ointment (it had ceased its sales by September 2014 but followed the increase on the gel three months later, on October 10, 2014).  Sandoz increased its WAC pricing on the gel by 491%.  That same day, Patel spoke to CW-1 at Sandoz by phone for more than three (3) minutes.

1373.   During this time period, Actavis had also started to re-enter the market for Fluocinonide 0.05% cream but had not yet gained any significant market share due to supply problems.  Nonetheless, Actavis still followed the Taro and Teva price increases in December 2014 by raising its prices to the exact WAC prices as Teva and Taro.  The Actavis price increase on Fluocinonide cream was effective December 19, 2014.  Not surprisingly, in the days and weeks leading up to the Actavis price increase, the co-conspirators at Actavis, Taro and Teva were all communicating frequently.  At least some of those communications are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:39 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:06 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:16 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:22 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:07 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:07:59 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:02:37 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:02:00 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:16:00 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:35 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:08:00 |
| 12/18/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:40 |

[197]

---

[197]  *Id.* at ¶ 846.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

14.     **August 28, 2014 Price Increases**

1374.   On August 28, 2014, Teva raised prices on a number of different drugs, including: Amiloride HCL/HCTZ Tablets; Amoxicillin/Clav Tablets; Carbamazepine Chewable Tablets; Carbamazepine Tablets; Cimetidine Tablets; Clemastine Fumarate Tablets; Clotrimazole Topical Solution; Desmopressin Acetate Tablets; Diclofenac Potassium Tablets; Dispyramide Phosphate Capsules; Enalapril Maleate Tablets; Epitol Tablets; Flurbiprofen Tablets; Flutamide Capsules; Fluvastatin Sodium Capsules; Hydroxyurea Capsules; Loperamide HCL Capsules; Penicillin VK Tablets; Prazosin HCL Capsules; Prochlorperazine Tablets; Topiramate Sprinkle Capsules; and Warfarin Sodium Tablets.[198]

1375.   In the days and weeks leading up to the price increase, Patel and Rekenthaler were communicating with every high-quality competitor on those drugs to coordinate the increases in advance.  At least some of those communications are set forth in the graphic at page 250 of the Amended State AG Complaint No. 2.  Those communications included communications between Teva and Mylan regarding Amiloride HCL/HCTZ Tablets; between Teva and Sandoz regarding Amoxicillin/Clav Chew Tablets; between Teva and Taro regarding Carbamazepine Chewable Tablets; between Teva, Taro, and Apotex regarding Carbamazepine Tablets; between Teva and Mylan regarding Cimetidine Tablets; between Teva and Sandoz regarding Clemastine Fumarate Tablets; between Teva and Taro regarding Clotrimazole Topical Solution; between Teva and Actavis regarding Desmopressin Acetate Tablets; between Teva, Mylan, and Sandoz regarding Diclofenac Potassium Tablets; between Teva and Actavis regarding Disopyramide Phosphate Capsules; between Teva, Mylan, Taro, and Wockhardt

---

[198]   *Id.* at ¶ 847.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

regarding Enalapril Maleate Tablets; between Teva, Apotex, and Taro regarding Epitol Tablets;

between Teva and Mylan regarding Flurbiprofen Tablets; between Teva, Actavis, and Par

regarding Flutamide Capsules; between Teva and Mylan regarding Fluvastatin Sodium Capsules;

between Teva and Par regarding Hydroxyurea Capsules; between Teva and Mylan regarding

Loperamide HCL Capsules; between Teva, Aurobindo, and Sandoz regarding Penicillin VK

Tablets; between Teva and Mylan regarding Prazosin HCL Capsules; between Teva, Mylan, and

Sandoz regarding Prochlorperazine Tablets; between Teva, Actavis, and Zydus regarding

Topiramate Sprinkle Capsules; and between Teva, Amneal, Taro, Upsher-Smith, and Zydus

regarding Warfarin Sodium Tablets.

1376.   The day before the increases became effective – August 27, 2014 – Patel spent

most of her morning discussing the price increases with her contacts at Sandoz, Actavis, Taro,

Zydus and Glenmark:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:11:03 | 0:11:13 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:19 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:42 | 0:00:03 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:27:27 | 0:02:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:31:03 | 0:00:33 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:32:42 | 0:20:31 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:01 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:06 | 0:00:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:58:01 | 0:16:23 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 9:23:26 | 0:18:34 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 10:34:34 | 0:00:06 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 16:29:08 | 0:07:52 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:09:15 | 0:00:06 |

[199]

1377.   In addition to those phone communications noted above, representatives from

Teva and every other Defendant met in Boston, Massachusetts shortly before the increase, from

August 23-26, 2014, for the NACDS annual event, which was the largest pharmaceutical

---

[199] *Id.* at ¶ 848.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

industry meeting of the year.  Cavanaugh, Rekenthaler and Patel, along with many other Teva executives, as well as executives from every other corporate Defendant, attended.

1378.   With regard to Enalapril Maleate, Patel was speaking to Aprahamian at Taro as shown above.  Aprahamian, in turn, spoke to M.C., the Vice President of Sales and Marketing at Wockhardt, on August 8, 2014 for thirteen (13) minutes, and again twice on August 14, 2014, including one call lasting eight (8) minutes.

1379.   Similarly, with regard to Prochlorperazine Tablets, Rekenthaler communicated with Nesta at Mylan on August 7 and August 11.  Nesta, in turn, communicated with M.D., a senior sales executive at non-Defendant Cadista Pharmaceuticals, on the same days that he had been communicating with Rekenthaler.

1380.   A large number of the drugs on Teva's August 28, 2014 price increase list were selected because Teva was following a "high quality" competitor.  The coordination between Teva and certain co-conspirators regarding those drugs is discussed more fully below.

<em>a.     Mylan</em>

1381.   Effective April 17, 2014, Mylan increased its WAC pricing on a number of different drugs, including several that overlapped with Teva.  Mylan also increased its contract prices, but at least some of those price increases would not become effective until mid-May 2014.

1382.   Pursuant to the established understanding between the two companies, Teva immediately decided that it would follow the Mylan increases.  On April 21, 2014, T.S., a national account executive at Teva, forwarded to Patel two spreadsheets with WAC and AWP pricing information for the price increases taken by Mylan.  The spreadsheets were created by Mylan personnel.

393

1383.   Patel, in turn, forwarded the e-mail to the Teva sales team and stated:  "Our intention is to follow Mylan on this increase.  Below, you will see the list of increase items where Teva overlaps with Mylan.  Please share any pricing intelligence you are able to obtain. Thank you in advance!" The list that Patel referred to included the following products, several of which had been the subject of coordinated price increases in 2013 as well:  Amiloride HCL/HCTZ tablets; Cimetidine tablets; Enalapril Maleate tablets; Fluvastatin Sodium capsules; Loperamide HCL capsules; Prazosin HCL capsules; and Sotalol HCL tablets.

1384.   Within days, Teva began receiving requests from its customers for bids due to the Mylan price increases.  On April 24, 2014, Patel began to formulate a "Mylan Increase Strategy" in order to respond to those requests but noted that Teva was "still awaiting intel" about the Mylan customer contract price points, which were not publicly available.  Previously, Patel had relied on Green to obtain specific Mylan customer price points (referred to as "intel") through his communications with Nesta of Mylan, which she used to follow Mylan's pricing.  The next day, in a follow-up e-mail about the Mylan strategy, Patel noted that one of her Mylan increase strategies would not have been appropriate for this situation, and concluded that:  "Plus, we really need some intel" about the Mylan contract price points.

1385.   Patel continued to push for specific contract price points from Mylan.  On April 28, 2014, Patel sent an e-mail to the Teva sales team, stating:  "To date, we have no intel on Mylan's recent increases.  I realize there is a lot of travel going on, but whatever you can gather and share would be greatly appreciated."

1386.   On May 9, 2014, Patel sent another e-mail:

1387.   Shortly after receiving that e-mail – at 11:15 a.m. that morning – Rekenthaler called Nesta at Mylan and left a message.  Nesta returned the call at 11:23 a.m., and the two spoke for nearly eight (8) minutes.

1388.   Separately, and before Rekenthaler was able to convey any information he had obtained, Patel forwarded a customer request from ABC (relating to the Mylan increase items) directly to T.S. at Teva, lamenting the absence of Green to obtain the Mylan intel:

> I am in a really tough spot on these.  Please help! There are several requests open for offers, but I have ZERO intel.   A little frustrating/discouraging, as we are bound to hear complaints on how long it took to close the Delphi request.  Is there anything you are able to get to help when you are back? .  .  . At some point, I know I'll have to find another source of magic :))[201]

1389.   The next day, T.S. sent Patel an e-mail with an attached spreadsheet listing the Mylan contract price points for all of the recent increases:

---

[200]   *Id.* at ¶ 859.

[201]   *Id.* at ¶ 860.



From:
Sent:        Tue 5/13/2014 1:34 PM (GMT-05:00)
To:          Nisha Patel02
Cc:
Bcc:
Subject:     FW: Dirt
Attachments: Mylan-Price List A.xlsx


FYI

———————————————————————— [202]

1390.   The e-mail was unclear on where T.S. had obtained this "dirt," but the spreadsheet attached to her e-mail was created by a Mylan employee.

1391.   Rekenthaler and Nesta spoke again on May 20, 2014.  Armed with this new source of "intel," Patel was more confident that Teva could follow the Mylan price increases exactly, without disrupting the market.  That same day, as Patel began to create a new list of Teva price increase candidates, she instructed a colleague to include the Mylan drugs for which Mylan had increased price – with specific price points – as its own separate tab in the spreadsheet, called "follow." Her colleague provided the list, as requested, on May 21.

1392.   On May 27, 2014, Rekenthaler and Nesta spoke twice, including one call lasting nearly four (4) minutes.  By May 28, Teva had a much more comprehensive list of price increase items.  On that list, seven of the Mylan items were prominently listed with a "Follow Urgent" notation listed next to each:

———————————————————————————————

[202]   *Id.* at ¶ 861.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Item Description | BUCKET | Comments |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 100 | Follow/Urgent | Follow Mylan increase |
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 1000 | Follow/Urgent | Follow Mylan increase |
| CIMETIDINE TABLETS 300MG 100 | Follow/Urgent | Follow Mylan increase |
| CIMETIDINE TABLETS 300MG 500 | Follow/Urgent | Follow Mylan increase |
| CIMETIDINE TABLETS 400MG 100 | Follow/Urgent | Follow Mylan increase |
| CIMETIDINE TABLETS 400MG 500 | Follow/Urgent | Follow Mylan increase |
| CIMETIDINE TABLETS 800MG 100 | Follow/Urgent | Follow Mylan increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 100 | Follow/Urgent | Follow Mylan increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 1000 | Follow/Urgent | Follow Mylan increase |
| ENALAPRIL MALEATE TABLETS 5MG 100 | Follow/Urgent | Follow Mylan increase |
| ENALAPRIL MALEATE TABLETS 5MG 1000 | Follow/Urgent | Follow Mylan increase |
| ENALAPRIL MALEATE TABLETS 10MG 100 | Follow/Urgent | Follow Mylan increase |
| ENALAPRIL MALEATE TABLETS 10MG 1000 | Follow/Urgent | Follow Mylan increase |
| ENALAPRIL MALEATE TABLETS 20MG 100 | Follow/Urgent | Follow Mylan increase |
| ENALAPRIL MALEATE TABLETS 20MG 1000 | Follow/Urgent | Follow Mylan increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 30 | Follow/Urgent | Follow Mylan increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 100 | Follow/Urgent | Follow Mylan increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 30 | Follow/Urgent | Follow Mylan increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 100 | Follow/Urgent | Follow Mylan increase |
| LOPERAMIDE HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan increase |
| LOPERAMIDE HCL CAPSULES 2MG 500 | Follow/Urgent | Follow Mylan increase |
| PRAZOSIN HCL CAPSULES 1MG 100 | Follow/Urgent | Follow Mylan increase |
| PRAZOSIN HCL CAPSULES 1MG 1000 | Follow/Urgent | Follow Mylan increase |
| PRAZOSIN HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 2MG 1000 | Follow/Urgent | Follow Mylan increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 5MG 100 | Follow/Urgent | Follow Mylan increase |
| PRAZOSIN HCL CAPSULES 5MG 250 | Follow/Urgent | Follow Mylan increase |
| PRAZOSIN HCL CAPSULES 5MG 500 | Follow/Urgent | Follow Mylan increase |
| SOTALOL HYDROCHLORIDE TABLETS 80MG 100 | Follow/Urgent | Follow Mylan increase |
| SOTALOL HYDROCHLORIDE TABLETS 120MG 100 | Follow/Urgent | Follow Mylan increase |
| SOTALOL HYDROCHLORIDE TABLETS 160MG 100 | Follow/Urgent | Follow Mylan increase |
| SOTALOL HYDROCHLORIDE TABLETS 240MG 100 | Follow/Urgent | Follow Mylan increase |

[203]

1393.   Also on the list were three additional Mylan drugs for which Teva would be leading the price increase:  Diclofenac Potassium tablets; Flurbiprofen tablets; and Prochlorperazine Tablets.

b.   Taro

1394.   Taro also significantly raised its prices on the following drugs which overlapped with Teva:  Carbamazepine chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, and Warfarin Sodium tablets.

---

[203]  *Id.* at ¶ 863.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1395.   Patel learned of the price increases for certain of these drugs in advance, based on her conversations with Aprahamian.  It was understood that Teva would follow the Taro price increases based on these and prior conversations.  In fact, Teva agreed and made plans to follow them before Taro had even put them into effect.

1396.   Specifically, on May 28, 2014, T.S. of Teva sent Patel the then-current version of her "Future Price Increase Candidate" spreadsheet.  That list included the following Taro drugs, which had not yet been increased by Taro:

| Item Description | BUCKET |
|---|---|
| CARBAMAZEPINE TABLETS 200MG 100 | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | Follow/Urgent |

[204]

1397.   Patel likely obtained this information from Aprahamian on May 14, 2014, when the two exchanged eight (8) text messages and spoke for more than four (4) minutes by phone.

1398.   On June 3, 2014 – the date of the Taro price increases on Fluocinonide, Carbamazepine, Clotrimazole, Warfarin Sodium and other drugs – Patel and Aprahamian exchanged five (5) text messages.  After exchanging those text messages, Patel confirmed to her supervisor K.G. and another Teva representative that Taro had in fact raised its pricing on Fluocinonide.  Patel then added:  "I expect to provide guidance at some point in the morning. I'm also hearing Warfarin, Carbamazepine as well.  I'll be looking at shares and intel tomorrow and will provide commentary.  (Taro is a high-quality competitor.  It's just a matter of who the

---

[204]   *Id.* at ¶ 867.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

others are.)" At 5:08 p.m. that evening, Patel called Aprahamian and the two spoke for nearly seven (7) minutes.

1399.   First thing the next morning, Patel and Aprahamian exchanged two (2) text messages.  Then, at 9:56 a.m., the two spoke again for almost twenty-six (26) minutes.  Shortly after hanging up the phone with Aprahamian, Patel sent an e-mail to K.G. making it clear that she had obtained additional "intel" regarding the Taro price increases that she did not want to put into writing, stating:  "I have additional intel (I can discuss with you) that will be useful."

1400.   On June 12, 2014, Teva internally discussed future projections regarding Carbamazepine – including the fact that its API supplier might run out of supply sometime in 2015.  One of the options discussed was a price increase.  K.G. – aware that Patel had been in discussions with Aprahamian and had "intel" regarding the Taro price increase on Carbamazepine (and other drugs) – stated:  "Nisha [Patel] would be able to provide guidance relative to [the Carbamazepine] price increase for the analysis being put together." In fact, Patel had communicated with Aprahamian earlier that same day for more than nine (9) minutes.

1401.   One of the drugs that Taro increased on June 3, 2014 was Warfarin Sodium tablets.

1402.   As of June 2014, there were three competitors in the market for Warfarin Sodium: Teva, Taro and Zydus.  Ten days after Taro increased its price, Zydus quickly followed with a price increase of its own on June 13, 2014.  In the days between the Taro and Zydus price increases for Warfarin Sodium, Teva, Taro and Zydus coordinated through various phone communications with each other, including at least the following:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/4/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:11:28 | 0:00:00 |
| 6/4/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 9:16:52 | 0:00:00 |
| 6/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:56:52 | 0:25:57 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/12/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:57:50 | 0:09:18 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

[205]

1403.   On June 13, 2014 – the date of the Zydus increase on Warfarin Sodium – Teva was presented with an offer from a customer for a one-time buy on that drug.  Patel responded that "[w]e will review, but note that we intend to follow [the] Taro and Zydus increase price." Later that same day, Patel sent an internal e-mail alerting her group, including her supervisor K.G., about a list of drugs on which Teva planned to raise prices.  A number of them – including Carbamazepine chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, Fluocinonide cream, emollient cream, gel and ointment, and Warfarin Sodium tablets – included the notation "Follow/Urgent - Taro" as the reason for the increase.  For that list of drugs, Patel directed that "we should not provide any decreases on these products." Patel's directive meant that Teva would not seek to compete for market share against Taro or Zydus when approached by customers due to those competitors' price increases.

1404.   On June 18, 2014, Patel sent that same list to the entire sales team at Teva, informing them of the status of Teva's next price increase.  She noted that Teva had already been "receiving multiple requests on several items that are prioritized as increase candidates." Patel continued:  "While we do not have an exact date of increase, we are taking our increase plans into consideration and are bidding on new business at the planned increase price where our WAC allows." Finally, Patel stated:

---

[205]   *Id.* at ¶ 872.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

> This is all in consideration of market factors, quality of competitors, current market share (including McK RFP results) and intelligence we have been able to gather. As you know, each situation is unique, but this should provide a high level overview.

[206]

1405.   Some of the "intelligence" referred to by Patel was gathered during a phone conversation she had with Aprahamian of Taro the day before, on June 17, 2014, which lasted more than fifteen (15) minutes.

1406.   The next day, Patel continued to gather "intelligence" and made concerted efforts to simultaneously coordinate with both Aprahamian and Green at Zydus.  The timing and duration of those phone calls is set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:38:09 | 0:00:01 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:07 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:56:47 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 14:08:53 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:24:45 | 0:00:09 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 14:25:32 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 15:40:08 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 16:01:31 | 0:13:35 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:23:36 | 0:00:05 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:24:07 | 0:13:15 |

[207]

1407.   On August 28, 2014, Teva followed the Taro price increases on Carbamazepine chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, and Warfarin Sodium tablets.  As discussed more fully above, Teva coordinated those increases with Taro (and Zydus) through direct communications with those competitors in the days leading up to the increase.

       *c.*      *Zydus*

1408.   In addition to their agreement on Warfarin Sodium, Teva also agreed with Zydus to raise the price of Topiramate Sprinkle capsules.

---

[206]   *Id.* at ¶ 874.

[207]   *Id.* at ¶ 875.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1409.   As of June 2014, Zydus and Teva had a large majority of the market share for Topiramate Sprinkle, while Actavis had just 3% of the market.

1410.   In April 2014, Zydus raised its price for Topiramate Sprinkle capsules.  Patel was in frequent communication with Green at the time of the Zydus price increase.

1411.   In the days leading up to the June 13 Zydus price increase on Warfarin Sodium, which is discussed more fully above, Green coordinated with both Patel and Rekenthaler at Teva, as set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/2/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 9:33:00 | 0:02:00 |
| 6/2/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 11:25:26 | 0:05:48 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

[208]

1412.   Green was likely speaking to Patel and Rekenthaler about both Warfarin and Topiramate Sprinkle capsules during those calls because on June 13 – the same day the Zydus price increase on Warfarin Sodium became effective, and after the conversations noted above – Patel added Topiramate Sprinkle capsules to Teva's price increase list, with a notation: "Follow/Urgent - Zydus." Two days before that - the same day that Green had extensive phone calls with both Rekenthaler and Patel - Rekenthaler also spoke twice with Falkin of Actavis, the only other competitor in the market for Topiramate Sprinkle capsules.

1413.   Teva followed the Zydus price increase for Topiramate Sprinkle capsules on August 28, 2014.  As noted above, Teva coordinated that increase with both Zydus and Actavis in the days and weeks before it.

---

[208]   *Id.* at ¶ 880.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 15.    January 28, 2015 Price Increases

1414.    Shortly after the August 28, 2014 Teva price increases, Patel accepted a new position at Teva.  She left her position in the pricing department to take on the role of Director of National Accounts at Teva.  Her new position meant new responsibilities, necessitating more frequent travel to customer conferences and trade shows, giving her a greater opportunity to meet and collude face-to-face with competitors instead of over the telephone.

1415.    When Patel left the pricing department at Teva her position was not refilled. K.G., Patel's former supervisor, assumed her role and became the executive responsible for identifying price increase candidates and implementing price increases.

1416.    On January 28, 2015, Teva raised prices on a number of different drugs.  Teva's price increase spreadsheet – now maintained by K.G. at Teva, identified the following drugs, among others, along with the price increase strategy and reasons for the increase:

| Product Description | Price Increase Strategy | Reason for Increase | Competitors |
|---|---|---|---|
| BETHANECHOL CHLORIDE TABLETS | Market Intel | Follow Competitor -Amneal | Amneal (63%); Wockhardt (14.9%); Rising (1.7%) |
| CIPROFLOXACIN TABLETS | 139% Increase | Follow Competitor -DRL & Actavis | Actavis (37%); Dr. Reddy's (29.3); Westward (11.2%); Pack (5.2%) |
| DILTIAZEM HCL TABLETS | 90% Increase | Lead -Semi-Exclusive | Mylan (41.8%) |
| ESTRADIOL TABLETS | 90% Increase | Lead -Semi-Exclusive | Actavis (12.3%); Mylan (3.1%) |
| FLUOXETINE HCL TABLETS | 612% Increase | Mylan (New Market Entrant) (6/23/2014) | Par (45.1%); Mylan (7.3%) |
| GLIMEPIRIDE TABLETS | 300% Increase | Follow Competitor -DRL | Dr. Reddy's (34%); Accord (17%); IHT Labs (15.3%); Virtus (3.6%); BluePoint (2%) |
| GRISEOFULVIN SUSPENSION | 50% Increase | Follow Competitor -Actavis | Actavis (47.2%); Qualitest (14.1%); Perrigo (8.9%) |
| ISONIAZID TABLETS | 50% Increase | Lead -Limited Competition | Sandoz (23.2%); Lannett (3.4%) |
| KETOPROFEN CAPSULES | 80% Increase | Lead -Semi-Exclusive | Mylan (42.2%) |
| KETOROLAC TROMETHAMINE TABLETS | 90% Increase | Lead -Semi-Exclusive (Mylan Supply Issues) | Mylan (40%) |
| NORTRIPTYLINE HCL CAPSULES | 90% Increase | Lead -Cost of Goods Increased | Actavis (29.4%); Taro (4.8%) |
| PROPRANOLOL HCL TABLETS | Market Intel | Follow Competitor -Actavis | Heritage (26.1%); Actavis (21.2%); Qualitest (12.8%); Northstar (7.5%); Mylan (2.6%) [209] |

1417.    Patel and Rekenthaler communicated with a number of Teva's significant competitors about these drugs in the days and weeks leading up to January 28, 2015.  The relevant phone communications between Teva and several of its competitors related to these drugs are set forth in the chart at page 262 of the Amended State AG Complaint No. 2.  Those communications included communications between Teva and Amneal concerning Bethanechol

---

[209]  *Id.* at ¶ 890.

Chloride Tablets; between Teva, Actavis, and Dr. Reddy's concerning Ciprofloxacin Tablets; between Teva and Mylan concerning Diltiazem HCL Tablets; between Teva, Actavis, and Mylan concerning Estradiol Tablets; between Teva, Par, and Mylan concerning Fluoxetine HCL Tablets; between Teva and Dr. Reddy's concerning Gumepiride Tablets; between Teva and Actavis concerning Griseofulvin Suspension; between Teva and Sandoz concerning Isoniazid Tablets; between Teva and Mylan concerning Ketoprofen Capsules; between Teva and Mylan concerning Ketorolac Tromethamine Tablets; between Teva, Actavis, and Taro concerning Nortriptyline HCL Capsules; and between Teva, Actavis, and Mylan concerning Propranolol HCL Tablets.

1418.   Upon information and belief, Patel also spoke in-person with many of these competitors.  For example, in her new role as a Director of National Accounts, Patel personally attended the following trade association events and customer conferences in the fall of 2014 and winter of 2014-15:  NACDS, Boston, MA (August 23-26, 2014); Econdisc Bidders Meeting, St. Louis, MO (September 17-19, 2014); PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14, 2014); Anda Strategy Meeting, Miami, FL (October 26-29, 2014); and the HDMA Round Table, Washington, DC (January 8, 2015).  These industry events were all well-attended by Teva's competitors.

1419.   Some specific examples of Teva's coordination with competitors regarding its January 28, 2015 price increases are set forth below.

> a.    *Propranolol HCL Tablets*

1420.   On January 15, 2015, Actavis sent a notice to its customers informing them of a significant increase to its WAC and Suggested Wholesale Prices (SWP) for Propranolol HCL

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

tablets.  The increases would not become effective (and thus publicly visible to the rest of the market) until February 17, 2015.

1421.   In the days before Actavis sent this notice to its customers, Falkin of Actavis and Rekenthaler of Teva spoke frequently.  For example:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 1/8/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 7:18:00 | 0:10:00 |
| 1/13/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:39:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

[210]

1422.   Indeed, the day before Actavis sent the price increase notice to its customers, Rekenthaler coordinated the price increase with Falkin and Nesta of Mylan, the other quality competitor in the market for Propranolol HCL tablets, in its own name and/or through its subsidiary, UDL Laboratories Inc.  The timing and duration of those phone calls are set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 3:12:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 5:39:00 | 0:09:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

[211]

1423.   On January 16, 2015 - more than a month before the Actavis price increase for Propranolol HCL tablets was disclosed to the public – Rekenthaler forwarded Teva's price increase list to Patel.  Propranolol HCL tablets were on the list, with the following explanations

---

[210]   *Id.* at ¶ 896.

[211]   *Id.* at ¶ 897.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

about pricing strategy and reasons for the price increase:

| Product Description | Price Increase Strategy | Reason for Increase |
|---|---|---|
| PROPRANOLOL HCL TABLETS 10MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 10MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 20MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 20MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 40MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 40MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 60MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 80MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 80MG 500 | Market Intelligence | Follow Competitor - Actavis |

[212]

1424.   Teva raised its pricing for Propranolol HCL tablets on January 28, 2015 – before the Actavis price increase even became effective.  As discussed above, Rekenthaler was in constant communication with Falkin of Actavis and Nesta of Mylan in the days leading up to Teva's price increase.

1425.   When the Actavis price increase on Propranolol HCL tablets did become effective – on February 17, 2015 – Rekenthaler and Falkin continued to discuss pricing.  For example, the day before those price increases became visible to the public – February 16, 2015 – Rekenthaler and Falkin spoke two times, including one call lasting nearly twenty- three (23) minutes. Rekenthaler then spoke to Nesta twice on February 18, 2015 and again on February 19, 2015.

1426.   Mylan ultimately followed the Teva and Actavis price increases for Propranolol HCL tablets with a price increase of its own on July 10, 2015.

1427.   Heritage and Par also agreed to these price increases.

1428.   According to NADAC data, various dosage levels of Propranolol HCL tablets saw the following price increases:

> Propranolol HCL 10mg tablets:  Between February 18, 2015 and
> September 23, 2015, the average price increased by 819%;

---

[212]  *Id.* at ¶ 898.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Propranolol HCL 20mg tablets: Between February 18, 2015 and November 18, 2015, the average price increased by 892%;

Propranolol HCL 40mg tablets: Between February 18, 2015 and February 17, 2016, the average price increased by 1008%; and

Propranolol HCL 80mg tablets: Between February 18, 2015 and November 18, 2015, the average price increased by 958%.



1429. The following charts depict Medicaid reimbursement rates for exemplary dosage levels of Propranolol HCL tablets showing simultaneous price increases by Actavis, Heritage, Mylan, Teva, and Par.



FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



b.     *Ciprofloxacin HCL and Glimepiride*

1430.   Dr. Reddy's significantly increased its pricing on both Ciprofloxacin HCL and Glimepiride on August 18, 2014.  The increases to the Ciprofloxacin HCL WAC were 201% - 533% depending on the dosage strength.  The increases to the Glimepiride WAC were approximately 300% for all dosage strengths.

1431.   In the days and weeks leading up to the Dr. Reddy's price increases for Ciprofloxacin HCL and Glimepiride, V.B., a senior sales executive at Dr. Reddy's, spoke frequently with Patel about the planned price increases.  At least some of those phone communications are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 13:28:12 | 0:12:14 |
| 7/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 16:20:45 | 0:00:10 |
| 7/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:51:53 | 0:04:14 |
| 7/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:19:44 | 0:06:33 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 10:31:30 | 0:00:04 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 10:40:28 | 0:04:03 |

[213]

---

[213]   *Id.* at ¶ 905.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1432.   V.B. continued to communicate with Patel after the Dr. Reddy's price increases became effective, in the hope that Teva would quickly follow with its own price increases.  The two exchanged four (4) text messages on August 25, 2014 – only three days before Teva's substantial price increase on August 28, 2014 (discussed above).

1433.   Despite Dr. Reddy's best efforts, Teva was unable to add Ciprofloxacin HCL or Glimepiride to its August 28 price increase.  On the same day that Teva sent its price increase notices out to its customers, T.W., a senior account executive at Dr. Reddy's, obtained a complete list of Teva's price increases (including a number of drugs not sold by Dr. Reddy's). Although unclear how T.W. obtained this information, the subject line of the e-mail clearly identified the information as "Confidential Teva increases." In her message to several other Dr. Reddy's colleagues, T.W. stated that Teva initiated price increases, but did not include glimepiride:



On Aug 28, 2014, at 4:11 PM, ██████████ > wrote:

Hi All,
Teva had price increases today.  No glimepiride though!
See products below.
Thanks,
██████

[214]

1434.   J.M., a senior marketing executive at Dr. Reddy's, replied:  "Thanks for sending. This was shown in the pricing compendium today.  I was a little disappointed.  However, some of the price increase[s] were led by other companies more than a month ago.  So I am still hopeful they may follow." Dr. Reddy's anticipated that Teva would follow its price increases

---

[214]   *Id.* at ¶ 907.

based on the understanding that had been reached between V.B. and Patel during their various conversations.

1435.   In fact, Teva did follow the Dr. Reddy's price increases – on both Ciprofloxacin HCL and Glimepiride – during its next round of price increases on January 28, 2015.  In the interim, V.B. and Patel continued to communicate, exchanging four (4) text messages on October 10, 2014.

1436.   Actavis – the only other quality competitor in the market for Ciprofloxacin HCL – increased its pricing for that drug on December 19, 2014 to exactly match Dr. Reddy's WAC pricing.  In the days leading up to the Actavis price increase, Rekenthaler of Teva spoke to Falkin of Actavis several times to coordinate the increase, including twice on December 17 (including one call lasting nearly nine (9) minutes) and once on December 18, 2014.

1437.   When Teva did follow the Dr. Reddy's (and Actavis) price increases on Ciprofloxacin HCL and Glimepiride, on January 28, 2015, Teva raised its WAC pricing to match Dr. Reddy's WAC prices exactly.  That same day, Dr. Reddy's was (again) able to obtain a full copy of Teva's price increase list.  That list included many drugs that Dr. Reddy's did not market.

c.    *Griseofulvin Oral Suspension*

1438.   On September 9, 2014, Actavis notified its customers of a price increase on Griseofulvin microsize oral suspension ("Griseofulvin Oral Suspension").  In the days leading up to September 9, 2014, Patel and Rekenthaler of Teva communicated with Falkin and Rogerson of

Actavis to coordinate the increase.  Some of those calls are detailed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:15:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:21:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:05:00 |
| 9/9/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:04:32 |

[215]

1439.   The Actavis price increase for Griseofulvin Oral Suspension became effective on October 6, 2014.

1440.   Teva promptly added Griseofulvin Oral Suspension to its own price increase list, with the notation "Follow Competitor- Actavis" as the reason for the price increase.

1441.   Teva followed the Actavis increase for Griseofulvin Oral Suspension during its next price increase event on January 28, 2015.  As discussed above, in the days leading up to that price increase Rekenthaler of Teva and Falkin of Actavis coordinated frequently.  Teva's price increase for Griseofulvin Oral Suspension matched Actavis's WAC pricing exactly.

**C.**     **Competitors Become "High Quality" After Successfully Colluding With Teva**

       **1.**     **Apotex**

1442.   Apotex was one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3.  When Patel updated her Quality Competitor rankings in May 2014, however, Apotex was rated +2 – an increase in five points over that twelve-month period.

---

[215]  *Id.* at ¶ 912.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1443.   Apotex made this jump in Teva's quality competitor rankings in large part due to Patel's relationship with B.H., a sales executive at Apotex, and the successful coordination between Apotex and Teva in 2013 on Pravastatin and Doxazosin Mesylate.

1444.   Patel revised her May 2013 price increase list on May 29, 2013 to add Pravastatin. The day before – May 28 – Apotex increased its price on Pravastatin by over 100%.  Apotex's new, higher prices for Pravastatin exactly matched Glenmark's May 16, 2013 price increase.

1445.   In the days leading up to Patel's decision to add Pravastatin to her list of price increase candidates – and Apotex actually increasing its prices – Patel communicated frequently with B.H. at Apotex.  Between May 20 and May 24, 2013, the two spoke five (5) times.

1446.   Teva ultimately raised its prices on Pravastatin – to follow Glenmark, Apotex, and Zydus – on August 9, 2013.  In the days leading up to the Teva price increase, Patel spoke to B.H. at Apotex three (3) times to coordinate.

1447.   Teva also increased its pricing on Doxazosin Mesylate in August 2013.  Teva's new, increased price (a 1,053% increase) matched Apotex's (and Mylan's) recent price increases.  Apotex itself had increased the price of this drug on July 23, 2013.  B.H. of Apotex and Patel of Teva had one conversation the week before Apotex took the increase, in addition to coordinating before Teva followed on August 9, 2013.

1448.   Apotex soared dramatically in the quality competitor rankings for one additional reason:  in April 2013, Apotex hired J.H. as a senior executive.  Rekenthaler of Teva and J.H. began communicating regularly after J.H. was hired by Apotex.  There is no record that they had ever communicated by phone before that.

1449.   That relationship continued through 2014.  On April 4, 2014, Teva increased the price on Pentoxifylline by as much as 69%.  Despite the fact that Apotex was the market leader

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

at that time, Teva chose to lead the price increase on Pentoxifylline.  In the weeks leading up to Teva's price increase, Rekenthaler of Teva engaged in numerous communications with J.H. at Apotex.  The two spoke twice on March 7, 2014, for two (2) and three (3) minutes, respectively.  They spoke again on March 20 for four (4) minutes, and again on March 25 for two (2) minutes.  A week after Teva increased its price – on April 11, 2014 – they spoke again for five (5) minutes.  During these calls, Rekenthaler gathered Apotex's pricing plans and conveyed them to Patel.

1450.   As a result of Patel and Rekenthaler's successful coordination with Apotex executives, Patel dramatically increased Apotex's quality competitor ranking in May 2014.

### 2.     Zydus

1451.   Zydus – like Apotex – had been one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3.  But, when Patel updated her quality competitor rankings in May 2014, Zydus was rated +2, an increase in five points over a twelve-month period.  While Apotex's increase in the ranking was due to Teva's successful collusion with Apotex on several price increases in 2013 and 2014, Zydus's increase was more personnel-oriented:  Green, who had himself conspired with a number of competitors while at Teva (at the direction of and in coordination with Patel and Rekenthaler at Teva, among others) moved from Teva to Zydus in November 2013.  With Green firmly installed at Zydus, Patel was emboldened to more fully include Zydus in the conspiracy.

1452.   Patel's confidence was well-founded.  In the year after Green joined Zydus, the two companies successfully conspired to divide markets and allocate customers relating to Zydus's entry into the market for multiple drugs, including:  Fenofibrate (February – March

2014), Paricalcitol (March – April 2014), Niacin ER (May – June 2014), and Etodolac ER (May – July 2014).  These agreements are discussed more fully above.

1453.    Teva and Zydus also agreed to increase prices on Topiramate Sprinkle and Warfarin Sodium tablets.  Zydus increased the price for both of those drugs on June 13, 2014.  Teva followed with an increase on both drugs on August 28, 2014.  With respect to the Topiramate Sprinkle, Teva was explicit in its internal communications that its increase was to "follow competitor," namely Zydus.

1454.    In the days leading up to both companies' price increases, Green and Patel communicated frequently to coordinate the price increases.  On June 19, 2014 – four days before Zydus increased its prices – Green and Patel spoke four (4) times.  And on August 27, 2014 – the day before Teva raised its prices – Green and Patel spoke three (3) times.

1455.    Green was also communicating frequently with Rekenthaler of Teva around the time of the price increases on Topiramate Sprinkle and Warfarin Sodium tablets.  On June 11, 2014, the two men spoke for eight (8) minutes.  On August 20, the two exchanged an additional pair of phone calls.

1456.    Patel and Rekenthaler did not communicate with Green in isolation.  The two Teva executives made sure to keep each other apprised of their conversations with competitors, including Green.  In early 2014, Patel and Rekenthaler both worked largely out of Teva's home office.  After either one of them engaged in a phone call with a competitor, he or she would be sure to provide an in-person debrief of the communication so as to avoid putting such information in writing.

1457.    Even before Green joined Zydus in November 2013, Teva had success in coordinating price increases with Zydus with respect to Pravastatin.  Patel decided to add

Pravastatin to her price increase list only after determining that Zydus agreed to the increase.  In the week leading up to Patel's decision to revise her price increase list to include Pravastatin, Green (still at Teva) spoke to K.R. and M.K., both senior executives at Zydus.

1458.   Just two weeks later, on June 14, 2013, Zydus increased its price on Pravastatin by over 150%.  Green similarly had numerous conversations with Zydus executives in the week prior to that company's Pravastatin increase, as shown in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 6/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:12:00 |
| 6/10/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:02:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |

[216]

1459.   As noted above, Teva ultimately raised its prices on Pravastatin on August 9, 2013.  At that time, Patel recommended that Teva follow the competitors that had already raised their prices – including Zydus.  Prior to Teva raising its prices on August 9, 2013, Green spoke to K.R. at Zydus three times – twice on August 4, 2013 and once on August 5.

### 3.   Heritage

1460.   Heritage, like Apotex and Zydus, was not a highly-ranked competitor when Patel first created the quality of competitor ranking list in May 2013.  Initially, Patel gave Heritage a ranking of "0." However, when Patel updated her quality competitor rankings in May 2014, Heritage received the highest possible ranking of +3.

---

[216] *Id.* at ¶ 933.

1461.   The reason for Heritage's significant improvement in Patel's quality competitor rankings was the relationship that Patel established with the Vice President of Heritage, Malek. After moving to Teva, Patel began communicating with Malek by phone as early as July 9, 2013. From that date until July 25, 2014, the two spoke by phone at least 37 times.

1462.   Heritage's successful efforts to coordinate price increases with Teva on seven drugs – Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline ER – are described above.

### 4.   Lupin

1463.   In Patel's initial May 2013 quality competitor ranking list, Lupin was given a ranking of +2.  When Patel updated her quality competitor rankings a year later, Lupin received the highest possible rating of +3.

1464.   Lupin was awarded the highest score in the quality competitor ranking in 2014 because Berthold of Lupin earned Patel's trust by consistently agreeing to her price increase plans.  From May 2013 through April 2014, for example, Patel and Berthold spoke at least 76 times by phone.  Green, while still at Teva, also had a very strong relationship with Berthold.  As discussed above, at times Patel and Green would even coordinate with each other regarding which one of them should coordinate a price increase or customer allocation agreement with Berthold.

1465.   As discussed more fully above, in 2013 – after Patel joined Teva – Teva and Lupin conspired to fix and raise prices on at least the following four drugs:  Cefdinir oral suspension, Cefdinir capsules, Cefprozil tablets, and Pravastatin.  Then in early 2014, executives at the two companies coordinated Lupin's entrance into the market for Balziva.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1466.   The relationship was so strong between Teva and Lupin that even when Green left Teva, and Patel was out of the office on maternity leave, Berthold still found other executives at Teva to communicate with regarding a price increase for the drug Cephalexin Oral Suspension. As discussed above, in October 2013, Berthold called Rekenthaler and T.S., a national account executive at Teva, to coordinate Lupin's November 1, 2013 price increase for Cephalexin Oral Suspension.  When Patel returned from maternity leave and began planning the next round of Teva price increases, she continued these communications with Berthold until Teva followed Lupin's price increase on April 4, 2014.

1467.   Patel and Berthold also coordinated a price increase and market allocation scheme with regard to the drug Niacin ER, as Lupin was entering the market in March 2014.  Given the successful track record between the two competitor companies, Lupin warranted a +3 in the quality competitor rankings when Patel updated them in May 2014.

### 5.   Par

1468. In Patel's initial May 2013 quality competitor ranking list, Par was given a ranking of +1.  When Patel updated her quality competitor rankings a year later, Par improved to a ranking of +2.

1469.   Par rose in the rankings largely because of several strong relationships between executives at the two companies.  For example, T.S., a national sales executive at Teva, had a strong relationship with R.K., a senior sales executive at Par.  The two began communicating by telephone in September 2013.  Between September 2013 and May 2014, the two spoke at least twenty-seven (27) times by phone.

1470.   Similarly, Rekenthaler at Teva had a very strong relationship with another senior executive at Par, M.B.  Rekenthaler spoke with M.B. frequently throughout 2013 and 2014.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

From the beginning of 2013 through May 2014, Rekenthaler spoke to M.B. at Par at least thirty-two (32) times by phone.

1471.   Patel was well aware of these strong relationships and relied on the information that T.S. and Rekenthaler obtained from their communications with senior Par executives in order to make pricing or bidding decisions for Teva's drugs.  One such example occurred on Friday, February 7, 2014 when Teva received notice from a customer that it had received a competitive challenge from Par on Labetalol HCL tablets.  Patel forwarded the e-mail to T.S. with three question marks:  "???"  T.S. responded immediately:  "left message."  The message that T.S. had left was for R.K. at Par, and the two executives spoke five (5) times that same day. After these calls with R.K., T.S. responded back to Patel saying "[l]et's speak on Monday.  Just received call back with more information."

1472.   The following Monday, Patel also forwarded the original e-mail (discussing the competitive challenge from Par on Labetalol HCL) to Rekenthaler, saying "[n]eed to make a decision quickly."  One (1) minute after receiving that e-mail, Rekenthaler called M.B. at Par and the two spoke for eighteen (18) minutes.  Shortly after hanging up the phone with M.B., Rekenthaler sent another e-mail to Patel, stating:  "[h]old off on this until I get back with you." Rekenthaler spoke to M.B. again later that afternoon for three (3) minutes.

1473.   After these discussions between Teva and Par executives, Teva ultimately offered only a nominal price reduction to that customer – knowing that this would likely concede the business to Par.

1474.   As discussed more fully above, Teva continued to conspire with Par on various market allocation and price fixing schemes throughout the remainder of 2014 and into 2015.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

6.      Amneal

1475.   In Patel's initial May 2013 quality of competitor ranking list, Amneal was given a ranking of +1.  When Patel updated her quality competitor rankings a year later, Amneal improved to a ranking of +2.

1476.   One of the reasons why Amneal rose in the rankings was because of several strong relationships between executives at the two companies.  For example, Rekenthaler of Teva had a strong relationship with S.R.(2), a senior sales executive at Amneal.  From May 2013 to May 2014, they spoke eight (8) times by phone, and attended many trade association meetings and customer conferences together as well.  Rekenthaler and S.R.(2) were regular participants in an annual golf outing hosted by a packaging contractor in Kentucky, where – as discussed above – the generic drug manufacturer participants (competitors) played golf by day and gathered socially by night, referring to each other as "friends" and "fraternity brothers." (Green and Ostaficiuk were also participants.)

1477.   Similarly, Patel also developed strong relationships with two Amneal executives: S.R.(1), a senior sales and finance executive at Amneal, and S.R.(2).  As discussed above, Patel and S.R.(1) coordinated price increases for the drugs Norethindrone Acetate (September 2014) and Bethanechol Chloride (January 2015).

1478.   Patel also spoke to S.R.(2) regarding Norethindrone Acetate in September 2014, and continued to communicate with S.R.(2) into at least 2015 – sometimes using alternative forms of communication.  In addition to their cell phones, the two executives also used Facebook Messenger to coordinate anticompetitive conduct.  In the message exchange below (relating to a drug not identified in this Complaint), S.R.(2) informs Patel that Amneal will concede Econdisc ("E") so long as Amneal is able to retain another large customer, Red Oak Sourcing ("RO"):



[217]

1479.   On the day of this message exchange, Patel and S.R.(2) also spoke by phone for nearly five (5) minutes.

### 7.   Non-Defendant Rising

1480.   In Patel's initial May 2013 quality competitor ranking list, non-Defendant Rising was given a ranking of +1.  When Patel updated her quality competitor rankings a year later, Rising improved to a ranking of +2.

1481.   Rising improved in the quality competitor rankings because of the relationship between Rekenthaler and CW-2.  In 2013, CW-2 left Sandoz to join Rising.  At that time, Rising was already preparing to enter the market for a drug called Hydroxyzine Pamoate.  Teva was one of the competitors already in that market.  During several calls in early October 2013, CW-2 coordinated with Green and Rekenthaler of Teva to acquire a large customer and facilitate Rising's entry into the Hydroxyzine Pamoate market.

---

[217]  *Id.* at ¶ 957.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1482.   Later, in March 2014, CW-2 sought to return the favor.  At that time, Rising experienced supply problems for Diflunisal Tablets – a two-player market involving only Teva and Rising.  In an effort to "play nice in the sandbox," and to further the ongoing understanding between the two competitors, CW-2 contacted Rekenthaler of Teva and informed him of Rising's supply problems and the fact that Rising may have to leave the market at some point in the future.  The purpose for the call was to alert Rekenthaler that Teva would have the opportunity to take a price increase, as Rising would not be in a position to take on any additional market share.

1483.   On April 4, 2014, Teva increased the price on Diflunisal Tablets (by as much as 182%), as well as Hydroxyzine Pamoate (by as much as 165%).  In the weeks leading up to those price increases, Rekenthaler communicated several times with CW-2 at Rising to coordinate the increases.  The two spoke by phone twice on March 17, 2014 and once on March 31.

1484.   When Rising decided to leave the Diflunisal market in mid-July 2014, CW-2 called Rekenthaler to let him know.  Four months later – after Rising remedied its supply problems – Rising re-entered the market for Diflunisal.  Consistent with the fair share understanding discussed above, CW-2 and Rekenthaler communicated in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to ensure the retention of the high prices that Teva had established through its price increase in April 2014.  On December 3, 2014, Rising re-entered the market for Diflunisal Tablets.  Its new pricing matched Teva's WAC price increase from April 2014.

1485.   Rekenthaler's successful efforts to coordinate price increases and customer allocation agreements with CW-2 of Rising led Patel to increase Rising's quality competitor ranking in May 2014.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 8.       Breckenridge

1486.   In Patel's initial May 2013 quality competitor ranking list, she gave Breckenridge a ranking of +1.  When Patel updated her quality competitor rankings a year later, Breckenridge improved to a ranking of +2.

1487.   Breckenridge improved in the quality competitor rankings largely because of the strong relationship established between Patel and Rekenthaler and certain executives at Breckenridge, which led to several successful price increases.

1488.   For example, on November 14, 2013, Breckenridge increased the WAC pricing of both Estradiol/Norethindrone Acetate Tablets ("Mimvey") and Cyproheptadine HCL Tablets.  In the weeks leading up to those Breckenridge price increases, Rekenthaler communicated by phone several times with D.N., a sales executive at Breckenridge.  The two spoke twice on October 14, 2013 and once on October 24, 2013.  The call on October 24 lasted twenty-six (26) minutes.

1489.   On April 4, 2014, Teva followed the Breckenridge price increases on Mimvey Tablets (increasing the WAC pricing by over 100%) and Cyproheptadine HCL tablets (increasing the WAC pricing by over 90%), to match Breckenridge's WAC pricing on both products.  Teva raised prices even higher on its customer contracts.  Teva increased the contract pricing of Mimvey Tablets by as much as 393%, and the contract pricing of Cyproheptadine HCL tablets by as much as 526%, depending on the dosage strength.

1490.   As Patel planned for Teva's April 4, 2014 price increases, both she and Rekenthaler continued to communicate with their counterparts at Breckenridge.  Rekenthaler spoke to D.N. at Breckenridge on January 15, 2014 – the day after Patel sent her first list of "Increase Potentials Q1 2014" to K.G. – for nineteen (19) minutes.  Similarly, Patel spoke with

S.C. – a sales executive at Breckenridge – two times on February 7, 2014, as she was determining whether Teva should provide a bid to a customer.  After her discussions with S.C., Teva declined to bid for the business in order to avoid taking market share away from Breckenridge as a result of the price increases.

1491.   As a result of the successful coordination of these price increases between Teva and Breckenridge, Patel increased Breckenridge's quality competitor ranking in May 2014.

**9.      Glenmark**

1492.   Not every Teva competitor saw its quality competitor ranking increase between 2013 and 2014.  Glenmark, for example, declined slightly in the rankings.  In Patel's initial May 2013 quality competitor ranking list, Glenmark was given a ranking of +3.  When Patel updated her quality competitor rankings a year later, Glenmark was given a ranking of +2.

1493.   The reason that Glenmark declined in the rankings was because Patel lost her most valuable relationship at that company – CW-5.  CW-5 left Glenmark in April 2014.  In the eleven-month period between Patel joining Teva in late April 2013 and CW-5 leaving Glenmark in April 2014, the two competitors communicated by phone or text message 121 times.  They also communicated frequently using an encrypted messaging application, WhatsApp.  As discussed more fully above, starting in early May 2013 Teva and Glenmark conspired to fix and raise prices on a number of drugs, including:  Adapalene, Nabumetone, Fluconazole Tablets, Ranitidine, Moexipril, Moexipril HCTZ, and Pravastatin.

1494.   In addition to CW-5, Patel also had other contacts at Glenmark – which is why Glenmark did not fall dramatically in the quality competitor rankings when CW-5 left the company.  For instance, Patel exchanged 44 phone calls or text messages with J.C., a sales and marketing executive at Glenmark, between May 2013 and July 2015.  Similarly, Patel exchanged

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

36 calls with Brown, the Vice President of Sales at Glenmark, between August 2013 and October 2014.  As discussed more fully above, Patel continued to coordinate with J.C. and Brown throughout 2014 on several drugs, including Desogestrel/Ethinyl Estradiol ("Kariva") and Gabapentin Tablets – demonstrating that Glenmark remained a quality competitor even after CW-5 left the company.

### 10.    Camber Pharmaceuticals

1495.    When Patel first created the quality of competitor rankings in early May 2013, she gave Camber Pharmaceuticals a ranking of -2.  When Patel revised those rankings one year later in May 2014, Camber's ranking did not change.  It remained one of the lowest ranked of all of Teva's competitors.

1496.    Nonetheless, Camber adhered to the fair share understanding, and consistently applied those rules in dealing with its competitors.

1497.    This was evident when, in September 2014, Camber entered the market for two different drugs that overlapped with Teva.

1498.    One of those drugs was Raloxifene Hydrochloride Tablets ("Raloxifene"), also known by the brand name Evista.

1499.    Teva had begun marketing Raloxifene in March of that year.  Actavis had received approval to begin marketing Raloxifene in 2014 as well but had not yet entered by September 2014.

1500.    The other drug was Lamivudine/Zidovudine – a combination medication also known by the brand name Combivir.  Camber had received approval to market a generic form of Combivir in February 2014, but as of September 2014 was still in the process of entering the market.  Already in the market were competitors Teva, Aurobindo and Lupin.  As discussed

more fully above, Teva, Lupin, and Aurobindo agreed to divide up the generic

Lamivudine/Zidovudine market in 2012 when Teva was losing exclusivity on that drug.

1501.   As the anticipated product launches for Raloxifene approached, the new entrants

discussed an allocation strategy with Teva to ensure they each received their fair share of the

market.  On September 9, 2014, Rekenthaler had a twenty-six (26) minute phone call with A.B.,

a senior sales and marketing executive at Actavis.  A short time later, a Teva executive told

colleagues that she had "just heard Camber and Actavis expect to launch 9/24."

1502.   Teva's discussions with Actavis escalated over the coming week.  On September

10, Rekenthaler exchanged two calls with Falkin of Actavis lasting fifteen (15) minutes and one

(1) minute, respectively.  On September 11, the men talked for ten (10) more minutes.  On

September 16, Rekenthaler spoke by phone a total of six (6) times with different Actavis

personnel, including one call with A.B. lasting thirty-four (34) minutes.

1503.   The following morning, in response to an inquiry regarding whether Teva

intended to retain a major customer's Raloxifene HCL business, K.G. of Teva replied in the

affirmative.  Rekenthaler then shared the information he had gathered through his

communications with competitors:  "I know Actavis will be late.  Camber is talking but their

[sic] being somewhat unclear as well.  I'll know more about them after my trip this week."  That

same day, on September 17, 2014, Camber sent an offer for Raloxifene HCL to Econdisc, which

was Teva's customer at that time.

1504.   Rekenthaler and Ostaficiuk, the President of Camber, spent the next three days –

September 17 through September 19 – playing golf during the day and socializing at night at an

industry outing in Kentucky sponsored by a packaging vendor.

1505.   On September 21, 2014, Ostaficiuk called Rekenthaler and the two spoke for two (2) minutes.  The next day, Rekenthaler initiated a series of four (4) phone calls with Ostaficiuk. The two spoke for a total of thirty (30) minutes that day.  Notably, these are the first identified phone calls ever between the two competitors.  As a result, Camber sent a revised offer to its potential customer that same afternoon, containing modified prices for Raloxifene.

1506.   On September 24, Patel discussed a Raloxifene allocation strategy with her Teva colleagues in light of Camber's offer to Econdisc, which was Teva's customer at the time.  She emphasized Camber's expressed commitment to the overarching conspiracy among the competitors – and conveyed information she obtained from Rekenthaler during his conversations with Ostaficiuk – stating:  "Camber indicated that they are targeting Econdisc and a small retailer ... and then they would be 'done.'"

1507.   As a part of this discussion, K.G. considered whether Teva should just concede Econdisc to Camber and seek to recover that market share with another customer.  At 9:07 a.m. that morning, Patel informed her supervisor K.G. and numerous others at Teva, that Rekenthaler

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

planned to discuss the matter with Camber:



218

1508.   Indeed, at 9:28 a.m. that morning, Rekenthaler called Ostaficiuk and the two spoke for two (2) minutes.  They spoke two more times that day, including one call that lasted eight (8) minutes.

1509.   Some of these calls also related to Camber's entry into the market for Lamivudine/Zidovudine.  Teva and Lupin were already in the market for Lamivudine/Zidovudine, and Ostaficiuk was engaging in contemporaneous communications with Rekenthaler of Teva and Berthold of Lupin to negotiate Camber's entry into that market. At least some of those calls on September 24, 2014 are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 5:28:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Rekenthaler, David (Teva) | 8:19:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Berthold, David (Lupin) | 8:21:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Berthold, David (Lupin) | 8:23:00 | 0:10:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 10:35:00 | 0:07:00 |

219

On that same day, Berthold also spoke with P.M., a senior operations executive at Aurobindo, for more than eighteen (18) minutes, to close the loop on the Lamivudine/Zidovudine communications.

1510.   On September 25, after discussing with his colleagues which customers Teva should concede in order to give Camber its fair share of the Raloxifene market and armed with

---

218   Amended State AG Complaint No. 2 ¶ 1097.

219   *Id.* at ¶ 1098.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the information Rekenthaler had gathered from Camber's President, K.G. concluded:  "Okay, we will concede additional smaller customer challenges (particularly distributors) since they are not going to target One Stop."  Rekenthaler and Ostaficiuk spoke again twice that day.

1511.   That evening, a Camber executive instructed a colleague to gather market intelligence on possible additional customers for Camber's new Raloxifene product but stressed that the company would not bid on any additional Teva accounts "until we know how we do with Econ[disc]."

1512.   On Friday September 26, 2014, Camber publicly announced that it was launching Raloxifene, the generic version of Evista.  Rekenthaler called Ostaficiuk that day, for a short one (1) minute call.

1513.   From those telephone calls, Rekenthaler expressed to Ostaficiuk that Teva did not want Camber challenging for any more of its customers, on Raloxifene or Lamivudine/Zidovudine.  As a result of this communication, on Monday, September 29, 2014 Ostaficiuk sent the following e-mail to his colleagues at Camber:

| Message | |
|---|---|
| From: | Kon Ostaficiuk [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Kon Ostaficiuk] |
| on behalf of | Kon Ostaficiuk |
| Sent: | 9/29/2014 5:27:43 PM |
| To: | ███████████ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=███████ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=██████ |
| CC: | ███████ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=████ |
| Subject: | RE: McKesson -- dead net prices for OS w/ Riteaid |

Hi Gang,
We do not offer anything to any Teva customers...

Not even a "bad price"!

Please acknowledge...We do not want to upset them more!

Thank you,
Kon

[220]

---

[220]   *Id.* at ¶ 1102.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1514.   A.R., a senior sales executive at Camber, replied:  "We have not made any offers to any Teva Raloxifene accounts since we received the Econ award.  Both Sales and Contracts are aware, & requesting incumbent detail for all offers, if Teva, no offer."  A.R. also added that "We are also not seeking any Lupin business on Lamo/Zidovudine." Ostaficiuk replied:  "Thank you.  We don't want to antagonize either of them and start a war..."

1515.   About a week later, on October 7, 2014, a large Teva customer informed a Teva sales representative that Camber had made an unsolicited bid for its Raloxifene business.  J.P., a Director of National Accounts at Teva, sent an e-mail to certain employees at Teva, including Rekenthaler, notifying them of her conversation with the customer, and expressing surprise given the agreement Teva had previously reached with Camber:  "I thought they were done after securing Econdisc?"  Based on his prior conversations with Ostaficiuk, Rekenthaler doubted that Camber made an offer to another Teva customer, stating:  "You're positive they sent them an offer?"

1516.   J.P. of Teva "relayed 'the message" to the customer that "the market should be stable at this point" and Teva would be surprised if Camber had intended to make an offer to the customer.  After further discussion with the customer, Teva staff learned that it was a misunderstanding.  Camber never actually made the offer but had instead complied with its agreement with Teva.

1517.   The fair share agreement continued to govern as usual until mid-December 2014, when Camber learned of supply problems at Teva on Raloxifene.  A Camber employee described the prospect of Teva being on backorder for this drug as a "Game changer." Expressing her understanding of the rules of the conspiracy, she pointed out:  "**Fair share only applies when**

<u>**there is not supply constraints.**</u>"  Ostaficiuk responded optimistically, but cautiously:  "Good

luck guys but go fishing and gather information before we commit . . . ."

## XI.     THE CONSPIRACY:  DERMATOLOGICAL DRUG-RELATED CONDUCT

1518.   Whereas the allegations in Section VIII  focused on Heritage's conduct with

respect to market entry and the allegations in Sections IX and X focused on Teva's conduct in

similar circumstances, the allegations in Section XI focus on dermatological drug-related

conduct.

### A.     Generic Topical Products – An Overview

1519.   Going back many years – from at least 2009 through early 2016 – collusion has

been rampant among manufacturers of generic topical products.  Topical products include any

drug that is administered by means of contact, most often with an external body surface,

including creams, lotions, gels, ointments, and solutions.  Manufacturers of generic topical

products typically face higher barriers to entry because technical hurdles associated with

demonstrating bioequivalence to branded products are more time consuming and expensive, and

manufacturing costs are high compared to other types of generic drugs.

1520.   Topical products are a niche market segment within the generic pharmaceutical

industry.  Historically, there have been fewer generic manufacturers that have focused on selling

topical products than "conventional" generic drugs such as oral solids (e.g., pills).  This is

because manufacturers of generic topical products typically face higher barriers to entry,

including technical hurdles relating to proving bioequivalence – which must be shown through

multiple clinical trials.  Further, once a manufacturer obtains FDA approval, topical products

often require higher levels of investment in manufacturing to produce the various dosage forms

involved.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1521.   The greater barriers to entry generally associated with topical products limit the number of competitors in any particular topical product market, creating an environment that is ripe for collusion.  Many topical products have only two or three competitors.  As a result, the sales and pricing executives at these companies know each other well and have used those business and personal relationships as a means to collude to limit competition, allocate customers, and significantly raise prices on dozens of generic topical products.

1522.   Indeed, the larger and more prominent topical manufacturers – including Defendants Taro, Perrigo, Fougera (now Sandoz), and Actavis – had long-standing agreements over the course of several years not to compete for each other's customers and to follow each other's price increases.  In order to maintain these unlawful agreements, the competitors stayed in nearly constant communication – meeting regularly at trade shows and customer conferences, and communicating frequently by phone and text message to reinforce their understandings. This Section is replete with examples demonstrating how these understandings manifested themselves with respect to specific products over a period of many years.

1523.   Nowhere was this understanding more pronounced than with regard to the sale of generic topical products, where the competition is limited and the product overlap extensive. Indeed, companies recognized that reality and celebrated the fact that they operated in this segment of the industry.  For example, Erika Vogel-Baylor, a senior sales and marketing executive at Defendant G&W, remarked in an internal e-mail from May 2013 ███████████

████████████████████████████████████████████████████████████████████

█████████████████

1524.   Although manufacturers of generic topical products have been colluding on price increases since at least 2009, the size and frequency of those increases grew exponentially in

2013 and 2014.  During that time period, the prices of hundreds of generic drugs – including many at issue in this Complaint – skyrocketed without explanation, sparking outrage from politicians, payers, and consumers across the country whose costs have doubled, tripled, or even increased by 1,000% or more.  Generic drug manufacturers argued publicly that the significant price increases were due to a myriad of lawful factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines.

1525.   However, these reasons were far from the truth.  In reality, there were several structural and personnel changes among generic topical manufacturers in late 2012 and early 2013 that fostered and facilitated collusion in that segment of the industry.  These changes increased opportunities for coordination between competitors – and coordinate they did.

1526.   First, in July 2012, Defendant Sandoz finalized its purchase of Fougera, a niche dermatology manufacturer, making Sandoz a much more prominent manufacturer of generic topical products.  Sandoz publicly touted that the purchase positioned it "as the new #1 in generic dermatology medicines both globally and in the U.S."

1527.   As a result of the acquisition, all of Fougera's sales executives lost their jobs, except for one executive, referred to herein as CW-3.  Because of Sandoz's size, and the fact that it was an active participant in many different product markets, many competitors reached out to CW-3 when they learned he had transitioned to Sandoz because they viewed it as a strategic opportunity to collude on overlapping products.  For example, Mitchell Blashinsky, then a senior executive at Defendant Glenmark approached CW-3 at an industry event in August 2012 and told him – ███████████████████ and ████████████████████

1528.   Over the ensuing years, CW-3 would leverage his competitor relationships – including his contacts at many of the corporate Defendants – to prove his worth to Sandoz

management by using those relationships to allocate customers and increase prices on dozens of products. His competitor contacts included Blashinsky, Aprahamian, and Walter Kaczmarek, but there were many others. Indeed, CW-3 took contemporaneous notes to keep track of all the different prices and products he was discussing at any given time. CW-3 maintained this direct evidence of anticompetitive conduct in a notebook (of which there are two volumes) that his colleague, referred to hereafter as CW-1, coined the █████████████ Various excerpts from the notebooks are referred to throughout this Section to support the allegations herein.

1529.   Second, in the months following the Fougera acquisition, three key Actavis executives –Douglas Boothe, Michael Perfetto, and Aprahamian – left Actavis to assume senior-level positions at competitor companies that were also prominent manufacturers of topical products. Boothe became an executive at Defendant Perrigo and Perfetto and Aprahamian became executives at Defendant Taro. These former colleagues – turned competitors – would use their longstanding relationships and new high-level positions as an opportunity to collude with their key competitors on overlap products.

1530.   Perfetto and Aprahamian, in particular, wasted no time working together to implement changes designed to improve Taro's financial bottom line and firmly position the company as a price increase leader. Although Taro had been successful in implementing price increases in the past, the increases taken by Taro in 2013 and 2014 would be much more significant. These increases caught the attention of other generic drug manufacturers across the industry. Indeed, one sales executive at a generic manufacturer remarked in an internal e-mail that ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████   To that, his colleague responded ███████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

█████████████████████████████████████████████████████████

████████████████████████

1531.   For example, in June 2014, Taro initiated significant price increases on more than

a dozen different drug products.  As a result of the June 2014 increases, Credit Suisse analysts

increased their price target for Taro and its parent company, Defendant Sun Pharmaceuticals,

from $85 to $150 per share.  As justification for the increase, Credit Suisse emphasized that

Taro's competitors had consistently followed the increases and prices remained high: ████████

████████



1532.   Defendant Taro's success in implementing price increases depended, in large part,

on the strength of the ongoing collusive relationships that Perfetto and Aprahamian had fostered

with their contacts at competitor companies – both with manufacturers of topical products and

beyond.  These included Boothe, Blashinsky, Kurt Orlofski, and Vogel-Baylor, but there were

others.  Numerous examples of how this collusion unfolded with respect to specific products will be discussed in detail below.

1533.   The price increases taken by generic topical manufacturers during this time period resulted in the accrual of significant profits.  Indeed, between 2008 and 2016, Defendants Taro and Perrigo both saw their profits from the sale of generic topical products increase by over 1300%.  The other corporate Defendants profited handsomely from this conduct as well.

**B.    Generic Topical Products – The Illegal Schemes**

1534.   Since at least 2007, the top three manufacturers, by sales, of generic topical products have consistently been Defendants Taro, Perrigo, and Fougera (now Sandoz).  Indeed, between 2007 and 2014, these three companies controlled approximately two-thirds of the topical market segment.  Several other manufacturers make up the remaining third, including Actavis, Mylan, Teva, G&W, Glenmark and others, as discussed throughout this Section.  The following graphic shows the market share breakdown on generic topical products for June 2007 through June 2012:

| Value market share | Jun-07 | Jun-08 | Jun-09 | Jun-10 | Jun-11 | Jun-12 |
|---|---|---|---|---|---|---|
| Taro | 19% | 18% | 20% | 17% | 17% | 25% |
| Perrigo | 22% | 22% | 21% | 19% | 24% | 21% |
| Fougera | 26% | 24% | 22% | 23% | 23% | 16% |
| Actavis | 3% | 4% | 4% | 4% | 6% | 9% |
| Mylan | 0% | 0% | 0% | 7% | 5% | 4% |
| Teva | 7% | 6% | 6% | 5% | 5% | 3% |
| Novartis | 2% | 2% | 2% | 2% | 2% | 3% |
| Glenmark | 0% | 0% | 0% | 0% | 0% | 2% |
| G & W | 0% | 0% | 0% | 0% | 0% | 2% |
| Prasco | 0% | 0% | 1% | 1% | 2% | 1% |
| Spear Derm | 1% | 1% | 3% | 3% | 2% | 1% |
| Hi-Tech | 1% | 1% | 1% | 1% | 1% | 1% |
| Pfizer | 1% | 1% | 1% | 1% | 1% | 1% |
| Wockhardt | 4% | 3% | 2% | 2% | 1% | 1% |
| Others | 14% | 18% | 17% | 13% | 9% | 8% |
| Derma generic mkt ($mn) | 779 | 837 | 955 | 1,230 | 1,740 | 2,510 |

*Source: IMS Health, Credit Suisse*

1535.   Similarly, the following chart from an internal Sandoz presentation details a consistent picture for 2014: ████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



1536.   The limited number of manufacturers of generic topical products has created an environment that is ripe for collusion.  Many topical products have only two or three competitors – which increases the likelihood that any market allocation or price fixing agreement will succeed.  In addition, sales and pricing executives at many of the prominent generic topical manufacturers are very familiar with their counterparts at competitor companies because of the extensive product overlap between them.  This personal familiarity among sales executives has led to greater opportunities to collude – which those executives have taken advantage of by consistently communicating and agreeing with each other to limit competition, allocate customers, and significantly raise prices on dozens of generic topical products.

### 1.       The Early Days – Collusion From 2009 to Early 2012

#### a.       *Key Relationships Among Generic Topical Manufacturers*

1537.   The key manufacturers of generic topical products during this early time period – Fougera (and later Sandoz), Perrigo, Taro, and Actavis – had ongoing understandings going back

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

many years not to poach each other's customers and to follow each other's price increases.  These competitors met with each other regularly at trade shows and customer conferences – in addition to speaking frequently by phone – and specifically discussed and agreed on allocating customers and coordinating price increases on the products they had in common.  The following Section focuses on these relationships and provides illustrative examples of how these ongoing understandings manifested themselves with respect to specific products.

(i)      *Fougera/Perrigo/Taro*

1538.   CW-6 was a senior sales executive at Fougera between October 2004 and August 2012 and a central player in the collusion taking place among generic topical manufacturers at that time.  Prior to working at Fougera, CW-6 was a lead buyer in the generics group at Cardinal Health where he developed extensive contacts in the industry.

1539.   Upon moving to Fougera, CW-6 was instructed by his supervisor, Walter Kaczmarek, a senior Fougera executive, to reach out to his contacts at competitor companies to discuss market allocation, price increases, and other commercially sensitive topics.  If CW-6 did not have a contact at a competitor, Kaczmarek directed him to pass messages to that competitor through his contacts that did.  This practice – facilitating anticompetitive conduct through a third competitor – was pervasive throughout the industry.

1540.   During his tenure at Fougera, CW-6 frequently attended trade shows and customer conferences.  At these events, he would regularly discuss competitively sensitive topics with his competitors.  CW-6 was also a prolific communicator by phone and exchanged thousands of calls and text messages with his competitors.  After speaking with a competitor, CW-6 would often report the competitive intelligence back to his supervisor, Kaczmarek, and

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Fougera would use that information to make competitive decisions, including which customers to give up to a competitor or what pricing actions to take and when.

1541.   CW-6 had a particularly collusive relationship with T.P., a sales executive at Perrigo, dating back to at least 2010.  CW-6 and T.P. were not social friends.  If the two were communicating, it was to coordinate behavior on products where Fougera and Perrigo overlapped.  CW-6 and T.P. regularly met at trade shows and customer conferences and discussed competitively sensitive topics.  The goal of these conversations was always to keep prices as high as possible.  CW-6 and T.P. also spoke often by phone.  For example, between February 2010 and August 7, 2012, CW-6 and T.P. exchanged at least three hundred and two (302) phone calls.

1542.   CW-6 also had a collusive relationship with H.M., a sales executive at Taro, dating back to at least 2011.  CW-6 spoke with H.M. in person at trade shows and customer conferences, as well as by phone.  During these conversations, the competitors coordinated customer allocation and price increases on products where Fougera and Taro overlapped. Between January 2011 and August 2012, CW-6 and H.M. exchanged at least eighty-six (86) phone calls.

1543.   There were several products where all three companies – Fougera, Perrigo, and Taro – sold a particular drug.  In these instances, CW-6 would facilitate the communications, passing messages from one competitor to the other to ensure the anticompetitive agreement was understood by all three competitors.  This was necessary because T.P. and H.M. did not have an independent relationship and depended on CW-6 to serve as a conduit to effectuate their collusion on overlapping products.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1544.   During this early time period, T.P. and H.M. were acting at all times at the direction of, or with approval from, their superiors, including Wesolowski of Perrigo and Blashinsky of Taro.

<em>(ii)      Actavis And Taro/Perrigo</em>

1545.   Michael Perfetto, then a senior sales and marketing executive at Actavis, had a collusive relationship with Mitchell Blashinsky, then a senior marketing executive at Taro.  Between January 2011 and May 2012, when Blashinsky moved to Defendant Glenmark, the competitors exchanged at least one hundred and twenty (120) phone calls.

1546.   Similarly, M.D., a sales executive at Actavis, had a collusive relationship with T.P. of Perrigo going back many years.  The two discussed market allocation and coordinated price increases on products where Actavis and Perrigo overlapped.  Between August 2011 and December 2013, the two competitors exchanged at least eighty-three (83) phone calls.

1547.   During this early time period, M.D. was acting at all times at the direction of, or with approval from, his superiors at Actavis, including Perfetto.

<em>(iii)     Sandoz/Taro</em>

1548.   CW-4 worked as a senior sales executive at Sandoz for many years, including during this early time period (between 2009 and early 2012).  At Sandoz, CW-4 was evaluated based on her ability to acquire competitive intelligence.  Competitive intelligence included information concerning product launches, customer alignment, price increases, and supply disruptions.

1549.   CW-4 obtained competitive intelligence from customers as well as competitors with whom she had relationships.  CW-4 viewed providing this information as a way to

439

demonstrate value to the company.  CW-4 reported competitive intelligence to superiors, including Kellum and CW-1, both senior pricing executives at Sandoz.  When CW-4 felt pressure from superiors to deliver useful information, she tended to engage in more anticompetitive conduct.

1550.   CW-4 had a longstanding relationship with D.S., a sales executive at Taro.  CW-4 first met D.S. when he was a buyer at a large grocery chain.  The two developed a friendly relationship, in addition to a professional one.

1551.   In 2009, shortly after D.S. joined Taro, he and CW-4 met in person at an industry event and had a high-level discussion about Taro's and Sandoz's philosophies with respect to market share and pricing.  The two competitors agreed that both of their employers believed in price increases and maintaining higher pricing.  D.S. explained that companies that compete on price to get more market share were bad for the market because they brought prices down.  CW-4 agreed and the two discussed the importance of maintaining a fair share balance, not being greedy about market share, and following price increases on overlapping products.

1552.   After this conversation, CW-4 and D.S. were confident that they had a consistent understanding, and that neither Sandoz nor Taro would compete aggressively against the other.  This conversation paved the way for them to work cooperatively in orchestrating Sandoz's and Taro's movements on several drugs in the coming years.

1553.   In addition to communicating frequently in-person, CW-4 and D.S. also spoke often by phone.  Between January 2011 (which is as far back as the State AGs have phone records) and October 2013 (when D.S. left Taro), the two exchanged at least seventy-three (73) phone calls.

1554.   During this early time period, CW-4 and D.S. were acting at all times at the direction of, or with approval from, their superiors including Kellum of Sandoz and Blashinsky of Taro.

1555.   The following Sections will discuss specific examples of how the long-standing competitor relationships detailed above manifested themselves regarding particular products between 2009 and early 2012.

### 2.        Carbamazepine ER Tablets

1556.   Shortly after their high-level conversation in 2009 about Taro's and Sandoz's respective views on competition and market-share, D.S. of Taro and CW-4 had the opportunity to put their understanding into practice as Taro and Sandoz both prepared to enter the market for Carbamazepine ER.

1557.   Taro received FDA approval in late March 2009 to enter the Carbamazepine ER market as the first-to-file generic.  A few months later, in June 2009, Sandoz received approval to launch as the authorized generic (the "AG").  As the AG, Sandoz would not be required to wait until the end of Taro's 180-day exclusivity period to enter the market.

1558.   Not only was Carbamazepine ER a high-volume, lucrative branded product for Sandoz's parent company, Novartis, but Novartis had also given Sandoz late notice that it would be entering as the AG.  As a result, Sandoz's sales and marketing executives felt a great deal of pressure to secure market share within a short time frame.

1559.   As the Taro launch grew close, R.T., a senior marketing executive at Sandoz, pressured CW-4 to obtain information from Taro about its impending launch.  Confident that their recent conversation meant that D.S. would readily provide such information, CW-4 reached out to him.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1560.   During one in a series of phone calls between the two, D.S. informed CW-4 that Taro had sent offers to Wal-Mart, Walgreens, and SUPERVALU.  Consistent with "fair share" principles and the fact that Taro would be the first to enter the market, D.S. told CW-4 that Taro's goal was to secure 50%-60% market share and that it would be pursuing other smaller customers as well.  CW-4 understood from that conversation that Sandoz should not compete for the customers that D.S. had identified, and that by identifying those specific customers Sandoz would, in turn, know which customers it should target.  As requested, CW-4 reported this information directly to R.T. at Sandoz.

1561.   Based on those conversations, Taro and Sandoz were able to enter the market with little competition, initially leaving generic pricing nearly as high as pricing for the branded drug.

1562.   After the initial launch, CW-4 and D.S. continued to discuss and share competitively sensitive information about Carbamazepine ER.  For example, when Taro was delayed in launching the 100mg formulation, Novartis put pressure on R.T. and others at Sandoz to get information about Taro's launch. R.T., in turn, asked CW-4 to obtain the information.

1563.   After exchanging several text messages in January 2010, D.S. informed CW-4 that Taro would not be launching the 100mg formulation because Taro was having trouble filling orders on the other strengths and needed the raw material for those other strengths (which were more profitable for Taro).

1564.   Through even 2011, Sandoz refused to challenge for Taro's customers with respect to Carbamazepine ER.  For example, on January 5, 2011, CVS provided Sandoz with a list of product opportunities for Sandoz to bid on, including Carbamazepine ER.  CW-2, then a senior sales executive at Sandoz, was hesitant, and asked his colleagues if there was any appetite to compete for the business.  The purpose for pursuing CVS, he opined, would be ████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

█████████████████████████████████████████████████████████ He added:

███████████████████████████

1565.   M.M., a Sandoz marketing executive, responded that pursuing CVS was tempting given that Taro's market share was higher than Sandoz's, but supply issues created short-term obstacles.  Further, the executive concluded that challenging for the business at CVS would ████████ the market and erode pricing.  As a result, Sandoz declined to bid on the Carbamazepine XR business at CVS.

**3.      Imiquimod Cream**

1566.   Imiquimod Cream was a high-priced, large volume drug that provided a significant source of revenue for its manufacturers.  In 2012, the annual market for Imiquimod Cream in the United States exceeded $200 million.

1567.   On February 25, 2010, Fougera received FDA approval to market Imiquimod Cream.  At that time, Fougera was the only generic manufacturer in the market and it used that as an opportunity to set a high price for the product.

*a.      Perrigo Entry (April 2010)*

1568.   Less than two months later, on April 13, 2010, Perrigo announced that it would be the AG for Imiquimod Cream.  That same day, D.K., a senior Fougera executive, sent the following e-mail to Kaczmarek, also a senior Fougera executive: ████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



1569.   Later that same day, Kaczmarek called CW-6, a senior sales executive at Fougera, and they spoke for nearly four (4) minutes.  CW-6 hung up and immediately called T.P., a sales executive at Perrigo, and they spoke for nearly nine (9) minutes.  When CW-6 hung up with T.P., he promptly called Kaczmarek back.  That call lasted less than one (1) minute.

1570.   It is rare that the entry of a generic competitor would cause prices to actually increase – but it did so in this case.  Three days later, on Friday April 16, 2010, in advance of Perrigo's entry into the market, Fougera increased its WAC pricing for Imiquimod Cream.  That same day, CW-6 called T.P.  The call lasted more than two (2) minutes.  Immediately after hanging up, CW-6 called his supervisor, Kaczmarek, and they ultimately spoke for more than six (6) minutes.  Immediately after hanging up with Kaczmarek, CW-6 called T.P. back.  The call lasted one (1) minute.

1571.   The next business day, Monday April 19, 2010, Perrigo sent an internal e-mail stating that █████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

███████  As a result of the increase, Perrigo's WAC pricing would end up even slightly higher than Fougera's.

1572.   That same day, John Wesolowski, a senior executive at Perrigo, called T.P. and they spoke for nearly six (6) minutes.  This set off another rush of communications between T.P. of Perrigo and CW-6 of Fougera, with each of them concurrently reporting the results of those communications to their superiors, Wesolowski and Kaczmarek.  These calls, which all occurred within the span of less than an hour, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:04:44 | 0:05:51 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:16:56 | 0:00:26 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:34:36 | 0:03:48 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:39:16 | 0:07:13 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:48:29 | 0:03:42 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:52:43 | 0:03:16 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:54:33 | 0:08:49 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:56:29 | 0:06:39 |

1573.   The following week, between April 24 and April 27, 2010, the NACDS held its annual meeting in Palm Beach, Florida.  Several executives from Fougera and Perrigo were in attendance, including Kaczmarek, D.K., and CW-6 from Fougera and Wesolowski and S.K., senior executives from Perrigo.

1574.   Fougera and Perrigo executives were speaking about Perrigo's launch throughout the conference.  On April 26, 2010, T.P. and CW-6 spoke by phone for seven (7) minutes.  Immediately after that call, CW-6 hung up and called Kaczmarek, speaking for four (4) minutes.

1575.   Similarly, on April 27, 2010, D.K. e-mailed Kaczmarek while they were still at the NACDS meeting, stating that he needed ████████████████████████████

████████████████████████████████████████████████████

████

1576.   On April 28, 2010, Perrigo officially entered the Imiquimod Cream market and published WAC pricing that was slightly higher than Fougera's.  That same day, D.K. e-mailed Fougera executives with an update regarding his conversations at the NACDS meeting.  With respect to Imiquimod Cream, D.K. stated ███████████████████████████████ ██████████████████████  D.K explained that Fougera gave up McKesson and ABC to Perrigo because ███████████████████████████████████████  D.K. also noted that he was pleased that Perrigo has ███████████████████████████ ███████████████  CW-3, a sales executive at Fougera, expressed confusion that Fougera had lost ABC's business.  Kaczmarek explained that ████████████████  CW-3 replied: █████████████████

1577.   On April 30, 2010, a senior Fougera executive, L.B., demanded an urgent explanation from D.K. as to why Fougera was willing to give up both McKesson and ABC. D.K. reminded L.B. that it was inevitable that Perrigo would take some of the market.  D.K. also explained: █████████████████████████████████ ████████████████████████████████████████████ ████████████████████  D.K. stated that Perrigo's share would likely settle in the range of 30-40% ████████████████████████████ ████████████████████████

1578.   Consistent with fair share principles and the prior discussions between the competitors, by April 30, 2010 Fougera had given up more than ten (10) of its Imiquimod customers to Perrigo.

1579.   On May 16, 2010, Fougera was preparing an internal presentation regarding Imiquimod Cream, which included a statement that ████████████████████

██████   While reviewing the presentation, L.B. challenged D.K. about the statement, asking

██████████████████████████████████████████████████████████████████

██████   D.K. assured L.B. that ████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████

1580.   The next day, on May 17, 2010, CW-6 and T.P. exchanged at least six calls,
including one lasting more than six (6) minutes, likely to confirm (again) the agreement in place
between the two competitors.

1581.   Several months later, on September 8, 2010, CW-6 circulated a press release to
the Fougera sales team announcing that Perrigo had received its own ANDA approval to market
generic Imiquimod Cream.  Previously, Perrigo had been selling the AG through a license with a
branded manufacturer.  That same day, CW-6 called T.P.  That call lasted less than a minute.
T.P. called CW-6 back almost immediately, and they spoke for more than two (2) minutes.

1582.   On September 27, 2010, CW-6 gave a presentation to Fougera's parent company
titled ██████████████████████ during which he noted that Fougera had given up
Imiquimod share to Perrigo and that, with regard to the larger fair share understanding, Fougera
is ████████████████████████████ Later that year, in November
2010, CW-6 also noted in his monthly recap that ████████████████████ in the
Imiquimod market.

1583.   Fougera also continued to monitor the status of other competitors' plans to enter
the Imiquimod market.  For example, on February 7, 2011, a Glenmark employee called CW-6,

and they spoke for four (4) minutes.  Later that day, CW-6 sent the following e-mail to

Kaczmarek and D.K. regarding Imiquimod Cream: ██████████████



Pleased that Fougera would not be facing any imminent competition from Glenmark, D.K.

replied: ████████████



> b.      *Sandoz Entry (February 2011)*

1584.   Although Fougera was fortunate that Glenmark had no near-term plans to enter

the Imiquimod Cream market, another competitor – Sandoz – did receive FDA approval on

February 28, 2011 to launch the product.  That same day, CW-6 of Fougera and T.P. of Perrigo

exchanged at least five (5) calls, including two calls lasting two (2) minutes each.

1585.   On March 1, 2011, one of Fougera's customers, NC Mutual, also e-mailed CW-3,

a sales executive at Fougera, to tell him that Sandoz was launching Imiquimod.  The NC Mutual

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

employee further noted: ███████████████████████████████ CW-3 promptly

forwarded the e-mail to Kaczmarek.  That same day, CW-6 called T.P. and they spoke for more

than three (3) minutes.

1586.   When Sandoz entered the market, it did so seamlessly – initially taking

comparable share from the existing competitors Fougera and Perrigo.

1587.   For example, in late February and early March, Sandoz made offers to ABC, a

Perrigo customer, and Rite Aid, a Fougera customer.  In total, the customers accounted for

approximately 13% of the Imiquimod Cream market (ABC at 8% and Rite Aid at 5%).

1588.   On March 3, 2011, Fougera declined to bid to retain the Rite Aid business and

gave up its primary position to Sandoz.  The next day, on March 4, 2011, Kellum of Sandoz

followed up with S.G., a sales executive at Sandoz, stating, ███████████████████████

███████████████████████████████████████████████████████ Later that

day, Perrigo followed suit and declined to bid to retain the ABC business.  That same day, CW-6

called T.P. and they spoke for four (4) minutes.  A few minutes later, Kaczmarek called CW-6

and they spoke for nearly five (5) minutes.

1589.   Around this same time, Taro was also starting to make plans to enter the market.

Between March 6 and March 10, 2011, representatives from Fougera, Perrigo, Sandoz, and Taro

were all in attendance together at the ECRM Retail Pharmacy Generic Pharmaceutical

Conference in Champions Gate, Florida.  These representatives included CW-6 from Fougera,

T.P. from Perrigo, CW-4 and Kellum from Sandoz, and H.M. and D.S., sales executives from

Taro.

1590.   On March 7, 2011, while at the ECRM conference, CW-4 of Sandoz and D.S. of

Taro spoke on the phone for four (4) minutes.  Later that day, Kellum – CW-4's boss – sent an

internal e-mail from ECRM stating that he had ███████ Taro may be entering the Imiquimod

Cream market.

1591.   Also, while at the ECRM conference, CW-6 of Fougera and T.P. of Perrigo spoke

once by phone on March 9, 2011.  The call lasted one (1) minute.

1592.   By March 9, 2011, Sandoz had acquired approximately 13% of the Imiquimod

Cream market and Kellum recommended that they ████████████████████████████████

████████████████████████ referred to a consortium composed of HEB, Ahold,

Schnucks, and Giant Eagle.  These were all Perrigo customers, and Sandoz intended to obtain

their Imiquimod business ████████████████████████████████████

████████████████████████████████ Those customers were the only

additional customers whose business Sandoz was seeking.  To that end, Kellum conveyed to

S.G., a sales executive at Sandoz, that ████████████████████████████████

████████████████████████████████████████████

Ultimately, on March 17, 2011, Perrigo conceded the consortium business to Sandoz.

1593.   On March 10, 2011, Kellum provided additional color for his recommendation

that Sandoz only go after smaller Fougera customers moving forward: ██████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*c.*      *Taro Entry (July 2011)*

1594.   A month or so later, on April 15, 2011, Taro received FDA approval to market Imiquimod Cream.  Taro immediately began coordinating its entry with competitors.  On April 17, 2011, D.S. of Taro and CW-4 of Sandoz exchanged two calls, with one call lasting twelve (12) minutes.  Within an hour of ending the second call, CW-4 called her supervisor, Kellum, and they spoke for five (5) minutes.  The next day, on April 19, 2011, D.S. called CW-4 again. The call lasted one (1) minute.

1595.   On these calls, D.S. and CW-4 discussed which customers Taro and Sandoz would and would not target.

1596.   The next day, on April 20, 2011, CW-4 shared this competitive intelligence with R.T., a senior sales and marketing executive at Sandoz:



1597.   Perrigo and Fougera were also simultaneously coordinating how they would react to Taro's entry.  For example, on April 18, 2011, Kaczmarek informed the Fougera sales executives that Taro had received FDA approval to market Imiquimod Cream and asked, ███████████████████████ This set off a flurry of communications that same day between CW-6 of Fougera and T.P. of Perrigo, who were both concurrently reporting to, and taking

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

direction from, their supervisors, Kaczmarek and Wesolowski.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:17:23 | 0:00:27 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:43:08 | 0:04:09 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:56:57 | 0:02:44 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 17:00:05 | 0:00:08 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 17:08:22 | 0:03:25 |
| 4/18/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 21:41:15 | 0:06:03 |

1598.   Three days later, on April 21, 2011, CW-6 decided to reach out to Taro directly and called H.M., a sales executive at Taro.  The two men spoke for eight (8) minutes.  Upon hanging up, CW-6 called Kaczmarek.  The call lasted one (1) minute.  First thing the next morning, CW-6 sent a text message to T.P. of Perrigo.

1599.   By early July 2011, Taro was finally starting to enter the Imiquimod Cream market.  On July 5, 2011, T.P. of Perrigo reached out to CW-6 of Fougera.  The call lasted only two (2) minutes, but it set off another rush of communications among the three competitors – Perrigo, Fougera, and Taro – to make sure they were on the same page regarding Taro's entry.  These calls, which all occurred within the span of approximately fifteen (15) minutes, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 9:12:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:13:00 | 0:01:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 9:18:00 | 0:06:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:23:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:25:00 | 0:02:00 |

1600.   At the same time, D.S. of Taro was coordinating with CW-4 of Sandoz.  On July 7, 2011, D.S. of Taro called CW-4 of Sandoz.  The call lasted two (2) minutes.  CW-4 returned

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the call and they spoke for sixteen (16) minutes. A few hours later, CW-4 called D.S. and they spoke for another four (4) minutes.

1601.   On July 14, 2011, CW-6 of Fougera called H.M. at Taro again and they spoke for nine (9) minutes. As soon as CW-6 hung up he called his boss, Kaczmarek, and the two spoke for five (5) minutes. Later that day, Kaczmarek e-mailed the Fougera sales team stating, ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1602.   On July 26, 2011, a customer, MedCo, informed Perrigo that it had received a competitive offer for Imiquimod Cream and asked if Perrigo could match the price. MedCo declined to disclose who made the offer. This sparked another flurry of phone communications starting first thing the next morning between Perrigo, Taro and Fougera, as detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 5:52:47 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:19:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:39:00 | 0:01:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:40:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:55:00 | 0:01:00 |
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 7:00:17 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:27:00 | 0:08:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 7:40:00 | 0:04:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:06:05 | 0:04:17 |

1603.   The next day, on July 28, 2011, Perrigo declined to bid to retain the MedCo business. That same day, CW-6 of Fougera called T.P. of Perrigo. The call lasted one (1) minute. T.P. returned the call and they spoke for six (6) minutes.

1604.   On August 8, 2011, D.S. of Taro called CW-4 of Sandoz again. They ultimately spoke for seventeen (17) minutes. On that call, D.S. informed CW-4 that Taro had officially been awarded the Econdisc business and the secondary position at Cardinal and that Taro could not support any more customers. CW-4 understood this to mean that the market would remain

strong with no price erosion and Sandoz would not have to relinquish any additional customers to Taro. Later that evening, on August 8, 2011, CW-4 passed this competitive intelligence along internally at Sandoz: ▮▮▮▮▮▮▮▮▮▮▮



1605.    On August 19, 2011, Hannaford – a retail pharmacy customer – advised CW-6 that it had received a competitive offer for Imiquimod Cream, but similarly would not identify which competitor made the offer. Thereafter, CW-6 spoke several times with T.P. of Perrigo and H.M. of Taro, in an effort to discover which competitor made the offer. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:07:00 | 0:01:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:07:00 | 0:02:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:09:00 | 0:01:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 6:10:00 | 0:06:00 |

1606.    During those calls, CW-6 was able to confirm that Taro had in fact made the offer. Later that day, CW-6 sent the following e-mail to Kaczmarek: ▮▮▮▮▮▮▮▮▮



1607.   An hour-and-a-half later, CW-6 followed up with Kaczmarek asking: ▮▮▮▮

▮▮▮▮



Kaczmarek ultimately agreed, and Fougera gave up the customer to Taro.

1608.   The goal of these communications between the various competitors on Imiquimod Cream – Fougera, Perrigo, Sandoz, and Taro – was always to avoid competition and minimize the price erosion that would typically come with the entry of new competitors.  The results were highly successful.

1609.   The next day, on August 20, 2011, D.K., a senior executive at Fougera, sent an email to other senior Fougera executives regarding Imiquimod Cream stating, ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1610.   Throughout September 2011, H.M. of Taro, CW-6 of Fougera, and T.P. of Perrigo spoke several times by phone during which they discussed, among other things, Taro's

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

new capacity to take on additional market share for Imiquimod Cream and how that should be accommodated in the market.  As always, CW-6 and T.P. kept their supervisors, Kaczmarek and Wesolowski, informed of the content of those conversations.  Some of these calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/21/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 6:22:00 | 0:01:00 |
| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:24:00 | 0:04:00 |
| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:49:00 | 0:02:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:46:00 | 0:03:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 11:31:14 | 0:12:10 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:23:00 | 0:04:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:29:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:39:00 | 0:03:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 12:46:00 | 0:04:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:49:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:12:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:19:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:26:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 5:48:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:50:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:16:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:16:00 | 0:04:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:46:35 | 0:05:01 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:05:00 | 0:03:00 |
| 9/27/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 8:42:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:24:00 | 0:01:00 |

1611.   After this series of calls, on September 30, 2011, Kaczmarek e-mailed other Fougera sales executives, including D.K., to advise them that Taro had made an offer for Imiquimod Cream at Wal-Mart, a Fougera customer.  Kaczmarek explained that ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

Kaczmarek reluctantly recommended that Fougera give up Wal-Mart's business and ██████

████████████████████  Kaczmarek noted that, if Fougera defended Wal-Mart's business,

456

Taro would likely just go after other customers at lower and lower prices ███████████

████████████  On the other hand, if Fougera gave up Wal-Mart, Taro would hopefully ██████

███████████████████████████████████████████████████████████████████████████████

D.K. agreed with Kaczmarek's recommendation and Fougera ultimately ceded the business to

Taro in order to keep the market stable.

### 4.   Triamcinolone Acetonide Cream and Ointment

1612.   As of July 2010, Fougera and Perrigo were the only generic manufacturers in the

market for both Triamcinolone Acetonide Cream and Ointment.  They took advantage of their

already ongoing collusive relationship to raise prices on both products.

1613.   On July 1, 2010 and again on July 20, 2010, Fougera raised WAC prices for

various sizes and formulations of both the cream and the ointment.  CW-3, a sales executive at

Fougera, later described these price increases as a ████████████████  On July 21 and July 30,

2010, Perrigo increased its own WAC prices on the same products to comparable levels.

1614.   In the days leading up to, and surrounding these increases, CW-6 of Fougera and

T.P. of Perrigo exchanged at least eight (8) calls.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/30/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:29:36 | 0:00:59 |
| 7/1/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:32:00 | 0:00:04 |
| 7/21/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:43:00 | 0:00:07 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:19:10 | 0:00:59 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:22:47 | 0:04:38 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:27:29 | 0:00:04 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:28:03 | 0:03:23 |
| 7/29/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:37:26 | 0:00:33 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1615.   After the price increases, both companies adhered to their understanding not to poach the other's customers or improperly take advantage of the price increase by seeking additional market share.

1616.   For example, on July 30, 2010, a Perrigo customer, ABC, provided Fougera an opportunity to bid on its Triamcinolone Acetonide business because of Perrigo's price increase. CW-3 of Fougera e-mailed Kaczmarek, his supervisor, stating, ███████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████

1617.   That same day, Kaczmarek called CW-6.  The call lasted two (2) minutes.  CW-6 then called T.P. of Perrigo and they spoke for three (3) minutes.  CW-6 hung up with T.P., called Kaczmarek back, and they spoke for five (5) minutes.  Immediately upon hanging up, Kaczmarek responded to CW-3's e-mail, with a copy to CW-6.  Confident that the agreement with Perrigo was strong, Kaczmarek stated, ████████████████████████

████   At the same time, T.P. called his supervisor, Wesolowski, and they spoke for five (5) minutes.

### 5.   Adapalene Cream

1618.   Adapalene Cream, also known by the brand name Differin, is a retinoid used to treat severe acne.  On July 6, 2010, Fougera received FDA approval as the first-to-file generic for Adapalene Cream.  Two weeks later, on July 20, 2010, Fougera entered the market and published WAC pricing.

1619.   Fougera quickly realized, however, that it would not be alone in the market for long, and that Perrigo would soon emerge as a competitor.  On August 9, 2010, Kaczmarek e-

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

mailed D.K., a senior executive at Fougera, regarding ████████████ stating:

█████████████████████████████████████████████████████████████████

████████████████    Similarly, a few weeks later, on August 30, 2010, D.K. informed

other Fougera executives: ███████████████████████████████████

███████████████████████████   Several Perrigo representatives

attended NACDS, including T.P., Wesolowski, and S.K., a senior Perrigo executive.

1620.   On September 27, 2010, CW-6 of Fougera called T.P. of Perrigo.  The call lasted

less than one (1) minute.  Minutes later, T.P. called CW-6 back and they spoke for three (3)

minutes.

1621.   Two days later, on September 29, 2010, Kaczmarek informed D.K. that Perrigo

would be shipping Adapalene Cream in two (2) weeks and sending out offers to customers

starting that day.  D.K. passed that information along to other senior Fougera executives.

1622.   On October 1, 2010, M.A., a marketing executive at Fougera, e-mailed D.K. to

inform him that there had been no publicly reported changes in the Adapalene market.  D.K.

responded: ████████████████████████████

1623.   Between October 5 and October 7, 2010, CW-6 of Fougera and T.P. of Perrigo

exchanged several calls.  Shortly after hanging up with T.P., CW-6 called his supervisor

Kaczmarek to report on his conversations.  These calls are detailed in the chart below:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/5/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 15:52:49 | 0:00:04 |
| 10/5/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 15:53:18 | 0:03:26 |
| 10/5/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:07:16 | 0:00:05 |
| 10/7/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:44:57 | 0:00:40 |
| 10/7/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:53:16 | 0:00:57 |
| 10/7/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 16:56:59 | 0:10:40 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1624.   On October 8, 2010, D.K. e-mailed Kaczmarek with a subject line ██████████

████████████████████████   That same day, Kaczmarek called CW-6 and they spoke for

two (2) minutes.  After that call, CW-6 again exchanged several calls with T.P. of Perrigo.  After

hanging up with CW-6, T.P. immediately called his supervisor, Wesolowski.  These calls are

detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/8/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 10:53:45 | 0:03:30 |
| 10/8/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 15:59:25 | 0:00:38 |
| 10/8/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:01:31 | 0:04:47 |
| 10/8/2010 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:07:04 | 0:00:49 |

1625.   CW-6 of Fougera and T.P. of Perrigo continued to exchange calls in the days

leading up to Perrigo's launch of Adapalene Cream.  As before, CW-6 and T.P. continued to

keep their supervisors, Kaczmarek and Wesolowski, informed of their conversations.  These

calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:53:56 | 0:01:00 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:55:16 | 0:00:08 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:55:46 | 0:05:04 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:01:36 | 0:00:03 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:33:46 | 0:00:36 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 11:46:18 | 0:15:02 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 15:58:59 | 0:01:40 |
| 10/19/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 16:37:08 | 0:00:58 |
| 10/19/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:49:32 | 0:12:42 |
| 10/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 17:10:46 | 0:04:14 |
| 10/21/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 13:03:06 | 0:02:35 |
| 10/21/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 13:05:59 | 0:00:00 |

1626.   On October 25, 2010, Perrigo entered the Adapalene Cream market and published

WAC pricing that matched Fougera's WAC pricing exactly.  That same day, CW-6 and T.P.

spoke again for nearly four (4) minutes.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1627.   From the outset, and consistent with fair share principles, Fougera understood and agreed that it needed to give up 40% of its share of the market to Perrigo.  CW-6 of Fougera and T.P. of Perrigo also discussed which customers Fougera would give up.  For example, the day after Perrigo's entry, on October 26, 2010, CW-6 and T.P. spoke at least four times.  Shortly after the last of those calls, CW-6 sent the following e-mail to Kaczmarek regarding ███████ ████████████████████████ stating:  ██████████████████████

██████████████████████████████████████████████████████████

1628.   Fougera wasted no time in acting on CW-6's recommendations and ceding significant share to the new entrant, Perrigo.  Perrigo, in turn, focused specifically on the list of customers provided by CW-6.  For example, on October 25, 2010, Publix informed Fougera that it had received a competitive offer for Adapalene Cream and offered Fougera the opportunity to retain the business.  The next day, on October 26, 2010, S.H., a Fougera sales executive, declined to bid stating, ████████████████████████████████████████████████████ ██████████

1629.   Also on October 25, 2010, NC Mutual informed Fougera that it had received a competitive offer for Adapalene Cream.  On October 28, 2010, CW-3 forwarded the request to Kaczmarek asking: ███████████████████████████  Kaczmarek responded in the affirmative.  Later that day, CW-3 responded to NC Mutual stating: ███████████████ ███████████████████████████

1630.   On October 26, 2010, Rite Aid advised Fougera that it had received a competitive bid for Adapalene Cream.  Consistent with the plan, on November 2, 2010, Fougera ceded the account to Perrigo, telling the customer: ███████████████████████  and reasoning that ████████████████████

1631.   On October 29, 2010, Kroger informed CW-3 that it had received a competitive offer from Perrigo for Adapalene Cream.  CW-3 forwarded the e-mail to Kaczmarek asking:

█████████████████████████████████████████████████████████

███████████████████████████████████████████

Kaczmarek responded: ███████████████████████████████

████████████████████████████████████████  CW-3 would later acknowledge in his October 2010 monthly recap that the decision not to match Perrigo's offer was a ████████████ meant ██████████████████  to the new entrant, Perrigo.

1632.   Further, by the end of October 2010, Fougera had also given up Cardinal's Adapalene Cream business to Perrigo.  The agreement operated successfully for both Fougera and Perrigo.  Fougera was impressed that Perrigo had behaved responsibly by keeping prices high and focusing on the agreed-upon customers as it entered the market for Adapalene Cream.  As D.K. noted in an internal e-mail, ████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████████████ He stated

further, ████████████████████████████████████

### 6.    Betamethasone Dipropionate Lotion

1633.   In 2010, Fougera, Perrigo, and Teva were the only three competitors in the market for Betamethasone Dipropionate.

1634.   On December 16, 2010, CW-6 of Fougera e-mailed Kaczmarek to inform him that Teva was exiting the market, leaving Fougera and Perrigo as the only competitors.  With a strong collusive understanding firmly in place between Fougera and Perrigo at that point, Kaczmarek was thrilled with the news and immediately suggested that Fougera take advantage of Teva's departure by increasing pricing on the product: ████████████████



1635.   Also on December 16, 2010, Perrigo held an internal meeting to discuss increasing pricing on Betamethasone Dipropionate.  Notes from that meeting stated: ████████

████████████████████████ That same day, T.P. of Perrigo and CW-6 of Fougera exchanged several calls.  After hanging up with T.P., CW-6 called Kaczmarek to update him on their discussions.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/16/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 8:58:29 | 0:00:25 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:12:49 | 0:05:32 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:18:34 | 0:01:03 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:20:00 | 0:03:51 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:24:02 | 0:05:03 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 10:00:24 | 0:01:08 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:34:32 | 0:01:04 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1636.   After this series of phone calls, Perrigo also decided to raise prices – and did so even before Fougera.  On January 4, 2011, Perrigo increased its WAC pricing for Betamethasone Dipropionate by 504% to $37.50.  That same day, T.P. called CW-6 and they spoke for seven (7) minutes.  Just minutes after hanging up, CW-6 again called Kaczmarek.  The call lasted one (1) minute.

1637.   Three days later, on January 7, 2011, the Fougera sales team held a conference call during which they discussed the upcoming increase on Betamethasone Dipropionate, among other products.  That same day, T.P. called CW-6 and they spoke for four (4) minutes.  Over the course of the day, the two competitors would exchange several more calls and CW-6 would continue to keep Kaczmarek apprised of his discussions.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/7/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 5:02:00 | 0:04:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:48:35 | 0:00:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:21:00 | 0:01:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:22:00 | 0:01:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 11:17:00 | 0:02:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 13:45:31 | 0:00:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 14:56:11 | 0:00:14 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 15:00:53 | 0:20:39 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 16:00:36 | 0:04:27 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:05:31 | 0:01:57 |
| 1/7/2011 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:17:40 | 0:01:15 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 17:09:52 | 0:00:00 |

1638.   On January 12, 2011, Fougera followed Perrigo and increased its WAC pricing on Betamethasone Dipropionate to $39.99 – slightly higher than Perrigo's WAC pricing.  The next day, on January 13, 2011, CW-6 called T.P. again and they spoke for twelve (12) minutes.

**7.     Clotrimazole Betamethasone Dipropionate Cream and Lotion**

1639.   In 2013, annual sales of CBD Cream and Lotion in the United States exceeded $150 million.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

a.   *March And April 2011 - Actavis Raises Prices And Fougera And Taro Follow*

1640.   In early 2011, the competitors in the generic market for CBD Cream were Fougera, Taro, and Actavis and the competitors in the generic market for CBD Lotion were Fougera and Taro.

1641.   On March 9, 2011, J.R., a senior Actavis pricing executive, circulated internally a proposed price increase plan for four products, including CBD Cream, to take effect on March 28, 2011.  Actavis planned to raise WAC prices for CBD Cream by 227% and to increase contract prices to customers by as much as 1100%.  Notably, Actavis had not yet conveyed the proposed increases to its customers.  In fact, in that March 9, 2011 e-mail, J.R. specifically told his colleagues ███████████████████████████

1642.   Even though Actavis had not yet told its customers of these substantial price increases, its competitors, Fougera and Taro, were already aware.  For example, on March 9, 2011 – the same day that J.R. circulated the price increase proposal internally at Actavis – D.H., a Fougera sales executive, sent a National Accounts Monthly Recap report for February 2011 to Kaczmarek.  In that recap, D.H. reported that for CBD ████████████████████████ Further, D.H. reported:  The reference to ████████████████████████  The reference to ██████████████ is a reference to all of Taro's betamethasone products, including CBD Cream and CBD Lotion.  Importantly, Taro had not yet raised its prices on those products.

1643.   Fougera was already aware of its competitors' price increases for CBD products because, in the preceding month, representatives of Actavis, Fougera, and Taro were in contact with one another to ensure that each competitor would follow the other's price increases.

1644.   For example, from February 1, 2011 to March 9, 2011, Perfetto, then a senior Actavis sales and marketing executive, spoke with Blashinsky, then a senior Taro marketing

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

executive, eight (8) times for a total of approximately fifty-two (52) minutes.  During that same time, H.M., a Taro sales executive, spoke with CW-6 of Fougera three (3) times for a total of approximately fifteen (15) minutes.

1645.   On March 25, 2011, Actavis informed its customers of the price increases for CBD Cream.  By happenstance, just days before the announcement, Actavis learned that its API costs for CBD Cream would increase.  Actavis immediately recognized that it could use this news to mislead its customers and provide cover for its illegal price-fixing conspiracy.

1646.   Before the announcements went out, Perfetto e-mailed the Actavis sales executives, telling them to ████████████ and to stick to the story that the price increase is ██████ ████████████████████████████████████ One sales executive even went so far as to tell Econdisc that the increase was necessary because Actavis's ████████████ ████████████ In reality, Actavis knew the API ████████████████████████████████████ ████████████████ and were ████████████ for the pricing of prescription medications such as CBD Cream.

1647.   In furtherance of their conspiracy to raise prices, Actavis, Taro, and Fougera remained in contact during the days leading up to Actavis's formal price increase announcement on March 25, 2011, including calls between the following individuals:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/17/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:03:40 | 0:01:44 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:50:22 | 0:00:00 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:51:24 | 0:00:34 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:27:28 | 0:02:38 |
| 3/22/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 15:26:45 | 0:02:00 |
| 3/23/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:31:15 | 0:00:24 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 12:44:00 | 0:09:00 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 13:07:00 | 0:15:00 |
| 3/24/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:49:00 | 0:15:00 |

1648.   On March 30, 2011 – just three business days after Actavis sent out its price increase notices for CBD Cream – Fougera sent out notices to its customers stating that it was

raising prices for CBD Cream.  Those increases, which took effect April 1, 2011, increased

Fougera's WAC prices for CBD Cream by 54% and increased contract prices across the board,

in some cases by over 1200%.  The day after Fougera announced those price increases, CW-6 of

Fougera and H.M. of Taro spoke three separate times for a total of eighteen (18) minutes.

1649.   Within days, on April 4, 2011, Taro implemented its own substantial price

increases across the board for both CBD Cream and CBD Lotion.  For some customers, Taro

raised prices for CBD Cream by approximately 1350% and raised prices for CBD Lotion by

approximately 960%.  The next day, H.M. called CW-6 and they spoke for eighteen (18)

minutes.

1650.   On April 14, 2011, Fougera followed Taro with a price increase on CBD Lotion –

raising its WAC by 71% and increasing its contract prices across the board, in some cases by

over 900%.  At the time, Fougera's gross profit margin on CBD Lotion was already 67%, yet,

with this price increase, their gross profit percentage would soar to 96%.  Fougera estimated that

these increases accounted for an extra $1.8 million in profit for the rest of 2011 alone.

1651.   In furtherance of the conspiracy, Fougera refrained multiple times from taking

customers that approached it for bids.  For example, after Taro's increase, Wal-Mart, a Taro

customer for CBD Cream and Lotion, asked Fougera to bid for that business.  Kaczmarek

cautioned ███████████████████████████████████████  In an effort to conceal the reason

for not bidding, Kaczmarek instructed his colleagues that the ████████████████████████

████████████████████████████████████  Likewise, when Rite-Aid approached Fougera,

Fougera did not even consider making a competitive offer.  Instead, a Fougera employee asked

internally: ██████████████████████████  Kaczmarek determined that Fougera

should opt for the latter.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1652.   Shortly after pulling off one massive coordinated price increase, Taro wasted no time planning the next.  In an e-mail to Kaczmarek on May 6, 2011, D.K., a senior Fougera executive, detailed how Taro had already approached Fougera about raising CBD prices again:



b.      *Taro Increases Prices On CBD Cream In April 2012 While Actavis And Fougera Play Nice In The Sandbox*

1653.   By March 5, 2012, Taro reignited its desire to raise prices on CBD Cream.  Over the next several weeks, representatives of Taro spoke several times with their contacts at Actavis and Fougera.  During these calls, Taro conveyed to its competitors its intentions to increase prices and secured their commitments not to poach Taro's customers.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/7/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:29:00 | 0:07:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:18:00 | 0:01:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:27:00 | 0:02:00 |
| 3/8/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:19:00 | 0:03:00 |
| 3/9/2012 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 7:37:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 9:42:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 9:49:00 | 0:02:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 15:34:00 | 0:01:00 |
| 3/16/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 4:51:00 | 0:10:00 |
| 3/17/2012 | Voice | D.S. (Taro) | Outgoing | K.K. (Fougera) | 11:08:00 | 0:02:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:11:00 | 0:05:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:29:00 | 0:01:00 |
| 3/22/2012 | Voice | CW-3 (Fougera) | Outgoing | Aprahamian, Ara (Actavis) | 7:32:00 | 0:13:00 |
| 3/29/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 8:49:00 | 0:05:00 |
| 3/29/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 10:58:00 | 0:05:00 |

1654.   The day after the final calls detailed above, on March 30, 2012, Taro increased its WAC prices for CBD Cream by approximately 7% and its contract prices by 15% for most of its existing customers.

1655.   In May 2012, McKesson twice asked Taro to reduce its price based on comparable sales by competitors.  Both times Taro declined, comfortable that its competitors would not poach its business.  Taro's confidence was well placed.

1656.   On May 23, 2012, McKesson contacted L.P., an Actavis sales executive, asking if Actavis's recent RFP bid still stood because ███████████████████████████████████ ████████████████████   At 5:02 p.m., L.P. forwarded McKesson's request to Perfetto and Aprahamian, then a senior pricing executive at Actavis. Perfetto said he was ██████████ █████████████████   and that Actavis ██████████████████"  Aprahamian replied, ██████████████████████████   The following day, Perfetto exchanged three calls with Blashinsky of Taro, including one call lasting fourteen (14) minutes.  Following his calls with Blashinsky, Perfetto instructed Aprahamian to call him.  Aprahamian called Perfetto the next morning on May 25, 2012.  After that call, an Actavis employee suggested that Actavis should stick by their RFP price and take the business because it was ███████████████████

██████████████████████ Aprahamian, however, responded simply and directly: ██

██

c.    *Fougera And Taro Raise CBD Lotion Prices In Late 2012/Early 2013*

1657.   In the fall of 2012, a fourth competitor (Prasco) was entering the CBD Cream market.  However, Taro and Sandoz (which acquired Fougera in July 2012) were still the only competitors in the CBD Lotion market.  Facing new competition on CBD Cream, Sandoz and Taro sought to maximize profits by raising the price of CBD Lotion.

1658.   Starting in late August 2012, Sandoz began planning a 100% price increase on CBD Lotion to take place in October, which – assuming ██████████████████████ – would bring in an estimated additional $3.9 million to Sandoz annually.  In the weeks leading up to its planned increase, Sandoz made repeated overtures to Taro to secure that ████████ behavior, including the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 10:15:00 | 0:01:00 |
| 9/20/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:13:00 | 0:17:00 |
| 9/21/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 8:18:00 | 0:03:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 9:54:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:11:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:04:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:27:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:53:00 | 0:01:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:25:00 | 0:02:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:49:00 | 0:21:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:11:00 | 0:02:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:12:00 | 0:03:00 |
| 10/8/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 10:32:00 | 0:09:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:00:00 | 0:01:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/12/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:01:00 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1659.   On October 18, 2012, Sandoz increased prices for CBD Lotion, doubling its WAC price (from $61.90 to $123.80) as well as its contract prices.  As expected, Taro did not attempt to poach Sandoz's customers.  For example, when MMCAP e-mailed Taro on October 26, 2012 to request a bid from Taro for a dual award in light of Sandoz's increase, Taro did not even respond to the customer's request.

1660.   Taro also made plans to follow the Sandoz price increase.  On January 4, 2013, J.J., a senior Taro sales executive, instructed Taro sales executives, including H.M. and D.S., to gather competitive intelligence on CBD Lotion in anticipation of Taro's planned price increase.  That same day, H.M. spoke with CW-3 of Sandoz for five (5) minutes.  The pair spoke again on January 7, 2013 for thirteen (13) more minutes.  Three days later, on January 10, 2013, D.S. spoke with CW-4 of Sandoz for twenty-three (23) minutes.

1661.   On February 12, 2013, Taro instituted its price increase on CBD Lotion raising WAC by approximately 80% and contract prices by approximately 60%.

1662.   After Taro's increase was issued, news of it spread throughout Sandoz.  One Sandoz employee remarked ███████████████████████  Just as Taro did not poach Sandoz's customers when Sandoz raised CBD Lotion prices, Sandoz was careful not to poach Taro's customers.  In fact, CW-1, a Sandoz senior pricing executive, specifically instructed Sandoz employees to ██████████████████████ for CBD Lotion bids, because ███████ ████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 8. Fluocinonide Solution

#### a. *Fougera Raises Prices In May 2011 And Taro Follows*

1663.   In early 2011, the competitors in the Fluocinonide Solution market were Teva, Taro, and Fougera.  All three competitors produced Fluocinonide Solution in 60ml bottles, while only Taro produced them in 20ml bottles.

1664.   In the beginning of April 2011, Fougera's Fluocinonide Solution products had been on long-term backorder due to quality control issues with the tips of the bottles leaking.  As a result, the market was split between Teva (76% market share) and Taro (19% market share) until Fougera returned to production.  Fougera was working to re-launch its Fluocinonide Solution products by mid-May 2011.

1665.   On April 21, 2011, Kaczmarek learned by e-mail that Teva was ▮▮▮▮▮▮▮▮▮ Fluocinonide Solution; that is, Teva was stopping production and leaving the market.  This meant the only competitors in the market would now be Fougera and Taro.

1666.   Even though it was still on backorder due to supply problems, Fougera viewed Teva's exit as an opportunity to increase prices.  In internal calculations of the expected benefit from the pricing action, Fougera assumed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and that they would split the market 50/50.  Fougera estimated that this would provide it with a yearly gain of $4.6 million.

1667.   On May 10, 2011, Fougera raised its WAC pricing for Fluocinonide Solution by 100% from – $12.50 to $25.00 – with the change effective the following day.  That evening, Fougera also sent out contract price-change notifications to customers where it had existing contracts for Fluocinonide Solution.  With those increases, the average net sales price jumped 800% from $2.50 to $20.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1668.   On May 13, 2011 – three days after Fougera sent out its price changes – CW-6 and H.M. of Taro exchanged two calls, with one call lasting five (5) minutes.

1669.   One week later, on May 20, 2011, Taro followed Fougera's lead by substantially increasing its pricing for Fluocinonide Solution.  Taro increased the WAC price for the 20ml and 60ml formulations by 200% and 400%, respectively.  Taro also increased average net sales prices by 260% and by over 500% for the 20ml and 60ml formulations, respectively.

1670.   Following their respective price increases, the market share between Taro and Fougera stabilized to rough parity.  By September 2011, Fougera had approximately 50% market share and Taro had approximately 48% market share.

b.    *Fougera Raises Prices In February 2012 And Taro Follows*

1671.   On January 25, 2012, CW-6 and H.M. exchanged several calls.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:36:00 | 0:01:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:37:00 | 0:01:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:38:00 | 0:04:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:19:00 | 0:02:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 9:32:00 | 0:02:00 |

1672.   First thing the next morning, on January 26, 2012, Kaczmarek sent an e-mail to his Fougera colleagues stating, ███████████████████████

████████████████████████████████████████████

████████████████████████   The proposed price increase involved nearly tripling Fougera's WAC price and increasing associated contract prices in a little over two weeks' time.

1673.   This price increase opportunity was viewed as so pressing by Kaczmarek that he asked A.R., a Fougera business analyst, to put together a pricing analysis that evening while flying on a plane because she had a scheduled day off the next day.

1674.   First thing the next morning, on January 27, 2012, Kaczmarek called CW-6 and they spoke for twenty-two (22) minutes.  CW-6 hung up and immediately called H.M. of Taro.  The call lasted one (1) minute.  A few minutes later, CW-6 called H.M. again and they spoke for twenty-one (21) minutes.  Later that day, CW-6 called Kaczmarek twice.  The calls lasted four (4) minutes and three (3) minutes, respectively.

1675.   Later that evening, on January 27, 2012, Kaczmarek submitted the proposed price increase to the Fougera Pricing Committee.  Now, the price increase had grown even larger.  The plan was to raise Fougera's WAC price from $25 to $80.99 and increase its average net sales price from $18.08 to $58.57.  This increase was estimated to bring in an additional $10.1 million in gross profit for the rest of 2012.  Members of the Fougera Pricing Committee enthusiastically embraced the massive price hike, with one member responding: ███████████

1676.   On February 13, 2012, CW-6 called H.M. and they spoke for five (5) minutes.  The next day, on February 14, 2012, Fougera formally raised its WAC and contract prices for Fluocinonide Solution as planned.

1677.   The increases more than tripled Fougera's WAC price as well as direct and indirect contract prices for its customers.  The increase was so dramatic, that third party data vendor Medi-Span – which tracks WAC prices – reached out to Fougera to confirm that the new WAC amount was not an error.

1678.   On February 15, 2012, the day after the increases, CW-6 called H.M. again and they spoke for six (6) minutes.  Later that day, Blashinsky, a senior Taro marketing executive,

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

circulated an e-mail informing others within Taro that prices in the Fluocinonide Solution

████████████████████████████████████████

1679.   In furtherance of their price increase conspiracy, and consistent with the

overarching conspiracy, Taro was careful not to use Fougera's price increase to poach customers

and upset market share.  Indeed, Taro refused to poach even very small customers.  For example,

Meijer requested that Taro submit a bid for Fluocinonide Solution.  Internally, Taro noted ████

█████████████████████████████████ of market share.  Nonetheless, Taro declined to

provide Meijer with a bid and instead falsely claimed that Taro did not have inventory to supply

them.

1680.   Similarly, HD Smith asked Taro to bid for its Fluocinonide Solution business

after Fougera increased.  The representative at HD Smith even stated that she ██████████████

██████████████████████████████ S.B., a Taro sales executive, relayed this

news to J.J., a senior Taro sales executive, who then chastised him for even considering the offer:

████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1681.   While Taro planned and implemented corresponding price increases, representatives of Taro and Fougera remained in contact, including but not limited to exchanging the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/15/2012 | Voice | D.S. (Taro) | Outgoing | CW-6 (Fougera) | 7:39:00 | 0:02:00 |
| 2/16/2012 | Voice | D.S. (Taro) | Incoming | CW-6 (Fougera) | 6:00:00 | 0:03:00 |
| 2/16/2012 | Voice | D.S. (Taro) | Outgoing | CW-6 (Fougera) | 6:03:00 | 0:02:00 |
| 2/29/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:13:00 | 0:07:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:18:00 | 0:01:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:27:00 | 0:02:00 |
| 3/8/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:19:00 | 0:03:00 |

1682.   The day after the final calls detailed above, on March 9, 2012, Taro implemented its price increase, which essentially doubled its WAC and contract prices for both the 60m1 and 20m1 formulations of Fluocinonide Solution.

### 9.   Erythromycin Base/Ethyl Alcohol Solution

1683.   In the summer of 2011, Fougera and Wockhardt were the only two competitors in the market for Erythromycin Solution.  However, both manufacturers would experience intermittent supply issues that would require their exit from the market for periods of time. Because of these supply problems, extensive coordination was necessary between competitors in order to maintain a stable market.

1684.   Between May 17 and May 19, 2011, Defendant Perrigo discussed internally whether to re-enter the Erythromycin Solution market.  The next day, May 20, 2011, T.P. of Perrigo called CW-6 of Fougera and they spoke for seven (7) minutes.  Immediately after that call, T.P. called his supervisor, Wesolowski, and they spoke for three (3) minutes.  The following Monday, on May 23, 2011, Wesolowski gave the green light to move forward with Perrigo's plans to re-launch the product within six months.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1685.   On August 5, 2011, CW-3 of Fougera e-mailed his supervisor, Kaczmarek,

stating, ████████████████████████████████████████████████

████████████████████████████████████████████████

1686.   Thereafter, on August 9, 2011, CW-6 of Fougera called M.C., a Wockhardt sales

executive, three times, including one call lasting ten (10) minutes.  Notably, these were the first

phone calls ever between the two competitors according to available phone records.  Indeed,

CW-6 and M.C. were not friends and did not socialize together.  If they did speak, it was to

coordinate anticompetitive conduct relating to products on which Fougera and Wockhardt

overlapped.

1687.   Over the next week, CW-6 exchanged several calls with M.C. of Wockhardt and

T.P. of Perrigo, the prospective new entrant.  Because T.P. and M.C. did not have an independent

relationship, CW-6 acted as the go-between – relaying information between the two.  After

speaking with his competitors, CW-6 called his supervisor, Kaczmarek, to report back what he

had learned.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |
| 8/15/2011 | Voice | M.C. (Wockhardt) | Outgoing | CW-6 (Fougera) | 7:31:00 | 0:02:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 7:39:00 | 0:06:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:50:00 | 0:01:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:11:37 | 0:11:55 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:53:00 | 0:09:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:58:18 | 0:10:00 |
| 8/17/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:48:00 | 0:05:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:07:00 | 0:01:00 |

1688.   On August 19, 2011, after the final call listed above, Fougera held an internal

meeting to discuss Erythromycin Solution and the intelligence that CW-6 had gained from phone

calls with competitors.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1689.   On November 15, 2011, Wesolowski of Perrigo sent an internal e-mail to the Perrigo sales team, including to T.P., stating that Perrigo planned to launch Erythromycin Solution the following month in December 2011.  Wesolowski stated, ████████████ ████████████████████████████████████████  Beginning that day, and over the next few days, T.P. exchanged several calls with CW-6 of Fougera.  At the same time, CW-6 was speaking with M.C. of Wockhardt.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:57:00 | 0:07:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 11:23:00 | 0:06:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 11:29:00 | 0:02:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 11:37:00 | 0:01:00 |
| 11/17/2011 | Voice | M.C. (Wockhardt) | Outgoing | CW-6 (Fougera) | 11:38:00 | 0:01:00 |

1690.   The next day, on November 18, 2011, K.K., another Wockhardt sales executive, called CW-3 of Fougera.  The call lasted two (2) minutes.  Later, CW-3 sent the following e-mail to his supervisor, Kaczmarek: ████████████████



1691.   It was CW-3's customary practice to state that he learned information from a customer when he actually learned it from a competitor because he wanted to keep that information out of writing.  In response to CW-3's e-mail, Kaczmarek stated simply: ████████████ ██████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1692.   On November 30, 2011, M.C. of Wockhardt called CW-6 and they spoke for four (4) minutes.  Later that same day, CW-6 sent the following e-mail to Kaczmarek regarding Erythromycin Solution: ██████████████



1693.   Kaczmarek forwarded the e-mail along internally to A.R., a Fougera operations manager.  A.R. reminded Kaczmarek that Fougera was also having supply issues and had temporarily exited the market.

1694.   A few weeks later, on December 19, 2011, Perrigo entered the Erythromycin Solution market and set WAC pricing that was significantly higher – indeed, approximately 200% higher – than the market WAC pricing at that time.

1695.   CW-6 of Fougera exchanged several calls with T.P. of Perrigo in the weeks leading up to, and surrounding, Perrigo's launch, including on the date of the launch itself.  On these calls, the competitors discussed pricing and the allocation of market share to the new entrant, Perrigo.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 4:40:00 | 0:04:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:05:00 | 0:01:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 5:13:00 | 0:01:00 |
| 12/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:10:00 | 0:05:00 |
| 12/20/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:38:00 | 0:03:00 |
| 12/21/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |

1696.   Several months later, between April 24 and April 27, 2012, the NACDS held its annual meeting in Palm Beach, Florida.  Representatives from Fougera, Perrigo, and Wockhardt

attended, including CW-6 and CW-3 of Fougera, Wesolowski of Perrigo, and M.C. of Wockhardt.

1697.   At that time, Fougera was readying to re-enter the Erythromycin Solution market. Shortly after the NACDS annual meeting, on April 30, 2012, Kaczmarek e-mailed his sales team stating, ███████████████████████████████████████████████████

███████   CW-3 responded with the following e-mail: ████████████████████



1698.   Fougera's re-launch caused a flurry of communications among the three competitors on May 1 and May 2, 2013.  Following his consistent practice, CW-6 reported these conversations back to his boss, Kaczmarek.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 6:56:00 | 0:02:00 |
| 5/1/2012 | Voice | CW-3 (Fougera) | Incoming | CW-3 (Fougera) | 10:04:00 | 0:03:00 |
| 5/1/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:07:00 | 0:02:00 |
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 13:12:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:20:00 | 0:04:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:24:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 15:25:00 | 0:01:00 |

1699.   The next day, on May 3, 2012, Fougera re-entered the market and matched Perrigo's increased WAC pricing.  That morning, Kaczmarek sent the following e-mail to his sales team: ████████████████████

-----Original Message-----
From: Walt Kaczmarek
Sent: Thursday, May 03, 2012 7:47 AM
To: National_Accounts
Cc: ███████████████
Subject: FW: Usage Decision Notification for Backorder Material

Gents:

We are back in business on erythro topical.  Launch quantities listed below.  Let's get some market share.  Smart, targeted approach please.

Walt Kaczmarek
Senior Vice President, Commercial Operations
Fougera Pharmaceuticals Inc.

1700.   That same day, CW-3 of Sandoz spoke with K.K. of Wockhardt for five

(5) minutes and called A.F., a sales executive at Perrigo.  Further, CW-6 called his contact at

Perrigo, T.P., and the two competitors spoke for fifteen (15) minutes.  Immediately after hanging

up with T.P., CW-6 again called his supervisor, Kaczmarek, and they spoke for five (5) minutes.

1701.   The following Monday, on May 7, 2012, Wesolowski of Perrigo sent the

following e-mail regarding Erythromycin Solution to other Perrigo executives: ███████

███████



███████ On that same day, Kaczmarek circulated a proposed customer pricing grid for

Erythromycin Solution to the Fougera sales team.  Kaczmarek advised: ██████████████

481

███████████████████████████████████   As he explained, blanketing the

market with offers is ████████████████████████████████

1703.  Over the next several days, CW-3 and CW-6 exchanged calls with their respective

contacts at Perrigo, A.F. and T.P.  As was his practice, after hanging up with T.P., CW-6

immediately reported back to Kaczmarek what he had learned.  These calls are detailed in the

chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:06:00 | 0:01:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:08:00 | 0:01:00 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 7:10:41 | 0:01:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Incoming | CW-3 (Fougera) | 7:12:36 | 0:00:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 8:05:00 | 0:01:00 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 8:52:56 | 0:10:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 9:29:30 | 0:01:34 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:09:00 | 0:05:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 5:13:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 8:24:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:26:00 | 0:11:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:38:00 | 0:02:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:10:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 12:39:00 | 0:02:00 |
| 5/14/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 13:09:00 | 0:02:00 |

1704.  On May 14, 2012, the date of the last calls detailed above, Kaczmarek sent the

following internal e-mail to his sales team, lying about the source of his information to avoid

putting evidence of illegal conduct into writing: ████████████████████



1705.   Less than two months later, on June 7, 2012, Fougera recalled Erythromycin Solution and again placed the product on back order.  By that time, Fougera had approached and secured approximately 12% market share on the product, including several customers on its target list such as Rite Aid, Cardinal, Optisource, and SUPERVALU.

1706.   By August 2012, Fougera had resolved those supply issues.  Around this same time, Defendant Sandoz had completed its acquisition of Fougera.  As Fougera (now Sandoz) prepared to re-enter the Erythromycin Solution market, the company set an internal market share goal of 20% on the product.

1707.   After the Fougera acquisition was completed, CW-6 left the company for another position.  At some point before he left Fougera, CW-6 introduced CW-3 – who would be remaining at Sandoz after the acquisition – to T.P. at Perrigo.  This was the beginning of a collusive relationship that would last several years and will be discussed in detail in subsequent Sections of this Complaint.

1708.   The first ever phone calls between CW-3 and T.P., according to the available phone records, were on August 8, 2012.  They spoke two times that day.  The competitors spoke again on August 21, 2012, as Sandoz was preparing to re-enter the market for Erythromycin Solution.

1709.   On September 5, 2012, S.G., a Sandoz sales executive, e-mailed CW-3 and Kellum to advise them that Sandoz had an opportunity to bid on Erythromycin Solution at Walgreens.  Kellum responded, ███████████████████  On September 6, 2012, CW-3 called T.P. of Perrigo and they spoke for eleven (11) minutes.

1710.   The next day, on September 7, 2012, CW-3 sent an internal e-mail including to CW-1, a Sandoz senior pricing executive, recommending that Sandoz target the same customers

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

that Fougera had targeted when it re-launched Erythromycin Solution in May 2012.  Not wanting to have a discussion in writing, CW-1 responded to CW-3 directly, stating, ████████████████ ████

1711.    On September 13, 2012, CW-3 called T.P. of Perrigo and they spoke for three (3) minutes.  CW-3 hung up and called R.T., a senior sales and marketing executive at Sandoz. The call lasted one (1) minute.  Later that day, CW-3 called K.K. of Wockhardt.  The call lasted one (1) minute.

1712.    The following Monday, on September 17, 2012, CW-1 instructed CW-3 to put together offers for Cardinal and Wal-Mart and advised that they would be the only customers Sandoz would be bidding on at this time.  That same day, K.K. of Wockhardt called CW-3 and they spoke for four (4) minutes.

1713.    Between September 20 and September 21, 2012, CW-3 and T.P. of Perrigo exchanged six (6) calls, including two calls lasting eight (8) minutes and seven (7) minutes, respectively.  By October 2012, Perrigo had conceded the Erythromycin Solution business at Cardinal and Wal-Mart to Sandoz.

### 10.    Nystatin Ointment

1714.    In early 2011, Fougera and Perrigo were the only players in the market for generic Nystatin Ointment.

1715.    On February 7, 2011, J.E., a Fougera sales executive, circulated internally a list of products and their potential for price increases.  While Nystatin Ointment was one of the products deemed worthy of consideration, the initial conclusion was that its ███████████████ ████████████████████

1716.   Undaunted, key Fougera employees turned to rival Perrigo for a creative solution to the problem of low prices and low profits on Nystatin Ointment.  Between February 7 and February 28, 2011, CW-6 of Fougera and T.P. of Perrigo were in frequent communication with each other, exchanging twenty-seven (27) calls and three (3) text messages, with eleven (11) of the calls taking place on February 28, 2011.  During these calls, the competitors hatched a plan for Fougera to leave the market temporarily, allowing Perrigo to significantly raise prices, at which point Fougera would return to the market at that new, higher pricing.

1717.   By March 1, 2011, word of the plan formulated during those phone calls had begun to spread into the market, reaching J.E. at Fougera by way of a customer.  Perplexed, J.E. e-mailed Kaczmarek, asking: ███████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████

1718.   Kaczmarek responded in the affirmative: ████████████████████

█████████████████████████████████████████████████

████████████████████████████████  In fact, other Fougera personnel were already preparing a draft letter announcing the discontinuation of the product.

1719.   Fougera subsequently discontinued Nystatin Ointment effective March 15, 2011.

1720.   By late March 2011, numerous large customers including Meijer, Morris & Dickson, Rite Aid, Giant Eagle, and NC Mutual, had switched their Nystatin Ointment business to the only remaining alternative in the market – Perrigo.

1721.   With essentially the entire market transferred to Perrigo, and customers left with no alternative suppliers, the stage was set for the next phase of the plan.  On June 1, 2011,

Perrigo instituted a large WAC price increase on Nystatin Ointment. Indeed, the price of a 15gm tube increased by 493%, and the price of a 30gm tube increased by 269%.

1722.   That same day, CW-6 of Fougera called T.P. of Perrigo.  The two competitors spoke for six (6) minutes.  Nine days later, on June 10, 2011, CW-6 and T.P.'s discussions intensified with the two competitors exchanging seven calls that day.

1723.   As those phone calls were taking place – and less than three months after it had discontinued the product – Fougera was taking the first steps towards re-launch by starting to market the remaining inventory of Nystatin Ointment that it had on hand when it discontinued the product.

1724.   On June 12, 2011, senior Fougera executive D.K. requested an update on discontinued items that the company might want to bring permanently back into its product line. J.S., a Fougera marketing executive, sent back a list the next morning, calling special attention to Nystatin Ointment: ███████████████████████████████████████████

███████████████ Recognizing the lucrative opportunity presented by following Perrigo's price hike, D.K. replied, ███████████████████████████████████████

████████████████████

1725.   But Fougera was not the only company that was motivated by the size of the price increase that Perrigo had managed to implement.  Late in the evening on June 14, 2011, Perfetto, then a senior sales and marketing executive at Actavis, sent an e-mail to Aprahamian and other Actavis colleagues with the subject line: █████████████████████████████████

███████████████████████ The text that followed was simple and clear: ███████████

███████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1726.   The next day, Actavis marketing executive J.M. responded with some projections on the financial implications of Actavis entering the Nystatin market.  The recent sharp WAC increase by Perrigo made the prospect of entry surprisingly irresistible. J.M. wrote: ██████

████████████████████████████████████████████████████████████

██████████████████ J.M. estimated that if Actavis secured a 30% share of the current two-player market, the company would realize more than $3.8 million in sales.  Aprahamian agreed that the time was right to capitalize on the Perrigo price hike, saying: ████████

████████████████████████████████████████████████████

██████████████████████████████

1727.   Meanwhile, Fougera continued selling off its previously stockpiled inventory of Nystatin Ointment and made plans to fully re-enter the market at the new higher WAC prices. On June 27, 2011, D.K. of Fougera e-mailed Kaczmarek asking: ██████████████

████████████████████████████████████████████████████████████

████████████████████████████

1728.   Actavis made its move in early November 2011.  On November 4, 2011, just days before the launch, Actavis executive D.M. opined in an e-mail to Aprahamian, Perfetto and other colleagues that conditions were favorable for a very successful launch, including the 187% increase in the price of Nystatin Ointment over the past year, and the fact that Fougera had not re-entered the market as yet. Aprahamian inquired how much share Actavis could handle.  In response, D.M., mindful of the fair share rules of the game, replied: ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████

1729.   On November 7, 2011, Actavis re-entered the market with WAC prices that exactly matched Perrigo's.

1730.   On the day of the Actavis launch, the phone lines among the three competitors were alive with activity.  In the morning, T.P. at Perrigo placed two calls to CW-6 at Fougera to discuss the Actavis development.  After the second call, T.P. called M.D., an Actavis sales executive, setting off a chain of three more calls back and forth between them totaling more than twenty-three (23) minutes collectively.  During these calls, the competitors discussed which customers Actavis should target to obtain its market share goals without eroding the high prices currently in the market.

1731.   In the coming weeks, having coordinated its entry with market leader Perrigo, Actavis began collecting its share of accounts, winning business at Omnicare, Publix, and Rite Aid, among others.

1732.   Meanwhile, unable to gear up its production for an immediate re-launch, Fougera set its sights on a June 2012 re-launch date for Nystatin Ointment.

1733.   On June 15, 2012, a Fougera marketing executive provided Kaczmarek with WAC pricing data for Perrigo and Actavis and asked what Fougera's re-launch WAC prices would be.  The competitors' prices were identical to the penny with each charging $14.00 for a 15gm tube, and $21.00 for a 30gm tube.  Later that day, Kaczmarek announced to his colleagues that Fougera would also fall in line, saying: ████████████████████████

████████████████████

1734.   On June 21, 2012, Kaczmarek instructed CW-6 to gather intelligence on price points and ████████████ for Nystatin Ointment.  CW-6 initially e-mailed Cardinal asking for contract pricing, emphasizing that Fougera did not ████████████████████ Knowing that

the most accurate source of competitor intelligence was the competitors themselves, however, CW-6 reached out directly to T.P. at Perrigo, initiating a call that lasted two (2) minutes that morning.

1735.   The competitors moved forward to claim the market shares to which they had agreed each was entitled, all the while taking great care not to erode the lucrative market pricing. On June 22, 2012, for example, Aprahamian at Actavis rejected a colleague's suggestion to offer a competitive price on Nystatin Ointment to one customer by saying, ███████████████████
███████████████████████ On the same day, CW-6 sent the following message to another customer: ███████████████████████████████
████████████████████████████████████████████
██████████

1736.   On June 25, 2012, CW-6 asked Kaczmarek for Fougera's market share goal for Nystatin Ointment.  Kaczmarek's reply acknowledged the importance of playing by the rules of the competitors' agreement: ██████████████████████

1737.   That same day, CW-6 called T.P. at Perrigo, and they spoke for ten (10) minutes. Immediately after hanging up with T.P., CW-6 called Kaczmarek, and they spoke for three (3) minutes.

1738.   With all decisions made and cleared with its competitors, Fougera re-entered the Nystatin Ointment market on June 29, 2012 at WAC prices identical to its competitors. Consistent with the fair share understanding in place between the three competitors, Fougera proceeded to claim its share of accounts over the coming weeks, including business at HEB, Giant Eagle, and Cardinal Health.

C.      **G&W And Its Relationships**

1739.   Although G&W is not a large company and does not manufacture as many topical products as some of the larger generic manufacturers discussed above, G&W has actively conspired with its competitors in the topical space for many years.  During this early time period, G&W had anticompetitive relationships with Fougera and Glenmark and used those relationships to allocate markets and fix prices on a number of products on which those companies overlapped.  These relationships, as well as some illustrative examples of how these relationships manifested themselves regarding specific products, are discussed in detail below.

D.      **G&W/Fougera**

1740.   Jim Grauso, then a senior sales and marketing executive at G&W, had a relationship with CW-6 of Fougera.  Although Grauso and CW-6 were social friends, they also had an ongoing understanding, on behalf of the companies they represented, not to poach each other's customers and to follow each other's price increases.  The two competitors conspired with regard to several products on which G&W and Fougera overlapped, some examples of which are discussed below.

1741.   Grauso was a prolific communicator who frequently engaged in anticompetitive conduct with his contacts at competitor companies.  Indeed, when CW-6 of Fougera needed to communicate with a competitor at which he did not have a contact, but Grauso did –Kaczmarek, CW-6's supervisor at Fougera, would direct him to call Grauso and ask him to convey the message to that competitor on behalf of Fougera.

1742.   One example of this involved Grauso's relationship with Perfetto, then a senior sales and marketing executive at Defendant Actavis.  Between January 1, 2010 and December 28, 2011, the two competitors exchanged at least eighty-nine (89) phone calls.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Because CW-6 did not have a contact at Actavis, he used Grauso's relationship with Perfetto to collude on products that Fougera and Actavis overlapped on.

1743.   During this early time period, Grauso was acting at all times at the direction of, or with approval from, his superior Orlofski of G&W.

1744.   Grauso left G&W in December 2011 to take a position as a senior executive at Defendant Aurobindo.  With Grauso's departure, CW-6 no longer had a contact at G&W and it became necessary for him to use Grauso to convey messages to Grauso's former colleagues – Kurt Orlofski and Erika Vogel-Baylor.  Orlofski was the President of G&W and Vogel-Baylor assumed Grauso's role as Vice President of Sales and Marketing after his departure.

1745.   This worked well for the first few months of 2012.  However, soon Orlofski believed it prudent to cut out the middleman and communicate directly with CW-6.  David Berthold, the Vice President of Sales at Defendant Lupin, introduced Orlofski to CW-6 and they set up a dinner meeting at an industry conference, which was also attended by Vogel-Baylor.

1746.   At dinner, the competitors engaged in a high-level discussion to ensure that both companies continued to "play nice in the sandbox" and minimize competition with each other even though Grauso had left. No specific products were discussed at the meeting.  The focus was to ensure that the competitors stayed the course and continued to coordinate customer allocation and price increases on products that G&W and Fougera overlapped on.

1747.   After the dinner, Vogel-Baylor began to communicate directly with CW-6. Indeed, between May 2012 and May 2013, when CW-6 left the industry, the two exchanged at least one hundred and thirty-three (133) phone calls and text messages.  During this time period, Vogel-Baylor was acting at all times at the direction of, or with approval from, her superior Orlofski.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1748.   The following Sections will discuss specific examples of how the long-standing competitor relationships detailed above manifested themselves regarding particular products between 2010 and early 2012.

### 1.   Metronidazole Cream and Lotion

1749.   In 2011, Actavis, Fougera, G&W, and Harris Pharmaceutical ("Harris") each marketed a generic version of Metro Cream, and Actavis and Fougera shared the market for generic Metro Lotion.

1750.   In early July 2011, Actavis initiated its plan to raise the prices of both products by reaching out to its rival G&W.  On July 6, 2011, Mike Perfetto, then a senior sales and marketing executive at Actavis, called Grauso at G&W twice.  The calls lasted four (4) minutes and twenty-one (21) minutes.

1751.   The next day, on July 7, 2011, the conversation continued, with Perfetto initiating a six (6) minute call to Grauso.

1752.   Confident that at least G&W was on board with the planned increase, Actavis raised the price of Metro Cream and Lotion effective July 22, 2011.  The new WAC price for Metro Cream was $153.33 for a 45gm tube, an increase of 278%.  The WAC price for Metro Lotion increased by 189% to $208.03 for a 59ml bottle.

1753.   That same day, M.A., a Fougera marketing executive, e-mailed several colleagues, including Kaczmarek, with the precise details of the Actavis increase.  Kaczmarek began at once assessing how Fougera would follow, mindful of the fair share rules and the agreement among the competitors.  He inquired of M.A. about G&W's current share of the market, saying: █████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1754.   The next morning, on Saturday July 23, 2011, Fougera utilized one of its most reliable sources of information – the relationship between Fougera's CW-6 and Grauso at G&W. CW-6 called Grauso and the two competitors spoke for four (4) minutes.  A few minutes later, CW-6 called Grauso again and they spoke for fourteen (14) minutes.

1755.   Just after 9:00 a.m. on Monday, July 25, 2011, Kaczmarek cautioned his team at Fougera to consult with management before quoting a price to any customer on Metro Cream or Metro Lotion, saying: ███████████████████████████████████████████

████████████████████████████████████

1756.   By 10:31 a.m. that morning, Kaczmarek had already decided on the exact amount by which Fougera should increase its price on these products to stay in lockstep with Actavis. He told his colleagues: ███████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████   By early afternoon, a price increase announcement letter had already been drafted and circulated for comment, incorporating Kaczmarek's ██████████████ formula.

1757.   Meanwhile, CW-6 and Grauso continued their discussions that same morning. CW-6 initiated calls to Grauso at 9:55 a.m. and 12:21 p.m.

1758.   Less than twenty (20) minutes after the second call with Grauso ended, CW-6 called his boss, Kaczmarek, to report the information he had obtained.  A total of eight calls were exchanged between CW-6 and Kaczmarek on the afternoon and early evening of July 25, 2011.

1759.   During those calls – only 3 days after the Actavis increase and before G&W had even been able to follow – Kaczmarek informed the Fougera team that ████████████████████

██████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1760.   In the early afternoon of Monday, July 25, 2011, a large customer reached out to CW-6 at Fougera seeking a new source of supply for Metro Lotion and another product.  CW-6 asked whether the request was the result of supply issues or ████████████████████  The buyer, tongue-in-cheek, asked which answer would yield the better price.  CW-6, following Kaczmarek's earlier instructions replied: ████████████████████████

████

1761.   That same day, Fougera informed its customers that it was increasing its pricing for both Metro Cream and Metro Lotion effective July 26, 2011, closely tracking Actavis's new prices.  The new WAC price for Metro Cream was $151.80 for a 45gm tube.  The new WAC price for Metro Lotion was $205.95 for a 59ml bottle.

1762.   Customers quickly began to complain to Fougera about the sharp price increase, prompting one Fougera customer service representative to ask Kaczmarek for help in framing a response to a disgruntled customer that e-mailed protesting that the roughly 150% price hike was

████████

1763.   Undaunted by the obvious dissatisfaction of its customers, Fougera's singular focus was on ensuring that the competitors all followed the price increases.  In response to yet another customer inquiry about the price spike, Kaczmarek virtually disregarded the news of the customer's displeasure, saying instead: ████████████████████

1764.   Kaczmarek did not have to worry for long, however, as G&W's plans to follow the Actavis and Fougera price increases on Metro Cream were already in full swing.  On July 26, 2011 – the day of the Fougera increase – Grauso of G&W called CW-6 of Fougera.  The call lasted one (1) minute.  CW-6 hung up and immediately called Kaczmarek.

1765.   Meanwhile, less than ten minutes after ending his call with CW-6, Grauso brought Actavis into the conversation, initiating a two (2)-minute call to Perfetto.  Orlofski of G&W similarly followed up with a text message to Perfetto at Actavis roughly a half hour after that. Grauso called CW-6 at Fougera again a few hours later, and the resulting call lasted seven (7) minutes.  Within five minutes of the end of that call, Grauso had placed yet another call to Perfetto at Actavis, this one lasting five (5) minutes.

1766.   By that evening, Grauso had spoken to Perfetto by phone for thirty-five (35) more minutes, and had sent him a text message, while CW-6 of Fougera had conferred twice more with his boss, Kaczmarek.

1767.   Over the next two days, July 27 and July 28, 2011, Grauso spoke to Perfetto at Actavis four more times and to CW-6 at Fougera six (6) more times.

1768.   With its competitors fully apprised, G&W raised the price of Metro Cream on July 28, 2011, following close on the heels of the Actavis and Fougera increases.

1769.   As the news of yet another Metro Cream price increase hit the market, customers again scrambled to find more reasonably priced sources of supply.  One large customer reached out to Fougera and Actavis on the same day as the G&W increase seeking quotes.  Fougera sales executive K.K. contacted Kaczmarek about the request, surmising both that the customer was currently supplied by G&W and that G&W must be implementing a price increase.

1770.   Despite over a week of receiving nearly constant updates from G&W through CW-6, Kaczmarek remained coy about his knowledge of G&W's increase, saying: ████

████████   Then, to ensure that K.K. did not try to compete for the business, he added:

████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1771.   Finally, just four days later on August 1, 2011, the remaining competitor, Harris, fell in line with an increase of its own on Metro Cream.  The new Harris WAC price was $135.00, an increase of 437%.

1772.   On August 2, 2011, a customer informed G&W that its increase would bump G&W from its primary position on Metro Cream, but only by a small margin considering the market-wide increases.  Vogel-Baylor promised the customer a slight price adjustment in order to maintain the primary position but asked who the other competitor was.  The customer responded that it was Harris.

1773.   The following day, the customer followed up with Vogel-Baylor to let her know that Harris would not be fighting G&W for the primary position.  The customer added that the Harris representative was upset about the outcome – not because it failed to win the primary position, but rather █████████████████████████████████████████████████

### 2.    Calcipotriene Solution

1774.   In early 2010, the market for generic Calcipotriene was shared by Fougera, Impax, and non-Defendant Hi-Tech.  Even with three competitors in the market, pricing remained high and the product was "hugely profitable" for the sellers.

1775.   On July 23, 2010, however, Hi-Tech received a warning letter from the FDA detailing numerous violations found during a recent manufacturing facility inspection.  Even though G&W was not in the Calcipotriene market at the time, Grauso knew his contact at Fougera would be interested in the information.  On July 28, 2010, he forwarded a copy of the FDA letter to CW-6 at Fougera.  Pleased with the news, CW-6 replied: █████████████

1776.   By the end of July 2010, Hi-Tech had discontinued the product, leaving its approximate 35% market share open for competitors to claim.

1777.   One year later, on June 6 and 7, 2011, CW-6 and Grauso exchanged several phone calls, with one call lasting eight (8) minutes.  During those calls, Grauso informed CW-6 that G&W would soon be launching its own generic Calcipotriene.

1778.   Shortly after speaking with Grauso, CW-6 e-mailed Kaczmarek and other colleagues at Fougera sharing the news that he had just learned from his competitor – G&W was launching that week.

1779.   G&W did, indeed, launch Calcipotriene that week – on June 10, 2011.  As G&W was entering the market, CW-6 and Grauso continued to speak, including exchanging two calls on June 23, 2011 and one call on June 24, 2011 lasting sixteen (16) minutes.

1780.   A few months later, between November 10 and November 17, 2011, CW-6 and Grauso exchanged at least seven separate phone calls.  The topic of conversation during these calls was a G&W price increase that was about to become effective for Calcipotriene.

1781.   At the end of this series of phone communications between Grauso and CW-6, G&W instituted a 54% price increase on Calcipotriene, effective November 18, 2011.  Grauso sent an internal e-mail advising the team to █████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████

1782.   Shortly after the G&W price increase became effective, on November 21, 2011, CW-6 of Fougera called his supervisor, Kaczmarek.  Immediately upon hanging up, CW-6 called Grauso and they spoke for five (5) minutes.  Within minutes after that call ended, CW-6 called Kaczmarek again to report the results of his call with the competitor.  Almost simultaneously, Grauso was also reporting the substance of his conversation with CW-6 to his G&W colleagues, by placing calls to Orlofski and Vogel-Baylor.

497

1783.   Fougera acted quickly.  Just two days later, it followed G&W's price increase. Fougera's new WAC price on Calcipotriene went into effect on November 23, 2011.

### 3.   Fluocinolone Acetonide Cream and Ointment

1784.   In early 2011, Fougera had 100% share of the market for these products and was making plans to implement a price increase.

1785.   At an October 3, 2011 meeting of the Fougera Pricing Committee, members discussed their confidence that they were nearly ready to execute the planned increase. Moreover, they discussed the possibility that Fougera could use the impending entry of a competitor into the Fluocinolone market to ensure the success of the price hike, saying: ███

████████████████████████████████████████

██████

1786.   The market intelligence that the Fougera Pricing Committee had when it convened was the result of at least a week's worth of preparatory conversations that CW-6 had in late September 2011 with the entering competitor – G&W.  Between September 20, 2011 and September 27, 2011, CW-6 and Grauso at G&W exchanged five phone calls, speaking for a total of forty-six (46) minutes.

1787.   The conversations between CW-6 and Grauso continued at a vigorous pace over the coming weeks as Fougera moved towards its price increase, and G&W planned for its launch.  The two exchanged sixteen calls during October and November 2011:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 11:10:00 | 0:06:00 |
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 12:10:00 | 0:01:00 |
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 13:08:00 | 0:14:00 |
| 10/10/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:22:00 | 0:01:00 |
| 10/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 14:53:00 | 0:01:00 |
| 10/11/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:39:00 | 0:02:00 |
| 10/31/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 4:01:00 | 0:06:00 |
| 11/2/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 9:49:00 | 0:10:00 |
| 11/9/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 12:22:00 | 0:01:00 |
| 11/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 4:29:00 | 0:02:00 |
| 11/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 5:56:00 | 0:07:00 |
| 11/11/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 9:55:00 | 0:04:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 14:37:00 | 0:02:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:54:00 | 0:11:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 15:04:00 | 0:04:00 |
| 11/21/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 8:37:00 | 0:05:00 |

1788.   On the morning of December 14, 2011, Fougera learned that G&W had launched Fluocinolone the preceding day and, importantly, that it had done so at nearly the same pricing as Fougera's current (pre-increase) price.

1789.   D.K., a senior executive at Fougera, was quite displeased with the development considering Fougera's impending price increase, saying: ████████████████ J.B., also a senior executive at Fougera, concurred: ███████████████████████

1790.   Less than a half hour later, Kaczmarek called CW-6.  The call lasted two (2) minutes.  Immediately after hanging up, CW-6 placed a call to Grauso.  They spoke for six (6) minutes.  Later that day, the competitors exchanged two more calls lasting nine (9) minutes and eighteen (18) minutes, respectively.

1791.   Having received some peace of mind from the conversations between CW-6 and Grauso, D.K. of Fougera sent an internal e-mail recommending that Fougera move forward with the planned price increase on Fluocinolone, adding ████████████████

1792.   To solidify the plan, CW-6 and Grauso placed three more calls to each other that afternoon.  Less than an hour after his final call with CW-6, Grauso initiated the first of three

calls to his superior, Orlofski, to update him on the Fluocinolone discussions with Fougera. CW-6 also called to update his supervisor, Kaczmarek.

1793.   Six more calls followed between CW-6 and Grauso in the days that followed between December 15, 2011 and December 21, 2011.

1794.   At the conclusion of that series of calls, on December 22, 2011, Fougera increased WAC pricing on Fluocinolone Cream and Ointment by 200%.

1795.   Fougera knew from its discussions with G&W that G&W would follow the price increase.  On the morning of December 28, 2011, D.K. of Fougera instructed a co-worker to find out whether G&W had followed Fougera's price increase yet.  The co-worker reported that the competitor had not.

1796.   Shortly before noon that day, CW-6 and Grauso had a twenty (20) minute phone conversation.  Immediately after that call ended, Grauso called his colleague at G&W, Vogel-Baylor.

1797.   Less than a week later, on January 3, 2012, G&W followed through with its assurances to Fougera, increasing WAC prices on Fluocinolone Cream and Ointment to within pennies of Fougera's prices.  D.K. was delighted by the news and agreed with a colleague's suggestion that Fougera would ████████████████████████████████████████ ████████████████

1798.   Fougera was satisfied with G&W's compliance and promptly gave up its Wal-Mart business to G&W, quoting intentionally high prices on this drug to allow the rival to ██████████████████  Specifically, Kaczmarek recommended giving G&W 30-35% share of the market, adding █████████████████████████████████████████

1799.   In early February 2012, the two companies continued to collaborate on allocating the market between themselves to give the new entrant its fair share.  CW-6 called Orlofski on the morning of February 1, 2012, because his regular contact at G&W – Grauso – had left the company for employment at Aurobindo a few weeks earlier.  Less than one hour later, Orlofski called CW-6 back.  On February 8, 2012, Orlofski called Kaczmarek.  Kaczmarek called Orlofski back on February 9, 2012, and the competitors exchanged two more calls the following day, including one call lasting over twenty-five (25) minutes.

1800.   At the conclusion of these communications, on February 14, 2012, Fougera ceded another large customer to G&W, telling Cardinal that it would █████████████████ ████████████.

1801.   In late 2012, Sandoz, which had acquired Fougera, learned that Teligent was planning to enter the Fluocinolone market.  Sandoz raised WAC prices for Fluocinolone again.  Then, once Teligent entered the market, Sandoz ceded share to Teligent.  In March 2013, when a Sandoz customer, █████, sought to negotiate lower pricing based on Teligent's entry, Sandoz personnel wrote internally that Sandoz ████████████████████████████████ ████████████████████████████████████████████ Teligent, in turn, matched the WAC price increases by Sandoz and G&W.

### 4.   Betamethasone Valerate Lotion

1802.   In mid-2011, two companies shared the market for Beta Val Lotion – Fougera with 79% of the market, and Teva with 21% market share.

1803.   In early November 2011, however, Grauso at G&W contacted CW-6 with some important news about G&W's plans to enter the Beta Val Lotion market.  Grauso called CW-6 late in the afternoon of November 9, 2011.  They also spoke three times the next morning.  Later

that day, CW-6 informed his Fougera colleagues that G&W would be launching  and that he believed Teva had discontinued the product. He opined that, under those circumstances, Beta Val Lotion ██████████████ Kaczmarek responded: ████████

████████

1804.   Fougera promptly began preparing for an even larger price increase than CW-6 had recommended. On December 13, 2011, CW-3, a Fougera sales executive, created a spreadsheet detailing Fougera's upcoming price increases, including a 200% increase in WAC pricing for Beta Val Lotion from $20.00 to $60.00 per 60ml bottle. The average net sales price for the product would go from $10.11 to $30.33.

1805.   With the Fougera price increase details now firm, CW-6 began coordinating the price increase directly with G&W, initiating what became a series of twelve phone calls with Grauso at G&W from December 14 through December 21, 2011, in the days leading up to Fougera's price increase for Beta Val Lotion.

1806.   Fougera's new $60.00 WAC price went into effect on December 22, 2011.

1807.   CW-6 and Grauso remained in close contact in the days that followed the Fougera price increase, as G&W also finalized plans for its Beta Val Lotion launch, including a twenty (20) minute call on December 28, 2011, Grauso's last day as a G&W employee. During these calls, the competitors discussed G&W's market share goals and identified customers for G&W to target as it launched.

1808.   On January 9, 2012, Vogel-Baylor of G&W (who had just taken over for Grauso) distributed to her colleagues a ████████████ for the G&W launch of Beta Val Lotion, saying ████████████████████████ That same day, she sent an e-mail to Wal-Mart announcing the

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

G&W launch.  On January 11, 2012, she followed up with a quote, offering to supply the product for $10.40, far below Fougera's newly increased average net sales price.

1809.   Vogel-Baylor directed her colleagues at G&W to generate a nearly identical offer letter for another customer – Rite Aid – on January 10, 2012, offering a price of $10.20.

1810.   Something had clearly been lost in translation after Grauso's departure, and CW-6 of Fougera set out to figure out what had happened.  Late in the afternoon on January 11, 2012, CW-6 placed an urgent call to Grauso, who had recently started at Defendant Aurobindo. Grauso called him back quickly and the two spoke for five (5) minutes Immediately upon ending that call, Grauso called his former colleague at G&W, Vogel-Baylor, to convey Fougera's concerns about G&W's drastically underpriced offers.  As soon as that call ended, Grauso called CW-6 of Fougera to confirm that he had addressed the problem.

1811.   At 10:02 p.m. that same day, Vogel-Baylor e-mailed Orlofski with the news she had just received about Fougera:



1812.   At 7:55 a.m. the following morning, Vogel-Baylor asked that the G&W team re-submit the Rite Aid proposal with a new price of $20.00, bringing it more in line with Fougera's new price.  That same day, G&W also issued a revised price proposal to Wal-Mart, quoting the new price of $20.00.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1813.   Vogel-Baylor explained the sudden about-face to a colleague by saying that she had revised the G&W launch pricing for this product ████████████████████ The modified schedule included $30.00 for large chains, $32-$75 for small chains, and $38.53 for wholesalers, closely paralleling the new Fougera prices.

1814.   One week later, on January 19, 2012, Vogel-Baylor announced to Orlofski that G&W had already reached its target market share for Beta Val Lotion: ████████████  ████████████████████████ By following Fougera's price increase, that 45% share equated to $1.6 million in total annual gross sales for G&W.

1815.   In a February 17, 2012 e-mail exchange with a distributor, Orlofski explained G&W's rationale for not seeking additional market share on this product: ████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████

### 5.   Metronidazole .75% Gel

1816.   As of June 2011, there were three principal competitors in the market for Metro Gel .75% – Fougera, Sandoz, and Taro.

1817.   In the summer of 2011, Sandoz was seeking opportunities to increase prices on its products.  In pursuit of that goal, on July 6, 2011, J.P., a product manager at Sandoz, sent an internal e-mail asking for information on any recent price increases instituted by rivals Taro and Fougera on a list of products on which the companies overlapped.  The list included Metro Gel .75%.  J.P. urged that obtaining such information would ████████████████████ ██████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1818.   That same day, July 6, 2011, CW-4, a senior sales executive at Sandoz, exchanged three calls with D.S. at Taro, including one call lasting sixteen (16) minutes.  During these calls, D.S. informed CW-4, among other things, that Taro would be raising prices on Metro Gel .75%.  Based on their prior conversations and understanding, CW-4 knew that Sandoz was expected to follow the price increase.

1819.   Later that day, CW-4 responded to J.P.'s e-mail stating ████████████████████ ██████████████████████   She then listed out the competitive intelligence she had just gathered from D.S.  Regarding Metro Gel .75%, she included the notation ████████████████████

1820.   Over the coming months, Sandoz kept watch on the market, waiting to follow Taro's expected price increase on Metro Gel .75%.

1821.   In the interim, on July 20, 2011, a fourth competitor, G&W, entered the Metro Gel .75% market.  Despite only recently entering the market, G&W quickly got to work coordinating a price increase on Metro Gel .75%.  For the increase to succeed, G&W would need to ensure that the other competitors in the market would follow – and follow they did.

1822.   From January 29 to February 1, 2012, the ECRM held its Retail Pharmacy Generic Pharmaceuticals Conference in Atlanta, Georgia.  Representatives from all four (4) competitors in the Metro Gel .75% market – Fougera, Sandoz, Taro, and G&W – were in attendance.  These representatives included CW-6 and Kaczmarek of Fougera, CW-4 of Sandoz, D.S. of Taro, and Vogel-Baylor and Orlofski of G&W.  Grauso, then at Aurobindo, was also in attendance.

1823.   On February 2, 2012, the day after the conference concluded, G&W generated a price increase analysis for Metro Gel .75%, which included a 245% increase to the WAC price from $39.99 to $137.99.  That same day, Vogel-Baylor used her former colleague Grauso (then

at Aurobindo) to convey information to CW-6 at Fougera regarding the Metro Gel .75% price increase.

1824.   For example, on February 2, 2012, Vogel-Baylor called Grauso and they spoke for eight (8) minutes.  Grauso hung up and immediately called CW-6 of Fougera.  The two men spoke for four (4) minutes.  Immediately upon hanging up, Grauso called Vogel-Baylor back and they spoke for eleven (11) minutes.  Grauso then called CW-6 again and spoke to him for five (5) minutes.  Grauso hung up, received a call from Orlofski at G&W, and the two men spoke for thirteen (13) minutes.  These calls, which all occurred within the span of less than an hour, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 9:29:00 | 0:08:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 9:36:00 | 0:04:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:40:00 | 0:11:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 10:14:00 | 0:05:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Orlofski, Kurt (G&W) | 10:19:00 | 0:13:00 |

1825.   Later that evening, CW-6 e-mailed his boss at Fougera, Kaczmarek, asking him to give him a call.  CW-6 and Kaczmarek spoke by phone three times the following day.

1826.   On February 7, 2012, Vogel-Baylor e-mailed Orlofski her latest price increase analysis for Metro Gel .75%.  The next day, on February 8, 2012, Orlofski called Kaczmarek at Fougera.  The two competitors exchanged two more calls over the next few days and finally connected on February 10, 2012 for a twenty-five (25) minute call.

1827.   The communications intensified on February 14, 2012 as G&W made final preparations for its price increase announcement.  As they had done previously, Vogel-Baylor and CW-6 used Grauso as the conduit to coordinate their plans on Metro Gel .75%.  These calls are detailed in the chart below:

| Date | Call Ty | Target Name | Direction | Contact Name | Time | Duration |
|------|---------|-------------|-----------|--------------|------|----------|
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 8:42:00 | 0:25:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 11:34:00 | 0:02:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 11:56:00 | 0:13:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Orlofski, Kurt (G&W) | 12:09:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:10:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 12:19:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 12:22:00 | 0:04:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 12:26:30 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | Grauso, Jim (Aurobindo) | 13:25:08 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 13:25:59 | 0:00:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:40:00 | 0:05:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 13:44:00 | 0:06:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:49:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 13:55:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 14:39:00 | 0:08:00 |

1828.  Similarly, the next day, on February 15, 2012, Vogel-Baylor called Grauso and they spoke for eleven (11) minutes.  Less than ten minutes later, Grauso called Vogel-Baylor back and they spoke for forty-one (41) minutes.  Grauso hung up the phone and immediately called CW-6 at Fougera.  That call lasted one (1) minute.  The next day, Vogel-Baylor instructed her team to generate price increase letters for Metro Gel .75%, and to issue them by 1:00 p.m. on February 17, 2012.

1829.  Even before G&W notified its customers of the increase, other competitors in the market knew that G&W would be increasing price and planned to do the same.  For example, on February 15, 2012, two days before G&W sent its notice letters to its customers, Blashinsky, then a senior marketing executive at Taro, informed his colleagues that prices had ██████ ██████████  for Metro Gel .75% and one other product.  ████████████  he added. B.S., a senior executive at Taro, responded: ██████████████████████ ████████████████████████████

1830.  On February 17, 2012, Orlofski e-mailed Blashinsky of Taro asking if he was going to the annual GPhA industry conference the following week.  Orlofski stated, ██████ ████████████████████  Blashinsky responded, ████████████████



████████████████ The next day, Orlofski e-mailed B.S., a senior Taro executive, asking

███████████████████████████████████████████████████████████████

████████████ B.S. replied, ████████████████████████████████████

1831.   On February 17, 2012, G&W sent out letters notifying its customers of the Metro Gel .75% price increase.  That same day, Grauso called Vogel-Baylor and they spoke for sixteen (16) minutes.  Following the now normal pattern, Grauso hung up and called CW-6 at Fougera. The two men spoke for five (5) minutes.  Immediately upon hanging up, Grauso called Vogel-Baylor again.  That call lasted two (2) minutes.

1832.   On February 18, 2012, a GPO customer e-mailed Vogel-Baylor after receiving the Metro Gel .75% notice asking, █████████████████████████████████████

████████████████████████████████████████████████

Vogel-Baylor responded, █████████████████████████████████████

███████████████████████████████████ Of course, Vogel-Baylor already knew that her competitors would follow G&W's price increase, but she could not tell the customer that.  Ultimately, the customer negotiated a 45-day notice period and noted, ████████

████████████████████████████

1833.   On February 20, 2012, Blashinsky reiterated to his colleagues that ████████

████████ were taking place in the Metro Gel .75% market, and that Taro ████████████

████████

1834.   From February 22 to February 24, 2012, the GPhA held its annual meeting in Orlando, Florida.  Senior executives from all four competitors in the Metro Gel .75% market – Fougera, Sandoz, Taro, and G&W – were in attendance.  These representatives included Kaczmarek and D.K., a senior executive at Fougera, R.T. of Sandoz, B.S. of Taro, and Orlofski

508
FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of G&W.  During the conference, the competitors were actively discussing and agreeing on the details of the Metro Gel .75% price increase.

1835.   On February 22, 2012, the first day of the GPhA meeting, Orlofski e-mailed B.S. again, stating ████████████████████████████████████████████████████ ████████████████████████████████   B.S. replied, ██████████████████████████████

1836.   Immediately after meeting with Orlofski on February 22, B.S. e-mailed Blashinsky regarding Metro Gel .75% stating: ████████████████████████████████ ████████   Blashinsky responded, ████████████   B.S. replied, ██████████████████████ to which Blashinsky answered, ██████████████████████   B.S. further inquired, "██████████ ████████████████████████   and Blashinsky replied, ████████████████████████████████ Of course, Fougera and Sandoz had not increased their Metro Gel .75% pricing yet – but B.S. of Taro understood that they would based on his conversation with Orlofski.

1837.   Similarly, that same evening, on February 22, 2012, Kaczmarek of Fougera (who was also at the GPhA conference) sent an e-mail to the Fougera Pricing Committee stating:

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

1838.   On March 5, 2012, CW-3, then a sales executive at Fougera, e-mailed Kaczmarek predicting that ██████████████████████████████████████ with one customer that had already received a pre-increase price quote from Fougera.  Kaczmarek was unsympathetic, responding that he was willing to lose the customer in the interest of maintaining the agreed-

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

upon higher prices.  He added that with respect to Fougera's price at another Metro Gel .75% customer, ████████████████████████

1839.   On March 9, 2012, Rite Aid e-mailed Sandoz asking for a bid on Metro Gel .75%. CW-4 of Sandoz forwarded the invitation to Kellum with the simple comment ████████████ Kellum wasted no time in telling his colleagues that Sandoz should stay clear of the Rite Aid bid, as Sandoz intended to follow the price increase that he believed spawned the opportunity, saying: ████████████████████████

1840.   One week later, when Rite Aid pressed again for a Sandoz bid, CW-4 contacted Kellum to verify that the decision was to decline.  Kellum not only confirmed that fact, but also suggested a pretext: ████████████████ Consistent with this instruction, CW-4 responded to Rite Aid: ████████████████████████ ████████████████████

1841.   Within the next several weeks, all three competitors followed G&W's increase on Metro Gel .75% as agreed and essentially matched G&W's WAC pricing.  Fougera increased on March 16, 2012, Taro increased on March 23, 2012, and Sandoz increased on April 6, 2012.

1842.   On March 22, 2012, the day before Taro increased its price, Orlofski at G&W received two phone calls from a Taro employee[221] lasting twelve (12) minutes and two (2) minutes, respectively.

1843.   Customers began to react immediately to the dramatic price hikes by seeking price quotes from the competitors.  The competitors, however, refused to break ranks.  On April 3, 2012, for example, Fougera received a request from a Taro customer to bid on Metro

---

[221] Taro employees do not have their own individual extensions and calls from their office lines appear in the phone records as coming from the Taro main company number.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Gel .75% in light of the Taro increase.  CW-6 relayed the information to Kaczmarek, saying: ███

███████████████        Kaczmarek responded simply: ████████

1844.   The following day, on April 4, 2012, CW-6 sent Kaczmarek an updated market share breakdown for the Metro Gel .75% market.  CW-6 expressed satisfaction that the market had arrived at an appropriate equilibrium in accordance with fair share principles, saying:

███████████████████████████████████████████████████████████████████

███████████████

1845.   Impax also manufacturered Metronidazole Gel.  Impax entered the market in 2012, and rather than undercut competitors, matched prices.

### E.    G&W/Glenmark

1846.   In addition to colluding with CW-6 at Fougera, Vogel-Baylor at G&W also had a collusive relationship during these early days with CW-5, a senior executive at Defendant Glenmark.  Although G&W and Glenmark did not overlap on a large number of products, Vogel-Baylor and CW-5 capitalized on their relationship to collude and enter into anticompetitive agreements on those products that they did have in common.

1847.   Vogel-Baylor and CW-5 first met at a Rite Aid event in Las Vegas, Nevada in March 2012.  In the months that followed, the two stayed in constant communication through e-mails, text messages, and phone calls, while also meeting in person at various trade shows and customer conferences.  For example, Vogel-Baylor and CW-5 exchanged hundreds of text messages and phone calls in April 2012 alone.  Indeed, between April 2012 and the end of that year, Vogel-Baylor and CW-5 exchanged at least 2,037 phone calls and text messages.

1848.   This Section will discuss a coordinated price increase on one product, Ciclopirox Cream.  A later Section of this Complaint will address additional collusion between the two

competitors in March 2013 regarding Ciclopirox Cream as well as various formulations of a different product, Mometasone Furoate.

1.     **Ciclopirox Cream – April 2012**

1849.   In the summer of 2011, the market for Ciclopirox Cream was evenly split between four competitors – Perrigo with 26%; Paddock Laboratories, LLC ("Paddock")[222] with 30%; Fougera with 21%; and Glenmark with 21%.  Defendant G&W was not in the market at this time.

1850.   On September 21, 2011, however, Vogel-Baylor learned from a customer that Fougera had temporarily discontinued Ciclopirox Cream.  Vogel-Baylor forwarded that information to her supervisor, Grauso, who then called CW-6 at Fougera twice to confirm the information.  The two competitors also spoke again the next morning.

1851.   G&W saw Fougera's exit as an opportunity to enter the market for Ciclopirox Cream.  After confirming Fougera's plans to exit, G&W began making plans to enter the market.

1852.   On October 28, 2011, Vogel-Baylor e-mailed Grauso regarding a meeting she had with Rite Aid concerning G&W's upcoming launches.  Regarding Ciclopirox Cream, Vogel-Baylor noted that Rite Aid's current incumbent was Glenmark and stated that ██████████ ██████████

1853.   Throughout January 2012, G&W began formalizing its strategy for the Ciclopirox Cream launch and reached out to various customers to obtain incumbent information, usage, and pricing intelligence.

---

[222] Perrigo acquired Paddock in July 2011.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1854.   On February 3, 2012, Vogel-Baylor e-mailed Orlofski, a senior G&W executive, notifying him that Ciclopirox Cream was now available in small quantities and that several additional batches would be ready for shipment in the next few weeks.  She further stated that she needed to sit down with him to discuss which customers G&W wanted to approach.

1855.   On February 20, 2012, Orlofski e-mailed Vogel-Baylor with a list of the tasks that she was accountable for.  One of those responsibilities was to secure approximately 20% market share of Ciclopirox Cream per the company's launch plan.

1856.   The next day, on February 21, 2012, Orlofski exchanged eight (8) text messages with S.K., a high-level executive at Perrigo.  Two days later, on February 23, 2012, the two competitors exchanged an additional ten (10) text messages.

1857.   As of March 2012, Glenmark had 60% share of the Ciclopirox Cream market, Perrigo had 25%, and Fougera had the remaining share even as it was phasing out of the market.

1858.   By March 19, 2012, G&W had secured the Ciclopirox Cream business at Walgreens.  Walgreens was a Glenmark customer that accounted for slightly less than G&W's goal of 20% of the market for Ciclopirox Cream.

1859.   On March 23, 2012, Vogel-Baylor asked C.M., a sales executive at G&W, to reach out to Publix to see if the customer would be interested in a bid for Ciclopirox Cream. C.M. responded: ███████████████████████████████████████████████ ████████████████████████████████████████ Vogel-Baylor responded: ████ ████████████████████████████████████████████████████████ C.M. replied: ███████████████████████████████████████ Vogel-Baylor answered immediately stating: ██████████████████████████████████████ ████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1860.   On March 27, 2012, C.M. advised Vogel-Baylor that G&W should put together a proposal for Publix and that the customer planned to award G&W the business before the upcoming RFP.  That same day, while they were both at a Rite Aid event in Las Vegas, Nevada, Vogel-Baylor met CW-5, a senior executive at Glenmark, for the first time.

1861.   Two days later, on March 29, 2012, Vogel-Baylor e-mailed CW-5 stating,  and asked the Glenmark executive to send his full contact information.  The next day, CW-5 responded to Vogel-Baylor's e-mail, providing his contact information and adding, After exchanging a few more e-mails, the two then also exchanged several text messages.

1862.   On April 2, 2012, CW-5 e-mailed Vogel-Baylor stating that he had forgotten his cell phone at home and was

1863.   Throughout the month of April 2012, Vogel-Baylor and CW-5 exchanged hundreds of text messages and phone calls.  During these communications, and others over the next several months, G&W and Glenmark colluded to significantly raise, almost simultaneously, their contract pricing on Ciclopirox Cream.

1864.   For example, on April 11 and April 12, 2012, Vogel-Baylor and CW-5 exchanged more than fifty (50) text messages and phone calls.  In the early morning of April 12, 2012, Vogel-Baylor e-mailed her supervisor, Orlofski, recommending that G&W increase contract pricing for Walgreens and Publix.  She suggested a direct price increase for Publix between 57% and 82% and between 233% and 408% for Walgreens, depending on the dosage size.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1865.   On April 18, 2012, Vogel-Baylor e-mailed C.M. at G&W with specific pricing to submit for the upcoming Publix RFP.  Regarding Ciclopirox Cream, Vogel-Baylor advised that because G&W was doing a price increase on the product, she was including increased pricing on the bid.  Vogel-Baylor further stated that C.M. should discuss this with her before submitting the bid.  That same day, Vogel-Baylor exchanged at least twenty (20) text messages and phone calls with CW-5 of Glenmark.

1866.   That same day, Glenmark also began sending out notices to its customers that it would be increasing its prices for Ciclopirox Cream.

1867.   From April 24 to April 27, 2012, the NACDS held its annual meeting in Palm Beach, Florida.  Representatives from Glenmark, G&W, and Perrigo all attended, including S.K. of Perrigo, Orlofski and Vogel-Baylor of G&W, and CW-5 of Glenmark.

1868.   S.K. of Perrigo and Orlofski of G&W communicated several times by phone in advance of the conference, as well as on the day the conference began.  Between April 19 and 24, 2012, Orlofski and S.K. exchanged at least fifteen (15) text messages.  Orlofski also called S.K. once on April 24, 2012.  The call lasted less than one (1) minute.  Vogel-Baylor and CW-5 of Glenmark continued to communicate constantly throughout this time period.  On April 24, 2012 alone, Vogel-Baylor exchanged eighty-eight (88) text messages with CW-5.

1869.   That same day, April 24, 2012, Cardinal e-mailed G&W requesting a bid on Ciclopirox Cream.  C.M., a sales executive at G&W, forwarded the request to Vogel-Baylor stating: ███████████████████████████████████████████

████████ G&W declined to bid on the opportunity.

1870.   The next day, on April 25, 2012, Vogel-Baylor e-mailed C.M. asking him to

████████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

1871.   Two days later, on April 27, 2012, Vogel-Baylor requested that G&W prepare a price increase letter for Walgreens raising the prices for Ciclopirox Cream between 233% and 408% depending on the formulation.

1872.   On May 21, 2012, Kroger, a Glenmark customer, e-mailed Vogel-Baylor asking if G&W would like to bid on Ciclopirox Cream.  Vogel-Baylor declined to bid on the opportunity claiming that G&W could not handle the volume.

1873.   On May 24, 2012, Vogel-Baylor e-mailed C.M. asking if he had heard whether Publix would accept the price increase on Ciclopirox Cream.  C.M. responded that Perrigo had submitted low pricing on the RFP.

1874.   By this time, Vogel-Baylor had been introduced to CW-6 at Fougera and was communicating with him directly (instead of through Grauso, as she had done previously). Vogel-Baylor knew that CW-6 had a relationship with T.P. at Perrigo, so she reached out to him that same day to have CW-6 act as a conduit between her and T.P. at Perrigo.  Immediately upon hanging up with Vogel-Baylor, CW-6 called T.P. of Perrigo.  After speaking with T.P., CW-6 hung up and immediately called Vogel-Baylor back.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/24/2012 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Fougera) | 17:35:03 | 0:01:01 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:39:00 | 0:05:00 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 17:43:00 | 0:02:00 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:45:00 | 0:01:00 |
| 5/24/2012 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Fougera) | 17:46:02 | 0:00:44 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1875.   Later that day, Vogel-Baylor replied to her colleague C.M. stating, ██████ ████████████████████████████████████████████████ Vogel-Baylor forwarded Perrigo's pricing to her supervisor, Orlofski.

1876.   On June 4, 2012, G&W sent its price increase notice to Walgreens.  In an internal pricing spreadsheet, Perrigo listed its direct pricing at one of its customers on the 15gm, 30gm, and 90gm package sizes as $7.14, $11.22, and $19.39, respectively.  Notably, this pricing was even higher than the increased pricing G&W sent to Walgreens on June 4, 2012.

1877.   On June 6, 2012, Vogel-Baylor and CW-5 of Glenmark exchanged eight phone calls.  All of the calls lasted less than one (1) minute.

1878.   On June 11, 2012, C.M. of G&W e-mailed Vogel-Baylor stating that he had spoken with Walgreens and the customer had told him ███████████████████ ██████████████████████████████ C.M. stated, ████████ ████████████████████████████████████ Vogel-Baylor responded: ████████████████████████████████ That same day, Vogel-Baylor and CW-5 of Glenmark exchanged more than eighty (80) text messages.

1879.   Vogel-Baylor forwarded her exchange with C.M. to Orlofski.  The next day, on June 13, 2012, Vogel-Baylor exchanged eighteen (18) text messages with CW-5 of Glenmark.  Also on June 13, 2012, Orlofski sent a text message to S.R. of Walgreens.  G&W ultimately retained the Walgreens business.

1880.   Between June 15, 2012 and June 26, 2012, Vogel-Baylor and CW-5 continued to exchange multiple text messages each day.  During that time period, the two competitors exchanged five-hundred and forty-five (545) text messages.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1881.   On June 29, 2012, C.M. e-mailed Vogel-Baylor to advise her that MMCAP was

requesting a bid on Ciclopirox Cream. Vogel-Baylor asked: ████████████████      C.M.

replied: ███████████████████████████████████████████████████████

████████████████████████████████ Vogel Baylor responded: ███████████████████

Vogel-Baylor later changed her mind and recommended to C.M. that he bid on the MMCAP

business. As she explained: ███████████████████████████████████████████

████████████████████████████████████

### F.   Additional Collusive Relationships

1882.   The key relationships discussed above are examples and are not meant to be an

exhaustive list of all the collusive relationships that the co-conspirators had with each other

during this time period.  Indeed, even if a company was not a prominent manufacturer of topical

products, if there were product overlaps and a relationship, there was an opportunity to collude.

1883.   The relationship between CW-6 of Fougera and E.B., a senior sales executive at

non-Defendant Hi-Tech, is a good example.  During his tenure at Fougera, CW-6 had only eight

(8) calls with E.B., according to available phone records.  However, Fougera overlapped with

Hi-Tech on the product – Lidocaine Ointment – and, upon information and belief, CW-6 used his

connection with E.B. to significantly raise price on that product prior to Hi-Tech's entry in early

2012.  This collusion is detailed in the following Section.

### 1.   Lidocaine Ointment

1884.   In late 2011, Hi-Tech began making plans to launch Lidocaine Ointment.  At that

time, Fougera was the sole generic manufacturer in the market.

1885.   On November 21, 2011, A.R., a Fougera sales executive, forwarded an invitation

to CW-6, among others, for a conference call on November 28, 2011 to discuss ███████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████ referred to Fluocinolone Acetonide – a product on which Fougera and G&W overlapped and where CW-6 was colluding with Grauso of G&W at the same time. That anticompetitive conduct is discussed above in an earlier Section of this Complaint.

1886.   The next day, on November 22, 2011, E.B. of Hi-Tech called CW-6 and they spoke for seven (7) minutes.  Immediately after hanging up, CW-6 called his supervisor, Kaczmarek, and they spoke for four (4) minutes.  The November 2011 call between CW-6 and E.B. was the first time that the two competitors had ever spoken by phone – according to the available phone records.  During these calls, the two competitors discussed Hi-Tech's entry into the market and Fougera's plan to raise its prices before Hi-Tech entered.

1887.   Fougera held its internal strategy meeting on November 28, 2011.  A few days later, on December 2, and then again on December 5, 2011, CW-6 called E.B.  The calls lasted one (1) minute each.

1888.   Later that month, on December 22, 2011, and consistent with the competitors' discussions, Fougera increased WAC pricing for Lidocaine Ointment by 200%.

1889.   Starting in February 2012, as Hi-Tech began preparing in earnest to enter the market, E.B. and CW-6 began speaking more frequently.  On February 23, 2012, E.B. of Hi-Tech called CW-6 and they spoke for seven (7) minutes.  Immediately upon hanging up, CW-6 called his supervisor, Kaczmarek, to report the conversation.  That call lasted one (1) minute.  An hour later, Kaczmarek called CW-6 back and they spoke for six (6) minutes.  Further, on March 7, 2013, E.B. called CW-6 and they spoke for five (5) minutes.  CW-6 called E.B. back a few minutes later.  The call lasted one (1) minute.  During these calls, the competitors discussed which customers Hi-Tech should target as it entered the Lidocaine market, as well as pricing.

1890.   One week later, on March 13, 2012, Hi-Tech entered the Lidocaine Ointment market and matched Fougera's increased WAC pricing.

1891.   After Hi-Tech entered, and consistent with fair share principles, Fougera gave up several of its Lidocaine Ointment customers to the new entrant.  For example, on March 22, 2012, ABC e-mailed Fougera to advise that it had received an offer for Lidocaine Ointment and asked whether Fougera wanted to bid to retain the business.  CW-3, then a sales executive at Fougera, asked Kaczmarek how to respond and he directed that CW-3 ██████████ to the new player.

1892.   Similarly, on March 27, 2012, CW-6 advised Kaczmarek that Hi-Tech had made an offer to another customer, Ahold, for Lidocaine Ointment.  CW-6 suggested that Fougera ████ ███████████████████████████████████ to which Kaczmarek replied: ████████████

1893.   On May 17, 2012, Wal-Mart e-mailed K.K., another Fougera sales executive, to advise that Fougera was not the lowest bidder on its RFP for Lidocaine Ointment and asked whether Fougera wanted to bid to retain the business.  K.K. forwarded Wal-Mart's request to Kaczmarek, asking how he should respond.

1894.   First thing the next morning, Kaczmarek called CW-6 and they spoke for ten (10) minutes.  A few hours later, Kaczmarek called CW-6 again and they spoke for three (3) minutes.  Immediately upon hanging up, CW-6 called E.B. of Hi-Tech.  The call lasted one (1) minute.  A half hour later, CW-6 called E.B. again.  The call lasted one (1) minute.  That same morning, Kaczmarek responded to K.K.'s e-mail stating, █████████████████████████████████ ████████████████████

1895.   Later that day, Kaczmarek e-mailed the sales team regarding Lidocaine Ointment and stated that Fougera had already given up CVS, ABC, and Rite Aid, which accounted for

34% market share, and advised that Fougera was ████████████████████ S.H., a

Fougera sales executive, then reminded Kaczmarek that Fougera had also given up HD Smith

and Anda to Hi-Tech.  Therefore, Kaczmarek recommended that Fougera ███████████

████████████████  The next day, on May 19, 2012, CW-6 called E.B., speaking

for four (4) minutes – likely letting him know that Fougera was now done conceding customers

to the new entrant.

### G.    Focus On Price Increases Intensifies – Collusion From Late 2012 - 2016

#### 1.    Shifts In The Market Foster Collusion

1896.   In late 2012 and early 2013, there were several changes in and among various

manufacturers of topical products – at both the corporate and personnel levels – that facilitated

and fostered a heightened focus on collusion among many of these competitors.

1897.   For example, in July 2012 Sandoz finalized its purchase of Fougera, a specialty

dermatology company, making Sandoz a much more prominent manufacturer of topical

products.  Indeed, Sandoz publicly touted that the purchase positioned it "as the new #1 in

generic dermatology medicines both globally and in the U.S."

1898.   As a result of the acquisition, most Fougera executives, including Kaczmarek and

CW-6, eventually lost their jobs.  Indeed, out of the five Fougera sales executives in place prior

to the acquisition, CW-3 was the only one to retain a long-term position with Sandoz.

1899.   Because of Sandoz's size and the fact that it manufactured and sold a large

number of generic drugs, many competitors reached out to CW-3 when they learned he had

transitioned to Sandoz because they viewed this as a strategic opportunity to collude on more

overlapping products.  In turn, and as discussed in further detail below, CW-3 would use these

contacts to his own advantage by engaging in anticompetitive conduct in order to prove his worth to Sandoz management.

1900.   Further, in the months following the Fougera acquisition, three key Actavis executives –Boothe, Perfetto, and Aprahamian – left Actavis to assume senior-level positions with competitors.  In December 2012, Boothe became the Executive Vice President and General Manager of Perrigo.  One month later, in January 2013, Perfetto became the Chief Commercial Officer of Taro.  And, in March 2013, Aprahamian followed his colleague Perfetto to Taro and assumed the role of Vice President of Sales and Marketing.

1901.   As discussed below, these former colleagues – now competitors – would use their longstanding relationships and new high-level corporate positions to collude with their key competitors on many overlapping products.

### 2.    Post-Fougera Acquisition, Sandoz Sales Executives Feel Pressure To Demonstrate Their Value

1902.   As a result of the Fougera acquisition, Sandoz had more dermatology products than anyone else.  Although Teva and Mylan were comparable in size to Sandoz, they had fewer topical products.  The other key players in the topical space, Perrigo and Taro, were smaller companies.

1903.   Sandoz moved at a much faster pace than Fougera and sold many more products. At the time, the company was also launching several high-value products and bringing even more new products to market.  CW-3 was thrown into the position and spent a lot of time learning about new (to him) oral solid products.  The mindset at Sandoz was not to celebrate work accomplishments, but to move quickly from one launch to the next.  As a result, CW-3 experienced a significant amount of culture shock and felt stressed and overwhelmed with his new circumstances.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1904.   In addition to his regular job duties and responsibilities, CW-3 was also required to participate in an informal working group created by Sandoz management to evaluate the profitability of the Fougera product line.  Shortly after the acquisition, it quickly became apparent that Fougera sales were lagging below Sandoz's initial financial projections.  As the lone holdover from Fougera, CW-3 felt a great deal of pressure from Sandoz management to come up with a plan to make the Fougera product line more profitable.  CW-3 was responsible for identifying areas to help Sandoz meet its numbers, including recommending where to increase prices or where to increase market share.

1905.   Other Sandoz sales executives were also feeling anxieties resulting from the Fougera acquisition.  For example, CW-4, a longtime Sandoz senior sales executive, was required to re-interview for her position and felt an immense amount of pressure to perform.  Although she ultimately retained her job, CW-4 continued to feel nervous about having to learn a whole new line of topical products and to prove her value to Sandoz management.

### 3.    Key Relationships Emerge And Existing Relationships Strengthen

1906.   The pressures that the Sandoz sales executives were experiencing translated into the emergence of new collusive relationships, and the strengthening of existing relationships, among many of the competitors for topical products.  For example, just as his predecessor CW-6 had done, CW-3 would forge ongoing understandings over the next several years with his key competitors – Taro and Perrigo – with regard to overlapping products.  Similarly, Perfetto would capitalize on his relationship with his former colleague Boothe to collude with respect to products on which Taro and Perrigo overlapped.  Lastly, CW-4 would find solace in her existing relationship with D.S. of Taro who provided confirmation that the companies' understanding

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

would continue unchanged despite the Fougera acquisition.  Each of these relationships is explored in greater detail below.

### H.     Sandoz/Taro

#### 1.     CW-3's Relationships With Aprahamian And H.M. Of Taro

1907.   Around the time of the Fougera acquisition, CW-3 was approached by Aprahamian, then a senior pricing executive at Actavis.  CW-3 and Aprahamian had known each other since 2006 – when CW-3 worked at Cardinal and Aprahamian worked at ABC.  The two men had lost touch over the years as they changed jobs, but they still saw each other throughout the years at trade shows and customer conferences.

1908.   Once CW-3 became a Sandoz employee, he and Aprahamian started communicating regularly again.  For example, although they had exchanged only two (2) calls in 2011 according to available phone records, CW-3 and Aprahamian exchanged at least two hundred and thirty-five (235) phone calls between April 2012 and August 2016 (when CW-3 left Sandoz to take a sales position with a competitor).  CW-3 and Aprahamian almost always communicated by phone and rarely met in person.

1909.   CW-3 and Aprahamian engaged in anticompetitive conduct with regard to several products that Sandoz and Actavis overlapped on while Aprahamian was still at Actavis.  Three examples – Desonide Lotion, Ciclopirox Shampoo, and Betamethasone Valerate Ointment – are discussed in detail below.  However, once Aprahamian moved to Taro in March 2013, the extent of the product overlap between the two competitors increased significantly, and so did their collusion.

1910.   Aprahamian's move to Taro was a promotion.  As Vice President of Sales and Marketing, Aprahamian had the power to set prices.  Similarly, when Aprahamian told CW-3

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

that Taro would give up a customer, CW-3 could rely on that representation given Aprahamian's senior role.

1911.   Over the years, Sandoz and Taro, primarily through CW-3 and Aprahamian, developed an ongoing understanding not to poach each other's customers and to follow each other's price increases.  Indeed, every time that Taro increased prices on a product for which Sandoz was a competitor, Aprahamian informed CW-3 about the increases in advance and provided him with specific price points.  CW-3 would write this information down and then pass the information along to his superiors, CW-1 and Kellum.  The expectation was always that Sandoz would follow the increases – and Sandoz did.

1912.   When there were other competitors in the market beyond Taro and Sandoz, upon information and belief, CW-3 understood that Aprahamian was also coordinating with those competitors as he was coordinating with him.  Many examples of this are discussed below in subsequent Sections of this Complaint.

1913.   Although Sandoz consistently followed Taro's price increases, the company could not always do so right away.  This did not mean that there was not an agreement to follow. Because price increases could trigger price protection penalties from customers, Sandoz would sometimes push the increases to the next quarter to ensure it hit its financial targets.  In the meantime, Kellum would order that Sandoz place the product on strict allocation – meaning that Sandoz would allocate product to a customer based on regular usage – so that there was not a run on Sandoz's inventory resulting from a competitor's increase.

1914.   Further, when Taro increased prices, Aprahamian typically warned CW-3 not to take Taro's customers.  Aprahamian was very animated and would say things like: "Don't take my f***ing customers," "Don't take my business," or "Don't be stupid."  These warnings to

meant that if a Taro customer asked for an offer in response to a Taro price increase, Sandoz should not compete for the business.

1915.   Aprahamian and CW-3 also coordinated on product launches.  For a Taro launch into a Sandoz market, Aprahamian would share with CW-3 the customers Taro was targeting. CW-3 would then pass that information along to CW-1 and Kellum, and then subsequently report their responses back to Aprahamian.

1916.   For a Sandoz launch into a Taro market, which was more often the case because Taro was a smaller company and did not launch as many new products, Aprahamian would give CW-3 specific contract price points for customers that Taro agreed to relinquish.  Aprahamian provided these price points so that Sandoz did not launch at too low a price.  Typically, when Aprahamian told CW-3 that Taro would give up a customer, it did.

1917.   CW-3 also colluded with H.M. of Taro.  Shortly after the Fougera acquisition, CW-6 – who would not be staying at Sandoz – provided CW-3 with H.M.'s contact information. Although CW-3 and H.M. had met each other at a supplier meeting several years earlier, they did not actively start conspiring with one another until after CW-3 moved to Sandoz.  According to available phone records, the two spoke for the first time by phone in September 2012 and then exchanged at least fifty-one (51) phone calls and text messages through March 2014, when H.M. left Taro.  Notably, CW-3 and H.M. were not social friends.  If they were communicating by phone, it was to coordinate anticompetitive conduct with regard to products on which Sandoz and Taro overlapped.

1918.   While at Taro, H.M. shared price points with CW-3 and Sandoz used that information to inform Sandoz's product launches and to obtain market share without significantly eroding prices.  CW-3 considered H.M.'s information to be reliable.  However,

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

once Aprahamian moved to Taro, he told CW-3 not to bother calling H.M anymore and to simply call him directly because he was responsible for pricing.

1919.   During this time period, CW-3 and H.M. were acting at all times at the direction of, or with approval from, their superiors, including CW-1 and Kellum of Sandoz and Aprahamian and Perfetto of Taro.  In turn, Aprahamian was acting at the direction of, or with approval from, his superior, Perfetto.

### 2.  CW-4's Relationship With D.S. Of Taro

1920.   As detailed above, CW-4 of Sandoz and D.S. of Taro had an ongoing understanding going back to at least 2009 that Taro and Sandoz would behave responsibly in the market and not compete on overlapping products.  However, CW-4 was unsure what impact the Fougera acquisition might have on that understanding and felt uneasy about having to learn a whole new product line.

1921.   Upon information and belief, CW-4 reached out to D.S. to calm her nerves and the two competitors had several conversations – both in person and over the phone – during which they discussed which manufacturers of topical products were responsible and which were not.  D.S. reiterated what he had conveyed to CW-4 previously – that ███████████████████ ███████   Upon information and belief, CW-4 understood this to mean that Taro wanted to maintain a fair market-share balance and keep prices high.  Both CW-4 and D.S. concurred (again) that this was the smart way of doing business.

1922.   During this time period, CW-4 and D.S. were acting at all times at the direction of, or with approval from, their superiors, including Kellum of Sandoz and Perfetto and Aprahamian of Taro.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1923.   Soon after the Fougera acquisition, CW-4 learned from Sandoz management that the company was looking to increase market share and take price increases on certain drugs in the Fougera product line to improve the profitability of the Fougera portfolio.  At this time, there were several products where Fougera had less than its fair share.

1924.   Shortly thereafter, CW-4 conveyed this information to D.S. at Taro.  CW-4 wanted to make sure that if Sandoz tried to take a Taro customer, D.S. would not get alarmed and would understand that it was only because Sandoz was looking for its "fair share" on that product.  Similarly, CW-4 wanted to signal to D.S. and Taro that if Sandoz took a price increase, Taro should follow, or vice versa.  D.S. listened to what CW-4 said and did not disagree.

### 3.   CW-3's Relationship With T.P. Of Perrigo

1925.   Just as CW-6 had provided H.M.'s contact information to CW-3 shortly after the Fougera acquisition, he also introduced CW-3 to T.P. of Perrigo.  The two competitors spoke for the first time by phone in August 2012 and then exchanged at least eighty-one (81) phone calls through the end of 2014.

1926.   CW-3 and T.P. were not social friends.  If they were communicating, it was to coordinate anticompetitive conduct with regard to products on which Sandoz and Perrigo overlapped.  CW-3 and T.P. generally spoke only by phone.  They did not exchange e-mails or text messages because T.P. did not want to create a written record of their communications.  T.P. also did not like receiving voicemails.  On one occasion, CW-3 left a voicemail for T.P. on his office phone.  T.P. thereafter called CW-3 to admonish him, demanding that CW-3 not call his office phone but instead only call him on his personal cell phone.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1927.   CW-3 continued the ongoing understanding that his predecessor, CW-6, had in place with T.P. – that the competitors would not poach each other's customers and would follow each other's price increases.

1928.   Conversations between CW-3 of Sandoz and T.P. of Perrigo about price increases were intended to encourage the other side to follow.  Sandoz was typically a price-increase follower.  Neither company wanted to disrupt the market or do anything to lower prices.  CW-3 and T.P. provided each other with information about price increases with the understanding that the other company would not use the price increase as an opportunity to compete for market share and take the other's customers.

1929.   Similarly, when Sandoz was launching into a Perrigo market, T.P. would provide CW-3 with a list of customers to target.  T.P. also had access to Perrigo's pricing file.  The file was searchable by customer and included non-public information such as contract pricing, dead nets, and cost of goods sold. T.P. provided pricing information to CW-3 when he requested it.  However, on occasion, T.P. had to first check with his boss, Wesolowski, before he did so.

1930.   When T.P. provided CW-3 with information, he typically cautioned that CW-3 should be "smart" with the information; meaning that Sandoz should not use the information against Perrigo. CW-3 could generally rely on the pricing and customer alignment information that T.P. provided to him.

1931.   During this time period, T.P. was acting at all times at the direction of, or with approval from, his superiors, including Boothe and Wesolowski.

### 4.    Perfetto's Relationship With Boothe Of Perrigo

1932.   Prior to Sandoz's acquisition of Fougera, H.M. of Taro and T.P. of Perrigo used CW-6 as a conduit to collude on overlapping products because the two competitors did not have

an independent relationship.  That changed when former Actavis executives, Perfetto and

Boothe, moved to Taro and Perrigo, respectively.  As a result of these moves, the two

competitors could now communicate directly to coordinate their anticompetitive conduct with

regard to products on which Taro and Perrigo overlapped.

1933.   Indeed, between January 2013 and January 2016 (when Boothe left Perrigo), the

competitors exchanged at least one hundred and nineteen (119) phone calls.  During this time

period, the two former colleagues colluded on numerous overlapping products. Some examples

of these products are discussed in detail below.

### 5.    Sandoz Management Knew Of, And Encouraged, The Collusion With Competitors

1934.   Early on after the Fougera acquisition, CW-3 had a conversation with Kellum

informing him that he could provide competitive intelligence on the Fougera product line.

Shortly thereafter, CW-3 began providing Kellum and CW-1 with competitive intelligence he

obtained from competitors regarding price increases, product launches, and customer allocation.

Kellum and CW-1, Sandoz senior pricing executives, both knew that CW-3 obtained this

information directly from competitors because he told them he did.

1935.   CW-3 conveyed competitive intelligence to Kellum and CW-1 through e-mails

and phone calls.  When communicating by e-mail, CW-3 would disguise the true source of his

information by stating that he had received it from a customer.  When CW-3 had truly learned

the information from a customer, it was always from a customer that he worked with, and he

referred to that customer by name in his e-mail.  Upon information and belief, CW-1 and Kellum

understood that when CW-3 referred to hearing from a "customer" without identifying that

customer – or if CW-3 provided information relating to customers that he did not have

responsibility for – it meant that CW-3 had gotten that information from a competitor.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1936.   As detailed above, CW-3's strongest relationships were with Aprahamian of Taro and T.P. of Perrigo, although he engaged in anticompetitive conduct with many others.  These other relationships are explored in greater detail in subsequent Sections of this Complaint.  Wherever possible, CW-3 leveraged his relationships with competitors to demonstrate his value to Sandoz management.

1937.   For example, due to the strength of CW-3's relationship with Aprahamian, Sandoz management created what it referred to as a ███████████ in July 2013 to collude on products where Taro was a competitor.  The ███████████ had a two-pronged approach: (1) implement concerted price increases on products where Sandoz and Taro were the only competitors in the market; and (2) exit the market for certain other products to allow Taro to raise prices and then Sandoz could re-enter the market later at the higher price.

1938.   Although Kellum and CW-1 knew what they were doing was illegal, they continued to encourage and approve of the collusion with competitors.  They did, however, seek to avoid documenting their illegal behavior.  Indeed, Kellum routinely admonished Sandoz employees for putting information that was too blatant into e-mails.  At one point, Kellum told CW-1 ██████████████████████████████████████████████████████ Similarly, as time went on, CW-3 became increasingly anxious about his behavior and said to CW-1 ████ ████████████████████████████████ CW-1 agreed with him.

## I.   Taro Emerges As A Leader Among Generic Topical Manufacturers

### 1.   Increased Focus On Fair Share And Price Increases

1939.   As detailed above, in early 2013 Perfetto and Aprahamian left their positions at Actavis to take executive-level positions at Taro.  The two men wasted no time working together to implement changes at Taro designed to improve the company's bottom line.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1940.   First, Perfetto and Aprahamian focused their efforts on ensuring that Taro had its fair share of the market on the products it manufactured.  To that end, the executives took steps to formalize internal processes for seeking and tracking competitive intelligence obtained by sales executives at the field level.  This included compiling intelligence from not only customers, but from competitors as well.

1941.   For example, in January 2013, at Perfetto's request, J.J., a senior Taro sales executive, e-mailed the sales team asking them to obtain competitive intelligence relating to a list of priority products where ████████████████████████ Taro then used that information to inform which products to bid on, at which customers, and at what price points to meet its fair share targets without eroding the market price.

1942.   Second, Perfetto and Aprahamian positioned Taro as a price-increase leader and implemented significant price increases on a substantial portion of Taro's product portfolio in 2013 and 2014.  Although Taro had had success implementing price increases in the past, the increases in these years would be much larger than they had been in past years.

1943.   For example, in February 2013, Taro took increases on several products, including Nystatin Triamcinolone – its highest grossing product.  When an executive at Dr. Reddy's learned of the news, he sent an e-mail stating: ████████████████████ ████████████████████████████████████████████ ████████   To that, a senior sales and marketing executive at Dr. Reddy's responded, ████ ████████████████████████████████████████████████ ████████████████

1944.   Similarly, in June 2014, Taro took simultaneous, significant price increases on more than a dozen different products.  The chart below, which was included in a Credit Suisse

investor report, details some of the products that Taro increased prices on in the summer of 2014, the percentage of Taro's sales implicated, and the size of the increases. ▇▇▇▇▇▇▇▇▇▇



1945.   As a result of these June 2014 increases, Credit Suisse increased its target pricing for Taro and its parent company Defendant Sun Pharmaceuticals from $85 to $150 per share. As justification for the increase, Credit Suisse emphasized that there had been zero rollbacks of Taro price increases in recent years: ▇▇▇▇▇▇▇▇▇



1946.   These price increases, and others taken by Taro in 2013 and 2014, resulted in the accrual of significant profits to Taro.  Indeed, between 2008 and 2016, Taro's profits increased by an astounding 1300%. As the graph below demonstrates, Taro's financial growth experienced a sharp uptick in 2013, when Perfetto and Aprahamian began at Taro and positioned the company as a price-increase leader.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



1947.   Taro's success in implementing these increases – and in obtaining its fair share on the products it manufactured – depended, in large part, on the strength of the ongoing collusive relationships that Perfetto and Aprahamian had with their contacts at competitor companies. Some of these relationships have been detailed above, but there were many more.

1948.   For example, between March 2013 and October 2018, Aprahamian exchanged at least six hundred and eighteen (618) phone calls and text messages with his contacts at competitors, including Defendants Sandoz, Glenmark, Actavis, Mylan, G&W, Wockhardt, Lannett, Amneal, and Perrigo, and non-Defendant Hi-Tech.

1949.   Similarly, between January 2013 and February 2018, Perfetto exchanged at least

six hundred and ninety (690) phone calls and text messages with his contacts at competitors,

including G&W, Perrigo, Actavis, Glenmark, Aurobindo, Wockhardt, Amneal, and Lannett.

1950.   Aprahamian and Perfetto capitalized on the foregoing relationships to set Taro

apart as a leader in the topical space.  Some examples of how these relationships manifested

themselves regarding specific products are described in detail below.

## 2.   Setting the Stage For Future Collusion –Aprahamian And CW-3 Collude On Products Where Sandoz And Actavis Competed

1951.   The collusive relationship between Aprahamian and CW-3 dated back to

Aprahamian's days at Actavis.  Indeed, two of the first examples of collusion between the two

competitors involved market allocation agreements on Ciclopirox Shampoo and Betamethasone

Valerate Ointment – both products where Sandoz was entering the market and Actavis, acting

through Aprahamian, agreed to cede share to the new entrant.  A third product – Desonide Lotion

– involved Sandoz increasing price while Actavis was out of the market and Actavis re-entering

later at the higher price, in coordination with Sandoz.  These agreements set the stage for how

collusion would work between the two competitors when Aprahamian moved to Taro.  These

products are discussed in greater detail below.

## 3.   Desonide Lotion

1952.   Between 2009 and 2011, Defendants Actavis and Fougera were the only two

generic manufacturers of Desonide Lotion.  In those years, the competitors instituted WAC price

increases that were in lock step with one another.  For example, on June 1, 2009, Fougera

increased WAC pricing by roughly 90% and Actavis followed and matched on September 1,

2009.  Similarly, on July 22, 2011, Actavis increased WAC pricing by nearly 200% and Fougera

followed three (3) days later, on July 25, 2011.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1953.   Following the increases, and consistent with fair share principles, the competitors declined opportunities to bid on each other's business so as not to take advantage of the price increases.  For example, when CW-3, then a Fougera sales executive, asked CW-6, his colleague at Fougera, whether Walgreens had accepted the 2011 price increase, CW-6 responded:

1954.   As of August 2012, the market for Desonide Lotion was evenly split between the two competitors with Sandoz at 56% market share and Actavis at 44%.

1955.   On August 23, 2012, Kellum circulated a list of Fougera products that he recommended taking price increases on, including Desonide Lotion.

1956.   Between August 25 and August 28, 2012, the NACDS held its Pharmacy and Technology Conference in Denver, Colorado.  Representatives from Defendants Actavis and Sandoz attended the conference, including CW-3 and Kellum of Sandoz and Aprahamian, then a senior pricing executive at Actavis.

1957.   At the conference, Aprahamian approached CW-3 and told him that Actavis was having supply issues on Desonide Lotion and would be exiting the market for a period of time. CW-3 then passed this information along to Kellum because he knew Kellum was interested in raising the price on Desonide Lotion and would view Actavis's temporary exit from the market as a positive development.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1958.   J.P., a product manager at Sandoz, was tasked with putting together information for the potential price increases, including on Desonide Lotion.  On September 12, 2012, J.P. e-mailed CW-1, a senior pricing executive at Sandoz, and Kellum asking for input on the rationale for the price increases.  Regarding Desonide Lotion, Kellum responded:  ███████

██████████████████████

1959.   One month later, in October 2012, Kellum asked CW-3 to reach out to Aprahamian to get more specific information regarding Actavis's supply issues on Desonide Lotion.  On October 17 and 18, 2012, CW-3 exchanged several calls with Aprahamian.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/17/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 9:15:00 | 0:02:00 |
| 10/17/2012 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 14:18:00 | 0:03:00 |
| 10/17/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 16:43:00 | 0:06:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:08:00 | 0:01:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:09:00 | 0:06:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 10:30:00 | 0:01:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 14:02:00 | 0:02:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 14:07:00 | 0:06:00 |

1960.   Later that evening on October 18, 2012, CW-3 sent the following e-mail to Kellum and other Sandoz colleagues reporting what he had learned from Aprahamian:  ███████

████████████



1961.   As would become his customary practice, CW-3 referred to his source vaguely as a ████████ because he wanted to avoid putting anything incriminating in writing.  Further,

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CW-3 knew that Kellum understood that his true source for the information was not a customer, but rather his contact at Actavis, Aprahamian.

1962.   After confirming their own ability to supply, Sandoz decided to move forward with a price increase on Desonide Lotion.  In November 2012, Sandoz generated a price increase analysis for the product.  In that analysis, Sandoz assumed ███████████████████████ ████████████████████████████████████

1963.   On December 5, 2012, Sandoz raised its WAC prices for Desonide Lotion by 75%.  On the day before and the day of the price increase, CW-3 called Aprahamian twice, letting him know the details of the increase.  The calls lasted seven (7) minutes and two (2) minutes, respectively.  Several months later, on May 10, 2013, Sandoz again increased WAC pricing for Desonide Lotion – this time by 11%.

1964.   On August 22, 2013, Actavis finally re-entered the Desonide Lotion market and matched Sandoz's increased pricing.  That same day, CW-3 received a text message from A.G., a sales executive at Actavis.

1965.   On August 26, 2013, CW-3 notified the rest of the Fougera sales team that Actavis had re-entered the market.  In response, CW-1 sarcastically recommended reducing all Desonide prices by 75%.

1966.   Instead of cutting prices Kellum recommended that Sandoz ███████████████ █████████████████████████████████████ Kellum noted that ████████████████████ ███████████████████████████████

1967.   Sandoz proceeded to concede several of its Desonide Lotion customers to Actavis in order to allow Actavis to regain its market share without eroding the high market pricing.  For example, in a December 2013 Business Review, Sandoz noted that it had ████████████████████

████████████████████████████████████████████████  Several months later, in a

Fougera Business Review, Sandoz further stated that the Desonide Lotion ████████

████  and that Sandoz planned to ████████████████████████████████████

████████████████

### 4.    Ciclopirox Shampoo

1968.   As of the summer of 2012, the three competitors in the market for Ciclopirox

Shampoo were Perrigo, Actavis, and Taro.

1969.   After the Sandoz acquisition of Fougera was finalized in July 2012, Sandoz

engaged in a review of the Fougera product line to determine whether there were any Fougera

products for which Sandoz should considering re-entering the market.  One such product was

Ciclopirox Shampoo.

1970.   To that end, on September 4, 2012, J.P., a product manager at Sandoz, e-mailed

the sales team, including CW-3, asking for market pricing on Ciclopirox Shampoo, among other

products.  The next day, on September 5, 2012, S.G. a Sandoz sales executive, also followed up

with CW-3 and asked him to provide J.P. with the requested information.

1971.   The following morning, on September 6, 2012, CW-3 reached out to his contacts

at both Taro and Perrigo to discuss Ciclopirox Shampoo.  He then reported the results of those

conversations to both J.P. and S.G. at Sandoz, either that same day or the next day.  These calls

are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 10:15:00 | 0:01:00 |
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 10:32:00 | 0:11:00 |
| 9/6/2012 | Voice | H.M. (Taro) | Outgoing | CW-3 (Sandoz) | 10:57:15 | 0:02:49 |
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | S.G. (Sandoz) | 11:27:00 | 0:01:00 |
| 9/7/2012 | Voice | CW-3 (Sandoz) | Outgoing | J.P. (Sandoz) | 8:58:00 | 0:01:00 |
| 9/7/2012 | Voice | CW-3 (Sandoz) | Outgoing | S.G. (Sandoz) | 8:59:00 | 0:02:00 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1972.   On November 26, 2012, J.R., a marketing executive at Sandoz, e-mailed CW-3 and others at Sandoz regarding the Ciclopirox Shampoo re-launch. J.R. stated that Sandoz planned to re-launch the (former Fougera) product on December 3, 2012 and planned to target 12% market share due to limited supply.  J.R. asked CW-3 about current pricing and told him that they should discuss which customers to target to achieve Sandoz's market share goal.

1973.   The next day, on November 27, 2012, J.R. sent another e-mail about the re-launch reiterating that Sandoz was targeting 12% share and stating that ███████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████

1974.   Thereafter, CW-3 set out to coordinate Sandoz's entry with Aprahamian of Actavis.  The next day, November 28, 2012, CW-3 called Aprahamian and they spoke for nine (9) minutes.  First thing the following morning, on November 29, 2012, CW-3 called Aprahamian again and they spoke for ten (10) minutes.  A few hours later, Aprahamian called CW-3 back and they spoke for three (3) minutes.

1975.   That same day, J.R. e-mailed CW-3, copying CW-1, asking for pricing information on Ciclopirox Shampoo.  Not wanting to put anything in writing, CW-3 responded: ████████████████████  First thing the next morning, CW-3 exchanged two calls with CW-1, with one lasting five (5) minutes and the other lasting twelve (12) minutes, during which CW-3 conveyed the requested pricing information he had received from competitors.

1976.   Later that evening, R.T., a senior sales and marketing executive at Sandoz, sent an internal e-mail asking if Sandoz had sent out offers for Ciclopirox Shampoo.  The next day, on

November 30, 2012, J.R. responded that offers had been sent to Wal-Mart and HD Smith – both Actavis customers – and that Sandoz was considering approaching McKesson – a Perrigo customer.

1977.   That same morning, CW-3 called T.P. of Perrigo twice, to alert him to the fact that Sandoz would be approaching McKesson.  The calls lasted two (2) minutes and one (1) minute, respectively.  Later that day, CW-1 confirmed that Sandoz had sent an offer to McKesson for Ciclopirox Shampoo.

1978.   On December 3, 2012, Sandoz officially re-launched Ciclopirox Shampoo.

1979.   On December 4 and December 5, 2012, CW-3 called Aprahamian twice.  The calls lasted seven (7) minutes and two (2) minutes, respectively.  Also, to close the loop, on December 5, 2012, M.D., an Actavis sales executive, called T.P. of Perrigo and the two competitors spoke for seventeen (17) minutes.

1980.   Within three days of its entry, by December 6, 2012, Sandoz had already secured the Ciclopirox Shampoo business at HD Smith (from Actavis) and McKesson (from Perrigo).

**5.      Betamethasone Valerate Ointment**

1981.   In early January 2013, Sandoz began making plans to re-enter the market for Betamethasone Valerate and targeted February 15, 2013 as its re-launch date.  At that time, Actavis was the only other generic competitor in the market.

1982.   On January 21, 2013, Sandoz held a Commercial Operations call during which the Betamethasone Valerate re-launch was discussed.  During that call, CW-3 noted that Sandoz was seeking 40% of the market – which was typical (and consistent with fair share principles) for a second entrant in a two-player market – and was looking for price points and customer information.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1983.   On February 4, 2013, CW-3 called Aprahamian, who at that time was still at Actavis.  The call lasted one (1) minute.  The next day, February 5, 2013, CW-3 spoke with Aprahamian two more times – with one call lasting twenty-three (23) minutes.  Immediately after each call with Aprahamian, CW-3 called Kellum or CW-1 to report back what he had learned.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 10:14:00 | 0:23:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 10:38:00 | 0:01:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 10:39:00 | 0:01:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 11:24:00 | 0:03:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:27:00 | 0:01:00 |

1984.   During these calls, Aprahamian provided CW-3 with Actavis's non-public pricing for Betamethasone Valerate at its largest customers, as well as the percentage of the market that each customer represented.  The purpose of providing this specific information was so that Sandoz would be able to price as high as possible while still obtaining business from specific, agreed-upon customers that represented an agreed-upon market share.  CW-3 took the following contemporaneous notes in his Notebook, placing check marks next to Rite Aid and Walgreens, two of the customers that he and Aprahamian agreed that Sandoz would target.  These notes are pictured below: ████████████



1985.   Later in the evening on February 5, 2013, J.R., a senior Sandoz marketing executive, sent an internal e-mail, including to CW-3, stating: ███████████

██████████████████████████████████████████████████████

██████████████████████████

1986.   Two days later, on February 7, 2013, C.P., a pricing analyst at Sandoz, sent an internal e-mail, including to CW-3, stating that Sandoz planned to send an offer to Walgreens shortly and would send offers to additional targets once they received feedback from Walgreens. CW-3 responded: ███████████████████████████

1987.   On February 13, 2013, CW-3 called Aprahamian and they spoke for nearly sixteen (16) minutes.  That same day, on February 13, 2013, Rick Rogerson, a senior pricing executive at Actavis, discussed ceding the Walgreens account to Sandoz, stating in an internal e-mail: ███████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

██    In response, Aprahamian confirmed that Actavis would be ceding the Walgreens business,

████████████████████████████████████████████████████████

1988.   Two days later, on February 15, 2013, Sandoz re-entered the market and published WAC pricing that matched Actavis's WAC pricing.  That same day, on February 15, 2013, Sandoz was awarded the Betamethasone Valerate business at Walgreens.

1989.   On February 19, 2013, Sandoz bid on the Betamethasone Valerate business at Rite Aid.  That same day, CW-3 called Aprahamian to let him know.  The call lasted less than one (1) minute.  On February 28, 2013, Rite Aid awarded the business to Sandoz.

1990.   On March 15, 2013, Sandoz bid on the Betamethasone Valerate business at Cardinal.  A few weeks later, on March 27, 2013, Cardinal awarded the business to Sandoz. These three accounts – Walgreens, Rite Aid, and Cardinal – accounted for approximately 32% of the Betamethasone Valerate market.

1991.   On April 1, 2013, Sandoz held a Commercial Operations call during which they discussed, among other items, the status of the Betamethasone Valerate re-launch. CW-3's notes from that call reflect that Sandoz had been able to secure three customers, but was ████████████ one additional customer, OptiSource, to reach its original 40% market share goal: ██████

██████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1992.   The next day, April 2, 2013, CW-3 called and spoke with Aprahamian twice, with one call lasting six (6) minutes.

1993.   On April 4, 2013, Sandoz submitted an offer to Optisource for its Betamethasone Valerate business.  Four days later, on April 8, 2013, Optisource awarded Sandoz the business.

### 6.    Aprahamian Moves To Taro And Immediately Begins Colluding With CW-3 On Products On Which Sandoz And Taro Overlap

1994.   In March 2013, Aprahamian followed his former colleague, Perfetto, to Taro and assumed a senior sales and marketing position.  The product overlap between Sandoz and Taro was much greater than it was between Sandoz and Actavis, thereby allowing the collusion between CW-3 and Aprahamian to become systematic and routine.

1995.   Indeed, immediately upon moving to Taro, and even before, Aprahamian and CW-3 began colluding on several products on which Sandoz and Taro overlapped – Nystatin Triamcinolone Cream and Ointment, Fluocinonide Ointment, and Lidocaine Ointment.  The collusion on these products is discussed in detail below.

### 7.    Nystatin Triamcinolone Cream and Ointment

1996.   By early 2011, Sandoz had discontinued NT Cream and Ointment leaving Taro as the exclusive generic manufacturer of the products.

1997.   Capitalizing on this exclusivity, Taro took several significant price increases on NT Cream and Ointment in 2011 and 2012, which resulted in a total WAC increase of more than 700% on certain formulations.

1998.   Not surprisingly, during this time period, NT Cream and Ointment were Taro's highest grossing products and represented approximately 14.1% of the company's consolidated net sales for the year ending March 31, 2013.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1999.   Enticed by the high pricing, Sandoz began making plans to re-enter the NT Cream and Ointment markets in late 2012 and began coordinating regularly with Taro.  On November 12, 2012 – before Aprahamian had joined Taro – CW-3 of Sandoz called H.M., a Taro sales executive, three times with one call lasting four (4) minutes, to alert him to the fact that Sandoz might be entering the market.  That same day, CW-3 e-mailed M.A., a Sandoz marketing executive, regarding NT Ointment asking, ███████████████████████ ███████████████████████████   M.A. responded that Sandoz planned to launch all three package sizes.

2000.   Two days later, on November 14, 2012, B.S., a senior Taro executive, sent an internal e-mail to other senior executives at Taro and Sun recommending price increases on several products where Taro was exclusive, including NT Cream and Ointment. B.S. explained that ███████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████

2001.   Sandoz's launch dates for NT Cream and Ointment would get pushed back, but CW-3 continued to keep H.M informed.  On January 4 and 7, 2013, CW-3 called H.M. of Taro.  The calls lasted five (5) minutes and thirteen (13) minutes, respectively.  One week later, on January 14, 2013, Taro held a Sales and Marketing conference call. During that call, Perfetto, then a Taro senior executive, informed the team that it was a ████████████████ ██████████  that Taro was █████████████████████████  on NT Cream, and that the company should ██████████████████████████

2002.   Two days later, on January 16, 2013, Perfetto e-mailed J.J., a senior Taro sales executive, advising that it was █████████████████████████████████████████

████████████████████████ and asked J.J. to put together a list of Taro's top 10 customers. J.J. then forwarded the request along internally stating, ████████████████████████ ████████████████████████████

2003.   On February 12, 2013, Taro increased WAC pricing on NT Cream by 25%.

2004.   On February 28, 2013, CW-3 e-mailed M.A. of Sandoz asking for an updated target launch date for NT Ointment. M.A. responded: ████████   That same day, CW-3 called H.M. of Taro to keep him updated on Sandoz's plans, and they spoke for eleven (11) minutes. Two days later, on March 2, 2013, the two competitors exchanged three (3) text messages.

2005.   The following Monday, March 4, 2013, Taro held a Sales and Marketing conference call.  During that call, Perfetto informed the team that Sandoz was ████████ ████████████████

2006.   On March 13, 2013, D.P., a senior sales executive at Sandoz, sent an internal e-mail to the sales team, including to CW-3, requesting ████████████ regarding pricing for certain products that Sandoz was planning to re-launch, including NT Cream and Ointment.

2007.   One week later, on March 18, 2013, Aprahamian started at Taro.  Over the next several days, Aprahamian and CW-3 exchanged several calls.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:16:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 3/21/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:12:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:18:00 |

2008.   On March 19, 2013, D.P. sent CW-3 a ████████████ stating ████ ████████████████████ CW-3 responded: ████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████

███████████

2009.   True to his word, on March 22, 2013, after the series of phone calls referenced above, CW-3 stated: ███████████████████████████████████

██████████  Although CW-3 said his information came from ███████████  the true source was Aprahamian at Taro. CW-3 also shared the file with Kellum and CW-1, a Sandoz senior pricing executive.  Upon information and belief, Kellum and CW-1 understood at the time that CW-3 obtained this information directly from Taro.

2010.   The file attached to CW-3's e-mail, which is pictured below, contained Taro's non-public contract pricing at several customers for several products, including specific price points for NT Cream and Ointment at Cardinal and Rite Aid.  Notably, CW-3 did not have responsibility for either of those customers – which was a clear signal to his superiors that CW-3 had received the information from a competitor rather than a customer.  ████████████████



2011.   The pricing information had been provided directly by Aprahamian for the express purpose of allowing Sandoz to price as high as possible when entering the market.

2012.   On the morning of April 15, 2013, Aprahamian called CW-3 and they spoke for eighteen (18) minutes.  A few minutes after hanging up, CW-3 called Aprahamian back.  The

call lasted one (1) minute.  Upoin information and belief, during these calls, CW-3 told

Aprahamian that Sandoz would be entering the market for NT Cream shortly.  Later that day,

Taro held a Sales and Marketing conference call.  The minutes from the conference call stated:



2013.   On that same day, April 15, 2013, Sandoz held its own Commercial Operations

call during which they discussed NT Cream. During that call, Sandoz identified ABC,

Walgreens, Rite Aid, Wal-Mart, and Omnicare as potential targets for the re-launch.  CW-3's

contemporaneous notes from that call are pictured

2014.   Later that same day, on April 15, 2013, CW-3 called Aprahamian to further

discuss the NT Cream launch.  The two competitors spoke for nine (9) minutes. CW-3's

contemporaneous notes from that call are pictured below:



FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2015.   On the call, Aprahamian provided CW-3 with Taro's non-public pricing at ABC, Walgreens, Rite Aid, and Omnicare.  Aprahamian also told CW-3 that Taro would not defend these customers.  CW-3 noted that by drawing arrows pointing at those customer names in his Notebook.

2016.   After hanging up with Aprahamian, CW-3 immediately called Kellum to report his conversation with the competitor.  The call lasted one (1) minute.  First thing the next morning, on April 16, 2013, CW-3 called Kellum again and they spoke for five (5) minutes.

2017.   From April 20 to April 23, 2013, NACDS held its annual meeting in Palm Beach, Florida.  Representatives from Taro, including Aprahamian and Perfetto, and Sandoz, including D.P. and R.T., a senior sales and marketing executive, attended.

2018.   The following day, on April 24, 2013, Aprahamian called CW-3 twice.  The calls lasted one (1) minute and five (5) minutes, respectively.  On April 25, 2013, CW-3 called Aprahamian.  The call lasted one (1) minute.  That same day, Sandoz re-entered the NT Cream market and matched Taro's increased WAC pricing.

2019.   On the day of Sandoz's re-entry, Rite Aid e-mailed Taro stating that it had received a competitive bid on NT Cream and asked whether Taro planned to bid to retain the business.  H.M. of Taro forwarded the request to his colleagues J.J., Perfetto, and Aprahamian, stating: ███████████████████████████████████████████████████

Aprahamian responded: ███████████████████████████

2020.   The next day, on April 26, 2013, Aprahamian called CW-3 and they spoke for eight (8) minutes.  Consistent with Taro's agreement to cede that customer to Sandoz, Aprahamian e-mailed H.M. on April 27, 2013 asking him to call him Monday morning and stating, ███████████████████████████████████████

2021.   Also on April 26, 2013, Omnicare e-mailed Taro indicating that it had received an offer for NT Cream and gave Taro the opportunity to match the pricing.  D.S. forwarded the request to Aprahamian who responded, ███████████████████████████████████

███████████████████████████████

2022.   That same day, Perfetto sent an internal e-mail to J.K. and M.K., two senior Taro executives, and others including Aprahamian, reporting that over the last two days, Sandoz had approached several of Taro's customers, including ABC, Rite Aid and Omnicare. Perfetto concluded: ████████████████████████

2023.   On May 8, 2013, Perfetto sent an internal e-mail to Taro executives advising that Walgreens was moving its NT Cream business to Sandoz and stating that ████████████████

████████████████   That same day, Aprahamian called CW-3 and they spoke for eight (8) minutes.  CW-3 called Aprahamian back later that day and they spoke for another nine (9) minutes.

2024.   On May 28, 2013, NC Mutual e-mailed Taro stating that it had received an offer from Sandoz and asked whether Taro planned to lower its price to retain the business.  E.G., a Taro sales executive, suggested that Taro defend the account, but Aprahamian disagreed, stating:

████████████████████████████████████████████████

████████████████   Two days later, on May 30, 2013, Aprahamian called CW-3. The call lasted one (1) minute.

2025.   On June 4, 2013, Taro circulated an internal spreadsheet tracking its customer gains and losses for May 2013 for various products.  With respect to Nystatin Triamcinolone Cream, Taro noted that it lost the business at Omnicare because it was ████████████████

and the Walgreens business was ████████████████

2026.   Despite Sandoz's entry, prices for NT Cream remained extremely high.  Around this same time, K.S., a policy executive at Taro, actually sent an internal e-mail to J.J., Perfetto, and Aprahamian asking whether there had ████████████████████████████████████ ████████████████████████████ because ████████████████████████████████████ ████████████████████████████ J.J. replied that Kaiser had begun ██████████████ ████████████████████████ in order to provide some financial relief to its patients.

2027.   Following Sandoz's re-launch into the NT Cream market, Sandoz executives began discussing a larger ████████████ which involved ████████████████████████████ ████████████████████████████ The rationale was simple – allow Taro to grow these markets by increasing prices and then Sandoz could re-enter later at the higher prices, in coordination with Taro.  Sandoz referred to NT Cream as ██████████ for the success of this suggested approach and further noted that it would ████████████████████████████ meaning that it would help Taro increase its profitability on other products in repayment for Taro's willingness to give up its market share to Sandoz on its most lucrative product.

2028.   Indeed, the following chart from a Credit Suisse Investor report graphically illustrates the success of such an approach – depicting the price increases taken by Taro on NT Cream while Sandoz was out of the market and Sandoz's re-entry at the higher price: ██████████ ██████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



2029.   In November 2013, Sandoz began readying to re-enter the NT Ointment market.

Sandoz executives, including Kellum, wanted to mirror the NT Ointment launch after the NT

Cream launch by targeting the same customers as it had for NT Cream.  Kellum specifically

discussed this approach with CW-1.

2030.   On November 13 and 15, 2013, Aprahamian and CW-3 exchanged several calls

during which they discussed NT Ointment.  CW-3 then reported what he discussed on those calls

to CW-1.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duratio |
|------|-----------|-------------|-----------|--------------|------|---------|
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 8:00:00 | 0:01:00 |
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:15:00 | 0:02:00 |
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:32:00 | 0:08:00 |
| 11/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 6:33:00 | 0:08:00 |
| 11/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 6:41:00 | 0:11:00 |
| 11/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 6:55:00 | 0:01:00 |

2031.   During his calls with Aprahamian, CW-3 took the following contemporaneous

notes in his Notebook regarding NT Cream and Ointment:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



2032.   On these calls, CW-3 and Aprahamian discussed Sandoz's plan to target the same customers that it had targeted on NT Cream - ABC, Walgreens, Rite Aid, and Omnicare.  CW-3 drew an arrow from the customers listed under NT Cream to the NT Ointment pricing to demonstrate this.  As he had done before, Aprahamian agreed that Taro would not defend those customers and provided CW-3 with Taro's pricing at those accounts.

2033.   On November 22, 2013, Aprahamian called CW-3 and they spoke for seven (7) minutes.  That same day, Sandoz re-entered the NT Ointment market and matched Taro's increased WAC pricing.  Per the competitors' agreement, Sandoz submitted offers to ████ ██████████████████████████████████████████████████

2034.   The next day, on November 23, 2013, P.G., a senior Sandoz executive, e-mailed Kellum and D.P. regarding the NT Ointment re-launch.  P.G. asked who the other competitors were in the market and how much share Sandoz planned to target.  D.P. responded: ████████ ████████████████████████████████████████████████████████ ██████████████████████████████

2035.   By December 2013, Sandoz had – as agreed – targeted and secured the NT Ointment business at ABC, Walgreens, Rite Aid, and Omnicare.

### 8.      Fluocinonide Ointment

2036.   In early 2013, the Fluocinonide Ointment market was evenly split between Teva with 50% share and Taro with 42% share.

2037.   On February 12, 2013, Taro increased pricing on several products, including Fluocinonide Ointment.  The increase included a 15% increase to WAC.

2038.   On February 21, 2013, M.A., a Sandoz marketing executive, e-mailed Kellum and other Sandoz executives to advise that Taro had increased pricing on several products for which Sandoz was re-entering the market, including Fluocinonide Ointment.  That same morning, CW-3 of Sandoz called H.M. of Taro and they spoke for (9) minutes.  Immediately after hanging up with H.M., CW-3 called his supervisor, Kellum, and they spoke for four (4) minutes.

2039.   One week later, on February 28, 2013, McKesson e-mailed Taro stating that it had received an unsolicited bid on Fluocinonide Ointment and asked whether Taro wanted to bid to retain the business.  Later that day, CW-3 called H.M. again and the two competitors spoke for eleven (11) minutes.  First thing the next morning, on March 1, 2013, CW-3 called his boss, Kellum, and they spoke for five (5) minutes.

2040.   On March 2, 2013, CW-3 and H.M. exchanged three (3) text messages.  That same day, E.G., a Taro sales executive, forwarded the customer request along internally and attached a spreadsheet indicating that McKesson was Taro's largest customer and including the notation: ███████████████████████████

2041.   Two days later, on March 4, 2013, M.L., a Taro pricing executive, forwarded the McKesson request to Perfetto and other Taro executives suggesting that Taro reduce its pricing by 20% and retract the price increase to retain the business.  Perfetto responded that he was okay

with this approach, but posed a question: ██████████████████████████

██████████████████████████████████████████████

2042.   On March 5, 2013, M.L. confirmed that Taro supplied all three wholesalers and

Perfetto responded by asking J.J., a senior Taro sales executive, ██████████████████

████████████████████████████████████████████████████

███████████████   After confirming that Taro was primary on all three, J.J. replied, ██████

████████████████████████████████████████████████████

██████████████████████

2043.   Looking for a creative way to communicate with Sandoz that Taro would rather it

approach ABC or Cardinal instead of McKesson, Perfetto reached out to his former colleague at

Actavis, Aprahamian, who he knew had a relationship with CW-3 at Sandoz.[223]  Perfetto asked

Aprahamian to speak with CW-3 about Fluocinonide Ointment.  The two exchanged calls, and

Aprahamian reported back to Perfetto what they discussed.  These calls are detailed in the chart

below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/4/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Aprahamian, Ara (Actavis) | 15:18:00 | 0:14:00 |
| 3/5/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Aprahamian, Ara (Actavis) | 8:01:00 | 0:02:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:05:00 | 0:02:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:07:00 | 0:11:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 14:52:00 | 0:04:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 10:50:00 | 0:04:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 13:24:00 | 0:03:00 |

2044.   At the same time, CW-3 was reporting back to CW-1, a Sandoz senior pricing

executive, what he had discussed with Aprahamian.  Shortly after that discussion, CW-1

e-mailed Kellum and F.R., a Sandoz pricing executive, regarding Fluocinonide Ointment stating

---

[223] Aprahamian was in the process of leaving Actavis at this point, but would not formally begin working at Taro
     until two weeks later – on March 18, 2013.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

that he had ███████████████████████████████████████████████  Kellum responded, ████████████

██████████████████████  Less than an hour later, Kellum called CW-3 and they spoke for

twenty-three (23) minutes.  Later that day, CW-3 called Aprahamian.  The call lasted less than

one (1) minute.

    2045.   Having identified ABC as its target, CW-1 then asked CW-3 to contact Taro and

obtain price points for the customer.  Following this directive, CW-3 exchanged several calls

with Aprahamian who, in turn, spoke with Perfetto and then relayed the information back to

CW-3.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 12:20:06 | 0:00:30 |
| 3/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 12:27:00 | 0:04:00 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | Perfetto, Mike (Taro) | 12:47:00 | 0:01:00 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 12:49:00 | 0:09:00 |
| 3/11/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 14:16:00 | 0:03:00 |
| 3/11/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 14:18:00 | 0:01:00 |
| 3/11/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 14:25:00 | 0:05:00 |

    2046.   After speaking with Aprahamian for the last time on March 11, 2013, CW-3

called CW-1 and left him the following voicemail:



    2047.   In accordance with the agreement between the two competitors, Sandoz bid on

Fluocinonide Ointment at ABC and Taro promptly conceded the business.

    **9.      Lidocaine Ointment**

    2048.   As detailed above in an earlier Section, in late 2011 Fougera raised its price on

Lidocaine Ointment in advance of non-Defendant Hi-Tech's entry into the market in

March 2012, and the two companies conspired to allocate customers to Hi-Tech in the months that followed.

2049.   One year later, in March 2013, Taro began preparing to re-launch into the Lidocaine Ointment market.  At that time, Sandoz (which by that point had acquired Fougera) had approximately 56% market share and non-Defendant Hi-Tech had 42%.

2050.   On March 18, 2013, the same day that Aprahamian started at Taro, Perfetto sent an internal e-mail, welcoming Aprahamian to the team and listing potential topics for a Monday call. One of those topics was ██████████████████████████

2051.   Over the next several days, Aprahamian and CW-3 of Sandoz exchanged several calls, including a call on March 19, 2013 lasting sixteen (16) minutes and a call on March 21, 2013 lasting twelve (12) minutes.

2052.   Later in the day on March 21, 2013, after Aprahamian's conversations with CW-3, J.J., a senior Taro sales executive, sent an internal e-mail listing Lidocaine Ointment usage numbers by competitor at various customers and stating: ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████  The next day, on March 22, 2013, Aprahamian called CW-3 again.  CW-3 returned the call and the two competitors spoke for seventeen (17) minutes.

2053.   Upon information and belief, during these calls in March 2013, Aprahamian informed CW-3 that Taro would be re-entering the Lidocaine Ointment market.  Upon

information and belief, CW-3, in turn, provided Aprahamian with non-public price points that Sandoz was charging to its customers for the product.

2054.   Armed with this competitively sensitive information, on or about March 23, 2013, Taro re-launched Lidocaine Ointment and matched Sandoz and Hi-Tech WAC pricing.  Over the next two weeks, Aprahamian and CW-3 exchanged numerous calls during which they discussed, among other things, the allocation of customers to the new entrant, Taro.  These calls are listed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/25/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 9:14:00 | 0:05:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 6:49:00 | 0:06:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:51:00 | 0:01:00 |
| 3/29/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 9:51:00 | 0:05:00 |
| 3/29/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:06:00 | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 6:12:00 | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:56:00 | 0:06:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:15:00 | 0:02:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:16:00 | 0:06:00 |

2055.   Although Aprahamian wanted CW-3 to tell him which customers to target, CW-3 had a difficult time obtaining that guidance from Kellum.  Aprahamian told CW-3 that Taro would be taking two customers from Sandoz.  Upon information and belief, CW-3 understood that to mean that Taro planned to take one wholesaler and one retailer.

2056.   On April 5, 2013, J.R., a senior Sandoz marketing executive, sent an internal email asking, ███████████████████████████████████████████████"
CW-3 responded: ███████████████████████████████████████████
███████████████████████████ J.R. replied by asking Defendant Kellum, ███████████
█████████ Kellum answered by providing his understanding of the conversations between CW-3 and Taro: ████████████████████████████████████████

███████████████████████████   Later that day, J.R. sent another e-mail to others at Sandoz

stating: ████████████████████████████████████████

2057.   On April 8, 2013, Taro held a Sales and Marketing conference call.  According to

the meeting minutes, Perfetto reported the following: ███████████████████████████████

████████████████████████████████████████ and ████████████████████████

The next day, on April 9, 2013, CW-3 called Aprahamian and they spoke for seven (7) minutes.

2058.   On April 15, 2013, Aprahamian and CW-3 exchanged three calls, including one

lasting eighteen (18) minutes and another lasting nine (9) minutes. Later that day, Aprahamian

sent an internal e-mail attaching a ████████████████████ The Summary detailed

that, consistent with fair share principles, Taro's ████████████ was ████████████ and they had

achieved ███████ share. For pricing, Taro matched ████████████████████████████

████████████████████████████████████████

2059.   The next day, on April 16, 2013, CW-3 called Aprahamian.  Aprahamian returned

the call and the two competitors spoke for eleven (11) minutes.  At the same time, J.J. of Taro

called E.B., a senior Hi-Tech sales and marketing executive, and they spoke for eight

(8) minutes.  Throughout the rest of April, CW-3 and Aprahamian would exchange at least ten

more phone calls.

2060.   In June 2013, Taro circulated a spreadsheet detailing its gains and losses for

May 2013 for various products.  With respect to Lidocaine Ointment, Taro noted that it did not

bid at Omnicare because ████████████████████

2061.   By January 2014, Sandoz held a ████████████████████████ which included a

presentation on ████████████████████████████████ The presentation contained a

slide titled, ████████████████████████ which included Taro, and identified the Lidocaine

Ointment launch as a key launch for Taro.  Sandoz described Taro's █████████████

███████ as a ███████████████████████████████

2062.   Throughout 2014, Sandoz was careful not to disrupt the market balance it had

achieved with Taro and Hi-Tech with regard to Lidocaine Ointment.  For example, in

March 2014 Sandoz created a list of products to target at Wal-Mart in 2014.  With regard to

Lidocaine Ointment, CW-3 responded that Sandoz had █████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

### 10.     Aprahamian And Perfetto Orchestrate And Lead Price Increases On A Number Of Key Products In May 2013

2063.   In addition to coordinating with Sandoz to allocate the market on several products

on which the two competitors overlapped as detailed above, Aprahamian and Perfetto also began

planning significant price increases on a number of products starting in early 2013.

2064.   Aprahamian and Perfetto focused their efforts on increasing prices on those

products where they had strong relationships and ongoing understandings with individuals at the

competitor companies.  The two men capitalized on these relationships to coordinate price

increases and avoid competing with each other in the markets for those overlap drugs.

2065.   One early example occurred in May 2013, when Taro increased its pricing on

twelve (12) different products (the "May 2013 Increases").  As result of these price increases,

Taro anticipated approximately $110 million in additional revenue.  These products, their

corresponding WAC increases, and Taro's competitors for each product are detailed in the chart

below:

| PRODUCT DESCRIPTION | LARGEST % WAC INCREASE | COMPETITORS |
|---|---|---|
| Alclometasone Dipropionate 0.05% Topical Cream | 223% | Sandoz, Glenmark |
| Ammonium Lactate 12% Topical Cream | 97% | Perrigo, Actavis |
| Ammonium Lactate 12% Topical Lotion | 88% | Perrigo, Actavis |
| Betamethasone Dipropionate (Augmented) 0.05% Topical Lotion | 29% | Sandoz |
| Betamethasone Dipropionate 0.05% Topical Cream | 10% | Sandoz, Actavis |
| Betamethasone Valerate 0.1% Topical Cream | 44% | Sandoz, Actavis |
| Carbamazepine 400mg Extended-Release Tablet | 43% | Sandoz |
| Carbamazepine 100mg/5ml Suspension | 18% | Wockhardt |
| Clomipramine Hydrochloride 75mg Capsule | 3441% | Sandoz, Mylan |
| Desonide 0.05% Topical Cream | 703% | Perrigo, Actavis (entered in Aug. 2013) |
| Desonide 0.05% Topical Ointment | 501% | Perrigo, Sandoz (entered in Jan. 2014) |
| Terconazole 3 Day 0.8% Vaginal Cream | 55% | Sandoz, Actavis |

## 11.    Aprahamian And Perfetto Communicate And Coordinate With Their Competitors In Advance Of The May 2013 Increases

2066.   In advance of the May 2013 Increases, Aprahamian and Perfetto spoke with their competitors on those products – Sandoz, Perrigo, Actavis, Mylan, and Glenmark – to discuss the increases and limit competition between them. Indeed, Taro began communicating with competitors, and formulating its list of products for the increases, as early as April 2, 2013.

2067.   For example, on April 2, 2013, Aprahamian spoke with CW-3 of Sandoz for six (6) minutes.  During that call, the two competitors discussed the price increases that Taro was planning for May 2013 and CW-3 took the following contemporaneous notes in his Notebook:



2068.   Immediately upon hanging up with Aprahamian, CW-3 called another competitor, T.P. of Perrigo, and they spoke for five (5) minutes.  During that call, CW-3 discussed the

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

May 2013 Increases with T.P. and T.P. told CW-3 that he already knew about them.  When

CW-3 hung up with T.P., he immediately called Aprahamian back.  The call lasted one

(1) minute.  A few minutes after hanging up with Aprahamian, CW-3 called his superior Kellum.

Later that morning, Aprahamian called CW-3 and they spoke for another six (6) minutes.

2069.   Two days later, on April 4, 2013, Aprahamian called M.A. of Mylan and the two

competitors spoke for fifteen (15) minutes.  Immediately upon hanging up, Aprahamian called

CW-3 of Sandoz and they spoke for six (6) minutes.  Mylan and Sandoz were competitors with

Taro on the product Clomipramine HCL Capsules ("Clomipramine"), one of the May 2013

Increase products.

2070.   The following Monday, April 8, 2013, Mylan circulated a list of products that it

wanted to focus on to increase its market share.  For Clomipramine, Mylan noted: ▮▮▮▮▮▮

▮▮▮▮▮▮▮



2071.   The fact that Clomipramine was a ▮▮▮▮▮▮▮▮▮▮▮▮ had come directly

from M.A.'s conversation with Aprahamian, because Taro had not yet publicly announced its

price increase on this product and would not do so for several more weeks.

2072.   At the same time, Taro was communicating with Blashinsky of Glenmark.  On

both April 2, 2013 and April 9, 2013, a Taro employee – likely Perfetto – called Blashinsky from

his office phone.  The calls lasted twenty-eight (28) minutes and twenty-three (23) minutes,

respectively.  Also on April 9, 2013, Aprahamian exchanged two calls with CW-3 of Sandoz,

including one call lasting seven (7) minutes.  Sandoz and Glenmark were competitors with Taro

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

on the product Alclometasone Dipropionate Cream ("Alclometasone Cream"), one of Taro's

May 2013 Increase products.

2073.   Further, on April 15, 2013 and April 16, 2013, CW-3 exchanged several calls

with Aprahamian and Blashinsky.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 5:26:00 | 0:18:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 5:49:00 | 0:01:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:58:00 | 0:09:00 |
| 4/16/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 6:29:00 | 0:01:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:32:00 | 0:12:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 10:38:00 | 0:01:00 |
| 4/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:04:00 | 0:11:00 |

2074.   During these calls, the three competitors discussed, among other things, Taro's

planned price increase on Alclometasone Cream.  During at least one of those calls, CW-3

recorded the following contemporaneous notes in his Notebook: ███████████████



2075.   At the same time, Perfetto and Aprahamian were communicating frequently with

their contacts at Perrigo and Actavis.  Further, Perrigo and Actavis were also speaking directly

with each other during this time period.  Perrigo and Actavis had at least two May 2013 Increase

products in common that overlapped with Taro, Ammonium Lactate Cream and Lotion.  These

calls are detailed in the chart below:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/5/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:36:00 | 0:30:00 |
| 4/9/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | M.D. (Actavis) | 14:50:00 | 0:19:00 |
| 4/11/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 12:35:34 | 0:00:29 |
| 4/12/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 13:02:12 | 0:00:56 |
| 4/12/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:12:00 | 0:25:00 |
| 4/15/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:59:00 | 0:01:00 |
| 4/15/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 11:00:00 | 0:08:00 |

2076.   While the competitors were communicating with each other, they kept their colleagues apprised of their communications with competitors.  For example, after several of CW-3's calls with competitors, he immediately called Kellum or CW-1 to inform them of what he had learned.  A few of these examples are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:50:00 | 0:01:00 |
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:51:00 | 0:07:00 |
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 5:58:00 | 0:02:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:58:00 | 0:09:00 |
| 4/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:07:00 | 0:01:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:32:00 | 0:12:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 6:46:00 | 0:05:00 |

2077.   By April 17, 2013, Aprahamian and Perfetto had finalized their list of products for the May 2013 Increases.  That same day, S.G., a sales executive at Sandoz, sent an internal e-mail, including to CW-3 and CW-4, regarding potential supply issues on Carbamazepine ER Tablets – a drug on Taro's list. S.G. stated, ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

2078.   After receiving the e-mail, CW-4 and D.S. of Taro spoke twice, with the calls lasting twelve (12) minutes and two (2) minutes, respectively.  On those calls, D.S. explained that Taro did not have any long-term supply issues.  After hanging up with D.S. for the second time, CW-4 responded to S.G.'s e-mail stating: ▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2079.   At the same time, CW-3 forwarded S.G.'s request regarding Carbamazepine ER directly to Kellum in a separate e-mail stating, ███████████████████████████ ████████ – likely referring to the impending Taro price increase.  To that, Kellum responded simply, ██████

2080.   In the days leading up to the May 2013 Increases, the competitors continued to communicate with each other in order to coordinate the price increases.  Some of these communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:28:00 | 0:13:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 10:41:00 | 0:01:00 |
| 4/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:13:00 | 0:01:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:30:00 | 0:09:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 5:12:00 | 0:01:00 |
| 4/20/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 7:24:00 | 0:01:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 10:44:00 | 0:02:00 |
| 4/20/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 11:48:00 | 0:02:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 11:49:00 | 0:02:00 |
| 4/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 5:43:00 | 0:04:00 |
| 4/22/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 7:00:00 | 0:01:00 |
| 4/22/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 13:42:00 | 0:08:00 |
| 4/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 11:51:00 | 0:02:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:42:00 | 0:01:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 7:52:00 | 0:02:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:34:00 | 0:05:00 |
| 4/25/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:43:00 | 0:01:00 |
| 4/26/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:30:00 | 0:08:00 |

2081.   Also, between April 20 and April 23, 2013, the NACDS held its annual meeting at the Sands Convention Center in Palm Beach, Florida.  Representatives from Taro, Sandoz, Perrigo, Actavis, Mylan, and Glenmark were all in attendance.  The attendees included Aprahamian and Perfetto of Taro, A.B., a senior-most executive at Actavis, and Blashinsky of Glenmark.

2082.   One week later, on April 29 and April 30, 2013, Taro sent notices to its customers informing them of the May 2013 Increases.  The next day, on May 1, 2013, Taro published increased WAC pricing for the affected products.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2083.   During this time, Aprahamian and Perfetto continued to communicate with their competitors.  For example, on April 30, 2013, Aprahamian and CW-3 exchanged two calls lasting fourteen (14) minutes and two (2) minutes, respectively.  During those calls, Aprahamian and CW-3 discussed the May 2013 Increases and the seven Sandoz products that Taro had increased prices on. CW-3's notes from those phone calls are detailed below.  The notes also include references to the other competitors on these products.  For example, CW-3 listed "Alclo Cream – T & G," which stood for Taro and Glenmark:



2084.   After each call with Aprahamian, CW-3 hung up and immediately called Kellum to inform him of what he had learned from Aprahamian.

2085.   At the same time, Aprahamian and Perfetto were also communicating with other competitors about the May 2013 Increases.  Some of these calls, which surround the calls with CW-3, are detailed in the chart below.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 6:30:00 | 0:01:00 |
| 4/30/2013 | Voice | Perfetto, Mike (Taro) | Incoming | A.B. (Actavis) | 7:14:00 | 0:10:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.D. (Actavis) | 10:24:23 | 0:00:06 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:50:00 | 0:14:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 12:44:00 | 0:15:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:37:00 | 0:02:00 |
| 5/1/2013 | Voice | D.S. (Taro) | Outgoing | Blashinsky, Mitchell (Glenmark) | 9:32:00 | 0:01:00 |
| 5/1/2013 | Voice | D.S. (Taro) | Incoming | Blashinsky, Mitchell (Glenmark) | 9:43:00 | 0:21:00 |
| 5/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.D. (Actavis) | 10:35:00 | 0:11:00 |

### 12.   Taro's Competitors Uniformly Declined To Bid On Taro Customers And Followed The May 2013 Increases

2086.   Consistent with their ongoing understandings, Taro's competitors uniformly declined opportunities to bid on Taro's customers after the May 2013 Increases.  Taro's competitors understood that to do so would violate the "rules of the road" and would disrupt the market-share balance that they had worked so hard to achieve.  Indeed, rather than compete, these competitors began working on implementing price increases of their own.

2087.   For example, on April 30, 2013, Publix e-mailed Sandoz stating that Taro had increased pricing on a number of Sandoz overlap products and asked whether Sandoz wanted to bid on them.  The products included Betamethasone Dipropionate Lotion, Clomipramine, and Carbamazepine ER. Kellum e-mailed CW-4 stating, ███████████████████ ████████████████████████████████████████████ CW-4 replied: ███████████████████████████ Upon information and belief, by ████████████ Kellum and CW-4 both meant that this was a chance for Sandoz to raise its prices on these products as well.

2088.   That same day, April 30, 2013, Publix e-mailed Actavis to notify it that Taro had raised pricing on Terconazole Cream and asked whether Actavis wanted to bid for the business. Two days later, and after several calls between Aprahamian and Perfetto and their former Actavis colleagues, M.B., a sales executive at Actavis, also refused to bid, stating: ███████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████████████████████

███████████████████

2089.   Similarly, on May 7, 2013, CVS asked Sandoz if they would be interested in bidding on several of the May 2013 Increase products.  C.P., a pricing analyst at Sandoz, responded internally stating, ██████████████████████████████████

██████████████████████████████████████████████████████████

████   To that, Kellum responded: ████████████████████████████████

████████████████████████████████████

2090.   At the same time, Taro was confident based on its conversations with competitors that its increases would stick. For example, when Kaiser gave Taro push back on the May 2013 Increases, including asking for ████████████████████████████████

██████████ Aprahamian saw no need for explanation and in an internal e-mail responded simply, █████████████████████████████████ Ultimately, Aprahamian's approach yielded results and Taro retained the business at the higher pricing.

2091.   Similarly, on May 8, 2013, Cardinal e-mailed D.S. of Taro stating that regarding Desonide, ████████████████████████████████████████████

████████████████████ D.S. forwarded the e-mail internally and Aprahamian responded, █████████████████████████████████████████████████████████

████████████████████████ Perfetto added, ████████

2092.   Further, by the time the May 2013 Increases were publicly announced, Taro's competitors were already well on their way to implementing comparable price increases of their own.  For example, by May 1, 2013, the day that Taro published its increased WAC pricing,

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Actavis had already conducted its own price increase analysis for Terconazole Cream and had revised its contract pricing to follow the Taro increase.

2093.   Similarly, one day later on May 2, 2013, Kellum e-mailed the Sandoz Pricing Committee recommending that Sandoz increase prices on six of the seven Sandoz products on Taro's May 2013 Increase list.  The power point presentation that Kellum submitted to the Committee contained no detailed price increase analysis and noted simply that Sandoz should increase because Taro had raised prices on those products: ▮▮▮▮▮▮▮▮▮▮▮▮



2094.   Over the next several months, and consistent with their ongoing understandings, Taro's competitors – Sandoz, Perrigo, Actavis, Mylan, and Glenmark – followed Taro's May 2013 Increases with increases of their own.  Several of these competitor price increases, and their corresponding dates, are detailed in the chart below:[224]

---

[224] This list is likely not exhaustive and is based on the information available to date.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Drug | Competitors | Lead/Followed | Date |
|------|-------------|---------------|------|
| Alclometasone Diproproprionate Cream | Sandoz | Followed | 5/10/13 |
| | Glenmark | Followed | 5/16/13 |
| Ammonium Lactate Cream | Actavis | Followed | 6/25/13 |
| | Perrigo | Followed | 7/30/13 |
| Ammonium Lactate Lotion | Actavis | Followed | 6/25/13 |
| | Perrigo | Followed | 7/30/13 |
| Betamethasone Dipropionate Lotion | Sandoz | Followed | 7/26/13 |
| Betamethasone Dipropionate Cream | Sandoz | Followed | 7/26/13 |
| Betamethasone Valerate Cream | Sandoz | Followed | 7/26/13 |
| Carbamazepine Extended Release Tablets | Sandoz | Followed | 5/10/13 |
| Clomipramine Hydrochloride Capsules | Mylan | Followed | 5/16/13 |
| | Sandoz | Followed | 7/22/13 |
| Desonide Cream | Perrigo | Followed | 5/21/13 |
| | Actavis | Re-entered and Matched | 8/15/13 |
| Desonide Ointment | Perrigo | Followed | 5/21/13 |
| | Sandoz | Re-entered and Matched | 1/17/14 |
| Terconazole Cream | Actavis | Followed | 6/5/2013 |

2095.   Consistent with past practice, the competitors also often spoke before they followed with a price increase.  By way of example, and as detailed in the chart above, Sandoz followed Taro's price increases on Alclometasone Cream and Carbamazepine ER with its own price increases on May 10, 2013, and Glenmark followed Taro's and Sandoz's price increases on Alclometasone Cream shortly thereafter, on May 16, 2013.  The following chart details the competitor calls surrounding those increases:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/6/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 7:33:00 | 0:01:00 |
| 5/6/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 8:32:00 | 0:01:00 |
| 5/7/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:01:00 | 0:07:00 |
| 5/8/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 2:44:00 | 0:02:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 5:09:00 | 0:08:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:30:00 | 0:09:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 4:42:00 | 0:02:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 4:45:00 | 0:01:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 4:51:00 | 0:07:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 5:29:00 | 0:01:00 |
| 5/13/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 13:10:00 | 0:01:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:01:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 4:00:00 | 0:18:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 5:23:00 | 0:01:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 11:56:00 | 0:01:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | CW-3 (Sandoz) | 12:27:00 | 0:05:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | CW-3 (Sandoz) | 12:49:00 | 0:05:00 |

2096.   Similarly, Sandoz followed the Taro price increases on Betamethasone Dipropionate Cream and Lotion and Betamethasone Valerate Cream on July 28, 2013.  In the

572
FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

days leading up to the Sandoz price increase, Aprahamian exchanged several calls with CW-3, including a call on July 23, 2013 that lasted three (3) minutes.  During that call, CW-3 conveyed to Aprahamian that Sandoz would be increasing prices on several Taro products, including the Betamethasone products.  CW-3's contemporaneous notes from that call are detailed below:



2097.   Lastly, Perrigo followed the Taro price increases on Desonide Cream and Ointment on May 21, 2013 and Actavis re-entered the Desonide Cream market and matched the competitors' pricing on August 15, 2013.  The chart below details at least some of the communications between the three competitors in the days surrounding these market events:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:38:00 | 0:02:00 |
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | T.D. (Actavis) | 4:41:00 | 0:11:00 |
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:56:00 | 0:17:00 |
| 5/22/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:22:00 | 0:02:00 |
| 5/22/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 12:32:20 | 0:00:19 |
| 5/22/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 12:46:00 | 0:14:00 |
| 5/23/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 11:01:47 | 0:24:02 |
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:47:00 | 0:02:00 |
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Incoming | Boothe, Douglas (Perrigo) | 10:33:00 | 0:13:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Falkin, Marc (Actavis) | 14:52:00 | 0:11:00 |
| 8/8/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 6:32:00 | 0:06:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:24:00 | 0:03:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 9:25:00 | 0:03:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:28:00 | 0:05:00 |
| 8/9/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 10:39:00 | 0:03:00 |
| 8/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.B. (Actavis) | 7:13:00 | 0:09:00 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2098.   Consistent with their ongoing understandings, Taro exercised restraint, just as its competitors had done, and did not poach customers from its competitors after they followed with price increases of their own.  For example, on May 23, 2013, Econdisc reached out to Taro asking for a bid on Alclometasone Cream.  Aprahamian asked D.S., a Taro sales executive, why Econdisc was looking for a bid and D.S. replied: ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

Aprahamian responded: ████████████████ Consistent with Aprahamian's directive, Taro subsequently declined to bid on the business.

2099.   The competitors continued to communicate about the May 2013 Increase products even after the competitors had followed the increases.  These open lines of communication were important to ensure that the competitors did not run afoul of the delicate market share balance they had achieved with each other.

2100.   For example, in September 2013, D.S. of Taro called CW-4 of Sandoz to tell her that Taro's Carbamazepine ER product was being held up at the border.  As a result, Sandoz would likely be receiving requests from Taro customers for the product.  By conveying this to CW-4, D.S. was sending the message that Taro would lose customers if Sandoz sold too much and Taro would have no choice but to compete to get its market share back.  This would disrupt the market and cause prices to deteriorate across the board.

2101.   After speaking with D.S., CW-4 sent an internal e-mail, including to Kellum, stating: ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ Kellum responded in agreement:

████████████████████████████████████

J.     **Building Upon Early Successes – Taro's Continued Collusion Over The Ensuing Years**

2102.   Over the next several years – indeed into at least early January 2016 – Aprahamian and Perfetto continued to use their contacts at competitor companies to collude on overlapping products and improve Taro's bottom line.  During these years, Aprahamian and Perfetto expanded their efforts to allocate markets and fix prices on additional products – including several non-topical products – and to collude with additional competitors.  Although the Taro executives continued to collude with their key competitors – Sandoz, Perrigo, Actavis, Mylan, and Glenmark – they also coordinated with their contacts at other companies including Rising, Lannett, Wockhardt, Amneal, and G&W.  By 2016, a large majority of the company's business was implicated by the executives' anticompetitive conduct.

2103.   The following Section discusses this collusion in further detail as it relates to specific products.

1.     **Alclometasone Dipropionate Ointment**

2104.   As discussed above in an earlier Section, Taro, Sandoz, and Glenmark colluded to significantly raise the price of Alclometasone Cream in May 2013.  Simultaneously, those same three competitors were also coordinating on Alclometasone Ointment.

2105.   In May 2013, Sandoz was the exclusive generic manufacturer of Alclometasone Ointment.  The other competitors – Taro and Glenmark – had exited the market due to supply issues.  However, around this time, Sandoz began experiencing supply issues of its own on Alclometasone Ointment.  As a result, Taro and Glenmark – in consultation with Sandoz – used this as an opportunity to raise the price of the product and re-enter at that higher price.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2106.  As detailed above, the competitors were discussing their plans for Alclometasone Cream and Ointment as early as April 2013.  For example, on April 15 and April 16, 2013, CW-3 of Sandoz exchanged several calls with Aprahamian of Taro and Blashinsky of Glenmark. On these calls, Blashinsky relayed that Glenmark expected to re-enter the Alclometasone Ointment market in the ███████████ and was seeking ██████ percent share.  CW-3 took contemporaneous notes during these conversations, and his complete notes from those calls are pictured below: ███████████████



2107.  Three days later, on April 19, 2013, CW-3 of Sandoz e-mailed M.A., a Sandoz marketing executive, stating ███████████████████████████ ███████████████████████████████████ ███████████████████  However, the true source of CW-3's information was

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Glenmark, not a customer. CW-3 wanted a breakdown of sales by customer so that he could understand how best to divide up customers as Glenmark entered the market.

2108.   On May 23, 2013, Sandoz sent an internal e-mail advising that it could no longer supply the 45gm formulation of Alclometasone Ointment. At that time, both the 15gm and 60gm formulations were also on temporary back order. That same day, on May 23, 2013, CW-3 called Blashinsky and they spoke for four (4) minutes.

2109.   On May 29, 2013, D.S., a Taro sales executive, forwarded Aprahamian an e-mail he received from Cardinal regarding Sandoz's supply issues on Alclometasone Ointment.  The next day, Aprahamian responded, ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

2110.   Over the next several days, Taro had several calls with Glenmark during which the two competitors coordinated their plans to increase pricing in advance of their re-entry into the Alclometasone Ointment market.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/31/2013 | Voice | Blashinsky, Mitchell | Incoming | D.S. (Taro) | 9:47:00 | 0:03:00 |
| 5/31/2013 | Voice | Blashinsky, Mitchell | Outgoing | D.S. (Taro) | 11:00:00 | 0:19:00 |
| 6/3/2013 | Voice | Blashinsky, Mitchell | Outgoing | Taro Pharmaceuticals | 13:03:00 | 0:06:00 |
| 6/3/2013 | Voice | Blashinsky, Mitchell | Outgoing | Taro Pharmaceuticals | 13:09:00 | 0:14:00 |

2111.   On June 6, 2013, after exchanging e-mails with Taro's supply chain regarding Alclometasone Ointment, Aprahamian sent an internal e-mail stating, ██████████████ ████████████████████████████ The next day, on June 7, 2013, Aprahamian called CW-3 of Sandoz and they spoke for eleven (11) minutes.

2112.   On June 10, 2013, Glenmark re-entered the Alclometasone Ointment market with WAC pricing that was significantly higher than Sandoz's WAC pricing.  The next day, on June 11, 2013, Taro issued notices to the three large wholesalers - ABC, Cardinal, and McKesson – announcing it was re-entering the Alclometasone Ointment market at new WAC pricing that matched Glenmark's.  Taro increased its WAC pricing between 201% and 239%, depending on the formulation.

2113.   That same day, on June 11, 2013, M.A. of Sandoz sent an internal e-mail indicating that Taro had increased pricing on Alclometasone Ointment.  J.R., a senior Sandoz marketing executive, responded approvingly: ███████████████████████

███████

2114.   The next day, on June 12, 2013, Aprahamian e-mailed Perfetto and J.K., a Taro executive, regarding Alclometasone Ointment stating that Taro had launched the product and

████████████████████████████████████████

████████████████████████████████

█████████████████████████

2115.   That same day, S.B., a Taro sales executive, e-mailed Aprahamian stating, ██████

████████████████████████████████████████

██████  Aprahamian responded: ████████████████  S.B. replied: ██████████

█████████████████████████████  Aprahamian – not wanting to take more share than Taro was entitled to – responded.██████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2. **Fluocinonide Solution**

2116.   As detailed above in an earlier Section, Fougera (now Sandoz) and Taro colluded to increase prices on Fluocinonide Solution twice – once in May 2011 and again in February and March 2012.

2117.   On June 17, 2013, Actavis filed a "CBE 30" application with the FDA, which would allow it to use an old ANDA to sell Fluocinonide Solution after having been out of the market for many years.  Actavis targeted the third week of July 2013 for its official launch date and identified a market share goal of 20% to 25%.

2118.   Beginning on June 17, 2013, and over the next several days, several Actavis employees exchanged calls with Aprahamian and Perfetto of Taro.  At the same time, Aprahamian was communicating with his contact at Sandoz, CW-3.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/17/2013 | Voice | Rogerson, Rick (Actavis) | Outgoing | Aprahamian, Ara (Taro) | 14:20:37 | 0:00:35 |
| 6/18/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | T.D. (Actavis) | 13:35:00 | 0:08:00 |
| 6/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:27:00 | 0:01:00 |
| 6/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | Rogerson, Rick (Actavis) | 10:47:00 | 0:12:00 |
| 6/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:08:00 | 0:15:00 |
| 6/19/2013 | Voice | Rogerson, Rick (Actavis) | Incoming | Aprahamian, Ara (Taro) | 14:48:04 | 0:11:54 |
| 6/27/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 4:25:00 | 0:13:00 |
| 6/27/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:39:00 | 0:07:00 |
| 6/27/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:15:00 | 0:03:00 |
| 6/28/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | S.C. (Actavis) | 9:47:00 | 0:06:00 |
| 7/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 12:22:00 | 0:39:00 |

2119.   Aprahamian was acting as a conduit – conveying information between Actavis and Sandoz – because the two competitors did not have an independent relationship.  For example, as detailed above, in between his communications with Actavis on June 19, 2013, Aprahamian spoke with CW-3 of Sandoz for fifteen (15) minutes.  During that call, CW-3 took the following contemporaneous notes in his Notebook regarding Actavis's entry on Fluocinonide Solution: █████████████



2120.   On July 5, 2013, Actavis submitted a challenge for Taro's Fluocinonide Solution business at ABC.  On July 9, 2013, ABC alerted Taro of the offer and extended Taro a right of first refusal.  Even though ABC did not disclose the challenger, Taro already knew it was Actavis.

2121.   After receiving the price challenge, H.M., a Taro sales executive, acknowledged that ██████████████████████████████ and asked Aprahamian if ABC was a customer that Taro wanted to give up. The following day on July 10, 2013, Aprahamian called three different Actavis sales executives, M.B., T.D. and S.C. Two of the calls lasted two (2) minutes and the third lasted one (1) minute.

2122.   The next day, on July 11, 2013, Aprahamian informed his colleague at Taro, H.M., that ██████████████████████ The following day, Aprahamian alerted ABC that Taro would not lower its price and, thereafter, ABC awarded the Fluocinonide Solution business to Actavis.

2123.   Having secured ABC from Taro, Actavis then focused on securing a larger customer from Sandoz so that Actavis could meet its target share.  In early July, Actavis solicited Walgreens, a large Sandoz customer.

2124.   When Actavis formally launched on July 22, 2013, it still had not received a decision from Walgreens.  The formal launch announcement prompted several companies, including CVS, McKesson, Morris & Dickson, Cigna, and Hannaford, to seek bids from Actavis.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Actavis, however, did not provide bids to any of these larger purchasers.  The few bids that Actavis sent out in response to solicitations were to smaller potential customers that it determined ███████████████████ in terms of market share.

2125.   Ultimately, Sandoz refused to bid to retain the Walgreens business, and conceded the customer to Actavis.  With this account, Actavis had met its share target and had secured 24% of the Fluocinonide Solution market.

2126.   During this time period, Taro and Sandoz were also careful not to poach each other's customers.  In early July 2013, Taro was backordered for Fluocinonide Solution.  On July 15, 2013, MMCAP, a Taro customer, reached out to CW-3 asking Sandoz to bid on Fluocinonide Solution.  Only three day later, CW-3 responded to MMCAP and declined to bid claiming supply constraints.  Sandoz's excuse for not bidding was a pretext.  In the intervening time, CW-3 exchanged three (3) text messages with H.M. of Taro and spoke with Aprahamian twice – with one call lasting sixteen (16) minutes and the second lasting eight (8) minutes.

### 3.   Taro's August 2013 Price Increases

2127.   Following shortly on the heels of the May 2013 Increases, Taro colluded with its competitors – Teva, Sandoz, and Perrigo – to significantly raise prices on three products – Etodolac Tablets, Etodolac ER Tablets (collectively, "Etodolac"), and Hydrocortisone Valerate Cream – in August 2013 (the "August 2013 Increases").  These drugs and their competitors, as well as the dates and sizes of the increases, are detailed in the chart below:

| Drug | Competitors | Lead/Followed | Date | Largest % Increase |
|---|---|---|---|---|
| | Sandoz | Lead | 7/26/13 | |
| | Teva | Followed | 8/9/13 | |
| Etodolac Tablet | Taro | Followed | 8/9/13 | 433% |
| | Teva | Lead/Followed | 8/9/13 | |
| Etodolac Extended Release Tablet | Taro | Lead/Followed | 8/9/13 | 183% |
| | Perrigo | Lead | 8/1/13 | |
| Hydrocortisone Valerate Cream | Taro | Followed | 8/9/13 | 351% |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2128.   In the weeks leading up to the price increases on Etodolac, Aprahamian was in frequent communication with his contacts at Teva (Nisha Patel) and Sandoz (CW-3) to coordinate.[225]  Similarly, and at the same time, Perfetto was colluding with his contact at Perrigo, Boothe, regarding Hydrocortisone Valerate Cream.

2129.   For example, on July 30, 2013, Perrigo notified its customers that it was increasing prices on a number of different products, including Hydrocortisone Valerate Cream. Notably, at the same time that Perrigo was colluding with Taro on Hydrocortisone Valerate, it was also colluding with other competitors regarding different products on its price increase list, including Promethazine HCL Suppositories (Actavis and G&W) and Ciclopirox Solution (G&W and Sandoz).  These products are discussed in detail in later Sections of this Complaint.

2130.   Two days later, on August 1, 2013, Aprahamian instructed a colleague at Taro to begin implementing price increases on Hydrocortisone Valerate and Etodolac.  Aprahamian stated, ███████████████████████  Not wanting to provide the details in writing, Aprahamian concluded: ██████████████████████

2131.   In the days leading up to the Taro increases, Aprahamian exchanged several calls with Nisha Patel and CW-3 regarding Etodolac, while Perfetto was coordinating with Boothe about Hydrocortisone Valerate.  At least some of those calls are detailed in the chart below:

---

[225]   The collusive relationship and interactions between Taro, Sandoz, and Teva with regard to the drugs Etodolac and Etodolac ER are addressed in greater detail above.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:47:00 | 0:02:00 |
| 8/7/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 7:45:00 | 0:03:00 |
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Incoming | Boothe, Douglas (Perrigo) | 10:33:00 | 0:13:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:19:00 | 0:02:00 |
| 8/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | Patel, Nisha (Teva) | 3:59:00 | 0:01:00 |
| 8/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 4:03:00 | 0:13:00 |
| 8/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 4:37:00 | 0:08:00 |
| 8/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 4:47:00 | 0:01:00 |
| 8/8/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 6:32:00 | 0:06:00 |
| 8/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:42:00 | 0:04:00 |

2132.   After this series of communications, on August 9, 2013, Taro followed the increases on Hydrocortisone Valerate and Etodolac and published WAC pricing that matched its competitors.

2133.   After the August 2013 Increases, several customers voiced concerns over the size of the increases on Hydrocortisone Valerate Cream.  For example, after receiving Perrigo's notification on July 30, 2013, one customer e-mailed P.H., a sales executive at Perrigo, asking,

██████████████████████████████████████████████

Knowing that there was no real justification for the increase, P.H. responded simply, ████

████████████████████

2134.   Similarly, on July 31, 2013, T.P., a sales executive at Perrigo, received some pushback from Walgreens about the Hydrocortisone Valerate price increases.  T.P. passed that information along to his supervisor, Wesolowski, a senior Perrigo executive, stating: ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 4.   Triamcinolone Acetonide Paste

2135.   As of October 2013, Rising and Taro were the two competitors in the market for Triam Paste and each maintained approximately 50% market share.

2136.   In October 2013, Rising was considering implementing a price increase on Triam Paste.  Prior to increasing the price, CW-2, then a senior sales and marketing executive at Rising, reached out to D.S., a Taro sales executive, to discuss the increase.  These calls are detailed in the chart below.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/27/2013 | Voice | CW-2 (Rising) | Outgoing | D.S. (Taro) | 13:32:00 | 0:02:00 |
| 9/30/2013 | Voice | CW-2 (Rising) | Incoming | D.S. (Taro) | 5:41:00 | 0:04:00 |
| 10/11/2013 | Voice | CW-2 (Rising) | Outgoing | D.S. (Taro) | 12:09:00 | 0:02:00 |
| 10/14/2013 | Voice | CW-2 (Rising) | Outgoing | D.S. (Taro) | 9:31:00 | 0:04:00 |

2137.   Two days after the final call detailed above, on October 16, 2013, Rising increased its WAC pricing for Triam Paste by 25%.  Two weeks later, on November 1, 2013, Taro published increased WAC pricing that matched Rising's pricing exactly.

2138.   Prior to implementing the increase, Aprahamian of Taro described in an internal e-mail that Taro was ███████ its prices ████████████ and noted that the risk of losing business was ██████  Indeed, the risk was ██████ because CW-2 and D.S. had discussed the increase in advance and Taro had confidence that Rising would respect its market position and not poach its customers.

### 5.   Acetazolamide Tablets

2139.   Since at least 2010, Taro and Lannett have been the only major suppliers of Acetazolamide Tablets.  Taro and Lannett both supply the 250mg dosage and Taro is the only major supplier of the 125mg dosage.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2140.   Since 2010, Taro and Lannett have coordinated three lockstep price increases on Acetazolamide: in December 2010, April 2012, and late fall 2013.  The graph below shows both the lockstep nature of the price increases and their growth in size:



2141.   Since at least 2010, each time Taro increased the WAC price of its 250mg dosage of Acetazolamide, it also increased the WAC of its 125mg dosage.

2142.   At the start of 2010, Taro and Lannett's WAC prices for the 250mg dosage of Acetazolamide were $34.21 and $32.70, respectively.  These prices remained unchanged until December 2010 when Taro and Lannett raised their prices to almost identical levels within two days of each other.  On December 6, 2010, Taro increased its WAC price for the 250mg dosage by 15% to $40.48.  Two days later, on December 8, 2010, Lannett increased its WAC by 24.26% to $40.75.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2143.   The day that Taro increased its prices, December 6, 2010, J.F., a member of Lannett's Board of Directors and an executive at a generics wholesaler, e-mailed K.S., a senior sales and marketing executive at Lannett, about the ████████ that ██████████████ ██████████ K.S. responded early the next morning stating, ████████████████ ████████

2144.   By April 2012, Taro and Lannett were ready to impose a larger price increase. On April 3, 2012 at 7:37 in the morning, Blashinsky, then a senior Taro marketing executive, called K.S. at Lannett.  The call lasted one (1) minute.  That same day, Taro increased its WAC price for the 250mg dosage by 44.5% to $61.43.  Lannett followed and matched Taro's increase two (2) days later on April 5, 2012.  M.B. and K.S. would not speak again until May 9, 2012.

2145.   The day of the Taro increase, a Cardinal representative called D.S., a sales executive at Taro, and told him that the customer would be putting Acetazolamide Tablets, as well as other Taro products, out to bid unless the company agreed not to increase prices on those products.  D.S. summarized the call in an e-mail to Blashinsky and asked him how to respond. Blashinsky replied that Acetazolamide was one of several ████████ and that the pricing on the product should ████████  What Blashinsky meant was that Taro had an understanding with Lannett that Lannett would follow Taro's price increase and it would not poach any of Taro's customers.  On April 10, 2012, Taro submitted reduced pricing to Cardinal for several of the products, but the price of Acetazolamide remained unchanged.

2146.   Also on April 3, 2012, Tracy Sullivan., a Lannett sales executive, e-mailed her supervisor, K.S., about bidding on a Target RFP and listed several products including Acetazolamide for which Taro was the current supplier.  Consistent with the ongoing agreement with Taro, K.S. directed Sullivan not to bid on the Acetazolamide business.  The next day,

April 4, 2013, Lannett submitted a response to the Target RFP that did not include
Acetazolamide.

2147.   In March 2013, Taro hired Aprahamian as a senior sales and marketing executive.
Aprahamian and A.B., a senior-most executive officer at Lannett, had a social relationship that
preceded Aprahamian's tenure at Taro.  The two men met up for meals, contemplated joining a
horse racing investment group, and did other favors for each other.

2148.   Shortly after Aprahamian began working at Taro, in the late fall of 2013, that
relationship became collusive and Taro and Lannett coordinated to again raise the price of
Acetazolamide – this time by raising it more than 220%.

2149.   In the months leading up to the increases, representatives of Taro and Lannett had
the opportunity to discuss and coordinate the late fall 2013 price increases in person at trade
association meetings and other social occasions.

2150.   For example, from August 10 to August 13, 2013, the NACDS held its Total
Store Expo in Las Vegas, Nevada.  Representatives from Taro, including Aprahamian and D.S.,
and representatives from Lannett, including Sullivan, K.S., A.B., and M.B., a Lannett business
and development manager, attended the conference.  Further, representatives from Sun
Pharmaceuticals, Taro's parent company, also attended, including G.S., a senior executive, and
S.K., a sales executive.

2151.   After the conference, on August 16, 2013, M.B. of Lannett and J.F., a Lannett
Board member, had dinner with G.S. and S.K. of Sun.  M.B. of Lannett followed up by e-mail a
few days later thanking G.S. for dinner and also █████████████████████████████████
█████████████████████   M.B. further noted that ███████████████████████████████
███████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2152.   Representatives from Taro and Lannett also attended the GPhA Fall Technical Conference in Bethesda, Maryland from October 28 through October 30, 2013.

2153.   Approximately two weeks later, on November 15, 2013, A.B. of Lannett called Aprahamian twice.  Both calls lasted two (2) minutes.  A.B. called Aprahamian again the next day, on November 16, 2013.  The call lasted one (1) minute.  According to available phone records, the calls on November 15, 2013 were the first calls between the two competitors since August 22, 2012, as well as the first time that they had spoken by phone since Aprahamian joined Taro.

2154.   Shortly after these calls, on November 26, 2013, Lannett raised its WAC price on Acetazolamide by 275.5% to $230.65.

2155.   Following the increase, Lannett customers reached out to Taro asking the competitor to bid on Acetazolamide.  Consistent with its ongoing understanding with Lannett, Taro turned the business away.

2156.   For example, Wal-Mart, a Lannett customer, e-mailed D.S. of Taro on November 26, 2013, asking if Taro was interested in bidding on its Acetazolamide business.  In response, Aprahamian sent an internal e-mail to D.S., and others at Taro, instructing them ████ ██████████████████████████████████████████████████  Aprahamian further advised that they should ███████████████████████████████████████

2157.   Later that same day, another Lannett customer, Meijer, reached out to S.B., a Taro sales executive, asking for a bid on Acetazolamide.  S.B. responded, █████████████ ████████████████████████████████████████████████████████ ██████████████████████  But that explanation was a lie; Taro was not having supply issues at that time.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2158.   Following Lannett's increase, Taro's customers, including Cardinal, McKesson, and Morris & Dickson, tried to increase their Acetazolamide orders with Taro at the lower pricing, anticipating that Taro might try to raise its prices as well.  Aprahamian told Taro's supply chain personnel to monitor these increased orders and cut them to historical levels.  He explained that ███████████████████████████████████████████

███████████████████

2159.   On December 4, 2013, Econdisc, a GPO customer, asked Sullivan of Lannett why the company had increased its pricing on Acetazolamide, noting ████████████████████

████████████   Sullivan drafted a response that blamed the increases on general market conditions and higher costs of production and forwarded the draft to R.F., a Lannett marketing manager, asking █████████████   R.F. responded: ██████████████



2160.   Later that day, Sullivan replied to Econdisc stating that Lannett raised the price on Acetazolamide because ██████████████████████████████████████

██████████████████████████████

2161.   At the same time customers were reacting to Lannett's increase, Taro was in the midst of implementing its own price increase.  On December 1, 2013, Aprahamian e-mailed pricing information for the Acetazolamide increase to the Taro sales team and asked them to

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

coordinate getting Taro's price increase letters out.  Taro sent the letters to its customers on December 11 and December 12, 2013.

2162.   On December 13, 2013, Taro raised its WAC price on the Acetazolamide 250mg dosage by 226.5% to match Lannett's pricing at $230.65.

2163.   The next day, on December 14, 2013, Aprahamian called A.B. of Lannett.  The call lasted two (2) minutes.  Aprahamian and A.B. would not speak again until April 8, 2014, according to available phone records.

2164.   Taro held firm to its increase even when a large distributor, McKesson, asked for a price reduction.  In support of a price reduction, McKesson noted that one of Taro's competitors could sell Acetazolamide for 18.42% below McKesson's current contract price. Aprahamian responded that ███████████████████████████████████████████ ██████████████████████████████████████ and suggested that the McKesson representative ███████████████████████ McKesson subsequently closed the issue.

2165.   Similarly, on December 16, 2013, Taro's customer, MMCAP, e-mailed asking why Taro had increased pricing on Acetazolamide.  L.R., a business analyst at Taro, forwarded the request to M.L., a Taro pricing executive, asking for advice on how to respond.  M.L. instructed L.R. to tell MMCAP the increase was ██████████████████████

2166.   That same day, on December 16, 2013, in a Sales and Marketing conference call, Aprahamian noted to the invitees, including M.L., that the Acetazolamide pricing adjustments ████████████████

2167.   Taro's and Lannett's revenue from Acetazolamide grew substantially with the coordinated price increases.  In 2012, total sales for Acetazolamide were $16,480,000. Revenue

from sales in 2013 rose to $21,270,000 and, in 2014 after the late fall 2013 price increases, total sales of Acetazolamide reached $60,680,000.

2168.   Throughout the period of the price increases referenced above, Lannett and Taro maintained a virtually even split of the 250mg market, with each having around 50% of the market.  Overall, combining the markets for the 125mg dosage and 250mg dosage, Taro had approximately 56% of the total market and Lannett had 43%.

### 6.     Desonide Ointment

2169.   As discussed in detail above in an earlier Section, Taro and Perrigo coordinated to significantly raise prices on Desonide Ointment in May 2013.  At the same time, Taro and Perrigo were also speaking with Sandoz about Desonide Ointment, knowing that Sandoz had plans to re-enter the market.

2170.   Indeed, as early as March 2013, Sandoz began discussing its potential re-entry into the market for Desonide Ointment both internally and with its competitors.

2171.   For example, on March 28, 2013, M.A., a Sandoz marketing executive, sent an internal e-mail, including to CW-3, stating ████████████████████████ ████████████████████████████████████████ ██████████████████████████ CW-3 immediately forwarded the e-mail to Kellum.

2172.   The next morning, on March 29, 2013, CW-3 called Kellum and they spoke for seven (7) minutes.  CW-3 then spent the next twenty-five minutes communicating alternately with Aprahamian and with his superiors at Sandoz.  After each call with Aprahamian, CW-3 would immediately hang up and call either Kellum or CW-1.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 9:41:00 | 0:07:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 9:51:00 | 0:05:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 9:56:00 | 0:10:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 10:06:00 | 0:06:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 10:12:00 | 0:01:00 |

2173.   The next business day, on April 1, 2013, CW-3 called T.P. of Perrigo – the other competitor for Desonide Ointment – and they spoke for seventeen (17) minutes.  During that call, T.P. provided CW-3 with a list of products, including Desonide Ointment, for which Perrigo had recently increased prices.  Notably, however, Perrigo had not yet increased pricing on several of those products, including Desonide Ointment.  CW-3's contemporaneous notes from that call are detailed below: ████████████████



2174.   Later that day, CW-3 typed up the information into an e-mail and forwarded it internally, including to Kellum: ████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



2175.   The next day, April 2, 2013, CW-3 called Aprahamian and they spoke for six

(6) minutes.  CW-3 hung up and immediately called T.P. of Perrigo.  The call lasted five

(5) minutes.  On these calls, and as discussed in detail in an earlier Section, the competitors

spoke about the products that Taro planned to increase prices on in May 2013, including

Desonide Ointment.  CW-3's contemporaneous notes from these calls reflect as much:



2176.   Several months later, after both Taro and Perrigo had implemented their price

increases on Desonide Ointment, Sandoz was readying to re-enter the market.  On December 18,

2013, M.A., a marketing executive at Sandoz, sent the following internal e-mail summarizing the

facts surrounding the re-launch:



2177.   That same day, CW-3 of Sandoz called T.P. of Perrigo and they spoke for five (5) minutes.  CW-3 hung up and called CW-1 twice.  First thing the next morning, on December 19, 2013, CW-3 called T.P. again.  The call lasted one (1) minute.  CW-3 hung up and immediately called CW-1 and they spoke for four (4) minutes.  Later that day, CW-3 spoke with Aprahamian at Taro.  The call lasted fifteen (15) minutes.

2178.   On January 6, 2014, Sandoz held a Commercial Operations call during which they discussed, among other things, the Desonide Ointment re-launch.  In particular, they discussed the market share breakdown between Taro and Perrigo, Sandoz's target market share, and the anticipated re-launch date of January 17, 2014.  CW-3's contemporaneous notes from the call are below: ███████████████████



2179.   Two days later, on January 8, 2014, CW-3 called T.P. of Perrigo.  The call lasted one (1) minute.  The next day, on January 9, 2014, CW-3 called T.P. again and they spoke for nearly sixteen (16) minutes.  During that call, T.P. provided CW-3 with Perrigo's non-public

pricing for Desonide Ointment at various customers.  T.P. also warned CW-3 not to go after

Walgreens.  CW-3's contemporaneous notes from that call are below: ████████████████



2180.   Immediately upon hanging up with T.P., CW-3 called Aprahamian and they spoke

for nine (9) minutes.  That same day, Perfetto of Taro and Boothe of Perrigo also exchanged two

calls lasting six (6) minutes and twenty-nine (29) minutes, respectively.

2181.   On January 16, 2014 – the day before Sandoz's anticipated re-launch – CW-3

called T.P. of Perrigo and they spoke for ten (10) minutes.  CW-3 hung up and immediately

called CW-1.  The call lasted eight (8) minutes.  A few days later, on January 22, 2014,

Aprahamian called CW-3.  The call lasted one (1) minute.  On January 24, 2014, CW-3 returned

Aprahamian's call and they spoke for twenty-two (22) minutes.

2182.   On these calls, T.P. of Perrigo and Aprahamian of Taro provided CW-3 with non-

public pricing for Desonide Ointment at various customers.  The competitors also discussed

which customers they would agree to cede to Sandoz.  CW-3 contemporaneously listed this

information in his Notebook and placed check marks next to the customers that Perrigo and Taro

agreed to give up to Sandoz.  These notes are below: ████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



2183.   In accordance with their agreement, on January 28 and January 29, 2014, Sandoz submitted bids for Desonide Ointment to Taro's customers Econdisc, McKesson, and Omnicare, and to Perrigo's customer, Rite Aid.  In each instance, the competitors declined to reduce their pricing to retain the business.  As a result, the customers awarded their Desonide Ointment business to the new entrant, Sandoz.

2184.   On February 13, 2014, Sandoz was presented with the opportunity to supply Cardinal with Desonide Ointment.  Not wanting to disturb the delicate market balance it had negotiated with its competitors, CW-1 responded, ███████████████████████

███████████████████████████████████████████████

███████████████████████████

### 7.    Taro's June 2014 Price Increases

2185.   Building on its successes in 2013, Taro set its sights even higher in 2014, implementing a number of significant price increases, including several of the largest WAC increases across the industry that year.  As they had done in the past, Aprahamian and Perfetto focused their efforts on increasing prices on those products where they had strong relationships and ongoing understandings with individuals at competitor companies.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2186.   For example, in April 2014 Taro capitalized on its relationships with Teva and Sandoz to significantly raise prices on Ketoconazole Cream and Tablets.  Aprahamian coordinated with Nisha Patel of Teva and CW-3 of Sandoz, while CW-1 of Sandoz also communicated directly with Patel.  The collusion on Ketoconazole is discussed in detail elsewhere in this Complaint.

2187.   Shortly thereafter, in June 2014, Taro increased pricing on several different products (the "June 2014 Increases").  Some of these products had also been the subject of coordinated increases in 2013 – including Carbamazepine ER Tablets (with Sandoz) and Hydrocortisone Valerate Cream (with Perrigo).  As a result of these increases, Taro expected approximately $289 million in additional revenues – more than 2 ½ times what Taro had expected from the May 2013 Increases.  Several of these products, their corresponding WAC increases, and Taro's competitors are detailed in the chart below:



2188.   As it had done in the past, Taro communicated with several of its competitors in advance of the June 2014 Increases and, consistent with their ongoing understandings, the competitors agreed to follow with comparable price increases of their own.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2189.   For example, on May 14, 2014, Taro had finalized its list of products to include in the June 2014 Increases and Aprahamian forwarded the list to K.S., a senior executive at Taro, for his review and approval.  That same day, Aprahamian exchanged eight (8) text messages and one five (5) minute phone call with Patel of Teva.  Taro overlapped with Teva on seven (7) of the June 2014 Increase products – including Fluocinonide, Carbamazepine, Clotrimazole, and Warfarin.

2190.   After speaking with Aprahamian, Patel directed a colleague to create a list of future Teva price increase candidates based on a set of instructions and data she had given to her Teva colleague.  On May 28, 2014, that colleague sent her a list titled "2014 Future Price Increase Candidate Analysis."  The list included several drugs from Taro's June 2014 Price Increase list – with the notation "Follow/Urgent" listed as the reason for the increase.  Notably, however, Taro had not yet increased prices on those drugs or notified its customers that it would be doing so.  The relevant portions of that spreadsheet are set forth below: ███

███



2191.   Similarly, on Friday May 15, 2014, the day after Taro finalized its June 2014 Increase list, Aprahamian called CW-3 of Sandoz and the two competitors spoke for fifteen (15) minutes.  Taro overlapped with Sandoz on seven of the June 2014 Increase products – including

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Carbamazepine ER Tablets and various formulations of Clobetasol Propionate.  The following

Monday, on May 19, 2014, CW-3 sent an internal e-mail, including to Kellum and CW-1,

advising them of the Taro increases: █████████████



2192.   Notably, the source of the information was not "a customer," but his competitor,

Aprahamian.  Further, Taro had not yet increased pricing on these products and would not do so

for another several weeks.  Later that day, CW-3 called Aprahamian.  The call lasted one

(1) minute.

2193.   Further, on May 27, 2014, Aprahamian exchanged three calls with M.C., a sales

executive at Wockhardt, including one call lasting nine (9) minutes.  Taro overlapped with

Wockhardt on one June 2014 Increase product – Clobetasol Solution.  That same day, ABC

reached out to C.U., a sales executive at Taro, asking for a bid on Clobetasol Solution because

Wockhardt was having issues with the FDA.  Having spoken with M.C. earlier in the day and

knowing that the competitors had discussed coordinating a price increase on the product,

Aprahamian responded, ████████████████████████████

██████████████████████

2194.   On June 2, 2014, Taro sent letters to its customers notifying them of the

June 2014 Increases.  The next day, on June 3, 2014, Taro published new WAC pricing for the

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

affected products.  In the days leading up to these actions by Taro, and in the days that followed,

Aprahamian and Perfetto reached out to their competitors – Sandoz, Perrigo, Actavis, Teva,

Hi-Tech, Wockhardt, Mylan, and Amneal – to discuss the increases and limit competition

between them.  These communications are detailed in the chart below:

| Teva: | Sandoz: | Hi-Tech: | Actavis: |
|---|---|---|---|
| Aprahamian speaks to Patel on 5/14, 6/3, 6/4 | Aprahamian speaks to CW-3 on 5/15, 5/19, 5/27, 5/28, 6/3, 6/4, 6/6 (2 calls) | Aprahamian speaks to E.B. on 6/6 (2 calls), 6/9 (2 calls) | Aprahamian speaks to Falkin on 6/4 (2 calls) and M.D. on 6/4; Perfetto speaks to M.D. on 6/6 |

| PRODUCT DESCRIPTION | COMPETITORS |
|---|---|
| Carbamazepine Tablet | Teva, Torrent, Apotex |
| Carbamazepine Chewable Tablet | Teva, Torrent |
| Carbamazepine Extended Release Tablet | Sandoz |
| Clobetasol Proprionate Cream | Sandoz, Hi-Tech, Actavis (entered in Mar 2015) |
| Clobetasol Proprionate Emollient Cream | Sandoz, Hi-Tech |
| Clobetasol Proprionate Gel | Sandoz, Hi-Tech, Perrigo |
| Clobetasol Proprionate Ointment | Sandoz, Hi-Tech |
| Clobetasol Proprionate Solution | Sandoz, Hi-Tech, Wockhardt |
| Clobetasol Proprionate Lotion | Actavis, Perrigo |
| Clotrimazole Topical Solution | Teva |
| Fluocinonide Cream .05% | Teva |
| Fluocinonide Emollient Cream | Teva |
| Fluocinonide Gel | Teva, Sandoz |
| Fluocinonide Ointment | Teva |
| Hydrocortisone Valerate Cream | Perrigo |
| Phenytoin Sodium Extended Release Capsule | Amneal, Mylan, Sun |
| Warfarin Sodium Tablet | Teva, Zydus, Upsher-Smith |

| Perrigo: | Wockhardt: | Amneal: | Mylan: |
|---|---|---|---|
| Perfetto speaks to Boothe on 6/3 (4 calls) | Aprahamian speaks to M.C. on 5/27 (3 calls) | Aprahamian speaks to S.R. on 6/6 (2 calls) | Aprahamian speaks to M.A. on 6/4, 6/6, and 6/9 |

2195.   After receiving notification of the increases, several customers complained to

Taro about the size of the increases.  However, confident in their strategy – and the strength of

the ongoing understandings they had with their competitors – Aprahamian advised his colleagues

that Taro should stay the course and stick with the plan.

2196.   For example, on June 24, 2014, McKesson e-mailed Taro stating, ███████

████████████████████████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████████████████████

███████████████████████████████████ E.G., a Taro sales executive, forwarded McKesson's

e-mail to Aprahamian who responded, ██████████████████████████████████████

█████████████████████ E.G. replied, ██████████████████████████ and Aprahamian stated,

██████████████████████████████████████████████

2197.   Similarly, on June 27, 2014, ABC sent out a request for bids on multiple products,

including several that Taro had increased prices on, and cited the reason as ██████████████████

████████████ C.U., a sales executive at Taro, forwarded the ABC request internally, stating that

he had left a message with the ABC representative to discuss the request.  A.L., a Taro pricing

executive, responded: ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████ To that, Aprahamian replied: ███████████████████████

█████████████████████████████████████████████████████████

2198.   Sandoz also received the ABC request on June 27, 2014.  Kellum forwarded it

internally, including to CW-1, stating simply: ████████████████ Although CW-1 already knew

that Taro had increased prices, he responded to Kellum's e-mail asking, ██████████████████

████████████████ Kellum replied, ███████ and CW-1 quickly answered, ████████████████

████████████ Kellum responded sarcastically: ███████████████████ Of course, and consistent

with past practice and the ongoing understanding between the two competitors, Kellum and CW-

1 did not want bid at CVS.  Further, on July 1, 2014, Kellum emailed the larger Sandoz team

about the ABC request stating, █████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████

2199.   Not surprisingly given Taro's understandings with its competitors, on July 11, 2014, ABC e-mailed C.U. to advise him that Taro had retained all of its business at ABC because ███████████████████ C.U. forwarded the e-mail along to Aprahamian, stating excitedly, ██████ Aprahamian then forwarded the e-mail to Perfetto stating: ████████████ ██

2200.   Consistent with past practice, and their ongoing understandings, the competitors uniformly followed the July 2014 Increases and matched Taro's increased WAC pricing.  These competitor price increases, and their corresponding dates, are detailed in the chart below:

| Drug | Competitor | Lead/Followed | Date Action |
|---|---|---|---|
| Carbamazepine Tablet | Apotex | Followed | 7/11/14 |
| | Teva | Followed | 8/28/14 |
| | Torrent | Followed | 9/12/14 |
| Carbamazepine Chewable Tablet | Teva | Followed | 8/28/14 |
| | Torrent | Followed | 9/12/14 |
| Carbamazepine Extended Release Tablet | Sandoz | Followed | 8/26/14 |
| Clobetasol Proprionate Cream | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| Clobetasol Proprionate Emollient Cream | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| Clobetasol Proprionate Gel | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| Clobetasol Proprionate Ointment | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| Clobetasol Proprionate Solution | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| | Wockhardt | Followed | 9/2/14 |
| Clotrimazole Solution | Teva | Followed | 8/28/14 |
| Fluocinonide Cream .05% | Teva | Followed | 7/1/14 |
| Fluocinonide Emollient Cream | Teva | Followed | 7/1/14 |
| Fluocinonide Gel | Teva | Followed | 7/1/14 |
| | Sandoz | Followed | 10/10/14 |
| Fluocinonide Ointment | Teva | Followed | 7/1/14 |
| Hydrocortisone Valerate Cream | Perrigo | Followed | 7/24/14 |
| Phenytoin Sodium Extended Release Tablets | Sun | Followed | 7/14/14 |
| | Mylan | Followed | 7/16/14 |
| | Amneal | Followed | 9/1/14 |
| Warfarin Sodium Tablet | Zydus | Followed | 6/13/14 |
| | Teva | Followed | 8/28/14 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2201.   The products on which Taro and Teva conspired above.  The following Sections explore in further detail the non-Teva overlap products that are the subject of this Complaint – Carbamazepine ER Tablets, Clobetasol Propionate, Hydrocortisone Valerate Cream, and Phenytoin Sodium ER Tablets.

## 8.   Carbamazepine ER Tablets and Clobetasol Propionate

2202.   Clobetasol Propionate ("Clobetasol"), also known by the brand name Temovate, is a corticosteroid that comes in various formulations and is used to treat skin conditions such as eczema, contact dermatitis, seborrheic dermatitis, and psoriasis.

2203.   In 2012, the annual market for Carbamazepine ER Tablets in the United States exceeded $100 million.

2204.   At that time, Taro and Sandoz were the principal competitors in the market for Carbamazepine ER.

2205.   As detailed above in earlier Sections, Taro and Sandoz have a long history of collusion on Carbamazepine ER – dating back to 2009 when Taro entered the market as the first-to-file generic and Sandoz entered as the AG.  At that time, CW-4 of Sandoz coordinated with D.S. of Taro to allocate the market as both companies entered the market.  Similarly, in May 2013, CW-3 of Sandoz colluded with Aprahamian of Taro to increase prices on Carbamazepine ER – along with a list of other products that Taro and Sandoz overlapped on.

2206.   Given that history, not surprisingly, when Taro added Carbamazepine ER to its June 2014 Price Increase list, it described the increase as ███ risk.

2207.   As of June 2014, Sandoz and Hi-Tech were Taro's primary competitors on the various formulations of Clobetasol, including the Cream, Emollient Cream, Gel, Ointment, and Solution.  In addition, Wockhardt marketed the Solution.

2208.   As detailed above, Taro spoke with each of these competitors in the days leading up to the increases on Carbamazepine ER and Clobetasol.  The sequence and timing of these calls is listed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/15/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:15:00 |
| 5/19/2014 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:23:00 | 0:01:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 9:35:00 | 0:01:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 9:36:00 | 0:01:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.C. (Wockhardt) | 9:39:00 | 0:09:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:17:00 | 0:01:00 |
| 5/28/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:37:00 | 0:10:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 9:16:00 | 0:01:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Incoming | Boothe, Douglas (Perrigo) | 14:03:00 | 0:01:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 14:04:00 | 0:05:00 |
| 6/3/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 14:06:00 | 0:01:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 15:23:00 | 0:01:00 |
| 6/4/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:04:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 6:54:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 12:34:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 12:52:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:14:00 | 0:08:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 6:26:00 | 0:10:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | E.B. (Hi-Tech) | 6:35:00 | 0:01:00 |

2209.   After Taro's price increases for Carbamazepine ER and Clobetasol were announced, and consistent with their ongoing understandings, Taro's competitors declined opportunities to bid on customers so as not to take advantage of Taro's price increases, except in those circumstances where they sought additional market share to meet their fair share targets.

2210.   For example, on June 4, 2014, Wal-Mart e-mailed Sandoz asking whether it would like to submit a bid for Carbamazepine ER because Wal-Mart had received a price increase from Taro.  Wal-Mart followed up on the request again on June 10, 2014. L.B., a sales executive at Sandoz, e-mailed the request to Kellum asking, ███████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ Not wanting to bid, and instead planning to take a price increase as well, Kellum suggested a pretext: ████████████████

████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2211.   Also on June 4, 2014, Cardinal e-mailed Sandoz asking it to bid on its Clobetasol business as a result of the Taro price increase.  Kellum responded similarly: ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

2212.   Further, on June 23, 2014, McKesson presented Sandoz with an opportunity to take on additional business for several products, including both Clobetasol and Carbamazepine ER.  K.K., a senior sales executive at Sandoz, responded to the customer: ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████   Less than five minutes later, Kellum responded to K.K. (without copying the customer) stating: ████████████████████████████████

████████████████████████████████████████████████████████

K.K. replied: ████████████████████████████████████████████████

███████████████████   The next day, K.K. responded to McKesson, raising the familiar refrain:

████████████████████████████████████████████████████████████████

██████████████████████████████████

2213.   Throughout June 2014, Aprahamian exchanged several calls with his contacts at Taro's principal competitors on Carbamazepine ER and Clobetasol – Sandoz and Hi-Tech – to discuss the increases and coordinate their actions.

2214.   For example, on June 6, 2014, Aprahamian called E.B., a senior sales and marketing executive at Hi-Tech twice.  Both calls lasted one (1) minute.  These were the first calls ever between the two competitors according to the available phone records.  Then, on June 9, 2014, Aprahamian and E.B. exchanged two more calls, including one call lasting ten (10)

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

minutes.  The next day, on June 10, 2014, E.B. met in-person with B.K., a senior executive at

Akorn, and S.G., a sales executive, ███████████████████ regarding Clobetasol.

    2215.   On June 20, 2014, Aprahamian engaged in a series of communications with both

CW-3 of Sandoz and E.B. of Hi-Tech.  Each time that CW-3 hung up with Aprahamian, he

immediately called his supervisor, Kellum, to report the conversations.  This call pattern is

detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:40:00 | 0:02:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 11:42:00 | 0:01:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:43:00 | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:56:00 | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 12:07:00 | 0:12:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:40:00 | 0:10:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:50:00 | 0:01:00 |

    2216.   During these calls, upon information and belief, Aprahamian provided CW-3 with

Taro's new non-public prices, by class of trade, for Carbamazepine ER, the various formulations

of Clobetasol, and Fluocinonide (discussed above).  In all, Aprahamian identified more than

seventy (70) different price points for these products.  CW-3 took contemporaneous notes of

these conversations in his Notebook.  A snapshot of these notes is pictured below: ███████

███████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



607
FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



2217.   When CW-3 conveyed the price points to Kellum and CW-1, Kellum was

shocked by the size of the increases and asked CW-3 to go back and confirm with Aprahamian

that the information was correct.  Indeed, Taro had increased WAC pricing on certain

formulations of Clobetasol by more than 1000%.  When CW-3 called Aprahamian to confirm, he

placed a ✓ next to each price point that he confirmed.  When CW-3 later conveyed this

information to Kellum, he wrote a second ✓ next to each of the price points.  Armed with this

information, Kellum then directed CW-3 to tell Aprahamian that Sandoz would follow and

remarked: ██████████████████████████████

2218.   Similarly, after E.B.'s conversations with Aprahamian, on June 24, 2014, Hi-Tech

held an internal ██████████████████████████ which E.B. attended.  The agenda for

the call was ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

2219.   Over the next several days, Hi-Tech held several internal meetings during which

they discussed the Clobetasol price increase – including on July 1, July 2, and July 8.  E.B.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

attended all three meetings.  On July 8, the day of the third meeting, E.B. called Aprahamian.

The call lasted one (1) minute.  Less than a half hour later, Aprahamian called CW-3 of Sandoz.

The call lasted one (1) minute.

2220.   Three days later, on July 11, 2014, Hi-Tech sent letters to its customers notifying

them that it was increasing WAC pricing on the various formulations of Clobetasol effective

August 9, 2014.  The new pricing matched Taro's pricing exactly.  That same day, Aprahamian

exchanged two calls with CW-3 – lasting three (3) minutes and five (5) minutes – and two calls

with E.B – each lasting one (1) minute.  Notably, these were the last calls that Aprahamian and

E.B. exchanged, according to the available phone records.

2221.   Shortly after Hi-Tech increased its price on Clobetasol, the other competitors

followed suit.  On July 18, 2014, Sandoz increased its WAC pricing on Clobetasol to match both

Taro and Hi-Tech.  On August 26, 2014, it raised its WAC pricing on Carbamazepine ER to

match Taro.  Further, on September 2, 2014, Wockhardt increased its WAC pricing on

Clobetasol Solution to match Taro, Hi-Tech, and Sandoz.  As had been the pattern, Aprahamian

spoke with both CW-3 of Sandoz and M.C. of Wockhardt in advance of these price increases.

These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/8/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.C. (Wockhardt) | 7:46:00 | 0:13:00 |
| 8/13/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 14:10:00 | 0:07:00 |
| 8/14/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 5:48:00 | 0:08:00 |
| 8/14/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 12:03:00 | 0:01:00 |
| 8/14/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 12:04:00 | 0:08:00 |
| 8/21/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 6:09:00 | 0:02:00 |

2222.   Notably, after the calls highlighted above, Aprahamian and M.C. of Wockhardt

would not speak again by phone until June 9, 2015, according to the available phone records.

2223.   In addition to coordinating pricing for Carbamazepine ER Tablets with

competitors, Taro coordinated price increases for Carbamazepine Chewable Tablets and

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Carbamazepine Tablets in 2014.  A March 2014 internal Taro document concerning Carbamazepine Chewable Tablets observed that ███████████████████████  In June 2014, Taro increased WAC prices for Carbamazepine Chewable Tablets.  In the subsequent three months, Apotex, Teva, and Torrent imposed identical price increases.  Similarly, in July 2014, Taro increased prices for Carbamazepine Tablets, and was followed by Apotex, Teva, and Torrent.

2224.   Throughout this period, Taro, Sandoz, Teva, Apotex, and Torret met at trade conferences and communicated directly with each other in furtherance of the Fair Share Agreement.

2225.   In early June 2014, Taro increased prices on Carbamazepine ER Tablets, Carbamazepine Tablets, and Carbamazepine Chewable Tablets.  On May 14, 2014, before those increases, Nisha Patel of Teva exchanged eight (8) text messages and a phone call with Ara Aprahamian of Taro.  After speaking with Aprahamian, Patel directed a colleague to create a list of price increase candidates, which designated Carbamazepine as ███████████  On June 3, 2014, the day Taro increased prices, Patel and Aprahamiam communicated several times.  Subsequently, on June 5, Dave Rekenthaler of Teva communicated by text message with J.H., SVP and General Manager at Apotex.  On June 17, Rekenthaler and J.H. had an eight minute phone call.

2226.   Apotex announced its increased WAC price for Carbamazepine products on July 14.  J.H. at Apotex and Rekenethaler at Teva had spoken again on July 3, before the increase, and then again on July 15, after the increase.  Patel of Teva spoke with Aprahamian of Taro for approximately 21 minutes on July 29.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2227.   On August 27, 2014, Patel and Aprahamian spoke again by telephone.  On August 28, 2014, Teva announced increased WAC prices for Carbamazepine products.  On September 11, 2014, T.C., Teva Senior Director of Sales, and K.G., Torrent VP of Sales, communicated by phone.  The next day, on September 12, the next day, Torrent announced increased WAC prices for Carbamazepine products.  That same day, Patel of Teva and Aprahamian of Taro spoke.  J.H. of Apotex spoke with Dave Rekenthaler of Teva on Septemnber 8, 10, 25, and 27, and with Maureen Cavanaugh, Teva's SVP of Sales and Marketing, on Septemebr 18.

### 9.    Hydrocortisone Valerate Cream

2228.   The two competitors on Hydrocortisone Valerate Cream were Taro and Perrigo.  As detailed above in an earlier Section, Boothe of Perrigo colluded with Perfetto of Taro to raise the price of Hydrocortisone Valerate Cream in August 2013, including raising WAC pricing by 351% on certain formulations.  Building on this success, the competitors colluded to raise the price again in June 2014.

2229.   As detailed above, on June 3, 2014, Taro published increased WAC pricing for the June 2014 Increase products, including Hydrocortisone Valerate.  That same day, M.C., a sales executive at Perrigo, sent an internal e-mail advising of the Taro price increases.  Wesolowski, a senior executive at Perrigo, responded stating: ████████████████████████ ████████████  That same day, Boothe and Perfetto exchanged four phone calls, including one call lasting five (5) minutes.  Two days later, on June 5, 2014, Boothe followed up with Perfetto again.  The call lasted two (2) minutes.

2230.   On July 14, 2014, A.F., a sales executive at Perrigo, sent an internal e-mail asking for a list of products that were due for a price increase.  The next day, on July 15, 2014, D.B., a

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Perrigo pricing executive responded ███████████████████████████████████

███████████████████████████████ Hydrocortisone Valerate was on the list.

2231.   Over the next several days, Boothe and Perfetto exchanged several calls during which they discussed the price increase on Hydrocortisone Valerate, as well as other products. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/18/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 12:10:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:51:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:02:00 |
| 7/21/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 14:20:00 | 0:26:00 |
| 7/24/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 10:40:00 | 0:02:00 |
| 7/24/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 15:03:00 | 0:07:00 |

2232.   After the lengthy twenty-six (26) minute call between Boothe and Perfetto on July 21, 2014, Perrigo notified its customers on July 22, 2014 that it would be increasing its WAC pricing on a list of products, including Hydrocortisone Valerate, effective July 24, 2014. Notably, Perrigo was also colluding with competitors regarding other products on its list – Econazole Nitrate Cream (with Taro and Teligent) and Hydrocortisone Acetate Suppositories (with G&W).  These products are discussed in detail below in subsequent Sections.

### 10.    Phenytoin Sodium ER Capsules

2233.   Throughout the spring and summer of 2014, there were four competitors in the Phenytoin Sodium market: Taro, Mylan, Amneal, and Taro's parent company, Sun.

2234.   In early April 2014, Taro began formulating its list of products for the June 2014 Increases.  On April 3, 2014, Aprahamian exchanged an e-mail with A.S., a pricing executive at Taro, concerning Phenytoin Sodium pricing and, by April 7, 2014, Taro had added the product to its price increase list.

2235.   Three days later, on April 10, 2014, Aprahamian and M.A., a Mylan sales executive, exchanged two calls lasting two (2) minutes and ten (10) minutes, respectively.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Notably, the competitors would not speak again by phone until June 4, 2014, one day after Taro increased its pricing on Phenytoin Sodium.

2236.   On April 16, 2014, Walgreens – an Amneal customer – e-mailed Taro asking for a bid on Phenytoin Sodium.  After an internal discussion regarding market shares, Aprahamian responded on April 20, 2014 stating: ███████████████████████████████████████

███████   Similarly, on April 24, 2014, Walgreens also e-mailed Mylan, another competitor in the market, asking for a bid on the product.

2237.   Between April 26 and 29, 2014, NACDS held its annual meeting in Scottsdale, Arizona.  Key representatives from Taro, Mylan, Amneal, and Sun attended the conference.  The attendees included Aprahamian and Perfetto of Taro, Jim Nesta, a senior pricing and sales executive at Mylan, S.R., a pricing executive at Amneal, and G.S., a senior executive at Sun.

2238.   While attending the NACDS annual meeting, the competitors had numerous opportunities at various programming and social events to discuss Phenytoin Sodium, along with other products on which they competed.  Indeed, between April 27 and April 29, Nesta of Mylan and S.R. of Amneal exchanged at least twenty-two (22) phone calls and text messages.  Further, on April 29, 2014, while still at the NACDS meeting, Aprahamian sent an e-mail to S.I., an administrative clerk at Taro, asking, ████████████████████████████████████████████

████████████████████████

2239.   One month later, on May 29, 2014, the Pricing and Contracts ("P&C") team at Mylan generated a Daily Report listing the Mylan opportunity at Walgreens on Phenytoin Sodium.  In the report, Mylan noted that it could supply in July 2014 and identified the product as ████████████████████████   Notably, no generic manufacturer of Phenytoin Sodium had increased pricing yet, including Amneal.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2240.   In the days leading up to the generation of the P&C Report, Nesta and M.A., a

sales executive at Mylan, both communicated multiple times with S.R. of Amneal.  These

communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/27/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 18:44:13 | 0:02:56 |
| 5/28/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 12:14:56 | 0:00:04 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 15:55:15 | 0:00:14 |
| 5/29/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:08:45 | 0:00:06 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:09:19 | 0:00:04 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:20:50 | 0:00:15 |
| 5/29/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:36:27 | 0:01:23 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:53:02 | 0:05:37 |
| 5/29/2014 | Text | S.R. (Amneal) | Incoming | M.A. (Mylan) | 17:05:22 | 0:00:00 |

2241.   Ultimately, Mylan declined to bid on the Walgreens business, refusing to take the

business away from its competitor, Amneal.

2242.   As detailed above, on June 2, 2014 Taro notified its customers that it would be

increasing its prices on the June 2014 Increase products, including Phenytoin Sodium.  That

same day, S.R. of Amneal called both M.A. and Nesta several times.  Over the next several days,

all three competitors would exchange a number of calls.  These are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:46:53 | 0:00:02 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 16:47:32 | 0:00:04 |
| 6/2/2014 | Voice | S.R. (Amneal) | Incoming | Nesta, Jim (Mylan) | 17:02:54 | 0:00:06 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 17:03:18 | 0:00:03 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 17:04:14 | 0:00:19 |
| 6/2/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:51:53 | 0:00:46 |
| 6/4/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 13:17:00 | 0:01:00 |
| 6/4/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 13:21:17 | 0:07:38 |
| 6/4/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 13:51:18 | 0:00:26 |
| 6/5/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 13:47:00 | 0:00:02 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Incoming | S.R. (Amneal) | 13:47:37 | 0:00:17 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 15:49:34 | 0:00:05 |
| 6/5/2014 | Text | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 15:50:12 | 0:00:00 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:36:15 | 0:00:00 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:36:41 | 0:03:34 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 6:56:00 | 0:02:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | S.R. (Amneal) | 6:57:00 | 0:07:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 12:41:00 | 0:09:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 9:02:00 | 0:04:00 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2243.   On July 2, 2014, S.K., a sales executive at Sun, sent an internal e-mail advising

G.S., a senior executive at Sun, and others, that Amneal had raised pricing on Phenytoin Sodium.

However, Amneal would not publish its increased WAC pricing until several months later – on

September 1, 2014.

2244.   In the days leading up to July 2, Taro, Mylan, and Amneal continued to

communicate.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/25/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 12:11:00 | 0:01:00 |
| 6/25/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 13:04:00 | 0:09:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:29:00 | 0:01:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:35:00 | 0:01:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 12:19:00 | 0:11:00 |
| 6/27/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 10:52:00 | 0:02:00 |
| 6/27/2014 | Voice | M.A. (Mylan) | Incoming | S.R. (Amneal) | 11:17:00 | 0:06:00 |
| 7/1/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 6:15:00 | 0:09:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 11:11:00 | 0:04:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:15:00 | 0:06:00 |
| 7/2/2014 | Voice | M.A. (Mylan) | Outgoing | Aprahamian, Ara (Taro) | 11:18:00 | 0:02:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 11:20:00 | 0:04:00 |

2245.   On July 10, 2014, Wal-Mart e-mailed Mylan requesting a bid on Phenytoin

Sodium because its incumbent supplier had increased its pricing.  That same day, M.A. of Mylan

called Aprahamian.  The call lasted seven (7) minutes.  The next morning, on July 11, 2014,

Aprahamian called S.R. of Amneal.  S.R. returned the call a few minutes later and they spoke for

three (3) minutes.  Later that day, C.W., a pricing executive at Mylan, sent an internal e-mail

regarding the Wal-Mart opportunity stating: ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████ (emphasis in original).

2246.   On July 14, 2014, Sun followed its competitors and increased pricing on Phenytoin Sodium.  Similarly, Mylan followed suit on July 16, 2014, increasing its WAC pricing by 210% to match market pricing.

2247.   On July 31, 2014, Wal-Mart was still looking for a supplier for Phenytoin Sodium and reached out to Taro asking for a bid.  E.G., a Taro sales executive, forwarded the request along internally, asking ██████████████  Although it was confirmed that Taro could, in fact, supply the customer, A.L., a Taro pricing executive, advised that E.G. respond to the Wal-Mart request as follows: ████████████████████████████████████ ███████████████████████████████  To that, Aprahamian replied to A.L. separately stating – ██████████████

2248.   One month later, on September 1, 2014, Amneal followed and matched its competitors' WAC pricing.

**11.    Econazole Nitrate Cream**

2249.   In the summer of 2014, there were three competitors in the market for Econazole: Perrigo, Taro, and Teligent.

2250.   In June 2014, Perrigo began planning a price increase.  On June 17, 2014, Boothe of Perrigo called a Taro employee – likely Perfetto – and they spoke for forty-five (45) minutes.

2251.   One week later, on June 25, 2014, S.B., a sales executive at Taro, sent an internal e-mail stating that ██████████████████████████████ ███████ and suggested bidding at Associated Pharmacies.  On July 8, 2014, Taro put together an offer for that customer.  With regard to Taro's pricing for the bid, Aprahamian stated: ███████████ █████████████████████████████████  Notably, the price of Econazole had not yet gone up – and would not do so for another several weeks.

2252.   On July 18 and July 19, 2014, Boothe of Perrigo and Perfetto of Taro exchanged three (3) short calls.  The next business day, on July 21, 2014, the two competitors spoke for twenty-six (26) minutes.  On July 22, 2014, T.P. of Perrigo spoke with S.M., a sales executive at Teligent, for more than five (5) minutes.  Three days later, on July 24, 2014, Boothe called Perfetto again.  The call lasted two (2) minutes.  Perfetto returned the call and the two competitors spoke for seven (7) minutes.

2253.   That same day, on July 24, 2014, Perrigo instituted a dramatic price increase for Econazole.  Customers saw increases ranging from 637% to 735%.

2254.   That morning, Aprahamian notified his colleagues at Taro of the development. He instructed them not to capitalize on any opportunities that might come Taro's way as a result of Perrigo's price increase, saying: ███████████████████████████████████ ███████████████████████████████  Aprahamian further instructed his team to increase Taro's Econazole price to GPOs to $0.02 under its WAC price with just five (5) days' notice for all such customers.  ████████████████████████  he added, ████████████ ██████████████████████████████

2255.   The next day, on July 25, 2014, E.G., a Taro sales executive, placed two (2) calls to S.M. at Teligent.  E.G. called S.M. again on August 12, 2014 and they spoke for nearly five (5) minutes.  The next day, on August 13, 2014, Perfetto spoke with Boothe for eleven (11) minutes.

2256.   The coordination among the competitors bore fruit quickly.  Just two weeks later, on September 1, 2014, Teligent increased its WAC prices for Econazole to match Perrigo. Taro's price increases followed two months later, on November 18, 2014.  After the Taro

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

increase, a customer forwarded the Taro notification to K.M., a sales executive at Perrigo, stating

██████████████████████████████████████████████████████████████████

2257.   By May 2015, Sandoz was making plans to re-enter the Econazole market,

attracted by the fact that the other players had instituted price increases.  CW-3 advocated a re-

launch strategy that considered fair share principles as well as Sandoz's ongoing understanding

with Perrigo.  He advised his colleagues: ███████████████████████████████████████

██████████████████████████████████████████████

2258.   On October 1, 2015, W.W., a Sandoz launch executive, e-mailed CW-3 seeking

intelligence on current prices for various customer accounts in anticipation of the upcoming

Econazole re-launch.  Less than an hour later, CW-3 called T.P. at Perrigo and they spoke for

twenty-seven (27) minutes.

2259.   Later that day, CW-3 responded to his colleague's e-mail with details of Perrigo's

pricing at Morris & Dickson.  Not wanting to put additional details about his conversation with

T.P. in writing, CW-3 copied CW-1, a senior pricing executive at Sandoz, stating: █████████

█████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

2260.   On November 30, 2015, Sandoz bid on the Econazole business at Morris &

Dickson.  Perrigo, however, refused to cede the business to Sandoz because it had already given

up one customer to the new entrant and was not inclined to hand over another.

2261.   Intent on working out a deal with the market share leader, CW-3 and T.P. of

Perrigo exchanged four (4) calls on December 16, 2015.  The next day, on December 17, 2015,

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Sandoz contacted Morris & Dickson and convinced the customer to consider a revised offer from Sandoz.  This time, Perrigo ceded the customer to Sandoz.

2262.   When Sandoz's re-launch of Econazole finally came to fruition in late 2015, it matched its competitors' increased WAC prices.

### 12.    Fluocinonide .1% Cream

2263.   On January 14, 2014, Perrigo launched Fluocinonide .1% as the first-to-file generic, giving it 180 days of exclusivity against all other generic competitors, except for the authorized generic (the "AG").  Two weeks later, on January 31, 2014, Oceanside Pharmaceuticals (a subsidiary of Valeant Pharmaceuticals, the brand manufacturer, and hereinafter referred to as "Valeant") launched the AG of Fluocinonide .1% and published WAC pricing that matched Perrigo.

2264.   When Valeant entered the market, the company submitted a bid to Publix for Fluocinonide .1%.  After consultation with T.P., a sales executive at Perrigo, and Wesolowski, a senior Perrigo executive, the company decided to ███████ and gave up the business to Valeant.

2265.   As the end of Perrigo's exclusivity approached, Taro and Glenmark both began making plans to enter the Fluocinonide .1% market.  Although Sandoz also had plans to enter, manufacturing issues would delay its launch until later in 2015.

2266.   On June 3, 2014, Perfetto of Taro exchanged four (4) calls with Boothe of Perrigo, including one call lasting five (5) minutes.

2267.   On June 9, 2014, A.L., a Taro pricing executive, sent an internal e-mail stating that Taro was nearing the Fluocinonide .1% launch and ████████████████████ A.L. further stated that ██████████████████████████████

██████████████████████████████████████████████ A.L. also explained, ████

██████████████████████████████████████████████████ Attached

to the e-mail was a fact sheet about the launch that identified Taro's target market share goal as

15%.  Thereafter, Aprahamian responded to A.L. directly to express his approval of the direction

the pricing executive had given to the sales team, stating simply: ███████

2268.   At the same time, Glenmark was planning its launch and targeting approximately

25% share of the Fluocinonide .1% market.

2269.   Over the next several days, Perfetto of Taro exchanged several calls with Boothe

of Perrigo and Grauso, a senior executive at Glenmark.   These calls among the three competitors

are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/12/2014 | Voice | Grauso, Jim (Glenmark) | Incoming | Perfetto, Mike (Taro) | 3:58:00 | 0:09:00 |
| 6/17/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Taro Pharmaceuticals | 12:13:00 | 0:45:00 |
| 6/18/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 6:33:00 | 0:02:00 |
| 6/19/2014 | Voice | Grauso, Jim (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 12:31:00 | 0:27:00 |
| 6/19/2014 | Voice | Grauso, Jim (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 13:00:00 | 0:01:00 |
| 6/19/2014 | Voice | Grauso, Jim (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 13:16:00 | 0:02:00 |

2270.   On June 25, 2014, Taro submitted an offer to Publix, a Valeant customer, for

Fluocinonide .1%.  On June 30, 2014, Publix e-mailed Valeant asking whether the company

wanted to bid to retain the business.  S.S., a sales executive at Valeant, forwarded the request

along internally stating that he had spoken with his contact at Publix who told him that Taro

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ After discussing the issue internally, M.S., a

marketing executive at Valeant, responded with his agreement to act in accordance with the

larger fair share understanding among the Defendants: ████████████████████████

████████████ Thereafter, on July 7, 2014, Publix awarded the business to Taro.

2271.   In the days leading up to Taro's and Glenmark's Fluocinonide .1% launch, Aprahamian of Taro and Grauso of Glenmark exchanged several calls, including two (2) calls on July 14, 2014 – the day that both competitors launched the product.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/1/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Grauso, Jim (Glenmark) | 13:33:00 | 0:18:00 |
| 7/8/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Grauso, Jim (Glenmark) | 6:11:00 | 0:07:00 |
| 7/8/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Grauso, Jim (Glenmark) | 6:21:00 | 0:01:00 |
| 7/9/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Grauso, Jim (Glenmark) | 11:55:00 | 0:06:00 |
| 7/14/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Grauso, Jim (Glenmark) | 13:26:00 | 0:01:00 |
| 7/14/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Grauso, Jim (Glenmark) | 13:31:00 | 0:02:00 |

2272.   On July 14, 2014, Taro and Glenmark published WAC pricing that essentially matched each other.  Prior to their entry, the generic market was evenly split between Perrigo (with 56%) and Valeant (with 44%).

2273.   Through the end of July 2014, the competitors continued to communicate with each other.  Aprahamian and Perfetto of Taro exchanged several calls with Grauso of Glenmark, and Perfetto exchanged several calls with Boothe of Perrigo. These calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/18/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Grauso, Jim (Glenmark) | 7:35:00 | 0:03:00 |
| 7/18/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 12:10:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:51:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:02:00 |
| 7/21/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 14:19:00 | 0:26:00 |
| 7/22/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Grauso, Jim (Glenmark) | 12:51:00 | 0:05:00 |
| 7/24/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 10:40:00 | 0:05:00 |
| 7/24/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 15:02:00 | 0:07:00 |

2274.   During this time, and in accordance with fair share principles, Perrigo and Valeant both ceded several accounts to the new entrants, Taro and Glenmark.

2275.   For example, on July 14, 2014, Meijer, a Perrigo customer, e-mailed Glenmark to advise that it was interested in receiving an offer for Fluocinonide .1 %.  J.J., a sales executive at Glenmark, forwarded the e-mail to his colleague Jim Brown, a senior sales executive at

Glenmark, who responded: ███████████████████████████████████

███████████████████████████

2276.   Over the next several days, Glenmark secured awards for Fluocinonide .1 % at

Econdisc, a Valeant customer, and Rite Aid and ABC, both Perrigo customers. With respect to

ABC, when J.C., a Glenmark sales executive, received the customer's acceptance she forwarded

it along internally, stating, ████████████████████████████████

█████████████

2277.   After securing these accounts, J.J. of Glenmark followed up with his colleague

Brown regarding Meijer, asking ███████████████████████████

███████████████████████ Brown replied to J.J.'s e-mail stating: █████████

█████████

███████████████████████████████████████

To that, J.J. responded: ███████████████████

██████████████████████████

2278.   Notably, after Glenmark bid on Fluocinonide .1% at Econdisc, but before it was

awarded the business, the customer e-mailed S.B., a Taro sales executive, asking ████████

██████████████████████████████████████ After

forwarding the request along internally, S.B. replied to the customer on July 18, 2014 stating that

Taro would not bid for the business.  That same day, Aprahamian of Taro spoke with Grauso of

Glenmark for three (3) minutes and Perfetto of Taro exchanged a one (1) minute call with Boothe of Perrigo.

2279.   In addition to securing Publix from Valeant in July, Taro also secured business at Walgreens, Optisource, and McKesson from Perrigo that same month.  When Optisource awarded Taro the business, the customer noted ████████████████████████████████ ████████████████████████████████ Further, in October and November 2014, Perrigo also gave up its business at Meijer and Omnicare to its competitors.

2280.   Approximately one year later, in September 2015, Sandoz had resolved its manufacturing issues and was readying to enter the Fluocinonide .1% market.  At that time, Valeant was the market share leader with 43.93% followed by Glenmark (23.79%), Perrigo (18.33%), and Taro (13.94%).

2281.   On September 18, 2015, W.W., a launch executive at Sandoz, e-mailed Sandoz sales executives CW-3 and W.G., requesting pricing, usage, and incumbent information for Fluocinonide .1% at three customers that Sandoz was considering targeting – H.D. Smith, Morris & Dickson, and Premier.  W.W. stated that ██████████████████████████████ ███████████████████████████████████████████████████

2282.   On September 24, 2015, CW-1, a Sandoz senior pricing executive, followed up regarding W.W.'s request, asking ██████████████████████ CW-3 responded to CW-1 only stating, █████████████ That same day, CW-3 called Aprahamian.  The call lasted one (1) minute.  An hour and half later, CW-3 called T.P. of Perrigo and they spoke for twenty-three (23) minutes.  Upon information and belief,  T.P. provided CW-3 with contract pricing for Fluocinonide .1% for various customers, including Walgreens, HEB, Target, McKesson, and Econdisc during this call.  None of these customers were CW-3's customers.  Later that day,

CW-3 e-mailed the information he had obtained from his competitor to CW-1, W.W., and others at Sandoz.

2283.   A few days later, on September 28, 2015, Sandoz provided CW-3 with an offer for Fluocinonide .1% to submit to his customer, Morris & Dickson.  CW-3 responded stating ███████████████████████████████████████████ and then re-forwarded his e-mail from September 24, 2015.

2284.   The next day, on September 29, 2015, CW-3 called Aprahamian and they spoke for eleven (11) minutes.  After that call, CW-3 sent the following e-mail to CW-1 and others at Sandoz: ██████████████



2285.   Thereafter, Sandoz revised its offer to Morris & Dickson and the customer awarded Sandoz the business.  On October 12, 2015, Sandoz also secured the Fluocinonide 1% business at Wal-Mart, a Taro customer.

### 13.   Metronidazole 1% Gel

2286.   In 2013, the annual market for Metronidazole ("Metro") Gel 1% in the United States exceeded $120 million.

2287.   Prior to the summer of 2014, Sandoz was the exclusive generic manufacturer of Metro Gel 1%.  In June 2014, Taro began making plans to enter the market and, on July 1, 2014, Taro launched the product and matched Sandoz's WAC pricing.

2288.   In the days leading up to the launch, CW-3 of Sandoz and Aprahamian of Taro exchanged several calls during which they discussed the launch and Sandoz's allocation of customers to the new entrant, Taro.  Further, during these calls, Aprahamian told CW-3 that Taro was targeting 35% market share and identified the customers that it planned to target. Immediately upon hanging up with Aprahamian, CW-3 reported this information back to his superiors, CW-1 and Kellum. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/17/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:44:00 | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:03:00 | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:18:00 | 0:01:00 |
| 6/19/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 9:55:00 | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:40:00 | 0:02:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:42:00 | 0:01:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:43:00 | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:56:00 | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:40:00 | 0:10:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:50:00 | 0:01:00 |
| 6/25/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:02:00 | 0:13:00 |
| 6/25/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 13:15:00 | 0:01:00 |
| 6/25/2014 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 13:18:00 | 0:01:00 |

2289.   On June 18, 2014, Aprahamian sent an internal e-mail to A.L., a pricing executive at Taro, stating ██████████████████████████████████████████████ ████████████████  WBAD is a GPO that purchases generic drugs on behalf of its members, including ABC and Walgreens.  On June 25, 2014, Taro submitted an offer to Walgreens.  A few days later, on June 30, 2014, Taro submitted a separate offer to ABC.

2290.   On the same day that ABC received the offer from Taro, the customer notified Sandoz that it had received a competitive bid from Taro and asked whether Sandoz would lower its price to retain the business.  S.G., a sales executive at Sandoz, forwarded the request along internally, including to CW-1 and Kellum.  CW-1 responded to S.G. stating: ██████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████████████████

████████████████████████ Kellum agreed: ████████████████████

2291.   The next day, July 1, 2014, A.H., a sales executive at Sandoz, sent an internal

e-mail stating that he had spoken with WBAD and learned that Taro was ██████████████

████████████████████████ Kellum responded, ████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ CW-1 replied:

███████████████████████████████████████████

2292.   Walgreens accepted Taro's bid on July 2, 2014 and ABC accepted Taro's bid on

July 7, 2014.  WBAD (including ABC and Walgreens) represented approximately 20% of

Sandoz's volume and sales for Metro Gel 1%.

2293.   On July 8, 2014, Taro also submitted a bid to Wal-Mart for Metro Gel 1%.  That

same day, Aprahamian called CW-3 of Sandoz twice.  Both calls lasted one (1) minute.  Two

days later, on July 10, 2014, Aprahamian e-mailed E.G., a Taro sales executive, asking her to

follow up with Wal-Mart regarding the offer.  The next day, on July 11, 2014, CW-3 and

Aprahamian exchanged four (4) calls.  After the last call, CW-3 hung up and immediately called

Kellum.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/11/2014 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:31:00 | 0:01:00 |
| 7/11/2014 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:49:00 | 0:01:00 |
| 7/11/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:05:00 | 0:03:00 |
| 7/11/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:52:00 | 0:05:00 |
| 7/11/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:57:00 | 0:01:00 |

2294.   The following Monday, on July 14, 2014, Wal-Mart notified Sandoz that it had

received a competitive bid on Metro Gel 1% that was 10% lower than Sandoz's pricing and

asked whether it would bid to retain the business.

2295.   On July 18, 2014, W.G., a pricing executive at Sandoz, forwarded the request internally, including to CW-1 and Kellum, stating ███████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████ CW-1 responded by recommending that

Sandoz relinquish Wal-Mart and stating, ███████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████ Kellum then

replied, ██████████

2296.   Notably, after sending this e-mail, someone at Sandoz changed the language in the earlier e-mail string from ██████████████████████ to ██████████████████

███████████████ Upon information and belief, Sandoz made this change to avoid documenting the fact that the competitively sensitive information came directly from its competitor, Taro.

2297.   Although Sandoz gave up the business, Wal-Mart was unexpectedly reluctant to stop ordering Metro Gel 1% from Sandoz.  On August 7, 2014, L.B., a sales executive at Sandoz, sent an internal e-mail advising that Wal-Mart was still ordering and stating, █████████████

██████████████████████████████████████████████████████████

██████████████████████████████ B.G. of Sandoz replied, ███████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████

2298.   On August 4, 2014, McKesson also notified Sandoz that it had received an unsolicited bid for the Rite Aid portion of its Metro Gel 1% business and gave Sandoz the

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

opportunity to bid to retain the business.  Kellum responded that ████████████

████████████████████████████████████████████████████████████  After

some internal discussion, Sandoz decided to cede the Rite Aid portion of the business to Taro.

As P.C., a pricing executive at Sandoz, explained in an internal e-mail on August 8, 2014: ████

███████████████████████████████████████████████████████████████████████

2299.   On August 11, 2014, McKesson awarded the Rite Aid portion of its Metro Gel

1% business to Taro.  Two days later, on August 13, 2014, Aprahamian called CW-3 and they

spoke again for seven (7) minutes.

**14.    Clotrimazole 1% Cream**

2300.   In early January 2015, Sandoz was readying to re-launch into the Clotrimazole

Cream market.  At that time, there were three (3) other competitors in the market – Taro,

Glenmark, and Major Pharmaceuticals.  Sandoz had some supply constraints and was only

targeting between 15% and 20% market share as the fourth entrant.

2301.   On the evening of January 7, 2015, A.G., a senior Sandoz launch executive, sent

an internal e-mail to the Sandoz launch team stating that the Pricing Department was preparing

pre-launch offers for Clotrimazole Cream to be sent the following week.

2302.   First thing the next morning, on January 8, 2015, CW-3 of Sandoz called

Aprahamian of Taro.  Aprahamian called him back shortly thereafter.  Both calls lasted one

(1) minute.  That same day, E.D., a Sandoz launch executive, told his colleague CW-1, a Sandoz

senior pricing executive, that CW-3 was getting an additional price point for the Clotrimazole

Cream launch.  The next day, on January 9, 2015, Aprahamian called CW-3.  CW-3 called him

back and they spoke for four (4) minutes.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2303.   First thing the next business day, Monday January 12, 2015, E.D. followed up with an e-mail to CW-3 stating, ███████████████████████████████████████████ ████████████████████████████████ CW-3 responded: ███████████████ ███████████████████

2304.   That same day, CW-3 called Aprahamian.  Aprahamian returned the call and they spoke for seven (7) minutes.  On that call, Aprahamian provided CW-3 with Taro's non-public pricing for two different customer categories; wholesalers and retailers.  CW-3 told Aprahamian that Sandoz had limited supply of Clotrimazole Cream and that it planned to target Wal-Mart and Walgreens only.  CW-3's contemporaneous notes from the call are detailed below: ███████ ████████████



2305.   Immediately after his call with Aprahamian, CW-3 called CW-1.  The call lasted one (1) minute.  Also, later that day CW-3 sent the following e-mail to E.D. at Sandoz, with a copy to CW-1, conveying the competitively sensitive information he had learned from Aprahamian: ████████████████████



2306.   The prices matched exactly the prices that CW-3 had written down in his Notebook.

2307.   The next day, on January 13, 2015, CW-3 spoke with CW-1 for sixteen (16) minutes.  Later that afternoon, Aprahamian called CW-3.  CW-3 returned the call and they spoke for eight (8) minutes.

2308.   On January 29, 2015, Sandoz bid on Clotrimazole Cream at Wal-Mart, a Taro customer.  Wal-Mart e-mailed Aprahamian to inform him of the bid and asked if Taro wanted to bid to retain the business.  Aprahamian responded, ████████████████████████ ██████████████████   That same day, Aprahamian called CW-3 and they spoke for nine (9) minutes.

2309.   The following Monday, February 2, 2015, Aprahamian e-mailed Wal-Mart and declined the opportunity explaining that ██████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████   Aprahamian then forwarded his response along internally stating: ████████████████████████ ████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2310.   On February 9, 2015, Wal-Mart e-mailed Sandoz to notify the company that it had won the Clotrimazole Cream business.

2311.   In March 2015, and consistent with its plans, Sandoz also bid on Clotrimazole Cream at Walgreens, a Glenmark customer.  On March 27, 2015, Walgreens awarded the business to Sandoz.

### 15.   Ketoconazole Cream and Fluocinonide Gel

2312.   In March 2015, G&W entered into an agreement with Teva to purchase its manufacturing facility in Sellersville, Pennsylvania.  As a part of that transaction, G&W acquired the rights to manufacture over twenty-five (25) of Teva's products, including Ketoconazole Cream and Fluocinonide Gel.

2313.   Taro had a history of colluding with Teva and Sandoz on both Ketoconazole Cream and Fluocinonide Gel.  As alleged above, in 2014, Aprahamian of Taro coordinated with Nisha Patel, a Teva pricing and sales executive, and CW-3 of Sandoz, to significantly raise prices on both products.

2314.   After G&W acquired these products from Teva, Taro immediately began communicating and colluding with G&W.  The following Sections will discuss this collusion on Ketoconazole Cream and Fluocinonide Gel in further detail.

### 16.   Ketoconazole Cream

2315.   At the beginning of 2015, there were three competitors in the market for Ketoconazole Cream: Taro, Teva, and Sandoz.  As detailed above, in March 2015, G&W purchased the rights to manufacture Ketoconazole Cream from Teva.

2316.   With G&W poised to enter the market, Orlofski of G&W placed a call to Aprahamian at Taro on June 10, 2015 to discuss the details.  They spoke for nine (9) minutes. The following Monday, on June 15, 2015, G&W entered the market for Ketoconazole Cream.

2317.   G&W's target market share for the launch was forty percent (40%), a share to which it felt entitled in light of its predecessor Teva's roughly 60% share in the months leading up to the sale of the Sellersville facility.  G&W took great care to aim for that target with precision, in compliance with its agreement with the other players in the market.  Late in the day on June 15, 2015 – the day of G&W's launch –Vogel-Baylor of G&W e-mailed a colleague to ask how close to the target forty percent (40%) G&W would be if it won both Walgreens and CVS. Vogel-Baylor added: ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ The response was good news: ████████████

████████████████████████████████████

2318.   Even though Teva, Taro, and Sandoz had conspired to significantly raise prices on Ketoconazole Cream only about a year earlier, G&W entered the market with a dramatic price increase – roughly four times that of the competitors already in the market.  Its WAC for the 15gm tube was $105.06, while market WAC was $24.72.  Its WAC for the 30gm tube was $166.76; market WAC was $41.69.  Its WAC for the 60gm tube was $221.55; market WAC was $63.30.

2319.   Orlofski placed another call to Aprahamian of Taro on June 17, 2015.  This time the call lasted twenty (20) minutes.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2320.   Two days later, on June 19, 2015, Aprahamian called CW-3 at Sandoz and they spoke for seventeen (17) minutes.  During that call, the two competitors discussed the details of G&W's entry and Taro's plans to follow the sharp price increase.  CW-3 took the following contemporaneous notes in his Notebook documenting their conversation: ███

███



2321.   Following his call with Aprahamian on June 19, 2015, CW-3 texted his superior, Kellum, to set up a time to talk to him about his discussion with Aprahamian.

2322.   G&W's bold price move upon entering the market was not well-received by customers.  On June 18, 2015, Red Oak reached out to Taro for a price proposal, saying ████

███████████████████████████████████████

███████████   Taro, however, held staunchly to its deal with its competitors. C.U., a Taro sales executive, forwarded Red Oak's message to Aprahamian with the comment: ███

███████████████████████████████████████

█████

2323.   The next day, on June 19, 2015, Red Oak also tried to interest Sandoz in its business, saying: ██████████████████████████████

2324.   Sandoz was careful to confer with the competition before responding.  On June 22, 2015, CW-3 of Sandoz placed two calls to Aprahamian at Taro, lasting seven

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

(7) minutes and nine (9) minutes, respectively.  On June 26, 2015, CW-3 initiated another call to

Aprahamian, and the two spoke for three (3) more minutes.

2325.   Four business days later, on July 1, 2015, CW-1, a Sandoz senior pricing

executive, gave approval to submit a bid to Red Oak for one of two drugs under consideration.

With respect to the second drug – Ketoconazole Cream – however, the answer was different.

CW-1 instructed: ████████████████████████████████████

2326.   Two weeks after the G&W launch, Walgreens was pressing G&W for some relief

from its steep price increase.  On July 1, 2015, Vogel-Baylor updated Orlofski on the situation.

She reported that her Walgreens contact ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ Vogel-

Baylor played hardball with Walgreens, however, knowing that the competitors would dutifully

follow G&W's price move.  She told Orlofski: ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

2327.   Orlofski e-mailed Vogel-Baylor the following day, July 2, 2015, emphasizing that

securing the Walgreens business was ██████████ adding: ██████████████████

████████████████████████████

2328.   On July 6, 2015, Vogel-Baylor notified Orlofski and A.G., a senior G&W

executive, that she had ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2329.   Orlofski acted quickly, calling Aprahamian the next day, plus four more times over the next three weeks as shown below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/7/2015 | Voice | Aprahamian, Ara (Taro) | Incoming | Orlofski, Kurt (G&W) | 12:03:00 | 0:03:00 |
| 7/9/2015 | Voice | Aprahamian, Ara (Taro) | Outgoing | Orlofski, Kurt (G&W) | 12:44:00 | 0:01:00 |
| 7/10/2015 | Voice | Aprahamian, Ara (Taro) | Outgoing | Orlofski, Kurt (G&W) | 12:58:00 | 0:06:00 |
| 7/22/2015 | Voice | Aprahamian, Ara (Taro) | Incoming | Orlofski, Kurt (G&W) | 12:02:00 | 0:29:00 |
| 7/28/2015 | Voice | Aprahamian, Ara (Taro) | Outgoing | Orlofski, Kurt (G&W) | 12:17:00 | 0:01:00 |
| 7/28/2015 | Voice | Aprahamian, Ara (Taro) | Incoming | Orlofski, Kurt (G&W) | 14:45:00 | 0:15:00 |
| 7/30/2015 | Voice | Aprahamian, Ara (Taro) | Incoming | Orlofski, Kurt (G&W) | 8:09:00 | 0:02:00 |

2330.   On July 31, 2015, the day after the final call in the series of calls detailed above, Taro followed G&W's price increase on the 15gm and 30gm tubes of Ketoconazole Cream, instituting 325% and 300% WAC increases respectively.

2331.   On August 3, 2015, Orlofski initiated an eight (8) minute call to Aprahamian. Taro raised WAC on the 60gm tube by 250% that same day.

2332.   Orlofski was delighted when he heard that Taro had followed G&W's lead, calling it ▬▬▬▬▬▬▬▬▬  He instructed Vogel-Baylor: ▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

2333.   Sandoz did not delay in making its own plans to follow its competitors' price increases.  On August 17, 2015, the agenda of a Sandoz internal strategy meeting included the item: ▬▬▬▬▬▬▬▬▬▬▬▬▬  Before it could follow the price increases, however, it made sure not to poach any of its competitors' customers or take steps that would disrupt the market.

2334.   For example, on September 10, 2015, T.O., a Sandoz marketing executive, instructed a colleague that Sandoz should not submit a bid on Ketoconazole Cream in response to ABC's invitation to do so, revealing that the company's price increase was imminent. T.O. stated: ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

███████████████████████████████████████████

████

███████ In January 2016, a Sandoz internal report listed drugs they planned to increase prices on, with Ketoconazole Cream described as █████████████

2336.   In March 2016, Sandoz finally followed the competitors' moves, increasing its price for Ketoconazole Cream by 300%.  CW-3 of Sandoz and Aprahamian of Taro continued to coordinate even then, with a twenty-three (23) minute call on March 7, 2016, followed by a ten (10) minute call the next day, March 8, 2016.

### 17.    Fluocinonide Gel

2337.   For most of 2015, Taro was the only player in the market, with Teva and Sandoz having discontinued Fluocinonide Gel from their product lines in late 2014.

2338.   In the fall of 2015, however, G&W was making plans to join Taro in the market by launching the product that November, after purchasing the product from Teva.  G&W built into its plans an assumption that Taro would cede approximately twenty-five (25%) percent market share to G&W upon its launch.

2339.   By mid-November, G&W had bumped its product launch date back to December because of a product testing problem at an outside lab.  No longer content with *assuming* that Taro would give it a quarter of the market when the launch came to fruition, G&W executives reached out to the competitor to confirm.  On November 17, 2015, Orlofski of G&W called Aprahamian at Taro, and the two competitors spoke for seventeen (17) minutes.  Later that same day, Perfetto of Taro placed a brief call to Orlofski.  M.P., a G&W business development executive, also continued the dialogue with a call to Perfetto on November 18, 2015.

2340.   On November 20, 2015, Vogel-Baylor of G&W worked on confirming that Taro was, indeed, the only competitor with whom G&W had to confer, asking a colleague to pull information for Fluocinonide Gel: ████████████████████████████████

████████████████   The following day, Orlofski placed another call to Perfetto of Taro.

2341.   Two days later, on November 23, 2015 at 11:25 a.m., Orlofski called Perfetto yet again.  They spoke for seven (7) minutes.  Less than two hours later, Vogel-Baylor sent Kroger an e-mail with news of the G&W launch of Fluocinonide Gel and a request for information about the purchaser's usage numbers for the product.  On November 24, 2015, Kroger responded that G&W would need to offer all three sizes of the product – 15gm, 30gm, and 60gm – before it would consider moving the business.  G&W, however, would not be prepared to launch the two smaller sizes until May 2016.

2342.   The Kroger response sent the competitors back to square one in figuring out how to allocate the Fluocinonide Gel market between them.  G&W set to work quickly exploring other options.  On November 25, 2015, Orlofski called Perfetto and the two competitors spoke for seven (7) minutes.

2343.   On December 3, 2015, Vogel-Baylor reached out to Walgreens asking whether the customer would entertain a bid for Fluocinonide Gel.  Vogel-Baylor explained to Walgreens that it was ████████████████████████████

2344.   A few days later, on December 8, 2015, Aprahamian and Orlofski had a twenty-three (23) minute phone conversation.  Later that day, Vogel-Baylor moved forward, e-mailing her Walgreens contact to ask where G&W should send its Fluocinonide Gel proposal soliciting Walgreens' business.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2345.   While Vogel-Baylor awaited Walgreens' response, other G&W executives continued their conversations with their counterparts at Taro.  On December 13, 2015, Perfetto called M.P. of G&W and they spoke for twenty-nine (29) minutes.  The following day, December 14, 2015, Aprahamian called Orlofski and they spoke for nine (9) minutes.

2346.   Having gotten the requested information from Walgreens late in the evening on December 14, 2015, and having vetted the plan with its competitor, G&W sent its pricing proposal on Fluocinonide Gel to Walgreens the following day.

2347.   Walgreens contacted Taro two days later, on December 17, 2015, to inform the incumbent of G&W's proposal and to find out whether Taro intended to defend.  Taro sales executive C.U. asked Aprahamian: ███████████████████  Aprahamian responded simply ███████████████████  C.U. wrote back, emphasizing that he was well aware of Taro's cooperative arrangement with its competitors, saying: █████████████████████████ ██████████████████

2348.   To keep the lines of communication open, Orlofski called Perfetto first thing the following morning.

2349.   C.U. refrained from responding to Walgreens' question about Taro's intentions in writing, instead cautiously e-mailing his Walgreens contact on December 21, 2015: ██████ ██████████████████████

2350.   Having overlooked C.U.'s request for a phone call, on January 4, 2016, the Walgreens representative again pressed for an answer on what Taro's approach would be on Fluocinonide Gel, asking: ████████████████████████  C.U. responded: ██ ██████████████████████████████████████ ████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2351.   The following day, January 5, 2016, a Taro pricing executive, M.L., confirmed that Taro had voluntarily ceded its Walgreens business to the competitor, telling his colleague:

███████████████████████████████████████████████████████████████

██████

██████ That same day, a Taro pricing executive, A.L., advised C.U. that he should have someone on the pricing team send e-mails to customers when Taro declines to bid – like the one he sent to Walgreens for Fluocinonide Gel.  As A.L. explained, ████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████

2353.   ███████████████████████████ Taro declined to bid at Walgreens, Vogel-Baylor called C.U. at Taro and they spoke for twenty-five (25) minutes.  Notably, this was the only phone call ever between these two competitors according to the available phone records.

2354.   Several months later, on April 26, 2016, C.U. forwarded internally a monthly tracking spreadsheet entitled: ████████████████████████████ In the spreadsheet, C.U. noted with respect to Fluocinonide Gel at Walgreens: ████████████████████████

██████████████████████████████████████████████████████

### K.   Sandoz And Its Other Relationships

2355.   As discussed in detail above, CW-3 colluded extensively with Aprahamian and H.M. of Taro on products that Sandoz and Taro overlapped on and had an ongoing understanding going back many years not to poach each other's customers and to follow each other's price increases.  However, CW-3 was a prolific communicator who regularly colluded with many other competitors.

2356.   For example, between June 2011 and August 2016, when he left Sandoz, CW-3 exchanged at least one thousand one hundred (1,100) phone calls and text messages with his contacts at competitors, including Defendants Taro, Perrigo, Aurobindo, Actavis, Glenmark, G&W, Wockhardt, Mylan, Lannett, Lupin, non-Defendant Mallinckrodt, and non-Defendant Rising.

2357.   As detailed above, when CW-3 was coordinating with competitors, he was acting at all times at the direction of, or with approval from, his superiors, including CW-1 and Kellum.

2358.   Several of CW-3's relationships – including with Perrigo, Glenmark, Aurobindo, Rising, and non-Defendant Mallinckrodt – as well as other relationships between various Sandoz executives and certain competitors, are explored in greater detail in the following Sections.

### L.      Collusion Between Sandoz And Perrigo

2359.   As detailed above, Sandoz and Perrigo had an ongoing understanding over many years not to poach each other's customers and to follow each other's price increases.  This understanding was implemented primarily through communications between CW-3 of Sandoz and T.P. of Perrigo.  CW-3 continued the relationship with T.P. after his predecessor, CW-6, left Fougera in August 2012.  CW-3 and T.P. of Perrigo were not social friends.  If they were communicating with each other, it was to coordinate anticompetitive conduct with regard to drugs on which Sandoz and Perrigo overlapped.

2360.   During this time period, T.P. was acting at all times at the direction of, or with approval from, his superiors, including Boothe and Wesolowski.

2361.   Several examples of CW-3's coordination with T.P. on specific products are discussed in detail in the following Sections.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 1.     Bromocriptine Mesylate Tablets

2362.   As of December 2012, the three competitors in the market for Bromocriptine were Sandoz (with 65% share), Perrigo (with 30%), and Mylan (with 5%).

2363.   On March 1, 2013, Walgreens reached out to Sandoz asking for a one-time buy for Bromocriptine because Mylan was having supply issues and would be out of the market for two months.  On March 4, 2013, S.G. responded to Walgreens stating that Sandoz could not fill the customer's request.

2364.   Viewing Mylan's supply issues as an opportunity, S.G. forwarded his exchange with Walgreens to Kellum asking, ███████████████████   Kellum responded within the hour stating, ██████   That same day, March 4, 2013, CW-4, a Sandoz senior sales executive, spoke with Jim Nesta, a senior sales executive at Mylan, for nearly four (4) minutes.  The two competitors spoke again on March 11, 2013 for nearly ten (10) minutes.

2365.   On March 22, 2013, Kellum e-mailed the Pricing Committee recommending that Sandoz increase prices on Bromocriptine, among other products.  In particular, Kellum sought a 206% increase to Sandoz's WAC pricing for Bromocriptine and noted the reason for the increase was due to ██████████████████████

2366.   By March 31, 2013, all members of the Sandoz Pricing Committee (which included Kellum and CW-1, among others) had approved the increase.  The very next day, on April 1, 2013, CW-3, a Sandoz senior sales executive, called T.P. of Perrigo – the other competitor on Bromocriptine – and they spoke for seventeen (17) minutes.  The next morning, on April 2, 2013, CW-3 called T.P. again and they spoke for five (5) minutes.  Upon information and belief, on this call, CW-3 conveyed to his competitor a list of products that Sandoz planned to increase pricing on in April 2013, including Bromocriptine, as well as the amount of those

increases.  CW-3's contemporaneous notes from that call are detailed below: ██████

██████



2367.   After hanging up with T.P., CW-3 called Kellum.  The call lasted one (1) minute. A few hours later, CW-3 called CW-1, a senior pricing executive at Sandoz, and they spoke for eleven (11) minutes.

2368.   The next day, on April 3, 2013, Sandoz held an internal meeting attended by sales and pricing personnel, including CW-3, CW-4, CW-1, and Kellum, to discuss the upcoming Sandoz price increases, including Bromocriptine.

2369.   Two days later, on April 5, 2013, Sandoz implemented the Bromocriptine increase and raised WAC pricing on the product by 205%.

2370.   Throughout the first three weeks of May 2013, CW-4 spoke with Nesta of Mylan regularly.  These communications included at least the calls detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 7:51:16 | 0:03:20 |
| 5/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 8:40:23 | 0:04:07 |
| 5/20/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 10:42:42 | 0:00:04 |

2371.   By late May 2013, Mylan had resolved its supply issues on Bromocriptine and was readying to increase its own price.  To that end, on May 22, 2013, Mylan held an internal meeting to discuss Bromocriptine.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2372.   That same day, on May 22, 2013, ABC e-mailed Sandoz to request a bid on Bromocriptine, citing supply issues with its incumbent manufacturer.  S.G., a Sandoz sales executive, who had a better idea of Mylan's plans, forwarded the request to Kellum stating ███

███████████████████

2373.   Sandoz quickly set out to confirm the reason for ABC's request.  First thing the next morning, on May 23, 2013, Kellum called L.W., a sales executive at Mylan.  The call lasted two (2) minutes.  Notably, this was the only call ever between the two competitors according to the available phone records.  That same morning, CW-3 spoke twice with T.P. of Perrigo and CW-4 exchanged two calls with Nesta of Mylan.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 8:04:00 | 0:05:00 |
| 5/23/2013 | Voice | L.W. (Mylan) | Incoming | Kellum, Armando (Sandoz) | 8:33:00 | 0:01:55 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 10:49:23 | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 12:40:43 | 0:01:25 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:48:00 | 0:03:00 |

2374.   After speaking with their competitors, CW-3 and T.P. reported back to their superiors, CW-1 and Kellum of Sandoz and Wesolowski of Perrigo.  This call pattern is illustrated in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 8:04:00 | 0:05:00 |
| 5/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 9:13:00 | 0:07:00 |
| 5/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 9:20:00 | 0:01:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 10:26:00 | 0:01:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:48:00 | 0:03:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 14:51:00 | 0:01:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:14:00 | 0:16:00 |

2375.   During these calls, Sandoz learned that ABC was in fact Perrigo's customer, and that Perrigo might be leaving the market for Bromocriptine due to supply problems.

2376.   After this series of calls, Kellum called S.G. of Sandoz and they spoke for twenty-one (21) minutes.  While on the phone with Kellum, S.G. sent the following internal e-mail, with

a copy to Kellum, regarding the reason for ABC's bid request on Bromocriptine: ████

████



2377.   Not wanting to upset the market balance between the competitors, Sandoz ultimately decided to submit an offer to ABC for a one-time buy.  However, the customer declined the offer because Sandoz's pricing was too high.

2378.   Just one week later, on May 31, 2013, Mylan re-entered the market and published WAC pricing for Bromocriptine that matched Sandoz's increased pricing.  In the days leading up to, and on the day of, Mylan's price increase, the competitors again exchanged several calls. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/28/2013 | Voice | L.W. (Mylan) | Outgoing | CW-3 (Sandoz) | 7:58:00 | 0:07:00 |
| 5/29/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 9:46:30 | 0:12:51 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 11:46:43 | 0:08:32 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:45:59 | 0:00:06 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:54:01 | 0:00:04 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 13:54:45 | 0:03:01 |
| 5/28/2013 | Voice | L.W. (Mylan) | Outgoing | CW-3 (Sandoz) | 14:23:00 | 0:03:00 |
| 5/28/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:29:00 | 0:04:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:21:00 | 0:02:00 |

2379.   As of June 2013, Sandoz decided not to pursue additional market share on Bromocriptine because it had reached its ████  and achieved a ████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2380.   Perrigo did not quickly follow the price increases taken by Sandoz and Mylan, in part due to their intermittent supply issues.  As a result, Sandoz received several complaints from its customers that Perrigo was selling the product at a cheaper price.

2381.   For example, on July 22, 2013, McKesson e-mailed Sandoz requesting a price reduction for Bromocriptine because a competitor was selling the product at ████████████

████████████████████████  The next day, on July 23, 2013, CW-3 called L.W. of Mylan and they spoke for eight (8) minutes.  Within minutes of hanging up, CW-3 called CW-1. The call lasted two (2) minutes.  Two days later, Sandoz responded to McKesson and declined to lower its pricing stating, ████████████████████████████████████████

2382.   On July 29, 2013, McKesson asked that Sandoz reconsider its decision because otherwise it would need to request a bid from Perrigo.  That same day, T.P. of Perrigo called CW-3 twice.  Both calls lasted one (1) minute.  The next morning, CW-3 called T.P. and they spoke for thirteen (13) minutes.  Upon information and belief, during these calls, the competitors discussed the fact that Perrigo had not followed the Sandoz and Mylan price increases on Bromocriptine.  However, upon information and belief, T.P. assured CW-3 that Perrigo would not take Sandoz's business at McKesson.  CW-3's contemporaneous notes from his conversation with T.P. are pictured below: ████████████████



2383.   After hanging up with T.P., CW-3 called CW-1 and they spoke for four (4) minutes.  On this call, CW-3 conveyed to CW-1 what T.P. had told him about Bromocriptine. According to CW-3, it was not a question of whether Perrigo would follow, but when they would

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

follow.  Armed with this assurance from Perrigo, Sandoz responded to McKesson's request by declining to lower its pricing and reiterating ████████████████████████████ ████

2384.   Similarly, on August 23, 2013, Omnicare, a Sandoz customer, e-mailed Perrigo stating that they noticed Perrigo's price for Bromocriptine was significantly lower than the other competitors and asked ████████████████████████████ ████ P.H., a sales executive at Perrigo, forwarded the e-mail to T.P. asking, ████████ ████████████████████████████ To that, T.P. responded, ████ ████████████████████████ Although Perrigo considered bidding on the business, it ultimately declined the opportunity.  On September 5, 2013, P.H. e-mailed Omnicare stating, ████████████████████████████ ████████

2385.   Sandoz and Mylan generated a substantial amount of money from Bromocriptine sales in 2013.  For example, on February 4, 2014, Sandoz released a business review report that detailed how the 2013 price increases for certain drugs delivered upwards of $197 million of revenue for Sandoz after price protection.  Among the drugs mentioned, Bromocriptine realized incremental net sales of $3.2 million after price protection.

2386.   Perrigo ultimately followed its competitors and implemented a price increase on Bromocriptine in October 2014.

2387.   On October 2, 2014, T.P. of Perrigo called CW-3 and they spoke for seven (7) minutes.  Immediately upon hanging up with CW-3, T.P. called his supervisor, Wesolowski. Less than one (1) week later, on October 7, 2014, Perrigo sent letters to its customers notifying them of the Bromocriptine increase.  The next day, on October 8, 2014, CW-3 sent an internal

e-mail to Kellum and CW-1, among others, noting that Perrigo ███████████████
███████████████ █████████████████████ That same day, CW-3 called T.P. and they spoke
for four (4) minutes.

## 2.    Adapalene Cream

2388.   As detailed above in an earlier Section, Fougera and Perrigo colluded to
allocate market share to Perrigo upon its entry into the Adapalene Cream market as the
authorized generic in October 2010.

2389.   Two years later, in November 2012, Sandoz (which had acquired Fougera)
left the Adapalene Cream market temporarily due to supply issues.  This left Perrigo as
the sole manufacturer of the product.

2390.   By early January 2013, Sandoz was making plans for its re-entry into the market.
On January 14, 2013, CW-3 provided M.A., a Sandoz marketing executive, a list of potential
targets for Adapalene Cream stating that █████████████████████████
██████████████████████ CW-3 further explained that ████████
████████████████████████████████████
████████████████████ The list of potential targets was organized by
historical volume of units purchased and Walgreens was the first name on that list.  Wal-Mart
was not listed as a target.

2391.   On June 24, 2013, approximately one month before Sandoz's re-launch,
CW-3 and T.P. of Perrigo had a ten (10) minute phone call.  Upon information and belief,
during this call T.P. shared Perrigo's non-public dead net pricing for Adapalene Cream
for two customers – Walgreens and Optisource.  During that conversation, CW-3
recorded those prices in his Notebook as follows: ██████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



2392.   On July 15, 2013, Sandoz held a Commercial Operations call during which they discussed, among other things, the Adapalene Cream re-launch scheduled for July 26, 2013.  That same day, T.P. and CW-3 exchanged two more calls, both lasting one (1) minute.  After exchanging a third call that lasted one (1) minute on July 16, 2013, the two competitors connected on July 17, 2013 and spoke for nineteen (19) minutes. Upon information and belief, T.P. provided CW-3 with Perrigo's non-public pricing for Adapalene Cream for a list of customers during the call, and also told CW-3 that Perrigo was not willing to give up Walgreens to Sandoz.  CW-3's contemporaneous notes from this call are detailed below: ▮▮▮▮▮▮▮▮▮▮



FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

The purpose of conveying this information was so that Sandoz, when it re-entered the market, could target and obtain specific agreed-upon customers with the highest prices possible, to minimize price erosion.

2393.   Also, between July 16, 2013 and July 18, 2013, CW-3 and A.F., a sales executive at Perrigo, exchanged at least nineteen (19) text messages.

2394.   On July 26, 2013, the day of Sandoz's re-launch of Adapalene Cream, CW-3 called CW-1 and they spoke for eight (8) minutes. On this call, CW-3 provided CW-1 with the customer pricing for Adapalene Cream that T.P. had provided to him. Within minutes of hanging up with CW-3, CW-1 sent an internal e-mail, including to Kellum, regarding Adapalene Cream. In that e-mail, CW-1 recommended that Sandoz approach ████████████████████████ ████████████████████████████████████ CW-1 also provided the following pricing information for those customers: ████████████████████



2395.   Notably, the price points matched exactly with the price points T.P. had provided to CW-3. In his e-mail, CW-1 also stated that Sandoz would need to bid 30% lower than ABC's current price in order to win the business upon re-launch.

2396.   That same day, on July 26, 2013, Sandoz prepared and sent offers for Adapalene Cream to the three customers CW-1 identified – ABC, McKesson, and Wal-Mart – as well as Rite Aid and Morris & Dickson. Consistent with the prior

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

conversations between CW-3 and T.P. of Perrigo, Sandoz did not submit a bid to

Walgreens.

2397.   Later that day, on July 26, 2013, Morris & Dickson accepted Sandoz's bid

for Adapalene Cream.

2398.   Also, that same day, Wal-Mart declined the opportunity – but for reasons other

than price – stating: ███████████████████████████████████████████████

████████████████████████

2399.   The following Monday (the next business day), on July 29, 2013, T.P. of

Perrigo called CW-3 twice.  Both calls lasted one (1) minute.  The next day, on July 30,

2013, CW-3 called T.P. back and they spoke for thirteen (13) minutes.  CW-3 hung up

and immediately called CW-1 to report about his conversation with the competitor. The

call lasted four (4) minutes.  That same day, Rite Aid accepted Sandoz's bid for

Adapalene Cream.

2400.   The next day, on July 31, 2013, Sandoz sent an offer for Adapalene Cream

to Econdisc. The next morning, on August 1, 2013, Econdisc notified Perrigo of the offer

and gave the incumbent an opportunity to bid to retain the business.  Within the hour,

T.P. called CW-3.  The call lasted one (1) minute. Ten minutes later, T.P. called CW-3

again and they spoke for five (5) minutes.  Later that day, in an effort to avoid putting

evidence of his collusive conversations in writing, CW-3 sent the following e-mail to

CW-1: ████████████████████

████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

That same day, CW-3 and CW-1 spoke for five (5) minutes.

2401.   On August 2, 2013, ABC accepted Sandoz's bid for Adapalene Cream.

2402.   On August 6, 2013, T.P. and CW-3 exchanged two calls lasting four (4) minutes and twelve (12) minutes, respectively.  Later that day, T.P. and his colleagues at Perrigo, including his supervisor, Wesolowski, had a conference call to discuss Adapalene Cream.  That same afternoon, Perrigo notified Econdisc that it was declining to bid to retain the customer's business.  Later that day, Econdisc accepted Sandoz's bid for Adapalene Cream.

2403.   The next day, on August 7, 2013, McKesson accepted Sandoz's offer for Adapalene Cream.

2404.   T.P. of Perrigo and CW-3 continued to talk throughout August 2013 to coordinate Sandoz's smooth entry into the market.  For example, between August 12 and August 15, 2013, the two competitors exchanged at least eight calls, including two calls on August 15, 2013 lasting eight (8) minutes and fourteen (14) minutes, respectively. Later that day, M.A., a Sandoz marketing executive, e-mailed CW-1 regarding Adapalene Cream stating that Sandoz's market share was now 25.5% and asking whether Walgreens could be ███████████  As detailed above, Sandoz had stayed away from Walgreens because Perrigo said they would not give up the business.

2405.   Respecting the agreement that the two competitors had arranged, Sandoz stayed away from Walgreens and instead submitted another offer to Wal-Mart on August 27, 2013.  Wal-Mart, again, summarily refused the offer stating that it ██████ ████████████████████████  because Perrigo had been its supplier for less than one year.  The next day, on August 28, 2013, CW-3 called T.P. and they spoke for fourteen

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

(14) minutes.  T.P. hung up and spoke with his supervisor, Wesolowski, for seven

(7) minutes.

2406.   As of December 2013, and without the Wal-Mart business, Sandoz had

only obtained approximately 30% share of the Adapalene Cream market.  This was well

below its expected share in a two-player market and less than the 47% market share that

Sandoz had maintained prior to leaving the market in November 2012 due to supply

issues.

2407.   This underperformance caught the attention of high-level executives at

Sandoz.  On January 8, 2014, R.A., a Sandoz finance executive, convened a meeting to

discuss the Adapalene Cream re-launch and the issue of securing more market share on

the product.  By that time, it had been decided internally by the sales team that Sandoz

would pursue Walgreens – representing approximately 19% share – to meet its fair share

targets on Adapalene Cream.

2408.   That same day, on January 8, 2014, CW-3 called T.P. of Perrigo.  The call

lasted one (1) minute.  First thing the next morning, CW-3 called T.P. again and they

spoke for sixteen (16) minutes. T.P. and CW-3 would exchange two more calls the

following week, on January 13 and January 16, 2013, lasting one (1) minute and ten (10)

minutes, respectively.  Immediately upon hanging up from the ten (10) minute call, CW-3

called CW-1 and they spoke for eight (8) minutes.

2409.   On January 28, 2014, Sandoz held a follow-up meeting to discuss the

Adapalene Cream re-launch and Walgreens as Sandoz's next target.  Two days later, on

January 30, 2014, Sandoz met with Walgreens to discuss new product opportunities,

including Adapalene Cream.  The next day, on January 31, 2014, CW-3 called T.P. and

they spoke for eight (8) minutes.  Upon hanging up with T.P., CW-3 called CW-1. The

call lasted one (1) minute.

2410.   After this series of communications between CW-3 of Sandoz and T.P. of

Perrigo, Sandoz submitted a bid to Walgreens for Adapalene on February 14, 2014.

Perrigo promptly conceded the customer and Walgreens awarded the business to Sandoz

on March 5, 2014.  This award brought Sandoz's share back to 47% – the same

percentage it had before exiting the market in 2010.

### 3.    Calcipotriene Betamethasone Dipropionate Ointment

2411.   In early 2014, both Sandoz and Perrigo were preparing to launch CBD

Ointment.  Sandoz was preparing to launch as the first-to-file generic and Perrigo was

preparing to launch as the authorized generic (the "AG").  Under the agreement that

Perrigo had reached with the brand manufacturer, Perrigo could not launch until Sandoz,

the first filer, entered the market.  Typically, a first filer interested in gaining a

competitive advantage would want to keep its launch date a secret from the company

launching the AG so that the first filer could catch the AG by surprise and maintain

market exclusivity for a longer period of time.  But that was not the case with regard to

CBD Ointment.

2412.   T.P., a sales executive at Perrigo, and CW-3, a senior sales executive at

Sandoz, exchanged two calls in late February 2014.  On those calls, T.P. told CW-3 that

Perrigo would be launching the AG of CBD Ointment and asked CW-3 when Sandoz

planned to launch its generic version.

2413.   When first approached by T.P. about CBD Ointment, CW-3 was not aware

that Sandoz was planning to launch it.  After being approached by T.P., CW-3 reached

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

out to others at Sandoz to find out what Sandoz's plans were.  On March 4, 2014, A.S., a senior Sandoz launch executive, confirmed to CW-3 that Sandoz would be launching CBD Ointment.  Within minutes of receiving A.S.'s confirmation the night of March 4, 2014, CW-3 e-mailed Kellum, stating: ████████████████████████████

2414.   The next day, on March 5, 2014, Sandoz held an internal ██████████████ ███████ teleconference to discuss its plans.  Kellum, A.S., CW-1, a Sandoz senior pricing executive, and other members of the sales and launch teams attended the call.  Additional meetings were held on March 10 and March 13, 2014 to coordinate the CBD Ointment launch.

2415.   Also on March 13, 2014, CW-3 called T.P. two (2) times, with one of the calls lasting twelve (12) minutes.  That same day, Perrigo scheduled its own teleconference for the following day to discuss its CBD Ointment launch. T.P., his supervisor Wesolowski, a senior executive at Perrigo, and over twenty (20) other Perrigo sales and launch team members attended the call.  On the call, the Perrigo sales executives were directed to go after only six (6) select customer accounts, and no others.  These accounts were referred to as ████████████████ ████████████

2416.   Promptly following the call, J.B., a Perrigo marketing executive, circulated a document that was discussed on the call.  The document was internally prepared at Perrigo and indicated that Sandoz may launch on March 31, 2014 and that Perrigo's ████████████ was 50% of the market. Perrigo's information was accurate.  Sandoz ultimately launched the 100gm size on March 31, 2014 and the 60gm size on April 1, 2014.  In harmony with Perrigo's target share goal of 50%, internal Sandoz e-mail correspondence circulated prior to launch stated that Sandoz also had a target market share of 50% for CBD Ointment.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2417.   While Perrigo planned to approach a small, select group of potential customers, Sandoz was deciding which large customers to go after.  Sandoz initially planned to target Walgreens and ABC for CBD Ointment.  However, Sandoz remained involved in ongoing business disputes with Walgreens and ABC in the middle of March 2014.  Sandoz was concerned that Walgreens and ABC would not award Sandoz their CBD Ointment business if the disputes were not resolved prior to launch.

2418.   On the night of Friday, March 14, 2014, A.S. e-mailed P.G., the President of Sandoz US, stating that resolving the ABC and Walgreens disputes would be a  for the CBD Ointment launch.  P.G. responded by directing A.S. to look for CBD Ointment business ███████████ and to ████████████████████ ████████

2419.   A.S. forwarded his e-mail correspondence with P.G. to Kellum and others at Sandoz on the afternoon of March 16, 2014.  Consistent with P.G.'s direction, A.S., Kellum, CW-3 and CW-1 immediately began to strategize how Sandoz could reach its market share target of 50% without Walgreens and ABC.  A.S. determined that in order to reach that goal, Sandoz would need to have CVS as a customer.  At an in-person meeting in Sandoz's Princeton offices, Kellum told CW-3 and CW-1 that he also wanted McKesson and Rite Aid as customers.

2420.   On the next day, March 17, 2014, CW-3 called T.P. at Perrigo to resume their discussions about customer allocation and to exchange pricing information.  Between March 17 and March 20, 2014, CW-3 and T.P. exchanged more than ten phone calls, with one call lasting eleven (11) minutes and another call lasting seventeen (17) minutes.  Further, T.P. reported the substance of these calls to his supervisor, Wesolowski, seeking direction from him on how to respond to CW-3. T.P. often spoke with Wesolowski between calls with CW-3, sometimes even

calling him immediately after hanging up with CW-3.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/17/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:38:00 | 0:01:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 8:56:00 | 0:11:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 9:08:00 | 0:12:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 12:42:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 12:49:00 | 0:01:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 13:13:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 13:22:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 13:48:00 | 0:08:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:56:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 14:00:00 | 0:03:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 15:30:00 | 0:04:00 |
| 3/19/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 16:20:00 | 0:17:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolwoski, John (Perrigo) | 8:37:00 | 0:01:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolwoski, John (Perrigo) | 8:40:00 | 0:03:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolwoski, John (Perrigo) | 12:37:00 | 0:08:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:18:00 | 0:07:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolwoski, John (Perrigo) | 14:24:00 | 0:01:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:08:00 | 0:03:00 |

2421.   Although most of T.P. and CW-3's calls were just between the two of them, occasionally other colleagues would join them.  For example, CW-3 made a call early in the week of March 17, 2014 to T.P. from A.S.'s office in Princeton, and Kellum and CW-1 also joined the call.

2422.   As noted above, over the course of these calls, T.P. and CW-3 discussed market pricing and customer allocation.  In a call early in the week of March 17. 2014, T.P. shared Perrigo's proposed WAC pricing and AWP pricing for different types of customers.  During that call, CW-3 took the following contemporaneous notes in his Notebook: ▮▮▮▮▮▮▮▮▮▮



FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2423.   When Perrigo launched CBD Ointment about two weeks later, its WAC and AWP matched those price points.  The two rows of WAC prices in the Notebook represent the different pricing for the 60gm and 100gm sizes. Sandoz's WAC prices at launch were close but slightly higher than Perrigo's, at $657.45 for the 60gm size and $968.40 for the 100gm size.

2424.   T.P. also shared with CW-3 what Perrigo's non-public, "dead net" pricing would be for its customers. Perrigo ranked its customers into five "tiers."  Customers in the same tier were typically sold a drug at the same "dead net" price. T.P. communicated the CBD Ointment pricing tiers to CW-3 by giving examples of the types of customers in a tier, such as large wholesalers like ABC and Cardinal or regional wholesalers like HD Smith or Optisource, and what the corresponding "dead net" pricing would be for that type of customer.  CW-3's contemporaneous notes regarding Perrigo's dead net pricing for CBD Ointment are below:



2425.   The pricing tiers T.P. gave to CW-3 matched the pricing tiers Perrigo planned to use.  The following rows are from an internally prepared spreadsheet that shows Perrigo's main pricing tiers for the two different sizes of CBD Ointment: ████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



2426.   Moreover, Perrigo's offers to customers were in step with the "dead net" pricing noted above.  For example, Perrigo made offers to Wal-Mart and Meijer, both so-called "tier 2" customers, that resulted in Wal-Mart and Meijer having "dead net" pricing of $426.31 and $627.94 for the 60g and 100g sizes respectively and offers to Optisource and Morris Dickson, both so-called "tier 3" customers, that resulted in Morris Dickson and Optisource having "dead net" pricing of $448.75 and 660.99 for the 60g and 100g sizes respectively.

2427.   As noted earlier, T.P. and CW-3 did not just use these calls to share pricing information in anticipation of their launches.  They also used them to allocate the customers that would be in the market.  When CW-3 and T.P. spoke on calls early in the week of March 17, 2014, each shared his respective company's position on how customers should be divided between them to achieve "fair share."  CW-3 told T.P. that Sandoz wanted McKesson, Rite Aid, Econdisc, CVS, Cardinal, Omnicare and Kaiser. CW-3 documented this in his Notebook:

2428.   T.P. responded that Perrigo wanted Anda, Walgreens, ABC, Wal-Mart, Rite Aid and McKesson. CW-3 documented this in his Notebook:



2429.   The purpose of reaching agreement on the list of customers was to avoid competing with one another as both companies entered the market simultaneously.

2430.   As the lists above show, with the exception of Rite Aid and McKesson, Sandoz and Perrigo were aligned on how significant customers should be allocated.  In March 2014, Rite Aid was purchasing generic drugs through McKesson's "OneStop Generics" program, so Perrigo and Sandoz viewed these customers as a package or, put another way, whoever got McKesson also got Rite Aid as a customer.  Both of the competitors wanted that business.

2431.   As the negotiations continued, Sandoz recognized that the list of customers it wanted for CBD Ointment was more than its fair share of the market.  However, in keeping with its general strategic preference for selling to a smaller number of large customers, Sandoz did not want to give up McKesson, Rite Aid, CVS, or Cardinal.  To resolve the issue, Kellum, CW-3 and CW-1 brainstormed a list of other customers that, when combined, would have about the same market share as Rite Aid and McKesson and that Sandoz was willing to give up to Perrigo. Ultimately, the list of customers that Sandoz created included Optisource, Publix, Morris & Dickson (MD), PBA Health (PBA), Meijer, and Kaiser.

2432.   Thereafter, CW-3 called T.P. and proposed that Sandoz give up these customers to Perrigo in exchange for McKesson and Rite Aid. CW-3 documented this in his Notebook:



FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Perrigo agreed.

2433.   Following the plan, Perrigo submitted offers to the customers listed above and was awarded the business at Optisource, Publix, Morris & Dickson, Meijer, and Kaiser.  In addition, and as planned, Perrigo bid on and won Anda, Walgreens, ABC and Wal-Mart, while Sandoz bid on and won McKesson, Rite Aid, CVS, Cardinal, and Omnicare.

2434.   While Wesolowski encouraged the Perrigo sales team to go after their assigned customers, he was also careful to make sure they adhered to the agreement reached with Sandoz. For example, on March 21, 2014, Omnicare reached out to Perrigo asking for a bid on CBD Ointment.  Omnicare was a customer allocated to Sandoz. P.H., a Perrigo sales executive, forwarded the request to Wesolowski who responded, ███████████████████████████ Consistent with Wesolowski's direction, P.H. told Omnicare that Perrigo was █████████ ████████████ even though Perrigo was actively sending offers to other potential customers at that time.

2435.   On March 31, 2014, CW-3 called T.P. The call lasted two (2) minutes.  That same day, Sandoz officially launched the 100gm package size of CBD Ointment and Perrigo launched both the 100gm and 60gm package sizes.  The next day, on April 1, 2014, Sandoz launched the 60gm size.  Early in the morning of April 1, 2014, M.A., a Sandoz marketing executive, e-mailed Kellum and A.S. to advise that she received an alert that Perrigo had increased prices on CBD Ointment.  She noted that she was █████████████████████████████████████

2436.   On April 7, 2014, D.A., a Sandoz launch executive, noted in an internal e-mail that Sandoz ████████████████████████ At the end of April 2014, Sandoz and Perrigo had a virtually even split of the market for that product.

### 4.     Tacrolimus Ointment

2437.   Recent annual sales of Tacrolimus Ointment in the United States exceeded $100 million.

2438.   In August 2014, Sandoz and Perrigo were both preparing to launch Tacrolimus. Sandoz was the first-to-file generic and Perrigo was the authorized generic (the "AG").

2439.   On August 13, 2014 at 3:57 p.m., E.D., a Sandoz launch executive, sent an internal e-mail asking if anyone knew whether there would be an AG for Tacrolimus or if any other competitors planned to enter the market.  At 5:11 p.m. that same day, CW-3, a Sandoz senior sales executive, called T.P., a Perrigo sales executive, and they spoke for fifteen (15) minutes.  Notably, prior to this call, CW-3 and T.P. had not spoken since June 18, 2014.  Within a half hour of hanging up with T.P., CW-3 sent the following e-mail responding to E.D.'s questions:

2440.   On September 8, 2014, Sandoz held a Commercial Operations meeting during which they discussed the Tacrolimus launch.  That same day, CW-3 called T.P. four times, with one call lasting eleven (11) minutes and another six (6) minutes. On those calls, CW-3 and T.P. discussed the Tacrolimus launch and decided to model it after the CBD Ointment launch.  As discussed above in the previous Section, in the spring of 2014 CW-3 and T.P. had colluded on CBD Ointment when Sandoz was entering as the first-to-file generic and Perrigo as the AG.  By

using CBD Ointment as a model, the competitors would not have to spend significant time negotiating the allocation of customers for Tacrolimus.

2441.   That same day, on September 8, 2014, CW-3 sent the following e-mail to Sandoz launch executives, E.D. and A.S., with a copy to CW-1, a Sandoz senior pricing executive:



2442.   Two days later, on September 10, 2014, CW-3 called T.P. and they spoke for fifteen (15) minutes.  During that call, the competitors again talked about the Tacrolimus launch. Specifically, they discussed the allocation of certain customers to Sandoz and Perrigo so that each competitor could reach 50% market share.  Further, T.P. provided CW-3 with Perrigo's WAC and AWP pricing for the three dosage sizes, and the dead net pricing that Perrigo was contemplating for various classes of customers. CW-3's contemporaneous notes from that call are pictured below:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



2443.   In his notes, CW-3 recorded that the competitors would ██████████████

and listed the customers that they agreed to allocate to each other. Sandoz planned to target the

customers listed in the box in the bottom right hand corner of the note, and Perrigo planned to

target the customers listed above it.

2444.   On November 10, 2014, A.F., a Perrigo sales executive, e-mailed Wesolowski, a

senior Perrigo executive, to advise that a customer told her Sandoz was launching Tacrolimus

that day.  In turn, Wesolowski e-mailed T.P. and others at Perrigo asking them if the launch

could be confirmed.  That same day, T.P. and CW-3 spoke two times, with one call lasting two

(2) minutes and the second lasting three (3) minutes.  During those calls, CW-3 told T.P. that

Sandoz had not yet formally launched the product or started shipping to customers.  Later that

afternoon, T.P. reported back to Wesolowski: ███████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

In order to avoid any written evidence of his illegal activity, T.P. referred to his source as a "customer" even though it was actually his competitor, CW-3.

2445.   On November 19, 2014, Sandoz launched Tacrolimus and Perrigo launched on the following day, November 20, 2014.  Consistent with the competitors' plans, Sandoz was awarded CVS, Cardinal, Omnicare, and Econdisc, among other customers.  As planned, Perrigo won Walgreens, Walmart, ABC (secondary), Anda, Optisource, and Publix.

2446.   On November 20, 2014, Boothe, a senior Perrigo executive, sent around a congratulatory e-mail to the Perrigo team that worked on the Tacrolimus launch.  He specifically congratulated C.V., a Perrigo business development executive, and Wesolowski for ███████  ███████████  A few days later, in response to a request from the Tacrolimus brand manufacturer on how sales were going, C.V. replied, █████████████████████  █████████████████████

### 5.   Methazolamide Tablets

2447.   By the fall of 2013, there were two manufacturers marketing Methazolamide – Defendant Sandoz and Fera Pharmaceuticals, Inc. ("Fera").  Both competitors had posted nearly identical WAC pricing for the 25mg and 50mg dosage sizes, respectively.

2448.   In early 2014, Sandoz began experiencing issues with its API supplier and was forced to temporarily withdraw from the market.  At that time, Sandoz expected that its supply problems would be resolved in June 2014 and it would re-enter then.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2449.   At the same time that Sandoz was experiencing supply problems, Perrigo acquired Fera's right to distribute Methazolamide.  As a result of Perrigo's acquisition, Fera left the Methazolamide market.

2450.   On March 6, 2014, Perrigo formally launched Methazolamide. Perrigo knew prior to its launch that Sandoz, its only competitor, was out of the market and was not expected to re-enter until the summer of 2014.  Perrigo leveraged its temporary position as the only manufacturer with the ability to supply by implementing a large price increase.  Perrigo's WAC pricing when it entered was 136% higher than Sandoz's.  An internal Perrigo document circulated approximately one month prior to the launch indicated that Perrigo's target share for Methazolamide was ███████████████████████████████████████████

2451.   On June 17, 2014, Perrigo learned from a customer that Sandoz was back in the Methazolamide market.  That same day, T.P. of Perrigo called CW-3, a Sandoz senior sales executive.  The call lasted one (1) minute.  After that call, T.P. called his supervisor, Wesolowski, and they spoke for three (3) minutes.  The next day, on June 18, 2014, T.P. and CW-3 exchanged two more calls, with one call lasting three (3) minutes.  On Monday, June 23, 2014, T.P. e-mailed Wesolowski the following: ██████████████████

██████████████████████████████

2452.   Indeed, Sandoz had re-entered the market for the 25mg with a WAC price of $129.84 – which was significantly lower than Perrigo's WAC price of $306.47.  Wesolowski was upset that Sandoz did not reach out to Perrigo before re-entering the market. Had it done so, Sandoz would have known to raise its price, and to what level.  Wesolowski forwarded T.P.'s

e-mail above to Boothe, a senior Perrigo executive, and others at Perrigo with the following

cover note: ████████████████



2453.   In the meantime, Perrigo would make sure that Sandoz did its ████████ before

re-entering on the 50mg, and that it would correct its prior mistake on the 25mg.

2454.   On October 21, 2014, CW-3 and T.P. spoke for fifteen (15) minutes.  During that

call, T.P. provided CW-3 with Perrigo's increased WAC pricing for the 25mg and 50mg package

sizes of Methazolamide to ensure that Sandoz would match those prices when it re-entered the

market.  CW-3's contemporaneous notes from that call are pictured below: ████████

████████



2455.   Shortly after the call, in early November 2014, Sandoz began ramping up for its

re-entry into the Methazolamide market.  On November 3, 2014, Sandoz held a Commercial

Operations meeting during which Sandoz discussed its plans for the Methazolamide re-launch,

including implementing significant price increases to align with Perrigo's pricing.

2456.   The next day, on November 4, 2014, CW-1, a senior Sandoz pricing executive,

sent an internal e-mail asking his colleague P.C. to evaluate the ████████████████ if

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Sandoz raised its WAC pricing to match Perrigo.  The next day, CW-3 called T.P at Perrigo and the two competitors spoke for twelve (12) minutes.  Also on that day, CW-1 directed the Sandoz pricing team to remove Methazolamide from any existing contracts. CW-1 explained that ████

██████████████████████████████████████████████████████████████████

███████████████

2457.   The two competitors continued to coordinate over the next several weeks as Sandoz made final preparations to re-enter the market and raise prices.  On November 10, 2014, CW-3 called T.P. twice with one call lasting two (2) minutes and the other call lasting three (3) minutes.

2458.   On December 4, 2014, CW-3 e-mailed Kellum, CW-1, and others at Sandoz regarding Methazolamide, providing them with specific, non-public pricing information he had learned from his competitor: ██████████████████

████████████████████████████████████

Internal Perrigo documents confirm that its so-called "dead net" pricing for group purchasing organizations (GPOs) at that time was approximately $250 for the 25mg and $500 for the 50mg. This pricing information was not publicly available.

2459.   On December 5, 2014, Sandoz re-launched its 50mg dosage with a WAC price of $612.97, which matched Perrigo's WAC price.  At the same time, Sandoz increased the WAC price on its 25mg dosage by 136% to match Perrigo's pricing.

**M.    Collusion Between Sandoz And Glenmark**

2460.   In August 2012, not long after Sandoz acquired Fougera, Mitchell Blashinsky, who had just recently joined Defendant Glenmark as its Vice President of Sales and Marketing,

attended the same NACDS conference in Denver, Colorado.  CW-3 of Sandoz attended the same event.

2461.   Over the next two years, the two competitors worked on both market allocation and pricing – speaking at least fifty (50) times.  Their communications were all collusive in nature.  The two competitors were not friends and had no other reason to speak except to coordinate anticompetitive conduct.  During that time period, Sandoz and Glenmark conspired to fix prices and allocate markets on at least two products: (1) Fluticasone Propionate Lotion (60ml) and (2) Desoximetasone Ointment.

1.      **Fluticasone Propionate Lotion (60ml)**

2462.   Glenmark was the first generic manufacturer to enter the market for Fluticasone on March 26, 2012.  As the first generic manufacturer to file an approved ANDA, Glenmark enjoyed a 180-day period of exclusivity during which time no other competitors could sell the product.  Even before Glenmark launched, Sandoz (then Fougera) was planning to enter the market for Fluticasone after Glenmark's exclusivity period ended in September 2012 and understood that Perrigo was also planning to enter at the same time. Over the course of several months, Fougera – in particular CW-6, at the direction of Kaczmarek – coordinated with Glenmark frequently about Fluticasone, including market share targets and pricing, to prepare for its eventual Fluticasone launch.

2463.   After the Sandoz acquisition of Fougera in July 2012, as the end of Glenmark's 180-day exclusivity period approached, Sandoz continued to stay in communication with Glenmark and Perrigo about Fluticasone.  As part of its launch strategy, Sandoz planned to obtain 33% of the market.  Perrigo, however, only anticipated taking about one-quarter of the market.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2464.   By mid-August 2012, Sandoz learned that its launch of Fluticasone would be delayed until the end of November 2012 because of certain production problems. As a result of this delay, Kellum was concerned that Perrigo would be able to launch earlier than Sandoz and wanted to learn more about Perrigo's launch strategy.  On August 21, 2012, Kellum sent an e-mail to his sales team asking about ███████████████   Within minutes of receiving the e-mail, CW-3 reached out to T.P., his contact at Perrigo, by phone.

2465.   CW-3 also sent a message to Perrigo through a customer.  That same day, the customer sent an e-mail to a Perrigo sales executive, stating: ████████████████████ ████████████████████████   The Perrigo sales executive informed the customer that Perrigo's Fluticasone launch had now been ████████ to the first quarter of 2013.  The customer then forwarded that e-mail directly to CW-3 at Sandoz, who reported the information directly to Kellum and others at Sandoz the next day.

2466.   Around this same time, Sandoz also began preparing to have conversations with "customers" about its Fluticasone launch while at the NACDS Conference in Denver in late August 2012.  It was at that same conference where CW-3 first spoke to Blashinsky at Glenmark about working ████████ and making ████████████   In an internal e-mail to the Sandoz sales team on August 25, 2012, in advance of the NACDS Conference, R.T., a senior Sandoz sales and marketing executive, instructed his team on the current strategy which aligned with the larger "fair share" understanding: ████████████████████████ ██████████████████████████████████████

2467.   As its launch date for Fluticasone approached, Sandoz began to think more critically about which customers to target and began to communicate directly with Glenmark on the subject.  On November 26, 2012, Sandoz scheduled an internal meeting to discuss which

customers it should approach as part of its Fluticasone launch.  That same day, CW-3 of Sandoz

spoke to Blashinsky of Glenmark twice, with one call lasting five (5) minutes. After the second

call with Blashinsky, CW-3 e-mailed his Sandoz colleagues a list of six (6) customers he thought

Sandoz should target.  That list would later grow to eight (8) customers. CW-3 also made it

known to his Sandoz colleagues that Glenmark was planning a potential price increase on

Fluticasone at some point in the future.

2468.   The next day, November 27, 2012, a senior Sandoz marketing executive asked

CW-3 to get Fluticasone ███████████ for the customers Sandoz had agreed to target. CW-3

responded that he was ██████████████████████ As promised, the next morning

(November 28) CW-3 called Blashinsky of Glenmark.  The two spoke four (4) times that day,

including one call lasting eight (8) minutes.  Later that same day, CW-3 was again asked if he

had been able to █████████████████████████████████████ CW-3

responded: ███████████████████████████████

2469.   The next morning, CW-3 sent an updated list of nine (9) customers that Sandoz

should target for Fluticasone – based on his conversations with Blashinsky – but he did not

include the pricing information that had been requested.  The senior Sandoz marketing executive

responded immediately: ██████████ CW-3 countered by referring to one of the biggest pop songs

of 2012, suggesting that his boss should call him instead of asking for the information in writing:

██████████████



2470.   As Sandoz continued to prepare for its imminent launch, it also began to evaluate the usage expected from the nine customers that it had agreed with Glenmark to target.  Sandoz found that those nine customers would not allow the company to reach its desired market share goals.  As a result, on November 30, 2012 a senior Sandoz marketing executive suggested that Sandoz approach two large wholesaler customers, instead of one as originally agreed.  CW-3 responded immediately, saying ███████████████████████  CW-3 then stated that ██████████████████████████████████████████████████████ ████████████████████████████████  A few hours later, CW-3 called Blashinsky and left a message.  Blashinsky promptly returned the call and the competitors spoke for three (3) minutes.  Later that day, CW-3 also called and spoke to his contact at Perrigo, T.P., twice.

2471.   Sandoz officially entered the market for Fluticasone on December 3, 2012, matching Glenmark's WAC pricing exactly.  That same day, CW-3 of Sandoz called Blashinsky of Glenmark and they had a two (2) minute call.  Also that day, Blashinsky directed the sales team to relinquish the Publix and Optisource accounts to Sandoz, two of the nine customers that Glenmark had agreed to give up to the new entrant.

2472.   Sandoz continued to coordinate with Glenmark to make sure that it was targeting the appropriate customers and minimizing price erosion as it entered the Fluticasone market.  For example, on December 13, 2012, a large wholesaler that Sandoz had agreed not to target approached Sandoz looking for an offer.  That same day, CW-3 spoke to Blashinsky twice.  When Sandoz refused to respond to the customer, the customer followed up again on December 21, 2012.  Again, following the same pattern, CW-3 spoke to Blashinsky twice that day, including one call lasting four (4) minutes.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2473.   Although Sandoz made sure to coordinate extensively with Glenmark, it had initial difficulty meeting its market share goal, in part because some of the customers already had a significant amount of inventory on hand.  On January 9, 2013, CW-3 had a conversation with Blashinsky where the two competitors walked through a list of customers, identifying those that Sandoz should target and those which it should not.  CW-3 took detailed contemporaneous notes of the conversation.  Later in the day, after reviewing the list, CW-3 of Sandoz began to suspect that Glenmark may have oversold to certain customers in advance of Sandoz's entry, stating in an e-mail that he had ███████████████████████████.

2474.   By January 11, 2013, CW-1 of Sandoz sent around a summary of ████████████ ████████████ stating that █████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████████  In response, R.T. of Sandoz indicated that he was ████████████████████ but that 21.8% market share was ████ ██████ and that Sandoz should continue to press for its original market share goal.

2475.   During an internal Commercial Operations meeting on January 21, 2013, Sandoz decided to approach another customer, CVS, in order to obtain additional market share.  But before doing so Sandoz wanted to confirm that it was acceptable with Glenmark.  In his contemporaneous notes of the meeting, CW-3 recorded in his Notebook that he was supposed to █████████████████████████████ and let him know that Sandoz was ████████ ██████████████████████.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



2476.   Sandoz subsequently learned why Glenmark was reluctant to give up more market

share to Sandoz.  There was a discrepancy between the two competitors about how much market

share Sandoz had already obtained.  On January 29, 2013, a senior Sandoz marketing executive

reported that ███████████████████████████████████████████████████

███████████████████████████████████████████ Two days later, on

January 31, 2013, CW-3 and Blashinsky spoke two more times, for five (5) minutes each.

2477.   Over the next several months Sandoz and Glenmark continued to coordinate

about Fluticasone, including about a Glenmark price increase on that drug.  For example, on

April 16, 2013, as Glenmark was preparing for a large-scale price increase on several different

drugs (in coordination with several different competitors), CW-3 of Sandoz had two separate

calls with Blashinsky of Glenmark, including one call lasting thirteen (13) minutes.  They talked

about several things, including Glenmark's potential entry and market share targets on a different

drug, Alclometasone, as well as a price increase on Fluticasone, as recorded by CW-3 in his

contemporaneous notes of the call: ███████████████████

███████████████████████████████████████████████

2478.   Blashinsky called CW-3 again on May 6, 2013, in advance of the Glenmark price

increase.  He also called CW-3 on May 17, 2013 – the day after the Glenmark price increase on

Fluticasone became effective.  In all, the two competitors spoke three times on May 17, 2013,

including two separate five (5) minute calls.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2479.   Throughout this time period, Sandoz also kept in close communication with Perrigo about the details of Perrigo's anticipated entry into the Fluticasone market.  For example, in early April 2013 CW-3 of Sandoz spoke to T.P. of Perrigo multiple times, including calls lasting seventeen (17) and five (5) minutes, respectively.  CW-3 subsequently reported to his colleagues at Sandoz that Perrigo would be delayed in entering the Fluticasone market ████ ████████████████████████████  On April 9, 2013, a colleague at Sandoz followed up asking CW-3 for additional information about whether Perrigo planned to enter ███████████████ ████████████  The next day, CW-3 communicated directly with Perrigo to obtain the answer, calling and speaking with T.P. two (2) times.

2480.   On May 21, 2013, as Perrigo was beginning to plan its entry into the market, a Perrigo executive asked T.P. to obtain ████████████ for Fluticasone Lotion.  Two days later, on May 23, 2013, T.P. called CW-3 at Sandoz.  They ended up speaking twice that day, for five (5) and three (3) minutes, respectively.  Immediately after their second call, CW-3 called Blashinsky at Glenmark – the other competitor on Fluticasone – and the two spoke for four (4) minutes.

2481.   Similarly, on May 28, 2013 a senior Sandoz executive requested additional ████████████████████ about Perrigo's entry timing on Fluticasone.  That same day, CW-3 called T.P. at Perrigo and they spoke for four (4) minutes.  The next day, T.P. called CW-3 back and they spoke again for two (2) minutes.

2482.   By July 2013, Perrigo finally began preparing in earnest to enter the Fluticasone market.  As of that time Sandoz had been able to obtain 30% market share, reaching its initial target goal for a 3-player market with Glenmark and Perrigo.  Sandoz understood that, because

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Glenmark still had a significant majority of the market share, Perrigo would target Glenmark customers as it entered.

2483.   In the days and weeks leading up to Perrigo's launch, Perrigo was in frequent communication with Sandoz, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 11:13:00 | 0:01:00 |
| 7/10/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:14:00 | 0:01:00 |
| 7/15/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 12:06:00 | 0:01:00 |
| 7/16/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 9:22:00 | 0:01:00 |
| 7/17/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 11:22:00 | 0:19:00 |
| 7/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 10:27:00 | 0:01:00 |
| 7/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:11:00 | 0:01:00 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 10:09:00 | 0:13:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:32:00 | 0:01:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:05:00 |

2484.   Perrigo held an internal meeting to discuss its Fluticasone launch on July 16, 2013.  As can be seen in the table above, on the day of the meeting T.P. of Perrigo called CW-3 at Sandoz and left a message.  He called CW-3 again the next day, and they were able to speak for nineteen (19) minutes.  During these conversations, T.P. informed CW-3 that, consistent with the "fair share" understanding, Perrigo was targeting specific Glenmark customers and looking for approximately 25% market share.  CW-3 took contemporaneous notes of his conversation with T.P., as set forth below:



2485.   On July 30, 2013, Perrigo received FDA approval to begin selling Fluticasone. That same day, T.P. of Perrigo spoke to CW-3 of Sandoz for thirteen (13) minutes.  Perrigo then

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

formally launched the product on August 1, 2013, with the same exact WAC pricing as

Glenmark and Sandoz.  T.P. and CW-3 also spoke twice that day.

2486.   As Perrigo entered the market it planned only a "limited launch," targeting only

$1 million per year in sales.  In accordance with the fair share understanding and the previous

communications between the competitors, Perrigo targeted – and Glenmark conceded – multiple

customers immediately.

N.   **Desoximetasone Ointment**

2487.   As of the summer of 2012, Defendant Taro was the only manufacturer of

Desoximetasone Ointment.

1.   **Sandoz Entry (September 2012)**

2488.   Starting in August 2012, Sandoz began making plans to enter the Desoximetasone

market.  Because it would be a 2-player market upon Sandoz's entry, and because Sandoz was

the second manufacturer to enter the market, Sandoz initially decided – consistent with the "fair

share" understanding outlined above – to target 40% market share.

2489.   On the evening of August 21, 2012, Sandoz held an internal meeting to discuss its

██████ and ████████████ regarding Desoximetasone.  Shortly after the meeting, a

Sandoz executive sent an initial list of eight (8) customers that Sandoz should consider

approaching.  The executive indicated that Sandoz's success would depend ████████████

██████ and that more research was necessary regarding one of the larger customers,

because approaching such a ████ customer could cause ██████████

2490.   First thing the next morning, Sandoz began to coordinate with Taro.  K.K., a

national account executive at Sandoz, called D.S., a senior sales executive at Taro, and the two

spoke for nine (9) minutes.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2491.   On August 30, 2012, Sandoz held another internal meeting to discuss its Desoximetasone launch.  That same day, K.K. of Sandoz spoke again to D.S. of Taro, this time for two (2) minutes.  The day after this internal Sandoz meeting and the phone conversation with Taro, on August 31, 2012, CW-1 of Sandoz sent Kellum a ███████ for Desoximetasone, which included specific pricing █████ and a more refined list of customers that would provide Sandoz with its target market share.

2492.   As the Sandoz launch date approached, CW-3 of Sandoz also began speaking to H.M., an account executive at Taro, to coordinate Sandoz's entry into the market.  The two competitors were not friends, and nearly all their conversations were collusive in nature.  According to phone records, the first ever call between the two competitors was on September 6, 2012.  They spoke again on September 21, 2012, as Sandoz was finalizing its launch plan.  During these calls, H.M. provided CW-3 with Taro price points for various customers so that Sandoz could bid as high as possible and avoid price erosion, while still obtaining new customers as it entered the market.  CW-3 passed that pricing information and list of customer targets on to CW-1 and Kellum at Sandoz.  That same day, H.M. also sent an e-mail to J.M., a sales executive at Taro, relaying a ████████ that Sandoz would be entering the Desoximetasone market ████████ ████████████ and suggesting six accounts as possible targets.

2493.   Sandoz received FDA approval and formally launched Desoximetasone on September 28, 2012, matching Taro's WAC pricing exactly.  That same day, CW-3 of Sandoz also called H.M. at Taro and left a message; H.M. returned the call almost immediately, leaving CW-3 a voicemail.

2494.   Based on the conversations with Taro, Sandoz decided to take a ████████ ████████ in targeting customers, so as ████████████████████ with its competitor.  In an

677
FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

internal Sandoz e-mail on October 1, CW-1 indicated that Sandoz's initial ████████████

for this product had now been adjusted slightly lower based on ████████████████

2495.   Shortly after receiving approval, on October 1, 2012, Sandoz began approaching a

limited set of customers, per its agreement with Taro.  That same day, CW-4 of Sandoz reached

out to D.S. at Taro – someone CW-4 had colluded with in the past – and spoke two times,

including one call lasting twenty-one (21) minutes.

2496.   Consistent with the understanding in place between the two competitors, Taro

immediately started conceding customers to Sandoz.  For example, on October 11, 2012, a high-

ranking Taro executive sent an internal e-mail discussing Sandoz's launch of Desoximetasone.

In the e-mail, the executive indicated that Taro had been aware of Sandoz's launch ███████████

█████ and that Taro had just conceded two large customers to Sandoz, with the expectation of

relinquishing ████████████████████ going forward.  That same day, H.M. of Taro called

CW-3 of Sandoz, likely to let him know that the customers had been conceded and confirm the

plan moving forward.  They spoke twice that day, including one call lasting more than six

(6) minutes.

2497.   Sandoz was able to obtain most of its targeted market share quickly, without any

market disruption.  By October 12, 2012, for example, R.T., a senior sales and marketing

executive at Sandoz, provided a summary of the Desoximetasone launch, stating: ████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

2498.   At that point, Sandoz decided it needed to obtain at least one more customer to

meet its fair share goals.  Internally, Sandoz discussed sending a message to Taro that ████████

████████████████████████   On October 23, 2012, CW-1, CW-3 and Kellum scheduled a

conference call to discuss which customers to approach to ███████████████████

That same day, CW-3 called H.M. at Taro and the two competitors spoke several times,

including two separate fifteen (15) minute calls.

2499.   As a result of these conversations, Taro agreed to relinquish additional customers

to Sandoz.  By February 2013, Sandoz had captured its original goal of 40% of the

Desoximetasone market, without any significant disruption.

### 2.       Glenmark Entry (September 2013)

2500.   Glenmark received FDA approval to sell Desoximetasone on September 20, 2013.

In the days and weeks leading up to the Glenmark launch, Glenmark, Taro and Sandoz were

speaking frequently to coordinate Glenmark's entry, including at least the following calls and

text messages:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/15/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Aprahamian, Ara (Taro) | 13:33:00 | 0:08:00 |
| 8/20/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Aprahamian, Ara (Taro) | 9:40:00 | 0:02:00 |
| 8/20/2013 | Voice | S.G. (Sandoz) | Outgoing | D.I. (Glenmark) | 13:45:00 | 0:01:00 |
| 8/20/2013 | Voice | S.G. (Sandoz) | Outgoing | D.I. (Glenmark) | 13:56:00 | 0:02:00 |
| 8/21/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 11:37:00 | 0:07:00 |
| 8/22/2013 | Text | CW-3 (Sandoz) | Incoming | D.C. (Glenmark) | 13:29:19 | 0:00:00 |
| 8/22/2013 | Text | CW-3 (Sandoz) | Incoming | D.C. (Glenmark) | 13:29:19 | 0:00:00 |
| 8/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:54:00 | 0:03:00 |
| 8/27/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 17:48:00 | 0:03:00 |
| 8/28/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 13:29:00 | 0:01:00 |
| 8/28/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:36:00 | 0:15:00 |
| 9/4/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:08:00 | 0:01:00 |
| 9/4/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:26:00 | 0:01:00 |
| 9/5/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 15:29:00 | 0:03:00 |
| 9/6/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 11:05:00 | 0:01:00 |
| 9/6/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 11:07:00 | 0:10:00 |
| 9/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 11:24:00 | 0:01:00 |
| 9/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 12:35:00 | 0:01:00 |

At the same time, Perfetto of Taro was also communicating with T.C., a senior-most executive at

Glenmark, through e-mail.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2501.   Glenmark's approval came on Friday, September 20, 2013.  The following Monday, there was a flurry of additional communications between the three competitors to coordinate Glenmark's entry.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/23/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 9:15:00 | 0:02:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:40:00 | 0:01:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 11:41:00 | 0:01:00 |
| 9/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:24:00 | 0:01:00 |
| 9/23/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 13:50:00 | 0:04:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 13:55:00 | 0:01:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 14:22:00 | 0:03:00 |

The day after that, September 24, CW-3 of Sandoz spoke to Aprahamian at Taro again for fifteen (15) minutes.  CW-3 then sent an e-mail to his superiors, including CW-1 and Kellum, alerting them to the situation: ███████████

2502.   On September 26th, there was another torrent of phone calls between Glenmark, Taro and Sandoz:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 8:45:00 | 0:04:00 |
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 11:35:00 | 0:06:00 |
| 9/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:22:00 | 0:15:00 |
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:32:00 | 0:02:00 |
| 9/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:44:00 | 0:01:00 |

During these calls, the competitors reached an understanding about which customers Glenmark would target and what prices it would offer in order to avoid price erosion.  That same day, September 26, 2013, CW-5, a senior-most executive at Glenmark, described Glenmark's launch strategy as a ███████████

2503.   Because Taro still had a majority of the market share, it understood pursuant to the "fair share" understanding that it would be the primary target of Glenmark and would have to relinquish market share to Glenmark as it entered.  Internally, Taro executives commented that it ███████████

2504.   Taro began to concede customers to Glenmark immediately.  By October 17, 2013, CW-5 reported internally that Glenmark had already been able to obtain 30% market share for Desoximetasone.

2505.   Because of the discussions between the competitors in advance, and because prices remained high, Taro was not upset about conceding this business to Glenmark.  Taro executives continued to stress that ██████████████████████████████████████ ██████████████████████████████████

2506.   In early November 2013, Taro was approached by a customer to bid on Desoximetasone as part of an RFP.  In deciding whether to provide a bid, Taro executives noted that the company had already ████████████████████ so that Glenmark could obtain market share.  Nonetheless, Taro still decided not to bid, stating ██████████████ ██████████████████████████████████

O.     **Collusion Between Sandoz And Aurobindo**

2507.   Following Sandoz's acquisition of Fougera, CW-6 left his job at Fougera in August 2012 and took a position as a sales executive at Aurobindo.  CW-6 followed his former friend and colleague, Grauso, who had moved to Aurobindo in December 2011 to assume a senior executive role.

2508.   As detailed above, CW-6 had a long-standing, collusive relationship with Grauso dating back to when he worked at Fougera and Grauso worked at G&W.  Further, the two had continued that relationship even after Grauso left G&W – with Grauso serving as a conduit to communicate messages between his former G&W colleagues, Orlofski and Vogel-Baylor, and CW-6 at Fougera.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2509.   CW-6 knew CW-3 at Sandoz.  When Aurobindo sold a product that overlapped with Sandoz, CW-6 used his relationship with CW-3 to collude on that product.  Although CW-6 and CW-3 were former colleagues, they were not social friends.  When CW-6 called CW-3 during this time period, they were engaging in anticompetitive conduct.  Between August 2012, when CW-6 began at Aurobindo, and May 2013, when CW-6 left the industry, he exchanged at least one hundred and nine (109) phone calls with CW-3.

2510.   During this time period, CW-6 was acting at all times at the direction of, or with approval from, his superiors, including Grauso.

2511.   The following Section will focus on the anticompetitive conduct engaged in by CW-3 and CW-6 with regard to several products on which Sandoz and Aurobindo overlapped during this time period.

### 1.      Oxacillin Sodium and Nafcillin Sodium Injectable Vials

2512.   In 2012, Sagent Pharmaceuticals and Sandoz were the primary generic suppliers of Oxacillin and Nafcillin.  However, in December 2012, Aurobindo began making plans to enter the Nafcillin and Oxacillin markets as a third entrant.

2513.   In advance of Aurobindo's entry into those markets, on December 26, 2012 for Nafcillin and January 22, 2013 for Oxacillin, CW-6 and CW-3 spoke several times to discuss pricing and the allocation of market share to the new entrant, Aurobindo.  All the while, CW-6 kept his supervisor, Grauso, informed of his conversations with CW-3.

2514.   For example, on December 12, 2012, CW-6 called Grauso and they spoke for five (5) minutes.  That set off a flurry of phone calls between CW-6 and CW-3, with nearly constant reporting back by CW-6 to his supervisor, Grauso, as the two competitors orchestrated how to avoid competition upon Aurobindo's entry. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:21:00 | 0:05:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 8:25:00 | 0:01:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 8:26:00 | 0:03:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:28:00 | 0:02:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 11:41:00 | 0:04:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 11:50:00 | 0:04:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:43:00 | 0:05:00 |

2515.   Two weeks later, on December 26, 2012, Aurobindo received FDA approval to market Nafcillin and published WAC pricing that essentially matched Sandoz's WAC pricing. On the date that Aurobindo received approval, and in the days surrounding the launch, CW-6 spoke several more times with CW-3 during which they discussed the launch.  As he had done before, CW-6 reported back to Grauso what they had discussed.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 9:29:00 | 0:03:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 9:46:00 | 0:01:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 12:26:00 | 0:08:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:43:00 | 0:01:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:49:00 | 0:02:00 |
| 12/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 16:49:00 | 0:02:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Aurobindo Pharma | 3:19:00 | 0:13:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:39:00 | 0:11:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:24:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:51:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 7:32:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 8:01:00 | 0:04:00 |

2516.   The calls between the competitors continued into January 2013.  On January 3, 2013, CW-6 spoke with Grauso three times for a total of twenty-five (25) minutes.  Twenty minutes later, CW-3 called CW-6.  The call lasted two (2) minutes.  The next morning, CW-6 spoke with Grauso for four (4) minutes.  That same morning, CW-6 called CW-3 of Sandoz twice, with one call lasting three (3) minutes.

2517.   Two days later, on January 6, 2013, Sandoz put together a Monthly Business review regarding its key products, including Nafcillin and Oxacillin.  Regarding Oxacillin,

Sandoz noted that Aurobindo was ███████ to be entering the market.  Sandoz stated that its

████████████████████████ were to ████████████████████████████

████████████████████████████ and ████████████████████████

████████████████████████████████████

2518.   Over the next several days, between January 7, 2013 and January 11, 2013, CW-6 and CW-3 spoke several more times by phone.  After those calls, CW-6 promptly called Grauso to keep him apprised of his discussions.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:44:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:47:00 | 0:06:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:00:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:11:00 | 0:14:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 6:39:00 | 0:07:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 7:26:00 | 0:01:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:37:00 | 0:06:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:59:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:27:00 | 0:11:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:34:00 | 0:02:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 5:36:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:32:00 | 0:08:00 |

2519.   Two weeks later, on January 22, 2013, Aurobindo entered the Oxacillin market and again published WAC pricing that essentially matched Sandoz's WAC pricing.  That same day, CW-6 spoke with Grauso for ten (10) minutes.  Ten minutes after hanging up, CW-6 called CW-3 of Sandoz.  The call lasted one (1) minute.  Over the next two days, CW-6 and CW-3 shared five (5) more phone calls.

2520.   In an e-mail dated January 30, 2013, Sandoz noted that it had ████████████ its Oxacillin contract at Walgreens to the new entrant, Aurobindo.  That same day, CW-3 and CW-6 spoke by phone for four (4) minutes.

### 2.    Cefpodoxime Proxetil Oral Suspension and Tablets

2521.   On January 3, 2013, CW-3 of Sandoz called CW-6 of Aurobindo.  The call lasted two (2) minutes.  The next day, on January 4, 2013, CW-6 called CW-3 twice, with one call lasting three (3) minutes.  A few minutes after hanging up, CW-3 called Kellum and they spoke for nine (9) minutes.  After that call, Kellum sent the following e-mail to R.T., a senior sales and marketing executive at Sandoz:



R.T. responded, ████████████████ to which Kellum replied, ████████

2522.   The following business day, on January 7, 2013, CW-6 of Aurobindo and CW-3 of Sandoz exchanged three calls, including one lasting six (6) minutes.  On these calls, CW-6 confirmed that Aurobindo planned to launch both formulations of Cefpodoxime that week.[226] CW-3 told CW-6 that Sandoz planned to increase pricing on both formulations by 20%.  CW-6 advised that Aurobindo was looking for 40% share and would start by targeting Cardinal and CVS.  In turn, CW-3 gave his competitor specific non-public contract price points that Sandoz was charging to those customers.  CW-6 then stated: ████████████████████████████

CW-3's contemporaneous notes from this call are pictured below: ████████████████

---

[226] On these calls, the two competitors also discussed Aurobindo's launch of Cefdinir Capsules and Cefdinir Oral Suspension, among other products.



2523.   Shortly after speaking with each other, CW-6 called Grauso and CW-3 called

Kellum to report back what they had discussed.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:44:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:47:00 | 0:06:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 4:53:00 | 0:07:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:00:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:11:00 | 0:14:00 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2524.   On January 9, 2013 and January 11, 2013, the day that Sandoz increased WAC pricing on Cefpodoxime, CW-3 and CW-6 exchanged three more calls.  After speaking with each other, CW-3 called Kellum and CW-6 called Grauso to report back what they had discussed.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 6:39:00 | 0:07:00 |
| 1/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 6:47:00 | 0:01:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 7:26:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:59:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:27:00 | 0:11:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:38:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:34:00 | 0:02:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 5:36:00 | 0:01:00 |

2525.   Due to an issue at its manufacturing facility, Aurobindo's launch of Cefpodoxime was delayed and the company was unable to launch in January 2013 as planned.

2526.   Between February 24 and February 27, 2013, ECRM held its annual Retail Pharmacy Generic Pharmaceuticals Conference in Dallas, Texas.  Representatives from Aurobindo and Sandoz were in attendance, including CW-6 and Grauso of Aurobindo and Kellum, CW-3, and CW-2 of Sandoz.

2527.   On February 26, 2013, CW-2, a Sandoz senior sales executive – while still at the ECRM conference – sent the following e-mail to his Sandoz colleagues: ███████████



FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2528.   On April 17, 2013, CW-6 of Aurobindo called CW-3 of Sandoz.  The call lasted two (2) minutes.  Less than an hour later, CW-3 called CW-6 back and they spoke for six (6) minutes.  The next day, on April 18, 2013, CW-6 called CW-3 and they spoke for ten (10) minutes.  That same day, Aurobindo launched both formulations of Cefpodoxime and matched Sandoz's increased WAC pricing.

2529.   On April 30, 2013, CW-3 and CW-6 exchanged three phone calls, including one call lasting three (3) minutes.  On these calls, the competitors again discussed Aurobindo's launch of Cefpodoxime Tablets, including that Aurobindo was looking for 40-50% market share. The competitors also discussed specific customers that Aurobindo was targeting. CW-3's contemporaneous notes from these calls are pictured below:



2530.   In accordance with the plan, on May 22, 2013, Aurobindo made an offer to CVS for Cefpodoxime Tablets and the customer accepted that offer the very next day on May 23, 2013.

2531.   Similarly, on August 29, 2013, Aurobindo made an offer to ABC for Cefpodoxime Tablets.  The next day, on August 30, 2013, ABC e-mailed Sandoz to advise that it had received a competitive offer and asked whether Sandoz wanted to bid to retain the business.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

On September 4, 2013, S.G., a Sandoz sales executive, responded to ABC and declined the opportunity stating, ███████████████████████████████ Later that same day, ABC awarded the business to Aurobindo.

2532.   Aurobindo would also win awards for Cefpodoxime Tablets at McKesson and several other smaller customers, without substantially eroding the high pricing in the market.

2533.   On September 9, 2013, P.S., an Aurobindo sales and marketing executive, pushed Grauso to submit a bid for Wal-Mart's Cefpodoxime business.  Grauso balked at the request stating, ████████████████████████ P.S. responded, █████████████

███████████████████████████████████████████████████████

███████████   Given the market share breakdown, Grauso gave his approval to submit a bid to Wal-Mart.  Thereafter, on September 30, 2013, the customer accepted the bid and awarded Aurobindo its indirect business.

2534.   Later, in December 2013, when Sandoz was looking to identify additional products to supply to Wal-Mart, Kellum noted with respect to Cefpodoxime: ████████████

███████████████████████████████████████████████████████

████████████

### 3.      Pioglitazone HCL Metformin HCL Tablets

2535.   Prior to February 2013, Mylan and Teva were the only competitors in the market for Pioglitazone Metformin.  As a result of settling patent litigation with the brand manufacturer, Mylan was entitled to 180 days exclusivity as the first-to-file generic and Teva earned the right to market the authorized generic.  During that period, Mylan and Teva split the market equally with Teva controlling 48% share and Mylan controlling 52%.

2536.   Mylan and Teva's 180-day exclusivity period expired on February 13, 2013 and Aurobindo and Torrent entered the market on that date.  Although Sandoz also planned to enter at that time, the company ran into regulatory obstacles that delayed its launch until April 16, 2013.

2537.   In advance of Aurobindo's entry, CW-6 and Grauso were in frequent communication with their contacts at Mylan and Teva to discuss, among other things, Aurobindo's entry into the Pioglitazone Metformin market.  On these calls, the competitors spoke about pricing and the allocation of market share to the new entrant.

2538.   For example, in the week leading up to Aurobindo's entry on February 13, 2013, CW-6 exchanged at least nine calls with Jim Nesta, a senior sales executive at Mylan.  At the same time, Grauso was communicating with his contacts at Teva, exchanging at least twenty-one calls with sales executives Kevin Green and T.S.  These calls are detailed in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 2/6/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 9:23:00 | 0:06:00 |
| 2/6/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 14:25:00 | 0:02:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 4:33:00 | 0:22:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 12:12:00 | 0:07:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 15:20:00 | 0:03:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 4:04:00 | 0:05:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 5:41:00 | 0:21:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 9:56:00 | 0:08:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 10:34:00 | 0:01:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 10:40:00 | 0:01:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 10:41:00 | 0:02:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 11:21:00 | 0:11:00 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 13:55:05 | 0:00:19 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 14:04:28 | 0:02:17 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 15:38:09 | 0:00:04 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 15:41:26 | 0:00:03 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 15:58:28 | 0:00:27 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 16:09:54 | 0:03:40 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 16:19:22 | 0:00:04 |
| 2/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 13:01:14 | 0:00:29 |
| 2/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 14:06:26 | 0:00:52 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 5:52:00 | 0:12:00 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | T.S. (Teva) | 6:26:00 | 0:39:00 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 13:35:00 | 0:45:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 9:53:00 | 0:09:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 11:11:00 | 0:01:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | T.S. (Teva) | 12:19:00 | 0:02:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 12:42:00 | 0:01:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 13:58:00 | 0:01:00 |

2539.   Illustrating the substance of these calls, on February 12, 2013, T.S., a Teva sales executive, spoke to Grauso at Aurobindo for forty-five (45) minutes.  Shortly after that call, T.S. sent an internal e-mail stating, ███████████████████████████ Cardinal was a Mylan customer.

2540.   At the same time, Mylan and Teva were communicating with each other. In the week leading up to Aurobindo's entry on February 13, 2013, Green of Teva exchanged at least seventeen (17) calls with Nesta of Mylan. These calls are detailed in the chart below:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:19:51 | 0:00:13 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:29:54 | 0:00:05 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:01:05 | 0:00:07 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 11:17:07 | 0:00:06 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:53:33 | 0:08:47 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:16:25 | 0:00:10 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 17:19:23 | 0:00:10 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 8:26:12 | 0:00:05 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:08:59 | 0:29:51 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:44:04 | 0:11:18 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:14:42 | 0:06:03 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:31:39 | 0:00:04 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:45:09 | 0:12:58 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:09:47 | 0:00:04 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 11:18:15 | 0:08:38 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:44:01 | 0:03:25 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 19:17:42 | 0:04:15 |

2541.   Similarly, Green of Teva exchanged several calls with his contacts at Sandoz, Kellum and CW-2. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/7/2013 | Voice | Green, Kevin (Teva) | Outgoing | CW-2 (Sandoz) | 4:24:00 | 0:05:00 |
| 2/7/2013 | Voice | Green, Kevin (Teva) | Outgoing | Kellum, Armando (Sandoz) | 11:04:00 | 0:01:00 |
| 2/7/2013 | Voice | CW-2 (Sandoz) | Outgoing | Green, Kevin (Teva) | 12:29:00 | 0:02:00 |
| 2/10/2013 | Voice | Green, Kevin (Teva) | Incoming | Kellum, Armando (Sandoz) | 9:09:00 | 0:06:00 |
| 2/12/2013 | Voice | Kellum, Armando (Sandoz) | Outgoing | Green, Kevin (Teva) | 7:15:00 | 0:08:00 |

2542.   On February 7, 2013, the same day that Green talked to both Kellum and CW-2, both of those Sandoz employees participated in a conference call in which they discussed ███ ███████ on Pioglitazone Metformin.

2543.   Finally, the new entrants, Sandoz and Aurobindo, were also communicating directly with each other regarding Pioglitazone Metformin.  For example, CW-3 of Sandoz and CW-6 of Aurobindo exchanged at least six calls between February 13 and February 19, 2013. These calls are detailed in the chart below:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/13/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:51:00 | 0:01:00 |
| 2/15/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:36:00 | 0:01:00 |
| 2/15/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 7:33:00 | 0:16:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:03:00 | 0:01:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:06:00 | 0:04:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:52:00 | 0:01:00 |

During their calls on February 19, 2013, CW-6 and CW-3 discussed specific customers and price points for Pioglitazone Metformin, and the fact that Aurobindo had already picked up Cardinal as a customer. CW-3's contemporaneous notes are pictured below: ████████████████



2544.   By mid-April, Aurobindo had secured approximately 20% of the Pioglitazone Metformin market, including Cardinal, a portion of the CVS business, Costco, and several other smaller customers.

2545.   Between February 24 and February 27, 2013, ECRM held its annual Retail Pharmacy Generic Pharmaceuticals Conference in Dallas, Texas. Representatives from Aurobindo and Sandoz attended, including CW-6 and Grauso from Aurobindo and CW-3 and Kellum from Sandoz.

2546.   On February 28, 2013, Kellum sent an internal e-mail to other Sandoz executives regarding the ████████████████████████████ With regard to Pioglitazone Metformin, Kellum stated the following: ████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2547.   A month and a half later, on April 16, 2013, Sandoz finally received FDA approval to market Pioglitazone Metformin.  The next day, CW-1, a Sandoz senior pricing executive, e-mailed the sales team stating: ███████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████ Six minutes later, CW-1 e-mailed CW-3 individually, asking him to ████████████████████████

2548.   That same day, CW-3 exchanged two calls with CW-6 of Aurobindo lasting two (2) minutes and six (6) minutes.  The next day, on April 18, 2013, the two competitors spoke again for ten (10) minutes.  During that call, CW-6 provided CW-3 with Aurobindo's dead net prices at several customers, including Cardinal and CVS. CW-3's contemporaneous notes from that call are pictured below: ███████████████████



FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2549.   At the same time, Sandoz was speaking with Teva.  On April 18 and April 19, 2013, CW-2, a Sandoz senior sales executive, spoke three times with Green of Teva, including two calls lasting four (4) minutes and one call lasting eight (8) minutes.

2550.   Later in the evening on April 19, 2013, CW-1 e-mailed Kellum and others at Sandoz regarding Pioglitazone Metformin stating, ███████████████████████████████ ████████████████████████████████████████████████████████████████ Others at Sandoz agreed, and Sandoz submitted an offer to ABC on April 22, 2013.

2551.   The next day, on April 23, 2013, ABC e-mailed Teva to inform it that Sandoz had made an offer for Pioglitazone Metformin and asked whether Teva intended to bid to retain the business.  ABC further stated that ████████████████████████████████████ ████████████████████████ Green, the Teva sales executive who had spoken to CW-2 the day before, forwarded ABC's e-mail to several other Teva executives, writing: ████████████ ███████████████████████████████████████████████████ █████  K.G., a senior Teva marketing executive, responded, █████████████████████

2552.   Three days later, on April 26, 2013, Teva declined to bid to retain the business and noted in Delphi, it's internal tracking database, that ████████████████████████████ ████████████████████████████ and stated the reason for the concession was ████████████████████████████ That same day, ABC awarded the business to Sandoz.

2553.   Also, that same day, on April 26, 2013, Sandoz officially entered the market and published WAC pricing that matched its competitors.  Kevin Green of Teva had multiple calls with P.K. of Sandoz in Paril 2013.

2554.   In the period from April 2013 to August 2013, Kevin Green of Teva also communicated with James Grauso of Aurobindo, James Nesta of Mylan, and Armando Kellum

of Sandoz.  Grauso communicated by phone with K.G. of Torrent on May 16, 2013, as well as

with Nisha Patel of Teva in the second half of 2013.  Nesta communicated with D.L. of Sandoz

during the second half of 2013.

2555.   Over the course of this period, Teva and Mylan conceded Pioglitazone Metformin

market share to Sandoz, Taro, Aurobindo, and Torrent.  Those new entrants maintained

supracompetitive prices and did not compete for market share beyond their Fair Share.

> **P.    Collusion Between Sandoz And Rising**

2556.   CW-3 and CW-2 worked together as senior sales executives at Sandoz until

August 2013 when CW-2 left Sandoz to become a senior sales and marketing executive at

Rising.  While at Sandoz, the two were close friends. CW-2 was responsible for Walmart and

helped transition the account to CW-3 when he moved to Rising.

2557.   Beginning in 2013, and beyond, these former colleagues turned competitors used

their relationship to collude with regard to products on which Rising and Sandoz overlapped.

One such example – Griseofulvin Microsize Tablets – is discussed in detail below.

> **1.    Griseofulvin Microsize Tablets**

2558.   The market size for Griseofulvin ranged between $13 million and $16 million

dollars annually.

2559.   Throughout 2013, Rising had a virtual monopoly on the Griseofulvin market, with

Valeant Pharmaceuticals maintaining only a small percentage of the share.

2560.   On August 7, 2013, Sandoz received FDA approval to market Griseofulvin.

Sandoz planned to talk to customers at the NACDS Annual Total Store Expo that weekend and

then launch the following week.

2561.   However, on August 14, 2013, Sandoz learned that the Griseofulvin launch would be delayed due to production problems.  Despite the delay, Sandoz estimated that it could still realize $2.5 million in sales in 2013 ████████████████████████

2562.   On September 19, 2013, CW-2, then a senior sales and marketing executive at Rising, called CW-3 of Sandoz twice. Both calls lasted one (1) minute.  CW-3 returned the calls later that day and they spoke for twenty-one (21) minutes.  During these calls, CW-2 and CW-3 discussed Sandoz's manufacturing issues on Griseofulvin and its continued delay in launching the product.

2563.   However, just one week later, on September 25, 2013, Sandoz learned that its production problems had been resolved.  The following Monday, on September 30, 2013, CW-3 informed CW-2 of this unexpected news in the following text message exchange: ███████



2564.   That same day, CW-2 called CW-3 twice.  The calls lasted one (1) minute and eight (8) minutes.  That evening, Sandoz held an internal meeting to discuss launch strategy for Griseofulvin, including which customers to approach in order to achieve Sandoz's market share goal.

2565.   Over the next several days, CW-2 of Rising exchanged several calls with CW-3 and L.J., a Sandoz sales executive, during which they discussed pricing for Griseofulvin and the allocation of market share to the new entrant, Sandoz.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/1/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 6:32:00 | 0:01:00 |
| 10/1/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 12:15:00 | 0:10:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 12:35:00 | 0:02:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 13:30:00 | 0:22:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 13:59:00 | 0:03:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 14:46:00 | 0:09:00 |

2566.   After this series of communications between the two competitors, on October 2, 2013, Kellum sent an internal e-mail identifying four (4) customers that Sandoz planned to target to obtain approximately 40% share of the Griseofulvin market – CVS (20%), McKesson (8%), Rite Aid (6%), and ABC (8%).  That evening, Sandoz prepared and sent its initial round of offers to CVS and McKesson.

2567.   The next day, on October 3, 2013, CW-2 of Rising exchanged three calls with L.J., the Sandoz sales executive responsible for the McKesson account, and one (1) call with CW-3 that lasted twenty-one (21) minutes.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/3/2013 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 6:23:00 | 0:01:00 |
| 10/3/2013 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 6:24:00 | 0:02:00 |
| 10/3/2013 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 6:25:00 | 0:05:00 |
| 10/3/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 11:34:00 | 0:21:00 |

2568.   On October 4, 2013, McKesson e-mailed CW-2 asking if Rising wanted to submit a bid for Griseofulvin.  Rising responded to the request by submitting a high bid so that Sandoz would win the business.  On October 7, 2013, McKesson advised Rising that its bid was not competitive and awarded the business to Sandoz.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2569.   On October 8, 2013, CVS e-mailed Sandoz and declined its Griseofulvin offer,

stating: ██████████████████████████████████████████

██████████████████   Later that evening, CVS e-mailed CW-2 asking whether Rising

planned to bid on the business.

2570.   First thing the next morning, on October 9, 2013, CW-2 of Rising and CW-3 of

Sandoz exchanged three calls, including one call lasting nine (9) minutes.   After these calls,

Sandoz reduced its pricing and sent a revised offer to CVS.   At the same time, Rising prepared

and submitted a high bid to CVS with the intention that Sandoz would win the business.

2571.   However, CVS threw a wrench in the competitors' plans when it refused to accept

Rising's high bid that same day stating: ████████████████████████████

Knowing he had agreed to give up the customer to Sandoz, CW-2 asked his colleague to reduce

the CVS offer only slightly – by $10 – and ███████████████████   Thereafter, on

October 10, 2013, CVS declined the Rising bid and awarded the business to Sandoz.

2572.   On October 15, 2013, Sandoz submitted an offer to Rite Aid for its Griseofulvin

business.

2573.   Between October 16 and October 21, 2013, CW-2 of Rising and CW-3 of Sandoz

spoke several additional times to coordinate Sandoz's entry.   These calls are detailed in the chart

below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/16/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 14:37:00 | 0:01:00 |
| 10/17/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 5:12:00 | 0:14:00 |
| 10/17/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 5:27:00 | 0:01:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 7:06:00 | 0:02:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 7:45:00 | 0:02:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 9:42:00 | 0:07:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 13:24:00 | 0:06:00 |
| 10/21/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 7:24:00 | 0:01:00 |
| 10/21/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 8:12:00 | 0:05:00 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2574.   On these calls, the two competitors discussed Griseofulvin and the accounts that Sandoz had targeted or planned to target. CW-2 also advised CW-3 that Rising would not give up Rite Aid to Sandoz.  On October 21, 2013, CW-3 took the following contemporaneous notes in his Notebook: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



2575.   First thing the next morning, on October 22, 2013, CW-2 of Rising called CW-3 of Sandoz twice.  Both calls lasted one (1) minute.  CW-3 returned the call later that morning and they spoke for eight (8) minutes.

2576.   The next day, on October 23, 2013, Rite Aid advised Sandoz that it declined to accept Sandoz's offer for Griseofulvin – as expected, Rising had lowered its pricing to retain the customer.  That same day, Sandoz began making plans to approach Wal-Mart and Cardinal as their next targets.

2577.   On October 28, 2013, CW-3 e-mailed Wal-Mart to see if the customer was interested in an indirect bid for Griseofulvin.  Wal-Mart replied that it was.  The next morning, on October 29, 2013, CW-3 of Sandoz called CW-2 of Rising and they spoke for twenty-two (22) minutes.  During that call, CW-3 informed CW-2 that Sandoz would approach Wal-Mart, and CW-2 agreed that Rising would relinquish that customer.  Later that day, Sandoz prepared an offer and sent it to Wal-Mart.

2578.   On November 4, 2013, CW-3 of Sandoz called CW-2 of Rising and they spoke for twenty-eight (28) minutes.  The next day, on November 5, 2013, Wal-Mart accepted Sandoz's offer for Griseofulvin and awarded it the business.

2579.   On November 20, 2013, CW-2 of Rising and L.J. of Sandoz spoke for three (3) minutes.  Later that day, Sandoz submitted an offer to Cardinal for its Griseofulvin business.

2580.   On November 22, 2013, CW-3 of Sandoz called CW-2 of Rising and they spoke for seventeen (17) minutes.  Later that day, Rising executives held a Commercial Operations meeting at which CW-2 conveyed that Sandoz needed Rising to relinquish one more account – Cardinal – so that it could meet its share goal.  CW-2 advised that Sandoz would be done after Cardinal and would not seek any additional share.

2581.   Thereafter, Rising conceded Cardinal. and Cardinal awarded its Griseofulvin business to Sandoz.

2582.   The following Monday, on November 25, 2013, Rising held a sales and marketing meeting during which they discussed Griseofulvin, among other products.  CW-2 forwarded the minutes from that meeting to several Rising executives and S.S., a senior Rising executive responded, ███████████████████████████████████████████████████████

███████████████   CW-2 responded with the following e-mail to S.S.: ████████████████████



To that, S.S. replied, apologizing that he had not put two-and-two together, and stated ▮▮▮▮▮▮▮

2583.   One year later, on October 15, 2014, Rising increased WAC pricing on Griseofulvin.  In advance of the increase, CW-2 of Rising exchanged several calls with L.J. of Sandoz, during which they discussed the price increase.  These calls are detailed in the chart below.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/1/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 14:16:00 | 0:04:00 |
| 10/2/2014 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 13:01:00 | 0:02:00 |
| 10/2/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 15:23:00 | 0:11:00 |
| 10/8/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 14:47:00 | 0:01:00 |
| 10/8/2014 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 14:57:00 | 0:07:00 |
| 10/13/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 14:33:00 | 0:08:00 |

Further, CW-2 also met in-person with L.J. and the two men discussed the increase over drinks.

2584.   Even after the Rising price increase, CW-2 of Rising continued to communicate with his former Sandoz colleagues about the increase.  For example, on November 12, 2014, CW-3 and CW-2 exchanged the following text messages: ▮▮▮▮▮▮▮

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



2585.   The next day, on November 13, 2014, CW-2 also exchanged several lengthy calls

with CW-3 and L.J. of Sandoz.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/13/2014 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 3:05:00 | 0:14:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 3:19:00 | 0:01:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 3:19:00 | 0:20:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 10:51:00 | 0:02:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 13:59:00 | 0:09:00 |

2586.   After speaking with CW-2 of Rising, CW-3 sent an e-mail to CW-1, a Sandoz

senior pricing executive, stating only ▮▮▮▮▮▮▮▮▮▮   CW-1 responded that he was ▮▮▮▮

▮▮▮▮   and CW-3 replied: ▮▮▮▮▮▮▮▮▮▮▮▮▮



As was his customary practice, CW-3 stated that he had learned the information from a

▮▮▮▮▮▮   when he had actually obtained the information directly from his competitor, CW-3.

Later that day, CW-1 and CW-3 spoke for twelve (12) minutes.

2587.   Sandoz did not follow the Rising price increase immediately because, after

conducting several analyses, it determined that the price protection penalties it would have

incurred were too high to justify the increase.

2588.   However, by July 2015 those concerns were alleviated.  On July 27, 2015, P.C., a Sandoz pricing executive, sent an internal e-mail detailing that Sandoz planned to increase prices the following week on a list of products, including Griseofulvin.  P.C. noted that for Griseofulvin, Sandoz was assuming ███████████████  In other words, Sandoz knew that Rising would not seek to take any of its customers after the price increase.

2589.   Two days later, on July 29, 2015, CW-3 of Sandoz called S.G., then a senior sales executive at Rising, and the two competitors spoke for nine (9) minutes.  One week later, on August 7, 2015, Sandoz followed Rising's price increase and published WAC pricing that matched its competitor.

### Q.   Collusion Between Sandoz And Non-Defendant Mallinckrodt

2590.   During his time at Fougera, CW-3 worked for Kaczmarek and with K.K., another Fougera sales executive.  Not long after the Sandoz acquisition of Fougera in July 2012, Kaczmarek and K.K. moved to non-Defendant Mallinckrodt.  Kaczmarek became a senior executive and K.K. took a senior sales executive position.

2591.   Beginning in late 2012, these former colleagues turned competitors would use their long-standing relationships to collude with regard to products on which Sandoz and non-Defendant Mallinckrodt overlapped.  Two such examples – Methylphenidate HCL Tablets and Methylphenidate HCL ER Tablets – are discussed in detail below.

### 1.   Methylphenidate HCL Tablets and Methylphenidate HCL ER Tablets

2592.   As of November 2012, the principal competitors in the Methylphenidate IR ("immediate release") Tablets market were non-Defendant Mallinckrodt with 43% share, Watson (Actavis) with 37% share, Sandoz with 16%, and Impax, Par, and Sun, which had smaller shares.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

For Methylphenidate ER ("extended release"), the principal competitors were non-Defendant Mallinckrodt with 54% share and Sandoz with 16% share.

2593.   On February 13, 2013, L.J., a Sandoz sales executive, sent an internal e-mail stating that he had heard that the non-Defendant manufacturer was experiencing supply issues on Methylphenidate.  Further, L.J. requested "customer intel" on ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

2594.   A few minutes later, D.P., a senior Sandoz sales executive, forwarded L.J.'s e-mail to his sales team, including to CW-3, asking ████████████████████████

████████████████████

2595.   That same day, on February 13, 2013, CW-3 called K.K., a senior sales executive at non-Defendant Mallinckrodt, and they spoke for sixteen (16) minutes.  Immediately upon hanging up, CW-3 called Aprahamian, then a sales executive at Actavis, and they spoke for sixteen (16) minutes.  A few hours later, CW-3 called D.P. of Sandoz to report back what he had learned.  That call lasted ten (10) minutes.

2596.   Later that day, CW-3 also sent the following e-mail conveying the information he had obtained from his competitors:  ██████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████

█████████████████████████████

2597.   As was his customary practice, CW-3 stated that the sources of his information were his "customers," to keep out of writing the fact that he obtained the information directly from his competitors – Actavis (Watson) and non-Defendant Mallinckrodt.  But CW-3's superiors were aware that the information was coming directly from those competitors, not a customer.

2598.   Having confirmed the non-Defendant manufacturer's supply issues – and the fact that the market share leader would be out of the market for a period of time – Sandoz immediately set to work on implementing a price increase on Methylphenidate.

2599.   Indeed, less than one week later, on February 19, 2013, Sandoz prepared a price increase analysis for Methylphenidate to send to the Pricing Committee for approval. In the analysis, Sandoz noted that the non-Defendant manufacturer had a ███████████████ and recommended increasing price by 340% on Methylphenidate IR and 125% on Methylphenidate ER.  Sandoz estimated that these increases would result in the accrual of an additional $12.9 to $36.0 million in profits.

2600.   On March 1, 2013, CW-3 of Sandoz exchanged at least nine (9) text messages with a senior executive at non-Defendant Mallinckrodt.  Through those text messages, the competitors discussed Sandoz's price increase on Methylphenidate and specific customer accounts.  During these conversations, CW-3 took the following contemporaneous notes in his Notebook: ██████████████████



2601.   Further, in the days leading up to the Sandoz price increase on Methylphenidate,

CW-3 exchanged at least twenty-three (23) calls and text messages with Kaczmarek and K.K.

These communications are listed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/4/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 12:08:02 | 0:00:00 |
| 3/4/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 12:08:35 | 0:03:14 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 12:50:02 | 0:00:00 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 15:25:08 | 0:00:00 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 15:25:40 | 0:00:00 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 16:50:58 | 0:00:00 |
| 3/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 17:27:43 | 0:01:02 |
| 3/6/2013 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (Mallinckrodt) | 6:53:00 | 0:01:00 |
| 3/6/2013 | Voice | K.K. (Mallinckrodt) | Outgoing | CW-3 (Sandoz) | 8:06:00 | 0:01:00 |
| 3/6/2013 | Voice | K.K. (Mallinckrodt) | Incoming | CW-3 (Sandoz) | 8:20:00 | 0:03:00 |
| 3/6/2013 | Voice | K.K. (Mallinckrodt) | Incoming | CW-3 (Sandoz) | 8:23:00 | 0:02:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 17:46:13 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:08:09 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:08:43 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 18:10:26 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:11:07 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:11:55 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 18:12:13 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:15:13 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:17:06 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:18:30 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 18:20:17 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:21:08 | 0:00:00 |

During this same time period, CW-3 was also in frequent contact with Aprahamian at Actavis, as

detailed in the table below:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:05:00 | 0:02:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:07:00 | 0:11:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 10:50:00 | 0:04:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 15:49:40 | 0:00:23 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:20:06 | 0:00:30 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:27:00 | 0:04:00 |

2602.   After this series of communications with both Actavis and non-Defendant Mallinckrodt, on March 8, 2013, Sandoz followed through with its plans and increased WAC pricing on Methylphenidate IR between 293% and 449%, depending on the formulation, and on Methylphenidate ER by 125%.

2603.   Three days later, on March 11, 2013.  Aprahamian of Actavis called Perfetto, at that point a senior executive at Taro, and they spoke for fifty-four (54) minutes.  The two competitors would exchange two more calls that day lasting one (1) minute and three (3) minutes.  Immediately upon hanging up with Perfetto, Aprahamian called CW-3 of Sandoz. The call lasted one (1) minute.  A few minutes later, Aprahamian called CW-3 again and they spoke for five (5) minutes.

2604.   The next day, on March 12, 2013, Perfetto e-mailed J.K., a senior Taro executive, and G.S., a senior executive at Taro's parent company, Sun, regarding Methylphenidate stating:



Perfetto's reference to ███████ was to one of Taro's sister companies, which was also a

subsidiary of Sun.  When G.S. of Sun expressed some confusion over what product Perfetto was

referring to, he sent the following e-mail to clarify: ████████████████



G.S. responded that Methylphenidate was a ██████████████ for Sun and the company was

working as quickly as possible to bring it to market.

2605.   Between March 13 and April 2, 2013, CW-3 of Sandoz and Kaczmarek

exchanged at least twenty-nine (29) text messages.  During that same time period, CW-3 was

also communicating frequently with his contact at Actavis, Aprahamian, who was also in the

process of transitioning to a position at Taro (his first day at Taro was March 18, 2013, but he

continued to speak frequently with Actavis colleagues after his departure).  Those calls are

detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 11:42:00 | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 8:07:00 | 0:16:00 |
| 3/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 11:28:00 | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 14:44:00 | 0:01:00 |
| 3/21/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:33:00 | 0:01:00 |
| 3/21/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:34:00 | 0:12:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 8:31:00 | 0:01:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Incoming | CW-3 (Sandoz) | 12:36:00 | 0:18:00 |
| 3/25/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Incoming | CW-3 (Sandoz) | 9:14:00 | 0:05:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 6:49:00 | 0:06:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 13:51:00 | 0:01:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 9:51:00 | 0:05:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 10:06:00 | 0:06:00 |
| 4/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:12:00 | 0:06:00 |
| 4/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:26:00 | 0:01:00 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

During his calls with Aprahamian on April 2, 2013, CW-3 took the following contemporaneous notes in his Notebook regarding Methylphenidate: ██████████████



Notably, as of April 2, 2013, Actavis had not yet published increased WAC pricing for Methylphenidate IR and would not do so for another several weeks.

2606.   Between April 20 and April 23, 2013, the NACDS held its annual meeting in Palm Beach, Florida.  Representatives from Sandoz, Actavis, Sun, and Taro were all in attendance.  These included senior executives – D.P. of Sandoz, Kaczmarek of non-Defendant Mallinckrodt, G.S. of Sun, and Perfetto, and J.K. of Taro.

2607.   The day after the NACDS annual meeting had concluded, on April 24, 2013, Actavis published increased WAC pricing for Methylphenidate IR that matched Sandoz's WAC pricing.  Two days later, on April 26, 2013, Sun entered the Methylphenidate IR market and matched its competitors' WAC pricing.  And, one week later, on May 1, 2013, non-Defendant Mallinckrodt re-entered the market and matched competitor WAC pricing on both formulations. That same day, Kaczmarek sent a text message to CW-3 of Sandoz.

2608.   Subsequently, Impax and Par joined the Methylphenidate market.  Impax joined the market in the spring of 2014.  Par joined the market in the summer of 2015.  Before entering, G.B. and K.O. at Par had calls with J.M., Manager of National Accounts at Sun.  Instead of offering lower pricing to win market share, Impax and Par matched the inflated prices of Sandoz, Sun, Actavis, and non-Defendant Mallinckrodt.

### R.        Sandoz's Collusion With A Non-Defendant Manufacturer

2609.   Defendant Sandoz (including its predecessor, Fougera) and a non-Defendant manufacturer coordinated market activity on several overlapping drugs starting at least as early as 2010.  Kellum of Sandoz, for example, had relationships with at least two different executives at the non-Defendant manufacturer.

2610.   In order to coordinate their market activity and maintain their anticompetitive agreements, executives at Sandoz/Fougera and non-Defendant manufacturer exchanged over three hundred and sixty (360) phone calls and text messages between January 2011 and October 2014.  Many of those calls and text messages can be tied directly to anticompetitive conduct and are discussed below.

2611.   During that same time period, Sandoz/Fougera and the non-Defendant manufacturer conspired to fix prices and allocate markets on at least the following products: (1) Clindamycin Phosphate Gel; (2) Clindamycin Phosphate Lotion; (3) Clindamycin Phosphate Solution; (4) Clindamycin Phosphate Cream; (5) Latanoprost Drops; and (6) Eplerenone Tablets.

### 1.        Clindamycin Phosphate

2612.   At all times relevant to the Complaint, Fougera (and later Sandoz, after its acquisition of Fougera) and the non-Defendant manufacturer were the primary players in the markets for the four different formulations of Clindamycin Phosphate.  In each of those markets, the two competitors adhered to the "fair share" understanding across all four product markets and coordinated several significant price increases.  In only one of those markets – Clindamycin Solution – did any significant competition ever enter the market.  As discussed more fully below, Taro and Perrigo entered the market for Clindamycin Solution in late 2013, coordinating to avoid competition and minimize price erosion consistent with the "fair share" understanding.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

      *a.*    *The First Coordinated Price Increase (60ml Solution – Fougera*
*And a Non-Defendant Manufacturer)*

2613.   In 2010, Defendant Fougera and the non-Defendant manufacturer were the only suppliers in the market for Clindamycin 60ml solution.  Fougera – a separate entity that was subsequently acquired by Sandoz in 2012 – temporarily discontinued the product in September 2010, leaving the non-Defendant manufacturer as the sole supplier in the market.

2614.   By late 2010, however, the non-Defendant manufacturer also began to experience production problems, although it did continue to supply certain select customers.  Fougera immediately started preparing to re-enter the market and significantly raise price – in direct coordination with the non-Defendant manufacturer.

2615.   On November 1, 2010, Fougera learned that it had Clindamycin 60ml solution in stock and that the product was available for shipping.  That day, Kaczmarek stated internally that

██████████████████████████████████████████████████████

████████   In response, a Fougera sales executive indicated that the non-Defendant manufacturer

██████████████████████████████████████████████████████

That same executive initially suggested that Fougera double its WAC price, from $7.50 to $15.

2616.   Fougera did get the price point ████████████ with the help of the non-Defendant manufacturer.  The next day – November 2, 2010 – Fougera scheduled an internal

████████████████████████████████████████████  for the call included Kaczmarek, CW-3 and CW-6, among others.  Before that conference call, CW-6 of Fougera and an individual at the non-Defendant manufacturer – someone he generally did not speak with on the phone for social reasons – and spoke for nearly six (6) minutes.

2617.   At some point that day, Fougera changed plans and decided to re-enter the market with a much more dramatic WAC price increase than originally suggested the day before, going

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

from $7.50 to $31.50 – or a 320% increase.  Customer contract prices increased even higher.

Within two days after the price increase, for example, during a conversation with a Fougera

national account representative, a customer complained that it had only just recently taken

Clindamycin off contract with Fougera but ██████████████████████████████████

██████████████  That same day, November 4, 2010, CW-6 and an employee of the non-

Defendant manufacturer exchanged twenty-one (21) text messages.

2618.   Based on their communications, Fougera knew that the non-Defendant

manufacturer would follow its price increase – but it could not tell its customers that.  For

example, in January 2011, a large wholesaler customer, ABC, approached Fougera asking if it

knew whether the non-Defendant manufacturer would be following Fougera's price increase on

Clindamycin Solution.  In an internal Fougera e-mail exchange, CW-3 asked CW-6 (who, as

stated above, had spoken with an employee at the non-Defendant manufacturer on the day of the

Fougera price increase) if there was ██████████████████████████████████████

██████████████████████████████████████████  CW-6 responded that he did

not have any new information, other than that a price increase by the non-Defendant

manufacturer ██████████  When CW-3 pressed for more detail about how quickly it would be

coming, CW-6 responded: ██████████████████████  Indeed, CW 6 had called an

employee at the non-Defendant manufacturer and left a 43-second voicemail immediately before

sending that e-mail to CW 3.

2619.   Over the ensuing months, Fougera was contacted by several customers requesting

price reductions due to the fact that the non-Defendant manufacturer had not yet followed.

Fougera continued to coordinate regularly with the non-Defendant manufacturer and did not

reduce its price, but grew frustrated when its competitor did not promptly follow as expected –

internally stating that the non-Defendant manufacturer was ███████████████████

and that they ████████████ and that they were ███████████

    2620.   The non-Defendant manufacturer did ultimately follow Fougera's price increase

with an increase of its own on Clindamycin Solution in July 2011, but it did not fully match

Fougera's public WAC pricing.  Nonetheless, Fougera refused to bid on any of the non-

Defendant manufacturer's accounts as it did not want to punish the non-Defendant manufacturer

for actually raising its prices.

    2621.   During this time period, the anticompetitive understanding and coordination

between Fougera and the non-Defendant manufacturer applied to the other formulations of

Clindamycin as well.  For example, in May 2012 the non-Defendant manufacturer notified

customers that it would be raising the price of Clindamycin Gel.  Shortly after that, Fougera was

approached by a customer asking for a bid on Clindamycin Gel.  In conveying the request to

Kaczmarek, a Fougera senior executive explained that ███████████████████████

████████████████████████████████████████████████████

Kaczmarek agreed: ███████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2622.   The next day, CW-6 exchanged five (5) text messages with an employee at the non-Defendant manufacturer, likely to convey Fougera's decision not to challenge the non-Defendant manufacturer's market share at that customer.

2623.   Similarly, on June 27, 2012, CW-3 at Fougera learned that ABC had put Clindamycin Gel, Lotion and Cream out to bid due to price increases.  That same day, CW-6 of Fougera placed a call to an employee at the non-Defendant manufacturer and left a 31-second voicemail.

b.      *The Second Coordinated Increase (October 2012 – All Formulations – Sandoz And the Non-Defendant Manufacturer)*

2624.   In late July 2012, Defendant Sandoz formally acquired Fougera.  As discussed more fully below, even before the acquisition Sandoz had been conspiring separately with a non-Defendant manufacturer to fix prices on Latanoprost Drops, and thus had its own separate relationships with that non-Defendant manufacturer.

2625.   After the merger, Sandoz began to scrutinize the Fougera business line and search for ways to maximize revenue for Fougera products in order to meet its pre-merger expectations. Starting in or about August 2012, Kellum (of Sandoz) and Kaczmarek (of Fougera, still with the company during the transition) – now co-workers – were tasked with discussing and identifying a list of price increase candidates from the Fougera drug portfolio.

2626.   By August 1, 2012, the non-Defendant manufacturer had identified Clindamycin Solution as a ███████████████    On August 7, 2012, Kellum called an employee at the non-Defendant manufacturer and the competitors exchanged six (6) text messages.  The next day, August 8, 2012, they spoke for ten (10) minutes.

2627.   Later that month, on August 22, 2012, Kellum identified Clindamycin, in all of its various formulations, as a price increase candidate.  In describing his reasoning, Kellum

indicated that the only competitor for all four formulations was the non-Defendant manufacturer,

████████████████████████████████████████████████ Kellum was

referring to his recent successful collusion with the non-Defendant manufacturer on Latanoprost

drops (discussed below) which had resulted in a significant price increase.  In response,

Kaczmarek recalled his own experience of the non-Defendant manufacturer's failure to follow

Fougera's Clindamycin Solution price increase as quickly as he wanted, stating ████████

████████████████████████████████████████████████

    2628.   Kellum's confidence in the non-Defendant manufacturer was based on his own

relationship with an employe at the non-Defendant manufacturer, and his prior conversations

with her.  Kellum pushed forward with the planned price increases for Clindamycin, noting in a

late-August 2012 presentation that the non-Defendant manufacturer was ████████████

████████████████████████████████████████████████

████████

    2629.   As Sandoz was planning for the Clindamycin price increase in August 2012,

Kellum was coordinating with an employee at the non-Defendant manufacturer.  For example,

on August 29, 2012, a colleague at Sandoz sent Kellum a draft ████████████████

████████, which included detailed information about the proposed Clindamycin price

increase.  After speaking with an employee at the non-Defendant manufacturer that same day for

more than three (3) minutes, Kellum responded to his colleague saying, ████████████

████████████████████████████████████████████████

    2630.   Similarly, in September 2012 when Kellum was asked for his "rationale" for the

price increases on Clindamycin, he told colleagues that he expected the non-Defendant

manufacturer would ████████████████████████████████ and follow the Sandoz

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

price increase.  Although others at Sandoz expressed some concern that the non-Defendant

manufacturer might not follow, Kellum remained confident in his agreement with the non-

Defendant manufacturer.

2631.   On October 19, 2012, Defendant Sandoz implemented price increases on all four

formulations of Clindamycin in the amounts set forth below: ███████████████████



2632.   In the days leading up to the price increases, Kellum continued his coordination –

by phone and text message – with an employee at the non-Defendant manufacturer.  Kellum

reached out repeatedly by phone and text message to an employee at the non-Defendant

manufacturer in the days leading up to Sandoz's announcement of the price increases.  This

culminated in a nearly four (4) minute call between the two competitors on October 19, 2012 –

the day the Sandoz price increases became effective.

2633.   During these communications, the competitors confirmed their understanding that

the non-Defendant manufacturer would follow the Sandoz price increases.  With the agreement

in hand and understood between the two competitors, Kellum and an employee at the non-

Defendant manufacturer would not need to speak again by phone or text message for nearly a

year-and-a-half, until March 18, 2014 – as Sandoz was preparing for another large increase on

Clindamycin (discussed below).

2634.   The non-Defendant manufacturer followed the price increases quickly this time,

notifying its customers of a price increase on all of Clindamycin formulations on November 27,

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2012 – although the WAC price increases did not become effective and publicly visible until December 27, 2012.  In the interim period before the non-Defendant manufacturer publicly followed the Sandoz price increases, Sandoz made sure to not disrupt the market.

2635.   When the non-Defendant manufacturer's customers approached Sandoz looking for a lower price, Sandoz refused to bid.  Kellum, in particular, ███████████████ that Sandoz avoid bidding as a result of the non-Defendant manufacturer's price increases.

2636.   During that same time period, Sandoz's own customers also approached the company, seeing lower public prices from the non-Defendant manufacturer and requesting that Sandoz reduce its pricing because they were not yet aware that the non-Defendant manufacturer had followed.  Knowing that the non-Defendant manufacturer would follow, however, Sandoz refused.  For example, in early December 2012 Sandoz was approached by its customer McKesson asking Sandoz to reduce its pricing for Clindamycin because the non-Defendant manufacturer was offering significantly lower pricing in the market.  A Sandoz pricing employee initially responded to the customer by refusing to lower the price, saying ████████████████ ███████████████████████ and ████████████████████████ ████████████████████ your e-mail.  When the customer challenged those responses and asked for additional details about what intelligence Sandoz was referring to, the pricing employee forwarded the e-mail string to Kellum and CW-1, asking for advice on how to avoid referring to the illegal understanding between the two companies: ████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Kellum responded by instructing the employee to call McKesson and ███████████████ ████████████ Knowing that an increase by the non-Defendant manufacturer would be coming, Kellum concluded: ███████████████████████████████████████████████

███████████████████████

2637.   The non-Defendant manufacturer's Clindamycin WAC price increases became effective and publicly visible on December 27, 2012.  The non-Defendant manufacturer followed Sandoz's WAC price increases to the penny on every formulation, with the non-Defendant manufacturer's prices on Clindamycin Solution increasing by 416%.

2638.   The coordinated price increases were a success.  In a May 2013 Sandoz Planning Meeting, Sandoz noted with respect to Clindamycin: ███████████████████████████ ██████████████████████ By May 2014, those price increases had resulted in an additional $61,000,000 in net sales to Sandoz.

> c. *New Entrants On Clindamycin Solution – Perrigo And Taro – Do Not Significantly Erode Pricing*

2639.   The late-2012 Sandoz and the non-Defendant manufacturer's price increases got the attention of two competitors – Taro and Perrigo – that had previously obtained approval to market Clindamycin Solution but had not recently been active in the market.

2640.   For example, in a January 2013 internal e-mail Perrigo employees noted that they had ████████████████████████████████ on Clindamycin Solution.  They noted that Perrigo already possessed approved ANDAs for the product that were ███████████ ███████████████ and ███████████████████████████████████████████████████ ███████████████████ Perrigo Perrigo did indeed begin making plans to return to the market; and was in frequent communication with its competitors at every important step throughout the process.

2641.   Taro similarly had approval to sell Clindamycin Solution; but had not been marketing the product.  As early as April 2013, however, Taro began taking steps to bring the product back to market, which included reaching out to competitors.  For example, on April 17, 2013, Taro circulated an internal e-mail about a ████████████ for Clindamycin Solution, requesting specific information about material availability in order to estimate an available launch date.  That same day, Aprahamian called his contact at Sandoz, CW-3, and the two spoke for four (4) minutes.

2642.   Similarly, Aprahamian scheduled a meeting with colleagues at Taro on June 6, 2013 to discuss Taro's entry into the market for Clindamycin Solution.  The day before that meeting, he sent an e-mail internally saying, ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████   The day after his internal meeting – June 7, 2013 – Aprahamian called CW-3 at Sandoz and the two competitors spoke for nearly eleven (11) minutes.

2643.   Starting in July 2013, Sandoz started having temporary supply problems for Clindamycin Solution, due to a change in the adhesive label which required additional testing. The disruption was temporary, and Sandoz expected to be back in the market by the end of the year.  However, this left the non-Defendant manufacturer as the only viable competitor while Taro and Perrigo were planning to enter the market.

2644.   Because it is well understood under "fair share" principles that the non-Defendant manufacturer would have to concede market share and "play nice in the sandbox" as these new competitors entered the market (and as Sandoz subsequently re-entered the market), it was

important for Taro, Perrigo and Sandoz to coordinate with each other in order to avoid competition and minimize price erosion as they re-entered the market.

2645.   Perrigo started preparing in earnest to enter the market for Clindamycin Solution in August 2013.  Over the next several weeks, executives at Perrigo, Taro and Sandoz were in almost constant communication, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:32:00 | 0:01:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:05:00 |
| 8/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 17:54:00 | 0:05:00 |
| 8/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 17:07:00 | 0:01:00 |
| 8/6/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:22:00 | 0:04:00 |
| 8/6/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:27:00 | 0:12:00 |
| 8/7/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:45:00 | 0:03:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:33:00 | 0:13:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 18:19:00 | 0:02:00 |
| 8/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:47:00 | 0:01:00 |
| 8/8/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 10:32:00 | 0:06:00 |
| 8/8/2013 | Voice | CW-3 (Sandoz) | Incoming | Aprahamian, Ara (Taro) | 16:42:00 | 0:04:00 |
| 8/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:37:00 | 0:08:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 6:42:00 | 0:03:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 11:04:00 | 0:01:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:39:00 | 0:02:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:04:00 | 0:01:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 16:22:00 | 0:01:00 |
| 8/14/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:01:00 | 0:01:00 |
| 8/15/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 12:53:00 | 0:08:00 |
| 8/15/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:09:00 | 0:14:00 |
| 8/21/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 13:51:00 | 0:08:00 |
| 8/21/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 19:41:00 | 0:05:00 |
| 8/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:54:00 | 0:03:00 |

2646.   On August 28, 2013, at 1:30 p.m. ET, the Perrigo sales team held an internal launch meeting regarding Clindamycin Solution.  In advance of that meeting, a Perrigo executive circulated pricing and market share information to the team, including a pricing grid with proposed Perrigo pricing for different ███ of customers.  One of the attached documents listed Perrigo's ███████ at ██████  This led to several more phone calls between Perrigo, Taro and Sandoz that same day, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/28/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 7:36:00 | 0:15:00 |
| 8/28/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 10:37:35 | 0:13:22 |
| 8/28/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Taro Pharmaceuticals | 14:36:00 | 0:13:00 |

As can be seen from the table above, Aprahamian of Taro and T.P. of Perrigo both spoke to CW-3 of Sandoz in the morning before the 1:30 p.m. ET Perrigo launch meeting. Shortly after the meeting, at 2:36 p.m., Boothe of Perrigo called the Taro main line and spoke to someone at Taro - likely Perfetto - for approximately thirteen (13) minutes.

2647.   Perrigo formally launched and entered the market for Clindamycin Solution on Monday, September 9, 2013 - a week earlier than expected. The week before the launch, as Perrigo was deciding which customers to approach, executives at the company were again in frequent contact with competitors Taro and Sandoz. On Wednesday, September 4, 2013, a Perrigo executive sent an e-mail to the Perrigo sales team about Clindamycin Solution, stating: ███████████████████████████████████████████ The next day, T.P. of Perrigo called his contact at Sandoz, CW-3, and the two spoke for approximately ten (10) minutes. The day after that – Friday September 6, 2013 – Boothe of Perrigo spoke to Perfetto of Taro for nearly two (2) minutes.

2648.   Perrigo was quickly able to obtain ABC and Walmart as customers, allowing the company to even exceed its initial market share targets.

2649.   Shortly after Perrigo entered the market, on September 12, 2013, Aprahamian of Taro sent an internal e-mail announcing that ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2650.   Over the next several weeks, executives at Taro communicated frequently with their counterparts at Perrigo and Sandoz to determine which customers to target, and how to avoid competing with each other.  At least some of those communications are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/17/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:10:07 | 0:16:39 |
| 9/17/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 19:08:00 | 0:02:00 |
| 9/18/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 11:52:11 | 0:11:14 |
| 9/19/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:41:00 | 0:17:00 |
| 9/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 15:23:00 | 0:01:00 |
| 9/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:24:00 | 0:01:00 |
| 9/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:42:00 | 0:15:00 |
| 9/26/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:37:17 | 0:06:44 |
| 9/26/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 15:22:00 | 0:15:00 |
| 9/27/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 16:00:00 | 0:05:00 |
| 10/1/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 17:56:00 | 0:01:00 |
| 10/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:41:00 | 0:10:00 |
| 10/3/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 16:13:00 | 0:05:00 |
| 10/3/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 18:16:00 | 0:01:00 |
| 10/4/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:32:20 | 0:00:12 |
| 10/4/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:32:52 | 0:04:51 |
| 10/4/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 15:37:00 | 0:02:00 |

2651.   As can be seen in the table above, Aprahamian called CW-3 at Sandoz on October 1, 2013.  CW-3 called Aprahamian back the next day, and the two spoke for ten (10) minutes.  During that call, Aprahamian and CW-3 talked about specific pricing in the market and which customers Taro should approach as it entered the market.  That same day – October 2, 2013 – Aprahamian created a spreadsheet titled ████████████████████████████ which documented some of the information he had received during that call.  In that document Aprahamian created an initial pricing model for Taro's upcoming launch of Clindamycin Solution, based on his conversations with CW-3.  The spreadsheet included not only public WAC pricing for Sandoz, the non-Defendant manufacturer, and Perrigo, but also – in a separate tab of the spreadsheet titled █████████ – non-public price points for three potential customers: Rite Aid, Publix, and ABC.

2652.   On October 8, 2013, Taro was busy preparing for the launch.  Aprahamian sent an e-mail to the Taro sales team indicating that Taro was planning to launch Clindamycin Solution █████████████ and asking those sales executives to reach out to customers and ██████ █████████████ Aprahamian said he was ██████████████████████████████████ ████████████████████████████████ Consistent with the "fair share" understanding, Aprahamian indicated that ████████████████████████████████ ██████████; meaning that Taro would only target the non-Defendant manufacturer's customers – not Perrigo – due to the non-Defendant manufacturer's very high market share.  Another Taro employee was concurrently creating a ███████████████████████ with information about the product, recent price trends in the market, competitors, and Taro's ██████ █████████████ of 20%.  That same day, Aprahamian called CW-3 at Sandoz and left a message. CW-3 returned the call immediately and the two spoke for approximately three (3) minutes.

2653.   Taro also scheduled an internal meeting regarding the Clindamycin launch for October 11, 2013.  The day before and the day of that meeting, Aprahamian was again busy communicating with CW-3 of Sandoz.  On October 10, 2013, Aprahamian called CW-3 twice – first on CW-3's office line, leaving a message, and then immediately after on his cell phone, leaving another message.  The next day – the day of the Taro internal launch meeting – the two competitors spoke three times, with calls lasting three (3), one (1), and five (5) minutes, respectively.

2654.   As Aprahamian kept speaking to CW-3 at Sandoz, who was in turn speaking with T.P. at Perrigo, he continued compiling competitively sensitive, non-public price points for various customers.  For example, by October 25, 2013, the ███████████████ tab of Aprahamian's

Clindamycin Solution pricing spreadsheet had grown.  Having this competitively sensitive, non-public information allowed Taro to price as high as possible while still obtaining new business – accomplishing one of the fundamental goals of the "fair share" understanding by minimizing price erosion as it entered the market.

2655.   Taro entered the market for Clindamycin Solution on October 28, 2013, matching Sandoz, the non-Defendant manufacturer, and Perrigo's WAC pricing exactly.  When launching, Taro quickly targeted and obtained Rite Aid – not ABC or Walmart – to avoid competing with Perrigo for market share.  This gave Taro approximately 13% market share immediately, almost reaching its target goal with just one customer.

2656.   When Sandoz subsequently re-entered the market for Clindamycin Solution in early 2014, it also did so in coordination with its competitors.  For example, on Monday, February 10, 2014, members of the Sandoz sales team had a conversation about the company's upcoming re-launch of Clindamycin Solution.  As a result of that discussion, it was decided that ███████████████████████████████████████████████████████████ That same day, Kellum sent an internal e-mail to the Sandoz sales team reminding them of the important understanding already in place with the non-Defendant manufacturer across all of the Clindamycin formulations, not just the Solution.

2657.   Two days later, on February 12, 2014, CW-3 of Sandoz called Aprahamian of Taro and the two spoke for seventeen (17) minutes.  They spoke again on February 13 for one (1) minute.  That same day – February 13, 2014 – CW-1 of Sandoz sent an internal e-mail again stressing the broader relationship with the non-Defendant manufacturer and the desire not to disrupt that relationship: ████████████████████████████████████

████████████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2658.   Over the next several weeks until Sandoz re-launched, the four competitors for Clindamycin Solution – Sandoz, Taro, Perrigo and the non-Defendant manufacturer – coordinated through numerous phone calls, in order to minimize any disruption that might be caused by Sandoz's re-entry.

2659.   Sandoz set its target market share at 25%, choosing to target 20% from the non-Defendant manufacturer and 5% from Perrigo.  In a May 2014 internal Sandoz presentation, Sandoz laid out its plan for re-entry.

2660.   Ultimately, these coordinated efforts to minimize price erosion were very successful.  Even after both Taro and Perrigo's entry, and Sandoz's re-entry, prices for Clindamycin Solution remained significantly higher than they had been prior to the first coordinated price increase.

> d.   The Third Coordinated Price Increase (2014 – All Formulations Except Solution – Sandoz And a non-Defendant manufacturer)

2661.   Starting in April 2014, Sandoz decided to raise prices on the three formulations of Clindamycin where the non-Defendant manufacturer was still its only competitor.  This led to a quick flurry of phone calls between the non-Defendant manufacturer and Sandoz in early April 2014 to confirm the understanding.  As a result of these calls, Sandoz understood that the non-Defendant manufacturer would follow its price increases.  During these calls, the competitors also discussed a separate price increase on Eplerenone Tablets, discussed more fully below.

2662.   Sandoz moved quickly, raising its WAC prices on Clindamycin Gel, Clindamycin Lotion, and Clindamycin Cream by approximately 20%, effective April 18, 2014.  Shortly after the Sandoz increase, on April 23, 2014, an employee at the non-Defendant manufacturer and Kellum spoke again for nearly fifteen (15) minutes.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2663.   By now, the non-Defendant manufacturer understood the need to follow the Sandoz price increases quickly – and did so.  It followed the Sandoz WAC increases to the penny less than a month-and-a-half later, with an effective date of June 2, 2014.  Shortly before the non-Defendant manufacturer followed the Sandoz Clindamycin increases – on May 22, 2014 – an employee of the non-Defendant manufacturer called Kellum of Sandoz twice, leaving him a forty-seven (47) second voicemail.  They did not speak again for nearly three (3) months.  Similarly, three days before the increases became effective, on May 29, 2014, an employee of the non-Defendant manufacturer called Kellum of Sandoz, leaving him a twenty-six (26) second voicemail.  As part of that same price increase, the non-Defendant manufacturer also raised its pricing on Eplerenone Tablets.

2664.   Sandoz honored the "fair share" understanding with the non-Defendant manufacturer and the agreement to raise prices on Clindamycin.  For example, when approached by a customer, Omnicare, on May 28, 2014, to provide a bid for Clindamycin Gel, the first reaction from a Sandoz marketing manager was that Kellum ███████████████████ ████████████  Omnicare approached Sandoz again in August, asking if Sandoz had enough supply to meet the customer's needs.  The e-mail from Omnicare followed a flurry of phone calls between Kellum and an employee of the non-Defendant manufacturer only a few days prior, on August 14, 2014 (their first calls since May 2014).  After receiving the e-mail from Omnicare, CW-3 of Sandoz informed the customer that Sandoz would not do anything that would disrupt the market.

2665.   In 2015, Actavis entered the market for Clindamycin.  In January 2015, before Actavis entered the market, M.D., Senior National Account Executive of Actavis, had two calls with Ara Aprahamiam of Taro.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 2.    Latanoprost Drops

2666.   In 2013, the annual market for Latanoprost Drops in the United States exceeded $100 million.

2667.   As of March 2012, there were three generic manufacturers in the market for Latanoprost Drops: Sandoz, Valeant (sometimes referred to as Bausch & Lomb ("B&L")), and the non-Defendant manufacturer.  The non-Defendant manufacturer had the largest market share with 42%, followed by Valeant with 30% and Sandoz with 19%.  In April 2012, all three manufacturers raised their prices in direct coordination with one another.

2668.   In early April 2012, the non-Defendant manufacturer informed its customers that it would be taking a price increase on Latanoprost Drops.  In the days and weeks leading up to the non-Defendant manufacturer's price increase notice, an employee of the non-Defendant manufacturer was coordinating with both Kellum of Sandoz and B.P., a sales executive at Valeant, by phone and text message.  This employee at the non-Defendant manufacturer consistently acted as the conduit, sharing information between Sandoz and Valeant in order to secure an agreement from both to raise prices.

2669.   On the day that the non-Defendant manufacturer sent out the price increase notices, April 3, 2012, both CVS and Walgreens approached Sandoz looking for a lower price on Latanoprost Drops.  That same day, an employee at the non-Defendant manufacturer and Kellum exchanged five (5) text messages while Kellum replied internally to his colleagues at Sandoz, stating: ███████████████████████████████████████████████████████████ ██████████████████████████████████████████  Later that evening, Kellum instructed his sales team not to make any ███████████ for Latanoprost and to put the product on ███████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Kellum also instructed S.G., one of his sales executives, to lie to Walgreens about why Sandoz was unable to bid, instructing S.G. to ████████ even though Sandoz had plenty of supply.

2670.   Sandoz immediately began preparing an increase of its own.  On April 4, 2012, Kellum called an employee at the non-Defendant manufacturer but was unable to connect. He called her again on April 5, 2012, and the two competitors spoke for nearly two (2) minutes.

2671.   On April 6, 2012, Kellum requested a customer list from a colleague so that he could begin calculating the financial impact of a Sandoz price increase.  He also added the item ████████████████████ to the agenda for that day's ████████████████ ████████████ After some quick calculations, Kellum determined that a Sandoz increase on Latanoprost Drops could increase the company's revenues by up to $14,900,000 per year.

2672.   In a presentation he created that same day to support the Latanoprost price increase, Kellum was intentionally opaque about why Sandoz should take the increase, stating that ████████████████████████████████████████ ████████████████████████████ But that was a lie.  Kellum had first learned of the the non-Defendant manufacturer's price increase directly from the non-Defendant manufacturer, not a customer.  In addition, the Valeant price increase had not even happened yet. In fact, it would not be effective until April 24, 2012, three weeks in the future; Kellum's inside information instead came directly from his prior conversations with his competitor, the non-Defendant manufacturer.

2673.   While he was in the midst of planning the Sandoz price increase on April 6, 2012, Kellum also exchanged two (2) more text messages and had a nearly seven (7) minute call with an employee from the non-Defendant manufacturer.  That employee, in turn, then called B.P. at

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Valeant and the two spoke for nearly five (5) minutes.  Later that evening, Kellum told

colleagues: ███████████████████████████████████████████████

2674.   Things moved quickly from there.  On April 9, 2012, Kellum sent around an

agenda for the Pricing Committee meeting the next day. The agenda included ███████

███████████████████████  He also called the employee of the non-Defendant

manufacturer but was unable to reach her.  Kellum quickly obtained approval for the Latanoprost

price increase; customers were notified of the increase on April 11, 2012, and it became effective

on April 13, 2012.

2675.   On April 12, 2012, a large retail pharmacy customer, Rite-Aid, sent the non-

Defendant manufacturer a request for a bid on Latanoprost.  Knowing that this was likely an

indication that Sandoz had followed the non-Defendant manufacturer's price increase, an

employee at the non-Defendant manufacturer (then using a different surname) forwarded the

e-mail directly to Kellum with an approving message.

2676.   That same day, a different customer, Optisource, approached Sandoz – angry that

it was not notified in advance of Sandoz's Latanoprost price increase.  A Sandoz sales executive

told the customer that Sandoz was simply ████████████████████ but Optisource

challenged that idea, saying that Valeant – which was also on a secondary contract with that

customer – had not raised its price.  Questioning Kellum's intelligence about the price increases,

a senior sales and pricing executive at Sandoz forwarded the e-mail string directly to Kellum on

Friday, April 13, 2012, asking: ███████████████████ Kellum immediately responded:

███████████████ Kellum's understanding, of course – based on his conversations with

the non-Defendant manufacturer – was that Valeant would be raising, or already had raised, its

price.

2677.   The following Monday, April 16, 2012, Kellum called an employee at the non-Defendant manufacturer.  She called him back the next day, but they were unable to connect.  On April 18 and 19, 2012, the employee of the non-Defendant manufacturer and B.P. of Valeant then communicated several times by phone and text message, including one call lasting nearly fourteen (14) minutes.

2678.   On April 24, 2012, Valeant raised its WAC pricing on Latanoprost to a point even higher than Sandoz's.  That same day, B.P. of Valeant called an employee at the non-Defendant manufacturer, likely to report the news.

2679.   Three price increases in the span of roughly three weeks caused a lot of customer activity and confusion – which in turn required additional coordination among the three manufacturers to make sure prices stayed high and the market remained stable.  For the most part, Sandoz tried to avoid taking any of its competitors' customers after the price increases, but it did want to pick up one customer to get closer to its "fair share" of the market.

2680.   For example, on Friday May 4, 2012 – shortly after the non-Defendant manufacturer's and Valeant's price increases became effective – Cardinal approached Sandoz with an opportunity to bid and take the business with a lower price.  Kellum called the employee at the non-Defendant manufacturer that day, but they were unable to connect.  He called her again on Monday, and they spoke for more than six (6) minutes.  They spoke about Sandoz's desire to obtain another customer, and which customer it should target.  Monday morning, before speaking to the non-Defendant manufacturer Kellum responded to the internal Sandoz e-mail saying ███████████████████████████████████████████████████

███████████████████████████████████████████████   The next day, after

speaking to the employee at the non-Defendant manufacturer, Kellum followed up the e-mail, confirming that Sandoz should pass on Cardinal, stating ████████████████████████████ ████████████████████████████████ Consistent with the agreement reached with the non-Defendant manufacturer, Sandoz retained its secondary position with Cardinal, instead of bidding for the primary position, and decided to wait until ABC put its Latanoprost business out to bid and let the non-Defendant manufacturer concede that customer instead.

2681.   Around this same time, CW-1 started at Sandoz.  He had previously worked with an employee at the non-Defendant manufacturer at a prior employer and thus had a pre-existing relationship with a sales executive at the non-Defendant manufacturer.  When some confusion arose later in May 2012 around the Cardinal business, an employee at the non-Defendant manufacturer communicated with both CW-1 and Kellum from Sandoz, as well as B.P. of Valeant, in order to enforce the agreement already in place among the three manufacturers.

2682.   For example, on the morning of May 31, 2012, B.P. of Valeant and the employee at of the non-Defendant manufacturer exchanged one text message and had several phone calls of varying lengths.  In the midst of those communications with B.P., an employee at the non-Defendant manufacturer was simultaneously communicating with CW-1 of Sandoz using iPhone chat.  As the employee at the non-Defendant manufacturer explained to CW-1, Valeant (B&L) had the Cardinal business, but Cardinal was telling Valeant that Sandoz had a lower price in the market.  The employee at the non-Defendant manufacturer expressed the need to call ██████ [Kellum] because CW-1 had only recently started at Sandoz and thus did not completely understand the scope of the prior collusive communications between the non-Defendant manufacturer and Kellum about the Latanoprost price increases.

2683.   Immediately following this exchange, the employee at the non-Defendant manufacturer did call Kellum, setting off a flurry of calls between the three competitors that day.

2684.   Over the next several weeks, the employee at the non-Defendant manufacturer went to great lengths to make sure Sandoz and Valeant lived up to their agreement to keep prices high across the board for Latanoprost.  For example, between June 26 and 28, 2012, an employee at the non-Defendant manufacturer and B.P. of Valeant exchanged twelve (12) text messages.

2685.   After that series of communications, on June 29, 2012, the employee at the non-Defendant manufacturer reached out again to CW-1 via iPhone chat.  At the exact same time, the employee at the non-Defendant manufacturer was also exchanging separate text messages with B.P. of Valeant.

2686.   Those efforts were successful.  On July 3, 2012, CW-1 followed up with the employee at the non-Defendant manufacturer via iPhone chat message confirming that Sandoz's pricing for Latanoprost was not low at Cardinal – or any other customer for that matter.  Again, shortly after receiving this information from CW-1 about Sandoz's pricing, the employee of the non-Defendant manufacturer sent a text message to B.P. at Valeant.  They exchanged several other text messages that same day.The non-Defendant manufacturer similarly lived up to its agreement to concede the ABC business to Sandoz, allowing Sandoz to get closer to its "fair share" of the Latanoprost market.  On June 22, 2012, ABC requested a bid from Sandoz on Latanoprost, as expected, due to the the non-Defendant manufacturer's price increase.  Consistent with the agreement, the non-Defendant manufacturer quickly conceded the customer to Sandoz, allowing Sandoz to obtain the business ████████████████████████

████████

2688.   As discussed above, this successful effort at price fixing convinced Kellum to recommend further efforts at price fixing with the non-Defendant manufacturer on various formulations of Clindamycin beginning in August 2012, continuing through 2014.  That history also paved the way for yet another successful price fixing agreement between Sandoz and the non-Defendant manufacturer on Eplerenone Tablets, discussed below.

### 3.   Eplerenone Tablets

2689.   As of spring 2014, Sandoz and the non-Defendant manufacturer were the only generic manufacturers of Eplerenone Tablets.

2690.   As discussed above, while the non-Defendant manufacturer was coordinating with Sandoz in April 2014 to follow Sandoz's price increases on various formulations of Clindamycin, it was also coordinating to lead a price increase on Eplerenone Tablets.

2691.   Originally, the non-Defendant manufacturer planned its Eplerenone price increase to become effective on May 1, 2014, but sometime in mid-April that increase was delayed. Shortly after the decision was made to delay the Eplerenone price increase, on April 22, 2014, an employee of the non-Defendant manufacturer called Kellum and left a message.  They traded voicemails until they were able to speak the next day for nearly fifteen (15) minutes.

2692.   The non-Defendant manufacturer planned its increases of Clindamycin and Eplerenone together, as it was coordinating with Sandoz – and both increases ultimately became effective on June 2, 2014.  Shortly before the increases became effective, on May 29, 2014, an employee of the non-Defendant manufacturer called Kellum of Sandoz, leaving him a twenty-six (26) second voicemail.

2693.   Sandoz's intent was always to follow the non-Defendant manufacturer's Eplerenone price increase, rather than compete for market share.  Sandoz began preparing to

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

follow the non-Defendant manufacturer's Eplerenone price increase in early July 2014.

However, because of price protection terms with several of Sandoz's customers, the company

decided to delay the roll-out of its Eplerenone price increase (and several others) until it made

more financial sense and Sandoz would be able to limit any contractual penalties that would arise

as a result of the increase.

2694.   Ultimately, Sandoz followed the non-Defendant manufacturer's price increase on

Eplerenone on October 10, 2014.  Sandoz increased its pricing by as much as 270% to certain

customers.  During the time period after the non-Defendant manufacturer's price increase and

before Sandoz could follow, the two competitors continued to coordinate by phone, including a

number of calls between Kellum and an employee of the non-Defendant manufacturer in

August 2014.  Shortly after the Sandoz price increase became effective, on October 15, 2014,

Kellum and an employee of the non-Defendant manufacturer also communicated briefly.

### S.      G&W And Its Other Relationships

2695.   Earlier Sections of this Complaint discuss in detail G&W's collusion with several

competitors between 2010 and July 2012, when Sandoz acquired Fougera – including collusion

with Fougera, Perrigo, and Glenmark.  Another Section focuses on collusion between Taro and

G&W in late 2015 and early 2016 on several products that G&W purchased from Teva.

2696.   However, G&W's illegal behavior goes well-beyond those examples. Indeed,

during the time period relevant to this Complaint, the vast majority of G&W's business was

implicated by its anticompetitive conduct.  Much of this collusion was spearheaded by Orlofski

and Vogel-Baylor.  Both were prolific communicators that used their many relationships with

competitors to collude on overlap products.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2697.   For example, between January 2011 and December 2016, when he left G&W, Orlofski exchanged at least one thousand eight hundred and sixty-three (1,863) phone calls and text messages with his contacts at Defendants Lupin, Aurobindo, Amneal, Wockhardt, Taro, Glenmark, Perrigo, Fougera, Actavis, and Sandoz.  These communications are detailed in the chart below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 589 | 4/4/2011 | 10/13/2016 |
| Grauso, Jim (Aurobindo) | 406 | 12/28/2011 | 1/20/2014 |
| S.R.(1) (Amneal) | 265 | 8/29/2011 | 4/8/2016 |
| M.C. (Wockhardt) | 238 | 4/19/2011 | 12/27/2016 |
| Perfetto, Mike (Taro) | 136 | 1/25/2013 | 9/1/2016 |
| Grauso, Jim (Glenmark) | 66 | 2/12/2014 | 10/27/2016 |
| S.K. (Perrigo) | 56 | 1/20/2011 | 4/24/2012 |
| Aprahamian, Ara (Taro) | 45 | 7/24/2013 | 6/10/2016 |
| Boothe, Douglas (Perrigo) | 19 | 1/25/2013 | 1/8/2015 |
| K.K. (Wockhardt) | 11 | 8/29/2011 | 8/30/2011 |
| Taro Pharmaceuticals | 11 | 3/22/2012 | 8/5/2014 |
| Kaczmarek, Walt (Fougera) | 4 | 2/8/2012 | 2/10/2012 |
| Boyer, Andy (Actavis) | 4 | 9/7/2012 | 7/22/2013 |
| D.P. (Sandoz) | 3 | 8/13/2013 | 8/13/2013 |
| Wesolowski, John (Perrigo) | 3 | 9/16/2014 | 9/16/2014 |
| CW-6 (Aurobindo) | 3 | 10/31/2012 | 5/25/2013 |
| CW-6 (Fougera) | 2 | 2/1/2012 | 2/1/2012 |
| B.S. (Taro) | 1 | 4/24/2012 | 11/15/2012 |
| C.V. (Perrigo) | 1 | 6/1/2016 | 6/1/2016 |

2698.   Similarly, between July 2011 and February 2017, Vogel-Baylor exchanged more than seven thousand (7,000) phone calls and text messages with her contacts at Defendants Aurobindo, Glenmark, Wockhardt, Actavis, Lupin, Amneal, Perrigo, Fougera, Valeant, Taro, and Mylan.  These communications are detailed in the chart below:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Grauso, Jim (Aurobindo) | 2120 | 12/29/2011 | 1/30/2014 |
| CW-5 (Glenmark) | 2061 | 3/30/2012 | 2/21/2014 |
| M.M. (Wockhardt) | 1158 | 7/31/2011 | 10/22/2013 |
| K.K. (Wockhardt) | 868 | 7/29/2011 | 1/31/2014 |
| Grauso, Jim (Glenmark) | 692 | 2/4/2014 | 7/18/2016 |
| Rogerson, Rick (Actavis) | 438 | 8/8/2012 | 2/8/2017 |
| Berthold, David (Lupin) | 159 | 8/28/2011 | 4/16/2013 |
| CW-6 (Aurobindo) | 121 | 8/26/2012 | 5/3/2013 |
| J.P. (Amneal) | 113 | 3/26/2014 | 12/6/2016 |
| T.P. (Perrigo) | 94 | 7/8/2013 | 4/29/2016 |
| Brown, Jim (Glenmark) | 56 | 5/7/2013 | 10/2/2015 |
| S.R.(1) (Amneal) | 24 | 5/15/2012 | 5/16/2013 |
| S.K. (Wockhardt) | 16 | 9/14/2011 | 9/24/2012 |
| M.C. (Wockhardt) | 13 | 8/28/2011 | 6/13/2012 |
| CW-6 (Fougera) | 12 | 5/18/2012 | 8/7/2012 |
| B.P. (Valeant) | 9 | 11/20/2013 | 11/25/2015 |
| Aprahamian, Ara (Taro) | 6 | 3/27/2014 | 9/24/2015 |
| Aurobindo Pharma | 6 | 1/17/2012 | 6/15/2012 |
| J.K. (Aurobindo) | 6 | 6/4/2013 | 7/17/2013 |
| Glenmark Pharmaceuticals | 2 | 3/14/2014 | 9/9/2015 |
| D.I. (Glenmark) | 2 | 3/3/2014 | 3/7/2014 |
| Perfetto, Mike (Taro) | 2 | 3/21/2014 | 3/21/2014 |
| C.U. (Taro) | 1 | 1/6/2016 | 1/6/2016 |
| M.A. (Mylan) | 1 | 5/20/2014 | 5/20/2014 |

2699.   At all relevant times herein, Vogel-Baylor was acting at the direction of her supervisor, Orlofski.  Orlofski was very much aware of her collusion with competitors and encouraged her to do it.  The Complaint is replete with examples of Vogel-Baylor communicating with a competitor and then immediately calling Orlofski to report back what she had learned.  Indeed, Vogel-Baylor was evaluated, at least in part, based on the strength of her competitive relationships.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2700.   Vogel-Baylor also directed her subordinates to collude with competitors.  For example, in February 2014, G&W hired K.K., previously a sales executive at Defendant Wockhardt.  Immediately upon his arrival, K.K. began colluding in earnest with his contact at Sandoz, CW-3.  Up to that point, no G&W employee had a relationship with anyone at Sandoz.  Although there had been a relationship with CW-6 of Fougera prior to the Sandoz acquisition, his departure from the company left a gap. K.K.'s relationship with CW-3 filled this void.

2701.   Although it was a smaller company, G&W celebrated the fact that it was selling topical products, where it was able to form anticompetitive agreements with most of its primary competitors.  For example, in May 2013, Vogel-Baylor was asked to put together a report for management regarding G&W's sales goals for the coming year.  After listing out a number of G&W's price increases from 2012 – all of which were the subject of collusion and are discussed at various points throughout this Complaint – Vogel-Baylor concluded:  ████████

████████████████████████████████████████

████████████

2702.   The following Sections focus on G&W's relationships with Defendants Perrigo, Actavis, Glenmark, and Lupin, and discuss specific examples of how those anticompetitive relationships manifested themselves with respect to particular products.

### 1.      Collusion Between G&W And Perrigo

2703.   As detailed above, after Sandoz's acquisition of Fougera in July 2012, CW-6 left Fougera and took a sales position at Defendant Aurobindo.  Although Vogel-Baylor could no longer use CW-6 to collude with regard to products on which G&W and Fougera overlapped, she knew that CW-6 had a contact at another one of G&W's key competitors – T.P. at Defendant Perrigo.  Over the next year, Vogel-Baylor and T.P. would use CW-6 as a conduit to pass

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

information between them and reach anticompetitive agreements with regard to a number of products on which G&W and Perrigo overlapped.

2704.   This collusive relationship was critical because G&W overlapped with Perrigo on more products than any other competitor during this time period.

2705.   In May 2013, CW-6 suffered an illness and left the industry.  With CW-6 no longer available to serve as middleman, Vogel-Baylor had no choice but to collude directly with T.P. of Perrigo.  In July 2013, she placed her first calls ever to T.P. according to the available phone records.  Over the ensuing years, Vogel-Baylor and T.P. colluded on several products that are discussed in detail below.

## 2.    Halobetasol Propionate Cream and Ointment

2706.   As of June 2012, the market was split between Perrigo with 60% share and G&W with 40%.

### a.    The First Coordinated Price Increase – September 2012

2707.   On September 25, 2012, both G&W and Perrigo announced price increases for Halobetasol Cream and Ointment.  G&W's price increases took effect on September 28, 2012 and Perrigo's price increases took effect one month later on October 28, 2012.

2708.   In the days leading up to the price increases, both Vogel-Baylor of G&W and T.P. of Perrigo had numerous discussions with CW-6 of Aurobindo concerning Halobetasol. Although Aurobindo did not manufacture either form of Halobetasol, Vogel-Baylor and T.P. used CW-6 as a conduit to convey information between them about the price increases.  As discussed in detail above, CW-6 had formerly worked at Fougera and had developed relationships with Vogel-Baylor and T.P. of Perrigo during his tenure there.

2709.   For instance, on September 19, 2012, less than one week before the price increases, Vogel-Baylor exchanged three (3) text messages with CW-6.  Then, CW-6 called Vogel-Baylor, hung up, and immediately called T.P.  After speaking with T.P., CW-6 hung up and immediately called Vogel-Baylor back, relaying the information he had learned from T.P.  Indeed, within a twenty-minute period, CW-6 had exchanged at least eight calls with Vogel-Baylor and T.P.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:16:11 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 10:17:50 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:18:49 | 0:00:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:44:00 | 0:01:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:45:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:52:00 | 0:03:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:57:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 14:03:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:04:00 | 0:02:00 |

2710.   After speaking with CW-6 for the final time on September 19, 2012, Vogel-Baylor immediately called her boss, Orlofski and spoke to him for thirteen (13) minutes.  Similarly, T.P. also reported back to his boss, Wesolowski, a senior executive at Perrigo, exchanging two calls with him totaling roughly six (6) minutes.

2711.   Further, two days later, on September 21, 2012, and then again on September 27, 2012, the day before the G&W price increase went into effect, the same call pattern occurred.  These calls are detailed in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duratio |
|------|----------|-------------|-----------|--------------|------|---------|
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 6:30:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:53:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:56:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:58:00 | 0:01:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 7:04:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:06:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:53:00 | 0:15:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:02:00 | 0:04:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 4:06:00 | 0:01:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 4:11:00 | 0:03:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:16:00 | 0:03:00 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2712.   In early November 2012, a customer reached out to G&W asking it to submit a bid for Halobetasol Cream and Ointment because the customer believed its prices were inconsistent with the market.

2713.   After receiving the request, Vogel-Baylor had several calls with CW-6 who, again, served as a conduit between Vogel-Baylor and T.P. to discuss Halobetasol.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:03:00 | 0:03:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:05:00 | 0:05:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:09:00 | 0:04:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:13:00 | 0:01:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:38:00 | 0:02:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 6:41:00 | 0:01:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:42:00 | 0:03:00 |

2714.   After this call exchange, Vogel-Baylor sent the following directive to C.M., a sales executive at G&W, instructing him to submit a cover bid to the customer in order to create a false appearance of competition between G&W and Perrigo:



   b.     *The Second Coordinated Price Increase – March/April 2013*

2715.   The competitors colluded to raise the price of Halobetasol again in 2013.  This time, there were multiple channels of communication between the competitors.  For example, on March 26, 2013, Boothe of Perrigo called Orlofski of G&W directly and they spoke for seven

(7) minutes.  That same day, T.P. of Perrigo once again called CW-6. The call lasted two

(2) minutes.  Right after that call, CW-6 called Vogel-Baylor.  That call lasted one (1) minute.

2716.   The next day, on March 27, 2013, Perrigo increased its WAC pricing for

Halobetasol Cream and Ointment by over 250%.

2717.   Roughly two (2) weeks later, on April 11, 2013, G&W also increased its contract

and WAC pricing for the two formulations.  G&W's contract price was now double what it had

been just the year before.

2718.   G&W told one of its customers, Morris & Dickson, that G&W increased prices in

████████████████████████████████████  Indeed, in the days leading up to the

G&W price increase, Vogel-Baylor and T.P. had again engaged in a game of telephone with

CW-6 to coordinate their pricing actions.  After speaking with T.P. for four (4) minutes on

April 8, 2013, CW-6 immediately called Vogel-Baylor.  The call lasted one (1) minute. CW-6

then called Vogel-Baylor a short while later and they spoke for four (4) minutes.  Immediately

after that call, Vogel-Baylor called her boss, Orlofski.  The call lasted a little over one

(1) minute.

    *c. Sandoz Launches Halobetasol Cream*

2719.   In December 2013, Sandoz began preparing to re-launch Halobetasol Cream.  At

that time, G&W had 63% of the market and Perrigo had 36%.  Sandoz was targeting 20% market

share.  Because G&W was the market share leader, Sandoz wanted to ██████████████████

████████████████████████████████████

2720.   On December 11, 2013, A.S., a senior Sandoz launch executive, instructed

Sandoz employees to reach out to Rite-Aid and Walgreens to learn who their suppliers were for

Halobetasol Cream and what their pricing was.  Upon learning that both customers were with

G&W – the market share leader – Sandoz decided to target those customers.

2721.   On December 12, 2013, Walgreens reached out to G&W to advise that Sandoz

had expressed interest in its Halobetasol Cream business.  When Vogel-Baylor shared this

information with Orlofski, he remarked that G&W ████████████████████████████

████████████  Although Sandoz submitted a bid for Halobetasol on December 16, 2013,

Walgreens declined to move the business because the price was slightly higher than G&W's

price.

2722.   On December 17, 2013, another one of G&W's customers, Ahold, informed

G&W that it had received a bid from Sandoz and was now seeking a lower price from G&W.

Vogel-Baylor e-mailed Orlofski stating, ████████████████████████████████████

████████████████████████████████████████████  Orlofski responded by

asking Vogel-Baylor to call him, noting ████████████████████████  Later

that day, Rite Aid also e-mailed Vogel-Baylor stating that Sandoz had submitted a bid for

Halobetasol Cream and requested that G&W lower its price to retain the business.

2723.   Vogel-Baylor tried calling Orlofski three times on December 17, 2013.  After the

third call, Vogel-Baylor called T.P. of Perrigo and they spoke for more than seven (7) minutes.[227]

Vogel-Baylor hung up with T.P. and called Orlofski again.  Orlofski returned her call later that

day and they spoke for five (5) minutes.

2724.   After speaking with Orlofski, Vogel-Baylor e-mailed Rite-Aid stating, ████████

████████████████████████████████████████████████████████████████

---

[227] As detailed above, by this time, CW-6 had left the industry and Vogel-Baylor had begun colluding with T.P. of Perrigo directly with regard to products on which G&W and Perrigo overlapped.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████████████████ Rite-Aid accepted Sandoz's offer the next day.

2725.   At the same time that Sandoz was going after G&W's Halobetasol customers, it was also approaching some Perrigo customers as well, albeit in coordination with Perrigo.  On December 17, 2013, CW-1, a senior Sandoz pricing executive, e-mailed CW-3, a senior Sandoz sales executive, asking him to inquire whether Wal-Mart, a Perrigo customer, was interested in receiving a bid from Sandoz for Halobetasol Cream.  CW-3 happened to be meeting with Wal-Mart at that time at its offices in Bentonville, Arkansas.

2726.   Wal-Mart told CW-3 that it was interested in receiving an offer.  Thereafter, CW-3 called T.P. of Perrigo.  During that call, T.P. provided CW-3 with Perrigo's price points for Halobetasol Cream at Wal-Mart and Omnicare and agreed to give up Wal-Mart to Sandoz. CW-3 took the following contemporaneous notes in his Notebook during that call:  ██████

██████



2727.   Also on December 17, 2013, CW-3 responded to an e-mail exchange with CW-1 and Kellum regarding Halobetasol Cream, stating: ████████████████████████████ ██████████████████████████████████

2728.   Two days later, on December 19, 2013, CW-3 called T.P. again. The call lasted one (1) minute.  After hanging up, CW-3 called CW-1, and they spoke for four (4) minutes.  That same day, Sandoz sent offers to Wal-Mart and Omnicare.  The next day, on December 20, 2014, K.K., a senior Sandoz launch executive, followed up with CW-3 regarding the Wal-Mart offer.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CW-3 responded, ████████████████████████████████████████████████████

████████████████████████████████████████████

     2729.   That same day, Boothe of Perrigo called Orlofski of G&W.  The call lasted two

(2) minutes.  Orlofski returned the call a half hour later and they spoke for eleven (11) minutes.

Later that day, Orlofski called Vogel-Baylor and they spoke for more than seventeen (17)

minutes.

     2730.   On January 8, 2014, CW-3 called T.P. of Perrigo.  The call lasted one (1) minute.

Later that day, Wal-Mart accepted Sandoz's bid for Halobetasol Cream.  CW-3 forwarded the

acceptance to his supervisor, CW-1, who asked, ████████████████████████.  CW-3 replied in

two separate e-mails sent simultaneously: ████████ and ██████████████████

     2731.   The next day, on January 9, 2014, CW-1 and CW-3 agreed that ████████████████

████████████   That same day, CW-3 called T.P. and they spoke for more than fifteen (15)

minutes.

     2732.   In early February 2014, K.K. joined G&W as a Director of Sales & Marketing.[228]

Once at G&W, K.K. wasted no time using his competitor contacts at Sandoz – CW-3 and CW-4

– to coordinate regarding Halobetasol.

     2733.   On February 18, 2014, K.K. of G&W e-mailed Vogel-Baylor stating that Sandoz

had bid on Halobetasol at Walgreens again and the customer was providing G&W with an

opportunity to bid to retain the business.  Less, than an hour later, Vogel-Baylor called T.P. at

Perrigo and K.K. called CW-3 at Sandoz to coordinate a response.  The calls lasted one

---

[228] The K.K. referenced in this Complaint that joined G&W in February 2014 is a different individual than the K.K. of Sandoz identified previously in this Section.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

(1) minute and two (2) minutes, respectively.  Immediately after hanging up, K.K. sent Vogel-Baylor the following e-mail: ███████████████



2734.   After receiving the e-mail, Vogel-Baylor called K.K. He returned the call and they spoke for sixteen (16) minutes.  Immediately after hanging up with K.K., Vogel-Baylor sent a text message to T.P. of Perrigo.  Later that day, K.K. sent the following e-mail to Vogel-Baylor: ████████████



2735.   Two days later, on February 20, 2014, K.K. had still not heard back from CW-3 and so he reached out to his other contact at Sandoz, CW-4, and the competitors spoke for four (4) minutes.  Immediately after hanging up, K.K. called Vogel-Baylor and they spoke for four (4) minutes.  Later that morning, Vogel-Baylor and K.K. exchanged two (2) more calls lasting

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

thirteen (13) minutes and three (3) minutes, respectively.  Upon hanging up with Vogel-Baylor,

K.K. sent an internal e-mail, including to Vogel-Baylor, stating: ████████████████



Vogel-Baylor later responded: ████████████████████████████

2736.   A few minutes after receiving K.K.'s e-mail, Vogel-Baylor sent a text message to

T.P. of Perrigo.  A half hour later, she called T.P. and they spoke for more than seven

(7) minutes.  At around the same time, CW-3 of Sandoz called K.K. and they spoke for

(8) minutes.  Immediately after hanging up with CW-3, K.K. called Vogel-Baylor to report back

what he had learned.  That call lasted nineteen (19) minutes.

2737.   Later that afternoon, Vogel-Baylor called her supervisor, Orlofski, to apprise him

of the situation and they spoke for twenty-one (21) minutes.  Upon hanging up, Vogel-Baylor

called K.K. and they spoke for nearly twelve (12) minutes.  Immediately after talking to K.K.,

Vogel-Baylor called T.P. of Perrigo one more time that day.  The call lasted less than one

(1) minute.

2738.   That evening, after his conversation with G&W, CW-3 also sent the following

e-mail to CW-1: ████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



Within a half hour of receiving the e-mail, CW-1 called CW-3 and they spoke for twenty (20) minutes.

2739.   The next morning, on February 21, 2014, CW-3 and CW-1 spoke again for fourteen (14) minutes.  CW-3 hung up and immediately called K.K. of G&W. The call lasted one (1) minute.  Immediately after that call, K.K. called Vogel-Baylor.  The call lasted one (1) minute.  That same day, K.K. sent the following response to Walgreens:



Walgreens had accounted for over one third of G&W's total market share for Halobetasol Cream.

        *d.*    *Taro Launches Halobetasol Cream and Ointment*

2740.   In mid-March 2014, Taro was making plans to re-launch Halobetasol Cream and Ointment.  Although its launch was ultimately delayed until May 2014 due to issues relating to

748

the FDA, Aprahamian called Vogel-Baylor on March 27, 2014 and they spoke for fourteen (14) minutes.  Notably, this was the first phone call ever between these two competitors, according to the available phone records.  Four days later, on March 31, 2014, Vogel-Baylor called Aprahamian and they spoke for over five (5) minutes.

2741.   On May 13, 2014, Taro re-entered the Halobetasol Cream and Ointment markets and published WAC pricing that matched its competitors.  In the days leading up to the re-launch, all four competitors were speaking frequently by phone.  At least some of those calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/7/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:28:00 | 0:04:00 |
| 5/7/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Vogel-Baylor, Erika (G&W) | 7:57:00 | 0:14:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (G&W) | 8:23:00 | 0:05:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 8:28:00 | 0:02:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (G&W) | 8:30:00 | 0:01:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (G&W) | 8:31:00 | 0:01:00 |
| 5/8/2014 | Voice | K.K. (G&W) | Outgoing | CW-3 (Sandoz) | 8:39:00 | 0:01:00 |
| 5/9/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Wesolowski, John (Perrigo) | 7:18:00 | 0:01:00 |
| 5/9/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Wesolowski, John (Perrigo) | 7:24:00 | 0:02:00 |

2742.   After the phone calls detailed above, Aprahamian would not speak to Vogel-Baylor again until September 2015.  Similarly, the two calls between Aprahamian and Wesolowski of Perrigo are the only calls ever exchanged between the two competitors, according to the available phone records.

2743.   On May 11, 2014, Aprahamian circulated a Fact Sheet including details regarding the Halobetasol re-launch.  Taro stated ████████████████████████ ████████████████████████████████████████████████ ██████████████   The Fact Sheet detailed the following market share breakdown and set Taro's target market shall goal at 15%: ████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



2744.   On June 10, 2014, Aprahamian instructed a colleague to put together offers for Halobetasol at Publix (a G&W and Perrigo customer) and HD Smith (a Perrigo customer). Aprahamian cautioned ███████████████████████████████████████ That same day, Perfetto of Taro exchanged three (3) text messages with Orlofski of G&W.

2745.   On June 11, 2014, Vogel-Baylor called T.P. of Perrigo.  The call lasted one (1) minute.  The next day, on June 12, 2014, HD Smith informed Taro that Perrigo had proactively revised its pricing shortly after Taro submitted the bid and asked Taro to lower its bid to win the business.

2746.   On June 17, 2014, Boothe of Perrigo called a Taro employee on his office line.[229] The call lasted forty-five (45) minutes.  Later that day, A.L., a Taro pricing executive, sent an internal e-mail stating, ███████████████████████████████████ ████████████████ The next day, June 18, 2014, Perfetto called Boothe.  That call lasted two (2) minutes.

2747.   Around that same time, G&W employees were having a similar exchange over e-mail.  On June 17, 2014, K.K. sent an internal e-mail to Orlofski stating: █████████ ████████████████████████████████████████████████

---

[229] As detailed above, Taro employees do not have their own individual extensions and calls from their office lines appear in the phone records as the Taro main company number. Given the history of conduct between the two, this Taro employee was likely Perfetto.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

2748.   On June 18, 2014, Orlofski sent a text message to Perfetto and also called him. The call lasted two (2) minutes.  The next morning, on June 19, 2014, Orlofski replied to K.K.'s e-mail stating:  ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████  K.K. then sent an internal e-mail directing that G&W should cede the Publix and Morris & Dickson accounts to Taro.  As K.K. explained to his colleagues, it was ██████████████████████████████████████

2749.   On June 20, 2014, Orlofski exchanged two text messages and two calls with Perfetto, including one call lasting nearly thirty-eight (38) minutes.

2750.   At the same time, G&W was also careful not to take any steps that would throw off its market share balance with Perrigo.  For example, on June 18, 2014, HEB, a Perrigo customer, asked G&W to bid on their Halobetasol business.  K.K. responded, █████████████

████████████████████████████████████████████████████

███████████████████████████

### 3.    Prochlorperazine

*a.    Prochlorperazine Maleate Suppositories*

2751.   Since at least 2011, G&W and Perrigo have been the only generic suppliers of Prochlorperazine Suppositories.  Throughout 2011 and 2012, G&W and Perrigo priced Prochlorperazine Suppositories similarly and maintained a virtually even split of the market.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2752.   In mid-January 2013, Perrigo hired Boothe as an executive.  On January 25, 2013, Orlofski called Boothe for the first time ever, according to the available phone records.

2753.   A little over one month later, on Friday, March 1, 2013, Boothe and Orlofski met for lunch at an Italian restaurant, Al Dente Ristorante, in Piscataway, New Jersey.

2754.   The next business day, on Monday, March 4, 2013, Orlofski met with Vogel-Baylor in his office at 1:00 p.m.  Later that same day, Vogel-Baylor sent an internal e-mail to M.S., a sales analyst at G&W, asking her to run sales reports on Prochlorperazine Suppositories in anticipation of a price increase.  M.S. provided the requested information to Vogel-Baylor on March 5, 2013.

2755.   On March 7, 2013, Vogel-Baylor e-mailed Orlofski a price increase analysis for Prochlorperazine Suppositories.  Vogel-Baylor recommended increasing WAC pricing by 200% from $35.66 to $106.98.

2756.   On March 19, 2013, G&W implemented the 200% increase.  That same day, Orlofski called Boothe.  The two competitors would exchange two more phone calls later that day, including one call lasting six (6) minutes.  These were the first calls exchanged between Orlofski and Boothe since their lunch on March 1, 2013, according to the available phone records.  Orlofski and Boothe would exchange one text message and one more phone call in March 2013 and would not communicate by phone again until August 30, 2013, according to the available phone records.

2757.   On April 11, 2013, Perrigo announced it would also be increasing its WAC price for Prochlorperazine Suppositories by 200% from $34.85 to $104.55.  However, Perrigo waited to notify its customers of the specific changes to its contract pricing until after attending the NACDS 2013 annual meeting.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2758.   The NACDS 2013 annual meeting was held at the Sands Expo Convention Center in Palm Beach, Florida between April 20 and April 23, 2013.  Boothe, Orlofski, and Vogel-Baylor attended the conference and had many opportunities to meet in person to discuss the Prochlorperazine increases at various programming and social events.

2759.   For example, on Sunday, April 21, 2013, Boothe and Orlofski had dinner together.  That same evening, Boothe and Orlofski also attended a wine tasting hosted by Upsher-Smith.  Also on Sunday, Vogel-Baylor told a potential GPO customer that G&W would need to understand who its incumbent supplier was for Prochlorperazine, among other drugs, before participating in a bid for new business.

2760.   Over the next several days, Perrigo sent out price increase notices to its customers for Prochlorperazine Suppositories specifying its new contract pricing.

2761.   On May 7, 2013, Associated Pharmacies, a Perrigo customer, e-mailed C.M., a sales executive at G&W, asking for a bid on Prochlorperazine Suppositories.  C.M. declined to bid on the new business, responding:



2762.   Although G&W turned away this business, a few months later it would take the customer back in retaliation against Perrigo for taking its Target business through McKesson's One Stop program.  After trading these accounts, the competitors fell back in line with the agreement.  By the fall of 2013, the Prochlorperazine Suppositories market was again virtually evenly split between Perrigo and G&W.

b.    *Prochlorperazine Maleate Tablets*

2763.   Since at least 2011, Teva, Mylan, Sandoz, and Cadista were the principal

manufacturers of Prochloperazine Maleate Tablets.

2764.   As detailed above, in August 2014, Nisha Patel and Dave Rekenthaler of Teva led

price increases on a number of drugs, including Prochlorperazine Maleate Tablets.

2765.   In order to coordinate the price increase with Mylan, Cadista, and Sandoz,

Rekenthaler communicated with James Nesta at Mylan on August 7 and August 11.  Nesta, in

turn, communicated with M.D., a senior sales executive at Cadista, on the same days that he had

been in communication with Rekenthaler.  Rekenthaler had previously communicated with M.D.

at Cadista on June 18, 2014.

### 4.    Ciclopirox Solution

2766.   As of January 2013, Perrigo and G&W were the two dominant suppliers of

Ciclopirox Solution, with 46% and 41% share of the market, respectively.  Sandoz had 7% share

and the remaining 5% of the market was split among non-Defendants Hi-Tech, Harris

Pharmaceutical,[230] and Versapharm.

2767.   Between April 20 and April 23, 2013, representatives from Perrigo, G&W, and

Sandoz attended the NACDS 2013 Annual Meeting in Palm Beach, Florida ("NACDS 2013").

During the conference, the attendees had many opportunities to interact with each other at

various programming and social events.

2768.   Vogel-Baylor was among the attendees at NACDS 2013.  Immediately upon

returning from the conference, on April 24, 2013, Vogel-Baylor prepared a price increase

---

[230] Harris obtains its supply from G&W.

analysis for Ciclopirox Solution and e-mailed it to Orlofski and R.G., a senior G&W executive. Vogel-Baylor proposed increasing WAC pricing by 132% – from $16.00 to $37.15.  According to the analysis, the increase would result in over $7.6 million in additional sales revenue to G&W annually.  R.G. was excited at the prospect of this large price increase, replying to the e-mail:

▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

2769.   The following Monday, April 29, 2013, Vogel-Baylor coordinated on the price increase with competitors Perrigo and Sandoz.  Vogel-Baylor used CW-6 (then at Aurobindo) as a messenger to communicate with both T.P. of Perrigo and CW-3 of Sandoz.  As discussed above, Vogel-Baylor often used CW-6 as a conduit to convey competitively sensitive information to competitors – even on products that Aurobindo did not sell.

2770.   As detailed further in the chart below, Vogel-Baylor had an early morning phone call with CW-6 on April 29, 2013 that lasted four (4) minutes. After that call ended, CW-6 immediately called T.P. and then CW-3. The phone calls between CW-6 and Vogel-Baylor, T.P., and CW-3 continued throughout the day, and included at least the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:09:00 | 0:04:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 9:13:00 | 0:01:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 9:14:00 | 0:03:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:17:00 | 0:02:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 9:29:00 | 0:03:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 9:56:00 | 0:03:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:58:00 | 0:02:00 |
| 4/29/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:10:19 | 0:00:36 |
| 4/29/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 13:19:58 | 1:08:00 |

After the flurry of calls on April 29, 2013, Vogel-Baylor e-mailed J.G., an operations manager at G&W, advising him that she would know the next day whether G&W was going to be able to increase price on Ciclopirox Solution.

The phone calls between the competitors continued throughout the next day and on May 1, 2013, and included at least the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/30/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:36:00 | 0:01:00 |
| 4/30/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:38:00 | 0:03:00 |
| 4/30/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:45:00 | 0:02:00 |
| 5/1/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:13:36 | 0:00:03 |
| 5/1/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:20:00 | 0:02:00 |
| 5/1/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:22:00 | 0:01:00 |

2771.   On April 30, 2013, while speaking with CW-6, CW-3 made the following contemporaneous note in his Notebook detailing the amount of the proposed G&W price increase:



2772.   Also on April 30, 2013 CW-3 called his superior at Sandoz, Kellum, five times.

2773.   After her calls with CW-6 on May 1, 2013, Vogel-Baylor confirmed to J.G. that G&W would increase the price of Ciclopirox Solution and directed her sales team to start drafting price increase letters to customers.

2774.   On Tuesday, May 7, 2013, Vogel-Baylor and G&W sales representatives began informing customers about the price increases.  Several customers noted that although the product was available from other manufacturers for a lower price, the customer would wait to see what the market did before making G&W a secondary supplier.  Another customer thanked C.M., a G&W sales executive, for calling him about the price increase before sending the letter and C.M. responded:



FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

When the customer told C.M. he should ████████████████████ C.M. responded: ████████

████████

████████████████████████████████████████████

2775.   On May 8, 2013, Vogel-Baylor e-mailed her ██████ L.S., an account manager at the customer Ahold, to tell her that G&W was implementing a price increase on Ciclopirox Solution. Ahold was not G&W's customer for the product. Vogel-Baylor wrote that L.S. should ████████████████████ as a price increase on this product from Ahold's supplier ████████████████

2776.   By the end of the day on May 9, 2013, G&W's customer Rite Aid had sought a bid from Sandoz for Ciclopirox Solution as a result of the G&W price increase.

2777.   CW-4, a Sandoz senior sales executive, received Rite Aid's bid request and forwarded it to Kellum with the message ████.  Kellum responded that the bid request was due to a price increase.  C.P., a pricing analyst at Sandoz, asked whether Sandoz should bid for the business or ████████████████ Kellum replied, ████████████ Accordingly, Sandoz did not submit a bid for this business.

2778.   While G&W was in the midst of its price increase on Ciclopirox Solution, CW-6 left the industry and was no longer available to serve as a conduit between the competitors. Going forward, Vogel-Baylor would need to collude with T.P. directly and use him as a conduit to collude with CW-3 of Sandoz.

2779.   On July 30, 2013, T.P. had a thirteen (13) minute call with CW-3 of Sandoz and exchanged five (5) phone calls with Vogel-Baylor.  These calls are detailed in the chart below:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | Vogel-Baylor, Erika (G&W) | 3:38:00 | 0:03:00 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:19:00 | 0:01:00 |
| 7/30/2013 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 7:09:00 | 0:13:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 8:58:06 | 0:02:33 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | Vogel-Baylor, Erika (G&W) | 9:29:00 | 0:10:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 14:29:07 | 0:09:05 |

2780.   That same day, Perrigo prepared price increase letters for Ciclopirox Solution. Two days later, on August 1, 2013, Perrigo raised its WAC pricing by 60% – from $15.00 to $24.00.

2781.   On August 5, 2013, Perrigo's customer Kroger reached out to Vogel-Baylor and asked if G&W would like to bid on Ciclopirox Solution.  Vogel-Baylor declined the opportunity, explaining to the customer that it is currently a ███████████ and G&W ███████████

2782.   Later in August, Versapharm, a small player with under 1% of the Ciclopirox Solution market, submitted a bid to Cardinal, a G&W customer.  Cardinal reached out to Vogel-Baylor to ask G&W to lower its price.  Vogel-Baylor wanted to keep the business but also thought, consistent with fair share principles, that she may need to give it up to VersaPharm because of its low share.  Vogel-Baylor asked Orlofski, her supervisor, for his direction on this. Orlofski decided G&W should retain the business, but should use the customer to convey a message to its competitor VersaPharm explaining the fair share understanding and the rules of engagement between generic manufacturers: ███████████



FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2783.   Consistent with Orlofski's recommendation, Vogel-Baylor lowered Cardinal's price on Ciclopirox Solution and sent Cardinal the following e-mail: ███████



### 5.   Hydrocortisone Acetate Suppositories (Anucort HC)

2784.   During the time period relevant to this Complaint, Hydrocortisone Acetate was G&W's top-selling product.  As of January 2016, the 25mg formulation of Hydrocortisone Acetate accounted for nearly half of all of G&W's moving annual sales, totaling more than $119.7 million.  Similarly, Hydrocortisone Acetate was Perrigo's second-best selling product. During that same time period, Perrigo's moving annual sales for the 25mg and 30mg formulations accounted for approximately $78.3 million of Perrigo's total sales.

2785.   In 2013, the Hydrocortisone Acetate market was split between G&W with 41% market share, Perrigo with 32%, and County Line Pharmaceuticals ("County Line") with 25%. However, by late June 2013, County Line made the decision to exit the market for Hydrocortisone Acetate.

2786.   County Line's exit created an opportunity for Perrigo and G&W to collude to significantly raise the price of Hydrocortisone Acetate in July 2013, and then again one year later in July 2014.

2787.   On June 25, 2013, Vogel-Baylor of G&W e-mailed Wal-Mart, a County Line customer, stating that she had heard that County Line was discontinuing Hydrocortisone Acetate and asked whether Wal-Mart was interested in a new supplier.

2788.   Similarly, on June 26, 2013, ABC, also a County Line customer, e-mailed G&W requesting a bid on Hydrocortisone Acetate due to a ██████████████████ Vogel-Baylor forwarded the request to her supervisor, Orlofski, explaining: ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

2789.   Between June 27 and June 30, 2013, representatives from Perrigo and G&W, including Vogel-Baylor, attended the annual trade show, McKesson ideaShare, at the Venetian hotel in Las Vegas, Nevada.

2790.   While at the trade show, on June 27, 2013, Vogel-Baylor received a call from S.S., a sales executive at Perrigo.  The call lasted approximately one (1) minute.  A few hours later, Vogel-Baylor called Orlofski and they spoke for nearly fifteen (15) minutes.  Shortly thereafter, Vogel-Baylor sent an internal e-mail to her team notifying them that G&W would be implementing a price increase for Hydrocortisone Acetate and requesting that they draft customer notifications to that effect.  The price increase included a 200% increase to WAC and would result in an estimated $27.9 million in increased sales for G&W.

2791.   J.G., an operations manager at G&W, responded to Vogel-Baylor's e-mail stating, █████████████████████████████████████████ to which Vogel-Baylor responded: ██████████████

2792.   The next day, on June 28, 2013, Vogel-Baylor contacted Orlofski three more times from the trade show, including exchanging two (2) text messages and one call lasting more than nineteen (19) minutes.

2793.   On July 8, 2013, T.P. of Perrigo and Vogel-Baylor exchanged two (2) calls and then connected for a call lasting more than seven (7) minutes, during which they coordinated their price increases on Hydrocortisone Acetate.  After that call, both T.P. of Perrigo and Vogel-Baylor reported the substance of their conversations back to their supervisors.  Immediately upon hanging up with T.P., Vogel-Baylor called Orlofski and they spoke for more than six (6) minutes.  Similarly, T.P. called Wesolowski three (3) times after speaking with Vogel-Baylor, including two calls lasting one (1) minute and a third lasting six (6) minutes.

2794.   The G&W price increases on Hydrocortisone Acetate went into effect on July 9, 2013.  That same day, Perrigo issued a product announcement notifying its customers that it was also increasing its pricing on Hydrocortisone Acetate effective July 11, 2013.  Perrigo increased its WAC by 473% on the 25mg formulation to essentially match G&W's WAC.  That same day, July 11, 2013, T.P. of Perrigo called Vogel-Baylor.  The call lasted one (1) minute.

2795.   Also on July 11, 2013, ABC e-mailed Vogel-Baylor asking G&W to lower its dead net pricing for Hydrocortisone Acetate to match Perrigo's slightly lower dead net pricing.  Vogel-Baylor forwarded the request to Orlofski who responded: ██████████  Vogel-Baylor replied, ██████████  Later that day, Vogel-Baylor responded to ABC and declined to lower its pricing.

2796.   On July 19, 2013, Harvard Drug Group e-mailed Vogel-Baylor asking why G&W was increasing its price on Hydrocortisone Acetate.  Vogel-Baylor replied: ██████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2797.   Several months later, on April 9, 2014, K.K., a G&W sales executive, e-mailed Vogel-Baylor regarding bidding on several products at Kaiser, including Hydrocortisone Acetate.  Vogel-Baylor responded that G&W could not disrupt the market and pursue the customer, reasoning that Kaiser ████████████████████████████████

████████████████████████████████████

2798.   On June 11, 2014, Vogel-Baylor e-mailed Orlofski recommending that G&W increase McKesson's contract pricing for Hydrocortisone Acetate.  That same day, Vogel-Baylor called T.P. of Perrigo.  The call lasted less than one (1) minute.  Two days later, on June 13, 2014, Vogel-Baylor tried to reach T.P. again by phone.  The call lasted less than one (1) minute.

2799.   Less than a week later, on June 26, 2014, Perrigo generated its own internal price increase analysis for Hydrocortisone Acetate.  The analysis assumed zero percent unit loss as a result of the planned increase.

2800.   On July 22, 2014, Perrigo notified its customers that it was increasing pricing on a list of products, including Hydrocortisone Acetate.  This included a 235% increase to WAC for its 25mg formulation, effective on July 24, 2014.

2801.   At the time the increase was announced, representatives from Perrigo and G&W, including Vogel-Baylor, attended the annual trade show, McKesson ideaShare, at the Gaylord Palms Hotel in Orlando, FL.

2802.   Over the next several days, G&W heard from multiple customers that Perrigo had increased pricing on Hydrocortisone Acetate.

2803.   In accordance with their ongoing understanding to follow each other's price increases, and consistent with past practice on this product and others, G&W went to work implementing a comparable price increase of its own.

2804.   On July 29 and July 30, 2014, Vogel-Baylor and Orlofski exchanged e-mails finalizing the details of the price increase for Hydrocortisone Acetate.  The increase included an increase to WAC for the 25mg, 12 count bottle that essentially matched Perrigo pricing.

2805.   Also on July 30, 2014, Vogel-Baylor learned of pricing that Perrigo had offered to Schnucks and sent a text message to her superiors: ██████████████████████████████

████████████████████████████████████████████████████████

2806.   The next day, on July 31, 2014, A.G., a senior G&W executive, e-mailed Vogel-Baylor stating: ████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████   Vogel-Baylor responded, ██████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████

2807.   The next day, on August 1, 2014, G&W began notifying its customers of the price increase on Hydrocortisone Acetate.  Vogel-Baylor sent an internal e-mail advising the team that, ███████████████████████████████████████████████████████

████████████████████████████████████████████████████   G&W sent out a second wave of letters to additional customers on August 5, 2014.

2808.   The increase included a 200% increase to WAC for all three package sizes. According to an internal analysis, G&W projected an increase in Hydrocortisone Acetate sales from $41.3 million to $111.3 million as a result of the increase, or a total of $70 million in sales.

2809.   The two competitors continued to coordinate after the price increases. On August 11, 2014, T.P. of Perrigo called Vogel-Baylor and they spoke for more than sixteen (16)

minutes. One week later, on August 18, 2014, Vogel-Baylor called T.P. and they spoke for more than ten (10) minutes.

2810.   Several customers did not react kindly to the increase. For example, when Vogel-Baylor e-mailed Econdisc to notify the customer of the price increase, Econdisc responded by stating that G&W's conduct was ███████████████████████ Similarly, after learning of the increase, Schnucks sent the following e-mail to Vogel-Baylor: ███████████████



## T.     Collusion Between G&W And Actavis

2811.   Vogel-Baylor met Rick Rogerson, a senior pricing executive at Defendant Actavis, while attending the NACDS Pharmacy and Technology Conference in Denver, Colorado, from August 25 to August 28, 2012.

2812.   After returning from the NACDS conference, Rogerson sent Vogel-Baylor an e-mail on August 30, 2012, stating: ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████

2813.   Later that same day, on August 30, 2012, Vogel-Baylor called Rogerson and they spoke for seventeen (17) minutes.  Over the ensuing months, the two competitors stayed in regular contact and colluded to raise prices on Promethazine HCL Suppositories twice – once in late 2012 and again in 2013.  The collusion on this product is discussed in detail below.

## 1.     Promethazine HCL Suppositories

2814.   In late 2012 and early 2013, the competitors in the market for Promethazine HCL were Actavis, Perrigo, and G&W.

2815.   Starting in late August 2012 – around the same time that Vogel-Baylor first met Rogerson at Actavis – G&W began planning a price increase for Promethazine HCL.  Prior to implementing that increase, and as it had done on other products, G&W reached out to its competitors to coordinate plans.

2816.   On September 18, 2012, Vogel-Baylor sent an internal e-mail to M.S., a sales analyst at G&W, asking her to prepare a spreadsheet containing Promethazine sales data for the price increase.  That same day, Vogel-Baylor also responded to a request from her boss, Orlofski, asking who the incumbent manufacturers were for the major wholesalers.  Vogel-Baylor stated that G&W was the incumbent at ABC and Cardinal and Actavis supplied

McKesson.  The next day, on September 19, 2012, Orlofski replied: ███████████

███████████████████████

2817.   Meanwhile, Vogel-Baylor was actively communicating with Rogerson of Actavis regarding the increases.  Indeed, on September 18, 2012 alone, Vogel-Baylor exchanged thirty-four (34) text messages with Rogerson.

2818.   Similarly, on September 19, 2012, Vogel-Baylor used her contact at Aurobindo, CW-6, as a conduit to communicate with T.P. of Perrigo, the other competitor on Promethazine HCL.  This call pattern is detailed in the chart below.  Notably, these are the same calls that Vogel-Baylor used to convey information regarding the price increase on Halobetasol, another product on which Perrigo and G&W overlapped, which was happening at the same time.  The collusion on Halobetasol is discussed in detail in an earlier Section.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:16:11 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 10:17:50 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:18:49 | 0:00:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:44:00 | 0:01:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:45:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:52:00 | 0:03:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:57:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 14:03:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:04:00 | 0:02:00 |

2819.   After speaking with CW-6 for the final time on September 19, 2012, Vogel-Baylor immediately called her boss, Orlofski, and spoke to him for thirteen (13) minutes.

2820.   While Vogel-Baylor was communicating with T.P. of Perrigo through her contact CW-6, T.P. was also communicating directly with M.D., a sales executive at Actavis, and reporting that information back to his superior, Wesolowski.  This call pattern, including the calls between T.P. and CW-6, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:38:00 | 0:11:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Aurobindo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Aurobindo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 13:58:00 | 0:02:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 13:59:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Aurobindo) | 13:02:00 | 0:02:00 |

2821.   Over the next week, G&W worked to finalize its price increase for Promethazine HCL.  On September 21, 2012, Vogel-Baylor forwarded her initial price increase analysis to Orlofski and scheduled a one-on-one meeting to discuss it on September 24, 2012.  Two days later, on September 26, 2012, Vogel-Baylor e-mailed a revised price increase analysis to Orlofski and, after obtaining his approval, e-mailed that analysis to the team on September 28, 2012.  In her e-mail, Vogel-Baylor informed the team that they were to send out their price increase notices to customers on October 5, 2013.

2822.   Throughout this time period, Vogel-Baylor stayed in constant communication with Rogerson at Actavis.  For example, between September 25, 2012 and October 5, 2012 – the day the price increase notices were sent – Vogel-Baylor exchanged thirty-eight (38) text messages with Rogerson.  Similarly, Vogel-Baylor continued to keep T.P. of Perrigo informed of G&W 's plans through her conduit CW-6.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 6:30:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:53:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:56:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:58:00 | 0:01:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 7:04:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:06:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:53:00 | 0:15:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:02:00 | 0:04:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 4:06:00 | 0:01:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 4:11:00 | 0:03:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:16:00 | 0:03:00 |
| 10/5/2012 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 5:30:01 | 0:01:41 |
| 10/5/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 5:38:00 | 0:02:00 |
| 10/5/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 5:39:00 | 0:06:00 |

767

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2823.   On October 8, 2012, G&W published increased WAC pricing for Promethazine HCL, which included an 18% increase on the 25mg dosage and a 35% increase on the 12.5mg dosage.

2824.   Perrigo followed suit on December 4, 2012, when it notified customers that it would be increasing contract pricing on Promethazine HCL effective January 5, 2013.  Similarly, on February 12, 2013 and April 3, 2013, Actavis also followed and increased its WAC pricing to match G&W on the 12.5mg and 25mg dosages, respectively.  On February 12, 2013, Rogerson called Vogel-Baylor and they spoke for nearly twenty-two (22) minutes.

2825.   The competitors were not satisfied to stop there, however.  Knowing now that all three competitors were on board to increase prices, they began contemplating a second increase on Promethazine HCL – and this time, it would be much larger.

2826.   On March 25, 2013, M.S., a sales analyst at G&W, forwarded Vogel-Baylor updated sales data for Promethazine HCL.  That same day, Orlofski of G&W sent a text message to Boothe, an executive at Perrigo. The next day, on March 26, 2013, Boothe called Orlofski back and they spoke for six (6) minutes.  Similarly, Vogel-Baylor continued to communicate with T.P. of Perrigo through her conduit, CW-6, about Promethazine HCL.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/26/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:59:51 | 0:00:15 |
| 3/26/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 13:21:57 | 0:06:46 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:28:00 | 0:01:00 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 17:33:00 | 0:02:00 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:36:00 | 0:01:00 |
| 3/27/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 20:04:10 | 0:00:00 |
| 3/27/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 20:05:10 | 0:01:37 |
| 3/28/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 18:19:55 | 0:00:03 |
| 3/28/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 18:41:00 | 0:05:00 |
| 3/28/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 18:46:00 | 0:01:00 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2827.   On March 28, 2013, the same day as the last calls listed above, Vogel-Baylor finalized a price increase analysis for Promethazine HCL and, on April 1, 2013, she forwarded that information to Orlofski.  Vogel-Baylor and Orlofski discussed some revisions to the analysis and, on April 10, 2013, Vogel-Baylor sent the revised analysis to Orlofski.  G&W planned to implement the price increase on April 15, 2013, but ultimately sent the notices on April 16, 2013.

2828.   Meanwhile, all three competitors continued to coordinate their plans on Promethazine HCL. Vogel-Baylor of G&W was speaking with Rogerson at Actavis, while T.P. at Perrigo was speaking to M.D. at Actavis.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/1/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 15:11:49 | 0:00:26 |
| 4/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:51:41 | 0:00:00 |
| 4/4/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:55:41 | 0:01:30 |
| 4/4/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 17:33:07 | 0:00:00 |
| 4/4/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 19:32:16 | 0:00:00 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:51:47 | 0:08:15 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:51:47 | 0:08:15 |
| 4/11/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 7:35:00 | 0:01:00 |
| 4/12/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:12:00 | 0:25:00 |

2829.   At the same time, Vogel-Baylor continued to use CW-6 as a conduit to communicate with T.P. of Perrigo regarding Promethazine HCL.  This call pattern is detailed in the chart below:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/4/2013 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:37:55 | 0:07:00 |
| 4/5/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:25:00 | 0:01:00 |
| 4/5/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 13:30:28 | 0:00:00 |
| 4/5/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 13:36:07 | 0:00:00 |
| 4/5/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 16:44:00 | 0:01:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 11:59:40 | 0:00:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:00:00 | 0:04:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:03:00 | 0:01:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:18:02 | 0:00:03 |
| 4/8/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:23:18 | 0:00:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:36:24 | 0:00:03 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:53:00 | 0:04:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:26:00 | 0:02:00 |
| 4/9/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 11:08:00 | 0:04:00 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 13:50:56 | 0:00:29 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:00:00 | 0:06:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 14:09:00 | 0:01:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 16:52:00 | 0:06:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 16:59:00 | 0:01:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 17:05:00 | 0:02:00 |

2830.   According to the plan, on April 17, 2013 G&W published new WAC pricing for Promethazine HCL, increasing WAC from $38.99 to $116.97 – an approximately 200% increase.

2831.   Around the time of the increase, G&W received an e-mail from a potential new customer seeking pricing on a list of products, including Promethazine HCL.  M.S. forwarded the request to Vogel-Baylor who responded, ██████████████████████████

███████████████████████████████████████████████████

████████████████████████████

2832.   A few weeks later, Actavis followed G&W's price increase on Promethazine HCL and, on June 5, 2013, published WAC pricing that matched G&W.  Prior to increasing its price, and as it had now done several times before, Actavis spoke with both G&W and Perrigo. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/29/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 9:09:00 | 0:01:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 12:12:00 | 0:02:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 12:14:00 | 0:05:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 12:19:00 | 0:02:00 |
| 5/31/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 4:04:00 | 0:09:00 |
| 5/31/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 8:38:00 | 0:07:00 |
| 6/3/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 12:00:52 | 0:14:17 |
| 6/4/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 11:10:30 | 0:12:16 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2833.   On June 26, 2013, Vogel-Baylor e-mailed Orlofski to advise him that G&W had received Cardinal's 2013 RFP.  Vogel-Baylor explained, ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████   The next day, Vogel-Baylor received a short phone call from S.S., a sales executive at Perrigo.  Several hours later, Vogel-Baylor placed a phone call to Orlofski.

2834.   G&W had no reason to fear because a few weeks later, on July 30, 2013, Perrigo notified its customers that it was increasing price on a list of products, including Promethazine HCL, with an effective date of August 1, 2013.  This included an increase to its WAC pricing that matched G&W and Actavis. In the days leading up to Perrigo's price increase, the three competitors again spoke several times by phone.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 7/29/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 0:01:11 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | Vogel-Baylor, Erika (G&W) | 0:03:00 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Outgoing | Vogel-Baylor, Erika (G&W) | 0:01:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 0:02:33 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | T.P. (Perrigo) | 0:00:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 0:09:06 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 0:21:00 |

2835.   Several months later, the collusion continued on Promethazine HCL.  On March 5, 2014, K.K., a G&W sales executive, informed Vogel-Baylor that Walgreens had received an offer from Actavis for a one time buy on the 25mg dosage at a significantly discounted price of $42.08.  G&W would later learn that Actavis had made the offer because it had an excess of short-dated inventory on the 25mg dosage.  This information stunned Vogel-Baylor, who asked, ████████████████████████████

2836.   Despite her initial surprise, Vogel-Baylor confidently reported to Orlofski: ███

████████████████████████████████████████████████████████████████████████████

███████   To make good on her promise, Vogel-Baylor placed a call to Rogerson fifteen (15)

minutes later.  The two competitors continued to trade phone calls over the next several days,

including a call on March 6, 2014 that lasted eleven (11) minutes.

2837.   Apparently, Vogel-Baylor's communications with Rogerson did yield a solution

to her problem.  On March 18, 2014, she e-mailed Walgreens to advise the customer that G&W

lowered its price on Promethazine HCL.  Aware that the details of her interactions with

Rogerson would be incriminating if reduced to writing, Vogel-Baylor offered only a vague

statement to the customer: ███████████████████████████████████████

2838.   Over the next several months, G&W would continue to decline to bid on new

opportunities for Promethazine HCL so as not to upset the market share balance it had achieved

with its competitors.

2839.   For example, on May 5, 2014, L.C., a sales executive at G&W, summed up

G&W's commitment to playing nice in the sandbox when she told a customer, PBA Health, that

she wanted to identify opportunities for Promethazine HCL (and other drugs) only if she could

do so ██████████████████████   Similarly, on May 30, 2014, Vogel-Baylor

instructed M.S. not to bid on the Promethazine HCL business at another customer, IPC, because

█████████████████████████████████████████████████   Further, on

August 8, 2014, Vogel-Baylor told K.K. that prior to bidding on Promethazine HCL at Humana,

G&W would need to know who the incumbent was and whether there was a right of first refusal

reasoning it was ████████████████████████████████

2840.   Lastly, on August 25, 2014, McKesson – an Actavis customer – e-mailed K.K. asking if G&W would like to bid on Promethazine HCL. K.K. knew that G&W would not bid, but in an effort to get the story straight, asked Vogel-Baylor if he should provide the pre-textual justification that G&W was at capacity.  Vogel-Baylor approved that messaging in a response on August 28, 2014 stating: ███████████████████████████████████

████████████████████████

### U.      Collusion Between G&W And Glenmark

2841.   As detailed above in an earlier Section, Vogel-Baylor of G&W had a long-standing relationship with CW-5, a senior executive at Defendant Glenmark, and the competitors used that relationship to fix prices on Ciclopirox Cream in April 2012.

2842.   One year later, on May 16, 2013, Glenmark increased pricing on at least eighteen (18) different products, including Ciclopirox Cream and various formulations of Mometasone Furoate that were also manufactured by G&W.[231]  The anticompetitive conduct relating to those products is discussed in further detail below.

#### 1.      Ciclopirox Cream and Mometasone Furoate

2843.   As of May 2013, the primary competitors for Ciclopirox Cream were Glenmark with 44% market share, Perrigo with 38%, and G&W with 16%.

---

[231] Notably, while Glenmark was colluding with G&W on these products, CW-5 and his colleagues were also colluding with competitors on other products on its price increase list.  For example, several of the products – Moexipril HCL Tablets, Moexipril HCL/HCTZ Tablets, Nabumetone Tablets, Pravastatin Sodium Tablets, and Ranitidine Tablets – overlapped with Teva.  Nisha Patel, a Teva sales executive, colluded with CW-5 and J.C., a sales executive at Glenmark, to significantly raise prices on those products.  Similarly, Glenmark's list included Alclometasone Dipropionate Cream – a product that Glenmark overlapped on with Taro that is discussed earlier in this Complaint.  As discussed above, Blashinsky, a sales executive at Glenmark, colluded with Aprahamian and D.S., a sales executive at Taro, to raise prices on that product.

2844.   As of May 2013, the same three competitors – Glenmark, Perrigo, and G&W – controlled a majority of the market share on the various formulations of Mometasone.

2845.   Beginning as early as May 2, 2013, Glenmark began communicating with its competitors, including G&W, to coordinate its May 2013 price increases.  Over the next several weeks, CW-5 and Jim Brown, a senior sales executive at Glenmark, had multiple calls with Vogel-Baylor of G&W during which they discussed and agreed to increase prices on Ciclopirox Cream and the various formulations of Mometasone.  Notably, prior to these calls, Vogel-Baylor had never spoken to Brown before, according to the available phone records.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/2/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-5 (Glenmark) | 18:10:31 | 0:00:33 |
| 5/6/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-5 (Glenmark) | 9:00:46 | 0:00:00 |
| 5/6/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 9:00:48 | 0:00:51 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 13:57:00 | 0:00:00 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 15:27:37 | 0:02:50 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:01:30 | 0:00:00 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:05:56 | 0:03:42 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:27:03 | 0:00:55 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 17:32:13 | 0:00:00 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 17:32:14 | 0:00:00 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 18:26:47 | 0:00:00 |
| 5/14/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 11:18:55 | 0:00:40 |
| 5/15/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:04:27 | 0:00:14 |
| 5/15/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:05:28 | 0:05:07 |
| 5/16/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:12:12 | 0:06:33 |

2846.   Similarly, Vogel-Baylor, as she had done in the past, used her contact, CW-6 – then at Aurobindo – to communicate with T.P. of Perrigo regarding the increases.  As discussed above, CW-6 had formerly worked at Fougera and developed relationships with Vogel-Baylor and T.P. of Perrigo during his tenure there.  At this time, G&W and Aurobindo had no products that overlapped and CW-6 and Vogel-Baylor were not social friends.  These communications are detailed in the chart below:

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:43:12 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:45:35 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:47:58 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:50:22 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:52:45 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:55:08 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:05:32 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:18:21 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:20:44 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:23:08 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:25:31 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:27:54 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:30:19 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:40:42 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:50:48 | 0:00:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:47:00 | 0:01:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:48:00 | 0:02:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:50:00 | 0:01:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 13:02:00 | 0:07:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:09:00 | 0:06:00 |

2847.   As a result of these conversations, Glenmark increased prices on Ciclopirox Cream and Mometasone Cream, Ointment, and Solution on May 16, 2013.  Soon thereafter, G&W would follow with comparable increases of its own on Ciclopirox Cream and the various formulations of Mometasone and Perrigo would follow with an increase on Ciclopirox Cream.

2848.   Over the next several weeks, G&W consistently declined opportunities to reduce pricing on the various formulations of Mometasone so as not to take advantage of the Glenmark price increases.

2849.   For example, on May 15, 2013 – the day before the Glenmark price increases would become effective and publicly visible – C.M., a G&W sales executive, e-mailed Vogel-Baylor to inform her that ANDA was requesting decreased pricing on several products because the prices were higher than their competitors.  The list included Mometasone Solution and listed Glenmark's pre-increase pricing for Cardinal as the comparison price point.  Knowing that Glenmark was increasing pricing on this product, Vogel-Baylor advised C.M. that G&W would not lower its pricing.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2850.   Similarly, on May 17, 2013, the day after the Glenmark increases became effective, McKesson sent G&W a request for a bid on Mometasone Ointment because it ████████████████████████████████████████████ Vogel-Baylor asked the customer who its incumbent was, and McKesson responded that it was Glenmark. Immediately upon receiving this response, Vogel-Baylor called CW-5 of Glenmark.  The call lasted less than one (1) minute. She then hung up and called Brown of Glenmark.  That call lasted less than one (1) minute. Fifteen minutes later, Brown called Vogel-Baylor back and they spoke for twelve (12) minutes. Later that day, Vogel-Baylor responded to McKesson and declined the opportunity, stating ███████████████████████████████████████████████████████████████████████

2851.   The next business day, on May 20, 2013, C.M. e-mailed Vogel-Baylor asking, █████████████████████████████████████████████████████ ██████████████████████████████████████ Vogel-Baylor responded by sending the following e-mail to C.M. and others on the sales team: ███████████████

████████████████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2852.   Later that day, ANDA e-mailed C.M. asking if G&W was interested in bidding on Ciclopirox Cream.  Because G&W had slightly less than its fair share of the Ciclopirox Cream market, C.M. responded: ███████████████████████████████████  ANDA provided the usage information and, the next day, on May 22, 2013, C.M. forwarded the request to Vogel-Baylor, along with some additional bid requests it had received from other customers on other products.  With regard to Ciclopirox Cream, C.M. stated: ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████  Vogel-Baylor responded: ███████████████████████████████████ ████████████████████████████████████████ █████████

2853.   On May 23, 2013, Vogel-Baylor e-mailed price increase analyses for Ciclopirox Cream and the Mometasone line to her supervisor, Orlofski.  The next day, May 24, 2013, Vogel-Baylor called CW-5 at Glenmark twice.  The calls lasted less than one (1) minute each.

2854.   On May 29, 2013, Vogel-Baylor exchanged five (5) calls with CW-5 and Brown of Glenmark. That same day, G&W finalized its price increase notifications for Ciclopirox Cream to send to its customers, including Publix and Wal-Mart.  Vogel-Baylor sent an internal e-mail to the team stating: ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2855.   Also on May 29, 2013, Target e-mailed C.M. of G&W stating that the customer had received a 250% price increase on another drug, Halobetasol, and asking whether C.M. could provide any insight into why.  C.M. responded, ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

2856.   On May 30 and May 31, 2013, Brown called Vogel-Baylor twice.  The calls lasted four (4) minutes and less than one (1) minute, respectively.

2857.   On June 4, 2013, G&W sent price increase notifications to its customers regarding the various Mometasone formulations.  That same day, Vogel-Baylor called Brown.  The call lasted less than one (1) minute.

2858.   On June 5, 2013, Pharmacy Select e-mailed C.M. regarding the notification and asked him to provide new WAC pricing for the Mometasone line of products.  C.M. forwarded the request to Vogel-Baylor asking, ██████████████████████ Vogel-Baylor responded, ██████████████████████████████████

2859.   G&W and Glenmark continued to coordinate even after their price increases.  For example, on June 5, 2013, Rite Aid, a G&W customer for Mometasone, asked Glenmark whether it wanted to bid for the business because G&W had increased price.  The next day, on June 6, 2013, Brown of Glenmark called Vogel-Baylor and they spoke for six (6) minutes.  On June 7, 2013, Vogel-Baylor called Brown back.  The call lasted less than one (1) minute.  That same day, CW-5 e-mailed his colleagues Brown and Blashinsky regarding the Rite Aid opportunity stating ██████████████████████ Brown responded: ████████████████

████████████████

2860.   After preparing the bid for Rite Aid, Brown e-mailed CW-5 and Blashinsky on Saturday, June 8, 2013 stating: ████████████████████████████████████  The following Monday, on June 10, 2013, Brown called Vogel-Baylor.  Vogel-Baylor returned the call and they spoke for more than six (6) minutes.  Within ten (10) minutes of hanging up, and having confirmed the pricing with his competitor, Brown e-mailed his colleagues with specific price points that Glenmark should use to bid high and not take the Rite Aid business from G&W.

## V.    Collusion Between G&W And Lupin

2861.   Orlofski of G&W had a long-standing relationship with David Berthold, a senior sales executive at Defendant Lupin.  Indeed, as detailed above, it was Berthold who introduced Orlofski and Vogel-Baylor to CW-6 of Fougera.  This connection allowed G&W and Fougera to continue their collusive relationship even after CW-6's contact, Grauso, had left G&W to take a senior position at Aurobindo.

2862.   Notably, G&W and Lupin only overlapped on one product – Ethambutol HCL Tablets – during the time period relevant to this Complaint.  However, that did not stop the competitors from using their relationship to collude on that product.  This collusion is discussed in further detail below.

### 1.    Ethambutol HCL Tablets

2863.   In 2012, G&W marketed the authorized generic of Ethambutol for the manufacturer, STI Pharma ("STI"), and Lupin, VersaPharm, and Teva sold the generic version.

2864.   By late 2012 and early 2013, however, both VersaPharm and Teva were experiencing supply issues on Ethambutol.  Viewing this as an opportunity, Lupin and G&W colluded to significantly raise price on the product while their competitors were out of the market.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2865.   In November and December 2012, Orlofski and Vogel-Baylor of G&W exchanged several calls with David Berthold of Lupin to discuss Ethambutol.  At the same time, Berthold was keeping Kevin Green, a sales executive at Teva, apprised of his discussions with G&W.

2866.   For example, on November 15, 2012, Orlofski exchanged at least eight (8) text messages with Berthold.  The next day, on November 16, 2012, Orlofski and Berthold spoke for nearly twelve (12) minutes.  Shortly thereafter, Berthold spoke three separate times with Green, with the calls lasting five (5) minutes, ten (10) minutes, and five (5) minutes, respectively.

2867.   That same day, G&W reached out to several VersaPharm customers, including Econdisc, HealthTrust, and FW Kerr, to inquire whether they were interested in a new supplier for Ethambutol due to VersaPharm's supply issues.

2868.   Over the next month, Berthold would continue to exchange numerous calls and text messages with Vogel-Baylor and Orlofski during which they discussed a coordinated price increase on Ethambutol.  These communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/18/2012 | Text | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 18:48:29 | 0:00:00 |
| 11/18/2012 | Text | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 18:48:33 | 0:00:00 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 12:55:26 | 0:00:03 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:24:13 | 0:07:55 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:31:57 | 0:00:03 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:57:55 | 0:03:11 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:30:34 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:30:36 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:04 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:08 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:15 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:19 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 20:30:46 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 20:30:48 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 14:54:28 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 14:54:33 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:01:44 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:01:45 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:05:03 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:05:08 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:21:48 | 0:00:00 |
| 12/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:22:36 | 0:00:03 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:57:26 | 0:00:00 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2869.   On December 9, 2012, the day after the final call listed above, J.G., a finance executive at Lupin, e-mailed Berthold at 3:41 p.m. stating: ████████████████████

████████████████████████████████████████████████████████████

████████   Three minutes later, at 3:44 p.m., Berthold called Orlofski. The call lasted less than one (1) minute.  The next day, on December 11, 2012, Berthold called Vogel-Baylor and they spoke for nearly six (6) minutes.  A short time later, Orlofski sent a text message to Berthold and the two competitors exchanged two (2) more calls that day, including one lasting nearly six (6) minutes.

2870.   On December 17, 2012, K.W., a Lupin sales executive, sent an internal e-mail including to Berthold, attaching the price increase letters for Ethambutol that Lupin planned to send on December 18, 2012.  Between December 17, 2012 and December 19, 2012, Berthold again exchanged several calls and text messages with Orlofski and Vogel-Baylor.  These are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/17/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:32:53 | 0:00:14 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 21:48:43 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 21:51:13 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 21:54:44 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 21:54:48 | 0:00:00 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 8:19:40 | 0:00:02 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:54:06 | 0:00:25 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 11:56:05 | 0:00:58 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:12:46 | 0:00:02 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 15:13:09 | 0:00:07 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:56:16 | 0:13:10 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 16:56:44 | 0:04:12 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:06:52 | 0:04:52 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:25:24 | 0:00:02 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:30:08 | 0:04:19 |

2871.   On January 2, 2013, Orlofski e-mailed Vogel-Baylor suggesting that they discuss the Ethambutol price increase during their meeting scheduled for the next day.  That same day,

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Vogel-Baylor called Berthold and they spoke for eleven (11) minutes.  Later that evening, Vogel-Baylor e-mailed Orlofski a price increase analysis for Ethambutol.

2872.   The next day, January 3, 2013, a customer, HEB, e-mailed C.M., a sales executive at G&W, to advise him that VersaPharm was out of the market.  C.M. responded that he was aware and stated: ████████████████████████████████ That same day, Vogel-Baylor exchanged at least four (4) calls with Berthold, including one lasting more than four (4) minutes.

2873.   On January 14, 2013, another customer, Morris & Dickson, e-mailed Lupin asking for a bid on Ethambutol.  The customer explained that both VersaPharm and Teva were having supply issues.  That same day, Orlofski sent a text message to Berthold.  Berthold also called Green of Teva and they spoke for nine (9) minutes.

2874.   On January 28, 2013, the manufacturer of G&W's authorized generic, STI, e-mailed Vogel-Baylor to inform her that it would be shipping Ethambutol to G&W the following day stating: ████████████████████████ Vogel-Baylor then forwarded the e-mail to Orlofski as an ████████ Later that day, Vogel-Baylor sent her Ethambutol price increase analysis to the sales team and asked them to draft letters to their customers advising them of the increases.  The next day, on January 29, 2014, Orlofski sent a text message to Berthold and Berthold spoke two times with Green of Teva by phone, with calls lasting three (3) minutes and more than five (5) minutes, respectively.

2875.   On January 31, 2013, Vogel-Baylor called Berthold and they spoke for three (3) minutes.  The next day, on February 1, 2013, Vogel-Baylor called Berthold again. Berthold returned the call and they spoke for five (5) minutes.  The following Monday, on February 4, 2013, Vogel-Baylor e-mailed Orlofski to inform him that G&W planned to send the Ethambutol

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

price increase letters on February 7, 2013 and would call customers in advance to advise that they would be coming.

2876.   Consistent with the plan, on February 6, 2013, G&W reached out to its customers to advise them of the Ethambutol increases.  As Vogel-Baylor explained in her e-mail to Wal-Mart: ████████████████████████████████████████

████████████████████████████████████████

███████████████

2877.   Berthold continued to communicate with Orlofski and Vogel-Baylor over the next several weeks.  For example, on February 19, 2013, Vogel-Baylor and Berthold had a joint dinner with representatives from two customers – ABC and Kroger.

2878.   On April 1, 2013, STI began notifying customers that it was terminating its relationship with G&W regarding Ethambutol.  STI advised that it would be taking over the marketing and distribution of the product effective April 15, 2013.  Between April 2, 2013 and April 15, 2013, Berthold exchanged several calls with Orlofski and Vogel-Baylor.  The calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 10:38:29 | 0:00:03 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 10:38:57 | 0:03:49 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:48:27 | 0:00:07 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 17:09:30 | 0:04:19 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 17:09:30 | 0:04:18 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 20:47:56 | 0:00:04 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:04:58 | 0:03:24 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:24:05 | 0:00:08 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:24:29 | 0:02:27 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:33:02 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:35:51 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:48:32 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:49:08 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:49:40 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:50:02 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:50:42 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:51:24 | 0:00:00 |
| 4/15/2013 | Text | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 21:37:55 | 0:00:00 |
| 4/15/2013 | Text | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 21:38:21 | 0:00:00 |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2879.   Notably, after April 15, 2013, the date of the last two text messages listed above, Berthold and Vogel-Baylor would *never* communicate by phone again, according to the phone records available to the Plaintiff States.

**W.    The Defendants' Profitability Increases Dramatically As A Result Of Collusive Conduct**

2880.   As discussed more fully above, between 2009 and early 2016, the Defendants colluded to allocate markets and raise prices on at least 80 different generic drugs.  The impact of this anticompetitive conduct on the Defendants' profitability was dramatic.

**1.    Defendant Taro And Defendant Perrigo's Profits Increased Over 1300% From 2008 To Early 2016**

2881.   Both Taro and Perrigo's Prescription (Rx) Pharmaceuticals segment saw profits increase over 1300% between 2008 and early 2016.  Taro often led price increases and Perrigo's Prescription (Rx) Pharmaceuticals segment reported revenues and profits for generic dermatology drugs disaggregated from other operations.  Accordingly, the profits of these two companies are instructive in showing the dramatic profits the Defendants made from their collusive conduct.

*a.    Defendant Taro*

2882.   By early 2016, Taro's operating income was 1303%, or more than thirteen (13) times, higher than it was in 2008.  Similarly, in 2016, Taro's net income was 1673%, or more than sixteen (16) times higher than it was in 2008.  Indeed, in 2016, Taro's net sales revenue reached nearly $1 billion, which was $600 million more than it made in 2008.

2883.   The graph below shows Taro's consistent financial growth from 2008 through early 2016 and highlights how the timing dovetails with Taro's price increases on products at issue in this Complaint.



2884.   As depicted above, as Taro increased prices, its profits increased.  Indeed, consistent with the allegations in the Complaint, Taro's profits grew steadily from 2010 through 2011, during the early days of collusion, and then increased exponentially from late 2012 through 2015 when price increases intensified across the industry.

2885.   In SEC filings, Taro repeatedly attributed its increases in sales revenue and gross profits to price adjustments.  For example, in its 2011 annual filing, Taro stated that its revenues and gross profits increased in the United States "primarily due to price increases on select products."  Similarly, in its 2013 annual filing, Taro stated that approximately $27 million of its increased sales in the first quarter of 2012 "resulted from price increases on seven dermatological topical products."

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

b.     *Defendant Perrigo*

2886.   Perrigo's profits also grew significantly as a result of its collusive conduct.  As noted above, this analysis focuses on the profits of Perrigo's Prescription (Rx) Pharmaceuticals segment, which covers its U.S. generic drug sales, with a strong focus on extended topicals.

2887.   In its fiscal year 2015, Perrigo's Prescription (Rx) Pharmaceuticals segment's operating income was 1648%, or over sixteen (16) times, higher than it was in 2008.  The segment's net sales revenue was just over $1 billion in 2015, which was over $800 million more than it made in 2008.

2888.   Perrigo's Prescription (Rx) Pharmaceuticals segment was the growth driver for Perrigo during this time period.  Perrigo's other operations grew much slower by comparison. While the segment's operating income grew 1648%, Perrigo's operating income for all its operations when combined grew only 278%.  Similarly, while the segment's net sales revenue grew 521%, Perrigo's net sales revenue for all its operations when combined was only 153%.

2889.   The graph below shows Perrigo's consistent financial growth from 2008 through 2015 and highlights how the timing dovetails with Perrigo's price increases on products at issue in this Complaint.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



[1] As discussed in earlier Sections of this Complaint, on July 24, 2014 Perrigo increased its prices on Econazole Nitrate Cream, Hydrocortisone Acetate Suppositories, and Hydrocortisone Valerate Cream.
[2] As discussed in earlier Sections of this Complaint, on August 1, 2013 Perrigo increased it prices on Ciclopirox Solution, Hydrocortisone Valerate Cream, and Promethazine HCL Tablets.

2890.   As depicted above, as Perrigo increased prices, the company profited handsomely. Further, and consistent with Taro's financial picture, Perrigo's profits from generic drug sales grew steadily during the early days of collusion, between 2010 and 2011, and then accelerated around 2012 when the industry began to focus more intensely on price increases.

> c.   *Other Defendants' Revenues And Profits Also Multiply From 2008 To Early 2016*

2891.   The other Defendants also profited from their collusive conduct.  For example, G&W and Actavis's revenues multiplied as their focus on price increases intensified.  G&W's sales tripled from 2011 to 2014, increasing by over 30% each year during that period.  In 2014, G&W's revenue from sales, at over $290 million, broke $200 million for the first time ever.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2892.   Similarly, Actavis's global generics business saw its revenues grow between 2008 and 2013 from just over $1.4 billion to approximately $6.35 billion.  Over that same time period, the company's profits from its generics business also grew from $416 million in 2008 to nearly $2 billion in 2013.

2893.   Defendants Fougera and Sandoz also profited from their collusive conduct.  In 2010 and 2011, during the early days of collusion, and prior to its acquisition by Sandoz, Fougera had gross profits of approximately $217 million and $304 million, respectively. Similarly, in 2010, Sandoz had over $1 billion of operating income and, in 2011, the company reported the highest operating income in its history at that time, just over $1.4 billion.

2894.   After acquiring Fougera, Sandoz's sales in the United States rose steadily each year from 2012, which had sales of over $2.7 billion, through 2016, when sales reached $3.7 billion.  Sandoz's operating income continued to exceed $1 billion each year during this period and, following years of collusive activity, in 2016 Sandoz's operating income exceeded the 2011 record and reached approximately $1.45 billion, the highest in Sandoz's history to date.

2895.   Sandoz executives wrote about the significant positive impact that the Fougera business had on Sandoz's profits.  For example, Sandoz noted in internal documents that █ ██████████████████████████████ was a driver of US sales growth in 2013, in October 2014 the Fougera team ███████████████████████ and in 2015 ███████████████ ████████████████████████

## XII.   OTHER DRUGS

2896.   Upon information and belief, Defendants also colluded to fix, increase, stabilize, or maintain prices, allocate customers and markets, and rig bids for numerous other drugs, including those listed below.  Defendants did so pursuant to the same "fair share" understanding

that governed their agreements to fix, increase, stabilize, or maintain prices, allocate customers and markets, and rig bids for the drugs enumerated in the preceding paragraphs.

### A.    Acetazolamide Tablets

2897.   Even before the Heritage 2014 price increase for Acetazolamide ER capsules discussed above, Acetazolamide in tablet form was the subject of price-fixing and a "fair share" allocation.

2898.   Acetazolamide tablets are sold in two dosages:  125mg and 250mg.  In the spring of 2012, Taro was the only manufacturer of 125mg tablets, but both Taro and Lannett manufactured the more popular 250mg tablets.  Taro and Lannett conspired to increase the price of both 125mg and 250mg tablets beginning in April and May of 2012.

2899.   Prior to the spring of 2012, Taro and Lannett competed on pricing and market share for Acetazolamide tablets.  They implemented independent price increases in different amounts at different times.  For instance, Taro increased prices in late 2009, but Lannett did not until a year later.

2900.   In April and May of 2012, Taro and Lannett suddenly imposed 40-50% price increases in unison, bringing their list prices for Acetazolamide 250mg tablets to identical levels. Taro's 125mg tablets increased in price simultaneously.

2901.   In early 2013, Taro slightly increased prices on both Acetazolamide tablets and by the middle of 2013, Taro and Lannett's market share stabilized as a result of their market sharing agreement.  Lannett held approximately 56% of the 250mg tablet market and Taro held approximately 44%.  As the only manufacturer at this time, Taro maintained 100% of the market for 125mg tablets.  When market sales for both tablets are evaluated together, Taro and Lannett's

dollar sales across both products remained virtually even.  The combined market share (total

dollar sales) for both 125mg and 250mg Acetazolamide tablets is depicted in the graph below.



2902.   With their respective market shares allocated by agreement, Taro and Lannett

were well-positioned to raise prices without losing customers.

2903.   Between November of 2013 and February of 2014, Taro and Lannett both

imposed over 200% price increases on their Acetazolamide tablets, bringing their 250mg tablets

to identical list prices.  Taro's 125mg tablets saw similar price increases and AWP prices for

both products increased significantly.

2904.   The price increases imposed by Taro and Lannett, initially in 2012, then by Taro

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

in early 2013, then most significantly in late 2013, can be seen on the graph below.



2905.   According to NADAC data, the average market price for generic Acetazolamide tablets saw the following price increases from November 2013 to February 2014

Acetazolamide 125mg:  increased by 241%

Acetazolamide 250mg:  increased by 265%

2906.   NADAC data show that average market prices of Acetazolamide tablets remained

artificially high thereafter, as depicted below.



2907.   Throughout this period, Lannett and Taro had ample opportunity to coordinate their market share agreements and price increases.  They both attended the (i) October 1-3, 2012 GPhA Fall Technical Conference in Las Vegas, Nevada; (ii) June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland; and (iii) October 28-30, 2013 GPhA Technical Conference in North Bethesda, Maryland.

2908.   The lockstep price increases with nearly perfect market share splits by Taro and Lannett contradicts expected pricing behaviors in a competitive market; it is, however, consistent with Defendants' "fair share" agreement.

**B.    Albuterol Sulfate**

2909.   At all relevant times, Mylan and Sun have dominated the market for Albuterol Sulfate.

2910.   Prior to 2013, the effective prices for Albuterol Sulfate were stable.

2911.   Beginning in March 2013, the average NADAC price for Albuterol Sulfate rose dramatically.

2912.   For example, Mylan's 100ct Albuterol Sulfate 2mg increased in price by over 4,300% from $0.13 to $5.88 on March 6, 2013.  Sun's 100ct Albuterol Sulfate 2mg increased 3,400% from $0.13 to $4.70 on April 15, 2013, as illustrated by WAC data:

| Product 2MG | Defendant | Old WAC | New | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|
| 100 ct | Mylan | $0.13 | $5.88 | March 6, 2013 | 4,317% |
| 500 ct | Mylan | $0.13 | $5.88 | March 6, 2013 | 4,549% |
| 100 ct | Sun | $0.13 | $4.70 | April 15, 2013 | 3,485% |
| 500 ct | Sun | $0.12 | $4.70 | April 15, 2013 | 3,674% |

### C.     Allopurinol

2913.   Defendants Actavis, Dr. Reddy's, Mylan, and Par were the principal manufacturers of Allopurinol Tablets (100 and 300 mg) during the relevant period.  Allopruinol has been available in the United States for decades in a generic form.

2914.   The GAO noted that Allopurinol had an "extraordinary price increase" in the years 2014–2015.

2915.   In September 2014, Actavis, Dr. Reddy's, and Mylan, began to raise prices on Allopurinol.  For example, in September 2014, Actavis raised its WAC price of Allopurinol 300 mg Tablets by 400%.  In January 2015, Dr. Reddy's followed suit, increasing its WAC price for Allopurinol 300 mg Tablets by 400%.  Finally in March 2015, Mylan instituted a similar 375% WAC price increase on Allopurinol 300 mg Tablets.  When Par entered the market for Allipurinol 300 mg Tablets in September 2014, it matched Actavis' inflated price.

2916.   Under the Fair Share Agreement, Actavis, Dr. Reddy's, Mylan, Par, and Sun did not attempt to undercut competitors' prices in order to gain additional market share.  For example, in March 2015, J.P. of Dr. Reddy's was discussing Allopurinol with several Dr. Reddy's colleagues.  After Mylan increased its Allopurinol price to match Dr. Reddy's, Kate Neely asked

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████

████████████████████ In response, another Dr. Reddy's employee said ███████████

████████████████████████████████████████████

████ In response, yet another Dr. Reddy's employee articulated the larger goal; ███████

████████████████████████████████

2917.   The ability of Actavis, Dr. Reddy's, Mylan, and Par to reach agreements on Allopurinol was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

### D.    Amantadine HCL

2918.   Defendants Lannett, Sandoz, and Upsher-Smith were the principal manufacturers of Amantadine HCL Capsules (100 mg).  Amantadine HCL has been available in the United States for decades in a generic form.

2919.   In late 2011, Sandoz and Upsher-Smith increased their prices for Amantadine HCL ████ and imposed identical WAC prices.

2920.   In late 2012, Lannett entered the market.  Rather than offering a lower price to win customers, Lannett announced an identical WAC price to Sandoz and Upsher-Smith.

2921.   The GAO noted that Amantadine HCL had an "extraordinary price increase" in the years 2012-2013.The ability of Lannett, Sandoz, and Upsher-Smith to reach agreement regarding Amantadine HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

### E.    Amitriptyline HCL Tablets

2922.   At all relevant times, Mylan, Par, and Sandoz have dominated the market for Amitriptyline HCL Tablets ("Amtriptyline").

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2923.   Prior to 2014, the effective prices for Amitriptyline were stable.

2924.   Beginning in May 2014, the average NADAC price for Amitriptyline rose dramatically.

2925.   These price increases followed the (i) April 1, 2014 HDMA Annual CEO Roundtable Fundraiser in New York, New York, which Mylan, Par, and Sandoz attended.

2926.   The charts below show average price increases for various dosages of Amitriptyline tablets:





FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2927.   WAC data confirm that Mylan, Par, and Sandoz increased Amitriptyline prices largely in unison by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Sandoz | 00781148801 | $0.05 | $0.57 | 5/23/2014 | 1,032% |
| 1,000ct | Sandoz | 00781148810 | $0.05 | $0.48 | 5/23/2014 | 945% |
| 100ct | Mylan | 00378265001 | $0.05 | $0.57 | 7/16/2014 | 1,032% |
| 1,000ct | Mylan | 00378265010 | $0.05 | $0.57 | 7/16/2014 | 1,157% |
| 100ct | Par | 00603221421 | | $0.57 | 9/26/2014 | |
| 1,000ct | Par | 00603221432 | | $0.48 | 9/26/2014 | |

2928.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, and market-wide price increases.  For example, the *Financial Times* reported on May 12, 2015 that the $1.07 price for a 100mg pill of Amitriptyline "jumped by 2,487 per cent in under two years" noting that "in July 2013, the same pill cost just 4 cents."[232] The *Boston Globe* similarly reported, in November of the same year, "The cost of the antidepressant drug amitriptyline jumped 2,475 percent, from 4 cents for a 100-milligram pill in 2013 to $1.03 in 2015."[233]

### F.   Atenolol/Chlorthalidone

2929.   Atenolol Chlorthalidone has been available in the United States for decades in a generic form.

2930.   Defendants Actavis and Mylan were the primary manufacturers of Atenolol Chlorthalidone Tablets (50-25 and 100-25 mg) during the relevant period.

---

[232]   David Crow, *Teva bids for Mylan amid pressure on copycat drugmakers*, FIN. TIMES (May 12, 2015), https://www.ft.com/content/8ff2fc5a-f513-11e4-8a42-00144feab7de

[233]   Priyanka Dayal McCluskey, *As competition wanes, prices for generics skyrocket*, BOS. GLOBE (Nov. 6, 2015), https://www.bostonglobe.com/business/2015/11/06/generic-drug-price-increases-alarm-insurers-providers-and-consumers/H3iA9CSxAUylnCdGjLNKVN/story.html.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2931.   For years, the prices for Atenolol Chlorthalidone tablets were relatively low and stable. Beginning in the spring of 2014, Mylan and Actavis began to steadily and consistently raise the prices of Atenolol Chlorthalidone tablets. By the end of 2014, list (WAC) prices for both manufacturers had more than doubled, and NSP prices ███████████████████

2932.   The GAO noted that the Atenolol Chlorthalidone had "extraordinary price increases" in the years 2014–2015.

2933.   As Mylan and Actavis raised prices, they aimed to divide the market between themselves.  Whenever market share diverged from a roughly equal split (as happened in a couple of instances when Mylan experienced supply disruptions), they eventually worked back toward a fair share divison in which each held 50% market share.  All the while, Mylan and Actavis were careful not to erode pricing.

2934.   Actavis and Mylan communicated directly with each other during this time period.  ██████████████████████████████████████████
██████████████████████████████████████████
██████

2935.   Between March 2014 and the present, Actavis and Mylan increased the price for Atenolol Chlorthalidone more than 200% and maintained pricing at that level.

### G.   Atropine Sulfate

2936.   Atropine Sulfate has been available in the United States for over a decade in a generic form.

2937.   Defendants Bausch and Sandoz were the principal manufacturers of Atropine Sulfate with close to an 80/20 split at all relevant times.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2938.   The GAO noted that Atropine Sulfate had "extraordinary price increases" in the years 2010–2011.

2939.   For instance, in February 2010, Sandoz instituted an approximately ███ WAC price increase on Atropine Sulfate Ophthalmic Solution (1%).  After this price increase, Sandoz's WAC price for Atropine Sulfate Ophthalmic Solution (1%) was nearly identical to Bausch's WAC price.

2940.   The ability of Bausch and Sandoz to reach agreements on Atropine Sulfate Ophthalmic Solution was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

### H.   Balsalazide Disodium

2941.   Balsalazide Disodium has been available in the United States for over a decade in a generic form.

2942.   Defendants Apotex and West-Ward were the principal manufacturers of Balsalazide Disodium capsules (750 mg) during the relevant time period.

2943.   In January 2014, West-Ward increased its WAC price for Balsalazide Disodium 750 mg capsules by more than ███.  That same month, Apotex increated its price for Balsalazide Disodium 750 mg capsules to exactly match West-Ward's post increase price.

2944.   The ability of Apotex and West-Ward to reach agreement regarding Balsalazide Disodium was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

### I.   Betamethasone Dipropionate Augmented

2945.   Betamethasone Dipropionate Augmented has been available in the United States for over a decade in a generic form.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2946.   Betamethasone Dipropionate Augmented is a more potent version of Betamethasone Dipropionate.  It is available in multiple formulations including Lotion (0.05%).

2947.   Defendants Sandoz and Taro were the principal manufacturers of Betamethasone Dipropionate Augmented Lotion at all relevant times.

2948.   In April 2012, Taro increased its WAC price for Betamethasone Dipropionate Augmented 0.05% lotion by ███.  In October 2012, Sandoz instituted a ███ WAC price increase for Betamethasone Dipropionate Augmented 0.05% lotion.  Then, in May 2013, Taro again increased its Betamethasone Dipropionate Augmented 0.05% WAC price by an additional ███.

2949.   Because of the ongoing understanding of the Fair Share Agreement between the companies, Sandoz and Taro did not worry about their ostensible competitor cutting prices to gain market share.  They also did not attempt to undercut their ostensible competitor's prices in order to gain additional market share.  For example, a Sandoz spreadsheet from August 2012 detailing the expected response to a Cardinal Request for Proposal (RFP) indicates that Sandoz did not intend to bid on Betamethasone Dipropionate Augmented Lotion because ████████  ████████  In another example, in April 2013, several months after the dramatic price increases, Publix requested a bid from Sandoz on Betamethasone Dipropionate Augmented due to the Taro price increase.  A Senior Sales Executive at Sandoz forwarded the request to several colleagues.  In response to Taro's price increase, Sandoz's Armando Kellum responded ████  ████████████████  In a separate Sandoz email chain, another Sandoz employee states ████████████████

2950.   The ability of Sandoz and Taro to reach agreement regarding Betamethasone Dipropionate Augmented was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

**J.      Betamethasone Dipropionate Clotrimazole**

2951.   Betamethasone Dipropionate Clotrimazole has been available in the United States for over a decade in a generic form.  It is available in, for example, cream and lotion formulations.

2952.   Defendants Actavis, Sandoz, and Taro were the principal manufacturers of of Betamethasone Dipropionate Clotrimazole Cream (0.05%) and Lotion (0.05%) during the relevant time period.

2953.   The GAO noted that Betamethasone Dipropionate Clotrimazole had an "extraordinary price increase" in the years 2011–2012.

2954.   For instance, in March 2011, Actavis increased the WAC price for Betamethasone Dipropionate Clotrimazole 1%-0.05% topical cream by approximately █████ .  The next month, both Sandoz and Taro instituted similar price increases on Dipropionate Clotrimazole 1%-0.05% topical cream; Sandoz increased its WAC price by approximately ████ and Taro increased its WAC price by approximately ████ .

2955.   Because of the ongoing understanding of the Fair Share Agreement between the companies, Actavis, Sandoz, and Taro did not worry about their ostensible competitors cutting prices to gain market share.  They also did not attempt to undercut their ostensible competitors' prices in order to gain additional market share.  For example, a Sandoz presentation from June 2014 titled ████████████████████████████████████ described Sandoz's

market approach with respect to clotrimazole-betamethasone: ███████████████

███████████████████████████

2956.   The ability of Actavis, Sandoz and Taro to reach agreement regarding Betamethasone Dipropionate Clotrimazole was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

2957.   The coordinated price increases by Actavis, Sandoz, and Taro are consistent with the Fair Share Agreement.

2958.   The agreement between Defendants Actavis, Sandoz, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Betamethasone Dipropionate Clotrimazole Cream (0.05%) and Lotion (0.05%).

### K.   Butorphanol Tartrate

2959.   Defendants Mylan, West-Ward, and Apotex were the primary manufacturrs of Butorphanol Tartrate at all relevant times.

2960.   For many years, the prices for Butorphanol Tartrate nasal spray were relatively stable.  In early 2013, West-Ward and Mylan had roughly equal shares of the Butorphanol market, and Apotex had a smaller share of the market.  In late 2013, Apotex exited the market, at which point West-Ward and Mylan raised prices.  Rather than compete with Mylan to pick up what had been Apotex's share of the market, West-Ward announced a significant price increase in its WAC price to match Mylan's WAC price.  Both manufacturers also ████████████

███████████████████████████████████

██████████████████

2961.   In the spring of 2015, Apotex re-entered the market.  Rather than offer better prices to take market share, it announced identical WAC prices to those of West-Ward. Nonetheless, Apotex obtained approximately a third of the market share.

2962.   The ability of Mylan, West-Ward, and Apotex to reach agreement regarding Butorphanol Tartrate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

2963.   The coordinated price increases by Mylan, West-Ward, and Apotex are consistent with the Fair Share Agreement.

### L.   Captopril

2964.   Captopril has been available in the United States for decades in a generic form.

2965.   Defendants Mylan, West-Ward and Wockhardt were the principal manufacturers of Captopril Tablets at all relevant times.  During much of the relevant time period, Wockhardt had approximately 85% of the market and Mylan had approximately 15%.  West-Ward re-entered the market after the price increase and had a small share.

2966.   In the years 2013-2015, Mylan, West-Ward and Wockhardt increased prices on Captopril.

2967.   In March, April, June, and July 2013, Mylan's Director of National Accounts, M.W., communicated with a West-Ward National Account Manager, K.B., by telephone.

2968.   In April 2013, West-Ward temporarily exited the market.

2969.   In July 2013, Defendant Mylan increased the WAC price of Captopril 12.5 mg tablets by more than ███████

2970.   On July 19, 2013 Wockhardt discussed Mylan's price increase internally. Wockhardt's Associate Vice President of Retail Generics added that Wockhardt ████████

████████████████████████████   In August 2013, Wockhardt followed Mylan by increasing its Captopril 12.5 mg tablets WAC price by more  than ██████.  On August 9, 2013, in response to Wockhardt's price increase, a customer asked if there was ████████████ ████████████   A Wockhardt employee responded ████████████████████ ████████████████████

2971.   In April 2014, Defendant West-Ward re-entered the market, increasing its WAC prices on Captopril 12.5 mg tablets by approximately ██████.

2972.   To match West-Ward's increase, Mylan again increased the WAC price of its Captopril 12.5 mg tablets by an additional ██████ the following month.

2973.   The ability of Mylan, West-Ward, and Wockhardt to reach agreements regarding Captopril was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

## M.    Cefuroxime Axetil

2974.   Cefuroxime Axetil is available in Tablet and Oral Suspension formulations.  It has been available in the United States for over a decade in a generic form.

2975.   Defendants Aurobindo, Citron, and Lupin are the principal manufacturers of Cefuroxime Axetil Tablets (250 and 500 mg).

2976.   In 2014, Aurobindo, Citron, and Lupin simultaneously increased prices for Cefuroxime Axetil.

2977.   For instance in February 2014, Defendant Aurobindo increased its WAC price of Cefuroxime Axetil 250 mg tablets by approximately ██████.  That same month, Defendant Lupin instituted an identical ██████ WAC increase on Cefuroxime Axetil 250 mg tablets.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2978.   Similarly in February 2014, Aurobindo increased its WAC price on Cefuroxime Axetil 500 mg tablets by approximately ██████.  That same month, Lupin instituted an identical ██████ increase on Cefuroxime Axetil 500 mg tablets.

2979.   In April 2014, Citron entered the marked and matched the WAC pricing of its competitors rather than undercutting them to compete for market share.  In exchange, Aurobindo and Lupin conceded market share to Citron so that it could obtain its fair share of the market.

2980.   For example, in April 2014, Aurobindo submitted a bid to OptiSource for Cefuroxime Axetil.  OptiSource responded asking Aurobindo to match a lower price.  In discussing the proposal internally at Aurobindo, Tim Gustafson of Aurobindo wrote to colleagues, ████████████████████████████████████████████████ ████████████████████  Ultimately, Aurobindo declined to decrease its pricing to the level requested by OptiSource and instead lowered its price slightly to move closer to Lupin's pricing.

2981.   As evidence of the competitors' agreement not to compete, Citron internally discussed which competitors were competing for a bid before responding to a customers' request.  In response to an ABC request for Cefuroxime Axetil on March 7, 2014, a Citron employee sent an internal email stating ████████████████████████████████████████ ████████████████████████████████

2982.   Aurobindo, Citron, and Lupin communicated directly with each other during this time period.  For example, ████████████ of Lupin spoke with ████ of Citron on ████████████ ██████████████████████████████████████.  ████████████████ of Lupin also spoke with ████ of Aurobindo on ████████████████████████████████████████ ████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2983.   The ability of Aurobindo, Citron, and Lupin to reach agreement regarding Cefuroxime Axetil 250 mg and 500 mg Tablets was also aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

**N.   Chlorpromazine HCL**

2984.   At all relevant times, the principal manufacturers of Chlorpromazine HCL were Sandoz, Mylan, and Upsher-Smith.

2985.   Beginning around August 2011, Sandoz, Mylan, and Upsher-Smith colluded to implement a series of significant price increases for Chlorpromazine HCL.

2986.   In May 2013 and July 2013, D.C., Senior Regional Account Manager of Upsher-Smith, e-mailed Sandoz personnel, including D.P., Armando Kellum, L.J., and others, regarding an increase in the price of the API for Chlorpromazine and other drugs.  During this period, D.C. spoke with Sandoz personnel regarding new purchase prices for Chlorpromazine.

2987.   During this time, personnel from Upsher-Smith and Sandoz were also in connection with personal from Mylan, including M.A. and James Nesta of Mylan.

2988.   Subsequently, knowing that each would increase prices for Chlorpromazine, Sandoz and Upsher-Smith increased WAC prices in July of 2013.

**O.   Cholestyramine**

2989.   At all relevant times, the principal manufacturers of Cholestyramine were Sandoz, Par, and Upsher-Smith.

2990.   In the summer of 2013, Upsher-Smith, Sandoz, and Par each implemented similar price increases for Cholestyramine.  After these increases, which ranged between 100% and 200%, these manufacturers each offered the same WAC price for Cholestyramine.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2991.   In the spring and summer of 2013, as alleged above, personnel from Sandoz and Upsher-Smith communicated regarding pricing for Chlorpromazine.  During this period, C.O., Upsher-Smith's Director of Strategic Generic Portfolio and Marketing, had two calls with K.O., Par's VP of National Accounts.

P.      **Clobetasol Propionate**

2992.   In 2009, there were approximately ten Clobetasol Propionate manufacturers.  In 2012, Novartis acquired Fougera and in 2013, non-Defendant Akorn acquired non-Defendant Hi-Tech, consolidating the market.  By 2014, many Clobetasol Propionate manufacturers exited the market, including Teva and Glenmark.

2993.   Since June 2014, Actavis, Fougera, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt have dominated the market for generic Clobetasol Propionate.

2994.   Prior to June 2014, prices for Clobetasol Propionate were stable.

2995.   Beginning in June 2014, Actavis, non-Defendant Akorn, Fougera, non-Defendant Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt increased their prices for Clobetasol Propionate abruptly and in unison.

2996.   Collectively, these Defendants raised prices for Clobetasol Propionate by approximately 1,300% between July 2014 and September 2014.

2997.   According to NADAC data, the average market price for generic Clobetasol Propionate saw the following price increases from July 2014 to September 2014, as shown below:  Clobetasol .05% Ointment (15g):  increased by 1,852%; Clobetasol 0.05% Solution (50mL):  increased by 1,176%; and Clobetasol 0.05% Cream (30g):  increased by 1,596%.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER







807

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



2998.   WAC data confirm that Actavis, non-Defendant Hi-Tech, Sandoz, and Taro all increased prices in their Clobetasol Propionate cream largely in unison by the following amounts:

| Clobetasol cream .05%: | Defendant: | Old WAC: | New WAC: | Date of Increase: | Percentage Increase: |
|---|---|---|---|---|---|
| 15gm | Taro | $0.38 | $6.84 | 3-Jun-14 | 1684% |
| 15gm | Sandoz | $0.73 | $6.84 | 18-Jul-14 | 833% |
| 15gm | Hi-Tech | $0.37 | $6.84 | 9-Aug-14 | 1732% |
| 15gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 30gm | Taro | $0.33 | $6.84 | 3-Jun-14 | 1993% |
| 30gm | Sandoz | $0.50 | $6.84 | 18-Jul-14 | 1268% |
| 30gm | Hi-Tech | $0.32 | $6.84 | 9-Aug-14 | 2026% |
| 30gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 45gm | Taro | $0.33 | $6.84 | 3-Jun-14 | 1971% |
| 45gm | Sandoz | $0.59 | $6.84 | 18-Jul-14 | 1057% |
| 45gm | Hi-Tech | $0.31 | $6.84 | 9-Aug-14 | 2138% |
| 45gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 60gm | Taro | $0.32 | $6.12 | 3-Jun-14 | 1832% |
| 60gm | Sandoz | $0.50 | $6.12 | 18-Jul-14 | 1124% |
| 60gm | Hi-Tech | $0.29 | $6.12 | 9-Aug-14 | 2016% |
| 60gm | Actavis | * | $6.12 | 10-Mar-15 | * |

2999.   Although WAC data is not available for Fougera, Morton Grove, Perrigo, Sandoz, and Wockhardt, upon information and belief, they implemented simultaneous and identical price increases for their Clobetasol Propionate products.

3000.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3001.   For example, by October 2014, pharmacists expressed outrage at the dramatic price increases.  Kushal Patel, a pharmacy manager at Well Future Pharmacy said "Clobetasol, which used to cost $10 for the entire tube, now costs $300.  The same exact medication we got one day.  Next day, it's an increase of three thousand percent."[234]

3002.   Ascension Health, a hospital system based in Missouri with facilities in 23 states, reported a price increase from $2.89 in 2013 to $198.64 (or 6,773%) in 2014 for a 45-gram tube of generic Clobetasol Propionate cream.[235]

3003.   A dermatologist reported the experience of his patient in Tucson, Arizona in 2015.  He expressed shock and dismay when his patient informed him that a 60-gram tube of Clobetasol Propionate cream would now cost him $220.  The dermatologist was so surprised that he called around to other local pharmacies, all of whom were pricing the product above $200.[236]

3004.   Patient reports also corroborate the skyrocketing prices for Clobetasol Propionate. In 2014, Millicent Graves of Williamsburg, Virginia paid $35 for her prescription of Clobetasol Propionate solution, but in 2015, it cost $475.88.  And just five weeks later, it rose to $627, overall a 1,691% increase over the course of a few months.[237]

3005.   An article in the *Boston Globe* described price changes from 2013 to 2015, when one form of Clobetasol Propionate's price spiked 1,496% from $0.23 per gram to $4.15 per gram.  In response, non-Defendant Akorn representative Dewey Steadman said that the company

---

[234] Dorothy Tucker, *Prices Soar For Some Generic Drugs – Why?*, CBS CHI. (Oct.  31, 2014), http://chicago.cbslocal.com/2014/10/31/prices-soar-for-some-generic-drugs-why/.

[235] Samantha Liss, *Hospitals and Pharmacies Grapple With Rising Drug Prices*, ST. LOUIS POST-DISPATCH (Nov. 16, 2014), https://khn.org/news/hospitals-and-pharmacies-grapple-with-rising-drug-prices/.

[236] Norman Levine, *The Tale of the $200 Tube of Clobetasol Cream*, DERMATOLOGY TIMES (Aug.  5, 2015), https://www.dermatologytimes.com/article/tale-220-tube-clobetasol-cream-3.

[237] *Unprecedented Generic Drug Price Spikes Wreaking Havoc*, SENIOR CITIZENS LEAGUE (Jul.  6, 2015), http://seniorsleague.org/unprecedented-generic-drug-price-spikes-wreaking-havoc/.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

simply reacted to price increases by its competitors, Novartis and Taro.  In doing so, he invoked the influence of their market dominance and rejected the possibility of outside price factors: "Following price increases by others in this highly competitive market, Akorn brought Clobetasol's price in line with other generic versions of the product."[238]

3006.   Defendants had numerous opportunities to coordinate their price increases.  Key pricing executives from at least Actavis, Sandoz, Taro, and Wockhardt attended the (i) June 1-4, 2014 HDMA Business and Leadership Conference in Phoenix, Arizona; and key executives from at least Actavis, Fougera, non-Defendant Hi-Tech, Morton Grove, Perrigo, Sandoz, and Taro attended the (ii) June 34, 2014 GPhA Annual CMC Workshop in Bethesda, Maryland.

Q.      **Desonide**

3007.   At all relevant times, Actavis, Fougera, Perrigo, Sandoz, and Taro have dominated the market for Desonide.

3008.   Prior to May 2013, the effective prices for Desonide remained stable.

3009.   However, beginning in May 2013, the average NADAC price for Desonide rose dramatically.

3010.   According to NADAC data, the average market price for generic Desonide saw the following price increases:

> Desonide 0.05% cream:  between July 11 and July 18, 2013, the average price increased by 442%

> Desonide 0.05% ointment:  between July 11 and July 18, 2013, the average price increased by 390%

3011.   NADAC data show that the average market price of Desonide remained stable

---

[238]   Priyanka Dayal McCluskey, *As Competition Wanes, Prices for Generics Skyrocket*, Bos. Globe (Nov.  6, 2015), https://www.bostonglobe.com/business/2015/11/06/generic-drug-price-increases-alarm-insurers-providers-and-consumers/H3iA9CSxAUylnCdGjLNKVN/story.html.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

prior to May 2013, but rose dramatically and remained artificially high after July 2013, as

depicted in certain forms and dosages below.



3012.   WAC data confirms that Perrigo, Taro, and Sandoz all increased their prices in

Desonide ointment in lockstep fashion in the following amounts:

| Product Package | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15gm | Taro | 51672128101 | $0.84 | $3.21 | 5/01/2013 | 282% |
| 60gm | Taro | 51672128103 | $0.53 | $3.21 | 5/01/2013 | 501% |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| 15gm | Perrigo | 45802042335 | $0.65 | $3.21 | 5/21/2013 | 392% |
|------|---------|-------------|-------|-------|-----------|------|
| 60gm | Perrigo | 45802042337 | $0.31 | $3.21 | 5/21/2013 | 932% |
| 15gm | Sandoz | 00168030915 | $0.70 | $3.21 | 1/17/2014 | 357% |
| 60gm | Sandoz | 00168030960 | $0.35 | $3.21 | 1/17/2014 | 815% |

3013.   Although WAC data is not available for Actavis or Fougera, upon information and belief, they implemented similar price increases, largely in unison for their Desonide products.

3014.   Actavis entered the Desonide market in August 2013 and set its prices at supracompetitive levels instead of entering at a lower cost and competing for customers.  Upon information and belief, Actavis contacted Fougera, Perrigo, Sandoz, and Taro well before August 2013 and explained its intention of market entry.  These Defendants then colluded to allocate market share and set supracompetitive prices.  This agreement prevented Actavis' entry from eroding the artificial equilibrium these Defendants conspiratorially created.

3015.   News reports and testimonials from physicians corroborate these dramatic, immediate, market-wide price increases.  For example, dermatologist Alan Rockoff reported in Dermatology News in February 2015:

> Then this week it happened again.  I prescribed hydrocortisone valerate 0.2% for a groin rash.  The patient left a message asking me for an over-the-counter suggestion, since the prescription was going to cost him $52.70 out of pocket.
>
> I asked my secretary to call the pharmacy to get a price for other generic steroid creams.   Triamcinolone would cost $14.70.  Alclometasone would cost $35.20.   And desonide – generic desonide – would cost $111.70.  For a 15-g tube.  $111.70 for 15 g of a generic cream that's been on the market forever! Does that make any sense?

3016.   Defendants had numerous opportunities to coordinate their price increases.

Shortly before increasing prices, key pricing executives from at least Actavis, Perrigo, Sandoz,

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

and Taro attended the February 20-22, 2013 GPhA Annual Meeting in Orlando, Florida and the June 4-5, 2013 GPhA CMC Workshop.

**R.     Digoxin**

3017.    In late 2012, Impax and Lannett were the only active domestic manufacturers of Digoxin.  Sun, Par and West-Ward re-entered the market in 2014 and Mylan re-entered in 2015. Since that time, Impax, Lannett, Mylan, Par, Sun, and West-Ward have dominated the market for Digoxin.

3018.    Prior to October 2013, effective prices for Digoxin were stable.

3019.    Beginning in October 2013, Impax and Lannett increased their prices abruptly and in unison.  During this period, prices for generic Digoxin rose more than 630%.

3020.    As a result, prices across the market rose more than 884% for Digoxin, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, depicted in the chart below:

| Drug | Avg.  Market Price Oct.  2012 | Avg.  Market Price June 2014 | Percentage Increase: |
|---|---|---|---|
| Digoxin (single tablet 250mcg) | $0.11 | $1.10 | 884% |

3021.    According to NADAC data, the average market price for generic Digoxin saw the following price increases from November 2013 to February 2014:

Digoxin 125 mcg tablets:  881%

Digoxin 250 mcg tablets:  825%

3022.    These dramatic price increases, initially instituted by Impax and Lannett, were maintained even after Par's entry into the market in early 2014, West-Ward's entry soon thereafter, and Mylan's entry in early 2015.  In fact, these Defendants including the new entrants continued to increase prices for Digoxin during the first six months of 2014.  This is especially

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

telling evidence of collusion, as entry of two (and later three) additional competitors would typically lead to substantial price decreases.

3023.  NADAC data show that average market prices for Digoxin rose dramatically and remained artificially high after November 2013, as depicted below.



3024.  WAC and AWP data for 0.25mg Digoxin tablets also shows that prices for Digoxin remained relatively stable prior to the November 2013 price increase.  This chart was submitted by Dr. Stephen Schondelmeyer, Director of the PRIME Institute at the College of Pharmacy for the University of Minnesota, as part of his testimony at the Senate Hearing on drug price inflation.



3025.   WAC pricing depicted below confirms that Impax, Lannett, Mylan, Par, and

West-Ward all increased their Digoxin prices substantially and largely in unison.

| Package size (0.125mg) | Defendant | NDG | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100ct | Lannett | 00527132401 | $0.14 | $1.19 | 10/16/2013 | 734% |
| 1,000ct | Lannett | 00527132410 | $0.12 | $0.99 | 10/16/2013 | 738% |
| 100ct | Impax | 00115981101 | $0.14 | $1.19 | 10/22/2013 | 734% |
| 1,000ct | Impax | 00115981103 | $0.12 | $0.99 | 10/22/2013 | 738% |
| 100ct | Par | 49884051401 | | $1.19 | 1/17/2014 | |
| 1,000 | Par | 49884051410 | | $0.99 | 1/17/2014 | |
| 100ct | West-Ward | 00143124001 | $0.16 | $1.19 | 4/14/2014 | 638% |
| 1,000ct | West-Ward | 00143124010 | $0.13 | $0.99 | 4/14/2014 | 687% |
| 100ct | Mylan | 00378615501 | | $1.19 | 11/17/2014 | |
| 1,000ct | Mylan | 00378615510 | | $0.99 | 11/17/2014 | |

3026.   Although WAC data is not available for Sun, upon information and belief, Sun

implemented simultaneous and identical price increases for Digoxin after it re-entered the

market.

3027.   News reports and testimonials from physicians and pharmacists corroborate these

dramatic, immediate, market-wide price increases.  Bill Drilling, a pharmacy owner in Sioux

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

City, Iowa, apologized to his customers in December of 2013 because a 3-month supply of

digoxin totaled $113.12, ten times its cost in August.  Drilling shared in his customers' outrage,

adding "I've been doing this since 1985, and the only direction that generics-drug prices have

gone is down."[239]

3028.   Rob Frankil, another pharmacist who testified before the Senate in November

2014, offered a similar narrative:  "A recent example from my own experience is the price of

Digoxin—a drug used to treat heart failure.  The price of this medication jumped from about $15

for 90 days' supply, to about $120 for 90 days' supply.  That's an increase of 800%.  One of my

patients had to pay for this drug...The patient called around to try to get the medicine at the old,

lower price, but to no avail."

3029.   Defendants had ample opportunity to coordinate their pricing agreements.

Shortly before the price increase, key executives from at least Impax, Lannett, Mylan, Par, and

Sun attended the October 28-30, 2013 GPhA Fall Technical Conference.

### S.        Diphenoxylate Atropine HCL

3030.   Diphenoxylate Atropine is available in Tablet and Oral Liquid formulations.  It has

been available in the United States for decades in a generic form.

3031.   Mylan and a non-Defendant manufacturer were the principal manufacturers of of

Diphenoxylate Atropine Tablets (2.5-0.025 mg) during the relevant time period.  During much of

the relevant time period, Mylan had approximately 75% of the market, and the non-Defendant

manufacturer had approximately 25% of the market.

---

[239]   Alan Katz, *Surprise! Generic-Drug Prices Spike*, BLOOMBERG (Dec. 12, 2013),
https://www.bloomberg.com/news/articles/2013-12-12/generic-drug-prices-spike-in-pharmaceutical-market-surprise.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3032.   In April 2014, Defendant Mylan instituted an approximately ▮ WAC price increase on Diphenoxylate Atropine 2.5-0.025 mg tablets.   Just two months later, the non-Defendant manufacturer followed suit, instituting an identical ▮ WAC price increase.   After this increase, both Defendant Mylan and the non-Defendant manufacturer offered identical WAC prices for Diphenoxylate Atropine 2.5-0.025 mg tablets.

3033.   The GAO noted that the Diphenoxylate Atropine had "extraordinary price increases" in the years 2014–2015.

3034.   The ability of Defendant Mylan and the non-Defendant manufacturer to reach agreement regarding Diphenoxylate Atropine was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

**T.     Divalproex Sodium ER**

3035.   At all relevant times, Dr. Reddy's, Mylan, Par, and Zydus dominated the market for Divalproex Sodium ER.

3036.   Prior to June 2013, effective prices for Divalproex Sodium ER were stable.

3037.   In June 2013, Dr. Reddy's, Mylan, Par, and Zydus increased their prices for Divalproex Sodium ER dramatically and largely in unison.

3038.   As a result, Divalproex Sodium ER prices rose across the market by more than 700%, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, depicted in the chart below:

| Drug | Avg.  Market Price Oct.  2012 | Avg. Market Price June 2014 | Percentage Increase: |
|---|---|---|---|
| Divalproex Sodium ER (bottle of 80, 500 mg tablets ER 24H) | $31 | $234 | 736% |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3039.   NADAC data show that average market prices of Divalproex Sodium ER remained stable prior to June 2013, but rose dramatically and remained artificially high after September 2013, as depicted in a sample dosage below.  For example, the average market price for Divalproex Sodium ER increased 920%, from $0.31 per tablet to $3.18 per tablet between September 12, 2013 and September 19, 2013.



3040.   These dramatic price increases, initially instituted by Mylan and Par, were maintained even after Dr. Reddy's and Zydus' entry into the market in August 2013.  WAC pricing, depicted below, confirms that Mylan and Par increased their prices uniformly and largely in unison and Dr. Reddy's and Zydus joined in the price increase when they entered the market, instead of competing on price as would be expected of new entrants:

| Package Size (500mg ER) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100ct | Mylan | 00378047301 | $0.74 | $3.26 | 6/14/2013 | 338% |
| 500ct | Mylan | 00378047305 | $0.71 | $3.26 | 6/14/2013 | 361% |
| 100ct | Par | 10370051110 | $0.74 | $3.26 | 6/26/2013 | 338% |
| 500ct | Par | 10370051150 | $0.71 | $3.26 | 6/26/2013 | 361% |
| 100ct | Zydus | 68382031501 | | $3.26 | 8/14/2013 | |
| 500ct | Zydus | 68382031505 | | $3.26 | 8/14/2013 | |
| 100ct | Dr. Reddy's | 55111053401 | | $3.26 | 8/14/2013 | |
| 500ct | Dr. Reddy's | 55111053405 | | $3.26 | 8/14/2013 | |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3041.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases.  According to Spalitto's Pharmacy in Missouri, 500 pills of Divalproex Sodium ER cost $122.99 in May of 2013.  By August 2013, the same number of pills skyrocketed to $1,629.95, an increase of 1,225%.  "We've been doing this for 30 years.  We've never seen anything like this," said the third-generation pharmacy owner.[240]

3042.   Industry experts and audit reports echoed this same narrative.  In January 2014, a Morgan Stanley analyst report found that "companies have been raising prices on divalproex....aggressively."[241]

3043.   Defendants had numerous opportunities to coordinate their price increases and market share agreements.  Shortly before the price increase, key pricing executives from Dr. Reddy's, Mylan, Par, and Zydus all attended the June 2-5, 2013 GPhA CMC Workshop in Bethesda, Maryland.  Among others, Burton (Par, Dr. Reddy's), Nesta (Mylan), Tighe (Mylan), Wyatt (Mylan), Aigner (Mylan), Green (Zydus), and Ronco (Zydus) all attended.

U.   **Doxycycline Hyclate**

3044.   Prior to October 2012, prices for Doxycycline Hyclate ("Doxy Hyclate") were stable.

3045.   Beginning in October 2012, Actavis, Par, Sun, Teva, and West-Ward increased their prices for Doxy Hyclate abruptly and largely in unison.  Collectively, these Defendants

---

[240]   Rob Low, *Rising Cost Some of Generic Drugs Set to Shock Consumers*, FOX4 (Aug. 14, 2013), https://fox4kc.com/2013/08/14/rising-cost-some-of-generic-drugs-set-to-shock-consumers/.

[241]   Morgan Stanley, *Specialty Pharmaceuticals Rx Trends in Pictures* (Jan. 27, 2014).

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

raised prices for generic Doxy Hyclate by at least 2,000% (for certain dosages, as much as

8,200%) between November 2012 and March 2013.

3046.   As a result, prices rose dramatically and largely in unison.  According to a report

produced by PRIME Institute and presented by Dr. Stephen Schondelmeyer at a Senate hearing

in November 2014, Doxy Hyclate prices rose approximately 2,000% between December 2012

and December 2013.  Dr. Schondelmeyer's report chronicled the retail prices for West-Ward's

Doxy Hyclate prices, depicted in the chart below:

| Drug | Dosage | Manufacturer | NDC Code: | Usual Dose/ Day | Retail price/day (Median) Dec. 2012 | Retail price/day (Median) Dec. 2013 | Percentage Increase |
|------|--------|--------------|-----------|-----------------|--------------------------------------|--------------------------------------|---------------------|
| Doxycycline Hyclate | 100mg tablet | West-Ward | 00143211205 | 2.00 | $0.36154 | $7.21887 | 1,896% |
| Doxycycline Hyclate | 100mg capsule | West-Ward | 00143314205 | 2.00 | $0.34746 | $7.46247 | 2,047% |

3047.   NADAC data show that the average market price for Doxy Hyclate rose

dramatically around November 2012 and remained artificially high thereafter, as depicted in the

data for 50mg capsules below:



3048.  WAC and AWP data for West-Ward's 100mg Doxy Hyclate capsules show that

prices for Doxy Hyclate remained relatively stable prior to the November 2012 price increase. This chart was also submitted by Dr. Stephen Schondelmeyer, as part of his testimony at the Senate Hearing on drug price inflation.



3049.   WAC data confirm that Actavis, Sun, and West-Ward all increased their prices in generic Doxy Hyclate by the following amounts:

| Product | Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|---|
| 100mg capsule | 50ct | West-Ward | 00143314250 | $0.10 | $4.43 | 1/21/2013 | 4,326% |
| 100mg capsule | 500ct | West-Ward | 00143314205 | $0.10 | $4.43 | 1/21/2013 | 4,370% |
| 100mg capsule | 50ct | Actavis | 00591544050 | $0.10 | $2.74 | 2/1/2013 | 2,515% |
| 100mg capsule | 500ct | Actavis | 00591544005 | $0.10 | $2.74 | 2/1/2013 | 2,663% |
| 100mg capsule | 50ct | Sun | 53489011902 | $0.10 | $4.92 | 2/5/2013 | 4,847% |
| 100mg capsule | 500ct | Sun | 53489011905 | $0.06 | $4.92 | 2/5/2013 | 7,844% |
| 100mg tablet | 50ct | Actavis | 00591555350 | $0.10 | $2.74 | 2/1/2013 | 2,515% |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| 100mg tablet | 500ct | Actavis | 00591555305 | $0.10 | $2.74 | 2/1/2013 | 2,663% |
| 100mg tablet | 50ct | Sun | 53489012002 | $0.09 | $4.92 | 2/5/2013 | 5,631% |
| 100mg tablet | 500ct | Sun | 53489012005 | $0.08 | $4.92 | 2/5/2013 | 6,268% |

3050.   Although WAC data are not available for Par, upon information and belief, Par implemented simultaneous and identical price increases in Doxycycline Hyclate products.

3051.   Actavis, Par, Sun, Teva, and West-Ward had ample opportunity to conspire and coordinate their price increases and market share agreements.  Shortly before or while implementing the price increase, key pricing executives from at least Actavis, Par, Sun, and Teva attended the October 1-3, 2012 GPhA Technical Conference in Bethesda, Maryland.

3052.   In May of 2013, after the price increase was implemented, Teva discontinued production of Doxy Hyclate – a product it had manufactured for three decades.  This act contradicts Teva's self-interest, but furthered Defendants' conspiracy to coordinate pricing and allocate market share across the entire generic pharmaceutical industry.

3053.   In litigation between DAVA, now part of Par, and Chartwell Therapeutics Licensing, LLC ("Chartwell"), Chartwell alleged that DAVA refused to take delivery of Doxy Hyclate from Chartwell despite demand in the market and conspired to set Doxy Hyclate at an artificially high price.[242]  For example, Chartwell cites to an e-mail dated on or about July 11, 2014 in which Aram Moezinia[243] e-mailed Chartwell and stated that DAVA's plan was to sell doxycycline "slowly not to disturb pricing."  According to Chartwell, Par and Endo both

---

[242]   *See generally* Verified Answer and Counterclaims of Chartwell Therapeutics Licensing, LLC and Chartwell Pharmaceuticals LLC, *Dava Pharm., LLC* v. *Chartwell Therapeutics Licensing, LLC*, Index No. 502775/15 (N.Y. Sup Ct, July 29, 2016).

[243]   *Id.* at 47.  Aram Moezinia was a Defendant in the litigation and a Director on DAVA's Board at the time of the merger with Endo.

produced discovery materials to the DOJ and State AGs, whose inquiries focus on generic drugs that included Doxy Hyclate.

3054.   News reports and testimonials from hospitals and pharmacists corroborate these dramatic, immediate, market-wide price increases.  For example, Michael O'Neil, pharmacy manager at Vanderbilt University Medical Center, expresses his concern over the dramatic price increase for Doxy Hyclate, which increased from $10 for a 50-count bottle of 100mg tablets, to $250:  "It's a change that occurred overnight," he said in the March 2013 report.

### V.   Econazole

3055.   At all relevant times, Fougera, Perrigo, Sandoz, Taro, and Teligent dominated the market for Econazole, controlling approximately 99% of the market.

3056.   NADAC data show that the average market prices for Econazole remained stable prior to June 2014.

3057.   Between January 2011 and September 2013, Econazole cost approximately 12 cents for one month's worth of treatment.

3058.   Starting at least as early as July 2014, Fougera, Perrigo, Sandoz, Taro, and Teligent increased their prices for generic Econazole abruptly and in unison.  During this period, prices for generic Econazole rose more than 1,657%.

3059.   According to NADAC data, the average market price for Econazole saw the following price increases from July 2014 to March 2015:

Econazole 1% Cream (15g):  increased by 853%

Econazole 1% Cream (30g):  increased by 1,024%

Econazole 1% Cream (85g):  increased by 929%

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



3060.   WAC data depicted below confirm that Perrigo, Teligent, and Taro all increased their prices for Econazole cream between July and November 2014 by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 15gm | Perrigo | 45802046635 | $0.79 | $5.80 | 7/24/2014 | 637% |
| 30gm | Perrigo | 45802046611 | $0.69 | $5.80 | 7/24/2014 | 736% |
| 85gm | Perrigo | 45802046653 | $0.50 | $4.09 | 7/24/2014 | 719% |
| 15gm | Teligent | 52565002215 | $0.82 | $5.80 | 9/1/2014 | 610% |
| 30gm | Teligent | 52565002230 | $0.72 | $5.80 | 9/1/2014 | 704% |
| 85gm | Teligent | 52565002285 | $0.52 | $4.09 | 9/1/2014 | 688% |
| 15gm | Taro | 51672130301 | $0.66 | $5.80 | 11/18/2014 | 779% |
| 30gm | Taro | 51672130302 | $0.59 | $5.80 | 11/18/2014 | 890% |
| 85gm | Taro | 51672130308 | $0.42 | $4.09 | 11/14/2014 | 871% |

3061.   Although WAC data are not available for Fougera, upon information and belief, Fougera implemented simultaneous and identical price increases in their Econazole products.

3062.   No supply shortages or other market events can explain the Econazole price increases.  The only significant change was Teligent's market entry in February 2013, which should have, but did not, drive prices down.

3063.   Prior to 2012, Teligent focused its business on contract manufacturing.  But in late 2012 it sought to enter the market for numerous topical generic products.  By September 2013, Teligent had 12 ANDAs pending.  Teligent currently manufactures 20 topical generics

824

covered by 33 ANDAs.  For 17 of the 20 drugs, Teligent directly competes with Taro, and for fifteen of the drugs, Teligent directly competes with Perrigo.  This situation in particular lends itself to the Defendants' "fair share" agreement, as these three Defendants can creatively allocate drugs and market share to maintain an artificial equilibrium.

3064.   On February 1, 2013, Teligent obtained an ANDA for Econazole from Prasco LLC.  Shortly thereafter, Teligent's CEO, Jason Grenfell-Gardner, attended the 2013 GPhA Annual Meeting on February 20-22, 2013 in Orlando, Florida and the 2013 ECRM EPPS Retail Pharmacy Generics conference on February 24-27, 2013 in Dallas, Texas, along with representatives from Perrigo and Taro.  Specifically, the CEOs of Perrigo (Joseph Papa) and Taro (Kal Sundaram) joined Teligent's CEO at the 2013 GPhA Annual Meeting.

3065.   When Teligent launched Econazole under its own ANDA, it irrationally increased effective prices immediately, rather than compete for market share on price.

3066.   Significant price increases shortly followed or occurred at about the time of the following trade conferences:  June 1-4, 2014 HDMA 2014 Business and Leadership Conference in Phoenix, Arizona; June 3-4, 2014 GPhA CMC Workshop in North Bethesda, Maryland; October 27-29, 2014 GPhA Fall Technical Conference in Bethesda, MD; February 9-11, 2015 GPhA Annual Meeting in Miami Beach, FL; and February 22-25, 2015 ECRM 2015 Retail Pharmacy Generic Pharmaceuticals EPPS in Destin, FL.  Key executives from Fougera, Perrigo, Sandoz, Taro, and Teligent all attended.

### W.    Exemestane

3067.   Exemestane is available in Tablet form and has been available in the United States for many years as a generic medication.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3068.   Defendant West-Ward and a non-Defendant manufacturer were the principal manufacturers of 25 mg Exemestane Tablets during the relevant time period.

3069.   In January 2014, Defendant West-Ward increased WAC prices of Exemestane 25 mg tablets by approximately ███. The next month, the non-Defendant manufacturer increased its Exemestane 25 mg tablet WAC price by approximately ███ to match Defendant West-Ward's WAC price.

3070.   Following West-Ward's price increase, an employee at the non-Defendant manufacturer sent an internal email titled ███████████████████████████ on January 11, 2014. In response, another employee emailed a smaller group at the non-Defendant manufacturer stating ███████████████ Two days later, that same employee at the non-Defendant manufacturer emailed one other employee stating ████████████████ ████████████████████████████████████████████████ ██████████

3071.   In the summer of 2014, Alvogen entered the marked and matched the pricing of its competitors rather than undercutting them to compete for market share. Alvogen obtained market share despite offering comparable prices.

3072.   The ability of the non-Defendant manufacturer and Defendant West-Ward to reach agreements on Exemestane was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3073.   This agreement was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Exemestane tablets (25 mg).

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## X.      Fluticasone Propionate Nasal Spray

3074.   Fluticasone Propionate is available as a 50 cg Nasal Spray and has been available in the United States for many years in a generic form.

3075.   Non-Defendant Akorn and Defendants Apotex and West-Ward were the principal manufacturers of Fluticasone Propionate Nasal Spray during the relevant period.

3076.   For years, the prices for Fluticasone Propionate were relatively low and stable.  In early 2010, however, Akorn, Apotex, and West-Ward/Roxane imposed large and nearly simultaneous price increases.  By the summer of 2010, customers were paying approximately ███ ██████████ as before the increases.

3077.   In February 2012, Wockhardt entered the marked and matched the pricing of its competitors rather than undercutting them to compete for market share.  Wockhardt obtained market share despite offering comparable prices

3078.   The ability of Defendants Apotex, West-Ward, and Wockhardt to reach agreements on Fluticasone Propionate Nasal Spray was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3079.   For example, shortly before imposing sharp price increases, representatives from Apotex, Wockhardt, and non-Defendant Akorn/Hi-Tech attended the ECRM Retail Pharmacy Generic Pharmaceutical Conference from February 15–18, 2010.  Those three manufactmers were joined by West-Ward at the GPhA Annual Meeting later that same month.  In April 2010, Apotex and West-Ward attended the HDMA CEO Roundtable.  Those two companies were joined later that month by Wockhardt at the NACDS Annual Meeting.

3080.   During these periods, personnel at competitors also communicated by telephone. For example, on January 9, 2012, around the time that Wockhardt was entering the market, ███

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Vice President of Sales at non-Defendant Akorn/Hi-Tech, spoke on the phone to ███, Wockhardt Vice President of Sales, ████████████████████████████████████████

████████████████

### Y.    Isosorbide Dinitrate

3081.   Isosorbide Dinitrate has been on the market for decades and is available in several dosages, including 5 mg, 10 mg, 20 mg, and 30 mg Tablets.

3082.   Defendants Sandoz, Par, and West-Ward were the principal manufacturers of Isosorbide Dinitrate in the relevant period.

3083.   Before July 2012, Sandoz and West-Ward roughly split the market on the 5 mg, 10 mg, and 20 mg Tablets.  In June 2012 Defendant Sandoz increased its WAC Price of Isosorbide Dinitrate 10 mg tablets by approximately ████.  Following this increase, in October 2012 Defendant West-Ward increased its WAC price for Isosorbide Dinitrate 10 mg tablets by approximately ████.  Both claimed supply disruptions.

3084.   On June 6, 2012, CW-3 of Sandoz spoke with █████████, West-Ward's Director of National Accounts.  On June 15, 2012, Sandoz announced price increases on Isosorbide.  On September 6, 2012, ██████████████ of West-Ward spoke to █████████████ of Sandoz. CW-3 of Sandoz and █████████ of West-Ward spoke against on October 11, 2012, the day before West-Ward announced its price increases for Isosorbide Dinitrate.

3085.   In 2013, an internal Sandoz analysis of the Isosorbide Dinitrate market ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████

███████████

3086.   A spreadsheet maintained by Sandoz's ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

3087.   Following these price increases, Par sought to increase its market share of Isosorbide Dinitrate.  Rather than undercut Sandoz and West-Ward's pricing to take share, in March 2013, Par matched their ██████ price increase.  On March 26, 2013, ████████████, VP of National Account at Par, spoke to CW-1 of Sandoz.

3088.   The ability of Par, Sandoz, and West-Ward to reach agreement regarding Isosorbide Dinitrate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3089.   The agreement between Defendants Par, Sandoz, and West-Ward was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Isosorbide Dinitrate Tablets (5, 10, 20, 30 mg).

**Z.    Lidocaine**

3090.   Fougera, Impax, Sandoz, and non-Defendant Hi-Tech were the principal manufacturers in the market for one popular formulation of Lidocaine, Lidocaine-Prilocaine.

3091.   Prior to March 2014, the effective prices for Lidocaine-Prilocaine were stable.

3092.   Beginning in April 2014, Fougera, non-Defendant Hi-Tech, Impax, and Sandoz increased their prices abruptly and largely in unison for Lidocaine-Prilocaine.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3093.   Prices for other forms of Lidocaine also experienced increases.  The GAO Report noted an "extraordinary price increase" for Lidocaine 5% ointment in the 2012-2013 period and another "extraordinary price increase" for Lidocaine-Hydrochloride 3% cream in the 2011-2012 period.[244]

3094.   NADAC data show that average market prices for Lidocaine-Prilocaine increased by almost 300% beginning in April 2014 and remained artificially high thereafter:



3095.   These price increases occurred following the February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida, which at least representatives from non-Defendant Hi-Tech, Impax, and Sandoz attended.

**AA.     Metformin ER (F)**

3096.   Metformin ER (F) has been available in the United States for over a decade in a generic form.

3097.   During the relevant period, Actavis and Lupin were the primary manufacturers of

---

[244]   GAO Report, at 41.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Metformin ER (F).

3098.   For years, the prices for generic Metformin ER (F) were relatively low, stable and declining.  In 2015 Lupin and Actavis began to impose large price increases.  For instance, in September 2015, Lupin increased its WAC price of Metformin ER (F) 500 mg and 1000 mg extended release tablets by approximately ███.  Two months later, Actavis increased its WAC price of Metformin ER (F) 500 mg and 1000 mg extended release tablets by 58% and 63% respectively.

3099.   Throughout this period, Actavis and Lupin met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Metformin ER (F) and their Fair Share agreement.

3100.   For example, Lupin's ████████, VP of Sales, communicated by phone with Actavis's T.G., Director of National Accounts, throughout the period in which Lupin and Actavis raised and maintained high prices for Metformin ER (F).  They communicated by phone in June, July and October 2015, and again in May, June and July of 2016.

### BB.   Methadone HCL

3101.   Methadone HCL is available in Injectable, Tablet, and Oral Liquid formulations.  It has been available in the United States for decades in a generic form.

3102.   During the relevant time frame, Defendant West-Ward and a non-Defendant manufacturer were the primary manufacturers of Methadone HCL tablets.

3103.   For years, the prices for Methadone HCL tablets were relatively low and stable. Before the summer of 2014, West-Ward and the non-Defendant manufacturer sold Methadone HCL tablets for ████████████.  In the second half of 2014, however, West-Ward and

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the non-Defendant manufacturer nearly simultaneously imposed large price increases, approximately ▮▮▮ their list (WAC) prices.

3104.   Throughout this period, West-Ward and the non-Defendant manufacturer met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Methadone HCL tablets and of their Fair Share agreement.

3105.   On May 15, 2014, West-Ward's D.S. and an employee at the non-Defendant manufacturer communicated by phone.  In August, the two sales executives attended the NACDS Total Store Expo in Boston on August 23 to 26, 2014.

3106.   Approximately one month after the NACDS meeting, West-Ward announced list (WAC) price increases for Methadone.  A few weeks later, the non-Defendant manufacturer matched West-Ward's list (WAC) prices.

### CC.   Methylprednisolone

3107.   During the relevant time frame, Defendants Sandoz, Par, Breckenridge, Cadista, and a non-Defendant manufacturers were the principal manufacturers of Methylprednisolone.

3108.   For years, the prices of Methylprednisolone were relatively low and stable, but that changed abruptly in early 2011.   When some manufacturers had supply disruptions, all manufacturers used it as pretext to increase prices; ███████████████████████ ███████████.  Although the supply disruption—which in any event did not impact all manufacturers—was resolved in few months, prices never returned to the prior, lower levels.

3109.   In 2011, Sandoz, Cadista, and a non-Defendant manufacturer announced identical list (WAC) prices in succession, and when one of the non-Defendant manufacturers entered the market in the fall of 2011, it matched the list prices of Sandoz and Cadista.  Similarly, when Par entered the market in January 2016, it matched the list prices of Sandoz and Cadista.

3110.   Defendants' Fair Share agreement and agreement to fix the prices of Methylprednisolone enabled them to maintain elevated prices.  In a 2012 internal analysis, Sandoz wrote that ███████████████████████████████████████████████████

███████████████████████████████████████████████████.  That, of course, is how a competitive market is supposed to work.  However, Methylpredinsolone prices did not erode because of Defendants' adherence to their Fair Share agreement.

3111.   For example, in late 2012, when Breckenridge and one of the non-Defendant manufacturers were re-entering the market, R.T. and Armando Kellum of Sandoz avoided disrupting other manufacturers' Fair Shares.  ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████ Kellum was concerned that ███████████████████████

███████

3112.   In September 2013, ████████████████████████████████████

█████████████████████████.  Kellum quickly followed up ██████████████████████

███████████████████████████████████████████████████

███████████████████████████ Kellum responded, consistent with the Fair Share agreement between Sandoz and Cadista (and the other Defendants), ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3113.   Throughout this period, Sandoz, Par, Breckenridge, and the non-Defendant manufacturers met at trade conferences and communicated directly with each other in furtherance of their price fixing agreements on Methylprednisolone and their Fair Share agreement.

**DD.   Metronidazole**

3114.   Sandoz and Valeant conspired to increase the price of Metronidazole vaginal gel. Valeant manufactures a branded metronidazole gel under the name MetroGel vaginal.

3115.   The Metronidazole vaginal gel price increase occurred shortly after trade association meetings where representatives from Sandoz and Valeant were in attendance, such as:  (i) June 2014 HDMA Business and Leadership Conference; (ii) December 3, 2014, NACDS Foundation and Reception Dinner in New York, New York; and (iii) April 2015 NACDS Annual Meeting.

3116.   Notably, the Metronidazole vaginal gel price increase occurred around the same time Valeant was also dramatically increasing prices of numerous other drugs.  At the end of 2012, Valeant acquired Medicis, which originally manufactured brand MetroGel vaginal, and proceeded to engage in a series of price increases on MetroGel vaginal in 2013 and 2014.  Such price increases are a well-known business strategy of Valeant.[245]  Valeant was among the generic manufacturers that received a letter as part of the Congressional investigation into generic price increases.

---

[245]   See Press Release, U.S. Sen. Bernie Sanders, "Sanders and Cummings Ramp Up Investigation of Staggering Drug Price Increases" (Aug. 14, 2015), https://www.sanders.senate.gov/newsroom/press-releases/sanders-and-cummings-ramp-up-investigation-of-staggering-drug-price-increases (asking Valeant why prices of drugs increased when the only change in the drugs is "the company that owns them").

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### EE.    Naproxen Sodium

3117.   During the relevant timeframe, Defendants Glenmark and Amneal were the principal manufacturers of Naproxen Sodium tablets.

3118.   For years, the prices for Naproxen Sodium tablets were relatively low and stable. In 2015, Teva prepared to and eventually did exit the market, leaving Glenmark and Amneal as the dominant suppliers.  Rather than compete against each other to pick up Teva's market share, Glenmark and Amneal imposed very large and nearly simultaneous price increases.

3119.   For instance in April 2015, Glenmark imposed an approximately ███ WAC price increase on Naproxen Sodium 275 mg tablets.   Two months later, Amneal imposed an approximately ███ WAC price increase on Naproxen Sodium 275 mg tablets.   Following Amneal's ███ increase, its WAC price identically matched Glenmark's WAC price.

3120.   Throughout this period, Glenmark and Amneal met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on generic Naproxen Sodium and of their Fair Share agreement.

3121.   For example, ███, VP of Sales at Glenmark, and S.R., Senior Director of Sales at Amneal, frequently communicated during the period when Glenmark and Amneal raised and maintained the prices of Naproxen Sodium.   The two executives communicated by phone multiple times per month in every month of 2015.

### FF.    Neomycin Polymyxin Hydrocortisone

3122.   Neomycin Polymyxin Hydrocortisone is available in several forms, including a Solution, and has been available in the United States for over a decade in a generic form.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3123.   At all relevant times there have been multiple manufacturers, with Bausch and Sandoz serving as the principal manufacturers of Neomycin Polymyxin Hydrocortisone (3.5 mg–10 MUI%).

3124.   In the spring of 2010, Bausch and Sandoz began increasing prices in parallel.  In the fall of 2010, both Bausch and Sandoz again increased prices.  In the summary of 2015, both Bausch and Sandoz further increased prices, ████████████████████████████.

3125.   The ability of Bausch and Sandoz to reach agreements on Neomycin Polymyxin Hydrocortisone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

## GG.    Oxycodone Acetaminophen

3126.   Oxycodone Acetaminophen is a pain reliever that has been available in the United States for decades.  It is available in Capsule, Tablet, and Oral Solution formulations.

3127.   Defendants Actavis, Alvogen, Amneal, Aurobindo, Mayne, and Par were the principal manufacturers of Oxycodone Acetaminophen, which comes in several dosage strengths including 5-325, 7.5-325, 10-325 mg Tablets.

3128.   Given the large number of competitors entering the market for Oxycodone Acetaminophen between 2011 and 2015, pricing should have fallen over time.  That did not come to pass.

3129.   Between 2011 and 2012, Actavis, Alvogen, and Amneal sold 100-tablet bottles of 10/325 mg pills sold for $18 per bottle.

3130.   In 2013, Actavis, Alvogen, and Amneal increased the prices of 100-tablet bottles of 10/325 mg pills for more than $80.  Aurobindo and Par re-entered the market for Oxycodone

Acetaminophen in 2013 as well.  Rather than undercutting their competitors' prices to win market share, Aurobindo and Par imposed ████████████████████████████.

3131.   On November 29, 2013, Par[246] received a request from Econdisc to bid for Econdisc's Oxycodone Acetaminophen business.  Adhering to Fair Share principles, Par declined to compete for this business with lower pricing.

3132.   In late 2014, Mayne entered the market for Oxycodone Acetaminophen.  In planning the launch, ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ Upon entry, Mayne in fact did receive its Fair Share while offering similar prices to its competitors rather than undercutting them.

3133.   The ability of Actavis, Alvogen, Amneal, Aurobindo, Mayne, and Par to reach agreement regarding Oxycodone Acetaminophen was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3134.   These Defendants also communicated among each other by telephone.  Between September and December 2013, ████████████████████████████████

████████████████████.  During the same period, ████████████████████

██████████████████████.  Similarly, in December 2013 and January 2014,

████████████████████████████.

3135.   The agreement between Defendants Actavis, Alvogen, Amneal, Aurobindo, Par, and a non-Defendant manufacturer was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer

---

[246] At the time, Qualitest.  Qualitest merged with Par in 2016.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

allocation for generic drugs, including Oxycodone Acetaminophen Tablets (5-325, 7.5-325, 10-325 mg).

### HH. Permethrin

3136.   Permethrin has been available in the United States for decades in a generic form.

3137.   At all relevant times, Actavis, Perrigo, and Mylan were the principal manufacturers of Permethrin 5% Cream.

3138.   In the summer of 2010, effective prices for Permethrin cream sold by Perrigo and Actavis were low and stable at less than ▮ per unit.  In the summer of 2011, however, Perrigo and Actavis agreed to implement significant price increases and by the summer of 2013, when Mylan entered the market, prices were more than ▮ higher than in 2009 through early 2011.

3139.   Permethrin 5% Cream had an "extraordinary price increase" in the years 2011-2013.   Both Actavis and Perrigo issued large and identical WAC price increases in close succession.  For instance in July 2011, Actavis increased its WAC price for Permethrin 5% Cream by approximately ▮.  The following month, Perigo instituted an identical approximately ▮ WAC price increase for Permethrin 5% Cream matching Actavis' increase.

3140.   In March 2013 Perrigo instituted another approximately ▮ WAC price increase for Permethrin 5% Cream.  Just one month later, Actavis issued an approximately ▮ WAC increase, thereby matching Perrigo's WAC price.

3141.   When Mylan entered the market in the late summer of 2013, rather than offer lower prices to gain market share (as would be expected in a competitive market), Mylan announced identical list (WAC) prices, which was consistent with their price-fixing agreement on Permethrin and their Fair Share agreement.

3142.   The ability of Actavis, Mylan, and Perrigo to reach agreement regarding Permethrin was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3143.   For example, on May 27, 2010—right around the time that Actavis and Perrigo first raised NSP prices— ██ , Actavis's Director of National Accounts spoke by phone with ██ , Perrigo's Director of National Accounts for nearly 10 minutes.

3144.   The two spoke again the following summer.  In late July 2011, Actavis announced a list (WAC) price increase.  Shortly thereafter, the Perrigo Director of National Accounts and the Actavis Director of National Accounts spoke for three minutes on August 3.  Two days later, Perrigo announced an identical list (WAC) price.  That day, the Perrigo Director called the Actavis Director and appears to have left a message.  A few days later, on August 8, they finally connected and spoke for nearly 9 minutes.

3145.   The pattern repeated in 2013.  This time, Perrigo led the list (WAC) price increase on March 13, 2013.  The next day, the Actavis and Perrigo Directors spoke for more than 10 minutes.  They spoke again for nearly 25 minutes on April 12.  On April 25, Actavis announced list (WAC) prices identical to those of Perrigo.

3146.   Before Mylan entered the market in late 2013, Mylan's Jim Nesta and Perrigo's T.P. (Director of National Accounts) communicated.  On August 27, the two executives exchanged messages but finally connected on the 28th and spoke for 10 minutes.  They spoke again on November 15.  Perrigo's Director of National Accounts kept Actavis in the loop.  He again spoke to ██ Director of National Accounts at Actavis on August 21, 23 and September 11, 2013.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

II.    **Perphenazine Tablets**

3147.   Prior to 2009, the price of Perphenazine cost pennies per dose.  However, Qualitest left the market in 2009 due to a disruption in supply, and Sandoz dramatically increased prices.

3148.   When Qualitest re-entered the market in the summer of 2009, rather than resume its formerly low pricing to compete with Sandoz to win back customers, it joined the market at Sandoz's elevated prices.  This was consistent with the Fair Share agreement between Sandoz, Qualitest and all Defendants.

3149.   The market shares of Qualitest and Sandoz are wholly reflective of each company's adherence to the fair share rules.  As of May 2010, Qualitest had less than 14% market share, compared to Sandoz's 86.1% share of the market.  Over the next year, Sandoz conceded approximately 20% market share to Qualitest, and by May 2011, Qualitest's share was more than 33% compared to 66% for Sandoz.  But during this time, despite the fact that Qualitest increased its market share from 13% to 33%, prices charged by both companies remained virtually unchanged.

3150.   Indeed, between May 2011 and May 2014, the respective market shares of Qualitest and Sandoz remained essentially fixed, with Par supply roughly one third of the market, and Sandoz supplying the remaining two thirds.  As a result of their adherence to the fair share rules, the companies were able to increase prices twice (once in 2011 and again in 2013), and as a result, their average prices roughly doubles from the supracompetitive pricing establishing by Sandoz in 2009.  Adherence to the fair share rules rendered the price increases virtually self-executing.  Because each company knew that the other was committed to the conspiracy, the communications about pricing were essentially a formality.

3151.   In mid-2014, the companies reallocated share to be more consistent with fair share rules, and Sandoz conceded additional share to Qualitest so that the two companies had market share close to 50%.  Following this reallocation, Sandoz and Qualitest maintained market share within a few percentage points of 50% until at least the end of 2016.

3152.   Throught this period, Sandoz and Qualitest met at trade conferences and communicated with each other in furtherance of their price-fixing agreement on Perphenazine and of their Fair Share Agreement.

3153.   For example, in June 2020, Armando Kellum, Sandoz Director of Contracts and Pricing, spoke on the phone with a former Sandoz colleague, W.P., Qualitest  Senior Director of National Accounts.  Kellum and W.P. spoke again multiple times in early April 2013, as Sandoz and Qualitest began to implement another price increase on Perphenazine.

3154.   As a result of this collusion, Sandoz and Qualitest were able to charge supracompetitive prices for Perphenazine to Cigna and others in the United States.

**JJ.     Pilocarpine HCL**

3155.   Pilocarpine HCL is available in Tablet and Oral Liquid formulations.  It has been available in the United States for over a decade in a generic form.

3156.   Defendants Actavis, Impax, and Lannett were the principal manufacturers of Pilocarpine HCL Tablets (5 mg) during the relevant time period.  During much of the relevant time period, Lannett held approximately 80% of the market share and Actavis held most of the remaining 20%.  Impax had a relatively small market share.

3157.   For years, the prices for Pilocarpine HCL tablets were relatively low and stable. In late 2013 and early 2014, Impax experienced supply disruptions, at which point Actavis and Lannett immediately imposed very large price increases.  Rather than compete for Impax's old

customers on price, Actavis and Lannett relied on the Fair Share agreement to raise prices instead.

3158.   In the fall of 2015, when Impax was finally ready to re-enter the market, rather than compete for customers with better pricing, Impax offered higher prices than either Actavis or Lannett.  Even with higher prices, Impax was quickly able to build market share.  Meanwhile, prices for all three manufacturers remained higher than before the increases had been implemented.

3159.   The ability of Actavis, Impax, and Lannett to reach agreement regarding Pilocarpine HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3160.   Defendants also communicated by telephone.  In late 2013 and early 2014—the time of the Pilocarpine price increases—Actavis's Falkin and Lannett's K.S. communicated multiple times by phone.  Falkin (Actavis) also communicated by phone on November 15, 2013 with M.G., Senior National Account Manager at Impax. Lannett's K.S. also communicated by phone with Impax during this same window of time; on January 15, 2014, he spoke to D.D., Impax National Accounts Manager.

### KK.   Potassium Chloride ER

3161.   Potassium Chloride is available in different formulations, including Tablets LA. It has been available in the United States for decades in a generic form.

3162.   Actavis, Mylan, Sandoz, Upsher-Smith, and Zydus dominate sales of Potassium Chloride 8MEQ, l0MEQ, and 20MEQ Long-Acting Tablets.

3163.   For years, the prices of Potassium Chloride tablets were relatively low and stable. Upsher-Smith, Sandoz and Actavis were the principal suppliers in the market in the early years.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Upsher-Smith manufactured tablets and marketed and sold them under the brand name Klor-Con.  Upsher-Smith also supplied tablets to Sandoz, which in turn marketed and sold them under a Sandoz label.

3164.   In the summer of 2010, Upsher-Smith, Sandoz and Actavis imposed nearly simultaneous and very large price increases.  In the space of approximately 6 weeks, all three manufacturers ███████ their list (WAC) prices for Potassium Chloride 8MEQ and l0MEQ, and nearly doubled list (WAC) prices for Potassium Chloride 20MEQ.

3165.   In January 2011, Zydus entered the market.  Rather than offer better prices to win market share, Zydus tracked the high prices of Upsher-Smith, Sandoz and Actavis.

3166.   As of July 1, 2014, Upsher-Smith ceased to market and sell Klor-Con under the Upsher-Smith label, but instead licensed the Klor-Con name to Sandoz.  Thus, after July 1, 2014, Sandoz sold Klor-Con Potassium Chloride tablets under the Sandoz label, though the tablets continued to be manufactured by Upsher-Smith.

3167.   In the second half of 2014, Mylan entered the market for Potassium Chloride tablets.  Like Zydus before it, Mylan entered at high prices that tracked the other manufacturers already in the market.

3168.   Actavis, Mylan, Sandoz, Upsher-Smith, and Zydus's Potassium Chloride prices remained elevated.  The ability of Actavis, Mylan, Sandoz, Upsher-Smith, and Zydus to reach agreements regarding Potassium Chloride was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3169.   For example, during the summer of 2010, D.Z, the Senior National Account Manager at Upsher-Smith, and K.K., a Senior National Account Executive at Sandoz,

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

communicated a number of times by telephone both before and after the August list (WAC) price increases by Sandoz and Upsher-Smith.

3170.   During the summer of 2011, before Zydus entered the Potassium Chloride ER market, it first communicated with the incumbent suppliers.  K.R., Zydus's Assistant Vice President of National Accounts, communicated frequently that summer by phone, including voice and text messages, with D.L., a Director of National Accounts at Sandoz.

3171.   In the fall of 2014 when Mylan was entering the Potassium Chloride ER market, Mylan's Jim Nesta spoke to Marc Falkin at Actavis twice on September 23, 2014.  They also had been communicating over the summer leading up to Mylan's entry.  When Mylan finally joined the market it did so at elevated prices consistent with the Fair Share and price-fixing agreement.

3172.   

3173.   As a result of this agreement, Defendants have been able to maintain supracompetitive pricing for Potassium Chloride ER since August 2010.

### LL.    Prednisolone Acetate

3174.   Prednisolone Acetate has been available in the United States for decades in a generic form.   It is available in an Ophthalmic Solution and in Ophthalmic Liquid Eye formulations.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3175.   A non-Defendant manufacturer and Defendant Sandoz were the principal manufacturers of Prednisolone Acetate Ophthalmic Liquid Eye (1%).  For much of the relevant time period, Sandoz had approximately two thirds of the market, and the non-Defendant manufacturer had approximately one third of the market.

3176.   Prednisolone Acetate Ophthalmic Liquid Eye had "extraordinary price increases" in the years 2013-2014.  For instance in August 2013, Sandoz increased its WAC price for Prednisolone Acetate 1% opthamalmic suspension by approximately ████.  Documentary evidence confirms that these parallel price increases were the result of collusion among Sandoz and the non-Defendant manufacturer.

3177.   Because of the ongoing understanding of the Fair Share Agreement between the companies, they did not worry about their ostensible competitors cutting prices to gain market share.  They also did not attempt to undercut their ostensible competitors' prices in order to gain additional market share.  For example, in January 2014, several months after the dramatic price increase, C.B. of Sandoz reported to colleagues that ███████ was looking for a bid on Prednisolone Acetate.  Kellum of Sandoz responded, █████████████████████████ ████████████████████████████████████ D.H. of Sandoz wrote back, ██████ ██████████████████████████████████████████████████ ████████████████████████████████████████ █████████████████████████████████████████ ███████████████████████████████ Kellum confirmed, ███████████ ████████████████████████████ By way of another example, a Sandoz November 2015 █████████████████████████ states that

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Sandoz ███████████████████████████████████████████

███████████████████████

3178.   The ability of the non-Defendant manufacturer and Sandoz to reach agreement regarding Prednisolone Acetate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3179.   For example, representatives from the non-Defendant manufacturer and Sandoz convened at the NACDS 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada on August 10-13, 2013.  Less than two weeks later, Sandoz announced a large list (WAC) price increase, which the non-Defendant manufacturer promptly followed.

### MM.   Prednisone

3180.   Prednisone is available in Tablet and Oral Solution formulations. It has been available in the United States for over a decade in a generic form.

3181.   Defendants Actavis, Cadista, Par, and West-Ward were the principal manufacturers of Prednisone tablets.

3182.   For years the prices of Prednisone tablets were relatively low and stable.  There were limited supply disruptions in 2012 and early 2013.  In January 2013, Cadista had temporarily exited the market.  Ultimately, market supply recovered and, for some dosages, increased in 2014.  Nonetheless, in the spring of 2013, all manufacturers shifted their prices significantly higher.  By the end of 2013, Prednisone tablet prices were more than ████ the prices that they were at the beginning of the year, and prices have remained higher than former levels through the present.

3183.   For instance in July 2013, West-Ward increased its WAC price for Prednisone 20 mg tablets by approximately ████.  Two months later, Actavis increased its WAC price for

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Prednisone 20 mg tablets by approximately ███. After Actavis' WAC increase, its price for Prednisone 20 mg tablets precisely matched West-Ward's WAC price for Prednisone 20 mg tablets. When Cadista reentered the market in August 2013, it followed the new higher pricing. When Par entered the market in January 2016, its WAC prices matched West-Ward and Actavis' inflated WAC prices.

3184.   The ability of Actavis, Cadista, Par, and West-Ward to reach agreements on Prednisone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3185.   In July 2013, shortly before Cadista reentered the Prednisone market, M.D., VP of Sales and Marketing at Cadista, spoke with Marc Falkin of Actavis on July 31, 2013. On November 1, 2013, M.D. of Cadista spoke with S.G., VP of Sales and Marketing at West-Ward. T.R., VP of Marketing at Cadista, communicated by phone with N.C., Executive Director of Marketing at Actavis, in July and October of 2013, and with A.G., Director of National Accounts at Actavis, in September of 2013.

3186.   D.S., who began as Head of Sales at West-Ward in January 2014 after leaving Taro, called K.O., VP of National Accounts at Par, during his first weeks on the job. The two had communicated when D.S. was at Taro, and the practice continued when D.S. moved to West-Ward. D.S. communicated by phone with K.O. throughout 2014. They communicated in January, February, April, May, June, July, October, November and December. Prices for Prednisone remained high throughout this time.

3187.   J.H., Par Regional VP of Sales at Par, began communicating with Marc Falkin shortly after Falkin joined Actavis. The two communicated by phone in September 2013, then throughout 2014, including (at least) in February, March, April, May, June, July, August and

October.  C.P., VP of National Accounts at Par, communicated multiple times by phone with A.S., VP of Sales at Actavis, in late 2013 and again in the fall of 2014.

### NN.    Propranolol HCL capsules

3188.    At all relevant times, Actavis, Breckenridge, and Upsher-Smith have dominated the market for Propranolol HCL capsules.

3189.    Actavis, Breckenridge, and Upsher-Smith collusively increased prices on Propranolol HCL capsules between December 2013 and October 2014.

3190.    According to NADAC data, various dosage levels of Propranolol HCL capsules saw the following average price increases:

> Propranolol HCL ER 120mg capsules:  increased by 181% between December 2013 and July 2014; and
>
> Propranolol HCL ER 180mg capsules:  increased by 174% between December 2013 and October 2014.



3191.    Medicaid reimbursement data also confirm that these Defendants increased their prices abruptly and largely in unison.  The following charts depict Medicaid reimbursement rates

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

for exemplary dosage levels of Propranolol HCL capsules.



3192.   These price increases followed the October 28-30, 2013 GPhA Technical

Conference in North Bethesda, Maryland, which representatives from Actavis, Breckenridge,

and Upsher-Smith attended.

**OO.    Ranitidine HCL Capsules**

3193.   Defendants Sandoz and Dr. Reddy's were the principal manufacturers of

Ranitidine HCL Capsules during the relevant period.

3194.   After years of stable list prices under $1.00, in early 2012, Sandoz and Reddy's

each imposed price increases for Ranitidine HCL Capsules of approximately 50%.

3195.   During this period, personnel from Sandoz and Dr. Reddy's met at trade conferences and communicated with one another.  The ability of Sandoz and Dr. Reddy's to reach agreements on Ranitidine HCL Capsules was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3196.   Personnel from Sandoz and Dr. Reddy's were also in communiation by phone during this period.  On March 23 and 26, 2012, J.A., VP of Sales and Marketing at Dr. Reddy's, and J.R., Director of Institutional Marketing at Sandoz, had phone calls.

### PP.   Silver Sulfadiazine

3197.   Silver Sulfadiazine has been available in the United States for many years in a generic form.  It is available in a Cream formulation.

3198.   Defendants Ascend and Actavis were the principal manufacturers of Silver Sulfadiazine Cream (1%) during the relevant period.

3199.   In the spring of 2012, Actavis and Ascend imposed large price increases in close succession.

3200.   During this period, personnel from Actavis and Ascend met at trade conferences and communicated with one another.  The ability of Actavis and Ascend to reach agreements on Silver Sulfadiazine was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

### QQ.   Spironolactone HCTZ

3201.   Spironolactone Hydrochlorothiazide (HCTZ) has been on the market for decades and is available in 25-25mg Tablets.

3202.   Defendants Mylan and Sun and a non-Defendant manufacturer were the principal manufacturers of 25-25mg Spironolactone HCTZ Tablets druing the relevant period.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3203.   After years of relatively low and stable pricing, in early 2013 the prices of Spironolactone HCTZ significantly increased.  Within approximately one month, Mylan, Sun and the non-Defendant manufacturer each announced list price increases of approximately 400%.

3204.   The GAO reported that 25-25mg Spironolactone HCTZ Tablets experienced "an extraordinary price increase" in 2013-2014.  There were no reported shortages of these products in the relevant period.

3205.   WAC pricing also rose in a coordinated fashion.  In April 2013, Sun raised its prices almost five times its prior WAC price, a decision it would not have made unless it had pre-existing knowledge that the others would quickly match, as they did.  The non-Defendant manufacturer matched Sun's WAC increase shortly thereafter, and Defendant Mylan essentially matched Sun's WAC price increase in October 2013.

3206.   A little more than a year later, in the summer of 2014, Mylan and Sun again raised prices.  Almost simultaneously, Mylan raised WAC prices by 33% and Sun raised WAC prices by 23%.

3207.   Jim Nesta of Mylan was in contact by telephone by personnel from the non-Defendant manufacturer during periods when Mylan, Sun, and the non-Defendant manufacturer increased prices for Spironolactone HCTZ.  Similarly, personnel from Sun's subsidiary Taro, including ███████████, were in contact by telephone with personnel from the non-Defendant manufacturer during this period.  ███████████ of Mylan spoke with ███████████ of Sun/Taro on March 17, 2014 and March 18, 2014, and ███████████ of Mylan and ███████████ of Sun's subsidiary Taro spoke on March 18, 2014, June 4, 2014, June 6, 2014, June 9, 2014, July 2, 2014, and July 10, 2014.

3208.   The ability of Defendants Mylan and Sun and the non-Defendant manufacturer to reach agreement regarding for Spironolactone HCTZ was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3209.   For example, Defendants Mylan and Sun all sent representatives to the GPhA Annual Meeting in Orlando, Florida on February 20 to 22, 2013.  All three companies also attended the NACDS 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida on April 20 to 23, 2013.

**RR.   Timolol Maleate**

3210.   Timolol Maleate has been available in the United States for decades in a generic form.  It is available in Opthalmic Gel, Opthalmic Liquid Eye, and Tablet formulations.

3211.   During the relevant time period, Defendants Bausch and Sandoz were the principal manufacturers of Timolol Maleate Opthalmic Gel, which is available in dosage strengths of 0.25% and 0.5%.  For much of the relevant time period, Bausch and Sandoz divided the market for Timolol Maleate Opthalmic Gel in close to a 50/50 split.

3212.   A May 2013 Sandoz internal document posed the following question: ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮   Not long after this analysis, Sandoz and Bausch almost simultaneously imposed significant price increases.  List (WAC) prices more than tripled.  Even as prices skyrocketed, market share remained roughly split between the companies.

3213.   Throughout this period, Bausch and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Timolol Maleate and of their Fair Share agreement.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3214.   For example, both companies sent representatives to the ECRM Retail Pharmacy Efficient Program Planning Session at the Omni Amelia Island Plantation Resort in Amelia Island, Florida on February 23-26, 2014.  Sandoz had raised its list (WAC) prices shortly before the conference.  Bausch announced its own list (WAC) price increases for Timolol Maleate shortly after the conference, on March 12, 2014.

3215.   For example in January 2014—a month before the Amelia Island Efficient Program Planning Session—Sandoz increased the WAC price of Timolol Maleate Ophthalmic Gel 0.25% by approximately ███.  Weeks after the conference, Bausch increased the WAC price of Timolol Maleate Ophthalmic Gel 0.25% by approximately ███.  After Bausch's increase, its WAC price for price of Timolol Maleate Ophthalmic Gel 0.25% exactly matched Sandoz's WAC price.

3216.   The GAO noted that Timolol Maleate Ophthalmic Gel had an "extraordinary price increase" in the years 2014-15.

### SS.     Tobramycin Dexamethasone

3217.   Tobramycin Dexamethasone has been available in the United States for over a decade in a generic form.

3218.   Defendants Bausch and Sandoz were the principal manufacturers of Tobramycin Dexamethasone Ophthalmic Liquid (0.3-0.1%) ████████████████████████████ ████████

3219.   ██████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3220.   In October 2012, Bausch instituted an approximately ██ WAC price increase for Tobramycin Dexamethasone 0.3%-0.1% Ophthalmic Suspension.  That same month, Sandoz increased the WAC price of Tobramycin Dexamethasone 0.3%-0.1% Ophthalmic Suspension by approximately ██.  After this increase, Bausch's and Sandoz's WAC prices were nearly identical.

3221.   The ability of Bausch and Sandoz to reach agreements on Tobramycin Dexamethasone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3222.   The parallel price increases by Bausch and Sandoz are consistent with the Fair Share Agreement.

3223.   The agreement between Defendants Bausch and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Tobramycin Dexamethasone Ophthalmic Liquid (0.3-0.1%).

**TT.    Trazodone HCL**

3224.   Trazodone HCL is available in tablet form in several strengths, including 100 mg Tablets.  It has been available in the United States for over a decade in a generic form.

3225.   During the relevant time period, Defendants Teva and Par were the principal manufacturers of Trazodone HCL 100mg Tablets, with Teva holding about 70% of the market and Par holding about 15% within that timeframe.  Apotex and Sun each held smaller shares.

3226.   In July 2015, Teva increased the WAC price of Trazodone HCL 100 mg tablets by approximately ██.  That same month, Sun instituted an approximately ██ WAC price increases for Trazodone HCL 100 mg tablets.  Just two months later, Apotex followed suit and

instituted an approximately ▇ WAC price increases for Trazodone HCL 100 mg tablets.  After Apotex's September price increase, Apotex, Sun, and Teva offered identical WAC prices for Trazodone HCL 100 mg tablets.

3227.   The ability of Apotex, Par, Sun, and Teva to reach agreements on Trazodone HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3228.   The agreement between Defendants Apotex, Par, Sun, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including 100 mg Trazodone HCL Tablets.

### UU.   Triamterene HCTZ

3229.   Triamterene HCTZ has been on the market for decades and is available in multiple forms and dosages, including Capsules (37.5-25 mg) and Tablets (37.5-25 mg and 75-50 mg).

3230.   At all relevant times, there have been multiple manufacturers: Defendants Lannett, Mylan, and Sandoz were the principal manufacturers of 37.5-25 mg capsules and Defendants Actavis, Apotex, Mylan, and Sandoz were the principal manufacturers of 37.5-25 mg and 75-50 mg tablets.

3231.   For many years the price of Triamterene HCTZ remained stable.  However, prices began to rise dramatically beginning in November 2011.

3232.   In November 2011, Mylan instituted an approximately ▇ WAC price increase on Triamterene HCTZ 75-50 mg tablets.  In January 2012, Sandoz followed suit by instituting an identical approximately ▇ WAC price increase on Triamterene HCTZ 75-50 mg tablets.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Next, in March 2012, Actavis increased its WAC price on Triamterene HCTZ 75-50 mg tablets by approximately ██ ██. Finally, in August 2012, Apotex increased its Triamterene HCTZ 75-50 mg tablets WAC price by approximately ███. After Apotex's August 2012 price increase, Mylan, Sandoz, Actavis, and Apotex offered nearly identical prices for Triamterene HCTZ 75-50 mg tablets.

3233.   Before 2011, prices for Triamterene HCTZ capsules were low.  In 2011, Sandoz temporarily exited the market, which prompted Mylan to raise its price.  When Lannett entered the market in December 2011, it did so at elevated prices and was careful not to disturb the market pricing.  Sandoz eventually re-entered the market as well, but even with three suppliers, prices did not return to prior—lower—levels.  Defendants' Fair Share agreement kept prices inflated above competitive levels.

3234.   For years, the price of Triamterene HCTZ tablets hovered below ████ per tablet. In 2011 and 2012, prices increased to approximately ████ per tablet when Mylan, Sandoz and Actavis imposed large price increases, all close in time and amount.  When Apotex joined the market in late 2012, rather than offer lower prices to win customers, it offered the same elevated prices as Mylan, Sandoz and Actavis.  All four manufacturers eventually imposed identical list (WAC) prices.  Mylan, Sandoz, Actavis and Apotex engaged in parallel, elevated pricing for Triamterene tablets, and Mylan, Lannett and Sandoz engaged in parallel, elevated pricing for capsules.  Triamterene HCTZ 75-50 mg tablets exhibit a similar pricing pattern.

3235.   The GAO reported that Triamterene HCTZ 50-75 mg Tablets experienced "an extraordinary price increase" in 2013–2014.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3236.   Throughout this period, Actavis, Mylan, Sandoz, Apotex and Lannett met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Triamterene HCTZ capsules and tablets and their Fair Share agreement.

3237.   For example, in November 2011—when Mylan announced list (WAC) price increases for Triamterene HCTZ tablets—M.W., Mylan Director of National Accounts, was communicating by phone with J.R., Sandoz Director of Institutional Marketing, and K.B., Sandoz National Account Manager.

3238.   On March 8, 2012, M.B., Actavis Director of National Accounts, communicated by phone with T.K., Apotex National Account Manager.  The next day, Actavis announced list (WAC) price increases for Triamterene-HCTZ.  M.B. (Actavis) and T.K. (Apotex) communicated by phone again on March 16.

In April 2012, not long after Lannett entered the Triamterene-HCTZ capsule market, J.K., Mylan VP & Executive Director of Sales, communicated by phone with K.S., VP of Sales and Marketing at Lannett, on April 19, 20 and 23.

**VV.   Ursodiol**

3239.   At all relevant times, Actavis and Lannett dominated the market for Ursodiol.

3240.   Prior to May 2014, prices for Ursodiol were stable.

3241.   Beginning in May 2014, Actavis and Lannett increased their prices for Ursodiol abruptly and largely in unison.

3242.   According to NADAC data, the average market price for generic Ursodiol saw the following price increase from May 2014 to November 2014:

Ursodiol 300mg Capsules:  increased from $0.29 per unit to

$4.49 per unit, a 1,448% increase.

3243.   NADAC data show that average market price for Ursodiol rose dramatically and remained artificially high after May 2014, as depicted below.



3244.   WAC pricing confirms that Actavis and Lannett increased their Ursodiol prices substantially and largely in unison.

| Dosage | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 300mg | Lannett | 00527132601 | | $5.11 | 5/1/2014 | |
| 300mg | Actavis | 00591315901 | $0.77 | $5.11 | 6/24/2014 | 562% |

3245.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, and market-wide price increases.  In November 2014, patient Barbara Heller reported that her three-month prescription for Ursodiol increased from $94.50 to $1,212.30 between refills.[247]

---

[247] Jonathan Lapook, *Why some generic drug prices are skyrocketing*, CBS NEWS (Nov. 12, 2014), http://www.cbsnews.com/news/generic-drug-prices-skyrocketing/.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

XIII.   **PRICE INCREASES SLOW DRAMATICALLY AFTER GOVERNMENT
INVESTIGATIONS COMMENCE**

3246.   As further evidence that the price increases discussed above were not the result of

normal market factors, the massive price spikes that were occurring in the industry in 2013 and

2014 slowed dramatically after the State of Connecticut commenced its antitrust investigation in

July 2014.  This was not a coincidence.  Generic drug manufacturers in the industry – including

the Defendants in this case – understood that they were under scrutiny and did not want to draw

further attention to themselves.

3247.   In January 2015, Sandoz conducted an analysis of the price increases in the

generic drug industry in 2013 and 2014, with an early look toward 2015.  In its report, Sandoz

found that "[g]eneric drug price increases in 2013 and 2014 were very common." Specifically,

the report stated:  "For the years 2013 and 2014, there were 1,487 SKU 'large price increases'

(WAC increase greater than 100%)[;] of this 12% (178 SKUs) were increased by more than

1000%."

3248.   The report went on to state that "[t]he number and level of price increases

declined noticeably in 4Q 2014." The following graphic, which was included in the Sandoz

report, demonstrates that the number of price increases started to decline dramatically after the

second quarter of 2014 – the same time that the Plaintiff States commenced their investigation:



3249.  To date, prices for many of these drugs remain at significantly inflated, anti-competitive levels.

## XIV.  CONSCIOUSNESS OF GUILT

3250.  The Defendants were aware that their conduct was illegal.  As alleged in Amended State AG Complaint No. 1, Amended State AG Complaint No. 2, and State AG Complaint No. 3, Defendants made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made.  There are numerous examples, discussed throughout this Complaint, where Teva employees indicated that they could not talk by e-mail, but had additional information that they could only convey personally.  This was part of a consistent effort by Defendants to avoid putting incriminating information in writing, in order to evade detection.

3251.  Going back to at least 2012, for example, Heritage executives took overt steps to conceal their illegal activity and destroy evidence of wrongdoing.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3252.   As alleged by the State AGs, none of the e-mail accounts maintained by Heritage had any document retention policy associated with them.  Heritage executives were aware of this and utilized the lack of a company retention policy to routinely destroy e-mails that memorialized their illegal conduct.  Heritage executives were aware that in order to permanently destroy an e-mail, however, the e-mail had to be deleted from more than just the recipient's in box.  For example, on June 27, 2012, Heritage CEO Glazer sent an e-mail to Malek titled "Email" instructing:  "Clean your sent file out as well."

3253.   Glazer continued to remind Malek not to put any evidence of his illegal conduct into writing.  In a text message dated June 26, 2014, Glazer warned Malek about his use of e-mail:  "No emails about products, price and competitors."

3254.   That same day, in an e-mail to the entire sales team at Heritage, Glazer made the point as clearly as possible:  "We don't talk about pricing dynamics and competition on emails.  If you have questions – you can call JM or me directly and then punch yourself in the face."

3255.   Heritage was not alone in its efforts to conceal its illegal activity.  For example, in May 2014, a large customer of Taro's received a bid on a product not identified in this Complaint and gave Taro an opportunity to bid to retain the business.  A.L., a senior contracting executive at Taro, sent an internal e-mail stating "FS ok, will not protect."  E.G., a senior managed care executive at Taro, responded "explain FS, (Fair Share)?"  Aprahamian replied:

No emails please. Phone call. ████ let's discuss. [248]

---

[248]   Amended State AG Complaint No. 2 ¶ 159.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3256.   Similarly, in June 2014, shortly after a text message exchange between K.A. of Citron and Anne Sather from Heritage wherein the two competitors discussed and agreed to raise the price of Glyburide, K.S. from Citron called D.L. at Heritage, informing him that she had been "looped" in on Heritage's plan.  According to Sather's notes, K.S. told D.L. that Heritage employees should not communicate with Citron through e-mail, but should instead call L.S., the Vice President of Sales at Citron, if they had information to convey.

3257.   Similarly, handwritten notes from an internal Sandoz business review presentation from May 2017 – after the States' investigation was well underway – read:  "Avoid Fair Share terminology on slides – underdeveloped or overdeveloped is better."[249]

3258.   To avoid creating a potentially incriminating paper trail, Kellum of Sandoz routinely admonished colleagues for putting information that was too blatant in e-mails, understanding that it could lead to significant legal exposure for both the company and the individuals involved.

3259.   As Defendants became more aware that they were under state and federal investigation, there was even more urgency to avoid detection.  For example, on June 2, 2015, after it had become public that Connecticut and the DOJ were investigating the industry, Malek sent Sather a text message stating:  "Just got your email on meprobamate.  Let's avoid emailing about other manufacturers and having discussions with them.  Can be misconstrued based on what we are hearing elsewhere...."  Upon information and belief, the referenced e-mail has, along with other relevant documents, been deleted by Heritage.

---

[249]   *Id.* at ¶ 159.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3260.   As another example, when Green wanted to speak with a particular competitor, he would routinely send a text message to that competitor, saying only "call me." Again, this was done to avoid putting any potentially incriminating communications in writing.  Patel learned this technique from Green, shortly after starting at Teva, and adopted a similar strategy for communicating with competitors.

3261.   Kellum of Sandoz was also aware that what he and others at Sandoz were doing was illegal.  Kellum had received antitrust training and knew that conspiring with competitors to fix, increase, stabilize, or maintain prices, allocate customers and markets, and rig bids was a violation of the antitrust laws.  Kellum would routinely admonish Sandoz employees for putting anything incriminating into e-mails, and voiced concern that the conduct they were engaging in – if discovered – could result in significant liability.  As a result of Kellum's admonishments, Sandoz employees (including Kellum himself) routinely lied in e-mails about the sources of their information to camouflage their conduct, claiming they learned the information from a customer instead of a competitor.

3262.   Similarly, when Vogel Baylor was asked by a G&W sales executive whether she is straightforward with customers regarding the true reason why G&W declines to bid to maintain market balance, Vogel-Baylor responded, ████████████████████████████████ ████████  Further, when Aprahamian was asked a similar question by a colleague – namely to explain what "fair share" meant – he responded, "No e-mails please. Phone call. . . . let's discuss."

3263.   Additionally, Defendants took actions to obstruct the State AGs' ongoing investigation.  Several were speaking frequently at or around the time a subpoena was issued, or when the State AGs were engaging in substantive discussions with their counsel. For example,

on April 16, 2018, David Berthold, the Vice President of Sales at Defendant Lupin, signed for a subpoena issued to him by the State AGs. That same day, Berthold called Grauso. The next day, April 17, 2018, Grauso returned the call and the two competitors spoke for eleven (11) minutes.

3264.   Similarly, on July 17, 2018, the State AGs issued a subpoena to Grauso through his counsel. That same day, Grauso spoke to Aprahamian for more than twelve (12) minutes. The State AGs then scheduled a conference call with Grauso's counsel for July 25, 2018. The day before that call – on July 24, 2018 –Aprahamian spoke to his lawyer, and then shortly thereafter called Grauso. The next day, shortly after a conversation between the State AGs and counsel for Grauso, Aprahamian and Grauso spoke again, this time for nearly seven (7) minutes.

3265.   Further, on October 19, 2018, Orlofski signed for a subpoena issued to him by the State AGs. That same day, Orlofski called his attorney. The following Monday, October 22, 2018, the attorney called Orlofski back and they spoke for fifteen (15) minutes. Less than two hours later, Orlofski called Grauso and they spoke for nearly thirty-two (32) minutes. The next day, October 23, 2018, Orlofski and Grauso spoke again for more than seven (7) minutes. Before these calls, the two competitors had not spoken since June 2, 2018.

3266.   In another example, K.K., a Director of Sales and Marketing at Defendant G&W, received a subpoena from the State AGs on July 28, 2017. The next day, July 29, 2017, K.K. called his former supervisor at G&W –Vogel-Baylor. K.K. called Vogel-Baylor again on July 30, 2017 and they spoke for ten (10) minutes. On August 2, 2017, Vogel-Baylor called K.K. and they spoke for thirty-three (33) minutes. Later that month, on August 23, 2017, the State AGs s spoke with K.K.'s attorney regarding the investigative subpoena. The next day, August 24, 2017, K.K. called Vogel-Baylor and they spoke for twelve (12) minutes.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## XV.    SPOLIATION OF EVIDENCE

3267.   As alleged in State AG Complaint No. 1 and Amended State AG Complaint No. 2, many of the individuals named above, and other employees of the various corporate Defendants, took active steps to delete their conspiratorial communications with competitors, and destroy evidence of their illegal behavior.

3268.   As set forth above, Heritage failed to maintain a document retention policy and took active steps to have e-mails destroyed.  Furthermore, upon information and belief, Glazer, Malek and certain other Heritage employees also deleted all text messages from their company iPhones regarding their illegal communications with competitors.

3269.   As another example, Patel produced text messages – in response to the States' subpoena – going back as far as early 2014.  Prior to producing those text messages, however, Patel had deleted all of her text communications with competitors from the same time period, including many text messages with Aprahamian, Brown, Cavanaugh, Grauso, Green, Rekenthaler and Sullivan; and many other text messages with employees of Dr. Reddy's, Glenmark (including CW-5), Par, Sandoz, Upsher-Smith and Zydus.

3270.   Patel deleted these text messages after a conversation with Rekenthaler in early 2015, when Rekenthaler warned Patel to be careful about communicating with competitors. Rekenthaler was aware of the government investigations that had been commenced and told Patel that the government was showing up on people's doorsteps.  Sometime after that, Patel deleted her text messages with competitors.

3271.   G.S. of Mayne, realizing the illegal nature of the agreements she entered into, also deleted from her cell phone several of the most incriminating text messages between her and Sather before the data on her phone was imaged and produced to Connecticut.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3272.   Apotex also destroyed an entire custodial file for one of its key employees (B.H., a senior sales executive), after the States requested it through an investigatory subpoena in July 2017.  As discussed above, B.H. was involved in coordinating two significant price increases with Patel of Teva in 2013, which resulted in Apotex soaring in the quality competitor rankings.  After the States' subpoena was issued, Apotex destroyed B.H.'s custodial file – and did not inform the States that it had done so for over a year.

## XVI.   OBSTRUCTION OF JUSTICE

3273.   As alleged in State AG Complaint No. 1, Amended State AG Complaint No. 2, and State AG Complaint No. 3, many of the Defendants have been coordinating consistently to obstruct the ongoing government investigations and to limit any potential response.  This coordination goes back at least as far as October 2014, when Congress first started investigating price increases in the generic drug industry.

3274.   When the federal government executed a search warrant against Patel at her home on June 21, 2017, she immediately called Rekenthaler (from another phone because her phone had been seized) even though Rekenthaler was no longer employed at Teva and was by that point the Vice President of Sales at Apotex.  Rekenthaler then immediately called Cavanaugh and C.B., another senior Teva executive.  Rekenthaler spoke several times to Cavanaugh before then calling his own attorney and speaking twice.  Later that day, Patel called Rekenthaler two more times to coordinate her response to the government.

3275.   Other Defendants took similar action in response to events in the States' investigation.  Several were speaking frequently at or around the time a subpoena was issued, or when the States were engaging in substantive discussions with their counsel.  As just one example, on July 17, 2018 the States sent a subpoena to Grauso, through his counsel.  That same

day, Grauso spoke to Aprahamian for more than twelve (12) minutes.  The States then set up a

conference call with Grauso's counsel for July 25, 2018.  The day before that call – July 24,

2018 – Aprahamian spoke to his lawyer, and then shortly thereafter called Grauso.  The next day,

shortly after a conversation between the States and counsel for Grauso, Aprahamian and Grauso

spoke again, this time for nearly seven (7) minutes.

## XVII.  PLAINTIFF'S PURCHASES AND ANTITRUST INJURY

3276.   Because of Defendants' illegal conduct, Cigna has incurred overcharges paid

directly and indirectly by Express Scripts Purchasers, Cigna Pharmacies, and Cigna Plans due to

artificially-inflated prices for each of the Subject Drugs listed above.  Those prices have been

substantially higher than the prices that Cigna would have paid for the Subject Drugs but for

Defendants' collusion.

3277.   Consequently, Cigna has sustained substantial losses and damages to its business

and property in the form of overcharges.  The full amount, forms, and components of such

damages will be determined after discovery and upon proof at trial.

3278.   Defendants' unlawful conduct has harmed competition in the market, and Cigna

has sustained, and continues to sustain, significant losses in the form of artificially inflated prices

paid to Defendants.  The full amount of such damages will be calculated after discovery and

upon proof at trial.

3279.   Defendants, through their unlawful acts, reduced competition in the United States

market for the Subject Drugs, increased prices, and caused antitrust injury to Cigna.

3280.   Prices for the Subject Drugs have been and continue to be inflated as a direct and

foreseeable result of Defendants' anticompetitive conduct.  The inflated prices that Cigna has

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

paid, and continues to pay, are traceable to, and the foreseeable result of, Defendants' unlawful conduct.

## XVIII. INTERSTATE TRADE AND COMMERCE

3281.   Defendants are the leading manufacturers and suppliers of the Subject Drugs sold in the United States.  At all material times, the Subject Drugs were manufactured and sold by Defendants, directly or through one of more of their affiliates, throughout the United States in a continuous and uninterrupted flow through interstate commerce, including through and into this District.

3282.   Between at least 2010 and the present, in connection with the purchase and sale of the Subject Drugs, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

3283.   Defendants' and their co-conspirators' activities were within the flow of interstate commerce, intending to have and having a substantial effect on interstate commerce in the United States.

3284.   Defendants' and their co-conspirators' conduct, including the marketing and sale of the Subject Drugs, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce in the United States.

3285.   The conspiracy alleged herein has directly and substantially affected interstate commerce; Defendants deprived Cigna and others of the benefit of free and open competition in the purchase of the Subject Drugs within the United States.

3286.   Defendants' agreement to fix, increase, stabilize, or maintain prices, allocate customers and markets, and rig bids for the Subject Drugs, and their actual inflating, fixing, maintaining, or artificially stabilizing prices of the Subject Drugs, were intended to have, and

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

have had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## XIX.   TOLLING AND FRAUDULENT CONCEALMENT

3287.   The claims asserted in this Complaint have been tolled as Defendants engaged in affirmative and fraudulent concealment of the conspiracies alleged in this Complaint.

3288.   Defendants knew their actions were illegal and consistently took overt steps to conceal their illegal conduct and destroy evidence of their agreements.

3289.   Among other things, as alleged in the Amended AG Complaint No. 2, Defendants' executives took affirmative steps to conceal and destroy evidence of their wrongdoing since as early as 2012.  These steps included failing to maintain a document retention policy, instructing each other and their co-conspirators not to put communications relating to the conspiracy in writing, intentionally withholding documents subject to subpoenas, and deleting text messages from their telephones, as alleged in paragraphs 158, 546, 647, 1117, among others, of the Amended State AG Complaint No. 2, which is incorporated by reference.

3290.   Furthermore, Defendants spoke and met in secret to conceal the conspiracies, often under the pretext of trade association and industry activities as set forth above and took steps (beyond those alleged above) to ensure that communications relating to the conspiracies were not recorded in writing.  In some cases, as alleged above, price increases were staggered to conceal the existence of the price-fixing agreements.  Also, as alleged above, Defendants engaged in bid coordination and fake bidding activity, which were intended to, and did, give a false impression of competition among Defendants.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3291.   Cigna acted with due diligence at all relevant times by, among other things, monitoring available prices for the Subject Drugs and seeking to obtain the most competitive prices possible, efforts that were hindered by Defendants' concealment.

3292.   The pendency of certain DOJ actions has also tolled the claims asserted in this Complaint.  On December 12, 2016, the DOJ filed an Information charging Glazer with the criminal offense of violating the U.S. antitrust laws by participating in a conspiracy to allocate customers, rig bids, and fix and maintain prices of generic drugs, including Doxycycline, sold in the United States.  The Glazer criminal proceedings, and the Malek criminal proceedings that were filed one day later, toll the running of the statutes of limitation on Cigna's claims during the criminal proceedings and for one year thereafter under 15 U.S.C. § 16(i), and under New York General Business Law § 342-c.

3293.   The pendency of one or more class action complaints, and any amendments, against Defendants and their co-conspirators for conspiring to fix prices of each of the Subject Drugs tolled the running of the statutes of limitations as of the date the first such class action complaint was filed.

## XX.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY

3294.   Discovery is necessary to determine the full scope of Defendants' conspiracy, including its full length, all affected products, and all participants.  Cigna reserves all rights to amend or supplement this Complaint to add additional Defendants, claims, years, products, or other allegations based upon discovery and further investigation.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

XXI.   **CAUSES OF ACTION**

**COUNT 1**
**The Overarching Conspiracy**
**Sherman Act § 1**
**(Direct Purchaser Claims: Purchases by Cigna Pharmacies and Express Scripts Purchasers)**

3295.   Cigna incorporates and re-alleges every preceding allegation as if fully set forth herein.

3296.   As set forth above, each of the Defendants has engaged and participated in one or more contracts, combinations, and/or conspiracies to artificially inflate prices for generic drugs sold throughout the United States.

3297.   Each Defendant's conduct violated, and continues to violate, Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as Section 3, 15 U.S.C. § 3, as an unreasonable restraint of trade.  Defendants' conduct is *per se* unlawful under antitrust law.

3298.   Each of the Defendants has committed at least one overt act in furtherance of one or more of the conspiracies alleged in this Complaint.

3299.   The acts done by each of the Defendants as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or done by Defendants' officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

3300.   The anticompetitive acts by Defendants and their co-conspirators had, and continues to have, a substantial and foreseeable effect on interstate commerce by artificially raising and fixing prices for the generic drugs at issue throughout the United States.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3301.   As a proximate result of Defendants' unlawful conduct, Cigna has been harmed by being forced to pay artificially inflated, supra-competitive prices for generic drugs in the United States.

3302.   Cigna has been injured and will continue to be injured in its business and property by paying more for the generic drugs at issue than in the absence of Defendants' unlawful conduct.  For example, the Express Scripts and Cigna Pharmacies, which purchased the Subject Drugs for dispensation by mail-order, specialty, and retail pharmacies, were injured.

3303.   Cigna seeks and is entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for all overcharges proximately caused by the antitrust violation(s) alleged above.  Such damages have been suffered in an amount to be proven at trial.

3304.   Cigna is also entitled, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to an injunction against Defendants, restraining and preventing the violations alleged in this Complaint, as well as attorneys' fees and costs, and all other forms of relief available under federal law.

### COUNTS 2 – 240
### Individual Conspiracies
### Sherman Act § 1
### (Direct Purchaser Claims:  Purchases by Cigna Pharmacies and Express Scripts Purchasers)

3305.   Cigna incorporates and re-alleges every preceding allegation as if fully set forth herein.

3306.   Counts 2 through 240 enumerate individual product conspiracies specific to each of the Subject Drugs.  For purposes of Counts 2 through 240, the term "Defendants" refers only to the companies identified in each individual Count.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Count | Drugs | Defendants |
|---|---|---|
| 2. | Acetazolamide | Heritage, Lannett, Taro, Teva, Zydus |
| 3. | Acetazolamide Tablets | Taro, Lannett |
| 4. | Adapalene | Glenmark, Taro, Teva |
| 5. | Adapalene Cream | Sandoz, Perrigo |
| 6. | Albuterol Sulfate | Mylan, Sun |
| 7. | Alclometasone Dipropionate Cream | Sandoz, Taro, Glenmark |
| 8. | Alclometasone Dipropionate Ointment | Sandoz, Taro, Glenmark |
| 9. | Allopurinol | Actavis, Dr. Reddy's, Mylan, Par |
| 10. | Amantadine Hydrochloride | Lannett, Sandoz, Upsher-Smith |
| 11. | Amiloride HCL/HCTZ Tablets | Mylan, Teva |
| 12. | Amitriptyline HCL Tablets | Mylan, Par, Sandoz |
| 13. | Ammonium Lactate | Taro, Perrigo, Actavis |
| 14. | Amoxicillin/Clavulanate Chewable Tablets | Sandoz, Teva |
| 15. | Amphetamine/Dextroamphetamine ER | Actavis, Teva |
| 16. | Amphetamine/Dextroamphetamine IR | Actavis, Aurobindo, Teva |
| 17. | Atenolol Chlorthalidone | Actavis, Mylan |
| 18. | Atropine Sulfate | Bausch, Sandoz |
| 19. | Azithromycin | Teva |
| 20. | Baclofen | Lannett, Par, Teva, Upsher-Smith |
| 21. | Balsalazide Disodium | Apotex, West-Ward |
| 22. | Benazepril HCTZ | Mylan, Sandoz |
| 23. | Betamethasone Dipropionate Augmented | Sandoz, Taro |
| 24. | Betamethasone Dipropionate | Sandoz, Taro, Perrigo |
| 25. | Betamethasone Valerate Cream | Sandoz, Taro |
| 26. | Betamethasone Valerate Lotion | Sandoz, G&W |
| 27. | Betamethasone Valerate Ointment | Sandoz, Actavis |
| 28. | Bethanechol Chloride Tablets | Amneal, Teva |
| 29. | Bromocriptine Mesylate Tablets | Sandoz, Perrigo, Mylan |
| 30. | Budesonide DR Capsules | Mylan, Par, Teva |
| 31. | Budesonide Inhalation | Actavis, Sandoz, Teva |
| 32. | Bumetanide Tablets | Sandoz, Teva |
| 33. | Buspirone HCL Tablets | Actavis, Mylan, Teva |
| 34. | Butorphanol Tartrate | Apotex, Mylan, West-Ward |
| 35. | Cabergoline | Teva |
| 36. | Calcipotriene Betamethasone Dipropionate Ointment | Sandoz, Perrigo |
| 37. | Calcipotriene Solution | Sandoz, G&W |
| 38. | Capecitabine | Mylan, Teva |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Count | Drugs | Defendants |
|---|---|---|
| 39. | Captopril | Mylan, West-Ward, Wockhardt |
| 40. | Carbamazepine Chewable Tablets | Taro, Teva, Torrent |
| 41. | Carbamazepine ER Tablets | Sandoz, Taro |
| 42. | Carbamazepine Tablets | Apotex, Taro, Teva, Torrent |
| 43. | Cefdinir Capsules | Lupin, Teva |
| 44. | Cefdinir Oral Suspension | Lupin, Teva |
| 45. | Cefpodoxime Proxetil Oral Suspension | Sandoz, Aurobindo |
| 46. | Cefpodoxime Proxetil Tablets | Sandoz, Aurobindo |
| 47. | Cefprozil Tablets | Lupin, Teva |
| 48. | Cefuroxime Axetil | Aurobindo, Citron, Lupin |
| 49. | Celecoxib | Actavis, Teva |
| 50. | Cephalexin | Lupin, Teva |
| 51. | Chlorpromazine HCL Tablets | Sandoz, Upsher-Smith, Mylan |
| 52. | Cholestyramine | Sandoz, Upsher-Smith, Par |
| 53. | Ciclopirox Cream | Perrigo, G&W, Glenmark |
| 54. | Ciclopirox Shampoo | Sandoz, Perrigo, Actavis, Taro |
| 55. | Ciclopirox Solution | Sandoz, Perrigo, G&W |
| 56. | Cimetidine Tablets | Mylan, Teva |
| 57. | Ciprofloxacin HCL Tablets | Actavis, Dr. Reddy's, Teva |
| 58. | Clarithromycin ER | Actavis, Teva, Zydus |
| 59. | Clemastine Fumarate Tablets | Sandoz, Teva |
| 60. | Clindamycin Phosphate Cream; Gel; Lotion | Sandoz |
| 61. | Clindamycin Phosphate Solution | Sandoz, Taro, Perrigo, Actavis |
| 62. | Clobetasol Propionate | Actavis, Fougera, Morton Grove, Perrigo, Sandoz, Taro, Wockhardt |
| 63. | Clobetasol Propionate Cream; Emollient Cream; Propionate Gel; Ointment | Sandoz, Taro |
| 64. | Clobetasol Propionate Solution | Sandoz, Taro, Wockhardt |
| 65. | Clomipramine HCL | Mylan, Sandoz, Taro |
| 66. | Clonidine TTS Patch | Actavis, Mylan, Teva |
| 67. | Clotrimazole Topical Solution | Taro, Teva |
| 68. | Clotrimazole Cream | Sandoz, Taro |
| 69. | Clotrimazole Betamethasone Dipropionate Cream | Sandoz, Taro, Actavis, |
| 70. | Clotrimazole Betamethasone Dipropionate Lotion | Sandoz, Taro |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Count | Drugs | Defendants |
|---|---|---|
| 71. | Cyproheptadine HCL | Breckenridge, Teva, Impax |
| 72. | Desmopressin Acetate Tablets | Actavis, Teva |
| 73. | Desogestrel/Ethinyl Estradiol Tablets (Kariva) | Glenmark, Teva |
| 74. | Desonide | Actavis, Fougera, Perrigo, Sandoz, Taro |
| 75. | Desonide Cream | Taro, Perrigo |
| 76. | Desonide Lotion | Sandoz, Actavis, |
| 77. | Desonide Ointment | Sandoz, Taro, Perrigo, |
| 78. | Desoximetasone Ointment | Sandoz, Glenmark, Taro |
| 79. | Dexmethylphenidate HCL ER Capsules | Sandoz, Teva, Par |
| 80. | Dextroamphetamine Sulfate ER | Actavis, Teva, Impax, Aurobindo |
| 81. | Diclofenac Potassium Tablets | Mylan, Sandoz, Teva |
| 82. | Dicloxacillin Sodium Capsules | Sandoz, Teva |
| 83. | Diflunisal | Teva |
| 84. | Digoxin | Impax, Lannett, Mylan, Par, Sun, West-Ward |
| 85. | Diltiazem HCL Tablets | Mylan, Teva |
| 86. | Diphenoxylate Atropine | Mylan |
| 87. | Disopyramide Phosphate Capsules | Actavis, Teva |
| 88. | Divalproex Sodium ER | Dr. Reddy's, Mylan, Par, Zydus |
| 89. | Doxazosin Mesylate Tablets | Apotex, Mylan, Teva |
| 90. | Doxycycline Hyclate | Actavis, Mayne, Par, Sun, Teva, West-Ward |
| 91. | Doxycycline Monohydrate | Heritage, Lannett, Mylan, Par |
| 92. | Drospirenone and Ethinyl Estradiol | Actavis, Lupin, Teva |
| 93. | Econazole Nitrate Cream | Sandoz, Taro, Perrigo, Teligent |
| 94. | Enalapril Maleate Tablets | Mylan, Taro, Teva, Wockhardt |
| 95. | Entecavir | Par, Teva |
| 96. | Epitol Tablets | Apotex, Taro, Teva |
| 97. | Eplerenone Tablets | Sandoz |
| 98. | Erythromycin Base/Ethyl Alcohol Solution | Sandoz, Perrigo, Wockhardt |
| 99. | Estazolam Tablets | Actavis, Teva |
| 100. | Estradiol Tablets | Actavis, Mylan, Teva |
| 101. | Estradiol/Norethindrone Acetate Tablets (Mimvey) | Breckenridge, Teva |
| 102. | Ethambutol HCL Tablets | G&W, Lupin |
| 103. | Ethinyl Estradiol and Levonorgestrel | Sandoz, Teva |
| 104. | Ethosuximide Capsules | Teva |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Count | Drugs | Defendants |
|---|---|---|
| 105. | Ethosuximide Oral Solution | Teva |
| 106. | Etodolac ER | Taro, Teva, Zydus |
| 107. | Etodolac | Sandoz, Taro, Teva |
| 108. | Exemestane | West-Ward |
| 109. | Fenofibrate | Lupin, Mylan, Teva, Zydus |
| 110. | Fluconazole Tablets | Glenmark, Teva, Citron, Dr. Reddy's |
| 111. | Fluocinolone Acetonide | Sandoz, G&W, Teligent |
| 112. | Fluocinonide | Actavis, Taro, Teva |
| 113. | Fluocinonide .1% Cream | Sandoz, Taro, Perrigo, Glenmark, Valeant |
| 114. | Fluocinonide Gel | Sandoz, Taro, G&W |
| 115. | Fluocinonide Ointment | Sandoz, Taro |
| 116. | Fluocinonide Solution | Sandoz, Taro, Actavis |
| 117. | Fluoxetine HCL Tablets | Mylan, Par, Teva |
| 118. | Flurbiprofen Tablets | Mylan, Teva |
| 119. | Flutamide Capsules | Actavis, Par, Teva |
| 120. | Fluticasone Propionate Lotion | Sandoz, Perrigo, Glenmark |
| 121. | Fluticasone Propionate | Apotex, West-Ward, Wockhardt |
| 122. | Fluvastatin Sodium Capsules | Mylan, Teva |
| 123. | Fosinopril HCTZ | Aurobindo, Citron, Glenmark, Heritage, Sandoz |
| 124. | Gabapentin Tablets | Glenmark, Teva, Aurobindo |
| 125. | Glimepiride Tablets | Dr. Reddy's, Teva |
| 126. | Glipizide-Metformin | Heritage, Mylan, Teva |
| 127. | Glyburide | Aurobindo, Citron, Heritage, Teva |
| 128. | Glyburide-Metformin | Actavis, Aurobindo, Citron, Heritage, Teva |
| 129. | Griseofulvin Suspension | Actavis, Teva |
| 130. | Griseofulvin Microsize Tablets | Sandoz |
| 131. | Halobetasol Propionate Cream | Sandoz, Taro, Perrigo, G&W |
| 132. | Halobetasol Propionate Ointment | Taro, Perrigo, G&W |
| 133. | Haloperidol Tablets | Mylan, Sandoz |
| 134. | Hydralazine HCL | Heritage |
| 135. | Hydrocortisone Acetate Suppositories | Perrigo, G&W |
| 136. | Hydrocortisone Valerate Cream | Taro, Perrigo |
| 137. | Hydroxyurea Capsules | Par, Teva |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Count | Drugs | Defendants |
|-------|-------|------------|
| 138. | Hydroxyzine Pamoate Capsules | Actavis, Sandoz, Teva |
| 139. | Imiquimod Cream | Sandoz, Taro, Perrigo |
| 140. | Irbesartan | Lupin, Teva |
| 141. | Isoniazid | Sandoz, Teva |
| 142. | Isosorbide Dinitrate | Sandoz, Par, West-Ward |
| 143. | Ketoconazole Cream | Sandoz, Taro, Teva, G&W |
| 144. | Ketoconazole Tablets | Mylan, Taro, Teva |
| 145. | Ketoprofen Capsules | Mylan, Teva |
| 146. | Ketorolac Tromethamine Tablets | Mylan, Teva |
| 147. | Labetalol HCL Tablets | Par, Sandoz, Teva, Actavis |
| 148. | Lamivudine/Zidovudine | Aurobindo, Camber, Lupin, Teva |
| 149. | Latanoprost Drops | Sandoz, Valeant |
| 150. | Leflunomide | Apotex, Heritage, Teva |
| 151. | Levothyroxine | Lannett, Mylan, Sandoz |
| 152. | Lidocaine HCL Ointment | Sandoz, Taro |
| 153. | Lidocaine-Prilocaine | Fougera, Impax, Sandoz |
| 154. | Loperamide HCL Capsules | Mylan, Teva |
| 155. | Medroxyprogesterone Tablets | Teva |
| 156. | Meprobamate | Dr. Reddy's, Heritage |
| 157. | Metformin ER (F) | Actavis, Lupin |
| 158. | Methadone HCL | West-Ward |
| 159. | Methazolamide Tablets | Sandoz, Perrigo |
| 160. | Methimazole | Heritage, Par |
| 161. | Methotrexate Tablets | Mylan, Teva, Par, West-Ward |
| 162. | Methylphenidate HCL Tablets | Sandoz, Actavis, Sun, Impax, Par |
| 163. | Methylphenidate HCL ER Tablets | Sandoz |
| 164. | Methylprednisolone | Sandoz, Par, Breckenridge, Cadista |
| 165. | Metronidazole Cream and Lotion | Sandoz, G&W, Actavis |
| 166. | Metronidazole .75% Gel | Sandoz, Taro, G&W, Impax |
| 167. | Metronidazole 1% Gel | Sandoz, Taro |
| 168. | Metronidazole Vaginal | Sandoz, Valeant |
| 169. | Moexipril HCL Tablets | Glenmark, Teva |
| 170. | Moexipril HCL/HCTZ Tablets | Glenmark, Teva |
| 171. | Mometasone | G&W, Glenmark |
| 172. | Nabumetone Tablets | Actavis, Glenmark, Sandoz, Teva |
| 173. | Nadolol Tablets | Mylan, Sandoz, Teva |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Count | Drugs | Defendants |
|---|---|---|
| 174. | Nafcillin Sodium Injectable Vials | Sandoz, Aurobindo |
| 175. | Naproxen Sodium | Glenmark, Amneal |
| 176. | Neomycin Polymyxin Hydrocortisone | Bausch, Sandoz |
| 177. | Niacin ER | Lupin, Teva, Zydus |
| 178. | Nimodipine | Ascend, Heritage, Sun |
| 179. | Nitrofurantoin MAC Capsules | Alvogen, Mylan, Teva |
| 180. | Norethindrone Acetate | Amneal, Glenmark, Teva |
| 181. | Norethindrone/Ethinyl Estradiol | Lupin, Teva |
| 182. | Nortriptyline Hydrochloride Capsules | Actavis, Taro, Teva |
| 183. | Nystatin | Actavis, Heritage, Par, Perrigo, Sandoz, Sun, Taro, Teva |
| 184. | Nystatin Ointment | Sandoz, Perrigo, Actavis |
| 185. | Nystatin Triamcinolone | Sandoz, Taro |
| 186. | Omega-3-Acid Ethyl Esters | Par, Teva, Apotex |
| 187. | Oxacillin Sodium Injectable Vials | Sandoz, Aurobindo |
| 188. | Ondansetron | Glenmark, Teva |
| 189. | Oxaprozin | Dr. Reddy's, Teva, Sandoz |
| 190. | Oxybutynin Chloride Tablets | Teva, Upsher-Smith, Par |
| 191. | Oxycodone Acetaminophen | Actavis, Alvogen, Amneal, Aurobindo, Mayne, Par |
| 192. | Paricalcitol | Dr. Reddy's, Teva, Zydus |
| 193. | Paromomycin | Heritage, Sun |
| 194. | Penicillin VK Tablets | Aurobindo, Sandoz, Teva |
| 195. | Pentoxifylline Tablets | Apotex, Mylan, Teva, Valeant |
| 196. | Permethrin | Actavis, Perrigo, Mylan |
| 197. | Perphenazine | Sandoz, Par |
| 198. | Phenytoin Sodium ER Capsules | Taro, Mylan, Sun, Amneal |
| 199. | Pilocarpine HCL | Actavis, Impax, Lannett |
| 200. | Pioglitazone HCL Metformin HCL Tablets | Sandoz, Aurobindo, Mylan, Teva, Torrent |
| 201. | Piroxicam | Teva, Mylan |
| 202. | Potassium Chloride | Actavis, Mylan, Sandoz, Upsher-Smith, Zydus |
| 203. | Pravastatin Sodium | Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Sandoz, Teva, Zydus |
| 204. | Prazosin HCL Capsules | Mylan, Teva |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Count | Drugs | Defendants |
|-------|-------|------------|
| 205. | Prednisolone Acetate | Sandoz |
| 206. | Prednisone | Actavis, Cadista, Par, West-Ward |
| 207. | Prochlorperazine Tablets | Mylan, Sandoz, Teva, Cadista |
| 208. | Prochlorperazine Maleate Suppositories | Perrigo, G&W, Cadista |
| 209. | Promethazine HCL Suppositories | Perrigo, G&W, Actavis |
| 210. | Propranolol HCL Tablets | Actavis, Heritage, Mylan, Par, Teva |
| 211. | Propranolol HCL Capsules | Actavis, Breckenridge, Upsher-Smith |
| 212. | Raloxifene HCL Tablets | Teva, Camber |
| 213. | Ranitidine HCL Capsules | Sandoz, Dr. Reddy's |
| 214. | Ranitidine HCL Tablets | Amneal, Glenmark, Sandoz, Teva |
| 215. | Silver Sulfadiazine | Ascend, Actavis |
| 216. | Spironolactone Hydrochlorothiazide (HCTZ) | Mylan, Sun |
| 217. | Tacrolimus Ointment | Sandoz, Perrigo |
| 218. | Tamoxifen Citrate Tablets | Actavis, Mylan, Teva |
| 219. | Temozolomide | Sandoz, Teva |
| 220. | Terconazole Cream | Sandoz, Taro, Actavis |
| 221. | Theophylline ER | Heritage, Teva |
| 222. | Timolol Maleate | Bausch, Sandoz |
| 223. | Tizanidine | Dr. Reddy's, Mylan, Sandoz, Apotex, Sun |
| 224. | Tobramycin | Sandoz, Teva |
| 225. | Tobramycin Dexamethasone | Bausch, Sandoz |
| 226. | Tolmetin Sodium Capsules | Mylan, Teva |
| 227. | Tolterodine ER | Mylan, Teva |
| 228. | Tolterodine Tartrate | Teva |
| 229. | Topiramate Sprinkle Capsules | Actavis, Teva, Zydus |
| 230. | Trazodone HCL | Apotex, Par, Sun, Teva |
| 231. | Triamcinolone Acetonide Cream | Sandoz, Perrigo |
| 232. | Triamcinolone Acetonide Ointment | Sandoz, Perrigo |
| 233. | Triamcinolone Acetonide Paste | Taro |
| 234. | Triamterene HCTZ | Actavis, Apotex, Lannett, Mylan, Sandoz |
| 235. | Trifluoperazine HCL | Mylan, Sandoz |
| 236. | Ursodiol | Actavis, Lannett |
| 237. | Valsartan HCTZ | Mylan, Sandoz |
| 238. | Verapamil | Actavis, Heritage, Mylan |
| 239. | Warfarin Sodium Tablets | Amneal, Taro, Teva, Upsher-Smith, Zydus |

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Count | Drugs | Defendants |
|-------|-------|------------|
| 240. | Zoledronic Acid | Dr. Reddy's, Heritage, Par |

3307.   Each of the Defendants has engaged and participated in one or more contracts, combinations, and/or conspiracies to artificially inflate prices for generic drugs sold throughout the United States.

3308.   Each Defendant's conduct violated, and continues to violate, Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as Section 3, 15 U.S.C. § 3, as an unreasonable restraint of trade.  Defendants' conduct is *per se* unlawful under antitrust law.

3309.   Each of the Defendants has committed at least one overt act in furtherance of one or more of the conspiracies alleged in this Complaint.

3310.   The acts done by each of the Defendants as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or done by Defendants' officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

3311.   The anticompetitive acts by Defendants and their co-conspirators had, and continues to have, a substantial and foreseeable effect on interstate commerce by artificially raising and fixing prices for the generic drugs at issue throughout the United States.

3312.   As a proximate result of Defendants' unlawful conduct, Cigna has been harmed by being forced to pay artificially inflated, supra-competitive prices for generic drugs in the United States.

3313.   Cigna has been injured and will continue to be injured in its business and property by paying more for the generic drugs at issue than in the absence of Defendants' unlawful conduct.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3314.   Cigna seeks and is entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for all overcharges proximately caused by the antitrust violation(s) alleged above.  Such damages have been suffered in an amount to be proven at trial.

3315.   Cigna is also entitled, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to an injunction against Defendants, restraining and preventing the violations alleged in this Complaint, as well as attorneys' fees and costs, and all other forms of relief available under federal law.

**COUNT 241**
**The Overarching Conspiracy**
**State Antitrust and Unfair Competition Law**
**(Indirect Purchaser Claims: Purchases by Cigna Pharmacies, Express Scripts Purchasers, and Cigna Plans)**

3316.   Cigna incorporates and re-alleges every preceding allegation as if fully set forth herein.

3317.   By engaging in the conduct alleged above, each of the Defendants has entered into one or more contracts, combinations, or conspiracies in restraint of trade violating the antitrust and competition statutes of each the following States and territories:

      (a)    Alabama: Ala. Code §§ 6-5-60, *et seq.*; §§ 8-10-1, *et seq.*

      (b)    Arizona: Ariz. Rev. Stat. Ann. §§ 44-1401, *et seq.*

      (c)    California: Cal. Bus. Code §§ 16700, *et seq.*

      (d)    Connecticut: Conn. Gen. Stat. Ann. § 35-24, *et seq.*

      (e)    District of Columbia: D.C. Code Ann. §§ 28-4501, *et seq.*

      (f)    Hawaii: Haw. Rev. Stat. §§ 480-1, *et seq.*

      (g)    Illinois: 740 Ill. Comp. Stat. 10/1, *et seq.*

      (h)    Iowa: Iowa Code §§ 553.1, *et seq.*

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

(i)     Kansas: Kan. Stat. Ann. §§ 50-101, *et seq.*

(j)     Maine: Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(k)    Maryland: Md. Code, Com. Law § 11-204, *et seq.*

(l)     Michigan: Mich. Comp. Laws Ann. §§ 445.771, *et seq.*

(m)   Minnesota: Minn. Stat. §§ 325D.49, *et seq.*

(n)    Mississippi: Miss. Code Ann. §§ 75-21-1, *et seq.*

(o)    Nebraska: Neb. Code Ann. §§ 59-801, *et seq.*

(p)    Nevada: Nev. Rev. Stat. Atm. §§ 598A.010, *et seq.*

(q)    New Hampshire: N.H. Rev. Stat. §§ 356:1, *et seq.*

(r)     New Mexico: N.M. Stat. Ann. §§ 57-1-1, *et seq.*

(s)     New York: New York Gen. Bus. Law §§ 340, *et seq.*

(t)     North Carolina: N.C. Gen. Stat. §§ 75-1, *et seq.*

(u)    North Dakota: N.D. Century Code §§51-08.1-01, *et seq.*

(v)    Oregon: Or. Rev. Stat. §§ 646.705, *et seq.*

(w)    Puerto Rico: 10 L.P.R.A. §§ 257, *et seq.*

(x)     Rhode Island: R.I. Gen. Laws §§ 6-36-1, *et seq.*

(y)    South Dakota: S.D. Codified Laws §§ 37-1-3.1, *et seq.*

(z)    Tennessee: Tenn. Code Ann. §§ 47-25-101, *et seq.*

(aa)   Utah: Utah Code §§ 76-10-3101, *et seq.*

(bb)  Vermont: Vt. Stat. Ann. 9, §§ 2453, *et seq.*

(cc)  West Virginia: W. Va. Code §§ 47-18-1, *et seq.*

(dd)  Wisconsin: Wis. Stat. §§ 133.03, *et seq.*

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3318.   The conduct of each of the Defendants further constitutes unfair competition or unfair, unlawful, unconscionable, deceptive, and/or fraudulent acts or practices in violation of the consumer protection statutes of each the following States and territories:

(a)   Alaska: Alaska Stat. § 45.50.471, *et seq.*

(b)   Arkansas: Ark. Code §§ 4-88-101, *et seq.*

(c)   California: Cal. Bus. & Prof. Code §§ 17200, *et seq.*

(d)   Colorado: Colo. Rev. Stat. § 6-1-101, *et seq.*

(e)   Delaware: 6 Del. Code § 2511, *et seq.*

(f)   District of Columbia: D.C. Code §§ 28-3901, *et seq.*

(g)   Florida: Fla. Stat. §§ 501.201, *et seq.*

(h)   Georgia: Ga. Code Ann. § 10-1-370, *et seq.*; *§* 10-1-390, *et seq.*

(i)   Hawaii: Haw. Rev. Stat. § 480-1, *et seq.*

(j)   Massachusetts: Mass. Gen. Laws, Ch. 93A, §§ 1, *et seq.*

(k)   Michigan: Mich. Compiled Laws § 445.903, *et seq.*

(1)   Minnesota: Minn. Stat. § 325D.43, *et seq.*

(m)   Missouri: Mo. Rev. Stat. § 407.010, *et seq.*

(n)   Montana: Mont. Code, § 30-14-103, *et seq.*; *§* 30-14-201, *et seq.*

(o)   Nebraska: Neb. Code Ann. §§ 59-1601, *et seq.*

(p)   Nevada: Nev. Rev. Stat. § 598.0903, *et seq.*

(q)   New Hampshire: N.H. Rev. Stat. §§ 358-A, *et seq.*

(r)   New Jersey: N.J. Stat. § 56:8-1, *et seq.*

(s)   New Mexico: N.M. Stat. Ann. §§ 57-12-1, *et seq.*

(t)   New York: New York Gen. Bus. Law §§ 349, *et seq.*

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

(u)      North Carolina: N.C. Gen. Stat. §§ 75-1.1, *et seq.*

(v)      North Dakota: N.D. Century Code § 51-15-01, *et seq.*

(w)      Rhode Island: R.I. Gen. Laws § 6-13.1-1, *et seq.*

(x)      South Carolina: S.C. Code Ann. § 39-5-10, *et seq.*

(y)      South Dakota: S.D. Codified Laws §§ 37-24-1, *et seq.*

(z)      Utah: Utah Code §§ 13-5-1, *et seq.*

(aa)    Vermont: Vt. Stat. Ann. 9, §§ 2451, *et seq.*

(bb)    Virginia: Va. Code Ann. § 59.1-196, *et seq.*

(cc)    Wisconsin: Wis. Stat. §§ 100.18, *et seq.*

3319.   The unlawful acts by Defendants and their co-conspirators had, and continue to have, a substantial and foreseeable effect on the commerce of each above State and territory by artificially raising and fixing prices for the generic drugs at issue as sold, paid for, and/or dispensed in each State or territory.

3320.   Defendants' unlawful activities, as described in this Complaint, affected both intrastate commerce and interstate commerce flowing in to or out from each of the above States and territories, and had direct, substantial and reasonably foreseeable effects upon trade and commerce in each respective State or territory.

3321.   During the relevant period, through either Defendants themselves or the regional and national distributors, wholesalers, and retailers that Defendants have engaged for the sale of the generic drugs at issue, many millions of dollars' worth of the drugs have been, and continue to be, sold in each of the above States and territories every year.

3322.   As a direct and proximate result of Defendants' violation of each of the foregoing laws, Cigna has been harmed by being forced to pay artificially inflated, supra-competitive

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

prices for generic drugs dispensed to insureds throughout the United States.  Cigna has suffered damages in an amount to be proven at trial.

3323.   There was and is a large disparity between the price that Cigna paid and continues to pay for the generic drugs at issue, and the value received, given that more cheaply-priced generic drugs should have been available, and would have been available, absent Defendants' illegal conduct.

3324.   Cigna has been injured and will continue to be injured in its business and property by paying more for the generic drugs at issue than in the absence of Defendants' unlawful conduct and violation of the foregoing laws.

3325.   Defendants' conduct in violation of each of the foregoing laws was done knowingly, willfully, and flagrantly.

3326.   In light of the foregoing, and other facts to be learned through discovery and/or proved at trial, Cigna seeks damages, trebled or multiplied to the full extent permitted by each of the foregoing States and territories, for all overcharges incurred and paid by Cigna as a result of Defendants' conduct, restitution, attorneys' fees and costs, and all other forms of relief available.

**COUNTS 242-480**
**<u>Individual Conspiracies</u>**
**State Antitrust and Unfair Competition Law**
**(Indirect Purchaser Claims: Purchases by Cigna Pharmacies, Express Scripts Purchasers, and Cigna Plans)**

3327.   Cigna incorporates and re-alleges every preceding allegation as if fully set forth herein.

3328.   Counts 242 through 480 are based on individual product conspiracies specific to each of the Subject Drugs, as enumerated above in Counts 2 through 240.  For purposes of Counts 242 through 480, the term "Defendants" refers only to the companies identified in Counts

885
FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2 through 240 and the enumerated individual product conspiracies specific to each of the Subject Drugs.

     3329.   By engaging in the conduct alleged above, each of the Defendants has entered into one or more contracts, combinations, or conspiracies in restraint of trade violating the antitrust and competition statutes of each the following States and territories:

       a)  Arizona: Ariz. Rev. Stat. Ann. §§ 44-1401, *et seq.*

       b)  California: Cal. Bus. Code §§ 16700, *et seq.*

       c)  Connecticut: Conn. Gen. Stat. Ann. § 35-24, *et seq.*

       d)  District of Columbia: D.C. Code Ann. §§ 28-4501, *et seq.*

       e)  Hawaii: Haw. Rev. Stat. §§ 480-1, *et seq.*

       f)  Illinois: 740 Ill. Comp. Stat. 10/1, *et seq.*

       g)  Iowa: Iowa Code §§ 553.1, *et seq.*

       h)  Kansas: Kan. Stat. Ann. §§ 50-101, *et seq.*

       i)  Maine: Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*

       j)  Maryland: Md. Code, Com. Law § 11-204, *et seq.*

       k)  Michigan: Mich. Comp. Laws Ann. §§ 445.771, *et seq.*

       l)  Minnesota: Minn. Stat. §§ 325D.49, *et seq.*

       m)  Mississippi: Miss. Code Ann. §§ 75-21-1, *et seq.*

       n)  Nebraska: Neb. Code Ann. §§ 59-801, *et seq.*

       o)  Nevada: Nev. Rev. Stat. Atm. §§ 598A.010, *et seq.*

       p)  New Hampshire: N.H. Rev. Stat. §§ 356:1, *et seq.*

       q)  New Mexico: N.M. Stat. Ann. §§ 57-1-1, *et seq.*

       r)  New York: New York Gen. Bus. Law §§ 340, *et seq.*

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

s)   North Carolina: N.C. Gen. Stat. §§ 75-1, *et seq.*

t)   North Dakota: N.D. Century Code §§51-08.1-01, *et seq.*

u)   Oregon: Or. Rev. Stat. §§ 646.705, *et seq.*

v)   Rhode Island: R.I. Gen. Laws §§ 6-36-1, *et seq.*

w)   South Dakota: S.D. Codified Laws §§ 37-1-3.1, *et seq.*

x)   Tennessee: Tenn. Code Ann. §§ 47-25-101, *et seq.*

y)   Utah: Utah Code §§ 76-10-3101, *et seq.*

z)   Vermont: Vt. Stat. Ann. 9, §§ 2453, *et seq.*

aa) West Virginia: W. Va. Code §§ 47-18-1, *et seq.*

bb) Wisconsin: Wis. Stat. §§ 133.03, *et seq.*

3330.   The conduct of each of the Defendants further constitutes unfair competition or unfair, unlawful, unconscionable, deceptive, and/or fraudulent acts or practices in violation of the consumer protection statutes of each the following States and territories:

a)   Alaska: Alaska Stat. § 45.50.471, *et seq.*

b)   Arkansas: Ark. Code §§ 4-88-101, *et seq.*

c)   California: Cal. Bus. & Prof. Code §§ 17200, *et seq.*

d)   Colorado: Colo. Rev. Stat. § 6-1-101, *et seq.*

e)   Delaware: 6 Del. Code § 2511, *et seq.*

f)   District of Columbia: D.C. Code §§ 28-3901, *et seq.*

g)   Florida: Fla. Stat. §§ 501.201, *et seq.*

h)   Georgia: Ga. Code Ann. § 10-1-370, *et seq.*; *§* 10-1-390, *et seq.*

i)   Hawaii: Haw. Rev. Stat. § 480-1, *et seq.*

j)   Massachusetts: Mass. Gen. Laws, Ch. 93A, §§ 1, *et seq.*

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

k) Michigan: Mich. Compiled Laws § 445.903, *et seq.*

l) Minnesota: Minn. Stat. § 325D.43, *et seq.*

m) Missouri: Mo. Rev. Stat. § 407.010, *et seq.*

n) Montana: Mont. Code, § 30-14-103, *et seq.*; *§* 30-14-201, *et seq.*

o) Nebraska: Neb. Code Ann. §§ 59-1601, *et seq.*

p) Nevada: Nev. Rev. Stat. § 598.0903, *et seq.*

q) New Hampshire: N.H. Rev. Stat. §§ 358-A, *et seq.*

r) New Jersey: N.J. Stat. § 56:8-1, *et seq.*

s) New Mexico: N.M. Stat. Ann. §§ 57-12-1, *et seq.*

t) New York: New York Gen. Bus. Law §§ 349, *et seq.*

u) North Carolina: N.C. Gen. Stat. §§ 75-1.1, *et seq.*

v) North Dakota: N.D. Century Code § 51-15-01, *et seq.*

w) Rhode Island: R.I. Gen. Laws § 6-13.1-1, *et seq.*

x) South Carolina: S.C. Code Ann. § 39-5-10, *et seq.*

y) South Dakota: S.D. Codified Laws §§ 37-24-1, *et seq.*

z) Utah: Utah Code §§ 13-5-1, *et seq.*

aa) Vermont: Vt. Stat. Ann. 9, §§ 2451, *et seq.*

bb) Virginia: Va. Code Ann. § 59.1-196, *et seq.*

cc) Wisconsin: Wis. Stat. §§ 100.18, *et seq.*

3331.   The unlawful acts by Defendants and their co-conspirators had, and continue to have, a substantial and foreseeable effect on the commerce of each above State and territory by artificially raising and fixing prices for the generic drugs at issue as sold, paid for, and/or dispensed in each State or territory.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3332.   Defendants' unlawful activities, as described in this Complaint, affected both intrastate commerce and interstate commerce flowing in to or out from each of the above States and territories, and had direct, substantial and reasonably foreseeable effects upon trade and commerce in each respective State or territory.

3333.   During the relevant period, through either Defendants themselves or the regional and national distributors, wholesalers, and retailers that Defendants have engaged for the sale of the generic drugs at issue, many millions of dollars' worth of the drugs have been, and continue to be, sold in each of the above States and territories every year.

3334.   As a direct and proximate result of Defendants' violation of each of the foregoing laws, Cigna has been harmed by being forced to pay artificially inflated, supra-competitive prices for generic drugs dispensed to insureds throughout the United States.  Cigna has suffered damages in an amount to be proven at trial.

3335.   There was and is a large disparity between the price that Cigna paid and continues to pay for the generic drugs at issue, and the value received, given that more cheaply-priced generic drugs should have been available, and would have been available, absent Defendants' illegal conduct.

3336.   Cigna has been injured and will continue to be injured in its business and property by paying more for the generic drugs at issue than in the absence of Defendants' unlawful conduct and violation of the foregoing laws.

3337.   Defendants' conduct in violation of each of the foregoing laws was done knowingly, willfully, and flagrantly.

3338.   In light of the foregoing, and other facts to be learned through discovery and/or proved at trial, Cigna seeks damages, trebled or multiplied to the full extent permitted by each of

the foregoing States and territories, for all overcharges incurred and paid by Cigna as a result of

Defendants' conduct, restitution, attorneys' fees and costs, and all other forms of relief available.

**COUNTS 481-720**
**<u>The Overarching Conspiracy and Individual Conspiracies</u>**
**Unjust Enrichment**
**(Direct and Indirect Purchaser Claims: Purchases by Cigna Pharmacies, Express Scripts**
**Purchasers, and Cigna Plans)**

3339.   Cigna incorporates and re-alleges every preceding allegation as if fully set forth

herein.

3340.   To the extent required, this claim is pleaded in the alternative to the other claims

in this Complaint.

3341.   Count 481 is based on the overarching conspiracy alleged in this complaint and in

Counts 1 and 240.

3342.   Counts 482 through 720 are based on individual product conspiracies specific to

each of the Subject Drugs, as enumerated above in Counts 2 through 240.  For purposes of

Counts 482 through 720, the term "Defendants" refers only to the companies identified in Counts

2 through 240 and the enumerated individual product conspiracies specific to each of the Subject

Drugs.

3343.   Defendants have benefited from their sales of the Subject Drugs because of the

unlawful and inequitable acts alleged in this Complaint.

3344.   Defendants' financial benefits resulting from their unlawful and inequitable acts

are traceable to overpayments by Cigna.

3345.   To its economic detriment, Cigna conferred upon Defendants an economic

benefit, in the nature of revenues and profits resulting from unlawful overcharges.

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3346.   Defendants have been enriched by revenue resulting from unlawful overcharges for the generic drugs at issue while Cigna has suffered an impoverishment by the overcharges it paid, imposed through Defendants' unlawful conduct.  Defendants' enrichment is traceable to the impoverishment of Cigna.

3347.   There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused an impoverishment to Cigna, having paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

3348.   Cigna did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

3349.   The benefits conferred upon Defendants are measurable, in that the revenues Defendants have earned due to their unlawful overcharges of the generic drugs at issue are ascertainable by review of sales and/or payment records.

3350.   As to payments by Cigna, it would be futile for Cigna to seek a remedy from any party with whom they have privity of contract.

3351.   The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic drugs is a direct and proximate result of Defendants' unlawful practices.

3352.   The financial benefits derived by Defendants rightfully belong to Cigna, because Cigna paid supracompetitive prices during the relevant period, inuring to the benefit of Defendants.

3353.   It would be inequitable under unjust enrichment principles of all States and territories in the United States, except Ohio and Indiana, for Defendants to be permitted to retain

any of the overcharges derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3354.   Defendants are aware of and appreciate the benefits bestowed upon them by Cigna.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

3355.   By engaging in the foregoing unlawful or inequitable conduct depriving Cigna of lower prices for generic drugs and forcing them to pay higher prices, Defendants have been unjustly enriched.

## XXII.  DEMAND FOR JUDGMENT

WHEREFORE, Cigna demands judgment against Defendants, as follows:

A.    Declaring the acts alleged herein to constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. §§ 1 and 3;

B.    Judgment against Defendants, jointly and severally, awarding Cigna actual, consequential, compensatory, treble, punitive, and/or other damages, in an amount to be proven at trial, including pre-judgment and post-judgment interest at the statutory rates;

C.    Awarding Cigna its reasonable costs and expenses, including attorneys' fees; and

D.    Awarding all other legal or equitable relief as the Court deems just and proper.

## XXIII. JURY DEMAND

Cigna demands a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Dated:  December 15, 2020                    Respectfully submitted:

                                        By:    */s/ Charles F. Rule*

                                             PAUL, WEISS, RIFKIND, WHARTON
                                             & GARRISON LLP
                                             Charles F. Rule
                                             Daniel J. Howley
                                             Paul E. Chaffin
                                             Benjamin Z. Bergmann
                                             2001 K Street, NW
                                             Washington, DC 20006
                                             Tel.: (202) 223-7320
                                             Fax.: (202) 204-7350
                                             rrule@paulweiss.com
                                             dhowley@paulweiss.com
                                             pchaffin@paulweiss.com
                                             bbergmann@paulweiss.com

                                             MACELREE HARVEY, LTD.
                                             Robert A. Burke, PA ID # 61268
                                             Jeffrey P. Burke, PA ID # 209684
                                             17 Miner Street
                                             West Chester, PA 19382
                                             Tel.: (610) 840-0211
                                             Fax.: (610) 430-7885
                                             rburke@macelree.com
                                             jburke@macelree.com

                                             *Attorneys for Plaintiff Cigna*

FILED WITH REDACTIONS – PUBLIC VERSION
MDL 2724: HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER